# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **REINALDO DENNES,** | § | |
| **Petitioner** | § | |
| | § | |
| **vs.** | § | **C.A. NO. H:14-cv-0019** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent** | § | |

## FIRST AMENDED DEATH PENALTY CASE APPLICATION
## FOR POST-CONVICTION WRIT OF HABEAS CORPUS

Petitioner, Reinaldo Dennes, pursuant to Title 28, U.S.C. Section 2254, moves this Court to issue a Writ of Habeas Corpus for his release from confinement by the Texas Department of Corrections on grounds that he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death.

Submitted by Kenneth McGuire

Counsel for Reinaldo Dennes

TABLE OF CONTENTS

Cover Page.......................................................................i

Statement of Facts..........................................................10

First Claim for Relief......................................................23

THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION.

Second Claim for Relief..................................................35

THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION.

Third Claim for Relief.....................................................51

THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION. THE FAILURE TO ASSERT THIS CLAIM BY TRIAL,

DIRECT APPEAL, AND STATE HABEAS COUNSEL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL AND DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

Fourth Claim for Relief.................................................................56

PETITIONER'S CONVICTION SHOULD BE REVERSED WHERE THE STATE WITHHELD THE FACT THAT DAVID BALDERAS, A KEY STATE WITNESS DURING THE PUNISHMENT PHASE OF TRIAL, HAD ENTERED INTO A LAW ENFORCEMENT CONTRACT WITH THE STATE, WHERE SAID CONTRACT WAS MATERIAL TO THE DEFENSE AS ADMISSIBLE IMPEACHMENT EVIDENCE, AND WHERE THE FAILURE OF THE STATE TO TIMELY DISCLOSE THE EXISTENCE OF THIS CONTRACT AND OTHER IMPEACHING INFORMATION VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL.

Fifth Claim for Relief.................................................................118

THE TRIAL COURT COMMITTED REVERSIBLE ERROR ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE PETITIONER WAS TAKEN UNFAIRLY BY SURPRISE, IN VIOLATION OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW.

Sixth Claim for Relief.................................................................134

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE PETITIONER WAS NEVER GIVEN TIMELY NOTICE PRIOR TO TRIAL, AS REQUIRED BY TEXAS LAW.

Seventh Claim for Relief.................................................................138

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT PETITIONER A PRETRIAL CONTINUANCE, WHERE COUNSEL REQUIRED THE TIME IN ORDER TO PREPARE TO DEFEND AGAINST THE STATE'S ADMISSION INTO EVIDENCE THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE DURING THE PUNISHMENT PHASE OF TRIAL.

Eighth Claim for Relief.................................................................140

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE THE ONLY EVIDENCE LINKING PETITIONER TO THE EXTRANEOUS OFFENSE WAS THE TESTIMONY OF DAVID BALDERAS, WHERE BALDERAS WAS AN ACCOMPLICE AS A MATTER OF LAW TO THE EXTRANEOUS OFFENSE, WHERE NO OTHER EVIDENCE CORROBORATED PETITIONER'S INVOLVEMENT IN THE EXTRANEOUS OFFENSE, AND WHERE CORROBORATION LINKING PETITIONER TO THE EXTRANEOUS OFFENSE IS REQUIRED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Ninth Claim for Relief.................................................................144

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE ON THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE THE ONLY EVIDENCE LINKING PETITIONER TO THE EXTRANEOUS OFFENSE WAS THE TESTIMONY OF DAVID BALDERAS, WHERE BALDERAS WAS AN ACCOMPLICE WITNESS TO THE EXTRANEOUS OFFENSE, WHERE NO OTHER EVIDENCE CORROBORATED PETITIONER'S INVOLVEMENT IN THE EXTRANEOUS OFFENSE, AND WHERE CORROBORATION LINKING PETITIONER TO THE EXTRANEOUS OFFENSE IS REQUIRED UNDER TEXAS LAW.

Tenth Claim for Relief.................................................................151

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S OUT-OF-COURT PHOTO SPREAD IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE.

Eleventh Claim for Relief.................................................................155

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S OUT-OF-COURT LINE UP IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE.

Twelfth Claim for Relief................................................................159

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S IN-COURT IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION WAS THE PRODUCT OF IMPERMISSIBLY SUGGESTIVE OUT-OF-COURT IDENTIFICATION PROCEDURES.

Thirteenth Claim for Relief..........................................................162

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE TESTIMONY BY ANTONIO RAMIREZ THAT HE HAD ASSISTED PETITIONER IN SMUGGLING DIAMONDS INTO THE UNITED STATES FROM MEXICO, WHERE THE ALLEGED EXTRANEOUS OFFENSE DID NOT RELATE TO ANY ISSUE IN THE CASE.

Fourteenth Claim for Relief..........................................................169

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE TESTIMONY BY ANTONIO RAMIREZ THAT HE HAD ASSISTED PETITIONER IN SMUGGLING DIAMONDS INTO THE UNITED STATES FROM MEXICO, WHERE THE PREJUDICIAL VALUE OF THE ALLEGED EXTRANEOUS OFFENSE GREATLY OUTWEIGHED ANY PROBATIVE VALUE THE EVIDENCE MIGHT CONTAIN.

Fifteenth Claim for Relief.............................................................173

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY THAT ANTONIO RAMIREZ WAS AN ACCOMPLICE WITNESS TO THE ALLEGED CAPITAL MURDER OFFENSE, AS A MATTER OF LAW, FOR PURPOSES OF APPLICATION OF THE ACCOMPLICE WITNESS RULE.

Sixteenth Claim for Relief............................................................180

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO AUTHORIZE THE JURY TO DECIDE WHETHER ANTONIO RAMIREZ WAS AN ACCOMPLICE WITNESS TO THE ALLEGED CAPITAL MURDER OFFENSE, AS A MATTER OF FACT, AND IF THEY SO FOUND, TO APPLY THE ACCOMPLICE WITNESS RULE TO HIS TESTIMONY.

Seventeenth Claim for Relief.............................................................183

    THE EVIDENCE WAS INSUFFICIENT, AS A MATTER OF LAW, TO SUPPORT PETITIONER'S CONVICTION FOR CAPITAL MURDER, WHERE THE ALLEGED UNDERLYING FELONY OFFENSE WAS ROBBERY, AND WHERE THE RECORD FAILS TO PROVE AN ATTEMPTED OR COMPLETED THEFT OF THE COMPLAINANT'S PROPERTY.

Eighteenth Claim for Relief.............................................................187

    THE EVIDENCE WAS INSUFFICIENT, AS A MATTER OF FACT, TO SUPPORT PETITIONER'S CONVICTION FOR CAPITAL MURDER, WHERE THE ALLEGED UNDERLYING FELONY OFFENSE WAS ROBBERY, AND WHERE THE RECORD FAILS TO PROVE AN ATTEMPTED OR COMPLETED THEFT OF THE COMPLAINANT'S PROPERTY.

Nineteenth Claim for Relief.............................................................190

    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER-S MOTION TO STRIKE RICHARD WAYNE MILLER FOR CAUSE, WHERE THE VENIREMAN WOULD FIND EVERY PERSON CONVICTED OF CAPITAL MURDER A CONTINUING THREAT TO SOCIETY, AND CONSEQUENTLY, COULD NOT CONSIDER LIFE IMPRISONMENT AS PUNISHMENT IN AN APPROPRIATE CASE, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTION RIGHT TO A FAIR AND IMPARTIAL TRIAL.

Twentieth Claim for Relief.............................................................193

    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO STRIKE MARTHA JEAN GUTIERREZ FOR CAUSE, WHERE THE VENIREMAN STATED THAT AFTER FINDING A DEFENDANT GUILTY OF CAPITAL MURDER, SHE WOULD NEVER CONSIDER MITIGATION EVIDENCE DURING THE PUNISHMENT PHASE OF A CAPITAL MURDER TRIAL, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTION RIGHT TO A FAIR AND IMPARTIAL TRIAL.

Twenty-First Claim for Relief.............................................................196

    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY ON THE BURDEN OF PROOF ON THE THIRD

SPECIAL PUNISHMENT ISSUE RELATING TO MITIGATION OF PUNISHMENT, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.

Twenty-Second Claim for Relief........................................................204

THE TEXAS CAPITAL PUNISHMENT SENTENCING SCHEME IS UNCONSTITUTIONAL, WHERE THE JURY'S DECISION ON EACH OF THE PUNISHMENT ISSUES IS NOT SUBJECT TO MEANINGFUL APPELLATE REVIEW, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.

Twenty-Third Claim for Relief.........................................................207

THE 12-10 TEXAS CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL, WHERE THE STATUTE CLEARLY SUBJECTS JURORS INCLINED TO ANSWER THE MITIGATION ISSUES FAVORABLY TO THE PETITIONER TO COMPROMISE THEIR VOTE IN FAVOR OF A DEATH SENTENCE, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.

Twenty-Fourth Claim for Relief........................................................210

Twenty-Fifth Claim for Relief..........................................................210

Twenty-Sixth Claim for Relief.........................................................211

Twenty-Seventh Claim for Relief......................................................211

Twenty-Eighth Claim for Relief........................................................212

Twenty-Ninth Claim for Relief.........................................................212

Thirtieth Claim for Relief................................................................213

Thirty-First Claim for Relief............................................................213

Thirty-Second Claim for Relief........................................................214

Thirty-Third Claim for Relief...........................................................216

Exhibits Index.................................................................................223

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **REINALDO DENNES,** | § | |
| **Petitioner** | § | |
| | § | |
| **vs.** | § | **C.A. NO. H:14-cv-0019** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent** | § | |

**FIRST AMENDED DEATH PENALTY CASE APPLICATION
FOR POST-CONVICTION WRIT OF HABEAS CORPUS**

Petitioner, Reinaldo Dennes, pursuant to Title 28, U.S.C. Section 2254, moves this Court to issue a Writ of Habeas Corpus for his release from confinement by the Texas Department of Corrections on grounds that he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death.

The discovery and investigation process in this post-conviction proceeding has not yet been completed. Permission to engage in discovery is being sought. Witnesses are still being interviewed. The compilation of evidence and other investigative matters are ongoing. Petitioner anticipates filing a Supplement to this Application.

## STATEMENT OF FACTS

Petitioner was charged with the murder of Janos Szucs during the course of a robbery on January 24, 1996. (CR. Vol. 1 p. 2).[1] Petitioner entered a plea of not guilty. (RR. Vol. 25 p. 8). Trial before a jury commenced on August 18, 1997.

Paul Terry testified for the State. (RR. Vol. 25 p. 14). Terry was a Houston Police officer. (RR. Vol. 25 p. 14). On January 24, 1996, he responded to a call at an office building, known as the Greenrich Building, located at 6222 Richmond, in Harris County, Texas. (RR. Vol. 25 p. 16-18). The time was 7:48 p.m. (RR. Vol. 25 p. 17). Inside the building, Terry observed a security guard, David Copeland, lying unconscious on the floor. (RR. Vol. 25 p. 18). Copeland had been shot several times. (RR. Vol. 25 pp. 20-23).

David Walter Copeland testified for the State. (RR. Vol. 25 p. 101). Copeland was employed as a security guard assigned to the Greenrich Building. (RR. Vol. 25 pp. 102-106). His post was a security console near the front of the building. Id.

---

[1] (CR. Vol. _ p. _) refers to the volume and page number of the Clerk's Record filed in the Texas Court of Criminal Appeals. (RR. Vol. _ p. _) refers to the volume and page number of the Reporter's Record filed in the Texas Court of Criminal Appeals. Both are attached to this Petition as Exhibits and are incorporated herein by reference.

Copeland was new to the Greenrich Building. January 24, 1996, the day of the alleged offense, was his third day on the job. (RR. Vol. 25 pp. 108, 116). Copeland testified that he understood that Petitioner had been a tenant in the building. (RR. Vol. 26 p. 46). However, he could not recall having ever seen Petitioner on the premises. (RR. Vol. 26 p. 46). Copeland noted that the Greenrich building was secured with automatic electrical security locks which closed the building entrances nightly at 6:00 p.m. (RR. Vol. 25 p. 109). Tenants were provided with electronic cards which permitted entry into the building after hours. (RR. Vol. 25 p. 110). Copeland further testified that on January 24, 1996, while on duty as security guard from 3:00 p.m. until 11:00 p.m. (RR. Vol. 25 p. 106), and after making his rounds, he noticed an individual working on the security console. (RR. Vol. 25 p. 121). Copeland assumed that this was the same technician who had been servicing the console earlier in the day. (RR. Vol. 25 p. 121). He observed the man as he got up from behind the console and walked briskly toward the loading dock door. (RR. Vol. 25 pp. 122-123).

Copeland approached the console. (RR. Vol. 25 p. 125). He then noticed that the video records contained within the security console had been removed. (RR. Vol. 25 p. 138). Copeland also noticed that the same man who had been walking briskly away had turned and was now

walking toward him. (RR. Vol. 25 p. 129). The man came near Copeland and shot him with a nine millimeter handgun equipped with a silencer. (RR. Vol. 25, pp. 134-135, 138; Vol. 26, p. 53). This man wore a disguise which consisted of a dark pair of glasses and a theatrical mustache. (RR. Vol. 25 pp. 140, 142-143). Copeland identified Petitioner as the person he observed on January 24, 1996, wearing the dark sunglasses and the theatrical mustache. (RR. Vol. 25 pp. 142-143; Vol. 26 p. 47). Copeland previously identified Petitioner in both a photo spread and a lineup. (RR. Vol. 25 pp. 150, 155).

M.R. Furstenfeld testified for the State. (RR. Vol. 28 p. 93). Furstenfeld, a Houston Police officer (RR. Vol. 28 p. 93), stated that he had been dispatched to the Greenrich Building on January 24, 1996. (RR. Vol. 28 p. 94). Upon arrival, he proceeded to the seventh floor and entered an office suite marked "J.S. Precious Stones, Inc. JAL Enterprises, Inc." (RR. Vol. 28 pp. 96, 98), where he discovered complainant, Janos Szucs, slumped over a chair in an inner office. (RR. Vol. 28 p. 107).

The complainant had been shot. (RR. Vol. 28 p. 122). Officer James L. Waltman also testified for the State. (RR. Vol. 28 p. 166). Waltman, assigned to investigate the alleged crime scene, (RR. Vol. 28 p. 167), stated that the Greenrich Building was monitored throughout by

electronic surveillance located in the entrance floor security console. (RR. Vol. 28 p. 188). Waltman had examined the complainant's body. (RR. Vol. 28 p. 203). He believed that the complainant had been shot with a nine millimeter handgun. (RR. Vol. 28 p. 205). Waltman located a safe in the complainant's office. It was locked. (RR. Vol. 28 p. 206). When the safe was later opened, it was empty. (RR. Vol. 28 p. 210). Waltman noticed that complainant's computer appeared to have been damaged, as if someone had attempted to force a disk out of the computer's drive. (RR. Vol. 29 p. 27).

Antonio Ramirez testified for the State. (RR. Vol. 26 p. 88). Ramirez, a tool and die maker, (RR. Vol. 26 p. 88), was acquainted with both Petitioner and Petitioner's brother, Alberto. (RR. Vol. 26 pp. 91, 112-114). Ramirez stated that he had consigned some jewelry and personal rings to Petitioner for sale. (RR. Vol. 26 p. 94). Ramirez had also crafted small jewelry parts for Petitioner and had used a lathe located in Petitioner's office. (RR. Vol. 26 p. 94-96). Petitioner's office was located in the Greenrich Building. (RR. Vol. 26 pp. 92-93). Ramirez testified that in January, 1996, Petitioner had approached him and had requested that he fashion a silencer for a handgun. (RR. Vol. 26 p. 113). He received $50 to purchase the necessary parts. (RR. Vol. 26 p. 115) . Thus, Ramirez constructed a silencer from a metal tube, using Petitioner's lathe and

other equipment located in Petitioner's office. (RR. Vol. 26 p. 117).

Ramirez completed the silencer on January 12, 1996. (RR. Vol. 26 p. 124). Petitioner thereafter tested the silencer with a nine millimeter handgun. (RR. Vol. 26 p. 125). Petitioner's brother, Alberto, also test fired the weapon. (RR. Vol. 26 p. 129). Petitioner was dissatisfied with Ramirez' silencer: he did believe that it not functioned adequately. (RR. Vol. 26 p. 125).

Ramirez subsequently constructed a second silencer. (RR. Vol. 26 p. 125). The latter device was completed on January 17, p, 1996. (RR. Vol. 26 p. 135). On the following day, Ramirez, Petitioner and Alberto met in a Chinese restaurant. (RR. Vol. 26 pp. 152, 155) . There, Ramirez learned that Petitioner and Alberto planned to rob a jeweler. (RR. Vol. 26 pp. 154-156). Petitioner invited Ramirez to participate in the planned robbery. (RR. Vol. 26 pp. 154-156). Ramirez agreed. (RR. Vol. 26 p. 156) . According to the plan, Albert would shoot the jeweler, Petitioner would steal the building's surveillance tapes, and Ramirez would seize the jeweler's diamonds. (RR. Vol. 26 p. 158).

Ramirez told the jury he had not really wanted to participate in the planned robbery. (RR. Vol. 26, p. 156). In fact, he had intended to leave the country. (RR. Vol. 26, p. 156). On the day after their meeting in the

restaurant, Ramirez attempted to retrieve the silencer. (RR. Vol. 26, p. 159). Petitioner refused. (RR. Vol. 26, p. 159).

Ramirez testified that he did not know that manufacturing a silencer was an illegal offense in the United States. (RR. Vol. 27 pp. 21, 33). Ramirez reiterated that he was unaware that his silencer would be used in the commission of a robbery or a murder. (RR. Vol. 28 pp. 33, 35). Ramirez insisted that he did not know that the instrument he had created for Petitioner was, in fact, a silencer. (RR. Vol. 27 p. 34). He believed that Petitioner should have advised him that it was illegal to manufacture or fashion a silencer. (RR. Vol. 27 p. 25). While dining at the Chinese restaurant, Petitioner paid Ramirez $2000. (RR. Vol. 26 p. 160). Ramirez was told that the money came from the sale of a portion of the jewelry he had consigned to Petitioner. (RR. Vol. 26 p. 160).

Ramirez departed to Ecuador on January 20, 1996. (RR. Vol. 26 p. 162). Upon his return to Houston and to Petitioner's office on February 2, 1996, (RR. Vol. 26 p. 165), he noted several police officers. There he saw policemen in the building. (RR. Vol. 26 p. 167). Ramirez eventually decided to tell the police what he knew. (RR. Vol. 26 p. 170).

Estrella Martinez testified for the State. (RR. Vol. 28 p. 8). Martinez was responsible for cleaning the Greenrich Building. (RR. Vol. 28 p. 11). She was born in Mexico, and was living in the United States illegally.

(RR. Vol. 28 pp. 8, 9). Martinez knew both Petitioner and his brother. (RR. Vol. 28 p. 11, 12, 18, 12). At the time of the alleged offense, she was Petitioner's lover. (RR. Vol. 28 p. 11, 12). Martinez testified to the jury that approximately two or three weeks prior to the alleged offense, Petitioner had arranged with her to open a back door entrance of the Greenrich building upon his signal. (RR. Vol. 28 p. 13). The entrance was routinely locked after normal business hours. (RR. Vol. 28 p. 13). Petitioner told her he wanted to take the security tapes from the security console. (RR. Vol. 28 pp. 13-14). The Petitioner gave her a cell phone to communicate with him. (RR. Vol. 28 p. 21).

On January 24, 1996, Petitioner called her on the cell phone. (RR. Vol. 28 pp. 39, 44). Martinez was working her second maintenance shift at the Greenrich Building. (RR. Vol. 28 p. 44). Over the telephone, Petitioner her asked her to open the back door for him. (RR. Vol. 28 p. 44) . Martinez complied. (RR. Vol. 28 p. 45) . Petitioner and Alberto entered through the back door, and proceeded up a flight of stairs. (RR. Vol. 28 p. 45). Alberto had a bag in his hand. (RR. Vol. 28 p. 45). Martinez stated that at approximately 7:00 p.m., Petitioner called her again, and requested that she distract the security guard. (RR. Vol. 28 p. 48) . Martinez sought the guard and told him she had locked her keys inside one of the business suits. (RR. Vol. 28 p. 48). This ploy forced the

guard away to leave his post at the building's security console on the ground floor, and to accompany Martinez to the fifth floor of the building. (RR. Vol. 28 p. 48).    Petitioner called Martinez a third time at approximately 7:30 p.m. (RR. Vol. 28 p. 50). Petitioner requested her to distract the security guard again. (RR. Vol. 28 p. 50). Martinez did so by asking the guard to let her in the snack bar area. (RR. Vol. 28 p. 52) . While in the snack bar, she saw Petitioner wearing a disguise and walking toward the security guard. (RR. Vol. 28 pp. 57-59) . She turned around and did not see Petitioner shoot the guard. (RR. Vol. 28 p. 61). Martinez told the jury that she met with a business partner of Petitioner on January 25, 1996. (RR. Vol. 28 p. 71). She was paid $5,000, and asked to return the cell phone. (RR. Vol. 28 pp. 71-72). She met Petitioner in his office later that day. (RR. Vol. 28 p. 83). Dr.        Tommy Brown testified for the State. (RR. Vol. 26 p. 72). Dr. Brown was the Assistant Harris County Medical Examiner assigned to perform an autopsy on the complainant's body. (RR. Vol. 28 p. 74). He told the jury the complainant died of multiple gunshot wounds to the head and chest. (RR. Vol. 26 p. 89).

Robert Baldwin testified for the State. (RR. Vol. 30 p. 148). Baldwin was a Houston Police firearms examiner. (RR. Vol. 30 p. 148). He confirmed that nine bullets were recovered from the complainant's body,

the complainant's office, and the downstairs hallway of the Greenrich Building. (RR. Vol. 30 p. 159). Baldwin stated that based on his examination of the bullets, his expert opinion was that six of the nine bullets had been fired from the same nine millimeter handgun. (RR. Vol. 30 p. 162).

Sam Solomay testified for the State. (RR. Vol. 31 p. 163). Solomay was a diamond merchant whose business office was located in the Greenrich Building. (RR. Vol. 31 p. 163). He told the jury the majority of the building's tenants were diamond and jewelry merchants. (RR. Vol. 31 p. 167). Solomay was acquainted with both the complainant and Petitioner. (RR. Vol. 31 pp. 163-164). The complainant was a well-known diamond merchant. (RR. Vol. 31 p. 168). Solomay stated Petitioner visited with the complainant frequently in January, 1996 (RR. Vol. 31 p. 181).

Solomay said that at the time of the alleged offense, he shared office space with the complainant. (RR. Vol. 31 p. 169).  He estimated the complainant's diamond inventory to be worth three to four million dollars. (RR. Vol. 31 p. 194). On direct examination, he speculated that the complainant's diamond inventory must have been taken during the alleged offense. (RR. Vol. 31 p. 199).

On cross-examination, Solomay admitted that the complainant's diamond inventory could have been removed and placed on display for sale at a diamond show. (RR. Vol. 31 p. 212). Solomay was aware of the extent and value of the complainant's inventory only through their conversations. (RR. Vol. 31 p. 199).

Officer Beth Hailing testified for the State. (RR. Vol. 30 p. 24) . On February 22, 1996 she executed a search warrant for Petitioner's office in the Greenrich Building. (RR. Vol. 30 p. 36). There Hailing recovered an owner's manual for a nine millimeter Taurus handgun. (RR. Vol. 30 p. 36).

Richard Earnst testified for Petitioner. (RR. Vol. 32 p. 83). Ernest was employed as a firearms examiner for Tarrant County, Texas. (RR. Vol. 32 p. 83). Ernest examined each of the nine bullets recovered at the scene. (RR. Vol. 32 pp. 108-109). He stated that he was unable to confirm that any of the bullets had been fired from the same weapon. (RR. Vol. 32 p. 108-109) .

Ellis McCullough testified for Petitioner. (RR. Vol. 32 p. 172). McCullough was an attorney licensed to practice law in the State of Texas, and had been appointed to represent Petitioner during the February 23, 1996 lineup. (RR. Vol. 32 p. 177). He told the jury David Copeland did not identify Petitioner during the lineup. (RR. Vol. 32 p. 181). McCullough

further stated that the officer in charge had mistakenly noted Copeland as a "tentative ID" on the offense report. (RR. Vol. 32 p. 181).

David Balderas testified for the State during the punishment phase of trial. (RR. Vol. 34 p. 49). He stated that in October, 1995, Petitioner had asked him to rob a diamond courier. (RR. Vol. 34 p. 57). The anticipated robbery would take place in the courier's house. (RR. Vol. 34 p. 57). Balderas recruited Hector Fugon and a person he knew only as Francisco to do the actual job. (RR. Vol. 34 pp. 61-62).

Balderas told the jury he met with Petitioner several times in order to plan the robbery. (RR. Vol. 34 pp. 63-72) . Also present during these meetings were Fugon and Francisco. Their plan consisted of Petitioner following the courier home from the airport, and paging Balderas when it was time for the robbery. (RR. Vol. 34 p. 67-69). The courier would be carrying the jewels in a black attache bag. (RR. Vol. 34 p. 70).

Balderas testified that one evening, Petitioner paged him. (RR. Vol. 34 p. 70). Balderas gathered Fugon and Francisco and proceeded to the courier's house. (RR. Vol. 34 pp. 70-73).   However, it turned out to be the wrong house. (RR. Vol. 34 p. 76) . Fugon and Francisco attempted to rob the occupants of the house, and then departed.

Balderas insisted he did not know how the wrong house had been selected. (RR. Vol. 34 p. 82). When he reported the mistake to Petitioner, he was accused of lying. (RR. Vol. 34 p. 76).

Danny Tsang testified for the State. (RR. Vol. 34 p. 101). Tsang and his family resided in Houston, Texas. (RR. Vol. 34 p. 102). He told the jury that on November 16, 1995, two men entered his home, tied him up, and demanded that he produce diamonds. (RR. Vol. 34 pp. 105-110). Tsang told them they had the wrong house. (RR. Vol. 34 p. 111). After searching his home for approximately two and one-half hours, the men left. (RR. Vol. 34 p. 117). Tsang identified Fugon and Francisco as the two men who had entered his home. (RR. Vol. 34 p. 107).

Petitioner did not testify during the guilt/innocence or punishment phases of trial. The jury was authorized to convict Petitioner of capital murder either as a principal, or under the law of parties. (CR. Vol. 1 p. 128). The jury was further instructed that Estrella Martinez was an accomplice witness as a matter of law, and that her testimony required corroboration. (CR. Vol. 1 p. 113).

The jury found Petitioner guilty of capital murder, and answered the special issues consistent with him receiving a death sentence. (CR. Vol. 1 pp. 137, 151-153; RR. Vol. 33 p. 107; Vol. 35 pp. 106-107).

Petitioner was sentenced on September 4, 1997. (CR. Vol. 1 p. 155). Petitioner filed a motion for new trial on Friday, October 3, 1997, and an amended motion for new trial on Monday, October 6, 1997. (CR. Vol. 1 p. 202; RR. Vol. 39 p. 204 [DX#5]). Hearings were conducted on Petitioner's amended motion for new trial on November 6 and 13, 1997. (CR. Vol. 1 pp. 194-195; Vol. 35 pp. 13, 131). At the conclusion of the hearing, the trial court overruled Petitioner's request for a new trial. (CR. Vol. 1 p. 195; RR. Vol. 35 p. 154).

The Reporter's Record (Volumes 1-39) is attached as Exhibit A and incorporated herein by reference. Additional facts are stated under each Claim for Relief below.

## PETITIONER'S FIRST CLAIM FOR RELIEF

**THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION.**

A defendant is denied a fair and impartial trial where a venireman withholds material information during voir dire. U.S. Const., Amends. 6 & 14; Cuellar v. State. 943 S.W.2d 487 (Tex. Crim. App. 1966); Salazar v. State, 562 S.W.2d 480 (Tex. Crim. App. 1978). The trial court committed reversible error in denying Petitioner's amended motion for new trial, where it was shown that during voir dire venireman Irene Rene Collins withheld the fact that she had twice been arrested and placed on probation for misdemeanor criminal offenses, where this information was material, and where the failure to disclose this information to Petitioner denied him the right to a fair and impartial jury guaranteed under the federal constitution.

The right to conduct voir dire of a jury panel and intelligently exercise peremptory strikes is included under the federal and state constitutional right to counsel. U.S. Const. Amends. 6 & 14; Tex. Const., art. I. sec. 10; Caldwell v. State, 818 S.W.2d 790, 793 N3 (Tex. Crim.

App. 1991); <u>Flores v. State</u>, 568 S.W.2d 132 (Tex. Crim. App. 1978). When a juror wrongfully withholds material information, a defendant is denied both the opportunity to exercise his peremptory challenges, and to a trial before a fair and impartial jury. <u>Cuellar v. State</u>, 943 S.W.2d at 491; <u>Salazar v. State</u>, 562 S.W.2d at 482.

A trial court is authorized to grant a new trial on the basis of jury misconduct. Tex. R. App. P. Ann. 21.3(g) (Vernon Pamph. 1998). Rule 21.3(g) provides that a new trial must be granted

> when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial...

While the rule is couched in terms of an empaneled jury engaging in misconduct, the rule has been construed more broadly. A defendant is entitled to a new trial where during jury voir dire a venireman withholds material information. <u>Cuellar v. State</u>, supra; <u>Von January v. State</u>, 576 S.W.2d 43 (Tex. Crim. App. 1979); <u>Norwood v. State</u>, 58 S.W.2d 100 (Tex. Crim. App. 1933).

Petitioner was sentenced on September 4, 1997. (CR. Vol. 1 p. 156). Petitioner's deadline for filing a motion for new trial was Monday, October 6, 1997. Tex. R. App. P. Ann. 21.4(a) (Vernon Pamph. 1998). On October 6, 1997, Petitioner filed an amended motion for new trial. Petitioner's original and amended motions for new trial were timely filed. Only Petitioner's amended motion for new trial was considered by the trial

judge. Hearings were conducted on Petitioner's amended motion for new trial [hereinafter referred as Petitioner's motion for new trial hearing] on November 6 and 13, 1997. (CR. Vol. 1 pp. 194-195).

Petitioner's amended motion for new trial does not appear in the Clerk's Record before this Court. Petitioner's amended motion for new trial was introduced into evidence as an exhibit at the motion for new trial hearing. (RR. Vol. 39 p. 204 [DX#5]). Also introduced into evidence at this time as exhibits were (1) a juror information form and questionnaire executed by Irene Rene Collins, (2) the attached cover letter by the trial judge; and (3) documents reflecting two separate criminal charges filed against Collins and their disposition. (RR. Vol. 39 p. 204 [DX#5]). Each document was admitted into evidence by the trial judge. (RR. Vol. 36 pp. 5-9). Petitioner has requested that the district clerk supplement the clerk's record with the missing amended motion for new trial. Tex. R. App. P. Ann. 34.5(b) (Vernon Pamph. 1998).

Each venireman was given an exhaustive 18 page questionnaire to answer prior to voir dire. The questionnaire included a cover sheet signed by the presiding trial judge and entitled "Juror Questionnaire." In this cover sheet, the trial judge urged the venireman to be as "accurate and truthful as possible."

Venireman Irene Rene Collins' questionnaire reflected that she was thirty years old, married, and employed by Texas Children's Pediatric Associates as a nurse. She listed her previous employment as "medical assistant" and "bar maid." (Collins indicated that had she left her previous employment as a nurse in order to attend "school." The questionnaire also reflected that Collins had received her nurse training from Houston Community College, and was currently taking home study courses in "nursing administration."

A separate "Juror Information Form," was attached to the 18 page questionnaire. Collins indicated on this form that she had previously served on a criminal jury. She also indicated that she had never been "an accused, complainant, or witness in a criminal matter." (RR. Vol. 39 p. 204 [DX#5]).

The 18 page questionnaire asked Collins the following questions:

35. Other than your prior jury service, have you ever been interested in the outcome of any criminal case?
**["Yes" box marked].**

Has your interest been stimulated through the newspapers, television, books, hearsay or any other manner of communication?

**[Response:] "Cousin was murdered, Last head news from relative. No."**

37. Have you, any member of your family, or any acquaintance, ever been accused in any criminal action?
**["Yes" box marked. Response:] "Blowing off firecracker on New Year Eve."**

26

40. Have you, any member of your family, or any acquaintance, ever been arrested?

**["Yes" box marked. Response:] "Driving Without A license."**

75. Have you ever had an unpleasant experience with law enforcement?
**["No" box marked.]**
87. Please list below anything you believe the Court and the lawyers should know about yourself that you think is important with reference to our ability to serve as a juror in this or any other criminal case?

**[Response space left blank].**

(RR. Vol. 39 p. 204 [DX#5]). See also testimony. (RR. Vol. 36 p. 23-26).

The questionnaire concluded with Collins executing an oath stating that "I hereby swear that the response(s) and information provided herein are true and correct." (RR. Vol. 39 p. 204 [DX#5]).

Included in the motion for new trial record as Defendant's Exhibit No. 3, and marked separately as "Exhibit E," are the following documents:

(1)   Misdemeanor information No. 9347066 charging Irene Rene Collins with public lewdness;

(2)   Misdemeanor information No. 9347066 reflecting an arrest date of November 19, 1993;

(3)   Order dated January 31, 1994 placing Irene Rene Collins on 1 year deferred adjudication, and assessment of a fine of $250.

(4)   Misdemeanor information No. 9304928 charging Irene Rene Collins with prostitution;

27

(5)     Misdemeanor information No. 9304928 reflecting an arrest date of February 1, 1993;

(6)     Order dated February 23, 1993 placing Irene Rene Collins on six months deferred adjudication, and assessment of a fine of $50.

(RR. Vol. 39 p. 35 [DX#3]). These documents were also admitted into evidence at Petitioner's motion for new trial hearing. (RR. Vol. 36 pp. 5-9).

In Cuellar v. State, supra, the Texas Court of Criminal Appeals held:

> There are two categories of cases where the information withheld is deemed material, thus warranting a new trial: (1) where a juror withholds information that he has personal knowledge about or was in some way acquainted with either the complainant or the defendant, and (2) where a juror by reason of past experiences has the potential to be biased or prejudiced against the defendant.

943 S.W.2d at 491 n 1. Thus, the failure of Collins in Petitioner's case to reveal that she had twice been arrested and twice placed on probation clearly demonstrates a past experience which has the potential of bias or prejudice against Petitioner.

During Petitioner's motion for new trial hearing, the State maintained that the key issue was whether Collins had been convicted of an offense, not whether she had been ever been charged with an offense. (RR. Vol. 36 p. 43). This is incorrect. Petitioner asserts that the key issue was whether the fact that Collins had been twice arrested, and has been

twice placed on probation, constituted material information. Given the scope and depth of the questions given to Collins, and her failure to mention these facts on the form constituted a withholding of material information.

This Court has stated the general rule that information is not withheld from a defendant, unless a direct question regarding the issue is propounded during voir dire. Armstrong v. State, 897 S.W.2d 361 (Tex. Crim. App. 1995). In Petitioner's case, Collins withheld material information by simply failing to mention the matter in the appropriate places on the questionnaire's form.

Petitioner was never given an opportunity to question Collins, or any other venireman, regarding their criminal history, during the individual voir dire phase of jury selection. On the first day of voir dire, the trial court ordered that the veniremen would be individually questioned only concerning capital issues. (RR. Vol. 7 pp. 49-60). After this limited individual voir dire, the panel would be reassembled for general voir dire regarding noncapital issues. (RR. Vol. 7 pp. 49-60).

Irene Rene Collins was questioned on July 30, 1997. (CR. Vol. 1 p. 126; RR. Vol. 11 p. 4). During the give and take of questioning by the trial court, the State, and Petitioner's counsel, Collins gave no response that would have suggested that she had twice been arrested and

prosecuted. (RR. Vol. 11 p. 4-50). Thereafter, on August 18, 1997, Collins was selected to serve on Petitioner's jury. (RR. Vol. 24 pp. 3-4, 26).

The Texas Court of Criminal Appeals Court has held that a defendant cannot rely on the responses contained on the juror information cards filled out by the veniremen in exercising his peremptory strikes. De La Rosa v. State, 658 S.W.2d 162 (Tex. Crim. App. 1983). See also Landry v. State, 879 S.W.2d 194 (Tex. App.-Houston [14th] 1994, pet. ref'd). Instead, counsel must propound a direct question to the venireman before any misrepresentation on a juror information card is deemed error. De La Rosa v. State, supra; Landry v. State, supra. Under this rule, one would have to question what purpose, if any, the cards serve.

Petitioner's case is factually distinguishable from De La Rosa, supra and Landry, supra. Neither of these cases was an appeal from a capital voir dire. In addition, it does not appear from the opinion in these cases that the juror information cards were executed under oath. The extensive questionnaire filled out by venireman Collins was executed under oath. Petitioner's counsel was entitled to rely upon the responses given in her questionnaire.

This Court has held that defense counsel may rely on responses given by a venireman to questioning by either the State or the trial court

in exercising his peremptory strikes. <u>Armstrong v. State</u>, 897 S.W.2d 361 (Tex. Crim. App. 1995). As noted above, attached to Collins' questionnaire was a cover letter from the trial court urging her to be candid. The instant questionnaire concluded with Collins signing the instrument and swearing that the responses contained therein were true and correct. There is no principled distinction between a defense counsel's reliance upon the responses by a venireman made in open court to questioning by the trial judge, and the written responses to the trial judge's written questionnaire propounding the identical questions.

This Court has observed that voir dire is often the lengthiest part of a capital murder trial. <u>Trevino v. State</u>, 815 S.W.2d 592 (Tex. Crim. App. 1991). Petitioner asserts that he had a right to rely upon the veniremen's responses to the highly detailed and specific questions contained in the trial court's questionnaire in order to save time during voir dire. (RR. Vol. 36 p. 40). Petitioner must not be penalized for his counsel's attempt to save the court and venireman time, whenever reasonable.

Petitioner's attorney during voir dire was Wendell Odom. (RR. Vol. 36 p. 13). Odom testified during the motion for new trial hearing. Odom confirmed that Collins served as a member of Petitioner's jury. (RR. Vol. 36 p. 16).

Odom stated he had received no indication that Irene Rene Collins had ever been arrested, or placed on deferred adjudication. (RR. Vol. 36 p. 18). Odom reiterated that had he known these facts, he would have exercised a peremptory strike against her. (RR. Vol. 36 pp. 21-22). Odom noted that at the time of trial he did not consider Collins a desirable juror, but had decided to use his peremptory strikes on other veniremen. (RR. Vol. 36 pp. 21, 62-68). Odom relied upon Collins' answers to the trial court's questionnaire during voir dire in choosing not to exercise a peremptory strike against her. (RR. Vol. 36 p. 67).

As noted above, this Court has found at least two categories of withheld information are material. Cuellar v. State, 943 S.W.2d at 491 n. l. The second category of withheld information consists of a potential bias or prejudice against the defendant. Petitioner's trial counsel was correct in being concerned about Collins withholding the material of her two previous arrests, and the fact that she had twice been placed on probation. Having received deferred adjudications in both cases, rather than final convictions, Collins' previous experience with the criminal justice system could have easily resulted in a bias in favor of the State.

This Court in Cuellar recognized personal familiarity with the parties, and a potential bias or prejudice against the defense, as two categories of withheld material information. However, these two

categories are not exhaustive. In the event that this Court finds that Collins' arrests and probations do not reflect a potential bias against Petitioner, this Court should nevertheless find the fact that Collins withheld these facts to be material.

Mark Vinson testified for the State during Petitioner's motion for new trial hearing. (RR. Vol. 36 p. 78). Vinson was one of the two Assistant Harris County District Attorneys present during the voir dire process of Petitioner's trial. (RR. Vol. 36 p. 78). He told the court his office had prepared a criminal record on each venireman. (RR. Vol. 36 p. 79). The result was a printout which was kept in the courtroom, and was available to defense counsel. (RR. Vol. 36 pp. 79-80). The printout reflected Collins' prosecutions for public lewdness and prostitution. (RR. Vol. 39 p. 221 [DX#26]). Vinson did not know whether Odom or any other member of the defense had in fact examined Collins' record or the printout. (RR. Vol. 36 p. 81).

A defense counsel must exercise diligence before material information on voir dire is considered withheld. Landry v. State, 879 S.W.2d at 195. This was the purpose of Vinson's testimony at the motion for new trial hearing. However, the prosecutor's testimony was immaterial. While defense counsel is required to exercise due diligence in asking questions designed to uncover material information, and in

following through after a response is given, there is no duty on defense counsel to independently investigate the veracity of each venireman's response. Landry v. State, 879 S.W.2d at 195.

During the motion for new trial hearing the State suggested that Collins' questionnaire had not been executed under oath. The document reflects that Collins signed the questionnaire with the following oath: "I hereby swear that the response (s) and information provided herein are true and correct." (RR. Vol. 39 p. 35 [DX#3]). The absence of a jurat appears next to Collins' signature is immaterial. See Tex. Penal Code Ann. sec. 37.07(a) (Vernon 1994)(irregularity not a defense).

Thus, the trial court committed reversible error in denying Petitioner's amended motion for new trial, where it was shown that during voir dire venireman Irene Rene Collins withheld the fact that she had twice been arrested and placed on probation for misdemeanor criminal offenses, where this information was material, and where the failure to disclose this information to Petitioner denied him the right to a fair and impartial jury-guaranteed under the federal constitution. McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984)(in a civil case, a party may "obtain a new trial ... [upon proof] that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid

basis for a challenge for cause."); <u>United States v. Scott</u>, 854 F.2d 697, 699 (5th Cir. 1988)(venireperson's failure to disclose fact that his brother was a deputy sheriff revealed bias and entitled defendant to new trial). This Court should reverse the trial court's judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S SECOND CLAIM FOR RELIEF

**THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION.**

A defendant is denied a fair and impartial trial where a venireman fails to answer honestly a material question on <u>voir</u> <u>dire</u>, and a correct response would have provided a valid basis for a challenge for cause. U.S. Const., Amends. 6 & 14; <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984)(a party may "obtain a new trial ... [upon proof] that a juror failed to answer honestly a material question on <u>voir</u> <u>dire</u>, and then further show that a correct response would have provided a valid basis for a challenge for cause."); <u>United States v. Scott</u>,

854 F.2d 697, 699 (5th Cir. 1988)(venireperson's failure to disclose fact that his brother was a deputy sheriff revealed bias and entitled defendant to new trial)("[C]ertainly, when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is a deprivation of the defendant's right to a fair trial.'")(citing United States v. Bynum, 634 F.2d 768, 770-71 (4th Cir.1980).

In Bynum, where the seated juror falsely answered a question, for reasons of shame and embarrassment, whether the prospective juror had a close family relative who had been charged with or convicted of a crime, doubts as to juror's objectivity and impartiality, concealed as a consequence of his nondisclosure, were compounded by the deliberate untruthfulness of potential juror's answer on voir dire, resulting in a deprivation of the defendant's rights to a fair trial. "Certainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's rights to a fair trial. [The seated juror] by his concealment impaired the right of [the defendants] to exercise intelligently a peremptory challenge to remove a juror who was suspected of being partial. Hence the convictions of [the defendants] must be reversed, and remanded for a new trial."). United States v. Bynum, 634

F.2d 768, 770-71 (4th Cir.1980). In <u>United States v. Perkins</u>, 748 F.2d 1519, 1532 (11th Cir. 1984), the Eleventh Circuit, citing the Supreme Court's decision in <u>McDonough Power Equipment Inc</u>. and <u>Bynum</u>, held:

> There are numerous indications of juror Goad's bias. Goad's dishonesty, in and of itself, is a strong indication that he was not impartial. As stated by Justice Blackmun in his concurrence in <u>McDonough</u>:
> I agree with the Court that the proper inquiry in this case is whether defendant had the benefit of an impartial trier of fact. I also agree that in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. <u>McDonough</u>, 104 S.Ct. at 850 (emphasis added).

The trial court committed reversible error in denying Petitioner's amended motion for new trial, where it was shown that during voir dire venireman Irene Rene Collins intentionally and knowingly withheld the fact that she had twice been arrested and placed on probation for misdemeanor criminal offenses involving moral turpitude, and additionally had once been charged with theft by issuance of bad check, also involving moral turpitude, where this information was material to her qualification to serve as a juror under Texas law because the arrests constituted acts of moral turpitude and consequently lack of good moral character. Tex. Govt. Code § 62.102(4). Additionally, the failure to disclose this information to Petitioner by intentionally and dishonestly concealing this information concerning acts of moral turpitude on the

juror questionnaire constituted a further act of moral turpitude evidencing dishonesty before the tribunal and the parties, and compounded the original dishonesty. United States v. Scott, 854 F.2d at 699 (5th Cir. 1988 ("[C]ertainly, when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is a deprivation of the defendant's right to a fair trial.'")(citing United States v. Bynum, 634 F.2d 768, 770-71 (4th Cir.1980).

The failure to disclose this information to Petitioner denied him the right to a fair and impartial jury guaranteed under the federal constitution, because a correct response would have provided a valid basis for a challenge for cause. Tex. Govt. Code § 62.102(4) ("A person is disqualified to serve as a petit juror unless the person: is of...sound mind and good moral character.") The right to conduct voir dire of a jury panel and intelligently exercise both peremptory strikes and strikes for cause is included under the federal and state constitutional right to counsel, right to trial by an impartial jury, and due process of law. U.S. Const. Amends. 6 & 14; Tex. Const., art. I. sec. 10. When a juror intentionally and knowingly provides false answers under oath to questions asked on voir dire, a defendant is denied both the opportunity to meaningfully exercise

his challenges for cause and peremptory challenges, and to a trial before a fair and impartial jury.

Petitioner's amended motion for new trial was introduced into evidence as an exhibit at the motion for new trial hearing. (RR. Vol. 39 p. 35 [DX#3]). Also introduced into evidence at this time as exhibits were (1) a juror information form and questionnaire executed by Irene Rene Collins, (2) the attached cover letter by the trial judge; (3) documents reflecting two separate criminal charges for prostitution and public lewdness filed against Collins and their disposition, and (4) a further charge for theft by issuance of a bad check. (RR. Vol. 39 p. 204 [DX#5]); RR. Vol. 39 p. 133 [DX#11]). Each document was admitted into evidence by the trial judge. (RR. Vol. 36 pp. 5-9).

Each venireman was given an exhaustive 18 page questionnaire to answer prior to voir dire. The questionnaire included a cover sheet signed by the presiding trial judge and entitled "Juror Questionnaire." In this cover sheet, the trial judge urged the venireman to be as "accurate and truthful as possible."

Venireman Irene Rene Collins' questionnaire reflected that she was thirty years old, married, and employed by Texas Children's Pediatric Associates as a nurse. She listed her previous employment as "medical assistant" and "bar maid." (Collins indicated that had she left her

previous employment as a nurse in order to attend "school." The questionnaire also reflected that Collins had received her nurse training from Houston Community College, and was currently taking home study courses in "nursing administration."

A separate "Juror Information Form," was attached to the 18 page questionnaire. Collins indicated that she had never been "an accused, complainant, or witness in a criminal matter." (RR. Vol. 39 p. 204 [DX#5]).

The 18 page questionnaire asked Collins the following questions:

35. Other than your prior jury service, have you ever been interested in the outcome of any criminal case?
**["Yes" box marked].**

Has your interest been stimulated through the newspapers, television, books, hearsay or any other manner of communication?

**[Response:] "Cousin was murdered, Last heard news from relative. No."**

37. Have you, any member of your family, or any acquaintance, ever been accused in any criminal action?
**["Yes" box marked. Response:] "Blowing off firecracker on New Year Eve."**

40. Have you, any member of your family, or any acquaintance, ever been arrested?

**["Yes" box marked. Response:] "Driving Without A license."**

75. Have you ever had an unpleasant experience with law enforcement?
**["No" box marked.]**

87. Please list below anything you believe the Court and the lawyers should know about yourself that you think is important with reference to our ability to serve as a juror in this or any other criminal case?

**[Response space left blank].**

(RR. Vol. 39 p. 204 [DX#5]). See also testimony. (RR. Vol. 36 p. 23-26). The questionnaire concluded with Collins executing an oath stating that "I hereby swear that the response(s) and information provided herein are true and correct." (RR. Vol. 39 p. 204 [DX#5]).

Included in the motion for new trial record as Defendant's Exhibit No. 5, and marked separately as "Exhibit E," are the following documents:

(1) Misdemeanor information No. 9347066 charging Irene Rene Collins with public lewdness;

(2) Misdemeanor information No. 9347066 reflecting an arrest date of November 19, 1993;

(3) Order dated January 31, 1994 placing Irene Rene Collins on 1 year deferred adjudication, and assessment of a fine of $250.

(4) Misdemeanor information No. 9304928 charging Irene Rene Collins with prostitution;

(5) Misdemeanor information No. 9304928 reflecting an arrest date of February 1, 1993;

(6) Order dated February 23, 1993 placing Irene Rene Collins on six months deferred adjudication, and assessment of a fine of $50.

(7)    Misdemeanor information No. 695009 charging Irene Rene
       Collins with Issuance of Bad Check. (RR. Vol. 39 p. 133 [At Def.
       Exhibit #11 [DX#11]).

(RR. Vol. 39 p. 63 [DX#5, Exhibit E; DX#11]). These documents were
admitted into evidence at Petitioner's motion for new trial hearing. (RR.
Vol. 36 pp. 5-9).

      The knowing failure in Petitioner's case of Juror Collins to reveal in
her Juror Questionnaire that she had been charged three times, arrested
twice and twice placed on probation for acts constituting crimes of moral
turpitude, demonstrated past conduct of acts of moral turpitude and lack
of good moral character, rendering the juror unqualified to serve as a
juror under Texas law, and thus subject to being stricken for cause. Her
knowing concealment of these acts under oath compounded the gravity
of these past acts, and itself constituted a separate act showing lack of
good moral character. Matter of Humphreys, 880 S.W.2d 402, 408
(Tex.1994)("[M]oral turpitude is implicated by crimes that involve
dishonesty, fraud, deceit, misrepresentation ... or that reflect adversely
on a honesty, trustworthiness, or fitness ... in other respects.").

      Both Texas and federal law hold that prostitution, theft and public
lewdness acts in Texas are conduct involving moral turpitude. Ex parte
Rodriguez, 378 S.W.3d 486, 490 (Tex.App.-San Antonio 2012)("[T]heft
and prostitution convictions in Texas are crimes involving moral

turpitude.") (citing <u>Fuentes-Cruz v. Gonzales</u>, 489 F.3d 724, 726 (5th Cir.2007) ("[C]rimes including an element of intentional deception are crimes involving moral turpitude."); <u>Holgin v. State</u>, 480 S.W.2d 405, 408 (Tex.Crim.App.1972) (prostitution involves moral turpitude); <u>Brown v. Tex. Dep't of Ins</u>., 34 S.W.3d 683, 690 (Tex.App.-Austin 2000, no pet.) (theft by check involves moral turpitude).

Engaging in conduct constituting the offense of public lewdness (engaging in acts of sexual intercourse or contact in public) is also an act of moral turpitude, and can preclude a finding of good moral character. <u>Gomez v. Texas Education Agency</u>, 354 S.W.3d 905, 910 (Tex.App.-Austin 2011)(teacher deprived of teaching certificate due to unconvicted, expunged conduct comprising acts of public lewdness [publicly exposing genitals with intent to arouse or gratify the sexual desire of any person] evidenced lack of good moral character required for teacher certification; teaching certificate revocation upheld).

When Juror Collins' non-objectivity was secreted and compounded by the untruthfulness of her answers on voir dire, the result was a deprivation of Petitioner's right to a fair trial. <u>United States v. Scott</u>, 854 F.2d at 699 (5th Cir. 1988) ("[C]ertainly, when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror's answer on voir dire, the result is a deprivation of the defendant's right to

a fair trial.'")(citing <u>United States v. Bynum</u>, 634 F.2d 768, 770-71 (4th Cir.1980).

During Petitioner's motion for new trial hearing, the State maintained that the key issue was whether Collins had been convicted of an offense, not whether she had been ever been charged with an offense. (RR. Vol. 36 p. 43). This is incorrect. The key issue was whether the fact that Collins had been charged three times, arrested two times and has been twice placed on probation, all for acts evidencing moral turpitude and lack of good moral character, and then affirmatively lied about such conduct before the Court in her answers to the Juror Questionnaire, constituted material information that would have made Collins disqualified to serve as a juror, and subject to a strike for cause. Given the scope and depth of the questions given to Collins, her failure to mention these facts on the form constituted a withholding of material information that rendered her an unqualified juror subject to striking for cause for lack of impartiality.

In Petitioner's case, Collins withheld material information by simply failing to mention the matter in the appropriate places on the questionnaire's form. Petitioner was never given an opportunity to further question Collins, or any other venireman, regarding their criminal history, during the individual voir dire phase of jury selection. On the

first day of voir dire, the trial court ordered that the veniremen would be individually questioned only concerning capital issues. (RR. Vol. 7 pp. 49-60). After this limited individual voir dire, the panel would be reassembled for general voir dire regarding noncapital issues. (RR. Vol. 7 pp. 49-60).

Irene Rene Collins was questioned on July 30, 1997. (CR. Vol. 1 p. 126; RR. Vol. 11 p. 4). During the give and take of questioning by the trial court, the State, and Petitioner's counsel, Collins gave no response that would have suggested that she had been twice arrested and three times prosecuted for acts of moral turpitude, or that she had misrepresented her answers to the Juror Questionnaire. (RR. Vol. 11 p. 4-50). Thereafter, on August 18, 1997, Collins was selected to serve on Petitioner's jury. (RR. Vol. 24 pp. 3-4, 26).

The extensive questionnaire filled out by venireman Collins was executed under oath. Petitioner's counsel was entitled to rely upon the responses given in her questionnaire. As noted above, attached to Collins' questionnaire was a cover letter from the trial court urging her to be fully candid, and that her answers would be under oath. The instant questionnaire concluded with Collins signing the instrument and swearing that the responses contained therein were true and correct. There is no principled distinction between a defense counsel's reliance

upon the responses by a venireman made in open court to questioning by the trial judge, and the written responses to the trial judge's written questionnaire propounding the identical questions.

Petitioner asserts that he had a right to rely upon the veniremen's responses to the highly detailed and specific questions contained in the trial court's questionnaire in order to save time during voir dire. (RR. Vol. 36 p. 40). Petitioner's attorney during voir dire was Wendell Odom. (RR. Vol. 36 p. 13). Odom testified during the motion for new trial hearing. Odom confirmed that Collins served as member' of Petitioner's jury. (RR. Vol. 36 p. 16).

Odom stated he had received no indication that Irene Rene Collins had ever been arrested, or placed on deferred adjudication. (RR. Vol. 36 p. 18). During voir dire, Odom in fact moved to strike Juror Collins for cause, on the grounds that she could not consider evidence regarding the age of the defendant on Special Issue Number Three (mitigation of the death penalty), and stated she could not follow the law in regards to the burden of proof upon the State as to Special Issue Number One (future dangerousness). (RR. Vol. 11 pp. 44-45). Odom's motions to strike for cause were denied. (RR. Vol. 11 pp. 47). Odom reiterated during the motion for new trial hearing that had he known these facts concerning prospective juror Collins' misrepresentations regarding her arrest and

prosecution record, he would have moved to strike the juror for cause, or exercised a peremptory strike against her. (RR. Vol. 36 pp. 21-22).

Odom testified:

> Q      Had you known about her criminal history and the fact that it differed significantly from the questionnaire, would that become a part of your voir dire?
> A      No question about it.
> Q      Would you have moved to strike her, at least, then on the basis that she had misrepresented some of the facts in the context of her voir dire?
> A      I believe that I would have moved to strike her for cause for another reason for two other issues. I can't imagine that I wouldn't also attempt to incorporate that as an additional strike for cause on that particular juror.
> Q      The record reflects that you did not exercise a peremptory challenge once your motion for challenge for cause was overruled. Had you known that she had misrepresented the facts about her prior criminal history, would you have challenged her peremptorily?
> A      Yes, I would. We did our peremptory challenges at the end of voir dire. And I had a chart laid out as to the order of strikes and the people that I was going to strike and the priorities I had for them. I did all my peremptory strikes from it. I asked for additional strikes. The Court gave me two additional strikes. The two alternate persons would have then ended up on the panel that I found them more objectionable than any other person on the panel. And I would certainly have used a peremptory strike on this juror had I known that there was an incorrect statement of the manner that there is in the juror questionnaire. (RR. Vol. 36 pp. 21-22).

Odom noted that at the time of trial he did not consider Collins a desirable juror, but had decided to use his peremptory strikes on other veniremen. (RR. Vol. 36 pp. 21, 62-68). Odom relied upon Collins' untruthful answers to the trial court's questionnaire during voir dire in

choosing not to exercise an additional strike for cause or peremptory strike against her. (RR. Vol. 36 p. 67).

Petitioner's trial counsel was correct in being concerned about Collins withholding the material of her two previous arrests for crimes of moral turpitude, criminal theft charge, and the fact that she had twice been placed on probation. Having received deferred adjudications in both cases, rather than final convictions, Collins' previous experience with the criminal justice system could have easily resulted in a bias in favor of the State. "[A juror's] dishonesty, in and of itself, is a strong indication that he was not impartial. As stated by Justice Blackmun in his concurrence in McDonough: I agree with the Court that the proper inquiry in this case is whether defendant had the benefit of an impartial trier of fact. I also agree that in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. 104 S.Ct. at 850." United States v. Perkins, 748 F.2d 1519, 1532 (11th Cir. 1984). United States v. Bynum, 634 F.2d 768, 771 (4th Cir. 1980) (juror decided to conceal family member criminal convictions for reasons of shame and embarrassment on juror questionnaire; episode demonstrated that for juror duty to tell the truth under oath took second place to preserving appearances for himself personally)("The circumstances created a substantial likelihood that [the juror] might be

either overly harsh or overly lenient in his reaction to black defendants. Certainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's rights to a fair trial.")

Mark Vinson testified for the State during Petitioner's motion for new trial hearing. (RR. Vol. 36 p. 78). Vinson was one of the two Assistant Harris County District Attorneys present during the voir dire process of Petitioner's trial. (RR. Vol. 36 p. 78). He told the court his office had prepared a criminal record on each venireman. (RR. Vol. 36 p. 79). The result was a printout which was kept in the courtroom, and was available to defense counsel. (RR. Vol. 36 pp. 79-80). The printout reflected Collins' prosecutions for public lewdness and prostitution. (RR. Vol. 39 p. 221 [DX#26]). Vinson did not know whether Odom or any other member of the defense had in fact examined Collins' record or the printout. (RR. Vol. 36 p. 81).

A defense counsel must exercise diligence before material information on voir dire is considered withheld. Landry v. State. 879 S.W.2d at 195. This was the purpose of Vinson's testimony at the motion for new trial hearing. However, the prosecutor's testimony was immaterial. While defense counsel is required to exercise due diligence in asking questions designed to uncover material information, and in

following through after a response is given, there is no duty on defense counsel to independently investigate the veracity of each venireman's response. Landry v. State, 879 S.W.2d at 195.

During the motion for new trial hearing the State suggested that Collins' questionnaire had not been executed under oath. The document reflects that Collins signed the questionnaire with the following oath: "I hereby swear that the response (s) and information provided herein are true and correct." (RR. Vol. 39 p. 204 [DX#5]). The absence of a jurat appears next to Collins' signature is immaterial. See Tex. Penal Code Ann. sec. 37.07(a) (Vernon 1994)(irregularity not a defense).

Thus, the trial court and Court of Criminal Appeals committed reversible error in denying Petitioner's amended motion for new trial, where it was shown that during voir dire venireman Irene Rene Collins knowingly and intentionally withheld from the court and defense counsel the fact that she had been three times been charged and twice arrested and placed on probation for misdemeanor criminal offenses constituting acts of moral turpitudes, where this information was material, and where the failure to disclose this information to Petitioner denied him the right to a fair and impartial jury-guaranteed under the federal constitution. This Court should reverse the Texas Court of Criminal Appeals' judgment, and order a new trial.

## PETITIONER'S THIRD CLAIM FOR RELIEF

**THE TRIAL COURT AND COURT OF CRIMINAL APPEALS COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S AMENDED MOTION FOR NEW TRIAL, WHERE IT WAS SHOWN THAT DURING VOIR DIRE VENIREMAN IRENE RENE COLLINS WITHHELD THE FACT THAT SHE HAD TWICE BEEN ARRESTED AND PLACED ON PROBATION FOR MISDEMEANOR CRIMINAL OFFENSES, WHERE THIS INFORMATION WAS MATERIAL, AND WHERE THE FAILURE TO DISCLOSE THIS INFORMATION TO PETITIONER DENIED HIM THE RIGHT TO A FAIR AND IMPARTIAL JURY GUARANTEED UNDER THE FEDERAL CONSTITUTION. THE FAILURE TO ASSERT THIS CLAIM BY TRIAL, DIRECT APPEAL, AND STATE HABEAS COUNSEL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL AND DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Petitioner hereby reasserts Claims for Relief One and Two and incorporates those claims herein by reference. A reasonably competent trial, direct appeal and state habeas attorney would have raised all of the claims now asserted in Dennes' federal petition in Claims for Relief One and Two, and ineffective assistance of trial, appellate and state habeas counsel establishes cause and prejudice for Claims for Relief One and Two should this Court find said claims to be procedurally defaulted.

In Trevino v. Thaler, 133 S.Ct. 1911 (2013), the Supreme Court extended the Court's holding in Martinez v. Ryan, 132 S.Ct. 1309 (2012) to Texas. In Martinez, the Supreme Court considered for the first time whether ineffective assistance of counsel in an initial-review collateral proceeding could provide cause to excuse procedural default of a claim

for ineffective assistance of trial counsel. <u>Martinez</u>, 132 S.Ct. at 1316. The Supreme Court answered in the affirmative, holding that when an initial-review collateral proceeding is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, the ineffective assistance of counsel in that initial-review collateral proceeding can provide cause to excuse the procedural default.

The facts brought forth by motion for new trial counsel in the amended Motion for New Trial, and ruled on by the trial court, established that Juror Collins lied on her Juror Questionnaire concerning her arrest and criminal charge record. As argued in Claims for Relief One and Two, and incorporated herein by reference, those intentional misrepresentations by Juror Collins established grounds to have her stricken for cause under Texas law, as not being a person of "good moral character." Tex. Govt. Code § 62.102(4). To the extent that this Court finds this claim procedurally defaulted, the ineffective assistance of trial, direct appeal, and state habeas counsel establish cause and prejudice for this procedural default. This legal and factual claim were readily apparent from the record, and reasonably knowledgeable and diligent trial, direct appeal, and state habeas counsel would have adequately investigated, presented and exhausted these claims in the state courts.

In order to establish cause to excuse his procedural default, Petitioner must prove that his counsel in the initial-review collateral proceeding was deficient; that is, he must show that the representation of his initial-review collateral proceeding "fell below an objective standard of reasonableness." See Strickland v. Washington, 466 U.S. 668, 688 (1984); see also Martinez v. Ryan, 132 S.Ct. 1309, 1318 (2012) (citing Strickland as the appropriate standard for judging whether state habeas counsel was ineffective). As part of establishing cause, Petitioner must also show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Martinez, 132 S.Ct. at 1318 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

To excuse the procedural default fully, Petitioner would then be required to prove that he suffered prejudice from the ineffective assistance of his trial counsel. See Martinez, 132 S.Ct. at 1321. Prejudice requires a showing that there is "a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. For the reasons already set forth in Claims for Relief One and Two, which are incorporated herein by reference, the failure to present and exhaust

available, readily discoverable legal claims supported by facts developed before the trial court and courts of appeals, and as alleged in Claims for Relief One and Two, constitutes representation that "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. The underlying juror misconduct claim alleged in Claims for Relief One and Two are "substantial claims, which is to say that the prisoner must demonstrate that the claim has some merit." Martinez, 132 S.Ct. at 1318.

To excuse the procedural default fully, Petitioner is required to prove that he suffered prejudice from the ineffective assistance of his trial counsel. See Martinez, 132 S.Ct. at 1321. Prejudice requires a showing that there is "a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. If trial, direct appeal, and state habeas counsel had presented and exhausted the claims set forth in Claims for Relief One and Two, there is "a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different," that is, there is a reasonable probability that the claims would have been granted by the trial court or the Court of Criminal Appeals, as Juror Collins lied on her

Juror Questionnaire, and truthful answers would have provided valid grounds to challenge the juror for cause, or would have caused trial counsel to knowingly exercise a peremptory strike to strike the juror Collins. There is "a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different," in that, had Petitioner's Motion for New Trial been granted on the Juror Collins lying during voir dire claims, Petitioner's jury finding of guilt of capital murder and sentence of death would have been reversed.

A different jury panel, comprised of impartial jurors, might have not found Petitioner guilty of capital murder, or might have answered Special Issues One or Two "No, or might have answered Special Issue Three "Yes." A reasonable probability is a "probability sufficient to undermine confidence in the outcome."

## PETITIONER'S FOURTH CLAIM FOR RELIEF

**PETITIONER'S CONVICTION SHOULD BE REVERSED WHERE THE STATE WITHHELD THE FACT THAT DAVID BALDERAS, A KEY STATE WITNESS DURING THE PUNISHMENT PHASE OF TRIAL, WAS A LONG-STANDING POLICE INFORMANT, HAD ENTERED INTO A LAW ENFORCEMENT CONTRACT WITH THE STATE, WHERE SAID CONTRACT WAS MATERIAL TO THE DEFENSE AS ADMISSIBLE IMPEACHMENT EVIDENCE, AND WHERE THE FAILURE OF THE STATE TO TIMELY DISCLOSE THE EXISTENCE OF THOS AND OTHER IMPEACHING INFORMATION VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL.**

A defendant is entitled to discover any plea bargains or deals made with a State's witness. Giglio v. United States. 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This discovery is necessary in order to afford a defendant a fair and impartial trial. U.S. Const., amends. 6 & 14; Giglio v. United States, supra. Petitioner's conviction should be reversed where the State withheld the fact that David Balderas, a key State witness during the punishment phase of trial, had entered into a law enforcement contract with the State, where said contract was material to the defense as admissible impeachment evidence, and where the failure of the State to timely disclose existence of this contract violated Petitioner's federal constitutional right to a fair and impartial trial.

The State introduced an extraneous offense during the punishment phase of trial, in order to demonstrate Petitioner's alleged continuing threat to society-the future dangerousness element. Tex. Code Crim.

Proc. Ann. art. 37.071 sec. 2(b)(1) (Vernon Supp. 1998). The alleged extraneous offense consisted of the robbery of Danny Tsang and his family in their home on November 16, 1995. [Hereinafter referred to as the Tsang robbery offense. See Petitioner's Fifth Claim for Relief, below]. The only evidence linking Petitioner to this alleged extraneous offense was the testimony of David Balderas, who was an accomplice to the extraneous offense. "The evidence introduced was David Balderas' testimony that he was an accomplice to the Tsang robbery and that Petitioner was the driving force behind its commission. No evidence other than Balderas' testimony linked Petitioner to the Tsang robbery.") Opinion at p. 12, <u>Dennes v. State</u>, No. 72,966 (Tex. Crim. App. Jan. 5, 2000)(unpublished).

David Balderas testified for the State during the punishment phase of trial. (RR. Vol. 34 pp. 49-82). He stated that Petitioner was the driving force behind the mistaken robbery of Danny Tsang and his family. (RR. Vol. 34 pp. 49-82). Also involved in this offense were Hector Fugon and a person Balderas knew only as Francisco. (RR. Vol. 34 pp. 49-82). Neither Fugon nor Francisco testified at Petitioner's trial.

Balderas revealed on cross-examination that he had never been arrested or otherwise charged for the Tsang robbery. (RR. Vol. 34 pp. 83-88). He further stated that he had told the prosecutors everything he

knew about the offense, and did not expect to be prosecuted for his role in the robbery. (RR. Vol. 34 pp. 83-88). He insisted further that "no deals" had been made between him and the prosecutors. (RR. Vol. 34 p. 88).

Petitioner's amended motion for new trial complained that the trial court had erred in allowing Balderas to testify because timely notice as previously ordered by the trial court had not been given to Petitioner [Ground #7]. Additionally, Petitioner complained that the trial court erred in failing to grant Petitioner a continuance in order to properly investigate Balderas once it had become apparent that the State would in fact be using the extraneous offense at the punishment phase of trial. [Ground #2. See also Petitioner's Sixth Claim for Relief, below]. (RR. Vol. 39 p. 204 [DX#5] ).

As developed in Petitioner's First Claim for Relief, above, a hearing was conducted on Petitioner's amended motion for new trial on November 6, 1997. At the hearing, Defendant's Exhibit No. 9 was introduced into evidence. (RR. Vol. 39 p. 208). The exhibit consisted of the following documents:

(1)     Misdemeanor information Cause No. 9632781 charging David Rene Balderas with assault on July 28, 1996;

(2)     A form Motion to Dismiss filed by the State and Order granted by the Court under Cause No. 9632781 dated August

23, 1996. The motion indicated that the dismissal was made at the "Request of complaining witness";

(3) Indictment Cause No. 744292 charging David Rene Balderas with felony possession of marihuana on February 4, 1997;

(4) A form Motion to Dismiss filed by the State and Order granted by the Court under Cause No. 744292 dated May 9, 1997. The motion did not indicate the reason for the dismissal.

(RR. Vol. 39 p. 204 [DX#9]). The prosecutor's signatures are not legible on the two dismissal forms. However, neither signature appears to be that of Mark Vinson or Don Smyth, the two prosecutors assigned to Petitioner's case at trial.

Petitioner's attorney at trial, Wendell Odom, testified that he was unaware that Balderas had had two criminal prosecutions dismissed by Harris County prosecutors prior to his testimony in Petitioner's trial. (RR. Vol. 36 pp. 28-30). Petitioner's motion for new trial hearing was continued on November 13, 1996. (CR. Vol. 1 p. 194-195; RR. Vol. 36 p. 111). Prior to this hearing, Petitioner sought discovery of information pertaining to the relationship between David Balderas and the Harris County District Attorney's Office, through a subpoena duces tecum. (CR. Vol. 1 p. 238-239).

In response, the State filed a motion to quash Petitioner's subpoena duces tecum. (CR. Vol. 1 p. 234; RR. Vol. 36 p. 111). The State sought to have the following documents held confidential:

(1)   A two-page letter from the Houston Police Department to the Harris County District Attorney's Office; and

(2)   A three-page contract.

(CR. Vol. 1 p. 234; RR. Vol. 36 pp. 111-112).

Petitioner's motion for new trial hearing resumed on November 13, 1997. The hearing commenced with the State attempting to suppress, through the motion to quash Petitioner's subpoena duces tecum, discovery of this law enforcement contract between Balderas and the State. (RR. Vol. 39 p. 111).

It is undisputed that the existence of this contract, and its terms, were never revealed to Petitioner's counsel at trial, and remained sealed to this day. (RR. Vol. 36 pp. 123-124). The prosecutors at Petitioner's trial told the court that they were not aware of Balderas' law enforcement contract. (RR. Vol. 36 pp. 124, 148). They further maintained that no deal had been made with Balderas concerning his testimony at Petitioner's trial, but the Harris County prosecutors in Petitioner's trial "got use immunity for his testimony but we didn't tell him we had it." (RR. Vol. 36 p. 123).

Petitioner complains under this Claim for Relief of the failure of the State to disclose the law enforcement contract between Balderas and the State, and the State's failure to disclose the facts that Balderas had twice been charged with criminal offenses, and twice had both charges dismissed by the Harris County District Attorney's Office.

It has now also come to light that prosecutors for the Harris County District Attorney's Office failed to disclose to trial counsel for use in impeachment of the State's witness Balderas the following additional facts, which members of the Harris County District Attorney's Office were aware of up to a year before the witness Balderas testified for the State at Petitioner's punishment phase hearing, and which facts were concealed from Petitioner's counsel for use in cross-examination of the witnesses during his trial:

1. That State's witness David Balderas was considered a suspect in the murder of Janoz Szucs, the decedent for whom Petitioner was tried for capital murder, by the Harris County District Attorney's Office; State v. Luis Hector Fugon Trial Transcripts (RR. Vol. 4 p. 248-49).

2. That the Harris County District Attorney's Office and prosecutor Chuck Rosenthal sought to impose the death penalty on State's witness David Balderas for the murder of

Szucs, and that prosecutor Chuck Rosenthal stated publicly that Rosenthal "wanted to put a needle in his [Balderas'] arm;" <u>State v. Luis Hector Fugon</u> Trial Transcripts (RR. Vol. 4 p. 248-49).

3. That Houston Police Department detective Jim De Los Santos, while investigating the capital murder of Janos Szucs in July 1996 and while seeking to impose the death penalty together with prosecutor Rosenthal on State's witness David Balderas for the murder of Szucs, offered Luis Hector Fugon half off his sentence for the Tsang home invasion robbery if Fugon would implicate David Balderas in the Tsang home invasion robbery, and that Fugon nevertheless still did not implicate Balderas in participation in the Tsang home invasion robbery; <u>State v. Luis Hector Fugon</u> Trial Transcripts (RR. Vol. 6 p. 75-76).

4. That in July 1996 the Harris County District Attorney prosecutor Chuck Rosenthal sought to impose the death penalty on State's punishment phase witness David Balderas for the murder of Szucs and "wanted to put a needle in his [Balderas'] arm", while Petitioner was already in custody and charged in Szuc's murder, and stated to Luis Hector Fugon's

attorney that State's witness David Balderas allegedly murdered a jeweler on the southwest side of Houston, Chuck Rosenthal "wanted to put a needle in his [Balderas'] arm," that Balderas was in custody, and prosecutor Rosenthal wanted Fugon to testify against Balderas for the murder of the jeweler. David Balderas was in fact in custody in Harris County in July 1996 on domestic violence charges, and Chuck Rosenthal at the time was lead prosecutor in Petitioner's capital murder prosecution from the beginning of the investigation on the night of Szucs' murder on January 26, 1996, until January 1997, when Rosenthal was replaced by Harris County prosecutors Vinson and Smyth. Further, Assistant District Attorney Chuck Rosenthal testified as a fact witness for the State in Petitioner's capital murder trial, but failed to disclose any of the above Brady/Giglio impeachment information to the jury, or to trial counsel for Petitioner.

5. That co-defendant Luis Hector Fugon, in the investigation conducted by the Houston Police Department and the Harris County District Attorney's Office of the Tsang home invasion robbery extraneous offense, for whom State's witness David

Balderas was the sole witness for the State linking Petitioner to this extraneous offense at Petitioner's punishment phase trial, told HPD officer Jim De Los Santos in July 1996 that Fugon did not know a David Balderas; <u>State v. Luis Hector Fugon</u> Trial Transcripts (Fugon RR. Vol. 6 p. 30).

6. That HPD officer Jim De Los Santos testified at both the Fugon trial and Petitioner's punishment phase trial, and that HPD officer Jim De Los Santos, who testified before Dennes' punishment phase jury immediately before David Balderas, did not disclose to the jury nor to trial counsel for Petitioner that Elvira, while identifying a Hector (Hector Luis Fugon) as participating in the Tsang home invasion robbery in Elvira's post-arrest statement, did not identify David Balderas or Reinaldo Dennes as having participated in the Tsang home invasion robbery. <u>State v. Luis Hector Fugon</u> Trial Transcripts (Fugon RR. Vol. 8, State's Exhibit #2, p. 30). Elvira was never impeached by the State on his failure to identify David Balderas or Reinaldo Dennes as having participated in the Tsang home invasion robbery.

7. That HPD officer Jim De Los Santos testified at both the Fugon trial and also Petitioner's punishment phase trial, and

that HPD officer Jim De Los Santos, who testified before Dennes' punishment phase jury immediately before David Balderas, did not disclose to the jury nor to trial counsel for Petitioner that Hector Luis Fugon had told De Los Santos that Fugon did not know a David Balderas. Officer Del Los Santos' testified in Dennes' punishment phase trial:

Q. Did you interview one of the suspects, sir?
A. Yes, sir, I did.
Q. And can you tell us who you interviewed?
A. His name was Francisco Elvira.
Q. And while you were interviewing this defendant, did you also learn who was the second person?
A. Yes sir I did.
Q. And who was the second person involved, the suspect?
A. His name was Hector Fugon.
Q. Now during the course of your investigation did you have a conversation with Mr. Fugon?
A. Yes sir I did.
Q. And not what he told you – don't tell me that -- but did you get a name from Mr. Fugon?
A. Yes sir I did.
Q. What name did you get?
A. David Balderas.
MR. ODOM That's okay.
Q. David Balderas?
A. Yes sir.
Q. Now during the course of talking to Mr. Balderas -- strike that -- Mr. Fugon did you attempt to contact Mr. Balderas?
A. Yes sir I did.
Q. And did you have any success?
A. No sir I was not successful.
Q. All right. You didn't have -any further involvement in this case is that correct?
A. No, sir, I didn't.
Dennes RR Vol. 34, p. 44-48.

HPD Officer De Los Santos and the Harris County District Attorney's Office, as the prosecution team, did not disclose to Dennes' punishment phase jury or to Dennes' trial counsel for use in impeaching De Los Santos or Balderas that De Los Santos and the lead Janos Szucs HPD Homicide investigator Detective Todd Miller had interviewed Fugon in July 1996, while Fugon was in custody awaiting trial, and that Fugon had denied knowing a David Balderas to both De Los Santos and Miller. HPD Officer De Los Santos testified during Fugon's trial:

BY MR. ALEXANDER:
Q. Did you have occasion to visit my client in jail in July of this year?
A. Yes, sir, I did.
Q. And did y'all talk about a guy named David Balderas?
A. We asked him about David Balderas, he denied knowing about anything.
Q. He said, "I don't know who David Balderas is"?
A. Yes, sir.
Q. Did you believe him?
A. No, sir.
Q. Do you think he knows David Balderas?
A. Yes, sir.
Q. What's the basis for that?
A. I had taken his statement a long time prior to this visit to the jail and he had given me his statement saying he knew who David Balderas was.
Q. Did he give you any address, phone number, information on this David Balderas character, how to run him down?
A. That I don't recall, sir.
Q. You didn't write anything down about it in that statement, did you?
A. I don't recall, sir.
...

Q.      When you visited my client in jail in July, who did you
go there with?
A.      Officer Miller.
Q.      Is that a Hispanic or white officer?
A.      He's a white officer.
Q.      Did he speak Spanish?
A.      No, sir.
MR. ALEXANDER: Pass the witness.
State v. Luis Hector Fugon Trial Transcripts (RR. Vol. 3, p.

61-63).

8. That co-defendant Luis Hector Fugon, in Fugon's trial
   conducted by the Harris County District Attorney's Office
   where Fugon was convicted of the Tsang home invasion
   robbery extraneous offense, and for whom State's witness
   David Balderas was the sole witness for the State at
   Petitioner's punishment phase trial linking Petitioner to this
   extraneous offense, testified at his trial that Fugon did not
   know David Balderas and that "it was a fantasy" that Fugon
   was involved with Balderas. State v. Luis Hector Fugon Trial
   Transcripts (RR. Vol. 3, p. 52-53)("Q.   First paragraph says
   that you were involved in this with a David Balderas. Is that
   true or fantasy? A It's fantasy.").

9. By July 9, 1996, lead Janos Szucs/HPD Homicide
   investigator Detective Todd Miller had interviewed David
   Balderas, and Miller had also interviewed Fugon and Elvira,

and was aware that "Fugon and Elvira both denied everything, especially regarding Ray and Albert." Letter from HPD Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, District Attorney's Office (dated July 9, 1996), Exhibit 1. In addition, in July 1996, while Fugon was in custody awaiting trial and was interviewed by police, that Fugon had denied knowing a David Balderas to both De Los Santos and Miller, supra, and that all during the time since July 1996 when prosecutor Chuck Rosenthal stated he "wanted to put a needle in the arm" of State's witness David Balderas for the murder of Szucs, and Fugon and Elvira made statements to HPD investigator Jim De Los Santos and Miller that they had no knowledge of a David Balderas or Reinaldo Dennes, Petitioner Dennes was in custody already charged for the murder of Janos Szucs, and was represented by Petitioner's trial counsel Wendell Odom;

10.     That since at least 1989, David Balderas was an active HPD cooperating informant providing information to the Houston Police Department on a regular basis, according to both Balderas attorney John Munier, who had been representing Balderas since at least 1989 when Munier left

the Harris County District Attorney's Office, and HPD Detective Bradley, Balderas's HPD handler. This fact was disclosed in open court during David Balderas' federal sentencing hearing in the United States District Court for the Southern District of Texas, McAllen Division, before the Honorable Ricardo Hinojosa, where David Balderas was indicted and convicted for "On or about March 24, 1998... knowingly and intentionally possess[ing] with the intent to distribute more than 100 but less than 1000 kilograms, that is approximately 195 kilograms of marijuana." Indictment of David Rene Balderas, Cause No. M-98-154, U.S. District Court for the Southern District of Texas, McAllen Division, Exhibit 2. During Balderas' sentencing hearing, Balderas' attorney John Munier admitted:

But the simple fact of the matter is my fellow, who has been a cooperating informant for years with the Houston Police Department -- as a matter of fact, ten days after I left the DA's Office in Houston in 1989, I was called by a couple of narcotics officers that I've known for years and asked me to shepherd him through the system when his problems came up because basically he had been cooperating with him on a long-term basis.

And this particular circumstance, he was set up by a Federal DEA informant, who was told to come down here and meet with these other two fellows and he did exactly what he was told and then he was arrested.

He was kind of halfway between his Houston handlers and these fellows down here. And of course, he was just far

enough off -- "off the reservation," as they would say, that we ended up -- after my analysis of the situation where we entered our guilty plea and we've come before the Court. ... Basically he has cooperated on a long-term basis on many investigations. He's testified for the State in capital murders. [at 5-6]

     ...

MR. MUNIER: No. No, I understand, Judge, but frankly, Judge, he basically still maintains the posture of cooperation with the law enforcement. Whether he's paid or not, that's not the issue. He's been passing on information for years and to his own detriment. He's actually had a family member murdered early in the game, which I didn't also produce, but I didn't really want to do that, so.

THE COURT: Well, the wife --

MR. MUNIER: Yeah.

THE COURT: But there's no indication here that this was in relationship to his cooperation and assistance.

MR. MUNIER: Well, it was never quite proved, but no other reason for his wife being murdered. You know, I mean -- all I'm saying is this fellow is a creature of the system.

THE COURT: This is way back in 1988.

MR. MUNIER: That's true, Judge. That's what I'm

-- I came across him in 1989 when I left the DA's Office and he even cooperated before I left the DA's Office in Harris County.

THE COURT: Okay. Well, he's been cooperating during all this period of time, but then there's been a continuation of arrests and dismissals on him, I guess.

MR. MUNIER: Well sometimes he's actually arrested as part of the operation, Judge.

THE COURT: It doesn't say that.

MR. MUNIER: I know it doesn't say that, and I doubt -- you know, this is a dirty, insidious game and that's what the problem is in some respects. You're right.

You know, your inherent distrust of it is to no avail.

THE COURT: There's no inherent distrust of this. What the inherent distrust is if somebody acting like they're cooperating and providing assistance and being an informant when they're out violating the law. There's --that makes a very serious distrust of that type of behavior and that's what we have here.

MR. MUNIER: Well you know, and it's the reason -- THE COURT: And believe me, he becomes worthless to the Government because you put this man on the stand the next time he testifies, what do you think the jury is going to think about this?

MR. MUNIER: Well usually the argument of the Prosecutor is well, you can't -- you know, fleas, as long -- fleas on the dog. That's usually what the argument is.

THE COURT: No, but in this case --

MR. MUNIER: They always adopt him somehow and get their convictions.

THE COURT: -- but in this case we have the added problem that while he's been adopted, he's running amok here.

MR. MUNIER: Well --

THE COURT: A lot of times it's stuff that's in the past and they're testifying about stuff they had done in the past, but they're no longer doing that. They're just being paid now and they're providing information and have rehabilitated themselves to some extent in some situations, they've actually rehabilitated themselves.

But in his case, while he's being paid and providing the information, he's also violating the law. That's not the usual situation we get as witnesses from these people.

MR. MUNIER: Well Judge, as I was trying to explain, in this particular situation we had no clear orders on him and we left the reservation and that's why I pled -- that's why we pled guilty.

THE COURT: There were no orders. You didn't leave the reservation. That was his reservation. That's what he was involved in.

MR. MUNIER: Well, I --

THE COURT: I mean, he was involved in drug transactions. He wasn't doing his -- maybe I missed something, but is the claim here that he was doing undercover work or informant work here?

MR. MUNIER: They were -- they did not have clear signals with the HPD narcotics police officer that's been handling Mr. Bradley. And I've discussed that with Mr. Bradley, as well as Mr. Martinez.

THE COURT: Mr. Balderas, you mean?

MR. MUNIER: Yes, yes.

MR. MARTINEZ [ASSISTANT UNITED STATE ATTORNEY]: Your Honor, I --

THE COURT: Is there a Mr. Bradley someplace?

MR. MUNIER: Well that's the HPD officer that's been handling him.

MR. MARTINEZ: HPD Detective Bradley, I spoke to him. He said absolutely in no way did this Defendant have permission to come down here to do a drug deal -- to get involved in a drug deal. He wasn't working for HPD. And then Officer Bradley said he would come down and testify to that effect. However, Officer Bradley did tell me that Mr. Balderas in the past had been a very reliable informant and that subsequent to his arrest that he had assisted the HPD in seizure of at least 2 kilos of cocaine, three to four individuals and over $15,000 in cash and that's the basis for the Government's 42-month recommendation on a 5K1, Your Honor.

But absolutely in this case, Officer Bradley told me there was -- there's no way this man could have thought that he was going to be working as an undercover and that's why he pled guilty, I believe.

[At 12-16]

United States v. David Balderas, Sentencing Hearing Transcript, Cause No. 7:98-CR-00154-2, United States District Court for the Southern District of Texas, Brownsville Division, p. 5-6, attached as Exhibit 3.

11.    That State's punishment phase witness David Balderas had been arrested on February 4, 1997 in Harris County and charged with felony Possession of Marijuana (more than 50 and less than 2000 pounds) in Cause No. 744292 in the 339th District Court of Harris County, Texas, was released from custody on bond on February 8, 1997, was interviewed sometime in February 1997 by Houston Police Department

Homicide investigators according to Balderas's trial testimony, yet under cross-examination at Petitioner's punishment phase trial witness Balderas testified that Balderas voluntarily came forward to the authorities through his brother-in-law, a Houston Police Department Homicide detective, about Balderas' involvement in the Tsang home invasion robbery extraneous offense, that Balderas was never arrested for an offense that led Balderas to talk to the District Attorney about his involvement in the Tsang home invasion robbery, despite Balderas having been arrested days before his interview with HPD Homicide detectives for felony Marijuana Possession charges, which charges were dismissed on May 9, 1997 by the Harris County District Attorney. The dismissal of these charges against State's witness Balderas was never made known to trial counsel for Petitioner Odom, nor made known to the jury during Petitioner's punishment phase trial, and Balderas was the sole witness tying Petitioner to the Tsang home invasion robbery extraneous offense.

12.     That Petitioner's trial counsel Wendell Odom was never informed of any of the above impeaching information

concerning State's punishment phase witness David Balderas, by either the Harris County District Attorney's Office or the Houston Police Department, and was unable to effectively cross-examine State's witnesses David Balderas, Chuck Rosenthal, or HPD Officer Jim De Los Santos during Petitioner's trial about any of the above <u>Brady/Giglio</u> impeaching information concerning State's punishment phase witness Balderas, De Los Santos, or Rosenthal, because this impeaching information was concealed from trial counsel Odom.

The record does not reveal the precise nature of the "contract" executed between Balderas and the Harris County District Attorney's Office because the terms of the contract were kept under seal by the trial court. However, it was understood during the hearing that the contract consisted of Balderas doing something in exchange for criminal charges either not being filed, or outstanding charges being dismissed, or in exchange for a specific plea bargain recommendation. Similarly, it was understood in the trial court that the something that Balderas would be expected to do would consist of: (1) testimony in criminal prosecutions against other defendants, and/or (2) assisting law enforcement in investigating and/or arresting other persons for criminal offenses. The

documents requested by Petitioner were ordered sealed and made a part of the appellate record. (RR. Vol. 36 p. 128). The sealed documents are on file with the Texas Court of Criminal Appeals and available for this Court's inspection.

Applicable Law

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court established the right of a criminal defendant to discover evidence in the State's possession which is favorable to his defense. Brady was extended to admissible impeachment evidence against key State witnesses in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Both Brady and Giglio address a defendant's express federal constitutional right to a fair and impartial trial. U.S. Const. amends. 6 & 14.

Brady is applicable to impeachment evidence against a State's witnesses testifying at the punishment phase of trial. Banks v. Dretke, 540 U.S. 668, 690-704, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); East v. Johnson, 125 F. 3d 235, 239-40 (5th Cir. 1997). Indeed, the decisions in Brady and Banks concerned the State's withholding of evidence favorable to the defense, which would be admissible to impeach a State's witness during the punishment phase of trial.

In <u>East v. Johnson</u>, 123 F.3d 235, 239-240 (5th Cir. 1997), a habeas corpus case involving a Texas capital murder prosecution and the State' nondisclosure of impeachment evidence concerning a witness Hardaway in the sentencing phase of the trial called by the State to support its argument that defendant posed a future danger to the public—exactly the factual scenario presented in Petitioner's case—the Fifth Circuit held:

> Rather than consider whether impeachment of Hardaway's testimony would undermine confidence in the jury's sentencing recommendation, the district court apparently considered whether the evidence was sufficient to support the recommendation without Hardaway's testimony. The Supreme Court has warned that the <u>Brady</u> materiality analysis
>
>> is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a <u>Brady</u> violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
>
> <u>Kyles v. Whitley</u>, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). In applying this standard to undisclosed impeachment evidence, we have recognized that when the testimony of a witness who might have been impeached by undisclosed evidence is strongly corroborated by additional evidence, the undisclosed evidence generally is not found to be material. <u>Wilson v. Whitley</u>, 28 F.3d 433, 439

(5th Cir.1994), cert. denied, 513 U.S. 1091, 115 S.Ct. 754, 130 L.Ed.2d 653 (1995) In contrast, when "'the withheld evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material.'" Id. (citation omitted).

While Ms. Sears' murder and other testimony provided evidence of East's violent nature, Hardaway was a key witness for the state in demonstrating East's propensity toward violence and his future dangerousness. The state produced no corroborating evidence for Hardaway's most damaging statements regarding her alleged rape and assault and East's alleged confession to other murders. In its closing, the state placed more reliance on Hardaway's testimony than any other item of evidence to establish East's future dangerousness. We are satisfied that Hardaway's testimony was a critical part of the state's case that East would likely commit future criminal acts of violence that would pose a continuing threat to society. We therefore conclude that the prosecution's Brady violation was material and necessitates that we vacate East's sentence.

The State argued during Petitioner's motion for new trial hearing that Balderas' law enforcement contract was not Brady material. The State reasoned: (1) that only admissible evidence was discoverable under Brady, and (2) the contract was not admissible as impeachment evidence. (RR. Vol. 36 p. 121-122).

The trial court informed the parties that he had read the contract in chambers. (RR. Vol. 36 pp. 114, 122). The court believed that the contract was not relevant impeachment evidence, as Balderas had completed his contract before Petitioner's trial, and all charges had been dismissed. (RR. Vol. 36 p. 121). The court believed that a different matter

would be presented if the relationship was still "ongoing" at the time of Petitioner's trial. (RR. Vol. 36 p. 119). The court was never informed of the additional impeaching facts concerning Balderas recited above that were concealed from the court and from counsel for Petitioner, including that Balderas' relationship was still "ongoing" at the time of Petitioner's trial because he continued to be an active Houston Police Department informant.

In ruling that Petitioner was not entitled to discover the terms and content of the law enforcement contract between Balderas and the State, the trial court concluded:

> I think the record is clear that there was a contract. I think I have indicated, from my reading of that document, that the contract had been fulfilled many months before the testimony of Mr. Balderas [in Petitioner's trial], that any obligations under that contract were concluded by the time he testified. And I still believe the documents, as I have said, are confidential and are not relevant to the issues with regard to the [amended] motion for new trial.

(RR. Vol. 36 p. 125).

The State's contention that the existence of a contract between Balderas and the State was not impeachment evidence must be quickly dismissed. A contract between a State witness and the State is impeachment evidence. Giglio v. United States, supra; Banks v. Dretke, supra; United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In Burkhalter v. State, 493 S.W.2d 214 (Tex. Crim. App.

1973) the Texas Court of Criminal Appeals held that a mere "understanding" between a State's witness' attorney and the State constituted admissible impeachment evidence against the witness. In the instant case, the State's witness had more than a mere "understanding." Balderas had an ongoing series of interactions with the HPD homicide investigators, beginning with being a suspect in the capital murder of Szucs where the State's prosecutor Chuck Rosenthal stated publicly that he "wanted to put a needle in his [Balderas'] arm," to being questioned by the HPD homicide investigators about the Tsang home invasion robbery after being arrested for felony possession of marijuana, to receiving a full blown contract with the Harris County District Attorney and having his felony possession of marijuana charges dismissed after being interviewed about the Tsang home invasion robbery by Harris County District Attorney and HPD Homicide detectives in February 1997. (RR. Vol. 34 p. 88). As admitted by his attorney Munier and confirmed by the federal prosecutor during his federal sentencing hearing shortly after his testimony in Dennes' punishment phase in 1997, Balderas was an HPD informant from at least 1989 until 1999.

Similarly, the State's contention that the contract between Balderas and the State is not discoverable evidence can also be generally dismissed. If a contractual relationship between a witness and the State

is admissible impeachment, it is clearly discoverable. <u>Giglio v. United States</u>, supra; <u>Banks v. Dretke</u>, supra; <u>Burkhalter v. State</u>, supra. Thus Petitioner reiterates that the contract Balderas had with the State, and all of the additional undisclosed impeachment evidence recited above and below, was admissible impeachment evidence and confrontation evidence, and consequently, fully discoverable.

Both the State and the trial judge believed that Balderas had completed his contract and obligations with the State prior to his testimony at trial, and therefore, the contract could not have "tainted" Balderas' testimony against Petitioner. Stated differently, the completed contract could not supply the defense with a potential motive for bias and prejudice to be explored by the defense while Balderas was on the stand before the jury. This ruling was not made with full knowledge of the additional undisclosed impeachment evidence cited in this claim. <u>Brady</u> and its progeny, including <u>Banks v. Dretke</u>, cannot be applied so narrowly.

All of the additional undisclosed impeachment evidence cited in this claim was withheld from Petitioner and his counsel during trial. In addition, defense counsel was not apprised, nor does the record reveal, when the contract was in fact completed. However, the record does reflect that a felony indictment which charged Balderas with felony

possession of marihuana was dismissed on May 9, 1997 by motion of the State.

The record demonstrates that Petitioner was arrested for the alleged capital murder and held in custody continually since a felony complaint was filed on February 24, 1996. (CR. Vol. 1 p. 3). Trial counsel made his first appearance on February 26, 1996. (RR. Vol. 36 pp. 47-48). Jury voir dire commenced on July 22, 1997. (RR. Vol. 6 p. 1). Balderas conducted interviews with HPD homicide investigators in July 1996 and February 1997, and his indictment was dismissed on May 9, 1997. Balderas thereafter testified for the State at Petitioner's punishment phase trial.

Brady and its progeny sought to insure that the State discloses evidence useful to the defense for impeachment of the State's witnesses. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court held that it was error for the trial judge to rule inadmissible at the defendant's trial the fact that charges against a State's witness had been dropped prior to trial. 475 U.S. at 679, 106 S.Ct. at 1435. The Court reasoned that jury could have inferred a motive for the witness to favor the State during his testimony, despite his

assurances to the contrary. 475 U.S. at 677 & 679, 106 S.Ct. at 1434-1435.

Delaware v. Van Arsdall is directly applicable to Petitioner's case. The jury in Petitioner's case was entitled to infer that Balderas had a motive to favor the State in his testimony during the punishment phase of Petitioner's trial, given the favor already shown him by the State, his continuing undisclosed status as an HPD informant, the threats to impose the death penalty for the Szucs murder made against Balderas by prosecutor Rosenthal and then withdrawn, Balderas' false testimony regarding not being brought to the attention of the police concerning the Tsang home invasion robbery due to his arrest for felony possession of marijuana and his interviews with HPD homicide investigators concerning the Tsang home invasion robbery immediately after this felony drug arrest, the dismissal of his felony drug charges, and his ongoing relationship with the Houston Police Department as an informer committing unsanctioned crimes, all of which evidence remained undisclosed by the State, undiscovered by Petitioner's counsel, and not presented to Petitioner's punishment phase jury. As in Van Arsdall and Banks v. Dretke, the fact that felony marijuana charges had been dismissed prior to Balderas testifying against Petitioner, and prosecutor Rosenthal's threat of Balderas receiving the death penalty had been

removed, were valid areas for the defense to explore concerning Balderas' bias or prejudice against Petitioner and for the State.

In the instant case, the prosecutors maintained as part of their defense that Balderas' law enforcement contract had been negotiated by another prosecutor in a different division of the Harris County District Attorney's Office. (RR. Vol. 36 p. 124). In <u>Giglio</u>, the Supreme Court held that prosecutors in the same office were under constructive notice of such agreements. <u>Giglio</u>, supra. 405 U.S. at 154, 92 S.Ct. at 766. The purpose of this constructive notice is to avoid precisely the argument utilized by the State in Petitioner's case. While it is possible that the prosecutors at Petitioner's trial were unaware of Balderas' law enforcement contract with other prosecutors in the same office, that is beside the point. What is the point is that through the State's failure to timely disclose the above-referenced impeachment information, Petitioner was not able to fully and fairly cross-examine Balderas and impeach his testimony before the jury—the sole witness linking Dennes to the Tsang home invasion robbery extraneous offense. <u>Banks v. Dretke</u>, 540 U.S. 668, 700-04, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004).

The failure of the State to disclose Balderas long-standing and ongoing status as an HPD informant, the existence and contents of the contract Balderas made with the State, the benefits received by Balderas,

and the threats to Balderas' life made by the State and then removed, is clearly error. The question remains as to whether the error is reversible. This issue is addressed in the test of "materiality" given in <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There the Court wrote:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. 473 U.S. at 682, 105 S.Ct. at 3383. (Emphasis added). The standard for reversible error is the same whether or not a specific request for the evidence is made. <u>United States v. Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383.

This Court must: have a serious lack of confidence in the outcome of the punishment phase of Petitioner's trial. Balderas' testimony constituted the only evidence that Petitioner had contemplated a violent act against any person other than the complainant and Copeland. As urged in Petitioner's Seventh and Eighth Claims for Relief, below, Balderas' testimony linking Petitioner to the alleged extraneous Tsang robbery was not corroborated by any physical evidence, or the testimony of any other witness.

Moreover, central to the State's jury argument on the issue of future dangerousness during the punishment phase of trial was Balderas' testimony that the Petitioner had been involved in another robbery. (RR. Vol. 35 pp. 60, 88). There is a reasonable probability that the jury would have reached a different result in answering the special issues during the punishment phase of trial, had the State timely revealed the existence and details of Balderas' status as a long-standing HPD informant who continued engaging in serious criminal acts while purporting to help enforce the law as an informant, the serious discrepancies between Balderas' testimony concerning the Tsang home invasion robbery and the statements made by the two persons convicted for that crime, the law enforcement contract between Balderas and the Harris County District Attorney's Office regarding his felony drug arrest in 1997 after being questioned by HPD homicide detectives about the Tsang home invasion robbery in 1996 admitting his involvement, the threats of the death penalty made against Balderas, as well as the fact prosecutions against Balderas had been dismissed.

Regardless of the precise contents of the contract between Balderas and the State, Petitioner was entitled to confront Balderas regarding the relationship between Balderas and the Houston Police Department homicide detectives, the Houston Police Department as a whole, between

Balderas and the Harris County District Attorney's Office, and to permit the jury to decide for themselves whether Balderas had a motive to fabricate a story against Petitioner.

Further Evidence in Support of Claim

The State concealed from trial counsel valuable impeaching information during the punishment phase of Reinaldo Dennes' trial, that should have been disclosed to trial counsel pursuant to Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166, 72 USLW 4193 (2004), Kyles v. Whitley, 514 U.S. 419 (1995), Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150, 153 (1972), concerning their sole future dangerousness witness linking Dennes to any prior violent crimes, David Balderas. Among the impeaching information the Harris County District Attorney failed to disclose to trial counsel either before or during Mr. Dennes' trial that have are the following:

13.    That Balderas lied before Mr. Dennes' punishment phase jury when Balderas testified during his cross-examination that Balderas was never arrested on something else that led Balderas to talk to the D.A. about the Tsang home invasion robbery offense. See State v. Dennes Trial Transcript, Punishment Hearing. (RR. Vol. 34, pp. 83-89).

> Q. My name is Wendell Odom. We've never met, have we?
> A [David Balderas]. No, sir.
> Q. When did you get arrested for being involved in this offense?
> Q. Never did.

Q. When did you get arrested on something else that led you to talk to the D.A. about this offense?

A. Never did.

Q. All right. How is it that the District Attorney approached you initially?

A. My brother-in-law. He's a homicide detective.

Q. Your brother-in-law is a homicide detective?

A. Yes, sir.

Q. And he approached you initially?

A. We were talking over dinner.

Q. All right. And my question was he talks to you or you talk to him first?

A. I talk to him.

Q. All right. And before this, you're laying low, right?

A. Uh-huh.

Q. And you've decided that you don't want to lay low any longer?

A. No, it had nothing to do with that.

Q. You just have a conversation with your brother-in-law that wherein you tell him of your involvement in this case?

A. No, not at all. I didn't involve myself at all. I talked to him about something else that pertains to what you all are doing now.

Q. You talked to him about a matter that's not a matter that is this particular offense, right?

A. Right.

Q. Is that another matter that involves the law?

A. Yes, sir.

Q. And is it another matter that you were involved in?

A. No, sir.

Q. It was just another matter you're talking to him?

A. Right.

Q. It's not a matter that you have any personal concern about?

A. A little bit.

Q. All right. What is your concern in the first matter that you talked to your brother-in-law about?

A. It was something I was approached about, and I didn't want to be down with - -

Q. Is it something that Ray Dennes approached you in regards to?

A. No.

Q. It was something that someone else approached you in regards to?

A. Yes.

Q. And did it involve criminal activity?

87

A. Yes.

Q. And did you talk to the person about the criminal activity that they approached you in regards to?

A. Yes.

Q. And what type of criminal activity was it?

A. I'm not sure. It was kind of bad though.

Q. All right. Tell us a little bit. What do you mean it was kind of bad?

A. Kind of like murder.

Q. All right. And when the person talked to you about this kind of like murder matter, did you tell him no?

A. Yes.

Q. But that concerned you a great deal, that approach, so you talked to your brother-in-law?

A. Correct.

Q. Some way or another that conversation led to the conversation of this matter?

A. Yes.

Q. All right. Did someone come to talk to you about this homicide matter, this other matter that was kind of like murder?

A. Yes.

Q. And when they talked to you about this other matter, kind of like murder, then did it come out that you may have been involved in this burglary of this habitation, this home?

A. Correct.

Q. And who did you talk to about the burglary of a home that you were involved in?

A. The first person I talked to about it?

Q. Uh-huh.

A. Some homicide investigators.

Q. And who was that?

A. I don't remember their name. I've got their card in my wallet. Q. Did you tell them about -- obviously at some point you told them about your involvement in this burglary?

A. In this what?

Q. What we call burglary of a habitation. We call it that.

A. Yes, yes.

Q. You talked to him about that, right?

A. Well, they talked to me about it first. I just went in for that murder kind of thing.

Then they mentioned the burglary thing to me, if I was involved in it.

Q. Okay. And have you been charged on this burglary case?

A. No.

Q. Are you going to be charged on this burglary case?

A. I hope not.

Q. All right. Have you talked with anyone about what your exposure is on being charged on the burglary case?

A. Yes.

Q. Who did you talk to?

A. The D.A.'s.

Q. And when did that take place?

A. When I came in for questioning, statement, whatever.

Q. All right. When you first talked to homicide about the burglary of a habitation, when was that?

A. Shoot, February.

Q. February?

A. '97.

Q. February of this year. Now, what do the District Attorneys tell you that your deal could be?

A. They didn't -- they don't make no deals. They just said that anything I say I'd get

immunity to for a burglary.

Q. They told you that anything that you say you're going to get immunity for being involved in that burglary?

A. Correct.

Q. And what is your understanding that that means?

A. That maybe I won't get charged.

Q. All right. What is your understanding of immunity?

A. Like, you know, I won't get charged. Probably, hopefully that's what -- nothing will happen.

Q. See here is what bothers me is that you're telling me you probably won't get charged, but your understanding of immunity is that you won't get charged?

A. I didn't say won't. I said maybe because I don't know how that really works.

Q. Okay, your understanding is that you don't have any deal?

A. I don't have any what?

Q. You don't have any deal?

A. Right.

Q. Right. But based upon what is testified to, then you might get off these charges?

A. Correct.

State v. Dennes Trial Transcript, Punishment Hearing, (RR. Vol. 34, pp. 83-89), Exhibit A.

Mr. Balderas falsely testified before Mr. Dennes' punishment phase jury when Balderas testified during trial counsel's cross-examination of him that Balderas was never arrested on something else that led Balderas to talk to the D.A. about the Tsang home invasion robbery offense. This false testimony went uncorrected by the Harris County District Attorney, because in fact Balderas had been arrested, indicted by a grand jury, and prosecuted by the Harris County District Attorney on February 4, 1997 for Felony Possession of Marijuana-more than 50 but less than 2000 pounds, and charged with this offense in the 339th District Court, Harris County, Texas. (RR. Vol. 39 p. 121), Defendant's Exhibit 9, David Balderas Felony Possession of Marijuana Indictment and Offense Reports. It has long been established that the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153 (1972) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935) (per curiam)).

Balderas also falsely testified he first talked to HPD Homicide about the Tsang burglary in February 1997, right around the same time of his felony arrest for Felony Possession of Marijuana-More Than 50 But Less

Than 2000 Pounds, which occurred February 4, 1997, when he testified in Dennes' punishment trial instead that he (Balderas) voluntarily approached HPD Homicide through his homicide detective brother-in-law in February 1997, and falsely testified that he had not been arrested for something that brought him to speak to investigators. In fact, David Balderas first spoke to HPD lead Homicide Detective Todd Miller in the Janos Szucs murder investigation as early as July 9, 1996, over a year before his testimony in the Dennes punishment phase trial. See Letter from HPD Sgts. Todd Miller and Jim Ladd to Chuck Rosenthal, District Attorney's Office (dated July 9, 1996), attached as Exhibit 1 ("I have also been in touch with David Balderas and he is still cooperative. Balderas' story differs from Fugon's slightly, but can be worked out I'm sure.").

The offense reports for Balderas' February 1997 felony Possession of Marijuana arrest state that "Offs[Officers] from HPD Narcotics and DEA received information that the Defs were trafficking in marijuana....The def[endant] Balderas stated that he had set up the marijuana deal and that the buyers were waiting in the Hobby Airport area with the money....The def[endant] Balderas directed the officers to the location of the buyers, where a large quantity of US currency was seized. The marijuana weighed approx. 297 lbs with a street value of $627,750.00 The cocaine weighed approx.[imately] 143 grams with a

street value of $14,300.00." None of these facts were disclosed to trial counsel for Dennes for his use in cross-examining and impeaching Balderas' punishment trial testimony, where Balderas testified to a very different version of having himself voluntarily approached his HPD Homicide detective brother-in-law to discuss the Tsang home invasion robbery and his participation in it.

These facts and this arrest of Balderas were never disclosed to trial counsel for Dennes for use in impeaching Balderas' testimony at Dennes' punishment phase hearing. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." Banks v. Dretke, 540 U.S. 668, 675-76 (2004).

14. "[B]eyond genuine debate, the suppressed evidence relevant here, Farr's paid informant status, qualifies as evidence advantageous to Banks. Thus, if Banks succeeds in demonstrating "cause and prejudice," he will at the same time succeed in establishing the elements of his Farr Brady death penalty due process claim." Id. at 691. Balderas' concealed status as an HPD informant since at least 1989 and past the time of Dennes' trial until at least 1999 required disclosure of Balderas' informant status to the defense for use as impeaching information against Balderas during cross-examination. As the Banks Court held:

Finally, relying on <u>Roviaro v. United States</u>, 353 U.S. 53 (1957), the State asserts that "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it was Banks' duty to move for disclosure of otherwise privileged information." We need not linger over this argument. The issue of evidentiary law in <u>Roviaro</u> was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does not call as a trial witness. 353 U.S. at 55-56. The Court there stated that no privilege obtains "[w]here the disclosure of an informer's identify, or of the contents of his communication, is relevant and helpful to the defense of an accused." Id. at 60-61. Accordingly, even though the informer in <u>Roviaro</u> did not testify, we held that disclosure of his identity was necessary because he could have "amplif[ied] or contradict[ed]" the testimony of government witnesses." Id. at 64.

Here, the State elected to call Farr as a witness. Indeed, he was a key witness at both guilt and punishment phases of Banks' capital trial. Farr's status as a paid informant was unquestionably "relevant"; similarly beyond doubt, disclosure of Farr's status would have been "helpful to [Banks'] defense." Id. at 60-61. Nothing in <u>Roviaro</u> or any other decision of this Court suggests that the State can examine an informant at trial, withholding acknowledgment of his informant status in the hope that defendant will not catch on, so will make no disclosure motion. <u>Banks</u>, Id. at 697-98.

"[T]he effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." <u>Kyles v. Whitley</u>, 514 U.S. 419, 445 (1995) (citing <u>United States v. Agurs</u>, 427 U.S.97, at 112-113, n. 21 (1976). Balderas' false testimony went uncorrected by the State, which knew Balderas' testimony was false, since the Houston Police Department had first interviewed Balderas about this burglary at least as early as July 1996, and not in February 1997 as Balderas testified he voluntarily provided information to his HPD

detective brother-in-law. The Houston Police Department had noted that Balderas' version of the facts conflicted with the testimony of the two persons charged and later convicted with the Tsang home invasion robbery, who both denied knowing Balderas, and neither of whom ever identified Reinaldo Dennes, thus contradicting Balderas, and the Houston Police Department had communicated this to the Harris County District Attorney's Office, who failed to disclose this to the Petitioner's counsel.

Both the Houston Police Department and the Harris County District Attorney's Office knew that Balderas' version of the Tsang burglary conflicted with that of the two persons arrested, prosecuted and convicted for the Tsang home invasion robbery, Hector Fugon and Angel Elvira, according to the Houston Police Department's own records, and neither agency turned over this critical Brady/Giglio material to the defense. If all of this impeaching information had been disclosed, trial counsel would have been able to strongly impeach the State's sole future dangerousness witness Balderas when he falsely testified that he had never been arrested before speaking to Harris County law enforcement about the subject matter of his testimony in Dennes' punishment phase trial, and for his numerous other inconsistencies and falsehoods. Trial counsel would have been able to additionally impeach Balderas'

punishment phase testimony against Dennes with the following additional undisclosed impeaching information known by the State and suppressed from Dennes' counsel:

15.     That Balderas' supposed co-conspirators in the Tsang home invasion robbery had gone to trial previously, and after trial, had been convicted and sentenced to fifty and thirty years imprisonment in the case of State v. Luis Hector Fugon, Cause Nos. 708544 & 708545, in the 232d District Court for Harris County, Texas, and forty and twenty-five years imprisonment, in the case of State v. Franscisco Tabares Elvira, Cause Nos. 708546 & 708547, in the 232d District Court for Harris County, Texas, respectively. Thus Balderas as their confessed co-conspirator was facing a similar thirty-to-fifty year sentence for his participation in this offense, but escaped that fate by cooperating with the police and prosecutors, despite having confessed his involvement in this crime to police in July 1996, before any use immunity was offered Balderas in August 1997. (RR Vol. 36 p. 81). The potential sentence facing Balderas were never disclosed to trial counsel for Dennes for use in impeaching Balderas' testimony at Dennes' punishment phase hearing.

16.     That Assistant District Attorney Chuck Rosenthal, Dennes' initial prosecutor until from his initial arrest in March 1996 until

January 1997, had approached Robert Alexander, attorney for Luis Hector Fugon, who received a sentence of fifty years imprisonment, during Fugon's trial in July 1996, over a year before Balderas' testimony in the Dennes punishment phase trial, and had asked Mr. Alexander if his client Fugon wished to testify against David Balderas, because ADA Rosenthal "indicated to me that Mr. Balderas allegedly murdered a jeweler on the southwest side of town, and that Chuck Rosenthal wanted to put a needle in his arm." Affidavit of Robert F. Alexander, Exhibit 4; State v. Hector Fugon Trial Transcript, (RR. Vol 5, p. 248-49). The fact that David Balderas was considered a suspect in the murder of Janos Szucs, and was threatened with the death penalty by Harris County District Attorney Chuck Rosenthal, was never disclosed to trial counsel for use in impeaching Balderas during his punishment phase testimony.

17.    That Balderas' supposed co-conspirator in the Tsang home invasion robbery, Hector Fugon, had previously testified in his trial that he did not know a David Balderas, and that both defendants otherwise failed to identify David Balderas as having participated in the offense, during their trial testimony that occurred in 1996, over a year before Mr. Dennes' trial, and that both Fugon and Elvira had also utterly failed to identify Reinaldo Dennes as having participated in the Tsang home invasion robbery for which they both were convicted, a fact that the

Harris County District Attorney's Office was well aware of because it prosecuted both Fugon and Elvira.

18.    That codefendant Angel Elvira, who was convicted of participating in the Tsang home invasion robbery along with Hector Fugon, had never testified or made any custodial statement that he met with Fugon, Dennes and David Balderas at a Burger King restaurant to discuss carrying out the Tsang home invasion robbery, as testified by David Balderas during Dennes' punishment phase hearing, and that Elvira never testified or made any custodial statement that he had in fact ever met David Balderas or Reinaldo Dennes, despite having confessed to his participation in the robbery and expressing remorse for doing so. This impeaching information was known to Harris County prosecutors and never disclosed to trial counsel for Dennes for his use in cross-examining the State's sole punishment phase future dangerousness witness Balderas.

Balderas testified at Dennes' punishment phase trial:

Q. (By Mr. Vinson) Now, did you ever meet with Hector Fugon and Francisco?
A. Yes.
Q. And how did that come about?
A. Well, I had to meet them to tell them what the deal was on this little job we had got.
Q. But I mean where did you all meet? Where did you go?
A. We went to a Burger King off of Fondren and Bellfort.
Q. Now, you met the two men, Hector Fugon and Francisco at a Burger King?

A. Yes, sir.

Q. And who all was present, just the three of you all?

A. Ray was there.

Q. Okay. And what happened then?

A. Just talked and he wasn't really

Q. Let's take it a step at a time. When you all went to the Burger King, how did you get there? Did all of you go there together?

A. No. Me and Compadre and Honduras rode together to Burger King.

Q. In whose vehicle?

A. Mine.

Q. And how did Ray Dennes get to the Burger King?

A. He come in his car, his car.

Q. Was Ray Dennes alone, or did he have someone else with him?

A. At that time he was alone.

Q. Where did this meeting take place, outside in the parking lot, inside the Burger King, or where?

A. Inside.

Q. What happened inside the Burger King?

A. We just all met. You know, he met them and, you know, asked if they were ready, whatever.

Q. I need you to keep your voice higher and to tell us what happened.

A. We just all met. We just shook hands.

He just asked if they were ready, you know.

Q. Who made the introduction?

A. I did.

Q. Who did you introduce? Did you introduce those two men to the defendant?

A. Not like shake his hand or anything. Just like I just pointed to him, told him who  he was and stuff, not by name, just said this is the guy who is going to give us the job.

Q. These are the guys that's gonna do what?

A. This is the guy that's going to give us the job. That's what I told Honduras, Compadre when I introduced them to Ray.

Q. What happened then?

A. He wasn't too sure about the place where it was at yet, Ray wasn't.

Q. Okay. What do you mean he wasn't too sure about the place?

A. He didn't know which house it was.

Q. What happened then?

A. He said when he found out he would get back with me.

(RR. Vol. 34 pp. 63-65).

Balderas' testimony concerning this meeting also varied dramatically from Elvira's testimony concerning how the robbery came about, in that Elvira's testimony did not include any meeting taking place at a Burger King with Dennes, (Fugon RR. Vol. 6, p. 112-118), did not include multiple meetings with the promoters of the robbery, Id., and that Fugon and Elvira were dropped off at the Tsang house by two men, who had driven Fugon and Elvira there, Id., while Balderas testified during Dennes' punishment phase that Fugon and Elvira called Balderas over the phone after being paged by Balderas, and Balderas gave them to OK to go rob the Tsang house that Balderas had previously pointed out to Fugon and Elvira, but Balderas did not drive to the Tsang's house with them. (RR. Vol. 34 p. 67-71). ("Q. What happened after they returned your page? A (Balderas). They told me they were going to take off over there. Q. You told them where to go, or did you take them there? A. I told them where to go. Q. And how did they get there? Do you know? A. No, sir, I don't."). Balderas' testimony further conflicted with Fugon's custodial statement, where Fugon purportedly said that Balderas drove Fugon and Elvira to the Tsang's house, gave them both guns, dropped them off, and told them he would wait for them to complete the robbery and then pick them up in Balderas' car.

"David picked us up by Airline at Main. We parked my truck at the Monte beach park. David picked us up there and we drove to the mans house. David told us that he had planned for us to be in the house in two minutes and he was going to drive up the street and turn back. He figured it would take five minutes for us to get the briefcase and run out of the house and get in his car. We got to house and we David dropped us off on the corner. David told us that if it took to long we would have to steal the mans car. David gave Francisco and I two guns.". (Fugon RR Vol. 7, State's Exhibit 1).

19.    That David Balderas referred to Angel Elvira as Francisco Elvira during Dennes' punishment phase trial, when Angel Elvira testified during his trial over a year earlier that his true name was Angel Elvira. Elvira testified during his trial that the reason Elvira was charged as Francisco Elvira was that Elvira had been arrested while using his brother Francisco Elvira's driver's license. (Fugon RR Vol. 6 p. 107). The fact that David Balderas did not know Angel Elvira's correct name, but identified him by a false name used in police reports, could have been used to impeach Balderas' testimony that Balderas in fact was familiar with Elvira and personally knew him before his testimony in Dennes' punishment phase.

19.    The particular facts surrounding the Tsang home invasion extraneous offense were not disclosed by the State to Dennes' trial counsel Odom until August 13, 1997, only days before the start of Dennes' guilt-innocence phase, despite the fact that the State had

interviewed David Balderas over a year before the start of Dennes' guilt-innocence trial, and was aware over a year before Dennes' guilt-innocence trial of the discrepancies between the version of the facts offered by David Balderas and codefendants Fugon and Elvira. The State achieved its goal of unconstitutionally frustrating defense efforts to investigate and challenge the facts surrounding any future dangerousness extraneous offenses such as the Tsang home invasion robbery used by the State to meet its burden of proof on the future dangerousness element. If the defense had had notice of the Brady material contained in the differing versions of how the Tsang home invasion robbery was carried out, defense counsel could have effectively impeached Balderas, who claimed he knew Elvira and met with him and Fugon multiple times leading up to the planning and carrying out of the Tsang home invasion, and yet in fact did not even know Elvira's true first name, but repeated the false name that only existed in the police reports discussing the offense.

20.    The Harris County District Attorney's Office together with Houston Police Department Homicide investigators as the prosecution team, failed to disclose to trial counsel for Dennes for use in impeaching David Balderas, and affirmatively misrepresented to the Court by omission, that in fact: (1) David Balderas had been an HPD informant

since at least 1989 until at least 1999, according to admissions by

Balderas attorney John Munier made in Balderas' presence to The

Honorable Ricardo Hinojosa, United States District Judge, Southern

District of Texas in David Balderas' sentencing hearing for federal

narcotics trafficking conspiracy in the Brownsville Division of the

Southern District of Texas in July 1999, Cause No. 7:98-CR-00154-2.

Balderas' attorney Munier disclosed in David Balderas' federal

sentencing hearing the following information:

> MR. MUNIER: But the simple fact of the matter is my fellow, who
> has been a cooperating informant for years with the Houston Police
> Department -- as a matter of fact, ten days after I left the DA's
> Office in Houston in 1989, I was called by a couple of narcotics
> officers that I've known for years and asked me to shepherd him
> through the system when his problems came up because basically
> he had been cooperating with him on a long-term basis.
>
> And this particular circumstance, he was set up by a Federal
> DEA informant, who was told to come down here and meet with
> these other two fellows, and he did exactly what he was told and
> then he was arrested.
>
> He was kind of halfway between his Houston handlers and
> these fellows down here. And of course, he was just far enough off -
> - "off the reservation," as they would say, that we ended up -- after
> my analysis of the situation where we entered our guilty plea and
> we've come before the Court.

United States v. David Balderas, Cause No. 7:98-CR-00154-2, United

States District Court for the Southern District of Texas, Brownsville

Division, Sentencing Hearing p. 5-6, attached as Exhibit 3.

> MR. MUNIER: No. No, I understand, Judge, but frankly, Judge, he
> [David Balderas] basically still maintains the posture of cooperation
> with the law enforcement. Whether he's paid or not, that's not the

issue. He's been passing on information for years and to his own detriment. He's actually had a family member murdered early in the game, which I didn't also produce, but I didn't really want to do that, so.

THE COURT: Well, the wife --

MR. MUNIER: Yeah.

THE COURT: But there's no indication here that this was in relationship to his cooperation and assistance.

MR. MUNIER: Well, it was never quite proved, but no other reason for his wife being murdered. You know, I mean -- all I'm saying is this fellow is a creature of the system.

THE COURT: This is way back in 1988.

MR. MUNIER: That's true, Judge. That's what I'm -- I came across him in 1989 when I left the DA's Office and he even cooperated before I left the DA's Office in Harris County.

THE COURT: Okay. Well, he's been cooperating during all this period of time, but then there's been a continuation of arrests and dismissals on him, I guess.

MR. MUNIER: Well sometimes he's actually arrested as part of the operation, Judge.

THE COURT: It doesn't say that.

MR. MUNIER: I know it doesn't say that, and I doubt -- you know, this is a dirty, insidious game and that's what the problem is in some respects. You're right. You know, your inherent distrust of it is to no avail.

THE COURT: There's no inherent distrust of this. What the inherent distrust is if somebody acting like they're cooperating and providing assistance and being an informant when they're out violating the law. There's -- that makes a very serious distrust of that type of behavior and that's what we have here.

MR. MUNIER: Well you know, and it's the reason –

THE COURT: And believe me, he becomes worthless to the Government because you put this man on the stand the next time he testifies, what do you think the jury is going to think about this?

MR. MUNIER: Well usually the argument of the Prosecutor is well, you can't -- you know, fleas, as long -- fleas on the dog. That's usually what the argument is.

THE COURT: No, but in this case --

MR. MUNIER: They always adopt him somehow and get their convictions.

THE COURT: -- but in this case we have the added problem that while he's been adopted, he's running amok here.

MR. MUNIER: Well --

THE COURT: A lot of times it's stuff that's in the past and they're testifying about stuff they had done in the past, but they're no longer doing that. They're just being paid now and they're providing information and have rehabilitated themselves to some extent in some situations, they've actually rehabilitated themselves. But in his case, while he's being paid and providing the information, he's also violating the law. That's not the usual situation we get as witnesses from these people.

MR. MUNIER: Well Judge, as I was trying to explain, in this particular situation we had no clear orders on him and we left the reservation and that's why I pled -- that's why we pled guilty.

THE COURT: There were no orders. You didn't leave the reservation. That was his reservation. That's what he was involved in.

MR. MUNIER: Well, I --

THE COURT: I mean, he was involved in drug transactions. He wasn't doing his -- maybe I missed something, but is the claim here that he was doing undercover work or informant work here?

MR. MUNIER: They were -- they did not have clear signals with the HPD narcotics police officer that's been handling Mr. Bradley. And I've discussed that with Mr. Bradley, as well as Mr. Martinez.

THE COURT: Mr. Balderas, you mean?

MR. MUNIER: Yes, yes.

MR. MARTINEZ: Your Honor, I --

THE COURT: Is there a Mr. Bradley someplace?

MR. MUNIER: Well that's the HPD officer that's been handling him.

MR. MARTINEZ [FEDERAL PROSECUTOR]: HPD Detective Bradley, I spoke to him. He said absolutely in no way did this Defendant have permission to come down here to do a drug deal -- to get involved in a drug deal. He wasn't working for HPD. And then Officer Bradley said he would come down and testify to that effect. However, Officer Bradley did tell me that Mr. Balderas in the past had been a very reliable informant and that subsequent to his arrest that he had assisted the HPD in seizure of at least 2 kilos of cocaine, three to four individuals and over $15,000 in cash and that's the basis for the Government's 42-month recommendation on a 5K1, Your Honor.

But absolutely in this case, Officer Bradley told me there was -- there's no way this man could have thought that he was going to be working as an undercover and that's why he pled guilty, I believe.

THE COURT: Well let me make some findings.

<u>United States v. David Balderas</u>, Sentencing Hearing, Id. at 12-16,

attached as Exhibit 3.

ADA Vinson further testified during the motion for new trial

hearing:

> Q <u>Now, with regard to the extraneous offense and Mr.
> Balderas, first of all, did you ever – did you know anything about
> this Tony Balderas or a Tony Balderas prior to, let's say, August 1,
> 1997</u>?
> A <u>Never heard of him</u>.
> Q And you said there is some conversation early on, back in
> '96, when Mr. Rosenthal was involved in the case so that would be
> sometime February of '96, that the State was trying to develop an
> extraneous involving this defendant on a home invasion robbery?
> A Correct.
> Q And Mr. Odom was aware of that?
> A Correct.
> Q Mr. Parnham was aware of that?
> A Correct.
> Q And you were aware of that?
> A Correct.
> Q During '96, apparently were you able to definitively tie the
> defendant, Reinaldo Dennes, into that home invasion robbery?
> A The only way we could tie into the home invasion robbery
> we thought was that we would have to bring back one of the
> codefendants who had been convicted and that was a matter of
> public record he had been convicted for the home invasion.
> Q Did you make an attempt to do that?
> A Yes.
> Q To your knowledge was Mr. Odom aware of your attempt to
> use this person that was in the penitentiary, the fact that the
> person's name was a Fugon, was it?
> A Yes, certainly was, because I think the defense attorney for
> that defendant -- actually I think she filed a motion to prohibit us
> from speaking to her client because that case was on appeal and I
> think Mr. Odom was aware of also what we were attempting to do
> as well.

Q Did you in fact have to have a Bench warrant issued by this Court to bring a person named Hector Fugon back from TDC to testify

A Certainly did. We did it early on and I think the subpoena I mean the Bench warrant can speak for itself as to the date.

Q In fact the attorney for Fugon got in contact with Mr. Odom regarding her desire to not have him talk to her client as well as you is that correct?

14 A That's correct.

15 Q And this was on the same invasion robbery this extraneous offense that was eventually used in punishment?

A Correct.

Q At some point in time did you abandon your efforts to use Hector Fugon?

A Yes. After his attorney took such a strong opposition and in light of an appeal case which he was being represented by-her- and I certainly thought the Court would rule against us on that effort since he was represented by counsel and the case was on appeal.

2 Q Did you quit trying to develop that home invasion robbery that involved the defendant Reinaldo Dennes as the master mind just because a codefendant wouldn't testify --

A Thats correct.

Q -- when you gave it up then?

A I did because we didn't have sufficient evidence.

Q Did you later make another attempt to get somebody else who knew about this home invasion robbery of Reinaldo Dennes to testify?

A Yes.

Q And who was that?

A David Balderas.

Q Do you remember the first day you ever talked to David Balderas?

A I don't recall but I think you have it on the calendar. I think we both met with him. Do you have the date there?

Q Let me. Can you relate that without giving me a date can you relate it? Were you still in active voir dire of the panel or had the panel already been completed by that time?

A I think by that time the panel had been completed.

Q Can you relate it to any document in the file? There is a subpoena for a David Balderas and some other people. I think it's dated August 13 1997.

A I think we talked – the way it worked I think we talked to Mr. Balderas. That apparently had to be on the 12th. At that time we determined hey he can't help us. We weren't even certain we could but after we talked to him he could help us get the case to the jury so at that time I immediately prepared the subpoena to be filed the next day.

Q And you filed the subpoena on August 13, 1997?

A That's correct.

Q Did you subsequently make Mr. Odom aware of the fact that you now believe you are going to be able to actually prove this extraneous on punishment?

A I certainly did.

Q And do you recall when you did that

A Immediately following the filing of the subpoena.

Q Do you remember having a meeting with the Judge and Mr. Odom back in the jury room of this courtroom on a Thursday the 14th?

A Yes.

Q Do you recall at that meeting advising again Mr. Odom that here's the file of subpoenas for the following people here is who they are including David Balderas?

A Correct.

Q Do you recall at that meeting giving Mr. Odom the opportunity to read the offense report regarding that home invasion robbery which you used as an extraneous offense at punishment?

A Correct.

Q And in that offense report which you provided him did it talk about information from David Balderas about two Cubans being the master minds of this particular home invasion robbery?

A Yes. He identified Hector Fugon along with a second person as actually committing the offense but he further stated that it was set up by the defendant who had befriended Mr. Balderas and so I didn't feel that Mr. Balderas was a complete stranger to defense counsel because his client Mr. Dennes had a prior relationship with Mr. Balderas.

Q That's all in the offense report

A If I recall yes.

Q And so that offense report was made available on August 14th?

2 A That's correct. And it's the same offense report that we used during the punishment stage of the trial.

Q And it wasnt until I guess August 12th that you finally became aware that you might be able to use that particular extraneous offense on punishment?

A That's correct.

Q In addition to not just telling – in fact wasn't there some conversation regarding the States concern for the well being of the various witnesses in this case in front of the Judge as well as Mr. Odom when we were talking about the extraneous offenses?

A That's correct. In fact I think Mr. Balderas represented to us that an investigator had been tracking him down before we even located him. Before we even located him somebody had been tracking him down and we made him aware that no one from our office at that point of time because we weren't aware of it.

Q Did you do anything in addition to notifying Mr. Odom of the subpoenas you filed and the people who were on that subpoena list as well as letting him look at the offense report in the extraneous offense case? Did you do anything additional with that on Friday the 15th of August?

A If I recall I think I took information to his office. I don't recall what it was but it was on the extraneous offense. And I know I think he was gone. We arrived there but I did speak to his secretary receptionist there in the office and left the information that he had requested or the information that he needed.

Q At any time did you ever close your file to Mr. Odom?

A No. In fact we encouraged him to read it and he had free access to the file from the day the case had been filed against his client. He and Mr. Odom met on occasion in the courtroom and reviewed the file and met on occasion and reviewed the file. It was always open.

Q When you say he who are you talking about?

A I am talking about Mr. Odom who represented Mr. Reinaldo Dennes the defendant.

Q Would that file include the offense report of the home invasion robbery that was eventually used as extraneous on punishment?

A If I recall it did. But the problem we were having was just trying to locate someone who could substantiate that the defendant set up the invasion.

Motion for New Trial Hearing Transcript, Dennes RR Vol. 36, pp. 81-89.

Under cross-examination, Mr. Vinson continued the misrepresentations concerning Balderas made by the District Attorney's Office:

> BY MR. SCHNEIDER:
> Q Mr. Vinson, does HPD investigate extraneous offenses?
> A Yes.
> Q Did they provide a supplement to you regarding David Balderas?
> A No, not that I recall. The only thing that was in the offense report, as I recall, was the -- I am trying to think if he was interviewed by HPD because the things that I remember that was in the offense report was the two defendants going to the wrong home, or whatever, going through the back door and committing the offense. And then I think Fugon was arrested. I don't recall all the details of it.
> Q So when was it Mr. Balderas' name came to the State of Texas, I mean, HPD, I mean any investigative agency?
> A I think it was about that I recall, I think it was about the time when we filed a motion to subpoena. I think it was about that time that I became aware.
> Q When was that?
> A And that's after we interviewed Mr. Balderas.
> Q What about the other agency?
> A What other agency?
> Q Did HPD bring him to your attention?
> A I don't recall who brought Mr. Balderas to my attention.
> Q What agency brought him to your attention?
> A I do not recall.
> Q Do you have that information in your file?
> A I would think it should be there.
> MR. SCHNEIDER: Would that produce that information of which agency and when?
> MR. SMYTH: Balderas' name is in the offense report that the State received from HPD, and it's in the offense report that the State gave to Mr. Odom to read.
> MR. SCHNEIDER: What is the date of that offense report?
> MR. SMYTH: I have no idea what the offense but it was pretty close to the time the event committed.
> MR. SCHNEIDER: When was the event committed?

MR. SMYTH: I want to say September of '85. So it has been in the offense report a long time.

MR. SCHNEIDER: May that offense report be admitted for the record?

THE COURT: What? Don't you have a copy of it?

MR. SCHNEIDER: No, Your Honor.

MR. SMYTH: I don't know whether they got a copy of it.

THE COURT: Sure. Let's include that part and parcel.

MR. SMYTH: I'll certainly do that.

Q (Mr. Schneider) Mr. Balderas' name is in the offense report dated September, 1995, according to Mr. Smyth?

A If Mr. Smyth says that, I'm not going to argue with his recollection.

Q At some point did you request that somebody go and interview Mr. Balderas?

A I didn't request anyone to go and interview Mr. Balderas. It was our intent to try to locate Mr. Balderas and interview him ourselves.

Q When did you locate Mr. Balderas?

A Mr. Balderas came to our office. I think it was the day before the subpoena was filed.

Q All right. So sometime the week of August 11th he came to your office?

A The subpoena was filed on the 13th. He had to come about the 12th.

Q And you picked the last juror on the 11th. You picked the last juror on the 11th?

A If the record reflects that, that's correct.

Q Who brought him to your office?

A I think my investigator located him. I'm not certain if she brought him. I'm not certain.

Q When did your investigator locate him?

A I don't know. I guess it would have to be at or near the time he appeared in my office.

Q Do you have any reports from your investigator about when she located Mr. Balderas?

A I have no such report.

Q No such report?

A I have no such report.

Q No notes?

A I have no notes. The only concern to me was if Mr. Balderas was out there, get him here and see if he could help. I didn't keep notes on that.

Q When you did you start investigating or looking for Mr. Balderas?

A When it became apparent that Hector Fugon was not going to assist us.

Q I show you Defendant's 24. Do you recognize it?

A Yes.

MR. SMYTH: Could I see that document before any testimony regarding that? These are documents that are already in the Court's file so I certainly have no objection to them.

Q Defendant's Exhibit 24 is a document regarding Mr. Fugon filed by his lawyer saying leave him alone

A Right.

Q -- and your conversations with his lawyer prior to that date; is that correct?

A Correct.

Q And you had bench warranted, caused to be bench warranted from TDC?

A That's correct.

Q And you brought him back and then he was returned to TDC on September 2nd; is that correct?

A If the document says that.

Q And Defendant's 25 is a Bench warrant returned?

A If the document says that.

Q So Mr. Fugon refused to talk to you?

A No. His attorney refused to let us talk to him.

Q And he's not going to be a witness in this case?

A After his attorney refused to allow us to talk to him, I think you are aware that he couldn't be a witness.

Q Now, in regards to juror, Ms. Collins, you have a printout here?

State v. Reinaldo Dennes, Motion for New Trial Hearing Transcript, (RR. Vol. 36 pp. 90-95).

Mr. Vinson, and/or the prosecution team as a whole, failed to

disclose all of this known impeaching information regarding punishment

phase future dangerous witness David Balderas, in particular his long-standing status since 1989 as an HPD informant, as disclosed by his attorney, David Munier a former prosecutor with the Harris County District Attorney's Office, during Balderas' federal sentencing hearing, in violation of their duties under <u>Brady</u>, <u>Giglio</u> and <u>Kyles v. Whitely</u>. <u>Banks v. Dretke</u>, 540 U.S. 668 (2004). In <u>Banks</u>, the Supreme Court held that, despite having an "open file" policy"

> the State withheld evidence that would have allowed Banks to discredit two essential prosecution witnesses. The State did not disclose that one of those witnesses was a paid police informant, nor did it disclose a pretrial transcript revealing that the other witness' trial testimony had been intensively coached by prosecutors and law enforcement officers.
>
> Furthermore, the prosecution raised no red flag when the informant testified, untruthfully, that he never gave the police any statement, and indeed had not talked to any police officer about the case until a few days before the trial. Instead of correcting the informant's false statements, the prosecutor told the jury that the witness "ha[d] been open and honest with you in every way," App. 140, and that his testimony was of the "utmost significance,". Similarly, the prosecution allowed the other key witness to convey, untruthfully, that his testimony was entirely unrehearsed. Through direct appeal and state collateral review proceedings, the State continued to hold secret the key witnesses' links to the police and allowed their false statements to stand uncorrected.
>
> We reverse that judgment. <u>When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight</u>.

<u>Banks v. Dretke</u>, 540 U.S. 668, 675-76, 124 S.Ct. 1256, 157 L.Ed.2d 1166, 72 USLW 4193 (2004)(emphasis added).

21.   On June 11, 1996, trial counsel Odom filed a Motion for Production of Evidence Favorable to the Accused. Clerk's Record, p.66-68. In that motion trial counsel moved the Court to order disclosure by the State of "any evidence or information within the knowledge or possession of the State, including the District Attorneys' office, sheriff's office, police department or any other law enforcement agency involved in this cause and all agents thereof, the existence of which is known to the State or which may become known, by the exercise of diligence, and which is favorable to the defendant on the issues of guilt/innocence, impeachment of State witnesses, or which might tend to mitigate punishment should the defendant be convicted." Motion for Production of Evidence Favorable to the Accused. (CR. p.66-68). In addition to this general request, counsel specifically requested disclosure to the defense "8. Whether any state witness has ever been a police informant," and "12. All witness statements which conflict internally or with the statements of other witnesses." Id.

Despite these pre-trial requests, and despite the fact that post-trial a subpoena was filed by defense counsel directed to John B. Holmes, Jr. or Custodian of Records of the Harris County District Attorneys' Office requesting production of "All files, papers, documents, and contracts in possession of [the] Harris County District Attorney's Office regarding

David Balderas' cooperation with agents/agencies of the State of Texas and/or Harris County District Attorney's Office in the investigation and prosecution of Special Crimes, including but not limited to contracts between David Balderas and [the] Harris County District Attorney's Office.", (CR. pp. 234-39), the Harris County District Attorney, through yet another lawyer in their office other than trial prosecutors Rosenthal, Vinson or Smyth, were successful in moving the trial court to quash Defendant's subpoena, citing work product privilege. (RR. Vol. 36 pp. 111-115). The Letter from HPD Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, District Attorney's Office (dated July 9, 1996), attached as Exhibit 1, was apparently ordered quashed by the trial court.

22.   The Harris County District Attorney's Office continued the affirmative misrepresentations to the Court of Criminal Appeals in their appellate argument regarding the true facts of what undisclosed impeaching information the State knew about punishment phase witness David Balderas, and when they knew it. In responding to Dennes' Fourth Point of Error, the Harris County District Attorney wrote:

> Appellant claims in his fourth point of error, that he was unfairly surprised by the admission of the Tsang robbery evidence, because defense counsel did not conduct voir dire on the issue. However, the record does not support appellant's claim of surprise.
> At the hearing on the motion for new trial, the defense attorney testified that during his pretrial investigation of this case he was aware the State was trying to connect appellant

to a home invasion. (R.R.36 - 48-49). Trial prosecutor Mark Vinson testified that the State wanted Hector Fugon to testify at the punishment phase of appellant's trial regarding appellant's involvement in the Tsang robbery. However, Fugon's case was still on appeal, and his attorney was opposed to him testifying at appellant's trial. The State therefore abandoned its attempt to use Fugon and gave up any hope of presenting the Tsang robbery evidence. (R.R.36 - 83-84).

Mark Vinson first talked to David Balderas on August 12, 1997, and decided Balderas could connect appellant to the Tsang robbery. Therefore, he filed a subpoena on August 13, 1997, and told defense counsel that he was going to use the extraneous at the punishment phase of appellant's trial. (R.R.35 - 85).

Brief of State on Direct Appeal (No. 72,966), pp. 36-37. These appellate arguments continue the false statements made in the trial court about when the prosecution team first interviewed David Balderas. When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is incumbent on the State to set the record straight, at whatever stage of the litigation. Banks v. Dretke, 540 U.S. 668, 675-76, 124 S.Ct. 1256, 157 L.Ed.2d 1166, 72 USLW 4193 (2004) ("Through direct appeal and state collateral review proceedings, the State continued to hold secret the key witnesses' links to the police and allowed their false statements to stand uncorrected. We reverse that judgment. When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.") Nonetheless, in knowing

violation of their constitutional due process obligations under <u>Brady</u>, <u>Giglio</u>, <u>Kyles v. Whitely</u>, and <u>Banks v. Dretke</u>, during direct appeal and state collateral review proceedings, the Harris County District Attorney's Office never has set the record straight or revealed the information that that has now come to light.[2] These constitutional violations prejudiced the Defendant, and eroded the integrity of the entire punishment phase of the trial. Exhibit 6, Affidavit of Wendell A. Odom, Jr., trial counsel for Dennes.

Petitioner's conviction and sentence should be reversed where the State withheld the fact that David Balderas, a key State witness during the punishment phase of trial, was an undisclosed police informant throughout his participation in the Tsang home invasion robbery and during his testimony as a witness for the State during Petitioner's punishment phase, Balderas' version of the Tsang home invasion robbery conflicted with the facts as stated by the persons charged and convicted

---

[2] The Harris County District Attorney's Office has a troubling history of prosecutorial misconduct in this period. See Exhibit 5 (Ex Parte David Mark Temple, No. 1008763-A, in the 178th District Court of Harris County, Texas, Findings of Fact and Conclusions of Law dated July 8, 2015). Judge Larry Gist ruled that Harris County prosecutor Kelly Siegler had committed 36 different instances of prosecutorial misconduct in the murder trial of David Temple, who was convicted of murdering his wife, Belinda Temple, in 1999, and said that Temple deserves a new trial. "Of enormous significance" according to Judge Gist, "was [Siegler's] testimony at the habeas hearing that apparently favorable evidence did not need to be disclosed if the State did not believe it was true." See also the allegations of serious and repeated acts of prosecutorial misconduct by the Harris County District Attorney's Office, including extensive evidence of fabricating informant testimony, in the murder trial of Ronald Prible

. <u>Prible v. Stephens</u>, Cause No. 4:09-cv-01896, U.S. District Court for the Southern District of Texas, Third Amended Petition for Writ of Habeas Corpus (D.E. 86-2)(including Exhibits), incorporated herein by reference.

with the crime, particularly concerning Reinaldo Dennes, Balderas had entered into a law enforcement contract with the State and received the undisclosed benefits that have now been recited above yet denied that before the jury testifying untruthfully, where said benefits were material to the defense as admissible bias impeachment evidence, and where the failure of the State to timely disclose existence of all of the above-discussed evidence violated Petitioner's federal constitutional right to due process and a fair and impartial trial. This Court should reverse Petitioner's sentence, and order a new trial as to punishment.

## PETITIONER'S FIFTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE PETITIONER WAS TAKEN UNFAIRLY BY SURPRISE, IN VIOLATION OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL TRIAL AND DUE PROCESS OF LAW.**

A defendant is deprived the right of a fair trial and due process of law where he is taken unfairly by surprise by the State introducing into evidence an extraneous offense during the punishment phase of a capital murder trial. U.S. Const., amends. 5, 6 & 14; Anandus v. State, 866 S.W.2d 210 (Tex. Crim. App. 1993); Guerra v State, 771 S.W.2d 453 (Tex. Crim. App. 1988); Garcia v. State, 581 S.W.2d 168, 180-81 (Tex.Crim.App. 1979). In Garcia, the Court of Criminal Appeals held that

> there is a constitutional compulsion to give the capital defendant due process (and due course) of law. Article 37.071 should not be construed as authorizing proof of unadjudicated, extraneous offenses if this comes as an unfair surprise to the defendant. Notice, a fundamental element of due process, must be provided. Allowing proof of unadjudicated, extraneous offenses comes close to allowing one or more "prosecutions" of the defendant in the sentencing proceeding. Simple fairness requires that the defendant be given notice that the State intends to offer proof of unadjudicated, extraneous offenses, so that the defendant and his counsel can investigate and prepare a response."

The trial court committed reversible error admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where Petitioner was taken unfairly by surprise, in violation of

his federal constitutional rights to a fair and impartial trial and due process of law.

The record shows that on December 4, 1996, Petitioner filed a written motion requesting notice of all extraneous offenses the State intended to use at the punishment phase of trial. (RR. Vol. 39 p. 205 DX#7). On January 13, 1997 Petitioner's counsel informed the Court that he had been told that the State might introduce an extraneous robbery offense ("home invasion") during the punishment phase of trial. (RR. Vol. 3 p. 3). Counsel specifically complained that he had not been given notice of the offense, date of offense, county where the offense occurred or any details of the offense. (RR. Vol. 3 pp. 4; 6-7). The State responded that such detailed notice was not required by law, and in response to questioning by the trial court that the State was not going to offer any extraneous offenses during the guilt-innocence or punishment phase. (RR. Vol. 3 p. 5-6).

The record shows that the State and defense counsel referred to the alleged extraneous offense as a "home invasion." This is a common courthouse term for an armed robbery occurring inside a home or residence. During the punishment phase of trial, the State offered evidence that Danny Tsang and his family were robbed inside their home. (RR. 34 pp. 43-142). For purposes of clarity in this brief, Petitioner

will refer to this evidence as relating to the alleged extraneous Tsang robbery.

At the conclusion of the January 13, 1997 hearing, the State announced that no extraneous offenses, other than the shooting of the security guard (David Copeland), would be introduced at either phase of trial. (RR. Vol. 3 p. 6). The State further agreed to give Petitioner notice of the time, date and county of any alleged offenses used for punishment, and the name and address of any punishment phase extraneous offense witnesses. (RR. Vol. 3 p. 7). The court ordered that notice for any extraneous punishment evidence be given two weeks or 15 days before trial, and earlier if possible. (RR. Vol. 3 pp. 7-8). The State agreed to comply with the court's order. (RR. Vol. 3 pp. 7-8).

In the same hearing, the State promised that it would comply with Brady information requested by defense counsel and ordered to be produced by the Court. (RR. Vol. 3 pp. 8). The following discussion occurred on the record:

> MR. ODOM: We also have some motions that that Mr. Vinson and I have talked about and there may be at least a partial, if not a complete agreement to. One is a Brady motion entitled motion for production of evidence favorable to the accused and we have a list of items that we view as favorable, if the State has such evidence, and I believe that Mr. Vinson maybe is at least partially agreeable to that motion, if not completely agreeable to that motion.
> THE COURT: If you will go over with Mr. Vinson and normally indicate on your copy what is agreed versus what is

not agreed and then I will rule on anything that you disagree on.

MR. ODOM: Okay.

MR. VINSON: Well, I think it's self-explanatory. Brady would be any evidence that we would have to show that this defendant did not commit this offense as favorable to him or that someone else committed it. And I'll follow that right down to the law, according to the case law. But I have nothing there. I haven't stumbled on nothing at this time.

THE COURT: You are under an obligation to do so.

MR. VINSON: It's a continuing obligation.

THE COURT: As soon as, if at any time you find such information, you are under an obligation.

MR. ODOM: To make sure we don't waive anything, we believe with the recent Supreme Court case, the United States versus Wilkinson, that we are entitled to go beyond evidence that merely shows that Mr. Dennes did not commit the crime, to wit, evidence that impeaches a witness on the part of the State, evidence that shows sloppy police work on the part of the State, evidence that tends to be favorable to the defendant in many ways can be viewed as Brady even though it falls short of the standard that Mr. Vinson has declared that being as evidence that shows that he is not guilty of the offense. We believe that it is not nearly that narrow, that doctrine, but it's evidence that is favorable to the defendant, it would be the doctrine and especially that recent case from the Supreme Court.

MR. VINSON: I am not going to police the police, Your Honor. I think that he has the duty to cross examine, and I'll operate consistent with Brady. I'm not to go out and reinvestigate the case for Mr. Odom's satisfaction.

THE COURT: Certainly, if you have a witness for the State was testifying and the State is aware that their testimony is tainted or somehow impeachable, or something of that nature, I certainly want you to make that available.

MR. VINSON: That's consistent with Brady.

MR. ODOM: In Wilkinson, the defense certainly can't police the police and it is his obligation.

(RR. Vol. 3 pp. 8-10).

Another hearing was conducted on this matter on August 18, 1997. This hearing occurred after individual voir on capital issues, and prior to voir dire of the panel as a whole on general principles of law. (RR. Vol. 24a p. 1-4). During this August 18th hearing, Petitioner's counsel objected that notice of the alleged extraneous robbery, and David Balderas' testimony in particular, had not been given within the 15 days as ordered by the trial judge, but given on August 13th. (RR Vol. 24a p. 4). The State argued that the notice was timely since it was given immediately after they had decided they could produce sufficient evidence to prove Petitioner's connection to the extraneous offense. (RR. Vol. 24a p. 14). The State claimed to the trial court during this hearing on the 18th that "We did discover a person by the name of Hector Luis Fugon, who had been convicted for home invasion, and we later determined -- and this is all since we have been in capital voir dire that Mr. Fugon there had been some communication between this defendant and Mr. Fugon in setting up that home invasion." (RR. Vol. 24a p. 9).

This testimony was false, because Fugon had been interviewed by HPD homicide investigators Jim De Los Santos and Todd Miller over a year before, on July 30, 1996, regarding the capital murder of a jeweler, testified to that fact under oath before another Harris County prosecutor at Fugon's trial on September 24, 1996, (Fugon RR. Vol. 3 p.53-57, 63;

Vol. 5 p. 29-30), and communicated the fact of their interviews of Fugon, Elvira and David Balderas to Dennes' prosecutor, Chuck Rosenthal. Exhibit 1, Letter from HPD Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, District Attorney's Office (dated July 9, 1996). "It is well settled that if a member of the prosecution team has knowledge of Brady material, such knowledge is imputed to the prosecutors." Avila v. Quarterman, 560 F.3d 299, 307 (5th Cir. 2009)(citing United States v. Antone, 603 F.2d 566, 569 (5th Cir.1979); Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir.1977)). As the dissent in Kyles v. Whitley noted, and as later affirmed by the U.S. Supreme Court in Kyles v. Whitley several years before Petitioner's trial:

> As an initial matter, I address the contention that has been made by the state trial court judge and the State pertaining to the fact that the trial prosecutors--as opposed to the New Orleans police--may not have been aware of some of this evidence at the time of trial. If this were indeed true, it would nevertheless be irrelevant. The Brady doctrine is not limited to prosecutors; rather, it includes all members of the "prosecution team," which includes all law enforcement officers who have worked on the case and thereby contributed to the prosecutorial effort. See Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir.1977) ("The petitioner...allege[s] that Nicholson was a state law enforcement officer. As such, he was a member of the prosecution team."); see also United States v. Buchanan, 891 F.2d 1436, 1442-43 (10th Cir.1989) (citing cases); United States v. Endicott, 869 F.2d 452, 455 (9th Cir.1989) (citing cases); United States ex rel. Smith v. Fairman, 769 F.2d 386, 391 (7th Cir.1985). In a similar vein, the good faith or bad faith of the prosecution has no bearing on the due process required by Brady. Brady, 373 U.S. at 87, 83 S.Ct. at 1196. Accordingly, "whether the nondisclosure

was a result of negligence or design, it is the responsibility of
the prosecutor." Giglio v. United States, 405 U.S. 150, 154,
92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Kyles v. Whitley, 5 F.3d 806, 830-31 (5th Cir. 1993)(King, J. dissenting),

rev'd, Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d

490 (1995).

Prosecutors were on constructive notice of these facts because HPD
Officers Jim De Los Santos and HPD Homicide Detective Todd William
Miller were State witnesses in Petitioner's trial, and thus was part of the
prosecution team investigating the Szucs murder since at least July 30,
1996, over a year before Petitioner's trial, when they interviewed Hector
Luis Fugon concerning the Tsang robbery. The State informed the court
that they were not able to use the testimony of Hector Fugon, since
Fugon's conviction was on appeal and his attorney objected to him
testifying. (RR. Vol. 24a p. 10). The State identified to the trial court
during the August 18, 1997 hearing that it first located and questioned
David Balderas for the first time on August 12, 1997, and immediately
filed a trial subpoena for Balderas' testimony the next morning, August
13th, 1997. (RR. Vol. 24a p. 11). This statement was also false, because
HPD Homicide detectives first interviewed Balderas about the Tsang
robbery extraneous offense sometime in July 1996. Exhibit 1, Letter from
HPD Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, District

Attorney's Office (dated July 9, 1996). The State maintained to the trial court that it was on August 12, 1997 that they first decided to use the alleged extraneous Tsang robbery offense. (RR. Vol. 24a p. 11).

The trial court stated during this August 18, 1997 hearing that he was inclined not to admit the extraneous offense, since Petitioner had not been given adequate time to investigate, stating:

> But I'll tell you my inclination, the fact that I said in my order that the defense was to say have 15 days or two weeks' notice and I don't believe the information that he was provided prior to the 13th was proper notice under the order that I gave, whatever date that excerpt is from, complies with it. I have a real tough time seeing how we are going to introduce extraneous when counsel has been made aware of them a few days before trial.

(RR. Vol. 24a pp. 11-13). The trial prosecutor objected to the court's ruling, stating:

> MR. VINSON: In respect to what the Court said, <u>if we were sitting on the offenses, if we already knew about them</u> -- in every capital case we have had, even in Medellin, we still did ongoing. And we discovered over the weekend what was introduced on the following Monday. <u>And we gave them notice no sooner than we discovered it</u>. <u>You gave a 15-day notice and that provided we already knew we had extraneous</u>.

(RR. Vol. 24a pp. 12)(emphasis added). Of course, members of the prosecution team already knew of the extraneous offense since at least July 1996, over a year before Petitioner's trial in September 1997, when HPD homicide investigators interviewed Balderas, Hector Luis Fugon and Francisco Elvira concerning the Tsang robbery, and "Fugon and Elvira

both denied everything, especially regarding Ray and Albert." Exhibit 1, Letter from HPD Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, District Attorney's Office (dated July 9, 1996). HPD Homicide detectives again interviewed Balderas about the Tsang robbery extraneous offense sometime in early February 1997 after he was arrested on Felony Possession of Marijuana charges in Harris County. (RR. Vol. 34 p. 88).

This further exchange occurred: "THE COURT: I ruled give 15 days. MR. VINSON: The appellate says as long as we give immediate notice when we find out." (RR. Vol. 24a pp. 14). The prosecution team, including investigating HPD Homicide officers, knew about Balderas' testimony because HPD Homicide officers interviewed Balderas, Fugon and Elvira about the alleged extraneous Tsang robbery offense sometime in July 1996, and Balderas again after Balderas' arrest on a felony Possession of Marijuana (50-2000 lbs.) charge on February 4, 1997. (RR. Vol. 34 pp. 88). However, the trial court reserved its ruling until the punishment phase of trial. (RR. Vol. 24a pp. 11-13; 15-17).

Petitioner's counsel filed a written motion for continuance on August 18, 1997. (RR. Vol. 24a p. 5; Vol. 39 p. 204 [DX#10]). Petitioner complained that he did not have time to prepare for the alleged extraneous Tsang robbery offense. (RR. Vol. 24a pp. 5-7; Vol. 39 p.

204[DX#10]). Petitioner's counsel informed the court that he had been aware in general terms of a "Home Invasion" involving Petitioner, since he first became attorney of record. (RR. Vol. 24a p. 7). He had not, however, been given any details. (RR. Vol. 24a p. 7). Petitioner was first given an opportunity to read the offense report prepared on the alleged extraneous Tsang robbery offense on August 13, 1997—offense reports that had been created by the Houston Police Department immediately after the crime on November 17, 1995, over a year and a half earlier. (RR. Vol. 24a pp. 17-18). This was only five days before the start of trial on the issue of guilt or innocence on August 18, 1997. (CR. Vol. 1 p. RR. Vol. 25 p. 1).

Trial commenced on August 18, 1997, immediately after the trial court heard Petitioner's complaints about the State's failure to given him adequate notice regarding their intent to use the alleged extraneous Tsang offense. (RR. Vol. 25 p. 3). On August 28, 1997, the jury returned a guilty verdict. (CR. Vol. 1 p. 137; RR. Vol. 33 p. 107). The next working day was August 29, 1997. (RR. Vol. 34 p. 1). Petitioner's counsel renewed his objection to the alleged extraneous Tsang robbery offense, citing lack of timely notice. (RR. Vol. 34 p. 29). The trial court overruled Petitioner's objection. (RR. Vol. 34 pp. 15, 37). The trial court specifically ruled that counsel had adequate prior notice. (RR. Vol. 34 p. 38). The court believed

that Petitioner had received timely notice, since the court could have appointed another investigator upon defense request. (RR. Vol. 34 p. 37).

The admission into evidence of the alleged extraneous Tsang robbery offense took Petitioner by unfair surprise. During the capital phase of jury voir dire, Petitioner had the right to rely on the State's January 17, 1997 assurance that they would give him notice if they intended to use any extraneous offenses other than the shooting of the security guard, and that the State would comply with its obligations under Brady v. Maryland and caselaw applying Brady. In Banks v. Dretke, the Supreme Court held:

> This case is congruent with Strickler [v. Greene, 527 U.S. 263, 281-282 (1999)] in all three respects. First, the State knew of, but kept back, Farr's arrangement with Deputy Sheriff Huff. cf. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Second, the State asserted on the eve of trial that it would disclose all Brady material. As Strickler instructs, Banks cannot be faulted for relying on that representation. See 527 U.S. at 283-284 (an "open file policy" is one factor that "explain[s] why trial counsel did not advance [a Brady] claim").
>
> Third, in his January, 1992, state habeas application, Banks asserted that Farr was a police informant and Banks' arrest, "a set-up." In its answer, the State denied Banks' assertion. The State thereby "confirmed" Banks' reliance on the prosecution's representation that it had fully disclosed all relevant information its file contained. 527 U.S. at 289; see id. at 284 (state habeas counsel, as well as trial counsel, could reasonably rely on the State's representations). In short, because the State persisted in hiding Farr's informant status and misleadingly represented that it had complied in full with

its <u>Brady</u> disclosure obligations, Banks had cause for failing to investigate, in state postconviction proceedings, Farr's connections to Deputy Sheriff Huff.

On the question of "cause," moreover, Banks' case is stronger than was the petitioner's in <u>Strickler</u> in a notable respect. As a prosecution witness in the guilt and penalty phases of Banks' trial, Farr repeatedly misrepresented his dealings with police; each time Farr responded untruthfully, the prosecution allowed his testimony to stand uncorrected. (internal citations omitted). <u>Banks v. Dretke</u>, 540 U.S. at 693-94.

No such prior notice of extraneous offenses was ever made by the State until days before the guilt-innocence trial, when effective investigation and use of the information could no longer be made by the defendant. This was compounded by the State's wholesale failure to produce the <u>Brady</u>/<u>Giglio</u>/<u>Kyles v. Whitely</u>/<u>Banks v. Dretke</u> evidence shown in Claim Four, incorporated herein by reference, it was both obligated and had promised to produce. Had adequate notice of the punishment phase extraneous offense testimony and <u>Brady</u>/<u>Giglio</u>/<u>Kyles v. Whitely</u>/<u>Banks v. Dretke</u> evidence been made, trial counsel would have discovered the information that has been presented in Claim Four, and effectively used it before the punishment phase jury.

Petitioner was entitled to individually voir dire on any issue relating to capital punishment. Tex. Code Crim. Proc. Ann. art. 35.17 sec. 2 (Vernon Supp. 1998). A venireman's understanding of the use of extraneous offenses during the punishment phase of trial, and the

State's ultimate burden of proof, is a proper subject of individual voir dire. Sigler v. State, 865 S.W.2d 957, 961 (Tex. Crim. App. 1993); Wilson v. State, 863 S.W.2d 59 (Tex. Crim. App. 1993). Since counsel reasonably believed that no such extraneous offense would be introduced into evidence during the punishment phase of trial, counsel chose not to conduct voir dire on these issues.

The State maintained that Petitioner learned that the State intended to use the alleged extraneous Tsang robbery offense on August 13, 1997. This notice was after the conclusion of individual voir dire on August 11, 1997. (CR. Vol. 1 p. 183-184). Petitioner never had the opportunity to voir dire the jury panel on this issue. The use of the alleged extraneous Tsang robbery during the punishment phase of trial resulted in unfair surprise to Petitioner, where Petitioner was never given the opportunity to individual voir dire on: (1) the burden of proof on the part of the State to link a defendant to an extraneous offense; (2) how the juror might use an extraneous offense in answering the special punishment issues presented, and (3) the State's burden of proof on the special issues, as they relate to extraneous criminal offenses.

The State suggested that Petitioner had not been surprised, since counsel was aware as far back as the January 13, 1997 hearing that the State was developing evidence against Petitioner for an extraneous

robbery offense. (RR. Vol. 24a p. 20). This argument ignores the State's unequivocal promise, also made at the January 13th hearing, that it would not use an extraneous offense at the punishment phase of trial, except for the shooting of the security guard, without giving Petitioner 15 days' notice. (RR. Vol. 3 p. 6). Counsel for the State also promised that day to comply with its Brady/Giglio/Kyles v. Whitely/Banks v. Dretke obligations, which it failed to do, despite being ordered to do so by the trial court. Supra. Petitioner was entitled to reply upon the prosecutor's word. "If it was reasonable for Banks to rely on the prosecution's full disclosure representation, it was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction. See Berger v. United States, 295 U.S. 78, 88 (1935); Strickler, 527 U.S. at 284." Banks v. Dretke, 540 U.S. at 694.

Texas courts have made the distinction between defense counsel being generally aware of the existence of an extraneous offense admissible against a defendant, and the State transmitting formal notice of its intent to offer evidence on the subject during the defendant's trial. Espinosa v. State, 853 S.W.2d 36 (Tex. Crim. App. 1993). Petitioner's counsel was made aware of the existence of an extraneous robbery offense ("Home Invasion") when he first entered as attorney of record.

Counsel was not given notice of the State's intent to use the alleged extraneous Tsang robbery offense until after the completion of individual juror voir dire, and was never given any of the <u>Brady</u>/<u>Giglio</u>/<u>Kyles v. Whitely</u>/<u>Banks v. Dretke</u> disclosure set forth in Claim Four.

Defense counsel never requested that the individual voir dire be reopened so that he could question the panel on extraneous offense punishment evidence. However, there was no need for counsel to make such a request in order to preserve the error presented under this Claim for Relief. Such a reopening would have consumed an undeterminable number of days. The trial court had already ruled that he would not postpone the beginning of trial due to the failure of the State to give Petitioner timely notice of the alleged extraneous Tsang robbery offense. (RR. Vol. 24a p. 12). Any request by Petitioner to reopen the voir dire would have been futile based on the trial court's prior ruling.

Furthermore, the announcement the State made on August 18, 1997, the date of trial, implied that the State might not introduce evidence of the alleged extraneous Tsang robbery offense after all. Any request by Petitioner to reopen the voir dire on the guess that the State intended to introduce into evidence an extraneous offense during the punishment phase of trial, would likewise be pointless.

By giving Petitioner notice only after the completion of individual juror voir dire, Petitioner was deprived of a fair and impartial trial. Petitioner's counsel objected to the alleged extraneous Tsang robbery offense, specifically on the grounds that he had not been able to voir dire the jury on the issue. (RR. Vol. 24a pp. 11-13). Petitioner objected to the use of the alleged extraneous Tsang robbery offense both at the time the State first announced its intention to use the evidence, and later at the time the testimony was admitted into evidence. (RR. Vol. 24a p. 4; Vol. 34 p. 29). The trial court reserved its ruling after Petitioner's first objection, and overruled Petitioner's second objection at the time the testimony on the alleged extraneous offense was offered into evidence. (RR. Vol. 24a pp. 11-13; Vol. 34 pp. 15, 37). Petitioner properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Thus, the trial court committed reversible error admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where Petitioner was taken unfairly by surprise, in violation of his federal constitutional rights to a fair and impartial trial and due process of law. This Court should reverse Petitioner's sentence, and order a new trial as to punishment. Tex. Code Crim. Proc. Ann. art.

44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S SIXTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE PETITIONER WAS NEVER GIVEN TIMELY NOTICE PRIOR TO TRIAL, AS REQUIRED BY TEXAS LAW.**

A defendant is entitled to timely notice of extraneous offenses that the State intends to use at the punishment phase of trial. Tex. Code Crim. Proc. Ann. art. 37.07(g) (Vernon Supp. 1998). The trial court committed reversible error in admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where Petitioner was never given timely notice prior to trial, as required by Texas Law.

Art. 37.07(g), supra, specifies that where a defendant so requests, the State must give timely notice of its intent to use extraneous offenses during the punishment phase of trial. As set out more fully in Petitioner's Fifth Claim for Relief, above, Petitioner was given only five days' notice that the State intended to offer evidence of the alleged extraneous Tsang robbery offense during the punishment phase of trial.

Petitioner is aware that Texas courts have ruled that Tex. Code Crim. Proc. Ann. art. 37.071 sec. 2 (Vernon Supp. 1998) controls for purposes of determining what is admissible evidence during the punishment phase of a capital murder prosecution. Adanandus v. State, 866 S.W.2d 210 (Tex. Crim. App. 1993). Under this statute, no advanced notice appears to be required. Alvarado v. State. 912 S.W.2d 199 (Tex. Crim. App. 1995); Adanandus v. State, supra; Vuong v. State. 830 S.W.2d 929 (Tex. Crim. App. 1992). Petitioner would urge that Texas courts have misconstrued arts. 37.07(g) and 37.071 sec. 2, and in doing so have violated Petitioner's right to due process of law and the right to a fair trial.

Art. 37.071 sec. 2 specifically addresses the admissibility of evidence at the punishment phase of a capital trial, but is silent as to any notice requirement to the defense regarding extraneous offenses. Art. 37.07(g) does not expressly apply to capital punishment trials, but does require the State to give timely notice of its intent to use extraneous offenses during the punishment phase of trial, upon demand by the defense. It is a well settled principle of statutory construction that specific statutes control over more general provisions. Tex. Gov't Code Ann. sec. 311.026 (Vernon 1998); Garza v. State, 687 S.W.2d 325 (Tex. Crim. App. 1985). The specific notice statute of art. 37.07(g) should

control over the more general provision of art. 37.071 sec. 2, for purposes of the statutory requirement of notice.

In addition, a requirement of express notice to the defense of extraneous offenses to be used at the punishment phase of a capital trial is required by due process of law and the right to a fair trial. The United States Supreme Court has held that evidence admitted during the punishment phase of a capital trial must be extremely reliable under the requirements of the Eighth and Fourteenth Amendments. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The requirement of adequate notice contained in Tex. R. Crim. Evid. 404(b) (Vernon Pamph. 1998) and Tex. Code Crim. Proc. Ann. art. 37.07(g) (Vernon Supp. 1998) are clearly designed to enhance reliability by minimizing surprise and unfair advantage.

In Petitioner's case, the State informed Petitioner on the record on January 13, 1997 that it <u>would</u> <u>not</u> be introducing into evidence any extraneous offenses not directly related to the alleged capital murder offense. Counsel relied upon this representation, and the trial court's ruling that the State would be required to give 15 days' notice before the alleged extraneous offense would be admissible. Counsel was then informed some five days before the commencement of trial on the issue of guilt or innocence that the State might or might not introduce evidence

on this offense. Petitioner has clearly received inadequate and untimely notice.

Petitioner objected to the use of the alleged extraneous Tsang robbery offense both at the time the State first announced its intention to use the evidence, and later at the time the testimony was admitted into evidence. (RR. Vol. 24a p. 4; Vol. 34 p. 29). The trial court reserved its ruling after Petitioner's first objection, and overruled Petitioner's second objection at the time the testimony on the alleged extraneous offense was offered into evidence. (RR. Vol. 24a pp. 11-13; Vol. 34 pp. 15, 37). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Thus, the trial court committed reversible error in admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where Petitioner was never given timely notice prior to trial, as required by Texas Law. This Court should reverse Petitioner's sentence, and order a new trial as to punishment. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S SEVENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT PETITIONER A PRETRIAL CONTINUANCE, WHERE COUNSEL REQUIRED THE TIME IN ORDER TO PREPARE TO DEFEND AGAINST THE STATE'S ADMISSION INTO EVIDENCE THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE DURING THE PUNISHMENT PHASE OF TRIAL.**

A defendant is entitled to a pretrial continuance upon sufficient cause shown. Tex. Code Crim. Proc. Ann. art. 29.03 (Vernon 1989). The trial court committed reversible error in failing to grant Petitioner a pretrial continuance, where counsel required the time in order to prepare to defend against the State's admission into evidence the alleged extraneous Tsang robbery offense during the punishment phase of trial.

As developed more fully in Petitioner's Fourth Claim for Relief, above, Petitioner was given only five days' notice before the trial on the merits that the State intended to use evidence of the alleged extraneous Tsang robbery offense during the punishment phase of trial. This was a wholly inadequate period of time, and could not have provided counsel with adequate time to prepare a defense against the extraneous offense.

The trial court had previously determined that a minimum of 15 days' notice would be fair to Petitioner. (RR. Vol. 3 pp. 7-8). Nothing had changed between the time the trial court made this determination, and when the State first sandbagged Petitioner by announcing that it would offer evidence on the alleged extraneous Tsang robbery offense. Petitioner

asks nothing more from this Court than it enforce what the trial judge had determined to be a reasonable length of time.

Petitioner orally requested a continuance on August 18, 1997. (RR. Vol. 24a pp. 10-12). The trial court overruled Petitioner's motion, stating that he did not want to postpone the trial. (RR. Vol. 24a p. 12). Later, Petitioner filed a written motion for continuance. (RR. Vol. 39 p. 204 [DX#10]). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Thus, the trial court committed reversible error in failing to grant Petitioner a pretrial continuance, where counsel required the time in order to adequately prepare to defend against the State's admission into evidence the alleged extraneous Tsang robbery offense during the punishment phase of trial. This Court should reverse Petitioner's sentence, and order a new trial as to punishment, because Petitioner's right to due process of law and a fair trial under the Fifth and Fourteenth Amendments were violated. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S EIGHTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE OF THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE THE ONLY EVIDENCE LINKING PETITIONER TO THE EXTRANEOUS OFFENSE WAS THE TESTIMONY OF DAVID BALDERAS, WHERE BALDERAS WAS AN ACCOMPLICE AS A MATTER OF LAW TO THE EXTRANEOUS OFFENSE, WHERE NO OTHER EVIDENCE CORROBORATED PETITIONER'S INVOLVEMENT IN THE EXTRANEOUS OFFENSE, AND WHERE CORROBORATION LINKING PETITIONER TO THE EXTRANEOUS OFFENSE IS REQUIRED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Eighth Amendment requires a measure of heightened reliability in the evidence offered during the punishment phase of a capital trial. U.S. Const., amends. 8 & 14; <u>Woodson v. North Carolina</u>. 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial court committed reversible error in admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where the only evidence linking Petitioner to the extraneous offense was the testimony of David Balderas, where Balderas was an accomplice as a matter of law to the extraneous offense, where no other evidence corroborated Petitioner's involvement in the alleged extraneous offense, and where corroboration linking Petitioner to the extraneous offense is required under the Eighth and Fourteenth Amendments to the United States Constitution.

As developed more fully in Petitioner's Fourth Claim for Relief, above, David Balderas testified during the punishment phase of trial

concerning Petitioner's alleged involvement in the alleged extraneous Tsang robbery offense. As shown above, there was no other testimony or physical evidence linking Petitioner to this extraneous offense. Likewise, the alleged extraneous offense constituted the only evidence offered by the State at the punishment phase of trial on the issue of Petitioner's future dangerousness, other than the nature and circumstances of the alleged capital murder offense itself. Tex. Code Crim. Proc. Ann. art. 37.071 sec. 2(b)(1) (Vernon Supp. 1998). The jury answered the special issue regarding Petitioner's future dangerousness in the affirmative. (CR. Vol. 1 p. 152).

David Balderas was an accomplice to the alleged extraneous Tsang robbery offense as a matter of law. In addition, there was no evidence corroborating his testimony. See Petitioner's Eighth Claim for Relief, below.

The Supreme Court has emphasized that the procedures employed in capital cases must satisfy a heightened standard of reliability to pass muster under the Eighth Amendment. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Corroboration of a witness to an extraneous offense admitted during the punishment phase of a capital murder trial would seem in order, where that witness was a willing participant in the alleged extraneous offense.

The federal courts have held that corroboration of accomplice witness testimony regarding extraneous offenses offered during the punishment phase of a capital murder trial does not require corroboration as a matter of federal due process of law. Thompson v. Lynaugh, 821 F.2d 1054 (5th Cir. 1987). However, Thompson did not consider the imperative for heightened reliability of evidence offered at the punishment phase of a capital murder trial. Woodson v. North Carolina, supra.

Petitioner's counsel objected to Balderas' testimony on the basis that it was uncorroborated accomplice witness testimony. (RR. Vol. 34 pp. 61-62). The trial court considered the objection and overruled it. (RR. Vol. 34 pp. 61-62). Thereafter Balderas testified concerning Petitioner's alleged involvement in the alleged extraneous Tsang robbery offense. (RR. Vol. 34 pp. 62-82). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Petitioner complains of constitutional error subject to harmless error review. This Court must reverse Petitioner's conviction unless the error can be characterized as harmless beyond a reasonable doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Turner v. State. 754

S.W.2d 668 (Tex. Crim. App. 1988). As developed more fully in Petitioner's Fourth Claim for Relief, above, the alleged extraneous Tsang robbery offense constituted the only evidence offered by the State during the punishment phase of trial, other than the nature and circumstances of the alleged capital murder offense itself, regarding the issue of Petitioner's future dangerousness. Likewise, Balderas was the only witness to Petitioner's involvement in this offense. This Court cannot say beyond a reasonable doubt that the jury would have answered the special issue of Petitioner's future dangerousness in the affirmative, had the trial court properly excluded David Balderas' testimony regarding this extraneous offense.

Thus, the trial court committed reversible error in admitting evidence of the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where the only evidence linking Petitioner to the extraneous offense was the testimony of David Balderas, where Balderas was an accomplice as a matter of law to the extraneous offense, where no other evidence corroborated Petitioner's involvement in the extraneous offense, and where corroboration linking Petitioner to the extraneous offense is required under the Eighth and Fourteenth Amendments to the United States Constitution. This Court should reverse Petitioner's sentence, and order a new trial as to punishment.

## PETITIONER'S NINTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING EVIDENCE ON THE ALLEGED EXTRANEOUS TSANG ROBBERY OFFENSE, DURING THE PUNISHMENT PHASE OF TRIAL, WHERE THE ONLY EVIDENCE LINKING PETITIONER TO THE EXTRANEOUS OFFENSE WAS THE TESTIMONY OF DAVID BALDERAS, WHERE BALDERAS WAS AN ACCOMPLICE WITNESS TO THE EXTRANEOUS OFFENSE, WHERE NO OTHER EVIDENCE CORROBORATED PETITIONER'S INVOLVEMENT IN THE EXTRANEOUS OFFENSE, AND WHERE CORROBORATION LINKING PETITIONER TO THE EXTRANEOUS OFFENSE IS REQUIRED UNDER TEXAS LAW.**

The testimony of an accomplice to an extraneous offense involving the defendant is not admissible unless the testimony is corroborated. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); Rice v. State, 605 S.W.2d 895 (Tex. Crim. App. 1980). The trial court committed reversible error in admitting evidence on the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where the only evidence linking Petitioner to the extraneous offense was the testimony of David Balderas, where Balderas was an accomplice witness to the extraneous offense, where no other evidence corroborated Petitioner's involvement in the extraneous offense, and where corroboration linking Petitioner to the alleged extraneous offense is required under Texas Law.

It is well established that under Texas law a conviction cannot rest on the testimony of an accomplice witness, unless the testimony is corroborated. Art. 38.14, supra; Edwards v. State, 427 S.W.2d 629 (Tex.

144

Crim. App. 1968). As a general rule, the credibility of witnesses is a matter strictly for the jury's consideration. <u>Bonham v. State</u>, 680 S.W.2d 815 (Tex. Crim. App. 1984); <u>Robinson v. State</u>, 135 Tex. Crim. 82, 117 S.W.2d 99 (1938). However, the Legislature has determined that accomplice witness testimony is by its very nature inherently suspicious. <u>Cast v. State</u>, 164 Tex. Crim. 3, 296 S.W. 2d 269 (1954).

In <u>Wells v. State</u>, 42 S.W. 606 (Tex. Crim. App. 1931), the Texas Court of Criminal Appeals first held that the accomplice witness rule, requiring corroboration of an accomplice witness' testimony, applies where the witness at trial is an accomplice to the alleged extraneous offense being offered against the defendant at trial. This Court found no difference in the legislative policy underlying art. 38.14 between the necessary corroboration of an accomplice witness testifying against an accused at the trial on the merits, and the necessity to corroborate a State's witness testifying to an extraneous offense against a defendant, to which the witness is an accomplice. The rationale in <u>Wells</u> was reaffirmed by this Court in <u>Rice v. State</u>. 605 S.W.2d 895 (Tex. Crim. App. 1980). <u>See</u> <u>also</u> <u>Bustamante v. State</u>, 653 S.W. 2d 846 (Tex. App.-Corpus Christi 1982).

In <u>Rice v. State</u>, the Court of Criminal Appeals opined:

The general rule that accomplice witness testimony must be corroborated is codified in Section 38.14 V.A.C.C.P. That

statute reflects the Legislature's determination, in accordance with common sense, that the testimony of an accomplice witness is generally less reliable than the testimony of a witness who is not connected with the crime or subject to being charged with an offense himself. <u>The reasoning behind the rule applies no less when the accomplice witness testifies in regard to an extraneous offense as when he testifies to the main offense charged. His testimony in both cases is offered to convict the accused.</u>

605 S.W.2d at 897-898. (Emphasis added).

Petitioner is aware that Texas courts have held that the accomplice witness rule is not applicable to witnesses at the punishment phase of a capital murder trial. <u>Farris v. State</u>, 819 S.W.2d 490 (Tex. Crim. App. 1990); <u>Thompson v. State</u>, 691 S.W.2d 627 (Tex. Crim. App. 1985). However, <u>Farris</u> and <u>Thompson</u> did not consider the Supreme Court's requirement that evidence presented during the punishment phase of a capital trial possess "heightened reliability." <u>Woodson v. North Carolina</u>, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

An extraneous offense must be established beyond a reasonable doubt before it is admissible at the punishment phase of a capital murder trial. <u>Rachel v. State</u>, 917 S.W.2d 799, 807 n 4 (Tex. Crim. App. 1996). As observed in <u>Rice v. State</u>, supra, the purpose of requiring corroboration of accomplice witness testimony regarding extraneous offenses is to insure that this high standard of proof is met. <u>Rice v. State</u>, 605 S.W.2d at 897-898.

David Balderas was an accomplice as a matter of law. An accomplice is a person who is or can be charged with the same offense for which the accused is on trial. Russell v. State, 598 S.W.2d 238 (Tex. Crim. App. 1980); Villarreal v. State, 576 S.W.2d 51 (Tex. Crim. App. 1976). Balderas testified that he aided, assisted, or encouraged two other persons to commit the alleged extraneous Tsang robbery offense. Balderas could have been prosecuted for this extraneous offense. Tex. Penal Code Ann. sec. 7.02(a)(2) (Vernon 1994); Gonzales v. State, 350 S.W.2d 553 (Tex. Crim. App. 1961).

The prosecutors testified at Petitioner's motion for new trial hearing that there was never any plan to prosecute Balderas for the Tsang robbery. (RR. Vol. 36 p. 123). Their reasoning does not appear from the record. Apparently, there was some concern about proving Balderas' guilt, since he remained outside the Tsang residence during the alleged robbery, and was apparently never seen by Danny Tsang or any member of his family. Balderas, however, apparently confessed to his involvement in the Tsang robbery when he was questioned in July 1996 by Houston Police Department homicide investigators,

Nevertheless, the decision not to prosecute Balderas for the Tsang robbery was a matter of prosecutorial discretion, and not a question of whether the available evidence was sufficient to legally establish his

guilt. An extrajudicial confession to a criminal offense is sufficient to support a conviction, where the corpus delecti is proven by other evidence. Dansby v. State, 931 S.W.2d 297 (Tex. Crim. App. 1996); Elliott v. State, 444 S.W.2d 914 (Tex. Crim. App. 1969); Blackstone v. State, 225 S.W.2d 184 (Tex. Crim. App. 1950). This independent proof requires only evidence that the offense in fact occurred. It is not necessary for this independent proof to link the individual to the offense. Wood v. State, 152 S.W.2d 335 (Tex. Crim. App. 1941); Damian v. State, 881 S.W.2d 102 (Tex. App.–Houston [lst] 1994, pet. ref'd). Balderas' statements to the police, coupled with Danny Tsang's testimony, would have been more than sufficient to secure a conviction against Balderas for the alleged extraneous Tsang robbery.

Balderas testified that Petitioner provided him with information regarding a diamond courier returning to his home from the airport. Balderas was unable to explain how the Tsang family were robbed by mistake. The State offered evidence that the probable target lived a few houses down from the Tsang residence.

The record fails to corroborate Balderas' testimony that Petitioner masterminded the Tsang robbery. The test for corroboration of an accomplice witness was given in Reed v. State, 744 S.W.2d 112 (Tex. Crim. App. 1988). There the Texas Court of Criminal Appeals wrote:

> The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. (emphasis added). 744 S.W.2d at 125.

In measuring the sufficiency of the evidence to corroborate an accomplice witness' testimony, each case must turn on its own facts. <u>Mitchell v. State</u>, 650 S.W.2d 801 (Tex. Crim. App. 1983). In Petitioner's case, there was no evidence or testimony presented, other than Balderas' testimony, that Petitioner masterminded an attempted robbery of a diamond courier. It was simply Balderas' word that Petitioner had anything to do with the alleged extraneous Tsang robbery.

Petitioner's counsel objected to Balderas' testimony on the basis that it was uncorroborated accomplice witness testimony. (RR. Vol. 34 pp. 61-62). The trial court considered the objection and overruled it. (RR. Vol. 34 pp. 61-62). Thereafter Balderas testified concerning Petitioner's involvement in the alleged extraneous Tsang robbery offense. (RR. Vol. 34 pp. 62-82). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Petitioner complains of nonconstitutional error under this Claim for Relief. Petitioner's conviction must be reversed where it can be shown

that Petitioner's substantial rights have been affected. Tex. R. App. P. Ann. 44.2(b) (Vernon Pamph. 1998). The right to have the accomplice witness rule applied to the admissibility of evidence at the punishment phase of a capital murder trial is a substantial right. For all the reasons urged in Petitioner's Seventh Claim for Relief, above, Petitioner has been harmed.

Thus, the trial court committed reversible error in admitting evidence on the alleged extraneous Tsang robbery offense, during the punishment phase of trial, where the only evidence linking Petitioner to the extraneous offense was the testimony of David Balderas, where Balderas was an accomplice witness to the extraneous offense, where no other evidence corroborated Petitioner's involvement in the extraneous offense, and where corroboration linking Petitioner to the extraneous offense is required under Texas Law. This Court should reverse Petitioner's sentence, and order a new trial as to punishment. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S TENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S OUT-OF-COURT PHOTO SPREAD IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE.**

An out-of-court identification of a defendant by a witness violates federal due process of law, where it is the fruit of an impermissible suggestive identification procedure. U.S. Const. amends. 5 & 14; Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 223, 53 L.Ed.2d 140 (1977); Jackson v. State, 657 S.W.2d 123 (Tex. Crim. App. 1983); Chaisson v. State, 761 S.W.2d 77 (Tex. App.-Beaumont 1988). The trial court committed reversible error in admitting into evidence David Copeland's out-of-court photo spread identification of Petitioner, where said identification procedure was impermissibly suggestive.

Petitioner filed pretrial a written motion to suppress the identification of Petitioner by any witness. (CR. Vol. 1 p. 83). A pretrial hearing was conducted on this motion on July 22 and 24, 1997. Officer Todd William Miller testified for the State at the suppression hearing. (RR. Vol. 6 p. 3). Miller was a Houston Police officer assigned to investigate the alleged offense. (RR. Vol. 6 p. 6). He told the court he was unaware of any photo spread shown to the complainant prior to the February 23, 1996 lineup. (RR. Vol. 6 pp. 13, 42).

David Copeland, the building security guard, testified at the suppression hearing. (RR. Vol. 6 p. 61). He told the court that prior to the lineup, he was shown a photo spread by police detectives. (RR. Vol. 6 pp. 72, 75). See State's Exhibits Nos. 33 & 34. (RR. Vol. 25 p. 150). He told the court he saw someone "who looked familiar." (RR. Vol. 6 p. 73). He was not sure of the position of this person in the photo spread. (RR. Vol. 6 pp. 73-74).

At the conclusion of the hearing, Petitioner's counsel argued that the identification procedure was impermissibly suggestive, since it was apparent that the complainant knew the officers had a suspect in custody at the time of the identification procedure. (RR. Vol. 7 p. 3). The trial court overruled Petitioner's motion to suppress. (CR. Vol. 1 p. 85; R. Vol. 7 p. 4).

As noted above, Petitioner filed a written pretrial motion to suppress the out-of-court and in-court identification of Petitioner by David Copeland. (CR. Vol. 1 p. 83). After a full and complete hearing, the trial court overruled Petitioner's motion. (CR. Vol. 1 p. 85; RR. Vol. 7 p. 7). During trial before the jury, Copeland testified regarding his identification of Petitioner during the photo spread session. (RR. Vol. 25 p. 150). Petitioner has properly preserved this error for appeal. Tex. Code Crim. Proc. Ann. art. 28.01 (Vernon Supp. 1998); Tex. R. Crim. Evid.

Ann. 103(a)(1) and 103(a)(2) (Vernon Pamph. 1998); Tex. R. App. P. 33.1(a) (Vernon Pamph. 1998); Moraguez v. State, 701 S.W.2d 902 (Tex. Crim. App. 1986); Riojas v. State, 530 S.W.2d 298 (Tex. Crim. App. 1975); Bosley v. State, 414 S.W.2d 468 (Tex. Crim. App. 1967).

Petitioner complains of constitutional error subject to harmless error review. This Court must reverse Petitioner's conviction unless the error can be characterized as harmless beyond a reasonable doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Turner v. State, 754 S.W.2d 668 (Tex. Crim. App. 1988).

Petitioner can demonstrate harm. Copeland was the only non-accomplice witness who could place Petitioner at the Greenrich Building during the time of the alleged offense. Copeland's identification of the Petitioner was used to corroborate the testimony of Estrella Martinez, the building custodian, and Antonio Ramirez. The trial court instructed the jury that Martinez was an accomplice witness as matter of law, whose testimony needed to be corroborated. (CR. Vol. 1 p. 113). As urged in Petitioner's Fifteenth and Sixteenth Claims for Relief, below, the trial court erred in failing to instruct the jury to require corroboration of Antonio Ramirez's testimony. Copeland's out-of-court identification of

Petitioner as the person he saw tampering with the building video monitoring system was critical for the State to establish Petitioner's guilt. Furthermore, Copeland's out-of-court identification of Petitioner served to bolster his in-court identification of Petitioner. See Petitioner's Twelfth Claim for Relief, below. At trial, Petitioner was required to don a theatrical wig and mustache for Copeland's in-court identification. (RR. Vol. 25 pp. 142-143). Wearing a disguise that would have concealed any person's identity, Copeland's out-of-court identification tended to increase an otherwise unbelievable in-court identification of Petitioner.

Thus, the trial court committed reversible error in admitting into evidence David Copeland's out-of-court photo spread identification of Petitioner, where said identification procedure was impermissibly suggestive. This Court should reverse the trial court's judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S ELEVENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S OUT-OF-COURT LINE UP IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE.**

An out-of-court identification of a defendant by a witness violates federal due process of law, where it is the fruit of an impermissible suggestive identification procedure. U.S. Const. amends. 5 & 14; <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S.Ct. 223, 53 L.Ed.2d 140 (1977); <u>Jackson v. State</u>, 657 S.W.2d 123 (Tex. Crim. App. 1983); <u>Chaisson v. State</u>, 761 S.W.2d 77 (Tex. App.-Beaumont 1988). The trial court committed reversible error in admitting into evidence David Copeland's out-of-court line up identification of Petitioner, where said identification procedure was impermissibly suggestive.

Petitioner filed pretrial a written motion to suppress the identification of Petitioner. (CR. Vol. 1 p. 83). A pretrial hearing was conducted on this motion on July 22 and 24, 1997.

Officer Todd William Miller testified for the State at the suppression hearing. (RR. Vol. 6 p. 3) . Miller told the Court a lineup identification was conducted on February 23, 1996. (CR. Vol. 6 p. 13). Petitioner and his brother Albert were both placed in the lineup, along with four other "fillers." (RR. Vol. 6 p. 13). David Copeland was present at the lineup.

(RR. Vol. 6 p. 15). He selected Petitioner's position in the lineup. Copeland remarked that of all the persons in the lineup, Petitioner "looks closest to the person who shot me." (RR. Vol. 6 p. 22). Miller classified Copeland's identification as "tentative." (RR. Vol. 6 p. 47).

David Copeland, the building security guard, testified at the suppression hearing. (RR. Vol. 6 p. 61). He confirmed his presence at the February 23, 1996 lineup. (RR. Vol. 6 p. 75). He told the court that out of all the persons present at the lineup, Petitioner "was the closet one there" in appearance to the man who shot him. (RR. Vol. 6 p. 77). Copeland added that "it would have helped" if Petitioner had been wearing glasses and a mustache during the lineup. (RR. Vol. 6 p. 77). Later at trial Copeland admitted that he knew at the time of the lineup that the police had arrested someone, and inferred that the suspect would be in the lineup. (RR. Vol. 25 pp. 164-165).

At the conclusion of the hearing, Petitioner's counsel argued that the identification procedure was impermissibly suggestive, since it was apparent that the complainant knew the officers had a suspect in custody at the time of the identification procedure. (RR. Vol. 7 p. 3). The trial court overruled Petitioner's motion to suppress. (CR. Vol. 1 p. 85; RR. Vol. 7 p. 4).

As noted above, Petitioner filed a written pretrial motion to suppress the out-of-court and in-court identification of Petitioner by David Copeland. (CR. Vol. 1 p. 83). After a full and complete hearing, the trial court overruled Petitioner's motion. (CR. Vol. 1 p. 85; RR. Vol. 7 p. 7). During trial before the jury, Copeland testified to his identification of Petitioner during the lineup. (RR. Vol. 25 p. 155). Petitioner has properly preserved this error for appeal. Tex. Code Crim. Proc. Ann. art. 28.01 (Vernon Supp. 1998); Tex. R. Crim. Evid. Ann. 103(a)(1) and 103(a)(2) (Vernon Pamph. 1998); Tex. R. App. P. 33.1(a) (Vernon Pamph. 1998); Moraguez v. State, 701 S.W.2d 902 (Tex. Crim. App. 1986); Riojas v. State, 530 S.W.2d 298 (Tex. Crim. App. 1975); Bosley v. State, 414 S.W.2d 468 (Tex. Crim. App. 1967).

Petitioner complains of constitutional error subject to harmless error review. This Court must reverse Petitioner's conviction unless the error can be characterized as harmless beyond a reasonable doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Turner v. State, 754 S.W.2d 668 (Tex. Crim. App. 1988). For all the reasons urged in Petitioner's Tenth Claim for Relief, above, Petitioner has been harmed by the admission into evidence of Copeland's out-of-court identification of Petitioner.

Thus, the trial court committed reversible error in admitting into evidence David Copeland's out-of-court line up identification of Petitioner, where said identification procedure was impermissibly suggestive. This Court should reverse the trial court's judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S TWELFTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE DAVID COPELAND'S IN-COURT IDENTIFICATION OF PETITIONER, WHERE SAID IDENTIFICATION WAS THE PRODUCT OF IMPERMISSIBLY SUGGESTIVE OUT-OF-COURT IDENTIFICATION PROCEDURES.**

An in-court identification of a defendant by a witness violates federal due process of law, where it is the fruit of an impermissible suggestive out-of-court identification procedure. U.S. Const., amends. 5 & 14; Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 223, 53 L.Ed.2d 140 (1977); Jackson v. State, 657 S.W.2d 123 (Tex. Crim. App. 1983); Chaisson v. State, 761 S.W.2d 77 (Tex. App.-Beaumont 1988). The trial court committed reversible error in admitting into evidence David Copeland's in-court identification of Petitioner, where said identification was the product of impermissibly suggestive out-of-court identification procedures.

Petitioner filed pretrial a written motion to suppress the identification of Petitioner by any witness. (CR. Vol. 1 p. 83). A pretrial hearing was conducted on this motion On July 22 and 24, 1996.

At the hearing David Copeland, the building security guard, identified Petitioner in open court as the person who shot him in the Greenrich Building on January 24, 1996. (RR. Vol. 6 pp. 78-79).

At the conclusion of the hearing, Petitioner's counsel argued that the identification procedure was impermissibly suggestive, since it was apparent that the complainant knew the officers had a suspect in custody at the time of the identification procedure. (RR. Vol. 7 p. 3). The trial court overruled Petitioner's motion to suppress. (CR. Vol. 1 p. 85; RR. Vol. 7 p. 4).

As noted above, Petitioner filed a written pretrial motion to suppress the out-of-court and in-court identification of Petitioner by David Copeland. (CR. Vol. 1 p. 83). After a full and complete hearing, the trial court overruled Petitioner's motion. (CR. Vol. 1 p. 85; RR. Vol. 7 p. 7). During trial before the jury, Copeland identified Petitioner in open court as the person who shot him on January 24, 1996 in the Greenrich Building. (RR. Vol. 25 p. 163). Petitioner has properly preserved this error for appeal. 'Tex. Code Crim. Proc. Ann. art. 28.01 (Vernon Supp. 1998); Tex. R. Crim. Evid. Ann. 103(a)(1) and 103(a)(2) (Vernon Pamph. 1998); Tex. R. App. P. 33.1(a) (Vernon Pamph. 1998); Moraguez v. State, 701 S.W.2d 902 (Tex. Crim. App. 1986); Riojas v. State, 530 S.W.2d 298 (Tex. Crim. App. 1975); Bosley v. State, 414 S.W.2d 468 (Tex. Crim. App. 1967).

Petitioner complains of constitutional error subject to harmless error review. This Court must reverse Petitioner's conviction unless the

error can be characterized as harmless beyond a reasonable doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998); <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Turner v. State, 754 S.W.2d 668 (Tex. Crim. App. 1988). For all the reasons urged in Petitioner's Tenth Claim for Relief, above, Petitioner has been harmed by the admission into evidence of Copeland's in-court identification of Petitioner. Thus, the trial court committed reversible error in admitting into evidence David Copeland's in-court identification of Petitioner, where said identification was the product of impermissibly suggestive out-of-court identification procedures.

This Court should reverse the trial court's judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S THIRTEENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE TESTIMONY BY ANTONIO RAMIREZ THAT HE HAD ASSISTED PETITIONER IN SMUGGLING DIAMONDS INTO THE UNITED STATES FROM MEXICO, WHERE THE ALLEGED EXTRANEOUS OFFENSE DID NOT RELATE TO ANY ISSUE IN THE CASE.**

A defendant has the right to be tried for the offense charged, and not for being a criminal in general. Tex. R. Crim. Evid. Ann. 404(b) (Vernon Pamph. 1998); Nobles v. State, 843 S.W.2d 503 (Tex. Crim. App. 1992); Couret v. State, 792 S.W.2d 106 (Tex. Crim. App. 1990). An extraneous offense is not admissible at trial unless it is relevant to an issue in the case. Rule 404(b), supra; Montgomery v. State, 810 S.W.2d 372 (Tex. Crim. App. 1990). The trial court committed reversible error in admitting into evidence testimony by Antonio Ramirez that he had assisted Petitioner in smuggling diamonds into the United States from Mexico, where the alleged extraneous offense did not relate to any issue in the case.

Antonio Ramirez testified for the State during the guilt or innocence phase of trial. (RR. Vol. 26 p. 88). Ramirez revealed that he had manufactured two silencers for Petitioner. (RR. Vol. 26 pp. 118, 125). The clear inference was that Ramirez had manufactured the silencer attached to the weapon which killed the complainant.

The complainant was shot and killed on January 24, 1996. (CR. Vol. 1 p. 2). Ramirez testified that sometime during the previous December, he had traveled to Mexico with the Petitioner and assisted him in smuggling diamonds into the United States. (RR. Vol. 26 pp. 105-113). Petitioner gave Ramirez the diamonds in the bathroom of a restaurant in Mexico. (RR. Vol. 26 p. 104). Ramirez then transported the diamonds into the United States by wearing them on his fingers. (RR. Vol. 26 p. 107-108).

In <u>Montgomery v. State</u>, supra, this Court set out the method of analysis for admissibility of extraneous offenses under the 1986 Rules of Criminal Evidence. This Court noted that an extraneous offense is not admissible simply as character evidence to show that the accused acted in conformity. Tex. R. Crim. Evid. Ann. 404(b) (Vernon Pamph. 1998); <u>Montgomery</u>, 810 S.W.2d at 387. An extraneous offense is admissible, however, where it logically serves to make more or less probable an evidentiary fact necessary to the state's case. <u>Montgomery</u>. 810 S.W.2d at 387. Under this rule, an extraneous offense would be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex. R. Crim. Evid. Ann. 404(b) (Vernon Pamph. 1998); <u>Montgomery</u>, 810 S.W.2d at 387.

In a hearing out of the presence of the jury, Petitioner objected to the State not approaching the bench before offering testimony on this extraneous offense. (RR. Vol. 26 p. 104-105). The State replied: "We didn't say it was an extraneous." (RR. Vol. 26 p. 105). By this response, counsel believes that the prosecutors at trial did not consider testimony regarding Petitioner's involvement in smuggling diamonds into the United States from Mexico to constitute a criminal offense. Even if the conduct did not constitute a full blown penal offense, it constituted bad conduct. Templin v. State, 711 S.W.2d 30 (Tex. Crim. App. 1986). The admissibility of bad conduct is governed by the same rules as the admissibility of extraneous criminal offenses. Templin v. State, supra. 711 S.W.2d 32 n 1.

The State sought to admit the details of Petitioner persuading Antonio Ramirez into smuggling diamonds from Mexico into the United States, in order to show that a "trust" had developed between Petitioner and Ramirez. The State was not entirely clear how Petitioner would later use this "trust" to entice Ramirez to participate in the alleged offense. (RR. Vol. 26 pp. 105-106). In the alternative, the State suggested that the diamond smuggling constituted part of Petitioner's "plan." (RR. Vol. 26 p. 105).

This extraneous offense took place in December of 1995, approximately a month before the alleged capital murder offense. (RR. Vol. 26 p. 103). The smuggling had nothing to do with the alleged murder. The defense never challenged the State's theory at trial that a "trust" could not have developed between Petitioner and Ramirez. It is hard to see how diamond smuggling in December could constitute part of a plan for the complainant's murder the next January. The State's theory that it needed to show a pre-existing "trust" between Petitioner and Ramirez was simply a transparent excuse to allow an irrelevant extraneous offense to be presented before the jury.

The test on appeal is whether the trial court abused its discretion in finding the alleged extraneous offense relevant. Montgomery v. State, 810 S.W.2d at 390. Ordinarily, a reviewing court should give great deference to the trial court's finding that the alleged extraneous offense is relevant. Montgomery v. State, 810 S.W.2d at 391. However, where this Court can say with confidence that by no reasonable perception of common experience can it be concluded that the alleged extraneous offense has a tendency to make the existence of any fact of consequence more or less probable that it would otherwise be, then it can be said that the trial court abused its discretion. Montgomery, 810 S.W.2d at 391. Where the trial court's ruling is outside a zone of reasonable

disagreement, an appellate court should reverse. <u>Montgomery</u>, 810 S.W.2d at 391.

In a hearing out of the presence of the jury, the trial court initially stated that he thought the testimony was irrelevant. (RR. Vol. 26 p. 105). However, the court eventually allowed the testimony as evidence of Petitioner's "plan." (RR. Vol. 26 pp. 105-106). Petitioner would urge that the trial court's determination of relevancy is outside any reasonable zone of disagreement.

Where the State attempts to introduced into evidence an extraneous offense, the defendant must timely object in order to preserve the issue of whether the offense is relevant. <u>Montgomery v. State</u>, 810 S.W.2d 372 (Tex. Crim. App. 1990). An objection is sufficient where the defendant states that the testimony is "not relevant," or constitutes "an extraneous offense." <u>Montgomery</u>, 810 S.W.2d at 387. Once this objection is lodged, the burden shifts to the State to demonstrate why the alleged extraneous offense is relevant under Tex. R. Crim. Evid. Ann. 404(b) (Vernon Pamph. 1998). Petitioner's objection to the alleged extraneous offense or conduct was sufficient to raise the issue of relevancy. (RR. Vol. 26 pp. 107, 109-110).

Petitioner's counsel objected to the alleged extraneous assault offense out of the presence of the jury. (RR. Vol. 26 pp. 107, 109-110).

Petitioner's objection clearly implied both logical and relevancy grounds. Voicing both of these objections in a hearing out of the presence of the jury is the preferred method of perfecting error. Ethington v. State, 819 S.W.2d 854, 859 (Tex. Crim. App. 1991). The trial court considered the logical objection and overruled it. (RR. Vol. 26 p. 110). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Petitioner's conviction must be reversed because the admission of the alleged extraneous offense denied Petitioner his federal and state constitutional right to the presumption of innocence and the right to a fair trial, and his conviction must be reversed where it can be shown that Petitioner's substantial rights have been affected. Tex. R. App. P. Ann. 44.2(b) (Vernon Pamph. 1998). It cannot be said beyond a reasonable doubt that the alleged extraneous offense did not contribute to the conviction. Clark v. State, 726 S.W.2d 120 (Tex. Crim. App. 1987) . Extraneous offenses are by their very nature inherently prejudicial. Elkins v. State, 647 S.W.2d 663 (Tex. Crim. App. 1983). The same prejudice attaches to extraneous conduct. Templin v. State, 711 S.W.2d 30, 32 n 1 (Tex. Crim. App. 1986).

An objection to the admission of an extraneous offense involves two distinct and separate objections. Ethington v. State. 819 S.W.2d 854, 859 n.7 (Tex. Crim. App. 1991). In Montgomery v. State, 810 S.W.2d 372 (Tex. Crim. App. 1990) this Court held that an objection to the relevancy of an extraneous offense must first be lodged under Tex. R. Crim. Evid. Ann. 404(b) (Vernon Pamph. 1998); Montgomery v. State, 810 S.W.2d at 387. It is only after this objection is overruled does the trial court entertain a second objection concerning whether the alleged extraneous offense is unfairly prejudicial to Petitioner. Rule 403, supra; Montgomery v. State, 810 S.W.2d at 389.

Petitioner raises the issue of the probative value of the alleged extraneous offense in his next Claim for Relief, below. The two issues concerning the alleged extraneous smuggling offense are briefed under different claims for relief to avoid any question of multifariousness. Tex. R. App. P. Ann. 38.1(e) (Vernon Pamph. 1998).

Thus, the trial court committed reversible error in admitting into evidence testimony by Antonio Ramirez that he had assisted Petitioner in smuggling diamonds into the United States from Mexico, where the alleged extraneous offense did not relate to any issue in the case. This Court should reverse Petitioner's conviction, and order a new trial. Tex.

Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P.

Ann. 43.2(d) (Vernon Pamph. 1998).


### PETITIONER'S FOURTEENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE TESTIMONY BY ANTONIO RAMIREZ THAT HE HAD ASSISTED PETITIONER IN SMUGGLING DIAMONDS INTO THE UNITED STATES FROM MEXICO, WHERE THE PREJUDICIAL VALUE OF THE ALLEGED EXTRANEOUS OFFENSE GREATLY OUTWEIGHED ANY PROBATIVE VALUE THE EVIDENCE MIGHT CONTAIN.**


An extraneous offense is not admissible unless its probative value

substantially outweighs it prejudicial effect. Tex. R. Crim. Evid. Ann. 403

(Vernon Pamph 1998); Montgomery v. State, 810 S.W.2d 372 (Tex. Crim.

App. 1990). The trial court committed reversible error in admitting into

evidence testimony by Antonio Ramirez that he had assisted Petitioner in

smuggling diamonds into the United States from Mexico, where the

prejudicial value of the extraneous offense greatly outweighed any

probative value the evidence might contain.

In Montgomery v. State, supra, the Court held that even where an

extraneous offense has been shown to be legally relevant as evidence, a

second analysis must then be conducted. 810 S.W.2d at 389. The

extraneous offense may be inadmissible where the probative value of the

evidence is substantially outweighed by its prejudicial effect. The Court wrote:

> When a further objection is made under Rule 403, it will not suffice for the trial court simply to determine that the evidence is relevant to some legitimate, non-character-related purpose such as one of those enumerated in Rule 404(b). The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403. 810 S.W.2d at 389.

In deciding whether the probative value of the alleged extraneous offense is substantially outweighed by its prejudicial by use of the extraneous smuggling offense. Any guilty knowledge on the part of Petitioner is clearly inferable from the alleged homicide act itself. Petitioner's state of mind was not an issue in the case.

The test on appeal is whether the trial court abused its discretion in finding the that the probative value of the alleged extraneous is not substantially outweighed by its prejudicial effect. Montgomery v. State, 810 S.W.2d at 390. Ordinarily, the trial judge should be afforded great deference in his judgment to admit the evidence. Montgomery v. State. 810 S.W.2d at 392. However, where the relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the alleged

extraneous offense, the reviewing court should find an abuse of discretion. <u>Montgomery v. State</u>. 810 S.W.2d at 392.

Once the trial court has determined that an extraneous offense is legally relevant, Petitioner must then make a second objection that the probative value of the offense is substantially outweighed by its prejudicial effect. <u>Nelson v. State</u>, 864 S.W.2d 496, 499 (Tex. Crim. App. 1993); <u>Montgomery</u>, 810 S.W.2d at 388. Petitioner implicitly lodged this second objection, and was overruled by the trial court. (RR. Vol. 26 pp. 107, 109-110). It is this second issue which is brought forward on this Claim for Relief.

Petitioner's counsel objected to the alleged extraneous smuggling offense out of the presence of the jury. (RR. Vol. 26 pp. 107, 109-110). Petitioner's counsel objection implicitly covered both relevancy and logical grounds. (RR. Vol. 26 pp. 107, 109-110) . Voicing both of these objections in a hearing out of the presence of the jury is the preferred method of perfecting error. <u>Ethington v. State</u>, 819 S.W.2d 854, 859 n.7 (Tex. Crim. App. 1991) . The trial court considered the relevancy point and overruled it. (RR. Vol. 26 p. 110). Petitioner has properly preserved this error for appeal. Tex. R. Crim. Evid. Ann. 103(a)(1) (Vernon Pamph. 1998); Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

Petitioner's conviction must be reversed because the admission of the alleged extraneous offense denied Petitioner his federal and state constitutional right to the presumption of innocence and the right to a fair trial, and his conviction must be reversed where it can be shown that Petitioner's substantial rights have been affected. Tex. R. App. P. Ann. 44.2(b) (Vernon Pamph. 1998). It cannot be said that the testimony regarding Petitioner's involvement in an extraneous smuggling offense did not contribute to the conviction. Clark v. State, 726 S.W.2d 120 (Tex. Crim. App. 1987). For all the reasons urged more fully in Petitioner's Twelfth Claim for Relief, above, the admission into evidence of the alleged extraneous smuggling offense was harmful to Petitioner, and denied him a fair and impartial trial.

Thus, the trial court committed reversible error in admitting into evidence testimony by Antonio Ramirez that he had assisted Petitioner in smuggling diamonds into the United States from Mexico, where the prejudicial value of the alleged extraneous offense greatly outweighed any probative value the evidence might contain. This Court should reverse Petitioner's conviction, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S FIFTEENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY THAT ANTONIO RAMIREZ WAS AN ACCOMPLICE WITNESS TO THE ALLEGED CAPITAL MURDER OFFENSE, AS A MATTER OF LAW, FOR PURPOSES OF APPLICATION OF THE ACCOMPLICE WITNESS RULE.**

A defendant is entitled to a jury instruction on the' law of corroboration of accomplice witness testimony, where raised by the evidence. <u>Arney v. State</u>, 580 S.W.2d 836 (Tex. Crim. App. 1979). The trial court committed reversible error in failing to instruct the jury that Antonio Ramirez was an accomplice witness to the alleged capital murder offense, as a matter of law, for purposes of application of the accomplice witness rule.

As developed more fully in Petitioner's Eighth Claim for Relief, above, a conviction cannot rest on the testimony of an accomplice witness, unless the testimony is corroborated. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); <u>Edwards v. State</u>, 427 S.W.2d 629 (Tex. Crim. App. 1968). The Legislature has determined that accomplice witness testimony is by its very nature inherently suspicious. <u>Cast v. State</u>, 164 Tex. Crim. 3, 296 S.W. 2d 269 (1954).

Antonio Ramirez testified that he manufactured two silencers for Petitioner. He also testified that at a meeting with Petitioner and Petitioner's brother Alberto, he learned that they intended to rob and kill

a jeweler. (RR. Vol. 26 p. 154). A person is an accomplice to an alleged offense if he can be prosecuted for the offense. Russell v. State. 598 S.W.2d 238 (Tex. Crim. App. 1980); Villarreal v. State, 576 S.W.2d 51 (Tex. Crim. App. 1976). Ramirez was an accomplice to Petitioner's alleged offense under at least two separate legal theories.

Ramirez testified that he knew that Petitioner and Alberto intended to rob and kill a jeweler. By manufacturing two silencers for Petitioner, Ramirez was clearly acting with the intent to aid, assist, or encourage the commission of the robbery offense. Ramirez was liable for the alleged capital murder offense under the law of parties. Tex. Penal Code Ann. sec. 7.02(a)(2) (Vernon 1994). A person can be liable for a capital murder offense under this legal theory. Fuller v. State, 827 S.W.2d 919, 933 (Tex. Crim. App. 1992).

It was not necessary to prove that Ramirez intended to assist in the commission of the complainant's murder. Where it is shown that a party intended to assist in the commission of the underlying robbery offense, the party is likewise culpable for the capital murder. Ex parte Zepeda, 819 S.W.2d 874 (Tex. Crim. App. 1991). It was sufficient to show that Ramirez had intended to aid, assist or encourage the commission of the robbery against the complainant. Ramirez clearly did this by manufacturing not one, but two silencers for Petitioner's use.

Ramirez insisted that he had not known what Petitioner and Alberto were intending to do with the silencers, until after the devices were finished. (RR. Vol. 26 p. 33). It is apparently this sequence of events that lead the State to argue, at first, that Ramirez could not have been a party to the alleged capital offense, since logically a party must have knowledge of the contemplated offense before he can act with the intent to promote its commission. (RR. Vol. 27 p. 32).

However, this argument missed a second theory of vicarious liability. Where an individual enters into a conspiracy to commit a felony offense, he is criminally liable for any other offense committed in furtherance of the conspiracy, where the other offense could have been anticipated as a result of carrying out the conspiracy. Tex. Penal Code Ann. sec. 7.02(b) (Vernon 1994). This theory applies to guilt of a capital murder offense. Fuller v. State, 827 S.W.2d 919, 933 (Tex. Crim. App. 1992).

Ramirez testified that he engaged with Petitioner and Alberto to manufacture and test a silencer, and that after his first silencer was found to be too noisy, he manufacture and tested a second device. (RR. Vol. 26 p. 125). Under Ramirez's testimony, he conspired with Petitioner and Alberto to manufacture and possess a prohibited weapon. Tex. Penal Code Ann. secs. 15.02(a) & 46.05(4) (Vernon 1994). It would seem that as

a matter of law, robbery and murder could be anticipated where a party, is requested to manufacture and test a silencer to a handgun in secrecy.

In a hearing out of the presence of the jury, the prosecutors told the court they believed Ramirez understood that Petitioner and Albert were going to both rob and kill someone. (RR. Vol. 27 p. 30). This understanding by Ramirez was sufficient, coupled with his actions in manufacturing two silencers for the offense, to make him a party to the alleged capital murder offense.

The record shows that Ramirez was never prosecuted for manufacturing the silencers. Charles A. Rosenthal Jr. testified for the State in the presence of the jury. (RR. Vol. 32 p. 5). Rosenthal was an Assistant Harris County District Attorney. (RR. Vol. 32 p. 5). He told the jury Ramirez was never prosecuted for the offense of manufacturing a silencer because the device was never recovered by the State. (RR. Vol. 32 p. 31). Rosenthal believed that Ramirez could be "theoretically" liable for the alleged capital murder. (RR. Vol. 32 p. 32).

The decision not to prosecute Ramirez for the manufacturing of the silencers was clearly based on prosecutorial discretion, and not on a lack of evidence to show guilt. An extrajudicial confession to a criminal offense is sufficient to support a conviction, where the corpus delecti is proven by other evidence. Dansby v. State, 931 S.W.2d 297 (Tex. Crim.

App. 1996); <u>Elliott v. State</u>, 444 S.W.2d 914 (Tex. Crim. App. 1969); <u>Blackstone v. State</u>, 225 S.W.2d 184 (Tex. Crim. App. 1950). This independent proof requires only evidence that the offense in fact occurred. It is not necessary for this independent proof to link the individual to the offense. <u>Wood v. State</u>, 152 S.W.2d 335 (Tex. Crim. App. 1941); <u>Damian v. State</u>. 881 S.W.2d 102 (Tex. App.-Houston[lst] 1994, pet. ref'd). The statements made by Ramirez to the police and federal agents, admitting that he had manufactured a silencer for a handgun, coupled with David Copeland's testimony that he was shot with a handgun equipped with a silencer, were sufficient evidence to sustain Ramirez's conviction for manufacturing and possession of a prohibited weapon. Tex. Penal Code Ann. sees. 15.02(a) & 46.05(4) (Vernon 1994).

The trial court is required to instruct the jury on the law of accomplice witness testimony, even where no request is made by the defense. <u>Polk v. State</u>, 131 S.W. 580 (Tex. Crim. App. 1910); <u>Smith v. State</u>, 36 S.W. 586 (Tex. Crim. App. 1896). However, the record shows that Petitioner objected to the trial court failing to instruct the jury on the law of accomplice witness testimony regarding Antonio Ramirez. (RR. Vol. 33 p. 32). The trial court denied the request. (RR. Vol. 33 p. 33). Petitioner has properly preserved the error. Tex. Code Crim. Proc. Ann. section 36.14 (Vernon Supp. 1998).

Where a timely objection to a jury charge is made, a reviewing Court must reverse the conviction if Petitioner suffered any harm. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 1981); Arline v. State, 721 S.W.2d 348 (Tex. Crim. App. 1986); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). In measuring the harm suffered, the reviewing court should look to the jury charge as a whole, the evidence at trial, the contested issues, argument of counsel, and any other relevant information. Abnor v. State, 871 S.W.2d 726 (Tex. Crim. App. 1994).

As urged more fully in Petitioner's Tenth, Eleventh and Twelfth Claims for Error, above, the in-court and out-of-court identifications of Petitioner by the security guard David Copeland were flawed. The testimony by Antonio Ramirez was used by the State to both bolster Copeland's identification, and to show a motive and reasoning behind Petitioner's commission of the alleged offense. Had the jury been properly instructed to require corroboration of Ramirez's testimony, then the jury might not have found Copeland's identification of Petitioner sufficiently compelling to find Petitioner guilty of the alleged capital murder. Thus, the trial court committed reversible error in failing to instruct the jury that Antonio Ramirez was an accomplice witness to the alleged capital murder offense, as a matter of law, for purposes of application of the accomplice witness rule. This Court should reverse the trial court's

judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a)

(Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

### PETITIONER'S SIXTEENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO AUTHORIZE THE JURY TO DECIDE WHETHER ANTONIO RAMIREZ WAS AN ACCOMPLICE WITNESS TO THE ALLEGED CAPITAL MURDER OFFENSE, AS A MATTER OF FACT, AND IF THEY SO FOUND, TO APPLY THE ACCOMPLICE WITNESS RULE TO HIS TESTIMONY.**

A trial judge is required instruct the jury to determine whether a witness is an accomplice as a matter of fact, and apply the law of accomplice witness testimony, where there is a factual issue as to the witness' status. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); Arney v. State, 580 S.W.2d 836 (Tex. Crim. App. 1979). The trial court committed reversible error in failing to authorize the jury to decide whether Antonio Ramirez was an accomplice witness to the alleged capital murder offense, as a matter of fact, and if they so found, to apply the accomplice witness rule to his testimony.

Ramirez testified he did not know that at the time he was manufacturing the silencers that they would be used to commit a homicide. (RR. Vol. 27 p. 33). Initially, it would appear that this testimony would raise a fact issue regarding Ramirez's status as an accomplice witness. If so, then the appropriate action by the trial court would have been to instruct the jury to decide whether Ramirez was as an accomplice, and if the jury so found, to require corroboration of his testimony before accepting it as true. Arney v. State, supra.

However, as demonstrated in Petitioner's Fourteenth Claim for Relief, above, Ramirez admitted involvement in the conspiracy of manufacturing and possession of the silencer, as a prohibited weapon, was sufficient to establish his accomplice status as a matter of law. Tex. Penal Code Ann. sec. 7.02(b) (Vernon 1994); <u>Fuller v. State</u>, 827 S.W.2d 919, 933 (Tex. Crim. App. 1992).

Ramirez's assertion that he did not know why Petitioner wanted a silencer is simply not credible. Ramirez told the jury he did not know that manufacturing a silencer was illegal in the United States. (RR. Vol. 27 pp. 21,33). He insisted that he never knew that the silencer was going to be used for a robbery or murder. (RR. Vol. 28 pp. 33, 35). Ramirez even insisted he did not know he was manufacturing a silencer while making it. (RR. Vol. 27 p. 34). He believed Petitioner should have told him that it was illegal to make a silencer. (RR. Vol. 27 p. 25).

As urged more fully in Petitioner's Fourteenth Claim for Relief, above, the record shows that Ramirez was an accomplice as a matter of law. However, in the event this Court finds that a proper fact issue was raised as to Ramirez's status, then the trial court erred in failing to instruct the jury to decide whether Ramirez was an accomplice to the alleged capital murder offense as a matter of fact.

The record shows that Petitioner objected to the trial court failing to instruct the jury on the law of accomplice witness testimony regarding Antonio Ramirez. (RR. Vol. 33 p. 32). Petitioner's objection was sufficient to require the trial court to authorize the jury to determine whether Ramirez was an accomplice as an issue of fact, and apply the appropriate law. The trial court denied the request. (RR. Vol. 33 p. 33). Petitioner has properly preserved the error. Tex. Code Crim. Proc. Ann. section 36.14 (Vernon Supp. 1998).

Where a timely objection to a jury charge is made, this Court must reverse the conviction if Petitioner suffered any harm. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 1981); Arline v. State, 721 S.W.2d 348 (Tex. Crim. App. 1986); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). For all the reasons urged in Petitioner's Fourteenth Claim for Relief, above, Petitioner has been harmed.

Thus, the trial court committed reversible error in failing to authorize the jury to decide whether Antonio Ramirez was an accomplice witness to the alleged capital murder offense, as a matter of fact, and if they so found, to apply the accomplice witness rule to his testimony. This Court should reverse the trial court's judgment, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

**PETITIONER'S SEVENTEENTH CLAIM FOR RELIEF**

**THE EVIDENCE WAS INSUFFICIENT, AS A MATTER OF LAW, TO SUPPORT PETITIONER'S CONVICTION FOR CAPITAL MURDER, WHERE THE ALLEGED UNDERLYING FELONY OFFENSE WAS ROBBERY, AND WHERE THE RECORD FAILS TO PROVE AN ATTEMPTED OR COMPLETED THEFT OF THE COMPLAINANT'S PROPERTY.**

The burden of proof is on the State to establish beyond a reasonable doubt that Petitioner committed the offense alleged. Hightower v. State, 389 S.W.2d 674 (Tex. Crim. App. 1965); McCullen v. State, 372 S.W.2d 693 (Tex. Crim. App. 1964). The evidence was insufficient, as a matter of law, to support Petitioner's conviction for capital murder, where the alleged underlying felony offense was robbery, and where the record fails to prove an attempted or completed theft of the complainant's property.

The indictment returned against Petitioner alleged,  in part, that he:

> did then and there unlawfully, intentionally and knowingly while in the course of committing and attempting to commit the ROBBERY of JANOS SZUCS, intentionally cause the death of JANOS SZUCS by SHOOTING JANOS SZUCS WITH A DEADLY WEAPON, NAMELY, A FIREARM.

(CR. Vol. 1 p. 8). The indictment properly alleged the offense of capital murder. Tex. Penal Code Ann. sec. 19.03(a)(2) (Vernon 1994).

The offense of capital murder under sec. 19.03(a)(2), supra, requires proof of a murder during the course of the commission or attempted commission of an enumerated felony offense. Rousseau v. State, 855 S.W.2d 666 (Tex. Crim. App. 1993); Allridge v. State, 762 S.W.2d 146 (Tex. Crim. App. 1988).

Petitioner's indictment alleged the attempted or completed offense of robbery. This allegation required the State to show that unlawful force was used: (1) to attempt a theft offense; (2) to complete a theft offense, or (3) in immediate flight from an attempted or completed theft offense. Tex. Penal Code Ann. sec. 29.01(1) (Vernon 1994); Barnes v. State, 845 S.W.2d 364 (Tex. App-Houston [lst] 1992). Consequently, the State was required to prove that Petitioner unlawfully appropriated, or attempted to unlawfully appropriate, the complainant's property, during the alleged murder.

Antonio Ramirez testified that Petitioner and Alberto had planned to rob and kill a jeweler. However, the only evidence that any property was in fact taken from the complainant was through the testimony of Sam Solomay. He estimated the complainant's diamond inventory to be worth three to four million dollars. (RR. Vol. 31 p. 194). On direct examination, he told the jury the complainant's diamond inventory was gone from the office. He further speculated that the diamonds had to

have been taken at the time the complainant was killed. (RR. Vol. 31 p. 199).

However, on cross-examination, Solomay admitted that the complainant or some other person could have taken the diamonds to a trade show for display and sale. (RR. Vol. 31 p. 212). Solomay was aware of the extent of the complainant's inventory only through conversations with the complainant at an undisclosed time prior to the alleged offense. (RR. Vol. 31 p. 199). Petitioner conclusively demonstrated that Solomay's testimony regarding the extent of the complainant's diamond inventory at the time of the alleged offense was nothing more than mere speculation.

The standard of review on appeal is whether a rational trier of fact could have found each element of the offense beyond a reasonable doubt. Geesa v. State, 820 S.W.2d 154 (Tex. Crim. App. 1991); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); McGoldrick v. State, 682 S.W.2d 573 (Tex. Crim. App. 1985); Jackson v. State, 672 S.W.2d 801 (Tex. Crim. App. 1984). A rational trier of fact could not have concluded beyond a reasonable doubt that Petitioner was guilty of capital murder as alleged in the indictment, where the State failed to establish that any property of the complainant had been the subject of a theft or attempted theft offense.

Petitioner challenges the sufficiency of the evidence in this Claim for Relief. This Court should consider and dispose of this Claim for Relief, even though reversible error may be based upon another Claim for Relief. Tex. R. App. P. Ann. 47.1 (Vernon Pamph. 1998); <u>Dunn v. State</u>, 721 S.W.2d 325, 327 (Tex. Crim. App. 1986); <u>Selman v. State</u>. 663 S.W.2d 838 (Tex. Crim. App. 1984).

Where the evidence is insufficient to sustain a conviction on appeal, double jeopardy bars a retrial. <u>Burks v. United States</u>, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); <u>Greene v. Massey</u>, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). This Court should reverse Petitioner's conviction, and order a judgment of acquittal. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(c) (Vernon Pamph. 1998); <u>Ortiz v. State</u>, 577 S.W.2d 246 (Tex. Crim. App. 1979) .

## PETITIONER'S EIGHTEENTH CLAIM FOR RELIEF

**THE EVIDENCE WAS INSUFFICIENT, AS A MATTER OF FACT, TO SUPPORT PETITIONER'S CONVICTION FOR CAPITAL MURDER, WHERE THE ALLEGED UNDERLYING FELONY OFFENSE WAS ROBBERY, AND WHERE THE RECORD FAILS TO PROVE AN ATTEMPTED OR COMPLETED THEFT OF THE COMPLAINANT'S PROPERTY.**

A criminal conviction should be reversed where the evidence is factually insufficient to support the trial court's judgment of guilt. Tex. Code Crim. Proc. Ann. art. 44.25 (Vernon Supp. 1998); Bigby v. State, 892 S.W.2d 864 (Tex. Crim. App. 1994). The evidence was insufficient, as a matter of fact, to support Petitioner's conviction for capital murder, where the alleged underlying felony offense was robbery, and where the record fails to prove an attempted or completed theft of the complainant's property.

As urged more fully in Petitioner's Sixteenth Claim for Relief, above, the State was required to prove that a theft or attempted theft of the complainant's property took place, in order to sustain Petitioner's conviction for the capital murder offense alleged in the indictment. The testimony of Sam Solomay was nothing more than mere speculation, and consequently, insufficient as a matter of law to establish this theft or attempted theft. The jury's implied finding that a theft or attempted theft of the complainant's property in fact took place is against the greater weight and preponderance of the evidence, and was manifestly unjust.

Furthermore, given the nature of Solomay's speculation that the complainant's property had been taken during the alleged murder, his testimony lacks credibility. Ordinarily, the credibility of witnesses will not be reviewed on appeal. Bowden v. State, 628 S.W.2d 782 (Tex. Crim. App. 1982); Robinson v. State, 135 Tex. Crim. 82, 117 S.W.2d 99 (1938). However, the entire point of the state statutory grant of authority to review factual sufficiency is to allow this Court to the review credibility of witnesses. Petitioner urges this Court to exercise this discretion, and find that the State's case against him simply was not credible enough to sustain a conviction as a matter of fact.

Petitioner's remedy is for this Court to reverse the conviction upon this Claim for Relief, and remand for a new trial. Where a reviewing court decides the jury's verdict is against the greater weight and preponderance of the evidence, federal constitutional double jeopardy does not bar a retrial. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 653 (1982); Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996); Meraz v. State, 785 S.W.2d 146 (Tex. Crim. App. 1990).

The evidence was insufficient, as a matter of fact, to support Petitioner's conviction for capital murder, where the alleged underlying felony offense was robbery, and where the record fails to prove an attempted or completed theft of the complainant's property. This Court

should reverse Petitioner's conviction, and order a new trial. Tex. Code Crim. Proc. Ann. art. 44.29(a) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(c) (Vernon Pamph. 1998).

## PETITIONER'S NINETEENTH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING PETITIONER'S MOTION TO STRIKE RICHARD WAYNE MILLER FOR CAUSE, WHERE THE VENIREMAN WOULD FIND EVERY PERSON CONVICTED OF CAPITAL MURDER A CONTINUING THREAT TO SOCIETY, AND CONSEQUENTLY, COULD NOT CONSIDER LIFE IMPRISONMENT AS PUNISHMENT IN AN APPROPRIATE CASE, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTION RIGHT TO A FAIR AND IMPARTIAL TRIAL.**

The purpose of voir dire is to insure the defendant a fair and impartial jury. U.S. Const., amends. 6 & 14; Cuellar v. State, 943 S.W.2d 487 (Tex. Crim. App. 1966). A defendant is entitled to strike for cause any venireman who has a bias or prejudice against any law applicable to the case which the defense is entitled to rely upon. Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (Vernon Pamph. 1998). The trial court committed reversible error in denying Petitioner's motion to strike Richard Wayne Miller for cause, where the venireman would find every person convicted of capital murder a continuing threat to society, and consequently, could not consider life imprisonment as punishment in an appropriate case, in violation of Petitioner's federal constitution right to a fair and impartial trial.

Richard Wayne Miller was examined on August 6, 1997. (RR. Vol. 18 p. 90). On direct examination by the State, he told the court "I have my mind made up right now" that an individual found guilty of capital murder would probably kill again in the future. (RR. Vol. 18 p. 110). On

cross-examination, he indicated a "mind set" to find that an individual convicted of capital murder would always be a person who would commit further acts of violence (RR. Vol. 18 p. 131).

A defendant is entitled to strike for cause any venireman who cannot consider the minimum range of punishment in an appropriate case. Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (Vernon Supp. 1998); Von Byrd v. State, 569 S.W.2d 883 (Tex. Crim. App. 1978). This rule clearly applies to a juror, in a capital murder prosecution, who could never consider answering the special issues consistent with the defendant receiving a life sentence.

Petitioner's counsel objected to the venireman. (RR. Vol. 18 pp. 129, 132, 136-137). The trial court considered the same and overruled it. (RR. Vol. 18 p. 137). Petitioner thereafter used a peremptory strike against Miller. (CR. Vol. 1 p. 124 [#34]). Petitioner has properly preserved the error. Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

The right to question veniremen and propound causal strikes is guaranteed under the federal and state constitutional right to counsel. Caldwell v. State, 818 S.W.2d 790, 793 N3 (Tex. Crim. App. 1991). Consequently, Petitioner complains of constitutional error subject to harmless error review. This Court must reverse Petitioner's conviction unless the error can be characterized as harmless beyond a reasonable

doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998); <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); <u>Turner v. State</u>, 754 S.W.2d 668 (Tex. Crim. App. 1988).

A trial court's error in refusing to grant a causal strike is reversible where the defendant has shown injury or where he was forced to proceed with an objectionable juror. <u>Page v. State</u>, 486 S.W.2d 300 (Tex. Crim. App. 1972). Petitioner's counsel requested additional strikes. (RR. Vol. 24a pp. 31-35). Petitioner's request was denied in part. (RR. Vol. 24a pp. 31-35), The record shows that at least one objectionable juror sat on Petitioner's jury. (RR. Vol. 24a pp. 31-35). Petitioner has demonstrated harm.

Thus, the trial court committed reversible error in denying Petitioner's motion to strike Richard Wayne Miller for cause, where the venireman would find every person convicted of capital murder a continuing threat to society, and consequently, could not consider life imprisonment as punishment in an appropriate case, in violation of Petitioner's federal constitution right to a fair and impartial trial. This Court should reverse Petitioner's sentence, and order a new trial as to punishment. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S TWENTIETH CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO STRIKE MARTHA JEAN GUTIERREZ FOR CAUSE, WHERE THE VENIREMAN STATED THAT AFTER FINDING A DEFENDANT GUILTY OF CAPITAL MURDER, SHE WOULD NEVER CONSIDER MITIGATION EVIDENCE DURING THE PUNISHMENT PHASE OF A CAPITAL MURDER TRIAL, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTION RIGHT TO A FAIR AND IMPARTIAL TRIAL.**

The purpose of voir dire is to insure the defendant an impartial jury. U.S. Const., amends. 6 & 14; Cuellar v. State, 943 S.W.2.d 487 (Tex. Crim. App. 1966). A defendant is entitled to strike for cause any venireman who has a bias or prejudice against any law applicable to the case which the defendant is entitled to rely upon. Tex. Code Crim. Proc. Ann. 35.16(c) (2) (Vernon Pamph. 1998). The trial court committed reversible error in failing to strike Martha Jean Gutierrez for cause, where the venireman stated that after finding a defendant guilty of capital murder, she would never consider mitigation evidence during the punishment phase of trial, in violation of Petitioner's federal constitution right to a fair and impartial trial.

A defendant is entitled to strike for cause any venireman who cannot consider the minimum range of punishment in an appropriate case. Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (Vernon Supp. 1998); Von Byrd v. State, 569 S.W.2d 883 (Tex. Crim. App. 1978). This rule clearly applies to a juror, in a capital murder prosecution, who could

never consider answering the special issues consistent with the defendant receiving a life sentence.

Martha Jean Gutierrez was called as a prospective juror. (RR. Vol. 9 p. 3). Through questioning by Petitioner's counsel, she told the court that after finding a defendant guilty of capital murder, and making the determination that the defendant would constitute a future danger to society, she could not then consider evidence in mitigation of punishment. (RR. Vol. 9 pp. 42-43) .

Petitioner's counsel moved to strike Gutierrez for cause. (RR. Vol. 9 pp. 43, 56). After considering the same, the trial court overruled Petitioner's objection. (RR. Vol. 9 pp. 56-57). Petitioner thereafter used a peremptory strike against Gutierrez. (CR. Vol. 1 p. 124 [#7] ) .Petitioner has properly preserved the error. Tex. R. App. P. Ann. 33.1(a) (Vernon Pamph. 1998).

As urged more fully in Petitioner' s Eighteenth Claim for Relief, above, the right to question veniremen and propound causal strikes is guaranteed under the federal and state constitutional right to counsel. Caldwell v. State, 818 S.W.2d 790, 793 n.3 (Tex. Crim. App. 1991) . For all the reasons urged under that point of error, the trial court's denial of Petitioner's causal strike against venireman Martha Jean Gutierrez was harmful error.

Thus, the trial court committed reversible error in failing to strike Martha Jean Gutierrez for cause, where the venireman ( stated that after finding a defendant guilty of capital murder, she would never consider mitigation evidence during the punishment phase of trial, in violation of Petitioner's federal constitution right to a fair and impartial trial. This Court should reverse Petitioner's sentence, and order a new trial as to l Punishment. Tex. . Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp_ 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

### PETITIONER'S TWENTY-FIRST CLAIM FOR RELIEF

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY ON THE BURDEN OF PROOF ON THE THIRD SPECIAL PUNISHMENT ISSUE RELATING TO MITIGATION OF PUNISHMENT, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

The trial court is under a duty to affirmatively instruct the jury on every law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 1982). The trial court committed reversible error in failing to instruct the jury on the burden of proof on the third special punishment issue relating to mitigation of punishment, in violation of Petitioner's federal constitutional right against cruel and unusual punishment. U.S. Const. amends. 8 & 14.

In Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court held that a jury sitting as trier of fact in a capital murder punishment hearing must be allowed to consider circumstances which would mitigate against imposition of the death sentence. Penry left open the appropriate burden of proof.

The trial court submitted three special punishment issues to the jury. The third special punishment issue in Petitioner's case was as follows:

> Whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral

196

culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Tex. Code Crim. Proc. Ann. art. 37.071(e) (Vernon Supp. 1998).

The trial court tracked this statute in its charge to the jury during the punishment phase of trial. (CR. Vol. 1 p. 153). This special punishment issue was the Legislature's response to the Supreme Court decision in <u>Penry</u>. Both the statute, and the trial court's charge to the jury, omitted any instruction on the applicable burden of proof on mitigation issues.

Petitioner's counsel objected pretrial in writing to the trial court's decision not to impose a burden of proof on the State on the <u>Penry</u> issue. (CR. Vol. 1 p. 40). Petitioner's pretrial motion was denied. (CR. Vol. 1 p. 43).

The absence of any direction regarding the burden of proof on the "sufficiency" of mitigating circumstances to warrant a life sentence results in the arbitrary and unreviewable imposition of the death penalty. As shown above, the Texas statute does not instruct the jury on the burden of proof or persuasion regarding the <u>Penry</u> special issue. Moreover, the language of the special issue implies that the defense has the burden, since the jurors are charged to determine whether "sufficient" mitigation exists to warrant a life sentence "rather than a

death sentence." The language thus suggests that the latter sentence (death) is presumptively appropriate in the absence of such "sufficient" mitigation.

The statute's silence regarding this critically important issue raises troubling questions. By what standard must the defendant prove the existence of "sufficient" mitigation to warrant a life sentence? Is the defendant required to show proof beyond a reasonable doubt? Proof by clear and convincing evidence? Proof by a preponderance of the evidence? The answer to these questions, which the Texas capital punishment scheme provides no guidance whatsoever, is anything but academic. The manner in which a jury resolves this ambiguity would in many cases constitutes the difference between life and death for a particular defendant.

The State may be expected to contend in this Court, that the absence of a burden of proof on the "mitigation" issue is actually beneficial to Petitioner because it gives the jury the absolute discretion to determine at what point there is sufficient mitigating evidence to warrant a sentence of life. That is precisely the problem. If the jury decides to set that threshold for "sufficiency" of the mitigating evidence at an unfairly high level, such as "beyond a reasonable doubt," the defendant will be

subjected to the death penalty despite the existence of factors that call for a lesser sentence.

This problem is especially pernicious in a setting in which the only other "burden of proof" which the jury has heard described is the State's "beyond a reasonable doubt." The jury in Petitioner's case was told that for both the State's case at the guilt phase and the State's case for "future dangerousness" at the punishment phase, the standard of proof is "beyond a reasonable doubt." Under such circumstances, there is a significant risk that the jury, faced with a subsequent factual determination such as the "mitigation" issue, and having just assessed two other factual determinations under the "beyond a reasonable doubt" standard, and having no other direction from its instructions, would require Petitioner to prove "beyond a reasonable doubt" that his mitigating evidence was "sufficient" to call for mercy.

Given the presentation of mitigating evidence at the punishment phase in the case at bar, it is possible that the entire jury thought that Petitioner had to prove by "a preponderance of the evidence," or even by "clear and convincing" evidence, that a "sufficient" mitigating circumstance existed to warrant leniency. Yet, the trial court's refusal to assign a specific burden of proof on this issue, coupled with the jury's prior indoctrination with the burden of "beyond a reasonable doubt" in

two other contexts, may well have convinced the jury to return a "no" answer, denying Petitioner a life sentence despite the fact that every member of his jury thought he had shown evidence of mitigating circumstances otherwise "sufficient" to preclude the death penalty -- but disagreed that he had shown the existence of such circumstances "beyond a reasonable doubt." This outcome is a classic example of arbitrary imposition of the death penalty, in violation of the Eighth and Fourteenth Amendments.

Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) provide instructive parallels. In both cases, the jury's penalty-phase instructions suggested that the juries were required to agree unanimously on the existence of particular mitigating circumstances before they could consider them in passing sentence. The Supreme Court noted in Mills the "intuitively disturbing" possibility that under such instructions, "[a]11 12 jurors might agree that some mitigating circumstances were present, and even that those mitigating circumstances [outweighed] any aggravating circumstances." However, because the jurors could not agree on the presence of the same mitigating circumstance, death would be imposed. Mills, 486 U.S. at 374. The Court held that "it would certainly be the height of arbitrariness to

allow or require the imposition of the death penalty under [such] circumstances." Id. See also McKoy, 494 U.S. at 453-454 (Kennedy, J., concurring) (defect in the jury instructions at issue in Mills risked arbitrary and capricious imposition of the death penalty).

As the foregoing discussion suggests, the failure of art. 37.071(e), supra, to assign a burden of proof with respect to the "mitigation" issue violates the Eighth and Fourteenth Amendments because it results in the arbitrary imposition of capital punishment. However, that same failure also renders the statute unconstitutional for a separate and analytically distinct reason, namely, because it renders the jury's sentencing verdict unreviewable on appeal.

The jury's decision that Petitioner failed to show "sufficient" mitigating evidence to warrant a sentence of life imprisonment must be subject to examination by this Court on direct review. This Court's decisions teach that juries sometimes erroneously find "future dangerousness" on a record that should not have permitted such a finding. See Ellason v. State, 815 S.W.2d 656 (Tex. Crim. App. 1991). In precisely the same manner, it is likely that in the future some jury will fail to find "sufficient" evidence of mitigation to warrant leniency despite a record that compels such a finding, and this Court will be required to review that decision. The absence of a burden of proof against which to

measure the defendant's quantum of evidence on the "mitigation" issue makes meaningful appellate review of a jury's negative finding impossible.

The United States Supreme Court has held that direct appellate review in capital cases performs the "crucial [and constitutionally required] role of ensuring that the death penalty is not imposed arbitrarily or irrationally." <u>Parker v. Dugger</u>, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). The Court has emphasized that the procedures employed in capital cases must satisfy a heightened standard of reliability to pass muster under the Eighth Amendment. See, e.g.. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In the absence of an express statement of the burden of proof on the "mitigation" issue, appellate review of death sentences in Texas will not satisfy this constitutionally mandated standard, and violates the Eighth and Fourteenth Amendments.

As noted above, Petitioner objected to the jury charge on this ground. (CR. Vol. 1 p. 40). The trial court considered the same and overruled Petitioner's objection. (CR. Vol. 1 p. 43). Petitioner has properly preserved this error for appeal. Tex. Code Crim. Proc. Ann. section 36.14 (Vernon Supp. 1998).

This Court cannot conclude that the error was harmless beyond a reasonable doubt. Tex. R. App. P. Ann. 44.2(a) (Vernon Pamph. 1998). Where a timely objection to a jury charge is made, this Court must reverse the conviction if Petitioner suffered any harm. Tex. Crim. Proc. Ann. Code Ann. art. 36.19 (Vernon 1981); <u>Arline v. State</u>, 721 S.W.2d 348 (Tex. Crim. App. 1986); <u>Almanza v. State</u>, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

The very nature of the charge given to the jury would cause any capital defendant to suffer harm. The jury had been instructed during the guilt or innocence phase of trial that the State had the burden of proof. (CR. Vol. 1 p. 128). Likewise, the jury was instructed that on the first special punishment issue, involving Petitioner's future dangerousness, the burden of proof was likewise on the State. (CR Vol. 1 p. 143). It is entirely possible that the jury might have concluded that on the third punishment issue involving mitigation, the State carried the burden of proof.

Thus, the trial court committed reversible error in failing to instruct the jury on the burden of proof of the third special punishment issue relating to mitigation of punishment, in violation of Petitioner's federal constitutional right against cruel and unusual punishment. This Court should reverse the sentence of death against Petitioner, and order a new

trial on punishment or enter a judgment and sentence for life, as required by law. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

### PETITIONER'S TWENTY-SECOND CLAIM FOR RELIEF

**THE TEXAS CAPITAL PUNISHMENT SENTENCING SCHEME IS UNCONSTITUTIONAL, WHERE THE JURY'S DECISION ON EACH OF THE PUNISHMENT ISSUES IS NOT SUBJECT TO MEANINGFUL APPELLATE REVIEW, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

A capital punishment scheme must be subject to meaningful appellate review in order to be constitutional. U.S. Const. amends. 8 & 14; Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Texas capital punishment sentencing scheme is unconstitutional, where the jury's decision on each of the punishment issues is not subject to meaningful appellate review, in violation of Petitioner's federal constitutional right against cruel and unusual punishment.

The jury in Petitioner's was given all three special issues provided by the Texas capital punishment scheme. Tex. Code Crim. Proc. Ann. art. 37.071 sec. 2(b) (1 & 2) and art. 37.071 sec. 2(e) (Vernon Supp. 1998) . As a consequence of the statutory provisions as written, and this Court's construction of the statutes, meaningful appellate review is impossible.

The first special issue presented the jury required a determination whether Petitioner constituted a continuing threat to society. (CR. Vol. 1 p. 151). See Tex. Code Crim. Proc. Ann. art. 37.071 sec. 2(b)(1) (Vernon Supp. 1998). This issue has been characterized as incapable of meaningful appellate review. Martinez v. State, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996)(Baird, J. dissent).

The second special issue presented to the jury was whether Petitioner had the intent to see the complainant killed. (CR. Vol. 1 p. 152). See Art. 37.071 sec. 2(b)(2), supra. This issue was designed to exclude "nontrigger" defendants from the death penalty. Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 1982). However, as a practical matter, every party found guilty of capital murder during the guilt or innocence phase of trial will necessary involve an affirmative finding on this second punishment issue. See Lawton v. State, 913 S.W.2d 542 (Tex. Crim. App. 1995).

The third special issue presented to the jury was whether any evidence mitigated against the imposition of the death sentence. (CR. Vol. 1 p. 153). See Art. 37.071 sec. 2(e), supra. This issue was mandated by the Supreme Court decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). This Court has held that this issue is not legally or logically subject to sufficiency review on appeal. Colella v.

State, 915 S.W.2d 834 (Tex. Crim. App. 1995); Lawton v. State, supra;

Broussard v. State, 910 S.W.2d 952 (Tex. Crim. App. 1995).

     In Gregg v. Georgia, the Supreme Court wrote:

> Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capaciously or in a freakish manner.

428 U.S. at 195, 96 S.Ct. at 2935. As demonstrated above, there is no meaningful appellate review on any of the three special issues submitted to a jury in a Texas capital punishment scheme. The Texas capital punishment sentencing scheme is unconstitutional, where the jury's decision on each of the punishment issues is not subject to meaningful appellate review, in violation of Petitioner's federal constitutional right against cruel and unusual punishment. This Court should reverse the sentence of death against Petitioner, and order a new trial on punishment or enter a judgment and sentence for life, as required by law. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S TWENTY-THIRD CLAIM FOR RELIEF

**THE 12-10 TEXAS CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL, WHERE THE STATUTE CLEARLY SUBJECTS JURORS INCLINED TO ANSWER THE MITIGATION ISSUES FAVORABLY TO THE PETITIONER TO COMPROMISE THEIR VOTE IN FAVOR OF A DEATH SENTENCE, IN VIOLATION OF PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

A state may not set up a capital punishment scheme that runs the risk jurors are required to agree unanimously on the existence of particular mitigating circumstances before they could consider them in passing sentence. U.S. Const., amends. 8 & 14; Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). The 12-10 Texas capital punishment scheme is unconstitutional, where the statute clearly subjects jurors inclined to answer the mitigation issues favorably to the Petitioner to compromise their vote in favor of a death sentence, in violation of Petitioner's federal constitutional right against cruel and unusual punishment.

Petitioner is aware that Texas courts have upheld the constitutionality of the 12-10 scheme in Davis v. State, 782 S.W.2d 211 (Tex. Crim. App. 1989). Petitioner would urge this Court to reconsider this decision.

Under Texas law a capital juror undertakes no obligation to agree or disagree with his fellow jurors in order to fulfill his responsibility to reach a verdict. Consequently, there is no such thing in effect as a "deadlocked jury" or "holdout juror" in a Texas capital murder prosecution. The law attaches a consequence of punishment immediately to every combination of twelve individual verdicts. There is no justifiable reason to retain the 12-10 rule and to inform the jury of only two of the three possible punishment results: (1) life imprisonment; (2) death; or (3) a mistrial, resulting in an automatic sentence of life. See Tex. Code Crim. Proc. Ann. art. 37.071 sec. 2 (d, e, f & g) (Vernon Supp. 1998).

The 12-10 provision violates the constitutional principles set out in Mills because, in order for the jury to return answers to the special issues that would result in a life sentence: (1) at least ten jurors must vote "no" in answering the first special issue, (2) at least ten jurors must vote "no" in answering the second special issue, or (3) at least ten jurors must vote "yes" in answering the mitigation special issue. Petitioner would urge that this scheme violates the Eighth and Fourteenth Amendments of the United States Constitution because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but because at least ten

jurors could not collectively agree on their answer to any one of the special issues, and because the jurors are not informed that their failure to answer any question results in the defendant receiving a life sentence, there is a constitutionally unacceptable risk that jurors would change an individual answer to be able to return a verdict.

The 12-10 Texas capital punishment scheme is unconstitutional, where the statute clearly subjects jurors inclined to answer the mitigation issues favorably to the Petitioner to compromise their vote in favor of a death sentence, in violation of Petitioner's federal constitutional right against cruel and unusual punishment. This Court should reverse the sentence of death against Petitioner, and order a new trial on punishment or enter a judgment and sentence for life, as required by law. Tex. Code Crim. Proc. Ann. art. 44.29(c) (Vernon Supp. 1998); Tex. R. App. P. Ann. 43.2(d) (Vernon Pamph. 1998).

## PETITIONER'S TWENTY-FOURTH CLAIM FOR RELIEF

Defense counsel was rendered ineffective because of the trial Court's denial of reasonable funds in advance of trial to undertake a proper pretrial investigation in this case and to prepare and present a defense at trial, in violation of his constitutional right to due process of law and <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985). Petitioner was indigent when the request was made. Had Petitioner been provided reasonable funds sufficiently in advance of trial as requested, defense counsel would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three, hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S TWENTY-FIFTH CLAIM FOR RELIEF

Defense counsel was rendered ineffective under the Sixth Amendment by the trial Court's improper denial of timely requests for a continuance in order to undertake thorough pretrial investigation of material issues in this case and to present defensive issues at trial. Had Petitioner been provided a reasonable continuance as requested, defense counsel would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three,

hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S TWENTY-SIXTH CLAIM FOR RELIEF

Petitioner was deprived of due process of law and a fair trial under the Fifth, Sixth and Fourteenth Amendments by the trial Court's denial of co-counsel to assist in a proper pretrial investigation of this case and to prepare and present a defense at trial. Petitioner was indigent when the request was made. Had Petitioner been provided co-counsel as requested, with the assistance of co-counsel the defense team would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three, hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S TWENTY-SEVENTH CLAIM FOR RELIEF

Petitioner was deprived of due process of law and a fair trial under the Fifth and Fourteenth Amendments by the trial court's abuse of discretion in its refusal to find him indigent pretrial, and in its refusal to grant investigatory funds to conduct a proper and thorough pretrial investigation until July 22, 1997, the day that jury selection began. Petitioner was indigent when the request was made. Had Petitioner been provided investigatory funds as requested, with the assistance of a

investigator the defense team would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three, hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S TWENTY-EIGHTH CLAIM FOR RELIEF

Petitioner was deprived of due process of law and a fair trial under the Fifth and Fourteenth Amendments by the trial Court's abuse of discretion in overruling' trial counsel's motions for continuance upon the untimely granting of investigatory funds on July 22, 1997, the day that jury selection began. Had Petitioner been provided a reasonable continuance as requested, defense counsel would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three, hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S TWENTY-NINTH CLAIM FOR RELIEF

Petitioner was deprived of due process of law and a fair trial under the Fifth and Fourteenth Amendments by the Court's abuse of discretion in refusing to find Defendant, Reinaldo Dennes indigent pretrial, and refusing trial counsel's timely requests for co-counsel and a defense

investigator in this capital murder prosecution. Had Petitioner's requests been granted, defense counsel would have uncovered and presented before the jury the evidence presented in support of claims One through Twenty-Three, hereby incorporated by reference, and that was not presented to his trial jury during guilt-innocence and punishment.

## PETITIONER'S THIRTIETH CLAIM FOR RELIEF

Petitioner was deprived of due process of law and a fair trial under the Fifth and Fourteenth Amendments by the trial Court's refusal to honor its own pretrial rulings requiring the State to give timely notice of its intent to introduce evidence of defendant's commission of extraneous offenses at trial, as alleged in claims One through Twenty-Three of this Petition, hereby incorporated by reference, thereby prejudicing Petitioner, and by the Court's overruling of Defendant's motion to exclude this untimely evidence at trial.

## PETITIONER'S THIRY-FIRST CLAIM FOR RELIEF

Petitioner was deprived of due process of law and his right to the assistance of counsel under the Sixth Amendment because of the ineffective assistance of counsel at trial: the failure to investigate evidence of defendant's alleged commission of extraneous offenses and

the failure to voir dire and qualify the jury panel regarding this material issue at trial.

J.J. Gradoni, a licensed private investigator, appointed by the Court at the request of Mr. Odom, Jr., to assist in the investigation and defense of Mr. Dennes. Mr. Gradoni asserts that he failed to investigate Petitioner's alleged commission of extraneous offenses in advance of his trial. Mr. Gradoni and associates had not completed the investigation of issues pertaining to the case in chief at the time that Defendant's trial began.

## PETITIONER'S THIRTY-SECOND CLAIM FOR RELIEF

Petitioner further asserts that the Court's lengthy emphasis at trial, specifically during the charge to the jury in the guilt or innocence phase of trial, regarding Petitioner's refusal to testify deprived him of a fair trial, of his right to Due Process, and of his right to the presumption of innocence and to not be compelled to be a witness against himself under the Fifth Amendment. This constituted a misdirection to the jury on the law and the commission of "some other material error calculated to injure the right of the Defendant."

In addition, Petitioner contends that his trial counsel could not render effective assistance in investigating or pursuing the statutory grounds for new trial if the jurors refused to speak with counsel. This

was demonstrated by the affidavit of Joseph W. Glezman, a licensed private investigator who, at the request of new trial counsel, Leora Kahn, contacted several jurors in this trial. Some of the jurors declined to answer any questions at all, in any manner, when they learned that the questions came from defense counsel. The Court had directed jurors after the trial that while the lawyers in this case were eager to speak with them and invited them to remain a few minutes longer for that purpose, they were under no obligation to answer questions or speak to anyone, including defense counsel, regarding this case. Further, the prosecutor's similar directions in a letter to the jurors following the trial compounded the error and more firmly impressed upon them that neither the Court nor the State wished for them to speak to defense counsel because the only result would be to imperil their verdict.

In this case, the Court's directions to the jurors, compounded by the State's letters that they need not answer defense counsel's legitimate, timely and relevant questions, was prejudicial error because it constituted a misdirection to the jury on the law and the commission of "some other material error calculated to injure the rights of the Defendant." Petitioner retained the right to effective assistance of counsel in pursuing a motion for new trial and an appeal. The jurors who refused

to speak at all to defense counsel at the urging of the State deprived Petitioner of that right.

## PETITIONER'S THIRTY-THIRD CLAIM FOR RELIEF

**PETITIONER IS ENTITLED TO RELIEF IN THAT HIS TRIAL COUNSEL FAILED TO PROVIDE HIM WITH EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES CONSTITUTION.**

Mr. Dennes was deprived of the effective assistance of counsel during the guilt-innocence phase of his trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. If he had received effective assistance of counsel, there is a reasonable probability that the outcome at trial would have been different.

A. Counsel Failed to Object to the State's Successful Efforts to Repeatedly Imply to the Jury that a Judge Had Seen a Probable Cause Affidavit and Decided Petitioner Was Probably Guilty.

Petitioner adopts and reasserts all the facts and arguments of his previous claims as if repeated herein their entirety. Furthermore, Petitioner observes that defense counsel only made two objections during the course of the testimony about the judge signing arrest and search warrants. Each of those objections prevented the police officer from going into more detail about the probable cause affidavit, but counsel did not ask to have the jury instructed to disregard, nor did he ever object to

216

relevancy or the fact that the testimony was more prejudicial than probative. Finally, defense counsel did not attempt on cross-examination to show the jury that a judge is only looking for probable cause based on preliminary investigation. Another words, counsel did not attempt to correct the impression created by the State that a judge had already looked at the evidence and determined Petitioner was responsible for the crimes of which he stood accused.

### B. Counsel Repeatedly Failed to Object to Inadmissible Hearsay Testimony Which Was Damaging to Petitioner.

During the guilt-innocence phase of Petitioner's trial, Houston Police Officer Todd Miller testified for the state about a line-up in which Petitioner participated. An attorney, Mr. McCuIlough, had been appointed to represent Petitioner at the line-up, and Officer Miller repeatedly testified about statements McCuIlough made regarding the line-up. "He said the fill-ins were fine as they were." (RR. Vol. 27, p. 167). "Mr. McCuIlough asked Mr. Morales [a fill-in in the line-up] if the defendant could borrow [his jacket] and wear it during the line-up."

This hearsay testimony was clearly intended to bolster the officer's testimony regarding the propriety of the line-up, but it was hearsay under Texas Evidence Rule 802. Defense counsel failed to object to the testimony.

Miller also gave testimony that relied upon hearsay and testified that Mr. Copeland, a witness who viewed the line-up, eliminated certain people and made a tentative identification of the Petitioner (It should be noted that Copeland himself testified at trial). (RR. Vol. 27, p. 176-177). This was received without objection by defense counsel.

C.   On Numerous Occasions Defense Counsel Failed to Object to the State Repeatedly Leading Its Witnesses to An Extent Which Was Tantamount to the State Testifying.

During the guilt-innocence phase of the trial, the State conducted direct examination of Estrella Martinez, who was not a hostile witness. At one point, the prosecutor asked her, "Is that Reinaldo Dennes who told you that he rented the motel room so people wouldn't know he was in Houston"? The witness responded, "Yes." (RR. Vol. 28, p. 19). Shortly afterward, the prosecutor asked, "Did you have any other conversation about letting the defendant, Reinaldo Dennes, in the side door of the building on Sunday, January 21, 1996, or Monday, January 22, 1996?" (RR. Vol. 28, p. 22). And then, "Did he tell you for somebody to let him in so he can give the tape to somebody upstairs?" (RR. Vol. 28, p. 23).

Subsequently, the State asked, "Has anyone from the district attorney's office, me or anybody else, promised to to [sic] intercede on your behalf with the immigration people?" The witness answered, "Yes." Whereupon the State asked, "And was that to make sure you didn't get

deported before these trials are finished?" The witness replied, "Exactly." (RR. Vol. 28, p. 91).

Fairness requires that one of the State's principal witnesses provide her own responses to questions, instead of simply agreeing with the State. Texas Rule of Evidence 611(c) provides that leading questions should not be used on direct examination of a witness except as may be necessary to develop the testimony of the witness. A question is leading when is suggests the answer desired so that the witness is merely reflecting back the answer provided by the questioner. <u>Newsome v. State</u>, 829 S.W.2d 260 (Tex. App. Dallas 1992).

Failure to object to a leading question at the time it was asked waives any error in the asking of it. <u>Myers v. State</u>, 781 S.W.2d 730 (Tex. App. Fort Worth 1989, pet. refused). Counsel did not object to the State leading witnesses in any of the above-referenced instances.

C. Counsel's Performance in a Capital Case Was Ineffective and Prejudicial to Petitioner.

Under the Sixth Amendment to the Federal Constitution, a defendant in a criminal case is entitled to the assistance of counsel. <u>Argersinger v. Hamlin</u>, 407 U.S. 25,32 (1972). The United States Supreme Court has held that the right to assistance of counsel is the right to effective counsel. <u>McMann v. Richardson</u>, 397 U.S. 759 (1970). Examination of the record in respect to the above-referenced failings by

trial counsel reveals that counsel fell far short of the minimally accepted standards of competent professional representation guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. If Petitioner had received effective assistance of counsel during trial, there is a reasonable probability that he would not have been convicted of capital murder. See Strickland v. Washington, 466 U.S. 668 (1984); Ex Parte Walker, 111 S. W.2d 427 (Tex. Crim. App. 1989). Any of these failings considered individually might not constitute ineffectiveness; when considered collectively, however, they fall far short of the mark of acceptable representation in a capital case. Thus counsel's ineffectiveness substantially prejudiced Petitioner.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Petitioner prays this Honorable Court to consider each and every Claim for Relief raised herein, to grant Petitioner requested discovery, to grant an evidentiary hearing on his claims for relief, and after due consideration, to reverse Petitioner's conviction, and to order a new guilt-innocence or punishment phase trial as the law and justice demand.

Respectfully submitted,

McGuire Law Firm

BY:  /s/ Ken McGuire_____
     Kenneth W. McGuire
     Federal Admission No. 21917
     State Bar No. 00798361
     P.O. Box 79535
     Houston, TX 77279
     Telephone: (713) 223-1558
     Facsimile:  (713) 335-3340

     ATTORNEYS for PETITIONER
     REINALDO DENNES

## **VERIFICATION**

    I, Kenneth McGuire, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Reinaldo Dennes.

/s/ Ken McGuire_____
Kenneth McGuire

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing pleading was served on the Attorney General for the State of Texas, Counsel for Respondent, by ECF / fax / first class mail service to:

> Jeremy Greenwell
> Capital Litigation Division
> P.O. Box 12548
> Austin, TX 78711-2548
> Phone: 512-463-2378
> Fax:  512-320-8132
> jeremy.greenwell@texasattorneygeneral.gov

Dated: _____September 17th_____, 2015.

> _/s/ Ken McGuire_____
> Kenneth McGuire

# Exhibits Index

Exhibit A    <u>State v. Dennes</u> Reporter's Record-Trial Transcripts (Volumes 3; 11; 24-39)

Exhibit B    <u>State v. Dennes</u> Clerk's Record (Volumes 1 of 1 and Supplemental Clerk's Record)

Exhibit C    <u>State v. Luis Hector Fugon</u> Trial Transcripts (Fugon RR. Vols. 3-8).

Exhibit 1    Letter from Houston Police Department Sgts. Todd Miller and Jim Ladd to ADA Chuck Rosenthal, Harris County District Attorney's Office (dated July 9, 1996)

Exhibit 2    Indictment, <u>United States v. David Rene Balderas</u>, Cause No. M-98-154, U.S. District Court for the Southern District of Texas, McAllen Division.

Exhibit 3    <u>United States v. David Rene Balderas</u>, Sentencing Hearing Transcript (July 29, 1999), Cause No. 7:98-CR-00154-2, United States District Court for the Southern District of Texas, Brownsville Division

Exhibit 4    Affidavit of Robert F. Alexander, Attorney for Hector Luis Fugon

Exhibit 5    Ex Parte David Mark Temple, No. 1008763-A, in the 178th District Court of Harris County, Texas, Findings of Fact and Conclusions of Law dated July 8, 2015

Exhibit 6    Affidavit of Wendell A. Odom, Jr., Attorney for Reinaldo Dennes, <u>State of Texas v. Reinaldo Dennes</u>, Cause Number 750313, in the 263rd District Court, Harris County, Texas