APPELLATE COURT NO. 72966

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

-----------------------------------------------------

REINALDO DENNES

                    Appellant,

VS.

THE STATE OF TEXAS,

                    Appellee.

-------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

                    TEXAS

Judge Jim Wallace, Presiding

-----------------------------------------------------

CAUSE NO. 750,313

MASTER INDEX

Volume 2 of 39 Volumes

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

1      Volume 2

2      Master Index

3

4      Volume 3

5      Pre-Trial Motions

6      January 13, 1997

7      January 16, 1997

8

9      Volume 4

10     Pre-trial Motions

11     July 18, 1997

12     Chronological

13     Reinaldo Dennes

14          Examination by Mr. Odom                    4

15          Examination by Mr. Smyth                   11

16          Examination by Mr. Odom                    22

17          Arguments by Mr. Odom                      25

18          Arguments by Mr. Vinson                    26

19

20     Volume 5

21     Voir Dire

22     July 18, 1997

23     Voir dire Examination of the Jury Panel

24     by the Court                                    4

25

| | | |
|---|---|---|
| 1 | Volume 6 | |
| 2 | Pre-trial motions | |
| 3 | July 22, 1997 | |
| 4 | Todd Williams Miller | |
| 5 | Examination by Mr. Smyth | 4 |
| 6 | Examination by Mr. Odom | 23 |
| 7 | Beth Halling | |
| 8 | Examination by Mr. Smyth | 49 |
| 9 | Examination by Mr. Odom | 58 |
| 10 | David Walter Copeland | |
| 11 | Examination by Mr. Vinson | 61 |
| 12 | Examination by Mr. Odom | 79 |
| 13 | State Rests | 92 |
| 14 | Beth Halling | |
| 15 | Examination by Mr. Odom | 95 |
| 16 | Examination by Mr. Smyth | 97 |
| 17 | Examination by Mr. Odom | 98 |
| 18 | | |
| 19 | Volume 7 | |
| 20 | Voir Dire | |
| 21 | July 24, 1997 | |
| 22 | Frank Ross Gelona | |
| 23 | Examination by the Court | 7 |
| 24 | Examination by Mr. Smyth | 8 |
| 25 | Examination by Mr. McDonald | 28 |

1            Examination Cont'd by Mr. McDonald          60
2                Examination by Mr. Smyth                68
3        David Richard Sanders
4                Examination by the Court                73
5                Examination by Mr. Vinson               75
6        Derdra Yuvette Brantley
7                Examination by the Court                83
8                Examination by Mr. Vinson               84
9        Rene Esparza
10               Examination by the Court                93
11               Examination by Mr. Smyth                96
12       Lana Mary Miller
13               Examination by the Court               101
14               Examination by Mr. Vinson              103
15       Terry Allen Pedigo
16               Examination by the Court               108
17               Examination by Mr. Vinson              110
18               Examination by Mr. McDonald            131
19
20       Volume 8
21       Voir Dire
22       July 25, 1997
23       Donald Lardy Turpentine
24               Examination by the Court                 3
25

1           Examination by Mr. Smyth              5

2           Examination by Mr. Odom               33

3      Rosa Whitly Patterson

4           Examination by the Court              59

5           Examination by Mr. Vinson             61

6      John Richard Blye

7           Examination by the Court              66

8           Examination by Mr. Vinson             68

9           Examination by Mr. McDonald           92

10     Thomas John Kelly

11          Examination by the Court              120

12          Examination by Mr. Smyth              123

13          Examination by Mr. Odom               152

14     Marvin Bryce Traweek

15          Examination by the Court              184

16          Examination by Mr. Vinson             185

17          Examination by Mr. McDonald           214

18     Norman Leslie Hommel

19          Examination by the Court              233

20          Examination by Mr. Smyth              237

21          Examination by Mr. Odom               264

22

23

24

25

```
1    Volume 9

2    Voir Dire

3    July 28, 1997

4    Martha Jean Gutierrez

5          Examination by the Court          3

6          Examination by Mr. Smyth           3

7          Examination by Mr. Odom           31

8          Examination by the Court         44

9          Examination by Mr. Odom           49

10         Examination by the Court         54

11   Joyce Griffis

12         Examination by the Court         59

13         Examination by Mr. Vinson        59

14         Examination by Mr. Odom          84

15   Gabriel Guzman

16         Examination by the Court        106

17         Examination by Mr. Smyth        106

18   Donna Jeffcoat Tippit

19         Examination by the Court        110

20         Examination by Mr. Smyth        110

21   Sharon Virt Alaimo

22         Examination by the Court        135

23         Examination by Mr. Vinson       136

24         Examination by Mr. Odom         158

25
```

| | | |
|---|---|---|
| 1 | Examination by the Court | 177 |
| 2 | Examination Cont'd by the Court | 183 |
| 3 | Daniel Lee Williams | |
| 4 | Examination by the Court | 187 |
| 5 | Examination by Mr. Smyth | 187 |
| 6 | Examination by Mr. Odom | 214 |
| 7 | Examination by the Court | 227 |
| 8 | Examination by Mr. Odom | 230 |
| 9 | | |
| 10 | Volume 10 | |
| 11 | Voir Dire | |
| 12 | July 29, 1997 | |
| 13 | David Ray Jones | |
| 14 | Examination by the Court | 4 |
| 15 | Examination by Mr. Vinson | 4 |
| 16 | Examination by Mr. Odom | 20 |
| 17 | Louis Clarence Taylor | |
| 18 | Examination by the Court | 27 |
| 19 | Examination by Mr. Smyth | 27 |
| 20 | Shelly S. Villarreal | |
| 21 | Examination by the Court | 40 |
| 22 | Examination by Mr. Vinson | 40 |
| 23 | Examination by Mr. Odom | 61 |
| 24 | | |
| 25 | | |

1    Gilbert Anthony Avalos

2         Examination by the Court              83

3         Examination by Mr. Smyth              83

4         Examination by Mr. Odom               111

5    Shirley Ann Itima

6         Examination by the Court              133

7         Examination by Mr. Vinson             133

8    Baldemar Alfaro

9         Examination by the Court              141

10        Examination by Mr. Vinson             141

11   Thomas Edward Barcello

12        Examination by the Court              152

13        Examination by Mr. Smyth              152

14

15   Volume 11

16   Voir Dire

17   July 30, 1997

18   Irene B. Umshtein Collins

19        Examination by the Court              4

20        Examination by Mr. Vinson             4

21        Examination by Mr. Odom               24

22        Examination by the Court              46

23   Robert Lee Schmidt

24        Examination by the Court              50

25        Examination by Mr. Smyth              50

1              Examination by the Court              81
2              Examination by Mr. Odom               84
3              Examination by the Court              92
4       L. C. Johnson
5              Examination by the Court              94
6              Examination by Mr. Vinson             94
7              Examination by Mr. Odom               117
8              Examination by the Court              133
9
10      Volume 12
11      Voir Dire
12      July 30, 1997
13      Yomi John
14             Examination by the Court              53
15             Examination by Mr. Vinson             54
16             Examination by Mr. Odom               76
17      Teresa Hamner Johnson
18             Examination by the Court              101
19             Examination by Mr. Vinson             101
20      Rhonda Johnson Mainor
21             Examination by the Court              3
22             Examination by Mr. Smyth              4
23             Examination by Mr. Odom               29
24
25

1      Kathleen D. McKinley

2           Examination by the Court          115

3           Examination by Mr. Vinson         116

4           Examination by Mr. Odom           129

5

6      Volume 13

7      Voir Dire

8      July 13, 1997

9      Voir Dire Examination of the Jury Panel

10     by the Court                            3

11     Jeanne Stanford Jarvis

12          Examination by the Court          51

13          Examination by Mr. Smyth          51

14          Examination by Mr. Odom           75

15          Examination by the Court          94

16     Hugh Frances Taylor

17          Examination by the Court          103

18          Examination by Mr. Vinson         103

19          Examination by Mr. Odom           118

20          Examination by the Court          131

21          Examination by Mr. Odom           136

22     Bruce Alan Crouch

23          Examination by the Court          140

24          Examination by Mr. Smyth          140

25          Examination by Mr. Odom           165

1    Belle Colleen Symmank

2         Examination by the Court          184

3         Examination by Mr. Vinson         184

4         Examination by Mr. Odom           208

5    Michael L. Zoellner

6         Examination by the Court          229

7         Examination by Mr. Smyth          229

8         Examination by Mr. Odom           257

9    Volume 14

10   Voir Dire

11   August 1, 1997

12   Leslie Schwabenland Line

13        Examination by the Court          3

14        Examination by Mr. Vinson         5

15        Examination by Mr. Odom           28

16   Nancy Poe Bolver

17        Examination by the Court          39

18        Examination by Mr. Smyth          40

19        Examination by Mr. Odom           69

20   Allen Lau Griffin

21        Examination by the Court          96

22        Examination by Mr. Vinson         97

23

24

25

1      Billy Ray Wierzbicki

2            Examination by the Court              147

3            Examination by Mr. Smyth              149

4      Cary Blank Heath

5            Examination by the Court              151

6            Examination by Mr. Smyth              151

7            Examination by Mr. Odom               180

8      Barbara Chavis Spencer

9            Examination by the Court              204

10           Examination by Mr. Vinson             205

11           Examination by Mr. Odom               225

12     Mable Senegal Dyer

13           Examination by the Court              233

14           Examination by Mr. Smyth              233

15           Examination by Mr. Odom               263

16

17     Volume 15

18     Voir Dire

19     August 4, 1997

20     Guadalupe Balboa

21           Examination by the Court              5

22           Examination by Mr. Vinson             7

23           Examination by Mr. Odom               32

24           Examination by the Court              44

25           Examination by Mr. Odom               45

  1    Jon Michael Shelton

  2          Examination by the Court            55

  3          Examination by Mr. Odom             57

  4          Examination by Mr. Odom             83

  5    Gaudelupe Ramos

  6          Examination by the Court            102

  7          Examination by Mr. Smyth            105

  8          Examination by Mr. Odom             135

  9          Examination by the Court            138

 10          Examination by Mr. Odom             141

 11          Examination by the Court            147

 12          Examination by Mr. Odom             150

 13          Examination by the Court            153

 14    Gregory David

 15          Examination by the Court            159

 16          Examination by Mr. Vinson           162

 17    Irma Ortiz Ledesma

 18          Examination by the Court            168

 19          Examination by Mr. Vinson           171

 20    Mark Edison Heatwole

 21          Examination by the Court            178

 22          Examination by Mr. Vinson           181

 23          Examination by Mr. Odom             200

 24

 25

```
 1    Henry Herman
 2          Examination by the Court        221
 3          Examination by Mr. Smyth        226
 4          Examination by Mr. Odom         255
 5
 6    Volume 16
 7    Voir Dire
 8    August 5, 1997
 9    Edwin Clarkson
10          Examination by the Court        3
11          Examination by Mr. Vinson       7
12          Examination by Mr. Odom         28
13    Terri Wong Lew
14          Examination by the Court        43
15          Examination by Mr. Smyth        49
16    James Thomas Pinto
17          Examination by the Court        59
18          Examination by Mr. Smyth        66
19    David Melton Eppley
20          Examination by the Court        70
21          Examination by Mr. Vinson       77
22          Examination by Mr. Odom         102
23
24
25
```

1    Sharon Bethea King

2        Examination by the Court          127

3        Examination by Mr. Smyth          136

4        Examination by Mr. Odom           166

5    Gerald Mathew Kappes

6        Examination by the Court          188

7        Examination by Mr. Vinson         197

8        Examination by Mr. Odom           219

9

10   Volume 17

11   Voir Dire

12   August 5, 1997

13   Robert Antonio Darrow

14       Examination by the Court          244

15       Examination by Mr. Smyth          257

16       Examination by Mr. Odom           287

17

18   Volume 18

19   Voir Dire

20   August 6, 1997

21   Voir Dire Examination of the Jury Panel

22   by the Court                          3

23

24

25

1    Richard Wayne Miller

2        Examination by the Court          90

3        Examination by Mr. Vinson         91

4        Examination by Mr. Odom          116

5        Examination by the Court         129

6        Examination by Mr. Odom          130

7        Examination by the Court         132

8        Examination by Mr. Odom          134

9    Dana Cris Durbin

10       Examination by the Court         139

11       Examination by Mr. Smyth         141

12       Examination by the Court         168

13       Examination by Mr. Odom          170

14       Examination by the Court         180

15   Susanne Marie Trevino

16       Examination by the Court         184

17       Examination by Mr. Vinson        187

18       Examination by Mr. Odom          212

19   Mark Anthony Jimenez

20       Examination by the Court         217

21       Examination by Mr. Smyth         221

22       Examination by Mr. Odom          252

23       Examination by the Court         265

24

25

1      Volume 19

2      Voir Dire

3      August 7, 1997

4      Robert Francis Talerico

5          Examination by the Court          3

6          Examination by Mr. Vinson         6

7          Examination by Mr. Odom           32

8      Dewayne E. Keith Glaesmann

9          Examination by the Court          61

10         Examination by Mr. Smyth          64

11     Mary Hubb Altizer

12         Examination by the Court          71

13         Examination by Mr. Smyth          74

14         Examination by Mr. Odom           106

15     Deborah Denise McNeal

16         Examination by the Court          129

17         Examination by Mr. Vinson         132

18         Examination by Mr. Odom           157

19     Leslie Chandler Bazzoon

20         Examination by the Court          179

21         Examination by Mr. Smyth          184

22         Examination by Mr. Odom           213

23

24

25

1    Efrain Campos

2         Examination by the Court          234

3         Examination by Mr. Vinson         239

4         Examination by Mr. Vinson         239

5         Examination by Mr. Odom           263

6

7    Volume 20

8    Voir Dire

9    August 8, 1997

10   Wanda Denise Debose

11        Examination by the Court          3

12        Examination by Mr. Vinson         6

13        Examination by Mr. Odom           31

14   Jerry Lee Lewis

15        Examination by the Court          57

16        Examination by Mr. Smyth          60

17        Examination by Mr. Odom           90

18   Ellen Marie Malwitz

19        Examination by the Court          113

20        Examination by Mr. Vinson         116

21        Examination by Mr. Odom           140

22

23

24

25

1       Volume 21

2       Voir Dire

3       August 8, 1997

4       Ross Stephen Harris

5               Examination by the Court            3

6               Examination by Mr. Smyth           10

7               Examination by Mr. Odom            41

8       Victor John Luszcz

9               Examination by the Court           69

10              Examination by Mr. Vinson          74

11              Examination by Mr. Odom            92

12      Joseph Edward Womack

13              Examination by the Court          118

14              Examination by Mr. Smyth          125

15              Examination by Mr. Odom           154

16

17      Volume 22

18      Voir Dire

19      August 11, 1997

20      Bobbie Joe Jackson

21              Examination by the Court            3

22      Eileen Walker Mandorff

23              Examination by the Court            5

24              Examination by Mr. Vinson          11

25              Examination by Mr. Odom            39

1    Brenda Yearwood Hargrave

2          Examination by the Court          66

3          Examination by Mr. Smyth          71

4          Examination by Mr. Odom           100

5    John Lucian Selman

6          Examination by Mr. Smyth          123

7          Examination by Mr. Odom           156

8

9    Volume 23

10   Voir Dire

11   August 11, 1997

12   Robin Vanderslice

13         Examination by the Court          3

14         Examination by Mr. Smyth          6

15   Praim Singh

16         Examination by the Court          15

17         Examination by Mr. Vinson         20

18         Examination by Mr. Odom           43

19         Examination by the Court          52

20         Examination by Mr. Odom           57

21         Examination by the Court          60

22   Ruby O. Flores

23         Examination by the Court          51

24         Examination by Mr. Vinson         64

25         Examination by Mr. Odom           83

```
 1     Pamela Jackson Chatman

 2          Examination by the Court              98

 3          Examination by Mr. Smyth             103

 4

 5     Volume 24

 6     Pre-trial Motions

 7     August 13, 1997

 8

 9     Volume 24A

10     August 18, 1997

11     Voir Dire

12     Voir Dire of the Jury Panel by the Court       4

13

14     Volume 25

15     Trial

16     August 18, 1997

17     Opening Statement by Mr. Smyth              10

18     Paul Terry

19          Direct Examination by Mr. Vinson       14

20          Cross Examination by Mr. Odom          29

21          Redirect Examination by Mr. Vinson     45

22          Recross Examination by Mr. Odom        47

23

24

25
```

1    J. L. Kay

2        Direct Examination by Mr. Vinson      50

3        Cross Examination by Mr. Odom        75

4        Redirect Examination by Mr. Vinson   97

5    David Walter Copeland

6        Direct Examination by Mr. Vinson     101

7        Cross Examination by Mr. Odom       157

8

9    Volume 26

10   Trial

11   August 19, 1997

12   David Walter Copeland

13       Cross Examination Continued by Mr. Odom  4

14       Redirect Examination by Mr. Vinson  51

15       Recross Examination by Mr. Odom    75

16   Antonio Ramirez

17       Direct Examination by Mr. Vinson    88

18       Voir Dire Examination by Mr. Odom   185

19

20   Volume 27

21   Trial

22   August 20, 1997

23   Antonio Ramirez

24       Cross Examination by Mr. Odom       4

25       Redirect Examination by Mr. Vinson  87

1    Recross Examination by Mr. Odom          106

2    Redirect Examination by Mr. Vinson       117

3  Lois Gibson

4    Direct Examination by Mr. Smyth          126

5    Cross Examination by Mr. Odom            140

6    Redirect Examination by Mr. Smyth        145

7    Recross Examination by Mr. Odom          148

8    Further Direct Examination by Mr. Smyth  150

9  Todd William Miller

10    Direct Examination by Mr. Smyth         151

11    Cross Examination by Mr. Odom           182

12

13  Volume 28

14  Trial

15  August 21, 1997

16  Estrella Martinez

17    Direct Examination by Mr. Smyth         8

18  M. R. Furstenfeld

19    Direct Examination by Mr. Smyth         93

20    Cross Examination by Mr. Odom           126

21    Redirect Examination by Mr. Smyth       141

22    Recross Examination by Mr. Odom         160

23

24

25

```
 1    James L. Waltman
 2          Direct Examination by Mr. Smyth        166
 3
 4    Volume 29
 5    Trial
 6    August 22, 1997
 7    James Waltman
 8          Direct Examination Continued by Mr. Smyth     4
 9          Cross Examination by Mr. Odom               32
10          Redirect Examination by Mr. Smyth          104
11          Recross Examination by Mr. Odom            113
12    Estrella Martinez
13          Cross Examination by Mr. Odom              120
14
15    Volume 30
16    Trial
17    August 25,1997
18    Estrella Martinez
19          Cross Examination Continued          4
20          Redirect Examination by Mr. Smyth    16
21          Recross Examination by Mr. Odom      20
22    Beth Halling
23          Direct Examination by Mr. Vinson     24
24          Voir Dire Examination by Mr. Odom    37
25          Direct Examination Continued         39
```

1   Voir Dire Examination by Mr. Odom  39

2   Direct Examination Continued  40

3   Cross Examination by Mr. Odom  49

4   Redirect Examination by Mr. Vinson  64

5   Recross Examination by Mr. Odom  68

6   Further Direct Examination by Mr. Vinson 71

7   Further Cross Examination by Mr. Odom 71

8  Tommy J. Brown

9   Direct Examination by Mr. Vinson  72

10   Cross Examination by Mr. Odom  96

11  G. L. Burke

12   Direct Examination by Mr. Vinson  102

13  W. L. Stairhime

14   Direct Examination by Mr. Vinson  107

15   Cross Examination by Mr. Odom  117

16   Redirect Examination by Mr. Vinson  123

17   Recross Examination by Mr. Odom  125

18  Walter Rowe

19   Direct Examination by Mr. Vinson  129

20   Cross Examination by Mr. Odom  134

21  Leroy Tuttle

22   Direct Examination by Mr. Vinson  138

23   Cross Examination by Mr. Odom  143

24   Redirect Examination by Mr. Vinson  145

25

```
 1    W. L. Stairhime
 2          Direct Examination by Mr. Vinson        146
 3    Robert Baldwin
 4          Direct Examination by Mr. Smyth         148
 5          Cross Examination by Mr. Odom           170
 6
 7    Volume 31
 8    Trial
 9    August 26, 1997
10    Robert Baldwin
11          Cross Examination Continued             4
12          Redirect Examination by Mr. Smyth       36
13          Cross Examination by Mr. Odom           46
14    Robert George Molina, Jr.
15          Direct Examination by Mr. Smyth         54
16          Cross Examination by Mr. Odom           156
17    Sam Solomay
18          Direct Examination by Mr. Smyth         163
19          Voir Dire Examination by Mr. Odom       194
20          Direct Examination Continued            196
21          Cross Examination by Mr. Odom           200
22
23
24
25
```

1     Volume 32

2     Trial

3     August 27, 1997

4     Charles A. Rosenthal, Jr.

5          Direct Examination by Mr. Vinson          5

6          Cross Examination by Mr. Odom            18

7          Redirect Examination by Mr. Vinson       35

8          Recross Examination by Mr. Odom          37

9     Nicole Szucs

10         Direct Examination by Mr. Vinson         39

11         Cross Examination by Mr. Odom            65

12    State Rests                                   65

13    Opening Statement by Mr. Odom                 77

14    Richard Ernest

15         Direct Examination by Mr. Odom           83

16         Cross Examination by Mr. Smyth          123

17         Redirect Examination by Mr. Odom        155

18         Recross Examination by Mr. Smyth        154

19         Further Direct Examination by Mr. Odom  170

20    Ellis McCullough

21         Direct Examination by Mr. Odom          172

22         Cross Examination by Mr. Vinson         183

23         Redirect Examination by Mr. Odom        200

24

25

1    J. J. Gradoni

2         Direct Examination by Mr. Odom          202

3         Cross Examination by Mr. Smyth           214

4         Redirect Examination by Mr. Odom         223

5

6    Volume 33

7    Trial

8    August 28, 1997

9    Daisy Dennes

10        Direct Examination by Mr. Odom           4

11        Voir Dire Examination by Mr. Smyth       11

12        Direct Examination Continued             13

13        Cross Examination by Mr. Smyth           16

14        Redirect Examination by Mr. Odom         25

15        Recross Examination by Mr. Smyth         26

16   Defense Rests                                 28

17   State rests and Closes                        30

18   Objections to the charge                      32

19   Closing Arguments by Mr. Smyth                41

20   Closing Arguments by Mr. Odom                 61

21   Closing Arguments by Mr. Vinson               85

22   Verdict                                       108

23

24

25

1      Volume 34

2      Punishment

3      September 2, 1997

4      Jimmy De Los Santos

5         Direct Examination by Mr. Vinson     43

6      David Balderas

7         Direct Examination by Mr. Vinson     49

8         Cross Examination by Mr. Odom       82

9         Redirect Examination by Mr. Vinson   95

10        Recross Examination by Mr. Odom    96

11     Danny Tsang

12        Direct Examination by Mr. Smyth    101

13     Christina Tsang

14        Direct Examination by Mr. Smyth    121

15     Rachel Ohayon

16        Direct Examination by Mr. Smyth    128

17        Cross Examination by Mr. Odom      133

18     Nicole Szucs

19        Direct Examination by Mr. Vinson   135

20     Ana Moreno

21        Direct Examination by Mr. Vinson   146

22     Roy William McDonald

23        Direct Examination by Mr. Vinson   150

24     State Rests                       156

25     Defendant's Motion           156

1    Calvin Wilson

2         Direct Examination by Mr. Odom         159

3         Cross Examination by Mr. Vinson         170

4         Redirect Examination by Mr. Odom        174

5         Recross Examination by Mr. Vinson       175

6         Further Direct Examination              176

7    Dr. Jerome Brown

8         Direct Examination by Mr. Odom          179

9         Cross Examination by Mr. Vinson         207

10        Redirect Examination by Mr. Odom        235

11        Recross Examination by Mr. Vinson       241

12        Further Direct Examination              243

13   Ray Dennes

14        Direct Examination by Mr. Odom          244

15

16   Volume 35

17   Punishment

18   September 3, 1997

19   Demitra Dennes

20        Direct Examination by Mr. Odom          6

21        Cross Examination by Mr. Smyth          17

22        Redirect Examination by Mr. Odom        23

23   Defense rests                                24

24

25

```
 1    Royce Smithy
 2         Direct Examination by Mr. Vinson        26
 3         Cross Examination by Mr. Odom           40
 4    State Rests                                  50
 5    Defense Rests                                51
 6    Closing Arguments by Mr. Smyth               58
 7    Closing Arguments by Mr. Odom                67
 8    Closing Arguments by Mr. Vinson              84
 9    September 4, 1997
10    Verdict                                     106
11    Sentencing                                  108
12
13    Volume 36
14    Motion for New Trial
15    November 6, 1997
16    Wendell Odom
17         Examination by Mr. Charlton             13
18         Examination by Mr. Vinson               31
19         Examination by Mr. Charlton             68
20         Examination by Mr. Vinson               72
21    Defense Rests                                77
22    Mark Vinson
23         Examination by Mr. Smyth                78
24         Examination by Mr. Schneider            90
25
```

```
 1          Examination by Mr. Smyth              102

 2          Examination by Mr. Schneider          107

 3          Examination by Mr. Smyth              108

 4      November 13, 1997

 5      Wendell Odom

 6          Examination by Mr. Vinson             131

 7          Examination by Mr. Charlton           145

 8          Examination by Mr. Vinson             149

 9      Motion Denied                             154

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        APPELLATE COURT NO. *72966*

2          IN THE COURT OF CRIMINAL APPEALS

3              OF THE STATE OF TEXAS

4

5      -------------------------------------------------

6    REINALDO DENNES

7                    Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                   Appellee.

11     -------------------------------------------------

12

13   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                      TEXAS

15          Judge Jim Wallace, Presiding

16     -------------------------------------------------

17              CAUSE NO. 750,313

18              August 13, 1997

19              Reporter's Record

20

21          Volume 24 of *39* Volumes

22

23          Sharon Kay Cook
            Official Court Reporter
24          301 San Jacinto
            Houston, Texas 77002

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk



Volume 24

Pre-trial motions

August 13, 1997

i

```
 1                        CAUSE NO. 750,313

 2    STATE OF TEXAS            IN THE 263RD DISTRICT COURT

 3    VS.                              OF

 4    REINALDO DENNES           HARRIS COUNTY, T E X A S

 5

 6    A P P E A R A N C E S:

 7    For the State:           Mr. Mark Vinson
                               Bar Card No. 20590456
 8                             Mr. Don Smyth
                               Bar Card No. 18777700
 9                             Assistant District Attorneys
                               201 Fannin
10                             Houston, Texas 77002
                               713-755-7050
11
      For the Defendant:       Mr. Wendell Odom
12                             Bar Card No. 15297500
                               Attorney at Law
13                             1303 McKinney, Suite 3100
                               Houston, Texas 7710
14                             713-951-9555

15

16             BE IT REMEMBERED that upon this the 13th

17    day of August, A. D. 1997, the above entitled and

18    numbered cause came on for motions before the

19    Honorable Jim Wallace, Judge of the 263rd District

20    Court of Harris County, Texas; and the State appearing

21    in person and the Defendant appearing in person and by

22    counsel, announced ready for hearing, and all

23    preliminary matters having been disposed of, the

24    following proceedings were had, viz:

25
```

1              THE COURT:   What do we need on the

2    record?

3              MR. ODOM:   We have reached an impasse on

4    certain motions we filed previously and discussed with

5    the State and I would like to request the following:

6              In regards to the motion for discovery, I

7    have requested a copy of the ballistic report that was

8    done by HPD on the bullets involved in this case, and

9    although being told of the results, the ultimate

10   results, I have been told that the report itself is

11   work product, and I would like a copy of the report.

12             I have requested a copy of the -- to copy

13   the original sketch that was done of the perpetrator

14   of the crime that was done by a sketch artist, HPD

15   sketch artist.  My understanding is the district

16   attorney's office does not have a copy themselves, and

17   I would request the original so I can take either a

18   photograph or look at the original sketch.

19             THE COURT:   Sketch of what?

20             MR. ODOM:   Of the person that shot the

21   security guard.

22             MR. VINSON:   A sketch made by an artist's

23   rendition.

24             MR. ODOM:   It's an artist's rendition of

25   the person who he said shot him that is related to the

1    case in question, the capital murder case.

2              THE COURT:  I thought you said the State

3    didn't have it.

4              MR. ODOM:  All they got is a xerox copy.

5    I want to see the original.

6              THE COURT:  Who has got the original?

7              MR. VINSON:  I take it, probably the

8    officer in the file.  Evidently these things are to

9    the public in some instances so I didn't quibble about

10   it.  And I made a copy of this, and it's the best I

11   could on a machine but we can let him look at the

12   original.  I don't have any problem with that.

13             MR. ODOM:  I would like to make a copy of

14   the original, take a picture or whatever.

15             MR. VINSON:  We will make a copy.

16             MR. ODOM:  He gave me the best copy he has

17   of his copy, which is not what I am complaining

18   about.  It's a fact it's hard to see.

19             I also would request a copy -- or to be

20   able to copy -- the photograph of the person that was

21   originally identified by Mr. Copeland, the security

22   guard, in the photo spread wherein he identified

23   another person as being the closest person to resemble

24   the assailant that shot him on the night in question.

25   And I believe that Your Honor heard a hearing in

1    regards to Mr. Copeland and I have seen the photo

2    spread.  I would like a copy of the photograph of the

3    person that was identified by Mr. Copeland in the

4    hospital off of that photo spread.

5              THE COURT:  Does the State have a problem

6    with that?

7              MR. VINSON:  The reason we don't

8    generally, first of all, because his client's picture

9    does not appear in here and this generally is not

10   offered to the public as opposed to the artist

11   rendition.  I have no problem making this available

12   for trial.  He can look at it.  Mr. Copeland said the

13   one in position number five and on February 5th of

14   last year.  He said that was the person that most

15   resembled the person who shot him.  And I think that's

16   what he testified to.  But we will certainly have it

17   for trial.  I don't care, any time he can look at it.

18   I just hate to get into.

19             MR. ODOM:  It's my position that is Brady

20   and that it will help my investigation, in the

21   assistance of my defense, for me to have a copy of the

22   person that the complainant said most resembled the

23   assailant.

24             MR. VINSON:  What I will do, Your Honor,

25   because he insists it is Brady and we are not

1    insisting it is Brady, and I will go ahead and xerox a

2    copy of this one photograph and give it to him; is

3    that satisfactory?

4              MR. ODOM:  That's fine.  And if I need an

5    actual copy of it, like make a photographic copy of

6    it.

7              MR. VINSON:  I think this is the best they

8    have to my understanding.

9              MR. ODOM:  If I could bring my own camera

10   and take a photograph, if that is necessary.

11             MR. VINSON:  Yeah.  I don't have any

12   problem with that, Your Honor.  We will do that.

13             THE COURT:  Okay.  But as far as the

14   ballistic report, that will be denied.

15             MR. VINSON:  Ballistic report, we will

16   make it available for cross examination.  We will have

17   it available for cross examination, if he needs it,

18   Your Honor.

19             THE COURT:  Okay.  What else?

20             MR. ODOM:  I have a motion for discovery

21   of extraneous offenses for the punishment stage as

22   well as in the case in chief.  My understanding:  I

23   have been placed on notice as to an extraneous on my

24   case in chief.

25             THE COURT:  Within the time frame that is

1    required.

2            MR. ODOM:  Within the time frame required

3    and they have complied with that.

4            But on the punishment stage, it is my

5    contention that I'm entitled to a great deal more

6    information than I presently have.  And if they are

7    going to use any evidence of extraneous matters at the

8    punishment stage, my understanding is they are still

9    working on the evidence that they have on the

10   extraneous stage, that maybe -- but I'm looking at

11   going to trial on Monday.  I am trying this by myself.

12     I may or may not have some assistance, but I would

13   not be in a position to investigate these matters,

14   these extraneous matters, for the punishment stage

15   unless I have adequate time to prepare investigation

16   and defend as due process entitles me to.

17           MR. VINSON:  In response to that, Your

18   Honor, this morning I did make Mr. Odom aware that in

19   the punishment stage we will attempt to prove a home

20   invasion.  At this time that has not jelled.  We still

21   are trying to develop it.

22           We do have the offense report, and I told

23   him if he wants to look at the offense report, we will

24   make that available to him.  Obviously, you are going

25   to have a homeowner, and you will have to have some

1    victim in that house.  We will have the officer, at

2    least one of the officers, who investigated it and

3    that's in the offense report as well.

4              THE COURT:  What was the disposition of

5    that case?

6              MR. SMYTH:  He was never charged in it.

7              MR. VINSON:  The defendant wasn't

8    charged.  We have some people who was prosecuted out

9    of it.  One man has been bench warranted back from

10   TDC.  We are not certain if we will get assistance

11   from him or not.  I think if Wendell will check with

12   Les today to see the name of the person bench

13   warranted back.

14             We are trying to track down another person

15   who may or may not be able to give some assistance,

16   and we won't know that until we get our hands on him

17   and talk to him and verify who he is and if he has

18   anything to contribute.

19             And moreover, my understanding, if this

20   person is willing to come forth and help us, there is

21   some concern about the safety of the person, so we

22   would be asking that if the Court is going to

23   entertain the identity of that person, first, we can

24   establish the identity ourselves and meet with the

25   Court in ex parte to discuss the safety of the person.

1          THE COURT:  I will defer any ruling on

2   that to see if it is going anywhere or not.  But we

3   will make the offense report available for Mr. Odom to

4   read.

5          (Off-the-record discussion held.)

6          MR. ODOM:  The last thing I have on my

7   list, I request any new reports that I haven't seen

8   and I have received a new report today on the

9   fingerprints.  My understanding:  There are no

10  additional new reports in relation to physical

11  evidence that I had requested originally in my motion

12  for discovery in which I had requested the ongoing

13  process of discovery in this case, if they have got

14  any new physical evidence, and that's my understanding

15  as of this date.

16         MR. VINSON:  So we can summarize then, I

17  am to give you a copy, a better copy of the artist's

18  rendition.  I agree that you can come with your own

19  camera and take a photo of the person identified in

20  position number five.

21         MR. ODOM:  And you disagreed on the

22  ballistic.

23         MR. VINSON:  And the ballistics report

24  will be available for cross examination.

25         And then the photo of the punishment, home

1      invasion -- not the photo, I mean the offense report,

2      we will have that available for you to read.

3                     MR. ODOM:  Great.  That's it.

4                     (Recess taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       APPELLATE COURT NO. _*72966*_

2             IN THE COURT OF APPEALS

3             OF THE STATE OF TEXAS

4

5       ----------------------------------------------------

6    REINALDO DENNES

7                    Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                   Appellee.

11      --------------------------------------------------

12

13   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                    TEXAS

15        Judge Jim Wallace, Presiding

16      ----------------------------------------------------

17              CAUSE NO. 750,313

18              August 18, 1997

19              Reporter's Record

20

21          Volume 24A of *29* Volumes

22

23           Sharon Kay Cook
          Official Court Reporter
24           301 San Jacinto
          Houston, Texas 77002

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Volume 24 A

Voir Dire

August 18, 1997

Motion by Mr. Odom                                          3

Voir Dire Examination of the Jury Panel

by the Court                                               22

Judge called the names of the jurors                       44

```
 1                      CAUSE NO. 750,313

 2   STATE OF TEXAS              IN THE 263RD DISTRICT COURT

 3   VS.                               OF

 4   REINALDO DENNES          HARRIS COUNTY, T E X A S

 5   A P P E A R A N C E S:

 6   For the State:           Mr. Mark Vinson
                              Bar Card No.
 7                            Mr. Don Smyth
                              Bar Card No.
 8                            Assistant District Attorneys
                              201 Fannin
 9                            Houston, Texas 77002
                              713-755-7050
10   For the Defendant:       Mr. Wendell Odom
                              Bar Card No. 15208500
11                            Ms. Yalia Guerrero
                              Bar Card No. 0078862
12                            Attorneys at Law
                              1300 McKinney, Suite 3100
13                            Houston, Texas 77010
                              713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 18th

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for voir dire before the

19   Honorable Jim Wallace, Judge of the 263rd District

20   Court of Harris County, Texas; and the State appearing

21   in person and the Defendant appearing in person and by

22   counsel, announced ready for voir dire, and all

23   preliminary matters having been disposed of, the

24   following proceedings were had, viz:

25
```

1          THE COURT:  Let the record reflect that we

2    are back in chambers with the attorneys for the State

3    and the attorney for the defendant and that the

4    defendant is present.

5          And I understand that -- let me start off

6    with saying that, as I stated earlier, I was going to

7    give each side a short opportunity to voir dire the

8    final panel today, if they had anything they wanted to

9    cover in the general voir dire.  And it's my

10   understanding that the State elects not to voir dire

11   the panel and is prepared to make their strikes; is

12   that correct?

13         MR. VINSON: Yes, sir.

14         THE COURT:  And Mr. Odom?

15         MR. ODOM:  That's correct.

16         THE COURT:  And you are prepared to go

17   without any additional voir dire of this panel?

18         MR. ODOM:  That's right.

19         THE COURT:  What I am going to do is a

20   short voir dire, to question whether or not they had

21   any change of heart on the answers they provided each

22   of you and conclude that, come back in chambers and

23   start picking the jury.

24         And I understand you had some other

25   matters that you would like to place on the record,

1    Mr. Odom.

2         MR. ODOM:  The first thing in regards to

3    my response that I would like to not voir dire, do an

4    additional general voir dire, this may bear on that

5    somewhat:  I have filed two motions that are related

6    this morning with the Court.  One is a motion to

7    prohibit the introduction of extraneous offenses at

8    the punishment stage of the trial and related to --

9    it's defendant's third motion for continuance, which I

10   can show the Court my copy.  I believe the originals

11   are here.  Both motions deal with the same subject

12   matter and it is this.

13        That on August 13th, which was last

14   Wednesday or Thursday, I was informed that the State

15   may offer certain extraneous offenses at the

16   punishment stage.  And I was told at that time that

17   the State had bench warranted an individual by the

18   time of Hector Luis Fugon, and I was able to get the

19   name of that individual at that date.

20        It's also my understanding, I was told,

21   that this involved my client being possibly the master

22   mind of some home invasions that occurred prior to --

23   I believe prior to the date of the offense that is

24   presently in question.

25        My motion for continuance is as follows:

1    That is, that I had requested this very information

2    almost a year ago, certainly six months ago.  The

3    Court had made a ruling in January of '97, that the

4    State was to provide to me 15 days prior to trial any

5    -- certain information regarding any extraneous

6    offenses that would be offered at the punishment

7    stage.  And although I had requested more, the

8    information that the Court had ordered that the State

9    give to me, included at the bare minimum, the fact

10   that such evidence existed and such extraneous

11   offenses existed.

12        My motion lays out -- and it's sworn -- to

13   the fact that my investigator -- who will be here at

14   10:30 and I would like to put him on the record to

15   verify this, has been working -- was appointed around

16   July 18th.  He has been working full time on the case

17   in chief.  We do not have time while I'm in trial to

18   investigate brand new offenses that may come up in the

19   punishment stage, and, as such, we would not be

20   prepared nor could we adequately defend ourselves

21   against brand new offenses that I was informed two

22   working days prior to the start of this trial.

23        My second motion, which is related to it,

24   and I asked on that motion for continuance just for at

25   least a week's continuance in order to allow me to

1    research these matters on the extraneous offenses.  If

2    the Court denies my motion for continuance, then I

3    have a motion to prohibit the introduction of

4    extraneous offenses at the punishment stage.

5         And essentially I'll lay out the same

6    facts except I point out that if the Court allows such

7    extraneous evidence to come in I am severely harmed

8    because 15 days prior to the start of testimony, which

9    I originally thought was going to be on August 12th

10   was changed to August 18th.  Because of our jury

11   selection, I started voir diring individually each one

12   of these jurors on the concept that there will be no

13   extraneous offenses at the punishment stage because I

14   relied upon the Court's rulings that the State had to

15   give me notice of such information.

16        Furthermore, as I put in my motion for

17   continuance, if you let the evidence in regarding

18   punishment, and I am aware of it being two working

19   days prior to the trial starts, I cannot be in any

20   position to research or to be able to attempt to rebut

21   or verify the truth of or cross examine these offenses

22   with any degree of effectiveness.

23        And, finally, it is in violation of my

24   request under four different motions that I filed of

25   such notice that I be placed on notice.

1          Also, Judge, I would like, for the record,

2    to reflect that the State hinted that there might be

3    some extraneous offenses a good time ago.  By that,

4    prior to me filing my motions to receive notice of any

5    extraneous offenses on the punishment stage.  By that,

6    I was told by Mr. Rosenthal there may be these home

7    invasions out there but I wasn't given any information

8    as to what they might involve, what night, where they

9    were, what the dates might be.  That's what made me

10   file my motion.  So I believe the State was aware that

11   there was a possibility that these particular

12   extraneous acts could come in in the punishment

13   stage.  That's why I filed my motion.

14          I believe the State indicated on August

15   13th that they are still working on their evidence.

16   They really hadn't pulled it down on August 13th.

17   That maybe, therefore, they were aware that it was a

18   possibility, so I believe the State was prior to the

19   15 days that the Court ordered for them to give me

20   that information they had a reasonable expectation

21   that such information might come to fruition as such.

22   It's not like this is something brand new on the part

23   of the State that they just discovered on August 13th.

24          And that's the gist of my two motions.

25   Like I said, one is related to the other.  If the

1     Court grants me a continuance just for a week to

2     research this matter, then, obviously, some of the

3     issues I raised, although not all the issues I raised

4     on the motion to prohibit this evidence coming into

5     trial, might be altered as far as me being able to

6     research it; however, that doesn't change the fact

7     that I relied, to my detriment, on my individual voir

8     dires of these individuals as to Issue Number One and

9     Issue Number Three on punishment on the fact that I

10    did not believe there were going to be any extraneous

11    offenses because the deadline had passed in regards to

12    the time for the State to put me on notice.

13             THE COURT:  Let me see a copy of the

14    motion where I granted the 15 days.  I have a copy of

15    the whole hearing.  I mean it is a duplicate of what I

16    signed.

17             MR. ODOM:  I have a copy of the hearing, a

18    copy of the motion.  I would have to go out and, I'm

19    sorry, you are talking to the clerk.  I have it marked

20    where you talked about this, but, Judge, yes, sir, I

21    only put three pages in.  I have the original out in

22    my briefcase out in the courtroom.

23             THE COURT:  Okay.  What's the State's

24    rely?

25             MR. VINSON:  First of all, Your Honor,

1    initially there was some rumors about some home

2    invasion so I had some notice there was going to be a

3    home invasion if we could ever develop it.  Mr.

4    Rosenthal got off the case.  We were never ever able

5    to really develop what home invasion.  We made the

6    Court aware that there would be ongoing investigation

7    right up to trial, which we generally do on any

8    capital murder, that we would continue to investigate

9    and try to find out extraneous offenses that we could

10   nail down and see what we have.

11           We did discover a person by the name of

12   Hector Luis Fugon, who had been convicted for home

13   invasion, and we later determined -- and this is all

14   since we have been in capital voir dire that Mr.

15   Fugon -- there had been some communication between

16   this defendant and Mr. Fugon in setting up that home

17   invasion.

18           Mr. Fugon is up in the penitentiary.  We

19   bench warranted him back and determined he may have

20   some information.  We filed our bench warrant on

21   August 8th in an attempt to bring him back here.  At

22   the same time we did that we made Mr. Odom aware that

23   we had a bench warrant on file, and it's been on file

24   since August 8th.

25           THE COURT:  Mr. Odom tells me he didn't

1    become aware of this until the 13th.  So what's the

2    right date?

3              MR. VINSON:  Here is the bench warrant

4    right here.

5              THE COURT:  When did he get a copy of it?

6              MR. ODOM:  I saw that bench warrant for

7    the first time on August 13th.  I went through the

8    file, and Mr. Vinson said we had a bench warrant.  I

9    had to go out to the file with Les.  We had to hunt

10   through the file.  I don't know where the bench

11   warrant was.  It wasn't with the witness list wherein

12   I was told I would be able to find various witnesses.

13   And I saw that warrant for the first time on August

14   13th after being told of it by Mr. Vinson.  I didn't

15   know about it on August 8th.

16             MR. VINSON:  I'm not arguing when he saw

17   it.  I am telling -- and I didn't have a copy of it

18   because we generally communicate that to Les to go

19   ahead and bench warrant the person back.  And I think

20   you had met with that attorney, and came in and

21   represented Mr. Fugon, and I think she prevented us

22   from speaking with him.

23             THE COURT:  He's not due until Wednesday.

24             MR. VINSON:  Something like that, even if

25   he gets here.  When that went south, we started

1    looking around again, going through the file and

2    trying to find out something else.  And we ran across

3    another person, I think David Balderas.  We ran across

4    him.  We sent Gail out to beat the bushes, to locate

5    him.  She located him.  Again, we still wasn't certain

6    we had a case because we didn't know what Balderas

7    could tell us.

8           When we talked with Mr. Balderas, he was

9    able to give us some information leading back to this

10   defendant.  At that time I again filed subpoenas on

11   Mr. Balderas.  We filed the subpoenas for the victim

12   because we thought we had something we could work

13   with.

14           THE COURT:  What dates are we talking

15   about, just roughly?

16           MR. VINSON:  And it was marked

17   "punishment" and that was filed August 13th and that

18   was the next morning after we talked to Mr. Balderas.

19   So there was nothing I could see we could file

20   legitimately in earnest until we actually talk with

21   the people and located them.

22           THE COURT:  Okay.  Here is what we are

23   going to do:  You are not to introduce any extraneous

24   period until we first approach the bench, see what

25   they are, and I'll rule on them at that time.  But

1    I'll tell you my inclination, the fact that I said in

2    my order that the defense was to say have 15 days or

3    two weeks' notice and I don't believe the information

4    that he was provided prior to the 13th was proper

5    notice under the order that I gave, whatever date that

6    excerpt is from, complies with it.  I have a real

7    tough time seeing how we are going to introduce

8    extraneous when counsel has been made aware of them a

9    few days before trial.

10           MR. VINSON:  In respect to what the Court

11   said, if we were sitting on the offenses, if we

12   already knew about them -- in every capital case we

13   have had, even in Medellin, we still did ongoing.  And

14   we discovered over the weekend what was introduced on

15   the following Monday.  And we gave them notice no

16   sooner than we discovered it.  You gave a 15-day

17   notice and that provided we already knew we had

18   extraneous.

19           THE COURT:  Regardless of that, the fact

20   is that, you know, we are either going to go forward

21   or I am going to be postponed to comply with the

22   15-day order, and I am not wanting to postpone.  I

23   told you what I am going to do.  I will rule on each

24   one individually.  That will give me an opportunity to

25   review this matter further and just make it clear:  No

1    extraneous comes in until we approach the Bench and

2    have a hearing and determine what is going to be

3    offered and whether or not it falls within the

4    guidelines I gave earlier.

5            Anything further?

6            MR. ODOM:  My only concern, in looking, in

7    trying to preserve harm, which seems to be a big issue

8    on these type of cases, if the extraneous come in at

9    the punishment stage and I knew that, at this point, I

10   would make a motion for mistrial as to presently and

11   request an opportunity to voir dire a new panel

12   because this panel has been qualified for a case

13   wherein there will be no extraneous on the punishment

14   stage.  I understand the Court is reserving its

15   ruling.  If the Court is to rule at a later date --

16           THE COURT:  I'll give you the opportunity

17   to raise that issue at that time.

18           MR. ODOM:  My point:  If I knew it was

19   coming in now, I would have to ask for a mistrial and

20   a new panel because of what I put in my motion but I

21   understand the Court's position.  I want to make the

22   Court aware of that and put it in the record.

23           THE COURT:  Okay.

24           MR. VINSON:  So the Court's ruling, so I

25   clearly understand, if we still discover something

1    this evening and we give Mr. Odom notice, that does

2    not meet the 15 days.

3              THE COURT:  That's reasonable to a

4    defendant and his client that suppose you discover on

5    the day of trial something they have absolutely --

6    wait a minute.  I am not through -- they have had

7    absolutely no opportunity to investigate that issue.

8    That doesn't sound very fair to me.

9              MR. VINSON:  The Court has ruled on that.

10             THE COURT:  I ruled give 15 days.

11             MR. VINSON:  The appellate says as long as

12   we give immediate notice when we find out.

13             THE COURT:  That's why I am going to delay

14   the rulings until I can review this matter and that's

15   what I meant and see how this has been planned in the

16   past, so when I do make a ruling on this issue, you

17   know, you may have an issue where you have nothing

18   because you don't know whether that guy is going to

19   talk to you or not, so if it even comes about, if it

20   does, at that time, I will be prepared to make a

21   ruling and have an opportunity to research those

22   areas.

23             MR. ODOM:  Judge, I think, when the time

24   comes to make such a ruling, that it is important that

25   I establish on the record that the State had a

1   reasonable expectation that this evidence might come

2   to fruition.  I think what Mr. Vinson is talking about

3   is a situation where there is brand new evidence as

4   opposed to being aware of something and it finally

5   comes together.

6               THE COURT:  I think he said, which I think

7   you did, clearly that they had indicated to you back

8   in January there might be something about home

9   invasions.

10              MR. ODOM:  That's right.

11              MR. VINSON:  And I think he could have

12   taken that in point when he was voir diring the jury.

13   If I reasonably expected something like that because

14   we reasonably expect, then he had a reasonable

15   expectation of something like that and he could have

16   taken care of that during the voir dire.

17              THE COURT:  That's why on August 1st --

18              MR. ODOM:  I waited 15 days prior to

19   trial.

20              THE COURT:  Let me quote you here, Mr.

21   Vinson.  Says the Court, "as to the punishment then?"

22   You reply, "But right now I don't see any reason based

23   on my understanding of the case, I don't see any

24   reason for an extraneous other than the offense was

25   committed during the alleged crime and everything

1    surrounding that alleged incident."

2              Okay.  So you are saying the State doesn't

3    have any plans to offer any extraneous other than what

4    as part and parcel of the offense and you are correct,

5    plan and sequence and the shooting of the weapon, that

6    will be fully the firing of the weapon, the design of

7    the weapon and shooting the security guard and all

8    those allegations will be offered in the case and they

9    are all aware of that.

10             Anything else to put on the record?

11             So it seems, when this was had, at that

12   time the State didn't have any indication that it was

13   planning to use anything else extraneous.  You didn't

14   qualify your answer in any way.  It sounded pretty

15   definite to me that you didn't have any plans to offer

16   extraneous.  We are talking about the punishment and

17   extraneous goes to the case in chief.  "We had no

18   extraneous and no extraneous other than the shooting

19   on rebuttal."

20             MR. VINSON:  As far as punishment

21   evidence, I still did not know if we had punishment

22   evidence.  And I never made a representation that we

23   had punishment evidence, Rosenthal said there was some

24   home invasions out there and Mr. Odom was aware of it

25   and we kept trying to make some determination if there

1    was any truth to that.  We kept getting some hearsay.

2    And it was just recently that I investigated, start

3    trying to put something together.

4                THE COURT:  Well, I think I made my

5    ruling.

6                MR. ODOM:   And did I put on the record

7    that I had requested a shuffle of this panel?

8                THE COURT:  You haven't.

9                MR. ODOM:   I would like to, pursuant to

10   the Code of Criminal Procedure, request a shuffle of

11   the full panel at this time before we make our

12   strikes.

13               THE COURT:  That will be denied.

14               Anything further?

15               MR. SMYTH:  Could we put in the record in

16   relation to Mr. Odom's request for a continuance, it's

17   the State's belief when we first became aware that we

18   had a realistic possibly of perhaps of putting on this

19   offense that his client was involved in at the

20   punishment stage that he was to be notified.  And this

21   would be last Wednesday.

22               Prior to that, I believe -- I don't

23   remember the date of last Wednesday, it was the

24   13th -- we all met back in the jury room and did some

25   things on the record.  And that we had notified Mr.

1    Odom at that time, prior to that, on August 8th, we

2    had filed a bench warrant, which is in the Court's

3    file, to try to get a guy who we have yet to talk to,

4    this Hector Fugon, back from TDC.  We had talked to

5    his lawyer before issuing the bench warrant, and she

6    said we couldn't talk to him without her being

7    present.  And she came in and the Court reinforced

8    that order that we were not to have a conversation

9    outside the presence of appointed attorney.  We don't

10    know if he is going to cooperate with the State or

11    tell us to drop dead.

12         We also filed on the 13th -- I believe

13    it's in the Court's file -- a list of witnesses for

14    that particular offense, which we will attempt to put

15    on the stand and to prove up that offense.  And I

16    think Mr. Odom is probably aware of those as of

17    Wednesday, the 13th.

18         On Wednesday, the 13th.  I believe Mr.

19    Vinson also let Mr. Odom read the offense report

20    regarding this home invasion robbery that we are going

21    to try to put on.

22         MR. ODOM:  Actually I didn't get a chance

23    on Wednesday.  That was a snafu.  Mark thought I was

24    going to be here, when I was back at the office.  I

25    came over here.  He didn't have the offense report

1    here.  You had it at your office.  We miscommunicated

2    on that.

3             MR. SMYTH:  We anticipated he wanted to

4    read the offense report was the best we could, since

5    we don't know who is going to talk to us and what they

6    are going to say other than what is in the offense

7    report.

8             Off the record, on that date, the Court in

9    the presence of Mr. Odom, the State said it

10   legitimately fearful that if the defendant became

11   aware of the witnesses that the State was attempting

12   to gloss their case, that these witnesses were in

13   legitimate danger, the State being that -- expressing

14   the fact, in our belief, that the defendant here is

15   not only of the mind set to cause them harm, he has

16   the wherewithal.  He has the financial ability, since

17   we are talking about a three point to four point

18   something million dollar diamond robbery and diamonds

19   and cash being involved, which has yet to be

20   recovered.  He has the ability to do it if he wants to

21   cause harm to those witnesses.  And, you know, that

22   obviously we are fearful of that happening.  That they

23   will be intimidated into not talking or to, you know,

24   disappear on us or something. So we have a real fear

25   about that, Judge.

1              As the Court is aware, this was not

2     something we just dreamed it up.  We talked to the

3     Court about it on the 13th.  And as far as Mr. Odom's

4     request for continuance, I believe its obligation is

5     on the defense to show that there is some type of

6     undue surprise on their part.  And by his own

7     admissions, it was suggested to him way back before I

8     got in by Mr. Rosenthal, the prior prosecutor, that

9     some home invasion robberies were out there that this

10    defendant may be a part.  And this was apparently back

11    before 1996, and I think sometime in the fall of 1996,

12    that he became aware that there may possibly be some

13    home invasion.

14              THE COURT:  I don't think that complies

15    with what is required.  We may have some home

16    invasions.  That doesn't go what is far enough as to

17    what is required to make a person aware, witnesses

18    involved and when, that he say and where they

19    occurred, what county.  Just to speculate some

20    invisions certainly doesn't put anybody on sufficient

21    notice they can now plan around that or to investigate

22    those allegations, and it just doesn't go far enough.

23    I don't think it sufficiently puts defense counsel on

24    notice that the State is serious about pursuing those

25    because, again, in this hearing that we had earlier in

1    the year, there was no indication that the State was

2    pursuing extraneous, whether it be guilt or innocence

3    or the punishment phase.  And I just want to insure --

4    and the reason I wanted to delay my ruling because

5    this may never happen anyway.

6              MR. SMYTH:  I suggest to the Court, when

7    it gets an opportunity, to read the Adanandus case.

8    I'll give you the cite on that, Judge.

9              THE COURT:  That's why I wanted to have an

10   opportunity to review the matters.

11             MR. ODOM:  I think it's very important for

12   us to know if they issued subpoenas on August 13th.

13   They knew something before August 13th and the cases

14   he is relying upon indicate situations that are brand

15   new, not situations to where they have been working on

16   it.  And suddenly they have decided maybe it is going

17   to come to fruition.

18             And the important issue is that they had

19   reasonable knowledge that this existed prior to that

20   15 days and for them to say, well, we just decided on

21   the 13th that it had gone far enough for us to tell

22   the defense is different from the cases he is citing

23   than the cases that are on the books.

24             THE COURT:  Anything further?

25             MR. ODOM:  No, sir.

1              (The following proceedings were held in

2      the presence of the jury panel.)

3              THE COURT:  Good morning.  Thank you for

4      being back with us.  I know this is a time-consuming

5      process, and let me thank you.  It took less than

6      three weeks what we are sitting as part of right now

7      and we used a new way.  We voir dired differently, and

8      it's worked out pretty well.  In the past, it has

9      taken anywhere from 10 to 20 weeks to pick a jury and

10     so this process, obviously, speeds things up a great

11     deal.

12             As I told you, some of you I didn't meet

13     with you because Judge Densen talked -- for the most

14     part with all of you.  I told you what would happen

15     today is that the attorneys are now going to pick 12

16     of you to serve as a jurors in this case, and we are

17     going to have two alternates to sit with us.  The rest

18     of you will be excused.

19             And what we are going to do, in just a

20     very few moments, the attorneys are going to go back

21     in my office, based on the conversations they had with

22     you and the forms you filled out, they have indicated

23     to me they pretty well know who they want and who they

24     don't want, so I anticipate the strikes will go very

25     quickly.  As soon as we finish our strikes, the 12

1     that remain will become our jury and the next two will

2     become the alternates.  The rest will be excused.

3              Let me ask you, for the record, since we

4     all had conversation -- some of us a few weeks ago --

5     is there any of you that have changed in your opinions

6     or your responses to the questions that were

7     propounded to you by counsel since we last spoke?

8              Okay.  Since I see no show of hands or any

9     indication otherwise, I assume that, therefore, all of

10    you are of the same mind set you were when we last

11    spoke.

12             Anybody disagree with that?

13             Very well.  We are going to start trial

14    this morning.  I still anticipate it taking about a

15    week.  If it runs over at all, I don't anticipate it

16    to run over more than a day or so or Monday or Tuesday

17    of next week.

18             With that, I'll allow -- we will meet with

19    the attorneys.  They are looking your faces over, to

20    make sure they have got the right people, with the

21    right information, and we will go back in my chambers

22    and make the strikes.  We will be right back out and

23    call your names and speed this up and get this going,

24    as quickly as we can, because I know all of you want

25    to sit on the jury.  And if you don't get chosen, you

1    may want to get back to work.  Thank you very much for

2    being with us today.

3                        (Whereupon, the following proceedings were

4    held in Chambers.)

5                        THE COURT:  Okay.  I need a list.  Do I

6    get a list of names or go by jurors or numbers?

7                        What says the State with regard to panel

8    number 1, Terry Allen Pedigo.

9                        MR. SMYTH:  State will accept.

10                       MR. ODOM:  Defense will accept.

11                       THE COURT:  What says the State as to

12    panel number Donald Laroy Turrentine.

13                       MR. SMYTH:  State will strike him, Judge.

14                       THE COURT:  Very well.

15                       What says the State with regard to jury

16    number three, John Blye.

17                       MR. SMYTH:  State will accept.

18                       MR. ODOM:  Defense will accept him.

19                       THE COURT:  Thank you.

20                       What says to juror number 4, Thomas John

21    Kelly.

22                       MR. SMYTH:  State will accept.

23                       MR. ODOM:  Defense will strike, Judge.

24                       THE COURT:  Very well.

25                       And the State as to panel number 5, Marvin

1      Traweek.

2                    MR. SMYTH:  I think Mr. Traweek has been

3      struck.   The State strikes him.

4                    THE COURT:  What says the State with

5      regard to panel number 6, Norman Hommel.

6                    MR. SMYTH:  State will accept him.

7                    MR. ODOM:  Defense will accept him, Judge.

8                    THE COURT:  Very well.

9                    What says the State with regard to panel

10     number 7, Martha Gutierrez.

11                   MR. SMYTH:  State will accept.

12                   MR. ODOM:  Defense will strike, Judge.

13                   THE COURT:  Very well.

14                   Panel number 8, Joyce Griffis.

15                   MR. SMYTH:  State will strike, Judge.

16                   THE COURT:  Very well.

17                   What says the State with regard to number

18     9, Sharon Alaimo.

19                   MR. SMYTH:  State will accept.

20                   MR. ODOM:  Defense will strike.

21                   THE COURT:  And what says the State with

22     regard to panel number 10, Daniel Williams.

23                   MR. SMYTH:  State will accept.

24                   MR. ODOM:  Defense will strike, Judge.

25                   THE COURT:  And panel number 11, Shelley

1      Villarreal.

2                  MR. SMYTH:  State will strike, Judge.

3                  THE COURT:  Panel number 12, Gilbert

4      Avalos.

5                  MR. SMYTH:  State will accept.

6                  MR. ODOM:  Defense will accept, Judge.

7                  THE COURT:  And to the number 13, Rhonda

8      Mainor.

9                  MR. SMYTH:  State will accept.

10                 MR. ODOM:  Defense will accept.

11                 MR. SMYTH:  Excuse me, Judge.  We accept.

12                 THE COURT:  Number panel number 14, John

13     Yomi.

14                 MR. SMYTH:  State will accept.

15                 MR. ODOM:  Defense will strike.

16                 THE COURT:  Very well.

17                 Number 15, Jeneane Jarvis.

18                 MR. SMYTH:  State will strike.

19                 THE COURT:  Number 16, Irene Collins.

20                 MR. SMYTH:  State will accept.

21                 MR. ODOM:  Defense will accept.

22                 THE COURT:  Panel number 17, Bruce

23     Crouch.

24                 MR. SMYTH:  State will accept.

25                 MR. ODOM:  Defense will strike.

1                    THE COURT:  Panel number 18, Belle

2     Symmank.

3                    MR. SMYTH:  State will accept.

4                    MR. ODOM:  Defense will accept.

5                    THE COURT:  Number 19, panel number

6     Michael Zoellner.

7                    MR. SMYTH:  State will accept.

8                    MR. ODOM:  Defense will strike.

9                    THE COURT:  Panel number 20, Nancy

10    Bolyer.

11                   MR. SMYTH:  State will strike.

12                   THE COURT:  The State, 21, Allan Griffin.

13                   MR. SMYTH:  State will accept.

14                   MR. ODOM:  The defense will accept, Judge.

15                   THE COURT:  Number 22, Cary Heath.

16                   MR. SMYTH:  State will accept.

17                   MR. ODOM:  Defense will strike.

18                   THE COURT:  Number 23, Barbara Spencer.

19                   MR. SMYTH:  State will strike.

20                   THE COURT:  Number 24, Mable Dyer.

21                   MR. SMYTH:  State will strike.

22                   THE COURT:  Number 25, Guadalupe Balboa.

23                   MR. SMYTH:  State will strike.

24                   THE COURT:  Number 26, Jon Shelton.

25                   MR. SMYTH:  State will strike.

1           THE COURT:   Number 27, Mark Heatwole.

2           MR. SMYTH:   State will accept.

3           MR. ODOM:   Defense will strike.

4           THE COURT:   Number 28, Henry Herman.

5           MR. SMYTH:   State accept.

6           MR. ODOM:   Defense will strike.

7           THE COURT:   Number 29, Edwin Clarkson.

8           MR. SMYTH:   State will strike.

9           THE COURT:   Number 30, David Eppley.

10          MR. SMYTH:   State will accept.

11          MR. ODOM:   Defense will accept.

12          THE COURT:   Number 31, Sharon King.

13          MR. SMYTH:   State will accept.

14          MR. ODOM:   Defense will accept.

15          THE COURT:   Number 32, Gerald Kappes.

16          MR. SMYTH:   State will accept.

17          MR. ODOM:   Defense will accept.

18          THE COURT:   Number 33, Robert Darrow.

19          MR. SMYTH:   State will accept.

20          MR. ODOM:   Defense will strike.

21          THE COURT:   Number 34, Richard Miller.

22          MR. SMYTH:   State will accept.

23          MR. ODOM:   Defense will strike.

24          THE COURT:   35, Robert Talerico.

25          MR. SMYTH:   State will strike.

```
1              THE COURT:  Number 36, Mary Altizer.

2              MR. SMYTH:  State will strike.

3              THE COURT:  Number 37, Deborah McNeal.

4              MR. SMYTH:  State will strike.

5              THE COURT:  Number 38, Leslie Bazzoon.

6              MR. SMYTH:  State will accept.

7              MR. ODOM:  Defense will strike.

8              THE COURT:  39, Efrain Campos?

9              MR. SMYTH:  State will strike.

10             THE COURT:  Number 40, Wanda Debose.

11             MR. SMYTH:  According to my count, we have

12   used all of our strikes unless -- and the only thing,

13   if we get alternates, we will get one more on both

14   sides.

15             Defense, where are you?

16             MS. GUERRERO:  13.

17             THE COURT:  Defense will use the strike?

18             MR. ODOM:  Defense will use the strike.

19             THE COURT:  What about number 41, Jerry

20   Lewis.

21             MR. ODOM:  We will use our 15th strike on

22   him.

23             THE COURT:  The very next one would become

24   the jury member.  The eleventh one was number 32.

25             MR. SMYTH:  If I call the numbers, you
```

```
 1    give me the name.

 2                THE COURT:  Pettigrew.

 3                MR. SMYTH:  Number 3 is on the jury.

 4    That's --

 5                THE COURT:  That's Blye.

 6                MR. SMYTH:  Number 6 is on the jury.

 7                THE COURT:  Hommel, Norman.

 8                MR. SMYTH:  Number 12 is on the jury.

 9                THE COURT:  Gilbert Avalos.

10                MR. SMYTH:  Number 13 is on the jury.

11                THE COURT:  Ronda Mainor.

12                MR. SMYTH:  Number 18 is on the jury.

13                THE COURT:  Symmank.

14                MR. SMYTH:  Number 16 is on the jury.

15                THE COURT:  Irene Collins.

16                MR. SMYTH:  Number 18.

17                THE COURT:  Belle Symmank.

18                MR. SMYTH:  Number 21.

19                THE COURT:  That's number 8.  Go ahead.

20                MR. SMYTH:  Number 30.

21                THE COURT:  That's Eppley.

22                MR. SMYTH:  Number 31.

23                THE COURT:  That's King.  That's number

24    10.

25                MR. SMYTH:  Number 32.
```

```
1              THE COURT:  Kappes, number 11.
2              MR. ODOM:  Ms. Malwitz, it's automatic.
3              MR. VINSON:  Which one did we accept?
4              MR. ODOM:  Malwitz.
5              THE COURT:  Are you going to ask for any
6    more?
7              MR. ODOM:  Yes, I am.
8              THE COURT:  So before we do Malwitz, so
9    you are out of strikes now.  So make your motions.
10             MR. ODOM:  At this time I would make a
11   motion for additional strikes and the basis for that
12   would be I made a motion for cause on juror number 26,
13   Jon Sleton and Gutierrez.  I believe I qualified her
14   for cause on, number one, that she could not consider
15   the full range of punishment on a lesser included
16   offense, that of murder; number two, that she would
17   not consider any mitigating facts as to Special Issue
18   Number Three, that if she had previously found the
19   defendant guilty and a yes and yes as to Issues Number
20   One and Two; and, number three, that the State was
21   allowed, over objection, to commit her as to the fact
22   that she would not need any additional evidence in
23   order to find yes as to answer number One except as to
24   the evidence on the case in chief.
25             I would have struck juror number 25 had I
```

Page 31

```
20   commit her to the fact that she would not need any
21   additional evidence other than what was in the case in
22   chief in order to answer Special Issue Number One yes.
23             Ms. Alaimo I struck.  I would have used
24   that strike for juror Irene Collins, which on this
25   list is 16, yes, juror number 16.
```

Page 32

1    had an opportunity to have an additional strike.

2            MR. SMYTH:  State struck him for you.

3            MR. ODOM:  Okay.  Never mind.

4            My number 25.  I'm sorry.  That would be

5    Mr. Hommel, H-o-m-m-e-l.  I wouldn't have struck him.

6    I would have struck juror number 62, my 62, which is

7    Belle Symmank, which would be juror number 18 on this

8    panel.

9            The next strike that I would ask for

10   relates to juror number 36 on the original list,

11   Sharon Alaimo.  I had to use a strike on her as well

12   as on the previous juror, Ms. Gutierrez, I had to use

13   a strike on them.  I felt that, number one, could not

14   disregard illegally seized evidence.  Number two, I

15   felt she would be struck for cause.  She didn't know

16   if she could disregard certain information she had

17   heard from friends that are with the Houston Police

18   Department, certain stories she heard them tell; and,

19   three, finally I believe the State was allowed to

20   commit her to the fact that she would not need any

21   additional evidence other than what was in the case in

22   chief in order to answer Special Issue Number One yes.

23           Ms. Alaimo I struck.  I would have used

24   that strike for juror Irene Collins, which on this

25   list is 16, yes, juror number 16.

1           My additional strike is juror number 37,

2     Daniel Williams on the original list, and we have to

3     find him on this list.

4           THE COURT:  Daniel Williams, 10.

5           MR. ODOM:  And Ms. Alaimo was number 9 and

6     Ms. Gutierrez was number 7, I believe, but Mr.

7     Williams I had to use a strike on him.  I felt that he

8     should have been disqualified for cause, number one,

9     he would put the burden on the defense to prove that

10    the defendant wasn't a future threat to society once

11    he had made a determination that he was guilty of

12    capital murder; number two, that the State was allowed

13    to commit him that he would answer Issue Number One

14    yes based upon the evidence on the case in chief.

15          My third request for an additional strike

16    is on Yomi John, I believe -- by the way, Judge, all

17    of those -- Yomi John is number 14.  I believe that

18    when Judge Densen was here -- and that's true to the

19    other ones I have made this motion -- the State was

20    allowed to commit Mr. Yami John as to finding that he

21    will not need additional evidence to find the

22    defendant guilty -- no, wait a minute.  He did not

23    need additional evidence as to Issue Number One if he

24    had found the defendant guilty of capital murder based

25    upon the facts.  And I would have used a strike, that

1    strike, to strike Bruce Crouch, who is juror number

2    17.  No, I did use him.  I would use that for juror

3    number 15, Irene Collins.

4                THE COURT:  Juror number 16 you mean.

5                MR. ODOM:  Yes, sir.

6                THE COURT:  You did mention Belle Symmank,

7    didn't you?

8                MR. ODOM:  Yes, I did mention her and I

9    did use one of my strikes on her.

10               What I said, I would have used a strike on

11   her had I had additional strikes and had those jurors

12   been properly struck for cause, then I would have used

13   one of my strikes to strike her.

14               THE COURT:  Okay.  I'll grant you two

15   additional strikes.  So let's make those.

16               Let's go back to where we are and we

17   stopped with two.

18               THE COURT:  Ellen Malwitz, what says the

19   defense?

20               MR. ODOM:  The defense accepts Ellen

21   Malwitz.

22               THE COURT:  Okay.  I would say he wouldn't

23   get any additional strikes since he accepted.  If he

24   has accepted number 42, then the jury is complete and

25   he is only entitled to one strike on the two

1    alternates.  He doesn't get to bank them and save them

2    to go into the alternates.  He said I need it because

3    I am going to strike Ms. Malwitz and the Court gives

4    him two and one on Ms. Malwitz and one on the next one

5    but he can't bank them.

6              MR. ODOM:  If I made my motion at the

7    inappropriate time, then I will tell the Court right

8    now that is due not to any strategy on the part of the

9    defense but purely on the lack of knowledge as to the

10   proper procedure of making the motion at the proper

11   time.

12             THE COURT:  I think what should be done,

13   you can accept them or pass them over and accept

14   later, come back and later, when you still have

15   strikes.  You have to go through the list of everybody

16   you want to strike and strike them.  And if you come

17   down here toward the end and there is somebody further

18   back to the front that is now on the jury and you say,

19   well, I would have struck those because you did have

20   strikes at that time -- if you follow what I am saying

21   -- you should have struck them then.

22             MR. SMYTH:  What I am saying, he can ask

23   for the additional strikes now if he wants to strike

24   Ms. Malwitz.  If he doesn't, the jury is complete with

25   12, and we now each get an additional strike for the

1  alternates that we are going to choose but he can't

2  ask for three strikes to go into the alternates.

3          THE COURT:  Yeah, the jury is picked.

4          MR. ODOM:  That's why I said, back in

5  chambers, that I wanted to go ahead and make my motion

6  as to who I felt I would be entitled to beforehand.  I

7  did not know that I could not go back and do what I

8  was attempting to do.  And what I was telling, for the

9  record, that was not any part of strategy on my part.

10  It was lack of knowledge on my part that is the proper

11  procedure to do that.  And that's true.

12          THE COURT:  I don't doubt that for a

13  second, and that's all I am saying in that regard.

14          MR. ODOM: I'm not saying anything else

15  other than the fact that's why I wanted to request --

16          THE COURT:  I just don't believe that both

17  sides can accept somebody and can later go back and

18  say we no longer accept them.

19          MR. ODOM:  That's what I am realizing at

20  this point.  I didn't realize that up until the point

21  I did that.

22          MR. SMYTH:  You are only entitled to ask

23  for additional strikes once you run out of strikes.

24  Like you said, you can't go back and now use them.

25          (Off-the-record discussion held.)

1            MR. ODOM:  Mr. Harris is the worse of the

2     two, I feel, and I will not request additional strikes

3     if it means that I have to end up with Mr. Harris on

4     my jury.

5            THE COURT:  I think we have reached the

6     jury with number 42.  I think it would be wise that we

7     had an alternate.

8            We are going to have two alternates, and

9     I'll give you an additional strike so let's talk about

10    the alternates.

11           What says the State?   Ross Harris.

12           MR. SMYTH:  State will accept.

13           MR. ODOM:  The defense will use its strike

14    on Mr. Harris.

15           THE COURT:  What about Victor Luszcz?

16           MR. SMYTH:  State will accept Mr. Luszcz.

17           THE COURT:  Very well.  That's one.

18           And Joseph Womak, what says the State?

19           MR. SMYTH:  State will accept Mr. Womak.

20           MR. ODOM:  Also, on the record --

21           THE COURT:  Yes, sir.

22           MR. ODOM:  I am going to request that

23    pursuant to Article 35.261 that the State has made a

24    number of strikes that are based upon the race of the

25    jurors.

1          MR. ODOM:  In good faith, since Article

2     35.261, I would point out that the present composition

3     of the panel includes one Hispanic and that the

4     defense has struck one Hispanic that it previously had

5     attempted to strike for cause, that being Ms.

6     Gutierrez, who is juror number 6, but that the State

7     -- 7, I'm sorry.  But the State has struck, has left

8     Mr. Avalos on the jury, who is the only Hispanic, that

9     being juror number 12, and has struck Mr. Balboa, who

10    is juror number 25, and juror Campos, who is juror

11    number 39, and that those strikes were based upon the

12    racial makeup of those jurors and that it works to a

13    disadvantage to my client because of him being

14    Hispanic.

15          THE COURT:  I don't think you have met

16    your burden yet.  You can't say he took some

17    minorities and, therefore, they are doing it because

18    of.

19          MR. ODOM:  Judge, I know. 35.261, the

20    defendant is a member of an identifiable, racial

21    group, that is, he is of the Hispanic origin.  I have

22    stated that the attorney representing the State, I

23    believe, exercised the peremptory for the purpose of

24    excluding persons from the jury on the basis of race.

25    And I would show that Mr. Campos as well as especially

1      Mr. Balboa certainly are in the same position as other

2      jurors that the State has taken.

3                  For example, Mr. Balboa, who wants to be a

4      police officer, served on a prior capital murder and

5      it was a not guilty; however, there are other jurors

6      on the panel who served on a prior capital murder

7      wherein a not guilty was determined who are white.

8                  THE COURT:  Who are they?

9                  MR. ODOM:  That would be juror number 6,

10     Mr. Hommel, H-o-m-m-e-l.

11                 MR. ODOM:  He testified to that on voir

12     dire.

13                 MR. SMYTH:  Prior murder, it was a

14     self-defense case where the taxicab driver got

15     harassed by a couple of patrons.

16                 MR. ODOM:  And I believe Mr. Balboa's case

17     was also one wherein --

18                 MR. VINSON:  Could we do it right, Your

19     Honor.  Let me make the rule apply to whatever he

20     says, if we have to.

21                 MR. ODOM:  He also -- that's all I feel

22     without having all my notes with me.

23                 THE COURT:  So we are talking about --

24     let's talk about which jurors you are specifically

25     referencing.

1              MR. ODOM:  The one I am focusing in on,

2    Judge, is 25.

3              THE COURT:  Mr. Balboa.

4              What says the State?

5              MR. SMYTH:  Obviously, the State struck

6    Mr. Balboa for a non-racial reason in that, the State,

7    in his voir dire, he indicated that -- one of the

8    things that he indicated was that he had sat on a

9    prior capital murder case within the last year or so.

10   It was a non-death capital and they found the

11   defendant not guilty.  And it was something in his

12   language that even though there was a couple of

13   eyewitnesses to it, they found him not guilty.

14             The State has determined from talking to

15   the prosecutors that handled that case they were

16   absolutely flabbergasted at the outcome of the case.

17   They had every reason to believe that not only would

18   this defendant be convicted but do a serious non-death

19   time.  They were shocked and amazed and told us that

20   the jurors went back in the jury room and began to

21   play cops and began to play defense attorney and the

22   facts of that case, as we learned from the

23   prosecutors, was a multiple shooting.  The defendant

24   and his codefendant killed -- this defendant's role in

25   the case that Mr. Balboa sat, they come in and there

1     is a dice game going on and take money from people.

2     As people run out of the room and this defendant

3     shoves into the room and one guy gets out and nobody

4     in the room sees somebody shoot the guy that goes

5     outside and he is shot and killed with two different

6     weapons.  The defendant had one weapon and the

7     codefendant another weapon.  And were arrested in

8     Louisiana some five days later in the car stolen from

9     the victims.  So we have no reason to have any

10    confidence at all in Mr. Balboa to be a fair and

11    impartial juror regardless of what he said about

12    wanting to be a police officer.

13             MR. ODOM:  I would like to inquire whether

14    or not the State additionally did the same research as

15    to juror number 6, Mr. Hommel.

16             THE COURT:  I consider that to be a race

17    neutral reason.  I believe, if you can rebut that,

18    that's fine.

19             MR. ODOM:  For the record, does the Court

20    feel that I did not meet my burden as to juror number

21    39, Mr. Campos?

22             THE COURT:  You haven't got there yet.

23             MR. SMYTH:  Do you want, Judge -- do you

24    want me to respond to Mr. Campos?

25             MR. VINSON:  With respect to Mr. Campos,

1    Your Honor, he was of the Pentecostal religion.

2              THE COURT:  Hold on.  I haven't heard the

3    prima facie reason why we are excluding him by the

4    defense.  We are now talking about Mr. Campos, okay.

5              MR. ODOM:  As to Mr. Campos, number 37, he

6    said he is opposed to the death; however, his religion

7    is opposed to death penalty; however, he could follow

8    his conscience and could find and could give the death

9    penalty.

10             Judge, there are a number of other jurors

11   who are Catholic who basically, although more

12   articulate than Mr. Campos, had said the same thing.

13   Mr. Campos is Pentecostal as opposed to Catholic.

14             THE COURT:  You are assuming that's the

15   reason the State struck him.

16             Let me hear the State's response.

17             MR. VINSON:  He was a Pentecostal.  That

18   wasn't the reason.  The reason we struck him, though,

19   he did bring up his religion and said they had been

20   taught against that.  And he was a very religious man,

21   and he would go against his religious beliefs, if

22   called upon, would go against his own personal views

23   and his religious views to sit as a juror.  And I

24   don't have much trust for a person, Your Honor, who

25   will go against your religious views as well and it

1    was the typical vacillating back and forth.  And we

2    attempted to strike him for cause and that was

3    denied.  And, certainly, we have a right to exercise a

4    challenge at this time without any additional

5    discriminatory affects against him.  It is just a

6    manner in which he responded to the questions.

7              THE COURT:  That's race neutral.

8              MR. ODOM:   That's it, Judge.

9              Juror number 11 is Ms. Villarreal.

10             MR. VINSON:  One thing, so we can clear

11   this right now, did you strike any Hispanics?

12             MR. ODOM:  Then it's over, if he struck

13   Hispanics himself.

14             MR. SMYTH:  Ms. Villarreal and in this

15   case it's the surname.  She is married to a Hispanic.

16             THE COURT:  Anything further?

17             It's 11:00 o'clock and we will go out and

18   there and pick the jury and seat the jury and we are

19   going to start.

20             (Whereupon, the following proceedings were

21   held before the jury panel.)

22             THE COURT:  Okay, ladies and gentlemen, we

23   have now have a jury.  Let me call your names.  As I

24   call your names -- can you hear me all right?

25             As I call your name, please have a seat in

1    the jury box and, also, have the juror tags up there

2    that you need to place on your person so we can

3    identify you as a juror in this case; and the two

4    alternates, we will seat you up here and we will get

5    started.

6             (Judge called the names of the jurors and

7    the two alternates.)

8             THE COURT:  Let the record reflect that

9    the jurors have been seated.

10            What says the State?

11            MR. SMYTH:  State has no objection.

12            THE COURT:  The defense?

13            MR. ODOM:  No objection other than those

14   previously mentioned.

15            THE COURT:  Very well.  Ladies and

16   gentlemen, those of you that have not been chosen, you

17   are certainly welcome to stay.

18            (Judge excused the jury panel.)

19

20

21

22

23

24

25

1    APPELLATE COURT NO. *72966*

2    IN THE COURT OF CRIMINAL APPEALS

3    OF THE STATE OF TEXAS

4

5    ---------------------------------------------------

6    REINALDO DENNES

7                    Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                    Appellee.

11   ---------------------------------------------------

12

13   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                    TEXAS

15        Judge Jim Wallace, Presiding

16   ---------------------------------------------------

17            CAUSE NO. 750,313

18            August 18, 1997

19          Court Reporter's Record

20

21        Volume 25 of *39* Volumes

22

23        Sharon Kay Cook
          Official Court Reporter
          301 San Jacinto
24        Houston, Texas 77002

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Page 1

Volume 25

Trial

August 18, 1997

Chronological

Opening STatement by Mr. Smyth                          10

Paul Terry

       Direct Examination by Mr. Vinson         14

       Cross Examination by Mr. Odom            29

       Redirect Examination by Mr. Vinson       45

       Recross Examination by Mr. Odom          47

J. L. Kay

       Direct Examination by Mr. Vinson         50

       Cross Examination by Mr. Odom            75

       Redirect Examination by Mr. Vinson       97

David Walter Copeland

       Direct Examination by Mr. Vinson        101

       Cross Examination by Mr. Odom           157

Volume 25

Trial

August 18, 1997

Alphabetical

David Walter Copeland

      Direct Examination by Mr. Vinson      101

      Cross Examination by Mr. Odom      157

J. L. Kay

      Direct Examination by Mr. Vinson      50

      Cross Examination by Mr. Odom      75

      Redirect Examination by Mr. Vinson      97

Paul Terry

      Direct Examination by Mr. Vinson      14

      Cross Examination by Mr. Odom      29

      Redirect Examination by Mr. Vinson      45

      Recross Examination by Mr. Odom      47

| | | |
|---|---|---|
| State's Exhibit No. 1 | photo | |
| Marked | Volume 25 | 24 |
| Identified | | 25 |
| Offered | | 25 |
| Admitted | Volume 25 | 25 |
| State's Exhibit No. 2 | photo | |
| Marked | Volume 25 | 24 |
| Identified | | 25 |
| Offered | | 25 |
| Admitted | Volume 25 | 25 |
| State's Exhibit No. 3 | photo | |
| Marked | Volume 25 | 24 |
| Identified | | 25 |
| Offered | | 25 |
| Admitted | Volume 25 | 25 |
| State's Exhibit No. 4 | photo | |
| Marked | Volume 25 | 24 |
| Identified | | 25 |
| Offered | | 25 |
| Admitted | Volume 25 | 25 |
| State's Exhibit No. 5 | photo | |
| Marked | Volume 35 | 24 |
| Identified | | 25 |
| Offered | | 25 |
| Admitted | Volume 25 | 25 |
| State's Exhibit No. 6 | photo | |
| Marked | Volume 25 | 24 |
| Identified | | 25 |

iii

|                          | Offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |
| State's Exhibit No. 7    | photo      |           |    |
|                          | Marked     | Volume 25 | 24 |
|                          | Identified |           | 56 |
|                          | Offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |
| State's Exhibit No. 8    | photo      |           |    |
|                          | Marked     | Volume 25 | 24 |
|                          | Identified |           | 56 |
|                          | offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |
| State's Exhibit No. 9    | photo      |           |    |
|                          | Marked     | Volume 25 | 24 |
|                          | Identified |           | 56 |
|                          | Offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |
| State's Exhibit No. 10   | photo      |           |    |
|                          | Marked     | Volume 25 | 24 |
|                          | Identified |           | 56 |
|                          | Offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |
| State's Exhibit No. 11   | photo      |           |    |
|                          | Marked     | Volume 25 | 24 |
|                          | Identified |           | 56 |
|                          | Offered    |           | 56 |
|                          | Admitted   | Volume 25 | 57 |

iv

| State's Exhibit No. 12 | photo |  |
|---|---|---|
| Marked | Volume 25 | 24 |
| Identified |  | 56 |
| Offered |  | 56 |
| Admitted | Volume 25 | 57 |
| State's Exhibit No. 13 | photo |  |
| Marked | Volume 25 | 24 |
| Identified |  | 56 |
| Offered |  | 56 |
| Admitted | Volume 25 | 57 |
| State's Exhibit No. 14 | photo |  |
| Marked | Volume 25 | 24 |
| Identified |  | 56 |
| Offered |  | 56 |
| Admitted | Volume 25 | 57 |
| State's Exhibit No. 15 | photo |  |
| Marked | Volume 25 | 24 |
| Identified |  | 56 |
| Offered |  | 56 |
| Admitted | Volume 25 | 57 |
| State's Exhibit No. 16 | photo |  |
| Marked | Volume 25 | 24 |
| Identified |  | 56 |
| Offered |  | 56 |
| Admitted | Volume 25 | 57 |

State's Exhibit No. 17          photo

          Marked              Volume 25                    24

          Identified                                       56

          Offered                                          56

          Admitted            Volume 25                    57

State's Exhibit No. 18          photo

          Marked              Volume 25                    24

          Identified                                       56

          Offered                                          56

          Admitted            Volume 25                    57

State's Exhibit NO. 19          photo

          Marked              Volume 25                    24

          Identified                                       56

          Offered                                          56

          Admitted            Volume 25

State's Exhibit No. 20          photo

          Marked              Volume 25                    24

          Identified                                       56

          Offered                                          56

          Admitted            Volume 25                    57

State's Exhibit No. 21          photo

          Marked              Volume 25                    24

          Identified                                       56

          Offered                                          56

          Admitted            Volume 25                    57

State's Exhibit No. 22      photo

          Marked          Volume 25              24

          Identified                             56, 96

          Offered                                56

          Admitted        Volume 25              57

State's Exhibit No. 22      photo

          Marked          Volume 25              24

          Identified                             56

          Offered                                56

          Admitted        Volume 25              57

State's Exhibit No. 23      photo

          Marked          Volume 25              58

          Identified                             58, 71

          Offered                                59

          Admitted        Volume 25              59

State's Exhibit No. 24      photo

          Marked          Volume 25              58

          Identified                             58, 71

          Offered                                59

          Admitted        Volume 25              59

State's Exhibit No. 25      photo

          Marked          Volume 25              58

          Identified                             58

          Offered                                59

          Admitted        Volume 25              59

                                                 vii

State's Exhibit No. 26      photo

      Marked             Volume 25                    68

      Identified                                       68,84

      Offered                                          68

      Admitted           Volume 25                    69

State's Exhibit No. 27      photo

      Marked             Volume 25                    68

      Identified                                       68

      Offered                                          68

      Admitted           Volume 25                    69

State's Exhibit No. 28      photo

      Marked             Volume 25                    68

      Identified                                       68

      Offered                                          68

      Admitted           Volume 25                    69

State's Exhibit No. 29      photo

      Marked             Volume 25                    68

      Identified                                       68, 84

      Offered                                          68

      Admitted           Volume 25                    69

State's Exhibit No. 30      photo

      Marked             Volume 25                    68

      Identified                                       68

      Offered                                          68

      Admitted           Volume 25                    69

State's Exhibit No. 31        .9mm semiautomatic

       Marked              Volume 25                68

       Identified

       Offered

       Admitted

State's Exhibit No. 32        mustache

       Marked              Volume 25               141

       Identified                                  141

       Offered                                     141

       Admitted            Volume 25               142

State's Exhibit No. 33        photo spread

       Marked              Volume 25               150

       Identified                                  150

       Offered

       Admitted

State's Exhibit No. 34        photo spread

       Marked              Volume 25               150

       Identified                                  150

       Offered

       Admitted

```
 1                    CAUSE NO. 750,313

 2   STATE OF TEXAS            IN THE 263RD DISTRICT COURT

 3   VS.                              OF

 4   REINALDO DENNES         HARRIS COUNTY, T E X A S

 5   A P P E A R A N C E S:

 6   For the State:          Mr. Mark Vinson
                             Bar Card No. 20590450
 7                           Mr. Don Smyth
                             Bar Card No. 18777700
 8                           Assistant District Attorneys
                             201 Fannin
 9                           Houston, Texas 77002
                             713-755-7050
10
     For the Defendant:      Mr. Wendell Odom
11                           Bar Card No. 15208500
                             Ms. Yalila Guerrero
12                           Bar Card No. 0078862
                             Attorneys at Law
13                           1301 McKinney
                             Houston, Texas 77010
14                           713-951-9555

15

16                    BE IT REMEMBERED that upon this the 18th

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for trial before the Honorable

19   Jim Wallace, Judge of the 263rd District Court of

20   Harris County, Texas; and the State appearing in

21   person and the Defendant appearing in person and by

22   counsel, announced ready for trial, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:
```

1               (Jury came into the courtroom.)

2               THE COURT:  Okay, ladies and gentlemen,

3   will you, please, stand and take your oath as jurors.

4               (Jury sworn.)

5               THE COURT:  Please have a seat.

6               Let me give you some instructions this

7   morning, ladies and gentlemen, that will stay with you

8   throughout the trial.  First off, no communication

9   regarding this matter is allowed.  Though I certainly

10   don't anticipate anyone trying to contact you, if

11   anyone does try to contact you or talk about this

12   case, you are to report it immediately to the bailiff.

13   You are not to discuss the evidence that you hear

14   starting this morning with anyone including the other

15   jurors, family members.

16               We will take you to lunch in a little

17   bit.  You will have heard some testimony.  At no time

18   during the breaks or lunch hours, when you are in the

19   back, are you to deliberate this case or talk about it

20   until I have actually instructed you to commence your

21   deliberations.  As I have told you earlier, during the

22   course of trial, I anticipate that it is likely there

23   may be some publicity about the case.  Do not read any

24   newspaper accounts or watch anything on television nor

25   listen to anything on the radio.

1          I do not allow note taking so, please, do
2     not take notes.
3          Shortly after we start you are going to
4     find out where this event allegedly occurred.  Please
5     don't go home, get in your car and drive over there
6     and start measuring and taking pictures or stuff.  No
7     outside investigations are allowed.  Do not visit -- I
8     know you haven't any inclination to-- do not visit
9     your local law library this evening and start reading
10    about cases of this nature.  All the evidence comes
11    from the witness stand and that's the purpose for
12    those.
13         Please close attention.  Often critical
14    testimony will not be repeated.  Those on the back
15    row, sometimes it's very easy to rest your head
16    against the soft wall and stare up in space and let it
17    all soak in but let me recommend to you, based on my
18    experience, that you get a lot more out of what a
19    person is testifying if you not only listen to what
20    they are telling you but you also watch the manner in
21    which they present their testimony.  Body language, I
22    think, is very important in a case -- in any case.
23    So, please, not only listen to the testimony, but
24    watch them closely to see how they act in a way that
25    helps you in any way with this case.

```
 1              In a few minutes the attorneys will have

 2     an opportunity to provide you an opening statement,

 3     basically a game plan of what they intend to prove and

 4     what they hope to show or not show.  Remember, as I

 5     told all of you earlier, nothing that I say and

 6     certainly nothing that anyone else says except the

 7     witnesses -- and that includes the lawyers -- nothing

 8     they say is evidence.  That's their opinions on what

 9     they anticipate will happen during the course of

10     trial.  The only evidence comes from the witness stand

11     and any physical evidence that is introduced and

12     admitted.

13              Okay.  I anticipate you will see in this

14     case, like in all cases, objections.  I will rule on

15     those objections.  Certainly you are not to hold it

16     against either side the fact that they are making

17     objections.  That's their job.  The State of Texas is

18     prosecuting and they are going to represent the State

19     as best they can, and they may make objections in

20     order to do that.  Mr. Odom has a client that is Mr.

21     Dennes and he is going to represent Mr. Dennes the

22     very best he can, if that is making objections on

23     behalf of his client, he is going to do it.  I would

24     expect him to do so.  I would be somewhat surprised if

25     he did not.  Do not hold it against either side if
```

1    objections are made and sometimes I will ask you to go

2    in the back while I rule on the objection.  And the

3    reason is you are only to hear admissible evidence and

4    sometimes these issues might involve sometimes a

5    question as to whether or not something that is being

6    asked or an item to be offered whether or not that is

7    admissible or not and those are matters that we need

8    to take up outside of your presence and I hope you

9    understand.

10          In the event that a question is asked and

11   an answer is given before the attorney might stand up

12   and say object but before I say anything, the witness

13   may respond,  I may turn to you and say disregard what

14   you just heard.  Now, certainly you can't wash that

15   out of your mind but what I am instructing you to do,

16   when you commence your deliberations, whatever was

17   said that I have asked you to disregard you are not to

18   consider that in your deliberations.  And determine

19   the facts, again, based on the credibility of the

20   witnesses and only you can decide who is credible and

21   who is not.

22          During the course of this trial, which

23   will last five days hopefully, no more than six or

24   seven, this is a noisy place.  This courthouse was

25   never intended to hold 22 to 25 courtrooms and because

1    of that, everything is congested.  The only way any

2    individuals can get to the back offices where the

3    staff works is through that door.  Every time that

4    door is opened in the morning it's very noisy, very

5    loud.  It's disconcerting.  It takes your attention

6    span away from the important part you are here to

7    play.

8            Tell us at any time if you do not hear a

9    witness respond to a question or even if you don't

10   hear the question, as far as I am concerned, raise

11   your hand and let me know that you did not hear that

12   response.  I will make sure the question and/or the

13   answer is repeated.  As you know, you cannot ask

14   questions of me or the attorneys but I want to make

15   sure that you hear the questions that are asked and

16   the answers that are given.

17           Normally what we are going to do is start

18   trial every morning at 10:00 o'clock because I have a

19   docket to call at 9:00 in the morning and it takes me

20   about an hour to get through that.  We worked around

21   that this morning.  We will gather downstairs, and I

22   will tell you more about that later, but start about

23   10:00 and go straight through to the noon hour and an

24   hour and a half for lunch.  We will take you to lunch

25   as our guests.  We will start back around 1:30.  We

1    will stop about 3:30 for a break, 15 minutes, and we

2    will go until about 5:00 at the outset, 5:30, if we

3    are in testimony with somebody that can't get back to

4    this or a critical part of the stage that we are in

5    but normally you can anticipate that we will be out of

6    here by 5:00 o'clock.

7              If, however, during the time that you are

8    sitting in that box or over here, a restroom break

9    becomes imperative, or any other emergency, don't

10   hesitate to raise your hand and let me know.  This is

11   a very serious matter, though we are not so serious we

12   can't take into account your comfort.  Let me know, if

13   you will raise your hand, and I'll deal with it and

14   take care of it for you.

15             I think that's about all I need to go

16   over, and I think we are ready to commence.

17             Will the State approach and the defendant,

18   please, stand.

19             (Whereupon, the State read the indictment

20   to the jury.)

21             THE COURT:  What is the defendant's plea:

22   guilty or not?

23             THE DEFENDANT:  I plead not guilty.

24             THE COURT:  Let it so reflect in the

25   record.

```
 1                    You may be seated.

 2                    Are there any witnesses in the courtroom

 3      that will need to be sworn?

 4                    MR. SMYTH:  Judge, we have one.

 5                    THE COURT:  What about the police officer.

 6                    (Witnesses sworn.)

 7                    THE COURT:  Does either side wish to

 8      invoke the rule?

 9                    MR. ODOM:  Yes, Your Honor.

10                    THE COURT:  Very well.  The rule has been

11      invoked, which means witnesses may not remain in the

12      courtroom while other witnesses are providing

13      testimony.  You are to remain outside the courtroom

14      until we call you, and you are not to discuss the case

15      with anyone other than counsel, and we will get to you

16      as quickly as possible.

17                    Who will be the first witness?

18                    MR. VINSON:  The State will call Officer

19      Terry.

20                    THE COURT:  We are not there yet.  Is the

21      State going to provide --

22                    MR. SMYTH:  Yes, Your Honor.

23                    THE COURT:  Mr. Odom, do you have any

24      objection to the first witness remaining in the

25      courtroom for the opening statement?
```

1           MR. ODOM:  No, I do not.

2           THE COURT:  Who is going to make the

3     opening statement?  Make it very brief and to the

4     point.

5           MR. SMYTH:  May it please the Court,

6     ladies and gentlemen of the jury:  This is, as the

7     Judge told you, our opening statement.  It's suppose

8     to be brief and, obviously, not evidence.  The only

9     evidence comes from the witness stand.

10          The State anticipates that it will call

11    witnesses and prove the following things:  State will

12    prove that on January 24, 1996, Janos Szucs was

13    murdered in his office at 6222 Richmond, the Greenrich

14    Building, a building that houses jewelers.  The State

15    will prove that the brains behind, the mastermind,

16    behind this murder as well as the robbery of at least

17    three point six million dollars' worth of diamonds and

18    an unknown amount of cash is none other than Reinaldo

19    Dennes.

20          The State will show that in the first part

21    of January in 1996, Mr. Dennes recruited a man to help

22    him build a silencer about which he was going to kill

23    Janos Szucs.  The State will show that the silencer

24    was completed and that the silencer was test fired

25    several times, both inside Mr. Dennes' office as well

1    as outside in the field, close to Mr. Dennes'

2    apartment.

3            The State will show, in addition to

4    recruiting someone to build a silencer, Mr. Dennes

5    recruited the maid, Estrella Martinez, to open the

6    back door of the building so he and his brother,

7    Alberto Dennes, could get in the back door unseen by

8    the security officer and security devices.

9            The State will show that, in order to

10   accomplish this task, Mr. Dennes used cell phones.  In

11   fact, on January 22, 1996, he went out and bought an

12   additional cell phone so he, as well as his lookout,

13   which is a Francisco Rojas, who would be in

14   communications with each other as well as with

15   Estrella Martinez.

16           And the State will show that on

17   January 22, 1996, they set up on the Greenrich

18   Building and started to carry out their plan, which

19   was to enter the building secretly, go to the 7th

20   floor, take the diamonds and cash from Mr. Szucs and

21   then kill him because Mr. Dennes had an office in that

22   very same building.  Mr. Dennes is in the diamond

23   business and he knows and has dealt with Mr. Szucs on

24   other occasions.

25           The State will show that the attempt to

1    engage in the deed on the 22th of January, 1996, was

2    called off, for some reason, and that plan was then to

3    go ahead and carry out the robbery murder on the

4    following date, which would be Tuesday, the 23rd.  The

5    State will show that efforts were made to carry out

6    the robbery murder on Tuesday, January 23, 1996, again

7    something was awry and the deed did not go off.

8        The State will show, undeterred by two

9    previous failures, that Mr. Dennes decided we will

10   carry out the operation on the 24th, Wednesday,

11   January 24, 1996.  The State will show that Mr. Dennes

12   then called Ms. Martinez and had her cell phone with

13   her at work and she let him and his brother Alberto in

14   the back door.  They went in the stairwell and went up

15   to the 7th floor where they killed Mr. Janos Szucs and

16   took the $3.6 million a minimum in diamonds as well as

17   unknown amount of cash.

18       The evidence will then show that Mr.

19   Dennes, as part of the plan, was to go down to the

20   first floor where the security guard has his station

21   and has a monitoring system that records the movements

22   on the floors.  The evidence will show that Mr. Dennes

23   then went to retrieve the video recording equipment,

24   as well as the surveillance tape, so he could not be

25   seen on the tapes.

1          And while doing that he ran into the

2    security guard, David Copeland.  The State will show

3    that Mr. Dennes was on his way out of the office

4    building when he then turned around and walked back up

5    to Mr. David Copeland, said a few words to him, and

6    stuck a gun with a silencer in his chest and fired one

7    time.  The State will show Mr. Copeland fell to the

8    ground, wounded.  Mr. Dennes stood over him and fired

9    one more wound in his back.  The State will show that

10   Mr. Dennes fled the building.  He then fled the

11   jurisdiction, went all the way to Miami, Florida.

12          Ladies and gentlemen, at the conclusion of

13   the State's evidence the State will show you beyond a

14   reasonable doubt that Reinaldo Dennes is guilty of the

15   offense of capital murder.

16          THE COURT:  Thank you, Mr. Smyth.

17          Mr. Odom, do you care to make an opening

18   statement?

19          MR. ODOM:  I would like to make an opening

20   and reserve it at the time we present our evidence at

21   the conclusion of the State's evidence.

22          THE COURT:  State call its first witness.

23          MR. VINSON:  At this time the State will

24   call Officer Terry.

25

1                        PAUL TERRY,

2    was called as a witness for the State and, having been

3    duly sworn, testified as follows:

4                     DIRECT EXAMINATION

5    BY MR. VINSON:

6         Q      Give your complete name and spell your

7    last name for the record, sir.

8         A      Paul Terry, T-e-r-r-y.

9         Q      And I am going to take it by your uniform

10   that you are employed by the Houston Police

11   Department?

12        A      Yes, I am.

13        Q      And how long have you been so employed?

14        A      Three and a half years.

15        Q      Will you tell the ladies and gentlemen of

16   the jury what type of training you have received to

17   prepare you to work as a police officer.

18        A      Well, I have got a degree in criminal

19   justice and went to the police academy for six months

20   for 900 hours of training.

21        Q      And do you also get in-service training as

22   well?

23        A      Yes, every year we get mandatory -- we

24   have to get at least 40 hours a year.

25        Q      Now, what capacity were you working as a

1    police officer back in 1996, was that a jailer or

2    patrolman or what?

3         A        I was on patrol.

4         Q        And while you were on patrol, did you have

5    a certain area within the city that you were

6    responsible for?

7         A        Yes, I do.

8         Q        Can you tell His Honor and the ladies and

9    gentlemen of the jury what area of the city you were

10   responsible for?

11        A        Well, I worked the west side area in 18

12   district.  And each district is broken into beats and

13   I worked 30 beat, which is between Gulton and Chimmey

14   Rock and then from 59 all the way to the Buffalo

15   Bayou.

16        Q        Is that in the southwest section of this

17   county?

18        A        Yes, it is.

19        Q        And can you tell us what time you went on

20   duty?  What were your normal working hours?

21        A        My hours are 3:00 p.m. to 11:00 p.m.,

22   Wednesday through Sunday.

23        Q        Do you work alone or have a partner with

24   you?

25        A        I work alone usually.

```
1        Q       And, I take it, you drive a patrol car?

2        A       Yes, I drive the patrol car.

3        Q       Let me take you back to January 24, 1996.

4   Were you on duty that day?

5        A       Yes, I was.

6        Q       And did you have the area of

7   responsibility that you just described to this jury

8   and His Honor?

9        A       Yes, I did.

10       Q       And did you get on about 3:00 that

11  evening?

12       A       Yes, I did.

13       Q       Now, later in the evening, did you get a

14  call to respond to a location on Richmond Avenue?

15       A       Yes, that's correct.

16       Q       And will you tell the ladies and gentlemen

17  of the jury what time you received the call.

18       A       I received the call at 7:46 p.m.

19       Q       And can you tell the ladies and gentlemen

20  of the jury to what location were you directed.

21       A       I was asked to respond to the address of

22  6222 Richmond.

23       Q       And is 6222 Richmond located here in

24  Harris County, Texas?

25       A       Yes, it is.
```

1       Q       And did you go to that location?

2       A       Yes, I did.

3       Q       And what time did you arrive?

4       A       I arrived two minutes later, 7:48 p.m.

5       Q       Now, when you arrived, what were your

6    observations?  Is this a commercial location or a

7    residential location or just what?

8       A       Right.  It's an office building,

9    commercial office building.

10      Q       And can you tell us what is located at the

11   Richmond address you responded to.

12      A       When I parked the patrol car and went in,

13   I observed Mr. Copeland.

14      Q       Just a minute, I mean was that an office

15   building?

16      A       Yes, it was an office building.

17      Q       And did you enter that building?

18      A       Yes, I entered the building.

19      Q       Was it a single story building or a

20   multilevel?

21      A       Multi level office building.

22      Q       You didn't check to see how many floors or

23   anything of that nature?

24      A       No.

25      Q       Were there any other officers at the scene

1    when you arrived?

2         A       There was one officer that got there

3    several seconds before I did but he arrived during the

4    same time that I did.

5         Q       Was that Boarca?

6         A       Yes, that's B-o-a-r-c-a.

7         Q       And what did you do when you arrived?

8         A       I walked through the front lobby door.

9         Q       What were your observations when you

10   walked in the lobby?

11        A       I observed the security guard lying face

12   down on the ground and a witness standing next to him.

13        Q       Now, did you ever identify the name of the

14   security guard?

15        A       Yes, I did.

16        Q       And did you come to know that person by

17   what name?

18        A       David Copeland.

19        Q       And how did you know that he was a

20   security guard?

21        A       He had a jacket from the security company

22   he works for, and I had been to the office building

23   before on burglary alarms, calls for burglar alarms.

24        Q       Can you tell us what, based on your

25   observations, what condition Mr. Copeland was in.

1    Could he speak with you?

2         A     At the initial time I saw him, no, I

3    didn't believe him to be conscious.  I didn't see his

4    face because he was face down.  And at that time we

5    were worried about securing the scene for any possible

6    suspects that could be in the area.

7         Q     Now, when you arrive on a scene, you try

8    to maintain the integrity of that crime scene; is that

9    correct?

10        A     That's correct.

11        Q     Explain that to the ladies and gentlemen

12   of the jury.

13        A     Well, when we arrive, we immediately try

14   to find out if there is a suspect in the area.  So

15   another officer and I went to where we were told the

16   suspect exited the building.  And we went that

17   direction, out the loading dock door, went outside and

18   searched around to see if we could see any possible

19   suspects in the area.

20        Q     And did you have any success with that?

21        A     No, we did not.  We didn't see anyone.

22        Q     Then you returned to the crime scene?

23        A     Yes, I did.

24        Q     And did you stay there until you turned

25   that scene over to a detective or someone from the

1      crime scene unit?

2          A       Yes, that's correct.  I went back over to

3      where Mr. Copeland was lying.

4          Q       Had anyone taken any steps to call for

5      emergency medical treatment for Mr. Copeland?

6          A       Yes, that was already called.  Once I

7      received my call, they dispatched the ambulance at the

8      same time that I'm dispatched so they were en route

9      when I got the call, also.

10         Q       And did they arrive while you were there?

11         A       Correct.  They arrived two minutes after I

12     arrived, approximately 7:48 p.m. or 7:50.

13         Q       And can you tell us if they attempted to

14     treat Mr. Copeland on the scene or what happened?

15         A       Yes, they treated -- they have to get him

16     stabilized the best they can.

17         Q       From your observation, could you tell what

18     type of injury Mr. Copeland had suffered?

19         A       Yeah.  I saw one bullet wound in his back

20     because he was lying face down.  I did see a visible

21     bullet wound and blood on the ground.

22         Q       Did you recall what location of the back

23     you saw that wound?

24         A       It was on his right upper back.

25         Q       And what else did you observe?

1       A       Well, when they turned him over?

2       Q       Yes.

3       A       When the paramedics turned him over, I saw

4    two bullet wounds to the chest, center chest.

5       Q       Could you tell what type of weapon had

6    been used based on your observation?

7       A       It looked to be a firearm.

8       Q       I mean, you don't know if it was an

9    automatic or a revolver or what caliber or what, do

10   you?

11      A       No, I couldn't tell from the bullet

12   wounds.

13      Q       Now, did you have any conversation with

14   Mr. Copeland when they turned him over?

15      A       Yes, I did.  I did before they turned him

16   over.  Before they got there, I was already attempting

17   to speak with him.

18      Q       And was he able to speak with you?

19      A       Yes, he was.

20      Q       What question did you put to Mr. Copeland?

21      A       Excuse me?

22      Q       What question did you put to Mr.

23   Copeland?  What did you ask him?

24      A       I asked him what had happened.

25      Q       Okay.  Did he tell you?

1       A       Yes, he said that he --

2               MR. ODOM:  Objection, hearsay.

3               THE COURT:  Sustained.

4       Q       (Mr. Vinson)   Just, if you can, answer

5   yes or no, did he respond to you?  Were you able to

6   understand what he told you?

7       A       Yes.

8       Q       And what did you do with the information

9   that he conveyed to you?

10      A       I wrote it down on a piece of paper.

11      Q       Could he tell you if it was a male or

12  female who committed this offense?

13      A       Yes, he could.

14      Q       And I think you have already testified

15  that he left from Mr. Copeland's area and went toward

16  what door?

17      A       This was the loading dock door where they

18  bring in deliveries to the building.

19      Q       And when you went in that direction, what

20  were you looking for, male or female?

21      A       We were looking for a male.

22      Q       Did you have any success in locating

23  anyone when you went to that door, the loading dock

24  door?

25      A       No.

1      Q      Now, did you do any further investigation
2  on this case after you are arrived on the scene and
3  made your observations and turned it over to the crime
4  scene unit, did you do any?

5      A      No, no more further.  I immediately called
6  homicide division of the Houston Police Department.

7      Q      Did you do any investigation whatsoever
8  there at the scene other than go to the loading dock
9  door?  Did you do anything other than that?

10      A      As far as the immediate area we tried to
11  mark where we may find any evidence of the shooting
12  that would be related and put a piece of paper there
13  and mark where it is and other than crime scene tape,
14  we don't do anything else beyond that.

15      Q      Did you see any evidence of a firearm used
16  out there other than the wound suffered?

17      A      Yes, I did.

18      Q      Will you tell His Honor and the ladies and
19  gentlemen of the jury what you observed.

20      A      I found spent shell casings from a firearm
21  that was fired.

22      Q      And where did you find that?

23      A      Those were lying on the lobby floor and,
24  also, I saw fragments on Mr. Copeland's jacket and
25  back of a bullet.

1          Q      Did they appear to be lead fragments?

2          A      Yes, they did.

3          Q      Did they appear to be consistent with a

4    round that had been fired?

5          A      That's correct.

6          Q      Did you do any other --

7          A      I'm sorry.

8          Q      Did you do any other work around there?

9    Did you check on any security system or anything of

10   that nature?

11         A      No.   I did notice that the video equipment

12   was missing.

13         Q      And how did you make that observation?

14         A      By looking behind the desk, we saw all the

15   exposed wires.   And like I said, I had been to the

16   building before and know they do have video equipment

17   set up behind the security desk.

18               MR. VINSON:   May I approach the witness,

19   Your Honor?

20               THE COURT:   You may.

21               (Whereupon, State's Exhibit Nos. 1 through

22   23 were marked for identification.)

23         Q      Sir, let me show you what has been marked

24   for identification purposes as State's Exhibit 1

25   through 5 -- they are photographs -- and take a look

1    at them and see if you can identify them.

2         A     Yes, I can identify these.

3         Q     And State's Exhibit 1 through 5, the

4    photographs that have been marked for identification

5    purpose, do they accurately reflect the scene as you

6    recall it to be back on January 24th of this year?

7         A     Yes, they do.

8         Q     Last year, 1996?

9         A     Yes, they do.

10             MR. VINSON:  Your Honor, at this time the

11   State will offer into evidence State's Exhibit 1

12   through 5 and tender the same to defense counsel for

13   his inspection.

14             MR. ODOM:  At this time, Judge, we would

15   object in that there is no correlation in there and

16   the murder of the complainant, Mr. Szucs, at this

17   point, and we would object until the time that the

18   State proves a correlation between this shooting and

19   that incident.  And we would object to it.

20             THE COURT:  It's overruled.  State's

21   Exhibit 1 through 5 are admitted.

22             MR. VINSON:  May the witness step down so

23   we can publish them to the jury.  We can move much

24   quicker.

25             THE COURT:  Surely.

1        Q       What is State's Exhibit 1?

2        A       This is a sign, the address of the

3   building that sits out in front of the building.

4        Q       And that's the location you went to --

5        A       That's correct.

6        Q       -- in Harris County, Texas, on January 24,

7   1996.

8                Can you tell the ladies and gentlemen of

9   the jury what they are looking at with respect to

10  State's Exhibit 2.

11       A       This is a security desk, the desk office.

12       Q       Now, is there something missing back here?

13       A       Yes.  The video recording equipment that

14  sits on the shelf right here is missing that holds the

15  tapes.

16       Q       Is that the area we are looking at where

17  wires are pulled out?

18       A       Yes, that's correct.

19       Q       And State's Exhibit 3 what do we have

20  there?

21       A       That's the lobby floor of the building

22  where the security guard, the area where he was lying.

23       Q       And had he been removed at that time

24  obviously?

25       A       Yes.  He had been removed by the

1    paramedics already at that time.

2        Q      What did they do, move in there real

3    quickly and treat him quickly and get him out of

4    there?

5        A      They were in there 10 minutes, as quick as

6    they believed they could, five or six minutes before

7    they moved him.  The fire engine arrived first and

8    then the ambulance followed coming in.

9        Q      Can you tell the ladies and gentlemen of

10   the jury what is identified here in State's Exhibit

11   4.  What is that?

12       A      That is a bullet, looks to be a bullet

13   sitting on the ground of the lobby.

14       Q      Could be a fired bullet; is that correct?

15       A      Yes, a fired bullet.

16       Q      And made contact with something or

17   someone?

18       A      Correct.  It's bent out of shape.

19       Q      And tell the ladies and gentlemen of the

20   jury what they are looking at here in State's Exhibit

21   5.  I am going to put my pencil.

22       A      That's a spent shell casing, meaning it's

23   the back of a bullet.  When a bullet is fired, that's

24   the shell casing that held the bullet.

25       Q      Now, does that tell you what type of

1    weapon was used during the commission of that offense?

2        A        Correct.

3        Q        Gives you some idea that maybe it was an

4    automatic, correct?

5        A        That's correct.

6        Q        And it was an automatic weapon -- does

7    what?

8        A        An automatic weapon will expel the shell

9    casing when it is fired.

10       Q        It automatically chambers another round to

11   be fired?

12       A        Correct.

13       Q        Now, did you have an opportunity to look

14   at this shell casing and determine what type of weapon

15   was used out there, just yes or no?

16       A        Yes.

17       Q        Why don't you have a seat.

18                And based on the shell casing, did you

19   come to some conclusion what type of weapon was fired

20   out there?

21       A        Yes, I did.  I did look at the shell

22   casing but I can't recall what millimeter or caliber

23   it was, right off the top of my head.

24       Q        No problem, fair enough.

25                And did you make an offense report as to

```
1    your observations out there and what you did?

2         A      Correct, I did.

3                MR. VINSON:  I have no further questions,

4    Your Honor.

5                THE COURT:  Mr. Odom.

6                MR. ODOM:   Before I question this man,

7    may I have an opportunity to the look at the offense

8    report he made.

9                THE COURT:  Let the record reflect the

10   State is now tendering the offense report to defense.

11               THE COURT:  While you are doing that, let

12   me introduce Ms. Yalila Guerrero, who assisting Mr.

13   Odom.

14

15                    CROSS EXAMINATION

16   BY MR. ODOM:

17        Q      My name is Wendell Odom.  We have had not

18   had an opportunity to talk, have we?

19        A      No, we haven't.

20        Q      First of all, you are what's known as a

21   patrol officer?

22        A      That's correct.

23        Q      And you are assigned to a particular area

24   that you patrol?

25        A      Correct.
```

1        Q       And the area that you patrolled on this

2    night is an area that you were familiar with and that

3    was around the building over on Richmond Avenue?

4        A       Correct.

5        Q       Now, Officer Terry, can you tell the jury

6    where on Richmond Avenue other than the address, give

7    them a location so they can put this building in

8    perspective.  What is it close to?

9        A       It's close to Greenrich Street.

10       Q       Is it fairly close to the Galleria area?

11       A       It's a couple of miles from the Galleria.

12       Q       Is it inside the Loop from the Galleria or

13   outside the Loop?

14       A       Outside the Loop.

15       Q       So it's farther down Richmond, away from

16   the Galleria area a couple of miles?

17       A       Correct.

18       Q       And you are familiar with the building

19   because, I believe, you stated before that you had

20   some prior experience and had gone to the building

21   before?

22       A       Correct.

23       Q       And now you stated that, when you came

24   into the building, you recognized the fact that this

25   was a security person, the person we know now as Mr.

1      Copeland?

2          A      Correct.

3          Q      And you recognized the fact because he was

4      wearing a jacket that reflected he was a security

5      guard?

6          A      That's correct.

7          Q      Did you recognize Mr. Copeland himself as

8      a person you had seen before at that building?

9          A      No, I can't say that I have.

10         Q      So although you have had prior occasions

11     to come to the building, you had not had an

12     opportunity or, if you did, you do not recall, ever

13     seeing this particular security guard, Mr. Copeland,

14     prior to this particular evening?

15         A      That's correct.

16         Q      Now, I believe you stated that this

17     building had lots of -- there were lots of jewelry

18     shops in this building.  Did you make that statement?

19         A      I don't know if I made the statement but

20     I've been there and, yes, there is jewelry shops in

21     there; many.

22         Q      For the benefit of the ladies and

23     gentlemen of the jury, this particular building had a

24     number of shops that were either in the jewelry

25     business or related to either jewels or precious

1    stones of one sort or another; isn't that a fair

2    statement?

3        A      Yes, that's correct.

4        Q      As such, did that building, if you know,

5    and if you don't just tell me, did it have what you

6    would call very good security or did it have medium

7    security or did it have poor security, if you know?

8        A      It's got good security.

9        Q      And that's pretty consistent with the fact

10   that there are several businesses there that have

11   precious commodities, isn't it?

12       A      Yes.

13       Q      Did I catch you off?

14       A      No, that's correct.

15       Q      It's not unusual for a jewelry store, or

16   people that are dealing in precious stones, to have

17   hired security than other the businesses, isn't it?

18       A      Yeah, that wouldn't be -- yeah, they do

19   have hired security.  They have their own plus, of

20   course, the security guard downstairs in the lobby.

21       Q      Now, the prior burglary calls you had were

22   those false calls or had there been prior burglaries

23   you investigated in that particular building?

24       A      No.  The only things I have been called to

25   is false burglar alarms, their alarms being set off

1    for one reason or another.

2          Q       So, in other words, the alarm goes off,

3    you go to the scene but it turns out it is a false

4    alarm?

5          A       Correct.

6          Q       Now, I believe you stated, when you

7    arrived at the scene, that you saw Mr. Copeland, a

8    person who you later determined was Mr. Copeland, and

9    a witness standing over him, correct?

10         A       That's correct.

11         Q       And that witness was that later did you

12   determine -- do you know, was that Mr. Vacek?

13         A       Mr. Have I /SEBG, yes.

14         Q       Did you know Mr. Vacek from prior

15   experience?

16         A       No, I did not.

17         Q       For the benefit of the jury and the ladies

18   and gentlemen of the jury, can you, officer, come down

19   and sketch for me basically where in the lobby that

20   you saw Mr. Copeland and where you saw the witness

21   standing over him, as well where the security booth

22   was that had the video equipment and the loading dock

23   area that you and the other officer went to.  Could

24   you do that for me.

25         A       Yeah.  I don't think I can do it to scale.

```
 1          Q        I know that, nor would I ask you to do

 2     that.

 3                   THE COURT:  Make sure you keep your voices

 4     up.

 5          A        Okay.  This is the front door to the

 6     building.

 7          Q        All right.

 8          A        It would be right here.

 9          Q        Now, this sign that we see in the

10     photograph, State's Exhibit 1, 6222 Richmond, where is

11     this sign going to be located?

12          A        The sign would be located right about

13     here.

14          Q        Okay.  And which entranceway do you come

15     into the building from?

16          A        I came in the front lobby.  The doors are

17     all right here.

18          Q        Okay.  And when you walk in, I take it,

19     there is some sort of parking facility out in front of

20     the building?

21          A        Correct.  It is a drive through circular,

22     semicircle drive through, and I parked my car right

23     about here.

24          Q        And you said there was another police

25     officer car that simultaneously or was already there?
```

1       A       He arrived a few seconds before me.

2       Q       You come to the front door?

3       A       Yes.

4       Q       As you come to the front door, the whole

5  lobby is it open?

6       A       Yes, it is.

7       Q       So you see Mr. Copeland, I take it, lying

8  here?

9       A       Yes, approximately right there; yes.

10      Q       And Mr. Vacek?

11      A       He was standing in this area.

12      Q       All right.  And you have drawn three

13  little squares.

14      A       These are elevators, standing there is a

15  set of elevators where the elevators start and go up.

16      Q       And State's Exhibit 2, to refresh your

17  memory, shows a chair with a booth.  Where is that?

18      A       This is right here.  This is where the

19  security guard sits --

20      Q       Okay.

21      A       -- in a booth.

22      Q       Okay.  Now, Officer Terry, are there some

23  steps that lead down to the lobby, that you recall, up

24  from the second floor?

25      A       A stairwell.

1     Q     Yes, sir.  An open stairwell -- or not a

2  closed door stairwell, like we have in this building,

3  but one that is in here; do you recall one?

4     A     No, I don't.

5     Q     Do you recall a deli being off this lobby?

6     A     Yes, I do.

7     Q     Where would that be?

8     A     That's going to be over here, in this side

9  exit.  There is a deli over in here in the hallway,

10  leading to this side exit.

11     Q     All right.  Now, looking at State's

12  Exhibit 3, that's a photo of the jacket, the shoes, I

13  assume that would be in the locale of where Mr.

14  Copeland was lying?

15     A     Correct.

16     Q     And, then, looking at State's Exhibit 4, a

17  spent bullet on a marble floor, if you recall, where

18  would that be located?

19     A     I can't tell you the exact area.

20     Q     And, then, the casing, where did you find

21  the casing?

22     A     There were casings in different areas.

23  There was one over here, I know that; and I remember

24  one particular over there.  I can't remember the exact

25  area of the other ones.

1      Q       How many casings did you actually find?

2      A       I saw at least two.

3      Q       All right.  I take it, then, you are not

4    the officer that picked up the casings?

5      A       No, I'm not.

6      Q       Is this from the deli area?  I take it,

7    there is some glass that allows you to look from the

8    deli into this lobby area?

9      A       No, you can't see at that point.  It's the

10   hallway, goes further down and the deli further up

11   here, behind the board, but you can't see from the

12   deli to the lobby.  You have to go and turn the

13   corner.

14     Q       Okay.  You may return to your seat.

15             Officer Terry, the photographs that we

16   have, State's Exhibit 1 through 5, you didn't take

17   these photographs, did you?

18     A       No, I didn't.

19     Q       I take it, that a HPD photographer came on

20   the scene and did that?

21     A       That's correct.

22     Q       And one thing, you know, and did this as

23   soon as I asked you to sit down but I believe you drew

24   on here the loading dock area up to the top left hand;

25   is that correct?

1          A        That's correct.

2          Q        Was it your understanding that the

3    assailant had made an exit towards the loading dock

4    area?

5          A        That's correct.

6          Q        Now, is the loading dock area, I take it,

7    it's on the same floor as the lobby and the front

8    entranceway?

9          A        Yes, it is.

10         Q        There are doors that are here on the

11   front?

12         A        That's correct.

13         Q        Did you go back into the loading dock

14   area?

15         A        Yes, I did go out the door on the loading

16   dock; yes.

17         Q        And does that lead into the garage of this

18   building or does it lead to an open area?

19         A        No, it leads into an open area.

20         Q        And by open area, I am talking about an

21   outdoors?

22         A        Right, it's outdoors and once you leave

23   the loading dock, you are on Richmond.

24         Q        What type of door is there at the loading

25   dock area?

1     A      It's a double door.

2     Q      All right.  And is it a door that is the

3  kind you turn a handle on and open or the kind where

4  you push a bar down and it opens up?

5     A      The best I remember: the type with the bar

6  that you push to open it up.

7     Q      And was that door locked when you went out

8  to the loading dock area?

9     A      No, it was open.

10    Q      And by open, was the door shut and you

11 were able to open it or was it just wide open?

12    A      I can't recall.

13    Q      Okay.  But at any rate you were not

14 obstructed and were able to leave out the door?

15    A      Yes, that's correct.

16    Q      Now, in your report you had indicated that

17 there were two suspects that were brought in.  Were

18 you involved in any way in bringing in two suspects?

19    A      No, I wasn't.

20    Q      How does that work?  Do sometimes you put

21 things in your report that you get the duty of having

22 to put somebody else's stuff in on occasion, if they

23 are?

24    A      Individual officers will come to the scene

25 and they searched in their vehicles around the general

1    area looking for any suspects --

2         Q     Right.

3         A     -- on the nearby streets.

4         Q     Right.  And what I am asking is -- and

5    this is just a point of information -- that do they

6    make separate reports or are you making their report

7    for them in your report?

8         A     They didn't make a report unless there was

9    some reason to but we determined that night that these

10   witnesses, or the people, possible suspects they

11   picked up, were not involved in this at all.

12        Q     Okay.  Now, the people that viewed these

13   possible suspects would that be Mr. Vacek?  I keep

14   saying it wrong.

15        A     He may have looked at them but he couldn't

16   tell for sure.

17        Q     Mr. Vacek is the one that would have

18   looked at the two suspects that were brought in that

19   night?

20        A     There was another female that looked at

21   them.

22        Q     And that was Mrs. Vacek?

23        A     No, there was a female maid or janitor

24   that worked at the building.  Supposedly she had seen

25   the assailant.

1      Q      And neither one of those persons could ID

2  the two suspects that were brought in?

3      A      Right.  They couldn't ID them positive as

4  being the one who committed the shooting.

5      Q      Now, you were also looking for a suspect,

6  were you not?

7      A      Yes, I was.

8      Q      Had you talked to either -- had you talked

9  to any of the witnesses at the scene before you

10 started looking for a suspect?

11     A      We just spoke to Mr. Vacek.

12     Q      And I believe you stated, when Mr. Vinson

13 was asking you, that you were looking for a male?

14     A      Yes.

15     Q      And were you looking for someone who had a

16 baseball cap on, as you recall?

17     A      No.  I don't recall we were looking for

18 someone with a baseball cap.

19     Q      Were you looking for someone that had a

20 mustache?

21     A      Upon first entering the building, we had

22 no description yet.  We just went to where this

23 supposed suspect exited.  We had no description yet.

24     Q      So I think you answered my question.

25            So what happened, if I understand you, is

1    that, when you first arrived, there was an indication

2    that someone had left out the loading dock so without

3    getting any description, you and officer -- what was

4    his name?

5         A    Boarca.

6         Q    You immediately go out the loading dock

7    area?

8         A    Correct.

9         Q    And you are looking for a male at that

10   point?

11        A    Looking for anyone in the general area

12   that may be leaving or looks suspicious right in that

13   general area.

14        Q    You are looking for a witness, you are

15   looking for suspect, anybody you can see?

16        A    Right, correct.

17        Q    So then you come back and then you may

18   have conversations with various witnesses at the

19   scene, correct?

20        A    Correct.

21        Q    And because there has been a call put out,

22   other officers who may be patrol officers or other

23   Houston police officers have picked up a couple of

24   people that they have brought into the lobby area

25   there; is that a fair statement?

1    A    They didn't bring in the lobby area.  They
2    had outside.
3    Q    And would have been out in front of the
4    building?
5    A    That's correct.
6    Q    And at that time two witnesses were unable
7    to identify those persons as being the assailant?
8    A    Correct.
9    Q    Did you in your report indicate the names
10   of those two suspects?
11   A    No, I didn't.
12   Q    Does someone have the names of those two
13   suspects?
14   A    I don't know if they do or not because
15   they were released that night.
16   Q    Well, if someone is released, if someone
17   was brought in as a suspect and they are released, is
18   it standard police policy before they are released to
19   get their names.
20        MR. VINSON:  He asked for a police policy,
21   and he said they were released and he doesn't have an
22   answer.
23        THE COURT:  I'll let him answer.
24   Q    (Mr. Odom)  What I am asking you:  Is it
25   standard policy when someone is brought in as a

1    potential suspect and they are released to get their

2    names or not to get their names?

3         A       It depends on what capacity -- they were

4    just detained.  They weren't under arrest or anything

5    like that.  We just had them detained.

6         Q       And my question is:  In that situation

7    where they are just detained, do you, as a police

8    officer, get their name for future purposes?

9         A       I'm sure, if they did have ID on them, the

10   officer -- the officers that were detaining these

11   people did get their ID and possibly run them in the

12   computer, and I don't even know if they wrote it down

13   or not.  I didn't speak with them about that.

14        Q       Now, are these the same officers that are

15   filling the report out or would there be some other

16   officer that would do this?

17        A       I just fill out the report for myself, my

18   observations.  I'm not sure if they did a supplement

19   or not.  I don't know if they did a report on what

20   they observed or who they picked up.  I don't know if

21   they did a report or not.

22            MR. ODOM:  May I approach the witness,

23   Your Honor?

24            THE COURT:  You may.

25        Q       Without reading the report to the jury --

1    I'm referring to these last few sentences in your

2    report -- could you read that to yourself, please.

3              What I am trying to ask and I need to look

4    at their names, what I am trying to ask you:  Would

5    Officer Thomas, B. J. Thomas, and Officer Rivera, who

6    brought in two suspects, would they have filed a

7    separate report?

8         A    It's possible but I don't know if they

9    did.

10             MR. ODOM:  That's all I have.  Pass the

11   witness.

12             THE COURT:  Redirect is going to take how

13   long?

14             MR. VINSON:  Going to be very short.

15

16                  REDIRECT EXAMINATION

17   BY MR. VINSON:

18        Q    Now, you said you were looking for a male;

19   is that correct?

20        A    Correct.

21        Q    Let's be more specific:  A black male or

22   white male or what?

23        A    We were looking for a white male.

24        Q    And were you looking for a person that had

25   a mustache?

1        A       Upon entry of the building, we didn't have

2    a description yet.  We just went towards the loading

3    dock.  He said he went that way and we went that way.

4        Q       After having an opportunity to talk with

5    Mr. Copeland, were you looking for a person that had a

6    mustache?

7        A       Yes, I was.

8        Q       The two men that was brought back did you

9    have an opportunity to see them?

10       A       I didn't have an opportunity to see them

11   up close because I was inside the building.

12       Q       But from where you were, could you

13   determine if they had a mustache or not?

14       A       No, I couldn't.

15       Q       Okay.  Fair enough.

16               Can you tell us what happened to those two

17   men?

18       A       Those two men were released.

19       Q       And they were released because you all

20   determined what?

21       A       The maid determined that it was not the

22   person that she saw do the shooting.

23       Q       And do you recall the maid's name who gave

24   you that information?

25       A       No, I don't.

1      Q      Do you think you would recognize the name

2   if you hear it again?

3      A      No, I don't.

4      Q      Now, you were not -- or the Houston Police

5   Department would not release someone if they had a

6   reasonable belief that they committed an offense,

7   would they?

8      A      Right.  We wouldn't release them if we

9   believe they committed an offense.

10             MR. VINSON:  I have nothing further.

11

12                    RECROSS EXAMINATION

13   BY MR. ODOM:

14      Q      Are you telling us that there is other

15   information for releasing these people or was it

16   simply the maid said she didn't recognize those two

17   persons?

18      A      There could have been more information

19   such as a test done on their hands to see if they had

20   fired a weapon recently but that would have been up to

21   the crime scene unit to conduct a test like that.

22      Q      Well, Officer Terry, it seems like a

23   simple question but Mr. Vinson asked would HPD release

24   someone if they had a reasonable belief they may have

25   been involved in an offense?  Have you known more than

1       one person to have been involved in an offense?

2           A       Have I known personally?

3           Q       Yes.

4           A       Yes, I have.

5           Q       So at the point these persons were

6       released, what you are saying, is that you knew they

7       hadn't been identified but you don't know what their

8       names are or anything else at this point, correct?

9           A       Correct.

10                  MR. ODOM:  Pass the witness.

11                  THE COURT:  Mr. Vinson.

12                  MR. VINSON:  I have nothing further.

13                  THE COURT:  Is this witness to be

14      excused?

15                  MR. VINSON:  Yes.  We have a procedure to

16      contact him.

17                  THE COURT:  You are excused subject to

18      recall.  Thank you for your testimony.

19                  We are going to break for lunch, ladies

20      and gentlemen.  We are going to stand in recess until

21      1:30.  We will take you to lunch.

22                  Please remember the admonishments I have

23      given you this morning about not discussing this case,

24      and I will see all of you back at 1:30, if you will go

25      with the bailiff, and go the jury room and get you

1     acquainted and take you to lunch promptly.

2                    (Recess taken.)

3                    THE COURT:  Are we ready?

4                    Bring the jury out.

5                    (Jury came into the courtroom.)

6                    THE COURT:  Please be seated.

7                    State call your next witness, please.

8                    MR. VINSON:  With the Court's permission,

9     the State would call J. L. Kay.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           J. L. KAY,

2     was called as a witness for the State and, having been

3     duly sworn, testified as follows:

4                       DIRECT EXAMINATION

5     BY MR. VINSON:

6          Q     Sir, will you give your complete name and

7     and spell your last name for the record.

8          A     James Kay K-a-y.

9          Q     And, I take it, by your uniform, that you

10    also work for the Houston Police Department?

11         A     Yes, sir, I do.

12         Q     And how long have you been employed with

13    the Houston Police Department?

14         A     18 years.

15         Q     And what type of training have you

16    received to gives you the background to work as an

17    officer with the Houston Police Department?

18         A     As a police officer or in my present

19    assignment?

20         Q     Both.

21         A     Well, as a police officer, of course, I

22    attended the Houston Police Academy.  After that, a

23    year of job training as a rookie officer, numerous

24    schools, up to the point, I applied for the homicide

25    division as the crime scene unit.  After I became a

1    crime scene officer, that's when I learned what going

2    to school is really all about.  I go a lot.  I just

3    returned from Miami, Florida, for a medical legal

4    definition school that was two weeks long.  I have

5    been to blood pattern and blood stain interpretation

6    And technology schools, different type of fingerprint

7    schools, numerous schools put on by the FBI on finding

8    fingerprints and chemical testing, and I am still

9    learning.  The schools are just a constant process.

10        Q       And you work as a crime scene officer; is

11   that correct?

12        A       Yes, sir.

13        Q       Tell the ladies and gentlemen of the jury

14   what you do in that capacity.

15        A       Our main job is investigation of homicides

16   and unknown deaths.  The only type of death we don't

17   investigate are traffic accidents and natural deaths

18   where a doctor signs the death certificate.  Because

19   of the training and the equipment, we also make other

20   high profile type of criminal activity, bank

21   robberies, section, metamphetamine and child abuse,

22   anything when it's some expertise needed to gather up

23   the evidence at the particular crime scene and the

24   evidence we pick up can be something you have to be

25   trained to recover, whether something as large as a

1       18-wheel truck or something microscopic that can't be

2       seen with the naked eye.

3           Q       Have you done that on few or many

4       occasions?

5           A       Many, many times.

6           Q       In essence, to summarize, you go to a

7       crime scene and from that crime scene, you collect

8       evidence; is that correct?

9           A       Yes.

10          Q       And then you control that evidence until

11      you get it to the proper facility to examine it and

12      complete the processing of it?

13          A       Yes, sir.

14          Q       And then you assist us in developing how

15      that evidence can be used, if there is a case; is that

16      correct?

17          A       Yes, sir.

18          Q       Let me take you back to January 24, 1996.

19      Were you on duty that day, sir?

20          A       Yes, sir, I was.

21          Q       And did you have an occasion to be called

22      to a location here in Harris County, Texas,

23      specifically on Richmond Avenue?

24          A       Yes, sir, I did.

25          Q       And can you tell His Honor and the ladies

1    and gentlemen of the jury about what time you received

2    that call and where did you go?

3         A      I received the call at 8:00 p.m. and it

4    was to go to the Greenrich Building at 6222 Richmond.

5    And I arrived at 8:20 p.m.

6         Q      And, I take it, too, that address is

7    located here in Harris County, Texas?

8         A      Yes, sir.

9         Q      When you arrived at the Greenrich

10   Building, what were your observations, just what type

11   of business this is?

12        A      There's a lot of jewelry wholesalers in

13   the building, some different businesses, a multi-story

14   building.  I was met there by an officer, Officer

15   Gathy (sic), I believe was her name, to explain to me

16   the details of the offense.  And I noticed that they

17   had the scene secured.  They had yellow crime scene

18   tape up, and everything was ready for me to go to

19   work.

20        Q      Now, how did you gain entry into that

21   building?

22        A      Through the main entrance, the entrance

23   that faces on to Richmond.

24        Q      Someone allowed you in or was the door

25   already open?

1          A       At that time the officers had allowed me

2    in.   We had officers stationed just inside the doors.

3          Q       And when you entered, is it the foyer area

4    of the building?

5          A       Yes, sir.

6          Q       And did you see anyone who had been

7    injured or had that person already been removed?

8          A       He had been transported to the hospital

9    already.

10         Q       So you never had an opportunity to see

11   that person?

12         A       No, sir.

13         Q       Will you tell the ladies and gentlemen of

14   the jury what you did to process that scene and

15   collect any evidence.

16         A       After I made entry into the foyer of the

17   building, I did a walk through, which is a preliminary

18   search for evidence.  And there was several items in

19   the foyer that were interesting.  There's a security

20   guard desk on your left, as you walk in, the top of

21   the staircase.  Right next to the security guard desk,

22   there was some bloody clothing, blood stains on the

23   floor itself.  Also, next to the security guard desk

24   there was a fired .9 mm shell casing, along with some

25   bullet fragments on the floor, next to the security

1    guard desk.

2            Further, to the right, your right, as you

3    walk up the stairs near the elevator banks, there was

4    a fired bullet that was mushroomed that was laying on

5    the floor.  In addition to that non-moveable type of

6    evidence, there was what appears to be a bullet strike

7    in the floor next to the security guard desk, which

8    had broken pieces of lead fragments around it, and

9    there was also a bullet strike in the wall next to the

10   elevator banks -- there were three elevators -- in

11   between the left two, there is the button you push to

12   call the elevator, there was a bullet strike in that

13   metal plate.

14        Q      Now, did you take photographs of all the

15   evidence and what you observed out there?

16        A      Yes, sir.

17        Q      And did you also do what we refer to as

18   the scene diagram?

19        A      Yes, I did.

20        Q      Do you think that would assist you in

21   communicating to the jury the location of these pieces

22   of evidence collected?

23        A      Yes, sir.

24        Q      Do you think the floor diagram would also

25   assist you in communicating to the jury the exact

1   location, as close as possible, to where you found

2   this evidence as well?

3        A        Yes, sir.

4                 MR. VINSON:  May approach the witness,

5   Your Honor?

6                 THE COURT:  You may.

7        Q        Let me show you what has been marked for

8   identification purposes as State's Exhibit 6 through

9   23.  There are 8 by 10 photographs.  Why don't you

10  take a look at them and see if you can identify them.

11       A        Yes, I can.

12       Q        And do these photographs truly and

13  accurately reflect the scene as you recall it back on

14  January 24th of last year, 1996?

15       A        Yes, sir.

16       Q        I noticed that State's Exhibit 15, 16, 17,

17  18, 19, 20, 21, 22, and 23 were photographed during

18  the day; is that the only exception?

19       A        Yes, sir.

20                MR. VINSON:  Your Honor, the State will

21  offer State's Exhibit 6 through 23 and tender the same

22  to defense counsel for his inspection.

23                MR. ODOM:  Your Honor, may I approach the

24  Court outside the presence of the jury.

25                (Whereupon, the following proceedings were

1     held before the Bench.)

2            MR. ODOM:  Judge, I have filed a motion

3     objecting to extraneous offenses.  I am objecting to

4     all of the testimony regarding the shooting of Mr.

5     Copeland unless and until they tie it up with the

6     murder of Mr. Szucs, and I continue to object to these

7     photographs, as well as the previous photographs, as

8     well as the previous testimony, as well as this

9     testimony, in that this is an extraneous offense, that

10    is, they haven't proved up this shooting as being tied

11    to the evidence of the murder case that they have

12    charged.  And I would renew my written objection in

13    that regards and the new objections I made to the

14    prior exhibits unless and until the time they tie this

15    together to the murder of the complainant in this

16    case.

17            THE COURT:  It's denied.

18            (Whereupon, the following proceedings were

19    held before the jury.)

20            THE COURT:  Very well, State's Exhibit 6

21    through 23 are admitted.

22            MR. VINSON:  May I approach the witness

23    again?

24            THE COURT:  Sure.

25       Q     What number is this?

1        Q       This is going to be State's Exhibit 24 and

2    25.

3                (Whereupon, State's Exhibit Nos. 24 and 25

4    were marked for identification.)

5                MR. VINSON:   These are poster board scene

6    photos, diagrams, I guess.

7        Q       Take a look at State's Exhibit 24 and see

8    if you can identify State's Exhibit 24 that was marked

9    for identification purposes.

10       A       Yes, sir.

11       Q       And is this your own drawing of the scene

12   on January 24, 1996?

13       A       Yes, it is.

14       Q       And State's Exhibit 25, marked for

15   identification purpose, can you identify that as well?

16       A       That's the first time I have seen this

17   one.  But it's the Greenrich Building.  I can tell you

18   that.  It's a larger area, showing a larger area than

19   what my diagram shows.

20       Q       Does this also encompass the drawing that

21   you made on January 24th, which is reflected here in

22   State's Exhibit 24 that was marked for identification

23   purposes?

24       A       Yes, sir.

25       Q       And does it also reflect the loading dock

Page 58

1    as well?

2        A      Yes, sir, the loading docks and, also, all

3    the additional suites and the rest rooms.

4        Q      To your knowledge, there has been no major

5    alteration to the building or anything of that nature?

6        A      No, sir.

7        Q      And that's the way you recall it to be

8    back on January 24, 1996?

9        A      Yes, sir.

10       Q      Does it fairly and accurately reflect that

11   area?

12       A      Yes, sir.

13       Q      And you were there Friday, as well, last

14   week; is that correct?

15       A      Yes, sir, I was.

16              MR. VINSON:  Your Honor, the State will

17   offer into evidence State's Exhibit 24 and 25, tender

18   the same to defense counsel for his inspection.

19              MR. ODOM:  Same objection, Your Honor.

20              THE COURT:  Very well, overruled.  State's

21   Exhibit 24 and 25 are admitted.

22              MR. ODOM:  May I have a running objection

23   on that issue, Your Honor?

24              THE COURT:  Go ahead and make your

25   objection so we don't get confused.

1          MR. ODOM:  Okay.

2          MR. VINSON:  Your Honor, may the witness

3   step down?

4          THE COURT:  Yes.

5     Q     Why don't you stand to one side so the

6   ladies and gentlemen of the jury, including the

7   gentlemen seated there -- you have to stand on this

8   side here.

9          MR. VINSON:  Mr. Odom, please feel free to

10  move around so you can see State's Exhibit 6 which I

11  have here.

12    Q     What is that?

13    A     That's the main entrance into the

14  Greenrich Building.

15    Q     And can you show the ladies and gentlemen

16  of jury where that is located on State's Exhibit -- is

17  that 24?

18    A     24, yes, sir.  These four doors right

19  there at the bottom of the diagram.

20    Q     State's Exhibit 7 what does that reflect?

21    A     That's these stairs leading up into this

22  foyer.

23    Q     And that's after you entered the building,

24  correct?

25    A     Yes, sir, just inside the glass doors.

```
 1        Q       State's Exhibit 8.

 2        A       That's a directory, showing the tenants of

 3   the building, and it's on this -- right here, the

 4   directory, next to the security desk.

 5        Q       And it shows all the tenants, the people

 6   who are conducting business in that building?

 7        A       Yes, sir, the tenants and their suite

 8   numbers.

 9        Q       With respect to State's Exhibit 8, what

10   tenant is that?

11        A       Precious Stones Incorporated No. 77.

12        Q       Is that J & S Precious Stones?

13        A       Yes, sir.

14        Q       And that's located in Suite 770?

15        A       Yes, sir.

16        Q       And do you also have what is located in

17   suite 320 of that building?

18                You just had an operation?

19        A       Yes, I did.

20                Which one?

21        Q       Right there.

22        A       Designs by Reinaldo.

23        Q       Designs by Reinaldo.

24                What does State's Exhibit 9 show in

25   relationship to State's Exhibit 24.
```

1          A        9 is a photograph of the floor on this

2    side -- this is the security guard desk.  On this side

3    of it, there is blood stains on the floor.  There is a

4    security guard jacket, some other clothing.  And you

5    won't be able to see it on that diagram but there is

6    also a bullet fragment in that photo, a bullet

7    fragment right there.

8          Q        Is that a fragment on the .9 mm as well?

9          A        Yes, sir.

10         Q        What kind of jacket was that bullet

11   constructed, if you recall?

12         A        It's copper jacketed.

13         Q        State's Exhibit 10 what is that?

14         A        Okay.  This is an area behind the security

15   guard desk, looking in, from this side, behind the

16   chair and against this book shelf, into it.  There is

17   a couple of monitors and big empty space, looking like

18   something missing out of there.

19         Q        How did you determine something was

20   missing out of there?

21         A        There were loose wires hanging and the

22   connectors pulled loose plus the rest of the area was

23   dusty.  This empty spot was fairly clean.

24         Q        As if something had been removed?

25         A        Yes, sir.

1       Q       And State's Exhibit 11 is this a close up

2   of that same area?

3       A       Yes, sir, it was.

4       Q       That was on 10.

5               It's showing some type of electronic

6   equipment removed?

7       A       Yes, sir.

8       Q       Now, what's unique about State's Exhibit

9   12?

10      A       That's a bullet strike in the metal strip

11  between the number one and number two elevators, the

12  strip that has all the push buttons, the bullet strike

13  on the right on the side of the wall.

14      Q       And that is located -- is that it right

15  there?

16      A       Yes, sir.

17      Q       Right at the end of that pen.

18              Now, did you also do a blow up of that?

19      A       Yes, sir.

20      Q       And is that State's Exhibit 13?

21      A       Yes, sir.

22      Q       And I mean of that, I am talking about the

23  bullet strike.

24      A       A close-up photo; yes, sir.

25      Q       What is State's Exhibit 14?

1        A        It's a hallway running north out of the

2    foyer that runs straight back into the parking garage.

3        Q        Is that an exit as well an entrance?

4        A        Yes, sir.

5        Q        And that's where the two double doors are?

6        A        All the way to the back is the entrance to

7    the garage.

8        Q        When you arrived, what was the lighting

9    conditions in the building?

10       A        Light fixtures.

11       Q        Similar to what we have here?

12       A        Yes, sir.

13       Q        Did you have any difficulty seeing your

14   way around there?

15       A        No, sir.

16       Q        Didn't need any additional light brought

17   in to do your work?

18       A        No, sir.

19       Q        What is State's Exhibit 15 and 16?

20                I guess we can move.

21       A        Those are both aerial photographs of the

22   Greenrich Building.

23       Q        It shows the Greenrich Building in its

24   location relative to other locations in that area; is

25   that correct?

1          A       Yes, sir.  That two-lane street or

2     four-lane street is Richmond and the one on the

3     opposite side is -- I forget -- Fairdale.

4          Q       And actually the building we are talking

5     about is State's Exhibit 15.  Is it this one here with

6     the glass in front of it; is that correct?

7          A       Yes, sir.

8          Q       And then State's Exhibit 16 gives you a

9     different area view.  And what do we have here in this

10    corner?

11         A       Okay.  That's the loading dock.  That's

12    directly in front of Richmond Avenue, the truck

13    loading dock.

14         Q       And trucks line up there, correct?

15         A       Yes, sir.

16         Q       You see the front entrance of the building

17    and you also see the loading dock and they both exit

18    on to what?

19         A       On to Richmond.

20         Q       State's Exhibit 17 gives you another view

21    of that loading dock; is that correct?

22         A       Yes, sir, from the west looking east on

23    Richmond, up Richmond.

24         Q       State's Exhibit 18 gives you a view of the

25    Greenrich Building and the parking facilities; is that

1    correct?

2         A      Yes, sir, the parking garage, looking

3    south from that direction.

4         Q      This parking facility is on level two; is

5    that correct?

6         A      Yes, sir.

7         Q      What does State's Exhibit 19 reflect?

8         A      That's the truck loading area.

9         Q      The loading area again?

10        A      Yes, sir.

11        Q      And it was taken from a unique angle, not

12   that well?

13        A      Yes, sir.

14        Q      It's a close up of that area.  And what

15   does State's Exhibit 20 show you?  This is the door?

16        A      Yes, sir.  That's the locked door that

17   leads from the truck loading area into this hallway on

18   this end.

19        Q      19 is the outside portion of the loading

20   dock and 20 you are looking into the building from

21   outside; is that correct?

22        A      Yes, sir.

23        Q      With the doors, front door, at least,

24   open.

25               And State's Exhibit 21 and 22, again, let

1    me show you the different scenes of the same loading

2    dock.

3        A       Yes, sir.  That's looking out on to

4    Richmond.

5        Q       How did these doors that lead from the

6    building to the loading dock operate?

7        A       There's a push button on the inside of the

8    building.  You push it and you hear an audible click

9    and you can push the door open but you cannot do the

10   same thing from the outside.

11       Q       And does State's Exhibit 23 show how that

12   mechanism on that door operates to open or close it?

13       A       Yes, sir.

14       Q       So if you are on the outside of the

15   building, you don't have a door knob or anything like

16   that to open it?

17       A       Right, there's nothing there.

18       Q       If you were trying to get in from the

19   outside, what would you have to rely upon?

20       A       You would have to go around to the front

21   and come in with the security guard or have someone on

22   the inside open it.

23       Q       You would have to go in the front secured

24   area or have someone do what?

25       A       Open it, open the door from the inside.

1        Q       Now, you were talking about some core

2    bullet that was recovered and a shell casing.

3        A       Yes.

4                THE COURT:  Is this witness to have a

5    seat?

6                MR. VINSON:  He is still going to be

7    working at the board, Your Honor.

8                (Whereupon, State's Exhibit Nos. 26

9    through 30 were marked for identification.)

10       Q       Let me show you what has been marked for

11   identification purposes as State's Exhibit 26 through

12   30.  Take a look at those, which appear to be a shell

13   casing and allegedly a bullet --

14       A       Yes.

15       Q       -- can you identify those?

16       A       Yes, sir.

17       Q       Are these items that were marked for

18   identification purposes?

19       A       Yes, sir.

20       Q       And how can you make that identification?

21       A       The container was marked with the case

22   number of this offense and, also, has my signature and

23   my unit number.

24                MR. VINSON:  Your Honor, at this time the

25   State will offer into evidence State's Exhibit 26

1    through 30, tender the same to defense counsel for his

2    inspection.

3                   MR. ODOM:  We renew our objection to the

4    previous exhibits.

5                   THE COURT:  Very well, State's Exhibit 26

6    through 30 are admitted.

7        Q    Sir, let me hand you what has been

8    introduced into evidence as State's Exhibit 26 through

9    30.  What I would like you to do is go ahead and mark

10   on this, by use of the -- just go ahead and mark on

11   there where those items were located.

12                  THE COURT:  Any objection to that, Mr.

13   Odom?

14                  MR. ODOM:  No, not at all, Judge.

15       A    You want to mark the exhibit number?

16       Q    Yeah, put the exhibit.

17                  THE COURT:  We are talking about State's

18   Exhibit 24?

19                  MR. VINSON:  We are marking on State's

20   Exhibit 24.

21       Q    Put "SX" 26.

22       A    (Witness complies.)

23       Q    Why don't you go ahead and explain to the

24   ladies and gentlemen of the jury where State's Exhibit

25   26 was located in relationship to that diagram and

1      tell them what caliber of round that is.

2          A      It's a Luger brand .9 mm fired shell

3      casing and located against the curved portion of the

4      wall, almost behind the security guard desk where this

5      arrow is pointing to.

6          Q      27.

7          A      27 is a fired and mushroomed bullet, and

8      it was located on the floor to the south of this

9      hallway that leads into the parking garage.

10         Q      Can you identify State's Exhibit 24.

11         A      Yes, sir.

12         Q      And does that truly and accurately reflect

13     the scene as you recall it to be back on

14     January 24, 1996?

15         A      Yes, sir.

16         Q      And is State's Exhibit 27 also reflected

17     in this photograph on State's Exhibit 4?

18         A      Yes, sir.

19         Q      And that's mushroom, like round?

20         A      Fired bullet, yes, sir.

21         Q      What is State's Exhibit 28?

22         A      28 is a fragment of a copper jacket off of

23     a fired bullet, and it was located where I have marked

24     28 on the north side of the security guard desk.

25         Q      And what is 29?

1       A       29 is a fragment of another jacket and

2   also a fragment of the lead core from the inside.   And

3   it was located, again, on the north side of the

4   security guard desk, mingled in with the security

5   officer's blue jacket.

6       Q       30.

7       A       30 are very small lead fragments from a

8   fired bullet and these were located in satelitte

9   position around the bullet strike on the floor, which

10  was right here, the bullet strike in the floor right

11  next to where it says 30.   And these were scattered in

12  a semicircle around the strike on the floor.

13      Q       Now, referring to State's Exhibit 25, can

14  you show the ladies and gentlemen the way one would

15  generally enter the building and how you could get

16  through the different locations to get to this loading

17  dock.

18      A       If you were driving into the loading dock,

19  you could drive directly off Richmond and drive into

20  it.   Of course, you couldn't get into the building.

21  If you want to enter the building off of Richmond, you

22  enter through the main doors, up the stairs, into the

23  foyer.   And from there, you would have access to, come

24  west in this hallway to the exit that goes to the

25  truck concourse or you could go up this north hall and

1    out the exit into the parking garage.  The only other

2    place to go either into the elevator and go upstairs,

3    or down here there is a door leading to the stairwell,

4    which is locked.  You couldn't get in there anyway.

5         Q    Okay.  You may return to your seat, sir.

6              Now, while you were there at the Richmond

7    location, did you deal with any suspects?

8         A    There were two possible suspects I did

9    deal with; yes, sir.

10        Q    And can you tell us how they were brought

11   to your attention?

12        A    They were brought in by officers.  One

13   they picked up.  He matched the clothing descriptions

14   and he was in a close proximity to the location and

15   the other one they draw their attention.  When he saw

16   the police cars, he ran.  He took off running and they

17   chased him down and they brought him in.

18        Q    Now, after they were brought in, did you

19   have an opportunity to do anything at that scene with

20   them?

21        A    Yes, sir, I did.

22        Q    What did you do?

23        A    I did what they call an anatomic

24   absorption test on the palms of both of the suspects.

25        Q    And what reason did you do that?

1          A          The anatomic absorption is a test to pick

2     up a test of barium and antimonium and it's released

3     from the gun after it is fired and he can tell if a

4     person had fired a weapon or handled a weapon in the

5     last three hours.

6          Q          Now, did you also get the name of those

7     two individuals?

8          A          Yes, sir.

9          Q          And what were their names?

10         A          One last name was Speers and the other one

11    was if I am -- Dalphinia, I believe, was the last

12    name.

13         Q          The last name Michael J. Dalphinia?

14         A          The other one was Steven Speers.

15         Q          Darrell Speers?

16         A          You are right.

17         Q          And Dalphinia D-a-l-p-h-i-n-i-a?

18         A          Okay, sounds good.

19         Q          While you were working with these two men,

20    can you tell us what their demeanor was like?

21         A          Yes, they were nervous.  They were

22    scared.  They didn't seem to know what was going on.

23    I didn't think they had anything to do --

24              MR. ODOM:  Object to what he may or may

25    not have thought from their demeanors whether or not

1    they were possibly involved in this case.

2              THE COURT:  It's not responsive to the

3    question that was asked.

4         Q    (Mr. Vinson)  Based on your 18 years of

5    training and experience working on crime scenes, what

6    were your feelings about them.

7              MR. ODOM:  Object to what his feelings

8    were or any speculation he may have to these two

9    witnesses based upon what we have already heard.

10             THE COURT:  Overruled.

11        A    It was my opinion they were just in the

12   wrong place at the wrong time, and they were just very

13   scared and very bewildered why they were picked up by

14   the police.  Their demeanor wasn't that of a criminal

15   type.

16             MR. ODOM:  Objection, non-responsive.

17             THE COURT:  Overruled.

18             MR. ODOM:  Asked and answered form.

19             THE COURT:  Sustained.

20        Q    (Mr. Vinson)  What was your basis for

21   your opinion?

22        A    Just over, like I say, the past 18 years,

23   talking with the hundreds of suspects, I have just

24   developed a trait to where if this sounds right, I can

25   tell when a person is telling the truth and these men

1    were saying they had nothing to do with --

2                MR. ODOM:  Object to what they may or may

3    not have been saying at this point.  It's hearsay.

4                THE COURT:  Sustained.

5        Q    (Mr. Vinson)   In your training and

6    experience, did they appear to know what had happened

7    there?

8        A    They did not appear to know what had

9    happened.

10       Q    And were they later excluded?

11       A    Yes, sir.  Well, they were released.

12       Q    And, in fact, they were released that

13   night; isn't that correct?

14       A    Yes, sir.

15               MR. VINSON:  I have no further questions,

16   Your Honor.

17               THE COURT:  Mr. Odom.

18

19                    CROSS EXAMINATION

20   BY MR. ODOM:

21       Q    Officer Kay, I would like to ask you a few

22   questions as well.  We haven't had an opportunity to

23   talk prior to this, have we?

24       A    No, sir.

25       Q    I take it that you have filled out either

1      one or two offense reports in your investigation?

2          A      In our --

3          Q      In this investigation --

4          A      Yes, sir.

5          Q      And I assume that's what I have been

6      handed by the State a copy of your offense report?

7          A      Probably, he's very efficient.

8          Q      In other words, you made an offense report

9      in this case?

10         A      Yes, sir.

11                MR. ODOM:  If may have a minute, Your

12     Honor?

13                THE COURT:  One moment.

14         Q      Officer Kay, to start off with, were you

15     the person that interviewed Darrell Speers and Michael

16     Dalphinia?  You weren't --

17         A      No, sir.

18         Q      Did you participate in that interview?

19         A      No, sir.

20         Q      I take it there were other officers that

21     interviewed the two suspects Darrell Speers and

22     Michael Dalphinia?

23         A      Any interview by witnesses are done by the

24     investigators or the sergeants that are assigned to

25     the scene by the homicide division.

1          Q        Right.  So you weren't participating in

2    that particular interview?

3          A        No, sir.

4          Q        Now, in reference to what your duties

5    were, they weren't to investigate, to interview

6    suspects, I take it, based upon the answer of that

7    question, right?  That wasn't your duty when you

8    arrived at the scene?

9          A        That's correct.

10         Q        Nor was it your duty later on when you

11   were investigating the scene, was it?

12         A        Right.

13         Q        Your duties related more to the gathering

14   of evidence.  That's what you are trained to do, is it

15   not?

16         A        Yes, sir, the evidence and the

17   reconstruction of the crime scene.

18         Q        Exactly.  And that was to dust for prints

19   and the concentration of your duties as opposed to

20   another officer whose job it may be to conduct

21   investigations and try to determine facts from an

22   investigation or an inquiry of a particular

23   individual, correct?

24         A        Yes, sir.

25         Q        And that's what you did in this case,

1    isn't it?

2        A      Yes.

3        Q      And in your 18 years of experience, that's

4    basically what you are trained to do, is it not,

5    officer?

6        A      From my job description, you know; yes,

7    sir.

8        Q      You have other police duties but

9    essentially what your focus at this point in your

10   career is what we call gathering evidence from the

11   crime scene?

12       A      Yes, sir.

13       Q      Now, start off with, you took a number of

14   photographs that, I believe -- first of all, did you

15   take photographs from State's Exhibit 1 through 5 as

16   well, do you know?

17       A      I don't remember which ones those are.

18       Q      Let me show you which one.

19              MR. ODOM:  May I approach the witness,

20   Your Honor?

21              THE COURT:  Sure.

22       Q      Officer, offered into evidence State's

23   Exhibit 1 through 5, it looks like they are familiar,

24   similar to the other.  Were you also the officer

25   taking those photographs?

1        A        Yes, sir, I took all of these.

2        Q        So you took photos of State's Exhibit 1

3    through 23 that are the photos, in other words, if

4    there is something that is 22, that is not a photo but

5    you didn't do anything with that but the photos we

6    have here, 1 through 23, these are your photos?

7        A        No.  There is some daylight photos that

8    were taken the next day that I didn't take.  Mine are

9    1 through 14.

10       Q        Okay.  In regards to the daylight photos,

11   have you ever been to this building in the daytime?

12       A        Yes, sir.

13       Q        So you do know that the daylight photos

14   are true and correct as to the photographs that you

15   did not take, those accurately resemble but what you

16   have seen out there at that building?

17       A        You lost me but they are all accurate.  I

18   have looked at all the photographs.

19       Q        What I am asking is you weren't there at

20   night.  You were also there at the daytime so you saw

21   the scene both at night as well as daytime?

22       A        Yes, sir.

23       Q        So the photographs -- you didn't take --

24   those during the daytime those are as far as you can

25   tell, accurate scenes of the building?

1          A       Yes, sir.

2          Q       Now, starting off with exhibit number 6

3     and exhibit number 8, this shows, I believe, as Mr.

4     Vinson pointed out, a directory of the building

5     occupants, correct?

6          A       Yes, sir.

7          Q       And it also shows a picture of someone

8     taking a photo.  That's you, I take it?

9          A       Yes, sir.

10         Q       With the flash that comes off?

11         A       Yes, sir, reflecting back on me.

12         Q       And he pointed you out on that and you put

13    on your glasses and pointed out to the jury that there

14    is a J & S Jewels that is up on the seventh floor?

15         A       Yes, sir.

16         Q       And there's a Designs by Reinaldo on the

17    third floor, correct?

18         A       Yes, sir.

19         Q       Without putting on your glasses and having

20    to go through it, you are aware, are you not, that

21    there are a number of jewelry or precious stone types

22    of businesses that are in this particular building,

23    are you not?

24         A       Yes, sir.

25         Q       And that directory would reflect the names

1    of at least the businesses that at that time were on

2    the directory that purported to be operation in the

3    building, right?

4        A    On January 24th; yes, sir.

5        Q    On January 24, '96.

6             Now, you set about collecting evidence

7    from the scene, correct?

8        A    Yes, sir.

9        Q    Had the scene already been taped off by

10   the time -- before you got there?

11       A    Yes, sir, it was.

12       Q    And, I take it, officers like Officer

13   Terry and the first fellow are officers that arrived,

14   it's their job to secure the scene?

15       A    Yes, sir.

16       Q    And for the ladies and gentlemen of the

17   jury, what securing the scene means, make sure no one

18   messes was anything, right?

19       A    Yes right.

20       Q    And they do that, sometimes run the yellow

21   tape around it and other times they will back

22   everybody away?

23       A    Most of the time; yes, sir.

24       Q    And do they actually gather evidence or if

25   they see evidence, do they wait until you come and

1    pick the evidence up?

2        A       No, they won't gather any evidence.   If

3    they see some, they might mark it but they won't touch

4    it but they mark it by a three-five card.

5        Q       And I noticed in some of these photographs

6    there appeared to be some little white things, the

7    three-five cards you are talking about?

8        A       There are some three-five cards, some of

9    white things you are seeing, the white decoration as

10   white squares in the green tile, looks like three-five

11   cards.

12       Q       Do you recall whether some of the original

13   patrol that secured the scene whether they did or did

14   not mark certain things for you previous if you

15   recall?

16       A       Yes, sir.

17       Q       And did they?

18       A       Yes, sir.

19       Q       Now, I believe you stated that in the

20   exhibits that you found a .9 mm casing; is that

21   correct?

22       A       Yes, sir.

23       Q       And I believe we described that as exhibit

24   number 26, I believe?

25               THE COURT:  Mr. Odom.

```
 1                    MR. ODOM:  May I approach?

 2                    THE COURT:  Yes, sir.

 3          Q        I show you State's Exhibit 26.

 4          A        Yes, sir.

 5          Q        That's the .9 mm casing?

 6          A        Yes, sir.

 7          Q        And I believe you stated that was found at

 8     the scene in State's Exhibit diagram 24 -- 26 was

 9     found back around behind the security booth here?

10          A        Yes, sir.

11          Q        Were there any other .9 mm casings that

12     were found?

13          A        Did not find any other casings.

14          Q        Were there -- yeah, there were no casing,

15      ,.9 mm or otherwise were found, were there?

16          A        No, sir.

17          Q        Now, I believe you also testified that

18     there were some bullet fragments and a mushroom bullet

19     that was retrieved; is that correct?

20          A        Yes, sir.

21          Q        Now, looking at exhibit number 27, is this

22     what you described as the mushroom bullet?

23          A        Yes, sir.

24          Q        Now, can you tell by looking at that

25     bullet if that's a .9 mm bullet?
```

1      A      It would be an opinion, but it appears to

2   be a .9 mm.

3      Q      When you told Mr. Vinson it's a .9 mm

4   bullet, are you sure of that?

5      A      I'm sure.

6      Q      In other words, you are not summarizing

7   from the fact that you found the casing that the

8   bullet was a .9 mm, you can actually look at the

9   bullet itself and based upon your experience and

10  expertise with handguns can tell that is a .9 mm?

11     A      Yes, sir.

12     Q      Now, did you retrieve the evidence first

13  or did you map out the diagram and the crime scene

14  first; which comes first in your business?

15     A      Photography and the rough sketch and then

16  the collection.

17     Q      So the first thing you do you immediately

18  take pictures of everything?

19     A      Yes, sir.

20     Q      And then you take -- you do your

21  sketching, which we have seen blowups on State's

22  Exhibit 23 and 24.

23     A      Yeah.

24     Q      And then you proceed to start recovering

25  physical evidence?

1       A       That's correct.

2       Q       Now, after you recovered physical

3  evidence, is there another crime scene unit that comes

4  and do they also recover physical evidence?

5       A       In some cases.

6       Q       Do you know if there was a crime scene

7  unit that arrived and recovered physical evidence

8  after you in this particular case?

9       A       Yes, sir.

10      Q       And so there was additional people that

11  came and did additional work on the crime scene and

12  various evidence that was to be recovered; is that

13  correct?

14      A       Yes, but it wasn't the same area I worked

15  in, same address but a different location.

16      Q       Okay.  I see what you are saying.

17              Now, what I am asking is that, after you

18  gathered the evidence in the lobby of this building

19  over on Richmond, do you know if any crime lab follow

20  up took place there, in the lobby, regarding and in

21  the same area that you recovered the physical evidence

22  that you recovered?

23      A       There probably was based on some of these

24  photographs were taken in daylight, which I didn't

25  take, so I'm assuming someone went back in.

1      Q      So I guess the answer to my question you

2  think so but you don't know for sure?

3      A      Sounds right.

4      Q      You see some photographs but you don't

5  know if there was actually any additional attempts to

6  retrieve physical evidence or to perform tests on the

7  crime scene there in the lobby of that building, do

8  you?

9      A      No.  I know there were follow up but what

10  was done, I don't have any knowledge of.

11      Q      Now, one of the series of questions that

12  you were asked concerns the photographs that you have

13  and the exhibits that you have regarding the door to

14  the docking area; do you recall that?

15      A      Yes, sir.

16            MR. ODOM:  May I approach the witness,

17  Your Honor?

18            THE COURT:  Certainly.

19      Q      All right.  That's exhibit number 23,

20  correct?

21      A      Yes, sir.

22      Q      And exhibit number 23, on State's Exhibit

23  24, is going to be over here to the loading dock'S

24  back door, correct?

25      A      Right.  If it was speculation, it would be

1    off the diagram.

2         Q     It would be off somewhere?

3         A     Yes, sir.

4         Q     And, then, it faces the same way the door

5    is actually opened out, the same way that Richmond is?

6         A     It faces south onto Richmond.

7         Q     And I believe that is displayed in some

8    other photographs you have, the aerial photographs

9    that you pointed out where the loading dock was and

10   Richmond was?

11        A     Yeah.

12        Q     So you were asked a series of questions

13   about entrances to the building.  Do you recall that

14   by Mr. Vinson?

15        A     Yes, sir.

16              MR. ODOM:  And if I may approach the

17   chart, Judge.

18        Q     Mr. Vinson said, well, you can come in

19   through the front doors, right?

20        A     Yes, sir.

21        Q     And you can come in through this lobby

22   area back here; is that correct?

23        A     From the garage, the parking garage.

24        Q     Well, I say the lobby area.  This hallway

25   that goes from the lobby to the garage back here?

1        A       Yes.

2        Q       And the third place that you can come in

3    and out of from these loading docks, right, the

4    loading docks?

5        A       If the doors are open but you couldn't

6    open them from the outside.

7        Q       Now, can you open these doors from the

8    outside?

9        A       They are unlocked; yes, sir.

10       Q       Do you know if you can open the doors from

11   the garage from the outside?

12       A       I'm sure you can.  That's the only way

13   they can get in.  They park in the garage.  I don't

14   know what time they lock them.  I'm sure they lock

15   them at certain times of the day.

16       Q       Did you make a determination if there was

17   other entrance from any other door on any other floors

18   from the garage into the building?

19       A       Not from the garage, the only other door I

20   found was north of the loading dock doors where the

21   doorway leading into the stairwell, which is locked,

22   you couldn't open it either.

23       Q       And by locked, does that mean locked on

24   both sides?

25       A       It was locked on the side I was on.

1    Probably one of these fire doors you can open it

2    coming down but you can't go back in.

3        Q      Now, Mr. Vinson asked you some questions

4    that there is no way that you can get into the loading

5    dock door unless someone opens it for you, correct?

6        A      That's correct.

7        Q      Now, on the loading dock door, this is a

8    panel that moves it shut and it opens the latch like

9    on a bar action, like a bar-type door, correct?

10       A      Yes, sir.

11       Q      Now, if someone wanted to get into that

12   door, or any other door like that, instead of having

13   someone let them in, couldn't they just leave that

14   door ajar and wouldn't it lock?

15       A      Yeah, if they could find something to

16   leave it ajar; yes, sir.

17       Q      So when Mr. Vinson said there is only

18   three ways you can get in and one is if you go in this

19   door or that door or someone lets you in, another way

20   you can get in these doors -- and everybody knows this

21   is the kind of door that has a latch that there is a

22   panel on the back of it -- all one has to do is be on

23   the inside of the door, open the door and put some

24   obstruction to keep it from closing shut and that

25   allows anyone to get in from the other side of the

1    door, would it not?

2         A     That's true with any door.

3         Q     Exactly.  So in regards to the question

4    that was asked, you left one of the options out, did

5    you not, and, that is, all you have to do is leave the

6    door ajar and you can get into that door, can't you?

7         A     You say the front door ajar as far as it

8    ajar and the door in the parking lot garage and leave

9    it ajar, go ahead and leave all of them open.

10        Q     Now, those doors do they have a dead bolt

11   on them?

12        A     They have a locking device on them; yes,

13   sir.

14        Q     Do you know if there was a locking device

15   that was employed on any of those other doors?

16        A     On the front doors; yes, sir.

17        Q     So we can't do it on the front door

18   because there is a locking device, can we?

19        A     Yes, sir.  Going by you what you are

20   saying, coming out, you push the door to come out.

21   You can't go back in or put a block in that you are

22   talking about.

23        Q     Officer Kay, not to be argumentive in

24   answering Mr. Vinson's question that you were very

25   eager to answer, you indicated --

1                    THE COURT:  Mr. Odom.

2                    MR. ODOM:  May I approach the diagram?

3                    THE COURT:  If you want to go to the

4       board, if you come this way.

5          Q        You indicated that the only way you can

6       get into this building here is if someone lets you in

7       from the outside, right?

8          A        Yes, sir.

9          Q        Now, on these doors, if they have a dead

10      bolt that locks those doors, then, if the doors are

11      left ajar, that dead bolt is not going to work, is it?

12         A        I don't know if they have a dead bolt on

13      the front doors or not.

14         Q        If they have a locking device that secures

15      the door shut, then the door is not going to be

16      secured shut if someone -- you are not going to be

17      able to engage that locking device, whether it be a

18      dead bolt or otherwise, if the door is ajar open, are

19      you?

20         A        I don't know anything about locks on these

21      doors.  Okay.  I'm sure what Mr. Vinson was talking

22      about was a normal entry into this building would be

23      the front door.  The back door normally you cannot get

24      into it, the loading dock.  Now, if someone propped it

25      open, of course, you can get in.  What I am trying to

1    say, the other thing with the other doors:  they are

2    normally open during business hours.  If they are

3    locked, you cannot get through it unless they have

4    done something earlier to prop it open, if that's what

5    you are talking about.

6         Q     So the real answer to the question is

7    other than someone letting you in the door there is

8    certainly other ways that all of us know to keep a

9    door open, if it's one of these self-shutting doors

10   that has a bar on one side and no handle on the other

11   side, that you can keep the door open and someone

12   could keep, in short, of someone letting you in?

13        A     Yes, I'm sure there is.

14        Q     Are you familiar with the mechanism on the

15   door that goes out to the garage?

16        A     No, sir.

17        Q     When you were recovering bullets from the

18   crime scene, are you the person that would like take,

19   for example, fingerprints?

20        A     Yes, sir.

21        Q     And I notice in your report that there

22   were blue fragments found on one of the bullets that

23   were recovered; is that correct?

24        A     Yes, sir.

25        Q     And I believe in your report you said that

1    is consistent with picking up the fibers in the jacket

2    of the security guard where the bullet pierced the

3    jacket of the security guard?

4         A     Yes, sir.

5         Q     Did you at the scene or around the body

6    did you see any small metal shavings or pieces of

7    metal that were around the scene where you picked up

8    the various bullets around the body of the security

9    guard?

10        A     Only the little small pieces that I picked

11   up that I labeled as lead fragments, maybe something

12   else.

13        Q     And those fragments are, I believe, as you

14   identified, part and parcel of actual bullets, are

15   they not?

16        A     That's what I thought they were; yes, sir.

17        Q     You didn't pick up any steal filings that

18   you are aware of?

19        A     No, not that I saw there.

20        Q     Now, you gave an anatomic absorption test

21   to the two suspects that were picked up, correct?

22        A     Yes, sir.

23        Q     An anatomic absorption, in essence, you

24   can determine whether or not someone has held -- is it

25   the touching of the metal of a gun or is it the actual

1    firing of a gun, the anatomic absorption?

2         A      The anatomic absorption is the firing of

3    the gun.  It will show whether that person fired the

4    weapon, held a weapon that recently fired or they were

5    in close proximity to a weapon being fired.

6         Q      So from that particular test, what you can

7    do any time there has been an explosion, like a gun

8    being fired, it releases certain gases and perhaps

9    other material that leaves a residue that you can pick

10   up off this case?

11        A      Yes, sir.

12        Q      Is that a rough laymen's definition of

13   it?

14               You performed such a test on the two

15   suspects that were brought in, correct?

16        A      Yes, sir.

17        Q      And you made a determination that they had

18   not fired a gun at that point?

19        A      Oh, no, the tests were turned into a

20   chemist and the results don't come back for sometimes

21   up to two weeks.

22        Q      So if the jury was left with the

23   impression that as a result of the test that was given

24   that these two suspects were released, that's not

25   true, is it?

1          A       No, I don't think we said that.

2          Q       Well, you may not have but I'm just saying

3     that the test you administered had nothing to do --

4     the result of that test had nothing to do with these

5     two particular suspects being released from the scene,

6     did it?

7          A       No.  The results came back a week and a

8     half, two weeks after this happened.

9          Q       Exactly.  So any reason for releasing them

10    would be based upon something other than the anatomic

11    absorption test, right?

12         A       Yes, sir.

13         Q       And you were not the one, as you

14    previously stated, that conducted the interview of

15    those particular persons, were you?

16         A       No, I did not interview the two suspects.

17         Q       Do you have any experience with

18    ballistics?

19         A       What could --

20         Q       Is there anyway that you could tell from

21    the bullet fragments that you picked up how many

22    bullets have been fired?

23         A       It would only be an opinion.  I'm not a

24    firearms examiner.

25         Q       Okay.  That's fine.  I am sure there will

1    be a ballistic person here.

2              MR. ODOM:  May I approach the exhibits,

3    Your Honor?

4              THE COURT:  Certainly.

5       Q     I didn't understand what you were

6    testifying what exhibit 20 is, and I want to make sure

7    I know.  Can you tell me what exhibit number 20 is?

8       A     Yes.  This is the loading dock doors from

9    the outside, looking in.

10      Q     Okay.

11      Q     So these are the doors that we are talking

12   about from the outside?

13      A     Yes.

14      Q     And then 21 is the reverse photograph; is

15   that correct?  Is that from the loading dock looking

16   out?

17      A     Yes, looking out on to Richmond.

18      Q     And once again these were not photographs

19   that you took because these photographs appear to be

20   taken during the daytime?

21      A     That's correct, they were taken the next

22   day.

23      Q     Who were the officers that were

24   interrogating the two suspects that were brought in?

25      A     It was either Sergeant Waltmon or Officer

```
 1      Halling.  They were two investigators assigned to the
 2      scene from homicide.
 3                  MR. ODOM:  Pass the witness, Your Honor.
 4                  THE COURT:  Thank you.
 5                  Mr. Vinson.
 6
 7                       REDIRECT EXAMINATION
 8      BY MR. VINSON:
 9          Q      And Officer Waltmon is an experienced
10      detective in homicide; is that correct?
11          A      I'm sorry.  Which one?
12          Q      Officer Waltmon, or Sergeant Waltmon, he
13      is an experienced investigator in the homicide
14      division, correct?
15          A      Yes, sir, he is one of the best.
16          Q      And after you took this anatomic
17      absorption test, did any prosecutor ever call you
18      about it?
19          A      No, sir.
20          Q      If the results had been positive, would
21      you have expected --
22                  MR. ODOM:  Object to the speculation on
23      his part as to him trying to bolster this particular
24      witness for not receiving results.
25                  THE COURT:  Sustained.
```

1      Q      (Mr. Vinson)   Well, you drew from your

2  own conclusion that those men didn't have anything to

3  do with it.

4             MR. ODOM:  Objection, Your Honor, first of

5  all, now I believe that I had a chance to cross

6  examine him that there is no basis for that particular

7  conclusion if he was not involved in the interrogation

8  of those particular individuals.

9             THE COURT:  Sustained.

10     Q      (Mr. Vinson)   Well, you weren't involved

11  in the interrogation, right?

12     A      No, sir, I wasn't.

13     Q      And Officer Waltmon didn't file any

14  charges against those two men; is that correct?

15     A      That's correct.

16     Q      Is that unusual that you are a suspect --

17             MR. ODOM:  Object as to whether or not it

18  is unusual or not.

19             THE COURT:  That's overruled.

20     Q      (Mr. Vinson)   Isn't that unusual if you

21  are a suspect at a crime scene?

22     A      If it turned out to be a good, bonafied

23  suspect, they wouldn't have left the crime scene.

24  They would have gone back with us back to homicide.

25     Q      And that's why they didn't go back --

1              MR. ODOM:  Objection, Your Honor, he is

2      speculating on what happened that particular evening,

3      not based upon past evenings, not based on what

4      happened.

5              THE COURT:  Sustained.

6              MR. VINSON:  We will call the two officers

7      at the appropriate time.

8              MR. ODOM:  Object to the side bar.  That

9      was a side bar statement.  I object to him making

10     comments to the jury.

11             THE COURT:  We are not going to have this.

12     I guarantee somebody is going to be held in contempt,

13     and we can do it.  No more side bars.  I want this to

14     be a clean trial and there is not going to be one way

15     or another.

16             MR. ODOM:  Absolutely.

17             THE COURT:  Mr. Vinson, do we understand?

18             MR. VINSON:  Yes, Your Honor.

19             THE COURT:  Mr. Smyth, do you understand?

20             MR. SMYTH:  I understand.

21             MR. ODOM:  I ask that the jury disregard

22     the last remarks by the prosecutor.

23             THE COURT:  I didn't get what the

24     prosecutor said.  The jury will disregard the side

25     bar.

1                    MR. VINSON:  Yes, Your Honor.

2                    THE COURT:  Anything further, Mr. Odom?

3                    Excused subject to recall?

4                    MR. VINSON:  Yes, Your Honor.  We have a

5       way to contact him.

6                    THE COURT:  Let's take a 15 minute break,

7       ladies and gentlemen.

8                    (Recess taken.)

9                    (Jury came into the courtroom.)

10                   THE COURT:  State call your next witness,

11      please.

12                   MR. VINSON:  Your Honor, the State would

13      call Mr. David Copeland.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    DAVID WALTER COPELAND,

 2   was called as a witness for the State and, having been

 3   duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. VINSON:

 6        Q    Will you give your complete name for the

 7   record, spell your last name.

 8        A    David Walter Copeland.

 9        Q    And spell your last name.

10        A    C-o-p-e-l-a-n-d.

11        Q    And how old a man are you, Mr. Copeland?

12        A    54.

13        Q    Do you live here in Harris County, Texas?

14        A    Yes, sir, I do.

15        Q    And how long have you lived in this

16   county?

17        A    Just about four years.

18        Q    Where did you live before you lived in

19   Harris County, Texas?

20        A    In California.

21        Q    What were you doing in California?

22        A    Working for the Oakland A's baseball team.

23        Q    What were you doing there?

24        A    Marketing, ticket sales.

25        Q    Did you have free tickets?
```

1          A          Yes, sir.

2          Q          And how long did you do that?

3          A          I was there about like a year and a half.

4          Q          And when you left Oakland, where did you

5     go?

6          A          We came to Houston.

7          Q          And for what reason?

8          A          Actually my wife's company relocated here.

9          Q          And is that your wife seated there in the

10    back --

11         A          Yes.

12         Q          -- The lady in the last row.

13                    And you came here for what reason?

14         A          Her company relocated to Houston.

15         Q          What type of work, after you relocated,

16    what type of work did you get involved?

17         A          I wound up doing security work.

18         Q          And did you work for any specific security

19    company?

20         A          I work for ABM Security.

21         Q          And what type of security did ABM provide?

22         A          Primarily they provided security to the

23    high rise buildings, typically more of a concierge

24    type of activity.

25         Q          And what type of training did you receive

1    to prepare you to work in the security field?

2        A        There were, I think, a couple of two or

3    three nights we went in for general training for

4    security procedures relative to the policy in the high

5    rise buildings and the fact that occurred, if you

6    tried to detain somebody in that position and the

7    legal responsibilities and so forth.  We spent more

8    time training at the actual job site for the specifics

9    of that location.

10       Q        And you say training at the specific job

11   site, were you out on a contractual basis or were you

12   actually employed by the company or just what?

13       A        The individual property management firm

14   was contracted with a security company and they

15   supplied the personnel.

16       Q        And then you would become familiarized

17   with that building's exits, entrances, the time it

18   opens and the time it closes the doors down --

19       A        Yes.

20       Q        -- security, if any, cameras, anything of

21   that nature?

22       A        Yes, sir.

23       Q        Let me take you back to January 24, 1996.

24   And at that time were you still with you said ABM?

25       A        Yes, sir.

1      Q      An ABM security?

2      A      Yes, sir.

3      Q      Now, before January 24, 1996, what

4      location had you been working?

5      A      I was working at the IBM Building out on

6      Riverway.

7      Q      Near the Galleria area?

8      A      I worked a year out there.

9      Q      And that work was security of an office

10     building?

11     A      Yes.

12     Q      Now, are you trained to carry a firearm in

13     your view?

14     A      No, sir.

15     Q      So, more or less, you all just observe in

16     your work duty, make observations, reports?

17     A      That's correct.

18     Q      Check against individual office doors?

19     A      Yes, sir.

20     Q      Then report any sort of violation?

21     A      Right.

22     Q      And if there is any need to, I guess, make

23     any report to any security violation like an alarm

24     going off, or something of that nature, what would you

25     do in that instance?

1          A       If it was a general building type of

2     alarm, we call the police.  If we got notification

3     from an individual security firm, in other words, if

4     one of the tenants had individual security alarm

5     systems in their facility, the alarm company will call

6     us, if they were monitoring a break-in, or something

7     like that, to have us check and verify it wasn't a

8     false alarm.  If we had any indication that there was

9     an actual event, we called the police.  We weren't

10    suppose to be confrontational.

11         Q       And, I take it, that the people you were

12    working for were aware that you did not wear a

13    firearm?

14         A       Very much so.

15         Q       And what type of uniform did you wear?

16         A       Basically in the buildings I worked in we

17    just wear a blue blazer and gray slacks.

18         Q       Shirt and tie?

19         A       Yes.

20         Q       Did you have some type of identification

21    on the outside of your jacket?

22         A       I beg your pardon?

23         Q       Did you have some type of identification

24    on the outside of your jacket?

25         A       At the IBM Building we had like a plastic

1    tag that indicated that we represented building

2    management.  And at the new building most of the

3    jackets of the people that were there had a patch that

4    said ABM Security on it.  This was only my third day,

5    and they had not gotten me a patch yet.

6         Q    Let's go back to January 24, 1996.  And

7    did you go to work on that day?

8         A    Yes, sir.

9         Q    And will you tell the ladies and gentlemen

10   of the jury and His Honor what your work schedule

11   was.

12        A    I worked the second shift, 3:00 to 11:00

13   p.m.

14        Q    And that's 3:00 p.m. did you say that?

15        A    3:00 p.m. until 11:00 p.m.

16        Q    And when you did work there, were you

17   working alone or did you have another security person

18   working with you?

19        A    After -- I don't recall if it was 5:00 or

20   6:00 o'clock -- the security person, who monitored the

21   traffic going in to the parking lot, went home so

22   after either 5:00 or 6:00 -- and I'm not sure which

23   one it was -- then I was there alone.

24        Q    So when you went to work at 3:00 p.m.,

25   there was a second person there?

1        A        Yes.

2        Q        And they would monitor what?

3        A        They were outside monitoring the license

4    numbers of the cars coming and leaving the building.

5        Q        And then what time would that person

6    depart?

7        A        I'm not sure.  It was either 5:00 or 6:00

8    o'clock.

9        Q        And once they leave, would you have the

10   responsibility for the interior security; is that

11   correct?

12       A        That's correct.

13       Q        And you had the responsibility for the

14   interior security when you went on at 3:00 p.m.; is

15   that correct?

16       A        Yes, sir.

17       Q        You just didn't have exterior security at

18   that time?

19       A        When I came on, we did but after either

20   5:00 or 6:00, after that time, I was alone and the

21   only monitoring to the outside was one camera.

22       Q        That's what I am saying.  After 5:00 or

23   6:00 p.m. in the evening, what it may be, there was no

24   longer exterior security?

25       A        That's right.

1      Q      Any one could come and go on the outside

2   of the premises, correct?

3      A      Yes.

4      Q      What building were you working in on

5   January 24, 1996?

6      A      I was in the Greenrich Building on

7   Richmond Avenue.

8      Q      And that's located here in Harris County,

9   Texas?

10     A      Yes.

11     Q      And how long had you been assigned to that

12  building?

13     A      There was only my third day at that

14  location.

15     Q      Your third day?

16     A      Yes.

17     Q      I take it, the first day you worked

18  without incident, correct?

19     A      That's correct.

20     Q      The second day you worked without

21  incident?

22     A      Right.

23     Q      On the third day, did your routine

24  generally go the same, that is, from 3:00 p.m. until

25  around 6:00 p.m.?

1        A       Yes.

2        Q       Now, when the building would close, after

3    you say that was around what time, around 6:00 p.m.?

4        A       As far as I believe at 6:00 p.m. when the

5    electric locks came on on exterior doors.

6        Q       Tell the ladies and gentlemen of the jury

7    what we are talking about the electric locks.   What

8    are you talking about?

9        A       The doors had like electrical electronic

10   locks they were controlled by a computer or IBM had

11   maybe just a timer there, but at a given time these

12   electric locks went on and you could not enter the

13   building.   You could exit the building but you could

14   not enter.

15       Q       Now, these electric locks would they be on

16   by manual control or would they go on automatically?

17   What I mean by that, did you turn them on?

18       A       They went on automatically.

19       Q       They had an internal system --

20       A       Yes.

21       Q       -- that locked the place up.

22               Now, when the building was locked down

23   automatically, how could one gain entrance to it?   If

24   I am there, let's just say I am late and suppose to

25   meet someone, how could I gain entrance legally?

1      A      You could come to the main entrance door

2   and basically knock.  I could see that from the

3   security console, and I would go down there.  There

4   was a red button just inside the door.  And I would

5   push and that would unlock the door for a few seconds

6   to let someone in.  People coming from the garage,

7   which was located in the rear of the building, could

8   come to a door on the first floor or on second floor

9   and had a key switch or an electronic card swiper that

10  opened the door for them.

11     Q      Now, the only people that had that

12  electronic card swiper would it be the ones who had

13  businesses in that building, correct?

14     A      As far as I know.

15     Q      I mean, strangers off the street didn't

16  have those, did they?

17     A      No, sir.

18     Q      And you wouldn't expect them to have it

19  legally?

20     A      No.

21     Q      Because that's why they had a security

22  system in place, correct?

23     A      Yes, sir.

24     Q      Now, if you used that electronic card to

25  get through the door, was there a record made of it to

1    your knowledge?

2         A     Not to the best of my knowledge.

3         Q     You don't know?

4         A     I don't know.

5         Q     Good enough.

6               Now, there was also another door there,

7    correct, that leads out to a loading dock?

8         A     Yes.

9         Q     Tell the ladies and gentlemen of the jury

10   how that door operated.

11        A     There was no way to access it after it was

12   locked from the outside.  You had to be let in from

13   the inside, a push bar-type of mechanism.

14        Q     And that locked down as well?

15        A     Yes, that wasn't on the same electric lock

16   at the same time.

17        Q     If I am out there on that loading dock,

18   trying to get in, I have to bang on the door and get

19   someone's attention, correct --

20        A     Right.

21        Q     -- or make arrangements to get in with

22   someone who is already inside?

23        A     Yes.

24        Q     Now, what type of security measures did

25   you have to check out different areas of the building?

1    Did you have anything at your location to determine if

2    there was any activities throughout the building?

3        A        There were surveillance cameras on several

4    of the floors on the building, and we had TV monitors

5    down by the security desk.

6        Q        The security desk was located where?

7        A        In the main lobby.

8        Q        On the first floor of the building?

9        A        Yes.

10            MR. VINSON:  May I approach the witness,

11   Your Honor?

12            THE COURT:  Certainly.

13        Q        Let me show you what has been marked and

14   admitted into evidence as State's Exhibit 16.  And I

15   am going to ask you if you can identify this building

16   that's in State's Exhibit 16.

17        A        Appears to be the Richmond Building where

18   I was working.

19        Q        Is that the same building that you worked

20   in on the 24th day of January of 1996?

21        A        Yes, it is.

22        Q        And, on here, it shows an entrance to the

23   garage; is that correct?

24        A        That's correct.

25        Q        And also shows an entrance or exit,

1    whatever it may be, combination of the loading dock;

2    is that correct?

3         A        Right there.

4         Q        And that's facing Richmond Street?

5         A        Yes.

6         Q        As well as the entrance to the building?

7         A        That's correct.

8         Q        And let me show you what has been admitted

9    into evidence as State's Exhibit 10 and 11.  Why don't

10   you take a look at those two photographs there.  Can

11   you identify those photographs?

12        A        This is the security desk and TV monitors

13   behind the desk.

14        Q        Is this one and the same desk that you are

15   working at back on the 24th day of January, 1996?

16        A        That's correct.

17        Q        What is that?

18        A        It appears to be some sort of bag.

19        Q        Was that your lunch?

20        A        It wasn't my lunch.

21        Q        Let me show you 11, which you have already

22   identified, and it appears to have a number of loose

23   cards.  Can you tell the ladies and gentlemen of the

24   jury if anything was there before that picture was

25   taken?

1      A       That's where the videotape recorder was

2   located that recorded the image of the security

3   camera.

4      Q       So anything you could pick up on the

5   security camera you had the capacity to see it?

6      A       That's correct.

7      Q       But also to record it; is that correct?

8      A       That's correct.

9      Q       So if I came in that building after hours,

10   you could always go back, by using this video camera,

11   you could go back and see if I, in fact, came in

12   there; is that correct?

13      A       That's true.

14      Q       Because it was taken, assuming that the

15   video was not destroyed or something of that nature,

16   you could play it back?

17      A       That's correct.

18      Q       If the video was taken and destroyed, it

19   wouldn't help you; these cameras wouldn't help you

20   much, would they?

21      A       No, sir.

22      Q       Now, was that system functioning on the

23   24th day of January when you went on duty?

24      A       Yes.

25      Q       You arrived at your usual time, I assume?

1        A       Yes.

2        Q       What happened?  What did you do?

3        A       Normal procedure, when we came on, was to

4    talk with the individual who was leaving, the security

5    guard that getting off as opposed to finding out

6    anything unique going on that we had to be aware of.

7    And there was an individual from the security, the

8    video camera system, the security people, that they

9    had a technician out there working on the system.

10       Q       Now you don't know for what purpose he was

11   working on the system, correct?

12       A       No.

13       Q       What did you think about that system in

14   the building?  How would you rate it, class A system,

15   A, B being the best or C being mediocre, what did you

16   think about it?

17       A       C minus.

18       Q       Did you ever see anyone that identified

19   himself as a technician to you working on that

20   equipment?

21       A       No.  When I came in, they were already

22   there.  They were only there for a few minutes and

23   left.  I asked was anything wrong and they said they

24   swapped a part, or something like that, and that was

25   the extent of my involvement.

1        Q       And did those people appear to be from

2    some -- I mean where were they from?

3        A       I don't know the name of the company.

4    That was my third day there.  I wasn't familiar with

5    the technicians that commonly came and repaired

6    things.

7        Q       Did they appear to be legitimate?

8        A       I assume they were, that the security

9    supervisor said that's who they are.

10       Q       You didn't see anything to arose your

11   suspicion to question what they were doing?

12       A       No.

13               MR. ODOM:  For the record, I renew my

14   objection that I made as a previous witness that I ask

15   for a running objection on.  I make it at this time

16   for housekeeping purposes.

17               THE COURT:  Thank you.  Overruled.

18       Q       (Mr. Vinson)  Can you tell us how many

19   floors are there in that building, that is, the

20   Greenrich Building, how many floors there are, if you

21   can recall?

22       A       I think there were eight.

23       Q       During your duty that night, did you go on

24   the various floors?

25       A       Yes, I did.  I had -- well, shortly after

1    I came on duty that day, we had a false alarm, fire

2    alarm system.

3        Q        When did that occur, if you can recall?

4        A        I believe it was shortly before 4:00

5    o'clock.

6        Q        What happened as a result of that?

7        A        The building manager -- we got it

8    straighten out.  There was a problem, though, in the

9    way the alarm system was going to notify the fire

10   department or not notify the fire department and,

11   also, it was two phase system.  And I was told by

12   building management --

13       Q        Okay.  Just don't tell us what someone

14   told us.  That's hearsay.  Just tell me what you did.

15       A        Okay.  I had been directed by the building

16   manager to notify the cleaning crew, when they came

17   in, that the response to the fire alarm would be

18   different.  They would leave on the first notification

19   instead of the second.

20       Q        What time did the clean-up crew generally

21   get there?

22       A        I believe right around 6:00.

23       Q        And did the clean-up crew come on on the

24   24th of January, 1996?

25       A        Yes.

1        Q        Did you make your general rounds, your

2    checking for security after the building closed?

3        A        I really hadn't gotten to general rounds

4    yet.  That was usually taken care of later because we

5    had a fair amount of traffic still coming and leaving

6    the building shortly after the official closing hour

7    and tenants coming.  And after hours you are suppose

8    to sign in and sign out so normally it's fairly active

9    in the lobby until 7:00.

10        Q        I think you also mentioned sign in and

11    sign out.  Assume that I work there, had a business

12    there, and I came in after the building closed.  Would

13    I have to sign in?

14        A        Yes.

15        Q        And would I have to sign out?

16        A        Yes.  Oh, you are suppose to.

17        Q        Well, if you are on the job, you would

18    make me do that, wouldn't you?

19        A        I would.  Now, if they came through the

20    second level from the parking garage --

21        Q        Listen to me.  If I came through that

22    front door, it's part of your duty to make me sign in,

23    correct?

24        A        Correct.

25        Q        I'm not saying you physically attack me

1    but you would request that I sign in?

2        A      Yes.

3        Q      And show some identification?

4        A      Right.

5        Q      And such would be recorded and maintained

6    in the record book; is that correct?

7        A      That's correct.

8        Q      When you leave, at least, I would have to

9    sign out, correct?

10       A      Correct.

11       Q      The clean-up crew arrived on the 24th.

12   Did you notice anything unusual about that?

13       A      No.

14       Q      And did you just go about your normal

15   course of business?

16       A      That's correct.

17       Q      Did something unusual happen later that

18   evening?

19       A      Yes, sir.

20       Q      Do you want to tell His Honor and ladies

21   and gentlemen of the jury how that came about.

22       A      Approximately -- well, sometime after

23   7:00, I started trying to track down the members of

24   the cleaning crew, actually tracked down one member of

25   the cleaning crew that spoke better English -- they

1    were Hispanic ladies -- and I was having trouble

2    locating her.  Every time I thought I saw her on one

3    of the cameras I'd go to that floor and I couldn't

4    find her on that floor.

5        Q      This was a member of the clean-up crew?

6        A      Yes.  I was looking to find them to go

7    ahead and let them know about the problem with the

8    firearm alarm system.  So I made several trips

9    upstairs.  I also made one trip -- and I don't know

10   which trip it was -- one of the cleaning ladies

11   apparently locked her keys in one of the tenant's

12   areas that she was cleaning and could not get back in

13   to get them.

14       Q      What happened next?

15       A      Well, I went probably around 7:30 or 7:35

16   on one of these errands.  I'm not sure which one it

17   was.  When I returned to the lobby, I stepped out of

18   the elevator and I noticed a gentlemen kneeling down

19   behind the security desk, appeared to be working on

20   the security camera system.

21       Q      When you left to go look for this maid,

22   was there anyone there from the security company to

23   your knowledge?

24       A      No.

25       Q      In fact, were those people suppose to have

1    departed the building?

2         A      To the best of my knowledge, they had.   We

3    did not at that location have what we call a pass on

4    book that indicated --

5         Q      Okay.  I'll get to that.

6                What did you do when you saw the man

7    working near the security booth?

8         A      I made the assumption that he had returned

9    to continue to work.  I assumed he was with the

10   security company that had been there earlier in the

11   afternoon.

12        Q      Did you see anything to give you any

13   indication that maybe he was with the security

14   company?

15        A      No.

16        Q      Well, what I am saying, was he wearing

17   similar clothing or what?

18        A      Not necessarily.  At that point in time

19   about all I could see was his head because he was

20   kneeling down behind the counter.

21        Q      You couldn't see the rest of his body?

22        A      No, not at that point in time.

23        Q      You could tell what he was doing?

24        A      Yes, I could tell what he appeared to be

25   doing.

1          Q      That was what?

2          A      Since he was kneeling down, facing where

3    the camera equipment was, I assumed he was working on

4    it.

5          Q      What happened then?

6          A      Part of my responsibilities was to check

7    the deli or the snack bar area that was there on the

8    first floor of the building.  When the cleaning crew

9    was in there, to go back by there and let them know I

10   was around so they wouldn't be filling their pockets

11   with potato chip bags and stuff like that.  So that

12   took less than a minute and then I returned to the

13   lobby.

14         Q      And when you returned to the lobby, what

15   happened?

16         A      The guy who had been behind the security

17   desk, I would say, scrambled to his feet and walked

18   rather briskly down the hallway towards the loading

19   dock door.

20         Q      Now, when en route to the deli, did anyone

21   try to get your attention or try to get you to run to

22   the deli, do you recall?

23         A      Not that I recall.  It was routine for me

24   to go to the deli and just check.  And I don't recall

25   any unusual conversation or anything going on other

1    than walk back there and looked in for a few seconds,

2    and let them know I was there.  And then I walked back

3    to the lobby.

4         Q    And the man who was working on the

5    security camera got up and left?

6         A    Got up early and headed down the hall

7    toward the loading door dock; yes.

8         Q    What is the lighting condition like when

9    the building is closed for business, does it still

10    have lights on like this?

11         A    In the lobby area, it was illuminated

12    approximately like this; yes.

13         Q    What direction did this man go who was

14    working, looked like he was working on the security

15    camera, whatever he was?

16         A    He basically went in a westerly direction

17    from the security console.

18         Q    What does a westerly direction mean in

19    terms of the construction of the building?  That's

20    toward a certain location?

21         A    It's toward the loading dock door.  I

22    don't know how better to describe it.

23         Q    Okay.  Now, what I would like you to do --

24    can you see from where you are seated.

25         THE COURT:  Mr. Vinson, you need to ask

```
 1    me.
 2                    MR. VINSON:  May I approach the diagram?
 3                    THE COURT:  Sure.
 4         Q         Can you see State's Exhibit 24?
 5         A         Yes, I can.
 6                    MR. VINSON:  Your Honor, may the witness
 7    step down?
 8                    THE COURT:  Certainly.
 9         Q         How can you identify State's Exhibit 24?
10         A         How can I identify?
11         Q         Yes, sir.
12         A         The floor plan of Richmond.
13         Q         Now, when you say he went in a westerly
14    direction, okay, what direction are we talking about
15    with respect to State's Exhibit 24?
16         A         Well, this is where I saw him, when I
17    returned to the lobby, and he went this way.
18         Q         So this is your security desk; is that
19    correct?
20         A         That's correct.
21         Q         And the snack bar is located --
22         A         Back down this hallway.
23         Q         So you came down, went up the hallway and
24    you came down from what floor?
25         A         I don't recall what floor I returned from.
```

1       Q       When you came downstairs, you saw someone

2   working in the security area behind the desk.

3       A       He was kneeling behind the desk over here,

4   facing this direction, which is where the camera

5   monitor was.

6       Q       Didn't that get your attention at that

7   time to go and check?

8       A       I was already heading that way.  When I

9   was returning from the deli, I made a normal walking.

10  And I came this way.  As soon as I stepped around the

11  corner here, he jumped up to his feet and heading down

12  towards the door.  My intention was to walk over here

13  and take a look at the system and see what was going

14  on.

15      Q       And did you do that?

16      A       Well, I got to about here.

17      Q       And what happened when you got about to

18  here?  You are talking about you are somewhere between

19  the second and third elevator there in the lobby; is

20  that correct?

21      A       That's about right; yes.

22      Q       And from that position, you can see down

23  this hall to the loading dock; is that correct?

24      A       Correct.

25      Q       And what was lighting condition in this

1    area?

2         A       About the same.

3         Q       About the same we have here in the

4    courtroom?

5         A       Correct.

6         Q       What happened then?

7         A       The gentlemen got about three fourths of

8    the way maybe toward the loading dock door, and he

9    stopped and turned around and said something to me to

10   the effect of --

11        Q       Take it a step at a time.

12                He turned around.  How far did he get down

13   the hallway?

14        A       Probably about three fourths of the way to

15   the door.

16        Q       Then he turned around?

17        A       Correct.

18        Q       Come back in your direction?

19        A       Yes.

20        Q       How was he walking?

21        A       At a normal, slightly brisk pace.

22        Q       He wasn't running toward you?

23        A       No.

24        Q       When he turned and left, how was he

25   walking?

1       Q       Then what did you say to that?

2       A       I don't know that I responded.  He was

3   heading towards me, and I figured he was going to show

4   me what he had.

5       Q       What were you expecting him to show you?

6       A       I didn't know.  At one point in time, as

7   he was walking towards me, I saw something that looked

8   long and silver as if he had a throw bar or jimmy bar

9   or by the back door, and something of that nature,

10   that I should know he found it.

11      Q       Did you expect him to tell you something

12   about the security system?

13      A       Not really.

14      Q       Did you expect him to tell you something

15   about the door back here?

16      A       No.

17      Q       Okay.  So you didn't have any idea what he

18   was going to tell you?

19      A       No.

20      Q       You say he appeared to have something in

21   his hand?

22      A       Right.

23      Q       Which hand are we talking?

24      A       It was in the right hand but keeping it,

25   more or less, behind his right leg as he walked.

1      Q       Did that concern you?

2      A       He began to the closer he got to me.

3      Q       Now, coming down this loading dock, what

4    happened then; this, that is, the hallway that leads

5    to the loading dock, what happens then?

6      A       I had taken maybe a couple of steps

7    towards him but I was waiting for him to come to me

8    and he continued up to me.

9      Q       Was this door to the loading dock was it

10   closed to your knowledge?

11     A       I don't know if it was or not for sure at

12   that point in time.

13     Q       Did you expect that door to be?

14     A       I expected it to be closed.

15     Q       Did you see anyone else in this area where

16   the defendant was?

17     A       No.

18     Q       Can you tell us how he was dressed?

19     A       He was wearing a dark colored jumpsuit; it

20   was either black or navy blue -- I believe black --

21   with a white shirt under it that was buttoned up to

22   the top.

23     Q       Still walking down this hall, what

24   happened next?  Where were you still standing?

25     A       I was still approximately in this area,

1     right here.

2          Q        Did you ever walk toward him or kind of

3     keep your distance?

4          A        I had taken several steps when he turned

5     around.  I had taken couple more steps, probably a

6     couple of steps further than before he turned around,

7     and so I was about in this area at that point in time.

8     I was waiting for him to come to me.  I wasn't going

9     down the hall to meet him.

10         Q        Had he continued out that door, would you

11    have stopped him?

12         A        No.

13         Q        Did you have any reason to stop him?

14         A        Not at that point in time.

15         Q        And did you know of anything that had

16    happened around here?

17         A        No, I had not reached the point where I

18    could see behind here yet.

19         Q        You had no reason to stop him and that

20    person proceeded through this door and out, is that

21    correct, but instead of they turned and came back?

22         A        That's correct.

23         Q        As they were coming back, did he take any

24    precaution to cover his face?

25         A        No.

1      Q      Did he take any precaution to lower his
2   face in a manner that you could not observe him?
3      A      No.
4      Q      What happened, after he reached you, upon
5   reaching you?
6      A      He said once again, "I have got something
7   I want to show you," stuck a .9 mm gun.
8      Q      Just a minute.  So he said he wanted to
9   show you something.  Did you keep your eye on him
10   while he was coming down the hallway?
11      A      Yes.
12      Q      You said you wanted to see what he wanted
13   to show you, correct?
14      A      Correct.
15      Q      When he got up to you, what did he show
16   you?
17      A      He showed me a .9 mm, stuck it in my chest
18   and pulled the trigger.
19      Q      Just a minute.  Where did he have the .9mm
20   gun, right or left hand?
21      A      Right hand.
22      Q      What did he do with the .9 mm gun?
23      A      As I said, he stuck it in my chest and
24   pulled the trigger.
25      Q      When he stuck it in your chest, what did

1     you do?

2          A     I hit the floor.

3          Q     How were you able to determine that it was

4     a .9 mm?

5          A     It's what it appeared to be.

6          Q     I mean --

7          A     It wasn't a revolver and it wasn't big

8     enough to be a .45.

9          Q     But he didn't hold you up and say I got a

10    .9 mm?

11         A     No.

12         Q     And, again, you weren't armed at that

13    time, correct?

14         A     Correct.

15         Q     When he approached you and placed the

16    .9mm, why don't you use my chest and demonstrate to

17    the ladies and gentlemen of the jury.

18              MR. VINSON:  May I have just a moment,

19    Your Honor?

20              THE COURT:  Certainly.

21              MR. VINSON:  Your Honor, could we have a

22    deputy to go ahead and clear the weapon?

23              THE COURT:  Very well.

24              MR. ODOM:  Your Honor, I object.

25              THE COURT:  What's the objection?

1              MR. ODOM:  Unless this is somehow or

2    another a pistol that is related to this offense and

3    they can show it, then, for them to stage this has no

4    relevant value as to a contested trial.

5              THE COURT:  It's overruled.

6              MR. VINSON:  With this demonstration, we

7    will keep the safety on.

8              THE COURT:  Are we going to mark it, Mr.

9    Vinson?

10             (Whereupon, State's Exhibit No. 31 was

11   marked for identification.)

12        Q    Why don't you demonstrate to the ladies

13   and gentlemen of the jury and I'll play your part.

14   Okay, show what the defendant did.  Can you do that.

15        A    Okay.

16        Q    And check the firearm.  Come from the

17   direction.

18             MR. ODOM:  If I miss, did he play the part

19   of the defendant?  I may have misunderstood.

20        A    Well, he approached me.  He had it, more

21   or less, back here.  He came up and said, "I got

22   something I want to show you," and pow.

23        Q    Put his hand and turn to the jury and he

24   placed what hand on your shoulder?

25        A    Left hand.

1       Q       What did he do with his right hand?

2       A       Brought the gun up and shot.  It had a

3    silencer on it.

4       Q       I was going to ask you that.

5               Did you notice anything peculiar about the

6    firearm that he placed it in your chest?

7       A       He had a silencer on it.

8       Q       How do you know it was a silencer?

9       A       I have seen them.  It was approximately

10   this long, about that big around, and put it right up

11   against my chest.

12      Q       And how many times did he fire the weapon

13   once he placed on your chest?

14      A       Once in the chest.

15      Q       What happened then?

16      A       Knocked me backwards and spun me around

17   and on the ground, face down.

18      Q       What happened next?

19      A       Well, having never been shot before, this

20   is quite a surprise.  Also, where I was shot I assumed

21   it had to go through the heart and an artery and I

22   figured I had seconds to live.  And I raised up

23   slightly to see if I was hurt.

24      Q       You said you raised up, did you raise?

25      A       No, I just kind of rolled to one side.

1      Q      All right, on one side.  What happened

2    then?

3      A      He shot me in the back.

4      Q      And why don't you use my back to

5    demonstrate to the ladies and gentlemen and describe

6    how that took place.

7      A      I didn't  feel the gun pressed against me

8    and had to be close and shot approximately in the

9    shoulder blade.

10     Q      How do you know?

11     A      What I heard about the size of the entry

12    wound.

13     Q      Go ahead.  What happened?

14     A      Well, at the very least, he was standing

15    right over me so it couldn't be very far away.

16     Q      What happened?

17     A      Shot me through the back of the left

18    shoulder blade.

19     Q      That would be --

20     A      About right there.

21     Q      What happened then?

22     A      I played dead.  I figured if he sees me

23    still breathing he is going to pop me again.

24            MR. VINSON:  You may return to your seat.

25     Q      What went through your mind when the first

```
 1   bullet hit you?  What went through your mind then?
 2        A     Well, I was stunned and to say when I hit
 3   the floor may sound strange but your mind -- if I was
 4   working any faster -- if you've never experienced
 5   anything before and my initial thought this guy
 6   obviously just shot me.
 7        Q     And then what happened?  What went through
 8   your mind when the second bullet hit?
 9        A     After the first one, I presumed I was dead
10   based on where the gunshot was.  The guy stuck the gun
11   in my chest and pulled the trigger and I figured I had
12   a matter of seconds to live.
13        Q     What did the defendant -- the person that
14   shot you --
15             MR. ODOM:  Object once again to the
16   defendant.
17             MR. VINSON:  Withdraw that.
18             MR. ODOM:  Ask the jury to disregard.
19             THE COURT:  The jury will disregard.
20        Q     (Mr. Vinson)   The person who shot you,
21   sir, what did you do?  I mean, what did he do at that
22   time after the second shot now?  Did he leave that
23   building, yes or no?
24        A     No.
25        Q     What did he do next?
```

1        A        Apparently proceeded to the security area;

2    I could tell by the footsteps and subsequently I heard

3    equipment and wires and things being slapped around.

4        Q        And this was in behind the security desk?

5        A        Yes.

6        Q        How close was that to where you were

7    laying?  It couldn't be very far.

8        A        Well, I know where I was when I first got

9    shot.  I'm not sure how far I staggered back so I

10   would say 10 feet or less.

11       Q        So he is still within 10 feet of you and

12   the person is still trying to get the tapes out of

13   this video?

14       A        Correct.

15       Q        Did they succeed in doing that, the

16   person.

17                MR. ODOM:  If the witness knows, Your

18   Honor, I object unless if he knows.  That is going to

19   require hearsay.

20                THE COURT:  I sustain that.

21       Q        (Mr. Vinson)   Did you know if he was able

22   to get the security system, from your own personal

23   knowledge, do you know if he was able to get it out,

24   yes or no, from your own personal knowledge?

25       A        No.

1        Q        But if you look at the photographs, that's

2    not the way the system was when you went to work,

3    correct?

4        A        That's correct.

5        Q        Something is missing, correct?

6        A        Yes.

7        Q        What's missing?

8        A        The videotape recorder.

9        Q        What did the rounds that was fired into

10   your body sound like, I mean --

11               MR. ODOM:  Objection, Your Honor, to any

12   relevance what the rounds sounded like on his body.

13               THE COURT:  Overruled.

14       Q        (Mr. Sims)  A .9 mm makes what kind of

15   noise?

16       A        It makes a pretty loud bang.  This day it

17   was a more of a muffled, more pop sound, as opposed to

18   the resounding bang.

19       Q        Can you make that sound?

20       A        No, I tried and I can't.

21       Q        Does it sound anything like that?

22       A        No, it was more of like if you pop a

23   balloon but the balloon sounds slightly muffled.  It

24   wasn't like you see in the movies when somebody fires

25   a silencer.

1      Q      It wasn't that quiet, was it?

2      A      No.

3      Q      What happened next?

4      A      I heard footsteps going rapidly down the

5   hallway towards the docking door.  That's the

6   individual was now running towards the dock door.

7      Q      Now, were you able to get a good look at

8   this person when they started back down that hall

9   toward you, walked up to you and fired the weapon?

10      A      Yes.

11      Q      Can you give us what you observed.  About

12   how tall was the person?

13      A      He was shorter than I was.  I am six feet

14   tall.

15      Q      You are six feet tall.  He had to be

16   shorter than you.

17      A      And I think my initial estimate that he

18   was five-nine or less.

19      Q      And approximately how much did he weigh?

20      A      I believe to be probably one seventy-five

21   or thereabouts.

22      Q      Black male, white male?

23      A      White male, light skinned.

24      Q      Did he appear to be a real young person or

25   middle aged or what?

1        A       I would estimate, I think, late thirties,

2    maybe early forties.  It wasn't a kid.

3        Q       Do you recall anything else that he was

4    wearing?

5        A       Wearing glasses.

6        Q       Had glasses on.  What else did he have on?

7    What else was he wearing?

8        A       In the way of attire?

9        Q       I am talking about his facial features,

10    did you notice if he had a mustache?

11        A       Had a dark mustache and glasses similar to

12    what I am wearing.

13        Q       Now, at my request did you go with me to

14    Southern Costumes here in Harris County, Texas --

15        A       Yes.

16        Q       -- several weeks ago?

17        A       Yes.

18        Q       And did I kind of just let you have free

19    run of the store and ask you if you could pick out a

20    mustache similar to the one that the defendant had on?

21        A       Yes.

22        Q       Not the defendant, the person who shot you

23    had --

24        A       Yes.

25        Q       -- was wearing.  And did he you do that?

1        A       Yes.

2                MR. VINSON:  May I approach, Your Honor?

3                THE COURT:  Certainly.

4                (Whereupon, State's Exhibit No. 32 was

5        marked for identification.)

6        Q       Let me show you what has been marked for

7        identification purpose as State's Exhibit 32.  And I

8        want you to take a look at that and see if that's the

9        same or similar to what you picked out with some

10       modification?

11       A       It appears to be the same.

12       Q       You made some modification this morning --

13       A       That's correct.

14       Q       -- based on your observation?

15       A       Right.

16               MR. VINSON:  Your Honor, at this time the

17       State offer into evidence State's Exhibit 32 and

18       tender the same to defense.

19               MR. ODOM:  Renew our original objections,

20       no additional objections.

21               THE COURT:  Very well, overruled.  State's

22       Exhibit 32 is admitted.

23               MR. VINSON:  Your Honor, with the Court's

24       permission, we would request that the defendant put on

25       State's Exhibit 32.

1           MR. ODOM:  Judge, I object.  I object to a

2   demonstration, unscientific lineup type of

3   identification after this witness has previously

4   already made certain findings and determinations.  And

5   I think that all this is bolstering.  This doesn't go

6   to the weight of his testimony.  This is a

7   demonstration that does not help the identification.

8   The person can either identify the person or he has

9   already previously.

10          MR. VINSON:  Object to what his legal

11  objection is.

12          THE COURT:  Thank you.  It's overruled.

13          (Defendant put on the mustache.)

14          MR. VINSON:  Could we also have the

15  defendant put on his glasses as well?

16          THE COURT:  Very well.

17          MR. VINSON:  May we have him stand as

18  well?

19     Q     Mr. Copeland, have you had an opportunity

20  to look at the defendant here?

21     A     Yes.

22     Q     Does he appear to be similar height?

23     A     Yes.

24     Q     Weight?

25     A     Yes.

1      Q      You may be seated.

2             Is that the person who shot you?

3      A      Yes.

4             THE COURT:  You may take the mustache off.

5             MR. VINSON:  Yes.

6             THE DEFENDANT:  May I have something to

7      clean it with?

8             MR. VINSON:  Your Honor, may the record

9      reflect that this witness has identified the

10     defendant, Reinaldo Dennes, as the person who shot him

11     on the 24th day of January, 1996.

12            MR. ODOM:  May the record reflect that he

13     has previously identified the defendant without the

14     mustache.

15            MR. VINSON:  I object to that.

16            THE COURT:  Very well, it's admitted.  Let

17     the record so reflect that identification has been

18     made.

19            MR. VINSON:  Thank you.

20            I would ask that you instruct the jury to

21     disregard anything that Mr. Odom just said.

22            THE COURT:  The jury will so disregard.

23     Q      (Mr. Vinson)   Sir, were you ever removed

24     from the Greenrich Building?

25     A      Ambulance crew came by and picked me up.

```
1          Q        And where were you taken?

2          A        Ben Taub Hospital.

3          Q        And what type of treatment did you receive

4   in Ben Taub?

5          A        Emergency surgery.

6          Q        And for what type, for the gunshot wound?

7          A        Yes.

8          Q        Can you tell us how long you were in the

9   hospital.

10         A        I was at Ben Taub for seven days.

11         Q        While you were in -- what type of injury

12  did you suffer internally?

13         A        A lot of muscle damage and damage to my

14  left lung.

15         Q        A lot of muscle damage?

16         A        Yes.

17         Q        What type of muscle?

18         A        A lot of my left shoulder and back area.

19         Q        And how has that affected you physically?

20         A        Well, I still don't have full use and

21  strength of the back.

22         Q        And is that across the entire back?

23         A        Mainly the left shoulder blade area.

24         Q        Are you in pain from that?

25         A        Not constantly but frequently.
```

```
 1        Q       What type of injury did the wound to the
 2   chest create?
 3        A       One of them, one of the gunshots, the
 4   bullet -- I assume it was the one from the front --
 5   was deflected by the bone structure and either one or
 6   both went through the top of the left lung and one
 7   came out the armpit and went through straight my left
 8   arm.
 9        Q       Through your lung?
10        A       Yes.
11        Q       Were you treated for that while you were
12   in the hospital?
13        A       That's what the surgery in Ben Taub was.
14   They wanted to correct that.
15        Q       To repair?
16        A       I had a lot of internal bleeding as well.
17   They had to take care of.
18        Q       Now, while you were in the hospital, did
19   you have a meeting with some officers?
20        A       Police officers; yes.
21        Q       Can you tell the ladies and gentlemen of
22   the jury and His Honor under what circumstances did
23   those officers come and meet with you?
24        A       Well, when they came, I was in intensive
25   care and --
```

1    Q       You were in intensive care, correct?

2    A       Yes, the entire time I was in Ben Taub I

3    was in intensive care, although ultimately transferred

4    to Methodist for five more days.  The officers came to

5    the intensive care as soon as I was without

6    anesthesia, which was basically the next afternoon

7    after the incident.

8    Q       When the officers came to the hospital to

9    talk to you, what were they there for?

10   A       Basically to find out what happened.

11   Q       And were you able to tell them what

12   happened?

13   A       Yes, I related basically the same

14   information I have given you this afternoon.

15   Q       And while you were there, did they also

16   have an artist with them?

17   A       Not on the first visit, they were there --

18   I believe it was Thursday afternoon.  They got the

19   preliminary information and they sent the sketch

20   artist over, I believe, Friday afternoon.

21   Q       By that time you were feeling a little

22   better than you initially was; is that correct?

23   A       A little bit, I was conscious.

24   Q       What did the artist do when she came?

25   A       Basically sat down and did the sketch.

1         Q       Did she have a conversation with you about

2    the person that shot you in trying to develop a

3    sketch?

4         A       Well --

5         Q       I mean you had to tell her something.

6         A       The way she worked, she had a book,

7    different types of face profiles and foreheads and

8    noses.  And she went through and had me go through and

9    pick out what I thought was close and use that as a

10   starting basis for my description how he looked in

11   general.

12        Q       I understand.  She would show you that and

13   you all had a conversation did he look like this or

14   that?

15        A       Yes.

16        Q       And then you would say it looks similar to

17   this?

18        A       That's correct.

19        Q       And everything you was pointing out to her

20   was similarities; is that correct?

21        A       Yes, of various features.

22        Q       And at some point in time she, I guess,

23   completed a sketch?

24        A       That's correct.

25        Q       And did the sketch look similar to the man

1   that shot you?

2        A      Yes, it did.

3        Q      Did it, in fact, look similar to the

4   defendant?

5        A      Yes.

6        Q      Did the eye glasses?

7        A      Yes.

8        Q      The mustache?

9        A      Yes.

10       Q      The facial features?

11       A      Yes.

12       Q      And you had an opportunity to be within

13   arm's distance of this defendant; is that correct?

14       A      I'm sorry.  I didn't hear the question.

15       Q      You had an opportunity to be as close to

16   the defendant as the distance of his arm; is that

17   correct?

18       A      Yes.

19       Q      32-inch arm length.

20              MR. ODOM:  At this point I am going to

21   object to the leading of the witness in the manner he

22   is.

23              THE COURT:  Sustained.

24       Q      (Mr. Vinson)   After she completed that

25   the sketch -- we refer to it as a composite sketch --

1      what happened next?  What did you do next?

2           A      She packed up and I went back to bed.

3      They had me sitting up for the time she was there.

4           Q      Now, did you meet with detectives or some

5      investigators on this case again?

6           A      Oh, yes, I did.

7           Q      And was that after you were released from

8      the hospital?

9           A      Yes.  The afternoon that I was released

10     they had called the hospital in the morning and they

11     knew I was suppose to get released and wanted to know

12     if I was still to be released and made an appointment

13     to come out to my house that afternoon.

14          Q      And did they do that?

15          A      Yes.

16          Q      And for what purpose did those officers

17     come?

18          A      They said they had some still photographs

19     they would like me to look at.

20          Q      And did they do that?

21          A      Yes.

22                 MR. VINSON:  May I approach the court

23     reporter, Your Honor?

24                 THE COURT:  Certainly.

25                 (Whereupon, State's Exhibit No. 33 and 34

1    were marked for identification.)

2                MR. VINSON:  May I approach the witness,

3    Your Honor?

4         Q      Let me show you what has been marked for

5    identification purposes as State's Exhibit 33 and 34.

6    Why don't you take a look at those two photo spreads.

7    Can you identify those photo spreads?  Have you seen

8    them before?

9         A      They appear to be similar but it's a long

10   time since I looked at them.  I haven't seen them

11   since that day.

12        Q      I showed them again to you today; is that

13   correct?

14        A      That's correct.

15        Q      You wouldn't argue if those were the photo

16   spreads you actually looked at?

17        A      No, I wouldn't.

18        Q      Now, did you see anyone in State's Exhibit

19   33 that is marked for identification, did you see

20   anyone that looked similar to the man who shot you?

21        A      No.

22        Q      And State's Exhibit 34, do you see anyone?

23        A      That would be the closest number five.

24        Q      And were you given some instructions

25   before you had an opportunity to look at State's

1      Exhibit 33 and 34 that is marked for identification?

2      Did the officers give you some type of instructions?

3           A      I don't remember any specific

4      instructions.  They said we have some photos we would

5      like you to look at.

6           Q      Wouldn't that constitute specific

7      instructions?

8           A      Okay, they said, "Please look at these

9      photos."

10          Q      Didn't they tell you that's the photos

11     they wanted you to look at?

12          A      Yes.

13          Q      And then they let you look at them, each

14     one, and no one influenced you, correct?

15          A      That's correct.

16          Q      And then you looked at the person on

17     State's Exhibit 34 marked for identification purpose,

18     you looked at the person in number five and you said

19     that kind of looked like him, is that correct, or

20     what?

21          A      I felt that was the one who was closest of

22     that group.

23          Q      Okay, of that group.

24                 But that was not the person; is that

25     correct?

1    A    I don't know who that person was.

2    Q    But I understand that was not the man that

3    shot you, correct?

4    A    No.

5    Q    And based on what they brought you, that

6    was a closest, the person who closely resembled the

7    person that shot you; is that correct?

8    A    Yes.

9    Q    Now, after the composite photo was made

10    and after the photo spread was shown to you at your

11    home -- I think that was about February 5th; is that

12    correct --

13    A    Yes.

14    Q    -- the same day you were released from the

15    hospital.

16        Were you called at a later date during the

17    month of February and asked to look at a lineup?

18    A    Yes.

19    Q    And in this lineup were you given an

20    opportunity to look at the person or several persons

21    in that lineup, head to toe, were you?

22    A    Yes.

23    Q    The actual physical person; is that

24    correct?

25    A    That's correct.

1        Q        And did you go to that lineup?

2        A        Yes.

3        Q        Can you tell the ladies and gentlemen of

4   the jury where it was conducted.

5        A        It was conducted at the Houston Police

6   Department Southeast Command Station on Mykawa.

7        Q        How did you get to that location?

8        A        My wife drove me down.  I could not drive

9   at that point in time.

10       Q        So your wife took you there?

11       A        Yes.

12       Q        Now, before you went in to view this

13   lineup, did you meet with some officers?

14       A        Yes.

15       Q        Do you recall who you met with, only if

16   you know?

17       A        I believe Sergeant Miller and one other

18   officer that I don't recall.

19       Q        Did he give you any instruction before you

20   viewed the lineup?

21       A        He visually said there had been an arrest

22   made in the case and they wanted me to view the

23   lineup.

24       Q        Did he tell you that you were to keep

25   quiet and not cry any outburst and look at the lineup?

1      A      They said sit in this chair and do not say

2   anything until the lineup has been concluded.   That

3   was it.

4      Q      And did he also tell you that you were

5   under no obligation to pick out anyone?

6      A      I believe so.

7      Q      Did you have an opportunity to look at

8   that lineup?

9      A      Yes, I did.

10     Q      Can you tell us how many persons were in

11  the lineup?

12     A      Six.

13     Q      And were they all males?

14     A      Yes.

15     Q      Were they of similar height?

16     A      Yes.

17     Q      Were they of similar age?

18     A      Yes.

19     Q      And were they of similar facial

20  structures?   You didn't have anyone in there that

21  looked so unusual that it would get your attention?

22     A      No.

23     Q      Now, was there anyone in the room with you

24  when you viewed the lineup?

25     A      Well, at least a half a dozen police

1    officers and I believe my wife was in the back of the

2    room as well at that point in time.

3         Q       How was the lineup conducted?  Did each

4    one come out one by one?  Were they all at one time on

5    the stage?

6         A       They all came out at the same time.

7         Q       All came out and lined up?

8         A       Right.

9         Q       And then were they asked to do anything?

10        A       I believe each one was asked to turn to

11   the left and turn to the right.

12        Q       Were they ever asked to say anything, if

13   you can recall?

14        A       I don't recall.

15        Q       Was the process under way with all the

16   persons who were in that lineup?

17        A       Yes.

18        Q       And did you see someone in that lineup

19   that you identified as the person who shot you?

20        A       I picked out number five from that lineup.

21        Q       And who was number five?

22        A       The defendant.

23        Q       Was that the person who shot you?

24        A       Yes.

25        Q       After the lineup, what did you do?  Did

1      you meet with the officers?

2          A      We went outside to the hallway on the

3      second level.  They had a bench out there and they

4      asked us to wait for a few moments and then one of the

5      officers came by.

6          Q      Did you meet with the officers?

7          A      One of the officers met us out there; yes.

8          Q      And did you tell him who you could

9      identify, the person that you saw in the lineup?

10     Where did that take place, was it in the lineup room

11     or outside?

12         A      In the lineup room.

13         Q      How did you do that, you yell that out or

14     whisper to him or what?

15         A      No.  We stepped to the back of the room

16     and basically I said the number five there appeared to

17     be the one.

18         Q      You say he appeared to be the one?

19         A      Yes.

20         Q      Why did you use that statement:  "He

21     appeared to be the one"?

22         A      Because at this point in time, the hair

23     had been changed, no longer the mustache and he wasn't

24     wearing glasses.

25         Q      He didn't have his glasses on?

1        A       No.

2        Q       And the hair had been changed?

3        A       The hair had been almost a buzz cut and no

4    mustache.

5        Q       Is there any doubt in your mind that this

6    is the person that shot you?

7        A       No.

8                MR. VINSON:  Your Honor, the State will

9    pass the witness.

10               THE COURT:  Very well.

11               Mr. Odom.

12               MR. ODOM:  It's possible I would like to

13   start my cross examination tomorrow just as far as the

14   sequence of events.  One of the things I would like to

15   set up --

16               MR. VINSON:  May we approach the bench?

17               (Off-the-record discussion held at the

18   bench.)

19

20                    CROSS EXAMINATION

21   BY MR. ODOM:

22       Q       Mr. Copeland, my name is Wendell Odom.  We

23   have ad an occasion to talk, have we not?

24       A       Yes.

25       Q       I believe that was in July, about the 22nd

1     of 1997, correct?

2          A     I don't remember the exact date.

3          Q     It was around somewhere in late July?

4          A     Several days ago; yes.

5          Q     And you wouldn't argue with me if I said

6     that was the 22nd of July?

7          A     No.

8          Q     I know you have seen transcripts of the

9     testimony that you gave on the 22nd.  Did you make any

10    written statements that were given to the police that

11    you are aware of --

12         A     No.

13         Q     -- or to the district attorney's office

14    that you are aware of?

15         A     No.

16         Q     Have you reviewed any notes of Sergeant

17    Miller or Officer Halling or anyone else that they may

18    have shown you?

19         A     I have not seen any of their notes.

20         Q     I would like to start off my examination

21    with asking you the number of times that you recall

22    that you talked to various persons involved with this

23    case that are authorities from either the Houston

24    Police Department or the district attorney's office.

25    I believe you started off by saying -- first of all,

1    do you recall talking to anyone the night of the

2    incident?

3         A       Not a police officer, no, not to the best

4    of my knowledge.

5         Q       But that night, it would be

6    understandable, you had suffered quite a shock, had

7    you not?

8         A       Yes.

9         Q       So let's discuss the first time you recall

10   talking to a member of the police department and that

11   would be sometime when you were in Ben Taub Hospital;

12   is that correct?

13        A       That's correct.

14        Q       And the first time you talked to someone

15   in Ben Taub Hospital do you recall who it was you

16   talked to?

17        A       I think it was Sergeant Miller but I'm not

18   sure.  It was two officers that came.

19        Q       At the hospital do you remember there were

20   two officers that came to visit you initially?

21        A       I believe that's correct.

22        Q       And I believe at that time you gave them a

23   description of who your assailant was; is that

24   correct?

25        A       Yes.

1     Q    And in that description you would have

2  told the officers that the person --

3     A    Pardon?

4     Q    What would have been the description that

5  you told the officers when they first came to the

6  hospital on that first occasion?

7     A    Basically the same description we

8  discussed that the individual I suspected was

9  five-nine or less or probably a hundred seventy-five

10  pounds approximately, glasses, mustache, etcetera.

11     Q    Would you have, also, given an age of the

12  person?

13     A    I don't know if I did or not.

14     Q    Do you know if you would have said what

15  type of hair he would have had?

16     A    It was dark hair, fairly full.

17     Q    Do you think you could have used a

18  description like coarse hair?

19     A    I don't recall if I said that or not.

20     Q    Coarse and bushy, do you recall that?

21     A    No.  What I recall, it was full.  It

22  wasn't over full to the collar, or things like that,

23  but it was full.

24     Q    But it was not coarse and bushy, right?

25     A    I said -- I would recall if those words

1    were used or not.

2         Q       When you told the jury a minute ago that

3    you would have said the same things to the officer

4    that you just testified to your basing that upon the

5    fact that you believe that Mr. Dennes was the

6    assailant, correct?

7         A       No.

8         Q       You do believe that's the person that shot

9    you, don't you?

10        A       Yes, I do.

11        Q       And you know that the person who shot you

12   does not have coarse and bushy hair; isn't that a fair

13   statement?

14        A       Doesn't appear to.

15        Q       He certainly doesn't have coarse and bushy

16   hair here, does he?

17        A       No.

18        Q       So we had a meeting at Ben Taub Hospital

19   with two HPD officers and, then, shortly after that, I

20   believe there was another meeting you had with someone

21   from law enforcement; is that correct?

22        A       The next day the sketch artist came to the

23   hospital.

24        Q       And what is his or her name?

25        A       Lois Gibson, I believe.

1     Q      And Ms. Gibson, who is sketch artist -- or

2  certainly one of our sketch arrests -- officer Gibson

3  comes in and shows you several samples and there is a

4  sketch made of someone that you believe is the

5  assailant, right?

6     A      Yes.

7     Q      And although you testified to the jury

8  that it looked like the defendant, did Mr. Vinson show

9  you a copy of that sketch that you are just now

10 testifying?

11    A      No.

12    Q      Did you see a copy of that sketch, before

13 you came up and testified?

14    A      No.

15    Q      Do you recall that in the sketch --

16           MR. ODOM:  And I don't have a copy of it.

17           MR. VINSON:  He has been provided a copy

18 of it, Your Honor.

19           MR. ODOM:  That's true.  I was provided a

20 xerox copy of it.

21    Q      But in that particular sketch do you

22 recall that the person had dark black rim glasses?

23    A      I don't recall that.

24    Q      You don't recall that.

25           Okay.  The person sitting there has gold

1    frame glasses like yours, right, Mr. Dennes does

2    sitting over there?

3         A       That's correct.

4         Q       Now, the next time that you met with HPD

5    or someone from law enforcement was when?

6         A       I beg your pardon?

7         Q       When was the next time you met with

8    someone with law enforcement?

9         A       I believe it was February 5th, the

10   afternoon I came home from the hospital.

11        Q       And who was it you met with on that day?

12        A       I believe that was Sergeant Halling and

13   Detective Huseman, or something like that, Huseman.

14        Q       Are those the two officers that showed you

15   the photo sketch?

16        A       Yes, I believe so.

17        Q       Could Officer Miller, Sergeant Miller, be

18   there as well?

19        A       I don't believe so.

20        Q       Two HPD and you are shown a photo spread,

21   correct?

22        A       Correct.

23        Q       And you say that there is someone there

24   that is the closest to the assailant, correct, off one

25   of the two photo spreads?

1          A      Yes.

2          Q      If I were to describe that as a tentative

3    ID, would that be incorrect?

4          A      Well, I don't know how you would define

5    tentative ID?

6          A      What I said, the group of pictures that

7    were there, the one I identified was the closest.

8          Q      Number five was the closest.

9                 I'll try to spell something in front of

10   the jury.  I will get it wrong.

11                The next time you meet with the members of

12   the Houston Police Department is when?

13         A      I guess it was when I went out to the

14   actual lineup at the Southeast Command Station.

15         Q      And who called you in regards to that

16   particular lineup?

17         A      I believe it was Sergeant Miller.

18         Q      And did he inform you that they had a

19   suspect that they wanted you to look at?

20         A      I think his words:  "We made an arrest in

21   the case and we would like you to come down and see a

22   lineup."

23         Q      So you knew there had been an arrest of

24   someone that was in that photo, not in photo spread,

25   that was going to be in the lineup, correct?

1           A       Made sense to me.

2           Q       Besides Sergeant Miller had already told

3    you that, correct?

4           A       Correct.

5           Q       So the next time is at the lineup.  Now,

6    at that time you make a positive identification of

7    Reinaldo Dennes?

8           A       No.

9           Q       If I had somehow or another got the

10   impression and based on your testimony and the way the

11   questions were asked of you of a positive

12   identification, that would be incorrect, wouldn't it?

13          A       That's correct.

14          Q       As a matter of fact, at that lineup

15   instead of a positive identification you identified

16   someone as being close to the person that had

17   assaulted you, correct?

18          A       Like I said --

19                  MR. VINSON:  Identified someone -- he

20   identified this defendant.

21          Q       (Mr. Odom)   All right, number five, I'll

22   rearrange that or someone.

23                  THE COURT:  Restate the question.

24          Q       When you made your identification, it was

25   someone who was the closest to the person who shot

1     you, right?

2          A     Yes.

3          Q     So there wasn't a positive identification

4     made on that lineup.  It was, I believe, number five

5     again; is that correct?

6          A     Yes.

7          Q     And it was close once again.

8                Now, when is the next time that you talked

9     to someone with the either the district attorney's

10    office or with the Houston Police Department?

11         A     I don't recall exactly.  It was some

12    period of time, as I recall.  After the lineup was

13    over, there wasn't much else said.  I believe what

14    happened was that several weeks later, possibly more

15    than just a few, I read in the newspaper there had

16    been another arrest in the case.  And I believe I

17    called Sergeant Miller to find out who and what was

18    going on.

19         Q     Did you have an opportunity to talk to

20    Sergeant Miller?

21         A     Yes.

22         Q     And did you determine that there had been

23    another arrest made in the case?

24         A     He told me there had been.

25         Q     And did he tell you that one of the

1    persons that you ID as close in the photo spread was

2    someone who had been arrested?

3        A        You said photo spread.

4                 MR. ODOM:  I'm sorry, I get photo spread

5    and lineup confused.

6                 MR. VINSON:  Object to the whole frame of

7    question.  It's totally misleading.  If someone is

8    already in the lineup, he made identification.  He was

9    already under --

10                MR. ODOM:  He said he testified he didn't

11   make a positive identification.

12                MR. VINSON:  He said he identified this

13   man.  He was in position number five.

14                MR. ODOM:  Object to the speaking

15   comment.  That's not what the man testified.

16                THE COURT:  Restate the question.

17       Q        (Mr. Odom)   You just testified -- unless

18   Mr. Vinson heard something somewhat different from

19   me.

20                MR. VINSON:  Object to the side bar.

21                THE COURT:  You are going to short term

22   memory.

23                MR. ODOM:  I apologize.  I shouldn't have

24   said that.

25                THE COURT:  Restate your question.

1      Q      (Mr. Vinson)   After you identified number

2   five not as being the person but the person that was

3   closest to the person that identified you, that's just

4   what you said, isn't it?

5      A      That's correct.

6      Q      Now, after you made that identification

7   and you had a chance to talk to Sergeant Miller, did

8   you not after you read something about another arrest

9   in the paper?

10     A      That's correct.

11     Q      At any point, whether it was at this

12  lineup time or when you talked to Sergeant Miller the

13  second time on the telephone, were you informed that

14  the person that you had identified as being close was

15  the person that they had arrested and was their

16  suspect in this case?

17     A      I don't recall that.  Immediately

18  following the lineup they indicated that they expected

19  to have two people formally charged later that day I

20  believe.  They didn't say who.

21     Q      But after they talked to you and you had

22  identified number five as being the closest, they had

23  indicated that they were expecting someone to be

24  charged, correct?

25     A      Someone, yes.

1       Q     Now, after you talked to Sergeant Miller

2   on the phone, did he in any way indicate to you

3   additional facts of the case as far as who would or

4   wouldn't be charged in the case?  Did he relay any

5   information to you?

6       A     I don't recall that he did.

7       Q     Did he talk to you about the facts of the

8   case at all?

9       A     I think the only conversation I recall was

10   that they had arrested someone they suspected as being

11   the get-away driver that was related to the article I

12   seen in the paper.

13       Q     So you had a telephone conversation is the

14   next contact you recall with someone with law

15   enforcement after the lineup, right?

16       A     Right.

17       Q     When was the next time you had any contact

18   with anyone with either the Houston Police Department

19   or the district attorney's office?

20       A     I don't remember exactly.

21       Q     I know you don't remember exactly but we

22   know that this occurred sometime in either late

23   January or February of 1996, right?

24       A     Correct.

25       Q     So which would you think it is, late

1      January, early February?

2          A       Which what.

3          Q       By this, I am referring to your initial

4      conversation with two HPD officers.

5          A       That would have been in January.

6          Q       Okay.  This is in January 1996, all right.

7      The sketch artist with Ms. Gibson was done sometime in

8      what, February of 1996?

9          A       That was also in the hospital in January.

10         Q       Okay.  This is in January, 1996.

11                 All right.  Two officers come out to the

12     hospital.  There is a photo spread that is done.  You

13     identified number five as being the closest person to

14     your assailant.  Do you think that was January or

15     February of '96?

16         A       That was February and it was done at my

17     house, not the hospital.

18         Q       All right.  The lineup was that in

19     February as well?

20         A       That was towards the end of February.

21         Q       The telephone call, do you recall if it

22     would have been February or would have been in the

23     winter, in the spring of '96?

24         A       It was probably a couple of months later.

25     I'm not exactly sure.  It had been enough time that I

1     was surprised because I thought everybody involved in

2     the incident had already been in custody.

3          Q     So perhaps it was in the spring but we

4     will put a question mark.

5                Then you say there is a long period of

6     time where there is no contact with anyone in law

7     enforcement, right --

8          A     I don't recall any direct conversation at

9     that point in time.

10         Q     -- or indirect conversations.  To a lawyer

11    that you don't recall any direct conversations, we are

12    just trained that way.

13         A     I don't remember exactly when the next

14    contact was made or who initiated it either.

15         Q     All right.  Do you recall that prior to

16    July 22, of this year, 1997, that you had contacts

17    with someone in law enforcement?

18         A     Well, the district attorney's office

19    notified me that there was going to be a hearing, and

20    I was going to testify.

21         Q     I understand that.

22               What I am saying is I am trying to pin

23    down if after this telephone call in the spring of

24    1996, and the time that I know you had to be contacted

25    because we had a hearing on July 22, 1997, whether you

```
 1        talked to anyone within the Houston Police Department
 2        or with the district attorney's office?
 3             A       I had been in to see the district
 4        attorney's office.  I don't remember the exact date.
 5        It was after the first of this year.
 6             Q       We know and you do not recall contacting
 7        anyone with the Houston Police Department or an
 8        investigator prior to that day?
 9             A       I may have.  I don't recall.
10             Q       But we know that sometime in 1997, I think
11        it was early '97?
12             A       I believe so.
13             Q       Early 1997, you meet with members of the
14        district attorney's office?
15             A       Yes.
16             Q       Now, in all probability did you meet with
17        Mr. Vinson?
18             A       Yes.
19             Q       Did you meet with a gentleman by the name
20        of Mr. Rosenthal?
21             A       I don't recall anyone by Rosenthal.
22             Q       Was it Mr. Smyth?
23             A       It might have been Mr. Smyth.
24             Q       At one time there was another person on
25        the case.
```

1          At that time did you go over the
2    identification process that had occurred prior to that
3    you just testified about that had occurred prior to
4    this?
5          A     Well, I recall going over the sequence of
6    events that happened that night.  I don't know if we
7    went over the so-called identification process in that
8    meeting.
9          Q     All right.  Did they talk to you about
10   your identification of the defendant in this case?
11         A     They may have.
12         Q     After that meeting did you meet with
13   anyone in the district attorney's office again?
14         A     I met with them prior to the hearing we
15   had on the 22nd.
16         Q     All right.  Was it shortly before the
17   hearing we had on the 22nd?
18         A     Yes.
19         Q     So you can say July 1997.  You have
20   another meeting with the district attorney's office,
21   right?
22         A     Correct.
23         Q     And after this meeting in early '97, and
24   before the July '97, meeting, I take it, you didn't
25   talk to anyone with the Houston Police Department or

1    law enforcement or any investigators?

2         A      I may have contacted the district

3    attorney's office to find out about what the

4    anticipated trial date was because it had been changed

5    numerous times.

6         Q      But you never talked with anyone -- or did

7    you talk with anyone that was involved in the facts of

8    the case?

9         A      Not that I recall.

10        Q      Nor did you talk about the facts of the

11   case over the phone at that time?

12        A      I don't believe so.

13        Q      Now, in July of 1997, prior to the

14   hearing, they did discuss with you matters regarding

15   the identification, didn't they?

16        A      Well, I'm not sure I understand your

17   question as far as prior.  We had the meeting prior to

18   this hearing, and we reviewed what was probably going

19   to be discussed as far as the photo spread and the

20   lineup procedure.

21        Q      So, in other words, to answer my question

22   asked, you did talk to the district attorney's office

23   at that time about the question of identification,

24   right?

25        A      Yes.

1        Q       At what point were you aware that there

2    had been an indictment in this case, that someone had

3    been officially charged in this case?

4        A       I read it in the newspaper.

5        Q       Would that have been before your first

6    meeting in 1997, with the district attorney's office?

7        A       Yes.

8        Q       And would it have been after the telephone

9    conversation you had with Sergeant Miller regarding an

10   additional arrest?

11       A       Yes.

12       Q       I'm sorry.  Now, I forgot what I asked.

13               Would that have been before or after that

14   telephone conversation?

15       A       I read it in the newspaper before that

16   telephone conversation.

17       Q       So you knew prior to talking to Sergeant

18   Miller there had been an arrest and formal charges had

19   been charged wherein this defendant had been charged,

20   right?

21       A       What I read in the newspaper was that an

22   individual --

23               MR. VINSON:  Object to any reading from

24   the newspaper is hearsay.

25               THE COURT:  Sustained.

1        Q        (Mr. Vinson)   My question is this:  Did

2    you know -- yes or no, if you can answer it yes or

3    no -- that Mr. Dennes, the person who you have

4    identified was charged with this crime, prior to your

5    telephone conversation you had with Sergeant Miller in

6    the spring of 1996?

7        A        I believe so.

8        Q        You knew it by the time you got to July of

9    1997, and had discussions that you recall with the

10   district attorney's office about the identification of

11   Mr. Dennes, correct?

12       A        Yes.

13       Q        Mr. Copeland, I am going to get back to

14   this issue towards the end of my examination but I

15   would like to walk with you, before I do, through the

16   sequence of events to make sure I understand the

17   sequence of events that you have testified to that

18   occurred on January 24th.  Your testimony is that

19   someone shot you on the night of January 24th in the

20   lobby.

21               THE COURT:  Excuse me.

22               MR. VINSON:  I am going to object.  That

23   is not a fair statement.  He has already identified

24   this defendant as the person that shot him.

25               MR. ODOM:  Judge, I have a right to ask

1    this man questions.

2              THE COURT:  Let's ask a question then.

3              MR. ODOM:  I have a right to ask him my

4    way.

5              MR. VINSON:  He identified --

6              THE COURT:  Very well, let's ask a

7    question, please.

8        Q    (Mr. Odom)  The identification of -- I'm

9    not going -- I'll go back to what I was going to do.

10   Number one, you started working for the security

11   company on what day?

12       A    Officially I believe it was

13   January 1, 1995.

14       Q    And you had been working at IBM prior to

15   working at what we call the name of the building, the

16   Greenrich Building; is that correct?

17       A    That's correct.

18       Q    I noticed when Mr. Vinson has asked you

19   questions how you rated the security system there at

20   Greenrich Building as a C minus, correct.

21       Q    I take it, that IBM had a much more

22   sophisticated security system?

23       A    Yes.

24       Q    And by giving it a C minus, is it fair to

25   say that not only was the equipment better but, also,

1      that the procedures were better at other facilities

2      that you had been in; is that a fair statement?

3          A       Yes.

4          Q       In other words, not only did IBM, or

5      whoever else you may have been with before, have

6      better electronic equipment, they had better just

7      security as far as how people came in and came out of

8      the building?

9          A       That's correct.

10         Q       Now, I noticed that you testified that you

11     were not trained in handguns on the job; is that

12     correct?

13         A       Not on the job, right.

14         Q       But I also noticed from your testimony

15     that you have a familiarity with handguns; is that

16     fair statement?

17         A       I have a familiarity; yes.

18         Q       You know what a .9 mm is?

19         A       I would call a .9 mm semiautomatic

20     something different from a revolver.

21         Q       Is a .9 mm  automatically a revolver?

22         A       No.

23         Q       It isn't?

24                 So educate me on this.  A revolver is only

25     a pistol that has a cocking mechanism and some sort of

1    rolling system of rotating system for shooting

2    bullets; is that correct?

3        A        Basically a revolver has a cylinder with

4    bullets arranged circle plan that rotates on lateral.

5        Q        So a revolver is different from an

6    automatic?

7        A        Yes.

8        Q        But they are both handguns, correct?

9        A        That's correct.

10        Q        Do you own a .9 mm?

11        A        No.

12        Q        I take it, though, you have some

13    experience with them?  Have you fired them before?

14        A        I had looked.  I was considering for

15    several months.  I had been down to Carter's Gun Shop

16    out on Katy Freeway and looked at them.

17        Q        But, I take it, this was home use as

18    opposed to on the job?

19        A        Yes, that's correct.

20        Q        Now, your job did not entail any actual

21    anticipated dealings with firearms, as I understand

22    your testimony.  You were not to try to apprehend as

23    much as you were to try to report any incidents of

24    either burglaries or break-ins or of misconduct that

25    occurred on the premise; is that a fair statement?

1        A        That's correct.

2        Q        And you got on at approximately 3:00 p.m.

3    and got off at approximately 11:00 p.m., if you were

4    on what you call the second shift?

5        A        Yes.

6        Q        Had you previously worked any shifts other

7    than the second shift of this building?

8        A        No.

9        Q        The previous two times that you had been

10   at that building were they the two prior nights to

11   this or had there been any sort of delay or gap in the

12   time sequence?

13       A        No, I started on Monday.  I worked Monday,

14   Tuesday, and on Wednesday the incident.

15       Q        I'm sorry.

16       A        Monday and Tuesday on that same week and

17   that Wednesday, the third consecutive, this occurred.

18       Q        And both prior occasions you worked the

19   second shift?

20       A        That's correct.

21       Q        Now, I believe your testimony is that up

22   until 5:00 p.m. that there is an external security as

23   well?

24       A        It was 5:00 or 6:00 o'clock they had

25   another security officer out on the driveway.

1      Q      And he leaves at one of those few times

2  5:00 or 6:00?

3      A      Yes.

4      Q      At that time the electronic locks go in

5  place?

6      A      I believe so.  And the reason I say that,

7  I was familiar with electronic locks on the IBM

8  building, I don't recall if it went on 6:00 or 7:00 at

9  that building but sometime 6:00, or after, they go on,

10  I believe.

11      Q      For my edification, the jury's

12  edification, what type of locking mechanism occurs

13  with the electronic lock?

14      A      It's basically a strong magnet, electronic

15  magnet, that locks the door.  The current has to be

16  released to let them open.

17      Q      But at least some of these doors can be

18  opened from the inside; is that correct?

19      A      Yes.

20      Q      How does the person who is opening the

21  door from the inside disengage the magnets?

22      A      There is a red button two to three feet

23  inside on the wall that a person presses, and it

24  releases for a few seconds to allow the person leave.

25      Q      Is there such a red button in the loading

1    dock?

2         A      No.

3         Q      So these electronic locks don't affect the

4    loading dock doors, do they?

5         A      As I recall, they had an electronic lock

6    but actually like you use like a push bar.

7         Q      So when the bar pushes, that disengages

8    the magnets?

9         A      I believe it did.

10         Q      When someone releases any of the doors,

11    does it cause a signal or a light to go off in the

12    security booth?

13         A      No.

14         Q      So one of the reasons that this place gets

15    a C minus because someone can disengage or open one of

16    these doors and it would not be reflected by any alarm

17    or any button or any beep that would be recorded at

18    the security booth; is that a fair statement?

19         A      That's correct.

20         Q      Now, we have got, I believe, a series of

21    four doors that you have possible exits and entrances

22    from the building, at least, that's what you testified

23    to about on direct examination.  Are there more than

24    the four doors that you testified to?

25         A      Not that I recall.

1      Q      And the four doors you testified to were

2   the front doors?

3      A      Yes.

4      Q      The first floor doors to the garage?

5      A      Yes.

6      Q      The second floor door to the garage?

7      A      Yes.

8      Q      And the loading dock door?

9      A      That's correct.

10     Q      Now, the second floor door has an

11  electronic pass key that allows you to open that door?

12     A      From the outside, yes.

13     Q      From the outside, okay.

14            And I believe you testified to that, in

15  fact, or I assume from your prior testimony that if

16  someone uses the electronic pass key, that alarm does

17  not go off in the security booth, if you are in the

18  security booth?

19     A      That's correct.

20     Q      I believe you also were going to testify

21  to or you also testified to the fact that if someone

22  uses their pass card then there is no recording made

23  that you are aware of the use of that pass card?

24     A      Not that I was aware of.

25     Q      There might be one, you just don't know

1    about it.

2         A       Building management may have tied to the

3    computer but it was not in my function.

4         Q       You weren't aware of that if that existed?

5         A       No.

6         Q       Now, the first floor exit that goes out to

7    the lobby it did not have a pass key to it?

8         A       The first floor door?

9         Q       From the lobby to the garage, I keep

10   misspeaking that.

11        A       I believe it had a card swiper, also.

12               MR. ODOM:   May I approach the board, Your

13   Honor?

14               THE COURT:   Sure.

15        Q       Mr. Copeland, we have a card that lets you

16   in on the first floor back here from the garage that

17   would allow you access to the lobby, correct?

18        A       Yes.

19        Q       Is the door on the second floor right

20   above this area or off center?

21        A       Right above the area.

22        Q       So you have got essentially two hallways

23   or doorways, one right on top of the other on

24   different floors?

25        A       Yes.

1      Q      Both of those doors are similar in that in

2    order to get out of the door, you have to hit the red

3    button to release the lock or you have to use a pass

4    key to get in those doors after the electronic locks

5    go on?

6      A      That's what I recall; yes.

7      Q      Now, I take it, from your prior testimony,

8    that you do have visual contact of both of those

9    doors?

10     A      No.

11     Q      You do not.  Okay.

12            Do you have visual contact of one of those

13   doors?

14     A      Neither.

15     Q      Okay.  I misunderstood you then.  I

16   thought the first floor door.

17     A      I had visual contact to the main entrance

18   doors that came in off of Richmond.

19     Q      By visual contact, I am referring to from

20   a security camera process.

21     A      No, not that I recall.

22     Q      Okay.  So that's another reason they get a

23   C minus.  That someone can come into the doors and you

24   wouldn't know about it until they walked around into

25   the lobby?

1        A        That's correct.

2        Q        Now, I believe you had answered certain

3    questions from Mr. Vinson regarding the fact that if

4    someone was going to come in and out of the building

5    that they would have to sign in with you after hours,

6    correct?

7        A        That was the normal procedure.

8        Q        But I believe you also testified to the

9    fact that sometimes someone could go out on the second

10   floor and you would never know when they left, would

11   you?

12       A        That's correct.

13       Q        And if they did that, they certainly could

14   very easily circumvent your signing in and signing out

15   process?

16       A        That's correct.

17       Q        And that's another point.  They can come

18   in without you knowing and having to sign in if they

19   came in on the second floor as well, right?

20       A        Before 8:00 o'clock.

21       Q        All right.  What happened at 8:00 o'clock?

22       A        At 8:00 o'clock we lock those doors

23   mechanically.

24       Q        At 8:00 o'clock you go up and use the dead

25   bolt and flip those locks shut?

1        A        Right.

2        Q        So there is access that people can use to

3    the building before 8:00 o'clock, coming in the second

4    floor, wherein you would have no idea if those people

5    were coming or going?

6        A        That's correct.

7        Q        And it's sort of a honor system that they

8    would come down to the first floor and fill out the

9    little book?

10       A        That's correct.

11       Q        Mr. Copeland, in the short time you were

12   there, three days you were there, those regular

13   tenants are certainly people that didn't always comply

14   with that honor system, did they?

15       A        I would suspect they did not based on

16   perhaps past experience.

17       Q        And human nature, right?

18       A        Yes.

19       Q        When the cleaning people came in, whose

20   job would be to let them in the building?

21       A        They normally got there before the locks

22   went on.

23       Q        And were you there long enough to know who

24   did or didn't have cards that allowed you access to

25   the card system on the first and second floor?

1        A        Specifically, no, I assumed all the

2    tenants did.

3        Q        Right.  And you certainly didn't know the

4    last time the cards were either changed or altered,

5    you don't know anything about this particular system

6    or what it was as far as the cards?

7        A        No.

8        Q        Now, when you first got on the job that

9    afternoon -- which I think was at 3:00 o'clock in the

10   afternoon?

11       A        Yes.

12       Q        -- you were informed of some difficulties

13   they were having with the alarm system?

14       A        No, that's not true.

15       Q        Okay.  When were you informed of the alarm

16   system difficulties?

17       A        Well, we had a fire alarm go off that was

18   false and they identified that the building engineer

19   had determined it was a false sensor, or something of

20   that nature, and the people who fix it were going to

21   be out that evening to fix it.  So the procedure to

22   have people leave the building was going to be

23   different than normal and this happened, I believe,

24   shortly before 4:00 o'clock.

25       Q        Is this when people leave the building in

1    case of fire?

2        A        In case the fire alarm went off; that's

3    correct.

4        Q        When were you informed of this breakdown

5    in the firearm system?

6        A        Right after it went off.  I believe

7    slightly before 4:00 o'clock.

8        Q        So while you were on the job, then, the

9    alarm system goes off?

10       A        The fire alarm system; yes.

11       Q        And people determine, the building

12   engineer, or somebody, determines it's a false alarm.

13   You are informed of that fact on the job.  You discern

14   that's a problem that arises that particular evening,

15   the fire alarm problem?

16       A        Well, it went off while I was there and

17   they determined the cause of it while I was there.  It

18   was after I came on duty.

19       Q        You were also informed earlier, unless I

20   am mistaken, of either putting new video equipment in

21   or a problem with the video equipment?

22       A        When I arrived at the job, there was an

23   individual there who was servicing the video program.

24   I was not told any specifics about it.  They said they

25   were doing something to it.

1      Q      And that was your predecessor there and
2  the person you replaced --
3      A      Yes.
4      Q      -- that informed you of that.  Were they
5  actually working on it when you arrived?
6      A      I believe they were.
7      Q      Now, I believe you stated that it was
8  going to be your job, once the fire alarm went off, to
9  inform the cleaning people that a new procedure would
10  have to be employed in case of fire?
11      A      Yes.
12      Q      And as such, in the early hours of that
13  evening, you were hunting a particular cleaning person
14  that you knew spoke more English than the others?
15      A      Yes.
16      Q      And were you looking at your video cameras
17  in the various locations of the building in order to
18  try to determine where that person was?
19      A      Yes.
20      Q      And would you be able to say she was on a
21  certain floor and that then you would attempt to
22  locate her?
23      A      Yes.
24      Q      The camera that -- the video camera, it's
25  a video camera that covers each and every floor in the

1      building?

2          A      I don't recall it was on every floor.

3          Q      Do you recall if there was a video camera

4      on the second?

5          A      I think there was.  Here again I'm not

6      sure.

7          Q      Back to your attempts to find this

8      particular cleaning lady, you were unsuccessful in

9      finding her or ultimately did you try to find her?

10         A      I ultimately did.

11         Q      And you relayed the problem to her?

12         A      Yes.

13         Q      Now, when you came back down from talking

14     to the cleaning lady, is that when you went to the

15     lobby and saw someone else that was working behind the

16     security desk?

17         A      I had made several trips up a couple of

18     times, two to three times probably, looking for the

19     cleaning lady.  And at one time the cleaning lady had

20     came down and indicated she had locked her keys in the

21     tenant's facilities and needed me to come up and use

22     the master keys and get her keys so she could continue

23     the cleaning duties.  And I'm not sure which trip I

24     was returning from.

25         Q      Was this the same cleaning lady or was

1     this a different one?

2          A      I don't recall.

3          Q      Now, when you returned to the lobby --

4                 THE COURT:  Okay.  I take it, you have

5     still got quite a bit of cross?

6                 MR. ODOM:  Yes, sir.

7                 THE COURT:  Ladies and gentlemen, we are

8     going to stop for the day.  It's 5:15.

9                 Let me instruct you to the following:  In

10    the basement of this building is a little snack bar,

11    cafeteria.  I ask that you report down there in the

12    morning at 9:45 because, as I told you this morning,

13    we have docket call.  It takes us about an hour to get

14    through.  At 9:45 I will send the bailiff to gather

15    you up and bring you upstairs and place you in the

16    jury room and then promptly start back at 10:00

17    o'clock.  And I usually am pretty good when I say we

18    are going to start at a certain time, I am pretty

19    close to that.

20                I don't know where all of you are parked

21    today.  My recommendation to you is that you park down

22    Preston Street, which is on the side of this building,

23    San Jacinto being the front, all the way down Preston

24    Street is a parking area that is cheaper than

25    certainly over in the jury assembly room.  It's an

1    eight story building that is not all that cheap, and

2    keep your car out of the sun and it stays open until

3    8:00 o'clock at night.

4            The thrust of it being:  Do not park in

5    any parking lot that takes your keys or locks up.  In

6    the event you are not there by 6:00 o'clock, you don't

7    have a car to get to. Keep your keys.  Make sure you

8    can drive readily off any lot you park in.  Further

9    down Preston you go the cheaper it is, $3, $3.50, $2,

10   etcetera.  I want to make sure you all have access to

11   your cars, not that I anticipate testimony running

12   past anywhere near 6:00 o'clock, but certainly on

13   deliberation day, whenever that is, it's quite often

14   that the jury will deliberate beyond 6:00 o'clock.

15           And what we will do on the day that the

16   deliberation occurs, I will let you deliberate.  And

17   if you are still deliberating around 5:00 or 5:15, I

18   will call you out and ask you if you want to continue

19   to deliberate or go home.  And depending on what the

20   vote, we will continue or go home and come back

21   tomorrow but I want to make sure you are thinking

22   about this case, not the fact that your car is locked

23   up.  And let me caution you not to park any place

24   where you do not have access to your vehicle.

25           Remember the admonishments I have given

1    you.   Tomorrow we will start again at 10:00 o'clock

2    and be downstairs at 9:45 and please be our guests for

3    lunch.   And if there are no questions or anything of

4    that nature, we will stand adjourned until 10:00

5    o'clock in the morning.   Thank you very much.

6              (Court adjourned for the day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPELLATE COURT NO. *72966*

2    IN THE COURT OF CRIMINAL APPEALS

3    OF THE STATE OF TEXAS

4

5    -----------------------------------------------------

6    REINALDO DENNES

7                    Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                   Appellee.

11   ----------------------------------------------------

12

13   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                      TEXAS

15        Judge Jim Wallace, Presiding

16   -----------------------------------------------------

17            CAUSE NO. 750,313

18            August 19, 1997

19        Court Reporter's Record

20

21        Volume 26 of 39 Volumes

22

23            Sharon Kay Cook
             Official Court Reporter
24            301 San Jacinto
             Houston, Texas 77002
25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Page 1

Volume 26

Trial

August 19, 1997

Chronological

David Walter Copeland

Cross Examination Continued                    4

Redirect Examination by Mr. Vinson            51

Recross Examination by Mr. Odom               75

Antonio Ramirez

Direct Examination by Mr. Vinson              88

Voir Dire Examination by Mr. Odom            185

Volume 26

Trial

August 19, 1997

Alphabetical

David Walter Copeland

       Cross Examination Continued           4

       Redirect Examination by Mr. Vinson    51

       Recross Examination by Mr. Odom      75

Antonio Ramirez

       Direct Examination by Mr. Vinson     88

       Voir Dire Examination by Mr. Odom   185

State's Exhibit No. 33     photo spread

    Marked

    Identified         Volume 26        32

    Offered                           32

    Admitted          Volume 26        32

State's Exhibit No. 34     photo spread

    Marked

    Identified         Volume 26        32

    Offered                           32

    Admitted          Volume 26         32

State's Exhibit No. 35     Artist sketch

    Marked             Volume 26         51

    Identified                       51

    offered                           68

    Admitted          Volume 26        60

State's Exhibit No. 36     business record

    Marked             Volume 26         60

    Identified                       61

    Offered                           61

    Admitted          Volume 26        61

State's Exhibit No. 37     photo

    Marked             Volume 26         98

    Identified                       98

    Offered                           98

    Admitted          Volume 26        98

State's Exhibit No. 38     photo

    Marked             Volume 26         98

    Identified                       98

    Offered                           98

    Admitted          Volume 26        98

| State's Exhibit No. 39 | photo | | |
| --- | --- | --- | --- |
| Marked | Volume 26 | | 98 |
| Identified | | | 98 |
| Offered | | | 98 |
| Admitted | Volume 26 | | 98 |
| State's Exhibit No. 40 | photo | | |
| Marked | Volume 26 | | 118 |
| Identified | | | 119 |
| Offered | | | 119 |
| Admitted | Volume 26 | | 119 |
| State's Exhibit No. 41 | photo | | |
| Marked | Volume 26 | | 118 |
| Identified | | | 119 |
| Offered | | | 119 |
| Admitted | Volume 26 | | 119 |
| State's Exhibit No. 42 | drawing | | |
| Marked | Volume 26 | | 121 |
| Identified | | | 121 |
| Offered | | | |
| Admitted | | | |
| State's Exhibit No. 43 | sketch of silencer | | |
| Marked | Volume 26 | | 138 |
| Identified | | | 139 |
| Offered | | | 140 |
| Admitted | Volume 26 | | 140 |
| State's Exhibit No. 44 | catalogue | | |
| Marked | Volume 26 | | 138 |

iv

|                           | Identified |            | Volume 26 | 139 |
|                           | Offered    |            |           | 140 |
|                           | Admitted   |            | Volume 26 | 140 |
| State's Exhibit No. 45    | catalogue  |            |           |     |
|                           | Marked     |            | Volume 26 | 138 |
|                           | Identified |            |           | 139 |
|                           | Offered    |            |           | 140 |
|                           | Admitted   |            | Volume 26 | 140 |
| State's Exhibit No. 46    | photo      |            |           |     |
|                           | Marked     |            | Volume 26 | 143 |
|                           | Identified |            |           | 146 |
|                           | Offered    |            |           | 147 |
|                           | Admitted   |            | Volume 26 | 147 |
| State's Exhibit No. 47    | photo      |            |           |     |
|                           | Marked     |            | Volume 26 | 143 |
|                           | Identified |            |           | 146 |
|                           | Offered    |            |           | 147 |
|                           | Admitted   |            | Volume 26 | 147 |
| State's Exhibit No. 48    | photo      |            |           |     |
|                           | Marked     |            | Volume 26 | 143 |
|                           | Identified |            |           | 146 |
|                           | Offered    |            |           | 147 |
|                           | Admitted   |            | Volume 26 | 147 |
| STate's Exhibit No. 49    | photo      |            |           |     |
|                           | Marked     |            | Volume 26 | 146 |
|                           | Identified |            |           | 146 |
|                           | Offered    |            |           | 147 |
|                           | Admitted   |            | Volume 26 | 147 |

v

State's Exhibit No. 50          wooden board

    Marked                Volume 26                147

    Identified                                      147

    Offered                                         147

    Admitted              Volume 26                147

State's Exhibit No. 51          shell casing

    Marked                Volume 26                171

    Identified                                      171

    Offered

    Admitted

State's Exhibit No. 52          shell casing

    Marked                Volume 26                171

    Identified                                      171

    Offered

    Admitted

State's Exhibit No. 53          photo

    Marked                Volume 26                178

    Identified                                      179

    Offered                                         179

    Admitted              Volume 26                179

State's Exhibit No. 54          photo

    Marked                Volume 26                180

    Identified                                      180

    Identified                                      181

    Admitted              Volume 26                182

State's Exhibit No. 55          photo

    Marked                Volume 26                180

    Identified                                      181

    Offered                                         182

    Admitted              Volume 26                182

                                           vi

State's Exhibit No. 56          photo

    Marked                  Volume 26                    180

    Identified                                           181

    Offered                                              181

    Admitted                Volume 26                    182

Defendant's Exhibit No. 1       copy of composite drawing

    Marked                  Volume 26                      3

    Identified                                            28

    offered                                               28

    Admitted                Volume 26                     28

Defendant's Exhibit No. 2       videotape

    Marked                  Volume 26                      3

    Identified                                            36

    offered                                               37

    Admitted                Volume 26                     37

```
 1                        CAUSE NO. 750,313

 2    STATE OF TEXAS              IN THE 263RD DISTRICT COURT

 3    VS.                                 OF

 4    REINALDO DENNES            HARRIS COUNTY, T E X A S

 5    A P P E A R A N C E S:

 6    For the State:            Mr. Mark Vinson
                                Bar Card No. 20590450
 7                              Mr. Don Smyth
                                Bar Card No. 1877770
 8                              Assistant District Attorneys
                                201 Fannin
 9                              Houston, Texas 77002
                                713-755-7050
10    For the Defendant:        Mr. Wendell Odom
                                Bar Card No. 15208500
11                              Ms. Yalila Guerrero
                                Bar Card No. 0078862
12                              Attorneys at Law
                                1301 McKinney Suite 3100
13                              Houston, Texas 77010
                                713-951-95555
14

15

16                    BE IT REMEMBERED that upon this the 19th

17    day of August, A. D. 1997, the above entitled and

18    numbered cause came on for trial before the Honorable

19    Jim Wallace, Judge of the 263rd District Court of

20    Harris County, Texas; and the State appearing in

21    person and the Defendant appearing in person and by

22    counsel, announced ready for trial, after a jury

23    having been selected, and all preliminary matters

24    having been disposed of, the following proceedings

25    were had, viz:
```

1                    (Whereupon, Defendant's Exhibit Nos. 1

2        and 2 were marked for identification.)

3                    (Jury came into the courtroom.)

4                    THE COURT:  Good morning, ladies and

5        gentlemen.  We are going to try to get right into

6        this.  We are running a little bit late.  If I recall,

7        Mr. Copeland was on the stand and he is being cross

8        examined by Mr. Odom.

9                    Mr. Odom, please continue.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         DAVID COPELAND,

2      was called as a witness by the State and, having been

3      duly sworn, testified as follows:

4                         CROSS EXAMINATION CONTINUED

5      BY MR. ODOM:

6           Q      Good morning.  How are you?

7           A      Good morning, fine.

8           Q      Yesterday I had asked you at the start of

9      your testimony if you had reviewed any documents or

10     any prior statements or written statements before you

11     testified.  Do you recall that question?

12          A      Yes.

13          Q      And your answer was that you had not.

14                 Since yesterday, have you had occasion to

15     sit down with any of the prosecutors and go over

16     certain written notes that may have been made and

17     review certain notes between yourself and the

18     prosecutor?

19          A      We spent a few minutes this morning.

20          Q      And did you look at those notes and did

21     they help refresh your memory as to certain events

22     that you may be testifying to?

23          A      Well, they raised some questions, you

24     might say, because I saw in the notes about we talked

25     about --

1          MR. VINSON:  Objection, Your Honor.

2      Q     (Mr. Odom)   I'm sorry, you saw certain

3  issues in the notes that may or may not affect your

4  testimony today; is that a fair statement?

5      A     May or may not, yes.

6          MR. ODOM:  Judge, I would ask to be able

7  to see those notes under Jinks and Brady.

8          THE COURT:  Let the record reflect the

9  State has tendered said notes to the defense.

10     Q     Mr. Copeland, I believe, when we adjourned

11 yesterday, I had gotten to the point where we were

12 discussing the fact that you had gone from the deli

13 area where you had checked on, when the cleaning

14 people were in the deli area, and you were approaching

15 the lobby.  Do you recall that line of testimony or

16 that part of the events that occurred?

17     A     Yes.

18          MR. ODOM:  May I approach the easel and

19 put up the State's Exhibit?

20          THE COURT:  Yes.

21     Q     Briefly, I believe your testimony was that

22 you came down from being upstairs and you -- did you

23 come down the elevators to the first floor the first

24 time you came down, after being upstairs, and you saw

25 someone at the security desk?

1          A      Yes.

2          Q      And do you remember whether you came out

3     of elevator one, two, or three?

4          A      I believe three.

5          Q      So you recall coming down elevator number

6     three.  You come out and you look over at the security

7     desk area and you see someone working on what appears

8     to be the video equipment?

9          A      Kneeling down back there, yes.

10         Q      So you can't actually see what they are

11    working on.  You see that someone is behind the

12    security desk?

13         A      Yes.

14         Q      And based upon the fact that you knew

15    there had been work on the video equipment, you did

16    not think there was anything unusual about that?

17         A      That's correct.

18         Q      So you continued on back around to the

19    deli area of the building?

20         A      That's correct.

21         Q      And I believe, if we look at State's

22    Exhibit 25, that puts the deli in this area right

23    here; is that correct?

24         A      That is correct.

25         Q      Okay.  Is this all deli here in the

1    concerned area of the building or two different

2    entities?

3         A       No, that lower of that area is that deli.

4         Q       The area I am pointing to right now which

5    I believe --

6         A       That's the deli.

7         Q       Okay.  So you come down this elevator bank

8    here.  You go around into the deli.  Your desk is

9    sitting right here somewhere --

10        A       Yes.

11        Q       -- in that general proximity?

12        A       Yes.

13        Q       How long do you think you were at the

14   deli?

15        A       I didn't even go in the deli, went to the

16   door and walked in and turned around and walked back

17   to the lobby.

18        Q       Was the deli door locked or do you know?

19        A       It was open and the maid was working in

20   there, as I recall.

21        Q       And did you have a conversation with

22   anyone or anyone talk to you when you went down to the

23   deli?

24        A       I don't recall talking to anybody down

25   there.

1      Q      When you started back towards the lobby,

2   did anyone attempt to contact you or talk to you or

3   distract you in any way?

4      A      Not that I recall.

5      Q      Now, as you came around the wall, down the

6   hall and came around here, there was someone still

7   behind your desk that appeared to be working on the

8   video equipment?

9      A      Correct.

10     Q      And if we look at now State's Exhibit 24,

11  that's a blow up of the lobby area.  As you came

12  around this elevator, the person, I believe your

13  testimony was, appeared to be startled or rapidly got

14  up.  Can you reiterate your testimony in that regard.

15     A      I think what I said he appeared to

16  scramble to his feet and walked hurriedly down the

17  hall.

18     Q      You didn't necessarily think there was

19  anything unusual?

20     A      I thought it was mildly unusual.  It was

21  one of those things, whether he was scrambling or

22  getting to his feet, he kind of tripped and was

23  catching himself.

24     Q      It wasn't done in such a manner that it

25  caused you immediate alarm.  You were still thinking

1    this is within the realm of perhaps explainable

2    behavior?

3         A       Yes.

4         Q       And as you walked down towards -- where

5    were you going, going towards your desk?

6         A       Yes.

7         Q       I take it, that, based upon your

8    testimony, he starts back toward the loading dock

9    area, you start walking towards the desk?

10        A       That's correct.

11        Q       Now, are you going to take your regular

12   position at the desk?  What's in your mind at this

13   point as to what you are doing?

14        A       I wasn't planning to take a seat at the

15   desk.  The plan I was going to do, first, take a look

16   at a video equipment and see what was going on back

17   there.

18        Q       So you are heading towards the desk and

19   are you keeping your eye on the person at this point?

20        A       I watched him walk down the hallway.

21        Q       Now, at that point did you get -- I

22   believe you gave a description of the clothes the

23   person was wearing.  Do you recall that yesterday?

24        A       Yes, sir.

25        Q       I believe you described him as a dark

1  jumpsuit and white shirt buttoned all the way to the

2  top.

3      A       That's correct.

4      Q       Now, can you tell the ladies and gentlemen

5  of the jury whether the person was wearing short

6  sleeves or long sleeves.

7      A       As I recall, they were long sleeves.

8      Q       Can you tell the ladies and gentlemen of

9  jury whether or not he had a hat on or whether he

10  didn't have a hat on?

11      A       I don't recall the hat.

12      Q       Do you recall whether or not you told any

13  of the policemen or any of the officers investigating

14  the case whether or not the person that you saw had a

15  hat or possibly had a hat on?

16      A       As I recall, I told the police officer I

17  didn't recall whether he had a hat on or not.

18      Q       You don't in any way hinted to the police

19  officer or indicated to the police officer that there

20  was a hat?

21      A       I did not.

22      Q       You didn't hint to that at all, right?

23      A       No.

24      Q       All right.  So in regards to a hat, you

25  did not tell anyone that the suspect was wearing a

1    hat?

2         A         I do not recall doing so.

3         Q         I believe yesterday you indicated that you

4    didn't recall telling anyone that the person had

5    coarse and bushy hair; is that correct?

6         A         That's correct.

7         Q         Is the fact you didn't tell them that or

8    you don't recall?

9         A         I don't recall it.

10         Q         Now, do you recall specifically whether or

11    not the person was wearing a long sleeve or a short

12    sleeve shirt?

13         A         I recall that he was wearing a long sleeve

14    jumpsuit, and I could not see if he was wearing a long

15    sleeve shirt.

16         Q         You recall that the jumpsuit itself had

17    long sleeves on it?

18         A         That's what I recollect; yes.

19         Q         So you recall the black jumpsuit being

20    long sleeved and you cannot recall the length of the

21    shirt?

22         A         That's correct.

23         Q         Because the sleeves of the jumper

24    inhibited you from seeing whether or not the shirt

25    under it was long or otherwise?

1      A       That's how I remember; yes.

2      Q       Now, at the time that you were looking at

3   the person initially how far away do you think he was

4   when you rounded the deli entranceway and first see

5   him, make your first identification of him?  When you

6   are here and he's here and you first see him, how far

7   do you think you are?

8      A       Probably 25 to 30 feet, something in that

9   order.

10     Q       And although you get a lot closer to him

11  later, this is your first impression of him is at this

12  distance, correct?

13     A       Yes.

14     Q       How close do you get to him before he

15  scrambles down the hallway?

16     A       Really not any closer because he started

17  walking down the hallway as I was walking towards the

18  desk.

19     Q       Would you say your first real good look at

20  the person is when he actually walks up towards you?

21     A       Yes.

22     Q       Now, what you are able to see is a person

23  in a dark, either black or dark blue jumpsuit, a

24  white, buttoned up shirt.  You don't recall if there

25  was a hat, and then he comes towards you.  And at that

```
 1     time you are able to observe his walk; is that
 2     correct?
 3          A      I observe what?
 4          Q      You are able to observe his walk.
 5          A      His walk; yes.
 6          Q      Did you notice anything unusual about his
 7     walk?
 8          A      Nothing remarkable; no.
 9          Q      At a later time you had an opportunity to
10     observe the defendant in a lineup.  Do you recall when
11     that occurred?
12          A      Yes.
13          Q      February 23rd or thereabouts?
14          A      Yes.
15          Q      And have you seen a copy of that lineup
16     since that night?
17          A      No.
18          Q      Do you recall whether you made your
19     identification that he looked close to the person that
20     assailed you in February at the lineup, do you recall
21     if you were able to observe his walk on that occasion?
22          A      Yes.
23          Q      Do you recall anything about his walk in
24     the lineup that was similar to the type of walk that
25     he did on the night in question?
```

1          A       No, not really.

2          Q       There wasn't anything about the way he

3     walked in the lineup that assisted you and that aided

4     you in identifying him as the person who shot you; is

5     that a fair statement?

6          A       That's a fair statement.

7          Q       Was there anything unusual about the way

8     the person walked in the lineup?

9          A       I didn't observe anything particularly

10    unique.

11         Q       All right.  Is it that it just didn't

12    appear similar to the walk of the person that you saw

13    in the hallway there or was it just that there wasn't

14    anything unusual about the walk of the person that

15    assaulted you in this hallway or the walk of the

16    person or of the defendant when you saw him at the

17    lineup on the night of the lineup?

18         A       When he approached me, coming down the

19    hallway, it appeared to be a normal, brisk walk.  As

20    the people went into the lineup -- and there was six

21    of them -- they were taking small steps to get in

22    position so there was a difference in that respect.

23         Q       So basically what you are saying is you

24    didn't get a chance in the lineup to observe his walk

25    in the lineup similar to the type of walk that he came

1    down the hallway?

2         A      That's correct.

3         Q      But when you saw him in the lineup, there

4    wasn't anything particularly unusual about his walk

5    that you did see in the lineup?

6         A      That's correct.

7         Q      Now, when the person came up to you, I

8    take it, that you were looking primarily at his face

9    at that time?

10        A      Yes.

11        Q      And, of course, you have made a

12   description of what his face was, right?

13        A      Yes.

14        Q      You told the jury, I believe, that he is

15   shorter than you.  How tall are you?

16        A      Six feet.

17        Q      And he was about five-nine or less, right?

18        A      That's correct.

19        Q      And I believe you told the jury that he

20   weighed about a hundred seventy to a hundred eighty

21   pounds?

22        A      That's correct.

23        Q      You said he was in the early thirties?

24        A      I believe I said late thirties, early

25   forties was my impression.

1    Q      Okay.  You said he was wearing glasses?

2    A      That's correct.

3    Q      That he had a mustache on?

4    A      Yes.

5    Q      And that he had glasses similar to yours,

6    right?

7    A      That's correct.

8    Q      Now, that's the description that you gave

9    to the jury, right?

10   A      That's correct.

11   Q      Have you given previous descriptions to

12   other people regarding the person who you saw that

13   night?

14   A      Yes.

15   Q      Have you had a chance to look or review

16   any reports that indicate what those descriptions are?

17   A      I don't think we covered those.

18   Q      Okay.

19          MR. ODOM:  May I approach the easel?

20          THE COURT:  Sure.

21   Q      Let's talk about the age of the person.

22   You told the jury he was in his late thirties to early

23   forties, right?

24   A      That was my impression.

25   Q      Do you recall telling anyone that he would

Page 16

1     have been in his early thirties?

2          A     No, I don't recall that.

3          Q     Now, do you recall instead of telling

4     someone that he was five-nine or less?  Do you recall

5     telling someone that he was five-nine or five-ten?

6          A     I don't recall specifically doing that.

7          Q     Do you recall indicating that initially

8     that the person possibly could have been wearing eye

9     glasses instead of the fact that he was wearing eye

10    glasses?

11         A     No, I don't remember that.

12         Q     Because you have it in your mind, you have

13    those glasses there, don't you?

14         A     Yes.

15         Q     So you don't think you would have said

16    possibly eye glasses at any point, do you?

17         A     That's correct.

18         Q     Now, as the person came up to you, you

19    begin to notice that he had something apparently in

20    his hand that was partially hidden from you?

21         A     Correct.

22         Q     And, as we know later, that turned out to

23    be a .9 mm, what appeared to be a silencer on it?

24         A     Correct.

25         Q     And when you started observing that, did

```
1     that peak your curiosity?

2         A     Yes.

3         Q     And did you start looking towards whatever

4     it was the person had in his hand, trying to figure

5     out what it was?

6         A     I glanced at it a couple of times; yes.

7         Q     About how long is it taking for him to --

8     I believe you said he was walking in a normal manner

9     or walking in a brisk manner?

10        A     I would say a normal manner.

11        Q     How long do you think the time is

12    taking --

13              MR. ODOM:  May I approach the witness?

14              THE COURT:  Sure.

15        Q     Are you somewhere up here?  I don't know

16    where you are as he is approaching you.  Are you

17    actually in this hallway or back more towards?

18        A     Pretty much out from the elevator,

19    straight out from the elevator number two location.

20        Q     So you actually haven't gotten to your

21    booth area?

22        A     That's correct.

23        Q     Well, that clears that up.

24              You are walking here.  You are about in

25    front of elevator number two?
```

1      A      Right.

2      Q      And he's walking back towards you.  How

3  far down this loading dock, do you think on this scale

4  of this, how far do you think down the hallway he has

5  gotten?  Has he gotten off the map here or still up in

6  this area before he turns around and comes back toward

7  you?

8      A      He's off the chart there.

9      Q      So you are watching him as he approaches

10 you, right?

11     A      Correct.

12     Q      How long do you think it takes for him to

13 get up to you?

14     A      I don't know.

15     Q      Do you think it takes several minutes for

16 him to get up to you?

17     A      No.

18     Q      It's a short period of time?

19     A      Yes.

20     Q      And at what point here do you start

21 observing something kind -- is it in his right hand or

22 left hand?

23     A      Right hand.

24     Q      Something kind of behind him, on the right

25 side of his body?

1      A      Probably when he gets about halfway back

2   to me.

3      Q      What are these here?  Is that just where

4   the hallway goes out and windows here?

5      A      I think those are glass office doors.

6      Q      Is he in front of these doors when you

7   start observing that he had something in his hand?

8      A      I think he was a little further back than

9   that.

10      Q      You are observing it from back here?

11      A      Approximately.

12      Q      And the closer he gets, of course, he's

13   still not revealed what it is he has in his right

14   hand?

15      A      That's correct.

16      Q      You don't see that until he gets right up

17   to you and he puts his left hand on your shoulder?

18      A      That's correct.

19      Q      When he puts his left hand on the

20   shoulder, as I recall your testimony, what he did, he

21   then pulls out what you recognize at the time is a .9

22   mm automatic pistol, right?

23      A      Right.

24      Q      And you remember seeing that pistol quite

25   vividly, do you not?

1       A       Oh, yes.

2       Q       And you know very well that it came from

3   the person's right hand, don't you?

4       A       Yes.

5       Q       And when he put that gun, you looked down

6   at the gun, did you not?

7       A       Yes.

8       Q       Did you see his hand that was on the gun?

9       A       I don't recall noticing the hand

10  specifically.  I remember seeing that gun.

11      Q       Do you recall seeing the sleeve to his

12  hand on the gun?

13      A       No.

14      Q       You just remember seeing the gun, right?

15      A       Oh, yes.

16      Q       And that's what your mind is focused on at

17  that point, is it not?

18      A       That's correct.

19      Q       And that is the point that you become --

20  that's when the adrenaline starts to flow and your

21  mind starts racing 90 miles an hour, is that not true?

22      A       That's not true.  There wasn't time.

23      Q       Pardon?

24      A       There wasn't time.

25      Q       Well, I am trying to put myself in your

1    shoes and it's hard for me to do it.  It actually

2    happened so fast at that point -- it just happened so

3    fast -- but you do remember very vividly that gun, do

4    you not?

5         A    Yes.

6         Q    And that is the point to where in your

7    mind your mind has a very vivid picture of that gun,

8    does it not?

9         A    Yes.

10        Q    Is it fair to say prior to that point,

11   although the actions of the person may be a bit odd,

12   they are not what you would call alarming or

13   extraordinary?

14        A    That's true.

15        Q    So sort of a normal encounter up to the

16   point when there is a .9 mm stuck and you are shocked,

17   right?

18        A    Right.

19        Q    So your description and your

20   identification of the person is not based upon the

21   same type of observation that you made as to when you

22   see this pistol coming out and you are focused on the

23   pistol; isn't that a fair statement?

24        A    I don't quite understand the question.

25        Q    Perhaps I didn't make the question very

1    clear.

2          But up to this point you are not really

3    observing him in the sense of something extraordinary

4    occurring, you are observing him like every day

5    observations of someone; isn't that a fair statement?

6    A     No.  As he approached and continued not to

7    show me what was in his hand, I became increasingly

8    concerned.

9    Q     You did but I believe you also testified

10   previously it was still within the realm of normal

11   behavior, right?

12   A     Yes.

13   Q     You thought he was going to show you

14   something he had uncovered?

15   A     That's correct.

16   Q     So the point of the mind focusing in vivid

17   detail on detail really occurs when you see that .9 mm

18   pistol come out with that silencer on it, right?

19   A     I guess.

20   Q     I mean you don't even see the person's

21   hand, you don't see his sleeves.  Your mind is focused

22   on that pistol at the point that pistol comes out,

23   right?

24   A     That's correct.

25   Q     The previous observations that you made

1    were made under an entirely different perspective from

2    your point of view, were they not?

3         A        I guess you could say that.

4         Q        Now, if you have made certain statements

5    regarding what you saw as far as the identification of

6    the person that you saw you on the night of

7    January 24, 1997, do you think your memory was fresher

8    towards the night of January 24th, '96, or do you

9    think your memory was fresher then or do you think it

10   is fresher now in this courtroom?

11        A        Normal circumstances would say then.

12        Q        Are you telling the jury then now your

13   memory as to what the person looks like is better than

14   what it was like around January, February of 1996?

15        A        I guess I would have to say no to that.

16        Q        It makes more sense that a description

17   that you would have given of the person in the months

18   and weeks right after the event is going to be a

19   fresher memory than any memory or any description you

20   give of someone, say, like July 22, 1997, correct?

21        A        Yes, sir.

22        Q        Mr. Copeland, isn't it true that you never

23   positively identified Mr. Dennes as the shooter until

24   July 22, 1997?

25        A        That's correct.

1      Q      Can you describe the person's demeanor who

2   shot you?

3      A      I would say fairly normal.

4      Q      Okay.  Would you describe him as either

5   rough looking or sort of odd or nerdy looking?

6      A      I think I may have used that reference

7   relative of the fact of the glasses and mustache, and

8   so forth, as kind of a nerd look about him.

9      Q      What do you mean by a nerd look?

10     A      No computer whiz or like a whiz possibly,

11  whatever.

12     Q      Okay.  I believe that we had gone to the

13  point, when I was asking you the number of times that

14  you talked to the various persons with either law

15  enforcement or the district attorney's office, that

16  you said the first time you recall talking to someone

17  was at the hospital shortly when you were at Ben Taub

18  Hospital?

19     A      Correct.

20     Q      So that we can erase the board, if we need

21  to.  I had Lee put the chronology on this piece of

22  paper that we, in essence, have over here.  Can you

23  see this, Mr. Copeland?

24     A      Yes.

25     Q      In January of 1996, you recall that there

1     were two HPDs officer that came to your hospital?

2          A     That's what I recall.

3          Q     You don't remember what they were.  You do

4     not remember Miller as being one of them and, I take

5     it, I assume you made a description of your assailant?

6          A     Yes.

7          Q     Then, on January of '96, Phyllis Gibson,

8     or a sketch artist with the Houston Police Department,

9     comes out and you do a composite drawing, do you not?

10         A     Yes, she put one together.

11         Q     And do you believe that the drawing of the

12    person that was put together resembled the assailant,

13    do you not?

14         A     Resembled, yes.

15         Q     At the time when you put this sketch

16    together, the way it is done is that there are certain

17    features that the artist asks you to focus on; is that

18    not true?

19         A     That's correct.

20         Q     So, in other words, they don't say let's

21    start making a sketch but instead of they say let's

22    start with the nose or let's start with the shape of

23    the face, I assume is what they start with, and then

24    they build on that; is that a rough or a fair

25    statement of what occurred?

1      A      It's a rough statement.

2      Q      Why don't you tell us how it is done then.

3      A      Ms. Gibson has a book of different

4   features, photographs of just foreheads and noses and

5   so forth.  And basically she starts building based on

6   the photographs.  It's not like she takes what I say

7   and starts sketching.

8      Q      What I am asking, does she start with the

9   shape of the head first or the nose?

10      A      I don't recall.

11      Q      Some way or another you focus on each of

12   the features that you recall in your memory, right?

13      A      Yes.

14      Q      And although it may not be the exact

15   person, it does resemble the person because you have

16   been focusing upon what you remember as to those

17   features, correct?

18      A      Correct.

19      Q      And you had an opportunity to see the

20   sketch, right?

21      A      Yes.

22      Q      And you felt that it resembled the person

23   that assaulted you and shot you on that night, right?

24      A      Yes.

25             MR. ODOM:  May I approach the witness,

1      Your Honor?

2                  THE COURT:  You may.

3      Q      I show you what has been marked as

4      Defendant's Exhibit 1 and ask if you can identify

5      that?

6      A      Yes, I can.

7      Q      What does that appear to be, Mr. Copeland?

8      A      That appears to be a copy of the sketch

9      made by Ms. Gibson.

10     Q      And this is what you had her draw,

11     correct?

12     A      That's what we wound up; yes.

13     Q      This is what actually -- or a copy of what

14     actually was displayed to you, you don't know whether

15     it was displayed or not, what was done?

16     A      That's the sketch.  That's all I can say.

17                 THE COURT:  It's not admitted.

18                 MR. VINSON:  State has no objection.

19                 THE COURT:  Very well.  Defendant's

20     Exhibit 1 is admitted.  Now you may publish it.  Just

21     make sure the alternate sees it clearly.

22     Q      Mr. Copeland, how is the hair drawn on

23     that particular person?

24     A      How was it drawn?

25     Q      Would you describe that as a fine,

1    straight hair or would you call that coarse and bushy

2    hair?

3         A     I would describe it as basically full

4    hair.

5         Q     That's another way.  But it's certainly

6    not a thinning or bald type hair, is it?

7         A     No.

8         Q     It's not straight hair either, is it?

9         A     In this particular thing it looks a little

10   bit curly or wavy.

11        Q     In looking at that particular photograph,

12   could you describe the nose as a long nose, a longish

13   nose?

14        A     Describe it about an average nose.

15        Q     It's an average nose.  It doesn't appear

16   to be a pointy-type nose, does it?

17        A     Not from this angle.

18        Q     The mustache -- would you say that

19   mustache looks like Mr. Vinson's mustache, for

20   example?

21        A     Well, it's darker.

22        Q     Certainly darker.  Both of us are getting

23   kind of long in the tooth there.

24              In regards to the shape of the mustache,

25   does it appear to be a straight mustache or a mustache

1      that droops down, which would you describe it more

2      as --

3          A      Well, it covers the entire lip and it

4      doesn't go like that, a Manchu so it's across the

5      upper lip.

6          Q      But does it have an angle that goes down,

7      similar to the one we demonstrated yesterday, or is it

8      more straight across in your sketch?

9          A      I guess you would say straight across.

10         Q      His chin does it seem to be an angular

11     jawline and chin or would you call it a sharp jawline

12     and chin?

13         A      I don't know how you describe that.  It's

14     not a square jaw, what I refer to as a square jaw.

15         Q      Does the person in that photograph -- and

16     that's a copy, I'm just asking on this one -- does the

17     person in that photograph appear to be dark

18     complected?

19         A      You can't tell from the photograph.

20         Q      You really can't, can you.

21                Tell me about the complection of the

22     person that you saw that approached you.  You did tell

23     the policemen who interviewed you that it was a white

24     person, did you not?

25         A      Yes.

1        Q        You did not tell them that you thought it

2    was a Hispanic person?

3        A        That's correct.

4        Q        The person -- that's a copy and as such a

5    Xerox, for example -- would not pick up the coloring

6    off the original sketch, would it, or probably?

7        A        I don't think it would.

8        Q        That's not a fair representation of the

9    sketch as far as the coloring is concerned, is it?

10       A        That's true.

11       Q        And in all other ways that is a fair

12   representation of the sketch that you helped

13   composite?

14       A        Yes.

15       Q        Now, this was done on January of 1996,

16   sometime in February of 1996.  We have some police

17   officers that come out and visit you with a photo

18   spread; is that correct?

19       A        That's correct.

20       Q        And the photo spread, which I believe --

21   there is two photo spreads that you see, correct?

22       A        There are two --

23       Q        Two sets?

24       A        Two sets, right.

25       Q        One of them, which is State's Exhibit 33,

1    and the other one is State's Exhibit 34, which --

2              MR. ODOM:  May I approach?

3              THE COURT:  You may.

4              MR. ODOM:  Were 33 and 34 offered into

5    evidence?

6              Your Honor, I would ask to see State's

7    Exhibit 33 and 34, please.

8              MR. VINSON:  They were turned in last

9    night.

10             MR. VINSON:  I apologize to the Court for

11   that.  They were marked for identification purposes.

12        Q    I believe you identified 33 and 34 as the

13   photo spreads you recall seeing on the day that they

14   came out to the hospital; is that right?

15        A    They came at home.

16        Q    Came to your home.  Do you recall seeing

17   those?

18        A    Yeah.

19             MR. ODOM:  At this time I would offer

20   State's Exhibit 33 and 34 into evidence.

21             MR. VINSON:  State has no objection, Your

22   Honor.

23             THE COURT:  State's Exhibit 33 and 34 are

24   admitted.

25        Q    Now, I believe on State's Exhibit 33 you

1    testified that you did not identify anyone out of that

2    photo spread, did you?

3         A    That's true.

4         Q    Now, on State's Exhibit 34 you identified

5    someone as being the closest, right?

6         A    I believe what I said of the ones there

7    that was the one that was the closest.

8         Q    That was the one that was the closest?

9         A    Right.

10        Q    When the officers came out -- and do you

11   recall which officers those were?

12        A    I believe it was Detectives Halling and

13   the younger officer, Huseman or Hauser.

14        Q    You don't recall Officer Miller?

15        A    I don't recall Officer Miller being there,

16   that name.

17        Q    He could have been but you just don't

18   recall?

19        A    I'm pretty sure he was not there.  There

20   was just two of them.

21        Q    Did they indicate to you that they had

22   some suspects they wanted you to look at.

23             MR. VINSON:  Your Honor, this is

24   repetitious, in a great deal of evidence and

25   repetitious, and I am objecting to it at this time.

```
1                    THE COURT:  I think we went through all of
2       this yesterday afternoon.
3                    MR. ODOM:  I don't recall.  Fine, Judge.
4                    THE COURT:  Let's go ahead and continue
5       but let's try to be expeditious.
6            Q       (Mr. Odom)  Do you recall whether or not
7       they indicated to you that on the photo spread, not
8       the lineup but the photo spread, did they indicate to
9       you that they had some suspects that they wanted you
10      to look at?
11           A       No.
12           Q       So this is just -- there's no indication
13      that someone has been apprehended or they are
14      suspecting, this is just looking at photos, right?
15           A       That's correct.
16           Q       And you identified number five in that
17      particular photo, right?
18           A       Yes.
19           Q       Did anyone tell you the identity of the
20      person that you identified, that being number five?
21           A       No.
22           Q       They never informed you who that was?
23           A       No.
24           Q       Now, I believe in our chronology we have a
25      phone call because you read something in the
```

1    paper -- -- I'm sorry.  The next thing that happens is

2    a lineup that occurs in February of 1996, right?

3         A         Correct.

4         Q         And at that time Sergeant Miller indicates

5    to you that they have made some arrests and he wants

6    you to view the lineup?

7         A         That's correct.

8         Q         And you do so.

9              If I were to say that lineup was on or

10   about February 23rd of '96, does that sound all right

11   to you?

12        A         Sounds right.

13        Q         During that lineup, you had identified Mr.

14   Dennes as being the closest person to the person that

15   assaulted you, right?

16        A         That's correct.

17        Q         And during that lineup, I believe you

18   testified yesterday -- if not, I will ask you -- the

19   people that you viewed in that lineup were they all

20   similar in height and hair and complection to Mr.

21   Dennes?

22        A         Yes.

23        Q         So Mr. Dennes didn't stand out in that

24   lineup, did he?

25        A         That's correct.

1        Q        During the lineup, everyone was wearing a

2    hat, were they not?

3        A        I believe they were.

4        Q        Do you know what it is that possessed the

5    police department to have them wear a hat during the

6    lineup?

7        A        No.

8        Q        You certainly don't remember anybody

9    wearing a hat, do you?

10       A        I don't recall whether they were or not.

11       Q        So you don't remember if the assailant was

12   wearing a hat, right?

13       A        Right.

14       Q        And when they all walked out, there was

15   nothing unusual about the way Mr. Dennes appeared when

16   he walked out either, right?

17       A        That's true.

18                MR. ODOM:  Your Honor, at this time I

19   would like to --

20                THE COURT:  I can't hear you.

21                MR. ODOM:  I'm sorry.  I would like to

22   have this marked as Defendant's Exhibit 2, a copy of

23   the video that I was provided of the lineup, and ask

24   if the witness can recall this as being the lineup

25   that he viewed on the night of February 23rd, 1996.

```
 1                THE COURT:  What says the State?

 2                MR. VINSON:  We have no objection, Your

 3   Honor, as long he plays the complete video from start

 4   to finish.

 5                MR. ODOM:  Play everything I got.

 6                THE COURT:  Defendant's Exhibit 2 is

 7   admitted.

 8                Ladies and gentlemen, can you see it all

 9   right?

10                (Whereupon, Defendant's Exhibit 2 was

11   played for the jury.)

12        Q      Mr. Copeland, does this appear to be --

13                THE COURT:  Can you see it, Mr. Copeland?

14                THE WITNESS:  Just barely.

15        Q      Does this appear to be the lineup?

16        A      The best I can tell.

17        Q      Now, the person that just walked by, the

18   second person that walked by, do you recognize him?

19        A      That's right.

20        Q      This person right here is that Mr. Dennes?

21        A      Yes.

22        Q      The person that is walking normally.  Do

23   you recall that he had a cast on?

24        A      No, I was looking at faces.

25        Q      You didn't see the cast?
```

1       A       No.

2       Q       Does number one here appear to you to be a

3   white male or a Hispanic male?

4       A       Appears to be a Hispanic.

5       Q       Does he appear to be light complected or

6   dark?

7       A       Relative light.

8       Q       Do you think he is light?

9               Number two does he appear to you to be a

10  white male or Hispanic male, can you tell?

11      A       I couldn't tell for sure.

12      Q       Okay.  Number three does he appear to you

13  to be a white male or does he appear to be Hispanic to

14  you?

15      A       He seems to be more Hispanic

16  characteristics.

17      Q       Number four does he appear to be a white

18  or a Hispanic-looking male?

19      A       I would have a difficult time with him.

20      Q       Pardon?

21      A       I couldn't really tell with him.

22      Q       Does he appear to be dark complected?

23      A       Pardon?

24      Q       Does he appear to be dark complected?

25      A       Not particularly.

1  Q  Number five does he appear to be lighter
2 complected than the others that you have seen thus
3 far?

4  A  Very slightly.

5  Q  Very slightly?

6  A  I would say so.

7  Q  Does he appear to not have any Hispanic
8 traits that you can tell?

9  A  Not that I notice.

10  Q  Did you notice the others having Hispanic
11 traits?

12  A  The ones indicated; yes.

13  Q  But not the others.

14    What about this gentlemen does he appear
15 to be Hispanic or dark complected features?

16  A  Somewhat.

17  Q  Now, at this point, when they are looking
18 at it from a distance, you are not looking at the fact
19 that he has a cast on, you are looking only at his
20 face, correct?

21  A  That's correct.

22  Q  You don't observe that cast?

23  A  That's correct.

24  Q  Now, Mr. Copeland, the lineup, I believe,
25 we can put 23rd of February on that.  Do you see that?

1       A       Yes.

2       Q       The 23rd of February, 1996, you identify

3   number five, Mr. Dennes, as being the closest person

4   to the person that shot you in January of 1996, right?

5       A       Correct.

6       Q       And, then, do you recall a telephone call

7   in early of 1997; then you recall talking to the

8   district attorney sometime in July of 1997, or before

9   July of 1997?

10      A       I spoke with the district attorney's

11  office a number of times primarily because the trial

12  date had been changed, and I kept trying to find out

13  what the new date was and what my obligations were.

14      Q       Did you talk to them about the lineup

15  procedure or anything about the defendants in the

16  case, any of the facts of the case?

17      A       I don't recall doing that.

18      Q       You do recall coming down in July of 1997,

19  wherein there was a hearing, right?

20      A       Yes.

21      Q       And the hearing concerned the

22  identification procedure; do you recall that?

23      A       Yes.

24      Q       And at that hearing where was Mr. Dennes

25  seated?

1     A     Let's see.  He was in the middle -- there
2     were three gentlemen, I believe two attorneys -- and
3     he was sitting in the center seat.
4     Q     By that, in more detail than I am asking,
5     but he was sitting on this side of the table, was he
6     not?
7     A     Yes.
8     Q     And the other gentlemen that was sitting
9     at the table would you describe him as a white haired
10    and elderly gentleman with a white beard?
11    A     I wasn't paying attention.
12    Q     Is it fair to say he didn't look anything
13    like Mr. Dennes, do you recall that.
14          MR. VINSON:  Object to the relevance of
15    that.
16          THE COURT:  Sustained.
17    Q     (Mr. Odom)  Let me approach it this way.
18    Maybe I can make the relevance.  The very first time
19    that you positively identified this person as the
20    defendant was in that hearing, right?
21    A     Yes.
22    Q     Right.  And in that hearing, which is the
23    first time you had identified Mr. Dennes, he was
24    sitting with myself and another person that didn't
25    look like Mr. Dennes, correct?

1          A          Correct.

2          Q          And at that time you knew that he was a

3     defendant and charged in this particular case, did you

4     not?

5          A          Yes.

6          Q          At that time he also was not wearing a

7     mustache, was he?

8          A          That's correct.

9          Q          So, yesterday, when we brought that

10    mustache down into the courtroom and we put it on Mr.

11    Dennes' upper lip for the jury to see, that had

12    nothing at all to do with your identification of him,

13    did it?

14         A          Not really.

15         Q          You could have put a mask on him as far as

16    you know because you had already decided in

17    July 22, 1997, that was the person that had fired at

18    you, right?

19         A          Yes.

20         Q          And that was when you saw him for the

21    first time, as he appears today, wearing a suit,

22    wearing glasses and sitting on the defendant's side of

23    the table, correct?

24         A          That's correct.

25         Q          Now, he was wearing a hat in the lineup

```
1    and he wasn't wearing a hat when he was here when you

2    positively identified him on July 22, 1997, was he?

3        A      No.

4        Q      However, when you did your police

5    sketching of the person, they were not wearing a hat,

6    were they?

7        A      No.

8        Q      And the hair that you sketched -- or that

9    you had Ms. Gibson put on the defendant -- was a

10   different type of hairstyle than what Mr. Dennes has

11   here, right?

12       A      Slightly different I would say.

13       Q      Slightly different.  Do you think that is

14   curly hair?

15       A      I think what I have described it as full

16   over the ears.

17       Q      What about on top of the head, does he

18   have full hair on top of his head?

19       A      No, he doesn't.

20       Q      Doesn't have much hair on top of his head,

21   does he?

22       A      No.

23       Q      He is, though, wearing glasses, is he not?

24       A      Correct.

25       Q      And I believe you stated that, by looking
```

1    at him wearing glasses, you are now able to identify

2    him as the person that shot you, right?

3         A      With the hair grown out and the glasses,

4    yes.

5         Q      With the hair grown out.  Do you recall a

6    buzz cut in that lineup?

7         A      I was looking more straight at the face

8    than the hair.

9         Q      I mean, in order to see the face and to

10   recognize the face, you kind of have to look at the

11   whole package, don't you?

12        A      Yes.

13        Q      I mean sort of like seeing the face but

14   not seeing the cast that the person is wearing, so you

15   don't know, when you say he has longer hair now than

16   he did back then, you don't really know whether he

17   does, do you?

18        A      As I recall, at the lineup the hair was

19   shorter than it is now or was on the 22nd.

20        Q      Mr. Copeland, as you recall in the lineup,

21   the hair had a hat on, right (sic)?

22        A      Yes.

23        Q      So the first time you saw this person with

24   glasses and no hat is on July 22, 1997, right?

25        A      Yes.

1        Q        And that's when you identified him, right?

2        A        Yes.

3        Q        You had previously identified another

4    person as looking similar to the assailant; do you

5    recall that?

6        A        Of the group of the images I was

7    presented, I identified him as the one closest.

8        Q        In that identification the person had a

9    mustache, did he not?

10       A        Yes.

11                MR. VINSON:  Object.  Again, it's

12   repetitious, all has been asked and answered.  The

13   photographs speak for themselves.

14                MR. ODOM:  I did not ask about the

15   mustache and this is my cross examination and this is

16   a new area that he may not like it.

17                MR. VINSON:  Object to the side bar

18   remark.

19                THE COURT:  Don't start.  Go in any new

20   areas but we are not going to have a lot of repetition

21   today.

22                MR. ODOM:  Yes.

23       Q        (Mr. Odom)   The previous photograph of

24   that person that person had a mustache, did he not?

25       A        Yes.

1       Q       One of the reasons you thought that person

2   was similar to the person that shot you was because of

3   the mustache, right?

4       A       Yes.

5       Q       Mr. Copeland, you recognize Mr. Dennes, do

6   you not?

7       A       Yes.

8       Q       You have seen Mr. Dennes before, have you

9   not?

10      A       Yes.

11      Q       Mr. Copeland, do you remember seeing Mr.

12  Dennes prior to the night of January 24, 1996?

13      A       I don't recall seeing him.

14      Q       How long had you been working in that

15  building?

16      A       Two days prior.

17      Q       Mr. Dennes did you know was a tenant of

18  that building?

19      A       I understand he was.

20      Q       You don't recall having seen him

21  specifically prior to that date, have you?

22      A       No, I do not recall that.

23      Q       You don't know that you didn't see him

24  prior to that date, do you?

25      A       He may walk through the lobby.

1       Q       In other words, you may have seen him
2   prior to the time of the shooting, right?
3       A       It's possible.
4       Q       It's not possible -- when did you start
5   work?  Yeah, when did your shift start on those
6   previous days?
7       A       3:00.
8       Q       It started at 3:00 in the afternoon?
9       A       Right.
10      Q       If Mr. Dennes was at work on either one of
11  those previous days after 3:00 and if he went through
12  the lobby, it's not only possible it's probable?
13      A       If he went through the lobby, it's
14  possible.
15      Q       If he went through the lobby, it's not
16  only possible it's probable?
17      A       If I was in the lobby at the time.
18      Q       Now that wouldn't be unusual, would it?
19      A       No.
20      Q       In your business as a security officer,
21  you do see eventually most of the tenants in the
22  building, do you not?
23      A       Yes.
24      Q       And the first time you see them you may
25  not really recognize them as a tenant but the next

1   time you see them they may have been a little more

2   familiar, have you seen the person?

3        A        That would be a typical series.

4        Q        Eventually, after you have seen them a few

5   times, it's not so much I have seen that person

6   before, it is you can associate that person with a

7   specific place, he is a tenant, right?

8        A        That would be true.

9        Q        Right.  You don't know whether part of

10  your identification in the lineup was made based upon

11  previously having seen Mr. Dennes prior to the day of

12  the shooting --

13               MR. VINSON:  Object, Your Honor, that's a

14  misstatement of the evidence.  There's no evidence

15  that he ever saw Mr. Dennes at all.  He is talking

16  about what is possible and probable.

17               MR. ODOM:  That's argument.

18               MR. VINSON:  I object to it.

19               THE COURT:  I sustain.

20        Q        (Mr. Odom)   Can you tell this jury that

21  you hadn't seen Mr. Dennes before?

22        A        I can't make that flat statement; no.

23        Q        You can't make that statement, can you?

24        A        No.

25        Q        Can you tell the jury that none of this

1    recognizing Mr. Dennes has anything to do with ever

2    having seen him prior to the night of the shooting.

3                MR. VINSON:  Object, again, there is no

4    evidence that he ever saw him.

5                MR. ODOM:  Judge, that's not the point.

6    The point is that he could have.  Judge, if he may, I

7    am cross examining him on his identity.  The point is

8    he could have seen him.  He could have made a false

9    identification based upon having observed him before.

10   That's legitimate cross examination in an area that I

11   am entitled to go in.

12               THE COURT:  I think he already testified

13   that he does not recall ever having seen him, counsel.

14   I sustain the objection.

15               MR. ODOM:  Note our exception.

16   Q       (Mr. Odom)   Mr. Copeland, have you ever

17   seen someone that was familiar but you didn't know

18   where you have seen them before.

19               MR. VINSON:  Objection, relevance.

20               THE COURT:  You can answer but let's move

21   on.

22   Q       (Mr. Odom)   Have you?

23   A       Yes.

24   Q       Have you ever seen someone that you

25   approached thinking they were someone that you knew

1   and it turns out they weren't someone you knew?

2          A       I don't recall that necessarily.

3          Q       You've never almost gone up to someone and

4   grabbed them and it turned out they wasn't the person

5   you thought they were going to be?

6          A       If I approached someone from behind or an

7   angle, once you saw them full, I would not approach

8   them.

9          Q       But there was something about certain

10  instances to wherein something looks familiar, you

11  can't put your finger on it.  You have had that

12  experience, have you not?

13         A       Yes.

14         Q       Most of the shops in that building do not

15  close at 3:00, do they?

16         A       Not that I am aware of.

17         Q       Most of them will close more like at 6:00

18  or 5:00 o'clock, will they not?

19         A       As I recall, that's correct.

20                 MR. ODOM:  Pass the witness, Your Honor.

21                 THE COURT:  Thank you.

22                 Mr. Vinson.

23

24

25

1             MR. VINSON:  May I approach, Your Honor?

2             THE COURT:  You may a.

3             (Whereupon, State's Exhibit Nos. 35 was

4    marked for identification.)

5             MR. VINSON:  May I approach?

6             THE COURT:  You may.

7

8                    REDIRECT EXAMINATION

9    BY MR. VINSON:

10        Q      Let me show you what has been marked for

11   identification purposes as State's Exhibit 35.  Why

12   don't you take a look at that and see if you can

13   identify it.

14        A      That appears to be the original sketch.

15        Q      Okay.  That's the rendition that you

16   discussed with Ms. Gibson, I think, and you all put it

17   together; is that correct?

18        A      That's correct.

19        Q      Now, the person on here does it have a

20   mustache similar to the mustache that was offered into

21   evidence yesterday as State's Exhibit 32?

22        A      Appears to be.

23        Q      Appears to have a mustache like that?

24        A      Similar, yes.

25        Q      And incidently I just put this mustache on

1    myself.  I have glasses on and I have the mustache on.

2    Did I shoot you?

3         A     No.

4         Q     The defense made a comment about if they

5    had put a bag over the defendant's head, you would

6    walk in here and identify them.

7                   MR. ODOM:  I didn't make any such comment.

8    I think the word was --

9                   THE COURT:  Counsel, I think we have

10   already -- if I am saying something, I expect you to

11   respect the Court and keep quiet.  I think the word

12   was mask.

13                  MR. VINSON:  Mask.  Thank you, Your Honor.

14        Q     (Mr. Vinson)   A mask, you would have

15   identified him, the man sitting there with a mask or

16   you can't see him, would you have identified him?

17        A     No.

18        Q     Now, when you identified him in the

19   courtroom when we had the hearing here in June, in

20   July, whatever, you made a positive identification.

21   You told His Honor, on the record, in the hearing that

22   was the man who shot you.

23                  MR. ODOM:  Object to the leading nature of

24   the question.

25                  THE COURT:  Sustained.

1            Are you through?

2            MR. VINSON:  No, I have something else.  I

3     have couple of other things.  I am trying to clear up

4     something first.

5            Q     (Mr. Vinson)   And at that time you

6     identified on the record that was the man who shot you

7     and I think this Judge was having a hearing; is that

8     correct.

9            A     That's correct.

10           MR. ODOM:  Object to the leading nature of

11    the question and ask that any time he answers is that

12    correct after he gives the long statement.

13           THE COURT:  I sustain, that's leading.

14           Q     (Mr. Vinson)   Who did you identify as

15    shooting you with that .9 mm with the silencer

16    attached?

17           A     The defendant.

18           Q     And where is the defendant this morning?

19           A     At the defense table.

20           Q     And is that the man who shot you?

21           A     Yes.

22           Q     Come tomorrow, come next week, come next

23    year, is that the same person that shot you?

24           A     Yes.

25           Q     Will that ever change?

1       A       No.

2       Q       Do you want to tell the ladies and

3   gentlemen of the jury why it will not change.

4       A       It's something I'll never forget and it's

5   not going to happen again.

6       Q       What I am saying, you also stated the

7   defense had you saying that simply because they had an

8   a mustache on you you identified?

9       A       No.

10      Q       What did you tell me about that mustache?

11  Do you remember saying even without the mustache.

12              MR. ODOM:   Objection.

13              THE COURT:   Sustained.

14      A       Yes.

15      Q       Do you recall telling me something about

16  the mustache, the absence of it?

17      A       I believe at the hearing that, just prior,

18  I mentioned with or without the mustache, with the

19  glasses and the hairstyle, I was positive.

20      Q       Positive that was him?

21      A       Yes.

22      Q       And then did I also further assist you, we

23  will get the mustache; is that correct?

24      A       I'm sorry.

25      Q       Did we go and get the mustache?

1       A       Yes.

2       Q       And for what reason did we do that?

3       A       I wasn't sure, to tell you the truth, so I

4    wanted to get the mustache.

5       Q       Are you absolutely certain, you've had an

6    opportunity to look at this defendant, this is the

7    person that shot you.

8               MR. ODOM:  Objection, asked and answered.

9               THE COURT:  Sustained.

10      Q       (Mr. Vinson)   Any doubt in your mind.

11              MR. ODOM:  Objection, Your Honor, asked

12   and answered.

13              THE COURT:  Sustained.

14      Q       (Mr. Vinson)   What was the difference

15   between the defendant's manner, that is, his face, if

16   anything, or his hairstyle at the lineup that was

17   different from the night you saw him when he shot you?

18      A       I recall the hair on the night I was shot

19   was full.

20      Q       Have you ever heard of wigs?

21      A       Yes.

22      Q       What do you do with wigs?

23      A       What I would do with wigs?

24      Q       What can you do with a wig?

25      A       You can wear it.

```
 1        Q        Where do you wear it?

 2        A        On your head.

 3        Q        How would you describe my complection?

 4        A        Dark.

 5        Q        Compared to what?

 6        A        Compared to white.

 7        Q        Okay.  How would you describe this

 8   defendant's complection?

 9        A        Very light, white basically.

10        Q        Compared to what?

11        A        Well, compared to you.

12        Q        Compared to what else, another white

13   person; is that correct?

14        A        Yes.

15        Q        Look at some people in the jury box and

16   look at his complection.  He is fairer than some of

17   the people in the jury box, is he not?

18        A        Yes.

19        Q        Now, did you have any say in how that

20   lineup was conducted?

21        A        No.

22        Q        During the lineup, I think, the defendant

23   had a cast on; is that correct?

24        A        From the videotape I saw, yes.

25        Q        And you could obviously see the way he was
```

1    walking on the videotape?

2        A      Yes.

3        Q      Was he walking like that on the night he

4    approached you?

5        A      No.

6        Q      Now, I think on cross examination you said

7    it didn't take long to get close to you; is that

8    correct?

9        A      Normal walking speed.

10              MR. VINSON:  Your Honor, the weapon is

11   still clear from yesterday.

12              THE COURT:  All right.

13              MR. VINSON:  We will have the bailiff to

14   check it anyway.

15              THE BAILIFF:  It is clear, Your Honor.

16              THE COURT:  Thank you.

17       Q      Take State's Exhibit 31.  What distance

18   was the defendant from you when you first observed him

19   turn around using this courtroom?

20       A      Maybe from here to the second row of the

21   gallery there.

22       Q      The second row of the gallery?

23       A      Approximately.

24       Q      Are you talking about 30 feet, about 10

25   yards?

1       A       Something of that nature.

2       Q       Obviously I have to walk, can't walk, have

3    to walk on an angle somewhat to get to you.

4               MR. VINSON:  May I approach the witness,

5    Your Honor?

6               THE COURT:  You may.

7       Q       So assuming that the manner in which he

8    walked toward you, normal manner, as I am walking

9    here?

10      A       About like that, maybe just a little bit

11   faster but about like that.

12      Q       But I mean he didn't rush up on you?

13      A       No.

14      Q       He didn't run up on you?

15      A       No.

16      Q       And he got close enough to touch you.

17      A       His left hand.

18      Q       Okay, would you lean forward.  I am

19   touching you with the left hand.  Where is his face?

20      A       About where yours is.

21      Q       And you are looking at him?

22      A       Yes.

23      Q       Does his arms appear to be as long as my

24   arms?

25      A       No, closer.

1       Q       So he had to be closer to you than I am.

2   So he had to be closer than 35 inches; isn't that

3   correct?

4       A       Yes.

5       Q       If someone walks up and touches you on the

6   shoulder, do they get your attention?

7       A       Oh, yes.

8       Q       And under those circumstances would they

9   get your attention?

10      A       Yes.

11      Q       And did this defendant get your attention?

12      A       Yes.

13      Q       Do you recall in the lineup if the

14   defendant was wearing glasses?

15      A       He was not.

16      Q       When the weapon was fired into your chest,

17   what type of look was on this defendant's face?

18      A       Cold.

19      Q       What do you mean cold?

20      A       He just looked me in the eye and just like

21   this, no smile, no smirk, just cold.

22      Q       Was there any hesitation on his part?

23      A       No.

24      Q       Was there any resistance on his part?

25      A       There wasn't time.

1          Q          There was some question about age.   What
2     would you estimate my age to be?
3          A          Probably fifties.
4          Q          And if you were to identify me to someone,
5     would you use the same term you just used in the
6     fifties?
7          A          Yes.
8          Q          Early fifties, middle, later as?
9          A          Early to middle.
10          Q          Based on your observation, correct?
11          A          Yes.
12          Q          Now, there was testimony about the log
13     that was kept there.   Could you identify the log if
14     you were to see it again?
15          A          Yes.
16                     MR. VINSON:  May I approach, Your Honor?
17                     THE COURT:  You may.
18                     MR. VINSON:  Your Honor, at this time the
19     State will offer into evidence State's Exhibit 35 that
20     has been marked for identification purpose.
21                     MR. ODOM:  No objection.
22                     MR. VINSON:  Tender it to defense counsel.
23                     THE COURT:  35 is admitted.
24                     (Whereupon, State's Exhibit No. 36 was
25     marked for identification.)

1          MR. VINSON:  May I approach?

2          THE COURT:  You may.

3     Q     Let me show you what has been marked as

4  State's Exhibit 36 and just ask you if you can

5  identify, not necessarily the business record

6  affidavit but the document?

7     A     It would be the sign-in sheets from the

8  building.

9     Q     That's the log that you all maintain; is

10  that correct?

11     A     Correct.

12     Q     That you maintained at that time?

13     A     Yes.

14          MR. VINSON:  Your Honor, at this time the

15  State will offer into evidence State's Exhibit 36 and

16  tender the same to defense counsel for his inspection.

17  It's a log with a business affidavit attached to it.

18          MR. ODOM:  No objection.

19          THE COURT:  State's Exhibit 36 is

20  admitted.

21     Q     Now, does this log reflect the activity at

22  ABS Security and the Greenrich Building, correct?

23     A     Correct.

24     Q     And does that reflect activities starting

25  at 7:18 a.m. in the morning of that day?

1       A       Yes.

2       Q       And then going to 7:30 p.m. of the same

3    date?

4       A       Yes.

5       Q       I want you to take a look at the fourth

6    entry on January 24, 1996, and tell who signed in.

7    What name does that appear to be?

8       A       It appears to be Estrella Martinez.

9       Q       And then does it also show a sign out

10   time?

11      A       Yes, it does.

12      Q       And the sign out time is what?

13      A       I can't see.  It looks like 12:55.

14      Q       On the same day do you see, if we go to

15   one, two, three, four, five, six -- to the tenth entry

16   for that afternoon, does it show who signed in on the

17   tenth entry?

18      A       That appears to be an Estrella Martinez

19   again.

20      Q       And does it also show what time she signed

21   in?

22      A       It shows 1745.

23      Q       And 1745?

24      A       5:45.

25      Q       5:45, okay.  And what company was she

1    working for?

2         A    It's abbreviated ABS.  I think it was

3    American Building Services, I believe it was.

4         Q    And she was working there in the capacity

5    of what?

6         A    A cleaning lady.

7         Q    A maintenance person, right?

8         A    Yes.

9         Q    Now, had you ever met Ms. Martinez

10   personally, yes or no, that you know of?

11        A    Yes.

12        Q    Can you tell us when did you meet Ms.

13   Martinez?

14        A    I had encountered her twice before when

15   they came in to get the keys for the building.  I had

16   additional keys for the building.  That's when I saw

17   her.

18        Q    And was that on your first day of work

19   there, your second day or your third day or all three

20   days?

21        A    All three days.

22        Q    Who did you relieve?  There was somebody

23   working there before you, correct?

24        A    Yes.

25        Q    And who did you relieve, if you know?

1          A       I believe the first name was Brian.   I

2     can't recall his last name.

3          Q       What happened to Brian, if you know?

4          A       I don't know.

5          Q       Brian was not working that shift the 24th

6     of January; is that correct?

7          A       No.  He left at 3:00, or shortly

8     thereafter.

9          Q       No, he is missing.  I don't think you

10    understood my question.

11               When you went to work at that building,

12    okay, and you started on the 21st, I mean, the 22nd;

13    would that be correct?

14         A       Yes.

15         Q       You worked the 22nd, right?

16         A       Yes.

17         Q       You worked the 23rd?

18         A       Yes.

19         Q       And the 24th?

20         A       Half of the 24th.

21         Q       Right, before you had that.

22               Who did you replace?  There was someone

23    working that shift before you went to that building.

24         A       I don't know who the individual was who

25    had been there before me.

1       Q       They come in and get the keys and go to

2    work?

3       A       Yes.

4       Q       And does she have in her capacity as a

5    clean up --

6               MR. VINSON:   May I have just a moment?

7       Q       Now, Ms. Martinez, once she has the keys,

8    she can go anywhere in the building; is that correct?

9       A       I believe so.

10       Q       Right, because the clean-up crew they go

11    into the different offices to clean up?

12       A       I'm not sure that they had access to every

13    office in the building.  Some of them may be

14    separately keyed.

15       Q       And that's why you have the procedure

16    there because some go in different offices and some go

17    to other offices?

18       A       Yes.

19       Q       And you had more than one person?

20       A       We had three people there.

21       Q       But, I mean, it wasn't nothing unusual for

22    her to work on the second floor, to work on the third

23    floor, to work on any floor where she needs to do her

24    work?

25       A       That was not unusual.

1      Q      And I think you were treated at Ben Taub

2   Hospital initially?

3      A      Yes.

4      Q      How long did you remain there?

5      A      Seven days.

6      Q      And were you in out patient or what?

7      A      No, I was in ICU.

8      Q      And ICU, intensive care?

9      A      Surgical intensive care.

10      Q      After you were treated at Ben Taub, where

11   were you released to?

12      A      I was transferred to Methodist.

13      Q      For what purpose?

14      A      Further recovery.

15      Q      And how long were you at Methodist?

16      A      Five more days.

17      Q      After you were released from Methodist,

18   what happened?  Were you treated?  Were you still

19   under the doctor's care?

20      A      Yes.  I continued to see Dr. Tuttle, who

21   will be the attending physician at Methodist, on a

22   regular basis for follow-up visits.

23      Q      And during this time, police officers

24   while they were talking with you, the case was

25   ongoing?  Well, let me take it back.

```
 1                    You were in the hospital.  I think you

 2      testified they come and spoke with you?

 3          A       Yes.

 4          Q       At that time were you under medication?

 5          A       Yes.

 6          Q       A great deal of medication?

 7          A       At Ben Taub; yes.

 8          Q       A lot of pain?

 9          A       Yes.

10          Q       Do you remember everything you told the

11      officers?

12          A       No.

13          Q       Is it fair to say you could have said some

14      things you don't recall today?

15          A       I was well doped.

16          Q       You wouldn't argue with the point about

17      the bushy hair.  From my understanding, you just don't

18      remember saying it; is that correct?

19          A       That's correct.

20          Q       How would you describe my hair?

21          A       Close cut.

22          Q       And what else?

23          A       Sort of a medium brown color, a little

24      wiry.

25          Q       I think on cross examination of some
```

1    questions about some sleeves you couldn't see the

2    sleeves or something.  Can you clear that up a little.

3    You said the defendant had on what type of outfit?

4         A    A jumpsuit.

5         Q    A jumpsuit.  Did the sleeves extend, if he

6    had any sleeves, did it extend beneath the jumpsuit,

7    the end?

8         A    You are speaking of the shirt sleeves?

9         Q    Yeah, did you see a sleeve?

10        A    No, I didn't see a shirt sleeve that I

11   recall.

12        Q    You don't know whether he had a long

13   sleeved, rolled up or too short or short sleeved

14   shirt, you don't know?

15        A    I don't know.

16        Q    Did that concern you?

17        A    No.

18        Q    And when the defendant was in the building

19   when you were shot, did you see anything unusual about

20   his walk that you observed --

21        A    No.

22        Q    -- that would assist you in identifying

23   him in the future?

24        A    No.

25        Q    You saw me walk across the courtroom this

1    morning.   Did you see anything unusual about my walk?

2         A        No.

3         Q        If I had a cast on my leg and was walking

4    in the manner the defendant was walking in that video,

5    would that assist you?

6         A        Yes, if you were walking like that.

7         Q        Assume that you saw me walking like that

8    at one point.  Assuming I came up and assaulted you

9    and I have a cast on and I am walking like that, would

10   that assist you in the future?

11        A        If you walked the same way, I assume it

12   would.

13        Q        What did Dr. Tuttle treat you for?

14        A        It was follow-up care, primarily

15   examinations and prescriptions for the pain

16   medication.

17        Q        And you went to see Dr. Tuttle through

18   November of last year; is that correct?

19        A        That's correct.

20        Q        What did Dr. Perez treat you for?

21        A        He's a psychologist and he was treating me

22   for post traumatic stress symdrome.

23        Q        As a result of?

24        A        The shooting.

25        Q        And who is Allen Brown?

1        A        He's an associate of Dr. Perez.

2        Q        And why were you seeing Allen Brown?

3        A        They had what they called biofeedback

4    wherein they did things almost on the verge of

5    hypnosis to help you to be able to relax.

6        Q        And have you received any physical

7    rehabilitation?

8        A        Yes.   I spent about eight or nine weeks

9    going to physical rehabilitation.

10       Q        Was that for the injury you suffered?

11       A        Yes.

12       Q        How would that assist you?

13       A        Try and get some -- the full use of my arm

14   back and improved the strength with light weight

15   training and exercises.

16       Q        Have you regained the full use of your

17   arm?

18       A        No.

19       Q        What is the prognosis?

20       A        I'm as well as I am going to be.

21       Q        Did you have the full use of your arm

22   before the shooting?

23       A        Yes.

24       Q        The defense, when he was cross examining

25   you, alluded to the fact that you had seen the

1    defendant in the lineup; is that correct?

2         A    Yes.

3         Q    You've seen the defendant at the hearing?

4         A    Yes.

5         Q    Was the basis of your identification on

6    the fact that you had an opportunity to observe the

7    defendant on the day he committed the offense or was

8    it because he was sitting in court between his counsel

9    and another person?

10        A    It was based on my recollections of the

11   event of the shooting.

12        Q    You also voiced a concern yesterday about

13   the security of the building.  What concern did you

14   have about the security?

15        A    Well, I had many concerns.

16        Q    Well, let's name one specific about the

17   doors.

18        A    Well, one that comes to mind is the fact

19   that the door to the stairwell that was used for the

20   emergency evacuations did not lock, in other words,

21   people could come into the lobby and open that door

22   and go up in the building.  The buildings where I

23   previously worked the staircase was secured.

24             MR. VINSON:  May I approach?

25             THE COURT:  You may.

1        Q        State's Exhibit 25, can you see that, sir?

2        A        Yes.

3        Q        Can you see the stairwell and the door

4    that we just testified?

5        A        Yes, I can.

6                 MR. VINSON:    His Honor, may he step down

7    and approach the exhibit?

8                 THE COURT:  You may.

9        Q        Without blocking the view from the jurors

10   on the far right and the juror on the far left, can

11   you show what door you are talking about.

12       A        This door, right here.

13       Q        Keep your voice up.

14       A        This door right here.

15       Q        And this is the fire escape door?

16       A        That's from the emergency stairwell exit.

17       Q        The emergency stairwell?

18       A        Yes.

19       Q        This is near that loading dock, is it?

20       A        Yes.  This is the loading dock door right

21   there.

22       Q        If someone would get in, back here, did

23   they have access to the entire building through the

24   stairwell?

25       A        Yes.

1       Q       Did you have any video camera or anything

2   like here near that loading dock or this emergency --

3       A       No.

4       Q       -- exit?

5               So if someone got in here, you could not

6   see them?

7       A       That's correct.

8       Q       Did you have any type of a security system

9   where an alarm would go off or maybe a light indicator

10  come on to show that a breach of security occurred in

11  this area?

12      A       No.

13      Q       How would you know that there was a breach

14  in security?

15      A       If I observed it personally.

16      Q       And how would you observe it personally?

17      A       I would have to be there.

18      Q       You would have to walk to that location?

19      A       Yeah.

20              MR. VINSON:  Okay, have a seat.

21              Your Honor, I pass the witness.

22              THE COURT:  Mr. Odom, how long do you

23  anticipate your recross?

24              MR. ODOM:  About 15 minutes, Judge.

25              THE COURT:  Proceed.

```
 1                    RECROSS EXAMINATION

 2    BY MR. ODOM:

 3         Q     Mr. Copeland, let me start off with some

 4    of the points that Mr. Vinson went over.

 5               First of all, he said have you ever heard

 6    of a wig.  You know what a wig is, don't you?

 7         A     Yes.

 8         Q     Have youver used that word "wig" before in

 9    any of your descriptions?

10         A     I don't recall that.

11         Q     Do you recall the person that assaulted

12    you was he wearing a wig?

13         A     I couldn't say for sure one way or

14    another.

15         Q     Could you say you can see Mr. Dennes here

16    now?

17         A     Yes.

18         Q     And you saw the assailant and you are

19    positive it's the same person.  Was he wearing a wig

20    or is that the same hair?

21         A     It appears different now.

22         Q     I understand that.

23               What I am saying is Mr. Vinson put in your

24    mind the idea that there might be a wig here.  Now,

25    have you ever told anyone that he was wearing a wig?
```

1        A      No.

2        Q      You saw him at the lineup, right?

3        A      Yes.

4        Q      You saw him on July 22nd, did you not?

5        A      Yes.

6        Q      And you saw him today, did you not?

7        A      Yes.

8        Q      Did you tell Mr. Vinson that he was

9   wearing a wig?

10       A      No, I did not.

11       Q      Now, when you did your drawing, the one

12  that we now have, the original of which is State's

13  Exhibit 34, this is the original, right?

14       A      Yes.

15       Q      This is the way you remembered the hair,

16  is it not?

17       A      That's correct.

18              THE COURT:  It's State's Exhibit 35.

19              MR. ODOM:  Okay, 35.

20       Q      Do you remember the mustache that was on

21  Mr. Dennes as drooping down?  You don't recall that?

22       A      Yeah.

23       Q      I'm sorry.  I didn't hear you.

24       A      She asked what I said and all I said was

25  yeah.

1         Q       Can you translate that for me.  You don't

2    recall one way or another, do you?

3         A       No.

4         Q       The truth of the matter:  The mustache

5    didn't have a whole lot to do with any identification

6    of this man, did it?

7         A       That's true.

8         Q       You had already sworn that it was the same

9    one, right?

10        A       That's true.

11        Q       So when we go down to Southern Import --

12   or we get a mustache for purposes for showing to the

13   jury -- that was not a factor in your identification,

14   was it?

15        A       That's true.

16        Q       The mustache on Mr. Vinson did not make

17   him look like the person that shot you, did it?

18        A       Correct.

19        Q       There's a little bit of difference, isn't

20   there.

21                MR. ODOM:  May I approach the witness?

22        Q       The mustache on number five that makes a

23   difference, doesn't it?  That does make a difference,

24   doesn't it?

25                THE COURT:  You need to answer the

1    question.

2         A       I didn't know if it was a question or a

3    statement to the jury.

4         Q       No, it was a question.  It makes a

5    difference?

6         A       A different to what?

7         Q       As making it appear it is similar to the

8    person that shot you?

9         A       Yes.

10         Q       Now, Mr. Vinson asked you other questions

11    about the hair, that is, when you saw Mr. Dennes at

12    the lineup, he didn't have hair as long as it is

13    today, right?

14         A       Not as I recall.

15         Q       Now, I believe you told this jury on

16    direct examination that he had a buzz cut, right, do

17    you recall that?

18         A       I may have.

19         Q       Looking at that video lineup, he had a hat

20    on, didn't he?

21         A       Yes.

22         Q       You can't tell whether it was a buzz cut

23    or not, can you?

24         A       It didn't come all the way down over his

25    ears.  It appeared to be close cut.

1      Q      Do you remember the side burns coming down

2   on that video?

3      A      No.

4      Q      You don't.

5             There's a lot you don't remember about the

6   video, is there?

7      A      There are some things.

8      Q      You didn't, for example, when you first

9   made a tentative ID or said he was close to the

10  assailant, you couldn't even remember that he had a

11  cast on, could you?

12     A      I was concentrating on the faces.

13     Q      I understand that.

14            Are you saying you didn't see the cast on?

15     A      I don't recall seeing it.

16     Q      And the night that the person shot you you

17  don't recall if that person was wearing a hat or not,

18  do you?

19     A      That's correct.

20     Q      Mr. Copeland, if someone were wearing a

21  hat that night, don't you think that would be a pretty

22  important detail?

23     A      Could be.

24     Q      I mean, you saw how long it took Mr.

25  Vinson to come back, go down and around and up to you.

1          That's not a sort of detail that you would forget,

2     is it?

3          A        No.

4          Q        And when Mr. Vinson asked you while you

5     were in pain at the hospital that you may have said

6     things you don't remember, let me ask you this:    If

7     you don't recall whether or not he was wearing a hat,

8     if you don't recall if you said his hair was coarse

9     and bushy, if you don't recall if his age was early

10    thirties, if you don't recall that his weight was less

11    than or his height was less than five-nine as opposed

12    to the five-nine to five-ten and if you don't recall

13    saying there was possible eye glasses, is it fair to

14    say that your description that you gave to this jury

15    in the courtroom when you first told them what the

16    assailant looks like is a lot different than the

17    features that you no longer recall that you may or may

18    not have told people after this incident occurred?

19         A        I wouldn't say a lot different.

20         Q        Can you say it has been fine tuned and

21    modified to more accurately describe this person than

22    perhaps some of the things that are on the sketch

23    board?

24         A        No.

25         Q        No?   All right.

```
 1                  So you think that it is a more accurate
 2      description of Mr. Dennes, or of the assailant, when
 3      you say that he was wearing a hat and he did have
 4      coarse and bushy hair.
 5                  MR. VINSON:  Object to the repetitious.
 6      We dealt with this over and over again.
 7                  THE COURT:  Sustained.
 8                  MR. ODOM:  May I approach the witness,
 9      Your Honor?
10                  THE COURT:  You may.
11           Q      You had before you a log.  The log, I
12      believe, this is State's Exhibit 36.  Do you recall
13      that?
14           A      Yes.
15           Q      Now, you had met Estrella Martinez before,
16      had you not?
17           A      Yes.
18           Q      Did you know her name at that time?
19           A      I don't know specifically if I knew her
20      name, you know.
21           Q      You knew her as one of the cleaning
22      ladies?
23           A      Yes, I recognized her.
24           Q      And you told Mr. Vinson that you can look
25      on this security log and you can see Estrella
```

1     Martinez's name, correct?

2          A     What I believe to be, yes.

3          Q     What did you tell the jury?  Didn't you

4     tell the jury that Estrella Martinez's name was on

5     that log?

6          A     Yes.

7          Q     What is on the log?

8          A     Which location?

9          Q     Well, in regards to what you believe

10    Estrella Martinez, what does the log say?

11         A     Well, it has printed out Estrella.

12    E-s-t-r-e-l-l-a and M-T-Z.

13         Q     When you are telling the jury, when you

14    are swearing to the jury that's Estrella Martinez, Mr.

15    Vinson has told you that the M-T-Z means Martinez?

16         A     No.  If she stands there while she is

17    signing in front of me, I know who she is.

18         Q     You didn't know her name?

19         A     When she writes it down, I knew her name

20    was Martinez.

21               MR. VINSON:  Objection, argumentive.

22               THE COURT:  Overruled.

23         Q     (Mr. Odom)   I thought you told me you

24    didn't know what her name was?

25         A     I watch when they sign in.

1        Q        But she didn't sign in Martinez, did she?

2        A        No, but put M-T-Z.

3        Q        So you have been told or when Mr. Vinson

4    says there's Estrella Martinez, you assume that the

5    M-R-T-Z means Martinez, right?

6        A        At some point in time, when I started

7    working there, the first time they came in, I was

8    introduced to them.

9        Q        I understand that.

10                 But you previously testified you did not

11   know her last name.  You knew her as one of the

12   cleaning ladies, right?

13       A        True.

14       Q        When Mr. Vinson is making his point and

15   when Mr. Vinson is telling you, does it say Estrella

16   Martinez.

17                 MR. VINSON:  Object to what I am telling

18   him, Your Honor.

19                 THE COURT:  Sustained.

20       Q        (Mr. Odom)   When Mr. Vinson is asking you

21   does it say Estrella Martinez there, you swear to the

22   jury that it says that, right?

23       A        I believe it to be her entry.

24       Q        Of course you do.  But the suggestion is

25   there and that's not what it really says, is it?

```
 1          A       That's correct.

 2          Q       What you have assumed is what you are

 3   telling the jury, correct?

 4          A       Yes.

 5          Q       Now, you have also told this jury under

 6   oath and with just as much as conviction that this is

 7   the same person that shot you, right?

 8          A       Yes.

 9          Q       And that will never change no matter what,

10   right?

11          A       Yes.

12          Q       Even though when you first saw him, it

13   wasn't the same person who shot you, right?

14          A       I beg your pardon?

15          Q       You didn't say it was the same person that

16   shot you when you first saw him, did you?

17          A       Are you speaking of the lineup?

18          Q       I am speaking of the first time you saw

19   him that you recall being at lineup?

20          A       The first time I saw him is when he shot

21   me.

22          Q       The first time you saw him when you ID was

23   not an absolute ID, was it?

24          A       That's correct.

25          Q       The first time you positively identified
```

1    him was on July 22, 1997, right?

2         A    Correct.

3         Q    And you stated that statement of yours

4    will never change no matter what, right?

5         A    Correct.

6         Q    And that's the truth, isn't it, Mr.

7    Copeland?

8         A    Yes.

9         Q    Even if it is not the right person, that's

10   what you believe; isn't that true?

11        A    That's true.

12        Q    And even if it is proved to you that it is

13   the wrong person, you are still going to believe that,

14   aren't you?

15        A    Yes.

16        Q    No matter what, right?

17        A    Yes.

18        Q    Because you are convinced that it must be

19   the right person, right?

20        A    It is.

21             MR. ODOM:  Pass the witness.

22             MR. VINSON:  I have nothing further, Your

23   Honor.

24             THE COURT:  Is the witness to be excused?

25             MR. ODOM:  Yes, sir.

1            MR. VINSON:  Yes.

2            THE COURT:  Thank you, Mr. Copeland.  You

3    may step down.  You are free to leave.

4            All right.  Ladies and gentlemen, we are

5    going to take a lunch break at this time.  We are

6    going to stand in recess until 10:30.  Please remember

7    the admonishment not to discuss the case.  We will

8    take you to lunch.  We called Tony's but they are full

9    but we are going to have to make other reservations

10   for you this afternoon and have a good lunch and I

11   will see you all of you back here at 1:30.  Stand in

12   recess until 1:30.

13            (Recess taken.)

14            (Jury came into the courtroom.)

15            THE COURT:  State call its next witness.

16            MR. VINSON:  The State will call Antonio

17   Ramirez.

18            THE COURT:  I understand there is to be an

19   interpreter used for this witness?

20            MR. VINSON:  Yes, from time to time.

21            A JUROR:  Restate the witness' name.

22            MR. VINSON:  Antonio Ramirez.

23            THE COURT:  Let me instruct if some one of

24   you speak Spanish, you are to rely on the

25   interpreter's interpretation what is said and not use

1    your own version what you believe is said.  As the

2    interpreter interprets from the responses will be the

3    official transcription, if you will call it that.

4                    Mr. Vinson.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       ANTONIO RAMIREZ,

2     was called as a witness for the State and, having been

3     duly sworn, testified through an interpreter as

4     follows:

5                       DIRECT EXAMINATION

6     BY MR. VINSON:

7          Q     Will you give your name for the record.

8          A     Antonio Ramirez.

9          Q     And spell your last name.

10         A     R-a-m-i-r-e-z.

11         Q     How old a man are you?

12         A     57.

13         Q     And do you reside here in Harris County,

14    Texas?

15         A     Yes.

16         Q     And are you employed?

17         A     Yes.

18         Q     And what type of work do you perform?

19         A     Tool and die maker.

20         Q     Tool and die maker?

21         A     Yes.

22         Q     And how long have you been a tool and die

23    maker?

24         A     For 35 years.

25         Q     So that's most of your lifetime?

1     A     Yes.

2     Q     Are you originally from the United States?

3     A     No.

4     Q     Where are you from?

5     A     Spain.

6     Q     What part of Spain?

7     A     Madrid.

8     Q     Have you lived in the United States on a

9  continual basis or have you lived in Spain and other

10  locations throughout the world?

11     A     Yeah.  I live in other locations.

12     Q     What other country was that?

13     A     Ecuador.

14     Q     In Ecuador?

15     A     Yes.

16     Q     And that is located in what hemisphere?

17     A     In South America.

18     Q     South America.

19           Can you tell the ladies and gentlemen of

20  the jury when you came to the United States with

21  respect to the year 1996?  Strike that.  Strike the

22  whole question.  I meant 1995.

23     A     In December.

24     Q     And where were you coming from?

25     A     Ecuador.

1      Q      And what reason did you come to the United

2   States?

3      A      To work.

4      Q      And during that time, did you come to

5   Houston?

6      A      Yes.

7      Q      Had anyone promised you work before you

8   entered the country or just by the nature of your job

9   that you generally don't have trouble finding work?

10     A      Yes.

11     Q      Yes to what part of the question?

12     A      Yes, to the second question.  I came here

13   because the job.

14     Q      Well, why did you pick Houston?

15     A      Because I live before here.

16     Q      You had been here before?

17     A      Yes.

18     Q      And when was the last time you were in

19   Houston?

20     A      In 1990.

21     Q      And you had been away from 1990 until

22   1995; is that correct?

23     A      Correct.

24     Q      When you returned, did you go to any

25   particular company to seek work?

1        A        No.

2        Q        Did you come in contact with a person that

3    you later come to know by the name of Reinaldo Dennes?

4        A        Yes.

5        Q        And is Reinaldo Dennes in the courtroom

6    this afternoon?

7        A        Yes.

8        Q        Can you tell His Honor and the ladies and

9    gentlemen of the jury where Reinaldo Dennes is

10   seated.

11       A        Over here.

12       Q        What is he wearing?

13       A        Glasses and gray suit.

14               MR. VINSON:  Your Honor, may the record

15   reflect that the witness has identified the defendant,

16   Mr. Dennes.

17               THE COURT:  Let the record so reflect.

18       Q        What month did you come in contact with

19   Mr. Dennes?

20       A        In December.

21       Q        How soon after you arrived in Houston did

22   you come in contact with him?

23       A        A few days.

24       Q        Do you recall what day you arrived in

25   Houston?

```
 1        A       No, I don't remember.

 2        Q       Okay, no problem.

 3                How did you come in contact with Mr.

 4   Dennes?  Did anyone introduce you to him?

 5        A       Yes.

 6        Q       And who did that?

 7        A       Francisco.

 8                THE COURT:  Restate the question.

 9                MR. VINSON:  Thank you, Your Honor.

10        Q       I think you were testifying to how the

11   introduction was made between you and Reinaldo Dennes.

12        A       Yes.

13        Q       And who made that introduction?

14        A       Francisco.

15        Q       Francisco; did he have a last name?

16        A       I don't remember.

17        Q       Could you identify him if you see a

18   picture of him?

19        A       Yes.

20        Q       And where did this introduction take

21   place?

22        A       At Reinaldo's office.

23        Q       Can you tell the ladies and gentlemen of

24   the jury where Reinaldo's office is located?

25        A       On Richmond Avenue.
```

```
1        Q        Where?

2        A        On Richmond Avenue.

3        Q        Do you know the name of that building?

4        A        No.

5        Q        What type of building is it, single or

6    multi story?

7        A        One, multi-story building.

8        Q        And for what purpose were you introduced

9    to Mr. Dennes?

10        A        Francisco is working at that time for

11   Reinaldo like a salesman.

12        Q        In what capacity, working for Reinaldo?

13        A        Like salesman.

14        Q        Like a salesman?

15        A        (Witness nods head.)

16        Q        What was he selling?

17        A        Jewelry.

18        Q        Where was the jewelry coming from?

19        A        I don't know.

20        Q        Did you have any jewelry with you?

21        A        Yes.

22        Q        And tell the ladies and gentlemen of the

23   jury what you had.

24        A        I got 67 rings and emerald and small

25   diamond that I bring from Ecuador.
```

1      Q        67 rings?

2      A        Yes.

3      Q        Were you interested in selling those

4    rings?

5               THE INTERPRETER:   Excuse me.

6      Q        I'm asking were you interested in the

7    selling the rings?

8      A        Yes.

9      Q        And how were you going to sell those

10   rings?

11     A        In any way.

12     Q        I mean, were you going to sell them, put a

13   booth on the corner and sell them or try to go through

14   someone and sell them?

15     A        Use somebody to sell them; yeah.

16     Q        You were going to go through someone?

17     A        Yes.

18     Q        And who was that person?

19     A        Francisco.

20     Q        Now, did you ever give your rings to

21   Francisco?

22     A        I give it to Francisco; yes.

23     Q        And what did Francisco do with your rings?

24     A        Give it to Reinaldo.

25     Q        And what was Reinaldo suppose to do with

1    the rings?

2         A      Sell them.

3         Q      Did Reinaldo have an office in the

4    building that was located out there on Richmond?

5         A      Yes.

6         Q      Can you tell the ladies and gentlemen of

7    the jury what floor that office was located on.

8         A      On the third floor.

9         Q      Did he have any identification markings or

10   signs or anything to indicate that was his office?

11        A      Yes.

12        Q      And what was that?

13        A      The sign Design by Reinaldo on the main

14   door.

15        Q      Was that the name on the outside of the

16   door?

17        A      Yeah.

18        Q      When you first met the defendant, how did

19   he act toward you?  You were a stranger to him; is

20   that correct?

21        A      Correct.

22        Q      How did he act toward you?

23        A      Indifferent.

24        Q      Can you describe his office.

25        A      It's when you come inside the entrance

1    door you have a showcase.

2         Q      A showcase.

3         A      Behind the showcase there is a hole and

4    then at the end of the hall were the showcases in the

5    shop.

6         Q      And the shop is that what you all

7    considered a work room --

8         A      Yes.

9         Q      -- where the jewelry is made or whatever?

10        A      Yes.

11        Q      Was there any specific equipment back

12   there that struck your eye, that got your attention,

13   any piece of machinery in that workshop that got your

14   attention?

15        A      Yes.

16        Q      And what was that?

17        A      A lathe.

18        Q      And what is a lathe?

19        A      It's a machine to working with metals.

20        Q      And have you used a lathe in your work

21   before --

22        A      Yes.

23        Q      -- on few or many occasions?

24        A      On many occasions, yes.

25        Q      When you saw the lathe, what did you do?

1        A        I start, played with, moving some parts of

2    it like.

3        Q        Did anyone else play with the lathe, move

4    the parts around?

5        A        Yes.

6        Q        Who did that?

7        A        Francisco and Reinaldo.

8        Q        And was any conversation made of that?

9        A        Reinaldo asked me if I could run the

10   machine.

11       Q        And what did you tell Reinaldo?

12       A        Yes, I could.

13       Q        And could you, in fact, operate the

14   machine?

15       A        No.

16       Q        Did you know how to operate that machine?

17   That's the question.

18       A        Yes.

19       Q        What was the quality of it?

20       A        Poor quality.

21       Q        Had you worked on lathes before?

22       A        Yes.

23       Q        Seen some with higher quality?

24       A        Yes.

25                MR. VINSON:  May I approach the court

1    reporter, Your Honor?

2                    THE COURT:  You may.

3                    (Whereupon, State's Exhibit Nos. 37, 38,

4    and 39 were marked for identification.)

5                    MR. VINSON:  May I approach the witness,

6    Your Honor?

7                    THE COURT:  Certainly.

8         Q        Let me show you what has been marked for

9    identification purposes as State's Exhibits 37, 38,

10   and 39.  Take a look at those eight by ten photographs

11   and see if you can identify them.

12        A        Yes.

13        Q        And those photographs do they truly and

14   accurately reflect the office that you just testified

15   about during the time you were there?

16        A        Yes.

17                   MR. VINSON:  Your Honor, the State will

18   offer into evidence State's Exhibit 37 through 39 and

19   tender the same to defense counsel for his inspection.

20                   MR. ODOM:  No objection.

21                   THE COURT:  State's Exhibit 37, 38, and 39

22   will be admitted into evidence.

23                   MR. VINSON:  Your Honor, may these be

24   published and I'll walk along and tell what they are.

25        Q        State's Exhibit 37 this is what?  That's

1    the office?

2         A       This is the sign on the main door.

3         Q       And that's on the third floor?

4         A       Yes, sir.

5         Q       And that sign reads Designs by Reinaldo?

6         A       Yes.

7         Q       And what else does it say?

8         A       Custom made jewelry, repair and setting

9    done.

10        Q       Can you see State's Exhibit 38 from where

11   you are seated?

12        A       Yes.

13        Q       And this is what, the lathe?

14        A       There is the lathe with attachment.

15        Q       And is that in the work shop?

16        A       Yes, sir.

17        Q       And 39 is this a close up of the lathe?

18        A       Yes.

19        Q       In the work shop?

20        A       Yes.

21        Q       Now, is this the lathe you testified to

22   that you started removing some of the parts and

23   playing around with?

24        A       Yes.

25        Q       What type of work were you suppose to

1    perform on this lathe?

2         A      I started working in bezels and some small

3    parts in the jewelry.

4         Q      Is the bet sell -- and what is that?

5         A      It's something a jeweler put in the watch,

6    around the watch.  I don't know exactly.

7                THE COURT:  Bezel.

8         Q      You put it around the watch; is that

9    correct?

10        A      Yes, in gold.

11        Q      And sometime you can put diamonds in them;

12   would that be a fair statement to say?

13        A      Yes.

14        Q      And sometimes they can be movable?

15        A      Yes.

16        Q      And have a number of different things you

17   can do?

18        A      Yes.

19        Q      And did you make any for Reinaldo?

20        A      Yes.

21        Q      Do you recall how many or how long you

22   worked doing that?

23        A      No, I don't remember.

24        Q      Were you expecting to be paid for that?

25        A      Not really.

```
1        Q       Well, why were you doing it?

2        A       I wait for my money from the rings.

3        Q       That way you really had your money from

4    the rings?

5        A       Yes.

6        Q       While you were working here in the shop,

7    was this on a routine basis?  Did you go back and

8    forth on a daily basis or what?

9        A       Not every day.

10       Q       Well, how would you come, just whenever

11   you chose to come to work?

12       A       Yes.

13       Q       And how would you gain entry to the

14   building?

15       A       I am suppose to sign in at the security

16   desk.

17               THE INTERPRETER:  At the security guard's

18   desk.

19       Q       So every time you came into the building

20   you would sign in?

21       A       Not every time.

22       Q       When would you have to sign in?

23       A       When I come in, I am suppose to sign in.

24       Q       Okay.  That's what I asked you.

25       A       When I came in.
```

1          Q       Okay, that's what I am saying.  Every time

2     you came in the building would you sign in?

3          A       Yes.

4          Q       And where would you sign in?

5          A       On the book.

6          Q       Was that book located in any particular

7     place?

8          A       Yeah, over the desk.

9          Q       Was that located near the security guard's

10    desk?

11         A       Yes.

12         Q       What time did Reinaldo, if you know, what

13    time did you open for business?

14         A       Not really.

15         Q       You don't know?

16         A       No, I don't remember.

17         Q       Would it be a fair statement to say every

18    time you went there they were already open?

19         A       Yes.

20         Q       Do you know what time he closed his

21    business?

22         A       Different hours.

23         Q       Such as what?

24         A       In the afternoon, 6:00, 7:00, 8:00.

25         Q       During time you were going to and from

1    happened?  Did you all return to the United States?

2         A      The next day.

3         Q      What was Reinaldo's attitude toward you

4    after that?

5         A      Normal.

6         Q      Was there any change or was it about the

7    same?

8         A      Almost the same.

9         Q      When you were in Mexico with Reinaldo to

10   purchase the diamond, where did the transaction take

11   place?  Was it in a jewelry store?

12        A      In a restaurant.

13        Q      Restroom?

14        A      Restaurant but in the restaurant there was

15   a bathroom.

16        Q      You said it took place in a restaurant?

17        A      Yes.

18        Q      What took place in the restroom then.

19               MR. ODOM:  Excuse me.  May I approach the

20   bench?

21               (Whereupon, the following proceedings were

22   held before the bench.)

23               MR. ODOM:  Judge, if the testimony is

24   going to the fact that the purchase of this diamond

25   was done in some nefarious manner, I would have a

1    motion that we agreed to approach the bench on the

2    extraneous.

3                    MR. VINSON:  We didn't say it was an

4    extraneous.  We are saying whether the transaction

5    went.

6                    MR. ODOM:  Furthermore, I haven't been put

7    on notice of such things.  If he was talking about the

8    transaction in a bathroom and it has no relation to

9    this case and the transaction in the bathroom, I

10   object to the relevancy and I think their intent is to

11   imply that something improper was going on.

12                   MR. VINSON:  This has been as part of the

13   file.  He has read the file and it was right in there.

14   I don't see how.

15                   THE COURT:  Where are we going with this

16   testimony?

17                   MR. SMYTH:  It shows you how that he

18   gained Reinaldo's trust so he could go to the next

19   step.

20                   THE COURT:  Is there anything in the

21   bathroom?

22                   MR. SMYTH:  That's where the transaction

23   took place.

24                   THE COURT:  I think it's irrelevant.

25                   MR. SMYTH:  I think he shows his plan now.

1    They show that they go to the bigger fish.

2              THE COURT:  I think you have done that.

3              MR. ODOM:  I don't know, has he testified

4    to the fact that there was a transaction that occurred

5    in the bathroom?

6              THE COURT:  No.

7              MR. ODOM:  I didn't think so.  If he had,

8    I would ask to disregard.

9              THE COURT:  That was the question being

10   asked.

11             MR. ODOM:  There was no testimony to that.

12   I am worried about the record.

13             (Whereupon, the following proceedings were

14   held before the jury.)

15        Q    (Mr. Vinson)   How did the ring get back

16   into the United States?

17        A    My finger.

18        Q    On your finger?

19        A    Yes.

20             MR. ODOM:  Your Honor, objection.  I would

21   like to approach the bench on that.  I would like to

22   make an objection outside the presence of the jury.

23             (Whereupon, the following proceedings were

24   held before the Bench.)

25             THE COURT:  Go ahead.

1          MR. ODOM:  Judge, I object.  This is 404 B

2    that I have not been given notice to that fact that it

3    is in the offense.  I requested that I have written

4    notice under the provisions of the Code of Criminal

5    Procedure, which they have told me some extraneous.

6    They did not tell this and I wanted specific

7    instructions pursuant to the code.

8          THE COURT:  Are you trying to bring in an

9    extraneous?

10          MR. VINSON:  We are trying to prove how

11    the trust was developed.

12          THE COURT:  Where are we going with the

13    testimony?  No, where are we going?

14          MR. VINSON:  Showing the trust.  The

15    perfect stranger had let him take a valuable ring back

16    on the finger.  We are not unlawful --

17          THE COURT:  I don't see any extraneous.

18          MR. ODOM:  If he says he put it on the

19    finger.

20          MR. VINSON:  I'm not saying that.

21          THE COURT:  I didn't pick that up.  I

22    certainly didn't pick that up.

23          (Whereupon, the following proceedings were

24    held before the jury.)

25      Q      (Mr. Vinson)  I think you were testifying

1    that you wore the ring back into the United States; is

2    that correct?

3        A        Yes.

4        Q        I mean, how did you get out of Mexico?

5        A        By plane.

6        Q        And you wore the ring back from Mexico

7    back into the United States?

8        A        Yes.

9        Q        Now, after you arrived back in the United

10   States, here, in Houston, did you keep the ring?

11       A        I give it to Reinaldo.

12       Q        Did you expect to keep that ring?

13       A        No.

14       Q        Were you present when the transaction was

15   made?

16       A        Yes.

17       Q        Do you know how much was paid for the

18   ring --

19       A        $15,000.

20       Q        -- after you returned to the United

21   States.

22                MR. ODOM:  Excuse me.  Before we go

23   further, I need to put in the record an objection with

24   regards to that testimony.

25                (Whereupon, the following proceedings were

1    held before the Bench.)

2               THE COURT:  Okay.

3               MR. ODOM:  Judge, I understand the stated

4    purpose of the State offering their testimony.  I

5    object to the testimony in that the clear implication

6    of this testimony is that $15,000 was paid for the

7    ring this man brought it back into the United States

8    and that it would have been done in such a manner to

9    give it back to the defendant, therefore, they are

10   committing an illegal act.  I know they are saying

11   it's on the basis of trust but the logical inference,

12   the logical interpretation for this, that they have

13   committed an illegal act, especially after he asked

14   the question that the transaction occurs in a

15   bathroom, although the witness is not allowed to

16   answer that question.

17              THE COURT:  He didn't say that, counsel.

18   He said what occurred in the bathroom.

19              MR. ODOM:  Exactly.  And the obvious

20   implication of all this that something illegal

21   occurred and that is the real intent of the State

22   offering this.  It's in direct violation of 404 B.  It

23   is in bad faith on the part of the State.  I object to

24   it, ask for the jury to be instructed to disregard

25   this testimony and that the Judge so instruct them to

1     disregard and move for a mistrial.

2                     THE COURT:  It's denied.

3                     (Whereupon, the following proceedings were

4     held before the jury.)

5          Q     (Mr. Vinson)   Were you ever paid after

6     you returned from Mexico?  Was that still in

7     December?  Go ahead, I'm sorry.

8          A     Yes.

9          Q     And did you go back to work for the

10    defendant?

11         A     Yes.

12         Q     Were you ever paid for the work that you

13    had done there?

14         A     No.

15         Q     Had your rings been sold by the time you

16    returned from Mexico?

17         A     No.

18         Q     Now, while you were working in Reinaldo's

19    shop there, did you have a particular address where

20    you were staying?

21         A     Yes.

22         Q     And where were you staying?

23         A     A friend of mine's house.

24         Q     And do you know the telephone number?

25         A     Yes.

1        Q        And what was that telephone number?

2        A        847-1448.

3        Q        847?

4        A        1448.

5        Q        4048?

6        A        1448.

7        Q        And what was the name of that person?

8        A        Jose Rivero.

9        Q        And do you know his address?

10       A        Yes.

11       Q        And what was address?

12       A        401 Memory Lane.

13       Q        And how long did you reside at that

14   address?

15       A        A few weeks.

16       Q        Did Reinaldo have Jose Rivero's telephone

17   number?

18       A        Yes.

19       Q        How did he get that number?

20       A        I gave it to him.

21       Q        Did you ever receive any calls while you

22   were living at that address?

23       A        Yes.

24       Q        And who did you receive calls from?

25       A        From different people.

1      Q      Did you ever receive any calls from

2   Reinaldo?

3      A      Yes.

4      Q      And just take it back just a moment.

5             When did this conversation about going to

6   Mexico come up?   Did it come up in Reinaldo's office

7   or somewhere else?

8      A      In Reinaldo's office, day before.

9      Q      Now, did you start getting more work, or

10  just kind of going in and out, or just what, after

11  coming back from Mexico?

12     A      Yes.

13     Q      Yes to what?

14     A      Yes, I started getting more work.   They

15  gave me something to do.

16     Q      Who was giving you more work?

17     A      Reinaldo.

18     Q      Did Reinaldo have a brother?

19     A      Yes.

20     Q      Did you ever meet his brother?

21     A      Yes.

22     Q      And what was his brother's name?

23     A      Alberto.

24     Q      Do you recall his first name?

25     A      No.

1      Q      But you know him by Alberto?

2      A      Yes.

3      Q      And how did you meet Alberto?

4      A      In Reinaldo's office.

5      Q      And when did that happen?

6      A      In January, 1996.

7      Q      Did you ever complain about your money

8   since you weren't being paid?

9      A      No.

10     Q      Did you ever ask for your money?

11     A      The money for the rings; yes.

12     Q      How did Reinaldo respond to that?

13     A      That he has not sold them yet.

14     Q      Had not sold yet what?

15     A      The rings.

16     Q      During the month of January of 1996, did

17   Reinaldo approach you about making something for him?

18     A      Yes.

19     Q      And where did that take place?

20     A      In Reinaldo's office.

21     Q      Do you remember what time of month that

22   was?

23     A      In the beginning of January.

24     Q      Beginning of January?

25     A      Uh-huh.

1        Q        And how did that conversation take place?

2        A        Excuse me.  Will you ask me again.

3        Q        How did that request take place?

4        A        It's in his office and he make a sketch

5    for me on a piece of paper.

6        Q        And he made a sketch for you?

7        A        Yes.

8        Q        Did you watch him make the sketch or was

9    it already made?

10        A        I watch.

11        Q        And what did he sketch out for you?

12        A        It look like a tubing.

13        Q        And was this made on paper that was in his

14    office there, the paper, I mean, was it there in his

15    office and he sketched it out on a checkbook, a piece

16    of paper or what?

17        A        Yes.

18        Q        Yes to what?

19        A        It's the office paper.

20        Q        What did the sketch look like to you?

21        A        Like a tubing.

22        Q        A metal tubing?

23        A        Yeah.

24        Q        And did you think you could make that

25    metal tubing?

```
 1        A       Yes.

 2        Q       What did you tell Reinaldo?

 3        A       Yes, I can make it.

 4        Q       What steps were taken to make that metal

 5   tubing?

 6        A       First of all, buy the material; second,

 7   buy the tools and, first, do the job on the lathe.

 8        Q       The materials were not in the office?

 9        A       No.

10        Q       What type of material did you need?

11        A       Aluminum tubing and solid back.

12        Q       Aluminum tubing?

13        A       And aluminum bar.

14        Q       Will you tell the ladies and gentlemen of

15   the jury what that sketch looked like.  I mean, was it

16   one dimensional or three dimensional or what?

17        A       Well, on the piece of paper you only can

18   draw by hand just one dimension, you know, flat

19   dimension.

20        Q       Where did you get the money to purchase

21   the material?

22        A       From Reinaldo.

23        Q       How much did he give you?

24        A       Like $50, something like that.

25        Q       And what did you do with that money?
```

1         A        I go to the Airline company, get some

2    material, three part steel is the name of it.  It's

3    SSS Steel on Airline.

4         Q        And were you able to make your purchase

5    there?

6         A        I buy the material over there; yes.

7         Q        And what did you buy there?

8         A        Aluminum tubing and solid bar.

9         Q        And how long was that aluminum tubing?

10        A        It's about three feet long, something like

11    that.

12        Q        And the solid metal aluminum bar?

13        A        The same dimension.

14        Q        Did you purchase anything else?

15        A        Yes.

16        Q        And what else?

17        A        A set of tubing.

18        Q        A set of tubing?

19        A        Yeah, a reamer.

20        Q        Reamer?

21        A        Yes, a reamer.

22        Q        What was a reamer for?

23        A        Oh, a reamer is used on this kind of job

24    to make it exact dimension when you make a hole.

25        Q        A reamer is used to make the hole?

1      A      No.  You make the hole with the tubing and

2  because the tubing don't give you the exact dimension

3  he request.  I buy the reamer, .9 mm reamer, and with

4  that tube you can make a .9 mm exactly.

5      Q      And based on the sketch that this

6  defendant had given you, that's what it took, a .9 mm

7  reamer to make that design, whatever he designed for

8  you?

9      A      Yes.

10      Q      Did you buy anything else while you were

11  at that store?

12      A      No.  Oh, yes, excuse me.

13      Q      What else?

14      A      While this happen a few days later.

15      Q      What happened a few days later?

16      A      I buy steel wool.

17      Q      Did you purchase anything else?

18      A      No.

19      Q      Now, when you had all the material

20  together, what did you do with it?

21      A      I started working on the aluminum tubing.

22      Q      And when you were working on that tubing,

23  where was that done at?

24      A      In Reinaldo's office.

25      Q      Would he step out and see how you were

1    coming along or did he show any interest in it while

2    you were making it?

3        A       Yes.

4        Q       What interest did he show?

5        A       Just looking.

6        Q       How long did it take you to manufacture

7    this drawing that Reinaldo had sketched out for you?

8        A       Almost 10 days.

9        Q       And when you finished it, what did you

10   have, what kind of product did you have?

11       A       A silencer.

12               MR. VINSON:  May I approach the witness,

13   Your Honor?

14               THE COURT:  You may.

15               (Whereupon, State's Exhibit Nos. 40 and 41

16   were marked for identification.)

17               MR. VINSON:  May I approach the witness,

18   Your Honor?

19               THE COURT:  Certainly.

20       Q       Let me show you what has been marked for

21   identification purposes as State's Exhibits 40 and 41.

22   Can you identify the items that are depicted in each

23   one of those exhibits?

24       A       This is a tubing where I buy.

25       Q       Just yes, yes or no.

1      A     Yes.

2      Q     And you say yes to which exhibit, both of

3  them or one or the other?

4      A     Yes to this one.

5      Q     Okay.  That's 40.  Okay.

6      A     Yes, on this one I did use different

7  tools.  This belong to the lathe machine.

8      Q     And can you identify, yes or no?

9      A     Yes.

10     Q     And does this photograph truly and

11  accurately reflect the drill bits that you purchased?

12     A     Yes.

13     Q     And the tools that you used to make the

14  silencer?

15     A     Yes.

16           MR. VINSON:  Your Honor, the State will

17  offer into evidence State's Exhibit 40 and 41 and

18  tender the same to defense counsel for his inspection.

19           MR. ODOM:  No objection, Your Honor.

20           THE COURT:  State's Exhibit 40 and 41 are

21  admitted.

22           MR. VINSON:  Again, may we approach them?

23           THE COURT:  Certainly.

24     Q     State's Exhibit 40 is that the tool kit?

25     A     Yes.

1     Q     Actually the drill bits?

2     A     The drill bits.

3     Q     And 41 are those tools that you used to

4  make the silencer?

5     A     Yes.

6     Q     The finished product was approximately how

7  long?

8     A     Six, seven inches.

9     Q     Why did you need three feet of material in

10  length?

11     A     It was already cut and it was a lot

12  cheaper.

13     Q     Now, did I have you to sketch the drawing

14  that Mr. Dennes, that is, the defendant, gave to you?

15  Did I have you to sketch that one time?

16     A     Yes.

17     Q     Do you think you can sketch that for the

18  ladies and gentlemen of the jury.

19     A     Yes.

20           MR. VINSON:  Your Honor, may the witness

21  be allowed to step down and go to the board.

22           THE COURT:  Very well.

23     Q     Now, just go ahead and draw in the very

24  first sketch you were given.

25     A     Something like that.

1        Q        Go ahead and draw it.  Put everything in

2   place.

3        A        That separate.

4        Q        Don't talk about it now.

5        A        Something like that.

6        Q        Why don't you step over here so you don't

7   block anyone's view.

8                 Now, let me mark for identification

9   purposes.

10                (Whereupon, State's Exhibit No. 42 was

11   marked for identification.)

12       Q        Referring to State's Exhibit 42.  That's

13   the sketch 42.  That's the sketch on the board you

14   have drawn?

15       A        Yes.

16       Q        Keep your voice loud.

17                Now, can you show us the business end of

18   in diagram that you have drawn.  What parts are on

19   the --

20       A        Weapon, this is tubing, aluminum tubing.

21       Q        Okay.  I am standing in the way.

22                Is this the aluminum tubing?

23       A        Yes.

24       Q        Now, I notice that there are horizontal

25   lines running down and then you have got some vertical

1    lines throughout.  Can you explain to the ladies and

2    gentlemen of the jury what all those lines represent.

3         A       Well, this line represent the thread.

4         Q       Again, you are standing in the way of the

5    jury.

6         A       This is the thread and this is the

7    washers.

8         Q       Washers, what are the washers made of?

9         A       Aluminum.

10        Q       And how was the washers placed in there?

11   Were they stacked in there, one on top of another, or

12   did you have some procedure to put them in there?

13        A       Threading them inside.

14        Q       How many washers did you put in there?

15        A       Around 40.

16        Q       Around 40.  And what were the washers

17   suppose to do?

18        A       Suppress the sound, the noise.

19        Q       And what end is going to be attached to

20   the weapon itself?

21        A       This end.

22        Q       Now, what was -- I notice on the drawing

23   here did you have any dimension for the type

24   ammunition was going to be used?

25        A       This is .9 mm.

1        Q        A projectile was to travel where

2    throughout that --

3        A        This way.

4        Q        Then would you have had anything in the

5    middle, right here, would you have anything here or is

6    this showing around the side or what?

7        A        No, nothing between.

8        Q        Can you give us a cross section there.

9        A        This is a cross section.

10       Q        Can you give me this end.

11       A        Yeah.

12       Q        Was that the first one that was

13   constructed?

14       A        Yeah.

15       Q        Was this ever turned over to the

16   defendant?

17       A        Yes.

18       Q        And when did that happen?

19       A        When I finished.

20       Q        So that was about ten days after you got

21   done?

22       A        Yes.

23       Q        Do you recall about what day you started

24   making the silencer?

25       A        In the beginning of January.

1      Q      About January 2nd, somewhere around there?

2      A      Yes.

3      Q      Because this was just, for time sake, it

4   was completed somewhere around January 12th?

5      A      Around there.

6      Q      Could it have been a little sooner?

7      A      Yes.

8      Q      Could have been a little later?

9      A      Yes.

10      Q      Let's call this first generation, okay.

11              What happened to the first generation

12   silencer you made?  Was it ever test fired?

13      A      Yes.

14      Q      And who test fired it?

15      A      Reinaldo.

16      Q      Where did this take place?

17      A      Outside the building.

18      Q      Where outside the building?

19      A      About three minutes away.

20      Q      Was this in a populated area?  Was it in a

21   neighborhood or some little --

22      A      An open field.

23      Q      Would you recognize that area if you were

24   to see it again?

25      A      Yes.

1      Q      And how did that silencer work out?

2      A      Don't work, it's too loud.

3      Q      What does it mean too loud?

4      A      The sound was too strong.  That's what Mr.

5   Reinaldo told me.

6      Q      The sound was too loud?

7      A      Yes.

8      Q      What happened with that silencer?

9      A      I don't know.

10     Q      What happened next?  Did you stop working

11  on the silencer or did you go to work?

12     A      Reinaldo give me approximately -- changes

13  to make to a second one.

14     Q      Did he tell you what changes to make, yes

15  or no?

16     A      Yes.

17     Q      Go ahead and draw in, about saying draw

18  the silencer that you made after Reinaldo made some

19  changes.

20     A      For me to make a second one, right.

21     Q      Yes, go ahead.

22     Q      That one has the same configuration as you

23  have?

24     A      Yes.

25     Q      Now, how was that suppose to work?  When

1     did you complete that silencer?

2          A       About three days later.

3          Q       I will tag what we are talking about

4     January 15th, somewhere around there.

5          A       Yes.

6          Q       Okay.  Now, make this second generation.

7                  And this is the one that Reinaldo gave you

8     the alterations on?

9          A       Yeah, this is the second one.

10         Q       Some modifications?

11         A       Yes.

12         Q       Tell the ladies and gentlemen of the jury

13    what's different.  What was the difference between the

14    first generation and the second generation?

15         A       Outside is the same.  Inside is different.

16    The outside is the same.  Inside is different.  I have

17    a few wads and between the wads are steel washers.

18         Q       Why did you put steel washers in there?

19         A       He wanted it like that.

20         Q       Now, while these silencers were being

21    made, did you ever make contact with Arizona?

22         A       No.

23         Q       Did anyone to your knowledge make contact

24    with Arizona?

25         A       Yes.

```
 1          Q        Who was that?

 2          A        Reinaldo.

 3          Q        And how did that take place?

 4          A        In his office.

 5          Q        And how did he make contact with Arizona?

 6          A        By phone.

 7          Q        And we are talking about the state of

 8   Arizona?

 9          A        Yes.

10          Q        And for what purpose did he call Arizona?

11          A        To buy some books.

12          Q        What type of books?

13          A        Book to make silencers.

14          Q        Let's go back to the silencer just a

15   moment, the second generation.  Was that silencer --

16   did it meet Reinaldo's approval after you made the

17   modification to it?

18          A        Almost.

19          Q        What do you mean almost?

20          A        Yes.

21          Q        And how did he communicate such approval

22   to you?

23          A        I would say in front when they tested it.

24          Q        No, no.  I mean did you hand it to him in

25   the office there where it was made?
```

```
 1        A        Yes.

 2        Q        I mean, how did he look at it?  Did he

 3   seem to approve the work or what?

 4        A        He looked at it.  He saw it.  He liked it

 5   very much and he even said it could even be sold.

 6        Q        And then what happened?

 7        A        Then we went to test it.

 8        Q        Where did you go to test it?

 9        A        Out of the building.

10        Q        And where out of the building?

11        A        In the open field.

12        Q        Was this the same open field that you

13   talked about earlier?

14        A        Yes.

15        Q        When you went to the open field a second

16   time, who fired the weapon that time?

17        A        Alberto.

18        Q        And that's Reinaldo's brother?

19        A        Yes.

20        Q        Where was Reinaldo?

21        A        With us, over there.

22        Q        How did you all get to that field?

23        A        In our cars.

24        Q        Did you have a vehicle?

25        A        Yes.
```

| | | |
|---|---|---|
| 1 | Q | Did Reinaldo have a vehicle? |
| 2 | A | Yes. |
| 3 | Q | And Alberto did he have a vehicle? |
| 4 | A | Yes. |
| 5 | Q | So who took lead position to get to the |
| 6 | | field? |
| 7 | A | Alberto. |
| 8 | Q | What time were these test firings to take |
| 9 | | place? |
| 10 | A | Late in the afternoon. |
| 11 | Q | Now, when you went out there to try the |
| 12 | | second silencer, like you say, you were present, |
| 13 | | right? |
| 14 | A | Yes. |
| 15 | Q | The defendant was present? |
| 16 | A | Yes. |
| 17 | Q | And his brother was present, Alberto? |
| 18 | A | Yes. |
| 19 | Q | What happened then? |
| 20 | A | Alberto tested it. |
| 21 | Q | How did he test it? |
| 22 | A | He shoot about four times. |
| 23 | Q | Did he shoot at anything in particular? |
| 24 | A | Yes. |
| 25 | Q | And what did he shoot at? |

```
 1          A       A piece of lumber.

 2          Q       If you were to see that piece of lumber

 3   again, could you recognize it?

 4          A       Yes.

 5          Q       How did the silencer operate at that time?

 6          A       Better; that's what Reinaldo said.

 7          Q       So we have gone from none working to

 8   better.

 9          A       Uh-huh.

10          Q       How did it sound?

11          A       Sound -- but I can't tell you exactly how

12   it sound.

13          Q       Have you heard a .9 mm weapon fired

14   before, a firearm?

15          A       No.  But I know it's very loud.

16          Q       The first silencer did it muzzle the sound

17   of that weapon when it was fired?

18          A       Very little.

19          Q       What about the second one?

20          A       A lot more.

21          Q       Was Reinaldo satisfied with that second

22   silencer?

23          A       Not completely.

24          Q       What was wrong with it?

25          A       He gave me other instructions.
```

1      Q      No, first of all, I am trying to find out

2  what was wrong with this second silencer.

3      A      Look like it too loud.  It was some too

4  loud.

5      Q      And, also, did something come out of that

6  silencer?  What about the steel wool?

7      A      The steel wool come out.

8      Q      I mean, were you there when it was fired?

9      A      But I don't see the steel wool come out.

10      Q      When you got it back -- did you get that

11  second silencer back?

12      A      Yes.

13      Q      Did you ever remove the tubing to see if

14  any steel wool was there?

15      A      No, I don't remove.

16      Q      Who removed it?

17      A      Reinaldo.

18      Q      What happened next?

19      A      Well, it's another occasion.

20      Q      Another modification?

21      A      Uh-huh.

22      Q      Who generated the next modification?

23      A      Reinaldo wanted more steel wool inside.

24      Q      Draw the third one or strike that or

25  whatever modification was made to the second one.  I

1    see you got some lines there, kind of zigzagging

2    metal.

3         A      This is steel wool.

4         Q      More steel wool?

5         A      Yeah.

6         Q      What's the difference between the way the

7    second one was modified and then when you made a final

8    modification, what's the difference?

9         A      That one have about six, seven wads

10   inside.  These only have three, four.

11        Q      So the number of washers are reduced?

12        A      The importance is steel wool.  He wanted

13   more steel wool inside.

14        Q      And did you put more steal wool in there?

15        A      No, I don't.

16        Q      Who put it in?

17        A      Reinaldo.

18        Q      Were you present when Reinaldo put the

19   steel wool in?

20        A      Yes.

21        Q      And where did he do that?

22        A      In his office.

23        Q      Who else was present, only if you can

24   remember?

25        A      I don't remember.

1        Q        What happened after the modification was

2   made?

3        A        Well, that same day, when I finish this

4   one, Alberto come to the office.

5        Q        Alberto comes to the office?

6        A        Yes.  And they test it in the office.

7        Q        Who is they?

8        A        Alberto and Reinaldo.

9        Q        Where did they get the ammunition from?

10       A        From Francisco.

11       Q        How did they test it?  When you say they

12   tested it, who tested, both of them would go and fire

13   or one of them fire?

14       A        No, Reinaldo do it.

15       Q        Where did he fire the weapon in the

16   office?

17       A        They fired through two telephone books and

18   a piece of lumber.

19       Q        Was this inside the business office or the

20   work location?

21       A        The work location.

22       Q        How did the silencer sound at that time?

23       A        More better.

24       Q        More better?

25       A        Yes.

1         Q       Do you mean that the silence was muffled a

2    little better?

3         A       Yes.

4         Q       Do you recall what it sounded like at that

5    time?

6         A       Like clapping, loud clapping, stronger;

7    just like that.

8         Q       How did Reinaldo respond to that result?

9         A       That's okay.

10        Q       Why don't you go and have a seat.

11                After Reinaldo appeared to be pleased with

12   that modification to the silencer, what happened?  Did

13   you all continue to work that day or just what

14   happened?

15        A       No, I don't work any more.

16        Q       Did you ever get any money for your rings?

17        A       Yes.  I got a thousand dollars already.

18        Q       You got a thousand dollars for the rings.

19   What was the true value of your rings?

20        A       About three thousand.

21        Q       About three thousand?

22        A       Yes, sir.

23        Q       Did Reinaldo have any further contact with

24   you after that modification was made?

25        A       I went to the shop the next day.

```
 1        Q        That would have been around what, the
 2   around the 18th?
 3        A        18th.
 4        Q        So the modification made around the 17th
 5   when it was completed on that third generation?
 6        A        Around there.
 7        Q        Or the modification of the second.  Okay.
 8                 You say the next day you went to the
 9   shop.
10        A        On the 18th in the afternoon.
11        Q        And what reason did you go back to
12   Reinaldo's shop?
13        A        I look for my money.
14        Q        What money were you looking for?
15        A        My rings' money.
16        Q        And did he pay you your money?
17        A        Not in that moment.
18        Q        When did he pay you?
19        A        Later in the night.
20        Q        And how late into the night?
21        A        After dinner.
22        Q        Where did you have dinner?
23        A        In Chinese buffet.
24        Q        What is the name of the place?
25        A        It's Chinese buffet.  I don't know the
```

1    name.

2        Q       And that was on the evening of the 18th?

3        A       Yes.

4        Q       Who all was present that evening?

5        A       Alberto and Reinaldo.

6        Q       Now, we were talking about the silencer

7    here, and I think you testified that it was designed

8    for a .9 mm; is that correct?

9        A       Yes, the drill, the hole is .9 mm.

10        Q       And the weapon that was test fired was

11   that a .9 mm?

12        A       Yes.

13        Q       Did the silencer fit it?

14        A       No, not at that moment when they give it

15   to me again.

16        Q       What did you have to do with the gun?

17   You say they gave you the gun.  Who gave you the gun?

18        A       Reinaldo.

19        Q       Can you tell what the gun looked like?

20        A       Silver color, aluminum color.

21        Q       Did you have to make some modifications to

22   the gun?

23        A       Yes.

24               MR. VINSON:  Your Honor, the weapon has

25   been cleared.

1                     May I approach the witness?

2                     THE COURT:  You may.

3          Q      Let me show you what has been marked for

4     identification purposes as State's Exhibit 31.  Take a

5     look at it and see if that's the same or similar to

6     the weapon that Reinaldo gave you, in other words, I

7     mean, you understand that it's not the same color but

8     is that the same or similar?

9          A      Yes.

10         Q      Now, will you tell the ladies and

11    gentlemen of the jury how you were able to attach the

12    silencers that you made.  Why don't you step down

13    here.  Why don't you step down here.

14                    THE COURT:  Sure.

15         A      Well, Reinaldo gave me a gun similar like

16    this, similar color, the distance in parts and

17    pieces.  And he give me -- this one is the barrel and

18    a threading over here and I turn down on the lathe and

19    I make a thread over here in order to screw on the

20    silencer.  This is what I do.

21         Q      What direction did you go?  Did you start

22    on the end or did you have to start somewhere in the

23    middle of the barrel?

24         A      Well, because it's too short a space, I

25    start from inside to outside the threads.  I threading

1    from in to outside.  This is the way to do this.

2         Q        And it had been removed and removed the

3    barrel from that weapon?

4         A        Yes.

5         Q        What would happen when you started trying

6    to cut the threads from this extended portion of the

7    barrel?

8         A        Before I make the threads, I turn down

9    this diameter to the right size and after that I make

10   the threads.  And when I make the thread, I take the

11   silencer and I screw on.  When I make the silencer, I

12   screw and it fits perfectly.

13        Q        Now, did you make some computation to

14   assist you in making sure that you made the right

15   thread on that barrel?  Did you make a little drawing

16   or sketch?

17        A        I make a smallest sketch on a piece of

18   paper to know exactly what I am suppose to do.

19        Q        Could you recognize that sketch if you

20   were to see it again?

21        A        Yes.

22                 MR. VINSON:  May I approach, Your Honor?

23                 THE COURT:  You may.

24                 (Whereupon, State's Exhibit Nos. 43, 44

25   and 45 were marked for identification.)

1              MR. VINSON:  May I approach the witness,

2    Your Honor?

3              THE COURT:  Sure.

4         Q    Sir, let me show you what has been marked

5    for identification purposes as State's Exhibit 43 and

6    ask you can you identify that exhibit.

7         A    Yeah, this is my letter and my numbers.

8         Q    What does that contain?

9         A    The sketch what I make myself to threading

10   the bottle.

11        Q    Let me show you State's Exhibit 44 and 45.

12   They were marked for identification as well.  Can you

13   identify those two pamphlets?

14        A    Yes.

15        Q    And what is State's Exhibit 44?

16        A    This is catalogue.

17        Q    What is State's Exhibit 45?

18        A    This is a book to make silencers.

19        Q    And did the defendant ever order State's

20   Exhibit 45?

21        A    Yes, he ordered.

22        Q    And is that when you made contact with

23   Arizona?

24        A    Yes.

25        Q    And when that arrived, did he give it to

1    you or did it come to your address?

2         A       No.   He give me address and, yes, he give

3    my address.

4                 MR. VINSON:   Your Honor, at this time the

5    State will offer into evidence State's Exhibit 43, 44

6    and 45 and tender the same to defense counsel for

7    inspection.

8                 MR. ODOM:   No objection.

9                 THE COURT:   State's Exhibit 43, 44 and 45

10   are admitted.

11                MR. VINSON:   Your Honor, may the witness

12   step down to show the ladies and gentlemen of the jury

13   what is on this sketch here.

14                THE COURT:   Yes.

15        Q       Show them what the sketch meant to you.

16        A       This is the sketch.   This is the end of

17   the bottle, three hundred thousand and 5, 15 and the

18   diameter.

19        Q       And how does that relate to this firearm?

20        A       The 300,000 is the ring what I use and the

21   3515 is the diameter what I use.

22        Q       Is this the sketch right there?

23        A       Yeah, that's the sketch.

24        Q       And explain to the ladies and gentlemen of

25   the jury what they are looking at.

1        A        Well, this is the ring and this is the

2    diameter.  This is the ring from here to here and this

3    is diameter.  Over here is 300,000 to use it to make

4    it different and diameter 515 means 515,000.

5        Q        And, again, what are they are looking at

6    here?

7        A        Okay.  This is the 300,000 and this is the

8    diameter 515.  There is 515 and diamater 515,000.

9                 MR. VINSON:  May I approach, Your Honor?

10               THE COURT:  You may.

11       Q        Now, State's Exhibit 45 is that the

12   silencer that was ordered while you were working for

13   this defendant -- the book on it?

14       A        Yes.

15       Q        For what reason did the defendant order

16   the book?

17       A        To make a silencer.

18       Q        When you received this book, did it assist

19   you in any manner?

20       A        No.

21       Q        And would this be the company where the

22   silencer was ordered from?

23       A        Yes.

24       Q        And inside this book, this catalogue that

25   is, is there an identical book in it for silencers?

1       A       Yes, this is the one.

2       Q       What is the cost of it?

3       A       $9.45.

4       Q       And when you look here, there is a one

5  eight number reflected here; is that correct?

6       A       Yes.

7       Q       And there is also the last four digits on

8  there are 6280?

9       A       Yes, 6280.

10      Q       And take a look here on this telephone

11  billing inquiry and see if you see two other numbers

12  there that end with those digits 6280?  Do you see

13  that?

14      A       Yes, I see.

15      Q       Where are those numbers, those calls

16  directed to?

17      A       Arizona.

18      Q       And is that to Cottonwood, Arizona?

19      A       Yes, sir.

20      Q       And does it also give you the date that

21  those calls were generated?

22      A       Yes.

23      Q       And what is that?

24      A       1-2.

25      Q       January 2nd?

1      A      January 2nd.

2      Q      Of 199 --

3      A      1996.

4      Q      Now, do you see another call to

5   Cottonwood, Arizona, during the month of January?

6      A      Yes.

7      Q      And again was that to the same number?

8      A      Yes.

9      Q      And what date was that?

10      A      On the 12th of January.

11      Q      Did you make those calls?

12      A      No.

13      Q      Who made those calls?

14      A      Reinaldo.

15      Q      And where did he make those calls from?

16      A      His office or his cellular.

17             THE COURT:  Mr. Vinson, it's time for a

18   break.  15 minutes, please.

19             (Recess taken.)

20             THE COURT:  Bring the jury in.

21             (Jury came into the courtroom.)

22             (Whereupon, State's Exhibit Nos. 46, 47,

23   48 were marked for identification.)

24             THE COURT:  Please be seated.

25             Please continue, Mr. Vinson.

1                MR. VINSON:  Thank you, Your Honor.

2        Q        When the Court took recess, I was asking

3    you about the calls and I think you stated that the

4    calls were made by Reinaldo to Arizona; is that

5    correct?

6        A        Yes.

7        Q        Now, you also mentioned your address at

8    one point in time when I was questioning you with

9    respect to the material that came from Arizona.  Was

10   that mailed to your address for some reason?

11       A        Yes, he give it to me.

12       Q        Who is he?

13       A        Reinaldo.

14       Q        What did he give to you?

15       A        Money to buy a money order.

16       Q        And did you buy that money order?

17       A        I buy the money order.

18       Q        And what did you do with the money order?

19       A        I sent it to Arizona.

20       Q        And that was for what?

21       A        To buy the books, the silencer books.

22       Q        How many books did you order, one or two?

23       A        Two.

24       Q        And how many books did you receive?

25       A        Just one with a cover.

```
1        Q       And that was the one that had been

2   admitted into evidence?

3        A       Yes.

4        Q       What happened with the second book?

5        A       I call myself to Arizona and I cancel the

6   second book.

7        Q       Where did you make that call from?

8        A       From a telephone, I don't remember.

9        Q       But not from Reinaldo's office?

10       A       No.

11       Q       Now, Reinaldo made a call on the 12th of

12  January, is that correct, based on the telephone?

13       A       Correct.

14       Q       I mean, for what purpose was that call

15  made?

16       A       Because the booklet don't come in yet.

17       Q       What, the second book had not arrived?

18       A       No, the first one don't come yet.

19       Q       The first book had not arrived yet?

20       A       No.

21       Q       Do you recall when the first book finally

22  arrived?

23       A       I don't remember the date but it's between

24  the 12th and 14th.

25       Q       What did you do with the first silencer?
```

```
 1     Do you know what happened to the one you made for

 2     Reinaldo that he was dissatisfied with, the very first

 3     one?

 4          A     I think he threw away.  I don't know.

 5          Q     Did you ever see it again?

 6          A     No, I don't see it again.

 7                MR. VINSON:  May I approach?

 8                THE COURT:  You may.

 9                MR. VINSON:  We are going to add one

10     additional exhibit.  It will be 49.

11                (Whereupon, State's Exhibit No. 49 was

12     marked for identification.)

13                MR. VINSON:  May I approach the witness,

14     Your Honor?

15                THE COURT:  You may.

16          Q     Let me show what is marked for

17     identification purposes as State's Exhibit 46, 47, 48,

18     and 49.  Can you identify those photographs?

19          A     Yes.

20          Q     And do those photographs truly and

21     accurately reflect the scene as you recall it to be

22     when you were going to that location, when you went to

23     that location with Reinaldo and Alberto, during the

24     test firing of the silencer that you made?

25          A     Yes.
```

1            MR. VINSON:  Your Honor, at this time the

2    State will offer into evidence State's Exhibits 46

3    through 49, and I'll tender the same to defense

4    counsel for his inspection.

5            MR. ODOM:  No objection.

6            THE COURT:  State's Exhibit 46, 47, 48, 49

7    are admitted.

8            (Whereupon, State's Exhibit No. 50 was

9    marked for identification.)

10   Q       Now, sir, let me show you what has been

11   marked for identification purpose as State's Exhibit

12   50.  This looks like a two by six piece of lumber?

13   A       Yes.

14   Q       And does this piece of lumber truly and

15   accurately reflect it to be in the same manner as it

16   was the last time you saw it back in January of 1996?

17   A       Yes.

18           MR. VINSON:  Your Honor, at this time the

19   State will offer into evidence State's Exhibit 50,

20   it's here for defense counsel's inspection.

21           MR. ODOM:  No objection.

22           THE COURT:  State's Exhibit 50 is

23   admitted.

24           MR. VINSON:  We will have a photograph to

25   substituted for it later for appellate purposes, Your

1   Honor.

2           THE COURT:  All right, sir.

3       Q       Now, State's Exhibit 48, that is, 47 and

4   48 through 49 including 46, can you tell the ladies

5   and gentlemen of the jury what these exhibits make

6   reference to?

7       A       The first one is the place we test that

8   day.

9       Q       Do they all make reference to the test

10  site location?

11      A       Yes.

12          MR. VINSON:  Your Honor, may the witness

13  step down and again we can move through publishing

14  them.

15          THE COURT:  Sure.

16      Q       State's Exhibit 46 and 47 will you tell

17  the jury what they are looking at.

18      A       Yeah.  This is the place where they test

19  the gun over here.

20      Q       And I notice in State's Exhibit 46 do you

21  see an apartment complex there?

22      A       Yeah, I see it.

23      Q       Do you know who lives there?

24      A       Reinaldo's.

25      Q       And so Reinaldo's apartment was right

```
 1      behind the test site; is that correct?

 2           A       Yes, correct.

 3           Q       And State's Exhibit 46 and 47 is that the

 4      location where the silencers are fired?

 5           A       Yes, sir.

 6           Q       And then State's Exhibit 46 where my left

 7      hand is pointed is that the apartment where Reinaldo

 8      lived?

 9           A       Yes, sir.

10           Q       How far was this location from Reinaldo's

11      office?

12           A       Three minutes, two minutes.

13           Q       And right here is this the apartment

14      complex?

15           A       This is the apartment complex.

16           Q       Where my left hand is?

17           A       Yes, sir.

18           Q       And this 47 is a close up of the location

19      where the test fires were?

20           A       Yes.

21           Q       And right here this is the apartment

22      complex?

23           A       Yes.

24           Q       And that's what that is?

25           A       Yes.
```

1      Q       And 47 is a close up of the test fires?

2      A       Yes.

3      Q       48, 49 what does it have there?

4      A       A piece of lumber.

5      Q       And what is the significance of that piece

6  of lumber?

7      A       The bullets that falls in the lumber.

8      Q       And 47 is a closer view than 48?

9      A       Just blow up.

10      Q       And 49 is the larger view than 48; is that

11  correct.

12      A       That's correct.

13      Q       And 49 do we see some indications of holes

14  in the piece of lumber there?

15      A       Yes.

16      Q       How many do you see?

17      A       Four.

18      Q       Can you point those out for ladies and

19  gentlemen.

20      A       Here, here and here.

21      Q       Who fired into that piece of lumber?

22      A       Alberto.

23      Q       During the course of that firing, where

24  was his brother, the defendant, Reinaldo?

25      A       Over there some place.

1      Q       The same location?

2      A       Yes.

3      Q       Now, State's Exhibit 50 is this the actual

4    piece of lumber that was fired into?

5      A       Yes, sir.

6      Q       State's Exhibit 50 we have what, one, two,

7    three, four?

8      A       Yes, sir.

9      Q       Appear to be four holes, right?

10     A       Yes.

11     Q       Turn 50 on the backside and look through

12    some projectile past through this wood; is that

13    correct?

14     A       That's correct.

15     Q       One, two, three, and four again; is that

16    correct?

17     A       That's correct.

18     Q       And you turn 50 to the backside, look like

19    again some lumber is ripped off, some splinters ripped

20    off from this lumber as a result of the projectile

21    making entry on the front portion; is that correct?

22     A       That's correct, one, two, three, and four

23    bullet holes.

24     Q       And the back side it has some construction

25    or some material that was removed?

1       A       Yeah.

2       Q       Now, while you were at that location, did

3   anyone ever attempt to clean it up?

4       A       Repeat again.

5       Q       Did anyone attempt to clean it up?

6       A       No.

7       Q       I mean, you had this .9 mm out there,

8   correct?

9       A       Correct.

10      Q       When it was fired, it would kick a shell

11  out?

12      A       Correct.

13      Q       Wasn't anybody concerned about picking the

14  brass up?

15      A       Nobody.

16      Q       Did the defendant concern himself in any

17  way?

18      A       No.

19      Q       Did it his brother concern himself in any

20  way?

21      A       No.

22      Q       Go back to the 18th, I mean, on the

23  evening of the 18th you met with the defendant; is

24  that correct?

25      A       That's correct.

1     Q     And that was at an Italian restaurant?

2     A     Chinese restaurant.

3     Q     Chinese restaurant.  Let me get it right,

4     a Chinese restaurant.

5           And where was this Chinese restaurant

6     located?

7     A     Westheimer.

8     Q     And did you go to that location at your

9     own motion or did someone request that you go there or

10    meet them there?

11    A     We went there to eat dinner.

12    Q     Did you go at someone's invitation or did

13    you happen to be out and about?

14    A     Yeah, Reinaldo invited me.

15    Q     Reinaldo invited you.

16          That evening how did Reinaldo respond to

17    you?

18    A     Well, he seemed like he would trust me a

19    lot more.

20    Q     And do you know why that came about?

21    A     I don't know exactly why.

22    Q     Could it have been because you made the

23    silencer for him?

24    A     Maybe.

25    Q     Did you all have a conversation at dinner

```
 1      that evening?

 2          A       Yes.

 3          Q       And who all was present?

 4          A       Alberto.

 5          Q       Alberto?

 6          A       Reinaldo and my person.

 7          Q       And were you all eating in the main dining

 8      area or a secluded table?

 9          A       We eat dinner at the same table.

10          Q       Where were you in the location?   Were you

11      kind of center or off somewhere?

12          A       When you come in at the entrance to the

13      left.

14          Q       What was the nature of the conversation?

15          A       At the beginning we talked about different

16      things.

17          Q       Did you ever get down to something very

18      serious?

19          A       Yes.

20          Q       And what was that?

21          A       I am going to say it in Spanish.   They

22      proposed to me to rob a jeweler.

23          Q       Okay.   And who is they?

24          A       Reinaldo was the one that make the

25      proposition.
```

1      Q       What did Reinaldo say to you about robbing

2    a jeweler?

3      A       That is, if I wanted to take

4    participation -- or participate in the robbery.

5      Q       What did you think about that?

6      A       I am really surprised but I tried to be

7    normal.

8              THE INTERPRETER:  I tried to be normal.

9      Q       You say you tried to be normal.  What do

10   you mean?

11     A       I didn't want to alarm them or anybody.

12     Q       Was there any conversation about where

13   this robbery was to take place?

14     A       In the building where he have the office.

15     Q       Who was generating the talk about where

16   the robbery was going to take place and who was to be

17   robbed?

18     A       Reinaldo.

19     Q       When he invited you into the plan, did you

20   respond?  Did you say anything?

21     A       Yes; I said yes, why not.

22     Q       Why did you say yes, why not?

23     A       Because I don't want to alarm anybody.  I

24   am looking for my money, and I don't want they think

25   in a different way.

1        Q       Now, the money that you are talking about

2   you are looking for your money?

3        A       My rings.

4        Q       The money from the rings?

5        A       Yes.

6        Q       And this dinner engagement took place on

7   the 18th?

8        A       Yes.

9        Q       And that was an evening?

10       A       Yes.

11       Q       Did you keep the conversation going or did

12  it taper off or drop off or what happened?

13       A       Reinaldo -- I thought Reinaldo was the one

14  make almost the whole conversation.  When he proposed

15  to me to rob with them the jeweler maker, I repeat I

16  tried to keep calm.  Because I didn't want in, no time

17  at all, I didn't want at all for them to find out that

18  I was going to leave to South America.

19       Q       Now, you said he told you, invited you,

20  that is, to engage with he and his brother to carry

21  out a robbery of a jeweler.  What building was this

22  suppose to take place in?

23       A       In the same building where Reinaldo has

24  his office.

25       Q       Did he also outline to you a plan?  How

1    was this suppose to take place?

2         A      I asked him what I am suppose to do.

3         Q      And did he tell you what you are suppose

4    to do?

5         A      Reinaldo tell me what I am suppose to do.

6         Q      And what were you suppose to do?

7         A      Get the diamonds.

8         Q      So you know at least in that conversation

9    you know the person was in the building, correct.

10                MR. ODOM:  Object to the leading nature of

11   these questions, Judge.

12                THE COURT:  Sustained.

13        Q      (Mr. Vinson)   Have you ever met this

14   jeweler?  I mean -- strike that question.  I guess the

15   best:  Did he tell you who the jeweler was?

16        A      No.

17        Q      Did he tell you when the robbery was to

18   take place?

19        A      No.

20        Q      Did he tell you anything about how you

21   would distribute the take?

22        A      No, he don't tell me that.  I ask him for.

23        Q      What did you ask him?

24        A      In how many parts would they be split.

25        Q      And what did Reinaldo say to you?

```
 1          A       In three parts.
 2          Q       So your job was to do what, to get the
 3     diamonds?
 4          A       Yes.
 5          Q       What was Reinaldo going to do?
 6          A       Alberto asked Reinaldo what he was suppose
 7     to do.
 8          Q       So it was Alberto who asked Reinaldo what
 9     he was suppose to do?
10          A       Yes.
11          Q       By the way, what was Alberto suppose to
12     do?
13          A       Alberto was suppose to shoot the jeweler.
14          Q       Suppose to shoot who?
15          A       The jeweler maker.
16          Q       What was Reinaldo suppose to do?
17          A       To take the videotapes.
18          Q       What was their concern about the
19     videotapes?
20          A       I don't know.
21          Q       Did you inquire?
22          A       No.
23          Q       What did you think of that plan?
24          A       I don't think nothing.  I don't have
25     nothing in mind at that moment.
```

1       Q       Did he appear to be serious?

2       A       Oh, yes.

3       Q       What did you do to break contact with

4  Reinaldo and his brother Alberto?

5       A       On the 19th, the next day, the following

6  day, I call Reinaldo at his office.

7       Q       Okay, the 19th you called Reinaldo?

8       A       Yes.

9       Q       For what reason?

10      A       I asked him, I want to get back the

11  silencer.

12      Q       And why did you want the silencer back?

13      A       I thought that it was not going to be used

14  in something good.

15      Q       Did you think perhaps it was going to be

16  used in that robbery?

17      A       I don't know exactly in what, one or

18  another, but I wanted the silencer back.

19      Q       Did you get the silencer back?

20      A       No.

21      Q       When you asked Reinaldo for it, did he

22  respond?

23      A       That don't belong to me, and when he say

24  that, I say, well, you don't pay for it.  And he say I

25  paid you already $3000 for that, don't worth nothing.

1      He is talking about the rings, you know.

2          Q      Now, how much had he paid you?

3          A      For total?

4          Q      Yeah.

5          A      $3000.

6          Q      Now, can you kind of give us some idea

7      when these payments were made?  How did you get the

8      money?

9          A      About the 15th or 16th of January I get a

10     thousand dollars.  I bought my ticket to South

11     America.

12         Q      What day did you buy your ticket to South

13     America?

14         A      16th or 17th, I believe.  I'm not sure.

15         Q      Where did you purchase your ticket?

16         A      In the travel agency.

17         Q      You went to a travel agent?

18         A      Yeah.

19         Q      Purchased your ticket to South America?

20         A      Yes.

21         Q      Did you tell Reinaldo about that?

22         A      No.

23         Q      When did you get the other $2000?

24         A      After we have dinner in the cafeteria,

25     restaurant -- excuse me -- he give me the remain

1    $2000.

2        Q      The next day when you asked him to give

3    you the silencer back did you all have a further

4    discussion?

5        A      No, just he don't want to give me back, of

6    course, the silencer because he give me already my

7    money so that's it.

8        Q      Did he say something to you about his

9    trust?

10       A      Oh, he say something on the telephone

11   like, "I knew, I knew, I knew."  But he don't talk to

12   me really.  Look like he talk to himself, "And as soon

13   as I give you the money, you fly away," something like

14   that.

15       Q      And did you leave the United States?

16       A      Well, before I leave the United States,

17   Reinaldo called me.

18       Q      Okay.  Hold up.  Reinaldo called you.  Do

19   you recall what date it was, only if you remember?

20       A      On the 20th, the next day.

21       Q      At what number?

22       A      847-1448, my friend's home.

23       Q      And what was the nature of that telephone

24   call?

25       A      He looking for me and look like he call

```
 1      several times and one of them I pick up the phone.  He

 2      recognize my voice.  And he invite me to go dinner

 3      somewhere, play pool.

 4           Q        He invited you to go to dinner?

 5           A        Yes.

 6           Q        Or shoot pool?

 7           A        Yes.

 8           Q        Did you take him up on that offer?

 9           A        No.

10           Q        Did you have any further communication

11      from Reinaldo?

12           A        No.

13           Q        What date did you leave the United States?

14           A        January 20th in the afternoon.

15           Q        And where did you fly to?

16           A        Ecuador, South America.

17           Q        Now, while you were in Ecuador, did you

18      make any telephone calls to the United States?

19           A        Yes.

20           Q        And can you tell us where you called?

21           A        I called twice.

22           Q        Twice where?

23           A        To the United States.

24           Q        Where?

25           A        One of them to Reinaldo's office and the
```

1      other one to Reinaldo's house.

2          Q      Why did you call Reinaldo from South

3      America?

4          A      I want to know about some watch.  I wanted

5      to know something about some watches.

6          Q      And what did you want to know?

7          A      Because here Reinaldo told me, he told me

8      that those watches here, in the United States, they

9      were very well paid.  And, in Ecuador, I found some of

10     those with a very low price.

11         Q      And how soon after you arrived in South

12     America did you call Reinaldo?

13         A      About a week, two weeks.

14         Q      Did you talk with him?

15         A      No.

16         Q      Who did you talk with?

17         A      One time with Francisco in his office.

18         Q      And Francisco?

19         A      And the second time with his wife.

20         Q      Whose wife?

21         A      Reinaldo's wife in his apartment, Louisa.

22         Q      After those two calls, did you ever call

23     back to the United States to speak to Reinaldo?

24         A      Yeah, one more time.

25         Q      When was that?

1       A       About three or four days before I leave

2   Ecuador.

3       Q       And why did you call then?

4       A       I asked the operator if he want to take

5   the charge.  I told the operator that it was a collect

6   call.

7       Q       But, I mean, why did you call Reinaldo?

8       A       Because I wanted to know the specific

9   indications of those watches.  I want to know if those

10  were the same.

11      Q       What were you planning to do with the

12  watches?

13      A       Sell it.

14      Q       Do you know what kind of watches they

15  were?

16      A       Plastic watches.

17      Q       Were you able to talk to Reinaldo at that

18  time?

19      A       No.

20      Q       And when you returned to the United

21  States, do you recall what date that was?

22      A       February 9th.

23      Q       So you returned on February 9th and where

24  did you go at that time?  Did you have some place you

25  were going to stay?

```
1         A        Yeah.

2         Q        And where were you going to stay?

3         A        In the same place where I been before, 401

4    Memory Lane.

5         Q        And that would be with whom?

6         A        A friend of mine, Raul's house.

7         Q        And that will be the same person that you

8    earlier identified; is that correct?

9         A        Yeah.

10        Q        The same telephone number?

11        A        The same telephone number.

12        Q        And did you do that?

13        A        Yes.

14        Q        Now, after you arrived in the United

15   States a couple of days later, did you have an

16   occasion to go back to the Greenrich Building?

17        A        Yes.

18        Q        And do you recall about what date that

19   was?

20        A        About the 12th.

21        Q        February 12th?

22        A        I don't remember exactly.

23        Q        So what brought you back to the Greenrich

24   Building on February 12th, I mean, we are in 1996,

25   correct?
```

```
 1          A       Yes.   In the same building there was
 2   another jeweler, his name Raul Inc., and he saw me
 3   work on the lathe machine, Reinaldo's lathe machine.
 4   And he wanted -- Raul wanted -- for me to set up a
 5   lathe machine that he had to make the bezels.
 6          Q       And did you go to that building for that
 7   purpose?
 8          A       Yes, sir.
 9          Q       Did you ever make contact with that
10   individual?
11          A       Yes.
12          Q       And did you set up that machine for him?
13          A       No.
14          Q       Why not?
15          A       Because the machine don't look like it was
16   suppose to do this kind of job.  This machine can't do
17   this job.
18          Q       Wrong type of machine?
19          A       Wrong type of machine.
20          Q       Now, while you were at the building, did
21   you find out some information that was somewhat
22   distressing to you?
23          A       Yes.
24          Q       And tell the ladies and gentlemen of the
25   jury what you discovered.
```

1          A          When I enter the building, there were

2     policemen everywhere.  And one had to sign also in the

3     book.  That surprised me because before there were no

4     policemens there.

5          Q          Just security guards?

6          A          Yes.

7          Q          Now, the policemen, the people that you

8     saw there, did they have firearms?  Were they wearing

9     guns, only if you remember?

10         A          I don't remember, sir.

11         Q          And what did you find out had happened in

12    that building?

13         A          Raul told me.

14                     MR. ODOM:  Objection, Your Honor.

15                     THE COURT:  Sustained.

16         Q          (Mr. Vinson)   But did you find out that

17    something had happened awfully bad there?

18         A          I was really surprised to see so many

19    people there at the lobby.

20         Q          I understand.  But what I am saying, at

21    some point in time did Raul tell you what happened,

22    yes or no?

23         A          Yes.

24         Q          But he was only able to tell you what he

25    knew; is that correct?

1          A          Correct.

2          Q          When Raul told you what he knew, what did

3    you do?

4          A          Immediately I left the building.

5          Q          Why?

6          A          First because I couldn't do anything for

7    Raul on his lathe machine; and, second, because I

8    didn't want to meet Reinaldo.

9          Q          Why didn't you want to meet Reinaldo?

10         A          I didn't trust him since the day that he

11   proposed to me to make the robbery.

12         Q          Did you think he had committed that

13   robbery.

14                     MR. ODOM:  Objection, Judge, it's to his

15   opinion at this point.

16                     MR. VINSON:  Well, he already answered it

17   anyway.  He said he doesn't know.

18                     THE COURT:  Very well.  Please proceed.

19         Q          (Mr. Vinson)   Now, after you left the

20   Greenrich Building, where did you go?

21         A          My home.

22         Q          You went to your home?

23         A          Yes.

24         Q          And what happened next?

25         A          Well, I went back to the place where the

1      pistol had been tested.  I was looking around for

2      where the shells were and I found two.

3           Q      Now, you say you found two of the shells.

4      What are you talking about the shell casings?

5           A      Yes, sir.

6           Q      The brass casings?

7           A      Yes, sir.

8           Q      And where did you find those?

9           A      Over the ground.

10          Q      The same area where the weapon had been

11     fired?

12          A      Yes, sir.

13          Q      Was this day or night?

14          A      Night.

15          Q      And how did you do that, a flashlight with

16     you or something?

17          A      No, it's not really night, a hundred

18     percent night.  I can see it.

19          Q      Okay.  While you were out there, did you

20     run into anyone else out there?

21          A      Yes.

22          Q      And who was that?

23          A      A homeless person.

24          Q      And did you have a conversation with that

25     homeless person?

1        A        Yes.

2        Q        About doing something for you?

3        A        I told him that I would give him $10 for

4    each shell casing that he would find.

5        Q        Why were you concerned about going back

6    and picking up the shell casings?

7        A        Reinaldo's apartment was just in front of

8    me.

9        Q        But, I mean, why did you go back to the

10   site to concern yourself about picking up the shell

11   casings?

12       A        I want to pick them up because I wanted to

13   give them to the police.

14       Q        And what did you do with the two shell

15   casings that you picked up?

16       A        I gave them to the police.

17       Q        Now, what caliber were the two shell

18   casings that you picked up at that test fire location?

19       A        .9 mm.

20       Q        When you picked up the casings, what did

21   you do with them?

22       A        I put them in my pocket.

23       Q        Did you have any communication with

24   Reinaldo at that time?

25       A        No.

1      Q       Were you looking for Reinaldo at that

2  time?

3      A       No.

4      Q       Did you even want to see Reinaldo at that

5  time?

6      A       No.

7              (Whereupon, State's Exhibit No. 51 and 52

8  were marked for identification.)

9              MR. VINSON:  We have marked for

10  identification State's Exhibit 52 is a shell casing

11  and State's Exhibit 51.

12             MR. VINSON:  May I approach, Your Honor?

13             THE COURT:  Certainly.

14     Q       Sir, let me show you what has been marked

15  for identification purposes as State's Exhibit 51 and

16  52.  Why don't you take a look at them and you can

17  actually take them out of the bag and look at them.

18  Can you identify those shell casings?

19     A       For me, they look the same.  Yes.

20     Q       They look the same?

21     A       Yes.

22     Q       And those shell casings that you just

23  identified they have a marking on there, what caliber?

24     A       .9 mm.

25     Q       And again what caliber?

1       A       .9 mm.

2       Q       Now, do you recall who you turned these

3       shell casings in to?  Who did you give them to?

4       A       Lieutenant, the police, Lieutenant Nealy.

5       Q       Lieutenant Nealy?

6       A       Nealy.

7       Q       And what agency was he with?

8       A       The Houston Police.

9       Q       Houston Police Department?

10      A       Yes, sir.

11              MR. VINSON:  May I approach again, Your

12      Honor?

13              THE COURT:  Yes.

14      Q       Let me show you State's Exhibit 17 and can

15      you identify that aerial photograph?

16      A       This is the building on Richmond Avenue.

17      Q       Okay, that's the Greenrich Building on

18      Richmond?

19      A       Yes.

20      Q       Now, when you would leave that building,

21      can you tell the ladies and gentlemen of the jury, can

22      you show them on this aerial photograph, what

23      direction you all would take and where you would go to

24      test fire the weapon.  Take a look and see if you can

25      do it on there.

1      A      Yes, I can.

2      Q      Okay.  And do you see what direction would

3   you travel?

4      A      Right across there, the parking lot of the

5   restaurant and make a left over here.

6      Q      And you were not and could you see

7   Reinaldo's home as you was traveling to that location

8   or do you only see it after you arrived at the test

9   fires?

10     A      Only when we arrive to the place.

11     Q      Now, you gave the shell casings to

12  Lieutenant Nealy; is that correct?

13     A      Yes.

14     Q      What did you do after that?

15     A      They asked me --

16     Q      Let's get something to it.  How did you

17  get in contact with Lieutenant Nealy?

18     A      I call a person with the name Andy Thomas,

19  an old man.

20     Q      Who is Andy Thomas?

21     A      It's an old man.  I call him and I tell

22  him what I found and I want to go to the police

23  because I don't speak it so well, the language.  So he

24  can say for me what I have you are looking for.  I

25  want to give you the casings and show the place where

1       I find these cases.

2              Q      And did you do that?

3              A      Yes.

4              Q      Who did you meet with?

5              A      First of all, with the FBI.

6              Q      And where did you meet with the FBI?

7              A      In the FBI building.

8              Q      And after you talked with the FBI, did you

9       talk to some officers from the Houston Police

10      Department?

11             A      Yes.

12             Q      And was that the time that you gave the

13      shell casings to Lieutenant Nealy?

14             A      Yes.  And in the FBI building, I give the

15      shells.

16             Q      What happened after you talked with the

17      officers from the Houston Police Department?

18             A      They asked me if I can bring them to the

19      place where I find the casings.

20             Q      Did you take them over there?

21             A      Yes, sir.

22             Q      And were you present when they started

23      looking around?

24             A      Yes.

25             Q      And did they find anything over there?

1        A        Yes, one more shell.

2        Q        They found what?

3        A        One more casing.

4        Q        One more casing over there?

5        A        Yes.

6        Q        And did you have an opportunity to look at

7    that casing?

8        A        It's on the ground.

9        Q        But, I mean, when they got it out, when

10   they got it out of the ground, did you look at it?

11       A        Well, it's over there.  They don't show me

12   in their hand.  They show me when it's on the ground.

13       Q        Did it appear to be a .9 mm casing?

14       A        It's a .9 mm casing.

15       Q        All right.  And did you see what they did

16   with that casing?

17       A        Well, after I took them there, Lieutenant

18   Nealy and the other policemen they call a van and a

19   van came over.  And in that van there were all the

20   things that he used to identify a place including the

21   metal detector.  So that person is coming in the van.

22   He start to make pictures and looking around with the

23   metal detector.  And Lieutenant Nealy he find the

24   shell, I mean the case.  And after that, I leave it

25   with the police officers and I don't know nothing else

1   about it.

2        Q       Okay.  Now, during the time you were

3   working in Reinaldo's office, from time to time would

4   you see a young lady come in there who was providing

5   clean-up service?

6        A       Yes.

7        Q       And how frequently would she come in, once

8   a day, twice a day, at no time or what?

9        A       Once a day, yes, normally once a day.

10       Q       And during the time, did you ever

11  determine her name or did you ever find out who she

12  was?

13       A       I don't remember.  I think it's Estrella

14  but I don't remember exactly.

15       Q       Were you ever introduced to her?

16       A       No.

17       Q       How did you come to know her name?

18       A       Well, they are talking to each other,

19  Reinaldo and this lady, and even Francisco is talking

20  with the lady.

21       Q       How did they act when they had these

22  conversations?  I mean, was it friendly toward each

23  other or what?

24       A       Yes, they are friendly.

25       Q       Did this young lady, Estrella, was she

1    friendly to anyone there a little more than someone

2    else?

3         A       Yes.

4         Q       And did she display more affection for

5    someone else in that office?

6         A       Yes.

7         Q       And who was that person?

8         A       Reinaldo.

9         Q       Did you ever hear Reinaldo and his brother

10   discussing something about a door?

11        A       Yes.

12        Q       And what were they talking about?

13        A       I don't know exactly what they were

14   talking about because they are speaking English so

15   fast.

16        Q       What did you hear them say?

17        A       Who?

18        Q       Go ahead.

19        A       Who?

20        Q       What was Reinaldo and his brother talking

21   about that door, what were they saying about it?

22        A       They were talking about the girl that

23   would clean there.  It seems like -- I'm not sure.

24            MR. ODOM:   I would object to anything that

25   he is not certain that he is speculating as to what

1    they were talking about.  I don't think the proper

2    predicate has been laid or that he can answer the

3    question as put to him.

4             THE COURT:  Let's restate the question so

5    that he understands that he is only to answer that

6    which does not call for speculation.

7        Q    (Mr. Vinson)   What did you hear them say

8    about the door?

9        A    That they needed someone to open the door

10   for one to come out or come in.

11       Q    Now, when you say they, who are you

12   talking about?

13       A    I am talking about Reinaldo and his

14   brother.

15       Q    If you saw a picture of this young lady

16   who was identified, I mean, that you refer to as

17   Estrella before this jury, do you think you can

18   identify her?

19       A    Maybe.

20            (Whereupon, State's Exhibit No. 53 was

21   marked for identification.)

22            MR. VINSON:  May I approach the witness,

23   Your Honor?

24            THE COURT:  Certainly.

25       Q    Let me show you what has been marked for

1    they were talking about.  I don't think the proper

2    predicate has been laid or that he can answer the

3    question as put to him.

4              THE COURT:  Let's restate the question so

5    that he understands that he is only to answer that

6    which does not call for speculation.

7         Q    (Mr. Vinson)   What did you hear them say

8    about the door?

9         A    That they needed someone to open the door

10   for one to come out or come in.

11        Q    Now, when you say they, who are you

12   talking about?

13        A    I am talking about Reinaldo and his

14   brother.

15        Q    If you saw a picture of this young lady

16   who was identified, I mean, that you refer to as

17   Estrella before this jury, do you think you can

18   identify her?

19        A    Maybe.

20             (Whereupon, State's Exhibit No. 53 was

21   marked for identification.)

22             MR. VINSON:  May I approach the witness,

23   Your Honor?

24             THE COURT:  Certainly.

25        Q    Let me show you what has been marked for

1    identification purpose as State's Exhibit 53.  Can you

2    identify that person in the photograph?

3         A     Yes.

4         Q     And who is that?

5         A     This is a lady that clean the office.

6         Q     The person that you come to know as

7    Estrella?

8         A     Yes.

9         Q     Now, you didn't have any personal

10   relationship with her; is that correct?

11        A     No, I don't have any personal relationship

12   with her.

13             MR. VINSON:  Your Honor, the State will

14   offer into evidence State's Exhibit 53 and tender the

15   same to defense counsel for his inspection.

16             MR. ODOM:  I don't have an opposition to

17   the photo.  Do you have an opposition to what is on

18   the photo.

19             THE COURT:  Let's see it.  Let's redact

20   it.

21             MR. VINSON:  May we approach, Your Honor?

22             MR. ODOM:  I have no objection.

23             THE COURT:  State's Exhibit 53 is

24   admitted.

25             MR. VINSON:  May State's Exhibit 53 be

1    published to the jury?

2              THE COURT:  Certainly.

3         Q    Now, the person that you identified as

4    Francisco do you think you could identify a photograph

5    if you were to see a photograph -- do you think you

6    can identify Francisco from a photograph?

7         A    Maybe.

8         Q    What about the person that you identified

9    as Alberto, do you think you could identify him from a

10   photograph if you were to see it?

11        A    Maybe.

12        Q    And could you identify the defendant from

13   a photograph the way he looked back in 1996, '95 and

14   '96, if you were to see him in a photograph?

15        A    Probably.

16             (Whereupon, State's Exhibit Nos. 54, 55,

17   and 56 were marked for identification.)

18             MR. VINSON:  May I approach the witness?

19             THE COURT:  Certainly.

20        Q    I show you what has been marked for

21   identification purposes as State's Exhibit 54.  Can

22   you identify that person?

23        A    Francisco.

24        Q    Okay.  And can you identify the person in

25   State's Exhibit 55?

```
 1        A       Alberto.

 2        Q       And is that the way he looked at or about

 3    the time that you met him?

 4        A       No.

 5        Q       What's the difference?

 6        A       He didn't have too much beard.

 7        Q       What about 56?

 8        A       Reinaldo.

 9        Q       Is that who the person in State's Exhibit

10    56 marked for identification purposes is?

11        A       Reinaldo.

12        Q       Okay.

13        Q       Is that the way he looked back in

14    December, January?

15        A       No.

16        Q       Did you have an opportunity to see him

17    after you came back?

18        A       No.

19        Q       But this is Reinaldo; is that correct?

20        A       Yes.

21                MR. VINSON:  Your Honor, at this time the

22    State will offer into evidence State's Exhibit 56 and

23    54 and tender the same to defense counsel for

24    inspection.

25                MR. ODOM:  With the same redaction, I
```

1        would have no objection.

2                    THE COURT:  Very well.

3                    MR. VINSON:  With the Court's permission,

4        I will go ahead and redact.

5                    THE COURT:  State's Exhibit 54 and 56 once

6        redacted, State's Exhibit 54 and 56 are admitted.

7                    MR. VINSON:  Again, Your Honor, could we

8        have 54 is a picture of Francisco and 56 is a picture

9        of Reinaldo Dennes published to the jury?

10                   THE COURT:  Sure.

11                   MR. VINSON:  Your Honor, and I think the

12       defense would have the same objection to State's

13       Exhibit 55; is that correct?

14                   MR. ODOM:  Yes, Judge, with the same

15       redaction, we have no objection.

16                   THE COURT:  With the same redaction,

17       State's Exhibit 55 will be admitted.

18                   MR. VINSON:  Was 55 admitted?

19                   THE COURT:  Yes.

20                   MR. VINSON:  May 55 be published to the

21       jury?

22       Q        And State's Exhibit 55 is a picture of

23       Alberto?

24       A        I have to see the number.

25       Q        Okay.  I'm sorry.

```
1          A      Yes.

2          Q      Now, sir, in preparing for this case, did

3      you meet with me?

4          A      Yes.

5          Q      And was Mr. Smyth also present?

6          A      Yes.

7          Q      And did you talk primarily with me,

8      though?

9          A      Yes.

10         Q      And did you also at a point in time before

11     I became involved with this case and Mr. Smyth became

12     involved in this case did you meet with another

13     district attorney?

14         A      Yes.

15         Q      And a tall guy, gray hair?

16         A      Yes.

17         Q      And would that be Chuck Rosenthal?

18         A      Yes.

19         Q      And at that time you had already given

20     your statement; is that correct?

21         A      Yes.

22         Q      And did he make you aware that the State

23     would not pursue any charges against you?

24         A      Yes.

25         Q      Did you sign any written agreement to this
```

```
 1        or anything of that nature?

 2             A        No, sir.

 3             Q        Then being from Ecuador, South America, at

 4        the time that you were manufacturing this silencer

 5        were you aware that it was against the law to do such?

 6             A        I am not from Ecuador.

 7             Q        I couldn't understand.

 8             A        I'm not from Ecuador.

 9             Q        Okay.  I'm sorry.  From Spain?

10             A        Spain; no.

11             Q        You did not realize that it was against

12        the law then?

13             A        No.

14             Q        Now you are aware of that, aren't you?

15             A        Oh, yes.

16             Q        You became aware of that after talking to

17        the FBI and to Chuck Rosenthal?

18             A        Oh, yes.

19             Q        And the Houston Police Department?

20             A        Yes.

21             Q        One final question:  With respect to

22        Estrella, did this defendant ever mention her to you,

23        if you can recall?

24             A        Repeat again, please.

25             Q        Did he ever talk to you about Estrella?
```

1        A       No.

2        Q       While she was coming back and forth, did

3    you ever form an opinion about the relationship they

4    were having.

5                MR. ODOM:  Objection, Your Honor, unless I

6    can have him on voir dire and we can make a basis for

7    any such speculation, I think it would be just that,

8    speculation.

9                MR. VINSON:  I am allowed to show together

10   and I am allowed to establish he had an opinion and

11   the basis for that opinion.

12               MR. ODOM:  Not unless it is based on

13   something more than mere speculation.

14               THE COURT:  Voir dire briefly.

15

16                    VOIR DIRE EXAMINATION

17   BY MR. ODOM:

18        Q       Mr. Ramirez, did you ever hear Mr. Dennes

19   and the woman you know as Estrella carry on

20   conversations?

21        A       They would talk, used to talk at the

22   office.

23        Q       All right.  And the type of stuff that

24   they would talk about would it be the type of stuff

25   that one would ordinarily talk about in an office?

1    A    I didn't pay much attention to what they

2    were talking about.  I was doing my thing.

3    Q    All right.  Did you as a result see them

4    outside of the office in any way?

5    A    No.

6    Q    Any opinion you would have about a

7    relationship that they would have would be

8    speculation, would it not?

9    A    Yes.

10    MR. ODOM:  Pass the witness.

11    MR. VINSON:  I'll withdraw the question at

12    this time and at this time I'll pass the witness.

13    THE COURT:  Okay.  Ladies and gentlemen.

14    It's almost 5:00 o'clock.  I don't think it's

15    practical to start what is probably a lengthy cross

16    examination only to stop here in the next few

17    minutes.  I will give Mr. Odom a chance to have a

18    non-interrupted cross examination.  For that reason,

19    we will stop now.  We will stand in recess.

20    Let me stress to you the importance of

21    being on time tomorrow.  We lost about 20 minutes

22    today and 20 minutes adds up.  And I know that at

23    times that's a problem but that's why I say 9:45

24    instead of 10:00, to give everybody a cushion of 15

25    minutes to get where they should be.  Let me stress to

1    be downstairs at 9:45, and the bailiff will retrieve

2    you and start promptly, hopefully, at this time at

3    10:00 o'clock.

4              Remember the Court admonishments I have

5    given you not to discuss this case with anyone and we

6    will stand in recess until 9:45.

7              Court adjourned for the day.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPELLATE COURT NO. _72966_

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

-----------------------------------------------------

REINALDO DENNES

                    Appellant,

VS.

THE STATE OF TEXAS,

                    Appellee.

-----------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

                    TEXAS

Judge Jim Wallace, Presiding

-----------------------------------------------------

CAUSE NO. 750,313

August 20, 1997

Court Reporter's Record

Volume 27 of 39 Volumes

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Volume 27

August 20, 1997

Trial

Chronological

Antonio Ramirez

       Cross Examination by Mr. Odom            4

       Redirect Examination by Mr. Vinson     87

       Recross Examination by Mr. Odom       106

       Further Direct Examination by Mr. Vinson  117

Lois Gibson

       Direct Examination by Mr. Smyth       126

       Cross Examination by Mr. Odom        140

       Redirect Examination by Mr. Smyth    145

       Recross Examination by Mr. Odom     148

       Further Direct Examination by Mr. Smyth  150

Todd William Miller

       Direct Examination by Mr. Smyth       151

       Cross Examination by Mr. Odom        182

Volume 27

August 20, 1997

Trial

Alphabetical

Lois Gibson

        Direct Examination by Mr. Smyth       126

        Cross Examination by Mr. Odom       140

        Redirect Examination by Mr. Smyth     145

        Recross Examination by Mr. Odom     148

        Further Direct Examination by Mr. Smyth   150

Todd William Miller

        Direct Examination by Mr. Smyth       151

        Cross Examination by Mr. Odom       182

Antonio Ramirez

        Cross Examination by Mr. Odom         4

        Redirect Examination by Mr. Vinson     87

        Recross Examination by Mr. Odom     106

        Further Direct Examination by Mr. Odom   117

| | | |
|---|---|---|
| State's Exhibit No. 56A | photo | |
| Marked | Volume 27 | 133 |
| Identified | | 134 |
| Offered | | 134 |
| Admitted | Volume 27 | 134 |
| State's Exhibit No. 56B | photo | |
| Marked | Volume 27 | 133 |
| Identified | | 134 |
| Offered | | 135 |
| Admitted | Volume 27 | 135 |
| State's Exhibit No. 56C | photo | |
| Marked | Volume 27 | 133 |
| Identified | | 134 |
| Offered | | 136 |
| Admitted | Volume 27 | 136 |
| State's Exhibit No. 56D | photo | |
| Marked | Volume 27 | 133 |
| Identified | | 137 |
| Offered | | 138 |
| Admitted | Volume 27 | 138 |

State's Exhibit No. 57        photo

    Marked                Volume 27              91
    Identified                                   92
    Offered                                      92
    Admitted              Volume 27              92

State's Exhibit No. 58        photo

    Marked                Volume 27              91
    Identified                                   92
    Offered                                      92
    Admitted              Volume 27              92

State's Exhibit No. 59        photo

    Marked                Volume 27              91
    Identified                                   92
    Offered                                      92
    Admitted              Volume 27              92

State's Exhibit No. 60        photo

    Marked                Volume 27              91
    Identified                                   92
    Offered                                      92
    Admitted              Volume 27              92

STate's Exhibit No. 61        photo
    Marked                Volume 27              91
    Identified                                   92
    Offered                                      92
    Admitted              Volume 27              92
State's Exhibit No. 63        tubing
    Marked                Volume 27              97

                                             iv

| | | | |
|---|---|---|---|
| | Identified | Volume 27 | 98 |
| | Offered | | 99 |
| | Admitted | Volume 27 | 102 |
| State's Exhibit No. 64 | | aluminun & iron ribbon | |
| | Marked | Volume 27 | 97 |
| | Identified | | 98 |
| | Offered | | 99 |
| | Admitted | Volume 27 | 102 |
| State's Exhibit No. 65 | | aluminun & iron shavings | |
| | Marked | Volume 27 | 97 |
| | Identified | | 98 |
| | Offered | | 99 |
| | Admitted | Volume 27 | 102 |
| State's Exhibit No. 66 | | steel wool | |
| | Marked | Volume 27 | 99 |
| | Identified | | 100 |
| | Offered | | 101 |
| | Admitted | Volume 27 | 102 |
| State's Exhibit No. 67 | | metal shavings, steel wool | |
| | Marked | Volume 27 | 99 |
| | Identified | | 100 |
| | Offered | | 101 |
| | Admitted | Volume 27 | 102 |
| State's Exhibit No. 68 | | metal shavings | |
| | Marked | Volume 27 | 99 |
| | Identified | | 118 |
| | Offered | | 118 |
| | Admitted | Volume 27 | 120 |

v.

State's Exhibit No. 69        box

    Marked          Volume 27                180
    Identified                               180
    Offered                                  181
    Admitted        Volume 27                181

State's Exhibit No. 69A       telephone
    Marked          Volume 27                180
    Identified                               180
    Offered                                  181
    Admitted        Volume 27                181

State's Exhibit No. 70        lease
    Marked          Volume 27                180
    Identified
    Offered                                  183
    Admitted        Volume 27                183

1                      CAUSE NO. 750,313

2     STATE OF TEXAS              IN THE 263RD DISTRICT COURT

3     VS.                                OF

4     REINALDO DENNES        HARRIS COUNTY, T E X A S

5     A P P E A R A N C E S:

6     For the State:          Mr. Mark Vinson
                              Bar Card No. 20590450
7                             Mr. Don Smyth
                              Bar Card No. 18777700
8                             Assistant District Attorneys
                              201 Fannin
9                             Houston, Texas 77002
                              713-755-7050
10    For the Defendant:      Mr. Wendell Odom
                              Bar Card No. 15208500
11                            Ms. Yalia Guerrero
                              Bar Card No. 0078862
12                            Attorneys at Law
                              1301 McKinney, Suite 3100
13                            Houston, Texas 77010
                              713-951-9555
14

15

16             BE IT REMEMBERED that upon this the 20th

17    day of August, A. D. 1997, the above entitled and

18    numbered cause came on for trial before the Honorable

19    Jim Wallace, Judge of the 263rd District Court of

20    Harris County, Texas; and the State appearing in

21    person and the Defendant appearing in person and by

22    counsel, announced ready for trial, after a jury

23    having been selected, and all preliminary matters

24    having been disposed of, the following proceedings

25    were had, viz:

1              (Jury came into the courtroom.)

2              THE COURT:  Please be seated.

3              Good morning, ladies and gentlemen of the

4    jury.  By this afternoon, we are playing our theme

5    song.  This is the third day.  We are moving along on

6    schedule.  This is my understanding and everyone was

7    timely this morning and we are prepared to start.

8              We left off with the State having finished

9    the initial direct of this witness.

10             And, Mr. Odom, are you prepared to

11   commence?

12             THE WITNESS:  May I say something?

13             THE COURT:  No, sir.

14

15

16

17

18

19

20

21

22

23

24

25

1                        ANTONIO RAMIREZ,

2      was called as a witness for the State and, having been

3      duly sworn through an interpreter, testified as

4      follows:

5                        CROSS EXAMINATION

6      BY MR. ODOM:

7           Q      Good morning, Mr. Ramirez.  How are you?

8           A      Fine.

9           Q      We have never had an opportunity to talk,

10     have we?

11          A      No.

12          Q      We will have an opportunity this morning.

13                 First of all, did you have a good night's

14     sleep last night?

15          A      Yes.

16          Q      I would like to discuss with you the

17     sequence of events that you related yesterday, but I

18     would like to start it with a part that was not gone

19     into very much yesterday; do you understand?

20                 You mentioned that you talked to an old

21     man by the name of Andy Thomas, Andrew Thomas; do you

22     recall that part of your testimony?

23          A      Yes.

24          Q      Have you ever known him to use another

25     name?

```
 1        A      No.

 2        Q      Mr. Ramirez, how do you know Mr. Thomas?

 3        A      I knew him from Reinaldo's office.

 4        Q      And Mr. Thomas works in the building, does

 5   he not?

 6        A      I don't know.

 7        Q      You met Mr. Thomas at the building?

 8        A      In Reinaldo's office.

 9        Q      But Reinaldo's office is in that building,

10   is it not?

11        A      Yes.

12        Q      You do not know what Mr. Thomas does?

13        A      No, not exactly.

14        Q      Do you have any idea what he does?

15        A      I think he sell jewelry or something like

16   that.

17        Q      I'm sorry, I didn't understand.

18        A      He sells things, watches and old clothing.

19        Q      He sells watches and old clothing as far

20   as you know?

21        A      Yes.

22        Q      And when you became aware of that -- when

23   you had come back from Ecuador, you went to the

24   Greenrich Building, did you not?

25        A      Yes.
```

1          Q        And when you went to the Greenrich

2     Building, you noticed, did you not, you went by and

3     noticed that Reinaldo's office was not open, did you?

4          A        Yes.

5          Q        And not only that but you knew at that

6     time that Reinaldo was in Florida, did you not?

7          A        I don't know if he is in Florida at that

8     time.

9          Q        You had heard that he had gone to Florida,

10    had you not?

11         A        Before I came into the United States.

12         Q        You didn't know if he had come back yet or

13    not, right?

14         A        No.

15         Q        Explain to me, did you know --

16                   MR. VINSON:  Object, unless he has

17    personal knowledge.

18                   MR. ODOM:  That's what I am asking, Judge,

19    his answer was confusing.  I am trying to clear up the

20    question.

21                   THE COURT:  All right.  Restate the

22    question.

23         Q        (Mr. Odom)   Did you not know that he had

24    returned or did you not know one way or another?  Your

25    answer confused me.

1             MR. VINSON:  I am objecting to the double

2     negative.  He can simply ask did he not know that he

3     was in Florida, did you not know.

4             THE COURT:  It's overruled.

5        Q    (Mr. Odom)   When you say no to my

6     question, is it that you didn't know that Mr. Dennes

7     had returned from Florida.

8             MR. VINSON:  Objection, Your Honor, he is

9     assuming he knew he went to Florida by the very

10    question he is putting to him.  It hasn't been

11    established that he had personal knowledge that Mr.

12    Dennes went to Florida.

13            MR. ODOM:  Judge, I am asking his state of

14    mind.

15            THE COURT:  Let's qualify if he knows or

16    not.

17            MR. ODOM:  I thought I did.

18       Q    (Mr. Odom)   I thought I had asked you

19    previously, Mr. Ramirez, but I will ask you again.

20            Had you heard that Mr. Dennes had gone to

21    Florida.

22            MR. VINSON:  Objection to hearsay.

23            THE COURT:  Overruled.

24       Q    (Mr. Odom)   Had you heard that?

25       A    When?

1      Q      When you were in Ecuador.

2      A      Yes.

3      Q      Did you know or did you believe whether he

4    had or hadn't that Mr. Dennes had returned from

5    Florida when you went to the Greenrich Building?

6      A      I didn't believe anything about anything

7    at that moment.

8      Q      So you didn't know whether he had come

9    back or not?

10     A      No.

11     Q      You went by his office and noticed that it

12   was closed?

13     A      I didn't go to his office.

14     Q      I know you didn't go to his office but you

15   observed his office was closed, did you not?

16     A      Next door closed.

17     Q      And Raul's office, the person you were

18   going to see, he was also on the second floor?

19     A      Third floor.

20     Q      But his office was right next to Designs

21   by Reinaldo?

22     A      Yes.

23     Q      And you observed that the office was

24   closed when you went by, correct?

25     A      I see dark inside but I don't look inside.

1      Q      You had already made some attempts to call

2   Reinaldo or Mr. Dennes while you were in Ecuador, had

3   you not?

4      A      I had tried to communicate with somebody

5   in his office.

6      Q      Well, you also called him at his home,

7   didn't you?

8      A      Yes.

9      Q      It wasn't just the office that you called,

10   you called him at his office and talked to his wife?

11      A      Yes.

12      Q      Now, when you were at the Greenrich

13   Building, you had learned that there had been a

14   homicide in that building, did you not?

15      A      Yes.

16      Q      And that came as a great surprise to you,

17   didn't it?

18      A      Not really, not too much.

19      Q      Now, you talked to Mr. Thomas and learned

20   about the facts of the murder, did you not?

21      A      No.

22      Q      You didn't?

23      A      I speak with Mr. Thomas but I don't know

24   about the fact of the murder.

25      Q      I'm sorry.

1          A       Wait a minute.  And I talked to Mr. Andy

2     Thomas but I didn't know either.  He told me about the

3     details of the death.

4          Q       Mr. Thomas is who you asked to contact the

5     police, is it not?

6          A       No.

7          Q       No?

8          A       No.

9          Q       I thought that you had trouble with your

10    English and that you asked Mr. Thomas to help you

11    contact the police?

12         A       I think you have a problem how you

13    understand it because Mr. Thomas don't talk to me

14    about going to the police.  I asked him, Mr. Thomas.

15    I do.  He don't ask me go to the police.  I asked

16    him.  "I want to go to the police."

17         Q       You talked to Mr. Thomas about going to

18    the police?

19         A       That is correct.

20         Q       And you talked to him about the case,

21    don't you?

22         A       About which case?

23         Q       About the fact that there had been a

24    murder in the building?

25         A       Yes.

1      Q      So you did talk to him about the murder,

2    didn't you?

3      A      I talked to him, to Mr. Thomas, about what

4    I knew and what had happened to me.

5      Q      Right.

6             MR. ODOM:  Your Honor, if I may, I would

7    like to make this in question and answer form.

8             THE COURT:  Very well.

9      Q      (Mr. Odom)    So the answer to my question

10   is that you did; Mr. Thomas did tell you about the

11   murder, didn't he?

12     A      The one that told me about the murder was

13   Senor.

14     Q      I understand that other people may have

15   told you about it but Mr. Thomas also talked to you

16   about the murder, did he not?

17     A      I don't remember.

18     Q      Well, didn't you just tell me that you

19   talked to Mr. Thomas about the murder?

20     A      To Mr. Andy Thomas, when I called him, I

21   told him about what I knew.

22     Q      Right.

23     A      And what had happened to me in December of

24    '95.

25             MR. ODOM:   Excuse me, Your Honor.  I ask

1    that he answer my question and that is a yes or no

2    answer and that is did he not talk to Mr. Thomas about

3    the murder.

4              THE COURT:  Let's approach.

5              (Off-the-record discussion held at the

6    bench.)

7         Q    Mr. Ramirez, if you will bear with me, try

8    to listen to my question and just answer my question,

9    okay.

10        A    Your question is confusing.

11        Q    I understand.  I am going to try to be

12   clearer in my questions.

13        A    Okay.

14        Q    I realize there is a communication

15   problem.  I will see if I can clear it up.

16        A    Okay.

17        Q    When you told Andy Thomas about what you

18   knew, did Andy Thomas tell you anything about what he

19   knew that happened in the building?

20        A    We talked about that.

21        Q    Yes, of course you did.

22             Did Andy Thomas at that time or a later

23   time tell you that there was a $75,000 reward for the

24   information that would lead to the arrest and

25   conviction of the person that committed the murder?

1          A       Mr. Andy Thomas, he told me about that

2     reward and there were many, many different numbers

3     about the reward.

4          Q       Let's start off.  Do you recall that the

5     amount of reward that he talked about was over

6     $75,000?

7          A       I don't remember exactly what he told me.

8          Q       No, no.  Do you recall that the numbers

9     that he gave you were over $75,000?

10         A       I don't remember exactly how much.

11         Q       I know you don't remember exactly how much

12    but do you recall that you had previously said -- do

13    you recall that the numbers were more than 75,000; do

14    you remember that?

15         A       I don't remember.

16         Q       Now, after you talked to Andy Thomas, you

17    went out and collected the casings; is that true?

18         A       No.

19                 THE WITNESS:  Did he ask me if I had

20    picked them up before or after?

21         Q       I asked you, after you had talked to Andy

22    Thomas, didn't you go out and pick up the shell

23    casings at the scene?

24         A       No.

25         Q       Mr. Ramirez, can you read English?

1       A       A little bit.

2       Q       Do you recall making a statement on

3    February 22, 1996?

4       A       Yes.

5       Q       Have you had an opportunity to look at the

6    statement?

7       A       A lot of times.

8       Q       A lot of times.

9               I would like to show you.

10              MR. ODOM:  May I approach the witness,

11   Your Honor?

12              THE COURT:  You may.

13      Q       I would like to show you the last page of

14   your statement and I have yellowed a certain portion

15   of it and see if this refreshes your memory.

16      A       What do you mean refresh my memory?

17      Q       As to your testimony, just read it,

18   please.

19      A       In my English.

20      Q       Can you not read that?

21      A       In my English, may I?

22      Q       No, not out loud, to yourself read it.

23      A       Yes.  About the 13 --

24      Q       No, excuse me.  After reading that, I will

25   ask you again did you first talk to Andy Thomas, and

1    after you talked to Andy Thomas on about the 13th or

2    14th, did you then go and hunt for the bullet casings

3    at the scene?

4         A    No.

5         Q    Does the statement that you read; is that

6    incorrect?

7         A    When I gave the statement --

8         Q    Please answer the question, please.

9              MR. ODOM:  I ask that he answer the

10   question.

11        A    I got a chance to explain.

12             THE COURT:  Answer the question, please.

13        A    What is the question?

14        Q    The question is:  Is that statement wrong

15   regarding when you talked to Andy Thomas and when you

16   went out to pick up the casings?

17        A    In this statement there are a lot of

18   things that are wrong.

19        Q    When you took this statement --

20             MR. ODOM:  May I approach the witness?

21             THE COURT:  Mr. Odom.

22             MR. ODOM:  May I approach the witness?

23             THE COURT:  You may approach.

24        Q    You are telling me, Mr. Ramirez, this part

25   of the statement is wrong and lots of other parts of

1       the statement are wrong; is that correct?

2           A       The order that they are in; yes.

3           Q       I see.  Now, is this your signature?

4           A       Yes, it's mine.

5           Q       After you made this statement, did you

6       have a chance to read over this statement?

7           A       I don't read English at that time.

8           Q       Pardon?

9           A       At that time I didn't read English like I

10      do today.

11          Q       Did you have someone read the statement

12      back to you?

13          A       No.

14          Q       So you didn't know what was in the

15      statement?

16          A       When I gave the statement, there was a

17      person that was translating what I was saying.  And

18      that person was from FBI.

19          Q       And you are telling this jury that after

20      the translator translated the statement and put it in

21      English the translator never read it back to you again

22      in Spanish?

23          A       No.

24          Q       They didn't?

25          A       No, they don't.

1      Q      Was this a male or a female translator

2  that did this?

3      A      Male.

4      Q      All right.  And I want to get this

5  correct.  This is a male translator for the FBI who

6  translated what you said in Spanish and it was typed

7  in English, correct?

8      A      No, he didn't write in English.

9      Q      All right.  Somebody typed this in

10 English?

11     A      Yes.

12     Q      The male translator told them what to put

13 down in English, did he not?

14     A      Yes.

15     Q      After it was put in English, they asked

16 you to swear to the truth of this document, did they

17 not?

18     A      I swore what I have said in Spanish.

19     Q      They asked you to swear to the truth of

20 this document, correct?

21     A      Yes.

22     Q      And you are telling this jury that the

23 Spanish translator for the FBI did not read this

24 statement back to you in Spanish so that you would

25 understand what was on the piece of paper that you are

swearing to, right?

A They didn't read it to me in Spanish, what the contents of that.

Q I understand. And that you are sworn to give testimony today?

A I swore what I said in Spanish.

Q But let me get this correct. Your sworn testimony today is they never read this statement back to you in Spanish before you swore to it?

A In Spanish?

Q Yes.

A No.

Q And you are as certain of that fact as to any other fact you testified.

MR. VINSON: Object, Your Honor, that question has been asked and answered.

THE COURT: Sustained.

Q (Mr. Odom) Now, that also explains why there is other errors in this statement, does it not?

A In the order that they are; yes.

Q Mr. Ramirez, can you read to the jury the part of the statement that you swore to but you didn't understand you made on February 22, 1996, that I have underlined, that I have highlighted.

A Do I read it in a loud voice?

1       Q       Yes, sir.

2       A       "About the 13th or 14th, I called Andy

3    Thomas to meet him.  I told Andy part of the story.

4    And Andy say that all the people suspect Reinaldo to

5    be behind this.  During the week between 12th and

6    17th, I went back to the place that Reinaldo had

7    tested the gun and right over the ground, lying on

8    top, was two spent shell casing and I pick up this two

9    that I could see and get out of there."

10      Q       Okay.  But that is not the order that it

11   really happened.  That's not the way it really

12   happened?

13      A       I pick up this one before I meet Andy

14   Thomas.

15      Q       Okay.  That answers my question.

16              So when you went back and picked up the

17   casings, you had not found out from Andy Thomas that

18   there was a great deal of money to be made for telling

19   the authorities about who may have committed the

20   murder --

21      A       For Andy Thomas, you say?

22      Q       -- or from anyone else for that matter?

23      A       I listen to many things, to many things.

24      Q       My question is:  You are telling the jury

25   before you went back to pick up the shell casings you

1     did not know there was a possibility of a reward?

2          A      I don't know if have the possibility or

3     not.

4          Q      You found that out later?

5          A      Yes.

6          Q      You told the jury yesterday that you

7     picked up those casings because you wanted to give

8     them to the police; is that correct?

9          A      What do you have with my case?

10         Q      My question:  You picked up the casings

11    because you wanted to give them to the police, right?

12         A      Yes.

13         Q      And you go to Mr. Andy Thomas, right?

14         A      Wait a minute.  I don't give the police.

15         Q      And I know.  And my question is:  you go

16    to Andy Thomas, correct?

17         A      Yes.

18         Q      Yes?

19         A      Yes.

20         Q      Right.  And when you go to Andy Thomas,

21    did you will tell Mr. Thomas to call -- did you have

22    Mr. Thomas report this anonymously, your information

23    anonymously?  Was that your idea or Mr. Thomas' idea?

24         A      I didn't ask Mr. Andy Thomas to make the

25    call.  I asked and I requested that Mr. Andy Thomas

1    for him, to help me to get in touch with the police

2    and the FBI.

3         Q       I understand that.  And Mr. Thomas you

4    found out did contact the police, didn't he?

5         A       With FBI.

6         Q       And my question is:  Was it your idea or

7    was it Mr. Thomas' idea that when you contact the

8    police that you not tell them your name, that you

9    remain anonymous?

10        A       I didn't know if making a silencer at that

11   time was illegal.

12               MR. ODOM:  Judge, I would like for him to

13   answer my question.  That's a non-responsive question.

14               THE COURT:  Tell him to answer the

15   question.

16        Q       (Mr. Odom)  All right.  Was it your idea

17   or was it Mr. Thomas' idea that when you did report to

18   the police that you do so without giving your name,

19   that you be anonymous?

20        A       My idea.

21        Q       Was it your idea or was it Mr. Thomas'

22   idea that Mr. Thomas not use his real name when he

23   contacted the police?

24        A       I don't know.

25        Q       Now, you had indicated that you did not

1    know if it was legal or illegal to make a silencer,

2    right?

3         A       In that time, yes.

4         Q       But you sure didn't want to contact the

5    police until you knew, did you?

6         A       No, that's not the reason.

7         Q       I didn't understand.

8         A       No, no, that's not the reason.

9         Q       My question is:  That whether you were

10   certain or whether you were uncertain, you were

11   reluctant to contact the FBI, were you not?

12        A       No.  I was reluctant to get in touch with

13   the FBI.

14        Q       And you are just reluctant to give them

15   your name?

16        A       Until I was for sure that they were not

17   going to do anything to me then; yes.

18        Q       Exactly.  Let's talk about that.

19                When you did talk to the FBI, you learned

20   that a silencer is illegal, did you not?

21        A       Yes.

22        Q       Mr. Ramirez, did you know that having a

23   machine gun is illegal.

24                MR. VINSON:  Object to the relevance of

25   that, Your Honor.

```
 1                    THE COURT:  Sustained.

 2         Q       (Mr. Odom)   Do you understand now that

 3    possessing a silencer is illegal in the United States?

 4         A       Now?

 5         Q       Yes.

 6         A       Yes.

 7         Q       Do you understand at that time possessing

 8    that silencer in Ecuador was illegal?

 9         A       No.

10         Q       Did you know at that time that possessing

11    a silencer in Spain was illegal?

12         A       No.

13         Q       Never occurred to you?

14         A       Never I make a silencer.

15         Q       That's not what I asked.   What I asked --

16         A       I answered never I make a silencer before.

17                    MR. VINSON:   Object, he has asked and

18    answered the question, Your Honor.

19                    THE COURT:   I sustained.

20         Q       (Mr. Odom)   But you wanted to make sure

21    that you wouldn't get in trouble before you talked to

22    the FBI, right?

23         A       Yes.

24         Q       Now, when you did contact the FBI, you

25    reached an agreement with the FBI, didn't you?
```

```
 1        A       What kind of agreement?  What are you

 2   talking about?

 3        Q       Didn't you reach an agreement that they

 4   would not press charges against you?

 5        A       Yes.

 6        Q       And did you have a lawyer when you talked

 7   to the FBI?

 8        A       No.

 9        Q       When you talked to the FBI, did they show

10   you any purple colored books similar to this?

11        A       No.

12        Q       When you talked to the FBI and learned

13   that a silencer was illegal, did the FBI tell you that

14   what you had done carried a minimum of ten years in

15   federal penitentiary with no parole?

16        A       No, they don't tell me nothing about it.

17        Q       They tell you have broken the law, right?

18        A       That I had done something illegal.

19        Q       All right.  But they didn't tell you, when

20   they discussed this with you, that it carried a

21   minimum of ten years.

22                MR. VINSON:  Objection, asked and

23   answered.  He stated they didn't do it.

24                THE COURT:  Sustained.

25        Q       (Mr. Odom)   They just told you it was
```

1      illegal but they didn't go into any details?

2          A      I believe that Mr. Reinaldo should have

3      told me that, that was illegal before I made.

4          Q      So they told you it's Reinaldo's fault --

5          A      No.

6          Q      -- that you didn't know it was illegal?

7          A      No.

8          Q      I mean, everything is Reinaldo's fault,

9      isn't it?

10         A      I don't know.

11         Q      Now, didn't you have a written agreement

12     that the FBI gave you about immunity?

13         A      No.

14         Q      They never faxed to you any sort of

15     agreement that was in writing about immunity?

16         A      No.

17         Q      No one has ever shown you any such written

18     agreement?

19         A      No.

20         Q      And as far as you know, such written

21     agreement does not exist?

22         A      I don't know if it exist.

23         Q      If it exists, no one has ever bothered to

24     show it to you, right?

25         A      Correct.

1          Q      So you have avoided a crime here from the
2     federal government but you have nothing in writing and
3     no one ever told you what the punishment might be,
4     right?
5          A      Could you repeat.
6          Q      All right.  The FBI told you you avoided a
7     crime, they are going to let you get off of being
8     involved in a crime but no one bothers to tell you
9     what the punishment is for the crime.
10               MR. VINSON:  Asked and answered, Your
11     Honor.
12               MR. ODOM:  Judge, this is cross
13     examination.
14               THE COURT:  I said I would let you answer.
15          A      Ask me again the question.
16          Q      The question is:  That the FBI lets you
17     off of a crime, says that you have immunity to
18     committing a crime but never puts anything in writing.
19               THE COURT:  Let's do it part by part.
20               MR. ODOM:  All right.
21          A      The question that he is making is
22     confused.  If you can be more specific, I have to say
23     that.
24          Q      The FBI says you will not be punished for
25     committing a crime?

```
 1        A      When I asked him, the FBI, if I be, if
 2   charges were going to be filed against me for making
 3   something illegal, they told for me not to worry, that
 4   I was not going to go to jail.
 5        Q      So you don't know if they are going to
 6   press charges?
 7        A      I don't know.
 8        Q      So you still don't know what the FBI,
 9   whether they plan to press charges or not now?
10        A      I don't know.
11        Q      Now, you also talked to the Houston Police
12   people, did you not?
13        A      The police was in the same building where
14   the FBI was.
15        Q      You had a number of conversations with the
16   state police, the Houston police as well as members of
17   the district attorney's office, correct?
18        A      Not several.
19        Q      Yesterday you told the jury that you
20   talked to Mr. Rosenthal with the district attorney's
21   office, correct?
22        A      You are talking in plural and I only
23   talked to that man one time.
24        Q      One time you talked to Mr. Rosenthal?
25        A      Yes.
```

1          Q       And you told the jury yesterday that Mr.

2     Rosenthal, or someone from the district attorney's

3     office, told you they would not prosecute you for any

4     crimes that came out of this case?

5          A       Yes.

6          Q       Did they tell you that it was illegal in

7     the State of Texas to have a silencer?

8          A       Yes, I know.

9          Q       Did they tell you what the punishment was

10    for having a silencer in the State of Texas?

11         A       No.

12         Q       Now, according to your testimony, you

13    believed Ray when he said that they were going to go

14    shoot someone, correct?

15         A       I don't remember if I believe it or not.

16         Q       So if you would have told that to the jury

17    yesterday, right now you don't remember whether you

18    believed it or not?

19         A       I don't remember what I believe in that

20    moment.   The only thing I wanted in that moment is

21    just South America.

22         Q       And we will get back to that.

23                 But, according to your testimony, you were

24    told there was going to be a murder before there was a

25    murder, right?

1          A       Yes.

2          Q       And you did not at that time attempt to

3    contact Mr. Thomas or anyone else to report this, did

4    you?

5          A       I did talk with Mr. Andy Thomas.  But I

6    didn't tell him what this man were planning to do.

7          Q       So the answer to my question is you didn't

8    tell Mr. Thomas or anyone with the police that there

9    was this crime about to occur, right?

10         A       What for, there is nothing happened yet.

11                 MR. ODOM:  May I approach the board?

12         Q       Because nothing has happened, there is no

13   reason to report it to anybody, right?

14         A       I don't see any reason to do that.

15         Q       Did anyone with either the police

16   department or with the district attorney's office tell

17   you that you could be charged with capital murder?

18         A       No.

19         Q       Did it ever occur to you that if they

20   didn't believe your story that you could be convicted

21   of capital murder?

22         A       The question is confusing again.

23         Q       All right.  Did it ever occur to you, in

24   your mind, that if these people over here did not

25   believe your story, you could be charged and perhaps

1    convicted of capital murder.

2              MR. VINSON:  Your Honor, object to that.

3    That's a misstatement of the law.  A person can only

4    be if there is an intent to commit the offense of

5    capital murder.

6              MR. ODOM:  I ask we approach the bench.

7              (Whereupon, the following proceedings were

8    held before the Bench.)

9              THE COURT:  I think I listened to this

10   stuff pretty good.  Are you sure yesterday he told me

11   there was a murder?  My understanding there was going

12   to be a robbery.

13             MR. SMYTH:  He said there was going to be

14   a murder and Albert was going to do the shooting so I

15   guess you could translate that into murder.  He didn't

16   use the word "murder."

17             THE COURT:  Go ahead.

18             MR. ODOM:  My position is that the motive

19   to lie, the reason his motive to lie, is that they

20   don't believe his story, he is instrumentally --  your

21   right to go into this area and to test this and to ask

22   these questions and to explore and they can put on

23   rebuttal if they want to put on rebuttal.  What they

24   are attempting to do is stand up and make an

25   objections to support their side.  They can do that on

1    redirect.

2              MR. SMYTH:  You got to be honest.

3              MR. ODOM:  I am not misstating the law.

4    If they believe he was involved in this, he can be

5    charged with -- as a matter of fact, the affidavit

6    from Tom Miller was to verify his credibility, his in

7    the crime.

8              MR. SMYTH:  In a possible offense that

9    making a silencer is exactly what they told me, not

10   the other thing.

11             MR. ODOM:  His testimony is that he makes

12   the silencer.  He was told it was going to be a

13   shooting and a robbery.

14             MR. VINSON:  Where is his intent?  Where

15   is his intent?

16             MR. ODOM:  That's only if you believe

17   everything he says.  No, I have the right.  I have a

18   right to cross examine.

19             THE COURT:  Wait a minute.  We can't talk

20   at the same time.

21             MR. ODOM:  It's not my burden.  My burden

22   is to cross examine on this, not to prove it, and

23   that's a right I have.  And if they want to cut me off

24   on it, fine, if they want to commit error on this one.

25             MR. SMYTH:  You can't misstate the law.

1          MR. ODOM:  I am not misstating the law.

2          THE COURT:  Very well, I don't think you

3    are being real accurate with what is required to

4    charge somebody much less convict somebody.  They have

5    to be charged first.  And I think you need to make

6    sure it is clear that if there is any indication that

7    he was involved in such a crime that he could be

8    indicted.

9          MR. VINSON:  Part of his involvement --

10          THE COURT:  I'll give you a couple of more

11    questions but then we are going to move on.

12          (Whereupon, the following proceedings were

13    held before the jury.)

14    Q     (Mr. Odom)  Mr. Ramirez, if you knew this

15    silencer was being made that you knew was being made

16    for the purposes of committing a robbery and a murder,

17    you realize that you could be charged for the robbery

18    and the murder, do you not.

19          MR. VINSON:  Object, Your Honor, only if

20    there is an intent on his part to engage in it.

21          THE COURT:  I think we need to establish

22    first.  Excuse me.  We need to establish first if he

23    knew that before he made the silencer or after.  I

24    think you are taking it for granted.  Let's qualify

25    that first.

1        Q        (Mr. Odom)    My question is:  If you had
2    the knowledge that the silencer that you made --
3                MR. VINSON:  Objection, Your Honor,
4    assuming facts that are not in evidence.  He needs to
5    establish if he knew at the time, not what he
6    supposes.
7                THE COURT:  Try to restate the question.
8                MR. ODOM:  Judge --
9                THE COURT:  Restate the question.
10       Q        (Mr. Odom)    You are telling this jury you
11   didn't know the silencer was going to be used for a
12   murder, right?
13       A        Yes.
14       Q        Isn't it true that for you to say that you
15   did have the knowledge that would put you in the
16   middle of a murder case.
17                MR. VINSON:  Objection, Your Honor, there
18   is no evidence to know that.
19                THE COURT:  He can ask the question.
20       A        If you have read my statement, also, in my
21   statement --
22                MR. ODOM:  Judge, I ask that he answer my
23   question.
24                THE COURT:  I think he is trying to.
25                MR. ODOM:  I apologize.  In all due

1    respect, I didn't ask him about his statement.  I

2    asked him a straight up question as to whether isn't

3    it true if he had knowledge that he would be involved

4    in the murder case.

5              THE COURT:  Very well, answer that

6    question.

7         A         Repeat the question.

8         Q         (Mr. Odom)   The question is this:  Isn't

9    it true that if you had knowledge that the silencer

10   that you made was going to be used in a robbery murder

11   that would involve you in the robbery murder --

12        A         Before making it?

13        Q         Or during the making of it.

14        A         Before finishing the silencer, I didn't

15   know it was a silencer.

16        Q         I know.  But the question is:  You know,

17   do you not, that if you did have the knowledge that

18   the silencer that you were making was going to be used

19   in a robbery murder that would make you responsible or

20   a party in the robbery murder.

21             MR. VINSON:  Objection, again, he has got

22   to know that not only the silencer was made but there

23   was intent to use it.

24             MR. ODOM:  Judge, I intend to try to do

25   that through cross examination.

1                    THE COURT:  Very well.

2        A       I will repeat.  Before making the

3    silencer, I didn't even know --

4                    MR. ODOM:  That's non-responsive.

5                    THE COURT:  Let him answer.

6        A       I didn't know it was illegal and I didn't

7    even know it was going to be used in a robbery.

8        Q       (Mr. Odom)   If I may, that was not my

9    question.  Please try to answer my question.

10       A       Okay.

11       Q       My question is, and I think you know the

12   answer, but if you would have the knowledge, if you

13   did have the knowledge that your silencer was going to

14   be used in a robbery murder, that would make you part

15   of the robbery murder.

16                   MR. VINSON:  Objection, assuming facts

17   that are not in evidence.

18                   THE COURT:  It calls for a speculative

19   answer.  He has testified he did not know, and I think

20   that's about as far as we will go.

21                   MR. ODOM:  But I am asking, Judge, his

22   motive for testifying the way he is testifying that he

23   has knowledge that --

24                   MR. VINSON:  Object to the speaking

25   objection.

1          THE COURT:  Go ahead.

2          MR. ODOM:  I have a right to explain this,

3     that he has a motive for testifying the way he is

4     testifying, and I am merely pointing out.

5          MR. VINSON:  Object, Your Honor, to any

6     other speaking objection.  And may we approach the

7     bench?

8          THE COURT:  Have a seat.

9          This is a very simple question as to

10    whether or not he has knowledge what the implications

11    would be if he was making a silencer.  He has already

12    testified he didn't know --

13         MR. ODOM:  I will, Judge.

14         THE COURT:  -- what the law would be.

15         MR. ODOM:  That's what I thought I had

16    been asking but I will try to ask it again.

17    Q      (Mr. Odom)  You do know that if you make

18    a silencer and you know that it will be used in a

19    robbery murder that you would then be part of the

20    robbery murder, right?

21    A      In this moment, yes.

22    Q      You have been told that you will not be

23    prosecuted for any robbery murder, right?

24    A      I haven't been told that I will not be

25    prosecuted for any robbery or any murder but they told

1    me that because making of the silencer under the

2    instructions of Mr. Reinaldo, I was not going to be

3    prosecuted.

4         Q       I believe that answers my question.

5                 Mr. Ramirez, did anyone tell you what the

6    punishment is for this type of murder.

7                 MR. VINSON:  Objection, Your Honor, I mean

8    what relevance is that.

9                 THE COURT:  I sustain.

10                MR. ODOM:  Note our exception.

11        Q       (Mr. Odom)   Now, Mr. Ramirez, what is

12   your legal status here in this country?

13        A       I am a legal resident.

14        Q       That was a Texas driver's license you

15   showed me?

16        A       Yes.

17        Q       Does that indicate your legal status?

18        A       I think so.

19        Q       Okay.  But you have a legal resident

20   status, correct?

21        A       Yes.

22        Q       What is the status of your wife?

23        A       I don't want to answer the question.

24        Q       I know you don't want to answer the

25   question but, please, answer the question.

```
 1         A      It's illegal.

 2         Q      Does the FBI -- are they aware of that

 3     fact?

 4         A      Yes.

 5         Q      Of course they are.

 6                And the district attorney's office is also

 7     aware of that fact, are they not?

 8         A      No.

 9         Q      But the federal government, the FBI, is

10     aware of that fact?

11         A      Not the FBI.

12         Q      Not the FBI?

13         A      No.

14         Q      Is any agency aware of that fact?

15         A      The Houston Police.

16         Q      The Houston Police is aware of that fact?

17         A      Yes.

18         Q      You don't have any written agreement with

19     anyone from the Houston Police Department indicating

20     that they will not tell INS, the Immigration or

21     Naturalization Service, about your wife, do you?

22         A      I don't know.  What is the question?

23                No, I don't have any.

24         Q      And you just answered my question.  You

25     answered no without knowing what my question was.
```

1   A  That if there was a document that was

2 protecting my wife?

3   Q  No, never mind.  Strike that question.

4     You do understand, however, that although

5 there is nothing official, that the Houston Police

6 Department could make a phone call and your wife could

7 be placed in custody and sent back to Ecuador; you

8 know that, don't you?

9   A  Maybe.

10   Q  Maybe?

11   A  Yes.

12   Q  I mean you know that, yes, right?

13   A  Maybe.

14   Q  You also know that, as your status here in

15 the country, if you are harboring an illegal alien,

16 that you would also lose your status here in the

17 country.  You know that as well, don't you?

18   A  I don't know.

19   Q  You were not aware of that fact?

20   A  No.

21   Q  When you got your permanent residency

22 status, they didn't tell you any of these rules?

23   A  I tell this man that my wife is here only

24 just for five months.

25   Q  Regardless of how long your wife is here,

1    you know that by having her here you can lose your

2    legal status?

3         A    I don't know, maybe.

4         Q    No one explained that to you when you got

5    your status coming here -- when you got your legal

6    resident status?

7         A    I don't remember.  It's too many years

8    ago.

9         Q    Now, when it came time to go to trial, it

10   was someone from the Houston Police Department who

11   contacted you and told you it was time to come to

12   trial, was it not?

13        A    No.

14        Q    Was it someone from the district

15   attorney's office that contacted you?

16        A    Yes.

17        Q    Now, have you ever had an attorney that

18   represented you during all of these discussions that

19   you had with the FBI, with the Houston Police

20   Department or with the district attorney's office?

21        A    You tell that if there is a need or do we

22   have to have our lawyer to tell the truth.

23        Q    My question is:  In any of these

24   dealings -- and you can tell me this -- in any of

25   these dealings have you ever had an attorney?

1       A       No.

2       Q       So if I may approach the board, in your

3   dealings on trying to get a reward --

4       A       I didn't try to get a reward.

5               THE COURT:  Let's not put words in his

6   mouth.  I don't recall that testimony.

7       Q       That's right, it's Mr. Thomas that made

8   that inquiry.

9               In your dealings with avoiding a federal

10  silencer law --

11              MR. VINSON:  Your Honor, I am going to

12  object to using the words "avoiding a federal silencer

13  law."  They said they wouldn't prosecuted him.  He

14  hasn't avoided anything.

15              THE COURT:  I think we understand.  Go

16  ahead.

17      Q       (Mr. Odom)   In your dealings with

18  avoiding a state silencer law and any potential

19  dealings involving any involvement in a murder case --

20              MR. VINSON:  Objection, there is no

21  evidence before the Court that he was involved in any

22  murder case.

23              THE COURT:  I sustain that.

24              MR. VINSON:  And I ask that the jury be

25  instructed to disregard it.

```
1                    THE COURT:  The jury will so disregard.
2          Q      (Mr. Odom)   And any dealings you have, as
3     far as your legal status or your wife's legal status
4     here in the country, you are relying upon the good
5     will and faith of the FBI, the Houston Police
6     Department and the district attorney's office?
7          A      My custom or my habit is always to tell
8     the truth.  And I believe everybody else acts the same
9     way with me.
10         Q      That was not my question.
11                My question was:  That you were relying on
12    their good will and faith in all of these dealings
13    with all of these different agencies as to the various
14    matters we have talked about?
15         A      No.
16         Q      No?
17         A      No.  I do this because I wanted to do it
18    because it is my own decision.  Nobody push me to come
19    in here.  Nobody make me come in here to make this
20    statement.  Nobody pushed me to make my declaration
21    here, and the only reason I be here is not because I
22    want to accuse somebody or to defend anybody.  The
23    only reason why I am here is my own personal reason, a
24    feeling that I have to know that I made something that
25    possibly was used to kill somebody.  That's the only
```

1    reason.

2        Q      I understand your position.  You have told

3    that to the jury.

4               But my question was:  That in all of your

5    dealings with these agencies, that it is their

6    interpretation of your story and it is their good will

7    that keeps your wife's status, your status as well as

8    certain legal statuses, the way it is, right?

9        A      I am a professional and I can't do any job

10   in any place.  I don't do that.

11       Q      Excuse me.

12              MR. ODOM:  It's a yes or no answer,

13   Judge.

14              THE COURT:  I think it is convoluted.  I

15   understand what you are trying to ask.  I think

16   because of the language barrier and I think Mr.

17   Ramirez is confused.  Will you try one more time to

18   try to get to the point.

19       Q      (Mr. Odom)  Mr. Ramirez, the truth of the

20   matter is that you have nothing in writing that

21   protects you in case someone thinks you are not

22   telling the truth?

23       A      That's correct.

24       Q      Thank you.

25              Now, having established that, let's talk

1      about the case.

2                    First of all, you come into the United

3      States with 67 rings, correct?

4          A      Correct.

5          Q      And although you are a tool maker, you are

6      attempting to sell the jewelry you have brought into

7      the United States?

8          A      Yes.

9          Q      That occasioned you to meet a Francisco,

10     right?

11         A      Yes.

12         Q      And when you came into the United States,

13     you, of course, reported those rings to customs, did

14     you not.

15                    MR. VINSON:  May we approach, Your Honor?

16                    THE COURT:  You may.

17                    (Whereupon, the following proceedings were

18     held before the Bench.)

19                    THE COURT:  Okay.

20                    MR. VINSON:  If he is going to attack him

21     on a custom, I am going to ask him on redirect.  I am

22     going to go into how they go through customs on the

23     other ring that was brought in that was Reinaldo's.

24     If he wants to take that route, he can.

25                    MR. ODOM:  I don't know by asking if he

1    comes into the United States, if he enters illegally,

2    that I have opened a door to an area.

3                 MR. VINSON:  He came in legally.

4                 MR. ODOM:  Not if he brought in the stolen

5    merchandise, not stolen undeclared.  He is not

6    going --

7                 MR. VINSON:  Well, he brought it in for

8    Reinaldo and I can ask him if he paid this.  You run

9    the risk.

10                 MR. ODOM:  I think if the Court will grace

11   us.

12                 THE COURT:  I don't think that would open

13   the door and I will not allow that question.

14                 (Whereupon, the following proceedings were

15   held before the jury.)

16        Q      (Mr. Odom)   Were the 67 rings legally

17   entered into the United States?

18        A      Have you traveled to --

19                 THE COURT:  Just answer the question yes

20   or no.

21        A      Yes.

22        Q      So you did declare them at customs?

23        A      You don't have to declare values less than

24   $10,000.

25        Q      Even if you are going to sell it?

1          A       I don't know.

2          Q       So the real answer to the question is

3     either no or you don't know?

4          A       See, custom says that I have to declare

5     values over $10,000.  They don't ask me what I am

6     going to do with the value of the money less than

7     $10,000.

8          Q       Mr. Ramirez, you have come into the

9     country more than once, have you not?

10         A       Yes.

11         Q       And you have brought other items into this

12    country for sale, have you not?

13         A       No.

14         Q       But you certainly have since then, have

15    you not?

16         A       No.

17         Q       You are telling this jury that you didn't

18    know if you were bringing something into this country

19    to resell that you did not have to declare it to

20    customs?

21         A       Not to custom, the Internal Revenue

22    Service.

23                 THE COURT:  Let's approach.

24                 (Off-the-record discussion held at the

25    bench.)

1      Q      (Mr. Odom)   You were looking to sell your

2    67 rings?

3      A      Yes.

4      Q      You are staying at a friend's house, are

5    you not?

6      A      Yes.

7      Q      And tell the ladies and gentlemen of the

8    jury what that person does for a living.

9      A      He has a mechanics shop.

10     Q      And Mr. Dennes does work or leaves his

11   truck at that particular shop, does he not?

12     A      That he lives there or he used to live

13   there?

14     Q      No, no.  The person who owns the mechanic

15   shop where you were staying he works on Mr. Dennes'

16   truck on occasion?

17     A      Yes.

18     Q      You meet Francisco who tells you that Mr.

19   Dennes can take your jewelry on consignment.

20     A      Francisco didn't tell me to give my

21   jewelry to Mr. Dennes to sell them because Francisco

22   was the one that was carrying them so he could sell

23   them.

24     Q      You give them to Francisco but eventually

25   you understand that Mr. Dennes is going to try to sell

1    the jewelry?

2         A      That I didn't know.

3         Q      Eventually you find that out, though?

4         A      Francisco is a salesman of that company

5    that he had.

6         Q      Right.  When you go to Mr. Dennes' office

7    for the first time, it's in relation to your 67 rings,

8    right?

9         A      The day I went to Mr. Reinaldo's office it

10   was to meet with Francisco, to meet him.

11        Q      Now, when you go to Mr. Dennes' office,

12   have you already given the rings to Francisco?

13        A      Yes.

14        Q      And what you are telling us, I understand,

15   is that you meet Mr. Francisco for the first time at

16   Mr. Dennes' office?

17        A      I went to Mr. Reinaldo's office to give

18   the rings to Francisco.

19        Q      I have got it.

20               Now, at that time you see that there is a

21   lathe in the back of the shop, right?

22        A      No, because I was on the other side of the

23   showcase that they have there.

24        Q      But you can see it from the front, can you

25   not?

1      A      I didn't realize that there was a lathe

2   machine in the back part of the shop.

3      Q      At what point did you realize there was a

4   lathe in Mr. Dennes' shop?

5      A      When they invited me to come inside.

6      Q      And when was that?

7      A      The same day.

8      Q      I thought I had asked that.

9             The first day you come to the shop that

10   you meet Francisco and that you meet Ray Dennes is the

11   same day that they invite you in and you see a lathe

12   machine in the shop?

13      A      That day I came to bring the rings to

14   Francisco was there at that place.  When I gave him

15   the rings, he called Mr. Reinaldo to where the

16   showcase is.  And I showed him the rings that I had

17   brought and he didn't want to buy them.  So, after

18   that, Francisco asked Reinaldo if I could go to the

19   back and he said yes and I went to the back.

20      Q      So the answer to my question is yes?

21      A      Yes to what?  Because you make two

22   question at the same time.

23      Q      Both of which the answer is yes.

24             You see the lathe and you start working

25   the lathe, right, yes or no?

1      A       No working on, just touch it.

2      Q       You move the parts?

3      A       Yes.

4      Q       And at that time Mr. Dennes asked you if

5   you know how to work such a machine?

6      A       Yes.

7      Q       And that creates a relationship where you

8   can work in Mr. Dennes' office, right?

9      A       Correct.

10     Q       Now, Mr. Dennes can also work the lathe

11  machine, could he not?

12     A       I don't know.

13     Q       The whole time you were there you never

14  saw Mr. Dennes work on watches with that machine?

15     A       No.

16     Q       The whole time you were there you never

17  saw the machine had been used when you weren't using

18  it?

19     A       I don't know.  I don't realize that.

20     Q       How long did you work there at the office

21  with that lathe machine?

22     A       For about 12, 15 days.

23     Q       And you never know whether or not Mr.

24  Dennes has either used the machine or can use the

25  machine during those 12 or 15 days?

1      A       I never seen him running the machine.

2      Q       Did you see people that would bring in

3      watches in for Mr. Dennes to repair?

4      A       Yes.

5      Q       Did you see pieces of jewelry that Mr.

6      Dennes had made?

7      A       Where with?

8      Q       At his place of business.

9      A       In the place, yes, not on the lathe.

10     Q       I understand that but at the place of

11     business, right?

12     A       Yes.

13     Q       But it never occurred to that Mr. Dennes

14     could use that machine or knew how to use that

15     machine?

16     A       I don't care about it.

17     Q       Okay.  You stated that Mr. Dennes would

18     let you come to his office and that he would give you

19     work to do; is that correct?

20     A       It's not that he let me.  He would give me

21     work.

22     Q       Did you call ahead of time to come into

23     Mr. Dennes' office or to his shop?

24     A       That if I call him to go there before is

25     the first day to get there, did I call him?

1       Q     No.  After you were working in the office,

2  would you just show up?

3       A     I would get there.

4       Q     Okay.  And you wouldn't know ahead of time

5  whether there was work for you there or not?

6       A     I would go to see if they had sold my

7  rings and to do any type of job that he would ask me

8  to do.

9       Q     Okay.  Did you have a key to let you in?

10      A     No.

11      Q     Now, did you say every time you came into

12  the building you had to sign in?

13      A     Not every time.

14      Q     Was there certain times that you came in

15  that you had to sign in?

16      A     It seems like, when you come in many times

17  into that building, the security guard that is there,

18  since they know that you come in and out, sometimes

19  you don't sign.

20      Q     So you went to the building a lot?

21      A     For about 15 days, 20 days, something like

22  that.

23      Q     The security guards knew you that you

24  would come in and work in Mr. Dennes' office?

25      A     No, they don't if I work or not.

1          Q       But they knew you as someone that would

2     come in?

3          A       Someone, yes.

4          Q       Now, during this time, you have no money;

5     is that correct?

6          A       It's not correct.

7          Q       Okay.  You are not getting any money from

8     Mr. Dennes during this time?

9          A       $300.

10         Q       Okay.  You are getting a little bit of

11    money from Mr. Dennes?

12         A       Yes, when we make the trip to Monterrey to

13    buy a diamond for $15,000.

14         Q       How many days had you been working for Mr.

15    Dennes when you went to Monterrey?

16         A       I don't remember.

17         Q       Is it a short period of time -- you had

18    only worked there for 15 days, right?

19         A       I don't remember exactly.

20         Q       When you bought the diamond in Monterrey

21    and brought it back to Houston, were you involved in

22    the selling of the diamond?

23         A       I don't brought that diamond.

24         Q       You didn't wear the ring back from

25    Monterrey?

1      A      Yes, but I didn't buy it.

2      Q      I understand that.

3             My question is:  I say when you brought it

4      back; I didn't say that you bought it.

5      A      You say that.

6      Q      You brought it.  It's confusing, I know.

7      A      Yeah.

8      Q      Were you involved in the financial

9      transaction on the diamond when it came back to the

10     United States?

11     A      No.

12     Q      You were not involved in any of that?

13     A      Mr. Reinaldo invited me to go to Monterrey

14     just to accompany him.  And also to carry $7000, for

15     me to carry for him, to give it to him in Monterrey.

16     Q      Now, when you went to Monterrey, did you

17     put Mr. Dennes in touch with the persons that you

18     bought the diamond from?

19     A      I repeat again I went as someone who had

20     been invited.

21     Q      I understand.  But did you not know

22     anybody in Monterrey?

23     A      No.

24     Q      And did you meet people in Monterrey that

25     you wanted to do business with after that?

1      A      No.

2             MR. ODOM:  May I approach the witness,

3    Your Honor?

4             THE COURT:  You may.

5      Q      Mr. Ramirez, do you recall seeing State's

6    Exhibit 43?

7      A      Yes.

8      Q      Now, that's the exhibit that you showed

9    the jury yesterday wherein you had made sketchings of

10   how to thread a silencer on a pistol, correct?

11     A      Yes, sir.

12     Q      On the top of that exhibit is a telephone

13   number, correct?

14     A      Yes.

15     Q      Is that your handwriting?

16     A      Yes.

17     Q      That's a number to Monterrey, is it not?

18     A      I don't know, maybe.

19            MR. ODOM:  May I approach the witness,

20   Your Honor?

21            THE COURT:  You may.

22            MR. ODOM:  May I have a moment, Your

23   Honor?

24     Q      Mr. Ramirez, yesterday do you remember Mr.

25   Vinson showing you some telephone records?

```
1        A       Yes.

2        Q       I would also like to show you a copy of

3    the same records that you saw.  Do you see the number

4    written on that piece of paper?  Do you see it, that

5    same number?

6        A       Yes.

7        Q       Where is that number to?

8        A       I don't remember.

9        Q       What does it say on there?

10       A       Monterrey.

11       Q       Monterrey?

12       A       Yes, sir.

13       Q       You don't know if that's your handwriting

14   or not?

15       A       This is my handwriting.

16       Q       That is your handwriting?

17       A       Yes.

18       Q       It's not Mr. Dennes' handwriting, is it?

19       A       Excuse me.

20       Q       It's not Mr. Dennes' handwriting?

21       A       No, it's mine.

22       Q       Now, I believe you stated that during

23   these 15 days that you worked --

24       A       I don't remember how many.

25       Q       All right.  During this time period that
```

1    you worked with Mr. Dennes, that they started giving

2    you more work to do?

3         A      Yes.

4         Q      Did you ever do any work on your own?

5         A      No.

6         Q      You never did any work for anyone else

7    other than Ray Dennes there in that shop?

8         A      No.

9         Q      And you certainly never did any work for

10   yourself that you showed to anybody else that you had

11   done there in that office?

12        A      I don't remember.  I don't think so.  I

13   don't remember exactly.

14        Q      Now, at some point Mr. Dennes approaches

15   you and has a sketch of something he wants you to

16   build, right?

17        A      Yes.

18        Q      And that is we know, what we call, what

19   Mr. Vinson called, the first generation silencer.

20        A      In that time I don't know a silencer.

21        Q      But Mr. Vinson called it and we are now

22   calling it the first generation silencer.

23        A      Yes.

24        Q      Now, when you made the first silencer for

25   Mr. Dennes, you don't know what happened to that

1    silencer, do you?

2         A      I don't remember.  I don't exactly.

3         Q      The second silencer that you made you know

4    that, according to your testimony, Mr. Dennes took the

5    threading out of it and put steel wool in it on

6    several occasions, correct?

7         A      On the second one?

8         Q      Yes.

9         A      Yes.

10        Q      I take it, the way the silencers are

11   constructed that you can take the washers out through

12   the threading; is that a fair statement?

13        A      Yes.

14        Q      In other words, in all the silencers you

15   made there were washers that were inside the tubing,

16   right?

17        A      Correct.

18        Q      And on all of the silencers that were made

19   the way these washers were put in is that they were

20   threaded into the inside of the tube?

21        A      Yeah.

22        Q      And at various times the washers could be

23   taken out and, at least in the last model, steel wool

24   could then be placed at various parts between the

25   washers, right?

1     A     Yeah.

2     Q     And, then, when the bullet is fired, the

3  bullet goes through the steel wool as it comes out the

4  other side, right?

5     A     Suppose to be.

6     Q     Well, that's what happened, isn't it?

7     A     I think so.

8     Q     You saw the silencer being screwed on to

9  the gun, did you not?

10    A     Yeah.

11    Q     You saw the bullet being fired through the

12 silencer, didn't you?

13    A     Yeah.

14    Q     So you know that's what happens?

15    A     It's suppose to be.

16    Q     Now, it did not take a machinist, did it,

17 to take out and reassemble the silencers; is that

18 correct?

19    A     No that's not -- no, it's not Dennes.

20    Q     What it did take a machinist to do,

21 however, was to build the tubing for the silencer?

22    A     Would you, please, repeat again.

23    Q     What your testimony was that it took a

24 machinist to build the tube for the silencer, correct?

25    A     Uh-huh.

1      Q      Yes?

2      A      Yes.

3      Q      And in order to do that, you had to go and

4  purchase certain tools to create this?

5      A      Yes.

6             MR. ODOM:  May I approach the witness,

7  Your Honor?

8             THE COURT:  You may.

9      Q      And your testimony is that exhibit 40 and

10  41 are photos of these tools, correct?  40, what is

11  exhibit number 40?

12     A      It's tool bit set or drill bit set.

13     Q      What exhibit number 40 is drill bits, is

14  it not?

15     A      Yeah.

16     Q      A set of drill bits, right?

17     A      Yes.

18     Q      And what's State's Exhibit 41 is.

19            MR. ODOM:  May I approach the witness?

20     Q      What is that?

21     A      What is this?

22     Q      Yes, sir.

23     A      Some parts belong to the machine and

24  others are tools to cut.

25     Q      All right, to cut, to do what kinds of

1    cutting?

2         A       Any kind.

3         Q       Used for cutting fine tools or bigger

4    items?

5         A       It depends on the capacity of the lathe

6    machine.

7         Q       I see.  Where is the .9 mm reamer in that

8    photograph?

9         A       It's not over here.

10        Q       So the tools that are in State's Exhibit

11   40 and 41 do not include any .9 mm reamer?

12        A       No.

13        Q       What they do include are tools that you

14   cut with on a lathe machine and a set of drill bits,

15   right?

16        A       Yes.

17        Q       Mr. Ramirez, were there any tools that

18   were at the mechanic shop where you lived?

19        A       In a mechanic shop there are many tools;

20   yes.

21        Q       But, of courses, there is no .9 mm reamer

22   in the mechanic shop where you lived, is there?

23        A       They also have a lathe machine over there,

24   also.  I don't know how many tools they have or what

25   kind.

1       Q       I see.

2               Now, the first silencer that you made was

3       made with a sketch that Mr. Dennes gives you, correct?

4       A       Yes.

5       Q       Where is that sketch?

6       A       You ask me?

7       Q       Yes, sir.

8       A       I don't know.

9       Q       It was given to you, right?

10      A       Yes.

11      Q       The sketch we do have is one that you

12      made, correct?

13      A       This one?

14      Q       Yes, sir.

15      A       This is the silencer.  This is the bottom.

16      Q       That's the only sketch we have, that is,

17      the one you made?

18      A       This is what I made.

19      Q       Along with a telephone number you put down

20      for Monterrey?

21      A       Yes.

22      Q       Now, it is your testimony that at some

23      point there were some catalogues that were ordered

24      from Arizona, correct?

25      A       Yes.

1  Q  And that Mr. Dennes made phone calls from

2 his office in Houston to Arizona?

3  A  Yes.

4  Q  Did you ever make phone calls from Mr.

5 Dennes' office anywhere?

6  A  Yes.

7  Q  You made phone calls to Ecuador?

8  A  Yes, sir.

9  Q  Mr. Dennes was the one that made these

10 phone calls, correct?

11  A  To Arizona?

12  Q  To Arizona.

13  A  Yes.

14  Q  And then Mr. Dennes --

15  A  From his office, yes.

16  Q  And then Mr. Dennes gives you money for

17 you to go purchase a money order to buy the

18 catalogues, correct?

19  A  Yes.

20  Q  That's correct.  And you are the one that

21 purchases the money order for Mr. Dennes and you are

22 the one that sends the money to Arizona to get the

23 catalogues, correct?

24  A  That's correct.

25  Q  And you have the catalogues sent --

```
 1        A       To my address.

 2        Q       -- to your house?

 3        A       Yes, it's not my house, my address.

 4        Q       It's the house where the mechanic shop?

 5        A       That is correct.

 6        Q       Now, at some point you make another phone

 7    call to Arizona, do you not?

 8        A       Yes.

 9        Q       And from where are you when you make that

10    phone call.

11                MR. VINSON:  Object to the form of the

12    question, you made another call.  There is no evidence

13    he ever made but one call.

14                MR. ODOM:  I'll restate the question.

15                THE COURT:  Very well.

16        Q       (Mr. Odom)   At some point you make a

17    phone call, according to your testimony?

18        A       You try to confuse me.

19                THE COURT:  Sir, wait a minute.  Listen to

20    the question.

21        Q       No, I don't have to try.  I don't come

22    here to be confused.  I come here to tell the truth.

23                THE COURT:  That's enough.  Ask the

24    question.

25        Q       (Mr. Odom)   You make a phone call to
```

1    Arizona?

2         A      Yes.

3         Q      Where is it that you make your phone call

4    from to Arizona?

5         A      I don't remember.

6         Q      You don't remember if it was from the

7    house you are staying at or from Mr. Dennes' office?

8         A      No, from Mr. Dennes' office definitely

9    not.

10        Q      It's from some other location that you

11   make this phone call?

12        A      Yes.

13        Q      And you cancel some of the books that,

14   according to you, Mr. Dennes has ordered, right?

15        A      I canceled the second book that Mr. Dennes

16   ordered; yes.

17        Q      Now, you then receive the money back for

18   that book?

19        A      Yes.

20        Q      And who gets that money?

21        A      In the money order, in a check.  Excuse

22   me.

23        Q      Does it come to your house?

24        A      Yes.

25        Q      And you cash that?

1      A      I don't remember.

2      Q      You didn't give it back to Mr. Dennes?

3      A      I don't remember.

4      Q      But you, according to your testimony, take

5   Mr. Dennes' money and send it to Arizona and get

6   catalogues for Mr. Dennes?

7      A      Correct.

8      Q      And these catalogues come to not his

9   office but to your house?

10     A      Me and others.

11     Q      Then you cancel one of the catalogues that

12   are Mr. Dennes' catalogues, correct?

13     A      Yes.

14     Q      And you get the money that is Mr. Dennes',

15   at least it goes to your residence, right?

16     A      It came to the address that Mr. Dennes

17   gave.

18     Q      Which is where you are staying?

19     A      Yes.

20     Q      And then you don't remember whether you

21   kept that money or give it back to Mr. Dennes?

22     A      I don't remember.

23     Q      But I believe you testified that Mr.

24   Dennes did not ask you to cancel that, did he?

25     A      No, he don't ask me that.

1          Q       So although this is Mr. Dennes' money, not

2     yours, and although the catalogues are going to Mr.

3     Dennes to your house and although you were doing what

4     Mr. Dennes tells you to do, you take it upon yourself

5     to cancel his catalogue with his money, correct?

6          A       When I realize what I doing, yes.

7          Q       That's the point when you realize what you

8     were doing, right?

9          A       After -- well, in the time I make the

10    silencer I realize what I doing.

11         Q       So now you realize what you are doing.

12    But, Mr. Ramirez, you don't know that this is illegal,

13    do you?

14         A       There is too many versions of it.

15         Q       Too many versions of the silencer?

16         A       There were too many versions because there

17    were too many people coming into the shop.  There was

18    some people.  Some people say it was illegal and some

19    people say it was not.

20         Q       So now people are telling you that the

21    silencer is illegal, right?

22         A       Not for sure because everybody say

23    different things.

24         Q       My question is --

25         A       The person suppose to told me that is Mr.

1    Dennes.

2         Q       So you are being told that this is

3    illegal?

4         A       Yes, when I finished, yes.

5         Q       And you cancel the catalogue?

6         A       Yes.

7         Q       But there is still work being done on the

8    silencer?

9         A       It had already been finished when I cancel

10   it.

11        Q       All right.  But you are still putting

12   steel wool into the silencer, are you not?

13        A       No, he was doing it.

14        Q       Okay.

15        A       Mr. Dennes.

16        Q       All right.  So now your testimony is at

17   the point you cancel the catalogue you knew that this

18   was an illegal enterprise or you suspected it was an

19   illegal?

20        A       I suspected it.

21        Q       Okay.  But you continued to work with Mr.

22   Dennes, correct?

23        A       Yes.

24        Q       And you continued to go out and test fire

25   the gun, yes?

1        A       Yes, I did go with him.

2        Q       All right.  And you continue to discuss

3   with them various activities about a possible

4   robbery.

5                MR. VINSON:  Objection, that's a

6   mischaracterization of all the testimony that we heard

7   yesterday.

8                THE COURT:  Sustained.

9                MR. VINSON:  And I ask that the jury be

10  asked to disregard it.

11               MR. ODOM:  Let me clear that up.

12       Q       (Mr. Odom)   Do you talk to them about a

13  possible robbery.

14               MR. VINSON:  I'll object again, Your

15  Honor.   That is an improper question.   He knows what

16  the testimony was yesterday.   He triggered the

17  conversation.

18               THE COURT:  Sustained.

19       Q       (Mr. Odom)   Did you have a conversation

20  with them about a possible robbery?

21       A       Yes, in a restaurant.

22       Q       Yes.  And didn't you tell the jury that

23  you went along with it.

24               MR. VINSON:  Again, mischaracterization of

25  the testimony.  He has testified yesterday and the

1    jury heard what he had to say about it.

2              THE COURT:  Sustained.

3         Q         (Mr. Odom)    Did you not say that during

4    the conversation you said why not?

5         A         Yes, sir.

6         Q         And then you participated, to talk to them

7    about a robbery, right?

8         A         Yes, sir.

9         Q         So although your testimony is that you

10   weren't serious, regardless of how we may characterize

11   it, it is true that you had conversations with them

12   about the robbery, right?

13        A         Yes.

14        Q         So much so that you believed they were

15   serious and you decided to go to South America?

16        A         That's wrong.  It's not like that.

17        Q         So, no, it isn't.  As a matter of fact,

18   you had already bought the tickets to go to South

19   America, had you not?

20        A         Yes.

21        Q         And you were already planning to leave for

22   South America on the day you left for South America?

23        A         On the 21st, yes.

24        Q         And that is the day you left for South

25   America?

1        A       Yes, sir.

2        Q       And it wasn't because of a conversation

3    you had at a restaurant that you went to South

4    America?

5        A       No.

6        Q       And while you were in South America, you

7    called Mr. Dennes on three occasions, did you not?

8        A       I don't call Mr. Dennes on three

9    occasions.

10       Q       You don't talk to him but you call him, do

11   you not?

12       A       In his office.

13       Q       You call his office twice and you call his

14   home once, correct?

15       A       Yes, that's correct.

16       Q       This is after you had a conversation with

17   him?

18       A       Yes.

19       Q       According to you, regarding the fact that

20   the three of you are going to engage in a robbery

21   shooting, correct?

22       A       Yes, sir.

23       Q       Then you come back to the United States,

24   right?

25       A       That's correct.

1      Q      And you come back and go to the office

2   next to Mr. Dennes, correct?

3      A      I don't go to Mr. Dennes' office.

4      Q      I said to the office next to Mr. Dennes.

5      A      Mr. Raul's office.

6      Q      Which is next to Mr. Dennes?

7      A      Yes.

8      Q      Then it is that you discover that there

9   has been a shooting and that there is a possible

10   reward, correct?

11      A      No, at that moment.

12      Q      I know, afterwards, after that time.

13             THE COURT:  Mr. Odom, it's noon, if this

14   is a decent time to stop.

15             MR. ODOM:  Yes, sir, it is a good time.

16             THE COURT:  We are going to recess for an

17   hour, hour and a half.  We will take you to lunch

18   again.  Remember your admonishments not to discuss

19   this case.  We will stand in recess until 1:30.

20             (Recess taken.)

21             (Jury came into the courtroom.)

22             THE COURT:  Please be seated, ladies and

23   gentlemen.

24             Mr. Odom.

25             MR. ODOM:  Thank you, Judge.

1      Q       (Mr. Odom)   Mr. Ramirez, I would like to

2  show you what has been marked as State's Exhibit 56

3  and 55 and you identified those yesterday.  Do you

4  recall that?

5      A      Yes.

6      Q      And I believe you told the jury that

7  State's Exhibit 55 and 56 are photos of Alberto and

8  Reinaldo Dennes, correct?

9      A      Yes.

10     Q      And you told the jury that they looked

11 different in those photographs than they did when you

12 knew them, correct?

13     A      Yes.

14     Q      To clarify any possible misconception, the

15 difference in those photographs is that it appears as

16 though they have not shaved for several days; is that

17 correct?

18     A      Looks like it.

19     Q      So, in other words, in these photographs

20 their hair is not a different color, is it?

21     A      No.

22     Q      There is no mustache that has been shaved

23 off that was there when you knew them, was there?

24     A      I don't remember.

25     Q      All right.  But it appears as though the

1    difference is that they have about a two- or three-day

2    growth on their chin, correct?

3         A     Yes.

4         Q     There is not a full beard there, is there?

5         A     No.

6         Q     I believe you stated that you made a

7    statement at the FBI office.  Do you recall that?

8         A     Yes.

9         Q     Was that statement transcribed or was

10   there any recording of that statement that you are

11   aware of?

12        A     I don't remember.

13        Q     You don't remember if they were running a

14   tape recorder or had a machine set up?

15        A     I don't remember.

16        Q     Now, did Mr. Dennes know the people

17   that -- what's the name you were staying with?

18        A     Jose Rivero.

19        Q     Did Mr. Dennes -- he did not know those

20   people prior to meeting you, did he?

21        A     No.

22        Q     He met them through you, correct?

23        A     Then, no, he only know one person, Jose

24   Rivero.

25        Q     I understand.  All right.

1                    Mr. Dennes meets Mr. Rivero through you?

2          A    Yes, sir.

3          Q    And Mr. Dennes has a truck, correct, or

4    had a truck at that time?

5          A    Yeah.

6          Q    And during the time that you were working

7    for Mr. Dennes -- or working in a shop -- did you

8    occasionally get to use Mr. Dennes' truck?

9          A    If I used his truck?

10         Q    On occasion, yes.

11         A    I got my own car.

12         Q    Did you never use Mr. Dennes' truck?

13         A    I think one time I use it.

14         Q    And occasionally Mr. Dennes' truck, or at

15   least on one occasion you know of, Mr. Dennes' truck

16   was left at the shop, Mr. Rivero's shop, to be

17   repaired, correct?

18         A    Yes.

19         Q    Would Mr. Dennes have to call that phone

20   number in order to determine if his truck was ready or

21   the status of his truck?

22         A    I don't know if he call or not.

23         Q    But if he wanted to talk to someone about

24   his truck, would he have to call on the same phone

25   that he would have to call to talk to you?

1        A        Maybe.

2        Q        Do you know if they had two phones, a shop

3    phone and a home phone?

4        A        There's only one.

5        Q        Do you remember what that telephone number

6    is?

7        A        Yes.

8        Q        And I believe yesterday you indicated it's

9    837-1448?

10       A        Yes.

11       Q        Correct?

12       A        Correct.

13       Q        Now, do you recall that while you were

14   working with Mr. Dennes that his truck was stolen?

15       A        No.

16       Q        You don't recall that?

17       A        No.

18       Q        Mr. Ramirez, how long did it take to build

19   the silencer?

20       A        More or less ten days.

21       Q        And how long did it take to build the

22   second silencer?

23       A        About two or three days.

24       Q        But you didn't order the catalogue for the

25   second silencer -- you ordered that and it arrived the

1    next day; is that correct.

2            MR. VINSON:  Object to the inference that

3    he ordered the catalogue.  I think he stated this

4    defendant ordered the catalogue.

5            THE COURT:  Sustained.

6        Q    (Mr. Odom)   Mr. Ramirez, let me rephrase.

7            After you sent the money to receive the

8    catalogue at your house, or where you were staying,

9    how long did it take for you to receive that

10   catalogue?

11       A    About 10, 12 days, maybe more.

12       Q    Did you order the catalogue after -- I

13   believe you testified previously that you ordered the

14   catalogue after the first silencer turned out to be

15   unsuccessful, correct?

16       A    No.

17       Q    Did you order the silencer at the very

18   beginning?

19       A    I didn't order any silencer.

20       Q    When you paid for the catalogue, had you

21   already built the first silencer?

22       A    Yes.

23       Q    How long did it take for that catalogue to

24   get to your house?

25       A    12, 13 days, something like that.  I don't

1   remember exactly how many days after he order.

2        Q       Mr. Ramirez, how long did you know Mr.

3   Dennes?  How many days did you know Mr. Dennes about?

4        A       How many days I know Mr. Dennes?

5        Q       Yes.

6        A       I met him in -- pardon me -- I met him in

7   December and January.

8        Q       You met Ray in December to early January,

9   correct?

10        A       I met Mr. Reinaldo Dennes in December.

11        Q       Okay.  Is it early or the late part of

12   December?

13        A       First half of the month.

14        Q       Meet Ray in early December.  When do you

15   start working for Mr. Dennes?

16        A       I don't remember, sir.

17        Q       Not the exact day but is it in January or

18   is it in December?

19        A       In December.

20        Q       Is it towards the end of December?  Is it

21   a long period of time after you meet him that you

22   start working for him?

23        A       I don't remember.

24        Q       We know you have already told the jury

25   that the first day you go to his office is when he

1   sees that you can work a lathe machine, do you recall?

2       A       Yes.

3       Q       So it's shortly after, early time in

4   December, that you start working at his office, is it

5   not?

6       A       I don't remember.  I don't remember when.

7       Q       I know you don't know which day it was but

8   didn't you testify that the very first time you come

9   to his office is when they start talking about when

10  you can work at his shop and do work for him?

11      A       From the very first time, like I say, I

12  don't start working on the lathe.  I come in one or

13  two days later.

14      Q       Okay.  It's one or two days after this

15  that you start working for Mr. Dennes?

16      A       After I meet, yes.

17      Q       All right.  Now, I believe you testified

18  yesterday to the fact that he came to you in like

19  early January for you to build a tool for him; do you

20  recall that?

21      A       I don't remember in what time he asking me

22  to do that.

23      Q       So if you would have told this jury that

24  it was January 2nd yesterday, that would not be a date

25  that you really remember; is that correct?

1        A        The 2nd?

2        Q        Right.

3        A        The 2nd of January?

4        Q        Yes, sir.

5        A        Maybe I start working on January 2nd but I

6    don't remember when he asked me to do that.

7        Q        In other words, in the questioning

8    yesterday, if Mr. Vinson would have said January 2nd

9    and you would have said yes --

10       A        I started working in that time but I don't

11   remember when he asked me about can I do that.

12       Q        But you do know that's when you started

13   working on the silencer is January 2nd?

14       A        More or less.

15       Q        More or less around January 2nd?

16       A        Yes.

17       Q        Now, I believe you testified that it took

18   about how many days to build the silencer?

19       A        Around ten days.

20       Q        Around ten days.  That would be around

21   January 12th, right?

22       A        Maybe ten, maybe nine or maybe it's eleven

23   or twelve.

24       Q        Somewhere around that day?

25       A        Somewhere around ten, you know.

1        Q       Now, you didn't test fire this first

2    silencer, did you?

3        A       I didn't test anything.

4        Q       Nor did you see this one being fired, did

5    you?

6        A       No.

7        Q       So Mr. Dennes takes it.

8                Does he see you the next day or is it

9    several days before he sees you again?

10       A       The next day.

11       Q       And that is the day or the next day, which

12   the following day Ray returns and says it's not

13   satisfactory, correct?

14       A       He said it's too loud.

15       Q       Okay.  He said it was too loud and you

16   knew by that it wasn't satisfactory, right?

17       A       Yes, correct.

18       Q       Making too much noise, right?

19       A       Correct.

20       Q       At that time you order the catalogue,

21   right, or at that time you pay for the catalogue to

22   come to your house, correct?

23       A       At that time I paid for the catalogue the

24   money he give me.

25       Q       Did you do that that day or did it take

1 another day to do it?

2  A You are talking the time, the 12th or

3 when?

4  Q When he gives you the money.

5  A Yeah.

6  Q The day after he brings the silencer --

7 the day after you give him the silencer is that the

8 day he gave you the money to order the catalogue?

9  A No.

10  Q What day did he give you the money to

11 order the catalogue?

12  A Early in January.

13  Q Or earlier in January?

14  A Yeah.

15  Q Okay, therein lies my confusion.

16  Before the silencer was ever built, he

17 gives you money to order a catalogue to build the

18 silencer?

19  A Before I finish the first silencer, he

20 orders the catalogue.  He called to Arizona or

21 Arkansas, or whatever it is, and he orders the

22 catalogue.  And after he order the catalogue, I give

23 my address, my name.

24  Q I understand that, Mr. Ramirez.

25  My question is this:  Is that you sent the

1    money to receive the catalogue at your house?

2         A     Yes.

3         Q     Before you finished building the first

4    silencer, correct?

5         A     Yes.

6         Q     When, in January, did you send the money

7    to build the silencer?

8         A     I don't remember.

9               MR. ODOM:  May I approach the witness,

10   Your Honor?

11              THE COURT:  Certainly.

12        Q     Can you look at the two highlighted

13   numbers there and can you tell the jury what day it is

14   that the two phone calls were made to Cottonwood,

15   Arizona?

16        A     January 2nd.

17        Q     Thank you.  January 2nd?

18        A     Yes.

19        Q     How long had you been working on the

20   silencer was it before you sent the money to Arizona

21   to receive the catalogue?

22        A     I don't remember exactly how many days I

23   work on the silencer.

24        Q     Was it more than two days, was it more

25   than ten days?

1       A       I remember Mr. Dennes called to Arizona

2  and after that he give me the money to buy the money

3  order and send to Arizona.

4       Q       I understand that.

5               But what I am asking is that approximately

6  how many days had you been working on the first

7  silencer when this occurs?

8       A       I don't remember.

9       Q       You don't have any idea?

10      A       Any idea?

11      Q       Yeah.

12              MR. VINSON:  Object, he has told him

13  several times he doesn't remember.

14              THE COURT:  I think the question has been

15  asked several times.  Sustained.

16      Q       (Mr. Odom)   However long it was, the

17  money that you send for the catalogue to build the

18  silencer is sent after you had already received a

19  sketch of a silencer and had bought materials and

20  started to build the silencer; is that correct?

21      A       Yes.

22      Q       And it takes about ten days for the

23  catalogue to arrive?

24      A       No, it's taking more.

25      Q       It took more than ten days?

1        A       Yes.

2        Q       About how many days did it take for the

3   catalogue to arrive?

4        A       I believe between 12 and 14 days,

5   something like that.  I'm not sure what day it

6   arrived.

7        Q       Do you think it takes -- well, between 12

8   and 14 days, right?

9        A       Maybe.

10       Q       Okay.  How long does it take to build the

11  new silencer once you see the catalogue?

12       A       When the catalogue come in, I finish

13  already both.

14       Q       So what you are saying is that, although

15  you had sent money for the catalogues, you never used

16  anything out of the catalogues to build the silencer

17  with?

18       A       No.  I don't use the catalogue to build

19  nothing.

20       Q       What day was it that you cancel the second

21  catalogue?

22       A       I'm sorry, I don't remember.

23       Q       But the reason you cancel the second

24  catalogue was because you didn't need it, correct?

25       A       Yes.  No, excuse me.  It's not because I

1    don't need it.  It's because I don't want it.

2         Q     You cancel the second catalogue because

3    you don't want it and the first catalogue gets here

4    sometime around January 12th, right?

5         A     I don't know exactly.

6         Q     Sometime around there, it's already built

7    when the first catalogue gets there?

8         A     It's built, the silencer?

9         Q     Yes.

10        A     Yeah, both.

11        Q     But you don't cancel the first catalogue.

12   You only cancel the second catalogue, right?

13        A     I cancel the second one; yes.

14        Q     And they were both ordered the same day,

15   were they not?

16        A     Yes.

17        Q     But you are saying neither catalogue was

18   used in helping to make the silencer.

19             MR. VINSON:  Asked and answered.

20             THE COURT:  Let's approach.

21             (Off-the-record discussion held at the

22   bench.)

23        Q     (Mr. Odom)   The bottom line, Mr. Ramirez,

24   is that you built Mr. Dennes two silencers without the

25   assistance of either one of these catalogues?

1      A      Yes.

2             MR. ODOM:  Pass the witness.

3             THE COURT:  Thank you, Mr. Odom.

4             Mr. Vinson.

5

6                    REDIRECT EXAMINATION

7    BY MR. VINSON:

8      Q      Whose assistance did you have when you

9    were building the silencer?

10     A      The instructions that Mr. Reinaldo gave to

11   me.

12     Q      Now, I think when Mr. Odom was asking you

13   some questions about the status of your wife you

14   became visually upset, why?

15     A      Why?

16     Q      Yes.

17            MR. ODOM:  May I approach the bench on

18   it?

19            (Whereupon, the following proceedings were

20   held before the Bench.)

21            MR. ODOM:  If there is some sort of

22   hearsay that I don't know about wherein someone else

23   may have threatened this man or that he may be nervous

24   about his wife, my questions related to his wife,

25   related to the motive he may have to cooperate with

1    the authorities, and I don't think it would open any

2    doors and it wouldn't be proper.

3              MR. VINSON:  I'm not asking.

4              THE COURT:  I haven't heard any hearsay.

5              MR. ODOM:  What I am saying, if the answer

6    is said, the skunk is already in the jury box because

7    something -- I don't know about in that regards.  It

8    has not been done in the good faith.

9              THE COURT:  Do you know what the faith?

10             MR. VINSON:  I think I am going to take a

11   reasonable response that's the risk he takes as a

12   lawyer.

13             MR. ODOM:  I don't think I opened any door

14   I cannot legitimately inquire as to what his

15   relationship with the State.

16             MR. VINSON:  And he made several hints

17   about being illegal attack on her.

18             THE COURT:  I agree.

19             MR. ODOM:  Note my exception.

20             (Whereupon, the following proceedings were

21   held before the jury.)

22        Q      (Mr. Vinson)   Why did you become upset,

23   sir?

24        A      To me, the teaching that they have given

25   me since I was very young is to respect the woman.

                                              Page 88

1    Because it is the ladies that has creation of the Lord

2    and the most perfect of all.  That's why one has to

3    respect her in every sense, in every place and in

4    every occasion.

5         Q      Now, sir, when you made your statement, do

6    you recall what day it was?

7         A      On the 22nd of February.

8         Q      Okay.  And at the time you gave your

9    statement where was your wife?

10        A      In Ecuador.

11        Q      And so, in essence, at the time you gave

12   your statement your wife wasn't in any fear of being

13   deported or anything of that nature, correct?

14        A      Absolutely not.

15        Q      She wasn't even in this country, correct?

16        A      No.

17        Q      When did your wife come to this country?

18        A      About four or five month ago.

19        Q      There was some questions put to you about

20   a lathe in the garage where you were living.

21        A      Those questions were made to me?

22        Q      Yeah.  Mr. Odom asked you if there was a

23   lathe in the garage.

24        A      There is machines over there.

25        Q      At the home where you are living?

1      A       There was; yes.

2      Q       What type of lathe was that?

3      A       A little more bigger than Mr. Reinaldo has

4    in his office.

5      Q       What type of work is generally done on

6    that lathe?

7      A       They do more mechanic things, I mean,

8    little things.  It's a small lathe.

9      Q       But they do work on jewelry and stuff like

10    that?

11      A       No, no.

12      Q       Now, when you worked on the lathe in

13    Reinaldo's office, the defendant here, did it

14    create -- I mean, what happened to all the debris that

15    came off the aluminum pipe?

16      A       It's a cleaning lady that come in every

17    day to clean them up, the office.

18      Q       Because when you are using that thing,

19    what happens to the aluminum that you are cutting?

20      A       When I cut the aluminum?

21      Q       Yeah.

22      A       What happened?

23      Q       Yes.

24      A       Jump all over.

25      Q       Big pieces or little pieces?

1       A       Little pieces, chips.

2       Q       Looks like little chips?

3       A       Yes, sir.

4               MR. VINSON:  May I approach, Your Honor?

5               THE COURT:  You may.

6               (Whereupon, State's Exhibit Nos. 57

7       through 62 were marked for identification.)

8               MR. VINSON:  May I approach the witness,

9       Your Honor?

10              THE COURT:  What is the numbers?

11              MR. VINSON:  Yes, Your Honor, 57 through

12      62 and they are photographs.

13      Q       Sir, let me show you what has been marked

14      for identification purposes as State's Exhibit 57

15      through 62 and ask you can you look at these

16      photographs and identify them.  Just look at them, yes

17      or no.

18      A       Yeah, I can identify this one.

19      Q       Okay.  Go ahead.  Can you identify?

20      A       Yes, this one, too; this one, too; this

21      one.

22      Q       Okay.

23      A       This one, too.

24      Q       Okay.

25      A       And this one, too.

1        Q       So you have identified all the photographs

2    that have been marked for identification, that is,

3    State's Exhibit 57 through 62; is that correct?

4        A       That's correct.

5        Q       And do these photographs truly and

6    accurately reflect the office of Reinaldo Dennes as

7    you recall it to be when you worked there in December,

8    January?

9        A       Yes, sir.

10               MR. VINSON:  Your Honor, at this time the

11   State offers into evidence State's Exhibit 57 through

12   62, tender the same to defense counsel for his

13   inspection.

14               MR. ODOM:  No objection, Your Honor.

15               THE COURT:  Very well, State's Exhibit 57

16   through 62 are admitted.

17               MR. VINSON:  Your Honor, to speed up the

18   process, may the witness be allowed to step down?

19               THE COURT:  Certainly.

20       Q       With respect to State's Exhibit 57 and 58,

21   why don't you tell the ladies and gentlemen of the

22   jury what you are looking at in State's Exhibit 57

23   here.  What is that?

24       A       That is the base of the lathe.  The lathe

25   sits over here.  This is a case and this is chips all

```
 1    around here.
 2         Q      Is this where the lathe was when you
 3    worked down there?
 4         A      Yes, sir.
 5         Q      Is this where the aluminum chips fly off
 6    in this area?
 7         A      Yeah.
 8         Q      What is this around the base?
 9         A      Aluminum chips.
10         Q      Is that the same lathe that is on that
11    safe?
12         A      Yes, sir.
13         Q      Is this the base where you worked on the
14    lathe?
15         A      Yes, sir.
16         Q      The base here to this safe?
17         A      Yes, sir.
18         Q      And what do we see these gray specks down
19    there?
20         A      Those are aluminum chips.
21         Q      Those chips came off the lathe you were
22    working on?
23         A      Yes, sir.
24         Q      And that lathe was seated on that base?
25         A      Yes, sir.
```

1       Q       The base up here, I mean, the lathe is up

2   here?

3       A       The lathe that is on the top.

4       Q       State's Exhibit 57 and, then, this is the

5   safe beneath the lathe?

6       A       Yes, sir.

7       Q       And that's a portion of the safe there?

8       A       Yes, sir.

9       Q       That wheel of the safe on 58 and what do

10  you have there?

11      A       Aluminum chips.

12      Q       Let's talk about State's Exhibit 61 and

13  62.  Now, there was some testimony about where

14  Reinaldo Dennes works.

15      A       Yes, sir.

16      Q       Did you ever see him work on the lathe?

17      A       No, never.

18      Q       Did he ever give you any indication that

19  he even knew how to operate it?

20      A       No.

21      Q       What does State's Exhibit 62 show the

22  jury.  Is this where the defendant would work?

23      A       Yes, sir.

24      Q       Do you see any lathe on that table?

25      A       No, I don't see any.

1      Q      What type of instruments do you see there?

2      A      Jewelry instruments.

3      Q      State's Exhibit 60, 61 and 62 is this

4    where the defendant, Reinaldo Dennes, worked?

5      A      Yes, sir.

6      Q      What is State's Exhibit 60, what is that?

7      A      This is a gear from the lathe.

8      Q      And these gears were from the same lathe

9    you worked on?

10     A      Yes, sir.

11     Q      While we can't see it in the photograph,

12   did you ever clean those gears off to try to remove

13   any of the aluminum shavings or anything?

14     A      No.

15     Q      There may still be some microscopic pieces

16   there, correct?

17     A      Correct.

18     Q      And what is State's Exhibit 59?  Can you

19   see a portion of the lathe in State's Exhibit 59?

20     A      Yeah, this is the opposite side of the

21   lathe.

22     Q      All right.  Now, why don't you take a look

23   here.  When you are looking at State's Exhibit 59, is

24   the lathe right against the work there?

25     A      No, you can walk around.

1      Q      Where did the firing, the test firing of

2  the last silencer take place?

3      A      Over here in this place.

4      Q      Okay.  Where was the firer standing?

5      A      Over there.

6      Q      I mean, what direction was the weapon

7  fired in?

8      A      In this direction.

9      Q      So the firer was standing over here and

10 fired in that direction?

11     A      Yes, sir.

12     Q      Firer standing over here and fired in that

13 direction of the work bench?

14     A      Yes, sir.

15     Q      59, firer standing over here in the work

16 office --

17     A      Yes, sir.

18     Q      Work room -- test fired and how many

19 rounds of fire do you recall?

20     A      Two.

21     Q      And it was fired into the telephone book;

22 is that right?

23     A      Yes, that's correct.

24     Q      Firer standing somewhere over here, fires

25 into the telephone book here; is that correct?

1        A       Yeah, the telephone book.

2        Q       Again, the firer is standing somewhere in

3    this position here and fires into the telephone book

4    from over here?

5        A       Yes.

6        Q       And is this a lathe?

7        A       The lathe.

8        Q       And this lathe is not an obstruction to

9    that?

10       A       No, you can walk around.

11       Q       I mean, was it in a position where the

12   lathe would not obstruct if someone was to hold a gun

13   out at arm's length?  Was it fired in that manner?

14       A       No.

15       Q       You say no.

16       A       No, it was not blocking.

17       Q       It was not being obstructed?

18       A       No.

19       Q       You may return to your seat, sir.

20               MR. VINSON:  May I approach and get this

21   marked?

22               (Whereupon, State's Exhibit Nos. 63, 64

23   and 65 were marked for identification.)

24               MR. VINSON:  May I approach?

25               THE COURT:  Please.

1      Q      Sir, let me show you what has been marked

2   for identification purpose as State's Exhibit 63, 64,

3   65.  Why don't you take a look at each exhibit and see

4   if you can identify the contents of each.

5      A      An aluminum shaving.

6      Q      What about State's Exhibit 64?

7      A      Yeah, this is aluminum shaving, too.

8      Q      What about State's Exhibit 65?

9      A      This is aluminum with metal.

10      Q      And that metal came from what?

11      A      Coming from different places but look like

12   the barrel, the metal of the barrel.

13      Q      And is that the reason it is somewhat

14   different in characteristic from the aluminum shaving

15   that is metal?

16      A      One is aluminum and the other is steel.

17      Q      Steel?

18      A      Yeah.

19      Q      And what was the barrel of the .9 mm made

20   out of?

21      A      Steel.

22      Q      And is that cut in a manner in which you

23   would have -- I mean, that shaving does it represent

24   the debris from the manner in which you thread that

25   barrel?

1          A        Yeah, this piece here is showing the way

2     it comes out of the machine.

3          Q        And that's when you are threading it?

4          A        No.  When you are threading, it doesn't

5     come out this way.  It is when you cut in another way.

6          Q        What does it represent, just tell me what

7     it represents.

8          A        This is a metal piece that came from

9     another metal piece.  And it looks like it came from

10    the barrel of the .9 mm.

11         Q        How would it come from the barrel of the

12     .9 mm?

13         A        To be able to thread, you have to cut

14    outside.

15                   MR. VINSON:  Your Honor, at this time the

16    State will offer into evidence State's Exhibit 63, 64,

17    and 65 and tender the same to defense counsel.

18                   MR. ODOM:  At this time I am going to

19    object that the proper predicate hasn't been laid

20    where they come from.

21                   THE COURT:  Sustained.

22                   MR. VINSON:  We will tie it up later.

23                   MR. VINSON:  May I approach the witness?

24                   THE COURT:  Certainly.

25                   (Whereupon, State's Exhibit Nos. 66, 67,

1      and 68 were marked for identification.)

2                 MR. VINSON:  Your Honor, we have marked

3      for identification purposes 66, 67, and 68.  And 66

4      appears to be some type of steel wool  -- disregard

5      68, Your Honor -- and 67, again, appears to be some

6      type of metal shavings and steel wool.

7                 MR. VINSON:  May I approach?

8                 THE COURT:  You may.

9           Q      Let me show you what has been marked for

10     identification purposes as State's Exhibit 66 and 67.

11     What does 66 appear to be?  Take a look at them, one

12     at a time.

13          A      Look like steel wool.

14          Q      Is that steel wool consistent with the

15     type of steel wool that the defendant placed in the

16     silencer that you designed in his office, that you

17     manufactured in his office?

18          A      Yes.

19          Q      I would take it it was a much greater

20     amount; is that correct?

21          A      Yes.

22          Q      And what does State's Exhibit 67 mean to

23     you?

24          A      This is aluminum chips, too.

25          Q      Aluminum chips as well.  Okay.

1    A    This one looks a little different than the

2    others.  This one looks like, when threading into the

3    aluminum tubing, it is coming in this shape.

4    Q    Is that consistent with the type of

5    aluminum shavings that you would expect to, I guess,

6    come from your work?

7    A    Yes, when through threading.

8    Q    And working on that silencer?

9    A    Yes, sir.

10    MR. VINSON:  I will make the same offer

11    again and anticipate the same objection.

12    MR. ODOM:  As to the objection until they

13    lay the proper predicate.

14    THE COURT:  Sustained.

15    Q    Now, do you have any personal knowledge,

16    I'm not talking about what somebody else said or

17    somebody tried to represent to you, do you have any

18    personal knowledge of this defendant being out of this

19    county, Harris County, Texas, when you returned in

20    January?

21    A    I didn't have any knowledge if he was here

22    or if he wasn't here.

23    Q    All you know he could have been down there

24    at the Holiday Inn, correct?

25    A    Yes.

1    Q       Or some other location in this county?

2    A       Somewhere, I don't know.

3            MR. ODOM:  If I may, I withdraw my

4    objection as to State's Exhibit 63, 64, 65, 66 and 67,

5    and we will let them be admitted at this time.

6            THE COURT:  Very well.  State's Exhibit 63

7    through 67 are admitted.

8            MR. VINSON:  May I approach to get a tag?

9            THE COURT:  Sure.

10   Q       You also told the defense attorney, on

11   cross examination, during the time that you all were

12   having dinner at a Chinese restaurant and that the

13   defendant communicated to you he had an intent to rob

14   a jeweler, you stated that you just went along?

15   A       Yes, sir.

16   Q       Did you have any intent whatsoever to

17   participate in that crime?

18   A       Absolutely not.

19   Q       Is that what motivated you to ask for that

20   silencer back?

21   A       Yes.  After they asked me to do it, the

22   next day I called him and I asked him for the

23   silencer.

24   Q       Now, there was a sheet of paper that I

25   think you had a diagram on, a drawing of how to thread

1    the barrel of the weapon.  There was also a telephone

2    number to Monterrey, Mexico; do you remember that?

3         A    Yes, I remember.

4         Q    And I think you told the ladies and

5    gentlemen of the jury that was your handwriting, that

6    telephone number?

7         A    Yes.

8         Q    But the defense attorney showed you some

9    telephone records and where was that call made from;

10   do you recall?

11        A    If I recall?

12        Q    I am saying do you recall from what office

13   was that telephone, based on those telephone records,

14   what office was the call made from?

15        A    I don't remember.

16        Q    If I show you the telephone record again,

17   do you think it would help to refresh your memory?

18        A    Yes.

19             MR. VINSON:  May I approach, Your Honor?

20             THE COURT:  Certainly.

21        Q    Let me show you a record here of telephone

22   inquiries.  That shows what year?

23        A    January 27, 1996.

24        Q    Does it show you a date?

25        A    The date.

1       Q      Yeah, a date?

2       A      Yeah, January 3rd.

3       Q      And that was to Monterrey; is that

4 correct?

5       A      Yes, correct.

6       Q      Whose telephone was that?

7       A      Reinaldo Dennes.

8       Q      Now, you testified you don't recall making

9 that call and you don't know who made that call?

10      A      I don't remember.  I'm sorry.

11      Q      Did you have any business in Monterrey,

12 Mexico, after returning from there?  Did you have any

13 further business there?

14      A      No, I don't.

15      Q      Have you visited Monterrey, Mexico, since

16 leaving there in December?

17      A      One time.

18      Q      And when was that?

19      A      Four month ago.

20      Q      And what reason did you go to Monterrey?

21      A      To meet my wife.

22      Q      And that's when she was flying in?

23      A      Yes.

24      Q      Now, did you write that on that paper at

25 someone's request, or since you had no association

1   with that number, did you write it at someone's

2   request, if you can remember, only if you can?

3        A        No, I don't remember but it's my writing.

4        Q        What type of truck was Reinaldo Dennes

5   driving?

6        A        A white Ford, a truck, a white car.

7        Q        A white Ford?

8        A        Yes, sir.

9        Q        Old model, late model or what?

10       A        A late model.

11       Q        And anything else you need to tell us

12  about, extended cab back or regular truck or what?

13       A        No, no, nothing special.

14       Q        Did you ever see him in a '92 Chevy that

15  you recall?

16       A        Chevrolet?

17       Q        Uh-huh.

18       A        No.

19       Q        You are not saying he don't own one, a

20  1992 Chevrolet, or are you saying you never saw him in

21  one?

22       A        I never saw him in one.

23                MR. VINSON:  Your Honor, we have nothing

24  further.

25                THE COURT:  Mr. Odom.

1            MR. ODOM:  Briefly, Your Honor.

2

3                    RECROSS EXAMINATION

4    BY MR. ODOM:

5            Q      Mr. Ramirez, there's interesting issues

6    that Mr. Vinson brought up in his redirect.  And I,

7    too, would like to ask you about 63 through 67.

8            MR. ODOM:  May I approach the witness?

9            THE COURT:  You may.

10           Q      First of all, exhibit 63 I believe you

11   said that was steel; is that correct?

12           A      No, I don't say this is a steel.

13           Q      You say it's not steel.

14           A      This is aluminum.

15           Q      So if you would have said those weren't

16   steel shavings -- for clarification, that is aluminum,

17   correct?

18           A      I need to touch them with my hand but it

19   looks like aluminum.

20           Q      The truth of the matter is you don't know

21   until you are able to analyze those, do you?

22           A      Those look like aluminum; yes.

23           Q      I understand they look like aluminum.  If

24   you indicated they were steel, that would be incorrect

25   they look like aluminum than steel?

1      A     This look like aluminum than steel.

2      Q     All right.  Number 64 these shavings also

3  appear to be aluminum shavings, do they not?

4      A     This is aluminum.

5      Q     Number 65?

6      MR. ODOM:  May I approach again.

7      Q     65 has two different types of metals in

8  there, does it not?

9      A     Yeah.

10      Q     One of them is an off color, it's not the

11  same color as the other, correct?

12      A     Yes, correct.

13      Q     And I believe you indicated that one of

14  them is aluminum shavings and the other you said was

15  steel; is that correct?

16      A     Yeah, one is aluminum and the other one

17  looks like a steel.

18      Q     Now, Mr. Ramirez, when silver solder is

19  out for a while, doesn't it get discolored after a

20  period of time?

21      A     Silver?

22      Q     Silver solder?

23      A     I don't know.

24      Q     You really don't know if that's steel in

25  there or if that's silver solder, do you?

1       A       Let me touch it and I'll let you know.

2       Q       I can't let you do that.  Perhaps the

3    State but I can't.

4               THE COURT:  Does the State have any

5    objection?

6               MR. VINSON:  We have no objection.

7               THE COURT:  You may open it.

8       Q       You can open it and touch it.

9       A       This is aluminum.

10      Q       Yes.  Okay.  We know that.

11              Aluminum shavings?

12      A       And this is the steel.

13      Q       And that's steel shavings, right?

14      A       Let me try again.  Yes.

15      Q       Now, Mr. Ramirez, the point of all that

16   was you can't tell what these materials are unless and

17   until you either break them or see what type of

18   resistance they have, can you?

19      A       I can say without touching approximately

20   what it is.  But when I touch it, then I know what it

21   is.

22      Q       The point is that especially for someone

23   who is in the jewelry business, just looking at

24   something and swearing to a jury what it is, you don't

25   really know until you have had an opportunity to

1    actually touch and feel the material, correct.

2              MR. VINSON:  Your Honor, there is no

3    evidence that he is in the jewelry business.  I don't

4    know what the relevance of the question, the way he is

5    going, someone in the jewelry business.

6              THE COURT:  Sustained.

7         Q    (Mr. Odom)   Someone who is identifying

8    metals like you just did before this jury, when you

9    swore to the jury that this was steel and that this

10   was aluminum, you don't really know that for sure

11   until you have an opportunity to touch it and see what

12   kind of metal it is, do you?

13        A    Do you want to tell me that if I close

14   this box and then I see what is inside then I don't

15   know what it is; is that what you are trying to tell

16   me?

17        Q    What I am telling you you couldn't be sure

18   what it was?

19        A    99 percent sure.

20        Q    Excuse me, until you touched it, could

21   you?

22        A    No.

23        Q    Now, did you earlier say that one of the

24   steel shavings was from the barrel of the gun that you

25   thread?

1    A      If I remember correctly, what I said was

2  that this was a piece of a metal piece and to be able

3  to make the threading on the barrel, one needs to cut

4  it first and the shavings come out like this, more or

5  less.

6    Q      Is this off of the gun or is this off of a

7  piece of the silencer?

8    A      The silencer was made of aluminum and the

9  pistol was made of steel.

10   Q      And the pistol was made of stainless

11  steel, correct?

12   A      I don't know if it's a stainless steel or

13  carbon steel or high steel or high speed.  I don't

14  know what kind of steel.

15   Q      Does that appear to be a high steel, as

16  you say?

17   A      It's steel.  I don't know the company and

18  this piece of steel.

19   Q      You don't know if that's the type of steel

20  that the gun barrel was made of, do you?

21   A      I don't know exactly if it is the same

22  material.  But this is the way that the shaving come

23  out when you cut a piece of steel.

24           MR. ODOM:  May I approach the witness,

25  Your Honor?

```
1        Q      Mr. Ramirez, what is this made out of?

2        A      What is it that you want?

3        Q      What is the metal that my watch --

4               MR. VINSON:  Object to the relevance.

5               MR. ODOM:  It's very relevant.

6               THE WITNESS:  You tell me.  You buy it.  I

7   don't know.

8               THE COURT:  All right.  Let's have order

9   in the courtroom.

10              It's overruled.

11              MR. VINSON:  Is he going to mark it and

12  have it marked?

13              MR. ODOM:  For demonstration.

14              THE COURT:  You give us a yes or no

15  answer.

16       Q      (Mr. Odom)  Mr. Ramirez, yes, I did buy

17  that and, yes, I do know what type without reading

18  it.  Can you tell what kind of metal that is?

19       A      Now, I know it is a stainless steel.

20       Q      Before you read that, could you tell what

21  it was made of?

22       A      I don't know because you can put this

23  color in any kind of material, even in gold, you can

24  turn this color if you want to.

25       Q      You don't know that particular watch, what
```

1    type of material that watch was made out of?

2         A    Just looking at the watch and what kind of

3    material you say?

4         Q    Right, in feeling it as well.

5         A    Nobody can tell you that.

6         Q    Nobody can?

7         A    I mean, in my knowledge, excuse me, excuse

8    me -- that is, that nobody -- I don't know,

9    somebody -- I cannot do it, if just looking at the

10   material, what kind of material it is.

11        Q    Fair enough.  You now know --

12             MR. ODOM:  May I approach the witness?

13        Q    It is made out of steel, correct?

14        A    Yes.

15        Q    Is it unusual in Designs by Reinaldo to

16   see a watch made out of steel?

17        A    Yes.

18        Q    Yes?

19        A    Yes.

20        Q    He didn't have any watches made out of

21   steel in his office?

22        A    I don't know.  I don't look that way.

23        Q    If you are going to make a bezel -- you

24   know what a bezel is on a watch?

25        A    Yes.

```
1        Q        You need a lathe, don't you?

2        A        Yes.

3        Q        If it is going to be made out of steel,

4    what is going to have to be cut?

5        A        If it's going to be made of steel?

6        Q        Yes.

7        A        From steel.

8        Q        Do you know what the brand Rolex is, the

9    watch brand Rolex?

10       A        I never have one, too expensive.

11       Q        Have you heard of that name?

12       A        Yes.

13       Q        Neither have I.

14                Are you familiar with aluminum watches?

15       A        Aluminum watches?

16       Q        Yes, sir.

17       A        I never saw one.

18       Q        So you have never seen the Rolex brand of

19   aluminum watches, right?

20       A        No.

21       Q        Did Mr. Dennes work on watches?

22       A        I think so.

23       Q        Mr. Vinson asked you --

24                MR. ODOM:   May I approach the witness,

25   Your Honor?
```

```
 1              THE COURT:  You may.

 2        Q     -- about a phone call that was made to a

 3   number in Monterrey, Mexico, and I believe that's the

 4   bottom one?

 5        A     This one?

 6        Q     Right.

 7        A     Yes.

 8        Q     And he asked where that phone call was

 9   made from and your answer was Mr. Dennes' office,

10   correct?

11        A     Reinaldo Dennes.

12        Q     Right.  The call right before that where

13   was that made to?

14        A     Ecuador.

15        Q     Where was that call made from, what office

16   was that made from?

17        A     From the same place.

18        Q     Yes.  Now, you told Mr. Vinson in direct

19   examination you did make that call to Ecuador, did you

20   not?

21        A     Excuse me?

22        Q     You did make that call to Ecuador?

23        A     I make that phone call with Mr. Reinaldo's

24   permission.

25        Q     Right.  And Mr. Vinson asked you if when
```

1    you came back to the United States from Ecuador, you

2    stated that you didn't know if Mr. Dennes was or was

3    not -- whether he had or had not returned from

4    Florida, correct?

5         A    No, I don't know if he is.

6              MR. ODOM:  May I approach the witness,

7    Your Honor?

8         Q    Let me show you your statement once again

9    of February 22, 1996.

10        A    Yes.

11        Q    Ask you to read page seven, the area that

12   I highlighted there to yourself, please.

13        A    Yes.

14        Q    Isn't it true that shortly before you came

15   back you called Mr. Dennes' house or office and he

16   answered the telephone?

17        A    It's true.

18        Q    So you knew that unless he had gone to

19   Florida again he had come back from Florida, didn't

20   he.

21             MR. VINSON:  He knew he had come back from

22   Florida because he is assuming facts not in evidence.

23   He never said he knew he was in Florida.

24             MR. ODOM:  Yes, he did.

25             THE COURT:  That's the same.  Restate it.

```
1        Q       (Mr. Odom)    Didn't you testify you were

2   told, when you tried to contact Mr. Dennes while you

3   were in Ecuador, he was in the Florida.

4                MR. VINSON:   We object to the hearsay and

5   we object is earlier and that is not personal

6   knowledge.

7                MR. ODOM:   It's not offered for the truth

8   of the matter.

9                THE COURT:   It's overruled.   He can

10  answer.

11       Q       (Mr. Odom)    Whether it's true or not, you

12  had heard that Mr. Dennes was in Florida while you

13  were in Ecuador?

14       A       Yes.

15       Q       You have testified numerous times that you

16  did not know if he had come back to Florida before you

17  returned to the United States?

18       A       Yes.

19       Q       But yet on January 22nd, under oath, you

20  told the authorities that you had called to Houston

21  from Ecuador shortly before coming back and that Mr.

22  Dennes had answered the phone?

23       A       Yes.

24       Q       In Houston?

25       A       In Houston; yes.
```

Page 116

1          Q       So you did know that Mr. Dennes was in

2     Houston before you came back from Ecuador, correct?

3          A       I don't know if he is in Houston or not.

4          Q       Well, he answered the phone in Houston,

5     didn't he?

6          A       Over here it says the fifth.  And I call

7     in on 9th.  So it's three or four days difference.  I

8     don't know if he is in Houston or not.

9          Q       My original question was he may have gone

10    out again but you do know he had returned from Florida

11    before you came back from Ecuador, correct?

12         A       Yes.

13                 MR. ODOM:  Pass the witness, Your Honor.

14                 THE COURT:  Is this witness free to

15    leave?

16                 MR. ODOM:  Yes.

17                 THE COURT:  Please be on call if we need

18    you again.

19

20                 FURTHER DIRECT EXAMINATION

21    BY MR. VINSON:

22                 MR. VINSON:  I want him to identify before

23    he leaves.

24                 THE COURT:  Very well.

25                 MR. VINSON:  May I approach?

1        Q        Why don't you take a look at this

2   statement and see if that's the statement you gave to

3   the Houston Police Department on February 22, 1996.

4                MR. ODOM:  Judge, I have an objection to

5   this and I would like to do so before the bench.

6                THE COURT:  Okay, what is the exhibit

7   number?

8                MR. VINSON:  The statement of Mr. Antonio

9   Ramirez, exhibit 68, given on February 22, 1996.

10               THE COURT:  All right.  Please approach.

11               MR. VINSON:  Is that your statement?

12               THE WITNESS:  Yes, sir.

13               (Whereupon, the following proceedings were

14   held before the Bench.)

15               MR. VINSON:  Did he make an objection?

16               MR. ODOM:  I believe it is improper and I

17   believe the Court of Criminal Appeals has ruled it is

18   improper for the State to offer an offense report or a

19   statement into evidence knowing that or making it

20   appear as though the defense has to then object to

21   keep that report from coming into evidence.  It gives

22   the appearance that the defense is attempting to keep

23   the jury from discovering evidence.  I object to them

24   offering the full statement of the witness because it

25   does nothing other than bolster his prior testimony

1  nor did I offer any portion of the statement except to

2  impeach the witness as to specific matters that he

3  testified to the contrary.

4          I want the record to reflect Mr. Vinson,

5  after I made my objection, continued to ask the

6  witness to identify.  He was looking directly at the

7  jury, indicating that this is something that they

8  needed to see, and I believe that is such a mistrial,

9  highly, highly damaging to my client and my ability to

10  object to and assert what I believe the state of the

11  law is.  I object to him offering that evidence into

12  evidence.  That's improper.

13          MR. VINSON:  And I think the defense knows

14  the proper way to impeach.  He shouldn't do that.  He

15  went and asked the witness to read from the statement

16  out loud in the courtroom and then he offered certain

17  parts and as a rule of evidence, I'm sure, that he is

18  board certified, the Rule 107.

19          THE COURT:  Let's not get personal.

20          MR. VINSON:  And that he offered parts of

21  the statement.  And under the law, when an opposing

22  side offers any part of a statement that is not an

23  offense, it's a statement, then the opposing side has

24  an opportunity to offer the whole to clear up the

25  matter.

1          MR. ODOM:  If my recollection serves me
2   correct, first I showed him the statement, then I
3   asked him if that refreshed his memory.  I didn't get
4   any sort of response.  I then asked if that impeached
5   or had him read the impeachment part of the statement.
6          THE COURT:  I think the statement is
7   admissible so, I take it, you object?
8          MR. ODOM:  You think it is admissible?
9          THE COURT:  Yes.
10          MR. ODOM:  I very much object.
11          (Whereupon, the following proceedings were
12   held before the jury.)
13          THE COURT:  State's Exhibit 68 is
14   admitted.
15          (Whereupon, the following proceedings were
16   held before the Bench.)
17          MR. ODOM:  This statement is inadmissible
18   because the witness has said it's not a true and
19   correct copy of what he said.
20          THE COURT:  That's not what he said.
21          MR. ODOM:  He did, Judge, he said that it
22   was not read back to him in Spanish and that is why it
23   is incorrect.  He said he did not endorse that
24   statement.  It was never read back to him in Spanish.
25   He specifically said that under oath.

1              MR. SMYTH:  What he said that the things
2    came down in different order than on the statement.
3    He didn't say that there is anything that is not
4    true.  He said regarding the way of order of things,
5    even that was not accurate, because in his statement,
6    it's clear even if the context of the statement, the
7    way that it happened, just the way he said it happened
8    he disagreed with.
9              THE COURT:  Look, one at a time.
10             MR. SMYTH:  He didn't claim any part
11   wasn't true.  He said it happened in a different way
12   than the way Mr. Odom was attempting to make it
13   happen.
14             MR. ODOM:  Which means part of it was not
15   true and he said the reason that part of it was not
16   true, whether he calls it the order or whatever he
17   calls it, but certainly the point that the issue, the
18   area pointed out to him, he said the reason it was
19   like that was because it's not read back to him in
20   Spanish when he swore to it.  And, Judge, you know,
21   that's pure bolstering of a document that he has
22   already testified to that was not read back to him in
23   Spanish before he signed it.
24             THE COURT:  I think you opened the door to
25   have the State offer the document, and that's what I

1    will rule.

2              (Whereupon, the following proceedings were

3    held before the jury.)

4              MR. VINSON:  Your Honor, we will offer

5    State's Exhibit 68 into evidence.

6              THE COURT:  I think we have already had a

7    ruling.  It has been admitted.

8              MR. VINSON:  We have no further questions.

9              THE COURT:  You are excused.  Thank you

10   very much.

11             Ladies and gentlemen, it's break time.  15

12   minutes, please.  Stand in recess for 15 minutes.

13             (Recess taken.)

14             MR. ODOM:  There is something that I

15   forgot to object to as to offering the statement,

16   which is --

17             THE COURT:  You are going to make an

18   objection after the fact that it has --

19             MR. ODOM:  It has not been displayed

20   before the jury and before it is displayed before the

21   jury --

22             MR. SMYTH:  Why don't we make his

23   objection before it is displayed.

24             THE COURT:  Because that's what we are

25   getting to do.

1          MR. ODOM:  I believe the optional

2    completeness rule relates only to those matters that,

3    in all fairness, would clear something up for the

4    jury.  Although my copy of that statement has been

5    taken from me and I no longer have my copy, from what

6    I remember in my copy of that statement, there are

7    certain paragraphs that relate to matters that were

8    not discussed either in direct examination or cross

9    examination.  Certain of those matters involve

10   hearsay, certain of those matters involve events that

11   have not been discussed, as such, would not be subject

12   to the optional completeness rule or either Rule 016

13   or Rule 107 and, as such, I would object to those

14   portions of the State exhibits that relate to matters

15   that, in all fairness, would not help the jury clarify

16   any issue that I may have cross examined him on or

17   that the State may have brought up.

18          I would add that as an additional

19   objection to State's Exhibit 68.

20          THE COURT:  State have any response?

21          MR. SMYTH:  Judge, I think the State would

22   tend to agree with Mr. Odom regarding the things that

23   we did not talk about in either direct or cross but

24   other than that we think the adoption of the optional

25   of completeness should allow us to offer the

1    statement.

2              THE COURT:  Okay.  That's redacted, those

3    portions that had not been dealt with on direct or

4    cross.

5              MR. SMYTH:  We need some time to go

6    through line by line and make sure we don't put

7    anything.

8              THE COURT:  Are you withdrawing your

9    offering?

10             MR. SMYTH:  Not withdrawing, telling the

11   Court that we will agree.  We will redact those items.

12             MR. VINSON:  Before it goes to the jury,

13   we will remove the areas that were not covered on

14   direct or by cross examination and then allow the

15   Court to review both.

16             THE COURT:  Give a copy to Mr. Odom.

17             MR. VINSON:  Yes.  And we will do that.

18   Do you mind if we --

19             THE COURT:  I thought you want to

20   withdraw.  You can have it to do that.

21             MR. VINSON:  Withdraw it, and we will

22   withdraw it at this time and reoffer the redacted

23   portion after the Court has an opportunity to compare

24   to.

25             THE COURT:  Okay.  Let the record reflect

1    that the State's Exhibit 68 has been withdrawn so that

2    it is no longer admitted into evidence at this time.

3              Okay.  Bring the jury out.

4              (Jury came into the courtroom.)

5              THE COURT:  Please be seated.

6              Ladies and gentlemen, the last offer that

7    was made was a statement by Mr. Remirez offered as

8    State's Exhibit 68.  It has been withdrawn and it is

9    no longer in evidence and you are to disregard

10   anything dealing with the offer and admission at this

11   time.

12             Okay.  Call your next witness.

13             MR. SMYTH:  State will call Lois Gibson.

14

15

16

17

18

19

20

21

22

23

24

25

1                        LOIS GIBSON,

2      was called as a witness for the State and, having been

3      duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5      BY MR. SMYTH:

6                MR. SMYTH:  May I approach the court

7      reporter, Your Honor?

8                THE COURT:  Certainly.

9                MR. SMYTH:  May I proceed?

10               THE COURT:  You certainly may.

11          Q      Ma'am, will you state your name and speak

12     loud for the last gentleman to hear.

13          A      Lois Gibson.

14          Q      How are you employed?

15          A      By all the law enforcement agencies in

16     this area of the state.

17          Q      And do you get a paycheck from anybody in

18     particular?

19          A      I get a paycheck from the Houston Police

20     Department.

21          Q      If you will sit back and relax, if you

22     want to, or adjust the microphone so it doesn't blur

23     on you.

24               So you are paid by the Houston Police

25     Department?

1       A       Yes.

2       Q       And in what capacity do you work for our

3    police department?

4       A       I am the forensic artist.

5       Q       What is a forensic artist?

6       A       I draw sketches of people's faces from the

7    witness' descriptions.

8       Q       What kind of training and experience, if

9    any, do you have to do this job?

10      A       I have a bachelor of fine arts with honors

11   from UT Austin.  I have went to dental school for a

12   year and a half.  I successfully completed the sketch

13   artist course at the FBI academy in Quantico,

14   Virginia, and successfully completed the artist course

15   at Northwestern University and at Scottsdale School of

16   Art in Scottsdale, Arizona.

17      Q       Is there more?

18      A       Yes.  I also did over 2000 portraits on

19   the Riverwalk in San Antonio of tourists.  They were

20   realistic, fine art portraits of looking as much like

21   the person, to the best of my ability, for a one time,

22   for an immediate fee.  And I have subsequently done

23   over 2700 composites for law enforcement agencies in

24   this area of the state and the sketches have helped

25   bring in over 800 criminals.

1    Q      Have you also had any training in the

2    field of facial reconstruction or skull

3    reconstruction?

4    A      Yes.  At Northwestern University I took

5    extensive courses in reconstructing a person's

6    features when they are murdered and all you have left

7    is a skeletal remain.  I also had instruction in aging

8    of people.  If a child is kidnapped and it's been four

9    years, I can make the child look four years older --

10   cases such as that.

11   Q      Have you in any of your work done work on

12   cases involving, say, a kidnapping where you had to

13   age a child in Harris County, Texas?

14   A      Yes.  I aged when the Charles Smith, Jr.

15   children who were kidnapped by Charles Smith, Jr. and

16   kidnapped away from the custodial mother for seven

17   years.  I did aging of those children from their

18   pictures when they were four and six, making them look

19   ten and twelve.  And they appeared on Unsolved

20   Mysteries and because of those sketches, they were

21   retrieved from Cuernevaca, Mexico.

22   Q      This was a couple of years ago, three or

23   four years ago in Harris County?

24   A      Yes, sir.

25   Q      Do you have any training and experience

1     before I get to the next question?

2         A     Yes.

3         Q     Have you testified in the courts of Harris

4     County, Texas, as an expert in the area of, let's say,

5     composite drawings or facial reconstruction expert,

6     that type of thing --

7         A     Yes.

8         Q     -- on few or many occasions?

9         A     Four or five.

10             MR. SMYTH:  Your Honor, at this time the

11    State would offer Ms. Gibson as an expert in the

12    composite as well as facial reconstruction.

13             MR. ODOM:  No objection.

14             THE COURT:  Very well.

15        Q     Ms. Gibson, did you have an occasion to be

16    called to render your services in the case in which a

17    security guard by the name of David Copeland was shot

18    while he was on duty at Greenrich Building, 6222

19    Richmond, Houston, Harris County, Texas, that shooting

20    occurring back on January 24, 1996?

21        A     Yes, I did.

22        Q     And did you have a chance to come in to

23    face contact with Mr. Copeland?

24        A     Yes, I went to Ben Taub Hospital.

25        Q     And do you recall what date you went to

1    Ben Taub Hospital?

2        A       Probably the 26th of January.

3        Q       And which would have been less than 48

4    hours after he was shot?

5        A       Correct.

6        Q       And when you got to Ben Taub Hospital, did

7    you meet David Copeland?

8        A       Yes, I did.

9        Q       And what conditions did you meet him?

10   What was the circumstances under which you met him?

11       A       He was in the intensive care unit of Ben

12   Taub Hospital and he was sitting in a half-sitting,

13   reclining position with his wife next to him, and I

14   believe he had -- I know he had a chest tube, at least

15   one chest tube in him.

16       Q       Was he bright and chipper and smiling or

17   was he -- what was his state?

18       A       He appeared to be in extreme discomfort.

19   The chest tubes is a tube running out of your chest

20   and it is generated pumps -- I don't know -- it pumps

21   and you see blood dripping from that tube and he was

22   just very uncomfortable.

23       Q       Was the fact that he was uncomfortable was

24   he willing to try to help you with his sketch?

25       A       Oh, yes.

1      Q      And you went there for the purpose of
2  trying to make a composite of the individual that shot
3  him?
4      A      That's exactly right.
5      Q      And he was willing to go ahead and try and
6  help you?
7      A      Yes.
8      Q      How long a process from start to finish
9  did it take before you got a composite of the person
10 that Mr. Copeland believed shot him?
11     A      More than one hour but probably way less
12 than two hours.
13     Q      How do you go about doing this?
14     A      First I try to relax the witness, which
15 was very hard in this case, and then I just started
16 the top and go down, asking questions.
17     Q      What do you start with?
18     A      Hair.
19     Q      We are talking about the top of the head?
20     A      Top of the head.
21     Q      Talk about hair and then you talk --
22     A      Forehead, eyebrows.
23     Q      Okay.  One at a time.  Eyebrows, eyes,
24 cheek bones, nose, mustache and/or not and lips, chin,
25 all way -- ears?

1        A        Exactly.

2        Q        What would you call those things that you

3    talk about?

4        A        Features.

5        Q        Are those features, let's say, with the

6    exception of, say, a mustache, which can be shaved and

7    hair can be shaved off, bald headed or disguised with

8    a wig and mustache can be disguised with a wig and can

9    be a disguised, also, but are those other things

10   generally features that are fixed on an individual?

11       A        Yes, all through -- yes, the only thing

12   that can change -- the bottom part of the face was fat

13   or lost of fat.

14       Q        Okay.  Or if you go into the make-up

15   business, you can add things -- movie people do that?

16       A        Not significantly.

17       Q        Basically features remain the same?

18       A        Yes.

19       Q        Growing hair or bushy eyebrows or bigger

20   head of hair?

21       A        Yes.

22       Q        Were you able to come up with a composite

23   that Mr. Copeland felt looked like the individual who

24   shot him?

25       A        Yes.

1                    MR. SMYTH:  May I approach the witness,

2    Your Honor?

3                    THE COURT:  You may.

4         Q        I am going to show you what has been

5    marked for identification purposes in evidence as

6    State's Exhibit 35 and ask you if you recognize that?

7         A        This is the sketch I created on that day.

8         Q        And how do you know it?

9         A        I dated it and I signed it with my name.

10                   MR. SMYTH:  May I approach the witness

11   again, Your Honor?

12                   (Whereupon, State's Exhibit Nos. 56 A and

13   56 B 56 C, and 56 D were marked for identification.)

14                   THE COURT:  You may.

15        Q        I am going to show you what has been

16   marked as State's Exhibit 56 and ask you -- and just

17   let me, first of all, regarding State's Exhibit 56,

18   this is a photograph of the defendant, Reinaldo

19   Dennes.  It doesn't have his glasses and has a heavy

20   beard and I ask you to look at that photograph and

21   look at Mr. Dennes and tell me whether or not you

22   think that is a fair and accurate depiction of Mr.

23   Dennes?

24        A        Yes, I do.

25                   MR. SMYTH:  Approach the witness again?

1              THE COURT:  Certainly.

2         Q       I show you, ma'am, what has been marked as

3    State's Exhibit 56 A and ask you to compare State's

4    Exhibit 56 with 56 A?

5         A       56 A is another reproduction and of the

6    photograph number 56.  It appears larger and also a

7    lot darker than the photograph.

8         Q       And it's 56 A?

9         A       Yes.

10             MR. SMYTH:  At this time the State offers

11    State's Exhibit 56 A and tenders the same to his

12    inspection.

13             THE COURT:  56 A is admitted.

14             MR. SMYTH:  Your Honor, may I move it?

15             May I approach the witness again, Your

16    Honor?

17             THE COURT:  Yes.

18         Q       Ms. Gibson, I show you State's Exhibit 56

19    B and ask you if you recognize that particular

20    photograph?

21         A       Yes, I do.

22         Q       And could you tell the Judge exactly what

23    that is?

24         A       I took the reproduction, another version

25    of the same reproduction, and changed the shadow

1    behind his neck so that it looked like a lighter

2    colored wall and not like hair, which it is not hair,

3    and then I lightened the 5:00 o'clock shadow area of

4    his face.

5         Q    Before we get to that, is this -- when you

6    talk about 56 A, you say it is rather dark?

7         A    It's very dark.

8         Q    Let me ask you:  Is 56 B the same

9    photograph as 56 A except it has been lightened

10   mechanically?

11        A    Exactly.

12        Q    Have any of the features on 56 B or 56 A

13   been changed from State's Exhibit 56?

14        A    No.

15        Q    The hair has not been changed, forehead is

16   the same and the eyebrow and the eyes and nose and the

17   lips and the only thing as, far as this particular one

18   -- I have another one -- is that the shadow that you

19   see in 56 A has been taken out by you?

20        A    Yes.

21             MR. SMYTH:  Your Honor, the State offers

22   State's Exhibit 56 B and tenders the same to counsel

23   for defense for his inspection.

24             MR. ODOM:  No objection.

25             THE COURT:  56 B is admitted.

1          Q       Now, I show you State's Exhibit 56 A, 56 B

2     and 56 C and ask you if you will compare all three of

3     those and tell me whether or not the same individual

4     is depicted in all three of those photographs?

5          A       The same individual is all depicted in all

6     three photographs.

7                  MR. SMYTH:  Your Honor, at this time the

8     State offers into evidence 56 C and tenders the same

9     to counsel for defense for his inspection.

10                 MR. ODOM:  No objection.

11                 THE COURT:  56 C admitted.

12         Q       With regards to 56 C, did you do anything

13    to change it from 56 B or 56 A?

14         A       Yes.  I just tried to eliminate the 5:00

15    o'clock shadow, darkness of his face.

16         Q       I think somebody earlier testified that

17    this photograph had additional shadow or beard in it

18    that didn't normally appear.  So what you did was take

19    the 5:00 o'clock beard out of 56 B and lighten the

20    face; is that correct?

21         A       Exactly.

22         Q       Now, Ms. Gibson, at my request -- not at

23    my request -- the request of the district attorney's

24    office -- I guess my request -- did you sit down with

25    State's Exhibit 56 C, the version that has the shadows

1    taken out from the side of the face as well as

2    lightened the beard and take a look at your composite

3    which is State's Exhibit 35.   35 I believe, yes, 35.

4    Did you then make an overlay that included only three

5    things and that is the hair that Mr. Copeland

6    described to you, the glasses that Mr. Copeland

7    described to you and the mustache that Mr. Copeland

8    described to you?

9        A       Exactly.

10       Q       Did you do anything to change any of the

11   features of the face other than that?

12       A       No.

13       Q       You didn't change the eyebrows, didn't

14   change the nose?

15       A       No.

16       Q       The eyes, cheekbone, the shape of the jaw?

17       A       No.

18       Q       The ears?

19       A       No.

20               MR. SMYTH:  May I approach the witness,

21   Judge?

22               THE COURT:  That's all right.

23       Q       Ma'am, I show you what has been marked as

24   State's Exhibit 56 D and ask you if you recognize

25   that?

1          A       This is the overlay I constructed.

2          Q       Would you put that overlay on State's

3    Exhibit 56 C?

4          A       Yes, I will.

5          Q       Have you got it on there to your

6    satisfaction?

7          A       One moment, there.

8                  MR. SMYTH:  Your Honor, at this time the

9    State would offer into evidence 57 D, the overlay

10   covering and the 56 C and tender the same to counsel

11   for defense.

12                 MR. ODOM:  No objection.

13                 THE COURT:  56 C is admitted.   56 D

14   admitted with C underneath.

15                 Why don't you you pull the exhibit closer

16   and Mr. Odom move.

17                 MR. SMYTH:  Your Honor, at this time may I

18   publish this to the jury?

19                 THE COURT:  Certainly.

20                 MR. SMYTH:  You may resume your seat,

21   ma'am.

22         Q       Ma'am, as an expert in the field of facial

23   reconstruction, I guess your job is looking at

24   people's facial features; is that correct?

25         A       Yes.

1      Q      How do the features on the composite that
2  you constructed with the assistance of Mr. Copeland
3  back on January 26, 1996, how do they stack up with
4  respect to the photograph of Mr. Dennes, which is 56 C
5  but say 56 B, how do the features from top to bottom?
6      A      They are all consistent.  All the features
7  of the sketch is consistent with his features.   No
8  sketch is perfect.  If you sit somebody in front of
9  me, I can't do a perfect picture but those are
10  consistent.
11      Q      And when you put the overlay involving the
12  hair that was added, the glasses that were added and
13  the mustache was added, these are what Mr. Copeland
14  described to you; is that correct?
15      A      Yes.
16      Q      Again, how, in your opinion, does State's
17  Exhibit 56 C, 56 D compare with State's Exhibit 35?
18      A      It seems like a very similar appearing
19  individual.  I might add the only thing that is
20  different that he is squarer in the sketch.
21          MR. SMYTH:  Pass the witness.
22
23
24
25

1                        CROSS EXAMINATION

2     BY MR. ODOM:

3          Q      Ms. Gibson, my name is Wendell Odom but we

4     have met before.  I, too, would like to ask some

5     questions.

6                 First of all, about your science, it's not

7     an exact science, is it?

8          A      That's correct.

9          Q      And what you do for a living is to try to

10    draw similarities of a particular face as opposed to

11    create an exact reproduction of the face; is that a

12    fair statement?

13         A      I try to give a vision to the law

14    enforcement people, who are looking for a criminal,

15    what that criminal looks like; yes.

16         Q      Exactly.  Or even if it isn't a criminal,

17    I mean it sounds to me, although you say criminal, but

18    the examples that you told the jury weren't criminals

19    at all.  They were people that were, for example,

20    kidnapped and people that have aged, that perhaps have

21    been taken, so you are not always doing criminals.

22         A      Those are from existent photographs that I

23    have and that I work with but the criminals are from

24    memory alone.  There are no photographs.

25         Q      Right.  But in your business of creating

1    these sketches, what, in essence, you are doing,

2    although you would like to create an exact likeness,

3    what you are working with are similarities, are you

4    not?

5        A       You are exactly right.

6        Q       And what you take is the features that the

7    person remembers the most and try to put those

8    features, as best you can, with their memory into a

9    complete picture?

10       A       Yes.

11       Q       And sometimes based upon what you have

12   learned at Quantico, which is the FBI, as well other

13   law enforcement training areas as well as

14   Northwestern, which is known for their program, is it

15   sometimes you even have to calm them down about

16   certain features and over exaggeration certain

17   features?

18       A       Sometimes perhaps but there is a real art

19   to knowing how to meld and meld what they are telling

20   into a sketch to be published or shown to law

21   enforcement at a later time?

22       A       Yes.

23       Q       And what you have done in this particular

24   instance is you are asked by the district attorney's

25   office to take a photograph and to see if you could

1    take that photograph and adjust the coloring and the

2    hair and add certain features to it and see if you can

3    make that photograph be similar to a sketching that

4    you have previously done with Mr. Copeland, correct?

5         A       No, I added no features.  I only added the

6    items that the witness, who was in Ben Taub, shot in

7    the chest, the items that he gave me that were being

8    worn by the person that shot him.  Those items were

9    hair, glasses and mustache.  I consider features to be

10   those things that you can't shave off or erase.

11        Q       That's my layman's lack of knowledge and I

12   would have viewed hair as a feature.

13               But what you have done is that you have

14   taken those items, as you say that were included in

15   the original description, and put them on top of the

16   photograph, to see if the photograph would be familiar

17   or similar to the sketching, correct?

18        A       Yes.  It was an unbiased attempt to bring

19   the items given me by the witness, place them on this

20   photograph and see if it did indeed.

21        Q       And I'm not suggesting that it is bias.

22   But that was the task that you were given, correct?

23        A       Yes.

24        Q       And you did manage to take the coloring

25   and make it lighter, correct?

1       A       Yes, just in the area where the person was

2   able to grow a beard.

3       Q       And you didn't make it lighter off the

4   original photograph, 56?

5       A       I don't understand the question.

6       Q       The coloring is not lighter than 56?

7       A       Yes, it is.

8       Q       But you have taken the coloring, then you

9   have added the hair that was described by Mr.

10  Copeland, correct?

11      A       Yes.

12      Q       The glasses that were described by Mr.

13  Copeland, correct?

14      A       Yes.

15      Q       And the mustache that was described by Mr.

16  Copeland?

17      A       Actually I failed to replicate but an

18  attempt.

19      Q       And by putting the hair, the glasses and

20  mustache, he looks very much like the sketching, does

21  he not?

22      A       Yes, indeed he does.

23              MR. ODOM:  May I approach the witness,

24  Your Honor?

25              THE COURT:  Certainly.

1     Q      I would like to show you State's Exhibit

2  34, the photograph, and ask you if you would do the

3  same with that photograph, it would look like this

4  sketching, too, would it not?

5     A      Similar.

6     Q      Similar.

7     A      The eyebrows are vastly different and his

8  mustache is a lot thicker and his head was turned.

9     Q      I thought those were not features that can

10  be altered?

11     A      The eyebrows, I am assuming that nobody

12  shaves their eyebrows.  I didn't do anything to the

13  eyebrows.  And my experience is that no one shaves

14  their eyebrows so I somewhat consider that a permanent

15  feature.

16     Q      And the mustache --

17     A      This mustache is way thicker.

18     Q      But once again that's not a feature,

19  right, I think that's something that you testified can

20  be altered?

21     A      Well, yes.

22     Q      What about State's Exhibit 55, did they

23  ask you to do anything with that?

24     A      No.

25     Q      If someone has the general characteristics

1    of a person that you have sketched or a person, you

2    can take these non-feature items like hair, glasses,

3    and mustache, into varying degrees that person will

4    look similar to that sketch, will it not?

5         A       Yes.

6                 MR. ODOM:  Pass the witness.

7                 THE COURT:  Thank you.

8

9                       REDIRECT EXAMINATION

10   BY MR. SMYTH:

11        Q       Are you telling the ladies and gentlemen

12   of the jury that State's Exhibit 56 and number 55 are

13   the same person?

14        A       No.

15        Q       Is there any difference structurally

16   between State's Exhibit 56, which is the defendant,

17   Reinaldo Dennes, and 55, which is his older brother,

18   Alberto Dennes?

19        A       Yes, the nose has a tear box shape on the

20   end and Reinaldo's is straighter, I would say, more

21   attractive.  This man has, well, a larger mustache

22   that completely covers his top lip.  He has a wider

23   face.  He doesn't have the fleshier pillows underneath

24   the eye.

25        Q       Who is he?

1      A       I'm sorry.  55.

2      Q       55 does not have the fleshy?

3      A       Fleshy pillows, there are some slight

4  pillows of flesh coming underneath the eyebrow on this

5  person right here.

6      Q       Which is 56?

7      A       Which is five or six.

8      Q       Which is the defendant?

9      A       And, also, the eyebrows on the defendant

10  are straighter and the eyebrows on this person become

11  very thick on the outside edge, sort of different.  A

12  lot of people have thicker eyebrows towards the inside

13  and thinner toward the outside and some people, like

14  this individual, they are thicker toward the outside.

15  Reinaldo's are thicker, a little bit thicker toward

16  the inside.

17      Q       Now, in your opinion --

18      A       One more thing -- I'm sorry -- his face is

19  so much wider that his ears are obscured quite a bit

20  and one can completely view the ears on this

21  individual, which is 56.

22      Q       Excuse me.  Slow down.

23      A       I'm sorry.

24      Q       55, the face you say is wider so that the

25  ears are obscured?

1        A       Yes.

2        Q       And on 56 the face is narrow so the ears

3    appear?

4        A       Yes.

5        Q       And those are fixed facial features?

6        A       They can't be changed unless someone gets

7    in a drastic car accident.  Nobody would pay to change

8    that.

9        Q       In your professional opinion, did Mr.

10   David Copeland on January 26, 1996, in his hospital

11   room, did he describe the person that appears in

12   State's Exhibit 55?

13       A       No, it's closer than number 56 for sure.

14               MR. SMYTH:  Your Honor, may I approach the

15   witness?

16               May I display these, publish them to the

17   jury again?

18               THE COURT:  Sure.

19       Q       As far as you are concerned, 55 and 56 are

20   distinctly different individuals?

21       A       Yes.  I don't believe one would confuse

22   them for twins.  I believe they would be able to keep

23   one from the other.

24               MR. SMYTH:  No further questions.

25

```
 1                      RECROSS EXAMINATION
 2      BY MR. ODOM:
 3          Q       These two people are not identical, are
 4      they?
 5          A       Right.
 6          Q       But we didn't have the same sort of
 7      comparisons with these two people wherein you
 8      lightened it, you lightened it and then add these
 9      features to it, did we?
10          A       That's correct.
11          Q       And this person would look a lot more like
12      this sketch here if we had done that; isn't that true?
13          A       Yes.
14          Q       And then this person is not identical to
15      this person either?
16          A       Correct.
17          Q       And no one asked you to go through the
18      same process of blowing that up and comparing that
19      person to this sketch, did they?
20          A       You are right.
21          Q       And this photograph here, if you would
22      have done that, would look a lot more like the
23      sketching had you done that, would you not?
24          A       Yes, but the eyebrows are drastically
25      different.
```

1      Q      Yes, it would.

2      Q      This is not identical to this, is it?

3      A      That's correct.

4      Q      So we are talking about degrees anyway?

5      A      Yes.

6      Q      So the only way we could compare is if we

7    had and the only way to be fair about this --

8             MR. SMYTH:  I totally object to that kind

9    of jury argument in asking questions.

10            THE COURT:  What part do you object?

11            MR. SMYTH:  The only way we could be fair.

12            THE COURT:  Let's not act it out.

13            MR. SMYTH:  That's exactly what happened,

14   and I object to that side bar and out of Mr. Odom and

15   ask that he be instructed to ask straight questions

16   without jury argument involved in all his questions.

17            THE COURT:  Sustained.  Ask your question.

18     Q      (Mr. Odom)  In order to make a fair

19   comparison, what we would really have to do, wouldn't

20   we, is to do the same thing with these other pictures

21   we have done with that picture, correct?

22     A      Correct.

23            MR. ODOM:  Thank you.

24            THE COURT:  Anything further, Mr. Odom?

25            MR. ODOM:  No, sir.

```
 1                    THE COURT:  Are you passing?

 2

 3                      FURTHER DIRECT EXAMINATION

 4     BY MR. SMYTH:

 5          Q       In your professional opinion, did Mr.

 6     David Copeland in the description that he gave you

 7     that allowed you to produce that composite sketch of

 8     the person that shot him produce a composite sketch

 9     that looks like the defendant, Reinaldo Dennes?

10          A       Yes.

11                    MR. ODOM:  No further questions.

12                    THE COURT:  You may step down to be

13     excused.

14                    MR. SMYTH:  Yes, Your Honor, I ask that

15     she be excused.

16                    THE COURT:  Call your next witness.

17                    MR. SMYTH:  Todd Miller.

18

19

20

21

22

23

24

25
```

```
 1                   TODD WILLIAM MILLER,

 2    was called as a witness for the State and, having been

 3    duly sworn, testified as follows:

 4                   DIRECT EXAMINATION

 5    BY MR. SMYTH:

 6               THE COURT:  Mr. Smyth.

 7               MR. SMYTH:  Thank you, Your Honor.

 8         Q      Sir, would you, please, state your name

 9    and speak loud enough for the entire jury panel and

10    the gentleman in the back to hear you.

11         A      Todd William Miller.

12         Q      How are you employed?

13         A      Houston Police Department.

14         Q      And how long have you been employed with

15    our police department?

16         A      About 15 years.

17         Q      And in what capacity are you currently

18    assigned?

19         A      I am a homicide investigator in the

20    homicide division.

21         Q      And how long have you been a homicide

22    investigator with the Houston Police Department

23    Homicide Division?

24         A      Almost five years.

25         Q      Were you employed and on duty, say,
```

1   approximately 11:00 p.m. on Wednesday,

2   January 24, 1996?

3        A        I was employed but I was not on duty at

4   that time.

5        Q        Where were you at that time?

6        A        I was at home.

7        Q        What are your normal working hours?

8        A        I work from 7:00 in the morning until 3:00

9   in the afternoon.

10       Q        Did you receive a phone call at your home

11  at approximately that time, somewhere between that

12  time and midnight, shortly after midnight, into the

13  early morning hours of January 25, 1996?

14       A        That's correct.  It was later in the

15  morning on January 25th when I was assigned by my

16  lieutenant to this case.

17       Q        And which you say this case, what case are

18  you talking about?

19       A        The murder of Janos Szucs.

20       Q        Was Mr. Szucs also known as Johnny?

21       A        Johnny, that's correct.

22       Q        And were you sent to any particular

23  location after being assigned to this case?

24       A        Yes, we were sent out 6222 Richmond.

25       Q        And what is located at 6222 Richmond?

1       A       The Greenrich Building.

2       Q       Is that in Houston, Harris County, Texas?

3       A       Yes, it is.

4       Q       Do you recall what time you arrived at

5    that location?

6       A       We got to the location in the later

7    morning hours, probably around 9:00 o'clock.

8       Q       So when you arrived at the location, had

9    the body of Janos Johnny Szucs been removed from the

10   scene?

11      A       Yes.  The primary scene detectives had

12   already had the body taken to the morgue, and they

13   were still working on the remaining crime scene.

14      Q       So you got in to kind of a follow-up type

15   investigation?

16      A       That's correct.  My partner and I were

17   assigned more to follow up to the actual scene

18   investigation itself.

19      Q       Were you still working on the case at the

20   time some arrests were made in the case?

21      A       Yes, I was.

22      Q       And do you recall when arrests were made?

23      A       Yes.

24      Q       Personal arrests?

25      A       I'm sorry.

1      Q      What was the first date that anyone was

2   arrested in this case?

3      A      The first date was on February 22, 1996.

4      Q      Were these people arrested with or without

5   a warrant?

6      A      They were arrested with warrants.

7      Q      And would you tell the ladies and

8   gentlemen of the jury what is an arrest warrant is.

9      A      An arrest warrant is a document signed by

10   a judge authorizing police officers to effectively

11   arrest the person named in the warrant, attached to

12   the warrant is a detailed probable cause, which the

13   judge goes over in which the officer --

14           MR. ODOM:   Object to the details in

15   regards to the warrant.  I think he has answered the

16   question.

17           THE COURT:  Sustained.

18      Q      (Mr. Symth)   So you had an arrest warrant

19   authorization from a district court judge; is that a

20   judge in Harris County, Texas?

21      A      Yes, it is.

22      Q      Do you recall whether or not the judge

23   that signed the warrants that you had was a Judge by

24   the name of George Godwin?

25      A      Yes, he was.

1      Q      Judge Godwin is the Judge of the 174th

2  District Court?

3      A      Yes.  He is here in this building.

4      Q      In fact, his courtroom, if you walk out

5  the door, you walk right into his courtroom?

6      A      Yes, you will.

7      Q      So Judge Godwin signed the arrest warrant

8  for how many people?

9      A      Two persons.

10     Q      And for whom did Judge Godwin sign the

11 arrest warrants?

12     A      Reinaldo Dennes and Jose Albert Dennes.

13     Q      Do you see the person in the courtroom who

14 you recognize to be Reinaldo Dennes?

15     A      Yes, I do.

16     Q      Would you point him out to the jury and

17 identify some item of clothing that he is wearing?

18     A      The person seated at the far end of the

19 defense table wearing the gray jacket.

20     Q      Red tie with red in it and wearing

21 glasses?

22     A      That's correct.

23            MR. SMYTH:  May the record reflect this

24 officer has indeed identified the defendant.

25            THE COURT:  The record so reflect.

1      Q      Okay.  After you received the warrant for

2  Mr. Dennes' arrest, that is, Reinaldo Dennes, did you

3  take part in the execution of that warrant?

4      A      Yes.

5      Q      And where did you find Mr. Dennes so that

6  he could be arrested?

7      A      At his apartment on Westheimer.

8      Q      Do you know the name of those apartments?

9      A      Yes, I do.  I have got it here.

10            MR. SMYTH:  May I approach the clerk and

11  get something?

12            THE COURT:  Sure.

13      Q      Do you recall where it was that Mr. Dennes

14  was arrested?

15      A      Yes.  It was at his apartment complex.

16  The name of the apartments are Meridian Apartments at

17  6263 Westheimer.

18      Q      And is that the intersection of the

19  Westheimer and Briar Grove?

20      A      That's correct.

21      Q      And Briar Grove is a north-south street

22  that runs off Westheimer?

23      A      Yes.

24      Q      Does that street dead end on the southern

25  end?

1       A       Yes, a field with a few trees and weeds in

2    it.

3       Q       If you continue through that street, do

4    you hit Fairdale?

5       A       That's correct.  Fairdale is the next east

6    and west street that runs right on there.

7       Q       Westheimer, Fairdale, do you know what the

8    next street is?

9       A       Richmond.

10      Q       Richmond Avenue, if you walk from Mr.

11   Dennes' apartment or walk through that field and turn

12   to your left and, therefore, you would be heading

13   east, would you eventually come to 6222 Richmond --

14      A       Yes, you would.

15      Q       -- on the back side of the Greenrich

16   Building?

17      A       On the backside of the building; that's

18   correct.

19      Q       Approximately how far is that?

20      A       Less than a block.  They are both in the

21   6200 block.  The apartments are 6263 and the Greenrich

22   Building at 6222.  You are effectively talking less

23   than a block.

24              MR. SMYTH:  At this time the State will

25   offer into evidence.

1              Excuse me, Judge.

2      Q      After you arrested Mr. Dennes, what's the

3 first thing that happened, by that, I mean the

4 defendant in this case?

5      A      I handcuffed him.

6      Q      Then what did you do?

7      A      Escorted him back to my car, which is

8 parked in the parking lot.

9      Q      Did you advise him what he was arrested

10 for?

11     A      Yes, I did.  And I read him his legal

12 warning off a blue card provided by the D.A.'s office.

13     Q      Do you recall what time it was that Judge

14 Godwin signed the arrest warrant for Reinaldo Dennes?

15     A      Yes, I do.  Judge Godwin signed the arrest

16 warrants at 7:35 p.m.

17     Q      And do you recall what time the arrest

18 warrant for Mr. Reinaldo Dennes was executed?

19     A      Yes.  I arrested Reinaldo Dennes at 8:40

20 p.m.

21     Q      On what date?

22     A      On February 22, 1996.

23     Q      And after his arrest, did you put him in

24 the car and read his rights and told him what he had

25 been arrested for?

1        A        That's correct, and that took place at

2    8:45 p.m.

3        Q        What did you do after you did those

4    functions?

5        A        Transported Reinaldo Dennes back to the

6    southeast command station where our homicide division

7    officers are located.

8        Q        What is the actual address of that

9    building?

10       A        8300 Mykawa.

11       Q        When you got back to the southeast command

12   station, did you take him to the homicide division?

13       A        Yes, that is correct.

14       Q        Did you read Mr. Dennes' rights to him?

15       A        Later on, in the evening, yes, I did,

16   during an interview; yes.

17       Q        Let's fast forward now and let me ask you

18   whether or not you conducted any lineups for a witness

19   to either the shooting of David Copeland or the murder

20   of Janos Johnny Szucs?

21       A        Yes, I did.

22       Q        When was it you conducted the lineup?

23       A        On the morning of Friday, February 23rd.

24       Q        And do you recall what time it was you

25   started to get this lineup together?

1      A      It was shortly after 7:30 in the morning

2   when we decided to have the lineup so I actually began

3   the first steps around between 7:00 and 7:30 in the

4   morning on February 23rd.

5      Q      Okay.  And what was the first step you

6   took?

7      A      I contacted Mr. Copeland, one of the

8   witnesses in the case, and asked him to come down to

9   our office to view a lineup.

10      Q      When you talked to Mr. Copeland, did you

11   tell him we got the guys that shot you or anything

12   like that?

13      A      No.  I merely told Mr. Copeland we needed

14   him to come down to look at a lineup and view a lineup

15   and ask what time could he be down to our office.

16      Q      Based on his response, did you try to set

17   up a lineup?

18      A      Yes, I did.  We proceeded with setting up

19   the lineup once we determined that the witness could

20   come down and view it.

21      Q      Let me ask you would it take a rocket

22   scientist to come to the conclusion, if the police

23   told me to come down to look at a live lineup with

24   people, they must think they got somebody?

25      A      I would think that person --

1            MR. ODOM:  Object to the speculative
2  nature of the question and answer, Judge.
3            THE COURT:  Sustained.
4        Q     (Mr. Symth)   You called Mr. Copeland to
5  come down.  And prior to his coming down or arriving,
6  did you take any steps with regard to putting the
7  lineup together?
8        A     Yes, I did.
9        Q     And what was that?
10       A     I asked the defendant in this case -- I'm
11 sorry.  I went from contacting Mr. Copeland to
12 selecting some fill-in subjects for the lineup.
13       Q     Was Mr. Reinaldo Dennes -- was anybody
14 else prior to conducting this lineup was anybody else
15 arrested --
16       A     Yes.
17       Q     -- in this case?
18       A     Yes.
19       Q     And who was that?
20       A     His brother, Jose Albert Dennes.
21            MR. SMYTH:  May I approach the board, Your
22 Honor?
23            THE COURT:  You may.
24       Q     I show you what is in evidence as State's
25 Exhibit 55 and ask you if you recognize that person as

1   well as the person depicted in State's Exhibit 56?

2       A       State's Exhibit 55 is a picture of Jose

3   Albert Dennes.   State's Exhibit 56 is a picture of

4   Reinaldo Dennes.

5       Q       And they were both arrested under warrants

6   given to you under the authority of Judge Godwin?

7       A       That's correct.

8       Q       Did you have any plans to put Jose Albert

9   Dennes in that lineup, also?

10      A       Yes, I did.

11      Q       At this time had anybody been identified

12  as being the person that shot David Copeland?

13      A       No.

14      Q       And so you put both Reinaldo Dennes as

15  well as his brother Jose Alberto Dennes in this

16  lineup; is that correct?

17      A       That's correct.

18      Q       And I assume that nobody had yet been

19  identified as the killer of Janos Johnny Szucs?

20      A       That's correct.   We had not identified the

21  killer yet.

22      Q       Were either Mr. Reinaldo Dennes or his

23  brother Alberto Dennes provided an attorney prior to

24  this lineup?

25      A       Yes, they were.

1        Q       And how did that come about?

2        A       Judge Godwin arranged for an attorney by

3    the name of Ellis McCullough to come to our offices to

4    represent both Jose Albert Dennes and Reinaldo Dennes

5    during the lineup.

6        Q       Prior to Judge Godwin arranging for an

7    attorney, did you give the defendant an opportunity to

8    call a lawyer.

9                MR. ODOM:  Object to this, Judge, as to

10    relative to what he did as far as the defendant making

11    a phone call.

12               MR. SMYTH:  We are trying to show.

13               MR. ODOM:  What it may be --

14               THE COURT:  One at a time.

15               MR. SMYTH:  May we approach the bench?

16               THE COURT:  Yes, approach.

17               (Whereupon, the following proceedings were

18    held before the Bench.)

19               MR. SMYTH:  I am just trying to show that

20    the officer is fair in this case, as the suggestion

21    that they are not being, they don't think they are

22    fair and trying to show that.

23               THE COURT:  That's fine.  You can go

24    ahead.

25               MR. ODOM:  For the record, I have noticed

1    that they didn't have an attorney.

2                   THE COURT:  All right.

3                   (Whereupon, the following proceedings were

4    held before the jury.)

5        Q    (Mr. Symth)   Did you allow Mr. Reinaldo

6    Dennes an opportunity to locate a lawyer, call a

7    lawyer?

8        A    Yes, I did.

9        Q    Was he successful?

10       A    He made several phone calls and left a

11   message for somebody that I assume was his lawyer; as

12   far as actually contacting a lawyer, no lawyer for him

13   ever showed up at our office.

14       Q    How about regarding Jose Albert Dennes,

15   did you give him an opportunity to locate a lawyer?

16       A    Yes, I did.

17       Q    Was he successful and spoke with either

18   his attorney or his attorney's representative and

19   notified them of the lineup.  Did you delay putting on

20   the lineup to allow lawyers to come down to view it?

21       A    Yes, we did.  We set up the lineup for

22   10:00 o'clock, giving the attorneys ample opportunity

23   to make it to our office to view the lineup.

24       Q    Anybody show up?

25       A    No.  By 10:00 o'clock in the morning, no

1    one's attorney for either one of the suspects had

2    showed up.

3         Q    So is that when you contacted Judge

4    Godwin?

5         A    That's correct.  I contacted Judge Godwin

6    through the assistant attorney Ted Wilson and an

7    attorney by the name of Ellis McCullough was assigned

8    to the case and came to our offices.

9         Q    Do you know Ellis McCullough?

10        A    I never met him before that day and I have

11   never seen him since that day.

12        Q    He came to your offices.

13             What happened after Mr. McCullough

14   arrived?

15        A    Once there Mr. McCullough was given an

16   opportunity to speak with the defendant in this case

17   privately for about 10 to 15 minutes.

18        Q    Did he understood, as far as you know, did

19   Mr. McCullough in your presence identify himself to

20   the defendant and tell him who he was and what his

21   purpose was?

22        A    In fact, that's the first thing he said.

23   He identified himself and said he was an attorney that

24   had been assigned by Judge Godwin.

25        Q    At some point in time, obviously, Mr.

1    McCullough finished his conversation with the

2    defendant?

3         A       That's correct.

4         Q       Did he have an opportunity to talk to Jose

5    Albert Dennes in private?

6         A       Yes, he did for about the same amount of

7    time, 10 to 15 minutes.  The same introduction took

8    place at the beginning and I stepped away so they

9    could speak in private.

10        Q       After these private conversations, did you

11   have any conversations with Mr. Ellis McCullough --

12   and don't tell me -- did you have a conversation?

13        A       Yes, I did.

14        Q       As a result of that conversation, did you

15   show Mr. McCullough the people that were going to be

16   in the lineup?

17        A       Yes, there were.  The fill-ins subjects

18   were all in the same room with the defendant in this

19   case, as well as his brother Jose Albert Dennes,

20   making the total number of people six.

21        Q       So two suspects and then four fill-ins?

22        A       That's correct.

23        Q       When you say fill-ins, what's a fill-in?

24        A       A fill-in was somebody in jail on an

25   unrelated charge that I went down and picked out to

1    stand in the lineup.

2         Q        Did you allow attorney Ellis McCullough to

3    look at the fill-ins?

4         A        Yes, he did.  He looked at the fill-ins.

5         Q        Did he voice any complaint about the

6    fill-ins?

7         A        No, he did not.  I specifically asked him

8    if he had any problem with the fill-ins and he said he

9    did not.

10        Q        He didn't complain that somebody was too

11   tall, too short, too fat, too dark skinned or anything

12   else?

13        A        No.  He said the fill-ins were fine as

14   they were.

15        Q        So you got approval regarding the

16   fill-ins.

17                 Did you ask or give attorney McCullough an

18   opportunity to do anything else with respect to the

19   lineup?

20        A        Yes.  I explained to Mr. McCullough

21   everybody in the lineup was going to wear a baseball

22   style cap, and I had an assortment of caps and allowed

23   him and his clients to choose which of the six caps he

24   wanted his client to wear.

25        Q        Did Mr. Dennes then select the baseball

1     cap that he wanted to wear?

2          A     Actually I think Mr. McCullough selected

3     the baseball cap for the defendant in this case.  And

4     once that was done, the same process was done, I went

5     through the same process with the baseball caps for

6     the other suspect in the case, Jose Albert.

7          Q     Whoever picked the baseball cap, you

8     didn't pick it?

9          A     I did not; no.

10         Q     Was there anything done by attorney

11    McCullough regarding the clothing that either Jose

12    Albert or Reinaldo Dennes was wearing?

13         A     Yes.  One of the persons in the lineup was

14    wearing a gray jacket.  Mr. McCullough asked -- this

15    is one of the fill-ins -- Mr. McCullough asked that

16    fill-in if he could borrow the jacket, the fill-in's

17    name was Eliasar Morales.  Mr. McCullough asked Mr.

18    Morales if the defendant could borrow it and wear it

19    during the lineup.  Mr. Morales agreed and gave his

20    jacket to wear during the lineup.

21         Q     Did anything else of a similar nature

22    happen to Jose Albert Dennes?

23         A     Yes, the same type of thing.  Mr.

24    McCullough asked if Albert could borrow a

25    long-sleeved, blue tee shirt that Demetro Padilla was

1   wearing.  Mr. Padilla agreed and gave the long sleeved

2   tee shirt to Albert who put it on over his tee shirt

3   that he was wearing.

4        Q       So attorney McCullough had his clients

5   change their clothing?

6        A       He did.  He had them change their

7   clothing.

8        Q       And he was ready to do the lineup -- or

9   did something else happen?

10       A       No.  At this point we are going to

11   position the lineup.  I asked Mr. McCullough if he

12   wanted to choose the spots, number one through number

13   six, if he wanted to pick the spots he wanted the

14   defendant in and the other suspect in the case to

15   stand in.

16       Q       And did Mr. McCullough pick spots after

17   consulting with his clients?

18       A       Yes, he did.

19       Q       What spot did Jose Albert Dennes choose?

20       A       Position number two.

21       Q       And what spot did Reinaldo Dennes choose?

22       A       Position number five.

23       Q       Position number five?

24       A       Position number five.

25       Q       Now, you didn't put Jose Albert Dennes in

1      position number five, did you?

2          A      No.

3          Q      He and his lawyer chose position number

4      five?

5          A      He and his lawyer chose position number

6      five in the lineup.

7          Q      Now, after they have chosen their own

8      spots in this lineup, did you just pick out or did Mr.

9      McCullough also position the other people in the

10     lineup?

11         A      Mr. McCullough positioned the fill-in

12     subjects in the lineup as well.

13         Q      So he decided he was going to be in the

14     number one spot, he put his own client, Jose Dennes,

15     in the number two spot, and then he decided who he was

16     going to put in the number three spot and the number

17     four spot.

18                MR. ODOM:  If that's a question, it's a

19     leading question.

20         Q      (Mr. Symth)   I'll do it very simple.

21                Did Mr. McCullough decide who would go in

22     the number one spot?

23         A      Yes, he did.  He positioned a fill-in in

24     number one spot.

25         Q      In the number two spot?

1        A        He selected, he and Jose Albert Dennes,

2    had chosen number two spot for that suspect to stand.

3        Q        Number three.

4        A        Mr. McCullough positioned a fill-in in the

5    number three position.

6        Q        Number four.

7        A        Mr. McCullough positioned a fill-in in the

8    number four position.

9        Q        And number five?

10        A        Number five, Mr. McCullough and the

11    defendant in this case chose to stand in that spot.

12        Q        And number six spot.

13        A        And the number six spot he positioned a

14    fill-in.

15        Q        So attorney McCullough and his clients

16    basically set up the lineup?

17        A        They put together the entire lineup; yes.

18        Q        Is that the final thing that happened

19    before the lineup was conducted?

20        A        That's correct.

21        Q        Now, this isn't done on the stage where

22    everybody can see it?

23        A        No.  It was done in the small room, a

24    small back room off the side of the stage.

25        Q        Mr. Copeland does he arrive in order to

1    view this lineup?

2         A     Yes, he did.

3         Q     Do you know what time he got there?

4         A     Not right off the top of my head; he

5    arrived at some point probably around 8:00, between

6    8:00 and 9:00 o'clock roughly.

7         Q     And what time was the lineup conducted?

8         A     The lineup was conducted at 11:40 a.m.

9         Q     Was Mr. Copeland given any instructions

10   before or after he got into the lineup room regarding

11   how this was going to occur, how the lineup occurred?

12        A     Yes, he was.

13        Q     Did you give them to him or did somebody

14   else?

15        A     No.  I spoke with Mr. Copeland and gave

16   the instructions.

17        Q     What did you tell him?

18        A     I instructed Mr. Copeland that the person

19   who shot him may or may not be in the lineup that he

20   was getting ready to view.  I told Mr. Copeland that

21   he was not required to pick anyone out of the lineup.

22   I asked him to look at all the persons in the lineup

23   individually and, also, asked him not to make any

24   comments during the lineup -- no, I asked him not to

25   speak during the lineup.

1         Q       Now, after you give these instructions,

2     are we now ready to conduct the lineup?

3         A       Yes.

4         Q       Tell the ladies and gentlemen of the jury

5     how the lineup is conducted.  What happened?

6         A       I'm sorry, I couldn't hear.

7         Q       How was the lineup conducted?

8         A       The lineup was conducted with me working

9     the front side of the lineup in the same room with Mr.

10    Copeland.  On the other side of the glass, the

11    defendant and his brother along with the fill-in

12    subjects walked onto the stage.  Initially, when they

13    walked onto the stage -- I'm sorry, the lineup is also

14    being videotaped by Officer Cherry from the robbery

15    division.  As the lineup people in the lineup walk

16    onto the stage, they are all stood facing forward,

17    facing the glass, facing Mr. Copeland.  And they stand

18    shoulder to shoulder.  After a few moments of that,

19    they spread out and, then, one at a time, they step to

20    an area towards the middle of the stage, and they go

21    through facing movements, quarter turns, facing

22    movements.

23        Q       Like you come up and face and then I turn

24    to the right and then show your left profile and then

25    your back and right profile and come back full face

1       again?

2           A       That's correct.

3           Q       And each of those people in the lineup did

4       that individually?

5           A       Yes, they did.  Everybody went through the

6       same facing movements one at a time.

7           Q       And then what happened?

8           A       After that was over, they stood together

9       as a group again, and then I asked Mr. Copeland to --

10      then I spoke with Mr. Copeland about the lineup.

11          Q       Now, is there a glass partition between a

12      person viewing the lineup -- let's say a citizen --

13      and the folks that are in the lineup?

14          A       Yes, there is.  It is a one-way mirror or

15      a two-way mirror.  The persons on the stage cannot

16      see, could not see Mr. Copeland, for instance;

17      however, Mr. Copeland could see them.

18          Q       Did you folks, after all was said and

19      done, did Mr. Copeland have an opportunity to view the

20      lineup to his satisfaction?

21          A       Yes, he did.

22          Q       What happens, does the lineup conclude at

23      this point?

24          A       Yes, the lineup was over at that point.

25          Q       Then what happened?

1          A          I spoke with Mr. Copeland about the

2    lineup.  And after that, after speaking with Mr.

3    Copeland about the lineup, Mr. McCullough was allowed

4    to speak with the defendant in this case and his

5    brother briefly before they were returned to jail.

6          Q          Was Mr. McCullough -- attorney

7    McCullough -- was he allowed to be present when you

8    talked with David Copeland about the lineup?

9          A          Yes, he was.  He stood right next to me.

10         Q          Did he stand next to you?  Did he hear any

11   conversation between you and does he hear what David

12   Copeland says about the lineup?

13         A          Yes, he did.

14         Q          Did Mr. Copeland -- was he able to

15   identify anybody in the lineup?

16         A          Yes, he was.

17         Q          Can you tell exactly what he said in

18   identifying the lineup.

19                    MR. ODOM:  Object to the hearsay.  I don't

20   object to the type of identification but I do object

21   to the hearsay.

22                    THE COURT:  Sustained.

23                    MR. SMYTH:  Judge, I think the Texas Rules

24   of Criminal Procedure allow us to show.

25                    THE COURT:  Are you telling me what the

1    law is?  Do you want to come up here?

2                 (Off-the-record discussion held at bench.)

3          Q    (Mr. Smyth)   Mr. Copeland, was he able to

4    identify anybody?

5          A    Yes, he was.

6          Q    And who did he identify?

7          A    He identified Reinaldo Dennes.

8          Q    And how did you characterize that

9    identification?

10         A    I characterized it as a tentative

11   identification.

12         Q    Was there any hesitation in his voice?

13         A    No.

14         Q    Was there any qualification to this as a

15   tentative identification?

16         A    Yes, there was.

17         Q    Was there anything about the person -- and

18   who did he identify you say?

19         A    He identified the defendant in this case.

20         Q    That's the person in the number five spot?

21         A    That's the person in the number five spot

22   in the lineup.

23         Q    Was there something that caused him not to

24   make a positive identification?  Were there any items

25   that caused him to hesitate?

1   A  Yes.

2   Q  And what features were that that concerned

3 him to cause him not to give a positive

4 identification.

5     MR. ODOM:  Object to that as hearsay.  He

6 is going through the back door what he couldn't get in

7 directly.

8     THE COURT:  Why don't you approach one

9 more time.

10     (Off-the-discussion held at the bench.)

11   Q  (Mr. Smyth)  Did Mr. Copeland eliminate

12 any persons as those who were his shooter?

13   A  Yes, he did.

14   Q  And who did he eliminate?

15   A  He eliminated number three, number four

16 and number six.

17   Q  Did Mr. Copeland indicate that number five

18 was the closest to the one that shot him?

19   A  Yes, he did.

20   Q  In addition to conducting the lineup and

21 in addition to getting an arrest warrant for the

22 defendant in this case, did you also obtain a search

23 warrant for Reinaldo Dennes' place of business?

24   A  Yes, I did.

25   Q  And from whom did you obtain a search

1    warrant?

2        A    A Judge Godwin, the same Judge that I

3    obtained the arrest warrant.

4        Q    How do you go about obtaining it?

5        A    Much in the same way as the arrest warrant

6    process, I present the Judge with.

7            MR. ODOM:  Object to what he presents or

8    doesn't present.  I think that's irrelevant.  I think

9    the fact that he has obtained a search warrant is the

10   relevant question, and I believe he has answered it.

11           THE COURT:  Sustained.

12       Q    (Mr. Symth)  Were you present when

13   Alberto Dennes was arrested?

14       A    Yes, I was the one that arrested -- or one

15   of the officers that arrested him, and I was the

16   person that handcuffed him.

17       Q    Could you tell the ladies and gentlemen of

18   the jury when it was that Albert Dennes was arrested?

19       A    Albert Dennes was arrested on February

20   23rd at 4:15 in the morning.

21       Q    Where was he arrested?

22       A    He was arrested at his girlfriend's house,

23   which is located at 11 -- I'm sorry, 11114 Somerford.

24       Q    And did you follow the same process in

25   arresting Jose Albert Dennes as the warning, his

1    rights?

2         A       Yes.  As soon as he did, I read his rights

3    off of a blue card.

4         Q       In addition to reading of his rights, did

5    you ask him if he would give you a consent to search

6    the apartment of his girlfriend?

7         A       It was a house and, yes, I did ask him for

8    a consent to search for the house.

9         Q       And did he give you a consent to search?

10        A       Yes, he did.  After reviewing the consent,

11   he did sign it and giving me written consent to search

12   the house.

13        Q       Is that something that he signs and you

14   can search for whatever you want?

15        A       Yes, it is.

16        Q       Did you also obtain a consent, a written

17   consent, from his girlfriend?

18        A       Yes, I did.

19        Q       And what was the girlfriend's name?

20        A       Jerraney Davidson.

21        Q       As a result of that consent to search from

22   both Jose Albert Dennes and his girlfriend, Ms.

23   Davidson, did you search for certain items?

24        A       Yes, I did.

25        Q       Did you seize any items?

```
1        A       Yes, I did.
2                MR. SMYTH:  May I approach the court
3    reporter and then the witness?
4                THE COURT:  You may.
5                (Whereupon, State's Exhibit No. 69 69 A,
6    and 70 were marked for identification.)
7        Q       Officer, I am going to show you what has
8    been marked for identification purposes as State's
9    Exhibit 69 and ask you if you recognize that?
10       A       Yes, I do.
11       Q       Not the contents, just the box.
12       A       Yes, I do.
13       Q       And where did you first see that box?
14       A       The master bedroom of Jerraney Davidson's
15   house next to the bed in the master bedroom.
16       Q       Did you after seeing that box open it up?
17       A       Yes, I did.
18       Q       And I ask you now, sir, to open up the box
19   and look at State's Exhibit 69 A and ask you if you
20   recognize that?
21       A       Yes, I do.
22       Q       And what is that?
23       A       There is a GTE cellular telephone that was
24   in the box that I opened at 11114 Somerford.
25       Q       When you obtained that item, with the
```

1    consent of Jose Albert Dennes as well as Ms. Davidson,

2    did you determine what the phone number was for that

3    item?

4         A    Yes, I did.

5         Q    And what was the phone number?

6         A    The phone number 281-383-7689.

7         Q    281-383-7689?

8         A    Yes, that is correct.

9         Q    How were you able to determine that?

10        A    Certainly by turning it on, hitting the

11   power button, the telephone number displays when it

12   first comes on.

13             MR. SMYTH:  May I approach the witness

14   again?

15             THE COURT:  You may.

16             MR. SMYTH:  Your Honor, at this time the

17   State would offer into evidence State's Exhibit 69 and

18   69 A and tender the same to counsel for his

19   inspection.

20             MR. ODOM:  No objection.

21             THE COURT:  Very well.  State's Exhibit 69

22   and 69 A are admitted.

23             MR. SMYTH:  Pass the witness.

24             THE COURT:  Thank you.

25             Mr. Odom.

```
 1                    CROSS EXAMINATION

 2    BY MR. ODOM:

 3        Q       Mr. Miller, you know who I am?

 4        A       Yes, I do.

 5        Q       How are you this afternoon?

 6        A       Just fine.  Thank you.

 7        Q       I am almost afraid to look at this

 8    question.  Have you looked at any notes prior to your

 9    testimony?

10        A       Yes, I have.

11        Q       And you have refreshed your memory based

12    upon reviewing the notes that you made regarding

13    events that occurred at an earlier date?

14        A       Yes.

15                MR. ODOM:  May I have an opportunity to

16    look at Mr. Miller's notes?

17                MR. SMYTH:  Judge, may the record reflect

18    the State is tendering to counsel for defense part of

19    a supplement begins with the date of Thursday,

20    February 22, 1996, that course of the events of 22nd

21    and 23rd of February, 1996, which covers the topic of

22    the conversation we talked about.

23                THE COURT:  Let the record reflect that.

24                MR. ODOM:  May I have a moment, Your

25    Honor.
```

1           THE COURT:  Briefly, counsel.

2           MR. SMYTH:  Your Honor, with the

3    permission of counsel for defense, can I go and offer,

4    with prefiled to the Court, and publish it to the jury

5    while Mr. Odom be profile with the documents of this

6    Court and notice has been given to Mr. Odom back in, I

7    guess.

8           MR. ODOM:  No objection.

9           THE COURT:  And number.

10          MR. SMYTH:  Number 70, the State offers

11   into evidence State's Exhibit 70.

12          THE COURT:  What is it?

13          MR. SMYTH:  State's Exhibit 70 it's an

14   apartment lease for Meridian Apartments, 6262

15   Westheimer for Reinaldo Dennes.

16          MR. ODOM:  No objection.

17          THE COURT:  It's admitted.

18          MR. SMYTH:  May we have it published to

19   the jury.

20          MR. SMYTH:  Yes, sir, just look at it.

21          THE COURT:  Is that all being introduced

22   to show that the defendant lived at that address?  I

23   think that ought to be stated.

24          MR. SMYTH:  I was trying to cover all

25   bases.

1        Q        (Mr. Odom)    Sergeant Miller, let me start

2    off with the areas that Mr. Smyth asked about.   But

3    before I do, you stated that you were involved in the

4    follow-up investigation of the Szucs homicide; is that

5    correct?

6        A        Yes.

7        Q        What were your duties in regards to this

8    particular investigation?

9        A        To begin follow up on the crime, on the

10   murder of Johnny Szucs, after the scene investigation

11   had been done.

12       Q        By that, it's your job to coordinate

13   information that is coming in to track down possible

14   leads, to find possible suspects and to -- are you the

15   officer in charge of this investigation?   That's the

16   point I am really asking.

17       A        No.

18       Q        Who is the officer in charge of the

19   investigation?

20       A        The person actually in charge of the

21   investigation was Lieutenant Nealy, Lieutenant Greg

22   Nealy.

23       Q        And would Lieutenant Nealy delegate

24   certain responsibilities to you and other officers,

25   like Officer Halling, that you all would perform in

1    regards to this particular case?

2         A       That's correct.  Although if I could

3    elaborate on that a little bit, Halling and Officer

4    Sergeant Waltman were the scene detectives.  In other

5    words, they handled the scene investigation at the

6    time it happened.  They work evening shift and they

7    work under a different lieutenant.  The lieutenant was

8    also involved in the investigation and handled

9    assignments to Officer Halling and Sergeant Waltman.

10        Q       So Lieutenant Nealy is the person in

11   charge of the investigation?

12        A       He is the day shift person in charge of

13   the investigation.  The evening shift is Lieutenant

14   Holt was actually in the charge of the evening shift

15   portion of the investigation.

16        Q       So you kind of divide duties on a case,

17   depending on who is there at a particular time, the

18   day shift it's one lieutenant and night shift there's

19   another?

20        A       That's basically correct.  Yes.

21        Q       And then what you are doing that someone

22   else is going to have to follow up during the night

23   shift, there would be someone that would follow up on

24   what you were doing?

25        A       No, that's not the way we worked this

1 particular case, although that has routinely happened.

2 In this particular case, if there was a lead to be

3 followed up on that my partner and I generated, we

4 generally saw it through to the end.  However, on the

5 evening shift, it was the same situation.  They

6 followed up on their leads as well.

7   Q  Who is your partner?

8   A  Sergeant Jim Ladd.

9   Q  Now, you indicated that there was a

10 warrant, an arrest warrant, where you arrested Mr.

11 Dennes on February 24, 1996?

12   A  February 22nd.  Are we talking about

13 Reinaldo Dennes?  I arrested Reinaldo Dennes on

14 Thursday, February 22, 1996.

15   Q  Did I get that 24th -- is that the day you

16 arrested Albert?

17   A  No, it's not.

18   Q  Is that the wrong day?

19   A  The 24th is the day that the murder

20 actually occur, the 24th of January.

21   Q  Of January.  Okay.

22     At the point that you arrested Mr. Dennes

23 I believe you testified that there had not been an ID

24 of a suspect on this case; is that correct?

25   A  We had not identified the person that

1    committed the murder; that's correct.

2         Q       My question is:  Had there been an ID of a

3    suspect prior to that date?

4         A       I didn't have any personal knowledge of

5    it.  That was handled by other detectives.

6         Q       Would that be Officer Halling, is that who

7    handled it?

8         A       No, it wasn't.  It was two other

9    detectives that are also working on the case.

10        Q       Which detectives were those?

11        A       That would be Huseman and Sergeant Tom

12   Ladd.

13        Q       So you are going to have two officer

14   Ladds?

15        A       Sergeant Tom Ladd works with Officer

16   Huseman and Sergeant Jim Ladd works day shift with me.

17        Q       Now, when you were involved in arresting

18   Mr. Dennes, the two brothers Dennes, what you

19   testified about and what you did was to take them down

20   to one of the police stations and to start the process

21   of what we call a lineup; is that correct?

22        A       Yes, eventually they both ended up in our

23   office and the lineup was conducted on the morning of

24   February 23rd.

25        Q       And which office is your office out of it?

1    Is it the main station on Riesner or one of the

2    substations?

3    A    It's at the southeast command.  It's on

4    8300 Mykawa Drive.

5    Q    And someone contacted you, you contacted

6    Mr. Copeland?

7    A    Yes, I did.

8    Q    And it is policy not to tell someone

9    whether or not there has been an arrest made, correct?

10    A    I don't believe there is a policy; no.

11    Q    It's better police practice not to do so,

12    wouldn't you say?

13    A    Yes.

14    Q    And I believe your testimony was that you

15    did not make any such statement to Mr. Copeland that

16    you recall?

17    A    No, I merely asked him to come down to

18    view a lineup.

19    Q    And Mr. Copeland did so?

20    A    Yes, he did.

21    Q    And in the lineup that was conducted you

22    had the two Dennes brothers and then you had what you

23    referred to as the fill-ins, right?

24    A    Yes.

25    Q    And baseball caps were provided in order

1    to be consistent with certain statements that you had

2    regarding the fact that people may have been wearing

3    baseball caps, correct?

4        A     That's correct, yes.

5        Q     And so when Mr. Copeland observed the

6    various people in the lineup, all of them were wearing

7    the baseball caps that we have seen the video of,

8    correct?

9        A     Yes, they sure were.

10        Q     For your information, you did not know

11    that the jury has seen the videotape of the lineup.

12           Now, in that lineup, I believe, you made

13    the statement that the defendant and Mr. McCullough,

14    Ellis McCullough, put together the entire lineup,

15    correct?

16        A     The defendant in this case as well as his

17    brother and Ellis McCullough.

18        Q     You are not saying, are you, that they

19    picked the fill-ins, are you?

20        A     I selected the fill-ins from the jail

21    population and brought them to the outer lineup

22    waiting room.

23        Q     So when you say that they picked the

24    entire lineup, what you mean by that is that they were

25    allowed to position themselves in certain positions.

1          They were allowed to choose whatever cap they choose

2     and I believe two jackets were exchanged, correct?

3          A          They selected the clothing that they wore

4     and they selected the positions they stood in.   They

5     selected the position the fill-ins stood in.   The only

6     active role that I took or played in putting the

7     lineup together was selecting the four fill-in

8     subjects.

9          Q     Mr. Miller, can you look at your notes and

10    tell us the names of the four fill-in subjects,

11    please.

12         A     Juan Garza.

13              MR. SMYTH:   Your Honor, could I move that

14    so it doesn't get destroyed?

15              THE COURT:   Certainly.

16         A     The person's name was Garza, Juan J.

17    Garza.

18         Q     All right.

19         A     Demetro D-e-m-e-t-r-o.

20         Q     Last name?

21         A     That's not D-e-m-e-t-r-i-o.

22         Q     That's an "R", you can't read.

23         A     Padilla  P-a-d-i-l-l-a.

24         Q     All right.

25         A     Eliasar Morales  M-o-r-a-l-e-s,

1      E-l-i-a-s-a-r.

2           Q      Okay.

3           A      Antonio Ramos, R-a-m-o-s, A-n-t-o-n-i-o.

4           Q      Now, obviously, when you went back to pick

5      the fill-ins, you were picking persons of Hispanic

6      persuasion?

7           A      Yes.

8           Q      And Mr. Dennes is -- in fact, his first

9      name is Reinaldo and his last name is Dennes -- of

10     Hispanic persuasion.  You knew that, didn't you?

11          A      Yes, he is.

12          Q      Mr. Dennes however does not look

13     particularly Hispanic, does he?

14          A      He does to me.

15          Q      He does?

16          A      Yes, he does.

17          Q      Do you know whether the descriptions

18     earlier of Mr. Copeland, for example, was of a white

19     person or of a Hispanic person?

20          A      I don't remember.  I don't remember

21     exactly what his earlier descriptions were.  I have

22     got it in the report.  I can check back.

23          Q      That's fine.  I guess, to answer the

24     question without looking at your report, you do not

25     recall?

1        A       Right, I don't recall.

2        Q       Do you recall in the lineup if Mr. Dennes

3    was the most fair complected of any of the persons in

4    the lineup?

5        A       I don't recall whether he was or not.

6        Q       And that's probably an unfair question.

7                When was the last time you saw a copy of

8    the video, if you have seen it, since then?

9        A       Several weeks ago.

10       Q       Mr. Dennes' brother has more of what I

11   would call traditional dark complected features that

12   we sometimes associate with Hispanics; would you

13   disagree with me in that regards?

14       A       I think they look very, very close to each

15   other, very similar in general features, and at the

16   time of their arrest and in skin color.  I think they

17   look very close to each other.

18       Q       You also, I take it, chose the other

19   Hispanics that were in this lineup based upon what you

20   viewed as a similarity and general appearance, if you

21   will; is that correct?

22       A       Yes.

23       Q       In other words, what you are trying to do,

24   when you do a lineup, is you don't want to have, for

25   example, four real dark complected people or five real

1    dark complected people and one real light complected

2    person, if the light complected person is the one that

3    is the possible suspect, correct?

4         A    Complection really don't play an overt

5    part in the selection process.  What we look for are

6    general characteristics.  We try to pick -- of course,

7    we do pick persons of the same race.  If we are

8    running a lineup with a person that is African

9    Americans, all of the fill-ins, of course, are going

10   to be African Americans.  If we are run a lineup with

11   a Hispanic person in it, all of the fill-ins are going

12   to be Hispanic.

13        Q    If you are looking at the African and very

14   light complected, you are not going to have several

15   very dark complected people with him; otherwise, he

16   would stand out?

17        A    We pick general appearances.  Like I say,

18   complections don't play an overt role.

19        Q    The general policy, if someone is

20   Hispanic, the fill-ins are going to be Hispanics,

21   correct?

22        A    That's correct.

23             MR. ODOM:  That's all I have at this time

24   of this particular witness, although we may ask him to

25   be recalled in regards to other matters.

1               THE COURT:  Anything else?

2               MR. SMYTH:  Nothing further at this point.

3               THE COURT:  You are excused subject to

4    recall.  Thank you for your testimony.

5               Okay, ladies and gentlemen, this is it

6    today.  Please be back downstairs at 9:45 in the

7    morning and we will try to start again promptly around

8    10:00 o'clock in the morning.  Thank you for being so

9    attentive.  I think it has been a long day and you

10   have done a very good job and I will see all of you in

11   the morning, and we stand in recess until 9:45.

12               (Court adjourned for the day.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPELLATE COURT NO. _72966_

2    IN THE COURT OF CRIMINAL APPEALS

3    OF THE STATE OF TEXAS

4

5    ----------------------------------------------------

6    REINALDOO DENNES

7                      Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                     Appellee.

11   ----------------------------------------------------

12

13   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                     TEXAS

15        Judge Jim Wallace, Presiding

16   ----------------------------------------------------

17              CAUSE NO. 750,313

18              August 21, 1997

19           Court Reporter's Record

20

21           Volume 28 of 3 7 Volumes

22

23              Sharon Kay Cook
             Official Court Reporter
24              301 San Jacinto
             Houston, Texas 77002

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Page 1



Volume 28
Trial
August 21, 1997
Chronological

Estrella Martinez

     Direct Examination by Mr. Smyth     8

M. R. Furstenfeld

     Direct Examination by Mr. Smyth     93

     Cross Examination by Mr. Odom     126

     Redirect Examination by Mr. Smyth     141

     Recross Examination by Mr. Odom     143

Mark A. Holbrook

     Direct Examination by Mr. Smyth     145

     Cross Examination by Mr. Odom     160

James L. Waltman

     Direct Examination by Mr. Smyth     166

Volume 28

Trial

August 21, 1997

Alphabetical

M. R. Furstenfeld

       Direct Examination by Mr. Smyth       93

       Cross Examination by Mr. Odom       126

       Redirect Examination by Mr. Smyth       141

       Recross Examination by Mr. Odom       143

Mark A. Holbrook

       Direct Examination by Mr. Smyth       145

       Cross Examination by Mr. Odom       160

Estrella Martinez

       Direct Examination by Mr. Smyth       8

James L. Waltman

       Direct Examination by Mr. Smyth       166

State's Exhibit No. 71          photo

          Marked               Volume 28                    14

          Identified                                        15

          Offered                                           15

          Admitted             Volume 28                    15

State's Exhibit No. 72          photo

          Marked               Volume 28                    14

          Identified                                        17

          Offered                                           17

          Admitted             Volume 28                    17

State's Exhibit No. 73          receipt of Motel 6

          Marked               Volume 28                    14

          Identified                                        19

          Offered                                           19

          Admitted             Volume 28                    19

State's Exhibit No. 74          photo

          Marked               Volume 28                    40

          Identified                                        41

          Offered                                           41

          Admitted             Volume 28                    41

State's Exhibit No. 75          photo

          Marked               Volume 28                    40

          Identified                                        41

          Offered                                           41

          Admitted             Volume 28                    41

State's Exhibit No. 76          photo

          Marked               Volume 28                    76

          Identified                                        76

          Offered                                           76

          Admitted             Volume 28                    77

                                                           iii

| | | | |
|---|---|---|---|
| State's Exhibit No. 77 | | photo | |
| | Marked | Volume 28 | 76 |
| | Identified | | 76 |
| | Offered | | 76 |
| | Admitted | Volume 28 | 77 |
| State's Exhibit No. 78 | | photo | |
| | Marked | Volume 28 | 76 |
| | Identified | | 76 |
| | Offered | | 76 |
| | Admitted | Volume 28 | 77 |
| State's Exhibit No. 79 | | bag with $900 | |
| | Marked | Volume 28 | 76 |
| | Identified | | 76 |
| | Offered | | 76 |
| | Admitted | Volume 28 | 77 |
| State's Exhibit No. 80 | | photo | |
| | Marked | Volume 28 | 97 |
| | Identified | | 97 |
| | Offered | | 98 |
| | Admitted | Volume 28 | 98 |
| State's Exhibit No. 81 | | drawing | |
| | Marked | Volume 28 | 97 |
| | Identified | | 101 |
| | Offered | | 101 |
| | Admitted | Volume 28 | 101 |
| State's Exhibit No. 82 | | photo | |
| | Marked | Volume 28 | 97 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 109 |

iv

| | | | |
|---|---|---|---:|
| State's Exhibit No. 83 | photo | | |
| | Marked | Volume 28 | 97 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 109 |
| State's Exhibit No. 84 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |
| State's Exhibit No. 85 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |
| State's Exhibit No. 86 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |
| State's Exhibit No. 87 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |
| State's Exhibit No. 88 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |

v

| | | | |
|---|---|---|---|
| State's Exhibit No. 89 | photo | | |
| | Marked | Volume 28 | 108 |
| | Identified | | 109 |
| | Offered | | 109 |
| | Admitted | Volume 28 | 110 |
| State's Exhibit No. 90 | photo | | |
| | Marked | Volume 28 | 114 |
| | Identified | | 200 |
| | Offered | | 200 |
| | Admitted | Volume 28 | 200 |
| State's Exhibit No. 91 | photo | | |
| | Marked | Volume 28 | 114 |
| | Identified | | 200 |
| | Offered | | 200 |
| | Admitted | Volume 28 | 200 |
| State's Exhibit No. 92 | photo | | |
| | Marked | Volume 28 | 114 |
| | Identified | | 200 |
| | Offered | | 200 |
| | Admitted | Volume 28 | 200 |
| State's Exhibit No. 93 | photo | | 114 |
| | Marked | Volume 28 | 114 |
| | Identified | | 115 |
| | Offered | | 115 |
| | Admitted | Volume 28 | 115 |
| State's Exhibit No. 94 | photo | | |
| | Marked | Volume 28 | 114 |
| | Identified | | 115 |
| | Offered | | 115 |
| | Admitted | Volume 28 | 115 |

vi

State's Exhibit No. 95          photo

    Marked                  Volume 28                    114

    Identified                                           115

    Offered                                              115

    Admitted                Volume 28                    115

STate's Exhibit No. 96          photo

    Marked                  Volume 28                    115
    Identified                                           115

    Offered                                              115
    Admitted                Volume 28                    115

State's Exhibit No. 97          photo
    Marked                  Volume 28                    115

    Identified                                           116
    Offered                                              116

    Admitted                Volume 28                    116

State's Exhibit No. 98          photo

    Marked                  Volume 28                    148

    Identified                                           149

    Offered                                              149

    Admitted                Volume 28                    149

State's Exhibit No. 99          photo

    Marked                  Volume 28                    148

    Identified                                           149

    Offered                                              149

    Admitted                Volume 28                    149

State's Exhibit No. 100         photo

    Marked                  Volume 28                    148

    Identified                                           149

    Offered                                              149

    Admitted                Volume 28                    149

State's Exhibit No. 101          photo
        Marked                 Volume 28              148
        Identified                                    149
        Offered                                       149
        Admitted               Volume 28              149

State's Exhibit No. 102          photo
        Marked                 Volume 28              148
        Identified                                    149
        Offered                                       149
        Admitted               Volume 28              149

State's Exhibit No. 103          photo
        Marked                 Volume 28              148
        Identified                                    149
        Offered                                       149
        Admitted               Volume 28              149

State's Exhibit No. 104          photo
        Marked                 Volume 28              148
        Identified                                    149
        Offered                                       149
        Admitted               Volume 28              149

State's Exhibit No. 105          envelope
        Marked                 Volume 28              155
        Identified                                    155
        Offered
        Admitted

State's Exhibit No. 105A         envelope
        Marked                 Volume 28              155
        Identified                                    155
        Offered                                       156
        Admitted               Volume 28              156

                                                      viii

State's Exhibit No. 106       large diagram

    Marked            Volume 28              157

    Identified                               157

    Offered                                  157

    Admitted          Volume 28              157

State's Exhibit No. 107       diagram
    Marked            Volume 28              190

    Identified                               190
    Offered                                  191

    Admitted          Volume 28              191

State's Exhibit No. 108       photo

    Marked            Volume 28              198

    Identified                               199
    Offered                                  199

    Admitted          Volume 28              199
State's Exhibit No. 109       photo

    Marked            Volume 28              198
    Identified                               199

    Offered                                  199
    Admitted          Volume 28              199

State's Exhibit No. 110       photo

    Marked            Volume 28              198

    Identified                               208
    Offered                                  209

    Admitted          Volume 28              209

State's Exhibit No. 111       photo

    Marked            Volume 28              198

    Identified                               208
    Offered                                  209

    Admitted          Volume 28              209

                                                                   ix

```
State's Exhibit No. 112        photo
        Marked                 Volume 28              198
        Identified                                    208
        Offered                                       209
        Admitted               Volume 28              209
State's Exhibit No. 113        photo
        Marked                 Volume 28              198
        Identified                                    199
        Offered                                       199
        Admitted               Volume 28              199
```

x

1                        CAUSE NO. 750,313

2    STATE OF TEXAS              IN THE 263RD DISTRICT COURT

3    VS.                                OF

4    REINALDO DENNES           HARRIS COUNTY, T E X A S

5    A P P E A R A N C E S:

6    For the State:           Mr. Mark Vinson
                              Bar Card No. 29589459
7                             Mr. Don Smyth
                              Bar Card No. 18777700
8                             Assistant District Attorneys
                              201 Fannin
9                             Houston, Texas 77002
                              713-755-7050
10   For the Defendant:       Mr. Wendell Odom
                              Bar Card No. 15208500
11                            Attorneys at Law
                              Ms. Yalia Guerrero
12                            Bar Card No. 0078862
                              1303 McKinney, Suite 3100
13                            Houston, Texas 77010
                              713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 21st

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for trial before the Honorable

19   Jim Wallace, Judge of the 263rd District Court of

20   Harris County, Texas; and the State appearing in

21   person and the Defendant appearing in person and by

22   counsel, announced ready for trial, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:

                                                    Page 2

1              THE COURT:  Okay.  Go ahead.

2              MR. ODOM:  For the record, I would like --

3    I have made a Brady motion previously, for the record,

4    in regards to the witness yesterday, Antonio Ramirez.

5    And in regards to Antonio Ramirez, I have not been

6    informed if he is a prospect to receive any reward

7    money out of this.  I don't know if he has received

8    any or if he potentially will receive any but I

9    believe it falls under the category of the Brady.

10             THE COURT:  Why didn't you ask him?

11             MR. ODOM:  I didn't know the answer to

12   that.  I think discovery is not necessarily suppose to

13   be done on the witness stand.  I think it is suppose

14   to be done prior to asking the witness the question.

15   Also, in regards and I just don't know, but if he

16   does --

17             THE COURT:  Now, he has told you.  I am

18   asking the State now.

19             MR. ODOM:  I think the State was under an

20   obligation to tell me long prior to this as the case

21   but so I'm assuming it hasn't been but I'm asking.

22             MR. SMYTH:  The State of Texas, Houston

23   Police Department has absolutely nothing to do with

24   any reward that may be offered or may be out there or

25   any conditions for the reward.  We have certainly made

                                              Page 3

1    no payments to anybody for anything.  Now, as far as I

2    know, no reward has ever been paid.

3              THE COURT:  Who is putting this reward

4    up?

5              MR. SMYTH:  I have no idea.

6              MR. VINSON:  Hearsay.  We don't know for

7    certain but it's suppose to be the merchants in the

8    building.  We don't know that for certain.

9              MR. SMYTH:  We don't have control if one

10   is controlled or if it is given or out of picture.

11   It's not our job and not our business.

12             MR. ODOM:  To clarify, it's not a question

13   of whether the State is or is not giving rewards, the

14   question whether they do or do not have any knowledge.

15             MR. SMYTH:  We don't have any knowledge.

16             MR. ODOM:  The second issue in regards to

17   Mr. Ramirez was a statement that there was never any

18   written immunity for him with the feds.  Being an

19   ex-federal prosecutor and having dealt with them for a

20   number of years, I find that difficult to believe.  If

21   the State has any knowledge of any such written

22   agreement, then I think that would also be Brady as

23   well and that I would be entitled to that.

24             THE COURT:  Okay.

25             MR. SMYTH:  Judge, I don't know whether it

```
 1    is written or not.  I know he was given immunity from
 2    federal prosecution.  What I asked him has he signed,
 3    and he hasn't, he himself has never signed anything.
 4    I know he has got and I think it is quite clear to Mr.
 5    Odom and we told him that the feds had given him
 6    immunity from prosecution.  What they did, I don't
 7    know.  I wasn't a party and I know, regarding us, we
 8    did not give any written document stating that he
 9    would not be prosecuted for anything.  We did give him
10    our oral promise, which is something that we rely on
11     -- he relied on -- that we would not prosecute him on
12    state charges based on what he told us.  And basically
13    we gave him in effect testimony for evidence that we
14    wouldn't use what he says.
15                MR. ODOM:  Once, again, my point, not that
16    they have given him written immunity, my point:  he
17    has testified he received no written immunity document
18    and my point is if the State is aware, has any
19    knowledge whether there was at any time a written
20    immunity document, then I believe that's Brady and I
21    am entitled to it.
22                MR. SMYTH:  He has read our file.
23                THE COURT:  Isn't your response you don't
24    know?
25                MR. SMYTH:  I know there was a document
```

1    prepared.  I don't know what happened to it.  I don't

2    know whether Mr. Ramirez ever even saw the document

3    but I do know the federal government to put in writing

4    for somebody they weren't going to prosecute and I

5    don't know if he ever got a copy or discussed whether

6    he saw.

7              THE COURT:  His testimony is he didn't.

8              MR. ODOM:  I know.  And what I am saying,

9    if they have a copy of such a written document.

10             MR. SMYTH:  As far as I know I don't.

11   I'll look and see.

12             THE COURT:  Recheck your files to make

13   sure.  If you do discover anything of that nature,

14   please tender to Mr. Odom as quickly as possible.  And

15   certainly he can call Mr. Ramirez.

16             MR. SMYTH:  I think it is adequate what

17   arrangements and whether they are invited or not.

18             THE COURT:  Anything further?

19             MR. ODOM:  No, Judge.

20             MR. SMYTH:  First witness Estrella

21   Martinez.

22             (Jury came into the courtroom.)

23             THE COURT:  Please be seated, ladies and

24   gentlemen.

25             Good morning.  I think we are running a

1    little behind time so I am thinking about staying

2    until midnight.  Hopefully we are still somewhere on

3    schedule.

4              Where we left, we finished with, I think,

5    who was that, Officer Todd Miller.

6              MR. VINSON:  Before we do that, Your

7    Honor, I will like to offer into evidence, that is, at

8    this time State's Exhibit 51 and 52, the shells that

9    Mr. Ramirez recovered.  We tender the same to defense

10   counsel for his inspection.

11             MR. ODOM:  No objection.

12             THE COURT:  Very well, State's Exhibit 51

13   and 52 are admitted.

14             THE COURT:  Thank you, Your Honor.

15             MR. SMYTH:  State would call Estrella

16   Martinez.

17

18

19

20

21

22

23

24

25

```
 1                    ESTRELLA MARTINEZ,

 2   was called as a witness for the State and, having been

 3   duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. SMYTH:

 6               THE COURT:  Mr. Smyth.

 7               MR. SMYTH:  Thank you, Your Honor.

 8        Q      Ma'am, would you, please, state your name

 9   and speak loud enough so the lady up there on the top

10   corner can hear you.

11        A      Estrella Jesus Martinez.

12        Q      And Ms. Martinez, what is your country of

13   origin?  Where were you born?

14        A      Matamoros, Coahuila, Mexico.

15        Q      Is that the country, the nation, of

16   Mexico?

17        A      Yes.

18        Q      Have you been in the United States for

19   some period of time?

20        A      Yes.

21        Q      And when did you come to the United States

22   of America?

23        A      July 1995.

24        Q      When you came to the United States, did

25   you come by yourself or did you come with other
```

1    people?

2         A      With my son.

3         Q      And who is your son and how old is he?

4         A      My son is Jose Alfredo and he is two years

5    and nine months old.

6         Q      When you and your son came to this

7    country, did you enter the United States legally with

8    a visa or something like that?

9         A      With visa.

10         Q      Are you currently in the United States on

11    a visa or has your visa expired?

12         A      It has already expired.

13         Q      So basically you are in this country now

14    illegally?

15         A      Yes.

16         Q      And are you presently -- or are there some

17    kind of proceedings to have you returned to Mexico?

18         A      Yes.

19         Q      And at my request have those proceedings

20    been delayed until you can finish testifying?

21         A      Exactly, yes.

22         Q      As soon as these proceedings are over, as

23    soon as you finish testifying, you are going to go

24    back to Mexico?

25         A      I believe so.

1       Q     When you came to United States back in

2  July or the summer of 1995, did you seek out

3  employment?

4       A     Yes.

5       Q     And what kind of job were you looking for?

6       A     Cleaning offices.

7       Q     Did you find a job cleaning offices?

8       A     Yes.

9       Q     What company did you find a job with?

10      A     The building services it seems to me.  I

11  don't remember the name.

12      Q     Did you work at cleaning offices in one

13  location or did you go to a number of locations?

14      A     In one location.

15      Q     And where was the location that you

16  worked?

17      A     6222 Richmond.

18      Q     Is that the Greenrich Building?

19      A     Yes.

20      Q     And is that building -- what kind of

21  businesses are in that building?

22      A     The majority jewelry.

23      Q     As part of your job, did you clean in the

24  building, clean an office on the third floor, number

25  320, Designs by Reinaldo or Designs by Dennes?

1          A       Yes.

2          Q       Is the name of Designs by Dennes or

3   Designs by Reinaldo?

4          A       The Designs by Reinaldo.

5          Q       And in your process of cleaning the

6   building, did you clean that office every day?

7          A       Yes, from Monday through Friday.

8          Q       And during the time you are cleaning that

9   office building in the fall of '95, did you come to

10  know the owner of that jewelry shop, Designs by

11  Reinaldo?

12         A       Yes.

13         Q       And what was the owner's name?

14         A       Reinaldo Dennes.

15         Q       Do you see the person that you know as

16  Reinaldo Dennes and who had an office in that

17  building, suite 320, in the courtroom today?

18         A       Yes.

19         Q       Would you point him out for the benefit of

20  the jury and describe the clothing that he is wearing.

21         A       Yes.  He has a tie, wine colored, and

22  that's him.

23         Q       What color would you describe his coat?

24         A       With a little bit of squares and then

25  beige colors, I believe.

1           MR. SMYTH:  Your Honor, may the record

2   reflect this witness has identified the defendant in

3   this case.

4           THE COURT:  The record so reflect.

5       Q       During the time of the fall of 1996, did

6   your relationship with the defendant become more than

7   just a cleaning lady?

8       A       Yes.  He was nicer and he was more

9   interested in getting to know me.

10      Q       Did he eventually get to know you?

11      A       Yes.

12      Q       Before January 1, 1996, did you and the

13  defendant become lovers?

14      A       Yes.

15      Q       Did you know he was married at the time?

16      A       Yes, he was separated.

17      Q       Did, in fact, your relationship develop to

18  the point you were actually like man and wife?

19      A       Yeah, the relationship was a lot more

20  intimate.

21      Q       Would that include like maybe you spent

22  the night together or some portion of the night

23  together in the motel, things like that?

24      A       Yes.

25      Q       At some point before January 22nd, which

1    is a Monday, did the defendant have any conversation

2    with you about your letting him in a side door of the

3    building after working hours?

4        A      Yes.

5        Q      Do you remember how many days or weeks

6    prior to Monday, January 22, 1996, the defendant had

7    that first conversation with you?

8        A      Two, three weeks before.

9        Q      Did he tell you why he wanted you to let

10   him in the side door of the building after working

11   hours?

12       A      Because he was going to take some tapes,

13   some videos.

14       Q      Where was he going to take the tapes and

15   videos from?

16       A      The area on the first floor of the

17   building.

18       Q      Would that be the area where the security

19   guard has a desk?

20       A      Yes.

21       Q      Is that an area where they have monitoring

22   TV, like monitoring machines, as well as tape

23   recording machines?

24       A      Yes.

25       Q      And are these videos are they videos that

1    a camera on the various floors take of people moving

2    about on those floors?

3         A     That's right.

4         Q     Do you recall Sunday, January 21, 1996?

5         A     Yes.

6         Q     Did you meet with the defendant, Reinaldo

7    Dennes, on that day?

8         A     Yes.

9         Q     How is it that you came to meet him?

10        A     He came at the apartment, my apartment.

11        Q     Came to your apartment?

12        A     Yes.

13        Q     And where were you living at the time?

14        A     623 on Marinette.

15              MR. SMYTH:  May I approach the witness,

16   Your Honor?

17              THE COURT:  You may.

18        Q     I am going to show you what has been

19   marked as State's Exhibit 71 and ask you to look at

20   that and tell me whether or not you recognize what is

21   in that, yes or no?

22        A     Yes.

23              (Whereupon, State's Exhibit Nos. 71, 72

24   and 73 were marked for identification.)

25        Q     Does that truly and accurately depict what

1    it deports to depict?

2    A    Yes.

3    MR. SMYTH:  Your Honor, at this time the

4    State would offer into evidence State's Exhibit 71 and

5    tender the same to counsel for defense for his

6    inspection.

7    MR. ODOM:  No objection.

8    THE COURT:  State's Exhibit 71 is

9    admitted.

10    Q    Ms. Martinez, would you, please, tell the

11    ladies and gentlemen of the jury what is depicted in

12    State's Exhibit 71.

13    A    It is the area outside of the apartments

14    where I used to live.

15    Q    That's where you lived back on

16    January 21, 1996?

17    A    Yes.

18    Q    And the Marinette Apartments at 6203

19    Marinette?

20    A    Yes.

21    MR. SMYTH:  Your Honor, may I publish

22    these to the jury?

23    THE COURT:  Yes.

24    Q    And after the defendant, Reinaldo Dennes,

25    picked you up at your apartment, where did you go?

1          A       To dinner.

2          Q       Went to dinner.  Was it just you and the

3    defendant that went to dinner?

4          A       Yes, and a nephew.

5          Q       Whose nephew?

6          A       Mine.

7          Q       How old was your nephew?

8          A       15, 16 years old.

9          Q       After dinner, did you take the nephew back

10   home to his apartment back on Marinette?

11         A       Yes.

12         Q       Did you get out on Marinette or did you

13   stay with Mr. Dennes?

14         A       I stayed there with Mr. Dennes.

15         Q       What type of vehicle were you picked up

16   in?

17         A       In a white truck.

18         Q       Is this a pickup truck?

19         A       It is a big -- it's big.  I don't know

20   what it is called.

21         Q       A big white truck.

22         A       Yes.

23         Q       And after you got picked up in the big

24   white truck, where did you go?

25         A       To a motel.

```
 1        Q        What motel did you go to?
 2        A        6.
 3        Q        Motel 6?
 4        A        Yes.
 5                 MR. SMYTH:  May I approach the witness,
 6   Your Honor?
 7                 THE COURT:  Sure.
 8        Q        I show you what has been marked as State's
 9   Exhibit 72 and ask you to look at that and tell me
10   whether it truly and accurately depicts what it
11   deports to depict?
12        A        Yes.
13                 MR. SMYTH:  Your Honor, at this time the
14   State would offer into evidence State's Exhibit 72 and
15   tender the same to counsel for his inspection.
16                 MR. ODOM:  No objections.
17                 THE COURT:  State's Exhibit 72 is
18   admitted.
19        Q        Could you tell the ladies and gentlemen of
20   the jury what is depicted in State's Exhibit 72.
21        A        The outside area of Motel 6.
22        Q        When you got to the Motel 6, did Mr.
23   Dennes have a room there?
24        A        Yes.
25        Q        And do you recall what room it was, what
```

1    the room number was?

2        A      117.

3        Q      Was there anybody there besides you and

4    the defendant Reinaldo Dennes?

5        A      Yes.

6        Q      And who was that?

7        A      His brother.

8        Q      And what's his brother's name?

9        A      Alberto Dennes.

10       Q      Did the three of you stay there for a

11   while or did somebody leave?

12       A      Alberto Dennes left.

13       Q      Did you ask the defendant, Reinaldo

14   Dennes, why he had this motel room?

15       A      Yes.

16       Q      Did he tell you why he and his brother

17   Alberto had the motel room?

18       A      Pardon me.  I didn't understand the

19   question.

20       Q      Did Reinaldo Dennes tell you why he had

21   the motel room at Motel 6?

22       A      Yes, he explained to me.

23       Q      And what did he say?

24       A      That they had said there at the office

25   that they were going to go to Florida.

1        Q       So why did they rent the motel room and

2    when they told people they were going to Florida?

3        A       For them not to know they were here in

4    Houston.

5                MR. ODOM:  Objection, Judge, I'm not sure

6    if based upon his questions that she heard them say or

7    if that's her speculation.

8                THE COURT:  Let's clarify.

9        Q       (Mr. Symth)   Is that Reinaldo Dennes who

10   told you that he rented the motel room so people

11   wouldn't know he was in Houston?

12       A       Yes.

13               MR. SMYTH:  Your Honor, at this time the

14   State would offer into evidence State's Exhibit 73 and

15   it's a prefiled document with this Court, which the

16   defense counsel has been given notice of earlier.

17               MR. ODOM:  That's correct, Judge.  I have

18   no objection.

19               THE COURT:  State's Exhibit 73 is

20   admitted.

21               MR. SMYTH:  Your Honor, at this time the

22   State would like to publish both the photograph and

23   the first page of the Motel 6 receipt.

24               THE COURT:  Is that what?

25               MR. SMYTH:  73 is motel receipt from 1-21

```
 1      to 1-22-96 and 1-23-1-24-96, room 133 and room 117.

 2                  THE COURT:  Very well.

 3           Q      Did you stay for any part of the night of

 4      Sunday, January 21, 1996, with the defendant, Reinaldo

 5      Dennes?

 6           A      Yes.

 7           Q      Did you spend the whole night there?

 8           A      No.

 9           Q      At some point did he take you back to your

10      home or some other place?

11           A      Yes, to my house.

12           Q      The next day was Monday, January 22, 1996.

13      Did you work that day?

14           A      Yes, I did work.

15           Q      What hours did you work at the Greenrich

16      Building that day?

17           A      From 9:00 to 1:00.

18           Q      Did you have a second shift that day?

19           A      Yes, the afternoon at night.

20           Q      So you work a split shift?

21           A      Yes.

22           Q      Your morning hours are from 9:00 to 1:00?

23           A      Yes.

24           Q      And your evening hours are from what time?

25           A      From 6:00 to 10:00.
```

1      Q      When you went to work during the morning

2   hours at the Greenrich Building, did you see the

3   defendant, Reinaldo Dennes, anywhere around the

4   building during the morning?

5      A      No.

6      Q      Did you see his brother, Jose Albert

7   Dennes, around the building any time during the

8   morning?

9      A      No.

10      Q      After you got off work at 1:00, or

11   thereabouts, did you see Reinaldo Dennes?

12      A      Yes.

13      Q      Where did you see Reinaldo Dennes -- or

14   how did you come into contact with him?

15      A      I called him on the phone.

16      Q      Did you meet up with him somewhere?

17      A      Yes.

18      Q      Was Alberto, his brother, with him?

19      A      Yes.

20      Q      Did you go somewhere and buy some things?

21      A      Yes.

22      Q      Where did you go first?

23      A      First we went to eat.

24      Q      Was it lunchtime then?

25      A      Yes.

1      Q       After you got off work, a late lunch?

2      A       Yes.

3      Q       Was it all three of you -- you, Reinaldo

4   and Alberto?

5      A       That's right.

6      Q       After you had lunch, where did you go?

7      A       We went to buy a cellular.

8      Q       Is that a cellular telephone?

9      A       Yes.

10      Q       Do you recall where you went to buy the

11   cellular telephone?

12      A       Not exactly but on Westheimer.

13      Q       Was the cellular telephone place where you

14   bought the phone close to the Greenrich Building?

15      A       Yes.

16      Q       Why did you go to buy a cellular

17   telephone?

18      A       Because he was going to give one to me.

19      Q       Did you have any other conversation about

20   letting the defendant, Reinaldo Dennes, in the side

21   door of the building on Sunday, January 21, 1996, or

22   Monday, January 22, 1996?

23      A       On Monday.

24      Q       And did the defendant tell you something

25   more about letting him in the back door?

1        A       Just for me to let him in, that he was

2    going to take the tapes and that because someone was

3    going to be upstairs.

4        Q       Did he let you tell you for somebody to

5    let him in so he can give the tape to somebody

6    upstairs.

7        A       Yes.  And for me to distract the security

8    guard for him to be able to pick up the tapes.

9        Q       Was the only person you are going to let

10   in the back door, the side door of the building, going

11   to be the defendant, Reinaldo Dennes, or were you

12   going to let somebody else in, also?

13       A       No, his brother was there, also.

14       Q       That's going to be Alberto Dennes?

15       A       Alberto.

16       Q       What time was it that you got the cellular

17   phones on Monday, January 22, 1996?

18       A       Around 3:00, 2:00, 3:00 in the afternoon.

19       Q       After you got the cellular phones, did

20   anybody try to use those phones, that phone, I'm

21   sorry?

22       A       Reinaldo was checking it because the phone

23   calls were not able to come in.

24       Q       Before the second telephone was purchased,

25   did Reinaldo already have a cell phone?

1        A        Yes.

2        Q        And who bought the second telephone?

3        A        Reinaldo.

4        Q        Did you see Reinaldo after the second

5    telephone purchase?  Did he ever try to call from

6    either the new telephone he had just got to the old

7    telephone that he already had?

8        A        Yes.

9        Q        Did he ever try to call from the old

10   telephone to the new telephone that he just bought?

11       A        Yes.  He was also doing that, trying to

12   see for the phone calls to come in.

13       Q        Do you know who a Francisco Santos-Rojas

14   is?

15       A        Yes.

16       Q        And who is he, who is Francisco Rojas?

17       A        He was his partner.  It was Reinaldo's

18   partner.

19       Q        Did Reinaldo from either one of those

20   cellular phones try to call Francisco Santos-Rojas?

21       A        Yes.

22       Q        And did he try to call him on a pager, use

23   the cell phone to call a pager?

24       A        Yes.

25       Q        Did he also try to use the cell phones to

1    call his office there, Designs by Reinaldo?

2         A    That I don't remember exactly.

3         Q    Okay.  That's fine.

4              After the phones were all checked out, the

5    cell phones, did you ever get a chance to take

6    possession or take a cell phone?

7         A    Yes.

8         Q    And who gave you a cell phone?

9         A    Reinaldo.

10             MR. SMYTH:  May I approach the court

11   reporter and then the witness, Your Honor?

12             THE COURT:  Certainly.

13        Q    Ma'am, let me show you what has been

14   marked and introduced into evidence as 69 A and ask

15   you to look at this.  Do you recognize that?

16        A    Yes.

17        Q    Is that same or similar to the cell phone

18   that Reinaldo Dennes gave you on the afternoon of

19   Monday, January 22, 1996?

20        A    Similar, it looks like.

21        Q    If that was the same phone, how long did

22   you have that phone in your possession, how many days?

23        A    Three days.

24        Q    So you had that phone on Monday?

25        A    Yes.

1      Q      The 22nd of January, Tuesday, the 23rd of

2    January?

3      A      Yes.

4      Q      Wednesday, the 24th of January?

5      A      Yes.

6      Q      And Thursday, the 25th of January?

7      A      Just in the morning.

8      Q      You got it on the afternoon of the 21st

9    and returned it in the morning of the 25th?

10     A      Yes.

11     Q      Had you seen the phone that Reinaldo gave

12   you since you returned it on January 25, 1996, had you

13   ever seen that phone again?

14     A      No.

15     Q      After you were given the phone, did you

16   make any telephone calls on that cell phone?

17     A      Yes.

18     Q      And who did you call?

19     A      A female friend, Sonja.

20     Q      And does Sonja, do you remember what

21   Sonja's telephone number is?

22     A      772-5543.

23     Q      So that 772-5543?

24     A      Yes.

25     Q      Does Sonja live with a man Cesar

1    Cepaddila?

2         A     Yes.

3         Q     In addition to calling Sonja at Cesar

4    Cepadilla's number, did you call anybody else?

5         A     Yes.

6         Q     And who is that?

7         A     A male friend.

8         Q     And what's his name?

9         A     Basel.

10        Q     Did you call him at his home or his place

11   of business?

12        A     Where he works.

13        Q     And where does he work?

14        A     At a place, body shop.  It seems like it's

15   called Roadmasters.

16        Q     Would that be Roadmasters Auto?

17        A     Yes.

18        Q     Did you go in to work on the evening of

19   Monday, the 22nd of January, 1996?

20        A     Yes.

21        Q     What time did you go to work?

22        A     Normally I get to my work before 6:00.

23              MR. SMYTH:  May I approach the court

24   reporter and then the witness?

25              THE COURT:  Certainly.

```
 1                    MR. SMYTH:  Thank you, Judge.
 2        Q       When you go to work, do you sign any kind
 3   of register or document to show that you are at work?
 4        A       Yes.
 5        Q       Do you do that every day you go to work?
 6        A       Yes.
 7        Q       Did you take the cell phone to work with
 8   you when you went on Monday afternoon?
 9        A       That's right.
10        Q       Why did you take the cell phone?
11        A       Because Reinaldo was going to call me, for
12   me to know what time I was going to open the door for
13   him.
14        Q       And what door were you going to open?
15   What door in the building were you going to open?
16        A       The door where you take out the trash on
17   or one side of the building.
18                    MR. SMYTH:  May I approach the witness?
19        Q       Would that be the loading dock door?
20        A       Yes.
21        Q       I show you what has been marked as State's
22   Exhibit 20 in evidence.  Is that the door we are
23   talking about?
24        A       Yes.
25        Q       That's the door you are suppose to open
```

1     for the defendant?

2          A      Yes.

3          Q      After you got to work, did you use the

4     cell phone to call the defendant, Reinaldo?

5          A      Yes.

6          Q      Do you recall what time it was you called

7     him first?

8          A      Around 6:00, from 6:00 to 6:30.

9          Q      Did you call Reinaldo on the telephone,

10    the cell phone, more than one time?

11         A      Yes.

12         Q      And were you calling him at his office or

13    his home or his car or calling to his cell phone?

14         A      To the cellular phone.

15         Q      So you are calling from one cell phone to

16    another cell phone?

17         A      Yes, that's right.

18         Q      After the first call to Reinaldo Dennes,

19    did you make any more calls that night to Reinaldo

20    Dennes?

21         A      Yes, about three or four more.

22         Q      Do you know the exact time that you made

23    any of those calls?

24         A      From 6:00 until 8:00.

25         Q      Between that period of time, you made all

1    the calls to the cell phone?

2         A    Yes.

3         Q    During any of these phone conversations,

4    did you get the word to go down and open up the back

5    door for Reinaldo on the loading dock?

6         A    No.

7         Q    Do you recall on Monday, January 22, 1996,

8    did you get a call from Reinaldo that night.

9              THE INTERPRETER:  Excuse me, January

10   22nd?

11        Q    January 22, 1996.

12        A    No.

13        Q    So the very last time you talked to

14   Reinaldo did he tell you to open the door or not open

15   the door or the deal is off or anything like that?

16        A    That today I was not going to open the

17   door for him until tomorrow because it was too late.

18        Q    Is that what Reinaldo told you in your

19   final phone call with him?

20        A    Yes.

21        Q    Not to open the door tonight, it's too

22   late, we will do it tomorrow?

23        A    That's right.

24        Q    During your conversations at this point,

25   either on Monday afternoon or before that or even up

1    to this time when the business is called off and

2    rescheduled for tomorrow, did Reinaldo tell you

3    anything about what his partner Francisco was going to

4    be doing?

5         A     That he was going to let him know if

6    somebody was getting out of the building, something

7    like that.

8         Q     That he, being Francisco, was going to let

9    Reinaldo know if somebody was leaving the building or

10   out of the building or something along those lines?

11        A     Yes.

12        Q     Did you have any cell phone calls to

13   Francisco?

14        A     No.

15        Q     Did you call Francisco on his pager?

16        A     No.

17        Q     Did you know anything more about what was

18   going to go on other than you are suppose to let

19   Reinaldo in the loading dock door?

20        A     Just that he wanted to take the tapes,

21   some videos.

22        Q     And you were suppose to distract the

23   guard?

24        A     Yes.

25        Q     You get off work at what time on Monday,

1      the 22nd?

2           A        Normally at 10:00 o'clock at night.

3           Q        And do you recall what time you got off on

4      that night exactly?

5           A        Before 10:00.

6           Q        When you get off work, what did you do?

7           A        I got out with my co-workers and I was

8      going to go home.

9           Q        Did you go home?

10          A        Yes.

11          Q        Did you see anybody -- how did you get

12     home?

13          A        By bus, Metro.

14          Q        When you left the office building, did you

15     talk to Reinaldo Dennes, Alberto Dennes or Francisco

16     Rojas?

17          A        With Alberto and Reinaldo.

18          Q        Where was it you talked with Alberto and

19     Reinaldo?

20          A        At the parking lot of the restaurant next

21     to the building.

22          Q        When you leave the building, did you go

23     out the loading dock door or go out the front door?

24          A        Normally almost by the front door.

25          Q        On that night did you go out the loading

1    dock door or the front door or do you remember?

2         A      I believe front.

3         Q      Had you already made arrangements to meet

4    with Reinaldo and Alberto in the parking lot of a

5    restaurant before you had gone to work?

6         A      Pardon me.  I don't understand the

7    question.

8         Q      Were you planning on meeting Reinaldo and

9    Alberto in that restaurant parking lot or did they,

10   you know, just jump out and wave at you or honk a horn

11   or come here or what?

12        A      No.  No, we had not talked about meeting

13   after work.

14        Q      How did they get your attention?  How did

15   you know they were there?

16        A      Because they approached me in their truck

17   and I recognized the truck.

18        Q      You had been in that truck before?

19        A      Yes.

20        Q      Did you have a conversation with Reinaldo

21   Dennes after you got off work that night?

22        A      Yes.

23        Q      What did you talk about?

24        A      I asked him if I was going to keep the

25   phone or if I had to give it back to him.

1      Q      And what did he say?  What did Reinaldo

2  Dennes say?

3      A      For me to keep it, for me to take it with

4  me.

5      Q      Did you go the work the next day, Tuesday,

6  the 23rd, at your normal time in the morning?

7      A      Yes.

8      Q      And during your morning shift, the one

9  from 9:00 until 1:00, did you see the defendant,

10  Reinaldo Dennes, in the Greenrich Building?

11      A      No.

12      Q      Did you see Alberto Dennes in the

13  Greenrich Building?

14      A      No.

15      Q      Did you receive any phone calls from

16  Reinaldo Dennes, Alberto Dennes or Jose -- excuse

17  me --  Francisco Rojas during your morning shift?

18      A      No, I don't remember.  No, I don't

19  remember.

20      Q      Did you have any contact by telephone or

21  in person with the defendant between the time you got

22  off work about 1:00 and you returned to work later on,

23  for your second shift, on Tuesday the 23rd?

24      A      No.

25      Q      Did you go to work again on Tuesday at

1      your normal time, the second shift?

2           A      Exactly, yes.

3           Q      After you got to work, did you receive any

4      phone calls from Reinaldo Dennes on Tuesday,

5      January 23, 1996?

6           A      No, no.

7           Q      Well, the year, how about the time that

8      this event was happening, Monday, Tuesday and

9      Wednesday of January the 21st, 22nd, 23rd, and 24th,

10     did you get any phone calls the second day or did you

11     make any phone calls on the cell phone?

12          A      Yes, in the afternoon.

13          Q      After you got to work, did you call --

14     well, before you got to work, did you call Roadmaster

15     Auto again?

16          A      Yes.

17          Q      After you got to work, did you call

18     Reinaldo Dennes on his cell phone?

19          A      Yes.

20          Q      What did you say to him or what did you

21     ask him?

22          A      At what time he was going to call me for

23     me to open -- at the time he was going to call me for

24     me to open the door.

25          Q      Did you make more than one call on

1    Tuesday, January 23, 1996, to Reinaldo Dennes' cell

2    phone from your cell phone?

3         A     Yes.

4         Q     Do you recall how many calls you made to

5    Reinaldo Dennes to his cell phone during the time that

6    you were working the second shift?

7         A     About three or four, three or four calls.

8         Q     And when you were working and have that

9    cell phone, where did you carry it:  in your pocket or

10   what?

11        A     In the pocket on my apron.

12        Q     So when you are cleaning, you have an

13   apron that you wear?

14        A     Yes.

15        Q     It's big enough to keep the cell phone in?

16        A     Yes.

17        Q     When you made most cell conversations to

18   Reinaldo Dennes' cell number, his cell number, did you

19   talk to Reinaldo Dennes?

20        A     Yes.

21        Q     Every time you called his cell number you

22   talked to Reinaldo Dennes?

23        A     Yes.

24        Q     You never talked to Alberto?

25        A     No.

1          Q          You never talked to Francisco?

2          A          No.

3          Q          Did you ever get the call from Reinaldo

4     Dennes to let him into the loading dock door on

5     Tuesday, January 23, 1996, did he ever call you about

6     that?

7          A          No.

8          Q          Did you ever find out on Tuesday that you

9     weren't going to be needing to let him in the back

10    door that day?

11         A          Yes.

12         Q          Did you make the call to Reinaldo Dennes

13    or did he call you to tell you that the deal is off.

14                     MR. ODOM:   I don't mind a little bit of

15    leading and now he is suggesting the answer.   I object

16    to leading questions.

17                     THE COURT:   Sustained.

18         Q          (Mr. Symth)   I think you previously

19    testified that you understood you weren't going to let

20    him in the back door.   How did you learn that you were

21    not suppose to let the defendant in the back door on

22    Tuesday the 23rd?

23         A          Because he called me.

24         Q          And what did he tell you?

25         A          He said that night he was not going to be

1    able to be going because it was too late and the

2    people that they want them to leave, they didn't

3    leave.

4         Q       That ended the matter of getting in the

5    back door for Tuesday; is that correct.

6                 MR. ODOM:  Once again object to the

7    leading questions.

8                 THE COURT:  Sustained.

9         Q       (Mr. Symth)   Did anything else happen

10   with respect to you letting him in the defendant on

11   Tuesday?

12        A       He just said that night it was not going

13   to be done and tomorrow he was going to try again.

14        Q       Try again the next day?

15        A       That's right.

16        Q       Did you leave work your normal time by

17   your normal path?

18        A       Yes.

19        Q       Did you have any contact with Reinaldo

20   Dennes, Alberto Dennes or Francisco Santos-Rojas after

21   you got off work on Tuesday, the 23rd?

22        A       No.

23        Q       How did you get home?

24        A       By bus, Metro.

25        Q       Did you go to work on Wednesday morning,

1    January 24, 1996?

2         A     Yes.

3         Q     Did you work your normal morning shift?

4         A     That's right.

5         Q     During the morning shift, did you see the

6    defendant, Reinaldo Dennes, in the Greenrich Building?

7         A     No.

8         Q     Did you see his brother, Alberto Dennes,

9    in the Greenrich Building?

10        A     No.

11        Q     You left work.  Where did you go after you

12   left work after the morning shift?

13        A     To my house.

14        Q     Did you ever have any contact by telephone

15   or in person with Reinaldo, Alberto or Francisco after

16   you left work and before you went back to work?

17        A     Yes, with Reinaldo and Alberto.

18        Q     Where did you have contact or how did you

19   have contact with Reinaldo and Alberto on

20   January 24, 1996?

21        A     They came to my apartment, to my

22   apartment, the outside area.

23        Q     Did they come up and knock on your door

24   and visit with you?

25        A     No, they sent someone to call me.

```
 1        Q      Who did they send to call you?

 2        A      Again.

 3        Q      Who or what did they send to call you to

 4   let you know they are there?

 5        A      My nephew.

 6        Q      And he brought you out or let you know

 7   they were around?

 8        A      Yes.

 9        Q      Did you meet with them in person?

10        A      Yes.

11        Q      Where did you meet with them in person?

12        A      The outside area of the apartments, not at

13   the parking lot but outside.

14        Q      Did they come in that white pickup truck?

15        A      No.

16        Q      What kind of vehicle did they come in?

17        A      In a small sports car.

18        Q      Had you ever seen that sports car before?

19        A      No.

20               MR. SMYTH:  Your Honor, may I approach the

21   witness?

22               THE COURT:  Certainly.

23               (Whereupon, State's Exhibit Nos. 74 and 75

24   were marked for identification.)

25        Q      Ma'am, I want to show you what has been
```

1   marked as State's Exhibit 74 and 75 and ask you if you

2   recognize what is depicted in those photographs?

3       A       Yes.

4       Q       Do those photographs truly and accurately

5   depict what is in those photos?

6       A       Yes.

7               MR. SMYTH:  At this time the State would

8   offer into evidence State's Exhibit 74 and 75 and

9   tender the same to counsel for defense for his

10  inspection.

11              MR. ODOM:  No objection, Your Honor.

12              THE COURT:  State's Exhibit 74 and 75 are

13  admitted.

14      Q       Ms. Martinez, will you tell the ladies and

15  gentlemen of the jury what is depicted in State's

16  Exhibit 74 and 75.

17      A       The back part and the side part of a white

18  sports car.

19      Q       Is this the sports car that Alberto and

20  the defendant, Reinaldo Dennes, came to see you in on

21  January 24, 1996, a Wednesday?

22      A       Yes.

23      Q       Did you ever get a chance to ride in this

24  car?

25      A       No, there was only room for two people.

1      Q      Is there anything in the car other than a

2   place for two people to sit?

3      A      I didn't see anything; no.

4      Q      Did Reinaldo tell you anything about where

5   he got this car?

6      A      No.  He just said he had sold a truck and

7   he had given more money for him to be able to get the

8   car.

9      Q      Did he tell you anything about what he was

10  going to do when he got in this car, where he was

11  going to go?

12     A      They were going to go to Florida.

13     Q      And when was Reinaldo Dennes going to go

14  to Florida?

15     A      Maybe after that night, the same night.

16     Q      Ma'am, I show what is already in evidence

17  as State's Exhibit 36, the register for the Greenrich

18  Building for January 24, 1996, and ask you if you'll

19  look at that and tell me whether or not you can

20  recognize any signatures on here.

21     A      Yes, mine.

22     Q      Is that your name, it says "Estrella MTZ"?

23     A      Yes.

24     Q      That's the way you sign Estrella Martinez?

25     A      Yes.

1        Q        Does that show you came to work on the

2    morning shift at 8:35 in the morning and then left at

3    12:55, right after noon?

4        A        That's right.

5        Q        And does it also show that, regarding the

6    second shift, does it show that you went to work for

7    the second shift on Wednesday, January 24, 1996?

8        A        That's right.

9        Q        And did you sign it the same way,

10   "Estrella MTZ," for Estrella Martinez?

11       A        Yes.

12       Q        And does it show, I guess, clocked in at

13   1745 hours on that day, which would be 5:45 p.m.?

14       A        Exactly.

15                MR. SMYTH:  Your Honor, may I publish the

16   photos and the sign-in log to the jury?

17                THE COURT:  Certainly.

18       Q        Did Reinaldo say anything to you when he

19   came by in that new sports car with respect to your

20   work on the second shift --

21       A        What about the second shift?  I don't

22   understand the question.

23       Q        -- to go to work in the afternoon?

24       A        Yes.

25       Q        Were you suppose to take the cell phone to

1    work?

2         A     Yes.

3         Q     Why are you suppose to take the cell phone

4    that afternoon?

5         A     Because he was going to give me a call to

6    tell me when I was suppose to open the door for him to

7    come in.

8         Q     Okay.  You went to work; is that correct?

9         A     Yes.

10        Q     By the way, did you call Basel at

11   Roadmaster Auto on Wednesday, the 24th, 1996, also?

12        A     I believe so.  I did most of the time.

13        Q     Did you ever get a call from the

14   defendant, Reinaldo Dennes, after you got to work on

15   the second shift, the afternoon shift, on

16   January 24, 1996?

17        A     Yes.

18        Q     Do you recall what time it was?  Did you

19   get more than one phone call?  What time was it you

20   got the first phone call from Reinaldo Dennes?

21        A     Around 6:00, 6:30, more or less.

22        Q     What did Mr. Dennes say to you, if

23   anything?

24        A     He said to me for me to go and open the

25   door for him.

1      Q       That's the loading dock door that you

2   earlier pointed out?

3      A       Yes.

4      Q       Did you go open the door for Alberto --

5   did you go open the door for Reinaldo Dennes?

6      A       It was already opened but, yes, I did go.

7      Q       You say open.  Was it standing open or was

8   it just unlocked?

9      A       Unlocked, a little bit open.

10      Q       Did you push the door open then?

11      A       Yes.

12      Q       When you pushed the door open, did you

13   stay there to see if anybody would come in?

14      A       Yes.

15      Q       Did anybody come in?

16      A       Yes.

17      Q       Who was that?

18      A       Alberto Dennes and Reinaldo.

19      Q       They came in the back door of the loading

20   dock?

21      A       Yes.

22      Q       What happened after they came in?

23      A       They took up the stairs.  They went by the

24   door by the stairs.

25      Q       When you come in the loading dock door,

1       are there a set of stairs close by?

2           A       Yes, there is a door and there is stairs.

3           Q       You don't have to go by the security

4       guard's place, his desk, to get to those doors, do

5       you?

6           A       No.

7           Q       And Alberto and the defendant, Reinaldo

8       Dennes, went into the stairwell?

9           A       That's right.

10          Q       What was the defendant wearing that night?

11          A       Suit, dark suit with a dress shirt.

12          Q       Do you recall what color the shirt was?

13          A       No, not exactly but it was light.

14          Q       What was Alberto Dennes wearing that

15      night?

16          A       Also, they were almost dressed the same.

17          Q       Do you know whether either one of them was

18      wearing a tie?

19          A       I don't remember exactly; no.

20          Q       Did anybody have anything in their hands?

21          A       Alberto.

22          Q       What did Alberto have in his hands?

23          A       Some type of bag, luggage.

24          Q       The luggage was it anything like this one

25      of the two pieces of luggage that I carry around?

1         A       More or less like that one.

2         Q       This one, I am holding up, has a black

3    knap case?

4         A       Dark, yes.

5         Q       Was it about this size?

6         A       Yes, it was not too big.

7         Q       Do you know what was in the case?

8         A       No.

9         Q       Did you have any conversation with either

10   Reinaldo or Alberto, when you let them in the back

11   door, did they say anything to you?

12        A       Just to wait for the call for me to

13   distract the security guard, that's it.

14        Q       Who said that?

15        A       Reinaldo.

16        Q       And you had your cell phone with you?

17        A       Yes.

18        Q       Do you follow them into the stairwell?

19        A       No.

20        Q       What do you do after you let them go into

21   the stairwell?

22        A       I continue working normally.

23        Q       Do you have any conversation with Reinaldo

24   or Alberto or anybody else on your cell phone while

25   you are continuing your work?

1       A      Only around 7:00 that Reinaldo called me

2  on the phone.

3       Q      And what did Reinaldo call you for, what

4  did he say to you?

5       A      He wanted for me -- he wanted for me to

6  distract the security guard.

7       Q      Did you distract the security guard?

8       A      Yes.

9       Q      How did you distract the security guard?

10      A      I told him that I had locked my keys in

11  one of the offices and that I needed them to continue

12  working.

13      Q      You needed your keys?

14      A      Yes.

15      Q      Did the security guard come and help you

16  get your keys?

17      A      Yes.

18      Q      Do you remember what office you locked

19  your keys in or what floor it was?

20      A      Fifth floor, the office would have been

21  500, 501, I don't remember.

22      Q      Do you recall if it took the security

23  guard off the first floor up to the fifth floor?

24      A      That's right.

25      Q      Did you get your keys back?

1      A      Yes.

2      Q      The security guard had you seen him before

3   that Wednesday night?

4      A      Monday and Tuesday.

5      Q      So he had only been working there since

6   Monday?

7      A      Yes.

8      Q      He wasn't the regular guy that worked

9   there?

10     A      No.

11     Q      The security guard that worked there

12   before had you developed a friendship with him?

13     A      Yes.

14     Q      By that, I mean, you smile, wave, talk,

15   things like that?

16     A      Yes.

17     Q      Had that prior security guard been there

18   all the time you had been there?

19     A      I don't understand the question.

20     Q      Were you at all concerned that you would

21   have trouble distracting this new security guard?

22     A      Well, yes, because I didn't know him.  He

23   didn't speak Spanish.  I don't speak English.

24     Q      Would you have any trouble distracting the

25   old security guard?

1        A      No.

2        Q      After you distracted the security guard,

3    did you get any other calls?  Did you have any other

4    conversations with Reinaldo Dennes?

5        A      Yes.

6        Q      Do you recall what time it was that you

7    had this second conversation with Reinaldo Dennes?

8        A      Around 7:30, 7:30, 7:00.

9        Q      What did Reinaldo say to you, if anything,

10   during the second conversation or it may have been --

11   after the conversation, after you had distracted the

12   security guard about the keys, did you have another

13   conversation with Reinaldo Dennes?

14       A      Oh, yes.

15       Q      And this is one that came about 7:00,

16   7:30, something like that?

17       A      Yes.

18       Q      What did Reinaldo Dennes say to you, if

19   anything, this next time that you talked to him?

20       A      That he needed me to distract the security

21   guard, and I told him that I had already done that.

22   And that he said to me I need for you to do it again.

23       Q      So you had a conversation about having to

24   go do this, try to distract this new security guard

25   again?

1          A       That's right.

2          Q       And this is right after you had just

3   distracted him?

4          A       Yes.

5          Q       Did Reinaldo say anything to you that made

6   you think you better go distract the security guard

7   again?

8          A       Yes, because we were in agreement that he

9   was going to be distracted one time and he was asking

10  me to distract him again.

11         Q       Did you distract the security guard any

12  more?

13         A       Yes.

14         Q       Why did you distract the security guard a

15  second time?

16         A       Because Reinaldo told me if I didn't

17  distract him, he was going to have to fire at him.

18         Q       If you didn't distract the security guard,

19  you was going to have to fire at him?

20         A       Yes.

21         Q       Did he use the word fire, shoot, kill or

22  what?

23         A       Yes, to fire, like shoot him.

24         Q       Shoot the security guard?

25         A       Yes.

1       Q       Did you go and distract the security guard

2   the second time?

3       A       Yes.

4       Q       How did you do that?

5       A       Well, I went to the first floor.  I told

6   the security guard that I needed to clean the snack

7   bar.

8       Q       Did he have to go let you in the snack bar

9   for you to clean it?

10      A       Yes, because he's the one that has the key

11  for the snack bar.

12      Q       Did you do anything with respect to the

13  cell phone you were carrying when you went down to the

14  distract the security guard the second time?

15      A       Yes.  The line was open.

16      Q       So after the conversation, you left the

17  telephone line hooked up between the two cell phones?

18      A       Yes, the line was open.

19      Q       Why did you do that?

20      A       For Reinaldo to listen so that's when I

21  was going to tell him how or when he was going to go

22  and get the tapes.

23      Q       So he could hear what is going on between

24  you and the security guard?

25      A       Yes.

1        Q        Now, where is the snack bar --

2                 MR. SMYTH:  May I approach the witness,

3        Your Honor?

4                 THE COURT:  Sure.

5        Q        Ma'am, I will show you what has been

6        marked as State's Exhibit 25 and ask you do you

7        recognize this as being the floor plan of the

8        Greenrich Building?

9        A        Yes.

10       Q        Can you see this now, ma'am?

11       A        Yes.

12       Q        Do you recognize this as the lobby area of

13       the Greenrich Building on the first floor?

14       A        Yes.

15       Q        And is this where the security guard

16       normally stays?

17       A        Yes.

18       Q        Now, where is the snack bar in

19       relationship to the security guard's booth?  Is it

20       here in the lobby or some place else?

21       A        To the right, by the hall.

22       Q        Right here in this area?

23       A        Yes.

24       Q        Down this hallway?

25       A        Yes.

1      Q      That would be the hallway that runs out

2    into the parking garage?

3      A      Yes.

4      Q      So do you know which one of these rooms is

5    marked off would be the snack bar area, this first

6    room, the second room or the top one?

7      A      The first one.

8      Q      This one?

9      A      Yes.

10     Q      You are able to get the security guard

11   then to leave his post to go over and open up the

12   snack bar?

13     A      Yes.

14     Q      Did he stay with you while you cleaned the

15   snack bar?

16     A      Well, I was just about done cleaning it

17   but, yes, he was with me.

18     Q      Did anybody else come to the snack bar

19   while you are working on it?

20     A      Yes, Jovanni.

21     Q      Who is Jovanni?

22     A      He is the owner of the snack bar.

23     Q      Did you still stay there, cleaning the

24   snack bar, when Jovanni showed up?

25     A      I was not cleaning the room yet.

Page 54

1          Q       Okay.  Did you start cleaning the room

2     while Jovanni was there?

3          A       No.  I asked him if I could do it or if he

4     wanted me to come back later.

5          Q       Did you do it or did you come back later?

6          A       I was going to come back later.

7          Q       Did you and the security guard then leave

8     the snack bar area?

9          A       Yes.

10         Q       Where did you go?

11         A       Me, to the area where the restrooms are.

12         Q       This appears to be the restroom area.  Is

13    this the restroom area on the first floor?

14         A       Yes.

15         Q       And it's got a couple of what appears to

16    be sink and laboratory sink, and things that indicate

17    it is a restroom?

18         A       Yes.

19         Q       When you were going to the restroom --

20    which restroom do you go to:  the first one or the one

21    closest to the outer wall?

22         A       The one closest to the wall.

23         Q       It would be the second one?

24         A       Yes.

25         Q       As you are going to the restroom area, did

1      you have occasion to look into the lobby area?

2          A      Yes.

3          Q      When you looked into the lobby, what did

4      you see, if anything?

5          A      I saw that someone was coming in with his

6      hands behind his back.

7          Q      Walking toward the lobby area?

8          A      Yes.

9          Q      Was the security guard in the lobby area

10     at that time?

11         A      Yes.

12         Q      The person that is walking in does he have

13     both hands behind his back or one hand or do you know?

14         A      It seems like both.  It seems like both.

15     I believe so.

16         Q      Were you able to see whether he had

17     anything in his hands?

18         A      No.

19         Q      Just hands behind the back?

20         A      Yes.

21         Q      Was he walking to you or was he walking to

22     the security guard or was he just walking in?

23         A      Towards the security guard.

24         Q      Were you right there, by the bathroom

25     door, or were you right there, by the corner, or where

1    when you saw this person walking toward the security

2    guard?

3         A       When I was about to enter the bathroom.

4         Q       Did you get a chance to observe the person

5    that was walking toward the security guard?

6         A       Yes.

7         Q       What was that person wearing?

8         A       An overall-type, working mechanic.

9         Q       What color was it?

10        A       Maybe was blue but it was dark.

11        Q       Dark blue, maybe black?

12        A       (Witness nods head.)

13        Q       Just a dark color?

14        A       Yes.

15        Q       Did the person have anything -- did you

16   recognize anything else about the person?

17        A       Yes.

18        Q       What's that?

19        A       The way he walks.

20        Q       When you saw the way the person walked,

21   did you know who it was?

22        A       Yes.

23        Q       And who was it that was walking toward the

24   security guard?

25        A       Reinaldo Dennes.

1          Q          The defendant in this case, Reinaldo

2     Dennes?

3          A          Yes.

4          Q          Did he look the same as he walked toward

5     the security guard as he did when you let him in the

6     loading dock door and he went up the stairwell?

7          A          No.

8          Q          And how was he different?

9          A          He had a mustache and he was like wearing

10    a disguise.

11         Q          When you first saw Reinaldo come in the

12    back door, he didn't have a mustache on?

13         A          No.

14         Q          Was he walking the way he normally walked?

15         A          Yes.

16         Q          When he came in the back door, he didn't

17    have a cast on his leg?

18         A          No.

19         Q          When you saw him walking across the lobby,

20    did he have a cast on his leg?

21         A          No.

22         Q          Did you ever see him with a cast on his

23    leg?

24         A          Yes, I have seen him.

25         Q          And when was that?

1        A        After what happened.

2        Q        After what happened he put the cast on his

3    leg?

4        A        Yes.

5        Q        You say he was wearing a disguise.  What

6    was the disguise?

7        A        Well, the only thing I saw different was

8    the mustache and the way he was dressed.

9        Q        Okay.  He had on the dark jumpsuit or

10   overalls.  Was there anything else he was wearing that

11   was different?

12       A        I don't know.  I got to see a cap that he

13   was wearing backwards.  I'm not very sure.

14       Q        What kind of cap?

15       A        Normal, the kind that the guy wear

16   backwards.

17       Q        A baseball cap?

18       A        You could call it like that.

19       Q        Was it a white cap, a green cap, red cap?

20   Do you know what color?

21       A        Dark.

22       Q        Excuse me, ma'am.

23       A        Dark.

24       Q        Dark colored cap?

25       A        Yes.

1                    MR. SMYTH:  May I approach the witness,

2      Your Honor?

3                    THE COURT:  You may.

4           Q       I show you what has been marked as State's

5      Exhibit 32 and ask you do you see that?

6           A       Yes.

7           Q       Have you ever seen anything like that

8      before?

9           A       Yes.

10          Q       Does that look like the mustache that

11     Reinaldo was wearing when he was walking across the

12     lobby toward the security guard?

13          A       Yes.

14          Q       Did you continue to watch Reinaldo, as he

15     approached the security guard, or did you do something

16     else?

17          A       No, I went inside the bathroom.  I didn't

18     see him any more.

19          Q       At the time you were watching was Reinaldo

20     having any conversation with the security guard?

21          A       It looked like he was leaving and the

22     security guard was trying to talk to him as if he was

23     talking to him.

24          Q       Did you see the security guard and

25     Reinaldo come together?

1       A       Before, just before getting into the

2    bathroom, I got to see they were going to come close

3    together.

4       Q       Did they get close enough to touch before

5    you went in the bathroom?

6       A       Not exactly.  I didn't get to see that

7    they would get that close.

8       Q       Did you see Reinaldo take a gun from

9    behind his body and shoot the security guard?

10      A       No.

11      Q       And why is that?

12      A       Because I was inside the bathroom.

13      Q       And you went in the bathroom before that

14   happened?

15      A       Yes.

16      Q       While you are in the bathroom, did you

17   hear anything unusual?

18      A       Yes.

19      Q       And what was that?

20      A       A weird sound was heard as if something

21   was touched or was touching something but not exactly

22   as the sound of a gunshot.  It was normal.

23      Q       It wasn't real loud?

24      A       No.

25      Q       Did you peak out to see what is going on

1      or did you stay in the bathroom?

2            A      I was still in the bathroom.

3            Q      Did you come out of the bathroom?

4            A      Yes.

5            Q      When you came out of the bathroom, was

6      Reinaldo still there in the lobby with the security

7      guard?

8            A      No.

9            Q      Was there anybody in the lobby?

10           A      Just the security guard.

11           Q      And where was the security guard?

12           A      On the floor, lying there, bleeding.

13           Q      Did you go up to the security guard?

14           A      Yes.

15           Q      Did the security guard say anything to

16     you, don't tell, just yes or no?

17           A      Yes.

18           Q      You could see the security guard was

19     bleeding, right?

20           A      Yes.

21           Q      Did you know what part of his body was

22     bleeding?

23           A      I think his chest.  He was face down.

24           Q      After what you saw and whatever the

25     security guard said to you, if anything he was saying

1     to anybody, did you do anything?

2          A     Yes.  I called Jovanni for him to call

3     911.

4          Q     Did any emergency, firemen, ambulance

5     people come?

6          A     Yes, they did come.

7          Q     Did the police come?

8          A     Yes.

9          Q     Did you talk to the police that night?

10         A     Yes, I did talk to the police.

11         Q     Did you also give a written statement to

12    the police that night?

13         A     That's right.

14         Q     Did you tell the police everything that

15    you told this jury today?

16         A     No.

17         Q     Did you give the police a description of

18    the person that was in the lobby where the security

19    guard was shot?

20         A     Yes.

21         Q     Did you tell the police that you knew that

22    person was Reinaldo Dennes, the defendant, who you

23    have identified here in court today?

24         A     No.

25         Q     Why didn't you tell the police that night,

1      Wednesday, January 24, 1996, that Reinaldo Dennes was

2      the man in the lobby with the security guard?

3            A       Because I was afraid, it is that I never

4      thought that would have happened.

5            Q       Did the police ever come out to you and

6      show you a lineup, not a lineup, did the police come

7      out and show you two six-picture photo spreads?

8            A       Yes.

9                    MR. SMYTH:  May I approach the bench, Your

10     Honor.

11                   THE COURT:  Yes.

12           Q       Ma'am, I am going to show you what is in

13     evidence as State's Exhibit 33 and 34 and ask you if

14     you recognize these photos spreads that the police may

15     have shown you on an earlier date.

16           A       Yes.

17           Q       With regard to State's Exhibit 33, did you

18     recognize any of these people or tell the police that

19     you recognized anybody?

20           A       In that one, no.

21           Q       When the police showed you these, what did

22     they say about the photograph?  Did they give you any

23     instructions or tell you anything about these

24     photographs?

25           A       Instructions like what?

1       Q       Did they tell you, hey, we want you to

2  pick out somebody here as being the shooter?

3       A       That if I could recognize the person that

4  had shot the security guard, for me, to write it down

5  or point it out.

6       Q       Did they tell you one of these people shot

7  the security guard and we want you to pick him out or

8  see if you recognize somebody that shot the security

9  guard?

10      A       That if I recognized someone from that

11  group of photographs.

12      Q       When the police showed you this, did you

13  say you recognized somebody or you saw somebody that

14  looked like they might be the person that shot the

15  police, or anything like that, who shot the security

16  guard?  Did you tell the police in State's Exhibit 34

17  that there was somebody that looked like the man that

18  shot the security guard?

19      A       Yes.

20      Q       And who was that -- or what number was

21  that?

22      A       Five.

23      Q       And did you sign your name or have your

24  name printed on the space next to number five,

25  indicating that the person in that number five

1    position looked like the person who shot the security

2    guard?

3         A      I wrote my name.

4         Q      And this would have been on

5    February 35, 1996, about 7:00 p.m.?

6         A      That's correct.

7         Q      Is the person you picked out, number five,

8    is that the person that shot the security guard?

9         A      No.

10        Q      Who shot the security guard?

11        A      Reinaldo Dennes.

12               THE COURT:  How much more direct?

13               MR. SMYTH:  I got some, not forever.

14               THE COURT:  Is this a good time for you?

15               MR. SMYTH:  Good as any.

16               THE COURT:  We will stand in recess until

17    1:30.

18               (Recess taken.)

19               MR. ODOM:  Judge, I believe this witness

20    made some statements that were videotaped and, of

21    course, I am entitled to see the statements once she

22    has testified.  The State has produced those

23    statements.  We have them in order to keep the flow.

24               THE COURT:  We have got two.  It takes two

25    videos.

1          MR. ODOM:  What I am suggesting, or at

2     least an alternative, is that perhaps I can waive my

3     cross examination right now of this particular

4     witness, or whenever it is they give her to me, and,

5     then, the State, if they can, put on somebody else, if

6     they have other witnesses available, and allow me over

7     the evening to review the tape and Ms. Guerrero will

8     have to translate it and then be ready for cross at

9     whatever time.

10          THE COURT:  Do we have enough to carry on

11     the rest of the day?

12          MR. SMYTH:  Two things:  One is Mr. Odom

13     doesn't know what is on that tape or Ms. Guerrero

14     listened, I turned over the tapes to her at 1:30.  I

15     don't know how long they are and I can't understand

16     them.  I didn't listen to them myself.

17          THE COURT:  Is that long?  Are we talking

18     about two, three hours tape?

19          MR. SMYTH:  I don't know how long they are

20     or how much has been recorded or not.  They are full

21     size tapes but whether there is an hour's worth of

22     conversation or three, I have no idea because I don't

23     understand Spanish.

24          THE COURT:  So what's the point?

25          MR. SMYTH:  My point:  That's highly

1    improper.  He's going to listen to them.  He is going

2    to have to listen to them in the custody of the State.

3    We are not going to give him those tapes to make

4    copies of and, you know, he is required to do after

5    she testified, allowed him to have access to a

6    previous statement that she made.  Second of all, they

7    were not sworn to the truth.  It is just something she

8    said.

9               THE COURT:  But it's her making a

10   statement?

11              MR. SMYTH:  It's her being interviewed by

12   police officers.

13              THE COURT:  So it's not an actual

14   presentation of a formal statement or anything of that

15   nature.

16              MR. SMYTH:  It's in the custodial

17   statements.  We got flat-footed.  When did you find

18   out this morning?

19              THE COURT:  Find out about what?

20              MR. SMYTH:  Find out that they are going

21   to request to delay the cross examination until

22   tomorrow and we don't have anybody else waiting in the

23   hallway.  Based on the progress, we figured he may

24   take most of the day with her.

25              THE COURT:  We have no further witnesses?

1          MR. SMYTH:  We will have to scramble and

2     we can do so.

3          MR. VINSON:  We will get ahold but based

4     on his cross, we anticipated something like that.

5          THE COURT:  Well, my attitude is you all

6     have a right to review the statements and so I won't

7     order you to do so.

8          MR. VINSON:  We will sit here with him at

9     the end of the trial and they can go over it and sit

10    back with the video and I will sit here.

11         THE COURT:  You absolutely don't have any

12    intention of letting him take them.

13         MR. SMYTH:  Absolutely not.  If they want

14    to, they can purchase the transcript or whatever.

15         MR. ODOM:  I'm not saying we have to go

16    home and look at them.  That's not what I was

17    suggesting.  I was suggesting to keep the jury from

18    sitting back there -- I mean, we are happy to do it

19    here.

20         THE COURT:  That's fine.  You see part of

21    it and think you don't need to.

22         MR. ODOM:  I am trying to offer a

23    suggestion and I'm not saying I should take it home.

24         THE COURT:  I'll be happy.  You are

25    willing to wait for cross and we will put Ms. Martinez

1    back on the stand, I guess, depending on where we are

2    today, the first thing in the morning or as soon as we

3    finish the last witness, if we don't finish the

4    witness today, I appreciate that.

5              Bring them out, please.

6              (Jury came into the courtroom.)

7              THE COURT:  Please be seated.

8              Ladies and gentlemen of the jury, it seems

9    like you are enjoying yourself so much instead of

10   paying you $6 a day, we are going to ask you to pay us

11   $6 a day.

12             Let's continue on, Mr. Smyth.

13             MR. SMYTH:  Thank you, Judge.

14   Q        I think we left off that you gave a

15   statement to the Houston Police Department the night

16   that the security guard was shot.  And in that

17   statement you didn't tell the police what you told

18   this jury today; is that correct?

19   A        That's correct.

20   Q        How long did you keep that cell phone that

21   Reinaldo gave you?

22   A        From Monday through Thursday.

23   Q        And you returned it on Thursday.  You

24   returned the cell phone to someone?

25   A        Yes.

1       Q       Who did you return it to?

2       A       Francisco.

3       Q       Why didn't you return it to Reinaldo?

4       A       Because he gave me instructions to give it

5   to Francisco.

6       Q       Okay.  How did you go about giving the

7   cell phone back to Francisco?

8       A       I communicated with Francisco at

9   Reinaldo's office.

10      Q       How did you communicate?

11      A       By phone.

12      Q       Did you use the same phone you had and

13  were going to give back and make a call on that?

14      A       Yes.

15      Q       About what time on Thursday,

16  January 25, 1996, did you call Francisco?

17      A       About 1:00, more or less, 1:00 in the

18  afternoon.

19      Q       And you called him at Reinaldo's business,

20  Designs by Reinaldo?

21      A       Yes.

22      Q       Did you and he make arrangements to meet

23  somewhere?

24      A       Yes.

25      Q       Where did you meet Francisco?

1        A        On Richmond and Hillcroft.

2        Q        And what is at Richmond and Hillcroft?

3        A        Metro bus stop.

4        Q        Did he just come down and pick you up in a

5    vehicle or something?

6        A        Yes.

7        Q        All right.  After he came and picked you

8    up, did you get in the car with him?

9        A        Yes.

10        Q        Did you stay there, sitting in the car, or

11    did you go somewhere?

12        A        I got in and then we drove on Richmond, up

13    a little bit after Fondren.

14        Q        What did you do when you got to this place

15    a little bit past Fondren?

16        A        I gave the cellular phone to Francisco.

17    And he told me that he had an envelope for me that

18    Reinaldo had told him to give it to me.

19        Q        Did Francisco give you the envelope?

20        A        He opened the envelope and then he gave to

21    me what it was inside.

22        Q        When he opened the envelope, what was

23    inside the envelope?

24        A        Money.

25        Q        How much money?

Page  72

```
1          A       $5000.

2          Q       Do you know the denominations of the

3      $5000?

4          A       I believe that a hundred and fifty.

5          Q       A hundred dollar bills and fifty dollar

6      bills?

7          A       I believe that it was just hundred dollar

8      bills.

9          Q       So that would be fifty one hundred dollar

10     bills?

11         A       Yes.

12         Q       Did you count the money or did Francisco

13     count the money?

14         A       Francisco counted the money.

15         Q       Did Francisco say anything to you why --

16     did he ask you why are you getting this money?

17         A       No.  No, he just told me that Reinaldo had

18     told him that I had.

19              MR. ODOM:  Object to any hearsay as far as

20     from Reinaldo at this point or, I mean, as far as

21     Francisco at this point.

22              MR. SMYTH:  Our position would be to the

23     conspiracy statutes this was an conspiracy that

24     anything Reinaldo said --

25              THE COURT:  It's overruled.
```

1       Q       (Mr. Symth)    Go ahead and answer that
2    question.

3       A       Francisco told me that Reinaldo had told
4    him for him to ask me for the cellular phone and for
5    him to give me the envelope with the money.

6       Q       And why did Reinaldo give you $5000?

7       A       Always, well, he started to helping me
8    economically or financially.  We started to have a
9    relationship and he wanted me to improve.  He wanted
10   me to study.  He wanted me to dress very nice.  He
11   wanted to help me because of my son --

12      Q       Did he give you --

13      A       -- and he wanted to help me.

14      Q       Excuse me.  Sorry, I didn't mean to
15   interrupt you.

16              Did he give you $5000 for opening that
17   back door?

18      A       Maybe, not precisely or exactly for
19   opening the door but he had already told me that he
20   wanted to help me.

21      Q       Would you have opened that back door
22   whether you got $5000 or not?

23      A       Yes.

24      Q       And why is that?

25      A       Because he had communication with me, he

1    would talk to me.  We would trust each other.  He

2    promised me that he was going to get a divorce.  That

3    he was going to marry me.  That he wanted to help me.

4        Q      You would do that for him.

5               MR. SMYTH:  May I approach the witness,

6    Your Honor?

7               THE COURT:  You may.

8        Q      What did you do with the $5000 that

9    Reinaldo Dennes gave you?

10       A      I bought clothing for my son, for me,

11   food, only that, just that.

12       Q      Did you subsequently get arrested by the

13   police?

14       A      Yes.

15       Q      And when you got arrested by the police,

16   did you have any of that money left?

17       A      Yes.

18       Q      How much money did you have left out of

19   that $5000?

20       A      900.

21       Q      And where was that $900?

22       A      In one of my jackets, kept inside.

23       Q      Did you tell the police where they could

24   find what was left of the $5000?

25       A      Yes.

1            MR. SMYTH:  May I approach the witness

2    now, Your Honor?

3            THE COURT:  Yes.

4            (Whereupon, State's Exhibit Nos. 76, 77,

5    78, and 79 were marked for identification.)

6        Q    Ma'am, I show you what has been marked as

7    State's Exhibit 76, 77, and 78, three photographs.  I

8    ask you, if you will, look at those and tell me

9    whether or not you can identify those items.

10       A    Yes.

11       Q    All three of them?

12       A    Yes.

13       Q    Also, do they truly and accurately depict

14   what they purport to depict?

15       A    Yes.

16       Q    Also, I show you what has been marked as

17   State's Exhibit 79, the contents of number 79, and ask

18   you if you recognize that?

19       A    Yes.

20            MR. SMYTH:  All right, at this time the

21   State would offer into evidence and tender to counsel

22   for defense State's Exhibit 76, 77, 78, and 79.

23            MR. ODOM:  No objection, Your Honor.

24            THE COURT:  Let's see 79, for a second,

25   please.

1              (Off-the-record discussion held at the

2    bench.)

3              THE COURT:  Very well.  76, 77, 78 and 79

4    are admitted.

5              MR. SMYTH:  For purposes of the record, we

6    would ask that we be allowed to substitute Xerox

7    copies of these $900 bills so the court reporter

8    doesn't have to take care of them.

9              THE COURT:  That will be 79 A.

10             MR. SMYTH:  We will do that before the end

11   of the trial.

12             THE COURT:  Very well.

13             MR. SMYTH:  May I proceed.

14        Q    Would you tell the ladies and gentlemen of

15   the jury what is depicted in State's Exhibit 76.

16        A    The outside area where Reinaldo's

17   apartment was.

18        Q    And State's Exhibit 78.

19        A    The front door of Reinaldo's apartment.

20        Q    And have you been to this apartment,

21   Reinaldo's apartment?

22        A    Yes.

23        Q    And State's Exhibit 77.

24        A    Yes.

25        Q    And what is State's Exhibit 77?

1        A       That's Richmond Street and Hillcroft.  It

2    is a bus stop there.

3        Q       Is this where Francisco Santos-Rojas came

4    by and picked you up on the 25th of January?

5        A       Yes.

6        Q       That's where you got in the car and went

7    down the street and exchanged the telephone for the

8    money?

9        A       Yes.

10       Q       And State's Exhibit 79 what's that?

11       A       That's the rest of the money that I had.

12       Q       Okay.  This is nine hundred dollar bills

13   that you had left?

14       A       How was that?

15       Q       There is the nine one hundred dollar bills

16   that you had left from the $5000 was in your coat

17   pocket?

18       A       Yes.

19               MR. SMYTH:  Your Honor, could I publish

20   this to the jury.

21               THE COURT:  Sure.

22       Q       Had you ever received money from Reinaldo

23   before?

24       A       Yes.

25       Q       And on how many occasions?

1        A        About three occasions.

2        Q        What's the largest amount of money

3   Reinaldo ever gave you prior to this time?

4        A        A hundred dollars.

5        Q        Was it a hundred dollar bill?

6        A        Yes.

7        Q        Was there some period of time, after you

8   saw Reinaldo in the lobby with the security guard,

9   that he was gone from the Houston area or that you

10   never saw him any more?

11        A        Yes.

12        Q        Then did you see him again after this

13   period of time?

14        A        That's right.

15        Q        Did you see him back in the Greenrich

16   Building?

17        A        Yes.

18        Q        At that time when he reappeared did he

19   have the cast on his leg?

20        A        Yes.

21        Q        You don't know what happened -- you don't

22   know or do you know of your own personal knowledge why

23   Reinaldo started wearing a cast?

24        A        He just told me because he was very

25   drunk --

1         Q        Excuse me.  I think you probably can

2    answer either yes or no.

3         A        Yes.

4         Q        So personal knowledge means not what

5    somebody told you.

6                  Did you see what happened to cause

7    Reinaldo to have to get a cast?

8         A        No.

9         Q        Thank you.

10                 I forgot to ask you one thing:  When you

11   were back in the lobby at the time Reinaldo was there

12   with the security guard, did you leave the cell phone

13    -- you originally left it on -- did you ever turn

14   that cell phone off?

15        A        After, I turn it off after.

16        Q        When did you turn it off?

17        A        When I saw the security guard lying there,

18   bleeding.

19                 MR. SMYTH:  May I approach the court

20   reporter?

21                 THE COURT:  Sure.

22        Q        After you saw Reinaldo again, after this

23   incident when he had his cast on, did you have any

24   conversations with him?

25        A        Yes.

Page 80

1      Q      Did you have any conversations with him

2  about what had happened in the Greenrich Building on

3  January 24, 1996, when the security guard got shot?

4      A      Yes.

5      Q      Did you tell Reinaldo that you recognized

6  him?

7      A      Yes.

8      Q      What did you tell him regarding disguises?

9      A      How is that, I don't understand the

10 question.

11     Q      That's fair enough.

12            Did your conversation ever deal with

13 disguises and the way Reinaldo walks?

14     A      Yes.

15     Q      And what did you tell Reinaldo with regard

16 to the way he walks?

17     A      I told him that at least he should have

18 changed the way he walks because I knew him.

19     Q      Meaning the disguise, the walk, too?

20     A      Yes.

21     Q      Did Reinaldo ask you any questions about

22 what the police were doing regarding the shooting of

23 the security guard?

24     A      Yes.

25     Q      And what did he tell you?  He asked you

1   questions.   What kind of questions did he ask you?

2       A       That if I was asked to identify the

3   person.

4       Q       You are asked to identify the person.  Did

5   he ask you -- I'm sorry.  I thought there was a

6   question mark at the end.  He asked you if you were

7   asked to identify the person?

8       A       Yes.

9       Q       And what did you tell him?

10      A       I said to him that yes.

11      Q       Did he ask you if you told the police that

12  it was him?

13      A       No, he didn't ask.

14      Q       Did he give you any instructions about the

15  way you should deal with the police?

16      A       Yes, yes.  For me to continue -- yes, he

17  gave me instructions.

18      Q       What were his instructions?

19      A       Yes, for me to continue identifying the

20  person that I had identified earlier, number five.

21      Q       After you got arrested, did you have any

22  conversations with Reinaldo Dennes?

23      A       Yes.

24      Q       Did he give you instructions about how you

25  should conduct yourself after you had been arrested?

1      A      Yes.

2      Q      And what was that?

3      A      He told me that he would pay my bond, for

4  me to go to Mexico and for me not to say anything.

5      Q      Let me go back a little bit.  And while

6  you were cleaning the offices, did you ever meet a man

7  that you knew by the name of Tony?

8      A      Yes.

9      Q      Did you see this man -- did you meet him

10  in Reinaldo's office?

11      A      Yes.

12      Q      And when you would see this man Tony, what

13  was he doing in Reinaldo's office?

14      A      Working at a machine.

15      Q      And were you up there -- is that when you

16  are cleaning up the offices is that when you would see

17  him working the machine?

18      A      Yes, sometimes he was working there.

19      Q      Do you know what he was working on?  Do

20  you know what he was making?

21      A      No.

22      Q      When he was working on this machine, was

23  he making a mess for you to clean up?

24      A      Yes, yes.

25      Q      The job that he was doing, what kind of a

1    mess would it make for you?

2         A    Like small aluminum, bunches of little

3    pieces.

4              MR. SMYTH:  May I approach the witness,

5    Your Honor?

6              THE COURT:  Yes.

7         Q    Let me show you State's Exhibit 38, 39,

8    and ask you if you recognize those two machines?

9         A    Yes.

10         Q    Is that the machines you saw Tony working

11    at?

12         A    Yes.

13         Q    Let me show you -- those pictures have

14    previously been introduced -- do you know what they

15    call this machine?

16         A    No.

17         Q    So you wouldn't know whether this is a

18    lathe or a drill press or what?

19         A    No, no, I don't know it.  I don't know.

20         Q    State's Exhibit 58 have you ever seen

21    anything like that in Reinaldo's office?

22         A    Yes.

23         Q    And let me show you just State's Exhibit

24    64 and 65.  Have you ever seen anything like that in

25    Reinaldo's office?

1        A       Yes.

2        Q       Is that the kind of aluminum-type stuff

3   you were cleaning up from the machine that Tony was

4   working with?

5        A       Yes.

6                MR. SMYTH:   Approach again, Your Honor?

7                THE COURT:   Yes.

8        Q       Let me show you State's Exhibit 10 and

9   number 11 and ask you if you recognize what is

10   depicted in those two photographs?

11        A       Yes.

12        Q       And what is depicted in State's Exhibit 10

13   and 11?

14        A       Those are the televisions where you can

15   see through the cameras to the flower shop.

16        Q       And is there normally is there something

17   you see State's Exhibit 11 -- there is an opening

18   there -- is there normally something else in there?

19        A       Yes, yes, the videos, what is it called,

20   where you put the video cassette.

21        Q       The video recording machine or video

22   cassette machine?

23        A       Yes.

24        Q       Normally there's some video cassette

25   machines in there?

1       A       Yes.

2       Q       Is this the area that Reinaldo was going

3    to take the videotapes from?

4       A       Yes.

5       Q       This is why you were letting him in the

6    back door?

7       A       Yes.

8       Q       While you were in Reinaldo's office, did

9    you ever see a gun?

10      A       No.

11      Q       After you got arrested, did you talk to

12   the Houston Police Department again, officers from the

13   Houston Police Department again?

14      A       Yes.

15      Q       And, in fact, did they do some interviews

16   where they videotaped you talking to them?

17      A       Yes.

18      Q       On how many occasions did you give

19   videotaped statements to the Houston Police

20   Department?

21      A       Two times.

22      Q       Do you recall what day you were arrested?

23      A       I believe on Friday, February 23rd, it

24   seems like.

25      Q       Did you give a videotape interview with

1    the Houston Police Department on February 23rd and

2    then give a second videotaped statement on

3    February 24, 1996?

4        A    Yes.

5        Q    When you gave those videotaped statements

6    to the Houston Police Department, did you tell the

7    Houston police at that time the same thing you told

8    this jury today?

9        A    No.

10       Q    And at that time you were under arrest; is

11   that correct?

12       A    Yes.

13       Q    Did you know what you were charged with at

14   that time?

15       A    Yes.

16       Q    What's that?

17.      A    Aggravated robbery.

18       Q    And is that for your role in what happened

19   in the Greenrich Building?

20       A    How is that?

21       Q    Is that for your part in letting Reinaldo

22   in the side door so he could come steal the videotapes

23   from the security guard's spot?

24       A    Yes.

25       Q    Did you know what Reinaldo and Alberto

1    were going to do once they left the first floor and

2    went up the stairwell?

3           A       No.

4           Q       Did you get an attorney to represent you

5    on your case, the aggravated robbery case?

6           A       I don't understand that at that time or --

7           Q       After you were arrested, at some point in

8    time, did you come to know an attorney by the name of

9    Eva Silva?

10          A       Yes.

11          Q       And after you were arrested, did you ever

12   go to Ms. Silva and tell her you wanted her to talk to

13   the police or the D.A.'s office?

14          A       Yes.

15          Q       And as a result of making that request to

16   Ms. Silva, did she then contact the district

17   attorney's office?

18          A       Yes.

19          Q       And, then, at Ms. Silva's request, did the

20   Houston Police Department and the district attorney's

21   office talk to you again -- start partly through, as a

22   result of your request to Ms. Silva to talk to the

23   district attorney's office or the police, did she get

24   in touch with those authorities?

25          A       Yes.

1        Q        And did you after that talk to the Houston

2   Police Department and members of the Harris County

3   District Attorney's Office?

4        A        That's right; yes.

5        Q        Do you remember when it was you first

6   talked to the district attorney's office?

7        A        April 4, 1996.

8        Q        This is after you already had been

9   arrested in February?

10       A        Yes.

11       Q        At that time when you talked to the

12   district attorney's office, did you tell the Houston

13   Police Department's representative and the district

14   attorney's office's representative what you told this

15   jury today?

16       A        Yes.

17       Q        In return, before we get to it, look at

18   the defendant, Reinaldo Dennes.  His complexion, skin,

19   is rather pale today.  Is he always this fair skinned?

20       A        No, a little bit more tan.

21       Q        And back on January 24, 1996, was he a

22   little bit more tan than he is today?

23       A        Yes.

24       Q        Now, I've talked to you on several

25   occasions, correct?

1      A      That's right, correct.

2      Q      And I've never been able to talk to you

3   just me and you; is that right?

4      A      That's correct.

5      Q      I've always had to have an interpreter?

6      A      That's right.

7      Q      How many times have we talked about this

8   case?

9      A      About three times.

10     Q      Have you been promised anything by the

11  State of Texas in return for your testimony?

12     A      Yes.

13     Q      And what is your understanding of what the

14  State of Texas is going to recommend your punishment

15  for your role in the shooting of the security guard?

16     A      That they were going to offer me ten years

17  probation.

18     Q      The State of Texas is going to offer you

19  ten years probation or ten years deferred

20  adjudication --

21     A      Ten years of deferred adjudication.

22     Q      -- for the offense of robbery?

23     A      Yes.

24     Q      And in return for getting ten years

25  probation for the offense of robbery, what are you

1    suppose to do?

2        A       Give my testimony.

3        Q       And who do you understand you are going to

4    be required testify and what trials?

5        A       Three trials.

6        Q       Reinaldo Dennes?

7        A       Yes.

8                MR. ODOM:  Objection to the three trials,

9    Your Honor.  It's irrelevant as far as this line of

10   question is concerned.

11       Q       (Mr. Symth)   Has anybody from the

12   district attorney's office, me or anybody else,

13   promised to to intercede on your behalf with the

14   immigration people?

15       A       Yes.

16       Q       And was that to make sure you didn't get

17   deported before these trials are finished?

18       A       Exactly.

19       Q       Do you expect to be deported when these

20   trials are over?

21       A       I believe so; yes.

22               MR. SMYTH:  Pass the witness, Your Honor.

23               THE COURT:  Very well, thank you.

24               Ladies and gentlemen, I am going to give

25   the defense an opportunity to cross examine this

1    witness at a later date, probably in the morning for

2    various reasons, so she is excused until that time.

3    And we are going to go ahead and call the next witness

4    for the State.

5              And who is that going to be?

6              MR. SMYTH:  If they are here because of

7    this -- may the record reflect that the State is

8    tendering to counsel for the defense copies of the two

9    video statements or conversations the defendant had.

10             THE COURT:  Let the record so reflect.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    M. R. FURSTENFELD,

 2   was called as a witness for the State and, having been

 3   duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5   BY MR. SMYTH:

 6        Q     Sir, will you, please, state your name and

 7   speak loud enough for the entire jury to hear you.

 8        A     M. R. Furstenfeld.

 9        Q     This is going to be a silly question.   How

10   are you employed?

11        A     I am a police officer with the City of

12   Houston.

13        Q     What capacity are you employed?

14        A     I am a sergeant and I work in the internal

15   affairs division as an investigator.

16        Q     And what is the internal affairs division

17   do?

18        A     We investigate allegations of wrongdoing

19   within the police department.

20        Q     So you are not here today to testify about

21   any wrongdoing by the Houston Police Department, are

22   you, sir?

23        A     No, sir, not that I know of.

24        Q     Do you know anything about or did you have

25   any connection with the investigation or anything that
```

1    occurred at the Greenrich Building at 6222 Richmond

2    Avenue here in Houston, Harris County, Texas, back on

3    January 24, 1996?

4        A    Yes, I did.

5        Q    How is it you came to get involved in that

6    matter?

7        A    A call went out at the building.  I was

8    one of the responding units in the area at that time.

9        Q    Now, IAD, internal affairs, does not

10   normally respond to calls for service, do they?

11       A    That's correct.

12       Q    At that time were you in IAD?

13       A    No, sir.  I was a supervisor over the gang

14   task force at the Westside Command Station.

15       Q    And you responded to the call for the

16   service at the Greenrich Building?

17       A    Yes, sir.

18       Q    And that was regarding what kind of a call

19   for service?

20       A    It went out as a shooting call.

21       Q    Did you go to that scene then?

22       A    I didn't go directly to the scene.  I

23   worked in the area around the scene because at that

24   time the dispatcher stated the suspects were not at

25   the scene.

1      Q      Okay.  Did you eventually end up at the

2   Greenrich Building?

3      A      Yes, I did.

4      Q      And where did the shooting occur in the

5   Greenrich Building that you respond to the call about?

6      A      The call was for a shooting in the lobby

7   at 6222 Richmond, the Greenrich Building.

8      Q      You eventually then ended up at the

9   building itself?

10     A      Yes, I did.

11     Q      Did you have an active role in the

12   investigation of that shooting in the lobby?

13     A      Not active in that particular area other

14   than I was on the scene and working in the area; was

15   there, if needed, more so in securing the scene.

16     Q      What hours did you work back then for the

17   gang task force?

18     A      At that time our standard hours were 6:00

19   p.m. to 4:00 a.m.

20     Q      Were you working your regular assigned

21   time or was this overtime or what?

22     A      I was working my regular assigned time.

23   We had worked overtime during the day, and I was

24   working during my regular shift at that time.

25     Q      While you were in the building, were you

1    approached by anybody regarding sticking around when

2    you got off work?

3         A       Yes.  One of the officers approached me

4    and stated that the building manager was requesting an

5    officer to stay.

6         Q       Okay.  Did you volunteer to stay or get

7    recruited or what?

8         A       A little bit of both; yes.

9         Q       While you are staying now in the building

10   and you are on the scene, at any time did you leave

11   the first floor lobby area of the Greenrich Building?

12        A       Yes, I did.

13        Q       And where did you go?

14        A       Went to the seventh floor.

15        Q       Did you go by yourself or with others?

16        A       No, I went with others.

17        Q       Who all went with you?

18        A       I went with the building manager Susan --

19   I can't recall her last -- I will think of her last

20   name -- and a couple of other officers.

21        Q       And when you went to the seventh floor,

22   did you go to any particular office on the seventh

23   floor?

24        A       Yes, I believe 770.

25        Q       And what was contained in office 770?

1        A        I was responding to a request by the

2     building manager.

3        Q        And why did you go up?  What were you

4     looking for?

5        A        She stated to me that they had a tenant

6     that had to be accounted for.

7        Q        And the office in suite 770?

8        A        Correct.

9        Q        Did you know this tenant personally?

10       A        No, sir, I did not.

11       Q        When you got up to --

12                MR. SMYTH:  May I approach the witness,

13    Your Honor?

14                THE COURT:  Sure.

15                (Whereupon, State's Exhibit Nos. 80, 81,

16    82 and 83 were marked for identification.)

17       Q        Let me show you what has been marked as

18    State's Exhibit 80 and ask you if you recognize that

19    photograph?

20       A        Yes, it appears to be the sign on the door

21    of 770.

22       Q        Does that truly and accurately depict

23    suite 770 on the seventh floor of the Greenrich

24    Building?

25       A        The best I recall that's what it looked

1      like at the time; yes.

2                  MR. SMYTH:  The State would offer State's

3      Exhibit 80 and tender the same to defense attorney.

4                  MR. ODOM:  No objection.

5                  THE COURT:  State's Exhibit 80 is

6      admitted.

7                  MR. SMYTH:  May I publish this to the

8      jury, please.

9                  THE COURT:  Sure.

10         Q      And I believe the sign on the door reads

11     "J. S. Precious Stones, Inc. JAL Enterprises, Inc.,";

12     is that correct?

13         A      Yes.

14         Q      When you got to that location, you got to

15     that door, did you try to open the door?

16         A      Yes, sir.

17         Q      How did you try to open that door?

18         A      I started by turning the knob and it was

19     locked.

20         Q      Were you able to get in anyway?

21         A      Yes.  The manager had, I guess, a master

22     key.

23         Q      Did you then go inside that door?  This is

24     the door on the hallway?

25         A      Yes, this is the hallway door.

1      Q       What happened when you opened the hallway?

2      A       When you open the hallway door, there was

3   a small entry area and then a second door immediately

4   and a glass window.

5      Q       Were you able to get through the second

6   door?

7      A       Yes.  Her pass key also worked on that

8   door.

9      Q       And it was locked, also?

10     A       Yes.  We first knocked on the door to

11  elicit a response.

12     Q       When you opened the second door, did

13  anything happen?

14     A       The alarm went off and was ringing.  I

15  don't know if it went off immediately when we opened

16  the door but I know the office alarm went off.

17     Q       You didn't get very far inside?

18     A       No.

19     Q       So shortly after you opened the door,

20  stepped inside, the alarm to the office went off?

21     A       Yes, sir.

22     Q       Were you able to turn off the alarm?

23     A       No.

24     Q       It continued to ring then?

25     A       Correct.

1      Q       Was it quiet alarm or loud?

2      A       No, it was very loud.

3      Q       What did you do after you set off the

4   alarm?

5      A       We continued in the office, appeared to be

6   his regular business office after he closed, and we

7   continued in and came to an office on the right, which

8   was vacant, and the door was open, I believe, as best

9   I recall.  It had a large window area where you could

10  actually see into it and found a second room that was

11  a break room, for lack of a better term, had a counter

12  top in it and that door was, also, open.

13     Q       At this point other than the alarm going

14  off, is there anything to indicate anything is out of

15  order?

16     A       Correct.  Everything looked business as

17  usual.

18     Q       Nothing messed up or turned over?

19     A       Correct.

20     Q       You continue then toward the back of the

21  office?

22     A       Correct.

23     Q       Were you able to go all the way to the

24  back office?

25     A       We went two doors at the back of the room,

```
 1    as you went through, and they were kind of at an
 2    angle.  We knocked on those doors, to listen for a
 3    response, but that's as far as we could continue into
 4    the office area.
 5              MR. SMYTH:  Your Honor, may I get an
 6    exhibit?
 7              THE COURT:  Sure.
 8         Q    Officer, I'll show you what has been
 9    marked as State's Exhibit 81 and ask you if you can
10    recognize from this diagram anything?  Does that look
11    like anything you have ever seen before?
12         A    It looks very similar to the floor plan or
13    the layout of the office we went into of 770.
14         Q    And you didn't draw this yourself, did
15    you?
16         A    No, sir, I didn't.
17              MR. SMYTH:  At this time offer into
18    evidence State's Exhibit 81 and tender the same to the
19    counsel for his inspection.
20              MR. ODOM:  I have no objection, Your
21    Honor.
22              THE COURT:  State's Exhibit 81 is
23    admitted.
24              MR. SMYTH:  May the witness step down?
25              THE COURT:  Certainly.
```

1        Q       Officer, if you would stand over, off to

2     the side.

3                Officer, I'm showing you what is in

4     evidence as State's Exhibit 81, which is a diagram of

5     suite 770 on the seventh floor.  The first door is

6     that the first door off the hallway?

7        A       Yes, correct.

8        Q       And it was locked?

9        A       Yes.

10       Q       There is the second door off the

11    hallway -- or you enter there?

12       A       Yes, the foyer or something entryway.

13       Q       This door, also?

14       A       Yes.

15       Q       And you go inside and you set off the

16    alarm?

17       A       Yes.

18       Q       And you say you continued on toward the

19    back and there was an office off to the right?

20       A       Yes.

21       Q       Was there anything out of order in this

22    lobby-type area?

23       A       Not that I can recall; no.

24       Q       Was there anything that appeared to be out

25    of order or disheveled in this first office off to the

1    right?

2         A      No, not that I recall.

3         Q      You continue up and you said there was a

4    break area?

5         A      Yes.

6         Q      Is it in this area?

7         A      Yes, this room here had kind of a counter

8    top and like a break room or a work room.

9         Q      And this first office had a couple of

10   three chairs and wastebasket and desk and the second

11   office has -- is that a sink?

12        A      Yes.

13        Q      And then a counter top area?

14        A      Yes, sir.

15        Q      Then you leave that.  Anything in disarray

16   in the break room?

17        A      Not that I recall, no.

18        Q      And then you go on toward the back.  You

19   said there is two doors; is that correct?

20        A      Correct.

21        Q      Do these doors lock?

22        A      They were locked.

23        Q      You tried to open them?

24        A      Yes.

25        Q      Did you say you knocked?

1      A       Knocked on the doors loudly.

2      Q       Did anybody call out any names or anything

3  like that, if you recall?

4      A       I called out "police officers" and asked

5  is anybody in here, banged on the door to elicit a

6  response but there was none.

7      Q       Were you in uniform?

8      A       Yes, I was.

9      Q       Like you are dressed today?

10     A       Yes, sir.

11     Q       So what did you do when you got no

12  response?  These doors are locked, were you able to

13  unlock them?

14     A       No, we were not.

15     Q       The building manager did not have a pass

16  key that unlocked these two doors?

17     A       That is correct.

18     Q       What did you do then?

19     A       There was myself and at least three other

20  uniformed officers and building manager.  And I had

21  one of the officers place a chair or stand on this

22  counter top, to see if he could look over -- the

23  ceiling tiles was dropped from the ceiling and the

24  tiles lift -- and had an officer stand up here, to see

25  if he could see over in, to be sure everything was

1    okay.

2         Q      Did you also get on this chair and stand

3    up and look in?

4         A      Yes.  We eventually placed a chair on the

5    counter top and one of the officers climbed on it and

6    looked in and take a look of what I thought of the

7    situation.

8         Q      When you got up on this chair, you pushed

9    the ceiling tile back?

10        A      Yes.

11        Q      When you got up on the chair and counter

12   top and looked in, did you see anything that caused

13   you concern?

14        A      Yes.  This room, as I recall, was lighted.

15    The lights were on in this outer room or this

16   first -- the door to the right, which we could see

17   into immediately.

18        Q      This would be the door.  This would be the

19   office directly north of the break room, has a couple

20   of chairs and table --

21        A      Correct.

22        Q      -- and things like that?

23        A      Correct.

24        Q      And the light was on?

25        A      The light was on and there was a doorway

1    that went into the two.  The light was off in this
2    office.  On the floor here, we could see some items
3    laying kind of in the doorway and on the floor, gave
4    an unusual hue due to the fact that the rest of the
5    office was very neat and well kept.
6          Q       What did you do after you felt that
7    something just didn't look right in the second office,
8    which would be the one that is to the west of the
9    first sitting room, or whatever you call it, what did
10   you do?  Did you knock down the door or what?
11         A       No.  At that time I came back down and
12   requested the manager to provide a ladder, which they
13   had downstairs, and someone -- I don't know who --
14   brought the ladder up to us.  I sat the ladder up here
15   immediately in front of this door, and repeated it
16   with the doors to the other offices.
17         Q       You pointed to the second right in number
18   five.
19         A       Correct.  And I climbed the ladder myself
20   and lifted the ceiling tile and peered over into this
21   office.
22         Q       When you looked into this office, the one
23   that was directly behind the rest of the others, did
24   you see anything unusual?
25         A       Yes, I did.

1       Q       What did you see?

2       A       I saw a male, sitting in the chair at the

3   desk, slumped over to the side.

4       Q       Did that male appear to be alive or dead?

5       A       He appeared to be dead.

6       Q       What did you do after you observed what

7   you believed to be a dead body?

8       A       I immediately advised the other officers

9   to stop where they were.  We have a body and contact

10  the homicide division to return back out and secure

11  the scene.

12      Q       Did you guys all leave the area and stand

13  at the front door or what?

14      A       I don't believe so.  I think we left this

15  part of the scene secured, since the doors were locked

16  and nobody had entered and I'm not sure whether or not

17  somebody called them, called the homicide division and

18  the other division.

19      Q       Did the homicide division respond back to

20  the building?

21      A       Yes, it did.

22      Q       Do you remember who came representing the

23  Houston Police Department Homicide Division to the

24  scene in suite 770?

25      A       As best I recall, it was the original two

1    sergeants that were out on the floor.

2         Q       That would be Waltman?

3         A       Halling and Waltman, correct.

4         Q       When they came back to the scene, did that

5    end your role?

6         A       No.  I assisted with securing the scene

7    because I was still working for the building and the

8    manager basically asked me to help out with whatever I

9    could.

10        Q       After the investigation, did you do

11   anything as far as taking pictures or picking up

12   evidence, interviewing the witnesses and making sure

13   these officers were able to do their job?

14        A       I didn't collect any evidence or any

15   active investigation, just scene security and

16   assisting whatever they have.

17        Q       Go ahead and resume your seat, sir.

18              MR. SMYTH:  Your Honor, may I approach the

19   witness?

20              THE COURT:  Yes.

21              (Whereupon, State's Exhibit Nos. 84

22   through 89 were marked for identification.)

23        Q       Sir, I want to show you a series of

24   photographs -- State's Exhibit 82, 83, 84, 85, 86, 87,

25   88, and 89 -- at this point and ask you, if you will,

1    look at those and tell me whether or not you recognize

2    them first.

3         A      Yes, I recognize them.

4                MR. SMYTH:  May I approach the witness,

5    Your Honor?

6                THE COURT:  Sure.

7         Q      Do these photographs truly and accurately

8    depict the scene as you observed them back on the

9    night or the early morning or the night of

10   January 24, 1996, or the early morning hours of

11   January 25th?

12        A      Yes, the general scene, I sure do.

13        Q      Do you recall what time it was you made

14   entry into suite 770?

15        A      The best of my recollection it was very

16   close to 11:30 p.m.

17        Q      Still on the 24th of January of '96?

18        A      Yes.

19        Q      Do they truly and accurately depict the

20   scene?

21        A      Yes.

22               MR. SMYTH:  The State would offer into

23   evidence State's Exhibit 89 - excuse me -- number 82

24   through 89, and tender the same to counsel for defense

25   for his inspection.

1           MR. ODOM:  No objection, Judge.

2           THE COURT:  State's Exhibit 82 through 89

3    are admitted.

4           MR. SMYTH:  Your Honor, could I ask the

5    officer, the sergeant, to step down and explain the

6    photographs off the diagram.

7           THE COURT:  Sure.

8       Q      Officer, I'll show you first State's

9    Exhibit 82 and ask you if you can recognize that

10   again.

11      A      Yes.  It's the window, which is located

12   right after you walk in the first door, the hallway

13   door.

14      Q      Could you point that out and point that

15   out for the benefit of the jury on the diagram where

16   we are talking about.

17      A      It's a photograph of this small security

18   window.

19      Q      And that's even labeled security window;

20   is that correct?

21      A      Yes.

22      Q      And that's right inside the door of the

23   alcove area?

24      A      Yes.

25      Q      And State's Exhibit 83 can you recognize

1    that?

2         A    Yes.  It's a view of that window and this

3    desk area taken from there, appeared from this

4    backside, the backside window.

5         Q    Up in this lobby-type area, looking back

6    toward the hallway?

7         A    Correct.

8         Q    And obviously publish to the jury.

9              Sir, now, let me show you State's Exhibit

10   84 and ask you do you recognize that?

11        A    Yes.  It again appears to be a photograph

12   of this doorway taken from inside out, the second

13   door.

14        Q    Just a different photograph showing --

15        A    Yes.

16        Q    -- apparently a painting on the wall?

17        A    Correct.

18        Q    And State's Exhibit 85.

19        A    And that is this same doorway taken from

20   the hallway direct, from back into the room.

21        Q    So this is from right here at the entry?

22        A    Yes.

23        Q    Taken from the hallway area, shooting back

24   in.

25             And this is the way you observed, nothing

1     really out of order?

2          A     The only thing different would be the

3     rubber gloves and things that were left by police

4     officers after the scene was being investigated, which

5     appears to be on the counter top.

6          Q     When you entered, that stuff was not

7     there?

8          A     Right.

9          Q     And those rubber gloves weren't there?

10         A     Correct.

11         Q     I show you this, State's Exhibit No. 89.

12         A     89 depicts the doorway leading into the

13    break room here and an open doorway leading into this

14    northeast office.

15         Q     And can you see in State's Exhibit 89 the

16    area where you removed the ceiling tile?

17         A     Correct.

18         Q     And is this the area that allowed you to

19    view through the ceiling into the office?

20         A     Correct.

21               MR. SMYTH:  At this time may I publish

22    this one to the jury?

23               THE COURT:  Yes.

24         Q     And my pen is where you removed the

25    ceiling tiles and crawled up on the counter and looked

1    over?

2         A     Yes, sir.

3         Q     And, again, you didn't notice in this area

4    any great amount of disorder?

5         A     That's correct.  Everything seemed to be

6    in order.

7         Q     State's Exhibit -- I believe we talked

8    about 85 -- yeah, we did, 85 and 86, 84.

9               86 what is depicted in the photograph?

10        A     This, again, is the lobby area here with

11   the desk.

12        Q     And, again, other than the fact that we

13   have some police paraphernalia, a camera and a hat, is

14   this the way it appeared to you?

15        A     Yes, it is.

16        Q     And the curved way with the chairs and no

17   amount of disorder?

18        A     Right, correct.

19        Q     State's Exhibit 87 and 88, tell the ladies

20   and gentlemen of the jury what is depicted in those

21   photographs and where they are located on the

22   diagram.

23        A     These photographs, as best I recall,

24   depict the interior of this office area as it looked

25   that night.

1      Q      And we have a table, two chairs, two

2   tables up against the wall with a telephone and a coat

3   and then a cap over on the right.  I guess, if you

4   would kind of patch these two photographs together,

5   they look something like that?

6      A      Very similar, yes.

7             MR. SMYTH:  May I publish these to the

8   jury, Your Honor?

9             THE COURT:  Sure.

10     Q      Kind of a panoramic view?

11     A      Uh-huh.

12     Q      And this is the way it looked when you

13   observed it?

14     A      Correct.

15            (Whereupon, State's Exhibit Nos. 90

16   through 95 were marked for identification.)

17            MR. SMYTH:  May I have one second, Judge?

18     Q      Officer, let me show you now State's

19   Exhibit 90 through 95 and ask you, if you will, look

20   at those and tell me whether or not you can recognize

21   them, the series of photographs.  If there is some in

22   there that you do not recognize or do not recall, pull

23   them out.

24     A      These I do not.  These I do.

25     Q      Do State's Exhibit 93, 94 and 95 truly and

1    accurately depict the scene as you observed it that

2    night?

3        A       Yes.

4                MR. SMYTH:  At this time the State would

5    offer into evidence State's Exhibit 93, 94, 95 and

6    tender the same to counsel for defense for his

7    inspection.

8                MR. ODOM:  No objection, Your Honor.

9                THE COURT:  Very well.  State's Exhibits

10   93, 94, 95 are admitted.

11       Q       Let me show you one more.  It's going to

12   be 96.

13               (Whereupon, State's Exhibit No. 96 and 97

14   were marked for identification.)

15       Q       Let me show you State's Exhibit 96 and ask

16   you if you recognize what is depicted in that

17   photograph?

18       A       Yes.

19       Q       Does it truly and accurately depict the

20   scene as you observed it?

21       A       Yes, it does.

22               MR. SMYTH:  The State would tender State's

23   Exhibit 96 to counsel for defense for his inspection.

24               MR. ODOM:  No objection.

25               THE COURT:  96 is admitted.

1       Q       Regarding State's Exhibit 97, do you

2  recognize that?

3       A       Yes.

4       Q       State's Exhibit 97 does that truly and

5  accurately depict that portion of the scene as you

6  observed it that night?

7       A       Yes, it does.

8               MR. SMYTH:  The State would also offer

9  State's Exhibit 97 and tender to counsel for defense

10  for his inspection.

11              MR. ODOM:  That's correct.  No objection.

12              THE COURT:  97 is admitted.

13      Q       Officer, I show you what is State's

14  Exhibit 97 and ask you to explain what that is.

15      A       Exhibit 97 depicts this office, the best I

16  recall, the first office you come to the right.

17      Q       And is that the office to you did not

18  appear that there was anything out of order

19  ordinarily?

20      A       Correct.

21      Q       State's Exhibit 95.

22      A       95 depicts the ceiling tile that I lifted

23  up to look over into the office.

24      Q       Is that where my pen is pointing at?

25      A       Correct.

1      Q       And that's where you got the ladder?

2      A       The ladder and I lifted the ceiling tile

3   and looked into this office here.

4      Q       State's Exhibit 96 can you tell the ladies

5   and gentlemen of the jury what is depicted in that

6   photograph.

7      A       96 depicts the things that I saw on the

8   floor, when I stood on the chair in the break room,

9   and looked over through this little doorway.  These

10  are the things that caused me concern and made me

11  investigate further, a box laying on the floor open or

12  a Bible or a book.

13     Q       It's a Bible?

14     A       A Bible.

15             MR. SMYTH:  Your Honor, I publish State's

16  Exhibit 95, 96 and 97 to the jury.

17             THE COURT:  Yes, you may.

18     Q       And what is depicted in 96 is that what

19  you observed when you got on the chair?

20     A       When I stood on the chair and looked in

21  through this.

22     Q       And State's Exhibit before I get to that,

23  let me have you go and resume your seat for a second.

24             Once you discovered the apparent disarray

25  and the body in the office up there -- I guess it is

1    going to be the northwest portion of that diagram --

2    you backed off and called for the homicide division?

3        A       That's correct.

4        Q       Did you stick around until they came?

5        A       Yes.

6        Q       After the homicide division got there, the

7    door is still locked.  Are they still locked when the

8    homicide division arrived?

9        A       Yes, they were.

10       Q       How do you get the doors unlocked?  The

11   building manager did not have a key?

12       A       Correct.

13       Q       And the alarm is still going off?

14       A       Correct.

15       Q       How do you get in either the sitting room

16   or the office where the body is?

17       A       One of my officers, I had him climb over

18   the wall and unlocked this first door to the right in

19   the northeast office.  From the chair we were standing

20   on in the break room, he crawled over the wall and

21   dropped down and opened the first door in the

22   northeast office.

23       Q       So he opens the sitting room door?

24       A       Correct.

25       Q       Did the other door remain locked?

1    A      Yes, it did.

2    Q      After he opened the sitting room door, did

3  you then get a full view of what was in the northwest

4  office?

5    A      Yes.  After the homicide detectives had

6  cleared this room and we worked our way through.

7              MR. SMYTH:  May I approach the witness?

8              THE COURT:  Yes.

9    Q      I show you what is marked as State's

10  Exhibit 93 and 94 and I think you have already

11  identified them and they have been admitted in

12  evidence.  Can you tell the ladies and gentlemen of

13  the jury what is depicted in State's Exhibit 93.

14    A      93 depicts the room, the interior of this

15  northwest office, a portion of the desk and the safe

16  and the file cabinet which are on, I guess, the

17  northeast wall or the northeast wall of that northeast

18  office -- the file cabinet and the safe and a portion

19  of the desk.

20    Q      And there's a desk.  There's the file

21  cabinet and the safe.  These are all things you could

22  see when you went into the sitting room area?

23    A      Yes.

24    Q      Is any portion of the body that you

25  observed visible in State's Exhibit 93?

1      A       Yes, it appears the hands.

2      Q       Would that be that area that my pen's

3  point is at?

4      A       Correct.

5      Q       Were you able to get a closer look at the

6  body of the deceased in this case?

7      A       Yes.

8      Q       I show you what has been marked, and it is

9  in evidence as State's Exhibit 94, and ask you if you

10  recognize that?

11      A       Yes.

12      Q       And is that the body as it appears when

13  you observed it after the door was opened?

14      A       Yes, it is.

15              MR. SMYTH:  Your Honor, at this time the

16  State --

17      Q       You didn't go up and touch the body or

18  move anything?

19      A       No, I didn't.

20      Q       It's exactly the way you saw it?

21      A       Yes.

22              MR. SMYTH:  At this time may the State be

23  allowed to publish 93 and 94 to the jury?

24              THE COURT:  You may.

25      Q       And is the body sitting in the chair just

1       like it is depicted in this photograph?

2            A        Yes, it was.

3            Q        Had glasses on his lap?

4            A        Yes.

5            Q        Other than the disarray, which you

6       described earlier, did it appear to be any signs of a

7       struggle?

8            A        Not per se, no, other than the fact that

9       there was a dead body there with injuries.

10           Q        Did you get close enough look at the body

11      and clothing of the deceased, as well the top of the

12      desk here, was there anything that stood out to you as

13      unusual about the desk top and the clothing of the

14      deceased and what was that?

15           A        There was small metal filings or shavings

16      on his lap, on the desk, just all over that general

17      area of the body.

18           Q        And was there also visible wounds of some

19      type?

20           A        Yes, there was.

21           Q        Did you know from looking at them -- how

22      long have you been a police officer?

23           A        It will be 17 years this November.

24           Q        Have you seen few or many deceased persons

25      in your career as a police officer?

1       A       Many.

2       Q       Have you seen few or many of those who

3   died as a result of gunshot wounds?

4       A       Many.

5       Q       And in looking at this -- you didn't

6   perform an autopsy or anything?

7       A       That's correct.

8       Q       You didn't remove any of the clothing?

9       A       No, sir.

10       Q       Did it look like this was a stabbing or a

11   shooting or what?

12       A       My first thought was a shooting.

13       Q       Could you point out to the ladies and

14   gentlemen of the jury some of these metal filings or

15   metal -- what do you call it -- filings?

16       A       Appeared to be small shavings, filings,

17   little shavings, pieces.

18       Q       Could you point out some of those, for the

19   benefit of the jury, and go ahead and use my pen.

20       A       I'm sorry.  It's visible here on his lap

21   area, on his pants, the pant's legs, some on the edge

22   of the desk, looks like little white flakes.

23       Q       Did that strike you as unusual?

24       A       It did because I looked around and saw no

25   type of grinding tools or anything that makes

1    something to create that sort of metal shaving type.

2        Q      In fact, in this office was there any work

3    room in this suite 770?

4        A      I saw no type of fabricating or work-type

5    making.

6        Q      You didn't see any lathe.  You know what a

7    lathe is, don't you?

8        A      Yes.

9        Q      Do you know what a drill press is?

10       A      Correct.

11       Q      Grinding wheels, things like that?

12       A      I didn't observe any type of those tools.

13       Q      None of that type of manufacturing tools

14   in this entire suite?

15       A      Not that I observed; no.

16              MR. SMYTH:  May I publish this to the

17   jury?

18              THE COURT:  Sure.

19       Q      And I assume the red area of the chest is

20   what you believe to be a gunshot wound?

21       A      Yes.

22       Q      Did you observe any wounds other than the

23   wounds to the chest?

24       A      Yes.  I observed one in his hand and then

25   one in the temple area or the right side of his head.

1     Q     And you were pointing to the right side?

2     A     Correct, the right side of the victim's

3  head.

4     Q     Was it your job to chart these wounds or

5  do anything?

6     A     No, it was not.

7     Q     It's something you observed?

8     A     Yes.

9     Q     And, again, the metal filings of white

10  specks that show up on the dark clothing --

11     A     That's what it appeared to me to be metal

12  filings.

13     Q     You didn't know who this person was, did

14  you?

15     A     No.

16     Q     You have never met him in your life?

17     A     Never in my life.

18     Q     And you are saying all of these light

19  specks that you see on the dark pants were metal

20  filings?

21     A     That's what it appeared to be to me.

22     Q     Have you ever seen steel wool before?

23     A     That's very similar to what it looked

24  like, little pieces of steel wool.

25           MR. SMYTH:  May I have one moment, Your

1      Honor?

2            Q      Let me show you what is in evidence as

3      State's Exhibit 66, particularly this box with these

4      silver type threads.  Did the metal shavings that you

5      observed on the pants and on the desk of the deceased

6      did they look anything like that either in size,

7      shape, coloration or do you know?

8            A      They appear colorwise and size but I don't

9      recall it being large pieces like that.

10           Q      Large, you mean not as long?

11           A      Correct.

12           Q      As far as the diameter goes, approximately

13     the same size around?

14           A      Correct.

15           Q      And the same coloration but not as long?

16           A      Right.

17                  MR. SMYTH:  Pass the witness.

18                  THE COURT:  Take a 15 minute recess.

19                  (Recess taken.)

20                  (Jury came into the courtroom.)

21                  MR. SMYTH:  May I approach the bench?

22                  (Off-the-record discussion held at the

23     bench.)

24                  THE COURT:  Mr. Smyth, please continue.

25                  MR. SMYTH:  Your Honor, I pass the

```
 1    witness.

 2                    THE COURT:  Mr. Odom, briefly.

 3

 4                    CROSS EXAMINATION

 5    BY MR. ODOM:

 6         Q     My name is Wendell Odom and we have only

 7    met briefly, have we not?

 8         A     Yes, correct.

 9         Q     We have never discussed the facts of this

10    case; is that correct?

11         A     That's correct.

12         Q     My understanding is that on the night in

13    question that you were working a job that is a

14    different division from the job you are in now?

15         A     That is correct.

16         Q     And you responded because you were in the

17    vicinity of the original shooting call that occurred

18    at the Greenrich, what we call the Greenrich Building?

19         A     That is correct.

20         Q     Roughly what time was that shooting to

21    your recollection, if you recall?

22         A     I don't recall when it actually occurred.

23    I would guess around 9:00 o'clock, maybe a little

24    after 9:00 p.m.

25         Q     I'm not trying a trick question.  It's
```

1    sometime in, oh, I will call early evening hours.  It

2    was when the first call occurred?

3         A     That would be accurate; yes.

4         Q     But it was dark or getting dark when that

5    call came?

6         A     It was dark as I recall; yes.

7         Q     And your job, or at least your duties that

8    you perform on that particular occasion, were

9    primarily the normal duties that an officer at the

10   scene does at any crime scene wherein he is not the

11   officer in charge, that is, assists in securing the

12   scene or doing whatever needs to be done?

13        A     Correct.

14        Q     For you, that night, what was that?

15        A     I was a supervisor, not particularly of

16   that scene.  There were -- you have two different

17   supervisors working myself as a gang task supervisor

18   who works more of a roving-type thing and beat

19   supervisor, who would be in charge of the units who

20   would receive the dispatched call.  I arrived at the

21   scene after the scene downstairs or the lobby scene

22   was contained.  And as a matter of fact, I got there

23   after the ambulance had already left the scene.

24        Q     So you did not view the victim of the

25   shooting that was in the lobby?

1        A        Correct, I did not.

2        Q        And, I take it, because of your arrival,

3    you did not have an opportunity to help secure the

4    actual crime scene in the lobby as well?

5        A        That's correct.  It was secured before I

6    arrived.

7        Q        So your duties were pretty much already

8    taken care of by the time you got to that particular

9    shooting.  You were sort of the middle or the tail end

10   of the investigation that was going on there?

11       A        Correct.

12       Q        Now, who was it that requested your

13   assistance to stay at the building after the units had

14   departed from the particular scene?

15       A        The building manager, I knew her as Susan

16   at that time.

17       Q        Vacek does that sound familiar?

18                Now, was there, as far as you know, an

19   attempt to secure the building or to check the

20   building after the shooting incident that occurred

21   earlier in the evening, the 9:00 o'clock or 8:00

22   o'clock incident?

23       A        To --

24       Q        To secure the entire building, the other

25   floors of the building?

1          A      I was not personally aware of that.  The

2     lobby had been secured and the units, the division

3     homicide division and those crime scenes units, may

4     have been collecting evidence and what we call working

5     the scene or processing the scene, I guess is a better

6     term, were handling the lobby area.

7          Q      All right.  I guess what my question is --

8     and it's more of a informative-type of question than

9     anything else -- is it customary, when you have a

10    seven- or eight-story building, to attempt to check

11    all the floors when there has been an incident like in

12    the lobby?

13         A      Yes.  I would think it would be a good

14    procedure.  I wasn't working it so I don't know if

15    they did or did not.

16         Q      And I ask my second question: You have no

17    knowledge, personal knowledge, one way or another

18    whether that was done?

19         A      That's correct.

20         Q      Now, how late was it before the inquiry

21    came regarding the seventh floor?

22         A      You mean from the time of the original

23    scene, when I arrived, how much longer; is that what

24    you are asking?

25         Q      What time it was when you went up to the

1    seventh floor, if you know?

2        A      It was right around 11:30 p.m. I would

3    think.

4        Q      I take it, you got an opportunity, you

5    know, because you looked at your notes or any offense

6    report that you made at the time?

7        A      Yes, I am.

8        Q      You reviewed those before you testified?

9        A      Yes, I do.

10              MR. ODOM:  May I have an opportunity to?

11              MR. SMYTH:  Did you write an offense

12   report?

13              THE WITNESS:  I did not personally write

14   it.  One of the officers that was there with me

15   entered the report.

16       Q      Which is fairly common?

17       A      Yes.

18       Q      In other words, two of you can be doing

19   the same and one of you can fill out the report?

20       A      Correct.

21              MR. SMYTH:  Do you recall whose report you

22   reviewed.

23              THE WITNESS:  I believe I reviewed Officer

24   Mayo, I believe, entered an offense report with our

25   supplement to the offense report.

1      Q       While we are looking at that, I can go on.

2              Now, at sometime around 11:40 you received

3      a request to go up to the seventh floor.  What's the

4      nature of that request?

5      A       The building manager came to me and stated

6      that she had a tenant she could not account for.

7      Q       Prior to that did you have any knowledge

8      that there was an attempt being made to account for

9      all the tenants?

10     A       No.

11     Q       Was there anything that you had knowledge

12     of about the previous shooting that would lead you to

13     believe that there might be the need for a tenant

14     check?

15     A       My personal knowledge, no, the

16     knowledge --

17     Q       Granted some other people may have but as

18     far as you knew, what was going on right there, you

19     didn't have that type of knowledge?

20     A       Correct.

21     Q       So you are just there and Ms. Vacek, the

22     manager, comes up and says hey we have got a tenant we

23     need to check on the seventh floor?

24     A       Correct.

25     Q       And you understand that that's needed so

1    you go up to the seventh floor?

2        A       Correct.

3        Q       When you get to the seventh floor, I

4    believe you testified there is a series of doors, the

5    first two being doors that the landlord has pass keys

6    to?

7        A       Correct.

8        Q       At that time you are not, I take it,

9    preserving a crime scene as such?

10       A       That is correct.

11       Q       And by that what we mean is --

12               MR. ODOM:  May I approach the exhibit?

13               THE COURT:  You may.

14       Q       When you are going through these doors,

15   you are not trying to preserve them for fingerprints

16   or dusting or counter top doors, things of that

17   nature, there's no attempt to keep them pristine

18   because at that time you don't know there has been a

19   crime committed?

20       A       That's correct.

21       Q       You are inquiring --

22               MR. SMYTH:  May I approach and see if this

23   is the report the officer reviewed?

24               THE COURT:  Sure.

25               MR. SMYTH:  I show you supplement number

1      6.   Is that the one you reviewed?

2                  THE WITNESS:  Yes.

3                  MR. SMYTH:  May the record reflect the

4      State is tendering a report of an Officer Mayo.

5                  MR. ODOM:  May I have a minute?

6                  THE COURT:  Yes.  Have you had an

7      opportunity to see there in the past?

8                  MR. ODOM:  Oh, I have had an opportunity

9      to look at the report in the past.

10                  THE COURT:  Please try to be brief.

11      Q       So when you go into the office, you are

12      going in, almost like a patrolman would check an alarm

13      or a burglary, you are not anticipating any trouble

14      but you certainly realize there's a possibility that

15      it might be?

16      A       Yes, that is correct.

17      Q       When you get to the back two doors, you

18      knock on the back two doors.  You don't think it is

19      particularly unusual that those two doors are locked,

20      do you?

21      A       No, Ms. Vacek advised that those were the

22      tenant offices and she did not have pass keys for

23      them.

24      Q       And it's pretty obvious from the nature of

25      this particular establishment they are security minded

1    because they deal with precious jewelry and stones?

2        A       Correct.

3        Q       When you look into the sitting room of the

4    back office, you notice that there is some books in

5    disarray and some papers in disarray?

6        A       In the sitting room, no.

7        Q       When you are looking through the sitting

8    room?

9        A       In to the office where the desk is?

10       Q       Yes.

11       A       Yes, you could see a few things in that

12   little doorway on the floor.

13       Q       In other words, you are looking across

14   this counter top and you can see a little bit of the

15   room that is the office as opposed to the sitting

16   room?

17       A       Correct.

18       Q       And from the photos that we saw, there

19   appears what to be an antique Bible and some other

20   papers that are scattered in an area and that's what

21   you observed, if I understand your testimony, from

22   looking over the ceiling?

23       A       That is correct.

24       Q       Now, you request a ladder.  A ladder is

25   provided.  You are able to look over and you see the

1    body of the complaining witness in this case?

2         A     Correct.

3         Q     And it's pretty obvious to you either he

4    has been murdered or something is seriously wrong?

5         A     Oh, yes, he appeared to be dead to me.

6         Q     You call homicide and at that point there

7    is -- well, that's not true.  Well, do you call

8    homicide at that point or do you climb into the side

9    room at that point or does someone climb into the side

10   room?

11        A     No, sir.  We didn't gain entry to either

12   of the back offices until the homicide division

13   arrived and requested an officer to go over the wall

14   and unlock the door.

15        Q     Homicide arrives and I believe it was the

16   same two lead officers that were there earlier in the

17   evening?

18        A     Yes.

19        Q     And they request that someone gain

20   entrance into the sitting room --

21        A     Sitting room area.

22        Q     -- of the side offices we are talking

23   about.  And that is done simply by going into that

24   room and opening up the door from the inside?

25        A     Yes.

1          Q          There is no dead bolt that cannot be

2     opened from the inside?

3          A          Not that I recall, no, a doorknob lock.

4          Q          That was going to be my next question.  If

5     there was a dead bolt, what was locked was the actual

6     knob that could be turned from the inside?

7          A          Correct.

8          Q          Once that was achieved, you all had

9     entrance into the office itself, right?

10         A          Yes.

11         Q          Did you make entrance into the office or

12    did you leave that up to homicide?

13         A          I left that to the detectives.

14         Q          Are you aware of how they gained entry

15    into the door that leads to the office?

16         A          It was standing open.  I don't know

17    whether it was a pocket door or was leaning back

18    against the wall but it was open.

19                    MR. ODOM:  May I approach the diagram?

20                    THE COURT:  You may.

21         Q          That was a poorly asked question.

22                    What I am asking, number five here, this

23    door, I understand they went around and opened this

24    door?

25         A          Correct.

1          Q        Do you know what type of locking mechanism
2     was on that door?
3          A        No, sir, I don't recall.
4          Q        So you weren't involved in any of that?
5          A        No.
6          Q        I believe you testified that you observed
7     on the body of the deceased there were some metal
8     shavings, right?
9          A        Yes, sir.
10          Q        I take it, that was after the homicide and
11     medical examiner people had already done what they
12     needed to do because that really wasn't your primary
13     responsibility, was it?
14          A        Correct.
15          Q        At the point that you look over the
16     doorway leading into the main office and you see what
17     appears to you to be a dead body, everything is
18     handled completely different in that office than it
19     was before; is that correct?
20          A        That's correct.
21          Q        We saw in several of the photographs of
22     some of the ante rooms here some latex gloves and
23     other items that belong to what the police do, when
24     they do what we call -- what is it called, crime lab
25     testing?

```
 1        A        Processing a scene.

 2        Q        Processing a scene?

 3        A        Uh-huh.

 4        Q        And no one, to your knowledge, at that

 5    point has touched doorknobs to the office that leads

 6    to number five, have they?

 7        A        The interior, no; the exterior I did check

 8    to see if it was locked.

 9        Q        When you first went up there, you did

10    that?

11        A        Correct.

12        Q        And then you knocked on the door?

13        A        Correct.

14        Q        As far as the interior doorknobs,

15    certainly no one did anything to that doorknob until

16    the Houston Police Department was aware of a body

17    being here, correct?

18        A        As best I recall, no.

19        Q        And the same goes as far as any of other

20    items that may have been in this office where the body

21    is, correct?

22        A        Correct.

23        Q        Officer, did you observe a safe when you

24    were in that office?

25        A        Yes.
```

1          Q       And you may have already testified to this

2     and I just missed it.  Did you tell the ladies and

3     gentlemen that the safe is over in the corner?

4          A       That's where it was; yes.

5          Q       Was the safe open?

6          A       I didn't check it.  The door appeared to

7     be closed.  I didn't look that close.

8          Q       Once, again, that wasn't your

9     responsibility?

10         A       Correct.

11         Q       While you were there in the office and

12    while securing the area and supervising the second

13    crime scene, were there a series of phone calls that

14    were occurring on the phone there in the office?

15         A       There was phone calls made from the phone

16    out in the reception office?

17         A       Yes.

18         Q       Once again that was a poorly asked

19    question.

20                 Were there any calls coming into the

21    office?

22         A       I don't recall.

23         Q       You don't recall that there were a series

24    of phone calls that were coming in and one of the

25    officers talking on the phone to someone who is

1    calling into the office?

2        A      Are we talking about in the main office or

3    in the back office?  I don't recall phone calls being

4    made in or out.  I mean, some were made out from the

5    reception area to the various divisions concerned.

6        Q      Well, sure.  And that's what I am asking.

7               What I am asking, you don't recall, one

8    way or another, whether any of these phones either in

9    this office or this office or the main office, for

10   that matter, was receiving any outside phone calls

11   during the time that the crime scene is being

12   investigated or processed?

13       A      I don't recall.

14       Q      Did you do any follow-up work on this

15   particular case, officer or sergeant?

16       A      Explain.

17       Q      I mean, did you do after this particular

18   -- after you secured this process, the scene for

19   processing, did you have any more responsibilities

20   associated with this case?

21       A      No, sir, not after that day I didn't.

22       Q      Okay.  During that night, were there any

23   other duties once you supervised the securing of that

24   particular office and the scene?

25       A      No.  Once the homicide division and the

1    crime scene units and those were actually processing

2    the scene took over, I returned to my responsibilities

3    of the building manager, who had hired me for the

4    night, and she requested I stay in the hallway there

5    upstairs until such time as the detectives didn't need

6    any more assistance in the building.

7                   MR. ODOM:  That's all I have, Your Honor.

8                   THE COURT:  Anything else, Mr. Smyth?

9

10                      REDIRECT EXAMINATION

11   BY MR. SMYTH:

12        Q      If anybody had gone -- when you went up

13   there to check on the tenant, a door was locked?

14        A      That is correct.

15        Q      Not only the outside door in the hallway

16   but the inside door?

17        A      As best I recall, yes.

18        Q      In the foyer area?

19        A      Correct.

20        Q      And, in fact, every door in that office

21   was locked?

22        A      Except for the one going in this first

23   office to the right, it was standing open as best I

24   recall.

25        Q      First office to the right and the break

1      area?

2           A      And the break area, correct.

3           Q      Do you have any reason to believe anyone

4      else, if they had gone at 8:00 or 9:00 o'clock, would

5      have found any different condition?

6           A      I couldn't tell you.  I never worked in

7      that building before that time.

8           Q      When you were there, was there a lot of

9      police activity in the area?

10          A      Yes, once the original call dropped.

11          Q      Police all over the place?

12          A      That's correct.

13          Q      And how about in the Greenrich Building

14     itself, were there a lot of police officers there when

15     you got there?

16          A      In the lobby area.

17          Q      News crews, too?

18          A      Yes.

19          Q      Any reason to believe after this place was

20     covered with the police, come, sneak in and go

21     upstairs.

22                 MR. ODOM:  Object to the speculative

23     nature of the question.

24                 THE COURT:  Sustained.

25

1                    RECROSS EXAMINATION

2       BY MR. ODOM:

3            Q       Not that but another issue:  Officer,

4       these first two doors were they similar to -- and by

5       that time, pointing to the doors that are the outside

6       hallway door and the entrance door from the foyer into

7       the main office, were these two doors similar to the

8       doors that we discussed up here, in the back office,

9       in that they could be opened and locked from the

10      inside, that the lock was on the doorknob as opposed

11      to a dead-bolt-type of lock?

12           A       I don't recall whether they had a dead

13      bolt on them.

14           Q       When you went through those doors, do you

15      recall if the landlord, using her pass key, merely

16      went through the round knobby part of lock as opposed

17      to flipping a dead bolt?

18           A       I don't recall.  I don't remember it being

19      difficult to get in or using the pass key but a dead

20      bolt.

21           Q       At that time you weren't paying much

22      attention to that sort of detail as you were to the

23      detail later on?

24           A       Correct.  There is a window to the right,

25      security window, once I get in through the first door,

1     and I was more concentrating behind that door before

2     somebody unlocked it and opens it for us.

3                    MR. ODOM:   That answers my question.

4                    MR. SMYTH:   Nothing further.

5                    THE COURT:   Is this witness to be

6     excused?

7                    MR. SMYTH:   We can track him down.

8                    THE COURT:   Thank you very much for your

9     testimony.

10                   Call your next witness.

11                   MR. SMYTH:   State call Officer Holbrook.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     MARK A. HOLBROOK,

2      was called as a witness for the State and, having been

3      duly sworn, testified as follows:

4                     DIRECT EXAMINATION

5      BY MR. SMYTH:

6                THE COURT:  Mr. Smyth.

7           Q      Sir, will you state your name and speak

8      loud enough for the entire jury panel to hear you.

9           A      Mark A. Holbrook.

10          Q      And how are you employed?

11          A      City of Houston police officer.

12          Q      And how long have you been employed with

13     our police department?

14          A      About seven and a half years.

15          Q      Where are you currently assigned?

16          A      I am currently assigned to the general

17     homicide investigations on the evening shift.

18          Q      And what do you do in that assignment to

19     the general homicide investigations?

20          A      Basically I am the administrator officer.

21     I handle the desks and the telephones, basically the

22     day-to-day telephone calls that come in and go out of

23     homicide, requests from other agencies, and things

24     like that.

25          Q      Have you held other assignments when you

1     were part of the homicide division as well?

2          A     Yes, sir.  I got transferred to the

3     general homicide about three months ago and prior to

4     that I was a crime scene investigator on the full

5     evening shift and the night shift.

6          Q     In fact, was your assignment at that time

7     with crime scene unit number 9?

8          A     Crime scene number 7; yes, sir.

9          Q     Can't read my own writing.

10               Were you on a crime scene unit back on

11    February 22, 1996?

12         A     Yes, sir, I was.

13         Q     And is that the -- I don't remember the

14    day of the week, it may well have been a Thursday --

15    what were your working hours during that time period?

16         A     I was assigned the evening shift.  It was

17    from 3:00 in the afternoon until 11:00 at night.

18         Q     So that means you would be on duty and at

19    work at 2100 hours?

20         A     Yes, sir, 9:00 o'clock at night; yes, sir.

21         Q     Did you have an occasion on that date of

22    February 22, 1996, to be called to a scene which is

23    located near the intersection of Westheimer and Briar

24    Grove?

25         A     Yes, sir, I did.

1      Q       And specifically where were you dispatched

2    to?

3      A       I was dispatched to meet some other

4    detectives at the Briar Grove and Westheimer area,

5    received the assignment from my sergeant.

6      Q       Did you go to that location?

7      A       Yes, sir, I did.

8      Q       And do you recall what time you were

9    dispatched and what time you arrived?

10     A       My sergeant gave me the assignment about

11   nine minutes after 9:00 at night and I got there about

12   9:30.

13     Q       When you got there, what did you find in

14   the area you went to be -- we are talking about a high

15   rise parking lot or a building or what?

16     A       Basically it was Briar Grove.  In that

17   area is a two-lane street that extends south off of

18   Westheimer and ends into sort of a field, overgrown

19   with trees, and there is a dirt trail extending back

20   into the field.  It's along the eastside of a large

21   apartment complex, westside.

22     Q       Do you remember what the name of that

23   apartment complex is?

24     A       The Meridian Apartment Complex.

25     Q       And what were you suppose to do when you

1    got to that location?

2         A    Supposed to generally check the area for

3    any ballistic evidence, shell casings, fired bullets,

4    evidence that a weapon had been fired in that area.

5         Q    And did you do that?

6         A    Yes, sir, I did.

7         Q    Did you find any ballistic-type evidence

8    or evidence that a weapon had been fired?

9         A    Yes, sir, I did.

10        Q    And once finding that evidence, did you

11   collect it?

12        A    I photographed it and then I recovered it;

13   yes, sir.

14        Q    Was that the general process that you

15   follow when you photograph evidence and then you

16   recover it?

17        A    Yes, sir.

18             MR. SMYTH:  May I approach the witness?

19             THE COURT:  You may.

20             (Whereupon, State's Exhibit Nos. 98

21   through 104 were marked for identification.)

22        Q    Sir, I'm going to show you a series of

23   photographs which will be State's Exhibit 99, 100.

24             THE COURT:  What happened to 98?

25        Q    I hand you 98, 99, 100, 101, 102, 103, and

1    104.  I ask you if you'll look at those and tell me

2    whether or not you can identify those particular

3    photos.

4         A     Yes, sir, these are photographs I took

5    that night.

6         Q     You took them yourself?

7         A     Yes, sir, I did.

8               MR. SMYTH:  May I approach the witness?

9               THE COURT:  You may.

10        Q     Do they truly and accurately depict the

11   scene that you observed back there on

12   February 22, 1996?

13        A     Yes, sir, they do.

14              MR. SMYTH:  Your Honor, at this time the

15   State would offer into evidence State's Exhibit 98

16   through 104, tender the same to counsel for defense

17   for his inspection.

18              MR. ODOM:  No objection, Your Honor.

19              THE COURT:  State's Exhibit 98 through 104

20   are admitted.

21        Q     If you would, sir, tell the ladies and

22   gentlemen of the jury what is depicted in State's

23   Exhibit 98.

24              THE COURT:  If you are going to ask, kill

25   two birds with one stone.

1          MR. SMYTH:  I am going to publish a couple

2    of them.

3          Q      State's Exhibit 98 can you tell the ladies

4    and gentlemen of the jury what that is?

5          A      Sure.  Okay.  This is a photo I took of

6    the dead end of Briar Grove.  Westheimer is behind me,

7    as I was taking the picture, and the Meridian

8    Apartments are sort of to one side of the photograph.

9    It lost the dead end street.

10         Q      The Meridian Apartments are off to this

11   side over here, which would be my right-hand side?

12         A      That's correct, the opposite side of the

13   thing.

14         Q      So you are north, looking south,

15   Westheimer is to your back to the north?

16         A      That's correct.

17         Q      And do you know what street is directly to

18   the south?

19         A      Fairdale, I believe.  It goes Richmond --

20   is in there, Fairdale.

21         Q      Fairdale and then Richmond.

22         A      That's correct.

23         Q      And there is just the dead end that you

24   were sent?

25         A      That's correct.

1      Q       State's Exhibit 99 and 100.

2      A       These are photographs of the wooded area

3   at the end of the street there next to the dirt trail.

4      Q       Okay.  And it shows a piece of board next

5   to, apparently somebody built a fire?

6      A       Yes, sir, some burned debris.

7      Q       And that would be 100; and, then, 99 is a

8   little closer view of that area?

9      A       That's correct.

10      Q       And 101.

11      A       101 is a photograph took, looking north

12   from the area around the burnt debris.  You can see

13   the drainage ditch to your right-hand side of the

14   photograph.

15      Q       What are the series of little lights

16   through there?

17      A       That's the lights for the Meridian

18   Apartments.

19      Q       That's Meridian Apartments that you see

20   all those lights?

21      A       Yes, sir.

22      Q       And this is kind of like you step back in

23   a more panoramic view of what is depicted in 99 and

24   100.

25      A       That's correct, the general area.

1       Q       State's Exhibit 104.

2       A       That is a shot I took looking south

3    towards Fairdale, the general area between the

4    drainage ditch and the bushes and the trees right

5    there.

6       Q       And the first tree that you hit, when you

7    come to the south where this bridge is, is that

8    Fairdale?

9       A       That's correct.

10       Q       And the next street would be Richmond?

11       A       Right.

12               MR. SMYTH:  Judge, these two I would like

13    to publish.

14       Q       Would you step on down here with the

15    Court's permission.

16               103 what's that a photograph of?

17       A       This is a photograph of some apparent

18    bullet holes through the orange and white stripe

19    board, looked like it came from a road barrier that

20    was laying on the ground there.

21       Q       Could you point out for the jury,

22    generally starting at this end and walk on down, and

23    show them where there are four bullet holes and this

24    man on the jury.

25       A       Okay.

```
 1        Q       Officer Holbrook, did you, in fact,
 2   collect that board and pick it up and take it with
 3   you?
 4        A       Yes, I did.
 5        Q       I show you what has been marked as State's
 6   Exhibit 50.  It is already in evidence.  Is this part
 7   of the road barrier with the bullet holes that are
 8   reflected in photograph 103?
 9        A       Yes, it is.
10        Q       And this is the one you collected?
11        A       Yes, sir, I did.
12        Q       Now, with respect to State's Exhibit 102,
13   do you recognize this photograph?  Do you recognize
14   that object I am pointing with the pen at?
15        A       That is a fired cartridge casing, which I
16   recovered lying in and around the burned debris.
17        Q       If you would, in the same manner you did
18   with respect to 103, would you show all the members of
19   the jury where this fired casing is in effect -- I'll
20   even loan my pen to point to -- start with the
21   gentlemen in the green shirt.
22        A       Sure.
23                THE COURT:  Did the jurors on the back row
24   have a chance to see it?
25                A JUROR:  Yes, sir.
```

1        Q       If you would go ahead and resume your

2    seat.  Thank you very much.

3                MR. SMYTH:  Your Honor, with the Court's

4    permission and counsel's permission, I have got some

5    adhesive arrows that I can -- I don't know if I

6    brought it or not, and I should have done this

7    before -- could I have Officer Holbrook take one of

8    these orange arrows and without obscuring the casing

9    actually have this arrow point to where that casing.

10               THE COURT:  Do you have any objection?

11               MR. ODOM:  No, Your Honor.

12       Q       Officer, again, for the benefit of the

13   record, you placed an orange arrow that points to the

14   brass casing you found on the ground?

15       A       Yes, sir.

16       Q       So that if somebody looks at it again,

17   they will be able to pick it out?

18       A        Yes.

19       Q       Thank you very much.

20               MR. SMYTH:  May I approach the witness

21   again, Your Honor?

22               THE COURT:  Sure.

23               (Whereupon, State's Exhibit Nos. 105 and

24   105 A were marked for identification.)

25       Q       Sir, I am going to show you what has been

1    marked as State's Exhibit 105 and State's Exhibit 105

2    A and ask you if you recognize first State's Exhibit

3    105?

4         A     Yes, sir, I do.

5         Q     And what is that?

6         A     This is the evidence envelope in which I

7    placed the little plastic baggy, which is 105 A, which

8    contains the fired cartridge casing that I found that

9    night.

10        Q     And you pulled out the contents of 105 A

11   and how do you recognize 105 A?

12        A     105 A has my name and unit number written

13   across in ink.

14        Q     Is that the spent cartridge casings that

15   are depicted in the photograph 102?

16        A     Yes, sir, it is.

17        Q     And what did you do with that after you

18   recovered it?

19        A     I recovered it and I placed it in a

20   plastic bag.  I brought it back to the crime scene

21   office where I wrote out this envelope, placed the

22   plastic bag in the envelope.  I sealed it with this

23   evidence tape, which I wrote my initials across, and

24   then I dropped it in a secure firearm's evidence

25   lockbox in our office.

1          Q      Go ahead, if you would reinsert that.

2               MR. SMYTH:  At this time the State would

3    offer into evidence State's Exhibit 105 A and tender

4    the same tender 105 A and 105 to counsel for defense

5    and only offer 105 A.

6               MR. ODOM:  Your Honor, offering only 105

7    A?

8               MR. SMYTH:  I'll be glad to offer both.

9               MR. ODOM:  No objection.

10              THE COURT:  105 and 105 A are admitted.

11              MR. ODOM:  Just 105 A.

12              THE COURT:  I thought both of them.

13              MR. SMYTH:  No, Your Honor, only 105.

14              THE COURT:  So the cartridge is 105.  The

15   cartridge is 105 A.

16              MR. SMYTH:  The evidence -- maybe I should

17   clear it up.

18              THE COURT:  What's 105 is the submission

19   and that's not what you are offering?

20              MR. SMYTH:  105 A is the cartridge which

21   is which, I guess, is an envelope and cartridge.

22              THE COURT:  105 A is admitted.

23              (Whereupon, State's Exhibit No. 106 was

24   marked for identification.)

25              MR. SMYTH:  May I approach the officer?

1       Q       Let me show you what has been marked as

2   106 and ask if you recognize that?

3       A       Yes, I do.

4       Q       And what is that?

5       A       It's a computer diagram, which I

6   generated, showing the scene in proportion as it was

7   out there that night.

8       Q       So is this pretty much to scale?

9       A       Roughly, yes.

10      Q       And there just shows an overall area,

11  since you don't have an overhead plane flying, this

12  depicts the area where you found the items we have

13  been talking about?

14      A       Yes, sir, that's correct.

15              MR. SMYTH:  The State offers into evidence

16  State's Exhibit 106 and tenders to counsel for defense

17  for his inspection.

18              MR. ODOM:  No objection.

19              THE COURT:  106 is admitted.

20      Q       Did you see this diagram now, sir?

21      A       Yes, sir, I can.

22      Q       What is this street here?

23      A       That is Briar Grove itself.

24      Q       And this is just the dead end you are

25  talking about?

1      A       That is correct.

2      Q       And then you have something labeled dirt

3   road?

4      A       Right.  The pavement ends right there and

5   the rest of it is dirt road extending south.

6      Q       And you photographed individual portions

7   of this entire diagram; is that correct?

8      A       Yes, I did.

9      Q       Westheimer will be at the top of the

10   diagram?

11      A       Yes, sir.

12      Q       And Fairdale and Richmond would be at the

13   bottom of the diagram?

14      A       That's correct.

15      Q       These items are trees, I take it?

16      A       Yes.

17      Q       And bushes or something?

18      A       Yes.

19      Q       And on your diagram, pointing to, first of

20   all, this round area says dug out area, what's that?

21      A       That's sort of the area of burned debris

22   and stuff I saw there and the area looked like

23   excavated.

24      Q       Like somebody had been looking for

25   something?

1          A        That's correct.

2          Q        And then they also shows an "X" with an

3     arrow drawn to or fired FP .9 mm shell casing this

4     depicted in the photograph that I think 102 shows the

5     spent cartridge?

6          A        Yes, sir.

7          Q        And, then, again five-foot board is that

8     what you saw previously as State's Exhibit 50?

9          A        Yes, sir, that is.

10         Q        And that's the position you found them in?

11         A        Yes, sir.

12         Q        And that's the way they look in

13    relationship to the dirt road and the pavement and the

14    Meridian Apartments?

15         A        That's correct.

16                  MR. SMYTH:  Pass the witness.

17                  THE COURT:  Mr. Odom.

18

19                      CROSS EXAMINATION

20    BY MR. ODOM:

21         Q        Detective Holbrook?

22         A        Officer Holbrook.

23         Q        But you are a detective?

24         A        Just of homicide.

25         Q        We would like to be, thanks.  I'll elevate

1      you.

2                  Officer Holbrook, did you like the other

3      officer before you review a report before you came and

4      testified?

5          A      Briefly I did, yes, sir.

6          Q      And id that help refresh your memory in

7      regards to some of the dates and times in regards to

8      your testimony?

9          A      That's correct.

10                 MR. SMYTH:  Your Honor, may the record

11     reflect with the Court -- may I first approach the

12     witness and make sure this is the report he reviewed?

13                 THE COURT:  Very well.

14                 MR. SMYTH:  I show you what is supplement

15     47 and ask you if you will look at that.

16                 THE WITNESS:  Yes, sir, this is the

17     supplement I generated regarding my actions at the

18     scene.

19                 MR. SMYTH:  This is the one you reviewed?

20                 THE WITNESS:  Yes, sir, that's all I

21     reviewed.

22                 MR. SMYTH:  At this time the State tenders

23     supplement 47 to counsel for defense.

24                 MR. ODOM:  Thank you.

25         Q      Officer Holbrook, if I may, we have never

1   had an opportunity to talk about this case before,

2   have we?

3           A       No, sir.

4           Q       Is this your only involvement with this

5   particular case?

6           A       I believe at a later time I checked the

7   lobby of the building on Richmond for some fired shell

8   casings with a metal detector.

9           Q       I take it that your general duties entail

10  searching for evidence in a manner similar to this?

11          A       Yes, sir.

12          Q       All right.  What is your official job

13  description?

14          A       At the time the crime scene investigator.

15  Basically our duties and responsibilities are the

16  scene itself, whatever it is, you know, to collect and

17  to preserve any evidence we recover, take photographs

18  of the scene, generate a diagram of the scene, things

19  regarding the evidence part of the scene is our

20  responsibility.

21          Q       All right.  Now, I believe you said that

22  at a later date you also went to the lobby, what we

23  have been calling in the courtroom, of the Greenrich

24  building.  Does that sound familiar?

25          A       6222 Richmond.

1        Q       Yes, sir, it is.

2                For the benefit of the ladies and

3        gentlemen of the jury, how far is the Greenrich

4        Building from this particular scene wherein you found

5        the casing?

6        A       I couldn't put a distance on it.  It's

7        fairly close.

8        Q       I'm not trying to pin you down.  It's a

9        half a mile or quarter of a mile, that is, it's not

10       very far away?

11       A       That's correct.

12       Q       By car, what would you say, five minutes

13       away?

14       A       I believe the hundred block of Westheimer

15       and Richmond roughly corresponds to 6200 block of

16       Westheimer would be the 6100 block of Richmond

17       roughly.

18       Q       So this particular scene where you found

19       the casing is not only close to the Meridian

20       Apartments but it's also particularly close to that

21       particular building?

22       A       That's correct.

23       Q       The photographs that you have do not show

24       that building; however, you cannot see those from

25       those particular photographs, can you?

1       A       I don't believe so.

2       Q       Now, when you went out to that particular

3    scene, did you find the casing via a metal detector?

4       A       No, sir.

5       Q       So you were able to kind of sort through

6    the debris and come across the .9 mm casing?

7       A       That's correct.

8       Q       Did you use a metal detector at any point

9    in order to attempt to retrieve anything from the

10   crime scene?

11      A       I don't believe I did at that time.

12      Q       Do you know if any of the other officers

13   attempted to use a metal detector when they retrieved

14   the casing from that scene?

15      A       I'm sorry.  Retrieve the casing that I

16   recovered?

17      Q       When you retrieved your casing, do you

18   know if any of other officers -- or were there any

19   other officers out there attempting to retrieve any

20   casings?

21      A       Yes, sir.  I was out there with two other

22   officers.

23      Q       Do you know if any of those officers that

24   were part of your team that was working on retrieving

25   this casing do you know if they were using a metal

1      detector?

2           A      Not that evening.

3           Q      Now, was this attempt made by yourself to

4      recover shell fragments from the vicinity of this

5      striped board that had bullet holes in it?

6           A      Yes, sir, there were.

7           Q      Were you successful in recovering shell

8      fragments?

9           A      Yes, sir.

10          Q      It would be difficult to find shell

11     fragments in many cases once they have gone through

12     something like a two by six?

13          A      Especially in the dark, yes, sir.

14          Q      Do you know if, later on, in the day there

15     was an attempt to find any shell fragments?

16          A      I don't know for certain.  I remember

17     somebody saying something about going back but I don't

18     know if they did.

19          Q      You don't know if it was done or not?

20          A      No.

21                 MR. ODOM:  That's all I have.  Pass the

22     witness.

23                 MR. SMYTH:  Nothing further.

24                 THE COURT:  Step down, subject to recall.

25                 Is the state prepared to call another

1     witness?

2                 MR. SMYTH:  Yes, Your Honor, I guess we

3     are.

4                 THE COURT:  Good.  Call them.

5                 MR. SMYTH:  Sergeant Waltman, if he is

6     here, I am prepared.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    JAMES L. WALTMAN,

 2    was called as a witness for the State and, having been

 3    duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MR. SMYTH:

 6         Q     Sir, will you, please, state your name and

 7    speak loud enough for the entire jury to hear you

 8    including the lady at the very top at the end of the

 9    row.

10         A     James L. Waltman.

11         Q     How are you employed?

12         A     I am a sergeant with the Houston police

13    Department Homicide Division.

14         Q     And how long have you been employed with

15    our police department?

16         A     29 years.

17         Q     And how long have you been with the

18    homicide division?

19         A     23 years.

20         Q     During that period of time, have you

21    investigated few or many homicides?

22         A     Many.

23         Q     What hours do you normally work?

24         A     4:00 to 12:00, 4:00 p.m. to 12:00

25    midnight.
```

1      Q       And what days do you normally work?

2      A       We rotate days off.  Like this month, I am

3   off Wednesday and Thursday and next month I will be

4   off Friday, Saturday.

5      Q       In the homicide division, you don't get

6   set hours unless you are a lieutenant or do they

7   rotate, too?

8      A       No, the lieutenants rotate, too.

9      Q       So you have set hours --

10     A       Set hours but not set days off.

11     Q       -- rotating days off.

12             Were you on duty with our homicide

13   division back on January 24, 1996?

14     A       Yes, I was.

15     Q       And that would have been a Wednesday, I

16   guess, you weren't off that day?

17     A       No, sir.

18     Q       Did you have an occasion to be

19   dispatched -- or were you in the office and get called

20   out to go to a shooting scene at 6222 Richmond Avenue?

21     A       Yes.

22     Q       That would be the Greenrich Building?

23     A       Correct.

24     Q       Is the Greenrich Building in Houston,

25   Harris County, Texas?

1          A       Yes, it is.

2          Q       Do you recall what time it was that you

3     were sent to that location?

4          A       Yeah.  We received the assignment

5     approximately 8:30.

6          Q       And what time did you get there?

7          A       About 9:15.

8          Q       Where was the shooting scene that you were

9     initially assigned to investigate, where was it

10    located in that building?

11         A       It was located in the lobby area of the

12    Greenrich Building.

13         Q       On the first floor?

14         A       First floor; yes, sir.

15         Q       When you got there, was the victim of that

16    shooting still there?

17         A       Yes, he was.  Oh, I'm sorry, the victim

18    had been removed by HFD number 68, I believe.

19         Q       So that fire department ambulance crew had

20    already taken him off the scene?

21         A       Yes.

22         Q       Do you have a partner that you normally

23    work with?

24         A       Yes, I do.

25         Q       And who is your partner?

1          A        Beth Halling.

2          Q        Was Beth Halling your partner back on that

3     date?

4          A        Yes, she was.

5          Q        When the homicide detectives go to the

6     scene, do you work in pairs?

7          A        Yes.

8          Q        Do you split up your duties in any

9     particular way?

10         A        Yes, we do.

11         Q        How do you split them up?

12         A        Well, usually one of us starts

13    interviewing the witnesses and the other one takes the

14    scene portion as far as in regards to the evidence and

15    having the CSU collect evidence and photographs and

16    other evidence and, also, you know, making sure all

17    the evidence that is available gets put down in

18    writing.

19         Q        At that time on this particular shooting

20    scene what was your particular job?

21         A        On this particular one, Beth done the

22    interviewing of the witnesses and suspects or

23    complaints, if they are available, and, also, I

24    started the scene investigation.

25         Q        So you are starting to look for evidence,

1    things like that?

2         A    Yes, sir.

3         Q    Was your initial investigation of the

4    shooting covered just the first floor area?

5         A    Yes, sir.

6         Q    Did somebody give you a run-down about

7    what they believe happened there in the lobby?  Did

8    you know that you had so many places to start looking

9    for things?

10        A    Yes, sir.

11        Q    And we have already heard testimony about

12   what was found in the lobby but did you see ballistic

13   evidence in the lobby, by that, I mean, at least one

14   spent cartridge casing, maybe a fired bullet and some

15   bullet fragments and things like that?

16        A    Yes, I did.

17        Q    Did you also see in the lobby area

18   clothing that was bloody and had been cut off the

19   individual?

20        A    Yes.

21        Q    Did you, as part of your investigation,

22   ever leave that main lobby area where the bullet

23   fragments and spent bullets and bloody clothes are and

24   go to any other portion of the first floor area?

25        A    Yes.  I checked all the exits.  I checked

1    the exits and entry of the first floor down the

2    hallway, the doors on that floor, out into the

3    stairwell and the double doors leading out into the

4    loading docks.

5        Q      So you went down that hallway that left

6    off of the lobby area?

7        A      Yes, sir.

8        Q      Specifically, with regard to the loading

9    dock area and the loading dock doors, was there

10   anything there that caused you to make a note?

11       A      Yes, sir.  At the loading dock doors there

12   was a rubber mat, a black rubber mat that appeared to

13   have been pulled over the door facing, the bottom of

14   the door, so the door couldn't lock, in other words,

15   it couldn't be shut and locked.

16       Q      Part of the door frame there at the

17   bottom?

18       A      Yes, sir.

19       Q      Is that one of somebody's hurrying to get

20   out of the building could they have kicked it and

21   knocked it into that position?

22       A      See, that was my -- I was looking at that

23   mat and I was wondering the same thing, especially

24   myself.  I went out the door.  They kicked that mat,

25   so I pulled the mat back in and I tried several times

1    and I have got boots on and tried to kick it up.  And

2    you have to stood there and really forcibly kick it to

3    even get -- and I still couldn't get it like that.  I

4    picked up the mat and pulled it across.

5        Q     Looked like it was more a deliberate

6    effort to keep the door open than it was an accidental

7    or unintentional effort?

8        A     Yes, sir.

9        Q     You don't know who did that or how that

10   happened?

11       A     No, sir.

12       Q     And, I mean, it could have been done

13   before the shooting you are investigating or after or

14   do you know?  Is that just something you noticed?

15       A     At the time that was just something I

16   noticed at the time.  It appeared, well, had to have

17   an entry into the building and that's the only open

18   doorway I found at that time other than the front

19   lobby door.

20       Q     When you are investigating the shooting,

21   you look for types of abnormal entries into a

22   building?

23       A     Yes, sir.

24       Q     And this was something that stuck in your

25   mind?

1        A       Yes, sir.

2        Q       Okay.  In addition to noticing that about

3    the first floor of the entryway of the loading dock,

4    is there a stairwell on the first floor?

5        A       Yes, sir, there's a stairwell, just, I

6    guess, you would say, north of the loading dock on the

7    east wall.

8                MR. SMYTH:  Your Honor, may I approach the

9    diagram?

10               THE COURT:  Certainly.

11       Q       Sergeant, can you see this diagram, if I

12   pull it out a little bit?

13       A       Yes, sir.

14       Q       Do you recognize this as a diagram or

15   floor plan of the first floor of the Greenrich

16   Building?

17       A       Yes, sir.

18       Q       And the name is State's Exhibit 25.  The

19   Greenrich Building do you know which direction it

20   faces, north and south, the front lobby?

21       A       The front lobby faces south.

22       Q       This would be the south side of the

23   building?

24       A       Yes, sir.

25       Q       Can you recognize this to be the open door

1    area to be the lobby?

2         A    Yes, sir.

3         Q    And this is where the shooting had already

4    occurred?

5         A    Yes, sir.

6         Q    What is here, which would be the west end

7    of the building?

8         A    That's the loading dock there.

9         Q    So this would be the loading dock area?

10        A    Yes, sir.

11        Q    Would this be the right immediacy head?

12        A    I'm sorry, you are talking about -- wait.

13   Let me see.  That hallway, okay.

14        Q    No, here, the lobby area and hallway.

15        A    That's part of the loading dock, yes,

16   sir.  That's the loading dock and the steps down.

17   That's what that is, a loading dock right there.

18        Q    Now, the loading dock, the doors on the

19   loading dock, do they open directly to the west or do

20   they open to the south?

21        A    They open to the south.

22        Q    And is there also a ramp that goes down

23   toward Richmond?

24        A    Yes, sir.

25        Q    Is this the area of the doorway where you

1   saw the rubber mat had been placed to keep the door

2   from locking?

3        A        Yes, sir.

4        Q        You say you checked.  There's some, I

5   assume, doorways along the first floor; is that

6   correct?

7        A        Yes, sir.

8        Q        These straight lines that arc off from it?

9        A        Yes, sir.

10       Q        Is this the stairwell you are talking

11  about, has several bar areas that indicates, I guess,

12  to be an architecture stair?

13       A        Yes.

14       Q        Just like these lines at the front of the

15  building indicate stairwell, stairs into the stairwell

16  area that you checked?

17       A        Yes, sir.

18       Q        Now, when you checked the doorway from the

19  stairwell, was it locked or unlocked?

20       A        It was unlocked.

21       Q        And does this stairwell go both up and

22  down or just up?

23       A        No, you can go up and down it.

24       Q        What is this, a basement in this building

25  or something?

1        A       No, sir.

2        Q       But this is the first floor?

3        A       Oh.

4        Q       How many floors up?

5        A       Yes, sir, there is eight floors in the

6    building.  That started on the first floor.  I'm

7    sorry, when you asked me a while ago, actually you

8    have to go up from that level right there; yes, sir.

9        Q       But the stairwell itself you can go up

10   there?

11       A       Yes.

12       Q       I didn't make myself clear.

13               But on the first floor you start up?

14       A       Yes, sir.

15       Q       And on the eighth floor you would have to

16   start down?

17       A       Yes, sir.

18       Q       And this door was not locked when you

19   checked it?

20       A       Yes, sir.

21       Q       Any reason why you checked -- did you

22   check all the doors on the first floor?

23       A       Yes, sir.

24       Q       Any reason why you would check this

25   stairwell?

1          A      Well, actually I went up to see if there

2     was any evidence, if a suspect came in, if he might

3     have went up that stairwell and so I went in and

4     checked it, looking for anything might have been

5     dropped or anything and, also, if there would even

6     possibly be somebody still up there, you know.

7          Q      Were there a lot of police officers

8     securing this whole building when you got there?

9          A      Yes, sir.

10         Q      Now, did you find any evidence in the

11    stairwell?

12         A      No, sir.

13         Q      I mean is that what you were looking for,

14    guns and things like that?

15         A      I'm sorry.

16         Q      Have you ever found guns tossed in places

17    like the scene?

18         A      Yes.

19         Q      So that would be some reason you might

20    look in the stairwell?

21         A      Yes.

22         Q      At this time when you are checking the

23    first floor doors and checking the stairwell, did you

24    have any idea that there might be something, there

25    might be -- let's put it straight -- there might be a

1     dead body on the seventh floor?

2          A      No, sir.

3          Q      You didn't have any idea.  You are just

4     checking?

5          A      Yes, sir.

6          Q      Did you find any other doors on the first

7     floor unlocked?

8          A      I believe the second door on your south

9     side was unlocked.  Got into, like it was an office

10    door there that led into the manager's office, and

11    there was a door pass it, next door, like boiler room,

12    kind of had a bunch of pipes.

13         Q      Did you look in that area?

14         A      Yes, I looked if the suspects -- anyone

15    tossed anything in there or any type of evidence that

16    I thought would be evidence in that area.

17         Q      And I assume you didn't find anything in

18    these of these doors that you checked?

19         A      No.

20         Q      Do you recall how long you stayed on the

21    scene when you were investigating the shooting of

22    David Copeland, the security guard?

23         A      We was there probably at least two hours

24    on that scene.

25         Q      You are doing the scene investigation and

1      Officer Halling is doing the witness interviews?

2         A      Yes, sir.

3         Q      At that time, when you left, did you have

4      any reason to believe that anything had happened above

5      the first floor?  Was there anything on the second,

6      third, fourth floor that you needed to check out?

7         A      No, sir, there was nothing.

8         Q      So you went ahead and left the scene?

9         A      Yes, sir.

10        Q      Where did you go when you left the scene?

11        A      We went directly over to the homicide.  We

12     was going to the hospital but Lieutenant, I think,

13     Burmester was at the hospital to talk.

14        Q      And I'll do it before defense counsel does

15     it.  Please don't tell us what anybody else said. --

16        A      Yes, sir.

17        Q      -- just what did you do, thank you.

18               So you left and you went back to homicide?

19        A      Yes, sir.

20        Q      For some reason, you had reason not to go

21     by the hospital at that time?

22        A      Yes, sir.

23        Q      While you were on the scene, before you

24     left, did patrol officers bring in anybody who they

25     thought might be suspects?

1        A        Yes, they did, sir.

2        Q        Do you remember how many people were

3    brought in?

4        A        Two people.

5        Q        Did you have an opportunity to view those

6    persons?

7        A        Yes, I did.

8        Q        And did you have an opportunity to talk to

9    those individuals?

10       A        Yes, I did.

11       Q        Did you have an opportunity to have those

12   individuals displayed to -- how many eyewitnesses did

13   you have, if any, to this shooting of David Copeland,

14   this security guard?

15       A        I had two.

16       Q        Did you have an opportunity to have those

17   two individuals viewed by your two witnesses to the

18   David Copeland shooting?

19       A        Yes, I did.

20       Q        And do you recall who those two witnesses

21   were?

22       A        Keith Vacek and Estrella Martinez.

23       Q        Is the clothing lady?

24       A        Yes, the cleaning lady.

25       Q        This  was Keith Vacek?

1    A        Well, yes, sir, Keith Vacek.

2    Q        And who is Keith Vacek?

3    A        Well, his wife was the manager of the

4    building and he had an office in that building where

5    he was teaching some type of educational language, I

6    believe it was.

7    Q        So both Estrella Martinez and Keith Vacek,

8    however his name is pronounced?

9    A        Yes.

10   Q        Did you have an opportunity to view these

11   two people brought in by patrol officers?

12   A        Yes.

13   Q        You were with them when they viewed the

14   two individuals?

15   A        Yes.

16   Q        Based on what they observed and what they

17   told you -- don't tell me what they told you -- did

18   you have any reason to hold those two individuals as

19   suspects?

20   A        No, I did not.

21   Q        And you had been doing this as a homicide

22   detective for 23 years?

23   A        Yes, sir.

24   Q        Were these people that were brought in did

25   they have a good identification?

1          A       Yes, sir.

2          Q       Did they produce a driver's license or

3    some other ID to let you know where you could find

4    them if you need to talk to them any more?

5          A       Yes, sir, they did.

6          Q       And you personally interviewed them?

7          A       Yes, sir.

8          Q       Based on what Estrella and Keith told you

9    and based on your interview, did you feel it was

10   necessary to take them to the homicide division?

11         A       No, sir, I did not.

12         Q       Did you have anything done with respect to

13   those two individuals, any tests run on them, just in

14   case your hunch is wrong?

15         A       Well, I had to make sure they had good IDs

16   and I checked that with officers.  I, then, had them

17   photographed and I had an anatomic absorption test

18   done on the hands to see if they had held a weapon.

19         Q       By a CSU officer?

20         A       Yes, sir.

21         Q       At that night, when you let them go, did

22   you have the result of the anatomic result test?

23         A       Not at that time, no, sir.

24         Q       Have you subsequently obtained the results

25   of the anatomic test?

```
 1        A       Yes, sir.

 2        Q       Based on the results you got from the

 3    anatomic absorption test, was there any reason --

 4                MR. ODOM:  Object, that's going to lead to

 5    hearsay.

 6                THE COURT:  It's overruled.

 7                You can answer the question.

 8                MR. ODOM:  Assuming facts not in evidence.

 9                THE COURT:  Overruled.

10        A       The results come back negative --

11        Q       Don't tell me what the result was.

12                This is my question to you, sir.  Based on

13    the result of those tests, did you have any reason to

14    suspect those two persons had done it.

15                MR. ODOM:  That is after the fact of it is

16    an after fact, assuming evidence that is not before

17    this Court that this Court upon which the witness

18    makes an opinion.  I object to that line of answering

19    of that question.

20                THE COURT:  It's overruled.

21        Q       (Mr. Symth)  You can answer it.  Did you

22    have any reason to hold them based on result of that

23    test?

24        A       No.

25        Q       These other things we talked about --
```

1     checking the doors, talking to these two people that

2     patrol officers picked up and released -- did you do

3     anything else as far as the scene at that time, the

4     scene of the shooting of David Copeland in the lobby?

5         A       No, sir.

6         Q       Either at the homicide division while you

7     were there or any other time that night, did you get a

8     call to return to the Greenrich Building?

9         A       Yes, sir.

10        Q       Do you recall what time that was?

11        A       It was approximately 11:40, 11:45 when we

12    received that call.

13        Q       Did you go back to the Greenrich Building?

14        A       Yes.

15        Q       Was that both you and --

16        A       Beth Halling.

17        Q       When you went back, what did you find?

18    Just, first of all, why did you end up going back?

19        A       Received a call that they had found a body

20    up on the seventh floor.

21        Q       When you went back, did you perform the

22    same duties, you take the scene and Sergeant Halling

23    take the witnesses?

24        A       Yes, sir.

25        Q       Did Beth Halling have much to do?  Were

1    there any witnesses to the shooting that you were

2    aware of?

3        A        No, there was no eyeball witnesses.

4        Q        So you got the tough end on this one.   You

5    had to do the scene; is that correct?

6        A        Well, at that point, okay.

7        Q        Where did you go when you got back to the

8    Greenrich Building?

9        A        We went up to the seventh floor.

10       Q        And did you go to any particular office or

11   suite on the seventh floor?

12       A        Yes, suite 770.

13       Q        And who or what is occupied in suite 770?

14       A        It was J & S Precious Stones owned by --

15   they call him Johnny Szucs.

16       Q        When you got to the seventh floor, did you

17   meet any personnel with HPD or anybody else?

18       A        Yes.   There was a Sergeant Furstenfeld, I

19   believe is the way you pronounced his name, other

20   officers, Officer Fitz were up there along with the

21   manager Sue Vacek.

22       Q        When you got these folks, were they

23   basically securing the scene for you?

24       A        Yes, they were.

25       Q        And when you went up there to the seventh

1    floor, does that diagram, State's Exhibit 81, depict

2    diagrammatically what the scene looked like?

3         A    Yes, it does.

4         Q    When you entered the scene, were you able

5    to just walk back in and view the body or was there

6    something that prevented you from doing that?

7         A    No, you couldn't walk back.  You could

8    through the first two doors and the two doors entering

9    into the complainant's office and the sitting room, or

10   the waiting area over to the right of his office, that

11   entrance door into that room and his door was locked.

12        Q    As far as you know, when you arrived

13   there, nobody went in and certainly nobody from law

14   enforcement had been inside the crime scene?

15        A    No, sir, nobody has been in.

16        Q    At your direction did officers then go

17   over, remove the ceiling tiles and crawl back down in

18   there and let you in?

19        A    Yes, they did.

20        Q    Did you go in at that time or climb up,

21   take a peak, or what?

22        A    I stepped inside the waiting area and

23   looked in to where the complainant was, stepped inside

24   there in the doorway.

25        Q    Did you as far as you know ever touch

1      anything when you looked in?

2          A       No, I made sure of this.  I says,

3      "Everybody stay out of here.  I am going to call the

4      lab out," the latent lab, and have them go do the

5      processing of the scene.

6          Q       Did you also call the CSU back out?

7          A       Yes, sir, I had CSU come back out.

8          Q       Before you go in and start doing any of

9      your investigation, do you have the crime scene unit

10     come out and do their process as well as the latent

11     lab people?

12         A       Yes.  I helped the crime scene and Officer

13     Burke and just take photographs and video.

14         Q       And then you say the latent lab comes out?

15         A       Yes.

16         Q       What's the latent lab?

17         A       It's the fingerprint section of the

18     Houston Police Department and I had their lab

19     technicians come out and do the printing.

20                 MR. SMYTH:  May I have just one moment?

21                 THE COURT:  Sure.

22         Q       Now, let's go back then and check.  When

23     you are checking out this building, did you make any

24     efforts to determine what type of security the

25     devices, if any, are in the Greenrich Building?

1          A       Yes, I did.

2          Q       From your experience on the first scene,

3    did you know that they had monitored certain floors

4    with cameras?

5          A       Yes.

6          Q       And, also, recorded the activity on those

7    floors with cameras?

8          A       Yes, I did.

9          Q       And was the recording of the activities in

10   that building available to you?

11         A       No.

12         Q       And why is that?

13         A       Both recorders had been torn out there in

14   the security booth and taken out of the building.

15         Q       And you learned that from your initial

16   scene investigation?

17         A       Yes, sir.

18         Q       Where are the cameras that you are aware

19   of in the Greenrich Building?  And let's just start

20   with the first floor.  Where do you know there are

21   cameras that record activity that feed an image to the

22   recorder that you have got?

23         A       None inside the building; there's one out

24   in the garage area.

25         Q       What portion of the first floor does that

1    one cover, the one that is in the garage area?

2         A     The one that is in the garage it covers --

3    there's an entrance walkway going from the garage on

4    the first floor into the building of the first floor.

5         Q     Right.

6         A     And it's a monitored camera that can be

7    controlled by the security people and it sweeps across

8    there and, also, it can note people walking up to that

9    walkway, leading up to the first floor, to go down to

10   get into the door leading into the building.

11        Q     So regarding the first floor, there is a

12   camera -- here's the garage area on the back side?

13        A     Yes, sir.

14        Q     And this camera somehow pans the garage

15   area?

16        A     Yes, sir.

17        Q     And it does record what's out in the

18   garage area?

19        A     Yes, sir.  And cover, you know, people

20   coming up that walkway, at the back, on the first

21   floor.

22        Q     There is the walkway right here in this

23   hallway?

24        A     Yes, sir.

25        Q     Any other cameras that you aware that

1     record activities on the first floor?

2          A      No, sir.

3          Q      How about -- what we are interested in the

4     seventh floor, are there any cameras on the seventh

5     floor?

6          A      Yes, they were.

7          Q      Do they record where they are located on

8     the seventh floor?

9          A      The cameras are located to the east and

10    the west side of the elevator, pointing in opposite

11    directions, in other words, the one on the east up --

12    it would be on the south wall of the hallway.

13         Q      If I got a diagram out, would that help

14    you describe?

15         A      Yes.

16                (Whereupon, State's Exhibit No. 107 was

17    marked for identification.)

18         Q      I am going to show you what has been

19    marked as State's Exhibit 107 and ask you if that

20    fairly and accurately depicts the floor plan of the

21    seventh floor of the Greenrich Building?

22         A      Yes, it does.

23                MR. SMYTH:  Your Honor, at this time the

24    State offers into evidence State's Exhibit 107 and

25    tenders the same to defense for inspection.

```
 1                    THE COURT:  State's Exhibit 107 is
 2      admitted.
 3          Q       Sergeant Waltman, now perhaps I can do a
 4      better job of explaining.  Where is the office suite
 5      770, J&S Precious Stones, do you see that on the
 6      diagram?
 7          A       The first office to the west of the
 8      elevator.
 9          Q       Okay.  Which?
10          A       That would be north, north of it; yes.
11          Q       North is at the top?
12          A       Yes.
13          Q       So the first office west of the elevator
14      is going to be right here?
15          A       Yes.
16          Q       And that's the layout of this particular
17      office?
18          A       Yes.
19          Q       Where are the cameras -- and what are
20      these three boxes in the middle?
21          A       That's three elevators leading from the
22      first floor.
23          Q       And does that represent that stairwell
24      that goes up and down at least on the seventh floor?
25          A       Yes.
```

```
1          Q       And this would be on the west end of the
2    building, right?
3          A       Yes, sir.
4          Q       And, I take it, this stairwell, if I go
5    down this stairwell, I am going to end up close to the
6    loading dock?
7          A       Yes, sir.
8          Q       Where are your security cameras?
9          A       Okay.
10         Q       Are they on the elevator side or other
11   side?
12         A       On the south side of there is one just
13   about if you go west, I mean.
14                 THE COURT:  Step down and show.
15         Q       If you would go ahead, with counsel's
16   permission, put an "X" where there are each of the
17   security cameras.
18         A       A camera approximately right in there.
19         Q       Step back so you don't block the views.
20                 You pointed an "X" right here.  And is
21   there another security camera on that floor?
22         A       Yes, there is about this area there.
23         Q       That blue "X" and those shoot down the
24   hall.  I guess it takes pictures of people coming off
25   the elevator?
```

1          A      Yes.   This camera takes pictures all the

2     way down to this end of the hall.   They photograph any

3     activity from this camera all the way to this hall,

4     any activity between this camera takes photographs;

5     any activity from here to this side of the hall is

6     photographed.

7          Q      These security cameras cover all activity

8     in the hall from the east end to the west end?

9          A      Yes, it will.

10          Q      Is there also a security camera -- this is

11     a crosswalk, a walkway, that leads from the second

12     floor of the parking garage into the second floor of

13     the building; is that correct?

14          A      Yes, sir, it is.

15          Q      Is there a camera that records activities

16     on that entrance?

17          A      Yes, sir, it is outside the door, leads

18     into the building right on the outside of the door.

19     If you are going out, it would be on your left-hand

20     side just over where they got a key entry -- I'm

21     sorry -- a key-card-type entry and put a card in to

22     unlock the door.

23          Q      All right.   How about is there a security

24     camera or a camera that photographs activities on the

25     loading dock door?

1        A       No.

2        Q       Who controls the activities regarding the

3    main door?

4        A       The security guard at the main door; yes,

5    sir.

6        Q       Is it correct to say the only door for

7    which there is neither a security guard or a security

8    camera that you can get in the building is the one at

9    the loading dock?

10       A       Yes.

11       Q       Let's go back to the seventh floor now.

12   When you got to the scene on the seventh floor,

13   regarding the diagram that I have just put up, State's

14   Exhibit 81, a diagram of suite 707 --

15       A       770.

16       Q       When went up there, at any time during

17   your investigation, did you look at the locks on the

18   doors in there for some type of a forced entry?

19       A       Yes, I did.

20       Q       Did you discover that was there any

21   evidence that those doors had been forcibly opened?

22       A       No evidence of any forced entry on any of

23   the doors.

24       Q       Do you recall what kind of locks are on

25   the first doorway, the outer door, in the hall?

1       A       The outer door had, you know, a regular

2  doorknob lock, with a push button on it, and, also,

3  had the dead bolt, you have to unlock with a key.

4       Q       It's one of those double barrel, doesn't

5  have a thumb latch on the inside, you have to have a

6  key to get in and out?

7       A       Yes, sir.

8       Q       And it has the thumb latch?

9       A       Yes.

10      Q       How about when you get into the little

11 alcove area of the second door.

12      A       The second door, also, had a thumb latch

13 on the doorknob but it also had an electronic lock

14 on.  There was no key electronic lock.  It was

15 activated by a switch in the complainant's office.

16      Q       So back in that office was a

17 push-button-type deal?

18      A       Yes.

19      Q       From that position, you can unlock the

20 second door?

21      A       Yes.

22      Q       How about the interior doors, is the one

23 that leads into the sitting room area and the one that

24 leads into what we call the complainant's office?

25      A       They were both door handle locks.

1  Q  The bush button?

2  A  Bush button.

3  Q  Push a button?

4  A  Yes.

5  Q  And you checked all those doors and no

6 evidence of any tampering with it --

7  A  No, sir.

8  Q  -- forcible entry?

9  A  No, sir, no evidence that I could find any

10 at all.

11  Q  Where was the push button that allowed

12 entry into the second door off the hall?

13  A  It was on that, directly behind the

14 complainant's desk, on that desk.  I guess you might

15 call it type of cabinet in the rear of the

16 complainant's desk there.

17     MR. SMYTH:  May I approach the diagram?

18     THE COURT:  Yes.

19  Q  Would it be on the credenza or I guess

20 type of on here?

21  A  Yes.

22  Q  And when you viewed this suite, did you

23 see a guy, sitting back in this office, how is he

24 going to know somebody is at the door?  Is there a

25 doorbell there?

Page 196

1       A       Well, he had a TV monitor in his office

2   and also TV cameras.  One in the first little

3   entranceway, there was a TV monitor there and then

4   there was another one inside the waiting room area.

5       Q       And in this area here?

6       A       Yes, sir.

7       Q       In addition to the two TV cameras that the

8   occupant of this suite had monitoring activity, was

9   there any other kind of security device, motion

10  detectors or infrared sensors you noticed?

11      A       There was two motion detectors that I

12  noted.  One was inside the first little area you enter

13  and then there was one in the waiting area.

14      Q       Okay.  Did you notice any other security

15  devices in that office, suite 770?

16      A       Well, the safe had a locking -- not a

17  motioning mechanism but a security alarm on it, and

18  there was, also, on that same bench I was telling you

19  a while ago where the switch to open the doors was.

20      Q       Yes, sir.

21      A       There was a button to hit for a robbery,

22  you know, you were getting robbed.

23      Q       It had a panic button?

24      A       Yes, sir.

25      Q       Did you determine was the safe alarm

1     system tied in to the rest of the alarm system or was

2     it separate?

3          A     It's separate.

4          Q     It went some place else altogether?

5          A     Yes, sir.

6          Q     Were they a monitored alarm?

7          A     Yes, sir.

8          Q     An outside company that monitors their

9     alarms?

10         A     Yes, sir.

11               MR. SMYTH:  Your Honor, may I approach the

12    board, Your Honor?

13               THE COURT:  Certainly.

14               (Whereupon, State's Exhibit Nos. 108

15    through 113 were marked for identification.)

16         Q     Sergeant, I show you what has been marked

17    as State's Exhibit 108 through 113, a series of

18    photos, and ask you to look at those and determine

19    whether or not you recognize what is depicted in those

20    photographs.

21         A     Yes, sir.

22         Q     With regard to State's Exhibit -- I am

23    missing a number.

24               MR. VINSON:  May I approach?

25               THE COURT:  You may.

```
 1          Q       I show the number, it should be number 108
 2    through 114.
 3                  MR. ODOM:  113.
 4                  MR. SMYTH:  Yes.
 5          Q       Regarding 108, 109, and 113, do you
 6    recognize what is depicted in those photographs?
 7          A       Yes.
 8          Q       108, 109 and 113 do they truly and
 9    accurately depict the scene as you viewed it that
10    night?
11          A       Yes.
12                  MR. SMYTH:  At this time the State offer
13    108, 109 and 113 and tenders to defense for his
14    inspection.
15                  MR. ODOM:  No objection.
16                  THE COURT:  State's Exhibit 108, 109, and
17    113 are admitted.
18          Q       Now, regarding State's Exhibit 91, 92 and
19    93, I ask you, if you will, look at those, tell me
20    whether you recognize those three photographs.
21          A       Yes, sir.
22          Q       Do those photographs 91, 92, and 93 truly
23    and accurately depict the scene as you viewed it that
24    night?
25          A       Yes.
```

1           MR. SMYTH:  The State offers into evidence

2     90, 91, 92, and tenders the same to defense for his

3     inspection.

4           MR. ODOM:  No objection.

5           THE COURT:  State's Exhibit 90, 91, 92 are

6     admitted.

7     Q     Sir, if you would, just look at this and

8     tell the ladies and gentlemen of the jury what is

9     depicted in State's Exhibit 90.

10    A     That's the alarm system where you activate

11    it and set it, when you get ready to leave, and turn

12    it off and on when you come back in.

13    Q     And is this inside the office of the

14    deceased, the complainant, in this case?

15    A     Yes.

16    Q     State's Exhibit 91, can you tell the

17    ladies and gentlemen what it is that I am pointing the

18    pen at.

19    A     That's the video monitor that monitors the

20    outside entranceway and, also, the sitting room or the

21    waiting room area, I mean through the second door.

22    Q     Does the two cameras do they go from one

23    to the other, back and forth, or do you switch them?

24    A     You switch them from one to the other.

25    Q     When you were in there that night on

1    January 24, 1996, was this camera showing on the foyer

2    area?

3         A    Yes, sir.

4         Q    So it's actually showing a photograph of

5    who would be in the foyer from somebody standing

6    there?

7         A    Yes, sir.

8         Q    Was this camera hooked up to a recorded

9    device that you were aware of?

10        A    No, sir.

11        Q    So it's strictly a monitor?

12        A    Yes, sir.

13        Q    And this monitor was on when you got to

14   the scene?

15        A    Yes, sir.

16        Q    In the area that it is monitoring, is that

17   area between the two outer doors?

18        A    Yes, sir.

19        Q    And State's Exhibit 92 is that just a

20   close up of that same alarm panel?

21        A    Yes, sir.

22        Q    Just a closer view?

23        A    Yes.

24        Q    State's Exhibit 108 and 109 what do those

25   two photographs show?

1       A       108 is inside the complainant's office.

2    109 also showed inside the complainant's office and

3    inside the waiting area.

4       Q       Okay.  It just shows another view and

5    gives a perspective of where this monitor for the

6    alcove area is located in regard to the complainant's

7    office?

8       A       Yes, sir.

9       Q       And, again, it shows that the monitor is

10   on and monitoring the alcove area?

11      A       Yes, sir.

12      Q       So that sets up so a person, who is

13   sitting at the complainant's desk, can view who is in

14   the alcove area?

15      A       Yes.

16      Q       And he has the electronic button to let

17   them in?

18      A       Yes.

19      Q       So you sit there at the desk and push the

20   button and let somebody in?

21      A       Yes, sir.

22      Q       He doesn't have to get up and go to the

23   front door?

24      A       No, sir.

25      Q       And State's Exhibit 113 -- and this

1    appears to be a different alarm-type panel; is that

2    correct?

3         A     Yes.  It's an alarm panel to set the

4    alarm, also, but it's in the waiting room area,

5    looking against that little wall.  See where you come

6    in the second door, you go straight down the back

7    side, right there, that little petition right in

8    there, I think it was.

9         Q     And that's just another alarm system that

10   you can set?

11        A     Yes.

12        Q     Now, let's get into those various security

13   measures that you observed in the suite.  Let's go

14   inside the suite.

15              Did you have an opportunity, since you are

16   doing the scene, to observe the body of the deceased

17   Johnny Szucs?

18        A     Yes, I did.

19        Q     Can you describe for the ladies and

20   gentlemen of the jury how the body was arranged.

21        A     Well, he was sitting in a chair, a big

22   leather chair, behind his desk, both feet on the

23   floor, and he was slumped to the right side and had,

24   what appeared, several bullet wounds to his body, with

25   blood on his shirt and blood splattering around the

1    area and on the desk and cabinets around him.

2        Q    Did you observe what caused the blood

3    splattering and the blood on his chest?

4        A    Well, it appeared to be bullet wounds,

5    gunshot wounds; yes.

6        Q    Were there any of the guns -- in the

7    sitting position that you described, did there appear

8    to have been any kind of a struggle?

9        A    No, sir, it did not.

10       Q    Did the deceased have anything in his

11   hands?

12       A    No, sir, he did not.

13       Q    Did he have a weapon in his hands?

14       A    No, sir, he did not.

15       Q    Did you look to see if he had a gun in

16   there or anything like that?

17       A    Yes, there was none around other than --

18       Q    Did you observe on his clothing or on the

19   desk anything that looked unusual?

20       A    Well, I observed all over him was a real

21   fine -- as a matter of fact, I had to really -- first,

22   I had never seen nothing like that.  It was my first

23   occasion to see that much.  It looks like little

24   particles of steel wool to me.  And I started looking

25   at him and it had blowed over onto the desk, kind of

1    white-looking desk, and you could see little bitty

2    fibers of metal-like steel wool.

3         Q    All over the front of the deceased?

4         A    Yes, sir, all over.  He's real heavy on

5    his person.

6         Q    Did you look for evidence of any cartridge

7    casings or anything like that?

8         A    Yes, I did.

9         Q    Did you find any cartridge casings in the

10   room where the deceased was killed?

11        A    No, sir, there was no cartridge casings

12   found.

13        Q    Were there any cartridge casings in the

14   entire suite?

15        A    No, sir, none.

16        Q    During your investigation, did you

17   determine what kind or caliber of weapon killed the

18   deceased?

19        A    Yes.

20        Q    And what caliber was it?

21        A    .9 mm.

22        Q    Would you have expected have found the .9

23   mm spent casings in that room?

24        A    Yes, I did.  I would have.

25        Q    What did that indicate to you when there

1    is no casing?

2        A      Well, it indicates to me that somebody

3    picked up the casings, took the time to pick them up

4    before leaving.

5        Q      Was there anything in the area of

6    deceased's lap?

7        A      Yes, sir, a pair of glasses, laying there,

8    in his lap of the deceased.

9        Q      Did you, also, during your investigation,

10   have to return the following day to do more

11   investigation?

12       A      Yes.

13       Q      And you had the print guys come in and do

14   a bunch of stuff?

15       A      Yes, sir.

16       Q      When you entered the office, was the safe

17   opened or closed?

18       A      When I entered, it was closed.

19       Q      Did you make any attempt to open it?

20       A      Not until after it was printed.

21       Q      So before you made any attempt to open the

22   safe, you had it printed?

23       A      Yes.

24       Q      Did you get any assistance in opening the

25   safe, just yes or no?

1          A       Yes.

2          Q       Did you ever operate a safe like this

3      before?

4          A       No, I did not.

5          Q       Did you find out how you go about opening

6      that safe?

7          A       Yes, I did.

8          Q       Was there anything special you had to do

9      to get in once you knew what you are suppose to do?

10         A       If you knew what you was doing, there was

11     not.  You can just open it up real easy.

12         Q       So you didn't try to open.  You didn't

13     realize how easy it was to open?

14         A       Yes.

15         Q       What did you have to do to open the safe,

16     did you have to dial?

17         A       No, sir, turn the key and turn the

18     handle.  You have to turn both of them and it opens

19     right up.

20         Q       And did you learn is that the way the safe

21     is always opened or is that just an easy way to open?

22         A       Well, that's called key locked.  From the

23     information, it was called key locked.  And if it's

24     locked, with the safe is securely locked and locked

25     with the safe dial, and you have to have a combination

1    to get in it and a key to get in it.  Of course, once

2    they open it, usually the key lock, if during the

3    daytime, so they don't have to keep doing the

4    combination so they can unlock it.  And if they want

5    to run out and, say, down the hallway and lock it and

6    take the key out with them, it's my understanding; and

7    if they want to secure it permanently where you had to

8    do the combination and key, it locks it through the

9    combination and take the key out.

10        Q     I show you what has been marked as State's

11   Exhibit 110, 111 and 112 and a series of three

12   photographs.

13        A     Yes, sir.

14        Q     And I ask you if you recognize what's

15   depicted in those photographs?

16        A     There is the safe that was --

17        Q     Just yes or no.

18        A     Yes.

19        Q     Do those photographs truly and accurately

20   depict the scene as you viewed it at the time those

21   photos were taken?

22        A     Yes.

23              MR. SMYTH:  Your Honor, at this time the

24   State will offer into evidence State's Exhibits 110,

25   111, and 112 and tender the same to defense for

1    inspection.

2              MR. ODOM:  No objection.

3              THE COURT:  110, 111, 112 are admitted.

4         Q      Can you explain for the jury what is

5    depicted in State's Exhibit 110.

6         A      This is the safe, showing the front of it,

7    with the door partially open.

8         Q      And could you also tell there is a lot of

9    black, smudge-looking stuff on this white file

10   cabinet.  Can you tell the ladies and gentlemen what

11   that is?

12        A      That's a print powder where they printed

13   it.

14        Q      So this photograph is taken after the

15   latent print lab folks had come in and dusted for

16   prints and gone on about their business?

17        A      Yes.

18        Q      You didn't make any attempt to open the

19   safe before they had done what they were suppose to

20   do?

21        A      No, sir.

22        Q      From the time you entered the building and

23   the first time that you got there and observed the

24   scene, the safe was in the key lock mode?

25        A      Yes.

1        Q        And that is the easy access mode?

2        A        Yes.

3        Q        The black smudge stuff is print powder

4    from the latent print?

5        A        Yes.

6        Q        And explain to the ladies and gentlemen of

7    the jury what is depicted in State's Exhibits 111 and

8    112.

9        A        111 is showing the inside of the safe

10   where the door opens and showing this other little

11   door that had a key in it, just how this door locked.

12       Q        That's another kind of a lock security

13   inside the safe itself?

14       A        Yes, uh-huh.

15       Q        And State's Exhibit 112.

16       A        That's showing the same safe and also

17   showing the inside portion of this other locking area.

18       Q        So this is after the safe is finally

19   opened and reveals the contents?

20       A        Yes.

21       Q        Display these to the jury.

22                I assume these photographs speak for

23   itself, the safe is pretty much cleaned out; is that

24   correct?

25       A        Yes, sir.

1                    THE COURT:  Can we stop?

2                    MR. SMYTH:  This is a good place.

3                    THE COURT:  We are going to stop for the

4       day, ladies and gentlemen.  Remember the admonishments

5       I have given you.

6                    We are going to start back promptly at

7       10:00 o'clock so, please, be downstairs at 9:45.  You

8       may be a little off schedule.  I anticipate the bad

9       news, if it's bad news, probably you will be coming

10      coming back Monday, Tuesday.  The good news we will

11      buy your lunch.  Stand in recess until 9:45 in the

12      morning.

13                   (Court adjourned for the day.)

14

15

16

17

18

19

20

21

22

23

24

25