1         APPELLATE COURT NO. *72966*

2           IN THE COURT OF APPEALS

3           OF THE STATE OF TEXAS

4

5    ----------------------------------------------------

6    REINALDO DENNES

7               Appellant,

8    VS.

9    THE STATE OF TEXAS,

10              Appellee.

11    ---------------------------------------------------

12

13    APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14             TEXAS

15      Judge Jim Wallace, Presiding

16    -----------------------------------------------------

17          CAUSE NO. 750,313

18          August 22, 1997

19         Court Reporter's Record

20

21       Volume 29 of *39* Volumes

22

23         Sharon Kay Cook
       Official Court Reporter

24         301 San Jacinto
      Houston, Texas 77002

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Volume 29

Trial

August 22, 1997

Chronological

James Waltman

          Direct Examination Continued by Mr. Smyth        4

          Cross Examination by Mr. Odom                   32

          Redirect Examination by Mr. Smyth             104

          Recross Examination by Mr. Odom               113

Estrella Martinez

          Cross Examination by Mr. Odom                 120

Volume 29

Trial

August 22, 1997

Alphabetical

Estrella Martinez

     Cross Examination by Mr. Odom         120

James Waltman

     Direct Examination Continued by Mr. Smyth    4

     Cross Examination by Mr. Odom         32

     Redirect Examination by Mr. Smyth      104

     Recross Examination by Mr. Odom       113

```
State's Exhibit No. 114        photo

            Marked            Volume 29                    5

            Identified                                     5, 7

            Offered                                        5
            Admitted          Volume 29                    7

State's Exhibit No. 115        photo

            Marked            Volume 29                    5

            Identified                                     5, 8

            Offered                                        5

            Admitted          Volume 29                    7

State's Exhibit No. 116        photo

            Marked            Volume 29                    5

            Identified                                     5, 15

            Offered                                       ᵤ5
            Admitted          Volume 29                    7

State's Exhibit No. 117        photo

            Marked            Volume 29                    5
            Identified                                     5
            Offered                                        5

            Admitted          Volume 29                    7

State's Exhibit No. 118        photo

            Marked            Volume 29                    5

            Identified                                     5
            Offered                                        5

            Admitted          Volume 29                    7

State's Exhibit No. 119        photo

            Marked            Volume 29                    5

            Identified                                     5
            Offered                                        5

            Admitted          Volume 29                    7
```

State's Exhibit No. 120       photo

    Marked                 Volume 29                    20

    Identified                                          24

    Offered                                             24

    Admitted               Volume 29                    24

State's Exhibit No. 121       photo

    Marked                 Volume 29                    20

    Identified                                          24, 25

    Offered                                             24

    Admitted               Volume 29                    24

State's Exhibit No. 121 A     photo

    Marked                 Volume 29                    20

    Identified                                          24

    Offered                                             24

    Admitted               Volume 29                    24

State's Exhibit No. 122       photo

    Marked                 Volume 29                    20

    Identified                                          24

    Offered                                             24

    Admitted               Volume 29                    24

State's Exhibit No. 123       photo

    Marked                 Volume 29                    20

    Identified                                          24

    Offered                                             24

    Admitted               Volume 29                    24

State's Exhibit No. 124       photo

    Marked                 Volume 29                    20

    Identified                                          24

    Offered                                             24

    Admitted               Volume 29                    24

iv

| | | |
|---|---|---|
| State's Exhibit No. 125 | photo | |
|    Marked | Volume 29 | 20 |
|    Identified | | 24, 28 |
|    Offered | | 24 |
|    Admitted | Volume 29 | 24 |
| State's Exhibit No. 126 | tape lift of particles | |
|    Marked | Volume 29 | 20 |
|    Identified | | 20 |
|    Offered | | 21 |
|    Admitted | Volume 29 | 21 |
| State's Exhibit No. 127 | glasses | |
|    Marked | Volume 29 | 20 |
|    Identified | | 22 |
|    Offered | | 22 |
|    Admitted | Volume 29 | 23 |
| State's Exhibit No. 128 | photo | |
|    Marked | Volume 29 | 20 |
|    Identified | | 29, 31 |
|    Offered | | 30 |
|    Admitted | Volume 29 | 30 |
| State's Exhibit No. 129 | photo | |
|    Marked | Volume 29 | 29 |
|    Identified | | 29, 31 |
|    Offered | | 30 |
|    Admitted | Volume 29 | 30 |
| State's Exhibit No. 130 | photo | |
|    Marked | Volume 29 | 30 |
|    Identified | | 35 |
|    Offered | | 35 |
|    Admitted | Volume 29 | 36 |

v

```
1                        CAUSE NO. 750,313

2    STATE OF TEXAS            IN THE 263RD DISTRICT COURT

3    VS.                               OF

4    REINALDO DENNES          HARRIS COUNTY, T E X A S

5    A P P E A R A N C E S:

6    For the State:           Mr. Mark Vinson
                              Bar Card No. 20590450
7                             Mr. Don Smyth
                              Bar Card No. 18777700
8                             Assistant District Attorneys
                              201 Fannin
9                             Houston, Texas 77002
                              713-755-7050
10   For the Defendant:       Mr. Wendell Odom
                              Bar Card No. 15208500
11                            Ms. Lali Guerrero
                              Bar Card No. 0078862
12                            Attorneys at Law
                              1301 McKinney, Suite 3100
13                            Houston, Texas 77010
                              713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 22nd

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for trial before the Honorable

19   Jim Wallace, Judge of the 263rd District Court of

20   Harris County, Texas; and the State appearing in

21   person and the Defendant appearing in person and by

22   counsel, announced ready for trial, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:
```

1                    (Jury came into the courtroom.)

2                    THE COURT:  Please be seated.

3                    Good morning, ladies and gentlemen.  As we

4        did yesterday, we were in the middle of direct, and I

5        think that's where we are going to pick up from.

6                    Mr. Smyth, are you ready to proceed?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    JAMES L. WALTMAN,

2     was called as a witness for the State and, having been

3     duly sworn, testified as follows:

4                    DIRECT EXAMINATION CONTINUED

5     BY MR. SMYTH:

6          Q     Sir, will you, please, state your name and

7     reintroduce yourself to the jury and speak to the last

8     lady on the top row.

9          A     Sergeant James L. Waltman.

10         Q     And you are the same James Waltman that

11    was testifying at the conclusion of our testimony

12    yesterday?

13         A     Yes, sir.

14         Q     I believe we had finished talking about

15    the security system and you had gotten to the point

16    you had gotten inside the office and found the

17    deceased slumped in the chair by his desk; is that

18    correct?

19         A     Yes, sir.

20               MR. SMYTH:  Your Honor, may I approach the

21    witness again?

22               THE COURT:  You certainly may.

23               MR. SMYTH:  May I approach the bench?

24               THE COURT:  Certainly.

25               (Whereupon, State's Exhibit Nos. 114

1     through 119 were marked for identification.)

2          Q     Let me show you what has been marked as

3     State's Exhibit 114, 115, 116, 117, 118, and 119 and

4     ask if you can identify that series of photographs.

5          A     Yes.

6                MR. SMYTH:  May I approach the witness

7     again, Your Honor?

8                THE COURT:  Sure.

9          Q     You do recognize what is contained in

10    those photographs?

11         A     Yes.

12         Q     Do these photographs, State's Exhibit 114

13    through 119, truly and accurately depict the scene and

14    the complainant as you viewed him on the night of the

15    incident?

16         A     Yes, it does.

17         Q     As well as other objects that you viewed

18    on his person?

19         A     Yes.

20               MR. SMYTH:  At this time the State will

21    offer into evidence State's Exhibit 114 through 119

22    and tender the same to counsel for defense for his

23    inspection.

24               MR. ODOM:  May I approach the Bench, Your

25    Honor?

1          THE COURT:  Sure.

2          (Whereupon, the following proceedings were

3     held before the Bench.)

4          MR. ODOM:  Judge, these are the

5     photographs 114 through 119.  I feel that I would

6     object to some of the photographs as not being

7     probative but are being shown to the jury for solely

8     purposes of displaying the aggravated nature of the

9     scene.  I would object that number 114, number 115,

10    both display the same items as the previous

11    photograph, and, as such, have no probative value.  I

12    would say that 118 and number 119 are not probative

13    because they merely reiterate what is in the previous

14    photographs.  As far as 117, I believe it is

15    probative.

16         THE COURT:  What's that?

17         MR. SMYTH:  It's a bullet with a piece of

18    gold chain.

19         MR. ODOM:  I think that's probative but as

20    far as the number of photos showing the same thing

21    over and over again, it's not probative of any weight,

22    solely for the purposes of displaying what, in the old

23    world, the bloody pictures before the jury.

24         THE COURT:  It's denied.

25         (Whereupon, the following proceedings were

1      held before the jury.)

2                    THE COURT:  State's Exhibit 114 through

3      119 are admitted.

4                    MR. SMYTH:  May I proceed?

5                    THE COURT:  Certainly.

6         Q       Let me show you what has been marked as

7      State's Exhibit 114 and ask you if you can describe

8      for the jury what is depicted in that photograph.

9         A       That's a photograph of the complainant,

10     James Szucs, sitting in his chair.  At the time I

11     arrived he was in that position.  That's the northwest

12     office that he is in, showing the outer area of the

13     office and the position of the body at the time I

14     arrived.

15        Q       Can you tell the ladies and gentlemen of

16     the jury what particular object I have got my pen

17     pointed toward?

18        A       That's the eyeglasses.

19        Q       And those are the position of the

20     eyeglasses when you saw him?

21        A       Yes.

22                    MR. SMYTH:  Your Honor, may I display to

23     the jury?

24                    THE COURT:  Yes.

25        Q       With the eyeglasses in that position, is

1    that some of the things that help you come to the

2    conclusion there was not a struggle in this particular

3    case?

4         A    Yes.

5         Q    State's Exhibit 115 could you describe for

6    the ladies and gentlemen of the jury what is depicted

7    in this photograph, particularly what's the orange

8    arrow pointed at.

9         A    Okay.  This photograph as, again, Johnny

10   Szucs was also in the same office in the rear of 770.

11   The arrow is a little particle and stuff like that.

12   The steel wool that I mentioned earlier in my

13   testimony was scattered and, also, the desk over the

14   body and you can't see it that well in the photograph.

15        Q    Would this particular photograph show the

16   steel wool on the desk top as well as the steel wool

17   on his pants and front shirt?

18        A    Yes.

19        Q    The orange arrow is pointing to the steel

20   wool particles?

21        A    Yes.

22        Q    And, again, the glasses hanging in his

23   hand?

24        A    Yes.

25             MR. SMYTH:  Your Honor, may I display

1      this?

2                      THE COURT:   Sure.

3          Q      Is this steel wool and white particles or

4      light colored particles that you see on the

5      photograph?

6          A      Yes.

7          Q      And that arrow points to the area where

8      you see all these particles?

9          A      Yes, that's part of the area.   They were

10     actually scattered all over the desk.

11         Q      The arrow points out some of them?

12         A      Yes.

13         Q      Did you have an opportunity to observe the

14     wounds that, what I guess you say, the gunshot wounds

15     to the deceased?

16         A      Yes, I did.

17         Q      Can you describe for the jury the gunshot

18     wounds that you observed.

19         A      I observed a gunshot wound to the lower

20     right leg below the knee, one that is kind of the

21     lower right side just below the knee, the calf area.

22     There was an exit or a wound which appeared --

23                      MR. SMYTH:   Excuse me, Your Honor.   At

24     this point could I ask that the officer be allowed to

25     step down and point out on my body the wounds that he

1    observed.

2            THE COURT:   Sure.

3      Q      If you would, Sergeant Waltman, step down

4    and let me sit in the chair and you position me the

5    best you can, the way you saw me, Mr. Szucs, Johnny

6    Szucs, and in fact I'll take any --

7      A      There was a gunshot wound here.

8      Q      Keep your voice up.

9      A      There was an entry gunshot wound just

10   below the knee, the calf area.  What appeared to be an

11   exit wound in this area.  This hand here had an entry

12   wound to the inside portion and, also, the exit about

13   this, I think, with this knuckle right in here that it

14   exited out of.  There was another gunshot wound

15   approximately in this area, which kind of was an

16   elongated wound, which appears the bullet, you know,

17   ran across the skin a little ways, ripping the skin,

18   more or less, and going up under the skin and

19   exiting.  The bullet was stuck right in this area

20   here.  It was sticking out there.  You could see the

21   bullet.  And there was a piece of chain still on it

22   where a chain was around his neck and apparently the

23   bullet struck his chain.  He had a gunshot wound to

24   this area here and there was a bullet wound to his

25   head right in here.  These wounds were consistently --

1    this one here appeared it was a closer range from what

2    I had seen in the other bullet wounds.  These, a

3    little bit, the distance was further.

4         Q       Were any of the gunshot wounds you talked

5    about, the knee area being a through and through

6    gunshot wound, the bullet entered and exited and the

7    one on the hand was a through and you found the bullet

8    was visible to your eye up in that area?

9         A       Yes.

10        Q       Was the head shot the through and through

11   wound?

12        A       No, sir.

13        Q       How about the chest shot?

14        A       The chest, through and through and exit

15   lower.

16        Q       Show the ladies and gentlemen where the

17   entry was and exit where you recall.

18        A       Right in this area and the exit in the

19   lower back, right in here, the side angle.

20        Q       Can you position me in the position that

21   you saw Johnny Szucs when you entered the office,

22   including any glasses.

23        A       Well, the glasses were -- well, basically

24   had his feet on the ground and the glasses were

25   laying.

1        Q        Were they opened or were the glasses

2    closed, do you recall?

3        A        Partially open, laying something like

4    that.

5        Q        What about the hand?

6        A        This hand was laying down and he was

7    slumped over like that.

8        Q        If you would, step aside.  So this is

9    basically the position which you saw Johnny Szucs when

10   you entered?

11       A        Yes, sir.

12       Q        Do you have any idea how it was that --

13   what happened to the bullet that went -- you didn't

14   find any loose slugs, correct?

15       A        No, sir, we found, in the search area, no

16   slugs.

17       Q        Do you have any idea what happened to the

18   bullet that passed through the knee and the hand --

19       A        Well --

20       Q        -- and position my body and if you have an

21   idea?

22       A        Looking at him there -- and I looked it

23   over carefully -- I think either --

24                MR. ODOM:  Objection, Judge, if he is

25   speculating; if he knows, that's different but I

1    object to any speculation on his part.

2              THE COURT:  Unless he is otherwise

3    qualified; sustained.

4         Q    (Mr. Symth)   How many years have you been

5    in homicide?

6         A    23, sir.

7         Q    Is it part of your job to try to

8    reconstruct the way that injuries were received by an

9    individual decendent?

10        A    Yes.  I also reconstruct not only the

11   injuries and exits, I also got to find the path of the

12   bullet and I also got to find -- if there was locating

13   a bullet, I have got to find where it went to and try

14   to find out where all the evidence went to, what

15   location it went to, also the path of the bullet.  I

16   have been doing that for 23 years.

17        Q    Was the bullet recovered from the head?

18        A    No, sir.

19        Q    I mean, one went -- I mean you didn't

20   recover?

21        A    No, sir, I did not.

22        Q    You didn't perform the autopsy?

23        A    No, sir.

24        Q    Was the bullets fired in the head, was

25   that recovered in the brain?

1          A      Yes, sir.

2          Q      Was the bullet that went through the chest

3     and exited the back, was that recovered in the

4     deceased's clothing?

5          A      Yes, sir.

6          Q      All right.   There was no other bullets

7     left around except one bullet right here in front of

8     the chest?

9          A      Yes, sir.

10         Q      Let me ask you this.   Go and sit down.   In

11    fact, stand right where you are.   Come and stand right

12    here.

13              Would something like this, with a foot on

14    the desk and hand on his leg and knee propped back

15    like this, would that be consistent and would that

16    account for a gunshot wound to travel through the

17    front of the leg and exit the back of the leg and then

18    goes through the hand and up into the chest area?

19         A      Yes, sir.

20              MR. ODOM:   Object to his opinion in that

21    regard.   If the ballistic or the autopsy person would

22    testify to that, I would have no objection to it but I

23    object to this speculation.

24              THE COURT:   It's overruled.

25         Q      (Mr. Symth)   And your answer was what?

1    Is that consistent, a relaxed position like this with

2    hand and glasses accounting for the shot through the

3    knee and through the hand and one that is show -- one

4    you saw lodged in the chest area?

5         A     Yes, that is consistent.

6         Q     Would that be consistent with three

7    gunshot wounds?

8         A     Yes, sir.

9         Q     One, two, three?

10        A     Yes, sir.

11        Q     Thank you, sir.  Go ahead and resume your

12   seat.

13              MR. SMYTH:  May I approach the witness,

14   Your Honor?

15              THE COURT:  Certainly.

16        Q     Let me show you again State's Exhibit 116

17   and 117 and ask you if you can identify or you have

18   already identified; they are in evidence.  Can you

19   tell the ladies and gentlemen of the jury what is

20   depicted in 116.

21        A     116 is a close up of the complainant with

22   his head tilted and you can see the chain around his

23   neck and also the bullet sticking out of the neck a

24   bit in that picture.

25        Q     And then 117.

1          A       117 is basically the same picture although

2     it shows the shoulder was opened up and close up view

3     of the bullet stuck in his neck.

4          Q       Is the, also, in addition to showing the

5     bullet stuck in his neck, does it also show at least

6     the gold chain better than those bullets?

7          A       Yes, sir.  That's what that indicates,

8     also.

9                  MR. SMYTH:  Your Honor, may I publish

10    State's Exhibit 117 to the jury?

11                 THE COURT:  Sure.

12                 MR. SMYTH:  Thank you, Your Honor.

13         Q       Now, is my pen -- I think the bullet is

14    rather obvious -- is my pen pointing at the gold chain

15    link?

16         A       Yes.

17         Q       In this photograph, in State's Exhibit

18    116, you can see at the top of the shirt collar.  Can

19    you see the gold chain?

20         A       Yes, sir.

21         Q       And the gold chain has been removed in

22    117?

23         A       Yes, sir.

24         Q       And again the gold chain is visible right

25    at the top of the shirt where it is buttoned together

1     for the opening of the neck?

2          A     Yes, sir.

3          Q     And my pen is pointing to the bullet and

4     then the gold chain that is embedded in the nose of

5     the bullet?

6          A     Yes, sir.

7          Q     As a result of looking at this bullet

8     there on the scene, were you able to recognize and

9     determine for yourself what the caliber of that bullet

10    would be?

11         A     Yes, sir.  It appeared to be a .9 mm to

12    me.

13         Q     Based on your experience and training as a

14    police officer, what type of weapon fires a .9 mm?

15         A     Semiautomatic.

16         Q     And what is the difference between a

17    semiautomatic and let's say -- is there a difference

18    between a semiautomatic and a revolver?

19         A     Yes, sir.

20         Q     And what's the difference?

21         A     A revolver has a rotating cylinder, which

22    it holds or the shells are placed in the cylinder and

23    holds the hulls after firing, stay in the pistol until

24    they are removed manually where an automatic, when

25    fired, usually it's loaded with a clip and upon firing

1    the weapon, it slings the hulls out of the pistol.

2         Q    So when a semiautomatic -- have you ever

3    known an .9 mm, have you ever heard of a .9 mm

4    revolver, a weapon that keeps the spent cartridges

5    inside the weapon?

6         A    No, ave notI.

7         Q    A .9 mm -- as a police officer for 29

8    years and with homicide for 23 years -- only comes in

9    a semiautomatic?

10        A    Yes, sir, as far as I know.

11        Q    Based on that knowledge, did you look for

12   spent cartridges?

13        A    Yes, I did.

14        Q    Did you find any?

15        A    No, sir.

16             MR. SMYTH:  May I approach the witness?

17             THE COURT:  Yes.

18        Q    Sergeant, I show you what has been marked

19   as State's Exhibit 31 -- it's cleared -- and ask if

20   you recognize that type of weapon?

21        A    Yes.

22        Q    And what is that?

23        A    That's a semiautomatic, .9 mm, the brand

24   name, it's a .9 mm semiautomatic pistol.

25        Q    Would that weapon be capable of firing .9

1   mm shells?

2        A        Yes.

3        Q        That's the type of weapon we are talking

4   about?

5        A        Yes, sir.

6        Q        And we are not saying that weapon fired

7   those shells, you are not saying that, are you?

8        A        No, sir.

9        Q        When you talked about a magazine that you

10  keep the bullets in, is this a dark object I am

11  holding in my hand, what you are talking about?

12       A        Yes.

13       Q        How does that get full of bullets?  How do

14  I make it work?

15       A        If this is full of bullets, you take and

16  slide the magazine and hit it and lock it in and pull

17  the chamber back and it would be ready to fire.

18       Q        Thank you.

19                By the way, is a weapon like this, State's

20  Exhibit 31, a .9 mm Taurus, is it a deadly weapon?

21       A        Yes, it is.

22                MR. SMYTH:  May I have one minute, Your

23  Honor.

24                THE COURT:  Sure.

25       Q        At your direction, sergeant, did you do

1    what we call tape lifts of either the clothing of

2    Johnny Szucs or the desk of Johnny Szucs to try to

3    recover those particles of steel wool?

4         A     Yes.

5               MR. SMYTH:  May I approach the witness,

6    Your Honor?

7               (Whereupon, State's Exhibit Nos. 120

8    through 129 were marked for identification.)

9         Q     Let me show you what has been marked as

10   State's Exhibit 126  -- I have some other numbers --

11   ask you if you recognize what is number 126?

12        A     Yes, I do.

13        Q     And what is 126?

14        A     That's a tape lift of the steel wool

15   particles found in the office.

16        Q     Were you present when this was recovered?

17        A     Yes, I was.

18        Q     In fact, was it recovered at your

19   direction?

20        A     Yes, it was.

21        Q     And where were the particles that are

22   shown on this tape lift found?

23        A     Those were found on the clothing.

24        Q     The clothing of Johnny Szucs?

25        A     Of Johnny Szucs.

1          MR. SMYTH:  At this time the State will

2    offer into evidence 126 and tender the same to defense

3    counsel for his inspection.

4          MR. ODOM:  No objection.

5          THE COURT:  126 is admitted.

6          MR. SMYTH:  May I display these to the

7    jury?

8          I'll stand off to the side.  I'm not

9    blocking in the dark suit.

10     Q      And this was simply you took a piece of

11   tape and patted on the clothing?

12     A      Yes, sir.

13     Q      And this is what was lifted off when it

14   was patted?

15     A      Yes, sir.

16         THE COURT:  The juror on the back row

17   can't see that well.  Pass it up.

18         MR. SMYTH:  I don't mind handing it to

19   them.  Maybe that will help some.

20         Your Honor, at this time -- this is a good

21   time as any -- with the Court's permission, we would

22   like to substitute until the jury gets into

23   deliberation 79 A, the nine one-hundred-dollar bills

24   and we will take them back, at least for the record at

25   this time, allow this to be the record but when the

1     jury goes into deliberation, we put it in.

2                    THE COURT:  Any objection to that?

3                    MR. ODOM:  No objection.

4                    THE COURT:  79 A is admitted.

5                    MR. SMYTH:  Thank you, Judge.

6        Q      In addition to the tape lift, at your

7     request were any other items recovered?

8        A      There was a little piece, like a little

9     zipper and also a piece of another tab off the

10    eyeglasses.

11       Q      Was the eyeglasses that appear in these

12    photos, were they also recovered?

13       A      Yes.

14                   MR. SMYTH:  May I approach the witness?

15                   THE COURT:  Sure.

16       Q      I show you what has been marked as State's

17    Exhibit 127 and ask you if you recognize these glasses

18    and also a piece of another piece of glasses?

19       A      Yes.

20       Q      These, again, were also recovered at your

21    direction?

22       A      Yes.

23                   MR. SMYTH:  At this time the State offers

24    into evidence State's Exhibit 127 and tenders the same

25    to counsel for defense for his inspection.

1           MR. ODOM:  No objection.

2           THE COURT:  127 is admitted.

3      Q     Was the lens popped out when it was

4  recovered; do you recall?

5      A     I don't think it was.

6      Q     So that's come out in the packaging?

7      A     Yes.

8      Q     And could you point out, for the benefit

9  of the jury, you say there is a piece of an earpiece.

10  Would you tell the jury which earpiece is missing or

11  what portion is off?

12      A     Well, on these glasses here, there is a

13  tip end of the right earpiece and then is the little

14  piece of another piece that we found on the floor.

15      Q     So you got the complete package, just in

16  several parts?

17      A     Yes, sir.

18           MR. SMYTH:  May I approach the witness

19  again, Your Honor.

20           THE COURT:  Sure.

21      Q     I show you a series of photographs marked

22  State's Exhibit 120, 121, 121 A, 122, 123, 124, and

23  125 and ask if you look at those and tell me whether

24  or not you recognize them, yes or no.

25      A     Yes, sir.

1       Q       Do those photographs that you just looked

2    at truly and accurately depict what they purport to

3    depict and the scene as you viewed it that night or as

4    you viewed it the next day after the latent print

5    folks had finished up?

6       A       Yes, sir, it's correct.

7               MR. SMYTH:  Your Honor, at this time the

8    State would offer into evidence State's Exhibits 120,

9    121 A, 121, through 124 and tender same.  Let me read

10   them out:  120, 121, 121 A, 122, 123, 124, and 125.

11              MR. ODOM:  No objection, Your Honor.

12              THE COURT:  Very well.  120, 121, 121 A,

13   122, 123, 124, 125 are admitted.

14              MR. SMYTH:  May I approach the witness

15   again?

16              THE COURT:  Sure.

17       Q      Let me ask you, if you would, sir,

18   describe what 120 is.

19       A       That's a photograph showing the counter or

20   the desk top and then of the whole west wall in the

21   complainant's office.

22       Q      Now, the complainant's office is on the

23   back side or the north side of the building; is that

24   correct?

25       A       Yes.  It would be the northwest portion of

1    suite 770.

2         Q      And his office, if you look at his office,

3    can you see the parking garage below?

4         A      Yes, sir.

5         Q      And also see Fairdale Street below?

6         A      Yes, sir, you can see Fairdale.

7         Q      So from his office, you can't see Richmond

8    Avenue?

9         A      No, sir.

10        Q      If you would, sir, let me show you 121 and

11   ask you to describe to the jury.

12        A      That's also a picture of his office with

13   the complainant removed and it shows the west wall.

14   It shows his desk and the articles around the desk top

15   and below the desk or cabinet, along that back wall,

16   and, also, shows -- there's, of course, you can't see

17   it, I think -- there is three windows there and the

18   blinds as they were at the time when we arrived.

19        Q      And the black powder that you see all

20   over, the black smudges-type substances?

21        A      That is fingerprint powder.

22        Q      The same type of stuff we have seen on the

23   photographs previously admitted?

24        A      Yes, sir.

25        Q      Number 121 A.

1        A       Okay.  That's showing just below his desk

2    -- really it's showing the blood on the floor where

3    the complainant -- apparently the blood dripped down

4    from his body.

5        Q       And 122, is that just a close up of that

6    same blood that you were describing?

7        A       Yes, sir, that's just a close up.

8        Q       So all of these areas of reddish brown

9    dots and splotches, that's blood?

10       A       Yes, sir.

11       Q       123.

12       A       That's also a photograph of his desk,

13   showing the computer where under his desk and on top

14   of his desk -- you can't really see that there is a

15   little, you know, blood splattering in there but I

16   can't tell if it shows it or not.

17       Q       Let me ask you then to look at number

18   124.  Does that help you out?  What is number 124?

19       A       That is the computer box as displayed

20   under his desk.  It does depict blood splattering on

21   it.  Also this photograph depicts the condition that

22   we found the computer in where the discs was ripped

23   out or pried out.  The face of this was also laying on

24   the floor that goes around this computer disc.

25       Q       Did you also see any objects with which

1    someone could have pried open the front of the

2    computer and tried and remove the disc?

3         A      Well, there was a pair of tweezers laying

4    on the floor just below the desk, also, on the floor.

5         Q      Is this what you are referring to,

6    apparent damage to the computer in Johnny Szucs'

7    office where my pen is pointing?

8         A      Yes.

9                MR. SMYTH:  Your Honor, could I publish

10   these two photographs to the jury.

11               THE COURT:  Yes.

12        Q      And the computer is kind of dark but this

13   is where the computer is located?

14        A      Yes, sir.

15        Q      Down below the laptop computer and I guess

16   the computer screen?

17        A      Yes, sir.

18        Q      I am computer illiterate.

19        A      I am, too.

20        Q      The front face of this computer was

21   removed and then it was bent up and there was some

22   tweezers on the floor?

23        A      Yes, sir.

24        Q      And those little red dots on the face of

25   that computer, that's what you believe to be blood?

1      A      Yes, sir.

2      Q      Was there a disc in this computer?

3      A      No, sir.

4      Q      So the disc had been removed?

5      A      Yes, sir.

6      Q      And finally, sir, let me show you State's

7    Exhibit 125 and ask you again to describe for the jury

8    what is depicted in that photograph?

9      A      Well, this is a photograph of one of the

10   cabinets in his office, the complainant's office, of

11   course.  It's showing -- that's a fingerprint powder

12   again -- the black portion but also showing the blood

13   splattering on that cabinet.

14     Q      And the blood splattering, you are talking

15   about these items, large and trail off, going down the

16   front face of this cabinet?

17     A      Yes, sir.

18            MR. SMYTH:  Your Honor, may I display this

19   to the jury.

20            THE COURT:  Yes.

21     Q      Does that mean the area where my pen is

22   there is at least three large ones and several below

23   it?

24     A      Yes, sir.

25            MR. SMYTH:  Your Honor, one more time, may

1      I approach the witness?

2              THE COURT:  Sure.

3      Q      Let me show you what has been marked as

4      State's Exhibit 126 and 127 and ask you if you

5      recognize those two photographs.

6      A      Yes, sir.

7      Q      And do they truly and accurately depict

8      the general area as they purported to depict at the

9      time those photos were taken?

10             MR. SMYTH:  It should be 128 and 129.

11             THE COURT:  Yes.

12     Q      I'll ask the same question regarding

13     State's Exhibit 128 and 129 and ask you if those

14     photographs truly and accurately depict what they

15     purport to depict?

16     A      Yes.

17     Q      Do you recognize what these gold arrows

18     are pointed to, yes or no?

19     A      Yes.

20     Q      And other than the fact that these gold

21     arrows have been pointing to certain objects, those

22     are true and accurate photographs?

23     A      Yes.

24     Q      The only thing added is the gold arrows?

25     A      Yes.

1           MR. SMYTH:  At this time the State would
2    offer into evidence State's Exhibit 128 and 129.
3           State tenders to counsel the same
4    photographs, 128 and 129.
5           MR. ODOM:  No objection.
6           THE COURT:  State's Exhibit 128 and 129
7    are admitted.
8       Q      Sir, can you tell the ladies and gentlemen
9    of the jury first what are State's Exhibit 128 and
10   129.
11      A      That's an overshot.  That's Fairdale
12   Street, which runs north and south there.
13      Q      That's where my finger is pointing to?
14      A      Yes.
15      Q      And the location where the arrows is
16   pointing to over there is the approximate location
17   where the -- the first arrow, what does the first
18   arrow point to approximately?
19      A      That's, I believe, the wooded area where
20   the --
21      Q      Silencer?
22      A      -- silencer was discharged into a board
23   and the ground out there.
24      Q      And the second arrow right next points to
25   what?

1        A        That points to the Meridian Apartments

2    where Reinaldo Dennes lived.

3        Q        And on State's Exhibit 129 what is the

4    arrow in that photograph?

5        A        That's the Greenrich Building, 6222

6    Richmond.

7        Q        Would there be a shot from the west,

8    looking back east?

9        A        Yes, sir.

10       Q        If I take State's Exhibit 128 and 129 and

11   then overlap it so that the tree and that red building

12   line up, would that be a fair and accurate

13   representation panoramic of that view?

14       A        Yes, sir, it would.

15       Q        In that you see, starting from my right to

16   left, the silencer and test fire site of the

17   defendant's, Reinaldo Dennes, apartment?

18       A        Yes.

19       Q        And the Greenrich Building where Johnny

20   Szucs was killed?

21       A        Yes, sir.

22                MR. SMYTH:  May I display this to the

23   jury, Your Honor.

24       Q        So basically this photograph shows the

25   close proximity of all three of those particular

1      locations?

2            A      Yes, sir, it does.

3                   MR. SMYTH:  Your Honor, I'll pass the

4      witness.

5                   THE COURT:  Thank you, Judge.

6                   THE COURT:  Mr. Odom.

7

8                        CROSS EXAMINATION

9      BY MR. ODOM:

10           Q      Sir, Mr. Waltman, and my name is Wendell

11     Odom and we have met before?

12           A      Yes.

13           Q      I would like to ask you some questions

14     regarding this case.

15                  First of all, you are one of the sergeants

16     that was assigned to investigate this homicide, were

17     you not?

18           A      Yes, sir.

19           Q      So your involvement in the case went

20     further than simply evaluating the evidence at the

21     scene, did it not?

22           A      Yes, sir.

23           Q      And you have a partner that assisted you

24     in the case?

25           A      Yes, sir.

1       Q       And that's Sergeant Halling?

2       A       Investigator Halling.

3       Q       Investigator Halling?

4       A       Yes.

5       Q       And she was in charge of, I believe,

6   witnesses.  You were in charge of physical evidence

7   initially, correct?

8       A       Well, I mean, that's what I was in charge

9   of the whole scene, both evidence and witnesses.  She

10  covered the witness section.

11      Q       Okay.  That was going to be my next

12  question.  What that really means, both of you all

13  worked on the case?

14      A       Yes, sir.

15      Q       And while she may focus on the witnesses

16  at certain points, it's really a joint effort when you

17  have a partner and you are working a case, isn't it?

18      A       Yes, sir.

19      Q       What got you involved in this case was

20  your initial call, not to the homicide on the seventh

21  floor but to the shooting in the lobby of the

22  building; is that a fair statement?

23      A       Yes, sir.

24      Q       And so earlier in the evening you arrived

25  with your partner?

1      A      Yes.

2      Q      And there is a shooting that has occurred

3   in the lobby of the Greenrich Building?

4      A      Yes, sir.

5      Q      When you arrived at that shooting, I

6   believe you testified to the fact that the body had

7   already been taken away?

8      A      Yes, sir.

9      Q      So when you arrived at that scene, did you

10  find large amounts of the metal filings at that

11  particular scene similar to the metal filings that you

12  found all over the office up on the seventh floor?

13     A      No, sir, I did not.

14     Q      However, the body was already gone, right?

15     A      Yes, sir.

16     Q      But nevertheless there wasn't this large

17  multiple of filings everywhere?

18     A      No, sir.

19     Q      Now, in regards to the incident there in

20  the lobby, there were a number of events you made to

21  investigate the scene of the building where the

22  shooting occurred there in the lobby?

23     A      Yes, sir.

24     Q      And you went with Mr. Smyth over the

25  reasons for some of those but the truth of the matter

1    is that the shooting was not consistent with a

2    shooting just to obtain video equipment, was it?

3         A     No, sir.

4         Q     So it appeared to you that perhaps

5    something else was going on other than just the theft

6    of video equipment there in that lobby; is that a fair

7    statement?

8         A     Yes, sir.

9         Q     So part of your scene inquiry at that time

10   is try to determine not only if there is other

11   suspects in the building, not only if there is other

12   evidence to be found but to a large extent what's

13   going on here; is that more or less correct?

14        A     Yes.

15        Q     And in order to do that, you started, had

16   took, I believe you called it, a diagram sketch of the

17   building or a rough draft of the building so you could

18   make future references to the layout inside that

19   building?

20        A     No, sir, I did not.

21        Q     You are not the one that made a sketch

22   initially that was used to try to determine the layout

23   of the building?

24        A     No.

25        Q     You did, however, become familiar with the

```
 1      layout of the building?

 2          A      Yes, sir.

 3          Q      And you testified about certain things

 4      that you observed when you are talking to Mr. Smyth in

 5      regards to that?

 6          A      Yes, sir.

 7                 MR. ODOM:  May I approach the exhibit?

 8                 THE COURT:  Yes.

 9          Q      I would like to show you what has been

10      marked as State's Exhibit 25.  Can you see that?

11          A      Yes, sir.

12          Q      Do I need to --

13          A      No, that's fine.

14          Q      State's Exhibit 25, of course, is the

15      diagram of the lobby floor of the Greenrich Building.

16                 You were aware, were you not, from

17      information you have learned at the scene, that

18      someone had left out with regards what we call the

19      loading dock door?

20          A      Yes, sir.

21          Q      So one of the first things -- I don't know

22      if it's one of the first things -- but certainly one

23      of the things you did was to cover this area out

24      towards the loading dock door, correct?

25          A      Yes, sir.
```

1      Q      And there you observed something that you

2  described as peculiar with that back door?

3      A      Yes, sir.

4      Q      The door was jammed opened, right?

5      A      Yes, sir.

6      Q      And the way it was jammed open, with a

7  rubber mat of some sort?

8      A      Yes, sir.

9      Q      I was a little bit confused as to your

10 description of what that was.

11            Are we talking about like a floor mat or

12 are we talking about some sort of rubber siding that

13 was pulled down off the door?  Tell me a little bit

14 more.

15     A      Just a rubber mat, like a door mat you put

16 in front of a door, a rubber mat.

17     Q      A kind of mat you typically wipe your feet

18 off?

19     A      Yes.

20     Q      That mat, was it lying rolled up or was it

21 just laying over the threshold of the door?

22     A      It was laying over the threshold.

23     Q      So what you observed was a rubber mat that

24 was laying over the threshold of the door and as such

25 offered enough resistance to where the door would not

Page 37

1    completely shut?

2         A     Yes, sir.

3         Q     And being an officer of the number of

4    years that you are, you realized that this was

5    peculiar, didn't you?

6         A     Yes, sir.

7         Q     By having the door propped open, it's

8    pretty obvious that someone could come in and out of

9    that door without having to have the door opened for

10   them; is that a fair statement?

11        A     Yes, sir.

12        Q     And, of course, if one person could come

13   in, then a number of people could come in, could they

14   not?

15        A     Yes.

16        Q     One thing I'm a little bit confused on:

17   This door right here, where does this go?  This door

18   goes into the stairwell.  This door goes out towards

19   Westheimer.  What is this area right here?

20        A     That's a loading dock.

21        Q     Is that an open loading dock?

22        A     Yes.

23        Q     Does it have a gate, one of the chain

24   gates that you see that denies access from this area

25   out into the street?

1       A       No, sir.

2       Q       So this door is yet another exit door?

3       A       That door was locked.

4       Q       That door was dead bolt locked?

5       A       Yes.

6       Q       Or was it shut locked?

7       A       No, it was like a dead bolt.

8       Q       So the access that someone had to the

9    street was to this loading dock door that had the

10   rubber mat?

11      A       Yes.

12      Q       Now, when you investigated this area, you

13   also noticed that one could get into the stairwell

14   system from that area, correct?

15      A       Yes.

16      Q       And did you go up the stairwell system and

17   check all the doors on the different floors?

18      A       I didn't go all the way up; no, sir.

19      Q       Did you go to the next floor to determine

20   if that door was open on the stairwell?

21      A       Yes.

22      Q       And you could get from the stairwell into

23   the building from that door?

24      A       Yes, sir.

25      Q       And you could then return from the hallway

1    back into the stairwell.  In other words, the door was

2    not locked in any way that would keep you either

3    access either from the stairway into the building or

4    the building back into the stairway?

5         A     Yes, sir, you could get in and out of the

6    door.

7         Q     There was no locking mechanism at all that

8    was engaged on those doors; is that correct?

9         A     No, I believe there was a locking -- that

10   was engaged, no.  They were unlocked, in other words.

11        Q     Right.  That's a better way of putting it.

12              Now, when you were investigating the scene

13   of the shooting on the robbery -- not the robbery --

14   yeah, the robbery, the taking of the videotape --

15        A     Yes, sir.

16        Q     -- did you talk to the building manager

17   when you were there?

18        A     Yes, I did.

19        Q     Did you ask the building manager to try to

20   determine the status of her tenants or his or her

21   tenants?

22        A     Yes, we did.

23        Q     And as far as you knew, she was starting

24   the process of doing that; is that a fair statement?

25        A     Well, her along with the officers searched

1     the building.

2          Q     Okay.  And by that, did they attempt to go

3     into all the different suites?

4          A     No, they checked the doors.  They were all

5     locked or, you know, I can't say but they didn't find

6     anything and we sent a dog through there.

7          Q     Talk to me about that.  What type of dog

8     did you send through there?

9          A     Just looked like a German shepherd.

10         Q     I don't mean what brand.  What was he

11    trained to do?  What was the dog trained to do?

12         A     He was trained to see if anybody else was

13    in the building, you know.  They just send him up the

14    stairs and he went up the stairwell and I think down

15    each hallway, you know, trying to locate -- just like

16    sent him in to see if there was a burglary in the

17    building and that's basically if he could find any

18    other persons in the building as far as in any open

19    areas.

20         Q     The dog is trained to sniff out anybody

21    that might be hiding back behind, like you talked

22    about, the boiler?

23         A     Yes, sir, like a live body.

24         Q     So you sent the dog through the various

25    areas that you looked at, like that on the first

1      floor, and then through the different floors of the

2      building?

3           A      Yes, sir.

4           Q      Now, I believe you stated you were there

5      approximately two hours; is that correct?

6           A      Yeah.  I can't sit here and tell you

7      exactly the time I left but I was there a good two

8      hours with probably maybe a few minutes later -- two

9      hours, ten minutes.

10          Q      You told Mr. Smyth two hours but we are

11     not talking about exact but you were there a couple of

12     hours?

13          A      Yes, sir.

14          Q      Now, during that time period, there were

15     two suspects that were brought in, right?

16          A      Yes, sir.

17          Q      You had the suspects photographed?

18          A      Yes, sir.

19          Q      Took their name?

20          A      Yes, sir.

21          Q      You interviewed those suspects?

22          A      Yes, sir.

23          Q      And then you released them, right?

24          A      After an atomic absorption test was done

25     on the hands.

1        Q       And you did the atomic absorption test, of

2    course, the results of that wouldn't come in until

3    much later?

4        A       Yes.

5        Q       You felt secure you knew how to get back

6    in touch with them?

7        A       Yes, sir.

8        Q       The reason you needed to know how to get

9    back in touch with them, oftentimes more than one

10   person will commit a crime, right?

11       A       Yes, sir.

12       Q       And just because the atomic absorption had

13   come back negative, that doesn't mean they were or

14   were not involved in some criminal activity in the

15   building, correct?

16       A       Correct.

17       Q       The reason that those people were released

18   primarily was because you had no reason to continue to

19   hold them; is that a fair statement?

20       A       Yes, sir.

21       Q       Now, did you talk to the witnesses that --

22   you did talk to at least two witnesses that observed

23   the shooting that evening, is that correct, or at

24   least two witnesses who saw that shooter involved in

25   the lobby incident?

1          A      Yes, sir.

2          Q      And one was a cleaning lady by the name of

3     Estrella Martinez?

4          A      Yes, sir.

5          Q      And the other one was the person that

6     worked in the deli?

7          A      Keith Vacek.

8          Q      So the person that was related to the

9     manager was the other person that you talked to?

10         A      Yes.

11         Q      Now, without saying what it was that was

12    told you in regards to your identification of the

13    person, when the two suspects came in, both of those

14    persons viewed the two suspects, correct?

15         A      No, sir.

16         Q      You didn't have them -- perhaps I am

17    confusing you.  When you brought in the two suspects,

18    the two people that were brought in by other

19    officers --

20         A      Yes, sir.

21         Q      -- did the two witnesses have a chance to

22    view those suspects?

23         A      Yes, sir, when they were brought back for

24    me, yes, sir.

25         Q      And neither one of those witnesses could

1    identify those subjects, neither one of those persons,

2    as being someone that they had seen earlier in the

3    evening, correct?

4         A     Correct.

5         Q     Now, one of those two witnesses indicated

6    to you, did they not, that they didn't get a good view

7    of the person anyway; is that a fair statement?

8         A     Yes, sir.

9         Q     That Mr. Vacek, or however it is

10   pronounced, didn't he indicate to you that he never

11   really got a look at the person's face?

12        A     Yes, sir.

13        Q     So the primary identification that you

14   would have to rely upon of the shooting in the lobby,

15   would that have to be that from Ms. Martinez?

16        A     Yes, sir.

17        Q     I take it that you and Officer Halling go

18   back to your office and start working on your reports,

19   right?

20        A     After the first scene?

21        Q     Yes, sir.

22        A     Yes, sir.

23        Q     And incidentally have you had an

24   opportunity to review your report prior to testifying

25   here yesterday as well as this morning?

1        A       Yes, sir.

2        Q       And, of course, with all the detail that

3    occurred, you have to rely on a lot of things that you

4    put into your report in order to refresh your memory

5    to be able to testify?

6        A       Yes, sir.

7                MR. ODOM:  Your Honor, I would ask to see

8    a copy.

9                MR. SMYTH:  Could you tell us what

10   supplements you reviewed.

11               THE WITNESS:  I don't know the exact

12   number of all of them.  I have to look.

13               MR. SMYTH:  I guess we start with the

14   supplement number one.

15               Let the record reflect the State is going

16   to retender to counsel for defense a document he has

17   already seen, supplement number one, and any other

18   supplements made by this officer.

19               THE COURT:  The record will so reflect.

20               THE WITNESS:  Supplement number one was

21   made by Officer Halling.  I made supplement number

22   two.

23               MR. SMYTH:  Is that the one you reviewed?

24               Supplement number two, also, Judge.

25               THE WITNESS:  Supplement number seven.

```
1                    MR. ODOM:  May I approach the witness,
2       Your Honor.
3                    THE COURT:  You may.
4            Q       Can you see if you can find it for me.
5       Here is supplement number one.  Is this all of this
6       supplement number one?
7            A       Yes, sir.  It was quite extensive.  This
8       is supplement number one and that's supplement number
9       two, starting right there.
10           Q       So you reviewed supplement number two,
11      correct?
12           A       Yes.
13           Q       And additional supplements as well?
14           A       Yes.
15           Q       What are those, please.
16           A       Number seven.  I am going to have to look
17      through it, sir, because I don't recall exactly what
18      supplements I made.
19                   MR. SMYTH:  Could I mark the appropriate
20      supplements?
21                   MR. ODOM:  I appreciate it.  It's like
22      Greek to me.
23           A       Supplement number 18, supplement number
24      25, supplement number 26.  May I ask a question,
25      please.
```

1      Q      Yes, please.

2      A      Do you want to know all the supplements we

3  made or some of them I didn't really review because of

4  the fact -- no meaning.

5      Q      I am only entitled to the ones you

6  reviewed prior to your testimony that refresh your

7  memory for what you were going to testify to yesterday

8  and today.

9      A      Okay.  Some of the ones I told you --

10  well, as far as I don't know exact when you say

11  reviewed, I didn't read over them and I glanced down

12  to see what they were and it really doesn't have a lot

13  to do with what we are going to be testifying to, I

14  guess you might say.  So I didn't study or read over.

15  I knew what it was, more or less, about.

16      Q      Well, you looked over it before so you

17  were familiar with certain areas?

18      A      I hadn't looked at them.  These particular

19  items are back during the investigation when we made

20  the report.

21      Q      Right.  What I am asking, whether either

22  you glanced at them or read them thoroughly between

23  that time and the time of testifying, if you looked at

24  them, in order to assist you to refresh your memory.

25      A      Not in testimony, no, sir.

1      Q      In regards to --

2      A      You know, to reflect back to them and see

3   if somebody -- or for addresses or names or somebody

4   if I couldn't remember exactly who said what or

5   something or another, that we interviewed so many

6   people I would go back to see, you know.  I don't

7   know.  I am just informing you now, as far as the

8   testimony before this Court this day, I did not read

9   some of these supplements that I did make just prior

10  being on the stand.

11     Q      Right.  But you had written them at some

12  point in order to assist you either for your testimony

13  or for the investigation?

14     A      Yes, sir.  Supplement number 30, 38, 43,

15  46.

16            THE COURT:  How many total supplements are

17  we talking about?

18            MR. SMYTH:  There is 85, Your Honor.

19            THE COURT:  This is taking up an

20  inordinate amount of time.  So I am not sitting here

21  and the jury is not sitting here, you all could have

22  gotten this together before trial and anticipating

23  that Mr. Odom is entitled to see what the officer has

24  testified to.  Why that is not done, I don't think it

25  is fair to anybody in here.

1          What I am going to order now, if you want

2     to continue to cross something involved, that's very

3     well and good; otherwise, what I would like to happen

4     is allow the sergeant to be excused until such time as

5     you have had a chance to get with him and find out,

6     you had a chance to reconvene and take more time and

7     get on with Ms. Martinez, if that is acceptable.

8          MR. ODOM:  What I was going to suggest, I

9     can continue on with my cross examination and look at

10    the supplements over lunch.

11         THE COURT:  Continue to tell you which

12    supplements is in.  We don't know that.  Perhaps we

13    can have an arrangement where we can determine that.

14         MR. SMYTH:  I would like the record to

15    reflect that counsel has had access to this entire

16    file prior to trial.

17         THE COURT:  But that doesn't necessarily

18    mean you know who wrote what report.

19         MR. ODOM:  I am entitled to write that and

20    entitled to make loose notes and I can't possibly

21    remember everything in that file.

22         THE COURT:  That's very good.

23         So if you have no objection, Mr. Odom,

24    I'll allow this witness to stand down until after

25    lunch and get on with Ms. Martinez.

1          MR. ODOM:  I think I can continue on with

2    him.  We have got 30 more minutes and get with him

3    after lunch and find out what other reports --

4          THE COURT:  Continue.

5      Q     (Mr. Odom)  If I understand our

6    procedure, I am going to ask you some questions I have

7    about your testimony and then I may review the

8    supplements and may ask you other questions as it

9    might relate to something in your supplement.

10     A     Yes.

11     Q     Now, after you were there for a couple of

12   hours, you go back and start doing your reports along

13   with Sergeant Halling, Officer Halling, and you

14   receive another phone call?

15     A     Yes.

16     Q     Do you recall who the call was from, the

17   second call?

18     A     I didn't take the call personally so I

19   really don't know.  I don't remember who it came from.

20     Q     Someone says you got to go back out there?

21     A     Yes, sir.

22     Q     And about how much later, about what time

23   roughly is it now that you are going back the second

24   time to the Greenrich Building?

25     A     At that time when they told us, hey, they

1    found another body out there at the Greenrich

2    Building, it was somewhere proximity of, say, 11:45

3    and 12:00 o'clock.

4        Q    And by the way, when does your shift end?

5        A    My shift ends at 12:00.

6        Q    So it's going to be a long night for you?

7        A    Yes.

8        Q    So you and Officer Halling go back out

9    there.  And when you get to the scene, what is the

10   status of the scene when you get to it?

11            If I may approach the exhibits, I'll put

12   the diagram up of suite 770 -- well, actually -- yes,

13   which I believe we have marked as Defendant's Exhibit

14   or State's Exhibit 81.  Can you see that?

15       A    Yes, I could.

16       Q    When you arrived at the scene, what is the

17   status?  Where are they?  And describe for the jury

18   the situation of everything when you get there.

19       A    When I arrived, the officers and the

20   manager was standing right outside this first door.

21   And I spoke with him, and they informed me what they

22   had at this time and what they found.  And then we

23   went on inside and they noticed the door leading in to

24   -- the main door there, the one with the door knob

25   leading into the office of the complainant's and the

1    door leading into that, I guess, you call it -- a

2    sitting area was locked and it was still locked.  The

3    tiles, the roof tiles, having been pushed aside right

4    over there, close to where the door is leading into

5    the office, where they had peered over into the office

6    and saw the complainant.

7        Q    Did you peer over the roof tiles yourself?

8        A    No, I did not.

9        Q    Were you the one that authorized them to

10   go ahead and go in and open the door?

11       A    Yes.  I have them go in the other kitchen

12   area.

13       Q    Yes, sir.

14       A    That little kitchen area I asked them, "do

15   you think we can go up and drop down and open up this

16   door?" because they had already looked there and they

17   could see through that other doorway.  It was a

18   sliding door and it was all the way back and they

19   could view and they couldn't see nobody.  That's when

20   they pushed the tile up and looked over into the

21   office.  Of course, they had to remove some more tiles

22   but they went over the kitchen, unlocked that sitting

23   room door and that's where we entered at.

24       Q    When the officer goes over into the

25   sitting room and opens that door from the inside, how

1    does he preserve the prints on the doorknob on that

2    particular door?

3         A      I don't know whether he preserved the

4    prints or not.

5         Q      So at that time, to your knowledge, there

6    is no attempt to preserve the prints on the inside of

7    the door in the sitting room?

8         A      I couldn't sit here and tell you if there

9    wasn't or wasn't.  If he picked up something, undone

10   the doorknob or grab something, I don't remember.  I

11   don't recall.

12        Q      Once that door is open, then everyone, I

13   take it, that is, yourself, Officer Halling and

14   eventually the crime lab people and those that are

15   assisting you in the investigation, you all enter the

16   office through the sitting room area; is that a fair

17   statement?

18        A      Yes, sir.

19        Q      Also, you indicated that before anything

20   was disturbed that you recognized that you needed to

21   bring the latent lab people out, right?

22        A      Yes, sir.

23        Q      And the purpose for that is because you

24   recognized at that point that without any suspects

25   there, with an obvious homicide there, that it's

1    important to preserve the integrity of any prints

2    and/or scientific evidence that one might discover at

3    the scene, right?

4          A    Yes, sir.

5          Q    Did you actually go in and start doing

6    your analysis before latent print gets there or do

7    they get there and go in about the same time you do?

8          A    No.  The latent prints didn't get there

9    when I did.  What I did, after entering and seeing the

10   body and the location of the body, I followed the

11   officers.  I placed the officers up there and told

12   them nobody else comes in here, called latent prints.

13   I did have the CSU, though, come in and photograph the

14   office area, the complainant prior to the prints

15   coming in, and I also had it photographed after the

16   body was removed and the print lab.

17         Q    But, of course, when they are

18   photographing, they are not touching anything or

19   disturbing anything?

20         A    No, sir.  As a matter of fact, Officer

21   Barrow (ph) was the first officer on the scene, was my

22   CSU on that scene, the particular scene at that time

23   of the morning, and I said, look, I don't want nothing

24   touched.  I mean, that's what I was telling everybody,

25   "I don't want nothing touched."

```
 1        Q       Now, obviously the videotape, which I have

 2   never seen, is going to reflect the same thing that

 3   the still photos reflect?

 4        A       No, sir.

 5        Q       There's no difference what they

 6   photographed with the video than what they

 7   photographed with the camera?

 8        A       No, sir.

 9        Q       With both doors being locked from the

10   inside and a body in that back office, it's apparent

11   to you, isn't it, that whoever committed the homicide

12   locked the doors on the way out?

13        A       Yes, sir.

14        Q       So it's important at that point in your

15   mind to preserve the integrity on the inside of this

16   door that goes directly to the office, correct?

17        A       Correct.

18        Q       And, I take it, that no one opens that

19   door until the latent print people get there?

20        A       The office door?

21        Q       The main office door.

22        A       No, sir.

23        Q       No, sir, what?

24        A       It wasn't opened.

25        Q       That's what you were saying but I asked
```

1    that in a funny way.

2              So this door remains shut.  And when the

3    latent print people get here, what all do they dust in

4    here, everything?

5         A      Everything, yes, sir.

6         Q      So they dust the couches, the TVs, all

7    these back cabinets, the desk, obviously, the safe and

8    the debris that is strewn from the desk over towards

9    the waiting area, correct?

10        A      Now, some of that they didn't print right

11   there, if that makes a difference.  Some of the stuff

12   they picked up and took down to the lab, you know,

13   like paper articles because they do what they call

14   iodine prints.

15        Q      Okay.  What about like the one photograph,

16   the antique Bible, for example, would that have been

17   printed there or taken down to the lab?

18        A      If it was printed, it would be taken to

19   the lab.

20        Q      What about the items like the computer

21   disc, receiver, that appeared to be pried open?

22        A      He printed all the desks, the computer

23   stuff.  He printed all that with powder.

24        Q      Okay.  And before you made the phone calls

25   in order to determine how to get into the safe,

1    obviously all the handles of the safe and the outside

2    of the safe as well as the trays and the inside of the

3    safe were photographed, I mean, were printed --

4        A       Yes, sir.

5        Q       -- dusted actually.

6                I believe you also testified to the fact

7    in this particular office there was a set of cameras,

8    security cameras, were not only out in the hall but

9    there was another independent set of cameras that were

10   in suite 707?

11       A       770, yes.

12       Q       And if I understand your testimony

13   correctly and from what I recall, this suite you have

14   a foyer here that has a TV camera that allows access

15   into the main area or is the TV cameras somewhere

16   inside in the office?

17       A       You have, yeah, cameras, the cameras for

18   in that foyer way and there was one, more or less,

19   kind of inside that door.

20       Q       Now, we are talking about the little

21   entrance foyer here?

22       A       Yes.

23       Q       And the TV camera it shows down on someone

24   coming into this area, right?

25       A       Yeah.

1       Q       What I don't recall, is there another TV

2    camera in the main lobby area of the office?

3       A       Yes, sir, just see that second door?

4       Q       Yes, sir.

5       A       Just as you go inside that door, up on

6    that wall, there was one up the ceiling -- I'm sorry.

7    See that little wall, the door that opens right there.

8       Q       Yes, sir.  Right here?

9       A       Well, see that wall to your right of your

10   door.

11      Q       This one?

12      A       The TV camera was above that partial

13   desk-type thing.

14      Q       So when someone opens this door, it opens

15   in, they have got to walk in and there is a TV camera

16   up here?

17      A       Yes, sir.

18      Q       And it would be able to show their face

19   and someone walking in from this direction?

20      A       Yes.

21      Q       Now, I believe you testified to the fact

22   that from this desk there was a mechanism that allowed

23   entry from the foyer into the main office; is that

24   correct?

25      A       Yes.

1       Q       That's where that switch is?

2       A       Yes, sir.

3       Q       There is not, if I understand your

4    testimony correctly, a switch that allows access from

5    this hallway into the main office; is that correct?

6       A       Correct.

7       Q       So that the automatic locking switch is to

8    allow someone -- someone can come into this foyer,

9    someone from this back office and look in a TV screen,

10   see who they are, pass them through this door while

11   they are still sitting in the office?

12      A       Yes, sir.

13      Q       Then, if they want to get into the back

14   office, that person would have to come and open the

15   door if it is locked?

16      A       Yes, it was shut.  They would have to open

17   it.

18      Q       The TV cameras are both in this front area

19   right here?

20      A       Yes, sir.

21      Q       Now, you also testified to the fact --

22              MR. ODOM:  If I may, Judge?

23              THE COURT:  Sure.

24      Q       There's two TV cameras, I believe you

25   testified to, are totally independent of any security

1    system the building has, right?

2         A    Yes, sir.

3         Q    So they are not tied -- no one from the

4    security desk can view what is going on inside this

5    office?

6         A    No.

7         Q    However, looking at State's Exhibit 107,

8    there is a diagram that either you or somebody did,

9    that reflects the floor plan here on the seventh

10   floor, right?

11        A    Yes, sir.

12        Q    And we've got two cameras that cover this

13   hallway on the seventh floor, right?

14        A    Yes, sir.

15        Q    I believe you testified that this is the

16   suite in question?

17        A    No, sir.

18        Q    No?

19        A    The next one over to your left.

20        Q    This one?

21        A    Yes, sir.

22        Q    This stairwell that is on the west side of

23   the building is the one that has access to the loading

24   dock, right?

25        A    Yes, sir.

1       Q       Someone coming up through here is going to

2    be seen from the camera in this direction, right?

3       A       Yes, sir.

4       Q       And if they travel past this camera area,

5    at least the back side is going to be here?

6       A       Yes, sir.

7       Q       And it would be briefly seen by coming

8    through this door by this camera?

9       A       Yes, sir.

10      Q       Now, you viewed the camera system down in

11   the lobby, did you not?

12      A       Yes, sir.

13      Q       As far as what the security had or what it

14   didn't have?

15      A       Yes, sir.

16      Q       Is this a system wherein the security

17   guard can observe what is going on in these various

18   floors from his desk?

19      A       Yes.

20      Q       He has a video monitor that allows him to

21   see what's going on in these various floors?

22      A       Yes, we have two monitors.

23      Q       Now, there is also some testimony about

24   various cameras that the video were set up in the

25   first floor of the building, in the garage area and

1    other floors.  Do you recall your testimony in that

2    regards?

3         A    Yes.

4         Q    And if we look at State's Exhibit 25,

5    you've got the entranceway to the garage from back

6    behind this deli area; is that correct?

7         A    Yes.

8         Q    And, then, on this next floor you have

9    another entranceway up above it that goes from the

10   garage into that entrance area?

11        A    Yes, sir.

12        Q    And likewise is it your testimony that the

13   security guard can observe anybody coming in and out

14   of the building from those camera sites?

15        A    Yes, sir.

16        Q    Now, how does the guard do that?

17        A    I'm sorry.

18        Q    How does the guard do that?  He has got

19   seven or eight floors -- I don't remember which -- he

20   has got two cameras at least on the seventh floor, so

21   I assume he has got a number of cameras all the way

22   down.  He has got several entranceways to cover from

23   his desk.  As far as coming in and out of the

24   building, how does he monitor all of that?

25        A    Well, these cameras can be switched from

1    floor to floor.  You can't monitor all the floors at

2    one time.

3         Q      So, do you know, was the system on when

4    you went there?

5         A      The monitors were on.

6         Q      Could you see if there was like an

7    automatic switching or does someone do it

8    individually?

9         A      I don't really recall exactly how.  I

10   remember it was switched from floor to floor but where

11   -- I think you had to do it manually but I'm not

12   going to say I personally remember that it was manual.

13   It seemed like it was manual.

14        Q      All right.  But the officer there at the

15   security desk can sit there and he can check all the

16   floors and he can check all the entranceways?

17        A      Yes, on that last question, sir.

18        Q      Well, all the entranceways where you got

19   cameras?

20        A      Yes.

21        Q      We have gone into the loading dock and

22   obviously there is not a camera and he can't check

23   there?

24        A      Yes, sir.

25        Q      Talk to me about the motion detectors that

1    are inside the office on the seventh floor of the

2    complainant.  Are those always on, and do they always

3    beep if someone breaks, are those the type of motion

4    you put your alarm system on at night before you left

5    the building?

6         A     No.  You set them when you get ready to

7    leave and cut them off during the day.

8         Q     That's the alarm system if anyone breaks

9    it and sets off the alarm?

10        A     Yes, sir.

11        Q     The safe system that the complainant had

12   in his office, I believe you testified that the safe

13   was closed but what it required was the key and

14   pulling the handle down at the same time you turned

15   the key, correct?

16        A     I believe that's what it was, yes.

17        Q     The key was inside the lock at the time?

18        A     Yes, it was still in the safe, the lock --

19   locked safe, yes.

20        Q     When you opened the safe, was there

21   anything inside?

22        A     There was still some loose jewelry,

23   papers, all that, not a whole lot of anything,

24   especially diamonds.  There were no diamonds in there.

25        Q     Were there empty cases in the safe?

1       A       Yes, sir, there was.

2       Q       Let me understand.  You had some loose

3  jewelry that was in the safe.  You had some papers

4  that were in the safe and then you had empty either

5  boxes or display cases of some sort?

6       A       Yes, sir.

7       Q       Were there any firearms that were found

8  either in the safe or in the office?

9       A       Yes, there was a .38 caliber pistol found

10  in the desk of the complainant in a locked drawer.

11       Q       Was that not in the credenza desk but in

12  the actual desk itself in front of the complainant?

13       A       Yes.

14       Q       And, officer, you testified about the

15  appearance that you observed as to various gunshot

16  wounds on the complainant?

17       A       Yes.

18       Q       And Mr. Smyth sat in the chair and

19  positioned himself.  Now, the positions that Mr. Smyth

20  took were similar -- that was the same position as the

21  photographs that you identified and we offered into

22  evidence, correct?

23       A       Close.

24       Q       But, in other words, those photographs

25  that we saw are the actual photographs of the way the

1      body was when you first went into the office?

2           A      Yes.

3           Q      You take the photographs before you move

4      anything, don't you?

5           A      Yes, sir.

6           Q      Now, is it your testimony that there were

7      only three gunshot wounds?

8           A      As far as I can -- yes, there were three

9      gunshots wounds that I could tell to the body.

10          Q      And of the three gunshot wounds, you

11     recovered one bullet in the clothing of the

12     complainant?

13          A      Right, back behind him.

14          Q      Tell me where you got the three bullets or

15     what bullets you recovered, tell me where they were

16     found.

17          A      Okay.  There was one bullet -- well,

18     recovered from the head.

19          Q      But you didn't recover that one, right?

20          A      No, I didn't recover it.  I didn't recover

21     none of the bullets in the complainant's office.  And

22     there was one to the head, one from the neck.  There

23     was a fragment, like the jacketing, the copper

24     jacketing on the outside bullet recovered somewhere in

25     his stomach area and abdomen and, then, there was a

1      bullet without a jacket that appeared and exited his

2      back but it was still in his clothing.  It was

3      recovered from his clothing.

4           Q      But you are relying upon either an autopsy

5      report of other persons who actually recovered those

6      either bullets, spent bullets or pieces of spent

7      bullets, when you are telling the jury that, right?

8           A      Yes, sir.

9           Q      At the time you cannot tell, can you, how

10     many times the complainant has been shot when you are

11     first standing there and looking at him?

12          A      Well, at this particular one I couldn't

13     tell exactly.  Now, you can -- I don't want to get in

14     conflict with my own testimony but you can sometimes

15     tell because you can see the whole body.

16          Q      Right.  But when you came in there, you

17     couldn't tell -- in other words, you tell the jury,

18     well, it is consistent with this happening and this

19     happening as far as this line of bullets going on.  At

20     the time you could not determine how many times the

21     person had been shot nor could you tell at that time

22     the angle of all the shots, could you?

23          A      Well, couldn't exactly without

24     unclothing.  I couldn't tell all the shots but you do

25     view the body in its natural position and I viewed the

1    body when it laid on the stretcher and I viewed most

2    of the wounds at that time but without taking his

3    clothing off --

4         Q       Right.  And the person who does that is

5    our medical examiner?

6         A       Yes.

7         Q       And the medical examiner is the one who

8    will tell us from what angle the bullets entered,

9    where they were retrieved and the nature of, although

10   you can make some superficial analysis, they are the

11   ones that are going to tell us the angle of these

12   wounds; isn't that right?

13        A       Yes.

14        Q       And that's when you are testifying this is

15   consistent with this and this.  Basically what you are

16   telling the jury, what you have learned from the

17   medical examiner doing exactly what you are talking

18   about, taking the body and determining the various

19   entry angles of wounds and things of that nature?

20        A       What I testified to awhile ago was what I

21   determined, what I seen that night at the scene.

22        Q       But not to argue but you didn't know how

23   many times he had been shot?

24        A       I think I only placed the one in the back.

25   I don't know exactly if I had an exit wound.

1      Q      You could determine that there were three

2   shots that night?

3      A      Well, actually you said how many times was

4   he shot awhile ago.

5      Q      Yes, sir.

6      A      I said three.

7      Q      Yes, sir.

8      A      But as far as gunshot wounds, there were

9   more than three.  And just from my observation of the

10  body, it appeared to me -- like I say, being at the

11  scene and looking at it -- it appeared to me he had

12  been shot three times.  That was my observation at

13  that time.

14     Q      So your initial observation was he had

15  been shot three times that was verified at a later

16  time when the medical examiner was able to determine?

17     A      Yes, sir.

18     Q      There was a great deal of steel wool at

19  this particular murder scene, right?

20     A      Yes, sir.

21     Q      And it wasn't just on the clothing of the

22  person, was it?

23     A      No, sir.

24     Q      There were no cartridge casings found at

25  the scene of this particular crime, was there?

1          A       No, sir.

2          Q       That's consistent, as Mr. Smyth pointed

3     out, of someone having retrieved the cartridge casings

4     because of the caliber of the bullet?

5          A       Yes, sir.

6          Q       Now, the head wound, you said it appeared

7     to be closer.  Is that based upon your observation or

8     upon a later report from the medical examiner?

9          A       I can't catch --

10         Q       The head wound being a closer wound?

11         A       Yes.

12         Q       Was that from the report that you received

13    from the autopsy report or could you visualize that

14    upon your cursory examination of the body when you

15    came in?

16         A       Just looking at the wound at the scene, it

17    appeared to me and what I seen and what I know about

18    wounds, it appeared to be a closer wound.

19         Q       All right.  Did it have stippling or marks

20    around it from a contact wound or did it just appear

21    to be a closer distant wound?  Tell the jury what we

22    mean when we talk about a contact wound.

23         A       A contact wound is real close, in other

24    words, put up to your head or the body, or whatever,

25    and pull the trigger, fire into the body.  Then you

1    got -- you'll have burning, charring, stippling coming

2    from that wound.  And, according to the distance of

3    it, you'll have what is blow back of the skin, blown

4    out areas, splitting of the tissue.

5         Q      It did not appear to be a contact wound,

6    did it?

7         A      Not a close contact wound.

8         Q      But it did, in your opinion, appear to be

9    a closer wound than the other wounds you observed?

10        A      Yes, sir.

11        Q      There was not any -- visibly that you

12   could tell there was not any of the stippling or black

13   powder wound or the blow back signs that would

14   indicate a right-on contact wound or a very close

15   contact wound, correct?

16        A      It appeared it was fairly close but as far

17   as a contact wound, it really didn't appear to me,

18   although I will leave that up to the medical

19   examiner's office because of the amount of blood dried

20   around that wound.

21        Q      The computer disc, is it correct that your

22   opinion that there appeared to be some sort of

23   jimmying and breaking open of the computer disc or the

24   computer receptacle that holds the disc?

25        A      Yes, sir.  I guess you call it the hard

1    drive maybe.  But anyway it appeared, in where the

2    computer disc goes in, it was bent, like a framework

3    that went around it was on the floor and, of course,

4    no disc in but it appeared to me somebody had tampered

5    with it.

6         Q    Is this the type of disc that ordinarily

7    you slide in and you take out of a computer

8    receptacle?

9         A    I think it was but basically I don't know

10   a lot about computers.  I don't know.  It appeared

11   kind of like you put a disc in and how you get it out,

12   I don't know.

13        Q    Do you have any knowledge that leads you

14   to believe that a person could not have taken the disc

15   out of that receptacle without just punching the

16   button and letting it come out?

17        A    I don't have no knowledge how you get it

18   out.

19        Q    So, do you have any knowledge that the

20   appearance of the computer disc has anything to do

21   with the homicide and robbery that occurred in that

22   office?

23        A    It appeared it had something to do with it

24   because it looked fresh.

25        Q    What I am saying, is there anything that

1   led you to believe at a later date that the two might

2   be connected?

3        A       It didn't lead me to really know more

4   conclusion at a later date than I concluded at the

5   scene that night.

6        Q       This is what I am asking, sergeant.  A

7   computer disc is not like a diamond.  It's not per se

8   valuable, right, I mean it's not as valuable as a

9   diamond?

10       A       I don't know.  Maybe it's what you got on

11  it.

12       Q       Well, it might be.  That's what I am

13  asking you.  There is nothing that led you later on in

14  your investigation to believe that there was anything

15  uniquely valuable about that computer disc or that

16  further enhanced your investigation on the robbery

17  homicide that led you to believe that it was part of

18  the theft of the diamonds and murder of the

19  complaining witness that they had to get something out

20  of the computer, right?

21       A       I am a little confused on that question,

22  which way you are going with, if I may say, that as

23  far as me proving it has something to do with.  It is

24  that what you are saying?

25       Q       What I am saying is that, first of all,

1    you don't know why someone just didn't push a button

2    in the computer and it didn't come out, right?

3         A      Yes, sir.

4         Q      Secondly, do you know what was inherently

5    valuable on that computer disc?

6         A      No, sir.

7         Q      We know that the diamonds are inherently

8    valuable?

9         A      Yes, sir.

10        Q      And, later on, you determined that there

11   were diamonds that were in that safe?

12        A      Yes, sir.

13        Q      Now, you displayed certain exhibits there

14   at the end of your testimony regarding the location of

15   the Greenrich Building to what Mr. Smyth called a test

16   fire site; do you recall that?

17        A      Yes, sir.

18        Q      You have been to that site?

19        A      Yes, sir.

20        Q      And I believe it's lined up to wherein you

21   can see the building and you can see Mr. Dennes'

22   apartment and you can see the test fire site, right?

23        A      Yes, sir.

24        Q      Have you been to Mr. Dennes' apartment?

25        A      Yes.

```
 1          Q      It's fair to say that Mr. Dennes'

 2   apartments is near the site that you are calling the

 3   test fire site, right?

 4          A      Yes, sir.

 5          Q      Another way of putting that:  They are all

 6   within very close proximity of the Greenrich Building,

 7   correct?

 8          A      Yes.

 9                 MR. ODOM:  At this time I have no further

10   questions of this witness.

11                 THE COURT:  Okay.  We will take a break

12   for lunch, ladies and gentlemen.

13                 Remember your admonishments and we will

14   recess until promptly 1:30.

15                 (Recess taken.)

16                 (Jury came into the courtroom.)

17                 THE COURT:  Are you ready?

18                 MR. ODOM:  Yes, sir.

19                 THE COURT:  Please continue.

20          Q      Sergeant Waltman, I am glad you didn't

21   review anymore notes than the number you did.

22                 In regards to your notes, I noticed that

23   you did not have in your notes the details regarding

24   what the security guard could and could not see from

25   his desk in regards to the cameras that are on --
```

```
 1                    MR. ODOM:    If I may, Your Honor.

 2                    THE COURT:   Certainly.

 3        Q        -- that reflect the entranceways here

 4   coming in from the garage on the first and second

 5   floor.

 6                    Are you basing your testimony that the

 7   security guard can see those entranceways from that

 8   security desk and those monitor cameras based upon you

 9   remembering having been able to do so there at the

10   desk or are you basing that upon information you may

11   have received from other persons?

12        A        Information I received -- you are talking

13   about the cameras out in the garage?

14        Q        Yes, sir, from the cameras to the

15   entranceway doors.

16        A        The information received from the security

17   people.

18        Q        So you personally do not know if the

19   security guard can sit at that desk and look into his

20   TV monitor and monitor the comings and goings from the

21   second and the third floor as far as from your own

22   personal knowledge, using that monitor system, that

23   camera system?

24        A        Did I do it and see it?  No, sir.

25        Q        That's my question.  That's not personal
```

1    knowledge on your part.

2            What you are relaying to us, this is

3    information that you either received or believed you

4    received from another party?

5    A       Yes, sir.

6    Q       Did you ever get a chance to talk to Mr.

7    Copeland about the security system there?

8    A       Not me.

9    Q       And, you know, of course, Mr. Copeland is

10   the security guard that was shot there in the lobby?

11   A       Yes, sir.

12   Q       Now, in this investigation, the event that

13   you have related regarding the scene and the building,

14   those events occurred on January 24, 1996?

15   A       Yes, sir.

16   Q       You then were showed regarding that site

17   wherein you learned some casing, shell casing, was

18   found?

19   A       Yes, sir.

20   Q       There was an extensive investigation that

21   went on after the homicide and before the arrest of my

22   client, Mr. Dennes, right?

23   A       Yes, sir.

24   Q       And it was sometime in February, was it

25   not, before there was an arrest made of Mr. Dennes?

1        A       Yes, sir.

2        Q       And I don't know if you remember.  Do you

3   remember the exact date or about when that would have

4   been?

5        A       When he was arrested?

6        Q       Yes, sir.

7        A       I think it was February 22nd.

8        Q       21st, 22nd, somewhere in there?

9        A       Yes, sir.

10       Q       I think you are right.  I don't remember

11   exactly but I think it was February 22nd.

12               During that time period, as part of your

13   job, was it not, to handle the various leads and try

14   to determine who did this homicide, correct?

15       A       Yes, sir.

16       Q       And it was pretty apparent, at least it

17   appeared to be from at first blush, that the body up

18   on the seventh floor explained the desire to retrieve

19   the video machine and the shooting of the guard on the

20   first floor of the lobby, right?

21       A       Yes, sir.

22       Q       To an extent that sort of answered a

23   question that you had on the night of the 24th before

24   the body was discovered up on the seventh?

25       A       Yes, sir.

1      Q      And in conducting your investigation, it
2  was apparent to you, was it not, that this building
3  had a number of business entities that were engaged in
4  the business of precious commodities, perhaps coins
5  but jewelry and matters that we would call precious
6  jewels?
7      A      Yes, sir.
8      Q      That explains some of the security system
9  we had, did it not?
10     A      Yes, sir.
11     Q      Now, in your business, I think you also
12  are aware of the fact that any time someone is dealing
13  with precious jewels, precious stones and jewelry and
14  gold, that is a very liquid commodity; is that a fair
15  statement?
16     A      Yes, I guess you say.
17     Q      Well, let me clear that up.  Cash money is
18  the most liquid of all commodities, isn't it?
19     A      Right.
20     Q      Cash money has no particular identity in
21  and of itself as such.  If I get a hundred thousand
22  dollars, it's pretty easy for me to get rid of a
23  hundred thousand dollars?
24     A      Yes.
25     Q      Stocks and bonds, real property you have,

1    it's a lot harder for someone, if they are a thief,

2    for example, to take that and to dispose of that,

3    correct?

4        A    Yes, sir.

5        Q    Precious jewels like diamonds and gold,

6    although it's not as easy to dispense with as cash, it

7    nevertheless has an intrinsic value that is going to

8    maintain its identity, that makes it desirable for

9    certain types of thieves to want to acquire?

10       A    Yes, sir.

11       Q    And there are certain types of thiefs or

12   criminals that specialize and that focus in the area

13   of precious stones and jewelry?

14       A    Yes, sir.

15       Q    We have in the Houston Police Department,

16   for example, we have a pawn shop detail, right?

17       A    Yes, sir.

18       Q    And although anything could be pawned,

19   guitars and anything else, a lot of what the pawn shop

20   detail looks at are the special stones, precious

21   stones or jewelry that has been turned over to a pawn

22   for resale and it has been obtained in a robbery or a

23   burglary or in some criminal fashion, right?

24       A    Well, they do focus in on precious stones.

25       Q    Although they focus on other things,

1       certainly a good part of it is precious stones?

2           A       Yes, sir.

3           Q       When you talk about someone who is in the

4       business of taking higher stones, the ones that don't

5       have -- the ones that may have a higher value, there

6       has to be a way for the person who gets those items to

7       get rid of those items somehow, if they are going to

8       make any money off of them, right?

9           A       Yes, sir.

10          Q       And they can't just go down to Corrigan's

11      or they can't go to the Tiffany's and have much

12      success in trying to sell them stones or jewelry that

13      they may have obtained in an illegal manner, can they?

14          A       I wouldn't think so.  I don't really know

15      personally but I wouldn't think they could go to those

16      places.

17          Q       In your investigation, did you discover

18      that the people that are in the business of dealing

19      with diamonds, jewelry and the stones that they often

20      come in contact with, shall we say, the other side of

21      the world, the shady side of the world, wherein people

22      are trying to get rid of or trying to sell, as we call

23      fence, these diamonds, jewels or precious stones?

24          A       Yes.

25          Q       And although because you are an

```
 1     experienced investigator and you probably have known
 2     this because you have known it before, it was
 3     certainly apparent when you started conducting this
 4     investigation and you started looking into the general
 5     activities that may occur in a jewelry business, when
 6     you are dealing with stones and jewelry, certainly
 7     became apparent in your investigation of this case
 8     that world is here; that is, the people that deal in
 9     the precious stones and jewelry and small jewelry
10     shops and that the world of people trying to peddle
11     stones and trying to peddle jewelry is pretty close to
12     that world, if you understand what I am saying?
13           A      I would say, yes, more or less.
14           Q      In other words, an independent jeweler
15     can't help but to some extent, regardless of what his
16     experience, an independent dealer who is dealing with
17     the stones and jewelry can't help but sooner or later,
18     whether he intends to or not, either come across or be
19     exposed to some fenced jewelry or some hot jewelry,
20     right?
21           A      Well, I'd probably say sometime somebody
22     can come across with fenced jewelry or stolen
23     jewelry.  I would say yes.
24           Q      This building is full of little shops that
25     have -- I don't know how little they all are -- but of
```

1     independent people that are in that business, not the

2     business of handling fenced jewelry necessarily but of

3     dealing with the precious stones and precious

4     commodities --

5         A     Yes.

6         Q     -- is it fair to say that from the very

7     beginning that you had a wealth of leads in this case?

8         A     I wouldn't say a wealth of leads, no.

9         Q     Did you have a number of leads?

10        A     Well, we had a number of possibilities.

11    They weren't leads, a lot of it.

12        Q     I'm probably using the wrong terminology.

13    To me, a lead is anything where you get an inquiry and

14    someone tells you, well, hey, I know something, you

15    need to check this out or you need to check that out?

16        A     In that case, I would say yes, such as

17    leads.

18        Q     When you were at the scene and in the

19    complaining witness' office, was the telephone ringing

20    while you were there?

21        A     Yes.

22        Q     Did you answer the phone?

23        A     I didn't.

24        Q     Do you know who did answer the phone?

25        A     I don't recall exactly.  The phone rings

1   many times.  I don't remember exactly who.  Nobody

2   answered nothing -- I'm sorry, there was one phone

3   outside they did answer.  I know I didn't answer.  I

4   was busy at the time.  I couldn't sit here and tell

5   you exactly who answered the phone each time it rang.

6       Q       Were you told of possible leads -- I guess

7   was the term you used -- of various other people in

8   the building that needed to be looked at or you needed

9   to inquire as far as if they had any involvement in a

10  possible homicide on this particular man?

11      A       Yes.

12      Q       In that regards, were you informed of a

13  particular company called the Diamond Dreamers?

14      A       Of what?

15      Q       I'm sorry.  Of Dynasty Jewelry, do you

16  recall that?

17      A       I recall that name, yes, sir.

18      Q       And do you recall a Yanna H-a-s-s-o-n?

19      A       I recall the name.

20      Q       Did you also receive certain leads about

21  people that you were aware of and that you knew were

22  in the business of doing what we call jewelry heists

23  or diamond heists?

24      A       Yes, sir.

25      Q       And was one of those leads that you got in

1    reference to a person by the name of James Bogottus?

2         A    Yes, sir.

3         Q    And a person in your business, to a large

4    extent, when you haven't focused upon a particular --

5    or any time you are doing an investigation, is it fair

6    to say you thrive on information?

7         A    Yes.

8         Q    I mean, all of this is really information

9    that can lead you down a number of paths but what you

10   find at the crime scene, what you hear from the

11   citizens, what you get from looking at the scientific

12   evidence that comes in, all of that is what you start

13   putting a theory together, as an officer, as far as

14   who may or may not have committed a crime in trying to

15   solve a crime, right?

16        A    Yes, sir.

17        Q    Early on, you received information, did

18   you not, about a possible person that was known to be

19   involved in armed robberies of diamonds by the name of

20   James Bogottus, did you not?

21        A    Yes, sir.

22             MR. ODOM:  May I approach the witness,

23   Your Honor?

24             THE COURT:  Yes, sir.

25        Q    Before this case, did you know who James

1    Bogottus was?

2         A      No, sir.

3         Q      Did you have an opportunity to see a mug

4    shot at any point of James Bogottus?

5         A      Yes, sir.

6         Q      I would like to show you what has been

7    marked as State's Exhibit 34.  And what is a mug shot?

8         A      It's a photograph taken at a jail facility

9    when you come in.

10        Q      That's where you first go in and they take

11   a photograph?

12        A      Yes, sir.

13        Q      And you all keep those on record for

14   future reference?

15        A      Right.

16        Q      State's Exhibit 34, that's a photo spread,

17   is it not?

18        A      Yes, sir.

19        Q      And in that photo spread, there is a mug

20   shot of James Bogottus, is it not?

21        A      I can't say -- I don't remember.  There

22   probably is but I don't know what he looks like.  It

23   has been back in '95.

24        Q      Looking at number five, who I believe you

25   previous testified there was a tentative ID by the

1      security guard, Mr. Copeland --

2                  MR. SMYTH:  Object to that.  That's not

3      the testimony at all.

4                  THE COURT:  Sustained.

5      Q      (Mr. Odom)   Who was described as the

6      closest one to match that shot him on the night in

7      question.

8                  THE COURT:  Sustained.

9      Q      (Mr. Odom)  That photograph, does that

10     person have a mustache?

11     A      Yes, sir.

12     Q      Is it your testimony you cannot recognize

13     him as being Mr. Bogottus?

14     A      Well, I didn't know for sure.  This looks

15     like the photograph -- I mean, look at this whole

16     thing, I remember this face but I couldn't say here,

17     right off the bat, because I didn't handle this

18     portion.

19     Q      Fair enough.  I won't ask any questions.

20            Now, do you recall that there was another

21     photo spread that was done that was shown to the

22     security guard, Mr. Copeland?

23     A      Yes, I believe there was.

24     Q      And do you recall that, if you know -- if

25     you don't, just tell me -- do you know one way or

1    another if those were random photographs or if there

2    was someone in there that the investigation by that

3    officers that were conducting the investigation

4    specifically had in mind that they wanted Mr. Copeland

5    to look at.

6              MR. SMYTH:  Object unless he knows of his

7    own personal knowledge what the purpose of those photo

8    spreads were.

9              THE COURT:  Know or what was the purpose?

10        Q     (Mr. Odom)   What was the purpose of

11   showing someone a photo spread?

12        A     Well, they wanted to see if he could pick

13   out anybody in the photo spread.

14        Q     And State's Exhibit 34 I showed you.

15   State's Exhibit 33, that looks like a photo spread,

16   doesn't it?

17        A     Yes, sir.

18        Q     And the usual purpose of a photo spread is

19   to see if a suspect you have in mind, if a person can

20   identify that suspect, right?

21        A     Yes, sir.

22        Q     Did you have another suspect in mind when

23   Mr. Copeland was shown, if you know, State's Exhibit

24   33?

25        A     Like I say, I didn't handle that

1    particular portion.  I don't know exactly what

2    photograph they showed him or what they showed him and

3    what they didn't.

4         Q       Officer Halling, would that be the officer

5    that would have better knowledge on that information?

6         A       She might.  I couldn't say what, you know,

7    she knows and what she didn't.  We have spread out so

8    many directions and it's hard for me to sit here and

9    tell you exactly what everybody done, sir.

10        Q       Then I'll move on.

11               Now, in regards in trying to determine a

12   motive of a particular crime, this one was fairly

13   easy, was it not?

14        A       Yes.

15        Q       There are diamonds that are missing?

16        A       Yes, sir.

17        Q       However, if someone knows who the

18   complaining witness' acquaintances were and who he

19   knew and who he dealt with, that would enable you to

20   sort of narrow the focus down as to who might be

21   involved in this particular robbery/murder; isn't that

22   a fair statement?

23        A       Yes, sir.

24        Q       Especially in lieu of the fact that it

25   appeared as though the complainant had let someone

1    into his office and there did not appear to be a

2    struggle when he was shot?

3         A    Yes, sir.

4         Q    Because of that, had you started doing a

5    history, did you not, on this particular individual

6    who is the complaining witness in this case?

7         A    Yes, sir.

8         Q    What did you determine, if you know, as to

9    where the complainant was tried.

10             MR. SMYTH:  Object, that's pure hearsay.

11   Object to all the questions that are strictly hearsay.

12             THE COURT:  Sustained.

13        Q    (Mr. Odom)  Do you make an inquiry in

14   trying to determine who the complainant may or may not

15   know as part of your investigation?  Do you

16   investigate to see if the complainant may have been

17   involved in other activities that might be

18   criminal-type activities to try to determine if that

19   may have some bearing on someone that he may or may

20   not know that's involved in this case?

21        A    Yes.

22        Q    And did you make such an investigation in

23   regards to the complainant in this case?

24        A    Yes.

25        Q    Based upon information that you may have

1    received about his background, did you make an inquiry

2    as to prior activities of the complainant in other

3    countries?

4        A    Yes.

5        Q    Did you contact the authorities in South

6    Africa in regards to the complaining witness?

7        A    They were contacted or tried to be

8    contacted.  I didn't personally do that.

9        Q    And, of course, any information you

10   received from that you did not have any knowledge of

11   what that information was, correct?

12       A    No, I have knowledge of the information

13   but, I mean, I didn't speak with the people myself.

14       Q    Okay.  Did you learn that the complainant

15   in this particular case was involved in some

16   activities that caused you concern as far as possible

17   motives for his homicide?

18       A    Yes.

19       Q    Now, did you narrow your focus of

20   investigation to those past activities or did you have

21   other countries that you had to make inquiry in as

22   regards to other suspects?

23       A    Made inquiry into that but we were also

24   working on other directions.

25       Q    That's what I am trying to ask.

1        A        We were working on other things, other

2    leads, as you said awhile ago, or other information

3    that came in.  We was -- well, it's more like I

4    explained but staying -- don't go in three or four or

5    five different directions, trying to cover as much as

6    territory as we could.

7        Q        When I said you had a wealth of leads,

8    perhaps that was not the way to put it, but the truth

9    of the matter there was a lot to be done as far as to

10   try to check some things out in this case?

11       A        Yes, sir.

12       Q        And like you said, you may not have been

13   talking to someone in South Africa; somebody was

14   talking to South African authorities about the

15   complainant in this case?

16       A        Yes, sir.

17       Q        Someone else may have been talking to the

18   authorities in Canada about possible suspects in this

19   case?

20       A        I believe they were.

21       Q        Someone in your office was contacting the

22   authorities here in the United States about Mr.

23   Bogottus as far as being a possible suspect in this

24   case; isn't that true?

25       A        Yes, sir.

1      Q      Someone in your office was contacting

2    another individual by the name of Mr. Wrightman as far

3    as being a complainant in this particular case; isn't

4    that a fair statement?

5      A      A witness in this case; you said a

6    complainant.

7      Q      I'm sorry.

8      A      Yes.

9      Q      You also have a lot of people just kind of

10   want to be helpful and just sort of call and say, hey,

11   someone just seemed to be acting suspicious and

12   someone told me that I heard this or I heard that.

13   There's a number of possibilities that anyone is asked

14   to run down in a case like that; isn't that fair to

15   say?

16     A      Yes, sir.

17     Q      Matters that did not require you to

18   contact authorities in South Africa or contact

19   authorities in Canada or try to focus on certain

20   particular individuals?

21     A      Yes, sir.

22     Q      As a result of contacting Mr. Copeland,

23   you are aware, are you not, of the fact that a sketch

24   was done of his possible assailant; do you recall

25   that?

1      A      Yes, sir.

2      Q      Were you involved or are you aware of the

3   fact that the sketch was published in the building, to

4   all the tenants of the building there at the Greenrich

5   Building?

6      A      Yes, I was there when we had a meeting and

7   me and my partner, Beth Halling, showed it.

8      Q      How many of the tenants in the Greenrich

9   Building told you that particular person was Ray

10  Dennes?

11     A      None.

12     Q      Were you there when a photo spread was

13  shown to Estrella Martinez wherein she identified

14  someone as being that resembled or that could possibly

15  have been the assailant who shot Mr. Copeland?

16     A      No, I wasn't present.

17            MR. ODOM:   If I may, Your Honor.

18     Q      Do you know if Estrella Martinez ever saw

19  State's Exhibit 34.

20            MR. SMYTH:  I object, that's asked and

21  answered.  He said he wasn't there when anybody showed

22  it.

23            THE COURT:  You can answer.

24     A      What was the question?

25     Q      (Mr. Odom)   The question was:  Do you

```
1    know if Estrella Martinez was ever shown State's

2    Exhibit 34?

3         A      She might have.  I can't sit up here and

4    tell you it was.  She probably was shown but I don't

5    recall who showed it to her.

6         Q      Who is James Bogottus?

7         A      Just a guy -- he's a male.  Do you want me

8    to go in detail?

9         Q      Yes, sir.

10        A      He is a male that was looked in to because

11   he was wanted for robberies of jewelry, I think, over

12   in Canada, California.  And I think in and around the

13   Dallas area and I want to say Florida, if I'm not

14   mistaken.  I might be wrong.

15        Q      Was he also involved in any jewelry heists

16   you are aware of in the Los Angeles area?

17        A      Yes, sir.

18        Q      Did you have occasion to determine that

19   some of the jewelry that he was associated with and

20   some of his activities had appeared in the Greenrich

21   Building?

22        A      I'm not familiar with that.

23        Q      Do you know where Mr. Bogottus is today?

24        A      I think he is in jail but I'm not for sure

25   where he is at.
```

1          Q        It is your belief he is in custody

2    presently?

3          A        Yes.

4          Q        I think you may be right.

5                   Did you determine at the time of this

6    offense that he was not in custody?

7          A        Yes.  He wasn't in custody at the time of

8    the offense.

9          Q        Your office made a determination, did it

10   not, that he was not involved in this particular case;

11   is that a fair statement?

12         A        Yes, sir.

13         Q        Your office did not, however, determine

14   his exact whereabouts, did it, during the time of

15   January 24, 1996, did they?

16         A        I can't really sit here and tell you, sir,

17   exactly that portion was -- I think Todd Miller and

18   Sergeant Ladd was working on the Bogottus people in

19   regards and, of course, I didn't have that much to do.

20   They were telling me what their findings was but as

21   far as me having personal knowledge of it, I can't sit

22   here with the personal knowledge of Bogottus.

23         Q        Did you ever determine whether or not the

24   complainant in this case had done business with and

25   was in any way associated with the Bogottus brothers?

```
 1        A        I don't believe he was.

 2        Q        That's your determination?

 3        A        Yes, sir.

 4        Q        Now, what really focused this case upon

 5   Mr. Dennes was Tony Ramirez, correct?

 6        A        Yes, sir.

 7        Q        And Mr. Ramirez did not step forward by

 8   himself to the authorities; isn't that a fair

 9   statement?

10               MR. SMYTH:  Object unless he knows of his

11   own personal knowledge how Mr. Ramirez came to be

12   known by the Houston Police Department.

13               THE COURT:  Sustained.

14        Q        (Mr. Odom)   Do you know how it is that

15   Mr. -- were you involved in the early stages of Mr.

16   Ramirez contacting your office?

17        A        Yes.

18        Q        Are you aware of the fact that Mr. Ramirez

19   went through an embassy in order to contact your

20   office, in other words, he used someone else to get in

21   touch with your office?

22        A        Yes, sir.

23        Q        And is it fair to say that Mr. Ramirez was

24   very interested in the reward that he might receive

25   for turning over the person that committed this
```

1    particular homicide.

2              MR. SMYTH:  Your Honor, that assumes there

3    is some kind of a reward out there for turning over

4    anybody.  I object on that basis.

5              THE COURT:  Sustained.

6         Q    (Mr. Odom)  Do you know if there was a

7    reward for the discovery of the person that killed the

8    complainant in this case?

9         A    There was no reward.

10        Q    There was no reward?

11        A    No reward.

12        Q    Was there a rumor of a reward?

13        A    Yes, sir.

14        Q    As a matter of fact, your notes reflect,

15   do they not, that the person that contacted your

16   office was interested in ten percent of the value of

17   the diamonds.

18             MR. SMYTH:  Object, the person that

19   contacted had nothing to do with this case so I ask

20   that he give us the name of some person contacted;

21   otherwise, I object to the question.

22             THE COURT:  Change it to a person.

23        Q    (Mr. Odom)  We were talking about the

24   fact that Ramirez used some other person to contact

25   the office.  Your office was contacted by a name of

1    John Vernon, is that correct, or something similar to

2    that, Vernon, Varner?

3        A    Oh, yes.

4        Q    That was not the real name of the person

5    that was contacting you; is that correct?

6        A    Yes.

7        Q    In other words, whoever it was that talked

8    to you didn't use his real name?

9        A    Yes, sir.

10       Q    He later turns out to be Andy Thomas,

11   right?

12       A    Yes, sir.

13       Q    But instead of saying there is Andy

14   Thomas, he calls himself something else, he calls

15   himself John Verner?

16       A    Yes, sir.

17       Q    John Verner calls, he knows someone that

18   has information in regards to this murder but he's

19   real interested in getting the reward, right?

20            MR. SMYTH:  Object, who is getting the

21   reward John Verner, Andy Thomas.

22       Q    (Mr. Odom)   You don't know at this point

23   but you assume that the person who says they have got

24   information is the one that is interested in the

25   reward, right.

1            MR. SMYTH:  Object, pure speculation,

2    Judge.  He is assuming.  That's pure speculation.

3    It's hearsay.

4            THE COURT:  It's overruled.

5            MR. SMYTH:  Speculation on hearsay.

6            THE COURT:  Thank you.

7        Q     (Mr. Odom)   I am talking about your state

8    of mind, sergeant.  When you are getting this

9    information from John Verner, it turns out to be Andy

10   Thomas and he tells you that I know or he tells

11   someone that I know a person who may know about this

12   homicide but that person is real interested in the

13   reward -- you are assuming that is the person that has

14   the information, right.

15           MR. SMYTH:  That's my objection, hearsay

16   on hearsay on hearsay and that's not offered --

17           MR. ODOM:  It's not offered for the truth

18   of the matter.

19           MR. SMYTH:  It makes no difference. It's

20   offered for the truth and that's why it has been

21   asked.  It's pure hearsay.

22           THE COURT:  I'll allow it.

23       Q     (Mr. Odom)   I don't know if I can repeat

24   the question.  I hope you remember it.

25       A     Well  --

1       Q       Just tell me what happened there, if you

2   can, sergeant.

3       A       First of all, I didn't talk to this person

4   and the next thing is what you're saying --

5               THE COURT:  From your own personal

6   knowledge; you might respond to the question based on

7   your own personal knowledge.

8       A       Well, I didn't personally talk to him.

9       Q       When I go over your notes, I have to rely

10  on what I see and I don't remember whether in your

11  notes you are saying someone else contacted me or I

12  personally did it.  I mean, I don't remember all that.

13      A       Yes, sir.

14      Q       So when I see this, sometimes it may be

15  you are saying someone else contacted you?

16      A       I am trying to explain to him why I don't

17  remember all.

18      Q       You are not the one that receives the

19  phone call from John Verner?

20      A       No, sir.

21      Q       Do you recall who it was that did receive

22  that phone call?

23      A       Beth Halling.

24      Q       Officer Halling did?

25      A       Yes.

1        Q       Now, once you became aware that Mr. Dennes

2    was a suspect in this case, you had Mr. Dennes under

3    surveillance for a period of time, is that a fair

4    statement, maybe a short period of time?

5        A       A short period of time.

6        Q       And, by that, sometimes he may be waiting

7    for an arrest warrant or you may be waiting for a

8    warrant to come in but you would have the person under

9    surveillance so once you receive that arrest, you can

10   make your arrest?

11       A       Yes.

12       Q       And it was similar to that?

13       A       Yes.

14       Q       At the time you saw him there was

15   something peculiar about his walk, wasn't there?

16       A       Yes, sir.

17       Q       And that is he is wearing a cast, isn't

18   he?

19       A       Yes.

20       Q       Were you involved in the search of his

21   office?

22       A       Yes, I was.

23       Q       In the search of his office did you find a

24    .9 mm reamer?

25       A       .9 mm?

1        Q       A reamer, a .9 mm, what has been defined

2     as a .9 mm reamer, a tool that would bore a .9 mm

3     diameter hole, if you know?

4        A       I recovered a lot of lathe tools.  I don't

5     know what a reamer looks like, you know.

6                MR. ODOM:  Pass the witness.

7                THE COURT:  Thank you, Mr. Odom.

8

9                      REDIRECT EXAMINATION

10    BY MR. SMYTH:

11       Q       You, in your investigation, I am going to

12    ask you what I think you have personal knowledge of.

13    Do you know what the phone, Jonas' number, J. S.

14    Precious Stones, Inc., that firm that occupies 770

15    where Johnny Szucs was found dead?

16       A       Yes, sir.  Area code 713-784-1196.

17       Q       713 --

18       A       784-1196.

19       Q       What are computers commonly used for?

20       A       To store information.

21       Q       Do you ever know of any business that keep

22    their inventory on the computer?

23       A       Yes.

24       Q       Describing what they have in inventory,

25    size, shape, clarity, cut, perhaps costs and then fair

1    market value?

2        A    Yes, sir.

3        Q    Would that be the kind of thing that would

4    typically be stored on a computer hard drive of a

5    diamond dealer?

6        A    Yes, sir.

7        Q    Would a disc containing that kind of

8    information be something that a jewel thief might want

9    to have?

10       A    Yes, sir.

11       Q    Why is that?

12       A    Well, basically if all this information

13   was on this disc in regards to the inventory of

14   diamonds or jewels, or whatever, if it was all stored

15   on there, it would give the clarity, the color, the

16   shape, the size, it might even tell if it has a

17   blueprint, what they call a blueprint, which is like a

18   fingerprint of a diamond and even the value, how much

19   you paid for it and how much it was worth.

20       Q    So it would be pretty important to the

21   police to have that information when they go looking

22   for a bunch of diamonds.  If you are like me, you

23   don't know one from the other?

24       A    Yes, sir.

25       Q    But somebody in the business would know

1    one from the other?

2         A     Yes, sir.

3         Q     If they had that kind of description,

4    whether it will be blueprinted, whether this was

5    stolen?

6         A     Yes.

7         Q     That would be the kind of stuff you would

8    like to have?

9         A     Yes, sir.

10        Q     Not only to know how much was taken in the

11   robbery but for attempts to recover that down the

12   road?

13        A     Yes, sir.

14        Q     That hard drive computer and the disc, if

15   there was one in there, was removed?

16        A     Yes, sir.

17        Q     And the fact that the hard drive was torn

18   up would suggest that something was in there that

19   somebody was looking for?

20        A     Yes, sir.

21              THE COURT:  Disc drive.

22        Q     Disc drive, whatever it was.  I think we

23   are on the same page because we don't know anything

24   about them.  We speak in the same language anyway.

25              In your investigation, did you learn where

1   stolen diamonds are fenced?  Were you one of the

2   detectives that found out where you go to fence

3   diamonds, and I am talking about in the United States

4   of America?

5        A       Well, as far as particular places, they

6   are all over the United States where diamonds can be

7   fenced.  It's like Chicago, Los Angeles, Miami,

8   Canada.

9        Q       So Miami is one of those places that

10  people go to fence diamonds?

11       A       Yes, sir.

12       Q       Now, in your investigation, you said you

13  guys got, once we find out what's ahead and what is

14  not ahead and decided any information you got was

15  ahead, did the police department follow up on each and

16  every lead that it got?

17       A       Yes, sir.  We spent many hours following

18  up on anything from a little lead to what we call may

19  even be a bigger lead.

20       Q       That included people that may have called

21  in anonymously?

22       A       Yes, sir.

23       Q       So if somebody called and said I think Don

24  Smyth had something to do with that robbery and

25  murder, you would have checked it out, wouldn't you?

1          A       Yes, sir.

2          Q       So I mean you just used all of them up?

3          A       Yes, sir.

4          Q       Defense counsel suggested, went to a lot

5     of time to talk about a Bogottus, that Bogottus must

6     be some kind of involved and I think, later on, Mr.

7     Bogottus had anything --

8                  MR. ODOM:  That's not true, that Mr.

9     Bogottus -- I implied just the other.

10                 THE COURT:  Sustained.  The jury will

11    disregard the last statement.

12         Q       (Mr. Symth)   I believe the question was:

13    Did the police department later determine that Mr.

14    Bogottus was not involved in this case; do you recall

15    that question being asked?

16         A       Yes.

17         Q       And what was your answer?

18         A       That Bogottus wasn't involved in this

19    case.

20         Q       And as far as any other leads of major

21    jewel thefts that you folks learned about, did you

22    follow them up?

23         A       Yes.

24         Q       Did you determine in each and every case

25    those other persons who you got as a possible suspect

1    was not involved in this case?

2         A     Yes.

3         Q     By determining they were either in another

4    location at the time of the event, in jail someplace

5    else, or were definitely not in the Houston area?

6         A     Yes, sir.

7         Q     And you are still working on this case

8    when Tony Ramirez comes to the Houston Police

9    Department via the FBI; is that correct?

10        A     Yes, sir.

11        Q     And he then gives you information that

12   points to the defendant, Reinaldo Dennes; is that

13   right?

14        A     Yes, sir.

15        Q     When you got that information that

16   Reinaldo Dennes was a tenant in that building who had

17   an office on the third floor, suite 320, did you think

18   you had an obligation to follow up on that

19   information?

20        A     Yes, sir.

21        Q     And did you follow up on that information?

22        A     Yes, sir, we did.

23        Q     And it's not like you just decided we will

24   pick on Reinaldo Dennes, is it?

25        A     No, sir.

1        Q        Regarding the composite that was done with
2    respect to the man that shot David Copeland, you
3    showed it throughout the building, asked anybody if
4    they had seen him --
5        A        Yes.
6        Q        -- if they knew if it was anybody?
7        A        Yes, sir.
8        Q        Did you ever take the defendant, Reinaldo
9    Dennes, and put a full set of hair on him and put the
10    certain kind of glasses fitting that composite and
11    mustache on him and ask everybody to come in and see
12    if that resembled the composite?
13        A        No, sir, I didn't do that.
14        Q        Now, as far as this John Vernon, Andy
15    Thomas, you didn't talk to him, did you?
16        A        No, sir.
17        Q        So you don't know what John Vernon said?
18        A        No, sir.
19        Q        And whatever John Vernon said, you don't
20    know if he is speaking for himself or he is speaking
21    for Andy Thomas or anything else, do you?
22        A        No, sir.
23        Q        In fact, in your investigation, did you
24    determine that Andy Thomas is, in fact, a friend of
25    the defendant's, Reinaldo Dennes, and has done jobs

1    for him?

2          A      Yes, sir.

3          Q      What you call a jobber, he goes out and

4    locates jewels and things and he brings it to Reinaldo

5    Dennes?

6          A      Yes, sir.

7          Q      So Andy Thomas knew Reinaldo Dennes?

8          A      Yes, sir.

9          Q      Is that the reason why he didn't want to

10   use his real name?

11         A      Yes, sir.

12         Q      In your investigation, I'm not talking

13   about this, all the rumors, innuendos, you know, talk,

14   you know, talk that cannot be supported by the facts,

15   but based on the facts that you determined to be true,

16   did you find that Janos Szucs -- Johnny Szucs -- was

17   anything but a reputable diamond dealer in the

18   business of diamonds?

19         A      He was a reputable person.  Everybody had

20   good words for him.  I never talked to anyone that

21   didn't think he was really a great guy and a good

22   businessman.

23         Q      And as far as what they said about him,

24   was he known to have perhaps the biggest and best

25   supply of diamonds in that building?

1    A    Yes, sir.

2    Q    He dealt in high quality stones?

3    A    Yes, sir.

4    Q    And he was a diamond wholesaler; is that

5  correct?

6    A    Yes, sir.

7    Q    And he didn't have a workroom in his

8  office and where he made jewelry and things like that;

9  is that correct?

10    A    Yes, sir, that's correct.

11    Q    If he had jewelry made, he sent it out to

12  people --

13    A    Yes, sir.

14    Q    -- like Reinaldo Dennes?

15    A    Yes, sir.

16    Q    And when we are talking about the kind of

17  diamonds that were stolen from Johnny Szucs, we are

18  not talking about little bitty diamonds that you buy

19  across the counter at Zales or Gordon's, are we?

20    A    No, sir.

21    Q    We are talking about the multicarat

22  diamonds that cost a lot of money?

23    A    Yes, sir.

24    Q    And that's not the kind of diamonds that

25  you are going to find in the pawn shop?

1          A       No, sir, you are not.

2          Q       Do you believe that you feel like this

3   case has been fully investigated?

4          A       Yes, sir, I do.

5          Q       Any reason to believe that there is

6   anybody other than Reinaldo Dennes --

7                  MR. ODOM:  Object, Judge, object to the

8   speculative nature of that question.

9                  THE COURT:  Sustained.

10         Q       (Mr. Symth)   Did you turn over every rock

11  and cranny and followed up every lead in the

12  investigation you had in this case, have you not?

13         A       Yes, sir, we have.

14                 MR. SMYTH:  Pass the witness.

15

16                         RECROSS EXAMINATION

17  BY MR. ODOM:

18         Q       Mr. Smyth asked you some questions that I

19  would like to ask you about.

20                 First of all, he said you talked to

21  several people in regards to the complainant, Mr.

22  Szucs, correct?

23         A       Yes, sir.

24         Q       And that a lot of people liked the

25  complainant, had good things to say about the

1    complainant, right?

2         A    Yes, sir.

3         Q    And that's true, right?

4         A    Yes, sir.

5         Q    They also told you, however, the

6    complainant was involved in a platinum heist in South

7    Africa, did they not?

8         A    Yes, sir.

9         Q    As a result of that involvement in the

10   platinum heist, when was in his involvement in that

11   particular activity?

12        A    I don't really recall the date.

13        Q    All right.  Obviously it was sometime

14   before he came to the United States, was it not?

15        A    Yes, sir.

16        Q    Because of that, a number of people

17   indicated to you, did they not, that he possibly had

18   some enemies out there because of that prior

19   involvement that he had with that particular

20   activity.

21             MR. SMYTH:  Your Honor, object.  That is

22   suggesting that is a fact other than a rumor.

23             THE COURT:  We are talking one at a time.

24   Let him --

25             MR. SMYTH:  I think he can put in the

1    hypothetical he wants to unless this officer knows for

2    a fact that indeed happened but I object to that pure

3    speculation and nothing but a suggestion from this

4    defense counsel based on rumor and innuendo.

5             MR. ODOM:  I did not go into that because

6    it was hearsay by asking all the hearsay questions

7    about all these things he has heard.  I have the right

8    to ask him about other things he heard as well.

9             THE COURT:  I sustain.

10            MR. SMYTH:  Thank you, Judge.

11    Q      (Mr. Odom)   Mr. Smyth asked you some

12    questions about Andy Thomas.  You never talked to Andy

13    Thomas when he first called you, did you?

14    A      No, sir.

15    Q      But you asked about the hearsay knowledge

16    you had of the information that was received from Andy

17    Thomas, right?

18    A      Yes, sir.

19    Q      I would like to ask you about that hearsay

20    information as well.

21            Andy Thomas doesn't use the name of Andy

22    Thomas when he is involved in a case, does he?

23    A      No, sir.

24    Q      He uses the name of John Vernon?

25    A      Yes, sir.

1      Q      When he uses the name of John Vernon, what

2   he is interested in, is it not true, the amount of the

3   reward that is being offered for the discovery of the

4   murderer of Mr. Szucs.

5              MR. SMYTH:   Your Honor, that is hearsay.

6   I never asked about what Andy Thomas told anyone.   I

7   asked did he ever talk to Andy Thomas or know what

8   Andy Thomas said.

9              THE COURT:   Sustained.

10     Q      (Mr. Odom)   Now, Mr. Smyth asked you in

11  regards to the Bogottus brothers, if the Houston

12  Police Department determined they were not involved in

13  this case, and you answered that yes?

14     A      Yes.

15     Q      Did you determine in your investigation

16  that Mr. James Bogottus was in the Houston area in

17  January of 1996?

18     A      Not that I know of.

19     Q      You didn't.  Did you determine in your

20  investigation of the Bogottus brothers, first of all,

21  that information came to you, it wasn't some wild

22  goose chase, you received information that those

23  individuals may be involved in this particular heist,

24  did you not?

25     A      Well, counsel, before I answer that

1    question, I still want to satisfy you.  I didn't have

2    personal -- I did not even work on the Bogottus

3    people.  The only thing that was drifted to me was

4    from, say, the other investigators on this scene, not

5    on the scene, but during this investigation.

6         Q     I understand.  Then let me ask the

7    question this way and I'll just clear this up.

8              Mr. Smyth asked you the question that the

9    police department determined that they weren't

10   involved in that.  You do not know because you did not

11   handle that type of investigation as to what

12   information was used to make that determination, did

13   you?

14        A     No, sir.

15        Q     It's fair enough.

16        A     Counsel, could I say one other thing in

17   regards to the question you asked me earlier about

18   speaking with --

19        Q     Andy Thomas.

20        A     -- Andy Thomas.  I told you Beth Halling

21   did.  Now I think about it, she didn't really speak

22   with him.  He called her --

23        Q     Agent --

24        A     -- on the telephone, left a message but

25   she didn't really speak with him.  I can't say she

1    spoke with him or she didn't really speak with him

2    because I said yes awhile ago but she didn't talk to

3    him.  He did call.

4         Q     He left a message?

5         A     Yes, sir.

6         Q     Now, Mr. Smyth asked you if the inventory

7    on these particular diamonds might be worth something,

8    right?

9         A     Yes, sir.

10        Q     And I believe you used the example of via

11   Don Smyth wouldn't know the value of these particular

12   diamonds, would he?

13        A     No, sir.

14        Q     Now if someone were in the jewelry

15   business, they might very well know the value of those

16   particular diamonds, wouldn't they?

17        A     Yes, sir.

18        Q     And you don't know whether that disc has

19   anything to do with this robbery, do you?

20        A     No, sir.

21              MR. ODOM:  Pass the witness.

22              THE COURT:  Both of you approach, please.

23              (Off-the-record discussion held at the

24   bench.)

25              THE COURT:  You may step down.

1           Let's call our next witness, please.

2           Ladies and gentlemen, if you will

3    remember, that yesterday Ms. Martinez was direct

4    examined by the State and we allowed Mr. Odom to have

5    an opportunity to commence his cross today.

6           Please proceed.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ESTRELLA MARTINEZ,
 2    was called as a witness by the State and, having been
 3    duly sworn, testified through an interpreter as
 4    follows:
 5                    CROSS EXAMINATION
 6    BY MR. ODOM:
 7         Q      My name is Wendell Odom.  We have never
 8    met or talked, have we?
 9         A      No.
10         Q      You do speak a little English, do you not?
11         A      Almost nothing.
12         Q      Now, Ms. Martinez, you have had an
13    opportunity to make several statements to the police;
14    is that not true?
15         A      Yes.
16         Q      And a number of the statements that you
17    have made to the police have been after you have
18    decided to say that you were involved in the robbery
19    that occurred at the building you worked?
20         A      After what part in me?
21         Q      After you told the police that you were
22    involved in the robbery of the building that you
23    worked at?
24         A      Which ones is the question?  I don't
25    understand you.
```

1     Q     First you told the police that you were

2 not involved in any way in the robbery that occurred

3 in your building?

4     A     Yes.

5     Q     Later you told the police that you were

6 involved?

7     A     Yes.

8     Q     And the reason I say robbery because

9 that's what you are charged with, armed robbery?

10     A     Armed robbery?

11     Q     Aggravated robbery.

12     A     Yes.

13     Q     I would like to ask you about various

14 stories you have told after you told the police that

15 you were involved in this robbery, okay?

16     A     That's fine.

17     Q     Later on, we will go back to other things

18 you said but right now I would like to focus upon the

19 versions that you gave to the police the second time.

20          Now, you gave one statement that was

21 videotaped to the police department?

22     A     Yes.

23     Q     And then you gave a second statement that

24 was videotaped with the police department?

25     A     That's right.

1      Q      Now, the first time that you were

2   videotaped, was that the first time you told the

3   police that you were involved in the robbery?

4      A      I don't remember exactly.

5      Q      At any rate, once you started telling the

6   police that you were involved in the robbery, at that

7   time you had no reason to lie for Mr. Dennes, correct?

8      A      I don't understand the question.

9      Q      You have talked to the authorities several

10  times?

11     A      Yes.

12     Q      But once you started telling the

13  authorities of your involvement in the robbery, you

14  always told them the truth, right?

15     A      Yes.

16     Q      Although you waited awhile before you and

17  your lawyer went and talked, you didn't tell a

18  different story then that you told on the videotapes,

19  right.

20            MR. SMYTH:  Your Honor, I object.  That's

21  a double negative.  It's impossible for her to answer.

22            THE COURT:  Rephrase.

23     Q      (Mr. Odom)  Anybody can ask a double

24  negative, I can.  I apologize.

25            You made two videotaped statements to the

1    police?

2         A      That's right.

3         Q      And then there was a period of time when

4    you stayed in jail.  You and your lawyer then went --

5    you need to say it out loud.

6         A      Yes.

7         Q      Then there was a time period before you

8    went to the authorities with your lawyer and worked

9    out an arrangement?

10        A      That's right.

11        Q      But what you told to the authorities, when

12   you worked out your arrangement, would be no different

13   than what you told to the police on the videotapes?

14        A       It is that it was almost the same but more

15   complete.

16        Q      First of all, on January 24, 1996, you

17   went and opened the door to let two people in?

18        A      Yes.

19        Q      Previously it is your testimony that Ray

20   Dennes told you that he needed for you to open the

21   door, correct?

22        A      That's right.

23        Q      Mr. Dennes told you, did he not, that he

24   needed to let some people in?

25        A      No.

1     Q      You didn't say that?

2     A      No.

3     Q      Did Mr. Dennes talk to you about this

4  event beforehand?

5     A      Is that a question?

6     Q      Yes.  Did he talk to you about letting him

7  in the building beforehand?

8     A      Yes.

9     Q      It's true, is it not, that he told you,

10  and you have testified, that he wanted to get the

11  videotape?

12     A      Exactly.

13     Q      Now, the person that was the security

14  guard before was who?

15     A      Before?

16     Q      Yes, before.

17     A      His name was Charles.  I don't remember

18  his last name.

19     Q      You told Mr. Dennes, according to your

20  testimony, that you could distract Charles, correct?

21     A      No.

22     Q      You didn't tell Mr. Dennes that?

23     A      No.

24     Q      Did Mr. Dennes tell you that he wanted

25  Charles to be distracted?

1        A       Yes.

2        Q       But you told him you could not distract

3   Charles?

4        A       Yes, that it was difficult.

5        Q       That you told him you would not be able to

6   distract him?

7        A       Only that it was difficult.

8        Q       Did you tell Ray that you would be able to

9   distract him?

10       A       I don't remember exactly if I said that.

11       Q       Ray told you that he wanted to get the

12   videotape?

13       A       Exactly.

14       Q       And that is your testimony?

15       A       Yes.

16       Q       He also told you that he wanted to let

17   some people in the building.

18               MR. SMYTH:  Objection, Your Honor.  That

19   has been asked and answered.

20               THE COURT:  Sustained.

21               MR. SMYTH:  I think that was a mistake.  I

22   thought the response --

23               MR. ODOM:  Because of the communication

24   problem, that she might remember a second way a second

25   time.

```
 1              MR. SMYTH:  It's a little difficult to
 2    show the video, Judge.
 3              THE COURT:  As long as you restate any
 4    question that she said when she said just the
 5    opposite.
 6        Q    (Mr. Odom)   Did you ever tell anyone that
 7    Ray told you that these people are very mean that
 8    would be coming into the building?
 9        A    No.
10        Q    Was it your understanding that Ray was
11    going to be the only person that comes into the
12    building?
13        A    No.
14        Q    Did Ray tell you everybody who would be
15    coming into the building?
16        A    No.
17        Q    Now, Charles, the security guard, was a
18    good friend of yourself, was he not?
19        A    Yes.
20        Q    You would laugh and joke with Charles?
21        A    Yes.
22        Q    All right.  And Charles could speak
23    Spanish?
24        A    Yes.
25        Q    At some point it became clear Charles was
```

1       no longer on the job?

2           A       Yes.

3           Q       He got fired?

4           A       Exactly.

5           Q       And a new security guard came to the

6       building, correct?

7           A       That's correct.

8           Q       Do you recall telling anyone that was good

9       because these people might hurt Charles?

10          A       No.

11          Q       You would remember something like that,

12      would you not?

13          A       If I had said it, yes.

14          Q       You would remember it if someone had told

15      you and you would remember if you had made that

16      statement in the past, right?

17          A       Yes.

18          Q       Was it Officer Chavez that you talked to

19      when your video was being taken?

20          A       Maybe.  I don't remember his name.

21          Q       Okay.  Now, on the night in question you

22      were supposed to open the door?

23          A       Yes.

24          Q       When you went to open the door, the door

25      was already open, was it not?

1          A       Yes.

2          Q       Now, Ray had not been to the office that

3     day, had he?

4          A       When?

5          Q       On the 24cth, the day that you were

6     supposed to open the door.

7          A       Yes, he did come.

8          Q       He did come to the office that day?

9          A       He came in.

10         Q       Before you opened the door, he was not in

11    his office Designs by Reinaldo?

12         A       I don't know.  I didn't see him.

13         Q       When Mr. Smyth was asking you questions,

14    didn't you tell him that Ray was pretending to be in

15    Miami and did not go to his office that day?

16         A       Exactly.

17         Q       So Ray was not in his office earlier that

18    day, correct?

19         A       That's correct.

20                 MR. ODOM:  May we approach one second.

21                 (Off-the-record discussion held at bench.)

22         Q       Now, when you do you come to work, when do

23    you start your work, what time?

24         A       At 9:00 in the morning.

25         Q       And how long do you work?  from 9:00 until

1    when?

2         A         9:00 to 1:00.

3         Q         From 9:00 in the evening or 9:00 in the

4    morning until 1:00 in the afternoon?

5         A         That's right.

6         Q         Then later do you come back and work in

7    the evenings?

8         A         That's correct.

9         Q         And when do you come back in the evenings?

10        A         From 6:00 to 10:00 maybe.

11        Q         So you are not there from 1:00 until 6:00

12   o'clock during that day.  From 1:00 in the afternoon

13   until 6:00 o'clock in the evening?

14        A         That's right.

15        Q         Now, before you were to open the door,

16   your friend noticed that the door would not shut

17   before what?

18        A         Pardon me?

19        Q         You had a friend that talked to you, if I

20   recall your testimony correct, that was having trouble

21   with the back door.

22             MR. SMYTH:  Your Honor, there's no

23   testimony to that effect.

24             THE COURT:  I don't recall that.

25             MR. ODOM:  Well, I had a note to that

Page 129

```
1    effect.  That's why I was asking the question.  I

2    mean, I am doing this to clear it up.

3              MR. SMYTH:  I ask the question to suggest

4    that she said that.

5              MR. ODOM:  I have to lead the witness

6    because I have trouble with the witness.

7         Q    Was anyone that you were working with

8    having trouble with the back door?

9         A    No.

10        Q    When you went back, how was the door not

11   closed?  Why would it not close?

12        A    I don't know.

13        Q    Did you look to see why the door was open?

14        A    No, neither.

15        Q    Now, it is your testimony that Ray Dennes

16   called you to open up the back door?

17        A    When?

18        Q    On the night of the 24th.

19        A    Yes.

20        Q    And that when you went to open the back

21   door, did you open it or did he already come in?

22        A    It was opened and after that they entered.

23        Q    Did you open the door for them or did they

24   come in before you got there?

25        A    No, I opened the door.
```

1      Q      So they called you and told you that you

2   needed to open the door for them?

3      A      Yes.

4      Q      Although the door was already opened?

5      A      Exactly.

6      Q      And as soon as you opened the door, they

7   were there immediately?

8      A      Yes.

9      Q      So you opened the door and they

10  immediately came in?

11     A      Yes.

12     Q      Now, your testimony was that Ray and his

13  brother Alberto came into the loading dock area.

14            MR. SMYTH:  That's a misstatement.  She

15  came to a loading dock area.  They came in the

16  building.

17     Q      (Mr. Odom)   They came in the door at the

18  loading dock?

19     A      Yes.

20     Q      And that one was carrying a briefcase or

21  both were carrying a briefcase?

22     A      That one was carrying a suitcase.

23     Q      You haven't previously stated that they

24  were both carrying a briefcase?

25     A      No.

1      Q     Now, when they came in, did you go with

2  them into the stairwell?

3      A     No.

4      Q     What did you do?

5      A     I went back to my job, continued cleaning.

6      Q     Did you wait for them while they went into

7  the stairwell?

8      A     No.

9      Q     You do not know if they went up the

10  stairs?

11      A     There are only stairs to go up.  I don't

12  know if they stayed there on the first floor.

13      Q     In other words, once they went through

14  that door, you went back to do what you had to do?

15      A     Yes.

16      Q     Now, was that the point to wherein you had

17  to distract the security guard?

18      A     No.

19      Q     Was the security guard -- were his cameras

20  on?

21      A     At what moment?

22      Q     At the moment that you let Ray and Albert

23  into the back door.

24      A     He was not.  He was not.

25      Q     I'm not asking if the security guard was

1    at the desk.    I am asking if the cameras were

2    functioning.

3        A      They were always functioning.

4        Q      And the security guard would be able to

5    see someone who walked out into the hallway, would he

6    not?

7        A      Which hallway, I don't know.

8        Q      The hallway up on the seventh floor, for

9    example.

10       A      Yes.

11       Q      Ray did not ask you to distract the guard

12   when you first let them into the back door, did he?

13       A      No.

14       Q      Now, at one point you did distract the

15   guard?

16       A      Yes.

17       Q      And when was that?

18       A      When Reinaldo called me on the phone.

19       Q      And at that point you told the guard you

20   locked yourself out, you had locked your keys on the

21   fifth floor?

22       A      That's right.

23       Q      And how long after you let Ray in was it

24   that you distracted the guard?

25       A      Around 30 minutes.

1                         THE COURT:  Can we break for a second?

2                         Take 15 minutes, ladies and gentlemen.

3                         (Recess taken.)

4                         THE COURT:  Please be seated, ladies and

5        gentlemen.

6            Q       (Mr. Odom)   Ms. Martinez, we were talking

7        about whether you were to going to distract the

8        security guard the first time.

9            A       Yes.

10           Q       What did you tell the security guard?

11           A       That my keys were left in one of the

12       offices on the fifth floor.

13           Q       Tell the jury how you said that in

14       English.

15           A       I'm sorry, my keys is on the fifth floor

16       and in the room.  I don't know the number.  I don't

17       remember.

18           Q       And, of course, he understood that?

19           A       Yes.

20           Q       And you went with him up to the fifth

21       floor?

22           A       Yes.

23           Q       And how long did that take?

24           A       From five to -- five minutes, I believe.

25           Q       After you got your keys back from the

1    fifth floor, where did you go?

2        A      I continued working.

3        Q      Where?

4        A      Fifth floor.

5        Q      Where did the security guard go?

6        A      The elevator.

7        Q      And he went back downstairs, did he not?

8        A      I didn't see him.  Maybe.

9        Q      He could have gone upstairs, I guess, but

10   he went in the elevator?

11       A      Exactly.

12       Q      How long was it after that Ray called you

13   and told you you needed to distract the guard?

14       A      About 30 minutes, 40 minutes -- between 30

15   and 40 minutes.

16       Q      It wasn't a very short period of time?

17       A      I don't know.

18       Q      You know it was 30 or 40 minutes at least?

19       A      Yes.

20       Q      Now, between the time you let Ray in the

21   back door and the first time he wanted to distract the

22   guard, how long was it?

23       A      Around 30 minutes.

24       Q      All right.  It's 30 minutes from the time?

25              MR. ODOM:   May I approach Estrella, Your

1    Honor?

2              THE COURT:   You may.

3    Q    You let him in around 7:30?

4    A    No.

5    Q    About what time did you let him in?

6    A    From 6:00 to 6:30.

7    Q    Okay.  Then 30 minutes goes by and he asks

8    for you to distract the guard?

9    A    Approximately, not exactly.

10   Q    Then he asks you to distract the guard a

11   second time and it's about 30 minutes later?

12   A    Yes, approximately.

13   Q    Now, during this time period, you are not

14   on the first floor, you do not go down to the first

15   floor?

16   A    No.

17   Q    During this time period, you do not

18   observe what is going on at the back door by that

19   loading dock door?

20   A    No -- yes, I don't know.

21   Q    And during this time period, you do not

22   see Ray?

23   A    Yes, I don't see him.

24   Q    You don't distract the guard the first

25   time until you are told to by Ray, right?

1      A       I distract the guard when he told me the

2   first time.

3      Q       After he calls you on the phone?

4      A       Yes.

5      Q       You don't open the door until he calls you

6   on the phone?

7      A       Exactly.

8      Q       And you don't distract the guard the

9   second time until he calls you on the phone?

10      A       Until he calls me on the phone.

11      Q       You think that after you have distracted

12   the guard the first time that Ray has taken the

13   video.

14              THE INTERPRETER:  Excuse me.

15      Q       That Ray has taken the video?

16      A       Yes.

17      Q       Because that's what he says he wants to do

18   is come take the video?

19      A       Exactly.

20      Q       Now, when Ray calls you the second time,

21   do you know where the guard is?

22      A       Normally on the first floor.

23      Q       Do you have a way of paging the guard?

24      A       No.

25      Q       You have to go find the guard?

1        A       Exactly.

2        Q       And where are you when he pages you the

3    second time?

4        A       What pager?

5        Q       I'm sorry.  Where are you when Ray calls

6    you the second time?

7        A       I believe I remember on the second floor,

8    I'm not sure.

9        Q       And you have to go find the security

10   guard?

11       A       Yes.

12       Q       Where is the security guard?

13       A       On the first floor.

14       Q       At his desk?

15       A       Yes.

16       Q       So you go down and find the security guard

17   at his desk on the first floor?

18       A       Yes.

19       Q       And you asked the security guard to let

20   you into the deli?

21       A       That's right.

22       Q       And you walk with the security guard to

23   the deli?

24       A       Yes.

25       Q       And both you and the security guard, when

```
1       you are at the deli, you realize you don't need to go

2       in the deli?

3            A       We were not inside the snack bar --

4       hallway.

5            Q       Now, in order to clean up these areas, do

6       you have anything with you?

7            A       Yes.

8            Q       Do you have a cart with you?

9            A       Yes.

10           Q       So you come down to the first floor where

11      your cart is?

12           A       Yes.

13           Q       And you take your cart and go to where the

14      security guard is?

15           A       Yes.

16           Q       And the two of you then walk to the deli?

17           A       Exactly.

18           Q       And you are not in the deli all by

19      yourself?

20           A       No.

21           Q       The security guard doesn't have to worry

22      about whether or not you are eating all the food in

23      the deli because Jeovanni is in there?

24           A       He didn't go inside the snack bar.

25           Q       Right.  But there would be no need for the
```

```
 1    security guard to worry about the cleaning people
 2    eating the food in the deli because Jeovanni is in the
 3    deli?
 4         A    The security guard didn't know Jeovanni.
 5         Q    But the security guard knows that he is a
 6    worker as opposed to a cleaning person in the deli?
 7         A    Excuse me.
 8         Q    I mean the security guard would be able to
 9    tell Jeovanni belongs to the deli; he is not a
10    cleaning person.
11              MR. SMYTH:  Object, that's speculation on
12    what the security guard knows or what she knows the
13    security guard may know about Jeovanni.
14              THE COURT:  Sustained.
15         Q    (Mr. Odom)  Now, during all of this time,
16    your phone is going off?
17         A    Yes.
18         Q    And Ray is on the other side of the phone?
19         A    That's right.
20         Q    So Ray can hear you talking to the
21    security guard?
22         A    Yes.
23         Q    And he can hear you walking down towards
24    the deli with the security guard?
25         A    Yes.
```

1        Q       And he can also hear that the guard is

2   going to come -- you are not going to -- there is no

3   need for you to go into the deli?

4        A       I don't understand the question.

5        Q       What is said, when you get to the deli and

6   Jeovanni is already in the deli, and the guard does

7   not need to let you in?

8        A       Not exactly.  I asked Jeovanni if I could

9   clean now the office or to wait after he finished.

10       Q       Okay.  And where is the telephone?

11       A       In my pocket, in my apron.

12       Q       And where is the guard?

13       A       Close to us.

14       Q       Once the guard hears that you do not need

15  to go into the deli, he turns around and goes back to

16  the lobby?

17       A       Exactly.                    .

18       Q       And you also turn around and follow him

19  towards the lobby?

20       A       No.

21       Q       What do you do?

22       A       I go towards the bathroom, the opposite

23  direction of him.

24       Q       I am confused.

25               MR. ODOM:  May I approach the chart?

```
 1                    THE COURT:  Yes.

 2        Q      Can you see this?

 3        A      Yes.

 4        Q      Do you recognize this as the lobby area?

 5        A      Yes.

 6        Q      And is the deli back here?

 7        A      No, the first part.

 8        Q      This part?

 9        A      No.  No, the first one.  Oh, yeah, I'm

10   sorry; yeah.

11        Q      This area right in here?

12        A      Yeah.

13        Q      And you talked to Jeovanni here at the

14   deli?

15        A      Yes.

16        Q      And the guard is with you?

17        A      Yes.

18        Q      And he goes back towards the lobby?

19        A      That's right.

20        Q      And you are going back the opposite

21   direction towards the garage?

22        A      No.

23        Q      You go down the hallway towards the lobby

24   as well, do you not?

25        A      That's right.
```

```
 1         Q      So you were walking behind the guard, the

 2    security guard?

 3         A      Almost near him.

 4         Q      But you are pushing a cart but he can walk

 5    faster than you can?

 6         A      Exactly.

 7         Q      So when you go around here -- I'm sorry.

 8    You are right.  I misspoke.

 9                When the guard walks around here, you are

10    carrying your cart with you behind him?

11         A      Yes.

12         Q      How far has the guard walked before you

13    see someone who walks like Ray?

14         A      Like close to the second elevator, the one

15    in the middle.

16         Q      So the security guard walks this far?

17         A      Exactly.

18         Q      And you are somewhere around the bathroom?

19         A      Yes.

20         Q      When you first come out into the lobby

21    area, do you look down and see someone that walks like

22    Ray going towards the security guard?

23         A      Yes.

24         Q      And you are shortly behind the security

25    guard?
```

1       A       No, I'm almost there at the bathroom.   I'm

2   almost there at the bathroom.

3       Q       But what I mean, you were following fairly

4   close behind the security guard.

5       Q       In this part?

6       A       In that part, yes.

7       Q       Okay.   The person that you see walking

8   down towards the security guard you do not get a good

9   look at his face, do you?

10      A       No.

11      Q       You recognize him only because of his

12  walk?

13      A       Yes.

14      Q       The person who is coming towards the

15  security guard, does he have a lot of hair on the top

16  of his head?

17      A       I didn't get to see very well.

18      Q       You did however see a hat on top of his

19  head?

20      A       Yes.   That's what I now --

21      Q       Now, describe Ray's walk.

22      A       Straight, somewhat elegant, and how would

23  you say, like strolling from side to side.

24      Q       And Ray is the only person you have ever

25  seen that has that type of walk?

1        A       Yes.

2        Q       It wasn't that he strolled, it was more

3    like he was jogging as he walked?

4        A       Yes, it could be.

5        Q       Isn't that what you said originally.

6                MR. SMYTH:  As far as that being what she

7    said originally, that's a misstatement.

8                MR. ODOM:  I don't think it is, Judge.

9                THE COURT:  Re-ask the question.

10               (Whereupon, the following proceedings were

11   held before the Bench.)

12               MR. ODOM:  Give me a time, there is a

13   translation.

14               THE COURT:  I didn't hear the question.

15   Let me hear what the question was.

16               MR. ODOM:  I think we are having a

17   difference.

18               THE COURT:  Let me hear what the question

19   was.

20               MR. ODOM:  The question:  Describe how he

21   walks and I believe the translator said that he was

22   strolling and my understanding is that an

23   interpretation of that would be more jogging as

24   opposed to strolling as to what she said.  What we are

25   having here is a difference to how the words can be

```
 1    used in different ways.  The Spanish word used in

 2    different ways is used in different ways and I am

 3    trying to clear that up.  I am not trying to --

 4             THE COURT:  Strolling and jogging

 5    certainly don't mean the same to me.

 6             MR. ODOM:  It was brought to my attention

 7    there might be a difference here and there might be a

 8    question and I was trying to focus on that.

 9             THE COURT:  Again, we don't ask it in such

10    a way to mean.  I want her to give her own independent

11    answer.

12             THE INTERPRETER:  When he says jogging,

13    that means like walking.

14             MR. ODOM:  That doesn't mean we have the

15    right to interpret.

16             THE COURT:  Make sure you don't.  As long

17    as you don't change the form, it's a given what she

18    said.

19             (Whereupon, the following proceedings were

20    held before the jury.)

21       Q     (Mr. Odom)   Ms. Martinez, can you show

22    what you mean?

23       A     Do I stand up?

24       Q     Yes, please.

25       A     (Witness demonstrates.)
```

1        Q        And had his hands behind him?

2        A        Yes.

3        Q        Ms. Martinez, Mr. Dennes is the only

4   person you know who walks like this?

5        A        Yes.

6        Q        Have you ever seen any other people that

7   walk like this.

8                 MR. SMYTH:  Object, Your Honor, asked and

9   answered.

10                THE COURT:  You asked.  Sustained.

11                MR. ODOM:  It's the only person she knows.

12   Because she can see other people that walk like that,

13   she does not know.  That's my whole point.

14                THE COURT:  Very well.

15                MR. ODOM:  With all due respect to Mr.

16   Smyth.

17                MR. SMYTH:  I apologize and I'm out of

18   line when making a gesture.

19                THE COURT:  It will cost you $500 the next

20   time.

21        Q        (Mr. Odom)  Ms. Martinez, this is the

22   only man you know that walks like that, correct?

23        A        Yes.

24        Q        There can be other people that walk like

25   that that you do not know?

```
 1          A       Maybe.

 2          Q       And if there is someone else who you do

 3    not know that walks like that --

 4                  THE COURT:  Let him finish asking the

 5    question.

 6          Q       -- you might think that was Ray Dennes.

 7                  MR. SMYTH:  Your Honor, that's a

 8    hypothetical based on facts not in evidence.

 9                  MR. ODOM:  That's a question as far as

10    probing her identification.

11                  THE COURT:  I'll sustain that objection.

12          Q       (Mr. Odom)   How many times have you seen

13    Albert Dennes walk?

14          A       Since I started working in the building.

15          Q       All right.  So you have seen Albert since

16    for five months?

17          A       Pardon me.  I understood Reinaldo.

18          Q       I meant to say Reinaldo.

19          A       I'm sorry.

20          Q       How long have you known Albert Dennes?

21          A       From one month, a month and a half only.

22          Q       You did not know his name however, did

23    you?

24          A       Yes.

25          Q       You did.  I'm confused.  You did know his
```

1    name or did not know his name?

2         A       Yes, I did know his name.

3         Q       When you were arrested, you knew that

4    Alberto was the brother of Ray and knew his name?

5         A       Yes.

6         Q       Now, did you see the face of the person

7    that shot the security guard?

8         A       Not totally.

9         Q       What did you see?

10        A       A person with an overall with a mustache,

11   Reinaldo's height, with a cap wearing it backwards.

12        Q       In order to see his mustache, you saw his

13   face?

14        A       The mustache was big and everything

15   happened so fast I didn't get to see his face.

16        Q       You don't remember his face but you

17   actually saw his mustache and his hat and his face,

18   did you not?

19        A       Yes.

20        Q       Does Albert have a mustache?

21        A       I don't remember, maybe yes.

22        Q       Do you remember how Albert walks?

23        A       No.

24        Q       You don't know if Ray had on a disguise

25   that night, do you?

1          A       I saw him already with a disguise.

2          Q       So you say that because you recognized his

3     walk, not because you saw his face?

4          A       Because the way he walks and because he

5     told me on the phone that he was going to shoot the

6     guard.

7          Q       Because you heard Ray say that?

8          A       No, he told me.

9          Q       Because you heard him say on the phone

10    that he might have to shoot the guard?

11         A       He told me --

12                 MR. SMYTH:  I'm not trying to -- did you

13    finish your question?

14                 MR. ODOM:  I was leading to another

15    question.

16                 MR. SMYTH:  I object to that question as

17    far as it got because it's a misstatement of what she

18    did say.

19                 THE COURT:  She is fine.

20                 MR. ODOM:  Judge, that's something for the

21    jury to determine.

22                 THE COURT:  Is that what you are referring

23    to?

24                 MR. SMYTH:  That he might have to shoot.

25    He said if you don't distract the guard, I will shoot

1    him.

2              THE COURT:  That's the statement that I

3    recall.

4        Q    (Mr. Odom)   Ray did not say that he was

5    going to shoot the guard, did he?

6        A    Yes, he told me.

7        Q    Didn't he say unless he was distracted

8    that he would have to shoot the guard?

9        A    I don't understand the question very well.

10       Q    In other words, Ray didn't tell you ahead

11   of time that he was going to go shoot the guard, did

12   he?

13       A    If I didn't distract the security guard,

14   that he was going to shoot him.

15       Q    Right.  So, in other words, Ray said he

16   may have to shoot the guard.

17             MR. SMYTH:  Your Honor, that's not what

18   she just said.

19             THE COURT:  I agree.  Well, that's not

20   what you said.  This is between what he might have to

21   do and what he would have to do.  So I sustain the

22   objection.  I agree something occurred but she

23   testified what he would do if an event occurred.

24       Q    (Mr. Odom)   Part of your identification

25   of Ray is based upon that conversation on the

1    telephone, is it not?

2       A    Yes.

3       Q    It's not based upon you seeing his face

4    and recognizing his face?

5       A    No, because it was different with the

6    mustache and I do know that he doesn't wear a

7    mustache.

8       Q    You do not know how many people have come

9    into the building from the back door, do you?

10      A    Like what time?

11      Q    When you open the door and after you leave

12    the back door.

13            MR. SMYTH:  Your Honor, that's pure

14    speculation whether anybody came in or -- in the whole

15    world.  She is not there.  She couldn't know.

16            THE COURT:  Sustained.

17      Q    (Mr. Odom)  You are not in a position to

18    know one way or another if other people came in the

19    back door, are you?

20      A    No.

21      Q    From the 30 minutes -- well, from 6:30

22    until an hour later, you do not know who may or may

23    not be coming in the door?

24      A    No, because I am working.

25      Q    You don't know where Albert is, do you?

```
 1        A       No.

 2        Q       You don't know where Francisco is, do you?

 3        A       Only that he was at a parking lot.

 4        Q       And how do you know that?

 5        A       Reinaldo told me.

 6        Q       So you don't really know if he was in the

 7   parking lot or if he has come in the building, do you?

 8        A       No.

 9        Q       And they don't tell you if there is other

10   people that may be in the building, do they?

11        A       No.

12        Q       You don't know who is on the seventh

13   floor, do you?

14        A       No.

15        Q       You don't know what is going on on the

16   seventh floor, do you?

17        A       No.

18        Q       Now, before this you have known Ray for

19   five months?

20        A       Yes.

21        Q       And how long had you been in the country

22   prior to working in the Greenrich Building?

23        A       15 days.

24        Q       And when you were -- where are you from?

25        A       Matamoros, Mexico.
```

1        Q        And, in Matamoros, what job, what

2     profession, were you in in Matamoros?

3        A        I was in control of contracts at a radio

4     station.

5        Q        You worked for a radio station?

6        A        Yes.

7        Q        And did you work for a theater as well?

8        A        No.

9        Q        Just for the radio station.

10       A        Yes.

11       Q        Did you do just the paperwork with the

12    radio stations?

13       A        Just the contracts, the control of

14    contracts.

15       Q        You did not know Ray before you came here?

16       A        No.

17       Q        You met him when you worked there at the

18    building?

19       A        That's right.

20       Q        Now, actually how long had he been your

21    boyfriend?

22       A        Like in October, more or less, November,

23    '95.

24       Q        Four months?

25       A        Three months.

1      Q       If you would have said five months before,

2   that would not be correct?

3      A       Incorrect.

4      Q       Now, you worked there because your sister

5   had worked there, correct?

6      A       That's right.

7      Q       And your sister was pregnant and you took

8   her place?

9      A       Yes.

10     Q       And it was upon her recommendation that

11  you were hired?

12     A       That's right.

13     Q       I believe you told Mr. Smyth that your

14  relationship with Ray was like husband and wife?

15     A       Yes, it was intimate.

16     Q       Was it more like lovers or was it more

17  like man and wife?

18     A       He was separated.  And he promised me a

19  lot of things; that he was going to get a divorce and

20  that we were going to be together.

21     Q       But you didn't have another boyfriend, did

22  you?

23     A       I had male friends.

24     Q       But no other lovers?

25     A       No.

1          Q       The defendant, Mr. Dennes, tells you that
2      he needs to get some tapes from the building?
3          A       Yes.
4          Q       Did you ask why he needs the tapes from
5      the building?
6          A       Yes.
7          Q       And he tells you that some men are going
8      to do something, correct?
9          A       Exactly.
10         Q       He doesn't say that he's going to do
11     something.  He indicates other people are going to do
12     something in the building?
13         A       Yes.
14         Q       And it's Ray's job to get the video?
15         A       Yes.
16         Q       Ray does not tell you he's going to pay
17     you money for this; is that your testimony?
18         A       I don't understand the question.
19         Q       When Ray says you need to leave the door
20     open so I can get the video, or whatever he says to
21     that effect, does he tell you that he is going to give
22     you money?
23         A       No.
24         Q       But after this is all done, he gives you
25     $5000?

1        A      He had told me before that he was going to

2    help me.

3        Q      But he told you that five months ago when

4    you all became lovers.

5        A      Five months before; no.

6        Q      I'm sorry, three months before.

7        A      Yes.

8        Q      Now, when you got the money from

9    Francisco?

10       A      Yes.

11       Q      You told the State that it was $5000?

12       A      Yes.

13              MR. ODOM:  May I approach the witness,

14   Your Honor?

15              THE COURT:  Certainly.

16       Q      And you were shown the money that was

17   taken from your apartment.

18              MR. SMYTH:  Your Honor, if he likes the

19   original money, we have got it.

20       Q      (Mr. Odom)  Do you recall seeing this

21   money?

22       A      Yes.

23       Q      But when you got this money, it did not

24   have this purple color to it, did it?

25       A      Exactly I don't remember it.  It's

1    possible.  There were too many.

2         Q      But regardless you don't remember the

3    strange purple color to the money, do you?

4         A      I didn't get to see one by one so I don't

5    remember.

6         Q      You don't know anything about

7    fingerprints, do you?

8         A      No.

9         Q      Now, Ray tells you that Francisco is to be

10   in the parking lot?

11        A      Yes.

12        Q      But he doesn't tell you about what Alberto

13   or anyone else is doing?

14        A      No.

15        Q      Has Ray given you anything as a gift?

16        A      Yes.

17        Q      What type of things has he given you?

18        A      A watch, money, perfume, small.

19        Q      But all of this or none of this has

20   anything to do with you opening a door for him, does

21   it?

22        A      No.

23        Q      Now, at some point Ray tells you he is

24   going to go to Miami?

25        A      Yes.

```
 1        Q        Do you know where Ray is from?

 2        A        Yes.

 3        Q        It's Miami?

 4        A        No.

 5        Q        Where is his family?

 6        A        His family is in Miami.

 7        Q        Do you know if Ray has gone to Miami

 8   before?

 9        A        No, no.

10        Q        When you let Ray in the door, is he

11   wearing a tie?

12        A        I don't remember.

13        Q        Is he dressed the same way that Albert is

14   dressed?

15        A        They looked almost the same.

16        Q        The person that shoots the security guard

17   is wearing a jumpsuit?

18        A        Yes.

19        Q        Is what you are saying that the shirts are

20   similar?

21        A        Which shirts?

22        Q        Between the men that shoots the security

23   guard and Ray when he comes in the back door.

24        A        No, he was not dressed the same.

25        Q        Do you recall if the shirts were similar
```

1   between the person who shot the security guard and the

2   shirt that Ray had on when he came in the back door?

3        A     No, because he had the overall on and he

4   looked all dark.

5        Q     I'm sorry.  I didn't hear that.

6        A     No, because he had the overall on and it

7   was all dark.

8        Q     Did the overalls cover the shirt?

9        A     Yes.

10       Q     The coveralls completely covered the

11   shirt?

12       A     Yes.

13       Q     Now, were the overalls long sleeved or

14   short sleeved?

15       A     I believe long sleeved.

16       Q     And was the person who shot the security

17   guard was he wearing gloves?

18       A     No.  I didn't pay attention.  He had his

19   hands in the back.  I didn't see.

20       Q     You have seen Ray's hands before, have you

21   not?

22       A     Yes.

23       Q     What's different about his hands?

24       A     I believe he has a burn, something like

25   that.  I don't remember.

1          Q       You have been intimate with Mr. Dennes,

2     have you not?

3          A       Yes.

4          Q       And you are not sure if he has any

5     distinctive mark?

6          A       In his arm, I believe, it seems like left

7     arm, it seems like.

8          Q       You would certainly know if he had a

9     distinctive mark, left arm or right arm, would you

10    not?

11         A       Yes.

12         Q       I take it, on the night in question, that

13    you did not have an opportunity to see if the person

14    who walked like Ray had a distinctive mark on his

15    hands or arms?

16         A       No, because he had a long sleeve.

17         Q       Now, is it his left arm that he has the

18    distinctive mark?

19         A       Not exactly, I don't remember.

20         Q       Does he have any other distinctive marks

21    on his body?

22         A       No, I don't remember.

23         Q       Ms. Martinez, if Ray Dennes was burned

24    over 19 percent of his body and you were intimate with

25    him, you would know that, would you not.

```
 1                    MR. SMYTH:  I Object.

 2                    MR. ODOM:  I think that's a fair

 3      statement.

 4                    THE COURT:  It's overruled.  You may

 5      answer.

 6          A      Yes.

 7          Q      (Mr. Odom)   But you don't remember any

 8      such burns on his body other than perhaps his arm?

 9          A      Exactly.

10                    THE COURT:  Okay.  It's 4:30 unless you

11      want to -- we are going to stand recessed unless you

12      want to come in tomorrow.  I assume you don't.  We

13      stand in recess until Monday morning at 9:45.

14                    Please once again remember the

15      admonishments not to discuss this case with anyone.

16      Have a good weekend and we will see you Monday.

17                    (Court adjourned for the day.)

18

19

20

21

22

23

24

25
```

APPELLATE COURT NO. *72966*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

-----------------------------------------------------

REINALDO DENNES

                  Appellant,

VS.

THE STATE OF TEXAS,

                  Appellee.

-----------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge Jim Wallace, Presiding

-----------------------------------------------------

CAUSE NO. 750,313

August 25, 1997

Court Reporter's Record

Volume 30 of *39* Volumes

**FILED IN**
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002



Volume 30
Trial

August 25, 1997

Chronological

Estrella Martinez

Cross Examination Continued 4

Redirect Examination by Mr. Smyth 16

Recross Examination by Mr. Odom 20

Beth Halling

Direct Examination by Mr. Vinson 24

Voir Dire Examination by Mr. Odom 37

Direct Examination Continued 39

Voir Dire Examination by Mr. Odom 39

Direct Examination by Continued 40

Cross Examination by Mr. Odom 49

Redirect Examination by Mr. Vinson 64

Recross Examination by Mr. Odom 68

Further Direct Examination 71

Further Cross Examination 71

Tommy J. Brown

Direct Examination by Mr. Vinson 72

Cross Examination by Mr. Odom 96

G. L. Burke

Direct Examination by Mr. Vinson 102

W. L. Stairhime

Direct Examinaton by Mr. Vinson 107

Cross Examination by Mr. Odom 117

i

Redirect Examination by Mr. Vinson                    123

Recross Examination by Mr. Odom                       125

Walter Rowe

Direct Examination by Mr. Vinson                      129

Cross Examination by Mr. Odom                         134

Leroy Tuttle

Direct Examination by Mr. Vinson                      138

Cross Examination by Mr. Odom                         143

Redirect Examination by Mr. Vinson                    145

W. L. Stairhime

Direct Examination by Mr. Vinson                      146

Robert Baldwin

Direct Examination by Mr. Smyth                       148

Cross Examination by Mr. Odom                         170

Volume 30

Trial

August 25, 1997

Alphabetical

Robert Baldin

       Direct Examination by Mr. Smyth     148

       Cross Examiantion by Mr. Odom     170

Tommy J. Brown

       Direct Examination by Mr. Vinson     72

       Cross Examiantion by Mr. Odom     96

G. L. Burke

       Direct Examiantion by Mr. Vinson     102

Beth Halling

       Direct Examiantion by Mr. Vinson     24

       Voir Dire Examination     37

       Direct Examination Continued     39

       Voir Dire Examiantion     39

       Direct Examination Continued     40

       Cross Examintion by Mr. Odom     49

       Redirect Examination     64

       Recross Examination     68

       Further Direct Examination     71

       Further Cross Examination     71

Estrella Martinez

       Cross Examination Continued     4

       Redirect Examintion by Mr. Smyth     16

Recross Examination by Mr. Odom                 20

Walter Rowe

    Direct Examination by Mr. Vinson          123

    Cross Examination by Mr. Odom             125

W. L. Stairhime

    Direct Examination by Mr. Vinson          107

    Cross Examination by Mr. Odom             117

W. L. Stairhime

    Direct Examination by Mr. Vinson          146

Leroy Tuttle

    Direct Examination by Mr. Vinson          138

    Cross Examination by Mr. Odom             143

    Redirect Examination by Mr. Vinson        145

State's Exhibit No. 131        photo
  Marked                Volume 30           35
  Identified                                35
  Offered                                   35
  Admitted              Volume 30           36

State's Exhibit No. 132        fired bullet
  Marked                Volume 30           35
  Identified                                35
  Offered                                   35
  Admitted              Volume 30           36

State's Exhibit No. 133        photo
  Marked                Volume 30           20
  Identified                                35
  Offered                                   35
  Admitted              Volume 30           36

State's Exhibit No. 134        photo
  Marked                Volume 30           35
  Identified                                36, 142
  offered                                   36
  Admitted              Volume 30           40

State's Exhibit No. 134 A      photo
  Marked                Volume 30           42
  Identified                                43, 141
  Offered                                   43
  Admitted              Volume 30           43

State's Exhibit No. 135        owner's manual
  Marked                Volume 30           36
  Identified                                36, 142
  Offered                                   36
  Admitted              Volume 30           43

State's Exhibit No. 136          photo

                Marked         Volume 30                        66

                Identified                                      66

                Offered                                         67
                Admitted       Volume 30                        67

State's Exhibit No. 137          photo

                Marked         Volume 30                        66

                Identified                                      66

                Offered                                         67

                Admitted       Volume 30                        67

State's Exhibit No. 138          photo

                Marked         Volume 30                        66

                Identified                                      66

                Offered                                         67

                Admitted       Volume 30                        67

State's Exhibit No. 139          photo

                Marked         Volume 30                        66

                Identified                                      66

                Offered                                         67

                Admitted       Volume 30                        67

State's Exhibit No. 140          photo

                Marked         Volume 30                        66

                Identified                                      66

                Offered                                         67
                Admitted       Volume 30                        67
State's Exhibit No. 141          photo

                Marked         Volume 30                        66
                Identified                                      66

                Offered                                         67

                Admitted       Volume 30                        67

State's Exhibit No. 142  photo

   Marked   Volume 30   66

   Identified       66

   Offered       67

   Admitted   Volume 30   67

State's Exhibit No. 143  autopsy report

   Marked   Volume 30   85

   Identified       86

   Offered       87

   Admitted   Volume 30   87

State's Exhibit No. 144  bullet

   Marked   Volume 30   85

   Identified       87

   Offered       87

   Admitted   Volume 30   87

State's Exhibit No. 145  bullet

   Marked   Volume 30   85

   Identified       86

   Offered       87

   Admitted   Volume 30   87

State's Exhibit No. 146  bullet

   Marked   Volume 30   85

   Identified       86

   Offered       87

   Admitted   Volume 30   87

State's Exhibit No. 147        photo

                    Marked            Volume 30                89

                    Identified                                 89

                    Offered                                    90

                    Admitted          Volume 30                92

State's Exhibit No. 148        photo

                    Marked            Volume 30                89

                    Identified                                 89

                    Offered                                    90

                    Admitted          Volume 30                92

State's Exhibit No. 149        photo

                    Marked            Volume 30                89

                    Identified                                 89

                    Offered                                    90

                    Admitted          Volume 30                92

State's Exhibit No. 150        photo

                    Marked            Volume 30                89

                    Identified                                 89

                    Offered                                    90

                    Admitted          Volume 30                92

State's Exhibit No. 151        photo

                    Marked            Volume 30                89

                    Identified                                 89

                    Offered                                    90

                    Admitted          Volume 30                92

State's Exhibit No. 152        photo

    Marked                   Volume 30                    89

    Identified                                            89

    Offered                                               90

    Admitted                 Volume 30                    92

State's Exhibit No. 153        photo

    Marked                   Volume 30                    89

    Identified                                            89

    Offered                                               90

    Admitted                 Volume 30                    92

State's Exhibit No. 154        photo

    Marked                   Volume 30                    89

    Identified                                            89

    Offered                                               90

    Admitted                 Volume 30                    92

State's Exhibit No. 155        fired core bullet

    Marked                   Volume 30                   105

    Identified                                           105

    Offered                                              105

    Admitted                 Volume 30                   105

State's Exhibit No. 156        latent fingerprint

    Marked                   Volume 30                   106

    Identified                                           116

    Offered                                              116

    Admitted

                                                   ix

```
 1                          CAUSE NO. 750,313

 2    STATE OF TEXAS              IN THE 263RD DISTRICT COURT

 3    VS.                                  OF

 4    REINALDO DENNES            HARRIS COUNTY, T E X A S

 5    A P P E A R A N C E S:

 6    For the State:            Mr. Mark Vinson
                                Bar Card No. 20590450
 7                              Mr. Don Smyth
                                Bar Card No. 18777700
 8                              Assistant District Attorneys
                                201 Fannin
 9                              Houston, Texas 77002
                                713-755-7050
10    For the Defendant:        Mr. Wendell Odom
                                Bar Card No. 15208500
11                              Attorneys at Law
                                Ms. Yalia Guerrero
12                              Bar Card No. 0078862
                                1301 McKinney, Suite 3100
13                              Houston, Texas 77010
                                713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 25th

17    day of August, A. D. 1997, the above entitled and

18    numbered cause came on for trial before the Honorable

19    Jim Wallace, Judge of the 263rd District Court of

20    Harris County, Texas; and the State appearing in

21    person and the Defendant appearing in person and by

22    counsel, announced ready for trial, after a jury

23    having been selected, and all preliminary matters

24    having been disposed of, the following proceedings

25    were had, viz:
```

1           (Jury came into the courtroom.)

2           THE COURT:  Please be seated.

3           Good morning, ladies and gentlemen.  I

4    want to clarify something, to make sure you don't

5    think I am way out of line with the estimate I gave

6    you about how long it was going to last.  If I recall,

7    I told most of you, if we went more than a week, I

8    didn't think we would go further than Monday or

9    Tuesday but remember I didn't tell you what Monday or

10   Tuesday.

11          I am ready to get started again, and we

12   are going to move along.  Mr. Odom has Ms. Martinez on

13   cross.

14

15

16

17

18

19

20

21

22

23

24

25

1                  ESTRELLA MARTINEZ,

2    was called as a witness for the State and, having been

3    duly sworn, testified as follows:

4                  CROSS EXAMINATION CONTINUED

5    BY MR. ODOM:

6                  MR. ODOM:  If I may, Your Honor.

7                  THE COURT:  Please.

8        Q        How are you this morning, Ms. Martinez?

9        A        Fine.

10       Q        We were talking on Friday about the events

11   that occurred on January 24, 1996.

12       A        Yes.

13       Q        And I believe I had asked you questions

14   and you had told both myself and Mr. Smyth about the

15   number of times that you had talked to the police.  Do

16   you recall that?

17       A        Yes, I remember something like that.

18       Q        Okay.  I would like to go in to some of

19   that briefly at this point.

20                First of all, you talked to the police on

21   January 24, 1996?

22       A        Yes.

23       Q        Did you talk to them again the following

24   day or the next two days?

25       A        I don't remember exactly.  I believe so.

1       Q       Do you recall if the next time you had a

2   long interview with the police was when they did a

3   videotape of your testimony?

4       A       Yes.

5       Q       And there were two incidents where you

6   talked to them and they videotaped what you had to

7   say?

8       A       Yes.

9       Q       And in both of those instances, you told a

10  different story than what you told on the night of

11  January 24th?

12      A       Yes.

13      Q       Now, do you recall when the videotapes,

14  when you sat down with the police and they videotaped

15  those stories, do you recall the dates of those?

16      A       February 23rd, it seems, '96.

17      Q       Okay.  The first one was February 23rd,

18  '96, right?

19      A       Yes.

20      Q       And do you recall making a second

21  statement the following day on the 24th?

22      A       Yes.

23      Q       And both of these were videotaped?

24      A       That's right.

25      Q       Now, when you told the police what

1    happened on the 23rd and the 24th, you told the truth,

2    correct?

3         A       No, totally the whole truth.

4         Q       But you were not covering up for Ray

5    Dennes any more on those occasions, were you?

6         A       Covering?  I don't understand that

7    question about covering.

8         Q       You were not lying for Ray Dennes at this

9    point?

10        A       Yes, the truth.

11        Q       I don't understand that answer.  You were

12   or you were not lying for Ray Dennes on the 23rd and

13   the 24th?

14        A       Yes, because he told me for me to continue

15   trying to say the same thing.

16        Q       But on the 23rd and the 24th you were no

17   longer saying the same thing, were you?

18        A       No, I didn't change.

19        Q       On the 23rd and the 24th, you were telling

20   a story similar to the story you told the ladies and

21   gentlemen of the jury?

22        A       Yes.

23        Q       And you were no longer lying for Ray

24   Dennes at that point?

25        A       Oh, I understand.  It is that I didn't

1    understand the question.

2          Q       Right.  I understand.

3                  Can you tell the ladies and the gentlemen

4    of the jury why it is -- first of all, can you tell

5    them if, on the 23rd and the 24th, did you mention

6    anything to the police about telephones?

7          A       The truth: too much time has passed by and

8    I don't remember exactly.

9          Q       You told Mr. Smyth that every time you did

10   something on the night of the 24th it was only after

11   Ray told you on the telephone, correct?

12         A       Yes.

13         Q       You also told Mr. Smyth that the reason

14   there is a ten-minute conversation on the telephone

15   was so that Ray could hear your conversation with the

16   security guard, correct?

17         A       Yes.

18         Q       And so that Mr. Dennes would know how long

19   it was that the security guard was being distracted?

20         A       Yes.

21         Q       Those are important matters that occurred

22   during the night of January 24, 1996, correct?

23         A       Yes.

24         Q       And you would have remembered those

25   matters when you talked to the police, would you not,

1    on the 23rd and the 24th?

2         A     Yes, I would have remembered.

3         Q     And, of course, you would have told the

4    police that on the night when you had those interviews

5    on the 23rd and the 24th, would you not?

6         A     I was very nervous.  I didn't know if to

7    say everything or -- I was afraid.  I was afraid to go

8    to jail.

9         Q     But you are telling the police that you

10   knew everything that you told the jury last week.  Why

11   would you be afraid to tell them about the telephones?

12        A     Because I was already involved on the

13   calls.

14        Q     I understand you were already involved.

15   The telephones don't make you any more or less

16   involved.  Did you just forget about the telephones?

17        A     No, I did know.

18        Q     But you are telling the jury you thought

19   that by not talking about the telephones it wouldn't

20   make you as involved?

21        A     No, not exactly.

22        Q     During the time you made the statements to

23   the police, do you recall that you were drinking a

24   Coke and you had chips?

25        A     Yes.

1    Q       And that they attempted to relax you as

2    much as possible?

3    A       Yes.

4    Q       And you talked to them on two different

5    days about the offense?

6    A       Yes.

7    Q       You didn't talk about the telephones until

8    you talked to the district attorney's office, did you?

9    A       Exactly.

10   Q       When you walked out into the lobby and saw

11   the security guard and saw someone that you testified

12   that walked like Ray Dennes --

13   A       Yes.

14   Q       -- you went into the bathroom?

15   A       Yes.

16   Q       And then you testified that you heard a

17   strange sound?

18   A       Yes.

19   Q       What did the sound like?

20   A       The first sound that I heard?  The first

21   sound that I heard, if someone was being hit with a

22   baseball bat or a stick.

23   Q       So you didn't hear a popping-type sound?

24   A       It was heard too soft.  I didn't hear it

25   too loud or too strong.

1        Q       Now, when you went out of the bathroom, it
2    was after everybody had -- the person had already run
3    away?
4        A       What person?
5        Q       The person that shot the security guard.
6        A       Yes.
7        Q       And so you did not see him run away?
8        A       No.
9        Q       But it was when you were in the bathroom
10   that you decided to hang up the telephone?
11       A       Yes.
12       Q       Did you attempt to talk on the telephone?
13       A       No.
14       Q       Now, after the night in question, the
15   police came to you with a photo spread of pictures,
16   different pictures; do you recall that?
17       A       Yes.
18       Q       There was a lady police woman that showed
19   you the photographs?
20       A       There was a police woman.  There was some
21   men, policemen.
22               MR. ODOM:  May I approach the witness,
23   Your Honor?
24               MR. SMYTH:  Asked and answered and
25   repetitious from last week.  I promise.

1           MR. ODOM:   I don't remember that.   Can I

2    very briefly?

3           THE COURT:   Briefly.

4           MR. ODOM:   I'll be real quick.

5      Q     (Mr. Odom)   Did I show you this last

6    week?

7      A     Yes.

8      Q     You identified which person in the photo

9    spread?

10     A     Number five.

11     Q     Now, prior to the events of January 24th

12   you had met someone named Tony Ramirez?

13     A     Yes.

14     Q     And you meet Tony Ramirez at Mr. Dennes'

15   jewelry shop?

16     A     Yes.

17     Q     How many times do you think you had met

18   Mr. Ramirez at Mr. Dennes' shop?

19     A     About two or three weeks but not

20   continuously, other a time of a month, month and a

21   half.

22     Q     Every time you met Mr. Dennes at the shop

23   Mr. Ramirez was not always there, was he?

24     A     Sometimes.

25     Q     And every time you saw Mr. Ramirez there

1       Mr. Dennes wasn't always there, was he?

2       A       Sometimes, also.

3       Q       Ms. Martinez, what is your attorney's

4   name?

5       A       Eva Silva.

6       Q       After you had been in custody for awhile,

7   you and Ms. Silva went to the district attorney's

8   office.

9       A       Yes.

10      Q       Were you in custody when this occurred?

11      A       Yes.

12      Q       How old is your son?

13      A       Two years nine months old.

14      Q       And at the time he was what:  One year,

15  nine months old?

16      A       Yes, more or less.

17      Q       Somewhere around there?

18      A       Yeah.

19      Q       Ms. Martinez, after you talked to the

20  district attorney's office, you reached an agreement

21  with them, did you not?

22      A       That's right.

23      Q       When you were in jail, was your sister

24  taking care of your son?

25      A       Yes.

1      Q      One of the first things that happened was

2    you got out of jail, didn't you?

3      A      When, after we talked to the assistant

4    district attorneys?

5      Q      Yes.

6      A      Oh, yes.

7      Q      And, secondly, they agreed that you would

8    work out what we call a plea bargain with your case?

9      A      Yes.

10      Q      And when you got out of jail, you once

11    again could be with your son, could you not?

12      A      Yes.

13      Q      And I believe you told Mr. Smyth the

14    agreement you reached was the type of a probation?

15      A      Yes.

16      Q      What we will call deferred adjudication?

17      A      That's right.

18      Q      And if you were on probation, of course,

19    you could then be with your son, could you not?

20      A      That's right.

21      Q      Then they told you that they would ask the

22    Immigration and Naturalization Service not to deport

23    you until after you finished with your testimony?

24      A      That's right.

25      Q      And I believe you also told Mr. Smyth and

1    the jury that you expect to be deported after this

2    case is over?

3         A     Yes.

4         Q     Where does that mean you go?  Once you are

5    deported, where do you go back to?

6         A     Mexico.

7         Q     And where in Mexico?

8         A     Is it necessary to say it?

9         Q     Well, not exactly; back to your home?

10        A     Yes.

11        Q     And will you take your son?

12        A     Yes.

13        Q     Ms. Martinez, has the district attorney

14   explained to you that the State of Texas doesn't have

15   any probation officers in Mexico?

16        A     I don't know if he had made a comment or

17   had talked about it with my lawyer.

18        Q     Has your lawyer indicated to you in any

19   way or another whether you'll have to report to any

20   type of probation officer while you are in Mexico?

21        A     No, she has not told me anything like

22   that.

23        Q     Has your lawyer told you whether or not

24   there are any probation officers with the State of

25   Texas in the country of Mexico?

1      A      No, she has not told me; no.

2      Q      Has anyone explained to you that if you

3   violate various terms of your probation, like not

4   paying fines or not paying monthly probation fees,

5   that there is not a probation officer in Mexico that

6   would be able to bring you back.

7              MR. SMYTH:  Object, I think that's a

8   misstatement of the law but certainly there is no

9   facts and evidence to indicate that, one, there is not

10  probation agents with Mexico; and, two, that she

11  wouldn't be brought back.

12             THE COURT:  Sustained.

13     Q      (Mr. Odom)   Did your attorney tell you

14  that there aren't any probation arrangements at all

15  with Mexico?

16     A      No.

17     Q      So we don't know what type of probation

18  you'll have when you go to Mexico, do we?

19     A      Is that a question?

20     Q      Yes.

21     A      I don't know.

22     Q      You really don't know.  But you do know

23  that you'll be at home with your son, do you not?

24     A      Exactly.

25     Q      Ms. Martinez, like any good mother, you

```
 1    would do almost anything to be with your son, would

 2    you not?

 3         A      Yes.

 4                MR. ODOM:  Pass the witness.

 5                THE COURT:  Thank you.

 6                Mr. Smyth.

 7

 8                     REDIRECT EXAMINATION

 9    BY MR. SMYTH:

10         Q      In regards to what your motivation may be

11    to have gone to the district attorney's office, was it

12    something that the defendant, Reinaldo Dennes, said to

13    you that caused you to go to the Harris County

14    District Attorney's Office or have your lawyer contact

15    the Harris County District Attorney's Office?

16         A      Yes.

17         Q      And were you afraid for yourself as well

18    as your son?

19         A      Yes.

20         Q      And is that as a result of the

21    conversation that the defendant, Reinaldo Dennes, had

22    with you?

23         A      Yes.

24         Q      And is that the reason you came to your

25    attorney to go to the Harris County District
```

Page 16

1     Attorney's Office?

2          A     Yes.

3          Q     I just have a couple of questions.  I will

4     be real brief.  There is some confusion in my mind and

5     you tell me.

6                MR. SMYTH:  Your Honor, may I approach the

7     board?

8                THE COURT:  Sure.

9          Q     Ms. Martinez, is there a difference

10    between a door being unlocked and able to be opened

11    and a door that is opened?

12         A     Yes.

13         Q     When you went to the back door, the

14    loading dock area of the building, in response to the

15    defendant's, Reinaldo Dennes, telephone call, was the

16    door unlocked and available to be opened or was it

17    open?

18         A     Unlocked, to be able to be opened.

19         Q     So when you went to the back door, the

20    door wasn't standing open?

21         A     No.

22         Q     When you left the telephone line open, you

23    had the phone line open during that ten-minute period

24    of time, when you were talking with Reinaldo, when you

25    were suppose to go distract the security guard for the

1    second time.  Do you know where --

2                    MR. SMYTH:  May I approach the evidence,

3    Your Honor?

4                    THE COURT:  Sure.

5         Q      Do you know what Reinaldo Dennes was doing

6    on the other end of the phone line?

7         A      No.

8         Q      Do you know whether he had it up here,

9    listening to what you were saying or not, and, I mean,

10   what you were saying to the security guard?  You don't

11   know whether he had the phone to his ear or down in

12   his pocket or what, do you?

13        A      No, just that he was going to listen.

14        Q      Okay.  After this incident, did you ever

15   go to a motel with Reinaldo Dennes, the defendant,

16   again, after January 24, 1996?

17        A      Yes.

18        Q      And at that motel did you have a

19   conversation with Reinaldo Dennes about the composite

20   photograph.

21                    MR. SMYTH:  May I approach the photograph,

22   Your Honor?

23                    THE COURT:  Sure.

24        Q      About the composite diagram, State's

25   Exhibit 35, that had been circulated in the building?

1       A       Yes.

2       Q       Did you talk to Mr. Dennes about the

3  disguise he was wearing?

4       A       No.

5       Q       Did you talk to him that he couldn't

6  disguise his walk to you?

7       A       Yes.

8       Q       Did Mr. Dennes make any comments about the

9  composite photograph that was floating around the

10  building?

11      A       Yes.

12      Q       And what did he say about the composite?

13      A       That he needed to change his glasses.

14      Q       And why did he say he needed to change his

15  glasses?

16      A       Because the photograph -- because in the

17  photographs they were similar to his.

18      Q       When you say the photograph, you are

19  talking about this object I am holding before you,

20  State's Exhibit 35?

21      A       Yes.

22      Q       So he said that the glasses in the

23  photograph, which matched the composite, were similar

24  to the one he wears?

25      A       Exactly.

1      Q      Did he indicate whether he was going to

2   change his glasses or do anything with respect to his

3   glasses?

4      A      That he was going to change his glasses.

5      Q      After this conversation, did you see

6   Reinaldo Dennes in the Greenrich Building again?

7      A      With the glasses, no.

8      Q      My first question:  Did you see him in the

9   building?  Did you see him in the building, was he

10  wearing glasses?

11     A      Yes, I have seen him but not any more with

12  the glasses.

13     Q      So he quit wearing his glasses in the

14  Greenrich Building after this composite started

15  floating around?

16     A      Yes.

17            MR. SMYTH:  Pass the witness.  Thank you.

18            THE COURT:  Mr. Odom.

19

20                  RECROSS EXAMINATION

21  BY MR. ODOM:

22     Q      Mr. Smyth asked you why is it you went to

23  the district attorney's office and you told the jury

24  it was because you were afraid.

25     A      Yes.

1          Q       I would like to ask you some questions

2     about that.

3                  Last week you testified that when you and

4     Mr. Dennes were in custody he made some comments to

5     you?

6          A       Yes.

7          Q       One of them was he would try to make your

8     bond and for you to go home?

9          A       Yes.

10         Q       Now, you have testified to this jury that

11    you knew that Ray Dennes was the person that shot the

12    security guard?

13         A       Yes.

14         Q       And that this occurred January 24, 1996,

15    right?

16         A       Yes.

17         Q       And that the defendant then went to Miami

18    for a period of time?

19         A       Yes.

20         Q       About how long was that?

21         A       A week and a half, more or less.

22         Q       One and a half to two weeks?

23         A       More or less.

24         Q       You also testified that you had a chance

25    to get back together with the defendant after he

1    returned, correct?

2          A        When did I make that comment?

3          Q        When you were talking to Mr. Smyth and

4    when you were talking to me and on your videotapes.

5          A        I don't remember that occasion.

6          Q        You didn't talk to the defendant again

7    when he got back?

8          A        Yes.

9          Q        You had a conversation between just the

10   two of you, did you not?

11         A        Oh, okay, yes.

12         Q        And you even talked about the fact that he

13   should change his disguise the next time he does this?

14         A        No.

15         Q        You didn't tell the jury that the next

16   time he disguises himself he needs to disguise his

17   walk?

18         A        No.

19         Q        And now you are also telling the jury that

20   he had conversations with you about, oh, I need to

21   change my glasses?

22         A        Yes.

23         Q        And you have fully talked about the events

24   that occurred on the 24th of January, 1996, did you

25   not?

1          A       Yes.

2          Q       Where was it that you got together with

3     the defendant again?

4          A       That they met -- who met?

5          Q       That you and Mr. Dennes after he came back

6     from Miami.

7          A       At a motel.

8          Q       You met with him in a motel?

9          A       He picked me up on the street and then we

10    went to the motel.

11         Q       And you had conversations with him and, I

12    take it, you slept with him?

13         A       Yes.

14         Q       But you did not become afraid of him until

15    you were arrested, did you?

16         A       Exactly.

17                 MR. ODOM:  Pass the witness.

18                 THE COURT:  Thank you.  Mr. Odom.

19                 MR. SMYTH:  Nothing further.

20                 THE COURT:  You may step down.

21                 MR. SMYTH:  May she be excused?

22                 THE COURT:  Yes, sir.

23                 Call your next witness, please.

24                 MR. VINSON:  The State would call

25    Investigator Halling, Beth Halling.

```
 1                        BETH HALLING,
 2    was called as a witness for the State and, having been
 3    duly sworn, testified as follows:
 4                       DIRECT EXAMINATION
 5    BY MR. VINSON:
 6              MR. VINSON:  Your Honor, may the record
 7    also reflect at this time I am tendering to defense
 8    counsel Ms. Halling's offense report with respect to
 9    the area that we are calling her to the stand on.
10              THE COURT:  Thank you very much.  I
11    appreciate that.  It saves some time.
12         Q     Good morning.
13         A     Good morning.
14         Q     Will you identify yourself, give your
15    complete name, your last name, spell your last name
16    that is, introduce yourself to the ladies and
17    gentlemen of the jury, His Honor and make them aware
18    of where you work.
19         A     My name is Beth Halling and the last name
20    is H-a-l-l-i-n-g.  I am an officer with the Houston
21    Police Department in the homicide division.
22         Q     And how long have you been a police
23    officer?
24         A     14 years.
25         Q     What type of training did you receive to
```

1    prepare you to work as a police officer?

2         A      Besides going through the police academy

3    every year, we are required to take an additional 40

4    hours of certification.  During that time, I have

5    taken numerous classes on the crime scene evidence,

6    photography, fingerprinting through the FBI academy,

7    just numerous classes so that I could carry on being a

8    better investigator within the homicide division.

9         Q      And while you are in homicide, do you on

10   work with a partner or alone?

11        A      I work with a partner.

12        Q      Would it be a fair statement it is your

13   partner who testified last week, Sergeant Waltman?

14        A      Yes, sir.

15        Q      And that's the older gentleman with the

16   gray hair?

17        A      That's him.

18        Q      Let me take your attention back to an

19   offense that was alleged to have been committed here

20   in Harris County, Texas, on January 24, 1996, where a

21   complainant by the name of Janos Szucs was involved.

22   Do you recall being involved in that investigation?

23        A      Very well.

24        Q      And did you also recall being involved in

25   executing a search warrant that had been obtained from

1    Judge Godwin, a District Court Judge in this county?

2        A    Yes, sir.

3        Q    Will you tell the ladies and gentlemen of

4    the jury and His Honor on what property that warrant

5    was suppose to be executed?

6        A    That property was executed at 6222

7    Richmond, which is known as the Greenrich Building,

8    and suite number 320.

9        Q    And can you make the jury aware who had a

10   lease on that property?

11       A    That property was leased out to Mr.

12   Reinaldo Dennes and it was called Designs by Reinaldo.

13       Q    We are talking about a particular suite

14   320; is that correct?

15       A    Yes, sir.

16       Q    What time did you get that assignment to

17   execute a warrant at that location?

18       A    I believe it was approximately around 9:00

19   o'clock in the evening.

20       Q    Now, prior to receiving the instructions

21   to execute the warrant at that location, had you gone

22   to the building earlier that day?

23       A    Yes, sir, I had.

24       Q    And for what purpose did you go to the

25   Greenrich Building?

1       A       We went there for the purpose to see if

2  Mr. Dennes was still in his suite.

3       Q       And why were you concerned about Mr.

4  Dennes at that time?

5       A       We had been informed --

6               MR. ODOM:  Object, Your Honor, to any

7  hearsay she had been informed regarding.

8               THE COURT:  Sustained.

9       Q       (Mr. Odom)   Don't tell me what someone

10 said, just tell me had he became a suspect.

11      A       Yes, sir.

12      Q       And what were you waiting for?

13      A       We were waiting for an arrest warrant and

14 search warrant to be signed.

15      Q       And did you follow Mr. Dennes around that

16 day?

17      A       Yes, sir.

18      Q       Now, did you see Mr. Dennes in the

19 building earlier on the 22nd of February --

20      A       Yes, I did.

21      Q       -- before you executed the warrant?

22      A       Yes, sir.

23      Q       Did you see Mr. Dennes have a conversation

24 with anyone?

25      A       He was with another --

1          Q       Just let me nail it down as to the

2    general, let me be more specific.

3                  Did you see Mr. Dennes have a conversation

4    in your presence, that is, a point where you could

5    observe that conversation going down with another

6    merchant?

7          A       No, I did not.

8          Q       Were you approached by another merchant?

9          A       Yes, I was.

10         Q       And did he have a conversation with you?

11         A       Yes, sir.

12         Q       And was that a person by the name of

13   Daniel Mushin, M-u-s-h-i-n?

14         A       Yes, sir.

15         Q       And he was the owner of what business?

16         A       He is the owner of D & M Diamonds, which

17   is located on the third floor as well.

18         Q       That's the same floor the defendant's

19   suite was located on?

20         A       That's correct.

21         Q       After Mr. Mushin approached you -- and

22   incidently how did he know you were a police officer?

23   I take it, you were in plain clothes?

24         A       I was in plain clothes but we had been out

25   there on a daily basis from the time this incident

1    occurred and I was very familiar with all the tenants

2    as they were with me.

3        Q       And after he spoke with you, did you have

4    some concern?

5        A       Yes, I did.

6        Q       And what was your concern?

7        A       I was very concerned at that time that Mr.

8    Dennes was going to pack up and leave and we had

9    information that he was --

10               MR. ODOM:  Object to what information she

11   may or may not have had.

12               THE COURT:  Sustained.

13       Q       (Mr. Vinson)   What was your concern about

14   whether Mr. Dennes was going to leave?

15       A       It was my concern that Mr. Dennes was

16   going to flee.

17       Q       Now, after you got the warrant, that is,

18   the search warrant, what did you do?

19       A       After I received the search warrant -- I

20   received it at the location where Mr. Dennes was

21   arrested.  Myself, my partner and Lieutenant Nealy

22   proceeded to the Greenrich Building where we then

23   began to conduct the search warrant.

24       Q       Okay.  And incidently the information that

25   you gained from Mr. Mushin did you pass that

1     information on to some other surveillance officers?

2          A     Yes, I did.

3          Q     And, at some point in time, those

4     surveillance officers, would it be a fair statement,

5     they picked up the watch on Mr. Dennes?

6          A     That's correct.

7          Q     And then you went ahead and executed the

8     search warrant?

9          A     Yes, sir.

10         Q     Now, when you executed the search warrant,

11    how did you gain entry into Mr. Dennes' suite?

12         A     First we contacted the building manager,

13    Ms. Susan Vacek, and asked her if she had a pass key,

14    which she did not.  We had another officer out there

15    that did surveillance, actually watched the building

16    itself, the suite, and he had to get a ladder and

17    climb up through the false ceiling and jump over and

18    open the door from inside of the suite.

19         Q     When you got in the suite, can you tell us

20    how you went about executing the warrant, the search

21    warrant?

22         A     Based on the information that we had

23    received, based on the facts of the search warrant

24    actually requested us to do, we went through the

25    entire vestibule, which was broken up into basically

1    two primary rooms, and we began conducting our

2    investigation for certain types of tools, machinery --

3          Q      And did you find certain types of tools?

4          A      Yes, I did.

5          Q      Were you also looking for some debris that

6    was consistent with aluminum shavings?

7          A      Yes, sir.

8          Q      And did you see that?

9          A      Yes, I did.

10         Q      And did you have that collected as well?

11         A      Yes, we did.

12         Q      Did you also look to see if there was a

13   lathe machine in that office?

14         A      Yes, I did.

15         Q      And did you find a lathe machine?

16         A      Yes, sir.

17         Q      What was the condition of the lathe

18   machine when you saw it?

19         A      The lathe machine was still in the middle

20   of a back work area but it had been broken down in

21   numerous parts.  It had been boxed up and sealed and

22   taped.

23         Q      And did you have an occasion to open that

24   box at some point in time?

25         A      Yes, sir.

1      Q      And did you find parts that had been

2   broken down from the lathe machine?

3      A      Yes, sir.

4      Q      What condition were they in?

5      A      They appeared to be in good working

6   condition.

7      Q      Did you notice anything else that was

8   consistent with what you were looking for in your

9   warrant.

10             MR. ODOM:  Object, that is testifying

11   about evidence and about material that is not in

12   evidence.  She can testify about what she found but as

13   far as consistent with something that is not in

14   evidence, it's hearsay, and to be real honest, I

15   remember and not necessary.

16             MR. VINSON:  I'll rephrase it, Your Honor.

17             THE COURT:  Okay.

18      Q      (Mr. Vinson)   What did you find on the

19   parts of the lathe that was already boxed up?  Did you

20   find any metal shavings on there?

21      A      Yes, we did.

22      Q      And they were consistent with what type of

23   shavings?

24      A      With aluminum shavings.

25      Q      Were you looking for something else as

1      well?

2          A      Yes, sir.

3          Q      What else did you find in that work area

4      back there?  Did you find any projectiles or anything

5      of this nature?

6          A      Yes, sir, I did.

7          Q      Will you tell the ladies and gentlemen of

8      the jury what you found.

9          A      I found one fired copper bullet.

10         Q      And are you familiar with different size

11     calibers of weapons?

12         A      I can look at a bullet and guesstimate

13     approximately as to what caliber.

14         Q      And approximately what caliber --

15                MR. ODOM:  Object to any speculation.

16         Q      (Mr. Vinson)   Have you seen projectiles

17     on the homicide scenes on few or many occasions?

18         A      Many occasions.

19         Q      From time to time are you called upon to

20     make a determination at that point in time about what

21     caliber it is, small caliber, medium caliber, large

22     caliber?

23         A      Yes, sir, I am.

24         Q      Can you do that?

25         A      Yes, sir.

1       Q       And did you form an opinion based upon

2   what you saw about what size caliber this was.

3                   MR. ODOM:  Object, unless she knows.

4                   THE COURT:  I think --

5                   MR. VINSON:  She can give an opinion.

6                   MR. ODOM:  Object as to any speculation on

7   the matter unless she knows.

8                   THE COURT:  I think he has qualified her

9   now.  But certainly I don't want her to answer the

10  question based on that opinion unless she has a pretty

11  good statement.

12      Q       (Mr. Vinson)   What opinion was that?

13      A       Based on my previous experience and my

14  personal opinion, it appeared to be a .9 mm fired

15  bullet.

16                  MR. VINSON:  May I approach, Your Honor?

17                  THE COURT:  Certainly.

18      Q       Your Honor, these exhibits have been

19  premarked.  They are exhibits 130 -- I think that's

20  where we are starting today -- 130 through -- 130,

21  131, 133, and 134 and they are going to be eight by

22  ten photographs.

23                  THE COURT:  Say again.

24                  MR. VINSON:  130, 131, 133, and 134 are

25  eight by ten photographs and 132 is a fired projectile

1    round.

2                    THE COURT:  Very well.

3                    (Whereupon, State's Exhibit Nos. 130

4    through 134 were marked for identification.)

5        Q      And let me show you what has been marked

6    for identification purposes as State's Exhibit 130

7    through 134, take a look at those exhibits and see if

8    you can identify.

9        A      Yes, sir, I can.

10       Q      And do these photographs appear to be a

11   true representation of what you observed at Mr.

12   Dennes' office, that is, suite 320, back on the 22nd

13   day of February, 1996?

14       A      That's correct.

15       Q      And does State's Exhibit 132 appear to be

16   a fired projectile?  Is that the projectile that was

17   recovered from Mr. Dennes' office back on

18   February 22, 1996, when you executed the search

19   warrant?

20       A      Yes, sir, it is.

21                   MR. VINSON:  Your Honor, at this time the

22   State will offer into evidence State's Exhibit 130

23   through 132 and tender the same to defense counsel for

24   his inspection.

25                   MR. ODOM:  Judge, other than previous

```
 1     motions, which the Court has ruled on, we have no

 2     additional objections.

 3               THE COURT:  Very well.  State's Exhibit

 4     130, 131, 132, 133 and 134 are admitted.

 5     Q       Did you find an owner's guide in there to

 6     a certain weapon?

 7     A       Yes, sir, I did.

 8     Q       And that was to what type of guide of

 9     what?

10     A       A guide, owner's manual, to the .9 mm

11     Taurus semiautomatic weapon.

12               MR. VINSON:  With the Court's permission,

13     we are going to mark that as State's Exhibit 135.

14               (Whereupon, State's Exhibit No. 135 was

15     marked for identification.)

16               MR. VINSON:  May I approach, Your Honor?

17               THE COURT:  Certainly.

18     Q       Let me show you the owner's manual here,

19     marked for identification purposes as State's Exhibit

20     135.  Is that the owner's manual that you found in Mr.

21     Dennes' office when you executed your warrant back on

22     the 22nd day of February, 1996?

23     A       Yes, sir, it is.

24               MR. VINSON:  Your Honor, at this time the

25     State will offer into evidence State's Exhibit 135 and
```

1    the State will tender to defense counsel for his

2    inspection.

3              MR. ODOM:   May I take her on voir dire?

4

5                    VOIR DIRE EXAMINATION

6    BY MR. ODOM:

7        Q    Officer Halling, once you obtained State's

8    Exhibit 135, what did you do with it?

9        A    The fired bullet?

10       Q    No, 135, the one we are talking about.

11       A    Now, that was placed in the evidence baggy

12   by CSU and they took it and tagged it to additional

13   locations.

14       Q    What's the CSU?

15       A    His name is Officer Tuttle.

16       Q    What does that stand for?

17       A    Crime scene unit.

18       Q    And where has it been since then?

19       A    I believe everything, as far as paper

20   items are concerned, went to the latent lab to be

21   fingerprinted.

22       Q    You see this item.  Is your initials on

23   this item in any way?

24       A    No, mine are not.

25       Q    How do you know this is the same manual

1    obtained from the office?

2         A      Because I believe Officer Tuttle is on

3    there and I was present when the manual was recovered.

4         Q      I understand this looks like the manual.

5    You believe Officer Tuttle put it in the property

6    room?

7         A      Yes, sir.

8         Q      And who took it out of the property room?

9         A      I don't know who took it out.

10               MR. ODOM:  We will object to it at this

11   point.

12               (Off-the-record discussion held at bench.)

13               THE COURT:  Sustained.

14               MR. VINSON:  At this time the State will

15   offer as same or similar, reoffered.

16               MR. ODOM:  I would renew my objection.  I

17   renew my objection.

18               THE COURT:  Sustained.

19               MR. VINSON:  Your Honor, may I approach?

20               (Off-the-record discussion held at the

21   bench.)

22

23

24

25

| | | |
|---|---|---|
| 1 | | DIRECT EXAMINATION CONTINUED |
| 2 | BY MR. VINSON: | |
| 3 | | MR. VINSON:  May I approach again, Your |
| 4 | Honor? | |
| 5 | | THE COURT:  Sure. |
| 6 | Q | Let me show you this manual here.  Is that |
| 7 | the manual that you saw in the defendant's office back | |
| 8 | on February 22, 1996? | |
| 9 | A | Yes, it appears to be the same manual. |
| 10 | Q | It appears to be the same manual? |
| 11 | A | Yes, sir. |
| 12 | Q | And you didn't pick up one Taurus manual |
| 13 | in there? | |
| 14 | A | I just picked up one.  That's correct. |
| 15 | | MR. VINSON:  Your Honor, we will offer it |
| 16 | as same or similar.  We offer. | |
| 17 | | MR. ODOM:  May I ask? |
| 18 | | |
| 19 | | VOIR DIRE EXAMINATION |
| 20 | BY MR. ODOM: | |
| 21 | Q | Do you know that is the same manual? |
| 22 | A | No, sir, I don't know if it is the same |
| 23 | manual. | |
| 24 | Q | You don't know what is in that manual, do |
| 25 | you? | |

1          A       I know it is instructions.

2          Q       I know that but you haven't read that

3     manual?

4          A       I have not personally sat down and read

5     that manual; no.

6                  MR. ODOM:  Object to it.

7                  THE COURT:  It's admitted, State's Exhibit

8     135.

9                  MR. VINSON:  Thank you, Your Honor.

10                 MR. VINSON:  Your Honor, may I approach

11    again?

12                 THE COURT:  Yes.

13

14                 DIRECT EXAMINATION CONTINUED

15    BY MR. VINSON:

16         Q       Now, let me show you what has been

17    introduced in evidence as State's Exhibit 43.  Do you

18    also recall finding State's Exhibit 43 when you were

19    in the office of Reinaldo Dennes?

20         A       Yes, sir, I do.

21         Q       And that appears to have some type of

22    little diagram and some notations on it; is that

23    correct?

24         A       That's correct.

25                 MR. VINSON:  Your Honor, could we have the

1      witness to step down so we can publish to the jury

2      what 131, 133, 134 are.

3                  THE COURT:  Certainly.

4          Q      Why don't you come down here and start on

5      this end.  Can you tell the jury what State's Exhibit

6      130 appears to be.

7          A      State's Exhibit 130 was a wooden table

8      that was positioned along the north wall of Mr.

9      Dennes' suite and underneath was some carpet, blue

10     colored carpet, and right here, on the corner, down

11     below, way back in the corner, was where we found that

12     fired bullet.

13         Q      Was that the fired bullet right there?

14         A      Yes, sir, it is.

15         Q      Now, State's Exhibit 131, is this a close

16     up of that same projectile?

17         A      Yes, sir, it is.

18         Q      And is State's Exhibit 132 the actual

19     projectile that was recovered?

20         A      Yes, that's the actual bullet.

21         Q      131 is just a close up; is that right?

22         A      Uh-huh.  And 132 is the actual bullet.

23         Q      This is State's Exhibit 133.  What will

24     the jury be looking at when they view this exhibit?

25         A      The jury would be looking at the boxes

1    that I previously described that were packaged with

2    the tape that was placed on the floor inside the suite

3    alongside the lathe drill unit.

4         Q       In other words, there were certain parts

5    of the lathe that was in that box --

6         A       Yes, sir.

7         Q       -- or in those boxes I should say?

8                 State's Exhibit 134 what will the jury be

9    looking at when they view this exhibit?

10        A       That's going to be a piece of machinery

11   off the lathe, and if you look real close, you can see

12   that there appears to be aluminum metal shavings on

13   that piece of the machinery itself.

14                MR. SMYTH:  May I approach the Court?

15                (Off-the-record discussion held at the

16   bench.)

17                MR. VINSON:  Your Honor, we are marking

18   134 A.  It is the actual running part of the lathe, I

19   mean, the machine wheel.

20                (Whereupon, State's Exhibit No. 134 A was

21   marked for identification.)

22        Q       Now, let me show you what has been marked

23   for identification purposes as State's Exhibit 134 A.

24   I want you to take a look at that and see if it's one

25   and the same thing item, that is, that's in State's

1       Exhibit 134?

2           A       Yes, it appears to be.

3           Q       The same one in State's Exhibit 134?

4           A       Yes, it appears to be the same one.

5                   MR. VINSON:  Your Honor, the State will

6       offer into evidence State's Exhibit 134 A, tender the

7       same to defense counsel for his inspection.

8                   MR. ODOM:  We made the same objection as

9       to 135 and we will re-urge that same objection.

10                  THE COURT:  Come up.

11                  (Off-the-record discussion held at the

12      bench.)

13          Q       Why don't you take a look at it and see if

14      it is the exact same, not whether it appears to be and

15      take a look at that.

16          A       Okay.

17          Q       Look at the characteristics of those

18      markings around there.

19          A       I would say that this is the exact same

20      item.

21                  MR. VINSON:  We offer it same or similar,

22      Your Honor.

23                  MR. ODOM:  The same objection.

24                  THE COURT:  Overruled.  State's Exhibit

25      134 A is admitted.

```
 1          Q        Now, if you notice here, there's some red
 2   markings.
 3          A        Yes, sir.
 4          Q        Do you have the same red markings on
 5   this --
 6          A        Yes, sir.
 7          Q        -- State's Exhibit 134 A?
 8          A        Yes, sir.
 9          Q        It has about six holes.  Do you have the
10   same six holes here?
11          A        Yes, sir.
12          Q        And, then, three of those holes what do
13   you have?  You have screws, correct?
14          A        Yes, sir.
15          Q        What do you have here?
16          A        Screws.
17          Q        The same three screws, right?
18          A        Yes, sir.
19          Q        And three holes don't have anything,
20   right?
21          A        That's correct.
22          Q        But each one of those holes have some red
23   markings around it?
24          A        Yes, sir.
25          Q        And I think the same red markings have got
```

```
 1      the same configuration, would you agree with me, that

 2      you have here on State's Exhibit 134 A?

 3           A      Yes, I would.

 4           Q      And what is this here that is contained on

 5      State's Exhibit 134 A?

 6           A      Those are the metal shavings.

 7                  MR. VINSON:  May I approach, Your Honor?

 8                  THE COURT:  Yes.

 9           Q      These are the actual metal shavings,

10      correct?

11           A      Yes, sir.

12           Q      And in that manual that you testified to,

13      that's a operating manual for what type of weapon?

14           A      Taurus .9 mm semiautomatic weapon.

15                  MR. VINSON:  May I approach again, Your

16      Honor, to get the book?

17                  THE COURT:  Certainly.

18           Q      Now, in here, I think it has two Taurus

19      weapons, is that correct, and it has a revolver and

20      then has an automatic; is that correct?

21           A      Yes, sir.

22                  MR. VINSON:  May I approach the witness,

23      Your Honor?

24                  THE COURT:  Certainly.

25           Q      Now, this .9 mm automatic what color does
```

1      it come in?

2           A      .9 mm automatic usually comes in either a

3      black finish or --

4           Q      Why don't you.

5           A      -- blue nickel.  This one came in blue or

6      nickel.

7           Q      Blue or nickel; is that right?

8           A      Yes, sir.

9           Q      And what model are we talking about?

10          A      We are talking about a model PT 92.

11          Q      What other model?

12          A      92 AF and 99 A.

13          Q      Go back to page 19.  Is there something

14     unusual about the barrel of the weapon against the

15     frame of the weapon?  Does the barrel extend out from

16     the frame of the weapon or is it cut unusual with the

17     frame of the weapon?

18          A      This particular weapon the barrel extends

19     out from the weapon.

20          Q      And since the barrel extends out from the

21     weapon, would it be a fair statement to say that

22     barrel could be threaded?

23          A      Yes, sir, it would be a fair statement.

24          Q      And it could be in a manner to accept a

25     silencer?

1          A          That's correct.

2                     MR. VINSON:   Thank you.

3                     May I have just a moment, Your Honor?

4                     THE COURT:   Yes.

5                     MR. VINSON:   May I approach again, Your

6     Honor?

7                     THE COURT:   You may.

8                     MR. VINSON:   May I approach the witness,

9     Your Honor.

10                    THE COURT:   Certainly.

11         Q          Let me show you a series of photographs

12    that have been admitted into evidence.   One is State's

13    Exhibit 137.   Why don't you take a look at them and

14    I'll ask you, State's Exhibit 38, State's Exhibit 40

15    and it's State's Exhibit 41, State's Exhibit 59,

16    State's Exhibit 60, 61, and 63.   Do those photographs

17    truly and accurately reflect the defendant's office as

18    you found it to be on the 22nd day of February, 1996,

19    when you executed your search warrant?

20         A          Yes, sir, they do.

21         Q          And do those photographs, with respect to

22    State's Exhibit 38, that's the lathe machine you

23    talked about; is that correct?

24         A          That's correct.

25         Q          And 39, also, shows another photograph of

1    the lathe machine?

2        A     Yes, sir.

3        Q     40 did you recover these drill bit tools

4    as well --

5        A     Yes, sir.

6        Q     -- and the box back there; is that

7    correct?

8        A     That's correct.

9        Q     And what about 41, did you recover those

10    items as well?

11       A     Yes, we did.

12       Q     And those are various parts that go to the

13    lathe?

14       A     That's correct.

15       Q     59 that's the work shop?

16       A     Yes, sir.

17       Q     And 60 those are different gears?

18       A     Yes, sir.

19       Q     61 and 62 are photographs of another work

20    table within the work shop; is that correct?

21       A     That's correct.

22       Q     And so you agree with those photographs

23    that they truly and accurately reflect everything you

24    saw in the defendant's office back on the 22nd day of

25    February?

1        A       Yes, sir, they do.

2        Q       1996.  Okay.

3                MR. VINSON:  Your Honor, I have no further

4    questions at this time.  Pass the witness.

5                THE COURT:  Thank you, Mr. Vinson.

6    Mr. Odom.

7

8                        CROSS EXAMINATION

9    BY MR. ODOM:

10       Q       Officer, I would like to ask you some

11   questions as well.

12               First of all, in regards to the time that

13   the search warrant was issued, you indicated that you

14   were afraid that Mr. Dennes was going to flee?

15       A       That's correct.

16       Q       Now, you had information that Mr. Dennes

17   was moving, did you not?

18       A       Yes, sir.

19       Q       And any time you have a potential suspect,

20   to a policemen, when someone is moving, that could

21   mean the possibility of flight, could it not?

22       A       That's always a possibility.

23       Q       You didn't have any tickets that Mr.

24   Dennes had to go to Brazil or any information in that

25   regards, did you?

1      A      As far as the tickets to Brazil; no, sir.

2      Q      You had information, did you not, that he

3   was going to Miami?

4      A      Yes, sir.

5      Q      You also knew that was where the

6   defendant's parents lived, did you not?

7      A      That's correct.

8      Q      You also knew -- or did you know -- that

9   before Mr. Dennes came to Houston that he had lived in

10  Miami?

11     A      Yes, sir.

12     Q      Now, you received a search warrant and you

13  issued a warrant to obtain certain items from Mr.

14  Dennes' office, correct?

15     A      Yes, sir.

16     Q      And when you went into the office, I

17  believe your testimony is -- and if not, correct me --

18  is it not true that the defendant's office was

19  consistent with items being boxed?

20     A      Yes.

21     Q      How long had Mr. Dennes been back from

22  Miami?

23     A      I have no idea.

24     Q      How long was it since the date of the

25  offense?

1        A        It was almost two days away from one month

2   exactly.   The offense occurred on the 24th of January

3   and this was the 22nd of February.

4        Q        So this is a month after the fact almost?

5        A        Almost, yes, sir.

6        Q        You did have information Mr. Dennes had

7   gone to Miami and had come back?

8        A        That's true.

9        Q        Now, when you searched the office, you

10  recovered a number of jewelry items, did you not?

11       A        Yes, sir, we did.

12       Q        And you got here, in your report, you got

13  what we refer to as an inventory, correct?

14       A        That's correct.

15       Q        And tell the ladies and gentlemen of the

16  jury what an inventory is.

17       A        An inventory is something that is required

18  as a result of a search warrant, something that has to

19  be returned back to the district judge and has to list

20  every piece of item that was recovered, taken out, as

21  a result of the search warrant.

22       Q        And the inventory goes to several pages,

23  listing various items of jewelry, does it not?

24       A        Yes, it does.

25       Q        We have got diamonds here, do we not?

1       A     Clear stones.

2       Q     You are no jeweler.  You are like me in

3  that regard.

4       A     That's correct.

5       Q     It could be a zirconium or a real diamond

6  and I wouldn't know the difference.

7       A     That's true.

8       Q     You wouldn't either, right?

9       A     No, sir.

10      Q     You have got sapphires, what appeared to

11  be sapphires?

12      A     Blue stones.

13      Q     You have got red stones?

14      A     That's correct.

15      Q     What appeared to be rubies?

16      A     Yes, sir.

17      Q     And on down the line, what appeared to be

18  opals, right?

19      A     Yes, sir.

20      Q     And what appeared to be garnets and then a

21  number of items that you associate with a jewelry

22  shop.  You had a necklace, right?

23      A     Yes, sir.

24      Q     Rings?

25      A     That's correct.

1        Q       You, also, had a number of watches, did

2   you not?

3        A       I think there were several watches.

4        Q       You, also, in your inventory recovered not

5   only whole watches that one might want to buy from a

6   the jewelry shop but didn't you also find pieces of

7   watches and parts of watches?

8        A       Yes, sir.

9        Q       Items that would be consistent with

10  someone who repairs watches and fixes watches?

11       A       That's correct.

12       Q       Now, you did not recover any diamonds that

13  were taken from the seventh floor of the complaining

14  witness, did you?

15       A       No, sir.

16       Q       When Mr. Vinson was asking you about

17  various items you found in regards to firearms, I

18  believe you testified that you found an owner's manual

19  that was similar to the one we have marked and

20  admitted into evidence?

21       A       That's correct.

22               MR. ODOM:  May I approach the witness,

23  Your Honor?

24               THE COURT:  Sure.

25       Q       Can you show me the page in the manual,

1     which is, I believe, State's Exhibit 135.  If you can,

2     can you see if you can find the part that you were

3     pointing out to the Mr. Vinson that related to the

4     different models of this gun.

5          A     It will take -- page 23.

6          Q     Now, you know, this indicates that the .9

7     mm -- somewhere you indicated that the Taurus can come

8     in either a .9 mm or a revolver, right?

9          A     Taurus manufacturer makes a .9 mm in a

10    revolver or a semiautomatic.

11         Q     Is the revolver in the .9 mm caliber?

12         A     No, sir.

13         Q     So it is consistent with a .9 mm that it

14    would always be, to your knowledge, in a semiautomatic

15    form?

16         A     That's correct.

17         Q     Now, there was some questions asked about

18    the length of the barrel and the make up of the type,

19    the styles that this gun comes in.  I believe Mr.

20    Vinson was asking you is one of them a chrome-colored

21    pistol; do you recall that question?

22         A     Yes, sir, I do.

23         Q     Show me where that is, if you can.

24         A     I believe what Mr. Vinson was pointing out

25    that this particular model comes in a blue or a

1    nickel.

2         Q        So the finish is in blue or nickel,

3    correct?

4         A        That's correct.

5         Q        Is the barrel of that gun anywhere that

6    you can see in that owner's manual made out of

7    stainless steel?

8         A        Anywhere in the owner's manual by

9    stainless -- I don't see it in the owner's manual.

10        Q        Officer Halling, have you ever heard of

11   someone nickel plating a stainless steel barrel?

12        A        Yes, I have.

13        Q        Do you know if the Taurus has a

14   nickel-plated, stainless steel barrel?

15        A        I don't know.  You are getting into an

16   area I'm not real good about.

17        Q        Have you ever heard of -- and is it not

18   uncommon -- for someone to nickel plate what I call a

19   blue barrel or finally a machine barrel that is not

20   stainless steel?

21        A        Yes, it's possible.

22        Q        That's more common, is it not?

23        A        I have heard that it's done.  I have seen

24   it done.

25        Q        You don't know -- I take it, from your

1    testimony, you don't know if it's common or uncommon

2    to nickel plate a stainless steel barrel?

3        A       I'll tell you that I have seen it done.

4        Q       Now, have you seen a manufacturer?

5        A       Not that I am aware.

6        Q       That's sort of a custom made someone might

7    want to do, right?

8        A       Yes, sir.

9        Q       As far as you can tell, can you tell

10   whether that particular Taurus .9 mm automatic has a

11   stainless steel barrel or not?

12       A       No, I cannot tell.

13       Q       Officer Halling, I believe, based upon

14   previous testimony, it's my understanding that your

15   partner is Sergeant Waltman?

16       A       That's correct.

17       Q       And although duties sort of merge, that

18   initially Sergeant Waltman was in charge of evidence

19   in this case and that you were in charge of witnesses

20   in this case?

21       A       That's correct.

22       Q       But now, as time goes on, Sergeant Waltman

23   may take a witness or you may take evidence but did

24   that sort of distinction, at least to some extent, in

25   your investigation of this case?

1    A    Not necessarily the first night that we

2    were there, that's true.  Until we actually left the

3    Greenrich Building, we worked together as partners and

4    no specific thing was divided between the two of us.

5    Q    When you first get so much to do, you

6    divide it, I'll take the witnesses and you take the

7    evidence sort of thing?

8    A    Yes, sir.

9    Q    And, then, as you continue on with the

10   investigation, you sort of work hand in hand with

11   whatever needs to be done?

12   A    That's correct.

13   Q    You did, however, talk to a number of

14   witnesses that told you of possible suspects.

15        MR. VINSON:  Object to what a witness

16   told.  That's hearsay.  He knows it is hearsay, Your

17   Honor.

18        THE COURT:  Sustained.

19   Q    (Mr. Odom)  Did you have other suspects

20   that you investigated as possible persons who murdered

21   the complaining witness in this case?

22   A    Yes, sir.

23   Q    Now, one of those persons was a James

24   Bogottus, was it not?

25   A    Yes, sir.

1        Q        And James Bogottus is a person who is
2   known for being involved in armed robberies that
3   involve diamonds; isn't that true?
4        A        That's true.
5        Q        Are you aware of the fact that some of Mr.
6   Bogottus' diamonds obtained from other robberies had
7   appeared at the Greenrich Building?
8        A        I am not personally with aware of that.
9        Q        In other words, some information might
10  come to you that another officer may have acquired and
11  you wouldn't have personal knowledge of that
12  information, would you?
13       A        Unless that officer shared that
14  information with me.
15       Q        All right.  Are you telling me -- well,
16  no, the question is more designed towards personal
17  knowledge.
18                Did you not know that or do you not have
19  personal knowledge of the fact of that information?
20       A        I do not have personal knowledge of that.
21       Q        You may have heard that but you have not
22  personally verified that information?
23       A        I have not.
24       Q        Were you involved in investigating Mr.
25  Bogottus' whereabouts on January 24, 1996?

1        A        No, I was not.

2        Q        Who was involved in that?

3        A        I believe that was going to be Sergeant

4   Tom Ladd, his partner, Officer Huseman.   There was

5   another set of detectives that were also involved in

6   that by the name of Officer Miller and his partner

7   Sergeant Jim Ladd.

8        Q        Who was Jeffery David Wrightman?

9        A        Jeffery David Wrightman that was an

10   individual's whose name was brought to our attention

11   during the course of this investigation.

12        Q        Was there another person who you received

13   -- well, was there another person who was a possible

14   suspect?

15        A        I believe that this person was the name

16   that was brought to our attention.   I personally did

17   not look into Mr. Wrightman.   That was another set of

18   detectives that handled that particular lead.

19        Q        All right.   And did he have an associate

20   by the name of Yonup Hasson H-a-s-s-o-n?

21        A        I believe that's true.

22                 THE COURT:   I need to break for lunch

23   today.

24                 Ladies and gentlemen, we are going to

25   break a little early for lunch today.   Please remember

1    the admonishments that I have given you to stay away

2    from discussing this case until I give you the

3    authority to do so.  We stand adjourned until 1:15.

4    Thank you very much.

5                   (Recess taken.)

6                   (Jury came into the courtroom. )

7                   THE COURT:  Sorry, we are starting a

8    little late.  I stuck in the elevator.

9                   Okay, proceed.

10        Q       (Mr. Odom)   Officer Halling, I was asking

11   you a list of names and I believe the last name have

12   you ever heard of H-a-s-s-o-n?

13        A       Yes, I have.

14        Q       And that is a person who had previously

15   been associated with the Greenrich Building, had it

16   not?

17        A       Yes, sir.

18        Q       And that's a person that was a suspect at

19   one time or, at least, was a possible suspect one time

20   in this case, correct?

21        A       That's correct.

22        Q       And there is a group of four Russians, is

23   there not, that were possible suspects at one time in

24   this case?

25        A       Yes, sir.

1      Q      And were you in the charge of the

2   investigation regarding those individuals?

3      A      No, sir, I was not.

4      Q      Those are individuals -- when we say a

5   possible suspect, we are not talking about the fact

6   that you go in your files and pull out a profile.

7   These are individuals that in some way or another you

8   have information that may or may not lead to a

9   connection to this particular case -- is that a fair

10   statement -- as to a possible suspect?

11      A      Yes, sir.

12      Q      Sometimes you see pictures, someone sits

13   down and goes through booking books and photos and

14   maybe they can recognize someone, maybe they can't.

15   You and your partner are receiving information all the

16   time.

17      A      On this case we were receiving it daily.

18      Q      And you had information that led you to

19   believe that the four individuals that we are talking

20   about, the Russian individuals, had been in the

21   building, had you not?

22      A      I believe so; yes.

23      Q      And that furthermore you had information

24   to believe they have been involved in other type

25   activities that were illegal activities?

1          A       Yes, sir.

2          Q       You also had to concern yourself with the

3    fact of -- one of the chief things you are attempting

4    to determine is who the complainant may have had

5    contact with in the past, correct?

6          A       Yes, sir.

7          Q       And some of those names would come up in

8    that regards, would they not?

9          A       Yes, sir.

10         Q       You, also, had some concern, did you not,

11   about the complainant's past behavior before he came

12   to the United States, did you not?

13         A       Yes, sir.

14         Q       And isn't it true that you were concerned

15   because of what he may have done in South Africa that

16   he may well have had some enemies that wanted to

17   murder him?

18         A       Yes, sir.

19         Q       Who is Anthony Coleman?  Did I ask you

20   that?

21         A       No.   Anthony Coleman?

22         Q       Do you remember Anthony Coleman?

23         A       Anthony Coleman, no.

24         Q       Do you remember information you may or may

25   not received from Ricky Fishel?

```
 1         A       I never spoke to Ricky in great detail.

 2         Q       You were, however, present when there was

 3   a photo spread that was done that was shown to Mr.

 4   Copeland, the security guard?

 5         A       No, sir, I was not present.

 6         Q       You were not present during that?

 7         A       No, sir.

 8         Q       Do you know what a photograph of James

 9   Bogottus looks like?

10         A       I believe I could probably recognize it if

11   I saw it.

12                 MR. ODOM:  May I approach the witness,

13   Your Honor?

14                 THE COURT:  Certainly.

15         Q       I would like to show you what has been

16   marked as State's Exhibit 34.  Do you recognize that?

17         A       Yes, I do.

18         Q       Photograph number five is that a photo of

19   James Bogottus?

20         A       Yes, sir, it is.

21         Q       Now, Mr. Bogottus has a brother, does he

22   not?

23         A       Yes, sir.

24         Q       And do you know if they, in any way, are

25   associated with or had been associated with the
```

1    complainant in this particular case?

2         A    Not that I am aware of.

3         Q    Are they, however, associated with having

4    committed an offense, by that, an armed robbery of a

5    diamond merchant, have they been associated with that

6    type of activity in the past?

7         A    Yes, they have.

8         Q    I believe you answered this question

9    earlier but I'll asked you again.  You weren't

10   associated with the investigation of the Bogottus

11   brothers?

12        A    No.  There was so many leads.  No, that

13   was not one of them.

14             MR. ODOM:  Pass the witness, Your Honor.

15             THE COURT:  Thank you, Mr. Odom.

16             Mr. Vinson.

17

18                    REDIRECT EXAMINATION

19   BY MR. VINSON:

20        Q    Defense attorney hit upon a number of

21   different names; is that correct?

22        A    Yes, sir.

23        Q    Did you all check out all those leads

24   through your investigation somewhere or your

25   investigative team checked out all leads?

1        A       Yes, we did.

2        Q       Did you find anything that connected any

3    name he mentioned before this jury about anyone else

4    to this case other than the Dennes brothers?

5        A       No, we did not.

6        Q       Now, did you also see the body of Mr.

7    Szucs in his office?

8        A       Yes, sir.

9        Q       And do you recall if he had a ring on his

10   finger?

11       A       No, he did not.

12       Q       And do you recall if he had some checks on

13   him?

14       A       Yes, he did.

15       Q       Will you tell the ladies and gentlemen of

16   the jury and His Honor about what amount we talking

17   about those checks added up to?

18       A       We are talking about approximately $37,000

19   with the checks.

20       Q       And were those checks made out by certain

21   people who had conducted business with Mr. Szucs?

22       A       I believe so; yes.

23       Q       And approximately how many checks were

24   there?

25       A       There were seven checks in total.

1          Q      Now, the defense also asked about the

2     inventory of Mr. Dennes' office, and I think you

3     testified you found some watch parts there and some

4     jewelry there.

5          A      Yes, sir.

6                 MR. VINSON:  May I approach, Your Honor?

7                 THE COURT:  Certainly.

8                 MR. VINSON:  Your Honor, these exhibits

9     are marked 136 through 142.

10                (Whereupon, State's Exhibit Nos. 136

11     through 142 were marked for identification.)

12         Q      Ma'am, let me show you what has been

13     marked for identification purposes as State's Exhibit

14     136 through 142.  Why don't you take a look at those

15     photographs and see if you can identify those

16     photographs.

17         A      Yes, sir, I can.

18         Q      Okay.  And do those photographs truly and

19     accurately reflect the inventory of the defendant

20     here, as you recall it to be, back on the 22nd day of

21     February, 1996?

22         A      Yes, sir.

23                MR. VINSON:  Your Honor, at this time the

24     State will offer into evidence State's Exhibit 136

25     through 142, will tender the same to defense counsel

1      for his inspection.

2                      May we have just one second, Your Honor?

3                      MR. ODOM:  No objection, Your Honor.

4                      THE COURT:  Very well.  State's Exhibit

5      136 through 142 are admitted.

6                      MR. VINSON:  Your Honor, we just ask that

7      they be published to the jury.  They can look at them

8      at their own time.

9          Q      136 through 142 represents the quality of

10     jewelry and stones that the defendant was working

11     with; is that correct?

12         A      That's correct.

13                     MR. VINSON:  Thank you, Your Honor.

14                     May we have them passed to the jury, Your

15     Honor?.

16         Q      Now, I know you are not a jeweler and

17     don't deal in math and expensive stones or anything of

18     that nature but based on what you determined in your

19     investigation of this case, did it appear that Mr.

20     Szucs dealt in a higher quality of stones than what

21     the jury is looking at.

22                     MR. ODOM:  Object, this witness is not

23     qualified to answer that.

24                     THE COURT:  Sustained.

25                     MR. VINSON:  I have no further questions,

1    Your Honor.

2              THE COURT:  Mr. Odom.

3

4                    RECROSS EXAMINATION

5    BY MR. ODOM:

6        Q      With regards to James Bogottus, his MO

7    fit, to some extent, in regards to an armed robbery,

8    to the MO in this particular case, did it not?

9        A      Sure did.

10       Q      In regards to his appearance, there was at

11   least a tentative or a qualified identification as to

12   him looking like the person that assaulted the

13   security guard, was there not.

14             MR. VINSON:  Object, Your Honor, unless

15   she was there when identification was made.

16             THE COURT:  Sustained.

17       Q      (Mr. Odom)   In answer to your question

18   that there is nothing that tied anything in this case

19   to any of those people, that's not completely true, is

20   it?

21       A      To the best of my recollection, I want to

22   say none of those people were tied in to this

23   investigation.

24       Q      But the question was none of those

25   suspects there was nothing to tie those other suspects

1    to this case?

2         A      I'm sorry.  Somebody was coughing.

3         Q      If I wrote the question down right, there

4    wasn't anything that tied the other suspects to this

5    case.  I believe you answered referring to the names I

6    gave you, being the other suspects?

7         A      That's correct.

8         Q      And you are telling the jury that there

9    wasn't anything that tied James Bogottus to this case?

10        A      To the best of my recollection, that's

11   correct.

12        Q      All right.  Let me ask you some

13   hypotheticals then.  Hypothetically, if someone gave a

14   tentative ID of someone as being the person that

15   committed the offense, would that be something that

16   you would say tied them to this case or would tie

17   someone to a case?

18        A      I see what you are getting at.  Okay.

19        Q      If you had someone whose mode of operation

20   was similar to the mode of operation, modus operandi,

21   that might be something that you view as tying to a

22   case?

23        A      I thought you were talking about

24   conclusively.

25        Q      Conclusive is sort of a subjective term.

1    We are trying to decide what conclusive is, isn't it?

2        A       That's true.

3        Q       What about if someone is in the vicinity

4    of the area that has something that has to do with

5    whether or not it ties them into the case, does it

6    not?

7        A       Sure.

8        Q       If someone --

9               MR. ODOM:  I lost my chain of thought.  I

10   have been at this too long, I'm afraid.

11       Q       If someone had either known the

12   complainant or had ties to the complainant, that would

13   be another thing that would tie him together with the

14   case, would it not?

15       A       That's correct.

16       Q       But once, again, you don't have personal

17   knowledge as to all aspects of the investigation,

18   correct?

19       A       That's correct.

20               MR. ODOM:  That's all I have, Your Honor.

21               THE COURT:  Thank you.

22

23

24

25

```
 1                     FURTHER DIRECT EXAMINATION

 2    BY MR. VINSON:

 3         Q      Hypothetically if this happened in

 4    December 25th, Santa Claus would be a suspect?

 5         A      Sure could.

 6              MR. VINSON:  I have no further questions.

 7

 8                     FURTHER CROSS EXAMINATION

 9    BY MR. ODOM:

10         Q      Have you ever known Santa Claus along with

11    his brother to take out a .9 mm pistol and rob diamond

12    jewelers?

13         A      Well, me personally, no, I haven't.  But

14    anything is possible.

15              MR. ODOM:  Pass the witness.

16              MR. VINSON:  I have nothing further.

17              THE COURT:  You are excused subject to

18    recall.  Thank you very much.

19              Call the next witness, please.

20              MR. VINSON:  At this time the State would

21    call Dr. Brown.

22

23

24

25
```

```
 1                    TOMMY J. BROWN,
 2   was called as a witness for the State and, having been
 3   duly sworn, testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MR. VINSON:
 6        Q    Sir, would you give your name for the
 7   record.
 8        A    Dr. Tommy J. Brown.
 9        Q    And how are you employed?
10        A    As an assistant medical examiner for the
11   Harris County Medical Examiner's Office.
12        Q    And how long have you been employed as an
13   assistant medical examiner with the Harris County
14   Medical Examiner's Office, sir?
15        A    Seven to eight years.
16        Q    Will you tell the ladies and gentlemen of
17   the jury and His Honor what type of training you have
18   received and what degrees you hold and are licensed to
19   perform as a medical examiner here in Harris County,
20   Texas.
21        A    I have a bachelor of science degree in
22   pharmacology, DO Degree from Kansas College of
23   Osteopathic, US Army internship in anatomic and
24   clinical residency with the U S army, nuclear medicine
25   fellowship; forensic fellowship at the Bexar County
```

1    Medical Examiner's Officer in San Antonio, and I am

2    board certified in clinical and forensic pathology and

3    nuclear and forensic pathology and I have a Texas

4    State Medical License.

5        Q     And do you hold a medical degree?

6        A     Yes, DO degree from Kansas College of

7    Osteopathic of Medicine.

8        Q     And you have a license to practice

9    medicine here in the State of Texas?

10       A     Yes.

11       Q     Tell the ladies and gentlemen of the jury

12   what an autopsy is.

13       A     An autopsy is an external and internal

14   examination of the body to determine the cause and

15   manner of death.

16       Q     And that happens, I take it, to anyone who

17   is not under the care of a physician who dies suddenly

18   or dies with some violent episode and some question

19   about the cause of death?

20       A     There is a certain criteria or a medical

21   legal cases that we are responsible for, suspicious

22   deaths, deaths that occur at home, unattended deaths,

23   deaths in a hospital less than 24 hours.  Those are

24   medical examiner's cases.

25       Q     And these autopsies are they performed at

1    or near the time of the event?

2         A     Yes.

3         Q     And do you keep the records of your

4    findings in the regular course of business?

5         A     Yes.

6         Q     And, also, are you required to do that?

7         A     Yes.

8         Q     And are the entries made by someone who

9    has personal knowledge of the autopsy report?

10        A     Yes.

11        Q     Now, at my request did you perform an

12   autopsy -- not on my request but at the request of the

13   state, did you perform an autopsy on a person by the

14   name of Janos Szucs, Jr.?

15        A     Yes.

16        Q     Will you tell the ladies and gentlemen of

17   the jury when this autopsy was performed, what date.

18        A     January 25, 1996, at 6:30 a.m.

19        Q     And at what location?

20        A     At the Harris County Morgue or the Harris

21   County Medical Examiner's Office.

22        Q     And how do you go about performing an

23   autopsy?

24        A     We weigh and measure the body and do a

25   complete external examination of the body, take

1    appropriate photographs of the body with the clothes

2    on and the clothes off.

3            Then, after the external examination is

4    done, an internal examination is performed in which we

5    do an incision from the shoulders down to the center

6    of the chest and the center of chest to the pubic

7    area.  We reflect back the soft tissue and examine the

8    chest cavity and the abdominal cavity.  After that is

9    done, organs are removed and weighed.  The brain is

10   also removed and examination of the brain and the

11   skull is performed.  The last part of the autopsy is

12   removal of the internal neck organs.  At the time of

13   the autopsy we take all fluids and tissue for

14   toxicological studies and microscopic examination, if

15   needed.

16        Q     And, doctor, do you have some protocol so

17   that in the future, if you were called to testify, as

18   you are testifying today, some manner and means in

19   which you connect any photographs of that person with

20   the written report?

21        A     Yes.

22        Q     And explain to the ladies and gentlemen

23   how you do that.

24        A     Each individual who comes through the

25   morgue for an autopsy or an external examination is

1    given a number and the numbers are in rotation and

2    that number is unique for that certain individual.  It

3    is not duplicated.  At the time of the autopsy the

4    body is identified, the number is assigned, the

5    photographs are also identification photographs and

6    other photographs are also matched up with the autopsy

7    findings and also with that particular individual.

8         Q     Okay.  Now, doctor, in this case, we have

9    96-694, would be the case year?

10        A     That's the year that the autopsy was

11   performed.

12        Q     And what does the 694 mean?

13        A     That means that this individual is early

14   in the year and he was the 694th case processed by the

15   medical examiner's office, either telephonic or an

16   external examination or by autopsy personnel in

17   rotation and that was the number assigned to him.

18        Q     Now, you perform autopsies on both you

19   said suspicious deaths, under circumstances a person

20   checks into the hospital and dies within a short

21   period of time and do you also do it in suspected

22   homicides?

23        A     Yes.

24        Q     And have you performed autopsies in

25   suspected homicides on few or many occasions?

1        A        Many occasions.

2        Q        Okay.  Let's refer to case 96-694, which

3   has already been identified as Janos Szucs, Jr., and

4   can you tell the ladies and gentlemen of the jury his

5   age.

6        A        He was 44 years of age.

7        Q        And can you give us his height.

8        A        He was 70 inches in height or five feet

9   ten inches.

10       Q        Can you give his weight.

11       A        Two hundred five pounds.

12       Q        Now, did he appear to be a well-nourished

13   person?

14       A        Yes.  He was a white male and

15   well-nourished, well-developed.

16       Q        And what did you determine from the

17   external examination?

18       A        He was clothed when he came in.  He had on

19   a long sleeved black and white shirt, white undershirt

20   and black brief undershorts and black slacks, black

21   belt, black socks and black shoes.  On removal of the

22   clothing, then the examination of the body was

23   performed then.

24              The body was then washed and another

25   examination of the body was done.  Photographs were

1    taken with the clothing on and, also, with the

2    clothing off and proper identification photographs and

3    photographs of documentation of the wounds were also

4    done.

5         Q      Did you see any type of wounds on the

6    outer portion of the skin?

7         A      Yes.

8         Q      Tell the ladies and gentlemen of the jury

9    what type of wounds you see.

10        A      Visible gunshot wounds.

11        Q      Do you recall how many gunshot wounds?

12        A      I believe there were five altogether.

13        Q      Do you want to start with the first one

14   and describe to the ladies and gentlemen of the jury

15   and His Honor where those various wounds were

16   located.

17        A      Sure.  The first wound, going from the top

18   of the head to the bottom, not in any order except

19   just going from the top of the head to the bottom of

20   foot, the gunshot wound was in the right lower

21   temporal area of the head just above the attachment of

22   the ear with the temporal bone.  That was the external

23   findings on that.

24               Post another about one and fourth inch was

25   a laceration was caused by a bullet fragment or some

1   fragment that the bullet might have hit into the head.

2   There bullet -- do you want me to go ahead with the

3   internal examination?

4       Q      Could we cover all the observations

5   outside and then make one trip.

6       A      The external examination also included an

7   entrance gunshot wound, just below the right clavicle

8   and the immediate upper chest.  This gunshot in upper

9   average exited the skin just beneath the clavicle and

10  lodged in the right neck area.  I recovered that

11  bullet just by pulling it out from the wound because

12  it did not go into the internal structures of the

13  neck.  There is another entrance gunshot of the left

14  mid chest area.  It also had a laceration that was

15  lateral and inferior or to the left and down a little

16  bit from it.  The gunshot wound was accompanied by the

17  small laceration.  There was another gunshot wound of

18  the right proximal lateral right leg.  The gunshot

19  wound had an exit wound of the medial distal right

20  anterior thigh.  It had fractured the distal femur, or

21  the thigh bone, as it went through the soft tissue of

22  the leg.

23              There is another entrance gunshot wound of

24  the palm surface of the right fourth finger.  This

25  gunshot wound went in an upper direction, and it came

1    out and went back in and exited the right third

2    knuckle.  So that was in and out, not through and

3    through.  That had a small amount of stippling around

4    it on the hand and there were a couple of small fibers

5    within that wound.  That essentially is the findings

6    of the external examination.

7         Q     Now, I think you said one of the fingers

8    there it had stippling around it.

9         A     Yes.  The palm and surface of the hand had

10   a small amount of stippling around it.

11        Q     What is stippling?

12        A     Stippling, whether burned and unburned,

13   are particles of the powder comes out of the end of

14   the gun barrel and small fragments of metal that

15   strike the skin that causes small scratches.

16        Q     And, generally, when we are talking about

17   making evidentiary findings of such, what distance are

18   we generally talking about the barrel of the weapon is

19   between the surface that the stippling is on and the

20   barrel of the weapon?

21        A     About a ball park figure would be 24

22   inches or a couple of feet.  However, this one had

23   small fibers in it so I don't know if the stippling

24   tore small abrasions were caused by powder or some

25   type of metallic debris.

1        Q     This fiber it wasn't a cloth fiber or

2  anything like that?

3        A     I couldn't tell.  There is two small

4  fibers.  I don't know.  I pulled them out of the wound

5  and couldn't identify as cloth.

6        Q     Could have been metallic in nature?

7        A     It could have been.

8        Q     Now, let's talk about the external --

9  strike that -- the internal path of the projectiles.

10  When you did your internal examination, will you tell

11  the jury what your finding was with a wound to the

12  head.

13        A     The gunshot wound to the head entered the

14  right temporal area.  It went across the brain and was

15  recovered in the left frontal area of the brain.  The

16  bullet track went through the basal ganglia and the

17  lateral ventricles of the brain, which are important

18  anatomical structures, and caused severe destruction

19  along the wound track.  That bullet was recovered.

20        Q     Would that shot be considered a fatal

21  shot?

22        A     Yes.

23        Q     What about the second wound?

24        A     The second gunshot wound was the right

25  temperal chest upper and tunneled beneath the skin and

1    the bullet lodged in the right neck.  That bullet was

2    recovered.  It was not considered a lethal wound but

3    it would have been a very painful type of a wound.

4        Q      What about the third wound.

5        A      The third wound was of left medial mid

6    chest.  This bullet went down toward from right to

7    left and downward and front to back.  That bullet

8    entered the chest cavity through the left fourth

9    intercostal or the muscle between the ribs.  It struck

10   the distal right ventricle of the heart and 150

11   milliliters in the sac around the heart.  The bullet

12   continued down through the diaphram that separates the

13   chest cavity from the abdominal cavity.  It then went

14   to the tail of the pancreas and, also, struck the top

15   part of the kidney.  It grazed along the top part of

16   the kidney.  It exited the left back.

17       Q      Now --

18       A      That was also a lethal wound because it

19   struck the heart.

20       Q      And is that the reason for all the blood,

21   was that the internal hemorrhaging?

22       A      Yes, also had a thousand milliliters of

23   blood in the abdominal capacity.

24       Q      What about the fourth wound?

25       A      The fourth wound was of the right lateral

1   lower leg that came up and exited the distal medial

2   right thigh.  It fractured the femur.  This was not

3   considered --

4              THE COURT:  Excuse me, could you stand up

5   so the jury can see.

6        A     The gunshot wound went in the lateral

7   right lower leg and exited the distal right thigh bone

8   anterior surface, went up like this, and broke the

9   femur or the side bore.  It exited to the thigh bone.

10  In other words, the bullet was going up like this.

11             Another gunshot wound was of the palm

12  surface of the hand and this one went, anatomically

13  correct, would be like anatomic position of the person

14  is straight up in this direction.  So the way we

15  classify would straight anatomical.  This bullet went

16  from the front to back from the palm surface up and,

17  also, to the right, from left to right, and it exited

18  the back of the knuckle.  That was not lethal.  Two of

19  the wounds would have been lethal, the one through the

20  head and one of the left mid chest.

21       Q     Now, with the wound to the hand, would

22  that be consistent with what we refer to as a

23  defensive wound?

24       A     It could be.  Defensive wound means a

25  person tries to stop or ward off or to interfere with

1     whatever is coming at him.  And it could be a club or

2     whatever but you can use, for the gunshot wounds, if

3     they are trying to grab the gun or some people will

4     try to block a gunshot.  Of course, it doesn't work

5     but they will reach out and try to do it as a reflex

6     to try to stop it.

7          Q      That could be consistent with a person

8     suffering that type of wound in the hand could be

9     consistent with a conduct that he observed someone

10    aiming a firearm at him, throws his hand up to ward

11    off the shot?

12         A      Could be and perhaps but I don't know that

13    for sure.

14         Q      I understand.  And assuming that the wound

15    is fired into his hand?

16         A      Yes, sir.

17         Q      Now, was there a laboratory work up and an

18    toxicology report made at this time?

19         A      Yes.

20         Q      And would you share that with the ladies

21    and gentlemen of the jury and His Honor.

22         A      The only positive from the toxicology was

23    caffeine was in his urine.  All other findings were

24    negative and he was a group B positive blood type.

25         Q      Now, doctor, you say you recovered some of

1    the rounds that were still in the body of Mr. Szucs;

2    is that correct?

3        A      Yes, sir.

4        Q      Now, will you tell His Honor and the

5    ladies and gentlemen of the jury what steps did you

6    take to preserve the rounds in a manner in which you

7    could identify them again in the future?

8        A      When we removed the bullets from the body,

9    I used the initial "T" and placed that on the bullet

10   and then I place it into a small plastic envelope and

11   I filled out the front of the envelope and signed the

12   bottom of the envelope.

13       Q      And the rounds that you were able to

14   remove from the body of Mr. Szucs did you determine if

15   they were the small caliber or a heavy caliber or

16   whatever?

17       A      I think I described them as a large

18   caliber bullet.  I recovered a jacket of the bullets,

19   too, of the nose part of the bullet.

20              MR. VINSON:  May I approach, Your Honor?

21              THE COURT:  You may.

22              (Whereupon, State's Exhibit Nos. 143

23   through 146 were marked for identification.)

24              MR. VINSON:  May I approach the witness,

25   Your Honor?

1                    THE COURT:   Certainly.

2         Q        Sir, let me show you what has been marked

3    for identification purpose as State's Exhibit 143 and

4    I'll ask you if you can identify State's Exhibit 143?

5         A        I can.

6         Q        Okay.  And State's Exhibit 143 is that the

7    autopsy report that was made at the time of the

8    autopsy was performed?

9         A        Yes.

10        Q        144 through 146?

11        A        Yes, I can identify these.

12        Q        And did you also have an opportunity to

13   look at those earlier this afternoon?

14        A        Yes.

15        Q        And are those the same three rounds that

16   you recovered from the body Mr. Szucs during the

17   course of the autopsy that was performed back on

18   January 25, 1996?

19        A        Yes.

20        Q        This last page here this is an

21   investigative report?

22        A        That's correct.

23                 MR. VINSON:   Your Honor, the State will

24   offer into evidence State's Exhibit 143 without the

25   investigator's report and State's Exhibit 144 through

1   146, tender the same to defense counsel, and ask that

2   we remove the hearsay on the report.

3          MR. ODOM:  Judge, we have no objection to

4   144, 145, 146.  We object to 143 as bolstering and

5   hearsay.

6          THE COURT:  With the deletions that were

7   referenced by Mr. Vinson, it is admitted and so is

8   144, 145 and 146.

9          MR. VINSON:  May I approach again, Your

10  Honor?

11   Q     Now, stand up and hold that up.  You may

12  want to step down and walk down.  Explain to the

13  ladies and gentlemen of the jury what these three

14  exhibits are 144 through 146, starting here.

15   A     The exhibit 144 is a bullet recovered from

16  the right anterior lower neck.  This is the bullet

17  that went up through the soft tissue and lodged in the

18  right neck.  It is a fully jacketed or large caliber

19  bullet is what it looks like.  There is also a small

20  fragment of the bullet.  The jacket had torn off and I

21  recovered that and that's included within the

22  envelope.

23          Exhibit number 145 is a bullet recovered

24  from the brain.  The bullet went across the brain and

25  was recovered on the left side of the brain.  It went

1    from right to left, slightly back to front and

2    slightly upward, and I recovered that bullet from the

3    brain

4            Exhibit number 146 is the nose jacket of a

5    bullet recovered from the left upper abdomen.  This

6    was recovered from around the diaphragm.  This is the

7    portion of the jacket of a bullet that had torn off.

8    The lead portion is not available.

9        Q    Would you step down, sir.

10            144 is the recovered bullet?

11       A    (Witness nods head.)

12       Q    145 is a recovered bullet; is that

13   correct?

14       A    Yes, that's from the back.

15       Q    And 146.

16       A    That's the nose jacket of a bullet that

17   has come off a bullet that was recovered from the left

18   upper abdomen.

19       Q    And all three bullets were recovered from

20   the body of Mr. Szucs; is that correct?

21       A    Yes.

22            MR. VINSON:  You may return.

23       Q    Now, did you form an opinion with respect

24   to Mr. Szucs as to his cause of death?

25       A    Yes.

```
 1        Q      And what was the cause of death?

 2        A      It was my opinion that Mr. Szucs came to

 3   his death as a result of a gunshot wound to the head

 4   and one of the chest.

 5               THE COURT:  Mr. Smyth, would you come up.

 6               (Off-the-record discussion held at the

 7   bench.)

 8               MR. VINSON:  May I approach?

 9               THE COURT:  Certainly.

10               (Whereupon, State's Exhibit Nos. 147

11   through 154 were marked for identification.)

12               MR. VINSON:  Your Honor, this is going to

13   be 147 through 152.

14               May I approach the witness, Your Honor?

15        Q      Let me show you what has been marked for

16   identification purposes as a State's Exhibit 147, 148,

17   149, 150, 151, 152, 153 -- we are going to add another

18   one -- and 154 and are those the wounds that you

19   already testified to?

20        A      Yes.

21        Q      And do those truly and accurately reflect

22   the body of Mr. Szucs with respect to the wounds that

23   you observed when you conducted your autopsy report?

24        A      They do.

25               THE COURT:  That's 147 through 154.
```

1          MR. VINSON:  It's going to be 147, Your

2     Honor, through 154.

3          THE COURT:  So you added two additional

4     photographs?

5          MR. VINSON:  Yes, 153 and 154.

6          Your Honor, at this time the State will

7     offer into evidence State's Exhibit 147 through 154.

8     We tender the same to defense counsel for his

9     inspection.

10          MR. ODOM:  I have an objection.

11          (Whereupon, the following proceedings were

12     held before the Bench.)

13          MR. ODOM:  Judge, I object to the

14     admission of all these photographs in that the

15     prejudicial effect outweighs any probative value, and

16     for the defendant, there is no issue to contest from

17     either the nature of the death or the angle of any of

18     the wounds.  They offered the offense report and

19     offered the deceased's picture at the time, therefore,

20     there is no probative value of the offer of admission.

21          Furthermore, as to State's Exhibit 147,

22     this particular photograph is already shown in State's

23     Exhibit 150.  The only probative --

24          THE COURT:  Let me see.

25          MR. ODOM:  There is no probative value to

1    that photograph other than the fact that it shows a

2    life-like expression of the face of the deceased,

3    which is 147, which is highly prejudicial and serves

4    no probative value and I object.

5              THE COURT:  Let me see the ones you didn't

6    submit.

7              MR. VINSON:  There is about another 18 in

8    there.  Each one of those depict a different wound.

9              We will withdraw.

10             THE COURT:  You didn't?

11             MR. ODOM:  Object to all of them but you

12   are right, that's sort of a duplicate.

13             THE COURT:  Which one do you want to

14   take?

15             MR. VINSON:  We will take 152 away.

16   Withdraw.

17             THE COURT:  This one you don't want

18   either.  That shows the leg wound.  You didn't offer

19   it.

20             MR. VINSON:  No, I haven't offered that.

21   I'll give you this one because it shows entrance and

22   exit.

23             MR. ODOM:  He doesn't need to ID that.

24   The defense has no objection.

25             THE COURT:  Okay.

```
 1                    MR. VINSON:  And that ties into the

 2      autopsy report.

 3                    (Whereupon, the following proceedings were

 4      held before the jury.)

 5                    THE COURT:  Okay.  State's Exhibit 147

 6      through 153 are admitted.  State's Exhibit 154 is not

 7      admitted.

 8                    MR. VINSON:  Your Honor, could the doctor

 9      step down so we could move through a much faster

10      pace?

11                    THE COURT:  Okay.

12           Q     Dr. Brown, State's Exhibit 147 is this the

13      identification of the autopsy report?

14           A     Yes.

15           Q     I mean that's the autopsy report number

16      here?

17           A     Yes.

18           Q     96-694 and 1-25-96 is that the date the

19      autopsy was performed?

20           A     Yes.

21           Q     And would you also tell what this appears

22      to be.

23           A     Yes, that's a gunshot wound of the left

24      mid chest that I described.

25                    THE COURT:  Pass those down.
```

1            MR. VINSON:  Okay, good enough.

2      Q      And State's Exhibit 148 is that the injury

3  to the hand?

4      A      That's the exit wound on the back of the

5  third knuckle --

6      Q      Okay.

7      A      -- right third knuckle.

8      Q      State's Exhibit 150 what does that depict?

9      A      This shows the gunshot wound that tunneled

10  underneath the skin and was lodged in the right lower

11  neck.  It also shows the left mid chest gunshot wound

12  with a laceration to the left of just interior.

13      Q      State's Exhibit 152.

14      A      This is a gunshot wound of the right

15  temporal area just above the attachment of the ear

16  with a laceration right behind it.

17      Q      And State's Exhibit 153.

18      A      This is an exit gunshot wound of the left

19  back, the right mid chest gunshot wound went down and

20  out the left back.

21      Q      And State's Exhibit 149.

22      A      This is the entrance gunshot wound of the

23  palm or surface of the hand with a small amount of

24  stippling and with small abrasions around it.

25            MR. VINSON:  May we demonstrate for a

1     moment?

2                    THE COURT:  Sure.

3          Q      Dr. Brown, would you stay down here.

4                    Assuming that I am seated at my desk in a

5     manner similar to this in my office, if I were to be

6     seated with my leg propped like this or leg up, could

7     you give the jury some manner or means in which a shot

8     was fired where it struck the leg and came out

9     through?  It was the right leg?

10         A      This right leg would have to have up like

11    this above the edge of the desk counter or the bullet

12    would have had gone through the top of the desk or you

13    could have had it with over, on top of the knee like

14    this, and the bullet come in here and gone here and

15    gone this direction.

16         Q      If it was up like on top of the table like

17    you said --

18         A      Then the shooter would have to be turned a

19    little bit more obliquely to the shooter and the

20    bullet came in here and came out here.  So the bullet

21    is traveling even though it hit the finger, it would

22    not have messed up the track of the bullet very much.

23    So bullet is traveling a straight line to match up the

24    end of the gun barrel to where the exit wound is.

25         Q      Could have been another person facing me

1    off to an angle, shooting this direction?

2        A      Yes.

3        Q      Or I could be seated like this and the

4    person would be facing me, fired the weapon?

5        A      Could be.

6        Q      Now, do you have an explanation for the

7    direction, that is, one of the wounds of the chest,

8    was it a downward direction?

9        A      This gunshot wound of the left mid chest

10   went down from right to left and front to back, in

11   other words, in approximately this direction here and,

12   then, again the track of the bullet was straight.  It

13   did not hit any bones to speak of so the gunshot track

14   was essentially straight or this occurred when the

15   individual, the shooter was standing up like this and

16   shot the gentlemen, or if he was leaning forward like

17   this, when he was shot from over on the other side of

18   the desk, then that would explain the downward

19   trajectory when you raise back but this went down.  In

20   other words, in that gunshot wound, if the person was

21   on the other side of the desk, then he more than

22   likely was leaning forward.

23            MR. VINSON:  Thank you, doctor.

24       A      The other gunshot wound, of course, went

25   in this direction from back to front and slightly

1    upward so the end of the gun barrel, since bullet is

2    traveling in a straight line, would have been gone up

3    this direction or the shooter either moved or the body

4    moved when he was reshot.

5        Q      And you can't tell the ladies and

6    gentlemen of the jury what round was fired first?

7        A      No.

8        Q      Doctor, the type of wounds that Mr. Szucs

9    suffered and the type of weapon that inflicted the

10   wound would that weapon be considered a deadly weapon?

11       A      Yes, sir.

12              MR. VINSON:  I have nothing further.

13              THE COURT:  Mr. Odom.

14

15                    CROSS EXAMINATION

16   BY MR. ODOM:

17       Q      Dr. Brown, my name is Wendell Odom.  How

18   are you?

19       A      Fine.

20       Q      I also would like to ask questions.

21              First of all, there has been some prior

22   speculation as to how many shots there were and how

23   many bullets were recovered.  You recovered two and

24   part of a third bullet --

25       A      Yes, sir.

```
 1        Q       -- is that a fair statement?

 2        A       Yes, sir.

 3        Q       Now, your notes that you used to refresh

 4    your memory in regards to your report that you did are

 5    those entirely contained within your autopsy report?

 6    In other words, before you came to testify, do you

 7    have notes other than what is contained in what we

 8    call the autopsy report?

 9        A       No.   Whenever we dictate the autopsy, we

10    give it by means of a foot pedal and a microphone.

11    That's taken up to the transcription department.  A

12    rough draft is made of that autopsy report and the

13    final report is then made.  The rough draft is

14    destroyed.

15        Q       Right.  My question was, however, you

16    didn't have any other notes that you relied on other

17    than the autopsy report before you came and testified?

18        A       No, sir.

19        Q       What I was asking, was that there were

20    three bullets that were recovered from the body,

21    correct?

22        A       Yes, sir.

23        Q       There are five wounds, gunshot wounds,

24    that are found on the complaining witness?

25        A       Yes, sir.
```

1     Q      Is there a missing bullet here or all the

2     wounds consistent with recovering the three bullets

3     that were recovered from the body?

4     A      The wound through the hand was through and

5     through.

6     Q      Yes, sir.

7     A      The wound through the leg was through and

8     through.  The wound through the chest and out the back

9     was through and through.  Those were all through and

10    through.  I recovered two bullets, one from the head

11    and one from the neck and also a copper jacketed tip

12    of the third bullet.

13    Q      I guess a better way to ask my question:

14    Is there anyway for you, by looking at the body of the

15    complainant, is there anyway that you can tell the

16    number of times he was shot -- excuse me -- the number

17    of bullets that pierced his body as opposed to the

18    number of wounds in his body, if you understand my

19    question?

20    A      I think I do.  It was shrapnel or

21    fragment, if the bullet fragmented, because there was

22    a laceration behind the bullet that went into his

23    head, which I cannot explain, and there was another

24    laceration to the left of the bullet in the chest.

25    It's almost like the bullet might have struck

1    something in its projectory toward the individual or

2    else I have no other explanation.  I think -- I have

3    no other explanation there.

4         Q    All right.  Is the wound that went through

5    the lower right leg of the complainant is that wound

6    consistent with another wound that was found on the

7    body of the complainant?

8         A    I could not match up that wound; however,

9    the one on the hand might possibly be the one that

10   went into the chest but I don't know that for sure.

11        Q    If I understand your testimony correct, we

12   have one wound to the head, the bullet of which was

13   recovered?

14        A    Yes, sir.

15        Q    We have one wound to the hand, the right

16   hand of the complainant, which is consistent with a

17   wound appearing in his chest, either one of the two

18   chest wounds perhaps?

19        A    Well, it could be.  If I was going to

20   match it up because the bullet that come beneath his

21   skin looks like it lost most of the velocity because I

22   recovered it beneath the skin in the right neck.  If I

23   had a choice between the two but I don't know actually

24   what occurred.

25        Q    We have another wound that seems to be

1    going as from a downward position upon the body of the

2    complainant and that was a through and through wound?

3          A      Yes, sir.

4          Q      And the wound upon the leg might indicate

5    to you that there is yet another unspent bullet that

6    was not recovered in the body of the complainant; is

7    that a fair statement?

8          A      I didn't see that one went into the body.

9    I think that one missed the body.

10         Q      That's what I am trying to say.

11         A      Yes, sir.

12         Q      Now, were there any other bullets that at

13   any time were recovered from the body of the

14   complainant?

15         A      None that I recovered, no, sir.

16         Q      And you would have recovered all, for

17   example, if there was a souvenir bullet, as we call

18   it, would you have been the one that recovered that?

19         A      You are talking about an old gunshot

20   wound?  Certainly, if I had seen it on x-ray, I would

21   have gone after it and recovered it.

22         Q      Now, we talked about stippling, that there

23   was a stippling on the right hand of the complainant

24   and that is consistent with what we call a defensive

25   reaction?

1          A       It could be.

2          Q       Yes, sir, or it could be.  That's really

3     my question.

4                  And I believe you told Mr. Vinson that

5     it's consistent that very often stippling will appear

6     within 24 inches of the barrel of a gun, correct?

7          A       That's correct.  But one would have to

8     test fire the weapon and match up the measurements.

9          Q       That's my point is that it really depends

10    on the type of the gun, the barrel length of the gun,

11    whether it is a rifle or whether it is a shotgun, that

12    depends on a number of factors?

13         A       That's correct.  But a ballpark figure

14    would be 24 inches.

15         Q       Yes, sir.

16                 MR. ODOM:  I have no further questions.

17                 THE COURT:  Mr. Vinson.

18                 MR. VINSON:  I have nothing further.

19                 THE COURT:  Thank you, doctor.  Appreciate

20    your testimony.

21                 MR. VINSON:  At this time, Your Honor, the

22    State would call G. L. Burke.

23                 THE COURT:  May he be allowed to return to

24    his work?

25                 MR. VINSON:  Yes, sir.

```
 1                          G. L. BURKE,

 2    was called as a witness for the State and, having been

 3    duly sworn, testified as follows:

 4                      DIRECT EXAMINATION

 5    BY MR. VINSON:

 6                  MR. VINSON:  Again, Your Honor, at this

 7    time we also want the record reflect that we are

 8    tendering to the defense counsel a copy of Officer

 9    Burke's offense report.

10                  THE COURT:  Once again, thank you.

11        Q        Sir, will you give your complete name for

12    the jury.

13        A        G. L. Burke.

14        Q        And how are you employed?

15        A        City of Houston police department.

16        Q        And how long have you been employed with

17    the City of Houston police department?

18        A        23 years.

19        Q        And will you tell the ladies and gentlemen

20    what type of training you received to become a police

21    officer and to perform the duties that you are

22    currently performing.

23        A        I went through the police academy, been an

24    officer for 16 years and went to senior officer in the

25    field on the street.
```

1     Q      And are you a crime scene unit

2   investigator?

3     A      I was up until last Monday.

4     Q      What happened last Monday?

5     A      I transferred to the homicide office.

6     Q      Now, you are at homicide.  All right.

7            I take it, that before you transferred,

8   you were working as a crime scene investigator?

9     A      Yes, sir, for 13 years.

10    Q      And as a crime scene investigator, would

11  it be a fair statement to say your job is to go out

12  and recover evidence, if it can be moved, or take

13  photographs of that which would be movable?

14    A      Yes, sir.

15    Q      Let me take your attention back to a case

16  involving a shooting of a person by the name of Janos

17  Szucs.  Were you involved in making what we commonly

18  refer to as a morgue run?

19    A      Yes, sir.

20    Q      And explain to the ladies and gentlemen of

21  the jury what that is.

22    A      The complainant's body is taken to the

23  morgue, the pathologist does the tests, they x-ray the

24  body and remove foreign objects that may be in the

25  body, the clothing.  They take their photographs.

1    They collect all the evidence and put it in a place

2    until we go get it.

3        Q    And did you do that in the case where Mr.

4    Szucs was involved?

5        A    Yes, sir, I did.

6        Q    And can you tell the ladies and gentlemen

7    of the jury and His Honor what day you made that run.

8        A    The 26th of January, 1996.

9        Q    And what did you pick up, sir?

10       A    I picked up a pair of black shoes, black

11   pants, black socks, white undershirt, black underwear

12   and black and white shirt and fired core bullet that

13   was in the undershirt and blood sample and I have just

14   got fired bullets.  I don't have the number but I

15   believe there was three.

16       Q    Now, did you take that fired core bullet

17   that was in the shirt, what did you do with that?

18       A    It was taken directly by me to the

19   firearms lab.

20       Q    Could you recognize that bullet if you see

21   it again?

22       A    I could recognize the container; yes, sir.

23            MR. VINSON:  May I approach the witness?

24            THE COURT:  Sure.

25       Q    And it has been marked as State's Exhibit

1     155.

2                    (Whereupon, State's Exhibit No. 155 was

3     marked for identification.)

4                    MR. VINSON:  May I approach the witness?

5                    THE COURT:  Certainly.

6         Q     Sir, let me show you what has been marked

7     as State's Exhibit 155.  Can you identify that?

8         A      It appears to be the same bullet, yes,

9     sir, in a bag with my name and initials on it and

10    stuff on it originally.

11                   MR. VINSON:  Your Honor, at this time the

12    State will offer into evidence State's Exhibit 155 and

13    tender the same to defense counsel for his inspection.

14                   MR. ODOM:  No objection, Your Honor.

15                   THE COURT:  Thank you.  155 is admitted.

16                   MR. VINSON:  I have no further questions.

17                   THE COURT:  Mr. Odom.

18                   MR. ODOM:   I have no questions of this

19    witness.

20                   THE COURT:  Is this witness to be excused

21    subject to recall?

22                   MR. VINSON:  Correct, Your Honor.

23                   THE COURT:  Thank you.  Appreciate your

24    testimony.

25                   Who is next, Mr. Vinson?

1    MR. VINSON:  Your Honor, at this time the

2 State will call Mr. Stairhime.  We are going to mark a

3 summary of latent prints as 156.

4    Before we start, may the record reflect I

5 am also tendering to defense counsel again the offense

6 report of Mr. Stairhime.

7    THE COURT:  Let the record reflect.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Whereupon, State's Exhibit No. 156 was
 2      marked for identification.)
 3                          W. L. STAIRHIME,
 4      was called as a witness for the State and, having been
 5      duly sworn, testified as follows:
 6                          DIRECT EXAMINATION
 7      BY MR. VINSON:
 8           Q      Sir, I think you have already spelled your
 9      last name, did you not?
10           A      Yes, sir.
11           Q      And what is your complete name?
12           A      Walter L. Stairhime, Jr.
13           Q      And how are you employed?
14           A      City of Houston Police Department,
15      identification division.
16           Q      And how long have you been employed in
17      that manner?
18           A      Over 25 years.
19           Q      What type of training do you have that has
20      prepared you to work for the Houston Police Department
21      in the ID division?
22           A      I have attended and successfully completed
23      the following courses, the Houston Police Academy, the
24      Texas Department of Public Safety, identification
25      officer's school, and the Houston Police Department
```

1    print kit course, the Houston Police Department

2    automated fingerprint identification, Houston Police

3    Department basic photography, Houston Fire

4    Department's arson practical evidence photography, the

5    FBI advanced latent techniques, the FBI administrative

6    advanced latent fingerprint school, the Houston Police

7    Department crime scene search, the University of

8    Houston advanced crime scene search, the FBI latent

9    print photography, the Houston police Department palm

10   print symposium and the FBI Smith & Wesson's fire and

11   examinations as well as teach at the Houston Police

12   Department Academy, Texas Department of Public Safety

13   and University of Houston in the field of

14   identification.

15       Q      Now, based on your training and

16   background, do you work with prints on a daily basis?

17       A      Yes, sir, I do.

18       Q      And, also, on many occasions are you

19   called on to compare the print from a source, a known

20   source, to a latent print from another source?

21       A      Yes, sir, I do.

22       Q      And is it possible in doing your work is

23   it possible to determine if the latent source and the

24   known source if the print was made by one and the same

25   person?

1          A       Yes, sir, it is.

2          Q       And if that's so, I take it, it would be a

3     fair statement to say likewise you can make a

4     determination if that source print, that is, a source

5     print was not made by the latent print; is that

6     correct?

7          A       That's correct.

8          Q       Now, were you called out to a crime scene

9     here in Harris County, Texas, to go out and secure

10    some latent prints from an office located on Richmond

11    here in Harris County, Texas?

12         A       Yes, sir, I was.

13         Q       And can you tell us on what day you went

14    to this Richmond location?

15         A       It was the early morning hours.  I believe

16    it was January 25, 1996.

17         Q       Now, when you arrived there, was someone

18    already there?  Did you have to go into the place or

19    were you allowed in by someone?

20         A       I was escorted in by an officer working

21    security.

22         Q       Tell the ladies and gentlemen of the jury

23    what a latent print is.

24         A       Yes, sir.  Present on the palm of the

25    surfaces of the hand and a plantar, skin like no other

1    body, this skin is raised and corrugated.  On the

2    raised portion of the skin are called friction ridges.

3    The friction ridges are not a continuous line as in

4    the corrugated ten.  They start and stop and they

5    split into two or more lines.  On the tops of this

6    raised portions of skin are minute openings, sweat

7    pores.  When there is enough perspiration, body oils

8    or other foreign matters on these ridges, it is

9    possible to touch a surface and leave a reproduction

10   of that friction ridge skin.  That deposit that was

11   made is called a latent print because it is unseen by

12   the naked eye until developed with chemicals or

13   powders.  That is a latent print.

14        Q      Now, when you go out and you go into a

15   scene to try to recover a latent print, what steps do

16   you take?

17        A      I examine the surface initially with just

18   a visual examination and then I begin, depending on

19   the surface that I am looking at, that will determine

20   what type of process I will use, whether it would be a

21   powder or I am going to treat it with chemicals.

22   Mostly a powder evidence is hard and smooth, a powder,

23   if it's porous as in paper, and I spray a chemical on

24   it.

25        Q      How do you get that print?  You know, I

1    have a print here on something that is immovable, how

2    do you lift that print?

3        A        You take a different types of brushes

4    either hair, fiberglass or feather and apply powder to

5    a surface.  If there is enough moisture, the powder

6    will stick to the moisture.  Once I have developed the

7    print, I have to preserve it.  In order to preserve

8    it, I take a frosted adhesive tape, apply it to the

9    surface, cover the area that I want to lift, lift it

10   up and then apply it to a similar surface such as a

11   white card.  So then I have a print on a white

12   background.  After I've done that, I document where

13   that print came from, what surface I lifted it from.

14       Q        When you say you document where the print

15   came from, you document it in what?

16       A        I turn the card over and do my

17   documentation on the back side immediately.  I

18   document where I made that lift from so I will know

19   exactly what surface it came from.

20       Q        You put the date there?

21       A        The date and the time or the date --

22   excuse me -- and my initials.

23       Q        And then do you go back and record all

24   this information in what you call the offense report

25   to perpetuate your testimony --

1     A       That's correct.

2     Q       -- of your findings?

3     A       Yes, sir.

4     Q       And did you do that in this case?

5     A       Yes, sir, I did.

6     Q       Now, during the lunch hour, you had an

7   opportunity to look at some photographs of suite 707.

8   Do you recall that was one you just testified you went

9   to back in January?

10     A       Yes, sir.  Is it 707?  770.

11     Q       I'm sorry, 770.

12             Now, when you went to that location, did

13   you use the same techniques that you testified to the

14   jury using powder and some of that nature?

15     A       Yes, sir, I did.

16             MR. VINSON:  May I approach the witness?

17             THE COURT:  You may.

18     Q       Why don't you take a look at State's

19   Exhibit 89, 93, 94, 108, 110, 111, 112 and do you see

20   if those are the same exhibits that you looked at over

21   the lunch hour.

22     A       Yes, sir, they are.

23     Q       Now, did you also get some prints of Mr.

24   Szucs?

25     A       Yes, sir, I did.

1     Q      And did you also take those prints and try

2     to eliminate Mr. Szucs' prints from that office?

3     A      Yes, sir, I did.

4            MR. VINSON:  Your Honor, may the witness

5     step down so he can show where he got all the various

6     prints from.

7            THE COURT:  Sure.

8     Q      Now, with respect to State's Exhibit 89,

9     could you tell the ladies and gentlemen of the jury

10    where this is located and why don't you hold it and

11    just show them what you recovered in that area.

12    A      This was a photograph of what I call the

13    kitchen area, a little kitchenette.  I recovered

14    fingerprints from this surface in the kitchen area,

15    latent prints.

16    Q      And who did those prints belong to?

17    A      Those prints belong to Officer G. S.

18    Mallen and Officer Stewart off this counter-top area

19    right here.

20    Q      And they had been at the crime scene; is

21    that correct?

22    A      Yes, sir.

23    Q      And State's Exhibit 93, can you tell the

24    ladies and gentlemen of the jury where you collected

25    prints from in that exhibit.  Start with two of the

1    gentlemen here.

2         A      This is the photograph the complainant's

3    office.  I collected paperwork from his desk because

4    paperwork I cannot powder.  It has to be processed

5    chemically.  I cannot do it at the scene.  I have to

6    take it back at my office.  I powder items on the

7    desk, the file cabinets, both sides of the desk, all

8    the credenza area behind it.  I developed a print on

9    the top, from what I call the owner's side of the

10   desk, the top drawer.  The top drawer has a brass

11   button on it, a knob and I developed a print from the

12   knob that came back to the victim.

13        Q      Mr. Szucs?

14        A      Johnny Szucs.

15        Q      Now, State's Exhibit 94 did you have any

16   success in locating any prints in that area?

17        A      The print that I was just talking about is

18   right here above my fingertip.  It's a little brass

19   knob on the top drawer of that desk.  It's a latent

20   print I developed that I had identified to the victim.

21        Q      And, again, that Mr. Szucs?

22        A      Mr. Szucs.

23        Q      And State's Exhibit 108 what did you

24   recover there?

25        A      State's Exhibit 108, again, well, this is

1    from the owner's side of the desk, looking back across

2    the office and the desk.  I developed prints on the

3    chairs that are across from his desk for visitors to

4    sit at.  I identified prints one to myself where I

5    grabbed one of these straight backed chairs and trying

6    to grab it and I let my finger touch the underside,

7    which is chrome.  I developed two latent prints to an

8    individual named Richard George Hainer, who I

9    understand was a customer.

10               MR. ODOM:  Objection, hearsay at this

11   point.

12               THE COURT:  Sustained.

13        A     And I also identified two latent prints,

14   left middle and the left ring on the underside of the

15   straight back chair to Jose Albert Dennes.  It was on

16   the chair next to the door.

17        Q     And that's in whose office.

18        Q     Sir?

19        Q     Whose office?

20        A     This is the complainant, Johnny Szucs.

21        Q     And that would be on the customer's side?

22        A     What I call the customer's side of the

23   desk.

24        Q     State's Exhibit 110.

25        A     State's Exhibit 110 is a photograph of the

1    front of the safe.  After the safe was opened, I

2    processed the inside.  I developed a print -- you

3    can't see it there but there are bolts inside that

4    door approximately that size.  They are locking bolts.

5      On the top of the one of the bolts, I developed a

6    print on the inside of this door, identified it to the

7    victim Johnny Szucs.

8         Q    Do we have the same thing as State's

9    Exhibit 11 and 12?

10        A    Yes, sir.  These are just photographs of

11   the inside of the safe.

12        Q    And that's where you recovered the prints

13   inside the safe on Mr. Szucs?

14        A    Yes, sir.

15             MR. VINSON:  You may return to your seat,

16   sir.

17        Q    Let me show you what you have referred

18   back to as State's Exhibit 156.  Does that give a

19   summary of the location you found the prints you have

20   testified to?

21        A    Yes, sir, it does.

22             MR. VINSON:  Your Honor, the State would

23   offer into evidence State's Exhibit 156 and offer to

24   the defense for inspection.

25             MR. ODOM:  We object, it's hearsay and

1      it true that you have to have a known set of prints in

2      order to compare them with?

3              A       That is correct.

4              Q       Which explains why you were able to find

5      out you had touched the back of a chair because you

6      had your set of prints on file, correct?

7              A       I actually rolled a set of my own.

8              Q       Now, that raises the next question.  I

9      know how they did it in the old days.  They would go

10     through a set of prints visually and try to find the

11     similar prints so they can make a comparison.  Today

12     do we have a computer analysis we do off the prints

13     that come up with possible print comparisons or do you

14     still be comparing the prints that you lift visually

15     to another set of prints to determine if you have a

16     match to those prints?

17             A       We have a system in place.  It's called

18     the Automated Fingerprint Identification System.  The

19     computer will generate a possible list of suspects;

20     however, it is still up to the human to sit down and

21     do a manual, one by one, comparison, side by side

22     comparison, in order to render a positive

23     identification or a non-identification.

24             Q       In other words, when you make a positive

25     identification on the prints, don't you have a number

1      of factors that will cause you to say that print is

2      the same print as this one?

3            A      That is correct.

4            Q      And you all even number them, you know,

5      number one, number two and then you will go to how

6      many identifiers you have but the computer just sort

7      of gets you in the world of the possible comparisons

8      but then you, as the print examiner and as the expert

9      in that field, it's up to you then to take that

10     possibility of prints and actually match them up to

11     determine the number of identifiers for you to

12     determine it is a positive.

13           A      That is correct.

14           Q      That's what you do, isn't it?

15           A      That's correct.

16           Q      Now, I take it, there were a number of

17     prints in the office that you were not able to

18     identify; is that correct?

19           A      That is correct.

20           Q      And that's real common, isn't it?

21           A      Yes, sir.

22           Q      I mean, we don't have everybody's prints

23     in your computer, do you?

24           A      No, sir.

25           Q      So if somebody's prints aren't in your

1    computer, then your system is not going to have a hit,

2    which will allow you to make a comparison and try to

3    determine if that print matches the other print,

4    right?

5         A       That is correct.

6         Q       Now, we have talked about suite 770.  Did

7    you also dust or analyze any prints that were found in

8    the lobby of that particular building, the Greenrich

9    Building?

10        A       Yes, sir.  I have a set of prints I

11   believe that were submitted to the lobby area.

12        Q       And were you actually the person that

13   actually lifted those prints, as you say?

14        A       No, sir.

15        Q       So, in other words, another person, who is

16   trained like you are in lifting prints, might lift

17   those prints and have you compare them, correct?

18        A       That's correct.

19        Q       And do you have a set of prints in the

20   lobby area that you were able to identify?

21        A       No, sir, I do not.

22        Q       Now, by the lobby area of the Greenrich

23   Building, do you know what the person actually dusted,

24   if they dusted the area around the security guard's

25   desk or do you have any knowledge as to what area you

1    may have dusted?

2         A       No, sir, I do not.

3         Q       Do you know if there were any prints

4    submitted to you in what is known as the loading dock

5    area around the door of the building that leads to

6    exiting out the loading dock?

7         A       Not to my knowledge.

8         Q       When you say not to your knowledge, by

9    that, do you not have knowledge that anyone dusted and

10   tried to lift prints in that area or that there were

11   none submitted to you from that area?

12        A       None were submitted to me.  I have no

13   knowledge whether anybody even attempted it.

14        Q       You are the kind of the person that

15   although sometimes on a special occasion you will go

16   and lift prints, very often people lift the prints and

17   submit them to you; is that a fair statement?

18        A       That is correct.

19        Q       If it's an unknown homicide, like we had

20   up in suite 770, there may be a situation like

21   Sergeant Waltman's, hold it, don't let anybody come in

22   here until Stairhime gets out.  You actually go to the

23   crime scene and very often, because of the amounts of

24   prints that are taken, a crime scene investigator

25   might have the knowledge that would allow them to lift

1    a print for you to examine at a later date, right?

2         A         That is correct.

3         Q         I believe you testified that there was a

4    positive print on the customer's side of the desk of

5    the complainant that related to Mr. Hainer, correct?

6         A         Yes, sir.

7         Q         And I believe you were going to testify

8    and I objected but I believe you were going to testify

9    that Mr. Hainer was a prior customer of the

10   complainant, Mr. Szucs'; is that correct?

11        A         That's what I was told.

12        Q         Were you told that information came from a

13   list of names of people that had seen Mr. Szucs

14   previously in the day before that or prior to the

15   January 24, 1996, date?

16        A         No, sir.  I wasn't told anything about a

17   list of customers, just that I identified the print

18   with the automated print system.  Once I notified

19   homicide I identified the print and they later came

20   back and told me it was a customer.

21        Q         You wouldn't know if Jose Alberto Dennes

22   was on the same list of a person who had been a prior

23   customer, had gone up to see Mr. Szucs prior to

24   January 24, 1996?

25        A         No, sir.

```
1                    MR. ODOM:  Pass witness.

2                    THE COURT:  Mr. Vinson.

3

4                    REDIRECT EXAMINATION

5    BY MR. VINSON:

6         Q      And you don't know that Mr. Dennes was

7    ever a customer of Mr. Szucs, do you?

8         A      No, sir, I don't.

9         Q      And you haven't run across any evidence to

10   reflect such, have you?

11        A      No, sir.

12        Q      Now one thing I did forget to ask you.

13   Where did you get Mr. Szucs' prints from?  Where did

14   you get his fingerprints, the known print of Mr.

15   Szucs?

16        A      I had to go -- well, a set of prints were

17   submitted by the crime scene officer.  They were

18   insufficient to identify.  I had to go to the funeral

19   home and attempt to print him myself.

20        Q      Now, did you also take a print off a box

21   that had been introduced here as State's Exhibit 69?

22        A      Yes, sir, I did.

23                   MR. VINSON:  May I approach, Your Honor?

24                   THE COURT:  You may.

25        Q      Take a look at State's Exhibit 69.  And
```

1    will you show the ladies and gentlemen of the jury and

2    His Honor where you were able to secure some latent

3    prints on State's Exhibit 69.

4         A    Print on State's Exhibit 69 are three

5    prints, latent prints, that I deemed identifiable.

6    Each one has a little ruler with the latent lab case

7    number and my initials.  Each one of the latent prints

8    was photographed and then compared to a list, long

9    list of suspects, and identified.  I photograph HH as

10   the left middle finger of Jose Albert Dennes.

11        Q    And who is Jose Albert Dennes to your

12   knowledge?

13        A    He was a possible suspect in this case.

14        Q    And is he the brother of Reinaldo Dennes?

15        A    To my knowledge, yes, sir.

16        Q    Now, you don't know at what time and place

17   Mr. Dennes was holding that box, State's Exhibit 69,

18   do you?

19        A    No, sir, I do not.

20             MR. VINSON:  Your Honor, I have nothing

21   further of this witness.

22

23

24

25

```
 1                    RECROSS EXAMINATION
 2    BY MR. ODOM:
 3              MR. ODOM:  May I approach the witness?
 4              THE COURT:  Sure.
 5         Q    State's Exhibit 69, the blue coloring
 6    that's on that exhibit, that's indicative of the
 7    powder that the lab used in order to try to pull a
 8    print up?
 9         A    It's not a powder.  It's a chemical that
10    was sprayed onto the cardboard.
11         Q    Does the lab do that or do you do that?
12         A    I did that as a latent print examiner.
13    That process is done in the latent lab.
14         Q    And are you able once again to get the
15    print of Jose Albert Dennes to come off of that?
16         A    That's correct.
17         Q    Now, did you have an opportunity -- you
18    didn't do any print analysis off of hundred dollar
19    bills, did you?
20         A    No, sir, I did not.
21              MR. ODOM:  May I approach the witness
22    again?
23              THE COURT:  Sure.
24         Q    This purple coloring on this exhibit
25    that's also consistent, isn't it, with the type of
```

1    substance that we see on the box, which is exhibit

2    number 59?

3        A       That's correct.

4        Q       You did not examine this money, did you?

5        A       No, sir, I did not.

6                MR. ODOM:  That's all I have, Your Honor.

7                MR. VINSON:  That's all I have.  No

8    further questions.

9                THE COURT:  You are excused.  Thank you

10   very much.

11               Call your next witness.

12               MR. ODOM:  Yes, I'm sorry, I do have one

13   more question.

14       Q       (Mr. Odom)   Mr. Stairhime, were you shown

15   some catalogues that you were asked to see if you

16   could pull latent prints off catalogues that refer to

17   making a silencer?

18       A       Yes, sir, I was.

19       Q       And did you perform an analysis off those

20   catalogues?

21       A       Yes, sir, I did.  I processed those

22   catalogues for latent prints.

23       Q       Were you able to find any positive

24   identification on the catalogues related?

25       A       Yes, sir, I did.

1        Q       And who were you able to positively

2    identify those prints with?

3        A       No one.

4        Q       You found prints.  You weren't able to

5    positively identify those prints as being the prints

6    of someone else?

7        A       That's correct.

8        Q       Officer Stairhime, I'll ask the obvious

9    here but you do have a copy of Mr. Reinaldo Dennes'

10   prints, do you not?

11       A       That's correct.

12       Q       And when you, say, make comparisons, for

13   example, on the catalogue, you make comparisons if Mr.

14   Reinaldo Dennes' prints were on that catalogue, did

15   you not?

16       A       That's correct.

17       Q       And the same thing in regards to State's

18   Exhibit 59, the box with cellophane?

19       A       That's correct.

20       Q       And the same thing in regards to all the

21   prints that were pulled out of the office up in 770 of

22   the complaining witness?

23       A       That's correct.

24               MR. ODOM:  No further questions.

25               MR. VINSON:  I have nothing further.

1              THE COURT:  I'm sorry.  Who is the next

2     witness?

3              MR. VINSON:  Officer Rowe.

4              Again, may the record reflect the defense

5     attorney has an opportunity to look at Officer Rowe's

6     statement while he is testifying.  That is his offense

7     report.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        WALTER ROWE,
 2    was called as a witness by the State and, having been
 3    duly sworn, testified as follows:
 4                      DIRECT EXAMINATION
 5    BY MR. VINSON:
 6         Q        Sir, will you give your complete name for
 7    the record.
 8         A        Walter Rowe.
 9         Q        And how are you employed?
10         A        With the Houston Police Department as a
11    latent print examiner in the identification division.
12         Q        And how long have you been employed with
13    the Houston Police Department?
14         A        For 14 years.
15         Q        And how long have you been a print
16    examiner?
17         A        For four years.
18         Q        What type of training did you receive to
19    compare your work in that area?
20         A        I was employed by the Federal Bureau of
21    Investigation and attended and completed their
22    specialized fingerprint class.  I worked there for
23    nine years and left there and came to the Houston
24    Police Department and went to the academy, attended a
25    fingerprint advanced latent techniques class that was
```

1    taught by the FBI at the academy and, also, a

2    specialized palm print identification class taught at

3    the police academy and an advanced latent techniques

4    class at the Department of Public Safety.

5         Q    Now, did you have an occasion to do some

6    print work in a case involving the death of Mr. Janos

7    Szucs?

8         A    Yes, sir.

9         Q    And will you tell the ladies and gentlemen

10   of the jury and His Honor how you came to be involved

11   in that case.

12        A    I was requested by my lieutenant to

13   compare two sets of prints and to determine if they

14   were a match.

15        Q    Now, you say determine prints.  Were you

16   given some items to see if you could actually get

17   prints off of?

18        A    Not at first.  I was requested to see if

19   the prints that Officer Stairhime had developed from

20   the office and submitted to the lab, that he was out

21   of the town at the time, so I matched his prints with

22   a record we had on file at the time.

23        Q    Now, when you talk about the prints, we

24   are talking about latent prints, correct?

25        A    That's correct.

1      Q      And you also are trained in same manner in

2    which Officer Stairhime is trained?

3      A      That's correct.

4      Q      Would it be a fair statement to say you

5    can take a latent print, based upon your training and

6    experience, and then take a known print from a source

7    and make a comparison and determine if those prints,

8    the latent and the known source, are made by one and

9    the same person?

10     A      Yes, sir.

11     Q      Have you done that on few or many

12   occasions?

13     A      Many.

14            MR. VINSON:  May I approach the witness,

15   Your Honor?

16            THE COURT:  You may.

17     Q      Let me show you what has been admitted

18   into evidence State's Exhibit 135.  Do you recognize

19   that?  That's all right.  Don't worry about that.

20     A      No, sir, I'm not familiar with that one.

21     Q      Let me show you what has been marked as

22   State's Exhibit 43.  Let me show you what has been

23   admitted into evidence as State's Exhibit 97.

24     A      I agree with this.

25     Q      Do you recognize both of those?

1          A      Yes, I have a latent number and my
2    initials on each item.
3          Q      Now, were you called on to see if you
4    could lift some prints from those two exhibits there
5    and if you could lift prints, determine who made those
6    prints?
7          A      Yes.  I processed both items, using the
8    techniques for paper, and there was no suitable prints
9    on either of the items.
10          Q      Now, you say there were no suitable
11    prints.  What are you talking about?
12          A      The prints that were developed there was
13    not enough for characteristics to compare a set of
14    known prints to these prints that I developed.  There
15    just wasn't enough characteristics to say who they
16    belonged to.
17          Q      With respect to the money, that's State's
18    Exhibit what?
19          A      79.
20          Q      All right.  Why don't you tell the ladies
21    and gentlemen of the jury why you couldn't get any
22    prints off of State's Exhibit 79.
23          A      Well, with money, most people think it is
24    paper but it's really cloth so when moisture adheres
25    to the cloth, it absorbs the moisture and we have to

1    process and using hydrant and it is dripped and all

2    the moisture, whether in the shirt pocket or pant's

3    pocket or wallet, it is just really difficult.  You

4    either get an overreaction or an underreaction.  It's

5    very difficult to get prints from money.

6         Q    Now, with respect to the next exhibit,

7    that was a piece of paper.

8         A    Yes.

9         Q    I noticed the gray color.  Was it that

10   color when you received it?

11        A    No.  I believe it was a white sheet of

12   paper but I just say sheet of paper in my notes.

13        Q    And why is it gray color now?

14        A    Processed with an hydrant and no

15   fingerprints developed that was with sufficient

16   characteristics, and I processed with another process,

17   physical developer, and that turns the paper gray.  It

18   darkens the paper and no fingerprints after that

19   process.

20        Q    And can you explain to the ladies and

21   gentlemen why there are no fingerprints on that

22   exhibit as well, why no prints on there.

23        A    Well, the latent print -- could you --

24        Q    Yeah, I'll rephrase the question because

25   you did find some prints on there, correct?

1        A      Some but they weren't suitable for

2     comparisons.

3        Q      That's what I mean.  You found some there

4     but they did not --

5        A      It didn't have enough characteristics.

6        Q      -- so you could make an identification?

7        A      Correct.

8               MR. VINSON:  I have no further questions.

9     I'll pass this witness.

10

11                    CROSS EXAMINATION

12    BY MR. ODOM:

13       Q      I am Wendell Odom.  We have never met --

14       A      No, sir.

15       Q      -- not that I know of.  I also would like

16    to ask you some general questions.

17              When we talk about lifting prints, prints

18    are everywhere.  It is just you always can't lift

19    them; is that a fair statement, or you can lift parts

20    of them but you have to have a certain set of

21    circumstances in order to pick up a print that is good

22    enough to compare to another print to make an

23    identification; is that a better way?

24       A      I'll agree with the circumstances.  It

25    will have to be right because you are transferring

1    moisture from the hands to a surface either oils or

2    body moistures.

3        Q      Right.  This table cloth is a perfect area

4    for a print.  You can also see it when someone puts

5    their thumb on it; is that a fair statement?

6        A      No, because each person is different and

7    not everyone has perspiration the same on their hands

8    or even the rest of their body.

9        Q      From a laymen's perspective, what I hear

10   you saying, is because money is a loose-weaved cloth,

11   it's hard to pull prints off of money?

12       A      That's correct.

13       Q      And you weren't able to pull any off of

14   this money, right?

15       A      That's correct.

16       Q      Well, because of any other number of

17   reasons, although paper, you can pull prints off, you

18   weren't able to pull any prints that you could compare

19   off of the diagram that is before you on the gray

20   piece of paper, exhibit number, I believe, is 43,

21   right?

22       A      That's correct.

23              MR. ODOM:   That's all I have, Judge.

24              THE COURT:  Thank you.

25              MR. VINSON:  I have nothing further.

1                    THE COURT:  Thank you very much for your

2      testimony.

3                    MR. VINSON:  I keep forgetting

4         Q      (Mr. Odom)  Officer Rowe, did you have a

5      copy of a Tony Ramirez's prints in order to compare

6      them had you been able to pull a print that's worth

7      comparison?

8         A      Would you rephrase your question.  I'm not

9      sure exactly what you are after here.

10        Q      I understand in order to compare prints

11     you have to have a known print to compare it with,

12     right?  I guess you don't have to but to identify a

13     person who belongs to a print, you are often asked to

14     identify an unknown print with a known print of a

15     person and whose name you may know, correct?

16        A      The name may be attached to a record in

17     our files and we would pull those prints and then

18     compare those prints with prints we have developed.

19        Q      Right.  I don't mean you actually know the

20     person but a name that is associated with the known

21     prints.

22                    When you were asked to do your analysis,

23     did you have a print of an individual by the name of

24     Tony Ramirez?

25        A      I don't recall that name right now.

1              MR. ODOM:  Thank you, pass the witness.

2              MR. VINSON:  I have nothing further.  He

3     may step down.

4              THE COURT:  Are you certain?

5              MR. ODOM:   Yes, sir, I'm sorry.

6              THE COURT:  Mr. Vinson.

7              MR. VINSON:  Yes, Your Honor, the State

8     will call Officer Tuttle.

9              THE COURT:  Very well.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          LEROY TUTTLE,

2     was called as a witness by the State and, having been

3     duly sworn, testified as follows:

4                      DIRECT EXAMINATION

5     BY MR. VINSON:

6                  THE COURT:  Mr. Vinson.

7          Q     Sir, I take it, by the uniform that you

8     are wearing, you are employed by the Houston Police

9     Department; is that correct?

10         A     Yes, sir, 21 years.

11         Q     And what is your complete name?

12         A     Leroy Tuttle.

13         Q     And how do you spell the last name.

14         A     T-u-t-t-l-e.

15         Q     Sir, will you tell the ladies and

16    gentlemen of the jury how you are employed within the

17    Houston Police Department.

18         A     I am with the crime scene unit attached to

19    the homicide division.

20         Q     And what type of training did you receive

21    to prepare you to work as a crime scene investigator?

22         A     We attend latent print schools.  I have

23    been to two latent print schools, photography school

24    -- that is basic and advanced photography -- shell

25    recovery, 40 hours of the crime scene unit school that

1    is put on out at the academy.

2         Q       And as a crime scene investigator, would

3    it be a fair statement to say that you are called to

4    various scenes here in Harris County, Texas, where the

5    Houston Police Department during an investigation and

6    from time to time you have to record that scene and

7    collect evidence?

8         A       Yes, sir.

9         Q       And that evidence is submitted for further

10   evaluation; is that correct?

11        A       Yes, sir, to the proper labs.

12        Q       Now, were you called to a scene here in

13   Harris County, Texas, on February 22nd where you met

14   with an Investigator Halling and went to an office

15   located on Richmond Avenue?

16        A       Yes, sir, I did.

17               MR. VINSON:  Again, may the record reflect

18   we are tendering to the defense counsel a copy of

19   Investigator Tuttle's report.

20               THE COURT:  The record so reflect.

21        Q       And, sir, can you tell His Honor and the

22   ladies and gentlemen of the jury for what reason you

23   went to that location.

24        A       I went to the location to document and

25   recover evidence of a search warrant.

1     Q      And while you were at that location, did

2  you enter an office?

3     A      Yes, sir, I did.

4     Q      And was that office on the third floor of

5  that building?

6     A      It was.

7     Q      And while you were in that office, were

8  you will called upon to secure some evidence?

9     A      Yes, sir, I did.

10     Q      And did you also make photographs while

11  you were there?

12     A      Yes, sir, photograph as you go along with

13  the recovery.

14            MR. VINSON:  May I approach the witness,

15  Your Honor?

16            THE COURT:  You may.

17     Q      I am going to show you what has been

18  admitted into evidence as State's Exhibit 39, 131,

19  134, and 59.  Will you take a look at those eight by

20  ten photographs and see if you can identify.

21     A      Yes, sir.

22     Q      And do those photographs truly and

23  accurately reflect the scene as you recall it to be

24  back on the 22nd day of February, 1996?

25     A      Yes, sir, it does.

1        Q       Let me show you what has also been
2    introduced into evidence as State's Exhibit 134 A.
3    It's a circular piece of metal here.  Will you take a
4    look at 134 A and tell us if you recognize that as
5    well, sir.
6        A       Yes, sir.  This is a face plate, I mean a
7    face plate and bolts that were removed from some
8    machinery.
9        Q       And the machinery we are talking about is
10   reflected in State's Exhibit 39 and then State's
11   Exhibit 59?
12       A       Yes, sir.
13       Q       It is also a close up in 134?
14       A       Yes, sir, it is.
15       Q       Is that State's Exhibit 134 one and the
16   same piece of machinery that is photographed here in
17   State's Exhibit 134?
18       A       Yes, sir, and it's in a bag with my
19   initials on it.
20       Q       And this is the actual piece that was
21   recovered; is that correct?
22       A       Yes, sir, it is.
23       Q       Let me show you what has been admitted
24   into evidence as looking the same or similar.  Do you
25   recognize State's Exhibit 135?

1        A      Yes, sir.

2        Q      And, sir, did you recover that while you

3    were in the office of the Greenrich Building back on

4    February 22, 1996?

5        A      Yes, sir.

6        Q      And let me show you what has been

7    introduced into evidence as same or similar State's

8    Exhibit 132 and why don't you take a look at that and

9    see if State's Exhibit 132 is the one and the same

10   piece of metal that is a projectile that is depicted

11   in State's Exhibit 131?

12       A      Yes, sir.  This is the recovery of area

13   and this is the fired bullet that I got under this

14   work bench here.

15       Q      And this is the real thing, is it not, in

16   State's Exhibit 132?

17       A      Yes, sir.

18              MR. VINSON:  Your Honor, may the witness

19   be allowed to step down and just show the ladies and

20   gentlemen of the jury where State's Exhibit 134 was

21   recovered from this lathe machine.

22              THE COURT:  Sure.

23       Q      State's Exhibit 134 is a photograph of

24   State's Exhibit 134 A; is that correct?

25       A      Yes, sir.

1        Q        Now, if you were to take State's Exhibit

2    39, would this help you show the ladies and gentlemen

3    of the jury -- starting right here with this gentlemen

4    -- and show them where 134 is recovered from.

5        A        Yes.  This was a face plate that was

6    removed from this part of the lathe here, removed from

7    the bottom of this lathe machine here along with these

8    bolts that, I think, are three or four.

9                 MR. VINSON:  Your Honor, the State has no

10   further questions.  Pass the witness.

11                THE COURT:  Mr. Odom.

12

13                        CROSS EXAMINATION

14   BY MR. ODOM:

15       Q        Briefly, Officer Tuttle, my name is

16   Wendell Odom.

17                Did you recover a number of different

18   types of shavings from the offense?

19       A        Yes, I did.

20       Q        Did you recover some gold shavings?

21       A        I don't know what kind of shavings they

22   were.

23       Q        Did you recover what appeared to be silver

24   shavings?

25       A        Yes, sir, they were silver in color.

```
 1          Q      Did you recover several silver shavings
 2     that appeared to be of different metals?
 3          A      Yes, sir.
 4          Q      You were not a person that is in the
 5     business of knowing the difference of all the
 6     different kinds of metals, are you not?
 7          A      Absolutely not; no, sir.
 8          Q      So you have no expertise in that
 9     particular field?
10          A      No, sir, that's why we submit them to the
11     lab.
12          Q      Officer Tuttle, on the lathe machine, do
13     you know anything about a lathe machine?
14          A      Very little, very little.
15          Q      Do you know what a reamer is?
16          A      No, sir.
17          Q      Did you recover any loose aluminum metal,
18     by that, blocks of metal or pieces of metal in or
19     around the lathe machine or the shop?
20          A      Yes, sir, I recovered metal that appeared
21     to be aluminum; yes.
22          Q      And how big were these pieces of metal?
23          A      There were various size of shavings.  They
24     weren't like block pieces.  They were shavings.
25          Q      I understand your testimony with Mr.
```

```
 1    Vinson that you recovered various shavings, aluminum
 2    and otherwise.  What I am asking, did you recover
 3    pieces of aluminum that one might work with?
 4         A    No, sir.
 5         Q    And no aluminum tubing, I take it?
 6         A    No, sir.
 7              MR. ODOM:  No further questions.
 8              THE COURT:  Mr. Vinson.
 9
10                    REDIRECT EXAMINATION
11    BY MR. VINSON:
12         Q    State's Exhibit 135 was that turned in to
13    you, what did you do with State's Exhibit 135?
14         A    That was sent to the latent print lab.
15              MR. VINSON:  Nothing further.
16              THE COURT:  Thank you, Mr. Odom.
17              MR. ODOM:  I have no further questions.
18              THE COURT:  Thank you very much for your
19    testimony.
20              MR. VINSON:  With that, Your Honor, we
21    would call like to recall Officer Stairhime for one
22    short question.
23
24
25
```

```
 1                    W. L. STAIRHIME,
 2   was recalled as a witness by the State and, having
 3   been duly sworn, testified as follows:
 4                    DIRECT EXAMINATION
 5   BY MR. VINSON:
 6              THE COURT:  Mr. Vinson.
 7              MR. VINSON:  May I approach?
 8              THE COURT:  Sure can.
 9     Q     Let me show you what is admitted into
10   evidence as State's Exhibit 135.  Did you receive that
11   in your laboratory?
12     A     Yes, sir, I did.
13     Q     And how do you know that's the same one
14   that you received in your lab?
15     A     It has my latent lab number and my
16   initials on it above the letter "T".
17     Q     And were you requested to try to lift some
18   fingerprints from State's Exhibit 135?
19     A     Yes, sir, I was.
20     Q     And did you attempt to do that?
21     A     Yes, sir, I did.
22     Q     Did you have any success?
23     A     No, sir, I did not.
24     Q     Would you explain to the ladies and
25   gentlemen of the jury and His Honor why you had no
```

1       success.

2               A       There are bits and pieces of latent prints

3       on State's Exhibit 135 but they are not identifiable.

4       As I had stated earlier, you can touch a surface.  If

5       there is enough moisture on the friction ridge skin,

6       you can leave a print.  If there is not enough, it's

7       also treated.  You can touch a surface and not leave a

8       print or leave a partial print, and in this case there

9       were partial prints there that did not contain enough

10      characteristics to be identified.

11                      MR. VINSON:  I have nothing further.

12                      MR. ODOM:  I certainly have no questions.

13                      THE COURT:  You are excused.  Thank you.

14                      MR. VINSON:  May he allowed to go back to

15      his job?

16                      THE COURT:  If he wants to.

17                      Who is the next one?

18                      MR. SMYTH:  Ron Baldwin, Your Honor.

19                      May the record reflect the State is going

20      to retender Mr. Baldwin's report in this case to

21      counsel.

22                      THE COURT:  Very well.  Thank you.

23

24

25

```
 1                    ROBERT BALDWIN,
 2    was called as a witness by the State and, having been
 3    duly sworn, testified as follows:
 4                    DIRECT EXAMINATION
 5    BY MR. SMYTH:
 6         Q     Sir, will you, please, state your name and
 7    speak loud enough so that the last lady on the top row
 8    can hear you.
 9         A     Good afternoon, ladies and gentlemen.  My
10    name is Robert Baldwin.
11         Q     Mr. Baldwin, how are you employed?
12         A     I am employed by the Houston Police
13    Department.  My job title is that of criminalist
14    three.  I am assigned to the HPD crimes laboratory.
15         Q     And how long have you been employed with
16    our police department?
17         A     I commenced my employment with HPD in
18    1989, July 8th.
19         Q     And what particular division of the unit
20    -- did you say the crime lab?
21         A     Firearms laboratory, which is part of the
22    identification division.
23         Q     You are a criminalist?
24         A     That's correct.
25         Q     And what particular field of expertise do
```

1      you have?

2           A      Again, my work has been in the area of

3      firearms identification since coming to HPD.

4           Q      Will you give the ladies and gentlemen of

5      the jury the benefit of your training and experience

6      that allows you to do this job for our police

7      department.

8           A      My formal education consists of a bachelor

9      science degree, juris doctor's degree and I have been

10     in the field of criminalistics in general for

11     approximately 20 years now and approximately 10 in the

12     firearms-related work.  I received Specialized

13     training at ATA, Smith & Wesson, Colt Arms, Sig arms,

14     Glock Arms on the forensic microscopy.

15          Q      What in the world is forensic microscopy?

16          A      The science of microscopy as it

17     particularly relates to the examination that is

18     pertinent to the forensic work.

19          Q      I don't think that helped me at all.  Does

20     that have anything to do what you are going to

21     testify?

22          A      Yes, sir.  My work is heavily involved

23     with the comparison microscope.

24          Q      Forensic microscope is that using

25     microscopes?

1          A       Yes, sir.

2          Q       In the firearms lab, you do have a type of

3     microscope?

4          A       Yes, sir.  We do comparison microscope, if

5     I might describe, that is actually a combination of

6     two microscopes combined as what is known as an

7     optical bridge.  You are able to view two specimens

8     simultaneously in a split screen view in the field of

9     view using the optical bridge.

10         Q       And when you are comparing -- let's narrow

11    it down to the firearms work.  When you are working

12    with the firearms-type evidence, ballistic types of

13    evidence, what do you look at?

14         A       Most commonly we are looking at fired

15    projectiles or fired cartridge cases and in some

16    instances, if we have a firearm that is recovered, the

17    examination would be focused on trying to determine if

18    those items were fired in that particular recovered

19    firearm.  If there is no firearm available, we can

20    compare the fired projectiles to one another to

21    determine if they were fired in the same firearm and

22    likewise compare the fired cartridge cases to one to

23    determine if they fired in the same firearm.

24         Q       Do you do this type of work on a daily

25    basis?

1      A      Yes, sir.

2      Q      Have you made few or many comparisons of,

3   let's say, bullets to determine if they were fired in

4   the same gun?

5      A      Numerous.

6      Q      Is that many?

7      A      Thousands.

8      Q      Have you also compared fired cartridges or

9   spent cartridges to determine whether or not they were

10  fired from the same gun?

11     A      Yes, sir, I have.

12     Q      And have you likewise compared fired

13  bullets and fired cartridges that came from an unknown

14  source with those that you have no origin because you

15  got a gun and make a test firing to determine whether

16  or not the unknowns were fired in a particular weapon?

17     A      Yes, I have.

18     Q      Have you done that on thousands of times,

19  too?

20     A      Yes, sir.

21     Q      And likewise have you been called upon to

22  testify in the district courts of Harris County,

23  Texas, before?

24     A      Yes, sir, numerous occasions.

25     Q      I suppose that's thousands, is it?

1        A        No, sir.

2        Q        Maybe hundreds?

3        A        Yes, sir.

4                 MR. SMYTH:  The State of Texas would

5        submit Mr. Baldwin as an expert in the field of

6        comparison.

7                 THE COURT:  Any objection?

8                 MR. ODOM:   Not at this point.

9                 THE COURT:  Very well.

10       Q        Did you have occasion to become involved

11       in the investigation of the shooting of a security

12       guard by the name of David Copeland and the killing of

13       a diamond jeweler by the name of Janos Szucs or Johnny

14       Szucs?

15       A        Yes, sir, I did examine evidence that was

16       associated with HPD incident 1030906 as David.

17       Q        And those involved a shooting that

18       occurred at 6222 Richmond Avenue here in Houston,

19       Harris County, Texas, back on January 24, 1996?

20       A        That information is based on information

21       that I have in our computer; yes, sir.

22       Q        Were you called out?  Did you go to the

23       scene of those particular shootings?

24       A        No, sir, I did not.

25       Q        It was a ballistic recovered and brought

1    to you?

2         A        That's correct.

3         Q        Can you tell us the type of evidence that

4    was brought to you.

5         A        The fired evidence in this particular case

6    that I examined consisted of fired bullets and bullet

7    fragments as well as fired cartridge cases.

8         Q        When you get evidence in your lab, do you

9    give it any unique numbering or identification system

10   that you folks in the firearms lab use?

11        A        Yes, sir.  We assign the HPD incident

12   number, that has been a firearms case number, and in

13   this case this incident was given case number 61-96.

14        Q        Do you also give the ballistics that has

15   been submitted under this firearm of 61-96, do you

16   give, let's say, a lead bullet, do you call it

17   anything special?

18        A        We give it an identifier.  The projectiles

19   are given identifiers that start with E B, standing

20   for the evidence bullet and E B one and through how

21   many ever of fired projectiles are submitted and,

22   likewise, the fired cartridges are giving E C C,

23   standing for the evidence cartridge case.

24        Q        Do you have any other identifiers you

25   give?

1      A      Other than we do assign the case number at

2   the time it is logged in, as well as we would note the

3   date that it was logged and the initials of the

4   individual who logged it in.

5      Q      Can you tell the ladies and gentlemen of

6   the jury how many evidence bullets, E B, items you

7   received in this particular case?

8      A      With respect to this particular incident,

9   there were a total of nine.

10     Q      So nine bullets and bullets fragments?

11     A      That's correct, sir.

12     Q      Can you tell the ladies and gentlemen of

13   the jury how many E C C or evidence cartridge cases

14   you received in this particular case?

15     A      A total of four, sir.

16     Q      In your examination of these bullets and

17   as well as cartridge cases, first of all, let me ask

18   you what type of bullets did you receive, what was the

19   caliber?

20     A      The intact projectiles are consistent with

21   weight and size and diameter with a .9 MM Luger.

22     Q      How about the E C C or the evidence

23   cartridge cases?

24     A      The head stamp indicated .9 mm Luger.

25     Q      In examining the bullet evidence, are you

1    able to come to an expert opinion or conclusion as to

2    type of weapon that may have fired that bullet?

3         A     I was able to examine the items and look

4    at the class characteristics that were exhibited on

5    those items and produce a listing of manufactures who

6    produce firearms that have class characteristics

7    consistent with those observed on the bullet.

8         Q     You say class characteristics --

9         A     By class characteristics would be

10   referring to the caliber, the number of lands and

11   grooves, the width of the lands and grooves and the

12   direction of twist.

13        Q     What are the lands and grooves for the

14   benefit of the jury?

15        A     In a firearm, as the type that was used in

16   this incident, the barrel is rifled and by that

17   rifling consists of a series of lands and grooves that

18   are cut into the interior surface of the barrel.  When

19   a projectile is fired through that barrel, there will

20   be impressions left with a rifling on the barium

21   surface of the projectile.

22        Q     When it's fired, it leaves some type of

23   markings?

24        A     That is correct.

25        Q     When you examined the lead bullets, the

1    fired ones that came into your lab, you say you were

2    able to develop a list of weapons that might possibly

3    have fired those bullets?

4        A       That's correct, sir.

5        Q       Now, in this case were you ever submitted

6    an actual weapon that was actually believed to have

7    fired the bullets and tested to see if it did it?

8        A       No, sir.

9        Q       So you are working without a gun?

10       A       That's correct, sir.

11       Q       But you can look at these bullets and

12   start narrowing the field, so to speak?

13       A       Certainly.

14       Q       Can you tell the ladies and gentlemen of

15   the jury, after examining the class characteristics of

16   the lead bullets that you received or bullet

17   fragments, what type of weapons would have fired that?

18       A       The listing of possible firearms that were

19   developed was a list totaling eight different

20   manufacturers.  By name, they were American Derringer

21   and Astra, Berringer, Danshway, Sterling Arms, SWB and

22   Taurus and Walther.

23       Q       Now, from looking at these fired cartridge

24   cases, can you, also, after examining them, too, you

25   are looking at a fired cartridge, what are you looking

1    for?

2         A        First of all, you are going again to look

3    at a class characteristic that again refers to the

4    particular cartridge type.  That being in this

5    particular case a .9 mm, the shape of the firing pin,

6    the presence or absence of breech face marks.  If

7    breech face marks are present, again you look at the

8    type of breech face marks and extractor and relative

9    to each other.

10        Q        And I assume you did that in this case --

11        A        Yes, sir.

12        Q        -- with respect to four fired cartridge

13   cases?

14        A        That's correct, sir.

15        Q        Were you able to, after looking at those

16   four cartridge cases, to come up again with a list of

17   possible weapons that would have fired?

18        A        I did not run the cartridge cases by

19   themselves -- excuse me.  Yes, sir, I did.  I'm sorry.

20   I was under the impression that I had run a combined G

21   R C.  I did run that, I did, and four total

22   manufacturers.

23        Q        What four manufacturers could have fired

24   those four cartridge cases?

25        A        Beretta, Danshway and, Helwan, and Taurus.

1      Q      Correct me if I am wrong, it looks like

2    there is three guns that are consistent -- were these

3    all .9 mm semiautomatics?

4      A      Yes, sir.

5      Q      We wouldn't be talking about -- I guess

6    you could talk about the spent cartridge with regard

7    to a revolver but in this case we are talking about a

8    semiautomatic firearm; is that correct?

9      A      That's correct.

10      Q      And that's one that is, after fired, the

11    casing is extracted and pitched out on the ground?

12      A      That's correct, sir.

13      Q      And from looking at the lead bullets, you

14    have a Beretta, a Taurus and a Danshway plus five

15    others.  And from looking at the spent cartridge

16    cases, you have got the Beretta, the Danshway and the

17    Taurus.  Those three weapons are consistent with both

18    the spent cartridge cases as well as the lead bullets?

19      A      Yes, sir.  For sake of accuracy on the

20    record, the bullets we are talking are jacketed lead

21    bullets, not just lead bullets.

22      Q      Does that change anything I said?

23      A      No, sir.

24      Q      Did you compare the various jacketed lead

25    bullets with each other to determine whether or not

1       they were fired from the same gun?

2           A       Yes, sir, I did.

3                   MR. SMYTH:  May I approach the witness,

4       Your Honor?

5           Q       You said under the E B designation, which

6       is lead bullets, you have a total of nine; is that

7       correct?

8           A       That's correct, sir.

9           Q       Mr. Baldwin, I want to show you, first of

10      all, State's Exhibit 27, 29, 28, 30, and ask you if

11      you looked at those particular items and tell me

12      whether or not you recognize those, and if so, how?

13          A       Yes, sir, I do.

14          Q       Okay.  Would you tell the ladies and

15      gentlemen of the jury what those particular exhibits

16      are, and if you would read off the exhibit as well the

17      E B designation that you gave it.

18          A       Certainly.  First of all, State's Exhibit

19      27, which is given the item designation of E B one, is

20      a fired lead bullet.  State's Exhibit 28 is a jacket

21      fragment and it was given the designation of E B 3.

22      State's Exhibit 29 was a jacketed lead fragment -- the

23      lead in the jacket have now separated -- and that was

24      given the firearms designation of E B two; and the

25      contents then of State's Exhibit 30 is six lead

1    fragments, and those fragments were given the

2    designation of E B 4.

3         Q       Do you know who submitted those particular

4    items E B one, two, three and four to you?

5         A       They were submitted to the firearms

6    laboratory from our firearms lockbox.

7         Q       Was there a particular CSU officer that

8    submitted those?

9         A       Yes, sir, if I could have one moment.  E B

10   one through four were accompanied by submission forms

11   that bears Jim Kay.

12        Q       Jim Kay?

13        A       That's correct, sir.

14        Q       Okay.  That's good enough.

15              Now, let me show you State's Exhibit 144,

16   145 and 146 as well as 155, and ask you if you can

17   identify those and give us, also, any E B designation

18   that you placed on those particular items.

19        A       Certainly.  Starting with State's Exhibit

20   144, which is given the item designation of E B 5, the

21   contents are a fired jacketed lead bullet; E B 6 is

22   State's Exhibit 145, again, a fired jacketed bullet;

23   E B 7 is given State's Exhibit 146 as a jacket

24   fragment; and State's Exhibit 155 is a lead bullet and

25   given the designation of E B 8.

1        Q       And finally State's Exhibit 132, would you

2   tell us what your E B designation is on that one.

3        A       State's Exhibit 132 is given the item

4   designation of E B nine.

5        Q       If you would, check your records and tell

6   the ladies and gentlemen of the jury who it was that

7   submitted State's Exhibit 144, 145, 146 and 155, which

8   is going to be, I believe, E B 35, E B 6?

9        A       E B 7, E B 8 those items were submitted by

10  Burke.

11       Q       Stony Burke?

12       A       Yes, sir.

13       Q       Have you seen him out in the hallway?

14       A       Yes, sir.

15       Q       The gentlemen that proceeded you, came on

16  the stand sometime before you did?

17       A       Yes, sir.

18       Q       And with regard to State's Exhibit 132,

19  which carries the designation of E B nine, can you

20  tell the ladies and gentlemen of the jury who

21  submitted E B nine?

22       A       E B nine came to us again through the

23  evidence lockbox; however, it was accompanied by a

24  submission form bearing Leroy Tuttle's name.  He is a

25  CSU officer.

1      Q       Is Leroy Tuttle the officer that got off

2      the stand shortly before you?

3      A       Yes, sir.

4      Q       Were you able to, using your microscope,

5      compare those various items with each other, E B one

6      through E B nine?

7      A       Yes, sir, I was.

8      Q       Will you tell the ladies and gentlemen the

9      result of your comparison.

10     A       Certain of these items I was able to

11     identify or determine that they were fired from the

12     same firearm, specifically those were items State's

13     Exhibit 27, which is E B one; State's Exhibit 29,-

14     which is given the designation of E B two; State's

15     Exhibit 144, which is given a designation of E B 5;

16     State's Exhibit 145, which is given a designation of E

17     B 6; and State's Exhibit 146, which is given the

18     designation of E B 7; and State's Exhibit 132 -- is

19     that correct, sir?

20     Q       Yes, sir.

21     A       -- which is given the E B designation of E

22     B nine.

23     Q       So if I am correct then, State's Exhibit

24     27 and 29, which are E B one and E B two, were

25     submitted to you by CSU Officer Kay?

1       A       That's correct.

2       Q       And State's Exhibit 144, 145 and 146 were

3    submitted to you -- and they are E B five, E B six and

4    E B seven -- and were submitted to you by Officer

5    Burke, Stony Burke, CSU officer?

6       A       Yes, sir.

7       Q       And State's Exhibit 132, which carries

8    your designation of E B nine, was submitted by Officer

9    Tuttle?

10      A       That's correct, sir.

11      Q       And all of those items were fired by the

12   same weapon?

13      A       That's correct.

14              MR. SMYTH:  May I approach the witness

15   again, Your Honor?

16              THE COURT:  You may.

17      Q       Let me show you now you E C C evidence,

18   the spent cartridges.  First of all, State's Exhibit

19   26, can you recognize State's Exhibit 26, State's

20   Exhibit 51, 52, and -- excuse me, 105 A and ask you if

21   you look at those items and tell me whether or not you

22   can recognize that?

23      A       All right, sir.  Yes, sir, I can recognize

24   all of those items.

25      Q       Were those spent cartridges submitted to

1     you by various crime scene officers?

2          A     They were all submitted to the crime

3     laboratory and, yes, they were all submitted in

4     conjunction with this case.

5          Q     With respect to State's Exhibit 26, what E

6     B designation -- is that E C C designation?

7          A     E C C designation is E C C one.

8          Q     And who submitted that?

9          A     Again, this was part of the submission

10     that came to us from Officer Kay.

11          Q     Officer Kay.

12                Now, State's Exhibit 51 and 52.

13          A     Yes, sir.  These two items are given the

14     designation E C C two and three.

15          Q     And they are submitted by?

16          A     They were submitted to the laboratory by

17     Lieutenant Neely.

18          Q     And State's Exhibit 105 A what is the E C

19     C designation?

20          A     E C C designation is E C C four, sir.

21          Q     And who submitted that?

22          A     I'll have to check the submission form.  E

23     C C four was submitted or accompanied by a submission

24     form bearing Officer M. A. Holbrook's name.

25          Q     And Holbrook is also the CSU officer?

1        A       Yes, sir.

2        Q       Did you have an opportunity with the

3    bullet evidence to make a comparison, or attempt to

4    make a comparison, for the various spent cartridge

5    cases submitted to determine whether or not, they,

6    too, were fired from the same gun?

7        A       Yes, sir, I did.

8        Q       What is the result of your investigation

9    and comparison and analysis?

10       A       The result of that examination indicate to

11   me that all four of the fired cartridge cases, were

12   fired in the same firearm.

13       Q       That would be State's Exhibit 26, which

14   carries an E C C one designation?

15       A       That's correct, sir.

16       Q       State's Exhibit 52 and State's Exhibit 51

17   and 52, which carries an E C C designation, E C C

18   three for 51 and E C C two -- excuse me, for number

19   52?

20       A       That's correct, sir.

21       Q       And, also, 105 A, which carries the E C C

22   four designation?

23       A       That's correct, sir.

24       Q       They are all fired from the same gun?

25       A       That's correct.

1          Q       Do you have an expert opinion, after

2     examining that evidence, which of these weapons that

3     you have listed of the eight possible weapons with

4     regard to the bullets and the four possible weapons

5     with regard to the spent casings which type of weapons

6     most likely fired that evidence?

7          A       Based on an examination of all those

8     items, the most likely firearm would have fired both

9     of the cartridge cases as well as the fired jacketed

10    bullets would be a .9 mm Luger Beretta or Taurus

11    manufacturer.

12         Q       Beretta or Taurus?

13         A       That's correct, sir.

14         Q       Is there anything unique about a Beretta

15    or a Taurus, anything common about those two weapons?

16         A       Well, the two firearms are, for all

17    intentional purposes, identical.  The Taurus basically

18    copies the design of a Beretta.

19         Q       Did, in fact, Beretta give its patent to

20    the Taurus Manufacturing Company in Argentina to make

21    that weapon?

22         A       That's correct.

23         Q       And of all those weapons that you listed

24    is there any unique features with respect to the

25    barrel of either a Beretta or a Taurus or both?

1        A        Both the Beretta and Taurus are basically

2    identical in appearance.  One of the features or

3    characteristics of that particular firearm is that the

4    end of the barrel ends a short distance from the end

5    of the slide.

6        Q        Do you know of any other .9 mm

7    semiautomatic handgun that has an extended barrel on

8    it other than a Beretta or a Taurus?

9        A        There are other ones; yes, sir.

10       Q        And what would those be?

11       A        Right off the top of my head Tech 9 is one

12   that has the barrel extended.  The end of barrel is

13   actually threaded.

14       Q        Let me show you what has been offered and

15   checked and cleared as --

16                MR. SMYTH:  May I approach the witness?

17                THE COURT:  You may.

18       Q        -- State's Exhibit 31 and ask you if you

19   recognize that?

20       A        Yes, sir, I do.

21       Q        And can you tell the ladies and gentlemen

22   what is that?

23       A        This is a Taurus .9 mm Luger model PT

24   semiautomatic pistol.

25       Q        And could you go ahead and release the

1   slide and show the ladies and gentlemen of the jury

2   what you are talking about when you say an extended

3   barrel.

4        A        With the slide in a fully closed position,

5   you will notice that the barrel which extends

6   approximately, oh, I would say about a half inch

7   beyond the end of the slide, which is what I am

8   referring to right here.

9        Q        Is that a barrel capable of being threaded

10  at least to that half inch --

11       A        Certainly.

12       Q        -- in such a fashion that could accept a

13  silencer, have it screwed on the end?

14       A        Yes, it could.

15       Q        When you examined the jacketed lead

16  bullets, did you notice anything unusual about them in

17  addition to the markings that allow you to identify

18  them?

19       A        The bearing surface of the projectiles

20  were abraded.

21       Q        When you say abraded, what are you talking

22  about?

23       A        They had a lot of scratches, would not be

24  characteristic of just having traversed the barrel or

25  having been fired through the barrel.

1          Q       Would the abrasions -- I assume that's a

2     good enough word -- the abrasions that you saw to

3     those lead bullets would those be consistent with a

4     bullet having been fired into the dirt or sand?

5          A       Certainly possible.

6          Q       Would it be consistent with a bullet

7     having been fired through steel wool?

8          A       Could be, yes.

9          Q       If a bullet is fired from a silencer that

10    is packed with steel wool, in your training and

11    experience, would some of that steel wool be blown

12    out?

13         A       It would certainly depend on the design of

14    the silencer.  If it was a simply a silencer that

15    consisted of a cylinder packed with steel wool and the

16    steel wool was not confined, certainly I would expect

17    that some of it to come out of the end of the silencer

18    when fired.

19         Q       Did anybody other than yourself view that,

20    look at that particular firearm evidence that you have

21    been talking about?

22         A       Yes, sir.

23         Q       And who was that?

24         A       Another examiner in our laboratory,

25    Charles Anderson, examined all of these items as well

1    as another expert that was retained by counsel,

2    defense counsel, a gentleman by the name of Richard

3    Ernest.

4              MR. SMYTH:  May I have a moment, Your

5    Honor?

6              THE COURT:  Certainly.

7              MR. SMYTH:  Pass the witness.

8              THE COURT:  Mr. Odom.

9

10                   CROSS EXAMINATION

11   BY MR. ODOM:

12        Q    My name is Wendell Odom, and we have never

13   talked, have we?

14        A    No, we haven't.

15        Q    I would like to ask you questions about

16   your field of expertise as well as the particular

17   examinations you did on these exhibits you testified

18   to.

19              First of all, I thought that you are in

20   the field of ballistics but that's not correct, is it?

21        A    Well, certainly ballistics is a term that

22   is loosely associated with the firearms examination

23   but I think it is a more accurate term to use the

24   firearms.  Ballistics can focus on such things as the

25   way that a projectile reacts inside a barrel or after

1    fired through the barrel and that's not the primary

2    focus of our work.

3         Q      A person wants to know how far a bullet

4    will travel and the speed it travels and the impact it

5    would have once it got there, that is more of a

6    technically ballistics field?

7         A      It could be more properly characterized as

8    ballistics.

9         Q      The field you are in is firearms

10   identification?

11        A      That's a fair statement; yes.

12        Q      And people that are in that very narrow

13   field of firearms you have associations?

14        A      That's correct.

15        Q      And I have heard the acronym.  What is the

16   association, the prominent association, the firearm

17   identification people are in?

18        A      There are -- well, there is the National

19   Association of Firearms and Tool Marks Examiner.  I am

20   sure some examiners belong to the American Forensic

21   Science and some informal associations, such as here,

22   in Texas, Texas Association of Firearms and Tool Marks

23   Examiners.

24        Q      But ATE is the national association?

25        A      Yes, sir.

1       Q       And that's the Association of the Firearms

2    and Tool Mark examiners?

3       A       Yes.

4       Q       And by firearms and tool mark examiners,

5    there is a different comparison that is done, although

6    somewhat similar in certain instances on the

7    characteristics than there is on the spent bullet, is

8    that a fair laymen's evaluation of a difference that

9    we have here?

10      A       Well, again, you are looking at the

11   markings that are left by the firearm on the cartridge

12   case.  Certainly, we are dealing with a different

13   portion of firearm in the fired projectile.  You are

14   looking at marks left by the barrel, when you are

15   doing comparison of cartridge cases, the firing pin

16   impressions, breech face marks, chamber marks,

17   extractor and ejector marks.

18      Q       You made the statement -- and I'll get

19   into this a little bit, as we go into, as I ask you

20   questions about your testimony -- but you made the

21   statement, in narrowing down the cartridge cases to

22   bullets that were fired, there is only two

23   manufactures that would have those cartridge markings

24   with those particular bullets that were fired.  And I

25   think you narrowed it down to the Beretta and the

1    Taurus; is that correct?

2         A        I believe what I said that based on my

3    experience or my intention to indicate, based on my

4    experience, the two prominent firearms that exhibit

5    the markings seen on the cartridge and bullets would

6    be the Beretta and Taurus.

7         Q        In your examination, were you able to

8    determine that the bullets that you compared came out

9    of the cartridges that you compared?

10        A        No, sir, I was not.

11                 MR. ODOM:  May I approach the board?

12                 THE COURT:  You may.

13        Q        So to start off with, we are making some

14   assumptions here.  If we compare the two because you

15   have got examinations that are done, on one hand, on

16   bullets and the others that are done on the cases?

17        A        That's correct, sir.

18        Q        And although there is a similarity in that

19   you will take a split microscope, or whatever you call

20   it --

21        A        Comparison microscope.

22        Q        -- wherein you bring them up, you are

23   really looking at something different on the bullet

24   than the casing, right?

25        A        That's correct.

1       Q       Like a typewriter that types a certain

2   print is going to have an irregularity, a gun that

3   puts a mark on the casing or a cartridge is going to

4   leave a unique mark to it, is it not?

5       A       There are unique markings that are left on

6   the cartridge case by a particular firearm; yes, sir.

7       Q       If that cartridge is jammed up in the

8   mechanism and ejected, for example, the way that gun

9   slams the cartridge back and flips it out might leave

10   additional markings that might be unique to that

11   particular cartridge?

12       A       That's possible.

13       Q       Some of them throw it one way a certain

14   distance and certain ones another distance and that

15   might cause the irregularity in the markings of when

16   it is ejected out from a laymen's perspective?

17       A       Well, certainly I'm not sure what you are

18   focusing on, whether you are focusing on the markings

19   or the way the firearm is ejecting.  Certainly, with

20   respect to the way that a fired cartridge case is

21   ejected from the firearm can vary and can vary based

22   on the particular powder charge and pressure that is

23   developed during firing can also be affected by the

24   way the firearm is being held.  The extractor and

25   ejector will make markings on the cartridge cases.

1    Usually those markings would not be the sole basis for

2    identification.

3         Q      And I didn't mean to say that, if I left

4    that impression.

5         A      All right, sir.

6         Q      What I am doing, I started off, you got

7    your firing pin, at least one mark?

8         A      That's correct, sir.

9         Q      And I can only relate this to a laymen

10   dealing with a gun.  I know some guns might throw a

11   shell this far and another gun might not throw as far

12   and because each gun is doing it a little different,

13   when it throws that shell out, it might leave a mark

14   on the shell different and unique to that gun as

15   opposed to another gun, right?

16        A      Well, again, I'm not sure I am clear on

17   what you are trying to ask me.  If you are asking me

18   if the extraction and ejection will produce marks,

19   that is a correct statement.

20        Q      And those marks aren't always the same,

21   are they?

22        A      There can be a variations.

23        Q      And that's one of the factors you use in

24   trying to determine the case?

25        A      It can be.

1       Q       Bullets, on the other hand, have been

2    fired through some sort of barrel and you compare the

3    bullet for certain marks that are left upon the bullet

4    that are unique to bullets; is that a good laymen's

5    way of saying that?

6       A       Well, if I might elaborate just a bit, you

7    will have markings left by the rifling of the firearm.

8    There will be class characteristics which, as I

9    indicated earlier, would consist of the caliber and

10   the number of lands and grooves, the width of the

11   lands and grooves and direction and twist.  There will

12   also be individual characteristics, which would be

13   those characteristics which are unique to that

14   particular firearm.

15      Q       Okay.  And you have to bear with me

16   because I'm not an expert in the field and I have to

17   go through this in my mind in a slow way.

18              But when a bullet is fired in a firearm,

19   if it has rifling to it, there will be certain

20   characteristics that are unique to that firearm, that

21   manufacturer of firearm, that every bullet will have

22   that is unique to that manufacture of a firearm, is

23   that what we call a class characteristics?

24      A       That's correct, sir.

25      Q       So on the bullets, if you have got a

1    Taurus -- is it T-a-u-r-u-s?

2         A       It's a Taurus.  T-a-u-r-u-s.

3         Q       They give me such a hard time on my

4    spelling.  I got to start asking that.  There is a

5    reason I became a lawyer.

6         A       Taurus.

7         Q       T-a-u-r-u-s?

8         A       T-a-u-r-u-s.

9         Q       Okay.  Does a Taurus have in its barrel a

10   series of what do we call it?

11        A       Lands and grooves.

12        Q       What is the difference between a land and

13   a groove?

14        A       The best way to explain it, to visualize a

15   barrel before it was rifled, it would simply be a

16   smooth tube and then you took a tool and you cut a

17   series of grooves.  The area between two grooves and

18   the raised area is known as land and the area you cut

19   away is known as the groove.

20        Q       Every manufacturer has a unique way, well,

21   can have a unique way of either making the bullet go

22   to the left or to the right perhaps, correct?

23        A       There is certainly unique.  There are a

24   number that use both the right land and left land.

25        Q       That will be a class characteristic, would

1    it not?

2         A       That's correct.

3         Q       And some people may put -- I don't know

4    how many twists you put in a barrel.  What's a typical

5    .9 mm?

6         A       You mean rate of twist?

7         Q       Yes, sir.

8         A       Maybe one in four inches, one in six

9    inches.

10        Q       How many turns are we going to have in a

11   barrel?

12        A       That means one in six rate for six of six,

13   the bullet will make one rotation.

14        Q       So this groove is going in around in the

15   barrel in one direction or the other, depending on the

16   manufacturer, they have a different twist.  They have

17   a different length of circular twists that they put on

18   the groove inside their barrel; is that a fair

19   statement?

20        A       I'm not sure I follow that question, sir.

21   Right hand and left hand twist is a very common

22   factor.  Most of the firearms that we encounter have a

23   right-hand twist.  If you are talking about the rate

24   of pitch --

25        Q       What I am talking about, does everybody

1    put a circular twist in the rifling, what I call the

2    rifling because I am a layman, is it all the same?

3         A       All to the right or all to the left.

4         Q       No, the amount of turn you have.

5         A       That's the rate of pitch so many rotations

6    over so many inches of barrel.  No, sir, it's not

7    unique.

8         Q       It's not unique?

9         A       No, sir.

10        Q       Everybody does it same way?

11        A       There can be variations and can be more

12   than one manufacturer that uses the same rate of

13   pitch.

14        Q       That would be a class characteristic?

15        A       Generally it's difficult to look at fired

16   evidence.

17        Q       What is leaving the mark on the bullet

18   that is the class characteristics or what in the land

19   and grooves?

20        A       Well, first of all, it's the rifling of

21   the barrel that is leaving the impressions on the

22   bearing surface of the bullet.  As I have indicated

23   previously, we have in this particular case a barrel

24   that has six lands and grooves.  It has a right hand

25   twist.  It has again its .9 mm caliber and the lands

1        and grooves have a certain width.

2             Q        So the pitch doesn't have a lot to do with

3        it?

4             A        The pitch is not something that is easily

5        determined, particularly in projectiles that are

6        deformed, such as these are.

7             Q        Well, now, you are comparing the bullet so

8        what you have got to find is the mark of the lands or

9        the grooves on it.  What leaves the mark on the

10       bullet?

11            A        The rifling of the firearm.

12            Q        But the rifling you said consists, as I

13       understand it, and, once again, I am a layman, but as

14       I understand it, the rifling consists of two things:

15       A notch that is in that barrel that is going around

16       either to the right or left, usually to the right, and

17       also a raised portion that is between the notch and

18       the barrel?

19            A        In this case we have a total of six of

20       those lands and six grooves.

21            Q        And by six lands and six grooves, are you

22       saying that inside the barrel that the bullet has gone

23       through the barrel and there are three grooves and

24       three lands that have left a mark on the bullet?

25            A        No, there are a total of six individual

1    lands and six individual grooves.

2         Q    All right.  And by six lands and six

3    grooves, is that six marks on the bullet, that is, a

4    land mark and a groove mark?

5         A    There could be a total of six land

6    impressions as well as a total of six groove

7    impressions.

8         Q    Now, I am not a person that is good with

9    someone telling me something, me visualizing.  I have

10   to sort of put it -- and I forgot the name, the term

11   they use -- but I sort of have to see it in the

12   optical form to really understand it.  But you got a

13   microscope and you have got a bullet.  And let's say

14   this is one of the exhibits that you saw that was not

15   a shattered bullet.  It's a whole bullet.  That bullet

16   has certain marks on it and you are saying six land

17   marks and six groove marks?

18        A    Correct.

19        Q    How do these marks appear on the bullet?

20        A    Would you like me to?

21        Q    Yes, sir.

22        A    All right.  If you were dealing here, as

23   we are here with lands and grooves with a right-hand

24   twist, you would have impression.  And if you don't

25   mind me labeling, I'll label this LI for a landing

1    impression, again another land impression.  And this

2    area between these two land impressions would be an

3    adjacent groove impression, if we were to rotate this

4    projectile around the entire circumstance, a total of

5    six landing impressions as well as a total of six

6    groove impressions.

7         Q     Okay.  So, Mr. Baldwin, when you say that

8    you found six land impressions and six groove

9    impressions, you then can determine from that there

10   are a certain number of pistols that leave or

11   manufacturers that leave, six land and six groove

12   impressions on a .9 mm bullet; is that correct?

13        A     Well, we would go one step further, sir.

14   Certainly, given the information that you gave me, we

15   could run a computer analysis, using a .9 mm Luger and

16   imputing six lands and grooves but that would be a

17   rather lengthy list.  The next step that would be done

18   to actual measure the width of those lands and grooves

19   impression and add that in as an additional factor in

20   analysis.

21        Q     Another one of the class characteristics

22   you use is going to be not only the number of grooves

23   but the width of lands as well as the width of the

24   grooves?

25        A     That's correct, sir.

1      Q      Okay.  So when you say, see, when you say

2  the land and groove, the diameters, the number of

3  lands and grooves and the width of the lands and

4  grooves, what you are comparing are the width of these

5  little marks and the raised areas on the bullet,

6  correct?

7      A      Two, I mean.

8      Q      Well, I take it, that you are comparing

9  one bullet to another bullet?

10     A      Yes.  You would be looking at initially

11 the width and lands and grooves of the two perspective

12 projectiles but this would be consistent with one

13 another.

14     Q      Even if you had one projectile, you could

15 determine if it was fired within a certain

16 manufactured firearms from that one bullet even if you

17 have no bullet to compare it to?

18     A      Yes, sir.  Again, if I input the balance

19 caliber and lands and grooves and the direction of

20 twist and measure the lands and grooves.

21     Q      Now, using the class characteristics, and

22 by class characteristics, what I am meaning by class

23 characteristics, you are talking about not unique

24 markings that are left by like an unique

25 characteristics in a particular barrel of a gun but

```
 1    the characteristics that any Taurus or Luger would
 2    leave or Taurus .9 mm would leave or any Beretta.9 mm
 3    gun would leave, using those class characteristics,
 4    you can narrow the number of firearms that would have
 5    fired the bullets that you were asked to compare,
 6    correct?
 7         A      That's correct, sir.
 8         Q      And the first list that you gave Mr. Smyth
 9    was the one wherein you gave a list of firearms,
10    right?
11         A      Again, I gave a list of manufacturers who
12    produce, or have been known to produce firearms, that
13    have the rifling characteristics consistent with the
14    class characteristics with the fired projectiles.
15         Q      Those were the American Derringer?
16         A      That's correct, sir.
17         Q      And I have got a whole right through there
18    so Sterling Arms, S-t-e-r-l-i-n-g, Astra?
19         A      Yes, sir.
20         Q      SWD --
21         A      That's correct, sir.
22         Q      -- Beretta, Danshway,  Taurus, and Walther
23    W-a-l-t-h-e-r.
24                Now, Mr. Smyth asked you a question
25    whether the Taurus and Beretta has an extended barrel
```

1    that protrudes out from the mechanism some distance

2    and I believe you testified that it did.

3         A    That's correct, sir.

4         Q    And you also testified that there's one

5    firearm that is called something Tech that actually

6    has threading on that.  It also extends out and it has

7    threading on it; is that correct?

8         A    Yes, the Tech 9.

9         Q    SWD doesn't it extend out as well?

10        A    Yes, sir, I believe it does.

11        Q    And it also has threading on it, doesn't

12   it?

13        A    That's correct, sir.

14        Q    So this particular firearm already has

15   threading on it to wherein someone who are per

16   military minded or they could put an attachment on

17   that barrel, could they not?

18        A    That's correct, sir.

19        Q    Now, the cartridges you got caused you to

20   identify four different manufacturers, correct?

21        A    The fired cartridge cases?

22        Q    Yes, sir.

23        A    Yes, sir, that's correct.

24        Q    You only got fired cartridge cases?

25        A    But you said cartridges, I want to make

1    sure we are on the same page.

2        Q       You've got to remember this is a new world

3    for me.

4        A       You are doing quite well.

5        Q       One of them is a Beretta, correct, sir?

6        A       That's correct, sir.

7        Q       One of them is a Danshway?

8        A       That's correct, sir.  D-a-n-s-h-w-a-y.

9        Q       And something is H-e-l-w-a-n and then we

10   have our Taurus --

11       A       Yes, sir.

12       Q       -- which I know how to spell now.

13               And, once again, there is no way to

14   clarify what bullets came from what cartridge, right?

15       A       That's correct.  There is no way to make a

16   correlation of the fired projectile back to a

17   particular cartridge case.

18       Q       You do know and you were asked several

19   questions about who submitted what bullets to the lab

20   by looking at certain exhibits and who submitted what

21   cartridges to you by looking at certain exhibits; do

22   you recall that?

23       A       Yes, sir.

24       Q       And I had to write all that down.  But the

25   bullets submitted were supplied by a Burke, a Kay, and

1    a Tuttle, right?

2       A    Now, you have got to get me to thinking

3    Officer Burke submitted, from Officer Kay submitted

4    certain items, which I think talking about the fired

5    projectiles, and Officer Kay submitted fired

6    projectiles and E B nine was submitted by Officer

7    Tuttle?

8       A    Yes, sir.

9       Q    You don't know if Mr. Burke submitted any

10    casings, do you?

11       A    I know when he submitted to the firearms

12    laboratory.  No, sir, he did not submit anything to

13    the firearms other than what I indicated.

14       Q    So Burke as far as you know -- well,

15    that's right.  You are looking at the actual custody

16    -- none of them submitted to you, did they, as such?

17       A    I mean, in person.  Yes, there were

18    several items that were submitted in person.  In

19    particular, Officer Burke did submit his items in

20    person and Lieutenant Neely submitted his items in

21    person.

22       Q    Officer Burke, when he submitted his items

23    in person, did he submit any cartridge cases that he

24    may have been recovered?

25       A    Not that I am aware of, only what I have

1    indicated.

2         Q       Okay.   Which are the bullets?

3         A       That's correct, sir.

4         Q       Now, the bullets that were compared, let's

5    say for hypothetical purposes, State's Exhibit 27,

6    which you call E B one, came from a Copeland.   Let's

7    say E B two, 29, similar.   Let's say 144, which is E B

8    five, came from complaining witness; and 145, 146,

9    which is E B six, E B seven is the same; and let's say

10   132.   We have labeled E B nine comes from the search.

11   Now, to make sure I have got this right, State's

12   Exhibit 27 is reflected in your E B number which means

13   evidence bullet?

14        A       That's correct, sir.

15        Q       And I wrote down, when you went through it

16   with Mr. Smyth, and I think I got this right, 27 would

17   be E B one and 29, E B two; 144, E W five; 145 is E B

18   six; 146 is E B seven, and 132 is E B nine?

19        A       I believe you have them correct.

20        Q       Now, of those bullets, are they all of the

21   same general characteristics, in other words, are they

22   all of the same type of bullet, but I know I go

23   hunting, I can buy a jacketed bullet or I can buy a

24   center core leaded bullet and it goes on and on.   And

25   what I am asking, in laymen's term, and I don't know

1    how you call it, do you understand the question I am

2    asking in that regard?

3        A       I believe I do.

4        Q       Can you help me out a little bit and tell

5    us what we call that.

6        A       All of the items that you have indicated

7    are jacketed lead projectiles.

8        Q       So these all bear the same characteristics

9    in the way they have been manufactured, I guess, is

10   one way of saying?

11       A       They are all jacketed.

12       Q       They are all jacketed?

13       A       Jacketed projectiles.

14       Q       Now, were all of these that you received

15   were they all in good condition?

16       A       No, sir, they were not all in good

17   condition.

18       Q       Which ones were in good condition?

19       A       Well, I guess it's a matter of opinion.  E

20   B two, which is your State's Exhibit 29, is severely

21   deformed; 27 is deformed but fairly intact; E B five

22   is in good condition.  E B six appears to be almost

23   intact but it's somewhat deformed; E B seven is just a

24   fragment of a jacket, and E B nine is basically

25   intact.

1          Q      Okay.  On your report you are showing one,

2     five and nine being good.  Can I talk by doing it that

3     way?

4          A      Sure.

5                 THE COURT:  Okay, ladies and gentlemen, we

6     are going to stand in recess for the day.  Once more,

7     again, tomorrow, please, same time, same station,

8     9:45.

9                 Remember your admonishments and we stand

10    adjourned until 9:45 in the morning.

11                (Court adjourned for the day.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPELLATE COURT NO. *72966*

IN THE COURT OF APPEALS

OF THE STATE OF TEXAS

-----------------------------------------------------

REINALDO DENNES

                    Appellant,

VS.

THE STATE OF TEXAS,

                    Appellee.

-----------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

                    TEXAS

Judge Jim Wallace, Presiding

-----------------------------------------------------

CAUSE NO. 750,313

August 26, 1997

Reporter's Record

Volume 31 of *39* Volumes

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Page 1

Volume 31

Trial

August 26, 1997

Chronological

Robert Baldwin

       Cross Examination Continued        4

       Redirect Examination by Mr. Smyth      36

       Recross Examiantion by Mr. Odom       46

Robert George Molina, Jr.

       Direct Examiantion by Mr. Smyth       54

       Cross Examination by Mr. Odom       60

Janet Horton

       Direct Examiantion by Mr. Smyth       63

       Cross Examiantion by Mr. Odom     156

Sam Solomay

       Direct Examiantion by Mr. Smyth     163

       Voir Dire xamination by Mr. Odom   194

       Direct Examination Continued     196

       Cross Examination by Mr. Odom     200

Volume 31

Trial

August 26, 1997

Alphabetical

Robert Baldwin

|  |  |
|---|---:|
| Cross Examination Continued | 4 |
| Redirect Examiantion | 36 |
| Recross Examination | 46 |

Janet Horton

|  |  |
|---|---:|
| Direct Examination by Mr. Smyth | 63 |
| Cross Examination by Mr. Odom | 156 |

Robert George Molina, Jr.

|  |  |
|---|---:|
| Direct Examiantion by Mr. Smyth | 54 |
| Cross Examination by Mr. Odom | 60 |

Sam Solomay

|  |  |
|---|---:|
| Direct Examination by Mr. Smyth | 163 |
| Voir Dire Examination by Mr. Odom | 194 |
| Direct Examination Continued | 196 |
| Cross Examination by Mr. Odom | 200 |

State's Exhibit No. 157  phone records

  Marked    Volume 31

                 54

  Identified

                 55

  Offered            55

  Admitted    Volume 31   56

State's Exhibit No. 158  phone records

  Marked    Volume 31   54

  Identified          64

  Offered            65

  Admitted    Volume 31   65

State's Exhibit No. 159  phone records

  Marked    Volume 31   54

  Identified          64

  Offered            65

  Admitted    Volume 31   65

State's Exhibit No. 160  phone records

  Marked    Volume 31   54

  Identified          64

  Offered            65

  Admitted    Volume 31   65

State's Exhibit No. 161

          telephone records

  Marked

  Identified

  Offered    Volume 31   53

  Admitted    Volume 31   53

iii

State's Exhibit No. 162          telephone records

        Marked

        Identified

        Offered                  Volume 31                    53

        Admitted                 Volume 31                    53

State's Exhibit No. 163          drawing on board

        Marked                   Volume 31                    35

        Identified                                            35

        Offered                                               35

        Admitted (demonstrative)                              35

State's Exhibit No. 165          diagram

        Marked                   Volume 31                    43

        Identified                                            43

        Offered                                               43

        Admitted         Volume 31 (demonstrative) 43

State's Exhibit No. 167          diagram

        Marked                   Volume 31                   101

        Identified

        Offered

        Admitted

State's Exhibit No. 168          diagram
        Marked                   Volume 31                   101
        Identified

        Offered

        Admitted

                                              -   iv

```
 1                     CAUSE NO. 750,313

 2   STATE OF TEXAS           IN THE 263RD DISTRICT COURT

 3   VS.                           OF

 4   REINALDO DENNES          HARRIS COUNTY, T E X A S

 5   A P P E A R A N C E S:

 6   For the State:          Mr. Mark Vinson
                             Bar Card No. 20590456
 7                           Mr. Don Smyth
                             Bar Card No.18777700
 8                           Assistant District Attorneys
                             201 Fannin
 9                           Houston, Texas 77002
                             713-755-7050
10   For the Defendant:      Mr. Wendell Odom
                             Bar Card No. 15208500
11                           Ms. Lalia Guerrero
                             Bar Card No. 0078862
12                           Attorneys at Law
                             1301 McKinney, Suite 3100
13                           Houston, Texas 77010
                             713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 26th

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for trial before the Honorable

19   Jim Wallace, Judge of the 263rd District Court of

20   Harris County, Texas; and the State appearing in

21   person and the Defendant appearing in person and by

22   counsel, announced ready for trial, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:
```

1                    (Jury came into the courtroom.)

2                    THE COURT:  Thank you.  Please be seated.

3                    Good morning, ladies and gentlemen.  We

4     are going to proceed today.

5                    It's my understanding that the State

6     indicated to me that we will finish its witnesses

7     today.  If they don't and you hold them to it, and so

8     we are making some progress but I don't think we will

9     conclude.  Let's get to work, do as much as possible.

10    For the rest of the week, it's not going to be a whole

11    lot of difference.  We will probably be staying around

12    5:00 since there is a particular problem with that.  I

13    am trying to make sure we get as much out of today as

14    reasonable so we can conclude in a fairly, orderly

15    manner.

16                   With that, let's continue.

17

18

19

20

21

22

23

24

25

1                         ROBERT BALDWIN,

2      was called as a witness by the State and, having been

3      duly sworn, testified as follows:

4                    CROSS EXAMINATION CONTINUED

5      BY MR. ODOM:

6           Q      Mr. Baldwin.

7           A      Robert Baldwin.

8           Q      And they made so much fun of my spelling

9      and my charts, I had to go buy a new pad.  It made me

10     nervous to see you.

11                 Yesterday you educated me on what the

12     lands and grooves were on a bullet and then we started

13     discussing which various bullets may apply to what

14     fact situation.  And if I understand your terminology

15     and your testimony correctly, based upon what you call

16     class identifications, you can look at these bullets,

17     which you have EB number, exhibit bullet numbers, and

18     we compared them with the State's exhibit numbers and

19     you can make a class identification regarding these

20     bullets that you have analyzed could have come from

21     any one of these particular manufactured firearms on

22     the top list, correct?

23          A      Yes, sir.  I believe what you're stating

24     is accurate, if I might clarify.  Identification of

25     those to one another, that is, comparing each B-1 to

1    2, 5, 7, 9 and are not just based on the class

2    characteristics.  That's class characteristics plus

3    the individual characteristics.  In terms of

4    determining which particular manufacturer produces

5    firearms that have the class characteristics

6    consistent with those exhibited, your statement is

7    correct, those firearms are the ones, based on our

8    data base, are currently that we know of manufactured

9    firearms that have those lands and grooves

10   configurations.

11        Q     We will get to the individual

12   characteristics and individual comparisons in a

13   minute.  First of all, these are what we call class

14   identification, right?

15        A     That's one way of calling it.  Class

16   characteristics.

17        Q     Anything else I couldn't spell so we will

18   call them a class.

19              And what that means, you can look at these

20   bullets, and based upon the lands and grooves that are

21   on there, which you explained to us on the little

22   diagram, we can tell those bullets were fired by any

23   one of those particular firearms because those

24   particular firearms leave those type of lands and

25   grooves on the bullet?

1          A          That's correct.

2          Q          Then, in your testimony yesterday, you

3    indicated, in answer to Mr. Smyth's questions, that

4    you then did a comparison of the bullets.  You

5    compared these bullets to each other?

6          A          That's correct.

7          Q          And you gave an opinion as to which

8    firearm you thought these bullets might have come from

9    and whether or not these bullets were all fired from

10   the same firearm?

11         A          That's correct, sir.

12         Q          And I believe we were talking yesterday

13   before we broke for the day and -- may I see a copy of

14   the police report?

15                MR. SMYTH:  Let the record that a copy of

16   the report has been tendered by the State.

17                MR. ODOM:  Thank you.

18         Q          And if you will, I can lay the exhibits

19   out in front of you as well.  155 is lead core, 146,

20   144, 145, 27, 29, 132.  So I have got all six of them

21   there.  These are the bullets that you did your

22   comparison off of, that you compared, correct?

23         A          That's correct.

24         Q          And these are the same bullets that Mr.

25   Anderson compared?

1        A        That's correct.

2        Q        And they are, also, the same bullets that

3    Mr. Ernest from Fort Worth compared?

4        A        I made all these exhibits available to

5    him.  I don't know specifically whether he looked at

6    all of them or not.  I believe he did.

7        Q        Assuming he did, those are the ones that

8    he was shown?

9        A        Made available to him.

10        Q        Now, we were talking about yesterday was

11    the fact that some of these bullets are in better

12    shape than others?

13        A        Yes, sir.

14        Q        And number 156 and number 146 and number

15    29 are fairly well mutilated, are they not?

16        A        Yes.

17        Q        And in your report, you made certain

18    categories of, I believe, some bullets were good and

19    some were mutilated and then you have another category

20    called lead core or fragments?

21        A        Right.

22        Q        And the good bullets, the bullets that

23    were in good shape, are EB 1, number 5 and number 9;

24    is that a fair statement?

25        A        That's what I indicated, yes, sir.

1        Q       But not only you indicated but they are in

2    the good shape, aren't they?

3        A       Relatively good shape, yes.

4        Q       And by relatively speaking, we mean that

5    they are intact and not for you to do what you need to

6    do as far as your analysis?

7        A       Yes, sir.

8        Q       Now, bullets EB number 2, 3, 6, 7 and you

9    have under a category of mutilated, right?

10       A       That's correct.

11       Q       2, 3, 6, 7 are mutilated.  Does that mean

12   you are not able to do a comparison or does that mean

13   that the comparison is a little more difficult?

14       A       It means that the condition of the bullet

15   itself is not as good.  It's not intact.  It indicates

16   that you may have more difficulty making a comparison

17   due to the deformity of the bullet.

18       Q       Were you able to do a comparison on any of

19   the mutilated bullets when you were doing your

20   identification?

21       A       I made a comparison, yes.

22       Q       Were you able to reach an opinion

23   regarding the comparison on the mutilated bullets?

24       A       Yes, sir.

25       Q       Is that all of the bullets or some of the

1     bullets?

2          A        You do not have EB 3 here.

3          Q        Right.

4          A        And we do not have EB 4, which is the lead

5     fragments, right?  And you do not have EB 8, which is

6     a lead core.

7          Q        Assuming that those are -- well, now, were

8     you able to do comparisons off of EB 3 -- which of the

9     numbers?

10         A        Obviously you do not have EB 3, E 4.  And

11    EB 8 up there.

12         Q        EB 4?

13         A        And EB 8.

14         Q        Let's talk about EB 3, 4, and 8.  One of

15    these, EB 4 or EB 8, is what we call a lead core?

16         A        Right, sir.  EB 8.

17         Q        EB 8?

18         A        Uh-huh.

19         Q        And I believe you identified that for me

20    as --

21         A        It's the large bag, sir.

22         Q        Thank you.  Number 155, correct?

23         A        That's correct, sir.

24                  MR. ODOM:  EB 4, EB 3 I do not know if

25    they are in evidence.

```
 1                    MR. SMYTH:  They are all in evidence.

 2        Q      EB 4 and EB is in evidence.

 3                    MR. SMYTH:  28 and 30.

 4        Q      So 28?

 5        A      That's EB 3, sir.

 6        Q      And EB 30 are these little lead pieces?

 7        A      That's correct, sir.

 8        Q      And that's EB 4?

 9        A      Correct.

10        Q      So now we have got the total number of

11    bullets or bullet parts that you examined?

12        A      That's correct, sir.

13        Q      And looking at -- now, one thing that

14    confuses me or at least causes me to ask a question.

15                    MR. ODOM:   May I approach the witness?

16                    THE COURT:  Sure.

17        Q      In looking at number 155, which you have

18    described as a lead core bullet, and it's obviously a

19    different color from, let's say, number 132, I

20    believe, which is a copper colored bullet but if you

21    look at the inside of that bullet, it has got lead.

22        A      Correct.

23        Q      So is 155 wherein the jacket has come off

24    of this and it just leaves the lead core?

25        A      That's correct, sir.
```

```
 1    bullets?

 2         A       You do not have EB 3 here.

 3         Q       Right.

 4         A       And we do not have EB 4, which is the lead

 5    fragments, right?  And you do not have EB 8, which is

 6    a lead core.

 7         Q       Assuming that those are -- well, now, were

 8    you able to do comparisons off of EB 3 -- which of the

 9    numbers?

10         A       Obviously you do not have EB 3, E 4.  And

11    EB 8 up there.

12         Q       EB 4?

13         A       And EB 8.

14         Q       Let's talk about EB 3, 4, and 8.  One of

15    these, EB 4 or EB 8, is what we call a lead core?

16         A       Right, sir.  EB 8.

17         Q       EB 8?

18         A       Uh-huh.

19         Q       And I believe you identified that for me

20    as --

21         A       It's the large bag, sir.

22         Q       Thank you.  Number 155, correct?

23         A       That's correct, sir.

24                 MR. ODOM:  EB 4, EB 3 I do not know if

25    they are in evidence.
```

```
 1                        MR. SMYTH:  They are all in evidence.

 2        Q      EB 4 and EB is in evidence.

 3                        MR. SMYTH:  28 and 30.

 4        Q      So 28?

 5        A      That's EB 3, sir.

 6        Q      And EB 30 are these little lead pieces?

 7        A      That's correct, sir.

 8        Q      And that's EB 4?

 9        A      Correct.

10        Q      So now we have got the total number of

11   bullets or bullet parts that you examined?

12        A      That's correct, sir.

13        Q      And looking at -- now, one thing that

14   confuses me or at least causes me to ask a question.

15                        MR. ODOM:   May I approach the witness?

16                        THE COURT:  Sure.

17        Q      In looking at number 155, which you have

18   described as a lead core bullet, and it's obviously a

19   different color from, let's say, number 132, I

20   believe, which is a copper colored bullet but if you

21   look at the inside of that bullet, it has got lead.

22        A      Correct.

23        Q      So is 155 wherein the jacket has come off

24   of this and it just leaves the lead core?

25        A      That's correct, sir.
```

1          Q       Are you able to make -- looking at the

2     lead core -- the same evaluations regarding the lands

3     and grooves on that as you can on the copper jacket?

4          A       No, sir.

5          Q       And the reason for that, I assume, and

6     correct me if I am wrong, is that these identifiers

7     that you are looking at that you make your class

8     identification as well as individual identification

9     that we are going to get to are on the surface?

10         A       On the bearing surface, yes, sir.

11         Q       So if you lose the surface and the lead is

12    left, then there's no barrel markings that you can use

13    to identify?

14         A       That's correct, sir.

15         Q       So it's fair to say EB 8 you cannot do an

16    identification off of?

17         A       That's correct.

18         Q       And I think it's logical to assume -- and

19    correct me if I am wrong -- in regards to EB 4, that

20    is a little lead fragment and the same would apply for

21    EB 4?

22         A       That's correct, sir.

23         Q       Now, EB 3 is a little piece of a jacket?

24         A       That's correct, sir.

25         Q       Is there enough on that little piece of a

1    jacket that we have right here for an identification,

2    for you to have made an identification off of this?

3         A       No, sir.

4         Q       So these three, although we have got them,

5    there's not enough material or it's the wrong type of

6    material for you to make a comparison with, that is --

7         A       An identification, yes.

8         Q       -- or an identification, give an opinion

9    as to whether or not they all came from the same

10   firearm?

11        A       That's correct, sir.

12        Q       That gets me back to where I was and that

13   is talking about these six bullets.

14             Now, of these six bullets, some are in

15   better shape than others.  You listed number 1, 5, and

16   number 9 as being in good shape.  There is number 2,

17   6, and 7 as being mutilated.  By that, are they so

18   mutilated that you can make a comparison or is that

19   more of a tentative comparison off of number 2, 6, and

20   7?

21        A       Well, the comparison was made, as well as

22   an identification was made, with respect to those

23   particular projectiles.  The fact that they are

24   mutilated can make the identification somewhat more

25   difficult than if they were obviously in pristine

1    condition.  In this case, with respect to those items,

2    you can make an identification.

3         Q       What I am asking is because the

4    identification requires comparing markings between

5    various bullets, I believe you said you have got a

6    split scope of some sort and you take a microscope and

7    project one bullet on one screen and project another

8    bullet on another screen.  If you have a partial part

9    or a fragment or a mutilated part of a bullet, as you

10   said, it might be more difficult to compare the

11   likeness between the two; isn't that a fair statement?

12        A       Yes, sir, it is.

13        Q       And if compared to a pristine bullet, or

14   at least a bullet in good shape, couldn't you say that

15   the identifiers that you use to establish the fact

16   that they have a great deal of similarity between them

17   might be stronger or there might be more identifiers

18   in bullets that are in good condition as opposed to a

19   bullet that is in good condition or a bullet in the

20   mutilated condition?

21        A       Yes, sir.

22        Q       Nevertheless, although looking at these

23   particular bullets, these are good and these are

24   mutilated, your opinion is you were able to look at it

25   in the mutilated condition and make an indication that

1    they were all fired out of the same firearm?

2         A       That's correct, sir.

3         Q       Now, let's talk about that because the way

4    I heard the testimony was that you look at the

5    bullets.  You have this magnifying glass.  You do what

6    you do and you give an opinion and you make a

7    determination that they were fired from the same

8    firearm.  We know in our class identification that you

9    are looking at lands and grooves that are made when

10   the bullet goes through the barrel.  And the lands and

11   grooves are created by the manufacture of the pistol

12   and that the manufacture of the pistol could produce,

13   I don't know, hundreds of thousands of pistols that

14   all have however their manufacturer is stamping these

15   particular lands and grooves, right?

16        A       Well, they cut the lands and grooves and,

17   yes, they do produce a number of firearms that have

18   the same rifling pattern.

19        Q       But when it comes to comparing not only

20   class identification basis where you made the

21   determination what firearm it came from but an

22   individual identification, you use a different

23   method.  You use the lands and grooves but you, also,

24   use other markings on the bullet to determine if this

25   bullet came from the same firearm as another bullet;

1    manifest itself on the markings left on the barium

2    surface, which could be used to individualize a

3    particular firearm or another.

4        Q      The way I understand this, you might have

5    -- and I don't know what it would look like -- but

6    you would have a little mark that appears on the

7    bullet that would be a unique mark that would also

8    appear on the second bullet you are looking at, have

9    the same lands and grooves, there would be whatever

10   the marks look like that you guys look at?

11       A      You would have the imperfection.  It would

12   manifest in what is known as a striata.  Your

13   projectile is moving or transversing the length of the

14   barrel.  If you have an imperfection in the barrel and

15   the bullet passes over that imperfection, it would

16   evidenced itself as a striata along the barium surface

17   or the length of the projectile.

18       Q      And that's what we call a striated mark;

19   is that right?

20       A      That's correct, sir.

21       Q      S-t-r-i-a-t-e-d.  And striated marks can

22   come from not only corrosion but they can come from a

23   number of different things that makes a firearm pistol

24   -- in this case barrel -- unique, correct?

25       A      Yes, other events, such as the process of

1      actually creating the rifling, will produce a number

2      of striatas or imperfections that evidenced itself as

3      striated on the bullet.

4           Q      We all heard there are no two typewriters

5      alike and the random they can compare.  The same is

6      true with machine barrels, isn't it?

7           A      That's correct.

8           Q      That there may be certain marks there when

9      the manufacturer produced the barrel?

10          A      That's correct.

11          Q      Some other things are the frequency of the

12     use in the firearm?

13          A      Wear can also create imperfections in the

14     barrel.

15          Q      The some old guys in the West wear a

16     barrel out before the life of the gun.  It can create

17     unique markings, right?

18          A      It can wear and create different markings.

19          Q      Different ammunitions through the barrel

20     can leave various marks?

21          A      The munitions can affect the way the

22     markings are produced.  For instance, you are talking

23     about the interpretation of two metallic objects, the

24     one being the barrel and the other the jacketed

25     portion of the projectile.  Certainly variations in

1     the hardness of the jacket's composition can result in

2     variation in the way markings are reproduced and

3     suppressions that are developed.

4         Q     In regards to that, if you have got, let's

5     say, a pot mark in your barrel, corrosion or residue

6     left from the powder being burned as it goes through

7     the barrel, you can actually have a change in the

8     barrel in one bullet to another bullet, can you not?

9         A     Well, in theory, it would have a change

10    that may be very minute in whether or not you would be

11    able to detect the minute change from one round to the

12    next round.  I don't think it would be significant

13    but, yes, the barrel will change as additional rounds

14    are fired and over a course of time.

15        Q     All right.  And you said something very

16    interesting.  You said it might be minute and you

17    might not detect it but, theoretically, if the barrels

18    are changing because of the frequency of the use or

19    one of the things that make the striated marks is

20    different ammunition or the ammunition alters in some

21    way an identifier that you used to determine what a

22    bullet is.  It may be there.  It is just difficult

23    sometimes for an examiner to detect that minute change

24    from one bullet to the other bullet, correct?

25        A     That's true.

1      Q      Is it fair to say that what you are doing

2  is looking at two bullets and saying that there is a

3  probable theory of like two bullets being so similar

4  in their marks that it is unlikely that they could

5  have come from another firearm; isn't that, in

6  essence, what you are saying?

7      A      Well, the degree of similarity is such

8  that it is not feasible that the two firearms would

9  have those, that number of similarities.

10     Q      Okay.  So you can't really -- when you are

11  looking at these bullets you are giving your opinion

12  is that there is enough similar marks that you say

13  that it's not fesible in your mind that these bullets

14  can be so alike and yet not come from a different

15  firearm.  Did I say it right?

16     A      That's very good.

17     Q      I kind of regurgitated what you said.

18     A      I think so.

19     Q      Now, your opinion that you gave is based

20  upon you looking at these bullets and looking for

21  these little marks, right?

22     A      That's correct, sir.

23     Q      And did you take a picture of these

24  bullets and then count the marks like the fingerprint

25  people do?

1        A       No, sir.

2        Q       Do you take a computer analysis and kind

3    of look at the different marks that may be on the

4    bullet and do some sort of a comparison based upon an

5    a computer?

6        A       I don't know of a computer analysis that

7    is available for that type of comparison of what you

8    are describing.

9        Q       I can't imagine what the software would be

10   like to do such a thing.  In other words, in order to

11   make that comparison, what it is, in essence, your

12   subjective opinion as an expert in this business that,

13   by just looking at these two bullets, you think those

14   two bullets have enough likenesses that you can give

15   an opinion that they come from the same firearm.

16       A       Based on my experience as well my opinion

17   in the field, yes, sir.

18       Q       The bullet itself has facts upon it,

19   static facts, that are there but the opinion, the

20   comparison, is based upon your personal subjective

21   experience in having looked a lot of bullets in the

22   past?

23       A       That's a fair statement.  Yes, sir.

24       Q       Now, let's talk about the subjective

25   opinion.  I believe that Mr. Smyth talked to you about

1   the fact that these bullets had a lot of markings on

2   them.  Do you recall that?

3       A       I think he asked me if -- specifically he

4   asked me about the surface of the bullets and whether

5   or not there was anything unusual about them.

6       Q       Okay.  That's what I am driving at.  That

7   wasn't a trick question.

8               The outside of these bullets had strange

9   markings on them.  Is that the way you view it; is

10  that fair?

11      A       I wouldn't call it strange.  As I

12  indicated during Mr. Smyth's questioning, the surface

13  of the bullet had a large amount of abrasion.

14      Q       If a bullet travels through a receptacle

15  and that receptacle has steel wool in it, as Mr. Smyth

16  asked you, that can cause, if it's going through all

17  this steel wool, all kind of marks to be on the

18  bullet, can it not?

19      A       It can cause abrasions on the bullet; yes,

20  sir.

21      Q       So on these bullets you not only might

22  have a few little marks that are left because the

23  bullet went through a barrel, you've got thousands of

24  little marks because the bullet may have gone through

25  some steel wool, correct?

1      A        There were abrasions.  I don't know that I

2      would characterize them as thousands but there was

3      abrasions on the barium surface of the bullet.  I

4      don't know what caused them but certainly the steel

5      wool would be a possibility.

6      Q        Hypothetically, it might be steel wool

7      that is causing these abrasions.  Abrasions are one of

8      the items, are they not, that you use as identifiers?

9      A        Well, the abrasions that we were using or

10     the markings are striata markings that are used for

11     evidence were actually the markings that are present

12     in the land impressions.

13     Q        And by that, between the grooves, not a

14     very good groove, you are talking about in this area

15     right here?

16     A        I guess you would have to label which one

17     you are going to call land.

18     Q        Sorry, a land.

19              Make that groove a little bit better.  You

20     are saying that the markings you were looking at were

21     markings that were in the raised portion that we have

22     learned is called the land?

23     A        You are talking about a land.  The raised

24     portion of the barrel is known as the land.  When you

25     fire the projectile or when the projectile traverses

1   the barrel, the impression left by the land will

2   actually be a depression so it would appear as a

3   groove but that's why we designate it land impression.

4        Q        So it sort of reverses itself?

5        A        Right.

6        Q        Are you saying that the steel wool

7   markings would not be in the land portion of the

8   bullets?

9        A        They would not be subjected as readily to

10  abrasions as the groove impression would be.

11       Q        So they are still marked by the steel

12  wool, if it's steel wool, this is based that we are

13  going through the steel wool.  It is just because

14  there is a lower area of the bullet.  You are saying

15  the markings are less than in another area of the

16  bullet.

17       A        I am saying that because the land

18  impression is actually an impression that is below the

19  barium surface or the rest of the barium surface is

20  less affected by the abrasion of the other materials.

21       Q        If theoretically a bullet is going through

22  a barrel, what you are saying is that the bullet goes

23  around in the barrel.  It leaves these little land and

24  groove impressions because of the outside of the

25  barrel?

1       A       Not the outside of the barrel but the

2   interior surface of the barrel.

3       Q       The inside of the barrel but the outside

4   of the bullet, right?

5       A       The impressions of rifling would be left

6   on the exterior of the bullet; yes.

7       Q       And you are saying, by using the fact

8   after it comes out of the bullet, that some of these

9   markings are raised and some of them are lowered that

10   you compared the part that was lowered or depressed,

11   the depression part of the markings in the bullet,

12   right?

13      A       I compared all of it but the customary

14   words, customary for me and other examiners, to

15   primarily focus on the land impressions.

16      Q       If, however, the barrel is filled with

17   steel wool, then, when the bullet goes through that

18   steel wool, if it's going directly through the steel

19   wool, it's not going to matter what's on the inside of

20   the barrel because you are going to have steel wool

21   that is going to be affecting both sections of the

22   bullet, are you?

23      A       You are not stuffing the barrel with steel

24   wool.

25      Q       No, we call it a suppressor.  Let's say

1     that the suppressor was stuffed with steel wool and

2     let's say the bullet went directly through the steel

3     wool out the other side?

4          A     Uh-huh.

5          Q     It's not going to matter whether you have

6     on the outside of the bullet raised or lowered areas

7     on there because you are going through a mass of steel

8     wool, correct?

9          A     I'm not going to agree with that

10    statement.  I am saying my land impression would less

11    likely to be affected.  I'm not saying it was likely

12    to affect at all.  It's less likely to be affected

13    than the groove impression.

14         Q     You'll acknowledge that it would still be

15    affected but you are saying that, in your opinion, it

16    would be less affected than the other part of the

17    bullet?

18         A     I believe so; yes.

19         Q     I take it that you are unaware of any

20    testimony regarding the type and particularly of a

21    manufacturer of a suppressor that may or may not have

22    been utilized in this particular case?

23         A     I'm not familiar.  I haven't heard any

24    testimony at all with regard to this case.

25         Q     I take it, in the background, that you may

1    or may not have, I don't know what kind of background

2    you receive when you get a bullet -- let me strike

3    that.   Let me do it the right way.

4            Did you receive any background information

5    regarding a possible use of a suppressor and the type

6    of suppressor that might have been utilized when you

7    made your comparison on the bullets?

8       A    At what time, sir?

9       Q    At the time you did your evaluation, your

10   identification on bullets.

11      A    The initial request for an evaluation on

12   any of this evidence was a request to compare certain

13   items recovered from one area to items that were

14   recovered from the complaining witness.   And prior to

15   that examination, I had no information as to the

16   possible use of any suppressor.   After making that

17   comparison, I commented to the investigator, after

18   having completed the examination, that I observed

19   these abrasions on the barium surface and at that time

20   I believe somebody indicated that they thought a

21   silencer had been used.

22      Q    Do you know the difference between -- and

23   I want to know -- the silencer and a suppressor?

24      A    I'm not sure.

25      Q    I'm not sure I can either.   I'll move

1    along.

2        A        There is such a thing as a flash

3    suppressor and that in terms of firearm and

4    suppressor, you are typically talking about a flash

5    suppressor.

6        Q        Were you able to make any identification

7    from the raised part of the bullet that you were able

8    to use as your identifiers when you were comparing the

9    bullets?

10       A        Again, sir, I evaluated all the barium

11   surface that was available to me and whether that

12   would include both the land impressions as well as the

13   groove impressions.

14       Q        I understand that.  But, you know, I

15   understand it.  You are looking at two bullets and

16   based upon your experience, you are looking at

17   similarities and little marks on these two bullets and

18   I believe you have testified that, well, as far as all

19   these abrasions that were all over these bullets that

20   might hamper you from determining whether these

21   bullets are fired from the same firearm, that one of

22   your responses was that, "Well, I can look at the

23   depressed part of the bullet and it's not scared up as

24   bad."

25                What I am asking is:  In the raised part

1    of the bullet, were you able to compare those two

2    bullets and look at those two parts of the raised

3    bullets and, in making your opinion, were you able to

4    see specific identifiers in the raised part of the

5    bullet that were identical to the other identifiers in

6    the other raised part of the other bullet?

7         A      I can't really address that.  All I can

8    tell you, based upon my examination of each of those

9    items that we talked about, and that would include the

10   land impression as well as the groove impression, I

11   was able to form an opinion with respect to those

12   particular items that I indicated and identified.

13        Q      Is it because you don't remember and your

14   notes do not reflect the basis of how many identifiers

15   you had or which marks you were using to make that

16   analysis or is it because it was sort of all one

17   package?  Well, that's two questions.  Let me ask one

18   question.  I'm sorry.

19               Is it because -- when you say you can't

20   really say whether you were able to identify a

21   particular similarity in the raised part of the

22   bullet, is that because the analysis is one complete

23   analysis?

24        A      That's correct, sir.

25        Q      Do you remember in your analysis, when you

1    did your analysis, that there were identifying marks

2    that were similar in the raised portion of all of

3    these bullets or of these bullets?

4        A     Again, so we are talking and using the

5    same term, I am assuming by raised area of the bullet

6    you are talking about the groove impressions; is that

7    correct, sir?

8        A     I think that's right.

9        Q     I mean, the laymen's terms, the part that

10   is lifted up, that is not the depressed part of the

11   bullet?

12       A     Which is the groove.

13       Q     Thank you.

14       A     My examination of any of the items is an

15   examination of the exhibit in totality.  I do not

16   necessarily pinpoint the groove impression versus the

17   land impression.  I will use any part of that

18   projectile or exhibit that is available to me and form

19   an opinion based upon a composite of that particular

20   item.

21       Q     I understand.  Here's the problem.  If

22   there is another opinion that differs -- and I don't

23   know how you got your opinion other than the fact

24   that, hey, I looked at it and made the two total

25   comparisons -- I have a hard time knowing what it is

1    that you saw there, or the jury has a hard time

2    knowing what you saw there, that made this bullet look

3    identical to the other bullet if the only answer is

4    the total package.

5        A       That's the answer I am afraid I have to

6    give you, counsel.

7        Q       Do you have a certain number of

8    identifiers that you use before you make this

9    similarity opinion that these two bullets all came --

10   that all these bullets came from the same gun?

11       A       I look at the nature and the quality of

12   the markings, sir.  Certainly 10 or 15 markings would

13   be a reasonable number.  Again, I look at the nature

14   and the quality of the markings and evaluate each of

15   the projectile as a total.

16       Q       All right.  How many markings did we have?

17       A       On each there was a sufficient number of

18   markings.  I did not count the marks and I did not

19   record the individual number.

20       Q       Because the science that you are in, that

21   is, of firearm and identifications, is a subjective

22   science, misidentifications do occur, do they not?

23       A       There have been instances I am aware of

24   misidentifications that occur.  Yes.

25       Q       And some very famous, have there not?

1          A          I don't know what you are having in mind.

2          Q          Well, for example, the Sirhan, Sirhan

3     case, wherein Robert Kennedy was shot, there were some

4     real controversy over those bullets, was there not?

5          A          I'm not familiar with that.  I can't

6     answer that.

7          Q          I won't ask any more of that.

8                     The casings analysis that you did those

9     also consisted of a two-part step, one wherein you

10    have a class identification and another wherein you

11    have an individual identification.

12         A          That's right, sir.

13         Q          And the class identification you can

14    narrow it down to the four  particular firearms that

15    we have in the bottom line, right?

16         A          That's correct.

17         Q          The identification, the individual

18    identification, that, however, was an identification

19    wherein you were able to observe these casings without

20    any abrasions of a large number on the outside of

21    these casings, at least, not to the extent we had on

22    the bullets; is that a fair statement?

23         A          That's a fair statement.  Yes.

24         Q          The casings identification, in other

25    words, are of various shell cartridges.  You can look

1    at and you said it with certainty with regards to the

2    bullets but, at least, unlike the bullets, you can

3    look at those shell casings and you don't have to

4    worry about whether you got a depressed or undepressed

5    part of the casings because they are in much more of a

6    pristine shape for you to make your comparison, right?

7         A    The shell casings or the cartridge casings

8    are in good condition; yes, sir.

9         Q    And I'm not implying -- well, I am.  Even

10   if you didn't have trouble on your identification of

11   the bullets because they may have gone through some

12   foreign substance before they ended up where they

13   were, at least on the casings, you are just able to

14   put them under on a microscope and you can see the

15   machine marks and the firing pin marks and they were

16   true, were they not?

17        A    That's correct, sir.

18        Q    Now, you don't know where the casings came

19   from, do you, the shell casings originally?

20        A    I have no personal knowledge.  No, sir.

21        Q    You do not know if there were any casings

22   that came from or were in any way associated with

23   State's Exhibit 144, 145 or 146, do you?

24        A    That were submitted to me, sir.

25        Q    Yes, sir.

1      A      There were no -- again, I don't know where

2   the particular cartridge cases came from.  I was

3   submitted a total of four cartridge cases.  There were

4   no cartridge cases submitted with the exhibits that

5   have been designated EB 5, 6, and 7.

6      Q      Now, you stated that, in your opinion, the

7   bullets, not the casings but the bullets, may have

8   come from a particular manufactured firearm; is that

9   correct?

10     A      Yes, sir.

11     Q      Can you look at the specific markings on

12  the bullets and determine not the class identifiers

13  but specific unique marks on the bullets and come to a

14  conclusion that a bullet has come from this particular

15  model firearm as opposed to another particular model

16  firearm?

17     A      No, sir.

18     Q      That is based upon purely the class

19  identifiers, right?

20     A      That's correct, sir.

21     Q      But yet in your report you say in the

22  class identifiers that the bullets could have come

23  from a number of different firearms, correct?

24     A      Yes, sir.

25     Q      Do you have to have additional information

1                    REDIRECT EXAMINATION

2    BY MR. SMYTH:

3        Q      Mr. Baldwin, you don't use a magnifying

4    glass in your work, do you?

5        A      No, we use a comparison microscope.

6        Q      You are not sitting there with a

7    magnifying glass looking to your bullets, are you?

8        A      No, sir.

9        Q      You actually align the bullets on two

10   stages, side by side, rotate them and look through a

11    comparison microscope and two surfaces at one rotate

12   until alighn, that's the way you make your comparison

13   in looking at lands and grooves and other striations

14   on the bullets.

15       A      That's correct.

16       Q      There is assume -- correct me if I am

17   wrong -- there is something what fingerprint examiners

18   do --

19              MR. ODOM:  If he knows.

20       Q      Have you ever done any fingerprint?

21       A      I am familiar.  I'm not a fingerprint

22   expert but certainly, yes, they compare the markings

23   or the characteristics of a minitiae on an inked to

24   the minitiae on the latent.

25       Q      And they are aligning up until they see

1    the markings on any of the each two fingerprints, one

2    being latent and the inked line up and decide it is

3    either or is not?

4         A       That's correct, sir.

5         Q       And basically what this boils down to is

6    the integrity of the examiner, is it not?

7         A       Certainly the integrity and experience are

8    factors to take into consideration.

9         Q       It is just like a fingerprint examiner,

10   when he is satisfied there is not just some, in his

11   mind, that the two are matches, then he calls a match.

12   If he is never satisfied, he doesn't call it a match.

13        A       That's, true, sir.

14        Q       And do you belong to any of these Firearm

15   and Tool mark Examiner's Association.

16        A       I am a member of the informal group, which

17   is the Texas Association of Firearms and Tool Marks

18   Examiners.  In the past, I have been a regular member

19   of the Association of Firearms and Tool Examiners but

20   I don't presently maintain my membership.

21        Q       Is there some magic of points you have to

22   meet in order to call it a match or a comparison or is

23   it up to the integrity of the examiner?

24        A       Certainly there has to be a minimal

25   number, although you are looking not just at the

1    number and nature and quality of the markings, the

2    degree to which the repetitiveness is being evidenced.

3      Again, there is no hard and fast rule.

4        Q      So it's not a magic number?

5        A      No, sir.

6        Q      It's possible that, let's say, you had

7    five real distinguishing marks that you saw over and

8    over again.  Would that be something again that be

9    compared in making your examination and your

10   comparison?

11       A      Yes, sir, it could.

12       Q      Was there anything in regard to the casing

13   -- is there anything unique when you look at the

14   casing and you look, I guess, at the firings of the

15   pin surface, the area where the firing pin strikes,

16   correct me if I am wrong, the firing pin strikes the

17   primer and the primer explodes the powder and the

18   powder and the pressure and gas explode that the

19   casing goes up against the breech face?

20       A      That's correct.

21       Q      In making comparisons, do you look at the

22   mark that the firing pin makes on the casing?

23       A      You look not only at the impression or the

24   markings left on the firing pin impression but, also,

25   the breech face markings.  And in this case there is a

1    phenomena known as that primer bleed where the primer

2    is actually deformed and knot metal of the primer

3    knots back to the orifices of the breech face.

4          Q       It leaves a unique mark?

5          A       Leaves a raised area that surrounds the

6    firing pin impression.

7          Q       Did you see that on all four of those

8    casings?

9          A       Yes, sir, I did.

10         Q       Is that phenomena that you talked about

11   unique to any particular type of weapon?

12         A       It's not necessarily unique to a

13   particular type of weapon but it is certainly one.

14   The firing pin bleed that was observed on these are

15   the very characteristics of what I observed on the

16   Beretta and Taurus on .9 mm other semiautomatics that

17   Beretta and Taurus manufactured.

18         Q       And assuming that these six bullets that

19   you have in evidence and you have identified as all

20   coming from the same gun were fired, six of, let's

21   say, nine or six of ten, would you expect by firing

22   through a silencer made of steel wool that steel wool

23   have any significant affect on the number one bullet

24   as opposed to the number ten bullet?  We talked about

25   repeated firings through the barrel.

1       A       Again, we talked about the design in a

2    particular silencer; that the design where the steel

3    wool is packed and was not contained, say, in any

4    fashion, as sequential firings occurred through that

5    steel wool, some of that steel wool would likely to be

6    disbursed out through the silencer.

7       Q       But as far as you are looking at the land

8    impressions, which is the groove on the bullet, do you

9    expect to see much difference between bullet number 1

10   and bullet number 10, I mean, it is going to be a big

11   difference between bullet number one or bullet number

12   one though there might be some difference caused by

13   the barrel and wear and tear, the same thing with the

14   silencer?

15      A       No, sir, a limited number of firings, one

16   to ten, the barrel is not going to change that

17   significantly.

18      Q       And that wouldn't have any affect on your

19   ability to make a positive comparison or not since?

20      A       Again, the change in the barrel from a

21   limited number of firings?

22      Q       Yes, sir.

23      A       No, sir.

24      Q       Now, what's most important in your

25   examination is really those bullets, those six bullets

1    that have been marked up there EB 1, 2, 5, 6, 7 and 9,

2    would you not say that is true --

3         A        Yes, sir.

4         Q        -- as opposed to the cartridges?

5         A        The cartridges certainly in this situation

6    the cartridge cases are not responsible for the demise

7    of the complaining witness.

8         Q        My point exactly.  The cartridge cases

9    didn't wound David Copeland?

10        A        That's true.

11        Q        In fact, you don't have any cartridge

12   cases attached to the bullets of Johnny Szucs so they

13   probably didn't wound him either?

14        A        That's true.

15        Q        And I believe you said there was a

16   cartridge case that was connected with the Copeland

17   shooting.  There was a spent cartridge submitted along

18   with the same bullets in the Copeland shootings by

19   Officer Kay; is that not correct?

20        A        That's correct, sir.

21        Q        Would it be unreasonable for somebody to

22   assume that if you got a .9 mm bullet on the floor and

23   you got a .9 mm spent cartridge on the same floor and

24   there has been a preserved scene and it's gathered up

25   that somehow those two items might have been at one

1        time part of the same intact bullet?

2        A        It's not an unreasonable assumption, sir.

3        Q        Is there something that is unique about

4        the SWD firearm that appears in the first list that

5        caused you to not put it in the second list?  In other

6        words, when you compare the bullets, you included the

7        SDW that could have fired the .9 mm bullets you are

8        looking at, however, you don't include that SWD in the

9        list of firings of cases.  Is there some reason you

10       didn't do that?

11       A        An SWD has a different firing pin shape

12       than what was observed on the cartridge case.

13       Q        We can exclude the SWD as something that

14       fired these cartridges?

15       A        That's correct.

16       Q        We are talking about the other nine

17       millimeters that had an extended barrel and some of

18       them were threaded; is that correct?

19       A        That's true.

20       Q        Well, we mentioned a Tech 9 and SWD; is

21       that right?

22       A        Yes, sir.

23       Q        At my request did you bring a Tech 9 and

24       SWD to Court?

25       A        Yes, sir, I did.

1              MR. SMYTH:  May I approach the bailiff?

2              THE COURT:  Sure.

3              MR. SMYTH:  May I approach the witness,

4    Your Honor?

5              THE COURT:  You may.

6         Q     Sir, I am going to show you what has been

7    marked for identification purposes as State's Exhibit

8    104 and ask you if you can identify that?

9         A     Yes, sir.

10        Q     And what is that?

11        A     This is a .9 mm Luger Intertech, model

12   Tech 9.

13             (Whereupon, State's Exhibit No. 165 was

14   marked for identification.)

15        Q     And I show you what has been marked for

16   identification purposes as State's Exhibit 165.

17        A     Yes, sir.

18        Q     And you can identify that?

19        A     Yes, sir, I can.

20        Q     And what is that?

21        A     There is a SWD Cobra, M as in Mary, 119.

22        Q     Now, these are the two weapons that you

23   were talking about as being weapons that had an

24   extended barrel and also had threading on them?

25        A     That's correct, sir.

1       Q       Would you compare State's Exhibit 104 with
2    State's Exhibit 31?
3       A       Yes, sir.
4       Q       Do you believe anybody would --
5               THE COURT:   Why don't you publish them
6    before the jury before it is admitted.
7               MR. SMYTH:   Your Honor, the State would
8    offer for demonstrative.
9               THE COURT:   If you don't any objection.
10              MR. ODOM:   I don't have any objection.
11              MR. SMYTH:   They are for demonstrative
12   before the jury.
13      Q       Is it your opinion anybody could mistake
14   State's Exhibit 164 for number 31?
15      A       Not likely, no.
16      Q       There would be -- this is the Tech 9?
17      A       Tech 9.
18      Q       And with respect to 165, I ask you to look
19   at 165 and compare it to 131 and ask you the same
20   question:   Do you believe anyone would ever mistake
21   165 from 31?
22      A       Not likely, sir.
23      Q       And this would be the 165 is the SWD?
24      A       SWD.
25      Q       The Tech rectangular-type of firing pin?

1       A       That's correct.

2       Q       Mr. Baldwin, again, is it your expert

3   opinion that the ballistic evidence that you examined,

4   by that, I mean the firearms evidence, I guess I

5   should say the bullets which are set out in --

6               MR. SMYTH:  May I approach, Your Honor?

7               THE COURT:  Yes.

8       Q       -- State's Exhibit 163 were fired in a

9   particular type of weapon or a particular brand

10  weapon, do you have an expert opinion which type of

11  those weapons up there fired those bullets?

12      A       Again, sir, considering just the fired

13  bullets, the rifling pattern is consistent with any of

14  those firearms that are listed above the line on the

15  blackboard.

16      Q       Then, let me ask this way.  Considering

17  the fired bullets in conjunction with the casings you

18  also inspected, do you have an opinion as to which, if

19  any, fired those bullets?

20      A       If you take into consideration the vast

21  cartridges cases as well as the fired projectiles, the

22  firearms, based on my experience, had most likely

23  fired would be a Beretta or a Taurus.

24      Q       And that would be a weapon similar to

25  State's Exhibit 31?

Page 45

1          A          I'm not aware of that, sir.   No, sir.

2          Q          Number two, does your organization set a

3     standard by when you take your photographs or that you

4     take photographs or record for another person to view

5     the actual comparison, do you all take photographs of

6     the comparisons?

7          A          We do not photograph.

8          Q          So there is no way that I can look at your

9     comparison and say I agree or disagree with your

10    comparison as such other than the fact that I can also

11    look at the bullet, right?

12         A          That's correct, sir.

13         Q          You don't make a photograph wherein you

14    circle or number the identifiers when you make your

15    determination, do you?

16         A          No, sir.

17         Q          Are you aware that a fingerprint expert

18    does that.

19                    MR. SMYTH:   Object, that is a fact that is

20    not in evidence if indeed a fact.

21                    THE COURT:   Sustained.

22                    MR. ODOM:   He asked the question is this

23    somehow like fingerprints and it's not and I think I

24    have a right to go into that.

25                    THE COURT:   I'll allow it.


                                              Page 47

1          Q       (Mr. Odom)    There are a number of

2     differences at least in regards -- the association

3     that you are a member of, the association of firearms

4     examiners and tool makers or identifiers -- I don't

5     know if I got that right -- does not have, does it, a

6     set minimum similar to what I have been talking about

7     that sets a minimum before there can be a positive

8     identification, does it?

9          A       Not that I am aware, sir.

10         Q       There may be a great deal of difference

11    between what we all may be familiar with in the

12    fingerprint examination and what you do in the

13    firearms examination; isn't that a fair statement?

14         A       There are differences; yes.

15         Q       Now, Mr. Smyth said that the real

16    difference is the integrity of the examiner.   Remember

17    when he asked that question.

18              MR. SMYTH:   That's a misstatement, never

19    the real difference.   I never said there was a

20    difference between fingerprints and firearms and it's

21    the integrity of the examiners in both cases.

22         Q       (Mr. Odom)    Mr. Smyth said it boils down

23    to the integrity of the examiner.

24         A       He indicated that the integrity plays in

25    part of the consideration here.

1      Q      Well, now, integrity implies a degree of

2    either honesty or dishonesty.  Isn't it fair to say

3    that two people in your business that are fire

4    examiners can have impeccable integrity, that can be

5    as honest as the day is long, but yet they can have a

6    legitimate dispute over the identification of bullets

7    because it is a subjective analysis?

8      A      Well, sir, in response to Mr. Smyth's last

9    question, it was indicated that certainly integrity is

10   a factor.  I'm certainly not intending to indicate

11   that was the only factor that was involved here.

12     Q      And my question relates more to the fact

13   that, at least in the sense of integrity, in one of

14   the definitions of integrity -- I don't intend to

15   diminish your integrity.  It's true that two perfectly

16   capable firearms examiners can have a difference of

17   opinion about whether or not two bullets came from the

18   same firearm because your examination is a subjective

19   examination?

20     A      I agree with that.  Yes, sir.

21     Q      And if I in some way implied by indicating

22   your integrity was somewhat and I apologize.

23     A      It wasn't taken that way, sir.

24     Q      Mr. Smyth did ask some questions and I got

25   confused on this one and I would like to clear it up

1     in regards to a hypothetical he posed.  If a bullet is

2     passing through steel wool, if the barrel is going to

3     change from the first time a bullet is fired from the

4     eight or nine times that a bullet was fired, and I

5     believe your answer, well, no, there shouldn't be any

6     change in the barrel, well, that's true.  Every time a

7     bullet goes through a barrel and then through the

8     steel wool and out the other end there's not going to

9     be any change in the barrel, is there?

10         A      There might be minute changes in the

11    barrel but, again, my response to his question, in the

12    context of making an identification, and, again, I

13    don't anticipate in ten shots there would be

14    sufficient enough change in the barrel to inhibit one

15    from making an identification.

16         Q      All right.  And that's within the barrel

17    of the firearm.

18         A      That's how I took his question; yes.

19         Q      I'm more concerned about what happens,

20    when the bullet has gone through the steel wool and

21    comes out the other end.  Every time that bullet goes

22    through a mass of steel wool the steel wool is going

23    to alter, is it not, or theoretically, I suppose,

24    wouldn't you imagine it would alter?

25         A      The steel wool being altered?

1        Q       Yes.

2        A       Yes, sir.

3        Q       It's not going to be in the same

4    configuration because a bullet goes through it every

5    time, right?

6        A       That's a reasonable statement.

7        Q       So the markings that the steel wool leaves

8    are going to be different every time presumably?

9        A       Yes, sir.

10        Q       I don't have any argument with your

11    identification on casings.  It's the bullets that I am

12    talking about.  We don't have that you are aware of

13    any casings that relate to State's Exhibit 144 through

14    146, right?

15        A       That's correct, sir.

16        Q       The only way that we know if those bullets

17    came from a SWD as opposed to a Taurus or a Beretta

18    is, if these bullets are the same as another bullet,

19    that may be identified through casings or through some

20    other method, correct?

21        A       No.  I'm not sure I follow your question.

22    Again, I have to go back again to your addressing a

23    particular manufacturer of a firearm.  In considering

24    the class characteristics of those fired projectiles

25    and not considering any other fired evidence, if

1    firearm manufacturers that have the class

2    characteristics was consistent with those observed,

3    those bullets would be indicated by the listing you

4    have indicated above the line.

5         Q        Which include, of course, both the Taurus

6    as well as the Beretta as well as the SWD --

7         A        That's correct, sir.

8         Q        -- and many others.

9              Now, I believe there is another firearm --

10   there may be others that have threads.  There is a

11   PKT.  Is this something like that has that you are

12   familiar with, and if so?

13        A        PKT Walther.

14        Q        And that's also listed on here as well, is

15   it not?

16        A        Yes, sir, it is.

17             MR. ODOM:  That's all I have.

18             THE COURT:  Thank you, Mr. Odom.

19             MR. SMYTH:  Thank you.  No further

20   questions.

21             THE COURT:  Thank you for your testimony.

22             MR. SMYTH:  Mr. Molina.

23             THE COURT:  Very well.

24             MR. SMYTH:  At this time the State offers

25   into evidence State's Exhibit 161 and 162 and tender

1    the same to counsel for defense for his inspection.

2              THE COURT:  What is it?

3              MR. SMYTH:  161 is a business record

4    regarding a certain pager of the Francisco Rojas and

5    other 911 calls on this night.

6              MR. ODOM:  No objection.

7              THE COURT:  161 and 162 are admitted.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ROBERT GEORGE MOLINA, JR.,
 2    was called as a witness for the State and, having been
 3    duly sworn, testified as follows:
 4                         DIRECT EXAMINATION
 5    BY MR. SMYTH:
 6         Q       Would you state your name and speak loud
 7    enough for the entire jury to hear you.
 8         A       Robert George Molina, Jr.
 9         Q       And how are you employed?
10         A       Security manager with Southwestern Bell.
11         Q       And what do you do as a security manager
12    for Southwestern Bell?
13         A       We investigate personnel matters.  One of
14    our duties is to testify in court as custodian of
15    record.
16         Q       And I guess that is my next question.  Are
17    the custodian of records for Southwestern Bell
18    Telephone Company?
19         A       Yes, sir.
20         Q       And have you been sent down here to
21    testify regarding certain of your business records?
22         A       Yes, sir.
23                 (Whereupon, State's Exhibit Nos. 157
24    through 160 were marked for identification.)
25                 MR. SMYTH:  May I approach the witness?
```

```
 1                    THE COURT:  You may.
 2        Q        I want to show you what has been marked as
 3   State's Exhibit 157, which is business records of
 4   Southwestern Bell Telephone Company, and see if you
 5   recognize those?
 6        A        Yes, sir, I do.
 7        Q        You are a custodian of those records?
 8        A        Yes, sir.
 9        Q        Are those records made in the normal
10   course of business of Southwestern Bell Telephone
11   Company?
12        A        Yes, sir.
13        Q        Are the entries contained in those
14   documents made on or about the time of the events
15   reflected?
16        A        Yes, sir.
17        Q        Are they made by someone who has personal
18   knowledge of the event reflected?
19        A        Yes, sir.
20                 MR. SMYTH:  At this time the State would
21   offer into evidence and tender to counsel State's
22   Exhibits 157 and, we previously provided him with a
23   copy.
24                 THE COURT:  157.
25                 MR. SMYTH:  Southwestern Bell record
```

1    regarding certain phone numbers.

2                MR. ODOM:  No objection.

3                THE COURT:  157 is admitted.

4    Q       Sir, if you would, I would like to go

5    through these records and see if you are record

6    reflects certain telephone numbers, and if so, who the

7    subscribers are.

8                First of all, do your records reflect --

9    let's go through it page by page -- about the third

10   page does it reflect who the subscriber for a

11   telephone number area code 713-783-33522?

12   A       Yes, sir.

13   Q       And who is the subscriber for that number?

14   A       Reinaldo Dennes, 6415 Wild River, Katy,

15   Texas 77449.

16   Q       And, later, or back toward the end of your

17   business records, specifically back, I guess, about

18   page six -- so that's not the end -- does it show that

19   there Reinaldo Dennes does business, has a DBA?

20   A       Yes, sir, it does.

21   Q       And who is that?

22   A       At Designs by Reinaldo.

23   Q       And what's the address?

24   A       6222 Richmond Avenue, Number 320, Houston,

25   Texas 77057.

1       Q       Let me ask you to look at the second page

2    of this document, and see if you have subscriber

3    information for a number that I believe this jury has

4    previously heard, which is area code, the enter

5    originally 713-847-1448 on page five?

6       A       Yes, sir, I do.

7       Q       Has that area code of 713 been changed to

8    now 281?

9       A       Yes, sir, 281.

10      Q       So it's now the official record,

11    281-847-1448; is that correct?

12      A       That's correct, sir.

13      Q       But at one time it was 713?

14      A       That's correct.

15      Q       And who is the subscriber for that

16    particular phone?

17      A       Jose Rivero.

18      Q       What is the address?

19      A       471 Memory Lane, Houston, Texas 77037.

20      Q       Excuse me.

21      A       713-847-1448.

22      Q       And that was for a Jose Reveria and 401

23    Memory Lane now.

24              Let me ask you, sir, if you will look at

25    page ten of those business records, do you show that

1     on page ten there is a series of long distance calls

2     to Miami from this phone number, the area code

3     713-783-3522?

4          A     Yes, sir, I do.

5          Q     And on page 11, does it show with regard

6     to the same phone number, that 713-783-3522 number,

7     show the first time a collect call on February 5th to

8     that number from Ecuador?

9          A     That's correct.

10         Q     Ecuador called Houston, Reinaldo Dennes,

11    the business?

12         A     That's correct, sir.

13         Q     If you would, sir, follow along through

14    the document with me into what I call page 16, second

15    page from the end.

16         A     Yes, sir.

17         Q     Does that cover that phone number, the

18    713-783-3522, Designs by Reinaldo number, does it

19    cover phone calls made from around December 29, 1995,

20    19 calls, all the way through, it looks like,

21    January 19, 1996?

22         A     It extends until January 9th and, yes,

23    sir, 19 calls.

24         Q     19 calls.  With respect to call numbers

25    two and three, can you tell the ladies and gentlemen

1      of the jury where those calls are made and what the

2      phone number is if, at least, called?

3          A      Yes, sir.  The calls originated from

4      713-783-3522 through 3522 and they were made on

5      January 2nd, 1:06 a.m. to Cottonwood, Arizona, the

6      telephone number, 520-634-6280, and duration of call

7      was for one minute.  Another call was made on January

8      2nd, at 11:09 a.m. to Cottonwood, Arizona,

9      520,634-6280.

10         Q      I ask you, if you would, look at calls

11     number 13 and 14, and see if there is any other long

12     distance calls.

13             MR. SMYTH:  May I approach the exhibits?

14         Q      Go ahead and answer.  Did you see any

15     other to Cottonwood or Arizona?

16         A      Right.  Call number 13 is Arizona on

17     January 12th at 5:30 p.m.  It was information

18     services, 605-555-1212; call number 14 was on

19     January 12th at 5:38 p.m. to Cottonwood, Arizona, and

20     to 520-634-6280.

21         Q      Let me show you an item that is in

22     evidence as State's Exhibit 44, a catalogue from

23     Butokukai, or something, Company, and ask if you can

24     tell me what the phone number for that business is.

25         A      Business number area 520-634-6280.

1          Q       And that's the phone number for a

2     business.   I'm going to spell B-u-t-o-k-u-k-a-i.

3                  I'll ask you, sir, if you look, and tell

4     me, regarding item number 16, was there a call placed

5     from Designs by Reinaldo's phone number to Ecuador at

6     the end of December?

7          A       Yes, sir, there was.

8          Q       What was the date of that call?

9          A       It was December 28th at 3:23 p.m. to

10    Ecuador.

11         Q       And I'll ask you, sir, if you would look

12    at item 18, and on the last page, and tell me whether

13    or not there were any other calls to Ecuador?

14         A       Yes, sir.   There was a call on January 4th

15    at 6:17 p.m. to Ecuador.

16                 MR. SMYTH:   Pass the witness.

17                 THE COURT:   Mr. Odom.

18

19                      CROSS EXAMINATION

20    BY MR. ODOM:

21         Q       Mr. Molina, you were asked about number

22    18, did you not?

23         A       Yes.

24         Q       Do you have phone call number 16 on the

25    same page?

1        A        Yes, sir.

2        Q        Which is a phone call on 12-28-96, to

3   Ecuador, correct?

4        A        That's correct, sir.

5        Q        You also have, I believe it is on there,

6   another phone call, number 18, on January 4, 1997,

7   from Ecuador, correct?

8        A        To Ecuador?

9        Q        To Ecuador.

10       A        Yes, sir.

11       Q        You also have phone number 17 on

12   January 13th, there was a phone call to Monterrey,

13   Mexico, correct?

14       A        It's January 3rd.

15       Q        What did I say?

16       A        The 13th.  It was January 3rd to

17   Monterrey, yes, sir.

18       Q        Yes, sir.  I meant to say the third.

19                And, then, the final page, number 19, on

20   January 9th there is a phone call.  And what is that

21   in Mexico?  What's the name of that town?

22       A        It's probably an abbreviation to a state

23   in Mexico.

24       Q        But another town that appears to be in the

25   same state of Mexico that Monterrey is in?

1          A        It would appear that way; yes, sir.

2          Q        There are also a number of phone calls

3     made from January 10th to January -- well, on January

4     10th to Florida, are there not?

5          A        Yes, sir, there are.

6                   MR. ODOM:  No further questions.

7                   THE COURT:  Anything further?

8                   MR. SMYTH:  Nothing further.

9                   THE COURT:  Thank you.  You may step down.

10                  MR. SMYTH:  May he be excused?

11                  THE COURT:  Certainly.

12                  MR. SMYTH:  I forgot her name but she is

13    the lady from GTE.

14                  THE COURT:  We are going to break for

15    lunch.  And the reason we are doing that this witness

16    supposedly may be a little lengthy in her testimony so

17    we will beat the lunch crowd and come back early.

18    Stand in recess until 1:15.

19                  (Recess taken.)

20                  (Jury came into the courtroom.)

21                  THE COURT:  Please be seated.

22

23

24

25

```
 1                         JANET HORTON,

 2   was called as a witness for the State and, having been

 3   duly sworn, testified as follows:

 4                      DIRECT EXAMINATION

 5   BY MR. SMYTH:

 6        Q        Ma'am, would you, please, state your name

 7   and speak loud enough so the lady at the very top can

 8   hear you.

 9        A        My name is Janet Horton.

10        Q        How are you employ?

11        A        I am employed with GTE, also.

12        Q        GTE Mobilenet?

13        A        That's correct.

14        Q        And how long have you been so employed?

15        A        Three and a half years.

16        Q        In your capacity with GTE, are you a

17   custodian of records of that company?

18        A        Yes, I am.

19        Q        And would those records include, amongst

20   others, your cell phone records --

21        A        That is correct.

22        Q        -- with regard to the subscribers and the

23   numbers that they have?

24        A        That is correct.

25        Q        How long have you been a custodian of the
```

1      business records of GTE Mobilenet?

2          A        For three years.

3                   MR. SMYTH:  May I approach the witness?

4                   THE COURT:  Yes.

5          Q        At this time I would like to show you what

6      has been marked as State's Exhibit 158 and 159 and 160

7      and ask you if you can recognize those particular

8      documents and yes or no, if you can?

9          A        Yes.

10         Q        What are those documents?  Just as a

11     group, do they have a generic name with regard to?

12         A        Billing.

13         Q        Are those the business records of GTE

14     Mobilenet?

15         A        Yes, they are.

16         Q        And do those documents contain entries

17     that were made by someone who has personal knowledge

18     of the entries?

19         A        Yes.

20         Q        And were they made on or about the time of

21     the entries therein?

22         A        At the time.

23         Q        And are they kept in the normal course of

24     business of GTE Mobilenet?

25         A        Yes, they are.

1            MR. SMYTH:  At this time the State offers

2   into evidence State's Exhibit 158, 159, 160, tender

3   the same to the defense for counsel for his

4   inspection, and we have previously provided him a copy

5   of these documents.

6            MR. ODOM:  Your Honor, I have no objection

7   as 159 or 160.  I have a relevance objection to 158.

8            THE COURT:  158, 159 and 160 are

9   admitted.

10           (Whereupon, the following proceedings were

11   held before the Bench.)

12           MR. ODOM:  158 are the telephone records

13   of Rojas and they haven't proved enough to show that

14   they are relevant to the transaction.

15           THE COURT:  158 is admitted.

16           (Whereupon, the following proceedings were

17   held before the jury.)

18      Q    Ma'am, would you, please, explain to the

19   the ladies and gentlemen of the jury, just as briefly

20   as you can, what State's Exhibit 158 is.

21      A    State's Exhibit 158 is billing information

22   for our customer.  The subscriber is Francisco Santos

23   Rojas.

24      Q    And explain to the ladies and gentlemen of

25   the jury what State's Exhibit 159 is, just briefly.

1          A          Billing information for the customer

2     Reinaldo Dennes.

3          Q          And would that be, if I pronounced,

4     Dennes, would you disagree with that?

5          A          No, I would not.

6          Q          And State's Exhibit 160.

7          A          Also billing information for Reinaldo

8     Dennes.

9          Q          Are those regarding Mr. Reinaldo Dennes,

10    is that two different telephones?

11         A          Yes, they are.

12         Q          Please start, ma'am, with State's Exhibit

13    160.  Can you tell me what the telephone number is

14    that we are talking about, this subscriber

15    information, and billing records.  What's the

16    telephone number?

17         A          The cellular number, which is called the

18    mobile number, 281-382-2072.

19         Q          And when was that -- that is a phone for

20    Reinaldo Dennes?

21         A          Yes, it is.

22         Q          And when was that phone installed or when

23    did it go on line?

24         A          Our representative activated with

25    Mobilenet July 28, 1995.

1      Q       And in getting that phone, did he get, I

2  think, a CBR or can be reached number?

3      A       Yes, he did.

4      Q       What was the can be reached number?

5      A       713-783-3522.

6      Q       And that's the same as on the board,

7  Designs by Reinaldo on the number on the board; is

8  that the number you just gave us?

9      A       I can't see.  Okay.  Yes, it is.

10     Q       Designs by Reinaldo?

11     A       Yes, it is.

12     Q       Did they give an alternate?

13     A       713-974-6137.

14     Q       Can you tell me, is that particular cell

15  phone still in operating condition with GTE Mobilenet?

16     A       No, it is not.

17     Q       Can you tell me when it was disconnected?

18     A       February 21, 1996.

19     Q       And approximately what time was it

20  disconnected?

21     A       One moment, please.  10:29 a.m.,

22  February 21, 1996.

23     Q       And is there a reason given for the

24  disconnect?

25     A       Yes, it is.  Mr. Dennes called to

1    disconnect and the reason given is for relocation.

2       Q      Did he give a forwarding address?

3       A      Yes, sir, he did.  740 Northwest 25th

4    Avenue North 517, Miami, Florida 33125.

5       Q      All right.  Thank you, ma'am.

6              Did those records that you have, State's

7    Exhibit 160, do they also contain the cell phone calls

8    made during the month of December and January,

9    December 1995 and January 1996?

10      A      Yes, sir.

11      Q      And do they also contain a list of various

12   roaming calls for January of 1996?

13      A      Yes, sir.

14      Q      And could you tell the ladies and

15   gentlemen of the jury what roaming calls are?

16      A      Roaming calls are simply one that is a

17   subscriber with a customer takes the phone out of his

18   home calling area and another carrier is allowing them

19   to place calls.

20      Q      And you can track those calls, also?

21      A      That's correct.

22      Q      Let's look now at State's Exhibit 158.

23   Can you tell the ladies and gentlemen of the jury who

24   is the subscriber for that particular cell phone?

25      A      Francisco Santos Rojas.

1       Q     And can you tell the ladies and gentlemen

2  of the jury what that cell phone number is?

3       A     713-253-2023.

4       Q     And do those records include Francisco

5  Santos Rojas' social security number as well as his

6  Texas driving license?

7       A     That is correct.

8       Q     Does he have to present the Texas driver's

9  license when he becomes a subscriber and takes your

10  equipment?

11      A     He doesn't have to be Texas, just valid

12  identification.

13      Q     Do those records show what date that

14  particular phone number was installed?

15      A     Yes, it does.

16      Q     And what's that?

17      A     Excuse me.  September 15, 1990.

18      Q     Do you know whether or not that phone is

19  still in business or can you tell from the records?

20      A     I can't tell from the records.

21      Q     And was the phone number -- would you

22  repeat that phone number?

23      A     713-253-2023.

24      Q     Do those records that you have regarding

25  Francisco Rojas, also contain phone calls made on his

1    cell phone in January of 1996?

2    A     That is correct.

3    Q     If you would, ma'am, I ask you to look at

4    the records that you have got in evidence with regard

5    to State's Exhibit 159.  Who is the subscriber for

6    that set of phone?

7    A     Reinaldo Dennes.

8    Q     And that's a different phone number than

9    the other exhibits; is that correct?

10    A     That's correct.

11    Q     And what's that number?

12    A     281-383-7689.

13    Q     So that's 281-383-7689?

14    A     That's correct.

15    Q     Can you tell the ladies and gentlemen of

16    the jury when that particular phone was installed,

17    came on line?

18    A     Yes.  January 22, 1996.

19    Q     1-22-96.  And does that have an address or

20    a billing address for that particular phone?

21    A     Yes, it does.

22    Q     And what is the address?

23    A     2767 Briar Grove, Houston, Texas 77057.

24    Q     And does it have that same can be reached

25    number 713-783-3522?

1          A          That is correct.

2          Q          Which would be Designs by Reinaldo, a

3     business place?

4          A          Okay.

5          Q          And, then, does it have the same

6     alternative can be reached number 713-974-6173?

7          A          Here it has 6137.

8          Q          Thank you, ma'am.  I appreciate you

9     catching it.

10               Can you tell from your records whether or

11    not that phone number is still in effect or still

12    active?

13         A          Our records indicate that it's live but I

14    don't know how old the copy is.

15         Q          On all of these cell phone records you've

16    got, do you have the ability to look at those records

17    and show when that cell phone placed a call to another

18    phone number?

19         A          That is correct.

20         Q          Do your records show the phone number that

21    was called?

22         A          Yes, it does.

23         Q          And do your records also show if that cell

24    phone received the call?

25         A          Yes, it does.  Our records do indicate

1     that.

2          Q       And does it indicate from what phone

3     number a cell phone may be receiving that call?

4          A       No, sir, it does not.

5          Q       So you just show that it received a call;

6     is that correct?

7          A       That is correct.

8          Q       Do your records indicate by time as well

9     as date when these phone calls are placed as well as

10    when a phone may receive a call?

11         A       That is correct.

12         Q       And, then, do you also indicate the length

13    of time for a call?

14         A       That is correct.

15         Q       Are these calls logged in in a full one

16    minute?

17         A       GTE does bill in one minute increments.

18         Q       If it is 59 seconds, you get charged for a

19    minute?

20         A       Unfortunately you do.

21         Q       If you use 25 seconds, you get charge for

22    the one minute?

23         A       One minute and fifteen seconds you get

24    charged two minutes; that's correct.

25         Q       Let me ask you, ma'am.

1               MR. SMYTH:  Your Honor, may I approach the

2     exhibit as well as put up a diagram?

3               THE COURT:  Sure.  Can you read that?

4               MR. SMYTH:  May I proceed on this

5     diagram?

6        Q     Ma'am, I ask you, if you would, to

7     organize your exhibits there, organize the exhibits so

8     we can talk about them.

9               I ask you, if you will, look first on what

10    I am going to call the phone numbers for Reinaldo

11    Dennes, that being 281-382-2072 number, which I

12    believe is the old telephone number, the one that you

13    put in effect in '95?

14       A     That is correct.

15       Q     I ask, if you would, in checking your

16    records, do you show that on December 14th at

17    approximately 1933 hours a call was made from that

18    phone?

19       A     December 14th at 1933?

20       Q     Correct.

21       A     And your question was it made from this

22    phone?

23       Q     Yes, ma'am.

24       A     That is correct.  A call was made from

25    this phone.

1    Q      And we are using military time?

2    A      Yes, we did.

3    Q      And 1933 would be 5:33?

4    A      No, sir, it's 7:33.

5    Q      I don't add any better than he spells.

6           That's 7:33?

7    A      7:33, that is correct.

8    Q      Can you tell the ladies and gentlemen of

9    the jury what number was called?

10   A      Yes, I can.

11   Q      What was that?

12   A      The number called 713-847-1448.

13   Q      And your records don't tell us who is the

14   subscriber for that particular phone.  That's just the

15   number that was called.  And how long was that call?

16   A      Our records indicate that was a two-minute

17   call.

18   Q      So that one minute could be one minute and

19   one second all the way up to two minutes?

20   A      That's correct.

21   Q      Also, on December 14, 1995, looking at

22   that same telephone, do you show another call being

23   placed at 1950.

24          MR. ODOM:  May we approach the bench?

25          (Whereupon, the following proceedings were

1    held before the Bench.)

2            MR. ODOM:  I might as well get this on the

3    record.  At some point I am going to be objecting to

4    the exhibits he has got because of various hearsay on

5    the exhibits.  I believe that Mr. Smyth's position is

6    that there is testimony that supports various parts of

7    the exhibits that comes to some conclusions; however,

8    I think that's up to the interpretation, and I would

9    object to certain parts of it at the proper time.  He

10    is not referring to the exhibit but I know it is

11    coming at a later time.

12            THE COURT:  Okay.  What type of hearsay

13    are we talking about?

14            MR. ODOM:  Well, in this one -- it's not

15    like some of the others -- in this one there are calls

16    like, for example, to Tony Ramirez.  Mr. Ramirez has,

17    also, testified that the cell number is the shop and

18    Mr. Dennes has had his truck in the shop and, as such,

19    by Tony Ramirez.  It could have been Jose Rivero and

20    the exhibit indicates that it is to Tony Ramirez and

21    some other exhibits -- there is going to be other

22    examples of information similar to that.  It could be

23    to this person and maybe it is not to that person in

24    that it's the conclusions that are a controverted

25    issue or it's what I would contend is a misstatement

1    of the totality of the evidence or it would be in some

2    instances, I believe, hearsay that I would object to.

3              THE COURT:  I guess I am having a little

4    trouble because I recall earlier, when you were

5    extensively using the board and even the diagram, that

6    you drew out, at least, in my opinion, sometimes you

7    would be listing things that I don't think that's what

8    the witness on the stand said but that's your

9    interpretation and hearing complaints from the State

10   and I don't see the difference between asking her all

11   these questions and taking the time and writing them

12   down to their interpretation is pretty much what you

13   did except you wrote them down individually as you

14   presented them your question.

15             MR. ODOM:  I understand.  And my point is

16   I don't mind her answering the questions and I realize

17   Mr. Smyth is doing this, based upon what he believes

18   the evidence to be but that's the objection.

19             THE COURT:  I think the proper way -- I'll

20   probably admit -- each time you see something

21   sufficiently hearsay in your opinion why don't you

22   make that objection so at least the jury put that in

23   their mind.

24             (Whereupon, the following proceedings were

25   held before the jury.)

1          Q        Regarding December 14th, 1950 hours, did

2    you find another call from Reinaldo Dennes' phone

3    number -- I mean, Reinaldo is the subscriber for that

4    number; is that correct?

5          A        That's correct, sir.

6          Q        Did you find another call at 1950 from

7    Reinaldo Dennes' phone number to another number?

8          A        That's correct.

9          Q        And what number was that?

10         A        713-847-1448.

11         Q        Let's go to December 15th now.  At

12   approximately 1539 hours did you find a call from that

13   same Reinaldo Dennes' phone number to some other phone

14   number?

15         A        That is correct.

16         Q        And what number was that?

17         A        713-847-1448.

18         Q        Let's go now to January 2nd.  Looking at

19   that and you won't have that particular number so let

20   me go -- I think this has already been testified to by

21   another person with Southwestern Bell regarding these

22   phone calls on the 2nd and the 12th.

23                  So if you would skip ahead to January 14th

24   with regard to that same Reinaldo Dennes' cell phone,

25   do you show a call on January 14th at approximately

1     1237 hours to a phone number?

2          A     That is correct.

3          Q     And what number was called on

4     January 14, 1996, at approximately 1237?

5          A     713-847-1448.

6          Q     And on the same date, January 14th,

7     looking at 1359 hours, regarding the same cell phone,

8     did it make a call?

9          A     Yes, it did.

10         Q     1359?

11         A     Yes, it did.

12         Q     What number was called?

13         A     713-847-1448.

14         Q     And how long was that has called that you

15    mentioned?

16         A     Two minutes.

17              MR. SMYTH:  Your Honor, at this time the

18    State would, if I'm not mistaken --

19              MR. ODOM:  I assume my objection earlier

20    applies to 166?

21              THE COURT:  Yes.  They haven't been

22    offered yet.

23              MR. ODOM:  I thought he did.

24              THE COURT:  Is this going to be 167?

25              MR. SMYTH:  Yes, at this time could I look

1      for an exhibit?

2                     THE COURT:  Yes.

3                     MR. SMYTH:  May I publish to the jury a

4      phone number at this time regarding State's Exhibit

5      161, which is in evidence.

6                     THE COURT:  Certainly.

7           Q      Ma'am, let me show you what has been

8      marked as State's Exhibit 161.  I know this is not

9      your record but I ask you to look at this record and

10     see whether or not it has a telephone number on it

11     and, if so, who does the number come back to?

12          A      It does have a telephone number here.

13          Q      Does it have a pager number?

14          A      That is correct.

15          Q      What is the pager number?  713-710-0456?

16          A      That is correct.

17          Q      And who does that record show the

18     subscriber for that pager to be?

19          A      C & G Auto Alarms.

20          Q      That's the people that own it?

21          A      I'm assuming.

22          Q      Do you see a name on there of Francisco

23     Santos Rojas?

24          A      Yes, I do.

25          Q      And does this record -- well, you can't.

1      I'll explain the records.  Thank you, ma'am.

2              Let me ask you now, if you will, look back

3    at your phone records regarding the same phone number

4    we have been talking about, the same cell phone

5    number, look at January 22nd.

6      A      Is that exhibit 1?

7      Q      It's regarding phone 281-3872.

8      Q      I ask you to look at January 22, 1996 of

9    at 1059.

10     A      Okay.  What was the time, sir?

11     Q      10:59.

12     A      Okay.

13     Q      Do you show a phone call at that time to

14   any particular number?

15     A      Yes, I do.

16     Q      And what is the number?

17     A      713-710-0456.

18     Q      Now, I ask you, ma'am, to look at your

19   phone records regarding the same cell phone held by

20   Reinaldo Dennes, 11 on 1 and tell me if a call is

21   placed or a call received by a cell phone?

22     A      A called was received by cell phone.

23     Q      At 11:01 cell phone number 281-382-2072?

24     A      Receives an incoming call.

25     Q      You can't tell from what phone number that

1      incoming call comes from; is that correct?

2           A      That is correct.

3           Q      I ask you now, ma'am, to look at the same

4      time frame of 11:01 and see whether or not that cell

5      phone we have been talking about if Reinaldo placed a

6      phone call at approximately 11:01?

7           A      That is correct.

8           Q      And what number was called?

9           A      713-783-3522.

10          Q      So that would be Designs by Reinaldo.

11                 How is it a cell phone can receive a call

12     and place a call in the same time frame?

13          A      That is possible.  And I have to explain

14     it to you, in laymen terms, for example, if I call my

15     husband -- and it's 11:00 o'clock -- and say, "honey,

16     I'm on the way home," and end the call and place

17     another call within that same minute, it's possible to

18     be billed for both calls showing the same time.

19          Q      Is that what happened with regard to these

20     two phone calls, the incoming call and then an

21     outgoing call within the same minute, the customer got

22     charged two minutes' worth of service?

23          A      That is correct.

24          Q      Let me ask you, ma'am, looking at

25     January 22, 1996, look down to 1523 hours.

1          A        Okay.

2          Q        And I ask you, if you will, to look at

3     cell phone records for, I believe it's going to be,

4     State's Exhibit 159.

5          A        Okay.

6          Q        Can you tell me what cell phone is on that

7     particular record?

8          A        On State's Exhibit 159?

9          Q        Yes, what number are we talking about?

10         A        281-383-7689.

11         Q        And that's the phone that came on line on

12    January 22, 1996?

13         A        That's correct.

14         Q        That phone was activated that day?

15         A        Yes, sir.

16         Q        Do your records -- are you able to look at

17    a cell phone and look at an identifying numbers on the

18    cell phone and tell the ladies and gentlemen of the

19    jury what phone number has been given to it, if it is

20    one of your phones?

21         A        Yes, sir, we are.

22                  MR. SMYTH:   May I approach the witness?

23         Q        I show you a cell phone marked 69 and ask

24    if you can look at that cell phone and look at the

25    phone numbers in your records and tell us whether or

1    not you know if it is the phone number assigned to

2    that phone.

3         A       Yes, sir, I can.

4         Q       Can you tell the ladies and gentlemen who

5    that cell phone number was assigned to, State's

6    Exhibit 69 A.

7         A       Area code 281-383-7689.

8         Q       281-383-7689?

9         A       That's correct.

10        Q       And that's the phone then that was put

11   into service on Monday, January 22, 1996?

12        A       That's correct.

13        Q       And apparently the first phone call made

14   from that phone was at 1523 hours?

15        A       From the phone?

16        Q       Yes, ma'am.

17        A       That is correct.

18        Q       So the first phone call of that number

19   that was just put in service was 1523 hours.

20                Can you tell the ladies and gentlemen of

21   the jury what number was called by that cell phone.

22        A       The first call it wasn't made -- it was --

23   no, no, it was made.  It called area code

24   281-382-2072.

25        Q       And that would have been the phone number

1    we have been talking about as belonging to Reinaldo

2    Dennes?

3         A         That's correct.

4         Q         Check your records on the Reinaldo Dennes'

5    phone records and tell me if at 1523 you show that he

6    did indeed receive a phone call?

7         A         Sir, both are listed to him.  So which

8    number.

9         Q         Thank you, ma'am.

10             The 281-382-2072 number did it receive a

11   phone call approximately 1523 on

12   January 22, 1996?

13        A         Yes, sir, it did.

14             MR. SMYTH:  Now, may I approach the

15   witness?

16        Q         Ma'am, I ask you now to look back to the

17   phone number -- State's Exhibit 159.

18        A         Okay.

19        Q         And ask you to look at approximately 1548

20   hours and tell me whether or not that cell phone made

21   a call.

22        A         Yes, sir, it did.

23        Q         And to what number did that cell phone

24   call?

25        A         713-710-0456.

1        Q       Let me ask you now to look at -- spread

2    these out to look at -- I believe it's State's Exhibit

3    158, and tell me whether or not, first of all, what is

4    the cell number for 158?

5        A       713-253-2023.

6        Q       Can you tell me, looking at that

7    particular exhibit and that particular cell number at

8    1550 numbers, did that cell phone make a call, and if

9    so, to what number?

10        A       On what day?

11        Q       January 22, 1996.  That's the day we are

12    going to be talking about until I give you a new day.

13        A       January 22nd, at 1550, cell phone did

14    place a call to 281-383-7689.

15        Q       Okay.  And now, if you would go to that

16    cell phone number 281-383-7689 and tell me at

17    approximately 1550 hours on that day of

18    January 22, 1996, that cell phone indeed received a

19    call?

20        A       Yes, sir, it did.

21        Q       I now ask you, ma'am, to look at the

22    records for the cell phone 281-382-2072 and look at

23    1538 hours and tell me -- 1638 hours.

24        A       I'm sorry, this is January  22nd?

25        Q       From now, for a number of calls, we are

1    going to be on January 22nd in regard to all previous

2    cell phones at 1538 hours.

3        A     Yes, sir.  It did place a call to

4    281-383-7689.

5        Q     So that 382-2072 called 383-7689 at 1638

6    hours?

7        A     That's correct.

8        Q     Can you tell whether or not that 383-7689

9    number received a call at approximately 1639 hours?

10       A     Yes, sir, it did.

11             MR. ODOM:  Would you give me a running

12   objection to this exhibit as well the previous

13   exhibits?

14             THE COURT:  I told you any time you felt

15   something is inadmissible.

16             MR. ODOM:  May I approach the bench?

17             (Whereupon, the following proceedings were

18   held before the Bench.)

19             MR. ODOM:  Judge, I would object to what

20   is in the chart in regards to the fact that it

21   indicates that Estrella Martinez received the phone

22   call as well as the phone number that is given.  I

23   think that's a conclusion, also.

24             THE COURT:  The phone numbers is the

25   conclusion?

```
 1                    MR. ODOM:  No, not the phone, what the
 2      witness is testifying to, the labeling of persons
 3      receiving the phone calls are conclusions that I
 4      object to this exhibit.
 5                    THE COURT:  Let me see the exhibit?  Set
 6      it on the table.
 7                    MR. ODOM:  The witness has testified --
 8                    THE COURT:  I see what you are saying.
 9                    MR. ODOM:  -- receiving these phone calls
10      and they have got the notations and Caesar Cepeda,
11      Roadmaster Auto, Designs by Reinaldo.  She has
12      testified to the fact that is in her records.  I don't
13      have no problem with that.  I do have a problem with
14      the other conclusions that the exhibit has.
15                    THE COURT:  Go ahead, Mr. Smyth, sounds
16      like hearsay to me.  I mean, how can you be that
17      conclusive?
18                    MR. SMYTH:  We have got testimony
19      regarding these.
20                    THE COURT:  What about the other ones?
21      How can you substantiate who answered the phone or who
22      placed the call?
23                    MR. SMYTH:  Well, to this point, I can't
24      tell you who answered this phone or who made this
25      call.  From this point on, the testimony is that she
```

1    received a cell phone from Reinaldo Dennes and she

2    made a series of calls and she kept that phone

3    continuously until it was returned.

4              THE COURT:  Okay.  But that doesn't mean

5    she answered.

6              MR. SMYTH:  This would be --

7              THE COURT:  If you qualify that by saying

8    the phone in her presence or property but you can't

9    substantiate the fact that she is the one that

10   answered it.

11             MR. SMYTH:  But that's whose possession

12   the phone was.

13             THE COURT:  Let's make sure the jury is --

14   did you hear that?  Does that satisfy you?

15             MR. ODOM:  Yes, sir.  I continue my

16   objection, for the record, that would be for what I

17   believe would be marked as 167.

18             THE COURT:  Even though he qualifies the

19   fact that it is not saying those are the persons that

20   answered the phone, only those are the persons who had

21   the phone in their control of the property because

22   there has been testimony to that.

23             MR. ODOM:  That may also resolve Martinez

24   and it's not going to Roadmaster and see pat to.

25             MR. SMYTH:  That's who they testified who

1    used this cell phone and called that number, that

2    number, and then he talks about calling.

3               THE COURT:  How do you know which time?

4               MR. SMYTH:  We talked about a number of

5    phone calls.

6               THE COURT:  You don't know which one is

7    which?

8               MR. SMYTH:  Three what?

9               THE COURT:  Three minute call or one

10   minute call on Caesar.

11              MR. SMYTH:  Judge, the testimony was, once

12   she got the phone call, prior to going to work and she

13   made -- who she called on that cell phone.

14              THE COURT:  You have got to say three

15   minutes to Cepeda and the one minute call to

16   Roadmaster.

17              MR. SMYTH:  That's the only phone calls.

18              THE COURT:  You don't know which is

19   which?

20              MR. SMYTH:  She testified --

21              THE COURT:  And she talked to him for

22   three minutes.  That's what I am --

23              MR. SMYTH:  I can take the length of the

24   calls off, if that's a point of contention.  We can

25   certainly show she made those calls.  We can verify

1   that she did call, using the cell phone given to her

2   by Reinaldo.  She called that number and then she

3   talked about receiving calls and making calls to these

4   numbers.

5              THE COURT:  I don't have a problem with

6   that.  I wish you would go ahead and offer these

7   before you start talking about.

8              MR. SMYTH:  I can't offer until I talk

9   about them.  It's the fact -- equivalent to what Mr.

10  Odom has been doing, and it's a tremendous timesaving

11  device.  If I can't go back to -- if that's the way we

12  can get out the news print.

13             MR. ODOM:  I have to make my objection and

14  you know I have to make it at some point.

15             THE COURT:  Yeah, I understand.

16             MR. SMYTH:  I believe we are entitled to

17  do a summary of the voluminous records.

18             THE COURT:  I don't have any problem but I

19  don't want to add problems.

20             MR. SMYTH:  We will tie all this up, you

21  know, instead of going through, moving a piece of

22  paper out and uncovering things, we will tie all this

23  up and Mr. Odom can argue, at least prior to this

24  point, we don't know who was on this phone.

25             THE COURT:  Okay.  How do we correct that

1    problem?

2              MR. SMYTH:  I did not.  I can black this

3    out, if any phone, in regard to this is the only

4    number we need.

5              THE COURT:  Well, the jury is still seeing

6    it.

7              MR. SMYTH:  He hasn't made an objection.

8              THE COURT:  I thought he just did.

9              MR. SMYTH:  Give me a mark and I will

10   black out whatever you wanted to.

11             MR. ODOM:  What you might do, maybe put a

12   little piece of paper so they don't tie it up later,

13   and we can always delete it, only take the piece of

14   scotch tape out if they don't tie it up.  When it

15   comes off, tear it off.  The point is they can tie it

16   up later, then, obviously, it comes in and we can pull

17   it off or we can do something.  I don't want them to

18   deface the exhibit.  I want to try to do this in an

19   orderly fashion.  I see what he is trying to do and am

20   sympathetic in that regards.  I am worried what if

21   they don't tie it up later and then --

22             THE COURT:  Here is what we are going to

23   do.  See where you got "crime" and take that off and

24   put some "phone in possession or/and from"; do you

25   follow what I am saying?  Write above it "and/or," but

1      that's okay. That's fine.

2                  MR. SMYTH:  Anything else?

3                  MR. ODOM:  I would request that the charge

4      from the Court that this is for demonstrative

5      purposes.

6                  MR. SMYTH:  It's a summary of computer

7      record is what it is and, you know, they are going to

8      have a actual records there.  They can go back.

9                  A COURT:  I will.

10                  MR. ODOM:  It's not the numbers I am

11      complaining about.

12                  THE COURT:  I know what you are saying.

13                  MR. ODOM:  But I don't want them thinking

14      that some of this is not disputed.

15                  THE COURT:  I'll instruct that.

16                  (Whereupon, the following proceedings were

17      held before the jury.)

18                  THE COURT:  Ladies and gentlemen of the

19      jury, let me clarify:  These documents are not yet in

20      evidence, first off, and it is a summary of the

21      business records of the phone company, which are

22      admitted, and you will go over extensive.  Anything

23      you see that contradicts these documents, I would say

24      probably rely on the phone documents, since it is

25      complete recitation of what occurred and, again, this

1    is just a demonstrative tool but just a tool to help

2    speed the process along and to assist in the direct of

3    the witness.

4              Also, we have added up to the top "phone

5    calls from," we have added.  It's not necessarily from

6    these people because, in some instances, as has been

7    testified to, the records don't know and cannot show

8    you private individuals who made the calls or even

9    companies.  They can show you who owns the phone and

10   so on the left-hand side, just in keeping these calls

11   from these people or someone in possession, if that's

12   what the evidence shows in your mind that the phones

13   were in possession of these individuals at the time

14   these calls were made.  Do we understand that?

15             So once it says, for example, any one of

16   those "Estrella," there is no way, the State agrees,

17   the records don't show that's who made the phone call

18   and so you are not to assume necessarily that is the

19   person but you can look back on the evidence and

20   recall the State has proved to you that the phones

21   were in possession of those people and, again, it

22   doesn't mean that person made the phone call.

23             In that regard, remember that, when you

24   are listening to the testimony, and pay attention to

25   that.  So when you are deliberating, you have a chance

1    to read the business records, if they are introduced,

2    that you will have a chance to review those.  And if

3    there is any conflict with the business records, you

4    are to assume that the business records, which are

5    more a full indication of exactly who is called and

6    what was called and what number, I think that would be

7    a more accurate rendition of the evidence and, again,

8    this is a short rendition, to try to speed the process

9    up.

10                    MR. SMYTH:  May I approach?

11                    THE COURT:  Sure.

12         Q      (Mr. Symth)   Ma'am, I am going to take

13    158.  And can you tell, by looking at one of your

14    other exhibits in order, if somebody wants to read

15    these records, what is in this first column?  It says

16    "from phone number" and it gives the phone number.

17    That's the cell phone that placed the call?

18         A      Yes, it is.

19         Q      And the second phone number to which the

20    cellular phone called?

21         A      That is correct.

22         Q      And then it says "bill phone."  What does

23    that refer to?

24         A      It's the cellular number of the account

25    holder.

1        Q        Who is going to have to pay for that

2    two-minute call that lasted a minute and one second.

3                And then it says "call date." Is that the

4    date the phone call is made?

5        A        Yes.

6        Q        And then it says "time." Is that the time

7    that the phone call was made?

8        A        That's correct.

9        Q        And that's in 24-hour military time?

10       A        Yes, it is.

11       Q        And when it says "minute," is that the

12   minute they were charged, billed for?

13       A        Yes, it is.

14       Q        And out here shows the amount of the call

15   and things likes that?

16       A        Yes, sir.

17       Q        So somebody, to do what you are doing, you

18   are having to bounce back between three different

19   series of cell phone records to put this together; is

20   that correct?

21       A        Yes, sir.

22       Q        Now, if a cell phone receives an incoming

23   call, how does that show up on the bill?

24       A        It shows up under two phones and this

25   cellular number will appear.  If they received an

1     incoming call, it shows under column two "phone" and

2     their cellular number will appear.

3          Q      So if the cell number, say, 713-253-2023

4     receives an incoming call under the two phone column

5     is going to have that same phone number?

6          A      Yes, sir.

7          Q      The 253-2023.

8                 Under that the same bill 713-253-2023?

9          A      Yes, sir.

10         Q      And you will have the date that phone

11    received the incoming call and the time?

12         A      That's correct.

13         Q      And that's how you cross back and forth?

14         A      That's correct.

15         Q      If somebody wants to read those records,

16    they now know how to do it.

17         A      (Witness nods head.)

18         Q      I think we got as far as, I believe, the

19    cell phone number 383-7689 receiving an incoming call

20    at about 1639 hours; is that correct?

21         A      That's correct.

22         Q      Next I'll ask you to look again at State's

23    Exhibit 160 and tell me whether or not at 1640 hours

24    that particular phone number 382-2072 placed a call?

25         A      Yes, sir, it did, to 281-383-7689.

1      Q      And with regard to that last number, you

2    have read, the 383-7698, I ask you to look at --

3      A      89.

4      Q      -- State's Exhibit 159 and see whether or

5    not approximately that same time 1640 hours that the

6    phone received a call?

7      A      Yes, it did.

8      Q      I ask you now to look at 1640 hours with

9    respect to the 383-7689 number and see if they placed

10   a call?

11     A      At what time?

12     Q      1641 hours.

13     A      Yes, sir, they did place a call to

14   281-382-2072.

15     Q      And did that last phone number you read,

16   your records reflect they received a phone call at

17   approximately 1641 hours?

18     A      Yes, sir, it did.

19     Q      I ask you to go to 1647 hours with respect

20   to 383-7689.

21     A      Okay.

22     Q      Do you show that it placed a phone call?

23     A      1647?  That is correct.

24     Q      Yes, ma'am.

25     A      To the number 713-772-5543.

1      Q      And the number that the phone call was

2  713-772-5433?

3      A      That is correct.

4      Q      And your records don't tell us who that

5  subscriber was who received that call but the previous

6  testimony that number belongs to Caesar Cepeda.

7             Now, with respect to that same phone

8  number, let me ask you to look at 1656 hours.  Did

9  that same cell phone 383-7689 place a call?

10     A      Yes, sir, it did.

11     Q      What was the number called?

12     A      713-781-2345.

13     Q      Area 713-781-2345.  Again, your records

14  don't show who the holder of that cell phone or who

15  the holder of that number is, do you?

16     A      No, sir, we don't.

17     Q      Previous testimony indicates that number

18  came back to a Roadmaster Auto.

19             If you would, ma'am, look at State's

20  Exhibit 160.

21     A      Okay.

22     Q      I ask if you would look at 1738 hours,

23  which would be 5:38, correct?

24     A      No, sir, it's 4:38.

25     Q      1738 hours?

```
1       A       I thought you said 1638.

2       Q       1738 hours, which is 5:38 p.m., correct?

3       A       On exhibit 160?

4       Q       Right.  Does it show that cell phone

5    calling to any particular number?

6       A       I'm sorry.

7       Q       1738 on January 22, 1996?

8       A       No, sir, it does not.

9       Q       And you do not show a call?

10      A       On exhibit 160, on January 22nd at 1738?

11      Q       Right.

12      A       No, sir.

13      Q       1739?

14      A       1730.

15      Q       Does it show making a call at 1730?

16      A       Yes, sir, I do.

17      Q       What number does it call?

18      A       713-783-3522.

19      Q       1730?

20      A       Uh-huh.

21      Q       I ask you, if you will, look at State's

22   Exhibit 159, cell phone number 383-7689, and on that

23   same date, looking at 1740 hours --

24      A       Okay.

25      Q       -- does that show the cell phone making a
```

1    call?

2         A     Yes, it does.

3         Q     Who does it call?

4         A     281-382-2072.

5         Q     If you would, look then at that particular

6    cell phone number, which, I believe, is State's

7    Exhibit 160, and tell me whether or not that cell

8    number I read received a call at approximately 1740

9    hours?

10        A     Yes, it did.

11        Q     Now, staying with the last cell number,

12   382-2072 at approximately 1805 hours, does that the

13   cell phone?

14        A     Repeat the cell phone number.

15        Q     It's going to be State's Exhibit 160 and

16   and 382-2072.  It's going to be 1805 hours.  And does

17   it make a call?

18        A     Yes, it does.

19        Q     What number does it call?

20        A     713-783-3522.

21        Q     Ma'am, staying with that same cell number

22   in 160, and look for 1847 hours on the date.  Tell me

23   whether or not  -- January 22nd -- it makes a call?

24        A     Yes, it does.

25        Q     What number does it call?

1          A        713-253-2023.

2          Q        If you will look at cell phone records for

3     a 713-253-2023, tell me whether or not that cell phone

4     received a call at 1847 hours?

5          A        Yes, sir, it did.

6          Q        I ask you to go back now to State's

7     Exhibit 159 and look at same date we have been talking

8     about 1850 hours -- that's going to be cell number

9     383-7689 -- and tell me whether or not it made a call?

10         A        Yes, it did.

11         Q        What number did it call?

12         A        281-382-2072.

13         Q        And can you, also, now, ma'am, look at

14    that particular phone we called, at least, State's

15    Exhibit 159, and tell me whether or not it received a

16    call at 1850 hours, 281-382-2072, State's Exhibit 159.

17         A        At what time, sir?

18         Q        1850 hours.

19         A        I would like to verify 281-382-2072.

20         Q        That number, yes, ma'am, did it receive a

21    call at 1850 hours?

22         A        Yes, sir, it did.

23                  MR. SMYTH:  I mark this as 167.

24                  (Whereupon, State's Exhibit No. 167 and

25    168 were marked for identification.)

1            THE COURT:  All right.  Why don't you take

2    that down for one second.

3            (Whereupon, the following proceedings were

4    held before the Bench.)

5            THE COURT:  Question:  Is there anything

6    on this board, State's Exhibit 168, before showing to

7    the jury, anything on this board that you object to?

8            MR. ODOM:  Okay, once again.

9            THE COURT:  May I see it?  Go ahead.

10           MR. ODOM:  What the State has labeled has

11   168.

12           THE COURT:  Same problem.

13           MR. ODOM:  The same problem in that it

14   indicates who made certain phone calls, which is

15   nothing more than theory on the part of the State.

16           MR. SMYTH:  This one doesn't say anything

17   about them.

18           MR. ODOM:  Well, regardless but it's a

19   continuation of the earlier exhibits but it certainly

20   implies who made the phone calls, and it implies who

21   receives them.  For example, on "2018 J & S Precious

22   Stones, complainant Johnny Szucs," that's an argument

23   their theory.  That's not what the records per se say.

24   And I continue to object to the fact that they are

25   doing jury argument in essence here.

```
 1                    THE COURT:  I agree.  It's a lot of work.

 2                    MR. SMYTH:  Judge, these records reflect

 3        and will reflect at that particular time that this

 4        cell phone number made a call to this number.

 5                    THE COURT:  But you don't --

 6                    MR. SMYTH:  We have in evidence already.

 7                    THE COURT:  What you got to need -- or it

 8        implies to me that Mr. Szucs answered that phone call.

 9                    MR. SMYTH:  It doesn't indicate who

10        answered the J & S Precious -- none of this says who

11        answered the call.  It just says from this number to

12        that number, this being who had the phone at the time.

13        I mean, the other had the phone number and their

14        evidence shows possesses this phone is the registered

15        subscriber for that phone.

16                    MR. ODOM:  And that's part of the problem

17        we have got.  Estrella, who the phone is not

18        registered to, but testified she had called Reinaldo

19        Dennes, who there is no testimony who it is registered

20        to.

21                    THE COURT:  There was testimony.

22                    MR. ODOM:  There was testimony to that.

23        She said she called him repeatedly on this first time.

24                    THE COURT:  Okay.

25                    MR. ODOM:  That's conclusionary.
```

1              THE COURT:  I understand and I have got to

2      take care of it.  Go ahead.

3              (Whereupon, the following proceedings were

4      held before the jury.)

5              THE COURT:  Again, for clarification

6      purposes, the names that appear by these phone numbers

7      unless --

8              MR. SMYTH:  I am going to add "possess."

9              THE COURT:  All this means, according to

10     this diagram, these names are not necessarily -- do

11     not imply that these are the persons that made the

12     phone call or answered the phone call.  What this is

13     saying that the phone calls were made or received the

14     to those particular numbers at a time when those

15     particular individuals were supposedly in possession

16     of that particular cell phone.  There is no evidence

17     that it existed, specifically received the phone call

18     or specifically made one.  The evidence has shown, if

19     it does at all, that these phones were in possession

20     supposedly for the people at the time the calls were

21     received.

22             MR. SMYTH:  May I proceed?

23             THE COURT:  Yes.

24        Q     (Mr. Symth)    Still with

25     January 22, 1996, I ask you, if you will, look at the

1    phone number contained in 158, a phone that your

2    subscriber information shows that belongs to the

3    Francisco Santos Rojas, phone number 713-253-2023.   I

4    ask you to look at 1907 hours on that date.

5         A    Okay.

6         Q    And tell me whether or not that phone made

7    a call.

8         A    Yes, sir, it does, sir.

9         Q    What number did it call?

10        A    281-382-2072.

11        Q    Can you look at the phone number for

12   281-382-2072 and tell me whether or not they received

13   a call approximately 1907 hours?

14        A    Yes, they did.

15        Q    What were the length of those calls?

16        A    On State's Exhibit 158, the length of the

17   call was for one minute.  And State's Exhibit 160 the

18   length of the call was also for one minute.

19        Q    Staying with those two incoming phone

20   numbers, looking again with respect to State's Exhibit

21   158 and the same date, January 22, 1996, 1918 hours,

22   and see whether or not that phone number 713-253-2033

23   made a call?

24        A    Yes, sir, it did.

25        Q    What number did it call?

```
 1       A       281-382-2072.

 2       Q       And if you would, how long was that call?

 3       A       For one minute.

 4       Q       Would you look then to 281-382-2072 and

 5    it's going to be State's Exhibit 1630 and tell me

 6    whether or not approximately that time on that date

 7    if, 1918 hours, it received a call?

 8       A       Yes, sir, it did.

 9       Q       And what was the length of that call?

10       A       One minute.

11       Q       Now, ma'am, please, State's Exhibit 159,

12    look at 1925 hours on January 22, 1996 --

13       A       Okay.

14       Q       -- that's going to be 281-383-7689 -- and

15    tell me whether or not it made a call at approximately

16    1925 hours?

17       A       Yes, sir, it did.

18       Q       What number did it call?

19       A       281-382-2072.

20       Q       And what length of time was that call?

21       A       It was for one minute.

22       Q       And looking at State's Exhibit 163, tell

23    me at that time at 1925 hours if that particular cell

24    phone received a call?

25       A       Yes, sir, it did.
```

CCA

Court _26328_

Cause No. _750313_

THE STATE OF TEXAS

VS

_Reinaldo Deines_

On this the ___ day of _Nov_,

A.D. 19_7_, I, CHARLES BACARISSE,

District Clerk of Harris County, Texas

do hereby certify that the foregoing

___ duplicate volumes of statement

of facts were received and filed in the

```
 1        Q       And how long a time was that call?

 2        A       One minute.

 3        Q       If you will, ma'am, go to State's Exhibit

 4    159 and tell me with regard to that particular cell

 5    phone whether or not it made a call at 1939 hours?

 6        A       State's Exhibit 159?

 7        Q       Yes, ma'am.

 8        A       At 1939?

 9        Q       1939 hours on January 22, 1996.

10        A       No, sir, it did not.

11        Q       Did it make a call anywhere in the area of

12    1939 hours?

13        A       1943.

14        Q       Are we talking about area code

15    713-253-2023?

16        A       No, I'm not.  I'm not looking at that.

17        Q       I would like to talk about 158.

18        A       Okay, I have 158.

19        Q       158, January 22, 1996, look at 1939

20    hours.

21        A       Okay.

22        Q       Did that cell phone make a call?

23        A       Yes, it did.

24        Q       And what number did it call?

25        A       281-382-2072.
```

1          Q        And let me ask you, also, at approximately

2     1939 hours did it make a second call?

3          A        Yes, sir, it did.

4          Q        And what number was the second call

5     placed?

6          A        281-382-2072.

7          Q        Look at that number 281-382-2072.  What

8     was the length of those two calls in 1939?

9          A        They were for one minute each.

10         Q        Now, look at State's Exhibit 160, same

11    date 1-22-96, same time, 1939 hours, and tell me

12    whether or not it received any phone call?

13         A        Yes, sir, it did.  It received two calls

14    both at 1939.

15         Q        What was the length of the calls?

16         A        Both for one minute.

17         Q        Billed at one minute each?

18         A        Uh-huh.

19         Q        Now, if you would, ma'am, who back at

20    State's Exhibit 158 and the same date, 1-22-96,

21    approximately 1949 hours.

22         A        1949, State's Exhibit 158?

23         Q        Yes, ma'am.

24         A        I have a 1941.

25         Q        That's what I am asking you about.

```
1        A       Okay.

2        Q       Did that 713-253-2023 make a call?

3        A       Yes, it did.

4        Q       What number?

5        A       281-382-2072.

6        Q       What was length of the call?

7        A       It was one call.

8        Q       Would you look at State's Exhibit 160.

9   Did that phone number receive that call at that time

10  at 1941?

11       A       Yes, sir it did.

12       Q       Is that phone number 281-382-2072?

13       A       Yes, sir.

14       Q       And it received a call that lasted for how

15  long or billed for how long?

16       A       One minute.

17       Q       I ask you now to go to 159.

18       A       159, okay.

19       Q       The same date we have been talking about,

20  January 22, 1996.

21       A       Yes, sir.

22       Q       Look at 1943 hours and tell me whether or

23  not that phone made a call?

24       A       Yes, it did.

25       Q       What number did it call?
```

1      A       281-382-2072.

2      Q       How long was the call?

3      A       For one minute.

4      Q       If you would now, look at that number that

5  was called, 281-382-2072 number on State's Exhibit

6  160, and tell me whether or not it received a call.

7      A       Yes, sir, it did.

8      Q       And for what length of time was it billed?

9      A       For one minute.

10     Q       If you would, now, sticking with the

11 281-383-7689, looking at 1850 hours, same date, and

12 tell me whether or not that phone made a call?

13     A       Yes, it did.

14     Q       What number did it call?

15     A       281-382-2072.

16     Q       And what was the billing fee on that call?

17     A       One minute.

18     Q       If you would, look at that call on State's

19 Exhibit 160, I believe it's number 281-382-2072, and

20 tell me whether or not they received a call at 1850

21 hours?

22     A       Yes, they did.

23     Q       And for what length of time was that call?

24     A       For one minute.

25     Q       And I ask you now, ma'am, to stay with the

1      phone number you have, that's 281-382-2072.

2          A      Okay.

3          Q      And tell me whether or not at 2014 hours

4      that cell phone placed a call?

5          A      Yes, it did.

6          Q      What number did it call?

7          A      713-253-2023.

8          Q      What was the length billed for?

9          A      It was billed for two minutes.

10         Q      Would you now look at State's Exhibit 158,

11     which is the phone number 713-253-2023.

12         A      Uh-huh.

13         Q      And look at 2014 hours on 1-22-96 tell me

14     whether or not it received a call 2014 or 2015?

15         A      1-22, right, the date?

16         Q      Yes, ma'am.

17         A      I'm sorry.  It received a call at 2015.

18         Q      Does it also show that it received a call

19     at 2014?

20         A      No, sir.

21         Q      It doesn't show it received a call at

22     2014?

23         A      No, sir.

24         Q      For what length of time was that bill on

25     that incoming call to 713-253-2023?

```
1         A        Two minutes.

2         Q        It's a two-minute call?

3         A        Uh-huh.

4         Q        If you would, ma'am, look at State's

5    Exhibit 159 and ask you to look at 2018 hours.

6         A        Okay.

7         Q        Tell me whether or not that cell phone

8    made a call?

9         A        Yes, it did.

10        Q        And what number did it call?

11        A        281-382-2072.

12        Q        And for what length of time was that call

13   billed?

14        A        Two minutes.

15        Q        Would you now, ma'am, look at 160 and tell

16   me whether or not at approximately 2018 hours that

17   cell phone number 281-382-2072 received a call?

18        A        Yes, it did.

19        Q        And for what length of time was that call?

20        A        One minute.

21        Q        One minute?

22        A        Uh-huh.

23        Q        At 2018 hours, that's a one-minute call?

24        A        On January 22nd?

25        Q        January 22nd.
```

```
 1        A       At 2018.

 2        Q       And the call --

 3        A       Received an incoming call and it was

 4   billed for one minute.

 5        Q       One minute?

 6        A       Yes, sir.

 7        Q       Can you explain how it could be, if one

 8   cell phone calls another cell phone, the calling cell

 9   phone might have a two-minute charge and the receiving

10   phone call would only get a one-minute charge?

11        A       In laymen's terms, again, I may place a

12   call at 1:58, almost at 2:00, right?  So I am going to

13   be called for two, I am going to be billed for one

14   minute.

15        Q       Two seconds?

16        A       Two seconds and when it rolls over to one

17   minute.

18        Q       You guys understand that if somebody

19   doesn't answer quick enough?

20        A       Well, no, not if they don't, I won't be

21   billed.

22        Q       My question:  You make the call.  It goes

23   into the system at 1:58.  The person doesn't pick it

24   up on the other end, say, until 2:001?

25        A       Do they pick it up?
```

1      Q      If they don't pick it up, I'm not going to
2    be charged until I pick up my phone and it starts
3    running, right?
4      A      That's correct.  And I'm not going to
5    either unless I let that phone ring for over one
6    minute.
7      Q      But if it rang for thirty seconds before
8    somebody picked it up and picked it up and had a
9    59-second conversation, the phone that called would
10   get billed for two minutes?
11     A      That's correct.
12     Q      Because it would have been a minute and
13   twenty-nine seconds but the call, the phone that
14   received it, would only get billed for one minute
15   because the phone call was only for 59 seconds?
16     A      That's correct.
17     Q      Let me ask you, ma'am, if you would go
18   back to 158 and look to 2018 hours on 158, which is
19   this 713-253-2023, does that cell phone place a call?
20     A      Yes, it did.
21     Q      Can you tell the ladies and gentlemen of
22   the jury what number the cell phone called?
23     A      It called 713-784-1196.
24     Q      Can you tell us who that particular number
25   belongs to?

1          A       No, I cannot.

2          Q       From previous testimony we know --

3                  MR. ODOM:  Object to what we know, the

4     conclusionary nature, unless it is in question form to

5     the witness.

6                  THE COURT:  Sustained.

7          Q       (Mr. Symth)   Would you disagree with me

8     that I told you that it was Sergeant Waltman of the

9     Houston Police Department.

10                 MR. ODOM:  But to ask the question poses

11    the harm, that's what I am objecting to.

12                 THE COURT:  Sustained.

13         Q       (Mr. Symth)   Would disagree with Sergeant

14    Waltman if he said --

15                 MR. ODOM:  Judge, it assumes facts that

16    this witness has no knowledge and objectionable on the

17    facts.

18                 THE COURT:  Approach.

19                 (Whereupon, the following proceedings were

20    held before the Bench.)

21                 THE COURT:  This has become --

22                 MR. SMYTH:  What I asked her, if she would

23    disagree with Sergeant Waltman if he says that this

24    particular number comes back to J & S Precious Stones,

25    which is in testimony.

```
 1                  THE COURT:  How would she know?
 2                  MR. SMYTH:  She can say agree or disagree.
 3                  THE COURT:  How would she know?
 4                  MR. SMYTH:  I don't know how she would
 5     know.
 6                  THE COURT:  Because I don't think she
 7     knows either.  You have to reinforce.
 8                  MR. ODOM:  Knowledge of it, it is getting
 9     through the back door what he can't do direct.
10                  THE COURT:  I agree.
11                  MR. ODOM:  Second, ask the question on
12     this form.
13                  THE COURT:  Ask her what number it is.
14                  MR. SMYTH:  Of course she doesn't know.
15                  THE COURT:  Okay.
16                  (Whereupon, the following proceedings were
17     held before the jury.)
18          Q     (Mr. Symth)  So you don't know what this
19     number 713-784 -- or do you know?  713-784-1196 do you
20     know who that is?
21          A     No, sir, I don't.
22          Q     Okay.  That's fine.
23                I'll ask you to go back to your records,
24     ma'am, and look at State's Exhibit 160.  And that's
25     going to be cell phone number 281-382-2072, look at
```

1    2024 hours on January 24, 1996, and tell the ladies

2    and gentlemen of the jury whether or not that cell

3    phone placed a call?

4         A    On January 24th at what time?

5         Q    2024 hours. I am talking about State's

6    Exhibit 160.

7         A    Oh, I have 160.

8         Q    January 24, 1996, 2024 hours.

9         A    I don't have that.

10        Q    2023 hours -- what's the last phone call

11   you have got regarding that cell phone number?  What

12   do you have around it, 8:00 o'clock, 8:00 p.m.?

13        A    My last call in the local home area is

14   January 24th at 2011.

15             MR. SMYTH:  May I approach the witness?

16        Q    I meant to say 1-22 and I got confused.

17             1-22-96 at 2024 hours and ask you if you

18   will who at, see if you have a call approximately at

19   that time placed by that phone number, 2024 hours, no

20   seconds?

21        A    At 8:24, yes.

22        Q    What number did that phone 281-382-2072

23   call?

24        A    It called 713-253-2023.

25        Q    If you would, look at State's Exhibit 158

1      and tell me whether or not that cell phone number

2      received a call at approximately 2024 hours?

3           A      Yes, sir, it did.

4           Q      And what were the lengths of those calls,

5      billing time?

6           A      They were both one minute.

7           Q      Now, ma'am, I ask you to who back at

8      State's Exhibit 160 at approximately 2029 hours on

9      that same date of 1-22-96.

10          A      Uh-huh.

11          Q      And tell me if 281-382-2072 placed a call?

12          A      281-383-7689.

13          Q      And can you tell me what was the length of

14     the bill for that call?

15          A      One minute.

16          Q      Would you now, ma'am, look at State's

17     Exhibit 159 and tell me whether or not that

18     281-383-7689 received the call at approximately 2029

19     hours?

20          A      Yes, sir, it did.

21          Q      And what was the length of the bill for

22     that call?

23          A      One minute.

24                 MR. ODOM:  Judge, may I have a running

25     objection --

1                    THE COURT:  You may.

2                    MR. ODOM:  -- as to 169.

3                    MR. SMYTH:  May I proceed?

4                    THE COURT:  Tilt it this way.

5                    Okay.  The same comments, I gave you the

6      instructions, that I gave you on the other ones.

7           Q      (Mr. Symth)  Ma'am, now, I ask you to

8      refer to State's Exhibit 160 and look at the date of

9      January 23, 1996.  It's going to be a Tuesday.  Tell

10     me whether or not approximately 12:03, that's going to

11     be three minutes after noon, that particular cell

12     phone, 281-382-2072, placed a call?

13          A      Yes, it did.

14          Q      And what number did it call?

15          A      713-873-3522.

16          Q      What length of time was that call billed?

17          A      One minute.

18          Q      Excuse me.  What number?

19          A      713-783-3522.

20          Q      12:03 a.m. on January 23, 1996, I am

21     talking about State's Exhibit 160.

22          A      Okay.  It was 12:00, then it would be

23     12:03.  State's Exhibit 160 on January 23rd and the

24     telephone number, he had 281-382-2072 and the number

25     713-783-3522 at 12:03.

```
 1                    MR. SMYTH:  May I approach the witness,
 2       Your Honor?
 3                    THE COURT:  Certainly.
 4          Q        Is there a second call at 12:03 at 42
 5       hundredths hour?
 6          A        Yes, sir, there is.
 7          Q        42 seconds later?
 8          A        Yes, sir.
 9          Q        Let me ask you:  That is 42 seconds after
10       the first call?
11          A        Yes, sir.
12          Q        Can you tell me what number that cell
13       phone 281-382-2072 called?
14          A        713-710-0456.
15          Q        And how long was that call?
16          A        One minute.
17          Q        If you would, ma'am, continuing on that
18       same cell phone record, look at 12:08 and tell me
19       whether or not that cell phone received a call?
20          A        It received a call at 12:06.
21          Q        12:06?
22          A        Uh-huh.
23          Q        And is there a incoming call at 12:08?
24          A        No, sir, it is not.
25          Q        12:09?
```

1        A        No, sir.

2        Q        So the only incoming call in that area is

3        12:06?

4        A        That's correct.

5        Q        Can you tell me what the length of that

6        call was?

7        A        For two minutes.

8        Q        And you don't know where that call came

9        from?

10       A        No, I do not.

11       Q        I ask you, ma'am, if you will, look at

12       State's Exhibit 159, cell phone number 281-383-7689,

13       and look at 17:07 hours.

14       A        Okay.

15       Q        Tell me whether or not that cell phone

16       made a call?

17       A        Yes, it did.

18       Q        What number did it call?

19       A        713-781-2345.

20       Q        And approximately how long was the bill?

21       A        For one minute.

22       Q        If you would now, ma'am, go back to

23       State's Exhibit 160.

24       A        Okay.

25       Q        On the same date, January 23, 1996, I ask

1    you if you will look at approximately 1719 hours of

2    that cell phone 281-382-2072 did it make a phone call?

3         A       Yes, it did.

4         Q       And what number did it call?

5         A       713-783-3522.

6         Q       And for how long was that call?

7         A       It was a two-minute call.

8         Q       Staying with that same cell phone, did it

9    make another call on 1722 hours on the same date?

10        A       Yes, sir, it did.

11        Q       What number did it call?

12        A       713-783-3522.

13        Q       If you would, ma'am, go to State's Exhibit

14   159.

15        A       Okay.

16        Q       And on the same date, January 23, 1996, on

17   Tuesday, look at 1748 hours, 281-383-7689, and tell me

18   whether or not it made a phone call?

19        A       Yes, it did.

20        Q       For how long was that call?

21        A       It was for three minutes.

22        Q       And who did they call?

23        A       281-382-2072.

24        Q       If you would go to State's Exhibit 160,

25   which is the number 281-382-2072, and tell me whether

1       A       For two minutes.

2       Q       I ask you now, ma'am, to go to cell phone

3   number 281-382-2072, State's Exhibit 160, and tell me

4   approximately if at 1828 hours on January 23, 1996,

5   did it receive a call at 1828 hours?

6       A       Yes, sir, it did.

7       Q       And for how long did it receive a call?

8       A       Two minutes.

9       Q       Billed for two minutes?

10      A       That's correct.

11      Q       Staying with that same cell phone, ma'am,

12  asking you to look at 160, on the same date,

13  January 23, 1996, did they place a call at 1906?

14      A       Yes, they did.

15      Q       What number did that cell phone

16  281-382-2023 call?

17      A       Called 713-710-0456.

18      Q       And for how long was that call billed?

19      A       For one minute.

20      Q       I ask you now, ma'am, to look at State's

21  Exhibit 159, the same date January 23, 1996, look at

22  1922 hours.

23      A       Okay.

24      Q       Do you show the cell phone 281-383-7689

25  placing a call?

1      A     Yes, I did.

2      Q     What number did it call?

3      A     281-382-2072.

4      Q     For how long was the call billed?

5      A     One minute.

6      Q     I ask you to look at State's Exhibit 160,
cell phone 281-282-2072.  Look at 1923 hours.  Show me
whether or not they received a call?

9      A     Yes, they did.

10     Q     And how long was the call?

11     A     One minute.

12     Q     I ask you now, ma'am, to go to 158.

13     A     Okay.

14     Q     Look at January 23, 1996.

15     A     Yes, sir.

16     Q     And approximately 1935 hours and tell me
whether or not that cell phone 713-253-2023 made a
call?

19     A     Yes, sir, it did.

20     Q     What number did it call?

21     A     281-382-2072.

22     Q     And for how long was the call billed?

23     A     For one minute.

24     Q     And I ask you to look at State's Exhibit
160 with regard to cell phone number 281-382-2072 and

1    tell me whether or not you have it receiving a call at

2    1935 hours?

3        A        Yes, sir, I do.

4        Q        And for how long was the call billed?

5        A        For one minute.

6        Q        Jump back to State's Exhibit 158.

7        A        Okay.

8        Q        The same day, we are talking about

9    Tuesday, 1-23, 1996, and ask you, if you will, look at

10   1937 hours and see if the 713-253-2023 made a call?

11       A        Yes, sir.

12       Q        And what number did it call?

13       A        713-974-6137.

14       Q        And your records show that the alternative

15   to be called for Reinaldo Dennes with regard to cell

16   phone number 713-974-6137?

17       A        That is correct.

18       Q        And for what length was that call?

19       A        1937 hours on State's Exhibit 158, date

20   January 23, 1996.

21       A        At 1938?

22       Q        1937.

23       A        It was a one-minute call.

24       Q        Staying with that same cell phone number,

25   let me ask you if you will look at 1956 hours and see

1      if that cell phone 713-253-2023 placed a call?

2      A      Yes, sir, it did.

3      Q      And what number did it call?

4      A      281-382-2072.

5      Q      And for how long was the call?

6      A      It was for one minute.

7      Q      And, if you would, now go to State's

8      Exhibit 160, cell phone number 281-382-2072.  Look at

9      1956 hours on 1-23-96, and tell me whether or not they

10     received a call?

11     A      Yes, they did.

12     Q      For how long was that call billed?

13     A      For one minute.

14     Q      If you would, ma'am, go to State's Exhibit

15     159, cell phone number 281-383-7689, and look at 2000

16     hours.

17     A      Uh-huh.

18     Q      It's 8:00 p.m., right?

19     A      Yes, sir, it is.

20     Q      And tell me whether or not they placed a

21     call?

22     A      Yes, he did.

23     Q      What number?

24     A      281-382-2072.

25     Q      And look at State's Exhibit 160 and tell

1    me whether or not that cell phone received a call at

2    8:00 p.m. 2000 hours on 1-23-96?

3         A       Yes, sir, they did.

4         Q       And what was the length of that call?

5         A       One minute.

6         Q       Outgoing and incoming one minute?

7         A       Yes, sir.

8         Q       And finally, ma'am, I ask you to look at

9    State's Exhibit 158 and tell me whether or not on

10   1-23-96, 2017 hours, that cell phone placed a call,

11   that being 713-253-2023?

12        A       Uh-huh.

13        Q       What number did it call?

14        A       713-784-1196.

15        Q       And how long was that call billed?

16        A       One minute.

17        Q       Ma'am, I ask you to look for records of

18   January 24, 1996, Wednesday.

19               MR. ODOM:  May I continue my objections

20   to --

21               THE COURT:  Certainly.

22               MR. ODOM:  -- State's Exhibit 160?   May I

23   have an instruction?

24               THE COURT:  Very well.

25               Again, ladies and gentlemen, you are to

1    regard any entries to the people's names merely as

2    this is inconclusive again who made these calls or

3    received these phone calls.  The same instructions

4    apply to the following exhibits.

5            MR. SMYTH:  May I proceed?

6        Q    (Mr. Symth)  Ma'am, I ask you, first of

7    all, if you will look at a State's Exhibit.  It's

8    going to be 158.

9        A    Okay.

10        Q    And ask you, ma'am, if you will look at

11    1728 hours for the cell phone number 281-383-7689?

12        A    Exhibit 158?

13        Q    I'm sorry, it should be 159.

14        A    159.

15        Q    January 24th --

16        A    Uh-huh.

17        Q    -- 1996, Wednesday at 1728 hours.

18        A    Okay.

19        Q    Do you show that cell phone making a call?

20        A    Yes, I do.

21        Q    What number?

22        A    713-781-2345.

23        Q    And what's the length of bill for that

24    call?

25        A    Two minutes.

1        Q        Now, I ask you to go to State's Exhibit

2    160.

3        A        Okay.

4        Q        And look at 1747 hours regarding that cell

5    phone, 281-382-2072, and tell me whether or not they

6    made a call?

7        A        Yes, they did.

8        Q        What number did they call?

9        A        713-783-3522.

10       Q        And for what was the length of the call

11   billed?

12       A        It was two minutes.

13       Q        I ask you to stay with that cell phone

14   number and look at 1833 hours.

15       A        All right.

16       Q        Did they make a call or did that cell

17   phone make a call at 1733 hours?

18       A        Yes, they did.

19       Q        What number did they call?

20       A        281-383-7689.

21       Q        And what was the length of time billed

22   for?

23       A        Two minutes.

24       Q        And I ask you now to go to State's Exhibit

25   159 and look for January 24, 1996, at 1833 hours.

1        A        Okay.

2        Q        Tell me whether or not that the cell phone

3   received a call at 1833 hours.

4        A        Yes, sir, it did.

5        Q        And for what length of time were they

6   billed?

7        A        Two minutes.

8        Q        I ask you, ma'am, to stay with that, go to

9   State's Exhibit 160.

10       A        Okay.

11       Q        And tell me whether or not that cell phone

12   281-382-2072 placed a call at 1900 hours, which is

13   7:00 o'clock, correct?

14       A        That's correct.  Yes, sir, it did.

15       Q        And what number did it call?

16       A        713-253-2023.

17       Q        And what length of time was the call

18   billed?

19       A        One minute.

20       Q        I'll ask you if you go to State's Exhibit

21   158.

22       A        Okay.

23       Q        On January 24, 1996, and tell the ladies

24   and gentlemen of the jury whether or not at 1901 hours

25   that cell phone received a call?

1     A     Yes, sir, it did.

2     Q     What we are talking about the area code,

3     713-253-2023?

4     A     That's correct.

5     Q     What period of time was billed?

6     A     One minute.

7     Q     If you would now, go to State's Exhibit

8     160.

9     A     Okay.

10     Q     January 24, 1996.

11     A     Uh-huh.

12     Q     At 1912 hours.

13     A     Okay.

14     Q     And tell me whether or not that cell phone

15     281-382-2072 placed a call?

16     A     Yes, sir, they did.

17     Q     What number did they call?

18     A     281-383-7689.

19     Q     And for what length of time was that call

20     billed?

21     A     One minute.

22     Q     If you would, now, ma'am, go to number

23     159 --

24     A     Okay.

25     Q     -- and tell me whether or not that cell

1    phone received the call at 1912 hours?

2         A    Yes, sir, it did.

3         Q    And what was the length of the call

4    billed?

5         A    One minute.

6         Q    I ask you now, ma'am, to go to State's

7    Exhibit 158 --

8         A    Okay.

9         Q    -- on January 24, 1996, at 1924 hours,

10   tell me whether or not that cell phone 281-253-2023

11   placed a call?

12        A    Yes, it did.

13        Q    And what number did it call?

14        A    281-382-2072.

15        Q    And what was the length of the call?

16        A    One minute.

17        Q    I ask you now, ma'am, look at State's

18   Exhibit 160 regarding cell phone 281-382-2072.  Look

19   at 1924 hours and tell me whether or not they received

20   a call?

21        A    Yes, they did.

22        Q    What length of time was that call billed?

23        A    What was the time?  I'm sorry.

24        Q    1924.

25        A    Cell phone 281-382-2072, incoming call, it

```
 1      was a drop call.

 2           Q      A drop call?

 3           A      Uh-huh.

 4           Q      Does that record any time on it?

 5           A      No, sir, it does not.

 6           Q      It means it didn't pick up -- or what

 7      happened?

 8           A      We had network call and our system cut it

 9      off.  It wasn't a clear signal.

10           Q      A disconnect?

11           A      Disconnect.

12           Q      Did you guys disconnect it?

13           A      No, we didn't.  The towers, you know,

14      handing off from tower to tower, and apparently the

15      signal was weak and the call was dropped.

16           Q      Dropped call?

17           A      It was a dropped call.

18           Q      Let me ask you, then, looking back at

19      State's Exhibit 158 --

20           A      Okay.

21           Q      -- and ask you to tell me on the same date

22      at 1926, on 1-24-96, Wednesday, that cell phone

23      281-253-2023 placed a call?

24           A      Yes, sir, it did.

25           Q      And to what number did it call?
```

1        A        281-382-2072.

2        Q        Okay.  Did that call go through?

3        A        Yes, sir, it did.

4        Q        And what was the length of the call

5    billed?

6        A        Two minutes.

7        Q        Would you now look at State's Exhibit

8    160.

9        A        Okay.

10       Q        Look at January 24, 1996, a Wednesday, at

11   1926 hours, and tell me whether or not that cell phone

12   281-382-2072 received a call?

13       A        Yes, it did.

14       Q        And what was the length of time the call

15   was billed?

16       A        Two minutes.

17       Q        Was it a completed call?

18       A        It was completed.

19       Q        That's going to be at 7:26?

20       A        1926, 9:26 p.m.

21       Q        I ask you now, ma'am, to look at State's

22   Exhibit 128.

23       A        State's Exhibit what?

24       Q        Excuse me, 158.

25       A        Okay.

1          Q          Cell phone, 281-253-2023.  Look at 1930
2     hours.

3          A          Okay.

4          Q          Did they place a phone call?

5          A          Yes, they did.

6          Q          Who did they call?

7          A          281-382-2072.

8          Q          And for what length of time was that call?

9          A          Two minutes.

10          Q          Would you now look at State's Exhibit 160
11     and tell me whether or not that cell phone received
12     that call on or about 1930 hours?

13          A          Yes, sir, they did at 1931.

14          Q          1931; is that another one you call two
15     minutes?

16          A          Right.

17          Q          And for what length of time was that cell
18     phone bill?

19          A          Two minutes.

20          Q          I ask you now, ma'am, to look at 1934
21     hours, which would be 7:34 p.m., on January 24, 1996,
22     and tell the ladies and gentlemen of the jury whether
23     or not that cell phone 281-383-7689 placed a call?

24          A          I'm sorry.  What date in time?

25          Q          January 24, 1996, Wednesday, at 1934

1    hours.

2         A    Uh-huh, 7:34, p.m. They placed a call.

3         Q    And what number did they call?

4         A    281-382-2072.

5         Q    And what length of time was that call?

6         A    Ten minutes.

7         Q    Ten minutes?

8         A    Uh-huh.

9         Q    Let me ask you now, if you will, look at

10   State's Exhibit 160, regarding cell phone number

11   281-382-2072, and tell the ladies and gentlemen of the

12   jury whether or not they received a call.

13        A    Yes, they did.

14        Q    And for what length of time was that call?

15        A    Ten minutes.

16        Q    You don't know anything about the 911 call

17   records that are in evidence now?

18        A    No, I don't.

19        Q    And I ask you now to go forward to the

20   same date, January 24, 1996.

21        A    Which exhibit?

22        Q    It's going to be 158.  I ask you, if you

23   would, ma'am, to look at that cell phone number

24   713-253-2023 and tell me if at 1949 that cell phone

25   placed a call?

1      A      What exhibit?

2      Q      Exhibit 158.

3      A      Exhibit 158, January 24th, a Wednesday.

4      Q      At 1949 hours.

5      A      Yes, sir, they did place a call.

6      Q      Can you tell me what number they called?

7      A      281-382-2072.

8      Q      For what length of time was that call

9  billed?

10     A      One minute.

11     Q      Could you look at State's Exhibit 160 and

12 tell me whether or not that cell phone at 1949 hours

13 received a call?

14     A      Yes, sir, it did.

15     Q      And we are talking about 281-382-2072?

16     A      That's correct.

17     Q      And for what length of time was it billed?

18     A      One minute.

19     Q      I ask you now, ma'am, to stay with that,

20 the same phone number 281-382-2072 and tell me whether

21 or not at 2004 hours, which I guess is 8:04 p.m. --

22     A      Yes, sir.

23     Q      -- that cell phone placed a call?

24     A      Yes, sir.

25     Q      And to what number did it call?

1        A        713-710-0456.

2        Q        And for what length of time were they

3    billed?

4        A        One minute.

5        Q        I ask you now, ma'am, to look at State's

6    Exhibit 158.

7        A        Okay.

8        Q        And tell the ladies and gentlemen of the

9    jury approximately at 2005, which is 8:05 p.m. on

10   January 24, 1996, that cell phone, 713-253-2023,

11   placed a call?

12       A        Yes, sir, it did.

13       Q        And you need to tell the ladies and

14   gentlemen of the jury what number it called.

15       A        281-382-2072.

16       Q        And for what length of time was that call

17   billed?

18       A        Two minutes.

19       Q        And I ask you now, ma'am, to look at

20   State's Exhibit 160.  --

21       A        Okay.

22       Q        -- cell phone number, 281-382-2072, and

23   tell me whether or not at 2005 hours, 8:05 p.m., that

24   cell phone received a call?

25       A        Yes, it did.

1       Q       And what length of time was that call

2  billed?

3       A       Two minutes.

4       Q       I ask you, ma'am, to go back to State's

5  Exhibit 158.

6       A       Okay.

7       Q       And I ask you to look at 2011 hours for

8  that cell phone and tell me whether or not they placed

9  a call?

10      A       Yes, they did.

11      Q       What number did they call?

12      A       281-382-3072.

13      Q       What length of time was that call billed?

14      A       One minute.

15      Q       I ask you to look at State's Exhibit 160,

16 January 24, 1996, Wednesday, at 2011 hours, 8:11 p.m.,

17 and tell me whether or not that cell phone received a

18 call?

19      A       Yes, it did.

20      Q       And for what length of time was it billed?

21      A       One minute.

22      Q       I ask you to stay with the same cell

23 phone.  And do you have records of that cell phone,

24 State's Exhibit 160, does it have roaming information

25 on it?

```
1          A       Yes, sir.

2          Q       I ask you to look for some roaming

3     information regarding that cell phone, 281-382-2072,

4     at approximately 2358 hours -- that's going to be

5     11:58 p.m. -- on January 24, 1996, and look for your

6     roaming.

7          A       Okay.

8          Q       On January 24, 1996, Wednesday, at 2358

9     hours, do you show a roaming charge, a roaming call,

10    being made by that cell phone?

11         A       I sure do.

12         Q       What number did 281-382-2072 call?

13         A       713-710-0456.

14         Q       Okay.  And what was the station or the

15    cell that phone called out of?

16         A       Lake Charles tower picked up the cell

17    phone and allowed the caller to place the call.

18         Q       That would mean this call was placed from

19    outside the Houston area?

20         A       That's correct.

21         Q       How far can I go east toward Lake Charles

22    and still hit a Houston cell?

23         A       Beaumont and a little past Beaumont.

24         Q       You've got to be at least past Beaumont to

25    have to hit?
```

1      A      The phone was in Louisiana when they

2  placed the call.

3      Q      This cell phone was already in Louisiana

4  when it placed that call?

5      A      Uh-huh.

6      Q      Somewhere close enough to Lake Charles?

7      A      The Lake Charles tower picked up this

8  phone.

9             THE COURT:  Okay, ladies and gentlemen,

10  it's 3:15.  Take about a 15 minute break.

11             (Recess taken.)

12             (Jury came into the courtroom.)

13             THE COURT:  Thank you.  Be seated.  While

14  you were out, we found six more charts.

15             Please proceed.

16             MR. SMYTH:  Thank you, Judge.

17      Q      Ms. Horton, I ask you to continue looking

18  at your roaming chart and your roaming information

19  regarding cell phone number 281-382-2072.

20             THE COURT:  The same instructions on the

21  chart, ladies and gentlemen.

22      Q      Do you have that roaming information?

23      A      Yes, sir.

24      Q      I ask you, looking at your roaming

25  information, we now go to January 25, 1996, a Thursday

1    morning, and ask you to look at approximately ten

2    minutes after midnight.

3         A        Okay.

4         Q        That would be ten minutes into the new

5    day?

6         A        Uh-huh.

7         Q        And regarding that particular cell phone,

8    did it place a call at that time, ten minutes after

9    midnight?

10        A        Yes, it did.

11        Q        And to what number did it place a call?

12        A        713-710-0456.

13        Q        And for how long was that call?

14        A        One minute.

15        Q        And can you tell me whether or not that

16   was a local call or hit a cell tower outside of the

17   Houston area?

18        A        It was a roamer call and it placed a long

19   distance call back to the Houston area.

20        Q        And what cell roamer tower?

21        A        Lake Charles, Lake Charles tower, Lake

22   Charles, Louisiana, loaded the roamer to place the

23   call.

24        Q        How long was that call?

25        A        One minute.

1        Q       Billed for one minute.

2                I ask you now, ma'am, staying with that

3    same cell phone, 281-382-2072, to see whether or not

4    it placed a roamer call at 0119 hours?

5        A       Yes, it did.

6        Q       And what number did it call?

7        A       713-710-0456.

8        Q       And how long was that call?

9        A       One minute.

10       Q       And out of what cell phone tower was that

11   call made?

12       A       Lake Charles, Louisiana.

13       Q       I ask, if you will, staying with the same

14   phone number, look at 0121 hours, two minutes after

15   the next call, is there an incoming call received?

16       A       Yes, sir, it is.

17       Q       What cell does the incoming call hit in

18   order for the cell phone to connect?

19       A       Lake Charles, Louisiana.

20       Q       What is the length of time billed for that

21   incoming call?

22       A       Two minutes.

23       Q       And, again, all of these are going to be

24   at least to that same cell phone.

25                I ask you, if you will, look at that cell

1      phone and tell the jury whether or not at 0807 hours

2      that cell phone again placed a call?

3          A       Yes, it did.

4          Q       And what number did it call?

5          A       713-710-0456.

6          Q       What length of time was that?

7          A       One minute.

8          Q       Out of what cell?

9          A       Lake Charles, Louisiana.

10         Q       Let me ask you, staying with the same

11     phone number, did that cell phone receive a call at

12     0809 a.m.?

13         A       Yes, sir.

14         Q       On January 25, 1996?

15         A       Yes, it did.

16         Q       And what cell picked up that incoming

17     call?

18         A       Lake Charles, Louisiana.

19         Q       For what length of time was that call?

20         A       One minute.

21         Q       Again, staying with that same phone

22     number, and tell the ladies and gentlemen whether or

23     not at 1138, a.m., that cell phone placed a call?

24         A       Yes, it did.

25         Q       And from what number was called?

1       A       713-783-3522.

2       Q       And what was the length of that call

3   billed?

4       A       One minute.

5       Q       And at 1138 what cell did that phone come

6   out of?

7       A       New Orleans, Louisiana.

8       Q       And that's at 1138 on the 25th out of New

9   Orleans, Louisiana?

10      A       Yes, sir.

11      Q       I ask you, ma'am, to look at State's

12  Exhibit 158 (sic).

13      A       Okay.

14      Q       And tell me whether or not that cell phone

15  at 1245 on 1-25-96, a Thursday, placed a call.  That

16  will be cell phone number, 281-383-7689, and I think

17  we are talking about this cell phone right here?

18      A       Exhibit 159.

19      Q       Correct.  Did its cell phone 68 A place a

20  call?

21      A       On 1-25 at 12:45 p.m.?

22      Q       Yes, ma'am.

23      A       Yes, it did.

24      Q       What number did it call?

25      A       713-783-3522.

1          Q        I ask you, ma'am, to go to State's Exhibit

2     158.

3          A        Okay.

4          Q        Look at January 25, 1996.

5          A        Uh-huh.

6          Q        And tell me whether or not at 1526 hours

7     -- excuse me, 1446 hours, cell phone 713-253-2023

8     placed a call?

9          A        Yes, it did.

10         Q        And what number did it call?

11         A        713-974-6137.

12         Q        And what was the length of that call?

13         A        One minute.

14         Q        Let me get you to go back to State's

15     Exhibit 159, the proceeding call at 1255.

16         A        State's Exhibit 159.

17         Q        Right.  A call at 2045?

18         A        Uh-huh.

19         Q        I believe you previously testified that

20     the phone call was 713-783-3522?

21         A        Uh-huh.

22         Q        And what was the length of that call?

23         A        For two minutes.

24         Q        Now, go to State's Exhibit 160.  On

25     January 25, 1996, can you tell me whether or not at

1      1526 hours for that number 281-382-2072 placed a call?

2          A      I'm sorry, exhibit 160?

3          Q      160.  January 25, 1996.

4          A      Is this a roamer call?

5          Q      A roamer call, I'm sorry.  I'll try to

6      keep myself straight.  It's a roamer call.

7          A      At 1615?

8          Q      No, ma'am, at 1526.

9          A      One moment, okay.

10         Q      1526 on January 25, 1996, did that cell

11     phone 281-382-2072 place a roamer call?

12         A      Yes, they did.

13         Q      What number was called?

14         A      713-710-0456.

15         Q      What cell was hit?

16         A      Pensacola, Florida.

17         Q      If you would, ma'am, I ask you to look at

18     State's Exhibit 158.  Do you still got that?

19         A      One minute.

20         Q      The one at 1527.

21         A      1527, two minutes.

22         Q      I'm sorry.  I lost myself.

23         A      One minute.

24         Q      One minute.  You are right.

25                Now, staying with that same roaming, stay

```
 1    with 160, roaming calls, did that phone number

 2    281-382-2072 receive a call at 1527?

 3         A     That's correct.

 4         Q     Can you tell the Court how long was that

 5    call billed for?

 6         A     For two minutes.

 7         Q     And what cell did that phone incoming call

 8    go through?

 9         A     Pensacola, Florida.

10         Q     I ask you now to go to State's Exhibit

11    158.

12         A     Okay.

13         Q     I ask you to look at State's Exhibit 158.

14         A     Uh-huh.

15         Q     Look at January 25, 1996, and look at 1528

16    hours.

17         A     All right.

18         Q     Did that cell phone 713-253-2023 place a

19    call.

20         A     Yes, it did.

21         Q     And what number did it call?

22         A     281-382-2072.

23         Q     And for how long was that call billed for?

24         A     Two minutes.

25         Q     I ask you, ma'am, to stay with that same
```

1   record and look at 1530 hours.

2       A       Okay.

3       Q       Did the cell phone place another call?

4       A       Yes, they did.

5       Q       And what number did that cell phone call?

6       A       281-382-2072.

7       Q       And for what length of time was that call

8   billed?

9       A       Two minutes.

10      Q       I ask you now to go back to State's

11  Exhibit 160 and look at the roaming charges.

12      A       Okay.

13      Q       And see if that cell phone 281-382-2072

14  received a phone call at approximately 1530 hours?

15      A       Yes, it did.

16      Q       And what length of time was that call

17  billed?

18      A       One minute.

19      Q       This is 1530?

20      A       1530, January 25th?

21      Q       Right.  One minute call?

22      A       Uh-huh.

23      Q       Is that the same type of thing we have

24  been talking about, a cell phone making a call, it can

25  be charged two minutes?

1     A     Right.

2     Q     And to receive a call can only get charged

3  for one minute?

4     A     Yes, sir.

5     Q     And what cell did that phone hit?

6     A     Pensacola, Florida.

7     Q     I ask you, ma'am, to again check your

8  records regarding State's Exhibit 158 --

9     A     Okay.

10    Q     -- and ask you to look at 1537 hours for

11 cell phone 713-253-2023.  Tell me whether or not it

12 placed a call.

13    A     Is that on January 25th?

14    Q     January 25, 1996.

15    A     Yes, they did.

16    Q     And what number was called?

17    A     281-382-2072.

18    Q     And what was the length of the call?

19    A     One minute.

20          MR. ODOM:  For the record, I continue to

21 object to State's Exhibit 172.

22          THE COURT:  Thank you.

23          MR. ODOM:  I ask for an instruction.

24          THE COURT:  Well, I gave it.  Same

25 instruction for this exhibit, ladies and gentlemen, as

1    previously stated in the series.

2         Q         (Mr. Symth)   I ask you to look at State's

3    Exhibit 160 regarding the roamer calls for cell phone

4    number 281-382-2072 -- and, I'm sorry, tell the ladies

5    and gentlemen of the jury whether or not that cell

6    phone received a call at approximately 1537 hours on

7    that day?

8         A         On what day?

9         Q         1-25-96.

10        A         1537, yes, it did receive an incoming

11   call.

12        Q         What length of time was that call billed?

13        A         One minute.

14        Q         What cell was hit?

15        A         Pensacola, Florida.

16        Q         I ask you to refer back to State's Exhibit

17   158.

18        A         Okay.

19        Q         Look again and see if there is a second

20   call placed by that cell phone at 1537 on 1-25-96.

21        A         Yes, sir, it is.

22        Q         And what number is called?

23        A         281-382-2072.

24        Q         And what's the length of that call?

25        A         One minute.

1      Q      And I ask you to look at the roaming call
2   for State's Exhibit 160, see if that cell phone
3   receiving a call at 1571 hours, 281-382-2072.
4      A      Yes, it does.
5      Q      What's the length of time that call was
6   billed?
7      A      One minute.
8      Q      One minute?
9      A      Uh-huh.
10     Q      What cell was hit with regard to that
11  call?
12     A      Pensacola, Florida.
13     Q      I ask you to look back at State's Exhibit
14  158 for January 25, 1996, 1539 hours.
15     A      Yes, sir.
16     Q      It's going to cell phone 713-253-2023.
17  Did that make a call?
18     A      Yes, they did.
19     Q      What number did they call?
20     A      713-974-6137.
21     Q      What was the length of that call?
22     A      One minute.
23     Q      I ask you to stick to the roaming,
24  281-382-2072, and ask you to who at Friday,
25  January 26, 1996.

1       A       Uh-huh.

2       Q       Look at 1132 hours.

3       A       Okay.

4       Q       Did that phone make a call?

5       A       Yes, it did.

6       Q       What number did it call?

7       A       713-783-3522.

8       Q       And what was the length of time for the

9   bill?

10      A       One minute.

11      Q       I ask you, ma'am, to look at State's

12  Exhibit 158 for January 26, 1996.

13      A       Okay.

14      Q       And see whether or not at 1516 hours that

15  cell phone 713-253-2023 placed a call?

16      A       Yes, it did.

17      Q       And what number did it call?

18      A       281-382-2072.

19      Q       And what was the length of that call?

20      A       Two minutes.

21      Q       And I ask you, if you will, look back at

22  State's Exhibit 160 for January 25th (sic), looking

23  for roamer charges, and tell the ladies and gentlemen

24  of the jury whether or not at 1516 or 1615, in that

25  area, that cell phone received a call.

1        A        January 25?

2        Q        Yes, sir, Friday, the 26th.

3        A        I show the 26th.

4        Q        Do you show any roamer calls from Miami,

5    Florida?

6        A        Out of where?

7        Q        Miami, Florida.  We are on State's Exhibit

8    160.

9        A        I'm sorry.  I am looking at 160.  I don't

10   see it, Mr. Smyth.  I'm sorry.  I have it.  I'm sorry.

11   Small print, page 15.

12       Q        Would you read the small print?

13       A        On January 26th, at 4:15, the cellular

14   received an incoming call and it lasted for one

15   minute.

16       Q        And that's out of Miami?

17       A        Miami, at military time 1516.

18       Q        Can you explain why a call placed on

19   apparently, why a cell phone call 713253 placing a

20   call to that number at 1516 would show on the number

21   called basically 1615?

22       A        Uh-huh.  Miami, Florida, is on east coast.

23       Q        It's different time?

24       A        Different time zone.  We are central and

25   they are Eastern.

```
 1          Q       And it's five minutes to 5:00 in Miami

 2   now?

 3          A       Yes, sir.

 4          Q       If I call Miami now, they are going to be

 5   receiving that call at five minutes to 5:00?

 6          A       That is correct.

 7          Q       Whether it hit the --

 8          A       Yes, sir.

 9          Q       That's the way they recorded it?

10          A       Yes, sir.

11          Q       That would be the same sequence of calls?

12          A       That is correct.

13          Q       I forgot.  Anything I should have asked

14   you?

15          A       Please don't, no, sir.

16                  MR. SMYTH:  Pass the witness.

17                  THE COURT:  Mr. Odom.

18

19                        CROSS EXAMINATION

20   BY MR. ODOM:

21          Q       My name is Wendell Odom.  We have met

22   briefly.  I'm not going to ask you about all those

23   phone calls.  I'm going to ask you some general

24   questions, a lot of which are obvious, and may have

25   already been commented upon.
```

1                But before I do, there is one thing I

2     would like to inquire about is you stated that phone

3     number out of exhibit 160, which is 281-382-2072 272

4     --

5          A     Yes, sir.

6          Q     -- and that was disconnected by a call

7     from a Mr. Dennes?

8          A     Uh-huh.

9          Q     And what was that date?

10         A     February 21, 1996.

11         Q     Do your records indicate which Mr. Dennes

12    made that phone call?

13         A     No, sir, it does not.

14         Q     It just says a Mr. Dennes?

15         A     But Mr. Dennes verified his social

16    security number before we processed his request.

17         Q     I believe you also testified that in

18    regards to a second number in Mr. Dennes' name, that

19    being State's Exhibit 159, 281-383-7689 --

20         A     Yes, sir.

21         Q     -- that your records did not indicate a

22    date of closing on that particular number?

23         A     No, sir, it does not.

24         Q     Now, when we look at these charts -- and

25    all you know when you are looking at your records is

1   you know who it is that the phone is registered to by

2   looking at your records; is that a fair statement?

3          A       Yes, sir, it is.

4          Q       You, also, know what number was called,

5   and if you have the proper records in front of you,

6   where that call was received; isn't that a fair

7   statement?

8          A       Yes, sir, it is.

9          Q       You also have some indication of how long

10  the phone call was, although you don't always, your

11  records don't always indicate whether there was a

12  conversation, does it?

13         A       That's correct.

14         Q       Many times someone, especially on a minute

15  call, someone can be called and there can be

16  situations where there is no conversation at all

17  because the machine that records this puts it in your

18  records what they are recording is a connected call,

19  not a conversation, such?

20         A       That is correct.

21         Q       And that can happen fairly often, can it

22  not?

23         A       That's true.

24         Q       Anyone that has any type of answering

25  machine you would show a one-minute call whether

1      someone talked on that phone call or not, correct?

2           A      Did the answer machine pick up?

3           Q      Yes, ma'am.

4           A      We would show it as a completed call.

5           Q      Are there other instances where you could

6      show a completed call wherein there may not be a

7      conversation?

8           A      If the customer, if the user of the phone

9      allows it to ring for more than one minute, the system

10     will begin to bill that customer.

11          Q      And I think Mr. Smyth -- if he didn't

12     comment -- he indirectly brought that out if someone

13     keeps letting the phone ring and it goes over a

14     minute, then it is going to reflect as a call?

15          A      That is correct.

16          Q      Are there other instances other than the

17     obvious where someone can pick up the phone and not

18     say anything?  Are there any other instances where you

19     can have been billing times and there not be a

20     conversation?

21          A      Not that I am aware of.

22          Q      Neither am I in that regard.

23                 Your records do not indicate that, for

24     example.

25                 MR. ODOM:  May I approach the chart?

1        Q        State's Exhibit 171, we are showing
2   Reinaldo Dennes and we are showing Francisco Rojas,
3   correct?

4        A        Yes, sir.

5        Q        What you know is that Mr. Dennes has that
6   phone taken out in his name, correct?

7        A        That's correct.

8        Q        What your records show is that Mr. Rojas
9   has the phone taken out in his name, correct?

10       A        That's correct.

11       Q        And, then, when we get over hear to
12   Estrella Martinez, your records do not show that Ms.
13   Martinez has the phone taken out in her name?

14       A        That's correct.

15       Q        And as far as calling at Designs by
16   Reinaldo, your records would not reflect who it is
17   they may have called?

18       A        That is correct.

19                (Whereupon, the following proceedings were
20   held before the Bench.)

21                THE COURT:  I just want the record to
22   reflect that Mr. Odom held up the exhibit 171 when he
23   questioned this witness in the view of the witness and
24   the jurors as well.

25                (Whereupon, the following proceedings were

1        held before the jury.)

2            Q      Now, Ms. Horton, if someone is making a

3        phone call, for example, from Ecuador to a cellular

4        phone, would that in any way be reflected in any of

5        your records?

6            A      Yes, sir.  The subscriber will receive an

7        incoming call.

8            Q      But would it show where the incoming call

9        was coming from?

10           A      No, sir, it would not.

11           Q      The only way you can make such a

12       comparison is, if we did what Mr. Smyth did this

13       afternoon, and, that is, have a copy of two different

14       phones and show corresponding phones; isn't that fair

15       statement?

16           A      It's a fair statement.

17           Q      From Ecuador, through phone record or

18       through some long distance exchange that reflects

19       that, right?

20           A      Yes.

21           Q      The same thing would be true if we had

22       calls from other person's apartments or residences

23       here, in Houston, which were not reflected in State's

24       Exhibit 160, 159 or 158, if these -- if a phone call

25       is received, you are not going to be able to identify

```
 1      it in your records unless there is a corresponding

 2      cell phone that is coming from or you have the number

 3      in another exhibit; do you follow me?

 4           A      Yes, sir, that's correct.

 5                  MR. ODOM:  That's all I have.

 6                  THE COURT:  Thank you, Mr. Odom.

 7                  Anything further, Mr. Smyth?

 8                  MR. SMYTH:  I have no questions.

 9                  THE COURT:  May she be excused?

10                  MR. ODOM:  Yes, sir.

11                  THE COURT:  Thank you very much for your

12      testimony.

13                  Call our next witness, please.

14                  MR. SMYTH:  Sam Solomay.

15                  THE COURT:  You may proceed.

16

17

18

19

20

21

22

23

24

25
```

1                              SAM SOLOMAY,

2      was called as a witness for the State and, having been

3      duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5      BY MR. SMYTH:

6                     MR. SMYTH:  Let me tender to defense

7      counsel a copy of Mr. Solomay's statement.

8           Q     Sir, will you, please, state your name and

9      speak loud enough for the entire jury.

10          A     Sam Solomay.  S-o-l-o-m-a-y.

11          Q     And how are you employed, sir?

12          A     I am employed by Diamond World, Inc.

13          Q     And what is Diamond World, Inc.?

14          A     A diamond wholesaler.

15          Q     And where is your office?

16          A     6222 Richmond, Suite 875, Houston, Texas.

17          Q     Is that the Greenrich Building?

18          A     Yes, sir.

19          Q     And how long have you been in the diamond

20     business?

21          A     I have been in the diamond business for a

22     long time but I've been totally devoted to it for the

23     last six years.

24          Q     During his lifetime, did you know somebody

25     by the name of Janos Szucs?

1      A      Yes.

2      Q      Did you know him by Janos Szucs or by some

3   other name?

4      A      Johnny.

5      Q      Does everybody in the Greenrich Building

6   call him Johnny?

7      A      Yes.

8      Q      How long had you known or how long did you

9   know Johnny Szucs?

10     A      Approximately since 1986, or '87, almost

11  like ten years.

12     Q      Ten years or so.

13            Did you have business deals with him where

14  you sold him merchandise or he bought merchandise from

15  you?

16     A      We had several different businesses

17  together.  We bought and sold to each other.  We

18  consigned to each other.  We went into partnerships

19  with each other.  It was different types of businesses

20  together.

21     Q      In the diamond business, it's a little bit

22  different than a lot of other businesses, isn't it?

23     A      Yes, sir.

24     Q      You do a lot of things on the hand

25  shake --

1      A      Yes.

2      Q      -- where you come in and I have got a

3  five-carat diamond that you want to try and make a

4  profit on and I am going to make a profit and I give

5  you only, sign a piece of paper, that says you got it?

6      A      Yes.

7      Q      And I put that in my file.  And if you

8  sell it, you give me my proceeds.  If you don't sell

9  it, you give it back to me, or if I want it back, you

10  give it back to me?

11      A      Yes.

12      Q      Is that the customary way the business is

13  in the diamond business?

14      A      All of them.

15      Q      And you can do that, pick up and, say, you

16  got any five-carat diamonds.

17      A      We can do it by telephone, interstate or

18  sometimes internationally.  Sometimes we do it on a

19  hand shake, even without papers, if we know each other

20  very well.  It's based on trust.

21      Q      When you have a diamond that you have let

22  somebody have, you say they have it on memo?

23      A      On memo or consignment.

24      Q      Memo or consignment, if somebody has got

25  some of your diamonds, your diamonds are out on memo?

1          A       Yes.

2          Q       And being on memo or things like that?

3          A       Yes.

4          Q       Is the diamond business is it a

5    competitive business?

6          A       Very competitive.

7          Q       Is it the type of business where you are

8    not going to tell me who your customers are and I

9    might not even ask who they are.  If I want a

10   five-carat diamond and I am in the diamond business,

11   who are you going to sell it to?

12         A       No.

13         Q       You either give it to me or you don't?

14         A       I wouldn't tell you my customers or my

15   suppliers.

16         Q       So nobody tells anything.

17                 After business, the business closes, do

18   you guys sit down and have a drink together and talk

19   about things?

20         A       Yes.

21         Q       During business hours, it's pretty

22   competitive?

23         A       There is no time for anything else.

24         Q       You said that this business, this diamond

25   wholesale business, is based a lot on trust between

1      the brokers?

2          A       Yes.

3          Q       How long have you had an office or been in

4      the office in the Greenrich Building?

5          A       Since approximately '93 or '94.

6          Q       Can you tell me what percentage of

7      tenants -- Greenrich is an eight-story building?

8          A       Yes.

9          Q       What percentage of tenants are in the

10     diamond business?

11         A       About 90 or 95 percent.

12         Q       So in that eight floors of businesses

13     almost everybody is in the diamond business?

14         A       Yes, mainly in the jewelry business.   Some

15     are diamonds and some are jewelry.

16         Q       And some of them are jewelers -- is there

17     a difference between a jeweler and the difference

18     between a diamond broker?

19         A       Yes.

20         Q       What is the difference?

21         A       Jewelers they carry gold and they carry

22     other precious items, rubies, sapphires, other gem

23     stones.

24         Q       During your time that you knew Johnny

25     Szucs, did you ever become a partner of his in various

1    ventures?

2         A      Yes.

3         Q      By that, I mean, you get word that

4    somebody wants to sell a ten-carat diamond.  You put

5    up half the money and he puts up half the money?

6         A      Yes.

7         Q      Is that a common thing to happen in the

8    diamond business?

9         A      Very common.

10        Q      And is it possible that somebody might

11   have three or four or more little ventures going on at

12   one time regarding various stones?

13        A      Yes.

14        Q      While you knew Johnny Szucs, did you ever

15   become more than a partner that made deals here and

16   there?

17        A      No.  He was a very large diamond dealer in

18   town, very reputable.  And he had a big inventory.

19   And when we first met, he was consigning diamonds and

20   jewelry for me to sell.

21        Q      Did you ever come to a point where you

22   begin to share the same office that he did?

23        A      Yes.  That was about ten days or two weeks

24   before the murder.

25        Q      Before his death?

1        A       Yes.

2        Q       That means you took up an office in suite

3    770, the Greenrich Building?

4        A       Yes.

5        Q       Did you still have an office in suite 770

6    on January 24, 1996?

7        A       The day Johnny was killed, yes.

8        Q       Let me talk to you then.  What was the

9    relationship of your business together?  Were you now

10   moved into his office?

11       A       We were establishing a partnership

12   together.  We had plans for the future.  And we were

13   kind of merging many things together.

14       Q       Did you still have things that you kept

15   separate and apart?

16       A       It was still separate at that time.

17       Q       So that even though, in your office, he

18   didn't tell you who his customers were and who the

19   suppliers, at least not in all cases?

20       A       No.

21       Q       And you didn't tell who your customers

22   were or suppliers were?

23       A       That's correct.

24       Q       At least on the things you weren't

25   partners with?

1       A       Yes.

2       Q       Do you recall on January 22nd, a Monday,

3    in 1996?

4       A       Yes.

5       Q       Did you go to work that day?

6       A       Yes.

7       Q       Did Johnny go to work that day?

8       A       Yes.

9       Q       Did you guys conduct your diamond business

10   during the day?

11      A       Yes.

12      Q       Is it customary in the diamond business

13   for brokers to stay past 5:00 o'clock in the

14   afternoon?

15      A       Yes.

16      Q       Did Johnny stay past 5:00 o'clock in the

17   afternoon?

18      A       Most of the time.

19      Q       On Monday, the 22nd, 1996, did you stay on

20   January 22, 1996?  Did you and Johnny stay in your

21   office, suite 770, past 5:00 o'clock?

22      A       Yes.

23      Q       How late did you stay?

24      A       Not exactly but it's past 7:30.

25      Q       And were you there with him all that time?

1        A        Yes.   He had his office.   I had mine.   He

2    was conducting his business and I was conducting

3    mine.   You know, during the day, we see each other

4    frequently.

5        Q        So both of you had your own customers

6    coming in?

7        A        Yes.

8        Q        Do you recall what time it was that you

9    left the business on Monday, 22nd, of January, 1996?

10        A        It was after 7:30.

11        Q        Did you leave with Johnny or after Johnny?

12        A        Before.

13        Q        Did you see him any more that day,

14    January 22, 1996?

15        A        Not after I left.

16        Q        So you left and went about your business

17    and he stayed behind.   You don't know what he was

18    doing?

19        A        Yes.

20        Q        Did you see Johnny on Tuesday,

21    January 23, 1996?

22        A        Yes.

23        Q        Did he come in and conduct business that

24    day?

25        A        Yes.

```
 1          Q        Did you conduct business that day?

 2          A        Yes.

 3          Q        Did you stay later into the day than 5:00

 4     o'clock?

 5          A        We stayed that day very late either until

 6     8:00 or 8:30.  And we were having a drink, in the

 7     front room, and planning for the future together.

 8          Q        You and Johnny were having a drink?

 9          A        Yes.

10          Q        Anyone else with you that day --

11          A        No.

12          Q        -- on Tuesday?

13          A        No.

14          Q        You say you stayed until 8:00 or 8:30?

15          A        Yes.

16          Q        Do you recall exactly what time you left?

17          A        It was sometime 8:00 or 8:30 because what

18     I recall, I wanted to leave around 7:00.  And he says,

19      "We had a long day, let's sit and have a drink and

20     chat a little bit," because, during the day, we don't

21     have time to chat.  I recall that very well.

22                   And he poured a drink for himself and me,

23     and we sat in the front room and talking about how we

24     are going to merge in the future, how we are going to

25     have plans together and what we are going to do.  We
```

1     were just in the planning stage.

2          Q     The Greenrich Building has a parking lot

3     on the north side of the building, correct?

4          A     Yes.

5          Q     Do the jewelers -- you say the diamond

6     brokers, the tenants that have offices, do they park

7     in any particular spot in that garage?

8          A     There are designated parking spaces on the

9     third floor and some jewelers rent those.  They have

10    to pay money, so very few jewelers have designated

11    parking spots.  And everybody else parks wherever it's

12    available.

13         Q     Did you have a place that you normally

14    parked?

15         A     No.  I was parking wherever it was

16    available at that time.

17         Q     Do you know whether or not Johnny had a

18    place where he normally parked?

19         A     I don't think he had a designated parking

20    space.  He used to park in different areas as well

21    because those parking spaces were very limited, too.

22         Q     Do you know how Johnny got home on

23    Tuesday, January 23, 1996?

24         A     Before we left, he said he wanted --

25         Q     Excuse me.  Before you jump in, let me ask

1    you.  If you would, answer the questions yes or no and

2    don't say what anybody said.

3         A      Okay.

4         Q      So my question is:  Do you know how Johnny

5    got home on Tuesday night, January 23, 1996, yes or

6    no?

7         A      Yes.

8         Q      Did he drive home in his car?

9         A      No.

10        Q      Did he ride home with somebody else?

11        A      Yes.

12        Q      Do you know who gave him a ride home?

13        A      Moy.

14        Q      Moy.  Does he have a last name?

15        A      I believe it's Rosenberg.

16        Q      And what business is Moy Rosenberg in?

17        A      Another diamond wholesaler.

18        Q      Do you know why Johnny had Moy drive him

19    home?

20        A      His car was in the garage.

21        Q      By that, you mean the shop?

22        A      In the shop, yes.

23        Q      Not like in the garage?

24        A      No, no.

25        Q      His car was in the shop being repaired?

1          A       Yes, mechanics.

2          Q       And you say you folks left somewhere
3     around 8:00 o'clock, 8:30?

4          A       Yes.

5          Q       Did you see Johnny on Wednesday,
6     January 24, 1996?

7          A       Yes.

8          Q       Did you see him there in the place of
9     business?

10         A       Yes.

11         Q       Did you folks conduct your normal business
12    throughout the day?

13         A       Yes.

14         Q       Did you stay past 5:00 o'clock?  Did you
15    and Johnny stay past 5:00 o'clock?

16         A       Yes.

17         Q       Do you recall what time you left the
18    business?

19         A       Approximately about 5:40.

20         Q       Did Johnny leave with you?

21         A       No.

22         Q       Is there some reason why he didn't leave?

23         A       He says he was waiting for some people.
24    He had an appointment with somebody.

25         Q       And you say you left at when?

```
 1        A      5:40.
 2        Q      When you left, did you do any favors or
 3   run any errands for Johnny?
 4        A      Yes.  Since he had to wait for that
 5   appointment, he asked me a favor, to drop off a
 6   Federal Express for him.
 7        Q      And did you do that for him?
 8        A      Yes.
 9        Q      One package, two packages?
10        A      Two packages.
11        Q      And I assume he is shipping diamonds
12   somewhere?
13        A      Yes.
14        Q      So sending them out on memo or whatever?
15        A      Yes.
16        Q      Do you know who Johnny had an appointment
17   with?
18        A      No, he didn't tell me.
19        Q      That's one of those things that people
20   didn't tell each other?
21        A      Right.
22        Q      Let me ask you about:  In your office,
23   suite 770, do you have any security systems in place?
24        A      Yes.
25        Q      And specifically in your office do you
```

1    have a monitor that would monitor the -- you have an

2    outer door that opens out to the hallway?

3         A     Right.

4         Q     I assume during normal business hours

5    that's open?

6         A     Yes.

7         Q     Does your monitor allow you to see who is

8    out in the hall itself?

9         A     No.

10        Q     Do you have a monitor you have then -- if

11   you come inside your first door, you have an alcove

12   area?

13        A     Yes, mantrap.

14        Q     Mantrap.  Okay.  It's kind of a one-way

15   trap, if I come in, I can still go back out?

16        A     No.

17        Q     If I get in, make a mistake and come in

18   off the hallway, I am stuck?

19        A     You are stuck.  When you open the second

20   door, the first one locks.

21        Q     Okay.  But if you don't open that second

22   door, I can still go back out?

23        A     Yes, you can go out.

24        Q     Then you are mantrapped.  Do you have a

25   security camera?

1      A      Yes.

2      Q      And for what purpose do you have a camera?

3      A      To see who is on the door and decide if we

4  want to let them in or not.

5      Q      Is that common in the jewelry business,

6  the diamond wholesale business?

7      A      Everyone.

8      Q      Well, how do you know there is somebody

9  out there?  Do you sit there and watch your monitor or

10  have something else?

11      A      We have a bell.  They ring the bell, and

12  we look at the camera.  And if we recognize them, we

13  buzz them.  We have a door strike.  We push the button

14  and they open the door.

15      Q      Now, do you have a TV monitor in your

16  office?

17      A      Yes.

18      Q      And Johnny had a TV monitor in his office?

19      A      Yes.

20      Q      So you both had the ability to see who is

21  in the mantrap?

22      A      Yes.

23      Q      Did you have a push button to allow

24  somebody to come on into the office through that

25  second door?

1      A      Yes.

2      Q      And does Johnny have the same thing in his

3  office?

4      A      Yes.

5      Q      So either one of you can buzz somebody

6  through?

7      A      Yes.

8      Q      Do you have -- what I am going to call --

9  the hold-up alarm or panic buttons in suite 770?

10     A      Hold-up button, yes.

11     Q      Is that connected to the security service

12  or the police station or what?

13     A      Both.

14     Q      Both?

15     A      No, it's actually connected to the

16  security service and they inform the police.

17     Q      So if there is trouble, you hit the

18  hold-up button.  The hold-up button you can hit it or

19  Johnny can hit it?

20     A      Yes.

21     Q      And you are in separate offices?

22            MR. SMYTH:  May I approach the witness for

23  just a second, Your Honor?

24            THE COURT:  Sure.

25     Q      Let me show you what is in evidence as

Page 179

1        State's Exhibit 107 and ask you if you recognize this

2        as the floor plan of the seventh floor there at the

3        Greenrich Building.  Does that look like the floor

4        plan?  Here is your elevators.  This would be north,

5        the parking garage would be on the back side, here is

6        770, J & S Precious Stones, showing this area just

7        west of the elevator?

8            A        Yes.

9            Q        Does that look like the floor you are on?

10           A        Yes.

11           Q        So you left the office then at 5:46,

12       something like that, on Wednesday the 23rd?

13           A        5:40.

14           Q        5:40.  And you ran an errand for Johnny.

15                    Did you ever see Johnny Szucs alive after

16       you left him there in the place of business on the

17       24th?

18           A        No.

19           Q        Was he alive when you left?

20           A        Yes.

21           Q        So you don't know who he was waiting for?

22           A        No.

23           Q        Have you ever seen the defendant, Reinaldo

24       Dennes, come up to Johnny Szucs?

25           A        Yes.

```
 1        Q       And how long did you work with -- you say
 2   knew Johnny for how long in January -- actually in
 3   that office on a daily basis?
 4        A       Between ten days to two weeks.
 5        Q       In the ten days to two weeks, did you ever
 6   see the defendant, Reinaldo Dennes, come into the
 7   office?
 8        A       Yes.
 9        Q       And do you recognize the defendant,
10   Reinaldo Dennes?
11        A       Yes.
12        Q       How long have you known him?
13        A       I have known him for approximately since
14   1990.
15        Q       Okay.  So there is no question about who
16   he is?
17        A       No.
18                MR. SMYTH:  May the record reflect this
19   witness has identified the defendant in this case.
20                THE COURT:  The record will so reflect.
21        Q       In that ten days to two weeks in the
22   Johnny's office, did you see the defendant come up to
23   suite 770 at any time?
24        A       Yes.
25        Q       How many times during that week to ten
```

```
1        days or ten days to two weeks, I guess, did you see

2        the defendant, Reinaldo Dennes, come into suite 770?

3             A       At least three times.

4             Q       Did he come to visit you?

5             A       No.

6             Q       Did he come to visit Johnny?

7             A       Yes.

8             Q       Anybody else in that office other than you

9        and Johnny?

10            A       No.

11            Q       Johnny didn't have a secretary?

12            A       No.

13            Q       So just the two of you?

14            A       Yes.

15            Q       Do you know what reason Reinaldo Dennes

16       came to Johnny's office?

17            A       He was working on some jewelry for Johnny.

18            Q       Do you know what Reinaldo Dennes does for

19       a living?

20            A       Yes.

21            Q       What did he do at that time?

22            A       I know he is a jeweler.  And he's a bench

23       jeweler.  He sets diamonds and he works on jewelry.

24            Q       Did he set diamonds for Johnny Szucs?

25            A       Yes.
```

1     Q     Did he make rings for Johnny Szucs?

2     A     Yes.

3     Q     Did he make and repair jewelry for Johnny?

4     A     Yes.

5     Q     You say he came in on at least three

6   occasions?

7     A     Yes.

8     Q     Do you know Francisco Santos Rojas?

9     A     Yes.

10    Q     And back in this period of time, January,

11   1996, did Francisco Santos Rojas work in the Greenrich

12   Building?

13    A     Yes.

14    Q     Who did he work with?

15    A     I have seen him at Reinaldo's office.

16    Q     Have you ever seen him up in Johnny's

17   office?

18    A     Yes.

19    Q     During this ten days to two weeks that you

20   were there, how many times did you see Francisco

21   Santos Rojas in Johnny's office?

22    A     One time.

23    Q     Do you know what he came for?

24    A     He was taking a diamond on memo.

25    Q     So Francisco Santos Rojas came to get a

1        diamond on loan?

2             A       Yes.

3             Q       He thought he had a customer for one of

4        Johnny's diamonds?

5             A       Yes.

6             Q       Do you know the defendant's -- Reinaldo

7        Dennes -- brother, Jose Alberto Dennes?

8             A       No.

9             Q       You've never been introduced to him?

10            A       No.

11            Q       Have you ever seen him?  You don't know,

12       haven't been introduced.  Did you ever see anybody --

13                    MR. SMYTH:  Your Honor, may I approach the

14       board exhibits, please?

15                    May I approach the witness, Your Honor?

16            Q       Let me show you State's Exhibit 56 and ask

17       you if you recognize that individual?

18            A       Yes.

19            Q       And who is that?

20            A       Reinaldo Dennes.

21            Q       The defendant in this case?

22            A       Yes.

23            Q       I show you State's Exhibit 54 and ask you

24       if you recognize that?

25            A       Yes.

1        Q        And who is that?

2        A        Francisco.

3        Q        Francisco Santos Rojas?

4        A        I know him always by Francisco.

5        Q        State's Exhibit 55, do you know who that

6    person is?  If you don't, that's fine.

7        A        No.

8        Q        Did you ever see this person around the

9    office, if you don't know by name, did you ever see

10   him in the office?

11       A        No.

12       Q        Did you ever see State's Exhibit 55 in the

13   company of, come up to Johnny office, with either 56

14   or 54?

15       A        No.

16       Q        That is in the company of Reinaldo Dennes

17   or Francisco Santos Rojas?

18       A        No.

19       Q        You've never seen him around Johnny's

20   office at all?

21       A        No.

22       Q        After you left Johnny's office, did you

23   ever get a call from the alarm company that controls

24   the alarms or monitors the alarm on the place of

25   business you and Johnny had?

1    A       Yes.

2    Q       For what reason did they call you?

3    A       Because the alarm wasn't set in the

4  office.

5    Q       That's the alarm system that you have in

6  the building in your offices.  Is that connected up to

7  the motion detectors and things like that?

8    A       Well, we have an opening and closing for

9  all jewelers connected to the security company.  We

10  have to open around a certain time and close at a

11  certain time.  If the company doesn't receive a signal

12  that we set the alarm, they call us automatically.

13    Q       Okay.  Do you recall what time they called

14  you?

15    A       They called me at home approximately about

16  9:00 o'clock in the evening.

17    Q       Okay.  Indicating the alarm was not set on

18  the office suite 770?

19    A       Yes.

20    Q       What did you do after you received the

21  call from the alarm company?

22    A       I called the office and then I paged

23  Johnny.  He didn't call me back so I called his office

24  and left him a message.

25    Q       When you called the office, did you

1    receive an answer?  Did anyone answer the phone when

2    you called the office around 9:00 o'clock?

3         A      It was either no answer or the answering

4    service answered the phone because he had the phone

5    set on the answering service after four rings or five

6    rings.

7         Q      Johnny didn't answer the phone?

8         A      No, Johnny didn't.

9         Q      Nobody else that you recognized other than

10   the answering service answered the phone?

11        A      No.

12        Q      Do you know what the phone number is for

13   the place of business there at J & S Precious Stones

14   back on January 24th, do you know what that phone

15   number is or was?

16        A      Maybe.

17        Q      Do you have a business card from that

18   office with you?

19        A      No, it's been a long time.  It's been 17

20   months.

21        Q      Do you know what the number is off the top

22   of your head?  I realize you are only in there 10 days

23   to 14 days.

24        A      I mean, I used to call Johnny all the

25   time.  It is just my mind is blank about the phone

1    number because I had my own separate line, too.

2        Q       After you called Johnny and paged Johnny,

3    did you ever get a response from Johnny Szucs?

4        A       No.

5        Q       What did you do after you got no response

6    from Johnny Szucs?

7        A       I called the security company again and I

8    asked them to set the alarm from their end.

9        Q       And did they do that as far as you know?

10       A       Yes.   I called back and they told me it

11   was set.

12       Q       So they remotely set the alarm in the

13   office?

14       A       Yes.

15       Q       Did you ever get any other calls in

16   relationship to Johnny or what's going on in the

17   office, just yes or no?

18       A       Yes.

19       Q       And from whom did you get calls in

20   relationship to Johnny Szucs or things going on in the

21   office?  First of all, did you get any calls with

22   regards to the whereabouts of Johnny Szucs?

23       A       Yes.

24       Q       Do you recall who it was that you talked

25   to?

1     A      It was the security company again.

2     Q      Don't tell me what they said.  What time

3  was this call?

4     A      It was late at night.

5     Q      Did Nicole Szucs ever give you a call?

6     A      No, I called her back.

7     Q      You called.  Did you get a page from

8  Nicole Szucs?

9     A      No.

10    Q      You called her looking for Johnny?

11    A      Yes.

12    Q      Do you recall what time that was?

13    A      After 11:00 o'clock.

14    Q      Did Moy Rosenberg ever call you?

15    A      No.

16    Q      Okay.  Did you say you ran into the

17  defendant, Reinaldo Dennes, who came up to Johnny's

18  office at least three times while you were there?  Did

19  he know that you were working with Johnny now and had

20  space in the Johnny's office when he first came up?

21    A      No.

22    Q      Was he surprised to see you there?

23    A      Yes.

24    Q      Did he say anything to you?

25    A      Yes.

1     Q     What did he say?

2     A     Said, "What are you doing here?"

3     Q     Okay.  Up until you took up space in and

4  occupied an office in Johnny's suite, did Johnny have

5  any partners that worked in there?

6     A     No.

7     Q     He always worked alone?

8     A     Yes.

9     Q     Always worked by himself?

10    A     Always.

11    Q     No secretary?

12    A     No.

13    Q     When was it that the defendant, Reinaldo

14  Dennes, came into the Johnny's office and said "What

15  are you doing here"?

16    A     It was maybe a day or two after I moved

17  in.

18    Q     Approximately what day would that be?

19    A     It would have been sometime like Monday or

20  Tuesday, ten days or two weeks before the incident.

21    Q     Talking about perhaps as early as January

22  10th?

23    A     Approximately.

24    Q     January 14th, something like that?

25    A     Yes.

```
1        Q        In that time frame?

2        Q        Yes.

3        Q        First half of January?

4        A        Right.

5        Q        Did you have any other conversation with

6    Reinaldo Dennes other than "what are you doing here"

7    and what did you say?

8        A        We had a brief conversation about some

9    mailers I was doing on my desk.  He wanted a copy of

10   one and I didn't give it to him and basically just

11   casual conversation.

12       Q        Is this regarding the mailers, regarding

13   the business you and Johnny were going in this

14   particular venture?

15       A        Right.

16       Q        Did you at some point in time find out

17   that Johnny had been killed?

18       A        Yes.

19       Q        Did you talk to the police about what you

20   knew regarding the way Johnny operated his business

21   after his death?

22       A        Yes.

23       Q        Do you know anybody by the name of Richard

24   George Hainer?

25       A        Yes.
```

1      Q       Who is Richard George Hainer?

2      A       He is what we refer to in the business as

3  a jobber or a broker.

4      Q       And what's a jobber or a broker?

5      A       A jobber that doesn't own a lot of

6  inventory but he takes from a wholesaler to a retailer

7  and he makes his commission in between.

8      Q       Did Richard Hainer come to Johnny's suite

9  on few or many occasions?

10     A       He came there several times.

11     Q       And was he a regular customer of Johnny's?

12     A       Yes.

13     Q       And he would come to get diamonds to take

14  to retailers?

15     A       Yes.

16     Q       He would make his commission out of

17  whatever he sold them?

18     A       Yes.

19     Q       And did he come -- do you remember what

20  last day it was that he came to Johnny's place of

21  business?

22     A       A few days before the incident but I don't

23  remember exactly.

24     Q       But he had been up in the office within

25  several days --

1      A      Yes.

2      Q      -- during that week that Johnny was killed

3    can?

4      A      Right.

5      Q      And he was a regular customer of Johnny's?

6      A      Yes.

7      Q      Back on January 24, 1996, were you aware

8    of the inventory that Johnny Szucs had in his office?

9      A      I had a rough idea but I didn't know

10   exactly how much it was.

11     Q      Did he have a few hundred dollars worth of

12   diamonds or did he have more?

13     A      More.

14     Q      And had Johnny just completed buying trips

15   to Europe as well as Italy?

16     A      Yes.

17     Q      And in those buying trips, I assume, he

18   bought diamonds to sell in America?

19     A      Yes.

20     Q      Was Johnny getting ready to go to some

21   shows in the United States to purchase other diamonds?

22     A      Yes.

23     Q      And as a result of that, did he have cash

24   on hand?

25     A      Yes.

1    Q        Did you know how many diamonds?  What the

2    value of the diamonds would be that Johnny had in his

3    safe?

4    A        Between three and a half to four million

5    dollars.

6             MR. ODOM:  First of all, I would like to

7    know if he knows.

8             THE COURT:  You can take him on voir dire.

9    Q        You were asking.

10            THE COURT:  I told him to take him on voir

11   dire.

12

13                    VOIR DIRE EXAMINATION

14   BY MR. ODOM:

15   Q        MR. Solomay, we had occasion to talk

16   before, have we not?  We have been in the courtroom

17   today together?

18   A        Yes.

19   Q        When you say that you have a rough idea as

20   to how many diamonds and how much your ex-partner had,

21   are you aware of how many diamonds he had in his safe

22   or in his possession on January 24, '96?

23   A        In terms of value but not in terms of

24   numbers.

25   Q        All right.  In terms of value, you have an

1    estimate of his total worth as opposed to knowing what

2    the inventory is; is that what you are telling us?

3         A     I have a rough idea what the total

4    inventory value is.

5         Q     Is that because you are part and parcel of

6    that inventory, was a participant, had knowledge of

7    generally what the diamonds were and what their worth

8    was?

9         A     No.

10        Q     Is this based upon comments that you may

11   have been told from someone as to what you believe his

12   worth was or the worth of the inventory rather?

13        A     From Johnny himself.

14        Q     All right.  And was this based upon

15   information you had received shortly before the 24th?

16        A     No, that's on a continuous basis.

17        Q     So, in other words, you had what you

18   believed, based upon what Johnny told you, was a rough

19   estimate of what his inventory would be at any given

20   period of time?

21        A     Yes.

22        Q     Not necessarily what it was on

23   January 24, 1996?

24        A     True.

25              MR. ODOM:   That's all I have, Judge.

1                    THE COURT:  Proceed.

2

3                    DIRECT EXAMINATION CONTINUED

4    BY MR. SMYTH:

5         Q     What would you say the value of the

6    diamonds in Johnny's safe were.

7                    MR. ODOM:  I think he is not qualified to

8    answer that question.  He may be qualified to answer a

9    general what he is worth but certainly not the

10   diamonds on a particular day.

11                   THE COURT:  If you will restate the

12   question.

13        Q     (Mr. Symth)   Do you know the value of the

14   diamonds of Johnny Szucs' inventory on

15   January 24, 1996?

16        A     No.

17        Q     Do you have an estimate as to what -- you

18   have been in his office, right?

19        A     Yes.

20        Q     Did you go in his office

21   January 24, 1996?

22        A     I was there all the time.

23        Q     Okay.  Did you ever look in that safe on

24   that day?

25        A     No.

1        Q        I'm not saying you walk up.  Did you ever

2    see any diamonds in that office?

3        A        Oh, yes.

4        Q        In fact, you were partners with him in

5    some transactions, correct?

6        A        Yes.

7        Q        Had you given Johnny money to take with

8    him on his jewelry buying trip he was going on, I

9    think, to Orlando, Florida, that week?

10        A        To Palm Springs, yes.

11        Q        So you gave him money?

12        A        Yes.

13        Q        How much money did you give him?

14        A        Fifteen thousand.

15        Q        Were you aware of any other persons giving

16    him money on particular ventures to go buy diamonds?

17        A        Yes.

18        Q        Who else gave him money that you

19    personally know of?

20        A        Ricky Fishel.

21        Q        And Ricky Fishel is another man that is in

22    the diamond business?

23        A        Yes.

24        Q        How much did Ricky Fishel give him to go

25    to Palm Springs buying?

1          A       I don't know exactly.

2          Q       Did you guys generally go in on halves or

3     some percent?

4          A       No, some percent.

5          Q       So your 15,000 was not half.  It was some

6     percent of the diamonds he was going to buy?

7          A       A small percentage.

8          Q       Did you ever see your $15,000 again?

9          A       No.

10         Q       Did you give a general estimate as to the

11    value of the diamonds that Johnny would have in his

12    safe on any given day of the month.

13              MR. ODOM:   Object, unless the witness

14    knows.

15         Q       (Mr. Symth)   If you know, I'm not asking

16    you to dream up something.  If you know what kind of

17    inventory he had and what the value is on any

18    particular day, a rough estimate, you can answer that

19    question.

20         A       Three and a half to four million.

21         Q       And before this buying trip to Palm

22    Springs, do you have an idea, a general estimate, as

23    to the cash on hand that the Johnny had to take with

24    him to go to Palm Springs to buy additional diamonds?

25         A       In excess of $200,000.

1    Q    And out of that 15,000 was yours?

2    A    Yes.

3    Q    Did you ever see any of that three and a

4  half to four million dollars' worth of diamonds in

5  that office again?

6    A    No.

7    Q    As far as you know, they were stolen when

8  Johnny was killed?

9    A    Yes.

10   Q    What about that two hundred thousand plus

11 dollars, did you ever see that in that office?

12   A    Yes.

13   Q    Likewise, was that stolen?

14   A    Yes.

15        MR. SMYTH:  May I approach the evidence?

16        THE COURT:  Yes.

17   Q    Mr. Solomay, I am going to show you a

18 photograph and ask you whether or not you can identify

19 the person in that photograph, State's Exhibit 118.

20 Do you recognize that person in that photograph?

21   A    Yes.

22   Q    Can you tell the ladies and gentlemen of

23 the jury who is depicted in State's Exhibit 118?

24   A    Johnny Szucs.

25   Q    Is that your business partner?

```
 1        A       Yes.

 2        Q       And what time was it that you last saw

 3   your business partner Johnny Szucs alive?

 4        A       January 24th.

 5        Q       And what time in the evening?

 6        A       5:40.

 7                MR. SMYTH:  Pass the witness.

 8                THE COURT:  Mr. Odom.

 9

10                   CROSS EXAMINATION

11   BY MR. ODOM:

12        Q       Mr. Solomay, you had been in business, at

13   least you had been officing or in partnership with Mr.

14   Szucs for, I believe you testified, ten days to two

15   weeks prior to his death; is that correct?

16        A       Yes.

17        Q       But you had been in the diamond business

18   for a time prior to that, had you not?

19        A       Yes.

20        Q       How long have you been in the diamond

21   business before that?

22        A       For a very long time but devoted to the

23   diamond business completely, it's been almost like six

24   years.

25                THE COURT:  Let's take a five-minute
```

1    break.

2                    (Recess taken.)

3                    (Jury came into the courtroom.)

4                    THE COURT:  Please be seated, ladies and

5    gentlemen.  I'm sorry about that interruption.

6                    Please continue.

7         Q     Prior to your working with the complainant

8    in this case, you were involved with another business

9    entity.  What was that, which one was that?

10        A     Before Johnny Szucs?

11        Q     Yes, sir.

12        A     Before Johnny, I was officing for about

13   three or four months with Rosh Sagel.  He is another

14   wholesaler in the building.

15        Q     And it's Rosh Sagel?

16        A     Sagel.

17        Q     And he is also a jeweler that is there in

18   the Greenrich Building?

19        A     Yes.

20        Q     And so you were in the Greenrich Building

21   prior to moving up on the seventh floor?

22        A     Yes.

23        Q     And which floor is Rosh on?

24        A     On the third floor.

25        Q     On the third floor.  And I believe we have

1    heard previous testimony that his office is right next

2    door to Designs by Reinaldo, is it not?

3         A    Yes.

4         Q    And how long were you in that office?

5         A    I was there approximately since September

6    of '95.

7         Q    Of '95?

8         A    Yes.

9         Q    So you had been there not quite a year

10   before you moved up to the seventh floor with Johnny?

11        A    Like three or four months.

12        Q    Before that were you in the building?

13        A    No.

14        Q    Previous to that?

15        A    No.

16        Q    When you were there in September, were you

17   aware, at that time Reinaldo Dennes was already

18   established as Designs by Reinaldo in the office

19   either next to you or across the hall from across

20   Rosh?

21        A    Yes.

22        Q    Were you aware of the fact that at one

23   time Ray Dennes had also leased an office from Rosh

24   R-o-s-h?

25        A    Yes.

```
 1        Q        And that was prior to you doing so?

 2        A        Yes.

 3        Q        Now, during the time period that you

 4   officed first with Rosh and then with Johnny, I

 5   believe you testified you have never before seen the

 6   brother of Reinaldo Dennes; is that correct?

 7        A        Yes.

 8        Q        Is it that you have never seen him before

 9   or you would not recognize him as such -- you are just

10   not aware that you have never seen him before; is that

11   a fair statement?

12        A        That's fair.

13        Q        You are not saying that his brother was

14   never in the office next to your office when you were

15   officing with Rosh, are you?

16        A        All I am saying, I have never seen him

17   before.

18        Q        And when you say you have never seen him

19   before even that may be somewhat of a misstatement.

20   You may not have seen him before.  You may not have

21   known that this was the brother of Ray Dennes?

22        A        True.

23        Q        If Ray Dennes has a brother, you wouldn't

24   know what he looks like.

25                 MR. SMYTH:  Object, repetitious.  It's the
```

1    third time we have gone in to it.  It's quite clear he

2    doesn't recall ever seen Alberto Dennes.

3              THE COURT:  Sustained.

4         Q    (Mr. Odom)   Now, you testified that you

5    do not recall seeing Alberto Dennes in the office

6    prior to January 24, 1996, correct?

7         A    Correct.

8         Q    You are not saying that Albert Dennes was

9    not in the office.

10             MR. SMYTH:  Object to that.  He doesn't

11   know the guy, if he saw him.

12             THE COURT:  Sustained.

13        Q    (Mr. Odom)   You weren't in the office all

14   the time, were you?

15        A    Which office?

16        Q    The office up on the seventh floor with

17   Johnny?

18        A    Yes.

19        Q    And when you tell the jury that you didn't

20   see Jose Albert Dennes up in the office, that

21   certainly you are not trying to tell him that Jose

22   Albert Dennes was not up in that office prior to

23   January 24, 1996?

24        A    I don't know if he was or not.

25        Q    Exactly.

1            Now, you indicated -- or did you see and

2     did you know a person that worked in the offices of

3     Ray Dennes by the name of Tony Ramirez?

4          A     No.

5          Q     You do not?

6          A     No.

7          Q     I believe you have testified the nature of

8     the business that you are in and that Mr. Szucs was in

9     is a somewhat of a secretive business?

10         A     Yes.

11         Q     That doesn't mean, however, that certain

12    information is not known in the business; is that a

13    fair statement?

14         A     I don't understand the question.

15         Q     Well, although you may keep certain deals

16    to yourself, there are certain deals that are public

17    and that become conversation in your business just

18    like any other business?

19         A     I don't know.

20         Q     If you were to -- if Johnny were to joint

21    venture something with Ricky Fichel and you weren't in

22    on it, that doesn't necessarily mean that you might

23    not hear about it through other sources or through the

24    shopping of the diamond, for example, right?

25         A     Most of the time we don't know.

1      Q    So you are saying that most of the time

2  you don't know if someone like Johnny were to enter

3  into a business deal with Ricky Fichel, you are saying

4  most of the time you wouldn't know that?

5      A    Most of the time unless I would have

6  interests in it or unless he tells me about it but,

7  generally speaking, no.

8      Q    You then were not aware of the fact, were

9  you, that Ray Dennes had done several business

10  transactions with Johnny Szucs that did not involve

11  Mr. Dennes fixing jewelry.

12           MR. SMYTH:  Object to that based on

13  speculation.  There is no evidence other than to make

14  jewelry.

15           MR. ODOM:   It's all I am doing.

16           MR. SMYTH:  Stating it as if a fact.

17           MR. ODOM:  Are you aware.

18           THE COURT:  Restate.

19      Q    Are you aware of the fact --

20           THE COURT:  I just asked him to restate,

21  counsel.

22      Q    -- Ray Dennes may have been other

23  businesses other than making jewelry with Johnny

24  Szucs.

25           THE COURT:  It's overruled.

1      A      I'm not aware of it.

2      Q      You are not aware of that?

3      A      No.

4      Q      Are you aware of any business between Ray

5  Dennes, Johnny Szucs and Ricky Fichel?

6      A      I am aware of one transaction between

7  Dennes and Ricky Fichel but I don't know if Johnny was

8  in it or not.

9      Q      Are you aware of a diamond transaction --

10  a business transaction, the transaction that you may

11  be familiar with Ricky Fichel is that a transaction

12  that occurred with a diamond that came out of

13  Monterrey, Mexico?

14      A      I'm not aware of the details.

15      Q      Are you aware there are more than one

16  diamond transaction that Ricky Fichel --

17             MR. SMYTH:  That's irrelevant what this

18  defendant did with anybody else in the world other

19  than Johnny Szucs.

20             THE COURT:  I'll allow the question.

21  Let's get to the meat of it.

22      Q      (Mr. Odom)   Who is Ricky Fichel?

23      A      He is currently my partner now.

24      Q      And Ricky Fichel, who is currently your

25  partner, was also someone who is in the business, by

1    that, someone who occasionally would be involved in

2    the purchase and sale of diamonds back in January of

3    1996, correct?

4         A    Yes.

5         Q    And Ricky Fichel you know, at least, was

6    involved in one transaction with Ray Dennes sometime

7    before January 24, 1996?

8         A    Correct, yes.

9         Q    You were not aware of the fact one way or

10   another whether Johnny Szucs was also involved in that

11   transaction, correct?

12        A    No.

13        Q    Are you only aware of one transaction with

14   Ricky Fichel or are you aware of other transactions

15   between Ray Dennes and Ricky Fichel that may have

16   involved diamonds.

17             MR. SMYTH:  May I approach the bench?

18             (Whereupon, the following proceedings were

19   held before the Bench.)

20             MR. SMYTH:  Judge, whatever business this

21   defendant did with Ricky Fichel is absolutely

22   irrelevant.

23             THE COURT:  That's what I told him.  I

24   want the relevancy brought out.

25             MR. VINSON:  Your Honor, he is offering

1    unsupported evidence.  He has been doing it throughout
2    the trial.
3                    THE COURT:  Let's not make it personal.
4                    MR. ODOM:  I would like to address this
5    issue and I think I can but I would like to do it out
6    of the presence of this witness.
7                    MR. VINSON:  Let's excuse the jury.  We
8    can't do it and he can't do it because he is sitting
9    there and throwing everything like are you aware.
10                   MR. ODOM:  I'm not acting in bad faith and
11   that's the issue I need to be able to present to the
12   Court.
13                   MR. VINSON:  We can ask the jury to be
14   removed.
15                   THE COURT:  I realize that, Mr. Vinson.
16   Thank you.
17                   MR. VINSON:  It's not fair.
18                   MR. ODOM:  I believe I am entitled to go
19   into these areas I have other than ask certain
20   business transactions.  I think it goes directly to
21   the point they are trying to make as to what my guy
22   was doing up there previous to that.
23                   MR. SMYTH:  He can --
24                   THE COURT:  I don't have a problem with
25   you asking as long as it's nothing incriminating or

1    insinuating about the deceased.  However, I'll give

2    you just a couple of questions and get to the point

3    and I'll start sustaining the objections.

4              MR. ODOM:  Judge, all right.

5              THE COURT:  We can sit here all day.

6              MR. ODOM:  But the witness is somewhat

7    reluctant to respond.

8              THE COURT:  I'll make sure he responds to

9    your questions.

10             (Whereupon, the following proceedings were

11   held before the jury.)

12             THE COURT:  Proceed, please.

13        Q    (Mr. Odom)   Do you know of a transaction

14   that involved Ray Dennes and Ricky Fichel and a number

15   of diamonds?

16        A    No.

17        Q    Mr. Solomay, you have testified to the

18   fact that Mr. Szucs was about to go on a buying trip,

19   I mean, a selling trip or a show -- I believe was the

20   testimony -- and that show was going to be in Palm

21   Springs, Florida, correct?

22        A    Yes.

23        Q    When was that show going to be?

24        A    That was approximately the following week

25   after the 24th.

1          Q       All right.  And isn't it also true that

2     there was another show, another diamond show or

3     another jewelry show, that was going to occur in

4     Orlando, Florida?

5          A       Yes.

6          Q       Immediately proceeding the show in Palm

7     Springs?

8          A       I don't know which one was before the

9     other but they were like neck to neck.

10         Q       In other words, if someone had diamonds,

11    regardless of when -- if someone was in the business

12    of selling diamonds -- and you were aware of the fact

13    that Mr. Dennes at least on one occasion in the past

14    had been in the business of selling diamonds, were you

15    not?

16         A       Yes.

17         Q       You are not aware if he had on other

18    occasions but you know at least on one occasion,

19    right?

20         A       Yes.

21         Q       If Mr. Dennes is in that business, then,

22    like Mr. Szucs, he might very well want to be in

23    Florida shortly after the 24th of January, 1996,

24    correct?

25         A       I don't know.

```
 1      Q      Well, it was two big shows, aren't there?
 2      A      I don't know if he goes to shows or not.
 3      Q      Well, I'm not asking if Reinaldo Dennes
 4   goes to shows and it's not a real hard question.  The
 5   question is --
 6             MR. SMYTH:  Object to his basically
 7   arguing with this witness.
 8             MR. ODOM:  I'm not arguing with the
 9   witness, Judge.
10             MR. SMYTH:  Side bar.
11             THE COURT:  Don't be argumentive.  Ask
12   your next question.
13      Q      (Mr. Odom)  The question is:  If you are
14   selling diamonds and there is a diamond show in
15   Orlando or Palm Springs, then it wouldn't be unusual
16   if you wanted to sell your diamonds, to go to Orlando
17   or Palm Springs, would it be?
18      A      No.
19      Q      Now, did say that Mr. Dennes was doing
20   some work for Johnny Szucs, correct?
21      A      Yes.
22      Q      So you, at least, know he was doing some
23   jewelry work for him, correct?
24      A      Yes.
25      Q      You don't know whether he was doing
```

1    anything else in regards to -- had any other business

2    transactions with Mr. Szucs, correct?

3         A    Correct.

4         Q    Are you aware if he has done anything in

5    the past with Mr. Szucs other than create jewelry for

6    him?

7         A    No.

8         Q    You did testify, however, that Francisco

9    Rojas was, also, a person who had shortly before

10   January 24th been up to the office of Mr. Szucs,

11   correct?

12        A    Yes.

13        Q    And Mr. Rojas was involved in creating

14   jewelry for Mr. Szucs?

15        A    I don't know.

16        Q    Would Mr. Rojas be a person who

17   occasionally was a broker or a jobber?

18        A    He was a jobber.

19        Q    And I believe that you already told us

20   that Richard Hainer, who you described as a jobber or

21   broker, someone who might take jewelry on loan and he

22   may have a buyer somewhere and he would try to sell

23   the merchandise, correct?

24        A    Correct.

25        Q    Where did Francisco Rojas office?

```
 1        A        With Reinaldo Dennes.
 2        Q        So although Mr. Dennes may not have
 3   directly been involved in that transaction or he may
 4   or may not have been, your business is somewhat
 5   secretive, is it not?
 6        A        Yes.
 7        Q        You also know of at least one incident
 8   wherein someone who is working in Mr. Dennes' office
 9   is taking a diamond on loan as a jobber, as you put
10   it, or as a broker, and he is going to attempt to sell
11   that diamond ostensibly because that's what they do
12   and that occurred shortly before January 24, 1996?
13        A        Correct?
14        A        Yes.
15        Q        And that's not unusual for just about
16   anyone in that building, is it?
17        A        Correct.
18        Q        I mean everybody in the business was
19   involved or just about everyone in the business was
20   involved in one way or another in the jewelry
21   business?
22        A        Yes.
23        Q        And a lot of people had deals and
24   transactions with Johnny Szucs that you were not aware
25   of, right?
```

1          A       Yes.

2          Q       Now, do you know a person by the name of

3     James Bogottus?

4          A       James.

5          Q       Or it's a brother -- there is two

6     Bogottus.  Do you know a person by the name of

7     Bogottus?

8          A       No.

9          Q       Angel Bogottus?

10         A       No.

11         Q       You've never done any business with them?

12         A       No.

13         Q       Your previous partner was it a Marion

14    Voss; is that correct?

15         A       He was not a partner.

16         Q       Were you ever associated with Marion Voss?

17         A       Yes.

18         Q       Do you know if he ever did any business

19    with those individuals?

20         A       I'm not aware of.

21         Q       Now, on the night in question, there were

22    a number of phone calls that transpired among the

23    tenants trying to figure out what was going on; is

24    that a fair statement?

25         A       After the incident?

```
 1        Q      Yes.

 2        A      Yes.

 3        Q      And you talked to Rosh and Rosh is calling

 4   you and you are calling other persons that may be in

 5   the building, correct?

 6        A      Yes.

 7        Q      Who is Sam Negroski?

 8        A      He works for Pioneer Diamonds.

 9        Q      Pioneer Diamonds?

10        A      Yes.

11        Q      He is one of the persons you talked to

12   that evening, is it not?

13        A      Yes.

14        Q      How is he related to Johnny or associated

15   with Johnny?

16        A      We all know each other very well.

17        Q      And you all do business with each other,

18   right?

19        A      Yes.

20        Q      It's sort, kind of a fraternity, so to

21   speak?

22        A      Yes.

23        Q      Do you know where he is today?

24        A      Negroski he is in the building.

25        Q      He is still in the building?
```

1          A       Sure.

2          Q       Are you aware of Mr. Negroski's criminal

3     conviction.

4          A       I don't know.

5                  MR. SMYTH:  Let's approach the bench.

6                  THE COURT:  All right.  I don't see the

7     total relevance.

8                  MR. SMYTH:  Totally irrelevant.  I ask the

9     jury be instructed to disregard that last question.

10                 THE COURT:  Sustained and disregard it.

11         Q       (Mr. Odom)   Mr. Solomay, isn't it true

12    that a number of people in the business that you in

13    are involved with people and sometimes are even

14    themselves involved in criminal activities.

15                 MR. SMYTH:  Your Honor, may we approach

16    the bench?

17                 THE COURT:  Sure.

18                 (Whereupon, the following proceedings were

19    held before the Bench.)

20                 MR. SMYTH:  Your Honor, I object to this

21    general line of character assassination of people

22    involved in the jewelry business unless he can show

23    that it is absolutely relevant and connected to this

24    case.

25                 THE COURT:  I sustain that objection.

```
 1              MR. ODOM:  If I may, for the record, the

 2    names that I am using are names that I have been

 3    provided in the offense reports that I have been

 4    provided by the district attorney's office that were

 5    obtained from various investigations that they have

 6    done on this case.  And, Judge, I think it's very

 7    important when you have a circumstantial evidence case

 8    of this nature that I'm allowed to develop the

 9    possibilities of relationships with other individuals

10    that have criminal records or are associated with

11    other criminal individuals.

12              THE COURT:  Okay.

13              MR. ODOM:  And I'm not saying and it

14    doesn't go directly to the complaining witness as much

15    as it goes to the exposure that he has to a certain

16    element of individuals.

17              THE COURT:  That's fine.  I think you are

18    trying to back door, impinging the deceased person's

19    reputation, and I'm not going to allow it.  And you

20    can ask any questions you have direct knowledge with

21    regards to certain matters and this is not a fishing

22    trip.  And I'm not going to allow a general slur of

23    the business and somehow try to tag that to the

24    complainant in this case.

                  Let's proceed.
```

                    (Whereupon, the following proceedings were
        d before the jury.)

3           Q       (Mr. Odom)   Mr. Solomay, there is a point
4       clarification on my part.  What was your estimate
5       of the value of the diamonds in the safe?  You gave a
6       range and I didn't hear that range.
7           A       Three and a half to four million.
8                   MR. ODOM:   That's all I have, Your Honor.
9       Pass the witness.
10                  MR. SMYTH:  Nothing further.
11                  THE COURT:   Is this witness excused
12      subject to recall?
13                  Thank you very much.
14                  (Off-the-record discussion held at bench.)
15                  THE COURT:  Ladies and gentlemen, we are
16      going to go ahead and break for the day.  I
17      understand, from the State, they anticipate they have
18      two more witnesses, one very short and one that
19      doesn't sound like particularly long, so I anticipate
20      that the State will rest in the morning.  And at that
21      point in time, the defense will have an opportunity to
22      present any evidence it wishes.  It has no obligation,
23      as I instructed earlier.
24                  With that, we stand adjourned for the day
25      until 9:45 in the morning in the basement of this

1    building, down there in the basement of this building.

2    Please be on time and we will be starting pretty close

3    by 10:00 o'clock.  And I anticipate we are going to do

4    that.  Stand adjourned.

5            (Court adjourned for the day.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPELLATE COURT NO. **72966**

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

-----------------------------------------------------

REINALDO DENNES

                    Appellant,

VS.

THE STATE OF TEXAS,

                    Appellee.

-----------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

                    TEXAS

Judge Jim Wallace, Presiding

-----------------------------------------------------

CAUSE NO. 750,313

August 27, 1997

Reporter's Record

Volume 32 of 39 Volumes

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Page 1

1    Volume 32

2    Trial

3    August 27, 1997

4    Chronological

5    Charles A. Rosenthal, Jr.

6        Direct Examination by Mr. Vinson          5

7        Cross Examination by Mr. Odom            18

8        Redirect Examination by Mr. Vinson       35

9        Recross Examination by Mr. Odom          37

10   Nicole Szucs

11       Direct Examination by Mr. Vinson         39

12       Cross Examination by Mr. Odom            65

13   State Rests                                  76

14   Opening Statement by Mr. Odom                77

15   Richard Earnst

16       Direct Examination by Mr. Odom           83

17       Cross Examination by Mr. Smyth          123

18       Redirect Examination by Mr. Odom        155

19       Recross Examination by Mr. Smyth        165

20       Further Direct Examination by Mr. Odom  170

21   Ellis McCullough

22       Direct Examination by Mr. Odom          172

23       Cross Examination by Mr. Vinson         183

24       Redirect Examination by Mr. Odom        200

25

1     James Gradoni

2          Direct Examiantion by Mr. Odom          202

3          Cross Examination by Mr. Smyth          214

4          Redirect Examination by Mr. Odom          223

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    State's Exhibit No. 173

 2         Marked        Volume 32              63

 3         Identified    Volume 32              64

 4         Offered       Volume 32              63

 5         Admitted      Volume 32              65

 6    Defendant's Exhibit No. 3   letter

 7         Marked        Volume 32              22

 8         Identified    Volume 32              22

 9         Offered       Volume 32              22

10         Admitted

11    Defendant's Exhibit No. 4   video cassette tape box

12         Marked        Volume 32              210

13         Identified    Volume 32              210

14         Offered

15         Admitted

16    Defendant's Exhibit No. 5   video cassette tape

17         Marked        Volume 32              210

18         Identified    Volume 32              211

19         Offered       Volume 32              211

20         Admitted      Volume 32              213

21

22

23

24

25
```

1      Volume 32

2      Alphabetical

3      Richard Earnst

4            Direct Examination                83

5            Cross Examination                 123

6            Redirect Examination              155

7            Recross Examination               165

8            Further Direct Examination        170

9      James Gradoni

10           Direct Examination                202

11           Cross Examination                 214

12           Redirect Examination              223

13     Ellis McCullough

14           Direct Examination                172

15           Cross Examination                 183

16           Redirect Examination              200

17     Charles A. Rosenthal, Jr.

18           Direct Examination                5

19           Cross Examination                 18

20           Redirect Examination              35

21           Recross Examination               37

22     Nicole Szucs

23           Direct Examination                39

24           Cross Examination                 65

25

```
 1                        CAUSE NO. 750,313

 2     STATE OF TEXAS              IN THE 263RD DISTRICT COURT

 3     VS.                                    OF

 4     REINALDO DENNES           HARRIS COUNTY, T E X A S

 5     A P P E A R A N C E S :

 6     For the State:            Mr. Mark Vinson
                                 Bar Card No. 2059040
 7                               Mr. Don Smyth
                                 Bar Card No.1877700
 8                               Assistant District Attorneys
                                 201 Fannin
 9                               Houston, Texas 77002
                                 713-755-7050
10     For the Defendant:        Mr. Wendell Odom
                                 Bar Card No. 15208506
11                               ms. Yalia Guerrero
                                 Bar Card No. 0078862
12                               Attorneys at Law
                                 1301 McKinney, Suite 3100
13                               Houston, Texas 77010
                                  713-951-9555
14

15

16                   BE IT REMEMBERED that upon this the 27th

17     day of August, A. D. 1997, the above entitled and

18     numbered cause came on for trial before the Honorable

19     Jim Wallace, Judge of the 263rd District Court of

20     Harris County, Texas; and the State appearing in

21     person and the Defendant appearing in person and by

22     counsel, announced ready for trial, after a jury

23     having been selected, and all preliminary matters

24     having been disposed of, the following proceedings

25     were had, viz:
```

```
 1    (              Jury came into the courtroom.)
 2               THE COURT:  Please be seated.
 3               We are going to proceed today.  I am
 4    pretty confident, as I told you, we will get through
 5    with the State's witnesses probably this morning.
 6               Somebody mentioned being sequestered, and
 7    I realize now I should tell you about that.
 8               What the law says in a capital murder,
 9    once you commence your deliberations, you are
10    sequestered until you reach a verdict, which means as
11    soon as I have a pretty good feel when this case will
12    come to a conclusion with regard to evidence, I will
13    try to tell you at least a day ahead of time.  In the
14    event you do not reach a verdict, I do have to
15    sequester you so you can bring any medication or
16    toothpaste.  However, if we are late concluding one
17    evening, like 4:00 o'clock or 5:00 o'clock, what I may
18    do -- and I will ask you ahead of time -- we will just
19    come back in the morning and start deliberations and
20    that way you can still go home that evening and have
21    the entire day to work on the verdict.  So anyway
22    that's what you can kind of prepare.
23               Again, I apologize.  I think the bailiff
24    has told you I have never conducted a capital case,
25    which is true, so I was always told a capital case was
```

1    pretty much the same.  We have non-death case capitals
2    and Mr. Smyth tells me this is the longest capital
3    that he has been in in years, so I didn't anticipate
4    this running so far over.  And I apologize about
5    telling you a week to maybe six or seven days.  If you
6    want to hold it against anybody, hold it against the
7    bailiff.
8            Let's proceed.  Call your next witness.
9            MR. VINSON:  At this time the State would
10   call Mr. Rosenthal.  He has not been sworn.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    CHARLES A. ROSENTHAL, JR.,
 2      was called as a witness for the State and, having been
 3      duly sworn, testified as follows:
 4                         DIRECT EXAMINATION
 5      BY MR. VINSON:
 6           Q     Sir, will you give your complete name and
 7      introduce yourself to the ladies and gentlemen of the
 8      jury, spell your last name for the record.
 9           A     My name is Charles A. Rosenthal, Jr.  I go
10      by Chuck.  R-o-s-e-n-t-h-a-l.
11           Q     And how are you employed?
12           A     Assistant district attorney for Harris
13      County, Texas.
14           Q     And how long have you been an assistant
15      district attorney for Harris County, Texas?
16           A     A little over 20 years.
17           Q     And do you also work with the district
18      attorney's office?
19           A     Yes.
20           Q     Let me take your attention back to an
21      offense that was alleged to have been committed here
22      in Harris County, Texas, on January 24, 1996,
23      involving a complainant by the name of Janos Szucs,
24      who was a diamond dealer here in Harris County.  Can
25      you tell His Honor and the ladies and gentlemen of the
```

1    jury if you have knowledge of that case?

2        A        Yes, sir, I do.

3        Q        And would it be a fair statement to say

4    you did investigate some aspects of the case?

5        A        Yes, sir, and assisted the investigators,

6    also.

7        Q        Will you tell His Honor and the ladies and

8    gentlemen of the jury how you became involved in that

9    case?

10       A        The night of the 24th I got a call at my

11   residence about -- it must have been about midnight.

12   I was asleep -- from the officers, who were at the

13   scene, asking certain procedural questions about their

14   ability to search the scene.

15       Q        And were you able to assist them?

16       A        Hopefully, yes.

17       Q        And as a result of assisting them in

18   providing them information, I take it, how to conduct

19   the search or go about conducting the search or what

20   was necessary to get the search started?

21       A        Yes.  Whether or not they needed a search

22   warrant or whether they could get permission from the

23   certain named individuals they gave me and tell me

24   what their participation with the people they were

25   seeking permission from.

1       Q        And did they follow your advice?

2       A        As far as I know, yes, sir.

3       Q        After that did you have any further

4   involvement in that case?

5       A        Yes, sir.  The next morning I talked to

6   the officers basically at the request of my minister,

7   who Mr. Szucs was a member of my church, Second

8   Baptist, and my minister called me and asked me to

9   look --

10               MR. ODOM:  Object to the hearsay comment

11   regarding his minister.

12      Q        (Mr. Vinson)   Did you speak with the

13   minister on the case?

14      A        Yes, I did.

15      Q        And based on that conversation that was

16   from Second Baptist Church?

17      A        Yes.

18               MR. ODOM:  Object to the relevancy of his

19   involvement in the case unless it goes to an issue in

20   dispute.  I think it is irrelevant testimony.

21               THE COURT:  It's not necessary to

22   approach.

23               It's overruled.

24      Q        (Mr. Vinson)   After speaking with the

25   minister at Second Baptist, what did you do, sir?

1      A      I talked to the Captain Richard Holland,

2   who is the head of the homicide division of the police

3   department, as well as some investigators who had been

4   working on the case.

5      Q      And did you become involved in assisting

6   in this investigation?

7      A      Yes, sir.  I later assisted the FBI in

8   interviewing Mr. Ramirez.

9           MR. ODOM:  May I approach the bench in

10  regards to my previous objection?

11           (Whereupon, the following proceedings were

12  held before the Bench.)

13           MR. ODOM:  Judge, my objection is they are

14  attempting to go in the back door, developing the good

15  qualities of the complainant through Mr. Rosenthal,

16  based upon his association with the complainant.  It

17  is at his church earlier.  Yesterday -- and it

18  it's on the record -- and to say I could have shown in

19  regard, the Court would not let me get into certain

20  matters regarding the character of the complainant.

21           What the State is obviously doing is

22  putting on character through Mr. Rosenthal that

23  doesn't have anything to do with or association with

24  the witness Tony Ramirez under the auspices of -- and

25  it's of no probative value and no basis.  What it

1    does, it bolsters the witness and he's offering

2    evidence that otherwise wouldn't be admissible.  And

3    it's objectionable.  And I would object.  And I would

4    ask the Judge to instruct to disregard the testimony

5    in that regard.

6              THE COURT:  Mr. Vinson, where are you

7    heading with all of this?

8              MR. VINSON:  He made his objection when

9    Mr. Rosenthal testified that he assisted the FBI on

10   speaking with the witness during the investigation and

11   he was going to apply to Tony Ramirez.  I think the

12   defense is the one that attacked Tony Ramirez with

13   regard to his motive.

14             THE COURT:  What does this have to do with

15   it?  What Mr. Scuzs --

16             MR. VINSON:  We are moving to that.  I

17   wanted to at least let the jury understand how he

18   became involved in it.  He just didn't want the case.

19   The only thing we do is lay some groundwork to show

20   how he became involved.

21             THE COURT:  Yes.  He was involved in this

22   case?

23             MR. VINSON:  Yes.  He became -- the

24   police called him about the search warrant and he

25   didn't know the victim and then his minister asked Mr.

1    Rosenthal to look into it and because Mr. Scuzs had a

2    meeting with them that evening and Mr. Rosenthal --

3            THE COURT:  I don't think it is

4    satisfactory.  I will tell the jury to disregard.

5            MR. ODOM:  I understand that but unless I

6    do so, I would after you instruct the jury to

7    disregard and I would ask the Judge for a mistrial.

8            THE COURT:  Denied.  I think disregard any

9    comments about a minister.

10            MR. ODOM:  Disregard comments as to other

11   persons that Mr. Rosenthal may have talked to other

12   than police personnel not involved in the case.  It

13   was obviously just a subterfuge to get into evidence

14   and it was inadmissible and it's not relevant to the

15   subject matter of Mr. Rosenthal.

16            MR. VINSON:  I don't think along those

17   lines.  I think my thoughts are a lot purer and

18   cleaner than that.

19            THE COURT:  I can see what somebody might

20   think.

21            Okay.  I'll figure out something.

22            (Whereupon, the following proceedings were

23   held before the jury.)

24            THE COURT:  Ladies and gentlemen.  Let me

25   instruct you to disregard anything that Mr. Rosenthal

1    may have said about talking to or met with or

2    discussed anything with the minister.  It's not

3    relevant.

4              Let's continue, Mr. Vinson.

5         Q    (Mr. Vinson)   You did assist the FBI in

6    this investigation; is that correct?

7         A    Yes.

8         Q    And will you tell the jurors what you did

9    in that?

10        A    I interviewed Tony Ramirez, through --

11   well, through an interpreter.

12        Q    And during the course of the interview,

13   was Mr. Ramirez able to give the information on this

14   case?

15        A    Yes, sir.  Again through the interpreter

16   and another FBI, Ruben Lopez.

17        Q    And the information Mr. Ramirez was able

18   to give you was that already known to the public or

19   did he have any information that was not known to the

20   public?

21        A    He provided specifically some information

22   that we kept from the media.

23        Q    I take it, he gave the information that

24   was not provided to the public?

25        A    Yes.

1        Q       And did that information appear to line up

2   with evidence that you already had secured.

3               MR. ODOM:   Object as to whether or not

4   hearsay matters, he has received information did or

5   did not line up with his investigation as far as the

6   relevancy of that was to any controverted fact in this

7   case.

8               THE COURT:   Before I rule on that, will

9   you restate the question for me.

10              MR. VINSON:   Yes, I will restate.

11       Q       (Mr. Vinson)   The information that you

12   obtained from Mr. Ramirez, okay, was that -- I didn't

13   get the response, let me start over.

14              The information that Mr. Ramirez gave you,

15   did he have any parts that had not been released to

16   the public?

17       A       Yes.

18       Q       And were you able to verify what he gave

19   you.

20              MR. ODOM:   Judge, that is bolstering.   I

21   object to that.

22              MR. VINSON:   I don't know how it's

23   bolstering.

24              THE COURT:   It's overruled.

25       Q       (Mr. Vinson)   Were you able to verify

1      that?

2          A      Yes, we were.

3          Q      Now, in the course of speaking with Mr.

4      Ramirez, was he also able to give the information that

5      lead you to a certain location here in Harris County,

6      Texas?

7          A      Yes, sir.

8          Q      And was that to a firing site?

9          A      Yes, sir.

10                MR. ODOM:  Object, this is bolstering the

11     prior witness' testimony.  The testimony stands on its

12     own.  They are attempting to give more weight to the

13     testimony by the testimony of Mr. Rosenthal bolstering

14     prior testimony and I believe the prior --

15                MR. VINSON:  Your Honor, Mr. Ramirez's

16     testimony has been under attack from the day he took

17     the witness stand.  This attorney has attacked and

18     created error.

19                THE COURT:  Let's don't get into that.

20                MR. VINSON:  I'll move on, Your Honor.

21                MR. ODOM:  It's like saying I believe him.

22     That's what bolstering is.

23                THE COURT:  Thank you for that.

24                I sustain that objection.

25                Ask the next question.

1        Q       (Mr. Vinson)   Well, was there any

2   discussion with Mr. Ramirez about him being prosecuted

3   for any involvement in this case?

4        A       With Mr. Ramirez, no.

5        Q       Did you have a discussion with Mr. Holmes,

6   the district attorney of Harris County, Texas?

7        A       I did.

8        Q       And after you talked with Mr. Holmes,

9   based on the evidence that you had involving Mr.

10  Ramirez, was there any possibilities of prosecuting

11  him?

12       A       No, sir.   It was not possible to prosecute

13  Mr. Ramirez based upon what he told me.

14       Q       Was it your understanding that he had

15  prepared a silencer?

16       A       Yes, sir.

17       Q       Why couldn't you --

18       A       Actually two of them.

19       Q       Why couldn't you prosecute him?

20       A       Because we didn't have either one of them.

21       Q       Do you know how Mr. Ramirez found his way

22  into the FBI or the Houston Police Department?

23       A       Both, yes, sir.

24       Q       And how did that happen?

25       A       I was initially contacted by my wife.   Sue

1    is an FBI agent, who, in turn, asked me to contact Tom

2    Barton and he's a special agent with the FBI, and was

3    introduced to an agent, who had Mr. Ramirez with him.

4    After our discussions, I had Ruben Lopez -- Special

5    Agent Ruben Lopez -- take Mr. Ramirez to the Houston

6    Police Department Homicide Division for further

7    questioning.

8         Q    Did the FBI have any interest in

9    prosecuting Mr. Ramirez?

10        A    Not that I know of, no.

11        Q    There was some mention of a reward?  Do

12   you know of a reward?

13        A    Yes, sir.  I know of a reward.

14        Q    With your conversation with Mr. Ramirez

15   through the interpreter, again did that reward ever

16   dominate the conversation?

17        A    I never discussed a reward with Mr.

18   Ramirez at all.

19        Q    Did he ever initiate any conversation with

20   you about a reward?

21        A    Not in the two hours I was with him, no,

22   sir.

23        Q    Incidentally, is there anything sinister

24   about paying a reward to a person that comes forth?

25        A    No, sir.

1     Q     Does it happen from time to time?

2     A     It does.  As I understand, the reward was

3  from the people who were in the building as opposed to

4  peace officers or anybody connected with law

5  enforcement.

6     Q     Did you also attempt to verify Mr.

7  Ramirez's location when this offense was committed?

8     A     Yes, sir.  We had an airline ticket.  He

9  brought an airline ticket with him that day.

10     Q     Did you have any reason to believe that he

11  was in the country when this offense was committed.

12           MR. ODOM:  Object to what he has reason to

13  believe or doesn't have reason to believe.

14           THE COURT:  It's overruled.

15     A     I felt that he was not in the country when

16  the offense happened.

17     Q     (Mr. Vinson)  Do you know anything about

18  some Bagotta brothers?

19     A     I have had some conversations with those

20  individuals.  Yes.

21     Q     And, I take it, that you investigated or

22  assisted in investigating all the leads; is that

23  correct?

24     A     I was kept aware of the status of the

25  investigation.  In fact, one reason I was asked to

1   help out with Mr. Ramirez is that the investigating

2   officers were investigating leads on other potential

3   suspects.

4        Q      And, in fact, I think His Honor assisted

5   you on this case at one time; is that correct?

6        A      Yes.  I think I actually presented the

7   case to the grand jury.

8        Q      Was there any reason to believe that the

9   Bogotta brothers were in Harris County.

10              MR. ODOM:  Object, unless this person has

11   personal knowledge.

12              (Off-the-record discussion held at the

13   bench.)

14              THE COURT:  Sustain testimony in that

15   regard.

16              MR. ODOM:  Ask for an instruction for the

17   jury to disregard.

18              THE COURT:  The jury will disregard that

19   last question.

20              MR. ODOM:  Ask for a mistrial.

21              THE COURT:  Denied.

22        Q      (Mr. Vinson)   And during the time that

23   Tony Ramirez was talking to you, sir, was there an

24   attorney with him?

25        A      No, sir.

1        Q       Was he interested in an attorney in your

2    office?

3        A       Didn't mention one to me.

4                MR. VINSON:  I have no further questions

5    of Mr. Rosenthal.

6

7                         CROSS EXAMINATION

8    BY MR. ODOM:

9        Q       Mr. Rosenthal, I believe, based upon your

10   testimony, you were one of the attorneys involved in

11   this case from the outset?

12       A       Yes, sir.

13       Q       And you were certainly one of the

14   attorneys that was involved in dealing with the person

15   that we have all seen and heard from by the name of

16   Tony Ramirez?

17       A       Yes, sir.

18       Q       And when Mr. Ramirez went over to the FBI

19   to discuss with them certain information, you actually

20   assisted in finding the right person for him to go

21   talk to over with the Department of Justice or with

22   the federal government?

23       A       No, sir.

24       Q       You weren't?

25       A       No, sir.

1      Q      You arranged for the contact to be made

2  wherein that was established for the person for them

3  to talk to?

4      A      No, sir.

5      Q      I thought that you contacted your wife and

6  then contacted someone else and made arrangements for

7  Mr. Ramirez to go see them over at the federal

8  government?

9      A      No, sir.

10      Q      How is it did Mr. Ramirez go to the

11  federal government initially and then come to see you

12  you?

13      A      I don't know what he did before he saw me.

14  I was contacted by my wife, who asked me to get in

15  touch with Tom Barton, and I met Mr. Barton, the

16  informant, Tony Ramirez, at the FBI office.

17      Q      The arrangement was already made for Mr.

18  Barton to get together with Mr. Ramirez prior to you

19  knowing about it?

20      A      Yes.

21      Q      I misunderstood that.

22          You are told that there is going to be a

23  meeting.  It's going to involve Mr. Ramirez, Agent

24  Barton, and because your office is also involved in

25  the case, you are going to be one of the

1    representatives, if not the representative, from the

2    State?

3         A     Not exactly that but you are close.

4         Q     More or less, close enough.  Okay.

5         A     Yes.

6         Q     Now, during the interview with Mr.

7    Ramirez, do you know if it was -- did you actually

8    attend a debriefing of Mr. Ramirez there at either the

9    bureau's office or somewhere with the federal

10   government?

11        A     Yes, sir.  I was there when they first

12   looked into.

13        Q     Pardon?

14        A     I was there when he was first spoken to.

15        Q     By that -- and this is what I am really

16   asking -- was that a full debriefing that was done or

17   was it a debriefing that was done of the witness?

18        A     No.  We were told that somebody had

19   information.  I went to see if the information was a

20   possibility, if it was possibly true, because,

21   obviously, we were exploring all leads.  When I heard

22   what I did, I made arrangements for him to talk to

23   HPD.

24        Q     My question was:  How long did the

25   interview take with Mr. Ramirez?

1      A      At least a couple of hours.

2      Q      It was question intensive or detail

3    intensive interview?

4      A      Yes, from my standpoint.

5      Q      Was there a videotape made of that

6    interview?

7      A      No.

8      Q      Were there notes made of the interview?

9      A      I'm sure there were.

10     Q      From your perspective, not from the

11   federal government's perspective?

12     A      I made no notes myself.

13     Q      Someone with the State?

14     A      Yes.  I took an HPD lieutenant with me and

15   did not disclose he worked for HPD.  He took notes.

16     Q      And which lieutenant would that be?

17     A      I beg your pardon?

18     Q      Who would that be?

19     A      Greg Neal.

20     Q      And, of course, as we all know, the bureau

21   is always taking notes in interviews?

22     A      I don't know if they took notes -- seemed

23   like there was a tape recorder there.

24     Q      There was either a recording or notes,

25   some sort of notes made.

1          As a result of either before or after that
2    interview, did you receive, what we call, a proffer
3    letter that the federal government had that had Mr.
4    Ramirez's name on it?
5         A    Yes.
6         Q    I would like to show you what I have been
7    shown and I'd mark.
8              (Whereupon, Defendant's Exhibit No.3 was
9    marked for identification.)
10             MR. ODOM:  May I approach the witness?
11        Q    Can you identify that?
12        A    Sure.
13        Q    Does that appear to be what we were
14    talking about, that is, a copy, unsigned copy, of what
15    we call a proffer letter?
16        A    Right.  I present it by my notations to
17   Mr. Vinson and my name meeting on it, also.
18             MR. ODOM:  Your Honor, at this time I
19   would offer Defendant' Exhibit 3 into evidence and
20   tender a copy to counsel.
21             MR. VINSON:  We would object to the
22   relevance, hearsay, and on several other grounds.
23             THE COURT:  Let me see it, please, Mr.
24   Odom.
25             At this time it will be denied.

1       Q       (Mr. Odom)   Mr. Rosenthal, you don't know

2   if this proffer letter was signed by Mr. Ramirez or

3   not, do you?

4       A       I have no idea.  No, sir.

5       Q       In the sequence of events, I know you can

6   look at the facts on the top of it and tell whether

7   you received it, but in the sequence of events as to

8   you meeting over at the bureau Mr. Ramirez and Agent

9   Barton, when did you receive -- and if you need to

10  look at this -- when did you receive this proffer

11  letter?

12      A       I want to say probably a week or so after

13  I met with Mr. Ramirez.

14      Q       And so what happens is that, after you

15  have had that meeting, in the normal course of your

16  business you received a Faxed copy of a document from

17  the Department of Justice?

18      A       I would not say in the normal course of my

19  business.  No, sir.

20      Q       In your business as a district attorney,

21  it wouldn't be unusual that you would get a copy of

22  something like that on a case that you are involved?

23      A       It is unusual.

24      Q       Although you may not get lots of

25  communication from the federal government, they have a

1    tendency to be close with their documents.  If you are

2    working a case and the government is working a case,

3    it's not unheard of for you to receive a copy of

4    something on a parallel case that they are working

5    with, is it?

6         A     I would say unusual.  It's not unheard of.

7    It's unusual.

8         Q     It's certainly something within the realm

9    of business?

10        A     Yes.

11        Q     And that's in furtherance of this case, is

12   it not?  That document relates to the matters that we

13   are litigating today to some extent, does it not?

14        A     That's your characterization.

15        Q     It talks about Tony Ramirez, doesn't it?

16        A     Yes.

17        Q     A Tony Ramirez is a witness in this case?

18        A     Yes.

19        Q     And you knew Tony Ramirez had something to

20   do with this incident on that date?

21        A     Yes.

22        Q     And the government is sending a letter to

23   Tony Ramirez is involved not only, they are looking in

24   to but what you are looking in to, right?

25        A     No.

1          Q      He's not involved in it?

2          A      Mr. Ramirez, as far as I know, there was

3     no federal investigation, nothing having to do with

4     any -- I mean, the FBI were facilitators.  They

5     weren't investigating the robbery murder.

6          Q      I understand they weren't investigating a

7     robbery murder but possession and manufacture of a

8     silencer is a federal offense, is it not?

9          A      It is, as I understand it.

10         Q      And that's certainly within the purview of

11    the federal government?

12         A      It is within the federal government, not

13    the FBI.

14         Q      Although they would have to turn it over

15    to the ATF, it's the FBI's obligation and duty when

16    they come across matters and find out if those matters

17    belongs to the ATF and they will send it over to the

18    Alcohol, Tobacoo and Firearms, correct?

19         A      I can't testify to that.  I don't know.

20         Q      Regardless, you received a copy of what we

21    call a proffer letter.

22                What is a proffer?  Tell the ladies and

23    gentlemen what we are talking about when we say a

24    proffer.

25         A      A proffer letter has to do with an

1    indication from a prosecutorial  agency what they are

2    going to do in a given situation.

3        Q     Very often a proffer letter is like I want

4    to come and talk to you, Chuck Rosenthal, and what I

5    have to say might incriminate me.  And if I tell you

6    something that might incriminate me, you could use

7    that against me at in a future trial.  As a result, we

8    have a device wherein you can agree, as a prosecutor,

9    that you will listen to what I have to say and no

10   promises are made but you cannot use what I say

11   against me in court if we don't work out some sort of

12   arrangement?

13       A     I cannot do that.

14       Q     The governmental authorities can do that,

15   can they not?

16       A     As I understand, it's statutory

17   federally.  In state court, only Mr. Holmes, the

18   district attorney, has that authority.

19       Q     And I didn't mean -- and, understandably,

20   in this courtroom you have got to be very technical.

21   I didn't mean you literally.  I meant the district

22   attorney's office and you are telling us the policy

23   that only Mr. Holmes has that authority?

24       A     Yes.

25       Q     But a district attorney or a federal

1 prosecutor or a U S attorney or his appointed

2 designatee can make an arrangement wherein they can

3 listen to someone, who can tell them a story, and that

4 story can incriminate that person, that is, what he

5 says can be matters that inculpate him, get him

6 involved in a case that would show his guilt in that

7 case but that the district attorney or the US

8 Attorney, or whoever it is, agrees that whatever they

9 hear they are not going to use that against that

10 person because they are trying to work out some sort

11 of a bargain.  Is that a rough fair statement of what

12 a proffer agreement very often is?

13  A  That could be a form of a proffer

14 agreement.  Yes.

15  Q  And that's, more or less, what you

16 received information that was being communicated as a

17 proffer letter between the federal government and Mr.

18 Tony Ramirez, is it not.

19    MR. VINSON:  Again, Your Honor, I am going

20 to object.  He is trying to get into what he couldn't

21 get into by way of hearsay.

22    THE COURT:  By what?

23    MR. VINSON:  He is trying to get into the

24 letter that was sent and you have already ruled on it

25 and it's hearsay.  It's not admissible.

1          THE COURT:  I didn't rule on that.

2          MR. VINSON:  Well, we denied.  When you

3     were at the bench, you denied it yourself, Your Honor.

4          MR. ODOM:  I think you denied.

5          THE COURT:  I didn't say for what reason

6     or anything of that nature.

7     A     Yes.

8     Q     (Mr. Odom)   Let's get to the point.   The

9     point is that you got a copy, did you not, Mr.

10    Rosenthal, of a proffer letter between the federal

11    government and Tony Ramirez that granted Tony Ramirez

12    immunity as to his testimony and that proffer letter

13    had both Tony Ramirez's name as well his attorney's

14    name on that proffer letter, correct?

15    A     Not correct.  I got a copy of a letter

16    that purported to be from an assistant district

17    attorney Joe Magilio to an attorney.

18    Q     Now, what's in dispute is we don't know if

19    the attorney may have given it to Mr. Ramirez or not

20    but --

21         MR. VINSON:  Again, we are going to

22    object.  There is no proof here before this Court that

23    Mr. Ramirez ever had an attorney.  There is no proof.

24         MR. ODOM:  That's the whole point.  That

25    letter establishes that he did.

1              THE COURT:  I sustain that objection.

2        Q        (Mr. Odom)   You received a document that

3    has in that document what purports to be a proffer

4    letter to Mr. Ramirez and someone who purports --

5              MR. VINSON:  Object to testimony coming

6    from that letter.  That's hearsay.

7              THE COURT:  Sustained.

8        Q        (Mr. Odom)   Do you know if Mr. Ramirez

9    ever had appointed for him by the federal government

10   an attorney?

11       A        I do not know that.

12       Q        Do you know if Mr. Ramirez ever had an

13   attorney that represented him in any regards in this

14   case?

15       A        Not personally, no, sir.

16       Q        You do have knowledge.

17              MR. ODOM:  May I approach the Bench, Your

18   Honor?

19              (Whereupon, the following proceedings were

20   held before the Bench.)

21              MR. ODOM:  Judge, I think I have

22   established that this witness has personal knowledge

23   having received this document.  Now, the State's

24   objection to the document is that there is no proof

25   that document was ever signed by a witness.  That's

1   not a hearsay objection.  That goes to the weight of

2   the evidence.

3               THE COURT:  You haven't asked the

4   question.  I am waiting for:  Does Mr. Rosenthal have

5   personal knowledge of Mr. Ramirez having seen that

6   document.

7               MR. ODOM:  He said he has no document or

8   not.

9               THE COURT:  Is that he said?

10              MR. ODOM:  But, Judge, the question is

11  that I am attacking the credibility of Mr. Ramirez and

12  a document exists that a jury could reasonably

13  determine, based upon that document, the weight of the

14  evidence.  Now, they can argue all day long, I never

15  proved received.

16              THE COURT:  Any document pops up on you,

17  any of it factual or valid or anything about that is

18  truthful.

19              MR. ODOM:  Judge, there is a lot in that

20  document that would lead a jury to believe that Mr.

21  Ramirez did receive such information.  It's not just

22  any document.  It's got a lot in there.

23              THE COURT:  Why couldn't he consider a

24  proposal to how do we know he got presented the

25  document?

1          MR. ODOM:  That goes to the weight of the

2     document and not the admissibility.

3          THE COURT:  I'm ready to rule.  It's

4     overruled.

5          MR. SMYTH:  Our objection is overruled?

6          THE COURT:  No.

7          MR. ODOM:  Mine.

8          THE COURT:  Your offer is overruled.

9          (Whereupon, the following proceedings were

10    held before the jury.)

11         THE COURT:  Let's continue, Mr. Odom,

12    please.

13    Q     (Mr. Odom)   Now, I believe you testified

14    that Mr. Ramirez could not be prosecuted; is that

15    correct?

16    A     Not on state level.

17    Q     And that's based upon the fact that he

18    committed no crime?

19    A     I don't know whether he committed a crime

20    or not but the problem is that when you offer -- if

21    you are going to prosecute somebody for making a

22    silencer, you have to be able to offer the silencer

23    into evidence and prove it was a silencer.  Since we

24    didn't have it, we couldn't do anything at that point.

25    Q     If a person makes an instrumentality of an

1    offense and is told that instrumentality is going to

2    be used in the commission of a crime and that person

3    does nothing to prevent that crime from occurring and

4    allows whatever he has created to be used as an

5    instrumentality in a crime, that person can be charged

6    either under parties or conspiracies for the actual

7    offense that was committed, could he not?

8         A      In theory, yes, sir.

9         Q      So just because you didn't have a silencer

10   does not mean necessarily that a person could not be

11   prosecuted for other offenses, correct?

12        A      Assuming other information, yes, sir.

13        Q      And assuming, of course, that the State

14   either believes or doesn't believe certain information

15   they may have and assuming a lot of other factors, but

16   to a certain extent whether or not someone will or

17   will not be prosecuted depends upon a prosecutor's

18   perspective of the offense, correct?

19        A      Our perspective of what the evidence is.

20        Q      Sure, that's what I am talking about.

21        A      Yes, sir.

22        Q      Also, there is other factors that might go

23   into determining whether or not a case will or will

24   not be prosecuted.  And one of those can depend upon

25   whether or not someone is a cooperating witness,

1     correct?

2          A      It could.

3          Q      And are you saying the fact that Mr.

4     Ramirez was a cooperating witness was not in any way

5     determinative as to whether or not he was going to be

6     prosecuted under any case?

7          A      Mr. Odom, I didn't make the decision.   Mr.

8     Holmes made the decision.   I don't know what he based

9     it on.

10         Q      That's fair enough.

11                Now, they asked you some questions about

12    reward money?

13         A      Yes, sir.

14         Q      And Mr. Vinson asked you specifically is

15    there anything sinister about reward money.   Is there?

16         A      No, sir.

17         Q      We use reward money all the time to solve

18    cases?

19         A      I say infrequently but it's not unheard

20    of.

21         Q      It's not unheard of.

22                Influence, reward money can be given in

23    many different ways, especially if I believe you

24    testified that this was not money that was associated

25    in any way with the State of Texas, correct?

1        A        That's right.

2        Q        In other words, a private organization can

3   put up money or a private person can put up money as a

4   reward money?

5        A        Yes, sir.

6        Q        And O. J. Simpson put up reward money?

7        A        I don't know.

8        Q        At least, if we believe the news reports,

9   we have been told that.

10               Are you aware of the fact that sometimes

11  reward money is conditioned upon the arrest and

12  prosecution of persons?

13       A        I'm sure it is.

14       Q        Well, you have heard that, haven't you?

15       A        I have heard that alluded to more in drama

16  than I have in fact.

17       Q        You have also seen instances where reward

18  money is based upon an arrest and prosecution of a

19  person?

20       A        I can't specifically name any time.  No,

21  sir.

22       Q        If that were the case, you are not telling

23  the jury that wouldn't necessarily be a motive for

24  someone to testify, are you?

25       A        I'm not trying to tell the jury anything

1     about rewards.

2          Q      Well, I realize that.  But when asked the

3     question about rewards, it's true, if an reward is

4     structured in a certain way, it certainly can be in

5     business a motive to testify one way or another,

6     right?

7          A      Hypothetically.

8                 MR. ODOM:  Pass the witness.

9                 THE COURT:  Mr. Vinson.

10

11                     REDIRECT EXAMINATION

12    BY MR. VINSON:

13         Q      Ms. Estrella Martinez, she has been

14    prosecuted; is that correct?

15         A      Yes, sir.

16         Q      And she's a cooperating witness?

17         A      Yes, sir.

18         Q      Hypothetically, if one develops an

19    instrument, criminal instrument, and he only discovers

20    during the development that it is a criminal

21    instrument and then one refuses to engage in any

22    offense where that criminal instrument will be used,

23    he has failed --

24         A      I beg your pardon?

25         Q      And failed to report it?

1        A       Okay.

2        Q       The person, they develop a criminal

3   instrument and don't realize what it is until after

4   some period of development, and then it comes to their

5   knowledge that it is going to be used in a crime and

6   they refuse to engage in that crime, can they be

7   prosecuted for the commission of an offense in state

8   court that they were not a party to?

9        A       They can under limited circumstances.

10  Yes, sir.

11       Q       But, I mean, if they were not a party to

12  the offense and had no perception that the offense was

13  going to be committed and, then, at a later date they

14  found out that the offense was going to be committed,

15  like in the circumstances of Tony, could they be

16  prosecuted in state court?

17       A       Mr. Vinson, I can't agree that

18  circumstances for Mr. Ramirez, as I knew them, there

19  is no affirmative duty to report a crime after it

20  happened.  This is not a felony in Texas.

21               MR. VINSON:  I have no further questions.

22

23

24

25

1                          RECROSS EXAMINATION

2        BY MR. ODOM:

3             Q       Briefly, in regards to what Mr. Vinson was

4        asking you, we don't have prison as a state offense

5        but the determination of whether someone has knowledge

6        and whether someone becomes involved or whether

7        someone tries to drop out of a conspiracy, that really

8        is the determining factor as to whether or not that

9        person is or is not involved in a crime, right?

10            A       I'm sorry.  I don't understand your

11       question.

12            Q       It's not a trick question.

13                    We are throwing all these hypotheticals

14       out at you about, well, if someone had knowledge at

15       that point and if someone didn't have knowledge at

16       this point or if someone created an instrumentality of

17       a crime.  What really determines whether a party is or

18       is not involved in an offense is going to be whether

19       that party has knowledge of what's going on, what his

20       knowledge of what's going on and what he does once he

21       acquires knowledge of what is going on.  Isn't that

22       real rough, sort of a ball park sketch, of major

23       determiners that a prosecutor uses when they determine

24       whether or not someone will or will not be charged as

25       a party or a conspirator?

1       Q       And where was that office located?

2       A       6222 Richmond on the seventh floor.

3       Q       And that building is commonly referred to

4   as a Greenrich Building?

5       A       Yes, it is.

6       Q       And did your husband also have a business

7   phone at that building?

8       A       I'm sorry.

9       Q       Did your husband also have a business

10  phone at that address?

11      A       Yes, he did.

12      Q       And do you know that address, that is, the

13  telephone to that address?

14      A       784-1996.

15      Q       And what was the name of the business?

16      A       J and S Precious Stones, after Johnny.

17      Q       Those were his initials, correct?

18      A       Yeah, Johnny Szucs.

19      Q       Can you see this number here where you are

20  seated?

21      A       Yes, I can.

22      Q       This one right here, 713-784-1996, is that

23  the same number you just testified to?

24      A       Yes, I did.

25      Q       Is that your husband's business number?

```
 1        A       Yes, it is.

 2        Q       How long had your husband been in that

 3   Richmond office on the seventh floor?

 4        A       1990, September of 1990, he moved in

 5   there.  I helped him decorate.

 6        Q       So he had been there a little over six

 7   years --

 8        A       Yes.

 9        Q       -- at the time of his death?

10        A       (Witness nods head.)

11        Q       Do you also do decoration as well?

12        A       No, I used to paint for him.  Every time I

13   paint your picture, "I like that.  I'll put it in my

14   office."  So all my paintings were in his office.  I

15   never sold any.  I just painted for him.

16        Q       Now, can you give us your husband's

17   procedure?  Approximately what time would he go to

18   work in the morning?

19        A       Well, he was an early riser.  I mean, he

20   get up like 5:00 in the morning.  And he had a

21   computer at home.  So he would program whatever he

22   needed from information on his computer at home, and

23   then he would go to the office about 7:30, 8:00

24   o'clock.  And then he would stay there until about

25   7:30, 8:00 o'clock at night.
```

1          Q       And have you and your husband developed
2     some kind of system where you all communicated with
3     each other?
4          A       Yeah.  When I wanted to call him, I would
5     either call him on his mobile or page him or call him
6     at his office but I am pretty persistent.  When I
7     wanted to call him and talk to him, I wanted to talk
8     to him right then and there.  He would answer me
9     pretty quickly.
10         Q       Now, when your husband would make
11    transactions, that is, on memo, did he have a certain
12    procedure -- and this memo, I think you have already
13    testified this is whereby a jeweler will let out or a
14    broker will let out a certain stone or stones and
15    would that be the accountability?
16         A       Yeah.  The procedure -- and I learned this
17    after my husband's death -- the procedure is a company
18    is going to get another stone from my husband,
19    Johnny.  Then Johnny would write out a memo that had
20    his company's name on it -- J and S Precious Stones --
21    and the date and describe the stone.  And he always
22    had a code and the clarity and color and, then, their
23    price that it was and, then, the person would sign it
24    with his signature, kind of a sealed contract.
25         Q       And did he do that on few or many

1    occasions?

2         A      All the time.

3         Q      It's on a regular basis?

4         A      That's how they do business.

5         Q      Now, did your husband from time to time

6    travel abroad to make purchases?

7         A      Yes, he did.  He would go to Belgium on a

8    regular basis, at least three or four times a year.

9         Q      And did you ever travel with him?

10        A      Yes, I did.  I would go just for fun and

11   go to the museums and look at all the pretty things.

12   That's about all I did.

13        Q      When was the last time your husband

14   traveled abroad to make a purchase?

15        A      We went on a trip to Holland with the

16   Second Baptist Church.

17        Q      What month was there?

18        A      In January of '96, and he was going to go

19   to the second part of it before we left Israel, to go

20   to Tel Aviv, to purchase some stones.

21        Q      Did he do that?

22        A      Yes.  We got baptized there, too.

23        Q      Did he maintain those stones in his

24   inventory as well?

25        A      Yes, he did.  As far as I know, I mean, I

1    don't know.

2         Q      How did he keep accountability of what he

3    had there that he had?

4         A      He had everything on his computer.  I

5    mean, that computer -- he would always be on that

6    computer.  And he would enter his stone he had on the

7    computer.  It would have location of where it was and

8    who had it and when they wrote out the memo.  And if

9    it was sold, he would write it.  It would say

10   "invoice" on there.

11        Q      Did he also have the same computer in his

12   office?

13        A      Yes.

14        Q      He had a computer there?

15        A      It was connected so all you had to do was

16   enter it and it would call automatically and we

17   would --

18        Q      What type of information would he maintain

19   in his data base there with respect to that inventory?

20        A      What it says on the computer was basically

21   the weight, the shape, the size of the stones, how

22   many of the stones there were because they could be a

23   parcel and the clarity, color, measurements, location

24   as to the stone, the cost of the stone and, then, the

25   selling price of the stone and who we had bought it

1    from.

2         Q      And was this, I guess, a constant state of

3    updating?

4         A      Yes, it was.  He constantly updated it and

5    would change around because every day would change.

6         Q      Did you visit him at his office?

7         A      I would go there after hours, after I got

8    off of work.  And I would bring Chinese food and,

9    hopefully, a big bottle of wine so he wouldn't have us

10   work too long.  And I would help him with inventory

11   and paperwork and things like that.

12        Q      Now, when you arrived there, if the office

13   was closed -- withdraw that -- and could one walk off

14   the main corridor in the building there, leads to the

15   various offices, could one walk off and walk into J

16   and S Precious Stones?

17        A      No, you couldn't.  When you would enter

18   Johnny's office, the first door opens.

19        Q      Not necessarily I am talking about the

20   outer office first.  If you are walking down the

21   hallway and there are different merchants on each

22   side --

23        A      Yes.

24        Q      -- and if I were walking down the hallway

25   and I get to J and S --

1       A       Yes.

2       Q       -- J and S Precious Stones, could I open

3   the door and walk in from the hallway?

4       A       Yes.

5       Q       Now, once, assuming that takes place,

6   could I go any further?

7       A       No.

8       Q       And will you tell the ladies and gentlemen

9   why that was?

10      A       It's called a man trap and you can't open

11  the door unless the person sees you on the camera and

12  releases a button to let you in.

13      Q       So once you get into this area -- you call

14  it the man trap -- then, to proceed further, you can

15  only do that by one or two things:  Tearing the door

16  down, correct?

17      A       Uh-huh.

18      Q       Or by someone inside allowing you entry?

19      A       Correct.

20      Q       And how would you gain entry?

21      A       The same way.

22      Q       You go in the man trap?

23      A       Uh-huh.

24      Q       And then your husband would look up?

25      A       There is a camera and on the monitor.

1      Q      And then what would he do to allow you

2   entrance?

3      A      Then he pushed the button, to release the

4   door, to let me in.

5      Q      Where was this located?

6      A      On his desk.

7      Q      Then he could do that without leaving his

8   desk?

9      A      Yes.

10     Q      And once you get into the office, then you

11  can try to go to the various offices?

12     A      Yes.

13     Q      Now, let me take you to the 24th of

14  January, 1996.  Can you tell the ladies and gentlemen

15  of the jury what time your husband went to work that

16  morning?

17     A      His car was in the shop.  Johnny hated

18  asking people -- and I'm not going to cry.  His car

19  was in the shop, so I had to take him to work that

20  morning.  I took him to work about 7:30 because I had

21  an appointment.

22     Q      And at that time did he have a business

23  partner?

24     A      He had someone sharing his office space

25  with him, Sammy Solomay.

1      Q      Did you have any further contact with your

2  husband on the 24th of January after you took him to

3  work?

4      A      I called him a couple of times during the

5  day, and he was very busy.  The last time I called him

6  was about 5:30 and he said, "baby" --

7      Q      Don't tell me what he said.

8             Did you have a conversation with him?

9      A      Yes, I did.

10     Q      Now, was your husband suppose to do

11  something or go some place that evening?

12     A      He had an appointment with Second Baptist

13  Church.  They had a meeting there.

14     Q      And, I take it, that you went ahead and

15  took care of whatever matter you had that evening?

16     A      Right.  I had a class I was going to that

17  evening.  We are both suppose to be home at 10:00

18  o'clock.

19     Q      When your husband didn't come home at

20  10:00 o'clock, what did you do?

21     A      Called him at his office first.  Then I

22  paged him.  Then I call him on his mobile.  Then, you

23  know, I repeated it about three or four times.

24     Q      Did you get any response?

25     A      No, I didn't.

1        Q        What did you do next?

2        A        Well, Moy Rosenberg called me and he said

3    that a guard had been shot.

4        Q        Okay.  Don't tell me.

5                 What was Moy Rosenberg to your husband?

6        A        He was a business associate.

7        Q        And did you talk with Moy Rosenberg?

8        A        Yes, I did.

9        Q        And from that conversation, did you become

10    somewhat concerned?

11        A        Yes, I did very much.

12        Q        And what did you do to try to relieve your

13    concern?

14        A        I told Moy to call the office manager,

15    Susan, to check to see if Johnny's car was still

16    there.

17        Q        Now, I think you said you drove him to

18    work that day?

19        A        The mechanic would always bring his car to

20    him, back to the building.

21        Q        Did your husband wear any rings on his

22    finger?

23        A        Yeah.  He always wore a pinkie ring, a

24    five-carat pinkie ring.

25        Q        When he went to work that morning, did he

1    wear that ring?

2        A     Yes.  It looked nice on his hand, too.  It

3    didn't look overdone, you know.

4        Q     Was the ring ever recovered?

5        A     No, it wasn't.

6        Q     After it was determined that your husband

7    had been shot to death in his office, at some point in

8    time, were you called upon to inventory the stones

9    that he had in his computer there?

10       A     I didn't know how to work the computer at

11   the time so I had to hire someone to figure out how to

12   work the computer but the hard drive was broken.  So I

13   had to get it repaired before we could do that from

14   his office.  We had a home computer so that's what I

15   worked from.

16       Q     With assistance, were you able to do that?

17       A     Pardon me?

18       Q     Were you able to make a determination on

19   the value of the diamonds that your husband had in his

20   inventory?

21       A     Yes, I did.

22       Q     And what value did you place on that

23   inventory?

24       A     3,609,000.

25       Q     Now, had you and your husband planned to

1      go on a buyer's trip during the month of January?

2          A       We were supposed to go to Palm Springs,

3      California, on that weekend.

4          Q       That would have been the weekend that he

5      was shot to death?

6          A       Right.

7          Q       And for what purpose, were you going to

8      that location?

9          A       There was a jewelry show there, in

10     California, and Johnny -- we always mixed some

11     business with, you know, pleasure, so I would go to

12     the shows with him.

13         Q       And when he would go to the show, would he

14     take cash on him?

15         A       Yes.

16         Q       And was he planning to take cash with him,

17     too?

18         A       He always used to bring cash with him.

19         Q       And that was to make the purchases?

20         A       Right, always; all those dealers.

21         Q       Now, when he would go to these diamond

22     shows and he would purchase, can you give us a ball

23     park figure on the value of the diamonds he would

24     purchase and the cash transactions he would make?

25         A       I really don't know because he always kept

1    that, you know, separate.  He never really --

2         Q      Fair enough.  But when he would go out,

3    would he buy expensive diamonds or what?

4         A      I mean, the business is a very secretive

5    business.  And I kind of talk too much, so he wouldn't

6    tell me too much about that because, you know, then

7    the dealers would ask me and then I would blurt it

8    out.  And he would say, "Don't tell them anything,"

9    because they would do it on purpose, to ask me for

10   information.

11        Q      Now, after your husband's funeral, did you

12   have occasion to be called upon to go out and try to

13   execute -- I guess you may say -- those memos that he

14   had where diamonds were still being held by certain

15   people?

16        A      The people he bought the larger purchases

17   from, before he was killed, I had to pay back since we

18   didn't --

19        Q      Listen to my question first.

20               First of all, did Johnny leave some memos

21   behind?

22        A      Yes.

23        Q      And were those memos an indicator of the

24   type of diamond he had out, he had released to

25   someone?

1       A       Yes.

2       Q       And the name of the party?

3       A       Yes.

4       Q       And what else would be contained on the

5    memo?

6       A       And the signature of the person.

7       Q       Now, were you called upon, at some point

8    in time, to get those diamonds that were still out in

9    possession of the parties?  Were you called upon to go

10   out and try to get those diamonds back?

11      A       Yes, I was.

12      Q       How did you do that?

13      A       With the memos I had, the memos prove it,

14   also, what was on the computer.

15      Q       And did you have any success in doing

16   that?

17      A       Some success.

18      Q       Did your husband have a procedure to show

19   if a memo was outstanding or if it had, that is, the

20   stone had been returned and that memo was no longer

21   outstanding?

22      A       Yes.  He would cross through it and sign

23   his name and the date.

24      Q       Did you visit with a person by the name of

25   Rojas?

1        A       I'm not good with names.  What was the

2   first name?

3                MR. VINSON:  May I approach?

4                Let me see the pictures here.

5        Q       Can you look?  Did you contact?  Did you

6   contact someone by the name of Francisco?

7        A       Yes, I did.

8        Q       And for what purpose did you contact

9   Francisco?

10       A       One of my associates told me that they are

11   leaving out of the --

12                MR. ODOM:  Object to the hearsay.

13                THE COURT:  Sustained.

14       Q       (Mr. Vinson)   Don't tell us what they

15   said.  Tell what you did.

16       A       I went to pick up the stone from

17   Francisco's office.

18       Q       Where was Francisco's office located?

19       A       On the third floor.

20       Q       And who was he officing with?

21       A       Reinaldo Dennes.

22       Q       And is it the Reinaldo Dennes here in the

23   courtroom today?

24       A       Yes, yes.

25       Q       Will you point to Reinaldo, where he is

1    seated and wearing.

2        A       He is right there and wearing glasses and

3    a black suit with a red tie.

4                MR. VINSON:  May the record reflect that

5    this witness has identified the defendant.

6                THE COURT:  The record will reflect.

7        Q       For what purpose, did you go to visit

8    Francisco?

9        A       I went to pick up a two-carat diamond.

10       Q       And did Francisco have the two-carat

11   diamond?

12       A       Yes, he did.

13       Q       And did you pick that diamond up?

14       A       Yes, I did.

15       Q       Did you have an occasion to check with

16   anyone else in that office with respect to a memo?

17       A       Yes, I did.

18       Q       Who else did you contact in that office?

19       A       Reinaldo Dennes.

20       Q       Incidentally, when you presented the

21   memorandum to Francisco and he made the return of --

22       A       Yes.

23       Q       -- two carats, like you say, did you also

24   indicate on the memo that he had made that return to

25   you?

1      A      Yes, I did.

2      Q      And did you keep a copy of that memo?

3      A      Yes.

4      Q      Now, did you have an outstanding memo for

5    the defendant here?

6      A      Yes, I did.

7      Q      And what was that memo in regard to?

8      A      Merchandise that he had taken from my

9    husband's office on memo.

10     Q      And do you know what he had taken from

11   your husband?

12     A      It was a variety of different things on

13   there.  There was a two carat oval; ruby ring, 18

14   carat gold; quite a few different things on the memo.

15     Q      Did this defendant return those?

16     A      No, he did not.

17     Q      What was his explanation?

18     A      He said that he was an old friend of

19   Johnny's.  That he had already returned it.

20     Q      Now, if the memo is outstanding and Johnny

21   had not signed off on it, is the person still

22   responsible?

23     A      To prove that he had returned it, yes.

24     Q      Was Johnny a front man in his business?

25     A      Very much so.

1        Q        Would he take care of matters of this type

2    legally?

3        A        Yes.

4                 MR. ODOM:  I would like to pose an

5    objection to the Court.

6                 (Whereupon, the following proceedings were

7    held before the Bench.)

8                 THE COURT:  Go ahead.

9                 MR. ODOM:  Judge, I was unaware this

10   testimony was going to come in.  I view it as a 404

11   B.  I don't think it is any part and parcel of the

12   intrinsic offense for which my client has been

13   charged.  I would ask that the testimony -- first of

14   all, I ask the testimony be excluded.  I ask that the

15   jury be instructed to disregard, and I would ask for a

16   mistrial in that order.  And I believe that, in

17   essence, it goes to an extraneous matter, not an

18   intrinsic matter.

19                THE COURT:  Well, my problem is, Mr. Odom,

20   you listened to the question and you knew where she

21   was headed.

22                MR. ODOM:  No, I didn't know where she was

23   headed.  I had no idea.  This is total surprise to me.

24                THE COURT:  As soon as Mr. Vinson -- you

25   did know if the defendant had any of that stuff.  I

1    would think you knew where it headed.

2           MR. ODOM:  I had no idea that my client

3    did not return jewelry.

4           THE COURT:  When he asked the question was

5    it returned, why couldn't you stand up?

6           MR. ODOM:  The answer could have been he

7    did return.  I thought that's what is going to happen.

8    I am absolutely positive he did not was what I thought

9    was going to be the response.

10          THE COURT:  We go through this long line

11   of questions and you let all of this come in without

12   any objection, and when it is after the fact and you

13   have a chance to evaluate --

14          MR. ODOM:  For the record, I believed,

15   without revealing attorney-client privilege, that the

16   testimony was going to be that my client returned

17   items, not that he didn't return items.

18          THE COURT:  It's all in dispute.

19          MR. VINSON:  It's not a criminal matter.

20   It's a civil dispute, given it is that way, but the

21   reason we entered so we can show that the client did

22   business with them so he is going to prove up he did

23   business with them.

24          MR. ODOM:  That's fine.  That's why I

25   didn't object to it.  They had a right.  I did not

1   know my client didn't return the items.

2              THE COURT:  Mr. Vinson, I have asked one

3   to talk at a time.

4              MR. ODOM:  It's more than a dispute.  It

5   shows a theft, which is 404 B.  And as far as any

6   waiver issue, Judge, I did not expect that answer.  As

7   soon as I heard that answer, it was after the fact and

8   I objected and the record may show I was slow on my

9   feet.  I did it as soon as I realized what had

10  happened.

11             MR. SMYTH:  If I may, Your Honor, the memo

12  is a contract.  It's a civil contract between two

13  parties.  Whether it is returned or not, it's a civil

14  matter, contractual.  It's not a crime of theft

15  because he received --

16             THE COURT:  404 B doesn't say crimes,

17  acts.

18             MR. VINSON:  It's not a crime.

19             MR. ODOM:  It could be.

20             THE COURT:  It has to be a crime.

21             MR. ODOM:  It could be and it doesn't have

22  to be.

23             THE COURT:  Okay.  Let's have our seats.

24  I'll make my ruling.

25             (Whereupon, the following proceedings were

```
 1    held before the jury.)

 2              THE COURT:  Okay.  Ladies and gentlemen, I

 3    instruct you to disregard the testimony related to

 4    whether or not the defendant in this case returned any

 5    items that may or may not have been in his possession

 6    in a memo.  You are not to take that into account and

 7    it cannot be used by you in your deliberations.  Is

 8    that clear?

 9              Your motion is denied.

10              MR. ODOM:  Thank you.

11              THE COURT:  Please proceed.

12         Q    (Mr. Vinson)   Now, from time to time did

13    the defendant, Reinaldo Dennes, do work for your

14    husband?

15         A    As far as I know, yes.

16         Q    And will you tell the ladies and gentlemen

17    what type of work Reinaldo Dennes did for your

18    husband?

19         A    Jewelry repair, jewelry, he would make up

20    pieces or he would set stones.

21         Q    And do you know how long that transaction

22    had been ongoing?

23         A    Not really.

24         Q    Well, I mean, it didn't start the week of?

25         A    No, no.  Johnny had been doing business
```

1    with Reinaldo for quite awhile.    He used to give him

2    business.

3         Q       Used to give business?

4         A       Johnny would give Reinaldo business.

5         Q       Now, the type of work that Mr. Dennes was

6    doing for your husband, would that be making a ring

7    for the stone to go in?

8         A       Yes.

9         Q       And would Mr. Dennes be allowed entry into

10   your husband's office the same way any other person or

11   business person?

12        A       Yes.

13        Q       Were any of the diamonds taken from your

14   husband's office ever recovered to your knowledge?

15        A       No, there was not.

16        Q       And how did you resolve the payment issue

17   on the diamonds?

18        A       We didn't -- are you asking if I had

19   insurance or not?  No, I did not have insurance.

20               MR. ODOM:  Objection, irrelevant.

21               THE COURT:  Ma'am, I don't want that

22   again.  Do you understand, ma'am?

23               THE WITNESS:  Yes, sir.

24               THE COURT:  Control yourself.  I

25   understand your situation but that's not called for.

```
 1                    And I sustain the objection.

 2                    Ask the next question.

 3                    MR. VINSON:  May I approach the court

 4      reporter, Your Honor?

 5                    THE COURT:  You may.

 6                    (Whereupon, State's Exhibit No. 173 was

 7      marked for identification.)

 8          Q     Now, let me show you what has been marked

 9      for identification purposes as State's Exhibit 173.

10      I'm going to ask you if you can identify the person in

11      that photograph, just yes or no?

12          A     Yes.

13          Q     And does the photograph truly and

14      accurately reflect your husband as he was before he

15      was killed in January of 1996?

16          A     Yes, it does.

17                    MR. VINSON:  Your Honor, at this time the

18      State will offer into evidence State's Exhibit 173.

19                    MR. ODOM:  Object to the probative value.

20      It does not outweigh the prejudicial and nothing

21      probative to this photo of the offense.

22                    THE COURT:  It's overruled.  It's

23      admitted.

24                    MR. VINSON:  May 173 be published to the

25      jury?
```

1                    THE COURT:  Surely.

2          Q      (Mr. Vinson)   Now, the inventory that you

3     testified here to the jury, I think you testified it

4     was three million and six hundred and some thousand

5     dollars.  Was that updated inventory from the previous

6     date?

7          A      Yes.

8          Q      And the previous date, I am talking about

9     when your husband arrived home on January 23, 1996?

10         A      Yes.

11         Q      If you know, do you know why anyone would

12    be interested in trying to take the hard drive out of

13    your husband's computer, if you know?

14         A      There was quite a few different reasons.

15    One would be to determine the cost and the clarity and

16    the clear of the merchandise and, also, to try to

17    discard the information from the computer.

18                    MR. VINSON:  May I approach, Your Honor?

19                    THE COURT:  You may.

20         Q      Let me show you what has been introduced

21    into evidence as State's Exhibit 54.  Can you identify

22    that person?

23         A      No, I can't.

24         Q      Okay.  What about State's Exhibit 56?

25         A      Yes.  That's Reinaldo.

1       Q       And what about State's Exhibit 55?

2       A       No, I can't.

3       Q       Had you ever seen this man in your

4    husband's office?

5       A       No.

6       Q       And were you in your husband's office from

7    time to time?

8       A       I was in there quite often.

9       Q       Did you ever see your husband conduct

10   business with this man?

11      A       No, I did not.

12              MR. VINSON:  Your Honor, I have no further

13   questions of Mrs. Szucs.

14              THE COURT:  Mr. Odom.

15

16                    CROSS EXAMINATION

17   BY MR. ODOM:

18      Q       My name is Wendell Odom, and I am going to

19   ask you some questions as well.

20              First of all, the prosecutor showed you

21   some photographs at the very end.  You couldn't

22   identify two of the photographs but you could identify

23   one of the photographs, correct?

24      A       Correct.

25      Q       You identified the photograph of Reinaldo

1          Dennes, right?

2          A        Yes.

3          Q        You did not identify the photograph of

4    Albert Dennes.  You didn't know that, did you?

5          A        No.

6          Q        You also did not identify the photograph

7    of Francisco Rojas.  Did you know that?

8          A        Yes.

9          Q        You knew that was Francisco?

10         A        But I didn't recognize him.

11         Q        So just because you didn't recognize that

12   photograph of Mr. Francisco Rojas, you have already

13   testified, have you not, to the fact that, after the

14   death of your husband you met with Mr. Rojas -- and I

15   assume Sam Solomay was with you -- and you actually

16   conducted a transaction with Mr. Rojas?

17         A        Correct, one time.

18         Q        A one-time transaction.

19               So either the photograph was bad or the

20   one-time meeting with Mr. Francisco Rojas did not

21   leave enough impression for you in your mind to

22   identify the photograph?

23         A        I don't think my state of mind at the time

24   was very good.

25         Q        All right.  But whatever your state of

1    mind was, you do not recognize Mr. Rojas from the

2    photograph and from the time you met him, right?

3         A     Yes.

4         Q     Now, there was some questions that were

5    asked of you about the inventory, and I would like to

6    ask some questions about the inventory.

7                I believe you testified -- and I'm not

8    sure if the term was memo -- that was the practice

9    that your husband would use when he would take an item

10   and he would loan it out to somebody?

11        A     Correct.

12        Q     And he had a written memorandum of some

13   sort that indicated that an item had been loaned to

14   someone?

15        A     Yes.

16        Q     And that's what you had in the case of

17   Francisco Rojas, for example?

18        A     Correct.

19        Q     Now, in his inventory were there also a

20   set of receipts for when someone would return

21   merchandise that they had on loan or on memo with your

22   husband?

23        A     It's the same memo.  It is just scratched

24   out and it says "returned on it" and the date and the

25   signature.

1        Q      Now, after the death of your husband, when

2    it was your job to handle the business affairs -- I

3    know you have testified to the fact that you

4    determined which items had not been returned -- did

5    you also have an opportunity to look at the inventory

6    and to see who had conducted business with your

7    husband prior to his death on the 24th?

8        A      Yes.

9        Q      And are you the one that kept a copy of

10   the memorandums that would owe on that -- this would

11   have been as far as who returned what merchandise

12   before January 24, 1996?

13       A      Before that date?

14       Q      Right.

15       A      No, after that date, after January 24th, I

16   was responsible with that but Johnny did it by himself

17   before then.

18       Q      I understand that.  But here's my

19   question.

20       A      Okay.

21       Q      How do I find out and who do I go to to

22   find the memos and any signatures that there might be

23   for the return of merchandise prior to

24   January 24, 1996?

25       A      Oh, Johnny kept very good records.

1        Q        So would you have a copy of those records?

2        A        Yes.

3        Q        Has anyone asked you or have you looked to

4     determine if there is a receipt signed or there is a

5     returned memo for a Jose Albert Dennes prior to

6     January 24, 1996?

7        A        The only memo I have on Ray Dennes is the

8     one I have given Mark Vinson today.

9        Q        Let me ask that again.  I'm not asking

10    about Ray Dennes.

11       A        Okay.

12       Q        I am asking prior to January 24, 1996, if

13    you have a receipt or a memo, or whatever procedure

14    Johnny used, that has on it a return that has Jose

15    Albert Dennes' name on it?

16       A        Not that I know of, no.

17       Q        Have you looked at your records to make a

18    determination as to a Jose Alberto Dennes?

19       A        I don't remember that name on any memo.

20       Q        I understand that.

21                What I am asking:  When you were looking

22    at the memos, were you looking for Jose Albert Dennes?

23       A        Was I looking for the name?  No, they are

24    all by companies.

25       Q        All right.  Let me ask you this:  Let's

1    say I have my company, W. W. Company, and I have

2    something on loan from your husband.  I am either

3    doing work for him or I am trying to job a jewel and I

4    don't go and return that item back in person.  Let's

5    say I have someone do that for me, a person in my

6    office, say, someone who may have been working with me

7    or affiliated with me.  Doesn't that person have to

8    sign a receipt of some sort?

9         A    Yes.  It's a three-part copy of the same

10   memo, so Johnny has the white copy and the pink copy,

11   and he would give the yellow copy out.

12        Q    Now, you have testified, to your

13   knowledge, that Mr. Dennes, Mr. Reinaldo Dennes, and

14   your husband have done a number of business

15   transactions in the last few years, correct?

16        A    Yes.

17        Q    Every time there is jewelry that is given

18   we would assume that there would be a copy of the

19   receipt in Johnny's records, correct?

20        A    Yes.

21        Q    Have you gone back and determined that

22   there were prior receipts before January 24, 1996, as

23   to business transactions between Reinaldo Dennes and

24   your husband?  Have you seen those memos?

25        A    For the last, the '95 year, yes.

1      Q     All right.  Up until late of '95, there

2  were memos.  Now, when the memo is in the file, is it

3  dated for when it's returned or is it dated for when

4  it is let out?

5      A     Both.

6      Q     Is there any return in January of 1996?

7      A     From?

8      Q     From either Ray Dennes or Jose Albert --

9  from the company Designs by Reinaldo?

10     A     No.

11     Q     Is there a return from Francisco Rojas in

12  1996?

13     A     Not that day but on February 1st, when

14  I --

15     Q     Well, we know the one afterwards.  What I

16  am asking about prior to January 24th.

17     A     No.

18     Q     If I have sent someone else to return the

19  item, would that person sign the receipt returning the

20  item on the inventory?

21     A     Yes.

22     Q     So --

23     A     No, excuse me.  Johnny would sign it if it

24  was his and they are returning it back to him.

25     Q     There would be no record of who actually

1    returned the item.  The record would be of the fact

2    that the item was returned?

3         A     Yes.

4         Q     But that person got a receipt from it?

5         A     They would always bring the yellow copy

6    and that was their receipt.

7         Q     I think I understand but the yellow copy

8    was already given to them previously?

9         A     Uh-huh.

10        Q     So there would be nothing on their copy

11   that return of the item unless they handed it to

12   Johnny and please mark on this return receipt?

13        A     Right.  Or they would get a carbon copy or

14   something like that, you know, a copy.

15        Q     That's what I was kind of asking.

16        A     But most of the time, the dealers, as long

17   as you mark it on your records, that's the most

18   important thing.  Sometimes they would give some part

19   of copy.  They make a copy on the copy machine.

20        Q     On occasion, if someone really wanted a

21   copy --

22        A     Right.

23        Q     -- they would go over to the Xerox machine

24   and make a copy?

25        A     Right.

```
 1          Q       Not a true carbon?

 2          A       Yeah.

 3          Q       The 3.96 million dollars that is on

 4   inventory, is that the wholesale or retail value of

 5   this stuff?

 6          A       That's the selling price.

 7          Q       So that would be the retail?

 8          A       Actually that's wholesale price.  It's not

 9   a retail price.  That's his selling price but he was a

10   wholesaler, see.

11          Q       Okay.  But even a wholesaler has got a

12   wholesale price but we don't call it retail.  But that

13   is what he would sell the merchandise to other

14   dealers?

15          A       To other dealers.

16          Q       Because he is a wholesaler?

17          A       Right.

18                  MR. ODOM:  Pass the witness, Your Honor.

19                  THE COURT:  Thank you, Mr. Odom.

20                  MR. VINSON:  Your Honor, I have no further

21   questions.

22                  THE COURT:  You may step down.  Thank you

23   for your testimony.

24                  THE COURT:  Mr. Odom, do you mind if Mrs.

25   Szucs sits in the courtroom?
```

1          MR. ODOM:  No, sir.

2          THE COURT:  All right.  Call your next

3     witness.  Who is it going to be, please?

4          MR. SMYTH:  Judge, we need to make an

5     offer.

6          (Off-the-record discussion held at the

7     bench.)

8          MR. VINSON:  Offer State's Exhibit 42.

9          THE COURT:  Any objection?

10          MR. ODOM:  No.

11          THE COURT:  State having offered and the

12     Court admits 42.

13          MR. ODOM:  I don't object to the

14     diagrams.  I object to the writing on the board.

15          THE COURT:  And whose writing is that?

16          MR. ODOM:   I certainly don't object to

17     the diagram.

18          THE COURT:  Let the record reflect the

19     State is now removing the writings that the defense

20     has made objection to it.

21          MR. VINSON:  We will make some

22     adjustments, Your Honor.

23          THE COURT:  With that -- do you have any

24     objection?

25          MR. ODOM:  No, sir.

1                    THE COURT:  State's Exhibit 42 is

2      admitted.

3                    Very well, please call your next witness.

4                    (Off-the-record discussion held at the

5      bench.)

6                    MR. VINSON:  Would you do that?

7                    THE COURT:  Yes, we can do that.

8                    Okay, let's break for lunch, ladies and

9      gentlemen.  Remember the admonishments I have given

10     you.  Please stand in recess until 1:15.

11                    (Recess taken.)

12                    THE COURT:  Bring them out.

13                    (Jury came into the courtroom.)

14                    THE COURT:  Please be seated, ladies and

15     gentlemen.

16                    State call its next witness, please.

17                    MR. VINSON:  Your Honor, the State has no

18     further witnesses to call at this time.  However,

19     during the lunch hour, we reduced State's Exhibit 42

20     to an eight by ten, and there appears to be no

21     objection, so we would like to offer State's Exhibit

22     42 and substitute it for the board.

23                    THE COURT:  Any objection, Mr. Odom?

24                    MR. ODOM:  No objection.

25                    THE COURT:  That substitution will be

1    made.

2              MR. VINSON:  And there are modifications

3    to be made to State's Exhibit 166 and 172, and this is

4    a summary of the telephone calls, and we will get it

5    taken and make the offer at that time later.

6              With that, the State will rest at this

7    time.

8              THE COURT:  Thank you very much.

9              Do you care to make an opening statement?

10             MR. ODOM:  I need to make a motion outside

11   the presence of the jury.

12             (Whereupon, the following proceedings were

13   held before the Bench.)

14             MR. ODOM:  Comes now Reinaldo Dennes in

15   the above and entitled case and makes a motion for a

16   directed verdict, and, for good cause, would show the

17   following:  That the State has charged the defendant

18   with the murder of Janos Szucs; however, the evidence

19   that the State has presented shows, if anything,

20   conduct that is consistent with the assault of a

21   security guard by the name of Copeland and that

22   assault is not a lesser included offense based upon

23   the evidence that has been presented of the murder of

24   the complainant Janos Szucs.  The defense would show

25   that the evidence, at most, puts the defendant in a

1    possible conspiracy, although not pled, which could be

2    considered as a lesser included offense of capital

3    murder.   However, it does not establish evidence

4    beyond a reasonable doubt that would allow the jury to

5    convict defendant Reinaldo Dennes of the offense of

6    capital murder upon the complaining witness, Janos

7    Szucs.

8              THE COURT:  That will be denied.

9              (Whereupon, the following proceedings were

10   held before the jury.)

11             THE COURT:  Mr. Odom, do you care to make

12   an opening?

13             MR. ODOM:  Yes, I would.

14             THE COURT:  Briefly, please.

15             MR. ODOM:  Ladies and gentlemen of the

16   jury, for the last week and a half, we have heard the

17   State present their case.  Now is the opportunity for

18   us to present our case.  And just as the State had an

19   opportunity to address you, to tell you what they

20   believe the evidence would show, I will briefly go

21   over what I believe the evidence will show from the

22   witnesses we intend to present to you.

23             I think that the evidence, although not

24   all inconclusive, will consist of primarily the

25   following witnesses.  We intend this afternoon to call

1    to the stand an expert in firearm identification by

2    name of Richard Earnst.

3              I believe the evidence will show that Mr.

4    Earnst is the counterpart to Robert Baldwin for

5    Tarrant County, which is the Fort Worth metroplex here

6    in the State of Texas.

7              I think that Mr. Earnst will testify that

8    he examined the same bullets and the same cartridges

9    that Mr. Baldwin did but yet he came to a different

10   conclusion.  I believe that what Mr. Earnst will tell

11   you is that the cartridge casings match.  That the

12   cartridges that he examined that were retrieved and

13   that were identified are all fired out of the same

14   firearm; however, Mr. Earnst will tell you that there

15   cannot be, in his opinion, a comparison of the bullets

16   matching, that is, the bullets that were found from

17   Mr. Szucs' office to the bullets that were found in

18   the lobby and the bullet that was found in the office

19   because of the nature of a mechanism -- well, they

20   cannot be matched because of the scar that was done on

21   the bullet.

22             And I believe you are going to hear a

23   number of hypotheticals what could cause that the

24   scarring.  You will hear a number of questions what

25   that does.

1          And I believe you are going to hear the

2     qualifications Mr. Earnst that allows him to give the

3     opinion.  I believe he is going to base his opinion in

4     great detail exactly why it is he comes to that

5     conclusion.  And I believe you will be able to make

6     your opinion based off of his expert testimony.

7          Next, attorney Ellis McCullough, you

8     probably remember that Ellis McCullough was at the

9     original lineup of what you have seen on a video.  I

10    believe you will hear his statement of fact how that

11    lineup was conducted and, more importantly, you will

12    hear his statement of fact of what kind of

13    identification was made of Mr. Dennes on that

14    particular night when Mr. Copeland had an opportunity

15    to view him in that lineup.

16         You are also going to hear evidence from

17    the investigator that the defense has retained to

18    assist in the differences of this case.  You are going

19    to hear from J. J. Gridoni.  Mr. J. J. Gradoni will

20    put on certain testimony, not the least of which is

21    going to be the fact that he went to Miami, Florida.

22    That in the presence of bank officials, and with a

23    video camera, that they opened the safety deposit box

24    in the name of Reinaldo Dennes and examined the

25    contents of that safety deposit box.  And I think you

1    are going to hear what was recovered from in the

2    safety box in Miami, Florida, on the day in question.

3    I also think you are going to hear what wasn't

4    recovered from the safety box in Miami on the day in

5    question of the opening of that box was done.

6              I think you are also going to hear either

7    a custodian of the records or a family member of Mr.

8    Dennes that will testify to certain physical

9    characteristics of Mr. Dennes.  I think you are going

10   to hear that about seven years ago Mr. Dennes, while

11   working on a riding lawn mower, that the gasoline came

12   out of the lawn mower, that it ignited.  And it

13   ignited not only upon Mr. Dennes but upon his

14   daughter.  That you are going to hear evidence that,

15   when he rolled the daughter on the ground, you are

16   going to hear medical evidence that he suffered severe

17   burns over 20 percent of his body.  And you are going

18   to hear the areas of his body that he suffered those

19   burns on.  You are going to hear a family member

20   testify as to where those burns are.

21             And I think you are going to hear evidence

22   that, I believe, will show you that there is no way

23   that someone can have an intimate relationship or no

24   one could see Mr. Dennes without his clothes on

25   without seeing distinguishing and unique

1   characteristics that absolutely, under no

2   circumstances, can be avoided.

3           You may also hear other evidence from

4   witnesses that the State has called.  You may hear

5   from other witnesses that we may call in order to

6   establish certain items that have not been completely

7   clarified as far as the evidence that the State

8   presented.

9           I believe you may hear some evidence of

10  additional dealings that Ray Dennes had with the

11  complainant, that being Mr. Szucs.  I believe you are

12  going to hear evidence of actual jobber situations

13  wherein Ray Dennes would either bring a diamond to Mr.

14  Szucs or Ray Dennes would be involved in having

15  diamonds on loan and trying to sell those diamonds.

16          I believe you may hear evidence that,

17  after the offense occurred, after the homicide of

18  Johnny Szucs, you are going to hear evidence that the

19  defendant, Ray Dennes, was in the Florida area, trying

20  to sell diamonds that came from a previous

21  transaction, and that they were in no way related to

22  the diamonds that were taken out of Johnny Szucs'

23  office.

24          And I believe the evidence will show that

25  occurred in Orlando, Florida.  And I believe that the

1    evidence will show that occurred shortly after the

2    homicide of Johnny Szucs, and that the diamonds being

3    sold were not the diamonds that are allegedly taken

4    out of the safe and secreted from the office of Johnny

5    Szucs on the night in question.

6         And I think you will also hear additional

7    evidence that is sum and part of the major witnesses

8    that you will be hearing from and what they will have

9    to say.

10        THE COURT:  Thank you, Mr. Odom.

11        Please call your first witness.

12        MR. ODOM:  Yes, Your Honor.  First witness

13   we call is Mr. Richard Earnst.

14        THE COURT:  MR. ODOM:

15

16

17

18

19

20

21

22

23

24

25

```
1                        RICHARD EARNST,
2    was called as a witness by the defense and, having
3    been duly sworn, testified as follows:
4                     DIRECT EXAMINATION
5    BY MR. ODOM:
6        Q       Would you state your name for the ladies
7    and gentlemen of the jury.
8        A       Yes.  My name is Richard Earnst.
9        Q       What do you do for a living, Mr. Ernest?
10       A       I am the senior firearms and tool examiner
11   for the Tarrant Medical Examiner's Crime Laboratory in
12   Fort Worth, Texas.
13       Q       And when you say the senior examiner for
14   Fort Worth, is that for the city or the county?
15       A       That is the county.
16       Q       And does the county -- does Tarrant
17   County, also, do work for outlying counties that may
18   be smaller counties other than Dallas County and
19   wouldn't have the medical examiner's services that a
20   metropolitan would have?
21       A       Yes, sir.  That's correct.
22       Q       Who do you do work for, as far as other
23   counties, as well as the medical examiner's office
24   there in Fort Worth?
25       A       We've worked a number of cases all the way
```

1    from Waco and beyond to the south of us, over to

2    Abilene and Vernon to the west and northwest of us so

3    it's quite a range of area.

4         Q     Now, you say you are the senior firearms

5    identification expert, what does that mean?

6         A     The main state of what I do is to examine

7    firearms and ammunition components and to determine

8    whether a particular firearm or an ammunition was

9    fired in a particular weapon or not; also, examination

10   of weapons for the functioning characteristics,

11   distance determinations, number of other firearms

12   related-types of services.

13        Q     Mr. Earnst, do you know a person by the

14   name of Robert Baldwin?

15        A     Yes, I do.

16        Q     And is he your counterpart or one of your

17   counterparts here in Houston, Harris County, Texas?

18        A     Yes, he is.

19        Q     If I had a case up in Fort Worth and I

20   were defending a person and there was a question as to

21   firearms identification, in all likelihood, would you

22   be testifying for me?

23        A     In that region, I will be testifying for

24   the State.  And the majority of the work that I do is

25   in regards to testifying for the State.

1        Q       If I had that case in Fort Worth, you
2    would be testifying for the State.  Because of
3    conflicts of interest, I would have to go to another
4    metropolitan, like Dallas, Houston, to find someone
5    like Mr. Baldwin if I wanted to get an expert opinion
6    in regards to the firearms identification?
7        A       Yes, sir.  That is correct.
8        Q       And that's not unusual, is it, that
9    someone, if they seek other expert advice, they would
10   have to go outside the county of where an examination
11   has been made in order to get an opinion where there
12   not be a conflict of interest, correct?
13       A       Yes, sir.  That's correct.  And we are
14   allowed to work --
15               MR. SMYTH:  Object, non-responsive.
16               THE COURT:  Sustained.
17       Q       (Mr. Odom)   And my next question, it's 90
18   percent of the time testifying for the State of Texas
19   is there any --
20               MR. SMYTH:  Leading his own witness and
21   ask straight up questions.
22               THE COURT:  Sustained.
23       Q       (Mr. Odom)   Is there any prohibition for
24   you to give an opinion on a case to wherein your
25   office is not directly involved or indirectly

1       involved?

2           A       No, sir.  As long as there is not a

3       conflict of interest, it is all right for us to work

4       private cases.

5           Q       Obviously, I asked you to do some work on

6       a case here in Houston, did I not?

7           A       Yes, that is correct.

8           Q       Did you make a determination there was no

9       conflict of interest?

10          A       Yes, sir.

11          Q       Mr. Earnst, what is it that allows you to

12      call yourself a firearms identification expert?

13          A       At this point I have been in the field of

14      firearms identification for about 20 years.  I

15      received my bachelor's science degree from the

16      University of Georgia and worked as a scientist for a

17      couple of years before going to work for the Georgia

18      Bureau of Investigation and Georgia Criminal

19      laboratory in Atlanta.

20              During my first year and a half to two

21      years there, I underwent an extensive training in the

22      area of firearms identification.  After that time

23      period was over and up to the present time, at last

24      count, I have examined well over 10,000 different

25      firearms and worked in the range of 8,000 firearms.

1    And I have testified in the range of about 800 times

2    in relation to those laboratory examinations.

3              I am a member of different scientific

4    organizations, including a distinguished membership in

5    the Association of the Firearms and Tool Mark

6    Examiners, which is the international association for

7    people in the field of firearms identification.  I

8    worked for the Georgia State Criminal Laboratory for

9    about 14 years before taking a position with the

10   Tarrant County Medical Examiner's Crime Laboratory.

11             MR. ODOM:  Your Honor, I would ask that

12   Mr. Earnst be allowed to testify as an expert on the

13   firearms identification and tool mark identification.

14             THE COURT:  Any objection, Mr. Smyth?

15             MR. SMYTH:  I won't object, Judge.

16             THE COURT:  Very well.

17        Q    Mr. Ernest, did you, at my request, have

18   an opportunity to view some evidence, that is,

19   evidence in this case?

20        A    Yes, sir, I did.

21        Q    And tell the jury where and how that came

22   about.

23        A    On August 5th of this year, I traveled

24   here to Houston and went to the Houston Police

25   Department Crime Laboratory.  And there I examined a

1    number of different items of physical evidence that

2    relate to the firearms examination aspects of this

3    particular case and that was conducted at the Houston

4    Police Department in the presence of Mr. Baldwin.

5         Q       All right.

6                 MR. ODOM:  May I approach the witness,

7    Your Honor?

8                 THE COURT:  You may.

9         Q       I would like to show you a series of

10   exhibits, Mr. Ernest.  This is State's Exhibit 163

11   that I will be referring to.

12                THE COURT:  If you want to bring it

13   closer, I wouldn't object.

14        Q       Can you see that?

15        A       Yes, sir, I can.

16        Q       And I would like to show you a series of

17   exhibits that have been admitted into evidence.  First

18   of all, I would like to show you what has been

19   identified as either bullets or fragments of bullets

20   that are State's Exhibit 27, 29.

21        A       Yes, sir.

22        Q       All right.  I would like to show you what

23   has been marked 144, 145 and 146.

24        A       All right, sir.

25        Q       And I would like to show you what has been

1    marked as exhibit number 132.

2         A     All right, sir.

3         Q     First of all, have you seen the items in

4    those exhibits 27, 29, 144, 145, 146 and 132 before?

5         A     Yes, sir.

6         Q     And were those some of the items you

7    examined?

8         A     Yes, they were.

9         Q     I would also like to show you what has

10   been marked as State's Exhibit 28.

11        A     All right.

12        Q     State's Exhibit 30.

13        A     All right, sir.

14        Q     And State's Exhibit 155.

15        A     Yes, sir.

16        Q     Are those also additional items that

17   you've seen and that you were allowed to examine?

18        A     Yes, they are.

19        Q     Now, in regards to all of these items, not

20   only State's Exhibit 27 through 132, or these six that

21   we have on State's Exhibit 163 but as well as the

22   other three items, all of those items have a

23   corresponding EB number; is that a fair statement?

24        A     Yes, sir.  That's correct.

25        Q     And you are able to look at the package

1    and on the package there is an exhibit number, is

2    there not?

3        A        Yes, there is.

4        Q        And also on the package there is as well

5    an E B number on each one of those exhibits, is there

6    not?

7        A        Yes, that's correct.

8        Q        Not only that, you have also made certain

9    memorandum and notes that allow you to identify

10   characteristics of these various bullets and bullet

11   fragments?

12       A        Yes, sir.  That is correct.

13       Q        So there is no question in your mind that

14   the bullets that you have before you and the bullet

15   fragments before you now are the one and same as the

16   bullet fragments you examined on August 5, 1997?

17       A        Yes, they are.

18       Q        Now, did you also have an opportunity to

19   examine State's Exhibit 26, 51, 52 and 105A?

20       A        Yes, sir.  I have examined these four

21   cartridge cases.

22       Q        Those four exhibits are, as you said, they

23   are cartridge cases, are they not?

24       A        Yes, they are.

25       Q        For what type of firearm?

1      A      .9 mm.

2      Q      And is it your experience that a .9 mm is

3   a semiautomatic pistol?

4      A      Yes, sir.  That is correct.

5      Q      When in a pistol it's usually a

6   semiautomatic?

7      A      Yes.

8      Q      And when we say a semiautomatic, what does

9   that mean is happening to the cartridge after the

10  bullet is being fired?

11     A      Basically that means that the empty

12  cartridge is being kicked out of the weapon for each

13  firing of the weapon.

14     Q      Now, did you examine the cartridge cases

15  and were you able to make certain determinations from

16  the cartridge cases?

17     A      Yes, sir, I was.

18     Q      And basically tell the ladies and

19  gentlemen of the jury what it is you are looking at

20  when you examine the cartridge cases and what you are

21  looking for and how you make these determinations?

22     A      Yes, sir.  I use the comparison

23  microscope, which is basically two microscopes that

24  are bridged together optically.  So under one field of

25  view, I am able to look at the magnified image in

1    direct comparison with another.  I am looking for the

2    presence there on the outside of the cartridge cases

3    of numerous different machinery marks that are

4    imprinted there during the firing of the weapon, such

5    as, the fire pin indention and the breech face

6    markings and the extractor and markings.  All of these

7    tiny machine marks have been imprinted on the outside

8    of these cartridge cases.

9              And after looking at these four cartridge

10   cases, it's my opinion they were all fired in the same

11   chamber of the same firearm.

12        Q     Now, when you make that determination,

13   your opinion that all four of those cartridges came

14   from the same firearm, you are combining, are you not,

15   a class -- well, what you guys call a class

16   identification with --

17              MR. SMYTH:  Object to leading his witness.

18        Q     (Mr. Odom)   Are you identifying a class

19   identification with an individual identification?

20        A     Yes, sir, I am.

21        Q     And, for the benefit of the jury, although

22   they probably know more about this than I do now, a

23   class identification allows you to do what?

24        A     The class characteristics of this

25   particular cartridge case tell me a good bit about the

1  manner in which the firearm is marking the cartridge

2  cases.   In the .9 mm firearms and in another different

3  firearms, the cartridges can get in a fairly

4  characteristic way as far as the class characteristics

5  are concerned.   The class characteristics in these

6  particular cartridge cases would lend me to believe

7  that we were dealing with either a Beretta .9 mm

8  pistol or some copy of a Beretta pistol, something

9  like the Brazilian Taurus, which was made in the old

10  Brazilian factory.   After it was taken over by

11  Taurus.   This is also a legal one .9 mm, which is

12  another copy of a Beretta.   It's an Egyptian copy.

13        Q      Would you argue with the fact that, first

14  of all, these are all taken off of what you describe

15  as a very popular Beretta styled .9 mm pistol?

16        A      Yes, sir.   They all bear characteristics

17  that are consistent with that.

18        Q      You have got an outfit called Taurus?

19        A      Yes, sir.

20        Q      And that is actually made in an old

21  Beretta factory in Brazil?

22        A      Yes.

23        Q      So it's certainly going to be like the

24  Beretta?

25        A      Right.

1       Q     And I believe you also described the

2  Helwan?

3       A     H-e-l-w-a-n.

4       Q     And that's an Egyptian knock-off of

5  Beretta?

6       A     Yes.

7       Q     And would you argue that it might also

8  fall in the same class as something called a Danshway?

9       A     Well, I would have to say that I'm

10  unfamiliar with that particular pistol.

11       Q     All right.  Have you ever heard of a

12  Danshway?

13       A     I have never heard of one or seen one.

14       Q     So there is certainly maybe a Danshway out

15  there and it certainly may be identical with that, but

16  in your experience are not familiar with the Dashway?

17       A     That's correct.

18       Q     Do you go to a reference book or a

19  reference to try to make those determinations on those

20  classifications?

21       A     Well, I did not go to that in this

22  particular case because I'm so familiar with those

23  characteristics but those references are available.

24       Q     Part of your individual identification is

25  made, I take it, after you have narrowed the class

1    that the cartridge would come out of?

2       A       Yes, sir.  That's correct.

3       Q       And once you have done that, then you

4    start looking for -- or if I understand your testimony

5    correct -- you then go on to what is known as an

6    individual identification?

7       A       Yes, sir.  That's correct.

8       Q       What are you looking for in your

9    individual identification?

10      A       I am looking for very tiny machine marks

11   that are indicative of the manufacture of one

12   particular pistol.  These are what we call

13   individualizing marks.  There are a number of them

14   that are present in the fire pin indention, breech

15   base markings, and so forth, that go beyond the class

16   characteristics and identify a particular pistol as

17   the contributor of that particular cartridge case.

18      Q       So if I may, after you have narrowed down

19   the class of the gun the cartridge came from, then you

20   look at like the firing pin and see where it hits on

21   the cartridge?

22      A       Yes.

23      Q       See how it hits on the cartridge?

24      A       I see what markings that it indents on the

25   cartridge case.

1       Q       Is every firing opinion different?

2       A       Every firing opinion is different at a

3    microscopic level at the very fine, little, tiny

4    markings that are made and that has to do with the

5    machine processes that make those firing pins.

6       Q       Although we may have an assembly line, no

7    two firearms are identical?

8       A       That's correct.

9       Q       And each firing pin has a unique quality

10   to it?

11      A       Yes, sir, it can.

12      Q       Are there other markings that you look for

13   on the cartridge to make your identification?

14      A       Yes, there are breech face markings --

15      Q       What's a breech face marking?

16      A       On the head of the cartridge case, on this

17   particular cartridge case, are going to be a series of

18   semicircular markings that are made there by the

19   milling machines that put the final touches on that

20   face that comes in contact with the head of the

21   cartridge case.

22      Q       So the actual tool part of the operating

23   apparatus that throws the cartridge out leaves a

24   distinctive mark?

25      A       Yes.

1      Q       What else do you look for?

2      A       There are a number of different chambering

3   marks.

4      Q       What's a chambering mark?

5      A       As the chamber is cut at the factory to

6   the size of this particular cartridge, there are a

7   number of different milling marks where the drill

8   drills out the chamber and the forming tools that are

9   used as a back up operation to that leave a series of

10   tiny marks in the chamber.

11      Q       All right.  And by that, on the outside of

12   the cartridge on the rounded part of the cartridge --

13      A       Yes.

14      Q       -- where the cartridge sits down in the

15   chamber?

16      A       Yes.

17      Q       After there is an explosion, it leaves an

18   imprint of some sort of whatever flaws or unique

19   markings there are to the chamber metal around that is

20   imprinted on that cartridge?

21      A       Yes, that's correct.

22      Q       What is else is there?

23      A       There is what is known as an extractor

24   mark, which during the firing operation, after the

25   cartridge is fired, the extractor is a hook-like

1    mechanism that hooks over the rim of the fired

2    cartridge case and pulls it from the chamber.

3          Q      Now, when you say an extractor, you mean

4    the rim of the cartridge case.  How familiar with

5    cartridge cases is that?

6          A      It's something like this.

7          Q      Now, is the extractor grabbing the little

8    bottom of the case or grabbing the top of the case?

9          A      What you call the bottom there or the rim

10   of the cartridge case, it's hooking over the edge of

11   that rim and pulling the fired cartridge case from the

12   chamber.

13         Q      There is the rim here?

14         A      Right.

15         Q      What else do you look for on individual

16   markings?

17         A      Usually on the opposite side from the

18   extractor, inside the chamber of the weapon, you are

19   going to find an ejector.  And the ejector is

20   basically a formed metal part that as the extractor is

21   hooking over the rim and pulling it back to a certain

22   point, the ejector is going to be stationary.  And

23   it's going to in effect pop the cartridge case, to

24   make it fly out the side of the weapon.

25         Q      So when this solid piece of metal hits the

1    cartridge with force as the extractor is grabbing, it

2    leaves a mark somewhere on the cartridge?

3         A      Yes, sir, that's correct.

4         Q      And that piece of metal being tooled under

5    microscopic examination will leave a different mark

6    from another piece of metal in another Beretta type .9

7    mm that will not be exactly alike?

8         A      That's correct.

9         Q      Anything else?

10        A      That's the major areas to look at and

11   those are the areas that I used in making the

12   determination that these our cartridge cases were

13   fired in the chamber of the same .9 mm pistol.

14        Q      Now, the microscopic examinations you did,

15   were you using the same microscope that Mr. Baldwin

16   had there at the Houston Police Department or at the

17   medical examiner's office -- I think you said the

18   Houston Police Department?

19        A      Yes.  The Houston Police Department and,

20   yes, this was the microscope that was provided to me

21   by Mr. Baldwin.

22        Q      Were you familiar with that type of

23   microscope?

24        A      Yes, sir.  I have one just like it.

25        Q      You recognize it is a tool that you all

1  use and it's a model that you are certainly familiar

2  with, if you have one just like it?

3      A      Yes.

4      Q      Was it a good microscope?

5      A      Yes.

6      Q      Were you able, when you say you hadn't

7  gave an opinion, all of these things you are talking

8  about -- the pin marker, the chamber marks, the breech

9  face, extractor, the ejector -- are all of these

10  markings on the outside of the cartridge case?

11      A      Yes, sir, they are.

12      Q      And you can examine the outside of the

13  cartridge case, correct?

14      A      Yes, sir.

15      Q      Do you do any other testing as far as a

16  chemical test or any other type of test on the

17  cartridge?

18      A      No, I did not.

19      Q      Do you ordinarily?

20      A      No.

21      Q      Ordinarily you do exactly what you do, you

22  look at these markings on the outside of the case; is

23  that correct?

24      A      Yes, sir.  That is correct.

25      Q      Based upon what you are able to observe

```
 1    from markings on the outside of the case, you are able
 2    to tell this jury that those cartridges came from the
 3    same firearm?
 4         A     Absolutely.
 5         Q     Now, do you use a somewhat similar process
 6    in the bullets?
 7         A     Yes, sir.
 8         Q     And did you examine all of the bullets
 9    that you have before you, State's Exhibit 27, 29, 144,
10    145, 146, 132, 29, 30, and 155?
11         A     Yes, sir, I examined all of those using
12    the same microscope.
13         Q     All right.  Now, were you able, looking at
14    those bullets to make certain class identifiers,
15    narrow the class of the bullet, the class of firearm
16    that bullet would have been able to come from?
17         A     Yes.  On most of these bullets and bullet
18    jacket fragments, there is the appearance of the class
19    characteristic rifling, this would be in accordance
20    with the six grooves with the right-hand twist,
21    grooves being of a particular small size.  All of that
22    again is consistent with Taurus and Beretta and so
23    forth.
24         Q     All right.  Is it a much bigger class of
25    firearms that the class characteristics are consistent
```

1    with on the bullets than it is on cartridges?

2        A      If we were just looking at the bullets

3    alone, yes, I think it does add some more

4    possibilities to the list.

5        Q      Now, I gave you a list of firearms that I

6    had written down and they were --

7               MR. SMYTH:  I object to counsel

8    testifying.  If he wants to the ask questions I have

9    no objection but he's testifying to what he may have

10   done.  And this man being an expert, he ought to be

11   able to testify.

12              THE COURT:  Sustained.

13       Q      (Mr. Odom)   Is the class characteristic,

14   that being a right-hand twist with six grooves, is

15   that the way you say it?

16       A      Yes.

17       Q      Is that consistent with an American

18   Derringer?

19       A      Yes, sir, it is.

20       Q      Is it consistent with something called an

21   Astra?

22       A      Yes, sir, it is.  A-s-t-r-a.

23       Q      Is it consistent with something called a

24   Beretta?

25       A      Yes, sir, it is.

1        Q       Is it requests with some called a Dashway,
2    if you know?
3        A       Well, again I have no personal knowledge
4    of that particular weapon.
5        Q       All right.  Question mark on that.  Is it
6    consistent with something known as a Sterling Arms?
7        A       Yes, sir.
8        Q       Is it consistent with something known as
9    an SWD?
10       A       Yes, sir, it is.
11       Q       Consistent with Taurus again?
12       A       Yes, sir, it is.
13       Q       Is it consistent with something known as a
14   Walter?
15       A       Walther.
16       Q       Now, is the right-hand twist the more
17   common of a less common twist for pistols?
18       A       It's the more common.
19       Q       I asked you this before and you didn't
20   answer.  Having rounded at sort of once before, do the
21   Swedish have a left-hand twist?
22       A       Do the Swedish have a left-hand twist?
23       Q       You have to have driven a Saub to
24   understand that.
25               It's not uncommon to have the right-handed

1      twist and the six grooves, right?

2           A      That's fairly common.

3           Q      Was it easy for you to determine the lands

4      and grooves on these pistols?

5           A      Yes, fairly easy.

6           Q      And by lands and grooves, are we referring

7      to groove marks that are indented on the barrel and

8      raised marks that are indented on the groove marks

9      that are indented on the bullet and raised marks that

10     are indented on the bullet that run somewhat, I call

11     it, longitude on the bullet?

12          A      Yes, sir.  That's correct.  There are a

13     series of spiral grooves that are cut into the

14     interior of the barrel and, then, when a bullet is

15     fired through the rifling of the barrel, it marks the

16     outside of the bullet with, in essence, the negative

17     imprint of the spiral grooves that are inside the

18     bullet -- inside the barrel, excuse me.

19          Q      You mean the bullet itself already has

20     these marks on it before it is ever fired?

21          A      No.  It picks up those marks during the

22     firing.

23          Q      When the explosion and bullet goes out,

24     it's such a tight fight that the rifling inside the

25     barrel leaves these lands and grooves, as you guys

1    call it?

2         A       That's correct.

3         Q       They are raised marks and indented marks?

4         A       Yes, sir.  That's correct.

5         Q       Now, after looking at State's Exhibits

6    that all have the EB numbers, EB number 1 through 9 --

7    when you looked at them, did they have these State's

8    exhibit numbers on them?

9         A       Yes, sir, they did.  Each of the different

10   packages that these different items were located in

11   had their firearm's examiner number, which was FA

12   61-96, and, then, in addition to that, they would have

13   a series of EB numbers for the bullet components and

14   ECC numbers for the cartridge case.

15        Q       All right.  But they did not have the

16   little white stickers that you see on them now that is

17   State's Exhibit 135, for example?

18        A       No, they didn't have those.

19        Q       So you had identified them based upon the

20   tool, the identifier that you would know as EB for the

21   bullets or CC for the cartridge?

22        A       Yes, sir.  That's correct.

23        Q       Now, after making your class

24   identification off the bullets, what is the next step

25   you do?

1          A          I noted in the examination of these

2     different items that, in addition to the six lands and

3     grooves with the right-handed twist, the outside of

4     these bullets, all of these different bullets and

5     bullet jacket fragments were covered with a series of

6     fine longitudinal lines or striata on the outside of

7     the bullet where most of the fine detail that would

8     have been picked up during the firing process was

9     obliterated by these markings.  And that's indicative

10    of the bullets passing through some sort of material

11    that we associate with being silencer-type material,

12    steel wool, etcetera.

13         Q          Mr. Ernest, the identifiers that you look

14    for, in comparing one bullet to another bullet to

15    determine if it was fired from the same firearm, where

16    are those identifiers going to be found?

17         A          Those identifiers are going to be found

18    all over the outside circumference, the bearing part

19    of the bullet, bearing surface of the bullet, that is

20    going to come in contact with the interior barrel of

21    the weapon.  Any impressions in the barrel are going

22    to score longitudinal lines outside the bullet.  In

23    addition to those identifying markers, those have been

24    largely covered by the fine markings of a longitudinal

25    nature, also, that we consider the silencer material.

1        Q       What makes the individual identifiers that

2    you are looking for?

3        A       Imperfections in the interior of the

4    barrel.

5        Q       And are we talking about when the barrel

6    is created or are we talking about after the gun is

7    used?

8        A       Most of these are in the barrel, as it

9    comes from the factory, although it can pick up more

10   markings after leaving the factory, if there is any

11   more damage to the bullet or to the barrel of the

12   weapon.

13       Q       Now, you have testified you have got these

14   class identifiers that are in all bullets and that's

15   these lands and groove marks.  Are those deep marks?

16       A       Yes, sir, they are.  Those are fairly -- I

17   mean, in the grand scheme of things, not very deep,

18   but microscopically they certainly stand out.  Those

19   are grooves on the bullet that are depressed areas

20   along the longitudinal line of the bullet and they are

21   certainly gross-looking features under a microscope.

22       Q       These identifiers that you are looking for

23   that gives an individual characteristic.  What do you

24   call those?

25       A       Those are individualizing marks or

1    striata.

2         Q        And did we spell that right, striated

3    marks?

4         A        Yes, sir.  That's correct.

5         Q        Are the striata or striated marks, are

6    they in comparison to the land and groove marks nearly

7    as distinguishable?

8         A        No.  They are usually very fine markings

9    themselves made from the very tiny impressions inside

10   the barrel of that weapon.

11        Q        Now, did you, after seeing that these

12   bullets had a number of -- were these few or many

13   marks that were on the outside of these bullets?

14        A        Many.

15        Q        And by many, were there open spaces where

16   there weren't marks?

17        A        Generally, in talking about all of these

18   different bullet fragments, they are covered with

19   markings.

20        Q        Were you able to compare individual

21   striata marks from the various bullets that you were

22   seeking?

23        A        I was not able to match these bullets

24   together nor eliminate them.

25        Q        What does that mean?

1        A        Well, it means that fine detail that was

2    needed for a match, in my opinion, was obliterated by

3    the presence of all of these brush marks from possibly

4    a silencer used in this case.  And when I examined

5    each particular bullet and bullet jacket fragment, I

6    was not able to match these bullets together.  They

7    have the same caliber and the same rifling structure.

8    They are certainly consistent with each other in

9    regard to that but the fine detail that was needed for

10   a match I was not able to find.

11       Q        Mr. Ernest, did you look both in the land

12   part of the bullet as well as the depressed groove

13   part of the bullet?

14       A        Yes, sir.  I looked over the outside

15   surface of each and every item.

16       Q        Were you able, with your microscope, to

17   look inside the depressed part of the bullet, be that

18   this area, or I don't know which would be the larger

19   on a bullet is going to be?

20       A        The smaller size groove, there would be

21   the groove on the bullet.

22       Q        Would that be the depressed area?

23       A        Yes.

24       Q        Were you able to, with your microscope,

25   look inside the depressed area or the groove in the

1    bullet?

2         A    Yes.  You can see that very clearly.

3         Q    Did you look in the groove or the

4    depressed area of the bullet to try to find these

5    striata or striated marks that you used to identify

6    one bullet as being consistent with coming from the

7    same firearm as another bullet?

8         A    Yes.

9         Q    Were there markings in the depressed part

10   of the bullet similar to the markings all over the

11   land or the raised part of the bullet?

12        A    There is markings all over the lands and

13   grooves of the bullet but I was not able to find

14   corresponding patterns that allow me to match one

15   bullet with another.

16        Q    Now, let's talk about your testimony in

17   regards to what you understand as a material that is

18   similar to a silencer or a suppressor.  We heard both

19   terms.  What is a silencer and what is a suppressor?

20   Is there any difference, or if there is, tell us what

21   you know in that regards.

22        A    What I know is this federal law prohibits

23   trying to attenuate or lessen the sound of any

24   firearm, so any device that lowers the sound made by a

25   firing weapon can be listed under federal law as a

1   silencer.

2          In common terms, though, there are a

3   number of different companies that have in the past

4   made both a screw on attachment known as a silencer

5   and a screw on attachments made as suppressors.

6   Generally, the suppressors would be to lessen the

7   sound.  They would probably lessen the sound less than

8   a silencer, an outright silencer that had been built

9   to basically silence the weapon.

10      Q      Either way it's illegal?

11      A      Both ways it's illegal.

12      Q      Are you familiar with a type of homemade

13   mechanism wherein you can attempt to silence the sound

14   of a gun using steel wool?

15      A      Yes, sir, I am.

16      Q      And how is it you have become familiar

17   with that?

18      A      Generally, these types of questions come

19   up from time to time relating to silencer mechanisms,

20   designs or silencers.  I have studied these things for

21   a number of years, and I am familiar with literally

22   dozens of different styles of silencers and how they

23   are manufactured.

24      Q      Mr. Ernest, I would like to draw your

25   attention to State's Exhibit 42.  Are your eyes good

1    enough to see this?  If they aren't --

2         A      Yes, sir, I can essentially see it.

3         Q      Are you familiar with a type of system to

4    wherein you can have a silencer, which would be a tube

5    such as we see here on State's Exhibit 42, and we can

6    have dispersed through this tube various washers, this

7    one I believe you have one, two, three, four washers.

8    And that these washers have holes through the center

9    of them, of course, and stuff between the spaces in

10   the washers, you could have a substance, such as, for

11   example, steel wool?

12        A      Yes, sir.

13        Q      Is that not an unheard of or -- first of

14   all, silencers are not common, are they?

15        A      Not very common.

16        Q      But in the world of silencers, is that one

17   of the known homemade techniques for making a

18   silencer?

19        A      Yes.

20        Q      Now, if a bullet is to go from the front

21   end of this device to the back end of this device, is

22   it going to have to pass through that steel wool?

23        A      Yes.

24        Q      And when it goes through the steel wool,

25   assuming this is the end of the silencer that you are

1    looking at, the steel wool is completely covering the

2    entrance the flat bullet is going to have to traverse

3    through?

4         A    Yes, in that particular design it is.

5         Q    Now, when that bullet, based upon your

6    experience and expertise, goes through the opening

7    made in the silencer, the opening in the silencer that

8    it goes through, will there be steel wool that will

9    mark, in your opinion, the depressed as well as the

10   raised parts on that bullet?

11        A    Yes.  It's going to brush the entire

12   outside bearing surface of the bullet.

13        Q    Now, after you fire one bullet through

14   that mechanism, will the second bullet that is fired

15   through that mechanism will it have the identical

16   markings all over it from the steel wool that the

17   first bullet has?

18        A    No.  The steel wool is going to be

19   compressed by that first bullet blowing through there

20   and the steel wool will spring back basically into

21   place except now it has got a tunnel through the steel

22   wool material but the steel wool will close back in a

23   smaller diameter and the next bullet is also going to

24   be brushed by the steel wool.  And since there, it is

25   a totally random by which the steel wool wires will

1    brush the outside of the bullet, it is not going to

2    have the same marks as the first bullet going through

3    it.  Every bullet passing down through it is going to

4    have a different set of brush marks.

5         Q    Mr. Ernest, if you had two silencers on

6    two .9 mm guns and you fired a bullet through one .9

7    mm and fired a bullet through another .9 mm that both

8    have silencers on it, would you, in your opinion --

9    and the type of silencers that is on State's Exhibit

10   42 -- in your opinion, would you be able to compare

11   the two bullets in order to give an opinion as to what

12   firearm it come out.

13             MR. SMYTH:  Object, that's hypothetical

14   based on facts to which there is no evidence.

15             THE COURT:  Do you want to restate that,

16   Mr. Odom?

17             MR. ODOM:  Well, just despite the fact

18   that it is based upon a hypothetical, which is no

19   evidence, we have them to the silencers.

20             MR. SMYTH:  No evidence of two different

21   firearms, .9 mms, taking two different silencers and

22   and firing through them.

23             MR. ODOM:  Firearms -- that the firearms

24   could have come from one of about--

25             THE COURT:  All right.  It's overruled.

1              You can answer.

2      Q      (Mr. Odom)    Do you want me to restate

3   your question?

4      A      Yes, sir.

5      Q      We are talking about silencers and

6   homemade silencers that have steel wool in them

7   similar to what we see in State's Exhibit 42.  If we

8   have got two silencers that have got steel wool and

9   you have got a .9 mm pistol of the Beretta style

10  design that we have talked about previously, if you

11  were to fire one bullet through one silencer and you

12  were to fire another bullet through another silencer,

13  in your opinion, would you be able to compare those

14  two bullets and make a determination that they came

15  from two different firearms?

16     A      Well, it's a matter of degree by which the

17  bullets are brushed by the steel wool.  I don't

18  believe I would be able to match those bullets

19  together because of the obliteration of the steel

20  wool.  And I don't think that you could tell whether

21  there was two firearms involved.

22     Q      So, in other words, if you didn't have

23  very much steel wool, you still might have your

24  identifiers on there?

25     A      Right.

1        Q       But if you have a whole bunch of steel

2   wool, you may not be able to find these identifiers?

3        A       Right.

4        Q       Now, in reference to the opinions that you

5   guys make, what you are looking at is static evidence

6   or it's evidence that is there when you are looking at

7   your bullet and when you are looking at your

8   cartridge, that evidence is not going to change, is

9   it?

10       A       No, it's not.

11       Q       That bullet is the same way it is when you

12   saw it back on August 5th?

13       A       Yes, sir.  It appears to be.

14       Q       Is, however, the opinions that are given

15   in your profession are they absolute and are they

16   static, if you will?

17       A       Well, they are just what they are.  They

18   are opinions.  There may be the opinion of one

19   firearms examiner that he may say that he matched two

20   bullets together.  Another firearm examiner may look

21   at the same evidence and decide that there is not

22   enough detail there to call it a match and his opinion

23   would be that he can neither match nor eliminate these

24   bullets as being fired from the same pistol, and

25   that's basically what we have in this case.

1      Q      In certain businesses wherein you have a

2  subjective opinion based off of static scientific

3  evidence, such as, for example, fingerprints, there is

4  a standard set down by an association that indicates a

5  minimum before a pistol identification could be made.

6  Does your organization have any such minimum standard

7  that you all set down before you can call something a

8  positive or a tentative, or whatever you want to call

9  it, type of identification?

10     A      No, sir.  There are no what they call

11 objective identification criteria that have been set

12 down for whether two bullets match each other on the

13 basis of the striations that are there.  It's been a

14 topic for a number of years but there's never been any

15 set rules as far as the amount of striata, their

16 position, number, and, so forth, in what makes an

17 identification.

18     Q      Have there been some rather well

19 publicized and disputed cases in your business of

20 misidentification on various bullets.

21            MR. SMYTH:  Object to whatever they have

22 in some other case.  We don't care about it.  It's

23 this case.

24            THE COURT:  Sustained.

25     Q      (Mr. Odom)   Is it your experience that

1    there have been misidentifications by perfectly good

2    examiners in your business that do occur.

3              MR. SMYTH:   Object, I think people have

4    come to different conclusions or opinions.

5              THE COURT:   Sustained.

6        Q      (Mr. Odom)    Whether the

7    misidentifications or not, in your business, can you

8    have two different opinions about the same bullet in

9    regards to the identification because of the

10   subjectity that each firearm and tool mark examiner

11   uses to make a match?

12       A      Yes, sir.  You can have a difference of

13   opinion based upon that.

14       Q      Now, my next question is that can you take

15   those exhibits, and by those exhibits, I am referring

16   to 27, 29, 144, 145 and 146, and 132, I believe, if

17   you haven't already answered this, I'll make sure --

18   you have testified that you cannot make a comparison

19   off of those bullets?

20       A      I was not able to match these bullets

21   together.

22       Q      Have I already asked you that?

23       A      I believe we have covered that.

24       Q      Is there then any additional custom that

25   you know that you can do to these bullets, short of

1    looking at them through the microscope, to make -- is

2    there another test that can be done off these bullets

3    that you know of for a comparison, see if they were

4    shot through the same firearm?

5         A      It would be the same type of comparison

6    done perhaps by another firearms examiner.

7         Q      We get another opinion but there is no

8    scientific test or physical test that can be done that

9    you are aware of that would give you a conclusion

10   regarding whether these bullets came from the same

11   firearm?

12        A      Yes, sir.  That's correct.

13               THE COURT:  Hold on.  Ladies and gentlemen

14   of the jury, why don't you please stand up and stretch

15   for a second.

16               Thank you very much.

17               Please continue.

18        Q      It's not the first time I have put this

19   jury to sleep.

20               Did you have an opportunity -- well, let

21   me rephrase that.  What is State's Exhibit 155?

22        A      What's State's Exhibit 155 is one of the

23   projectiles that was identified to me as coming from

24   the material from the medical examiner's office and

25   which is a lead core to a coppered jacketed bullet,.9

1    mm bullet.

2         Q       Number 155 is not on the list of bullets

3    that you see in exhibit 163, is it?

4         A       That's correct.

5         Q       Here he is 155 as corresponding to the EB

6    number, right?

7         A       Yes, sir.  That's correct.

8         Q       Now, did I have some question about

9    State's Exhibit 155?

10        A       Yes, sir, you did.

11        Q       And this morning did I ask you whether

12   that was a lead core bullet on 155?

13        A       Yes, sir.

14        Q       And did you, in order to determine if it

15   was lead cored bullet, did you take a pen knife and

16   scratch a bit of it, to determine if it was lead as

17   opposed to copper?

18        A       Yes, I did.  And I was very careful to do

19   that on the base of the bullet where there would be no

20   obliterations made on the area of the bullet that

21   would make any difference.

22        Q       Is that a technique that you use to

23   determine the composition of the bullets?

24        A       Yes.

25        Q       Lead soft?

1          A          Right.

2          Q          Copper is not soft?

3          A          That's correct.

4          Q          And you are able to determine what?

5          A          That this is, in fact, a lead core from a

6     .9 mm copper jacketed bullet.

7                     MR. ODOM:  May I approach the witness

8     again, Your Honor?

9                     THE COURT:  You may.

10          Q          Now, looking at the lead core bullet that

11     is found in 155, in comparison to the lead core that

12     we have on State's Exhibit 30 does -- 30, for instance

13     -- well, 30 appears to be fragments; is that a fair

14     statement?

15          A          Yes, sir, it is.

16          Q          And then 155 is a solid core of lead?

17          A          Yes.

18          Q          Is there any other than the fact that one

19     is in pieces and the other is solid, is there any

20     other physical differences between the two that you

21     noted?

22          A          I noted that in State's Exhibit 155 the

23     lead core appeared to me at the time of my initial

24     examination I thought that this was what we call a

25     souvenir bullet, one that had perhaps been in the body

1    of the victim for some period of time because of the

2    amount of oxidation that was present on the outside of

3    the bullet.

4        Q        And in laymen's terms, what does it mean

5    "a great deal of oxidation"?

6        A        Lead is one of those elements that is

7    going to very quickly tarnish in the presence of our

8    atmosphere because of the oxygen in our atmosphere and

9    it is going to tarnish the outside of the lead.  And

10   when it is in somebody's body, it's going to turn it

11   extremely black and coated with a blackish gray

12   coating.  And I thought this was perhaps a bullet that

13   had been in the person's body from some previous

14   incident.

15       Q        Is the oxidation that is on that lead core

16   regardless of whether -- can the lead core get that

17   oxidation when there is a copper jacket over it?

18       A        Oftentimes that's not seen because the

19   copper jacket is in such contact with the lead that it

20   keeps that oxidation from occurring until the core

21   becomes exposed.

22       Q        Can you have older bullets wherein the

23   oxidation has occurred and the lead core become

24   discolored inside the bullet?

25       A        That's certainly a possibility that it

1    could do that but, oftentimes, when you open up a

2    copper jacketed bullet, the lead still looks

3    apparently fresh on the inside.

4         Q       Is the lead core, the oxidation of the

5    lead core, on State's Exhibit 155?

6         A       Yes, 155.

7         Q       Yes, 155.  Does it have the same type of

8    oxidation that you see in the lead fragments that are

9    found in State's Exhibit 30?

10        A       Well, these fragments appear to be a

11   little bit fresher lead than State's Exhibit 155.

12   Again, that's really a matter of interpretation.

13        Q       All right, sir.  There can be a number of

14   factors that could cause one bullet to be oxidized and

15   another one not to be?

16        A       Yes, sir, that's correct.

17               MR. ODOM:  Pass the witness, Your Honor.

18

19                      CROSS EXAMINATION

20   BY MR. SMYTH:

21        Q       Mr. Earnest, my name is Don Smyth, and I

22   am an assistant district attorney here in Harris

23   County, Texas.  And we have never had the pleasure of

24   meeting before, have we?

25        A       No, sir, we have not.

1      Q      Did you make a report regarding your

2   findings?

3      A      No, sir, I have not.

4      Q      Did you write any notes down regarding

5   when you went and did your investigation?

6      A      I have my personal work notes.  Yes.

7      Q      Could I see those notes, please?

8      A      Certainly.

9      Q      And these are the notes that you made over

10   in the Houston Police Department lab when you

11   conducted your examination using their equipment?

12      A      Yes, sir, that's correct.

13      Q      Who are you employed by?

14      A      I am employed by the Tarrant County

15   Medical Examiner's Crime Laboratory but this case was

16   worked as a private consultation.

17      Q      So you just got contacted by Mr. Odom and

18   his defense team to come down from Tarrant County to

19   look at some evidence here in Houston?

20      A      Yes, sir.  That's correct.

21      Q      So you are being compensated by somebody

22   other than Tarrant County for this, I take it?

23      A      Yes, I am.

24      Q      And you are being -- how much are you

25   getting paid for this?

1        A        I charge a standard fee of $125 an hour.

2        Q        So that would have been paid from the time

3    you leave home until you get back home?

4        A        Yes, sir.  That's correct.

5        Q        How many hours did you get to put in back

6    on August 5, 1997?

7        A        I really haven't tallied up any of those

8    hours yet.

9        Q        How many hours did you spend in the HPD

10   lab?

11       A        Well, I would say total time during that

12   day I may have spent ten hours.

13       Q        In the lab, from the time you hit the

14   door.

15       A        I would say maybe two hours, perhaps

16   longer.

17       Q        What time did you get there?

18       A        I got there -- if you would let me have my

19   notes back, I'll be happy to give you.

20       Q        You can't remember without your notes?

21       A        Not off the top of my head.  Yes, sir, I

22   arrived at 11:15 at the Houston PD lab.

23       Q        These are the only notes you have made

24   regarding your investigation?

25       A        Yes, sir.

1     Q     There is no other reports anywhere?

2     A     No, sir.

3     Q     Your folder has got something else, it

4  doesn't have to do anything to do with this case?

5     A     There are other paper works in here.

6     Q     But does it have anything to do with this

7  case?

8     A     It has to do with this case in terms of

9  telephone numbers, addresses, things like that, but

10  not in terms of work notes in relation to the case.

11     Q     And not in terms of any report that you

12  generate?

13     A     No, there is no report.

14     Q     And this is everything you got?

15     A     Basically.

16     Q     So you arrived at 11:15 a.m..  What time

17  did you leave?

18     A     I have down that I left their laboratory

19  at 2:00 p.m.

20     Q     And that was after you went to lunch with

21  Charlie Anderson, right?

22     A     Well, Mr. Baldwin.

23     Q     Mr. Baldwin.  You went to lunch with Bob

24  Baldwin?

25     A     Right.

1      Q      How long did you have for lunch?

2      A      Maybe 45 minutes.

3      Q      45 minutes.  And you left at what time?

4      A      I don't know off the top of my head.

5      Q      So maybe two hours of examination, would

6    that be a fair statement?

7      A      Yes, I believe it would.

8      Q      And you spent two hours examining the

9    evidence in this case?

10     A      I believe so.

11     Q      And you came in the laboratory.  You

12   visited with Charlie Anderson, who is an old friend of

13   yours?

14     A      Yes.  I know Mr. Anderson.

15     Q      Would you tell the ladies and gentlemen of

16   the jury who he is?

17     A      Charlie Anderson is the chief firearms

18   examiner for the Houston Police Department.

19     Q      He would have an equivalent position of

20   you, I take it, he is a senior firearms examiner for

21   the Houston Police Department Firearms Lab.  You are

22   the senior firearms examiner for the Tarrant County

23   Firearms?

24     A      Yes, sir.  That's correct.

25     Q      Would that be correct?

1       A       Yes, sir.

2       Q       And Bob Baldwin is another examiner in the

3   office?

4       A       Yes.

5       Q       Do you have any question in your mind

6   about the integrity of Mr. Baldwin or Mr. Anderson?

7       A       Absolutely not.

8       Q       If they form an opinion, you have no

9   reason to believe that their opinion is anything other

10  than in good faith based upon what they see and what

11  they observed?

12      A       That's correct.

13      Q       And if your opinion is different from

14  theirs, it is just because you differed?

15      A       That's correct.

16      Q       It's not because they are trying to make a

17  case where you don't see a case?

18      A       That's correct.

19      Q       And in your case, just to start with, you

20  did not find a match?

21      A       That's correct.

22      Q       But you could not eliminate those bullets?

23      A       That's correct.

24      Q       So translated into plain English, that

25  means you cannot say that those six bullets up there

1    on State's Exhibit 163, which is State's Exhibit 26,

2    29, 144, 145, 146 and 132, you cannot say that those

3    bullets were not fired from the same gun, can you,

4    sir?

5         A    No.  I would have said the same, as I did

6    in testimony, that I could neither match them nor

7    eliminate them.

8         Q    So you are just saying you can't say that

9    they came from the same weapon but you are not saying

10    it didn't come from the same weapon?

11        A    That's correct.

12        Q    Let me ask.  I want to go to something

13    that is -- I don't know why it was asked but I want to

14    clear it up.

15             State's Exhibit 155, when you saw that

16    exhibit --

17             THE COURT:  Mr. Smyth.

18             MR. SMYTH:  I'm sorry.

19             Your Honor, may I approach the witness?

20             THE COURT:  You may.

21        Q    This is State's Exhibit 155.  You saw that

22    this morning, correct?

23        A    That's correct.

24        Q    That's the exhibit that you took out your

25    pen knife and scratched on the base of, right?

1          A          Yes, sir.  That's correct.

2          Q          At the time you saw that and started

3     scratching on the base of it, did you know that was a

4     piece of evidence in this case?

5          A          Yes, sir, I did.

6          Q          So basically what you are doing, you are

7     tampering with evidence in a criminal case, weren't

8     you?

9          A          No.

10         Q          You don't call scratchingo n something

11    tampering?

12         A          I would not calling scratching a lead core

13    that cannot be matched to any firearm on the base,

14    which is not a bearing surface that can be used with

15    anything, tampering or obliterating the evidence in

16    any way.

17         Q          You did that kind of wondering is this a

18    souvenir bullet?

19         A          Yes, that's correct.

20         Q          Would this surprise you to know that

21    State's Exhibit 155 is a bullet that passed through

22    and through the body of Janos -- Johnny -- Szucs and

23    was found in his undershirt, his clothing?

24         A          I did not know where that bullet came

25    from.

1        Q        With that evidence and with that

2    statement, did that change your opinion as to whether

3    this is a souvenir bullet?

4        A        In my mind, it was only a possibility to

5    begin with.

6        Q        When you formed your opinion that is a

7    souvenir bullet that may have been in the body for

8    some length of time, that opinion is wrong, is it not?

9        A        Apparently so.

10       Q        So if the state of the evidence testimony

11   was that it was found by a CSU officer in the clothing

12   of Johnny Szucs and one through and through bullet in

13   the body, the chest cavity, and it does not appear to

14   be a souvenir bullet, you would not quibble with that?

15       A        No, I would not.

16       Q        And the other bullets are found in the

17   brain and the chest and there's only one through and

18   through accounted for until it was found in the shirt?

19       A        I will have to take your word for that.  I

20   did not read any kind of autopsy reports and so forth.

21       Q        Would you agree with the state of evidence

22   that's not a souvenir bullet?

23       A        Yes, I would agree with that.

24       Q        The reason it may be a different color

25   because of some of the evidence, it was an older

1    bullet, an older cartridge?

2         A    That's one possibility.

3         Q    Maybe the guy that fired all these was too

4    cheap to go buy a box of ammo or collected it?

5         A    I couldn't say that.

6         Q    Or got friends and I need some bullets and

7    dug up whatever he could get?

8         A    Certainly I could speculate.

9         Q    There is lots of explanations why that

10   might be a different color?

11        A    There are other explanations.

12        Q    And we know it is not a souvenir?

13        A    I will have to take your word for it on

14   the medical examiner's autopsy, and so forth.  If

15   there is no other explanation and that was taken out

16   of his body and I would say that's probably not a

17   souvenir bullet.

18             MR. SMYTH:  May I approach the witness,

19   Your Honor?

20             THE COURT:  You may.

21        Q    You will agree that Robert Baldwin -- that

22   State's Exhibit 26, 51, and 52, and 105A, which are

23   the cartridge casings, were all fired by the same

24   weapon?

25        A    Yes, sir.  I agree with that.

1        Q       And you would agree with Robert Baldwin

2    that the weapon that probably fired these is most

3    probably a Beretta or a Taurus?

4        A       Yes, I would agree with that.

5        Q       So at least on those two points that you

6    agree with Mr. Baldwin?

7        A       Yes.

8        Q       Your disagreement -- or not

9    disagreement -- your differerence of opinion, I should

10   say?

11       A       It is a difference of opinion.

12       Q       -- is based upon the actual lead bullets.

13   Were you not able to match any of those lead bullets?

14       A       Well, back up for a second.  Copper

15   jacketed bullets?

16       Q       Correct.

17       A       And I was not able to.

18       Q       Okay.  And during this two hours that you

19   were in the lab --

20              MR. SMYTH:  May I approach the diagram?

21              THE COURT:  You may.

22       Q       There were nine copper-jacketed lead

23   bullets or lead fragments?

24       A       I believe that's correct, sir.

25       Q       And you know that Mr. Baldwin was unable

1    to match three of those lead, copper-jacketed bullets

2    or copper fragments himself?

3         A      I did not know that but I'll take your

4    word for that.

5         Q      Mr. Odom didn't tell you that?

6         A      I did not know that particular aspect of

7    it.

8         Q      And that Mr. Baldwin says, by his

9    examination, he was able to match -- he looked at 27,

10   29, 144, 145, 146 and 132, compared each one of those

11   to each other and was able to match those six bullets

12   and determine that they were all fired from the same

13   gun.  Through your examination, did you compare EB

14   one, which is State's Exhibit 27, to EB two?

15        A      I compared all of those against each

16   other.

17        Q      So you compared 27 to 29, 144, 146, 145,

18   and 132 you compared this one to all of the other 35

19   up here?

20        A      Right.

21        Q      And, I take it, you then took 29 and you

22   compared it to 144, 145, 146 and 132?

23        A      And 27.

24        Q      Well, I already did that.  I wasn't going

25   to repeat myself.

1     A     Yeah, but what you are doing is taking

2 each one at a time and comparing it to the others and

3 that's what I did.

4     Q     How many times, how many visual

5 comparisons, did you have to make to do that?

6     A     Well, I didn't count them.

7     Q     A whole lot?

8     A     Oh, yes.

9     Q     You have to do that.  If you did the

10 complete job, you also had to compare all of these six

11 listed on State's Exhibit 163 with the other three

12 pieces of copper jacketed bullets or pieces of the

13 jacket?

14     A     Yes, that's correct.

15     Q     So somebody did the math?

16     A     We are talking about dozens of different

17 comparisons.

18     Q     81?

19     A     There are dozens of them to be made.

20     Q     And all you have, you did that in two

21 hours?

22     A     Right.

23     Q     Did you photograph your work?

24     A     No, I did not.

25     Q     Is it unusual for an examiner, like you,

1      to photograph their work?

2           A      Yes.

3           Q      It wouldn't be unusual for Bob Baldwin not

4      to photograph his work?

5           A      No.

6           Q      And you wouldn't hold that against him --

7           A      No.

8           Q      -- to somehow to suggest he is trying to

9      do something shady or sneaky?

10          A      No, I certainly wouldn't say that.

11          Q      You didn't do that?

12          A      And I don't generally do that.

13          Q      Now, what we are comparing in this is

14     really you look at all what you call the bearing

15     surfaces of the bullet and what happens is, according

16     to the diagram barrel, has been tooled with a spiral

17     lands and grooves.  And when you look at the bullet,

18     the grooves, you are looking at the groove impressions

19     which becomes a raised portion of the bullet, correct?

20          A      Right.

21          Q      And the land impression for the barrel is

22     going to be a depress, as you call it, reverses or

23     negative or first negative-type situation?

24          A      Right.

25          Q      And in that you are looking for dominant

1    markings somehow, striata?

2        A       Striata.

3        Q       Now, is it your testimony that these

4    bullets were so obliterated by some substance, perhaps

5    steel wool, that you couldn't see striata other than

6    these fine, little markings all over?

7        A       My testimony would be that these bullets

8    were covered with fine striata from passing through

9    whatever material did that to them, and I was not able

10   to match these bullets against each other.

11       Q       Did you not see a single major dominant

12   piece of striata other than the fine little brushes?

13       A       I don't think I could characterize it as

14   that particular type of situation, just the reverse is

15   true.  You have bullets that have striata all over

16   them.  And I did not see any that I could find

17   matching patterns in.

18       Q       Well, did you find any of them?  Did you

19   find any major?

20       A       Major land marks and so forth?

21       Q       Yeah; any of them?

22       A       I did not find any that would give any

23   kind of corresponds.

24       Q       Just like being sand blasted?

25       A       Well, that's probably not a good

1       description of what's going on there.

2              Q      What about --

3              A      How about a wire brush?

4              Q      That's what I was going to say.  Somebody

5       took a wire brush?

6              A      Right.

7              Q      Are you telling the ladies and gentlemen

8       of the jury -- well, would it make any difference to

9       you, would it make any difference to what happens to a

10      bullet when it is fired through a silencing device, if

11      that silencing device as opposed to being packed full

12      of steel wool has, say, three washers, a washer has

13      the opening where the bullet is going to come out and

14      about one third of the way up and you pack the steel

15      wool and you put a washer and two thirds up and pack

16      with steel wool or divided in fourths, then you take a

17       .9 mm reamer and clear out a channel?

18             A      Again, you are going to have those wires

19      from the steel wool protruding down into the area.

20      Once you take the .9 mm reamer out, it is going to

21      collapse back in on a certain amount, and that's

22      what's going to brush the outside of the bullet.

23             Q      And it's not going to be like you fired it

24      through something that is solid steel wool, is it?

25             A      Probably less markings on it but, again,

1    that's a subjective determination.  You would have to

2    look at that and see that's what happens.

3         Q       You are going to have a channel.  When you

4    fire a weapon that has got a silencer, silencing

5    device on the front, and the hot gases and flames, now

6    instead of coming at the end of the barrel and

7    disbursing, they have to go through some portion of

8    that silencer before disbursing?

9         A       Right.

10        Q       Would those hot gases -- have you ever

11   taken a match to steel wool?

12        A       Right.

13        Q       Seem like, back in high school, we do

14   that, it would explode?

15        A       Well, that's not what happens in a

16   silencer.  There's no explosion of the steel wool.

17        Q       I mean burn or anything like that?

18        A       Some small portion of.

19        Q       And hot gases in the steel wool and the

20   hot gases that come through there are going to burn

21   that steel wool, aren't they?

22        A       If you are trying to portray that the

23   silencer is basically destroyed by that first blast

24   coming through there, that's wrong.

25        Q       So, no, I wasn't portraying.  I was asking

1     a question.

2                Is there or not, in your expert opinion,

3     that steel wool going to be burned and fused by the

4     hot gases that come through the silencer?

5          A     Certainly there could be a small amount of

6     that.

7          Q     Sure, there is.  If I put the gun to the

8     side of somebody's hide and you would have charring

9     and burning of the skin, wouldn't you?

10         A     Possibly.

11         Q     You would.  You were with the medical

12    examiner's office?

13         A     Yes.

14         Q     You have seen contact wounds before and

15    when somebody puts even a close contact?

16         A     Are you saying with a silencer in place

17    but without a silencer?  Without the silencer, you do

18    get that burning.

19         Q     And so isn't it likely, not unreasonable

20    to believe, that fire and hot gas out of the barrel of

21    the weapon would char and burn skin, then likewise

22    it's going to char and burn the steel wool?

23         A     Certainly a small amount of that does

24    happen.

25         Q     We don't know unless we took the silencer

1    and made a cross section of it.  We don't know how far

2    down that barrel or how far down the length of the

3    silencer it is going to char and fuse the steel wool?

4         A    Well, I have done that before and looked

5    at the silencer, having fired them, and right up close

6    to the end of the barrel, you do get that kind of

7    thing but past about 12 inches or so into it, the

8    effect is nothing.

9         Q    What happened after -- let's say, it is a

10   five-inch silencer.  What happens to the steel wool in

11   the last three inches?  The first two inches gets

12   charred and fused together?

13        A    There is some amount of that continues on.

14   With each bullet, the silencer gets dirtier.

15        Q    And is it the more times you fire bullets

16   through that, once you got the first two inches now

17   charred and fused together, you continue to fire

18   bullets through that charring and fusing of the steel

19   wool progressively down the barrel?

20        A    What you are trying to characterize, the

21   first two inches would not mar a bullet any further

22   and that's not right.  The steel wool may be charred

23   and fused together to a small degree but those ends of

24   the steel wool and everything could be there to brush

25   the outside of the bullet just the same.

1          Q       That wasn't my question.

2                  My question was:  Will not if you

3     repeatedly fire a bullet through there, the hot gases

4     have now done their job on the first two inches, isn't

5     it going to work its way on down there?

6          A       I'm sure if you fired fifty to a hundred

7     rounds, you could totally blow it out.

8          Q       I am talking about just the fusing blast

9     there.  Is that reasonable or am I way out of space?

10         A       Well, I agreed with you every way I can as

11    far as that goes.

12         Q       Hey, we know what we are doing here.

13                 Now, also in addition to the fusing of

14    steel wool together by the hot gases, some of that

15    steel wool is going to get blown out, isn't it?

16         A       Right.

17         Q       And the more of the steel wool that gets

18    blown out the less effective that silencer is going to

19    be?

20         A       Right.

21         Q       And the less steel wool there is going to

22    be in there, packed in there tight, to scratch the

23    surface of the bullet?

24         A       Right.

25         Q       So as that silencer is used repeatedly,

1    you should be able to -- is it reasonable to believe

2    that you might now have less and less abrasions on the

3    bullet?

4         A     I think that's reasonable to assume that

5    at some point, after you fired a number of different

6    rounds through it, you would have bullets that have

7    less scratches on the outside.

8         Q     Now, this abrasion or abrasive effect that

9    we are talking about, that won't just happen with a

10   silencer, will it, sir?  If I fire a bullet through

11   the sheet rock wall, is that going to pick up some

12   abrasions?

13        A     Yes.  But they are not going to have the

14   same look to them.

15        Q     But it's going to pick up abrasions?

16        A     Certainly it is going to abray the outside

17   of the bullet but it's not going to, through firing,

18   through steel wool.

19        Q     Of course not.  I wasn't suggesting it

20   was.  If I fired it through a piece of wool, there's

21   an abrasion as a result of the wool scratching the

22   surface?

23        A     Right.

24        Q     Now, quite often, in your work, you don't

25   get bullets fired in water tanks to look at, as a

1    general rule, other than just practice, when comparing

2    that to one that comes out of a body or a piece of

3    wood or a wall, do you?

4         A    Right.

5         Q    The perfect one you fired into that water

6    tank, it stops.  There is no abrasions to the

7    surface.  It is just beautiful to work with, right?

8         A    Yes, sir.  That's correct.

9         Q    So when you are dealing with bullets, you

10   generally are having to, I guess, the ones that come

11   out of the body, unless they hit a bone structure,

12   they don't pick up a lot of abrasions on them, do

13   they?

14        A    Some.  It depends on what hard surface

15   they have come through.

16        Q    But, I mean, your job is taking those

17   bullets, wherever you get them, and trying to see if

18   you can match to a weapon or each other?

19        A    Right.

20        Q    And I believe you have done that and

21   testified on at least 800 cases you did that type of

22   test?

23        A    Actually what I said was 8000 cases.

24        Q    I thought you testified in 800.

25        A    But I have done the work in about 8000.

1       Q       And you have seen bullets in all kinds of

2    conditions, have you not?

3       A       I have.

4       Q       You have dealth with the abraded surface

5    before, have you not?

6       A       Right.

7       Q       Have you ever done work with bullets that

8    somebody fired through a silencer before?

9       A       Right.

10       Q       You have?

11       A       Yes.

12       Q       And in those cases were you able to make a

13    match?

14       A       Yes, there are cases.  It depends on how

15    much damage is done to the outside of the bullet.

16       Q       But you have actually had cases where you

17    got a bullet that had been fired through a silencer

18    and you were able to, despite the abrasions on them,

19    make a match that either came from a certain gun or

20    that two bullets fired through that silencer were

21    fired from the same gun?

22       A       Right, I have.

23       Q       You just weren't able to do it in this

24    case?

25       A       That's correct.

1               MR. SMYTH:  May I approach the evidence?

2               THE COURT:  You may.

3        Q      Let me show you, sir, what is now State's

4   Exhibit 135 and specifically go to page 18 or page 19.

5   Do you recognize that as a portion of an owner's

6   manual for a Taurus weapon?

7        A      Yes, sir, it appears to be.

8        Q      And would that Taurus weapon, is that the

9   same type of weapon that, in your opinion, would have

10  fired all four cartridges that you have no

11  disagreement on?

12       A      That's certainly a possibility.

13       Q      I mean, the owner's manual that goes with

14  that weapon certainly could have fired these four

15  cartridges?

16       A      Yes, that's a possible.

17       Q      And you and Mr. Baldwin are in agreement

18  with that?

19       A      Yes.

20       Q      In fact, this particular Taurus with the

21  extended barrel, that's certainly a weapon that could

22  have accepted a silencer?

23       A      That's certainly a possibility.

24       Q      Is there any question in your mind that

25  all nine pieces of EB evidence 6 that are on State's

1    Exhibit 125 and the three that are on the other sheet

2    of paper, any question in your mind that those are .9

3    mm bullets?

4        A     As far as the bullet jackets and bullets

5    all of that is consistent with .9 mm.

6        Q     So they are consistent with the .9 mm?

7        A     Right.

8        Q     Hypothetically, if you came upon the scene

9    and you found a bullet on the scene and then some

10   distance it turned out to be a .9 mm bullet jacketed

11   lead bullet and, then, on that same scene, you found a

12   fired .9 mm cartridge casings, would it be reasonable

13   to assume that -- and there is nothing else around --

14   would it be reasonable to assume that bullet came with

15   that casing?

16       A     Well, that's certainly an assumption that

17   could be made.  That's a possibility.

18       Q     Well, is that an unreasonable

19   possibility?  Is that a far out possibility?

20       A     No, I wouldn't characterize as that.

21       Q     If you are a firearms examiner and out on

22   the scene that is secured by the police shortly after

23   the shooting and find a .9 mm bullet and you find .9

24   mm cartridge casings, spent casings, and you know the

25   number of shots that have been fired -- let's say two

1   shots that have been fired -- and you find an intact

2   bullet, maybe deformed, and you find some bullet

3   fragments, which suggest to you because of their

4   locations that there was two shots fired and you got

5   two holes and two gunshot wounds in it and one spent

6   .9 mm casing, would it be logical to assume that .9

7   mm casings with lead out are either one of those two

8   bullets?

9       A       Certainly that assumption can be made and

10  it's not an unreasonable assumption but the other

11  possibility could be that, with two shots fired, and

12  in your scenario only one bullet and one cartridge

13  case being found, you could have found the bullet from

14  one firearm and the cartridge case from the second.

15  That's a possibility.

16      Q       We are talking one gun.

17              MR. ODOM:  At this point, I mean, it's

18  speculative.  He's asking him a highly hypothetical,

19  not improper hypothetical question.  He is asking him

20  to speculate on matters that are beyond the scope of

21  this particular witness' expertise, and I object to

22  the speculative nature of the question besides asked

23  and answered.

24              MR. SMYTH:  Do I --

25              THE COURT:  It's overruled.

Page 148

1          Q      I asserted facts I didn't.  I'll narrow it

2     down so the hypothetical is very exact.

3                 The evidence is that there is only one gun

4     fired two shots and the evidence is that you find an

5     intact but mushroomed .9 mm jacketed lead bullet in

6     one area and you see on the floor a bullet strike and

7     surrounding the strike, as well as in the clothing cut

8     off the victim, are lead fragments from a second

9     bullet and off to one side you find one .9 mm

10    cartridge.  No evidence of two guns, just one gun.  Is

11    it unreasonable to believe that spent cartridge is

12    connected up with either the mushroomed but intact .9

13    mm jacketed lead bullet or the lead fragments from the

14    second shot?

15         A      Given that hypothetical, no, it wouldn't

16    be unreasonable.

17         Q      That would be a perfectly logical

18    assumption most people would make?

19         A      Certainly.

20         Q      And the fact that you don't find a second

21    cartridge case could be any kind of reason somebody

22    could have picked it up and put it in their pocket and

23    you have gone to the scenes, have you not?

24         A      Right.

25         Q      And you have gone to scenes where you

1      conclusion, you don't --

2                  MR. ODOM:  Objection, asked and answered.

3      Argumentive at this point.

4                  THE COURT:  Sustained.

5          Q      (Mr. Smyth)   You just didn't find it?

6                  MR. ODOM:  Judge, once again argumentive.

7                  THE COURT:  Sustained.

8          Q      (Mr. Smyth)   Now, I didn't ask you this.

9      I'll ask you.  There is not some set magic number of

10     identifiers that you have to see in order for you to

11     make a match --

12         A      Again, there's never been any objective

13     set of criteria for calling something a match.

14         Q      -- when you are matching it to a gun or

15     matching to the bullets to each other?

16         A      Right.

17         Q      And basically it's the quality of the

18     markings that you see as opposed to the quantity or is

19     it the quality of the markings that you see or is it

20     quantity or a combination of both that gets you to

21     that comfort level where you call it a match or no

22     match?

23         A      That's basically what the argument has

24     been for the 20 years I have been in the field.

25         Q      Well, what's more important to you?

1          A          Again, I go by the number, their position,

2     their position relative to each other, their

3     appearance, their depth, their nature, all of these

4     different things in trying to call something a match.

5          Q          Let me ask you:  I think you called it the

6     brushing affect.  Is that what you call the surface of

7     the bullet?

8          A          Yes.

9          Q          The bearing surface -- was the brushing

10    effect on these bullets that you looked at on the

11    jackets that you looked at specifically with regard to

12    the bullets, was it as great in, I guess, what's

13    called the grooved, as great in the land impressions

14    as it was in the groove impressions?

15         A          It seem to be a little bit more prominent

16    on the lands on the bullet because that's the outer

17    surface and the grooves on the bullet would be the

18    depressed areas on the bullet and less grooves or less

19    striata in there.

20         Q          I'm not understanding you.  I thought that

21    the land impressions --

22              THE COURT:  I thought you already did.

23              MR. SMYTH:  Thank you, Judge.

24         Q          Correct me if I am wrong, wouldn't this be

25    on a bullet, this land impression is actually grooved,

1      is it?

2         A      It's a grooved impression.

3         Q      Well, in the barrel of the gun, the land

4      is the flat surface and the groove is indented -- to

5      try to keep this from being confusing to everybody

6      concerned --

7         A      If you have grooves inside a barrel, they

8      make the lands on the bullet and vice versa.

9         Q      So the groove does not make a groove?

10        A      The groove in the barrel of the weapon

11     makes the lands on the bullet.

12        Q      Would it be more consistent to call it if

13     the bullet, if this is a groove, whatever it leaves

14     behind is going to be raised, impress the groove

15     impression.

16        A      Okay.

17        Q      I know what I am talking about and I

18     understand the way, how your terminology is to cross

19     over from what I am doing.  But you find less brushing

20     on the recessed portion of than you would have on the

21     raised portion?

22        A      Yes.

23        Q      And you didn't find any significant

24     markings in the recessed portion of the bullet?

25        A      No, I did not find any that I was able to

1     match these different bullets together.

2                   MR. SMYTH:  May I approach the diagram?

3                   THE COURT:  You may.

4     Q       And this recessed portion of the bullet,

5     let me make that recessed portion of the bullet is

6     actually made by the raised portion of the bullet?

7     A       Right.

8     Q       And then it cuts into that bullet and so

9     whatever was left by the tooling on this raised

10    portion of the bullet, which ended up on the recessed

11    portion -- excused me -- the raised portion of the

12    barrel, which ended up on the recessed portion of the

13    bullet was likewise obliterated by this steel wool?

14    A       I did not find anything that I could use

15    for a match there.

16                   MR. SMYTH: Pass the witness, Your Honor.

17                   THE COURT:  Thank you, Mr. Smyth.

18                   Ladies and gentlemen, let's take about a

19    15 minute recess.

20                   (Recess taken.)

21                   (Jury came into the courtroom.)

22                   THE COURT:  Thank you.  Be seated.

23

24

25

1                    REDIRECT EXAMINATION

2     BY MR. ODOM:

3          Q      Mr. Ernest, one of Mr. Smyth's last

4     question -- really wasn't much of a question.

5                    MR. SMYTH:  Object to the side bar.

6                    THE COURT:  Sustained.

7          Q      (Mr. Odom)   He stated he knows what he is

8     talking about, asked about, he knew what he was

9     talking about.  Do you know what you are talking about

10    here, Mr. Ernest.

11                   MR. SMYTH:  Object, it's argument.  It's a

12    comment.

13                   MR. ODOM:  It's in direct response to, I

14    suppose, a question.

15                   THE COURT:  Overruled.

16         Q      (Mr. Odom)   And, Mr. Ernest, do you know

17    what you are talking about when you are talking about

18    the lands and grooves about examining these bullets?

19         A      Yes, I do.

20         Q      You have done this for how many years?

21         A      Over 20 years.

22         Q      And you are the senior examiner for

23    Tarrant County, aren't you?

24         A      Yes.

25         Q      Mr. Smyth started off the examination by

1    asking you who you were paid by.  Who is paying your

2    bill in this case?  Do you remember that question,

3    that latter question?

4        A       Yes, sir, I do.

5        Q       The State of Texas is paying for you in

6    this case, are they not?

7        A       Yes, indirectly.  Yes, sir, that's true.

8        Q       That's your understanding?

9        A       That's my understanding.

10       Q       The State of Texas also pays for your

11   opinion in Tarrant County, does it not?

12       A       Yes, it does.

13       Q       When the State of Texas is paying for your

14   opinion on either side of the docket, does that in any

15   way or in any form or in any manner affect or cause

16   your opinion to change one way or another?

17       A       No, sir, it does not.

18       Q       Do you testify mostly for the State, when

19   the State is paying, by that, the prosecution, when

20   the State is paying for you or when the State is

21   paying for you, do you testify more for the defense?

22       A       I give my opinion, which is as objective

23   and scientific as I can, no matter what side I may be

24   testifying on behalf of.

25       Q       And, Mr. Ernest, once again, if this case

1  were in Tarrant County, wouldn't I have to go to

2  another county to find an expert for the defense.

3          MR. SMYTH:   Irrelevant, this case is not

4  in Tarrant County.  It's irrelevant what he would have

5  to do.

6          THE COURT:  It's been asked and answered.

7      Q    (Mr. Odom)  Mr. Ernest, I can't get the

8  expert from the Harris County Medical Examiner's

9  Office on this case, can I.

10          MR. SMYTH:  Object, there's already been

11  an expert come in here.

12          MR. ODOM:  That's not the question.

13          THE COURT:  Let's not be trivial and get

14  on to something substantive.

15      Q    (Mr. Odom)  And you and all examiners

16  that are in business have conflicts of interest that

17  we have to deal with, do you not.

18          MR. SMYTH:  It's repetitious.

19          MR. ODOM:  In response to the cross

20  examination, Judge.

21          THE COURT:  It's asked and answered.

22  Another question, Mr. Odom.

23      Q    (Mr. Odom)  In response to what Mr. Smyth

24  asked you in regards to the fact that you had come

25  down to Houston and that you were paid money and that

1    you had lunch and how long you were here, I have to

2    get someone out of county, don't I, Mr. Ernest.

3            MR. SMYTH:  I believe I object to that

4    prior to the Court's asked and answered.

5            MR. ODOM:  I pose it to be in direct

6    response to the attempt to impeachment of the matter.

7            THE COURT:  He may answer this question.

8    Go ahead.

9        A    I'm sorry.  Would you restate.

10           MR. ODOM:  I'll attempt to.

11       Q    (Mr. Odom)   You were asked a number of

12   question about how you came down from Fort Worth and

13   the number of hours to get here and how billing based

14   on your hours and all, I have to get someone because

15   of conflict of interest from out of county, do I not,

16   Mr. Ernest, in this kind of situation?

17       A    I would assume so.  Yes.

18       Q    Certainly would up in your county,

19   wouldn't you?

20       A    Yes.

21       Q    Now, Mr. Smyth asked in a number of

22   different ways about the fact you could not give an

23   opinion that the various bullets that we found in

24   exhibit EB -- I believe the ones we have are exhibit

25   number 163 -- that you could not say they were not

1        fired from the same gun.  Do you recall those

2        questions?

3            A        Yes, sir, I do.

4            Q        Which, of course, is the reverse you

5        cannot, in your opinion, you cannot say they were

6        fired from the same gun, correct?

7            A        Yes, sir.  That's correct.

8            Q        Now, the reason that you cannot say --

9                     MR. SMYTH:  Leading from the start.

10                    THE COURT:  Sustained.

11           Q        (Mr. Odom)  Why can you not give an

12       opinion that these bullets were neither fired from the

13       same gun or were not fired from the same gun?

14           A        Well, again, my results were basically

15       what oftentimes is called inconclusive.  We have the

16       same caliber.  We have the same rifling structure but

17       I am not able to say these bullets and bullets

18       fragments were fired from the same gun.  And I can't

19       eliminate them being fired from the same gun.

20           Q        And was that because there is a lack of

21       land marks or striation?

22                    MR. SMYTH:  Object to the leading.

23                    MR. ODOM:  That's a yes or no answer.

24                    THE COURT:  Overruled.

25           A        No, it was not from a lack.  It's from a

1    lack of matching striata or what I felt was matching

2    striata but, in essence, what it is because there are

3    so many striata there the bullets are brushed.

4         Q      Now, there were a number of questions that

5    were asked in regards to whether or not if the bullet

6    is fired through a silencer similar to the kind you

7    see on the diagram in State's Exhibit 42, that being

8    one that had washers with steel wool packed into it,

9    that there might be some burning effect and there

10   might be some gases.  There's some questions asked

11   from like when you are a Boy Scout and you set wood on

12   fire.  Have you personally fired a gun with a silencer

13   that is similar to the kind we see on State's Exhibit

14   42?

15        A      Yes, sir, I have.

16        Q      Have you personally done experiments with

17   pistols with silencers similar to the type we see on

18   42, that is, with washers, with steel wool between the

19   washers?

20        A      Yes, I have.

21        Q      And tell the ladies and gentlemen how much

22   of a burn factor there is and how much of a distortion

23   factor there is when you fire a series of bullets

24   through a silencer that you personally have performed

25   experiments on in the past in your business?

1        A       Well, as far as any burning and charring

2    goes, there is some limited amount of that happens out

3    the end of the barrel that is confined within the

4    silencer.  It doesn't take into effect very much the

5    silencer, that steel wool material.  It's not that

6    much of an effect.

7        Q       In your opinion, if the gun is fired -- if

8    you have the silencer similar to the design and the

9    bottom design there on State's Exhibit 42, it's packed

10   with steel wool, had a number of firings, from one to

11   four blow out all the steel wool and keep it from

12   being scared and striated?

13       A       No.

14       Q       How many times do you think it would have

15   to be fired -- and, of course, this is depending on

16   how much it is packed -- how many times would it have

17   to be fired before you actually blow out the steel

18   wool where you wouldn't have all these striated marks

19   on the bullet?

20       A       You would have to get to the point where

21   you have removed so much of the material.  That's hard

22   to say.  At some point down the line, you are going to

23   remove half enough material to where you are not going

24   to have all the striata on the outside of the bullets

25   but the testing I have done I have never seen that.

1      And I have fired silencers like this and fired a

2      couple of dozen different bullets out of a silencer.

3      That certainly didn't remove the brush marks.

4          Q      Now, there were a number of questions

5      asked by Mr. Smyth about State's Exhibit 155.

6                 MR. ODOM:    May I approach the witness,

7      Your Honor?

8                 THE COURT:   You may.

9          Q      State's Exhibit 155 has, I believe,

10     previously been identified as a lead core to a .9 mm?

11         A      Yes, sir.

12         Q      Now, did you actually form an opinion that

13     was a souvenir bullet?

14         A      No, I expressed -- I expressed an opinion

15     that was a possibility or expressed a possibility that

16     was a souvenir bullet but I did not give an opinion

17     that was a souvenir bullet.

18         Q      And you never expressed as an opinion to

19     either me or anyone else, did you?

20         A      No.

21         Q      Now, did you have some questions about

22     State's Exhibit 155?

23         A      Yes.

24         Q      And did you want to see State's Exhibit

25     155 again?

```
1          A       Yes, I did.

2          Q       And did you have an opportunity to see it

3     again this morning?

4          A       Yes, I did.

5          Q       Now, did you tamper with evidence, Mr.

6     Ernest?

7          A       No.

8          Q       Did you determine, however, that was a

9     lead core bullet or that was the lead core of a

10    bullet?

11         A       Yes, sir, I did.

12         Q       Now, is that bullet, based upon its

13    external appearance, was the other lead core fragments

14    or lead fragments that you have in the other State

15    exhibits that are in front of you?

16         A       I still think that it's different than the

17    other lead fragments that we have got.  That's a

18    matter of interpretation as to how much oxidation you

19    have on the outside of the bullet but it looks

20    different to me.  There are a number of different

21    possible answers as to why that might be.

22         Q       And Mr. Smyth asked a number of questions

23    that it could be an old bullet, it could be this, it

24    could be that.  But is there a marked difference

25    between State's Exhibit 155, which was according to
```

1    your records from the morgue, and State's Exhibit 30,

2    which I believe the testimony was indicated was found

3    in the downstairs lobby of the building?

4        A      There appeared to me to be a difference in

5    the amount of oxidation there.  Yeah, there could be

6    different explanations for how that might be.

7        Q      Mr. Smyth asked you if you photographed

8    your examination.  Do you recall that question?

9        A      Yes, sir, I do.

10       Q      And you said that if I had done something

11   tricky to indicate that Mr. Baldwin doesn't photograph

12   his questions that might somehow or another be -- that

13   wouldn't be regular on the part of Mr. Baldwin.  Do

14   you recall that line of questioning?

15       A      I recall that.

16       Q      If someone were to theorize that examining

17   bullets was a lot like examining fingerprints, there's

18   some major differences there, aren't there?

19       A      Yes.

20       Q      When you do fingerprints, you do make

21   photographs, don't you?

22       A      Quite often they do.

23       Q      Mr. Smyth asked you to make some

24   assumptions based on the cartridges that were found.

25   You got a couple of bullets here and couple of

1    cartridges close, by reasonable assumptions, come from

2    those cartridges.  Do you recall those assumptions?

3         A     Yes.

4         Q     If you have got no cartridges with

5    bullets, you can't assume the cartridges found in a

6    whole other location came from those same bullets, can

7    you?

8         A     Well, that's a stretch.

9              MR. ODOM:  Pass the witness.

10             THE COURT:  Mr. Smyth.

11

12                    RECROSS EXAMINATION

13   BY MR. SMYTH:

14        Q     Let me ask you:  We are talking about

15   these various bullets may be looking different.  Is it

16   unusual if you got somebody who gave you a hand full

17   of bullets that came from all different sources and

18   you load them in one clip and I think the magazine --

19        A     Right.

20        Q     -- and you fire the gun, empty the

21   magazine, and then you collect the lead.  The lead may

22   be different colors, right?

23        A     The lead from different manufacturers

24   could look different.  Yes.

25        Q     You can't, when you say that these -- you

1    are not saying that because these bullets may have a

2    different coloration to your eyes that they weren't

3    all fired at the same time, are they, out of the same

4    gun?

5         A    No, I'm not trying to say that.

6         Q    Okay.  I just want to make sure because

7    there is any number of explanations why bullets fired

8    at the same time out of the same gun might even look

9    different via color?

10        A    There are different explanations.  Yes.

11        Q    Now, correct me if I am wrong, when I was

12   talking about land type of drilling gun or bullet when

13   I referred to the marks on the bullet, I called them

14   grooves and then whatever markings left on the bullet

15   being a groove impression, which relating in my lingo,

16   the groove impression is now a raised area on the

17   bullet.  We understood that?

18        A    Right.

19        Q    You understood when I was talking?

20        A    At the moment you were saying that I

21   wasn't quite following that but now that you've gone

22   through this one more time, that's exactly right.

23        Q    Is there anything wrong calling the

24   impression left on a bullet by the groove, the groove

25   impression?

1        A       Yes.

2        Q       Whether it's an indentation or an

3   elevation?

4        A       Right.

5        Q       There's nothing wrong with talking about

6   that.  You don't fault me for doing it?

7        A       No.

8        Q       You, on the other term, when you talk

9   about the impression left by the groove, which would

10  be the elevated portion, you call that elevated the

11  land?

12       A       Right.

13       Q       So we are on the same page even though we

14  are not using the same language.  That's what I am

15  talking.  I know what I am talking about and you know

16  what you are talking about.

17              MR. ODOM:  That's misstatement.  I object

18  to talking about but I don't know whether that was a

19  question or not but that's an explanation.  It's

20  certainly an explanation.

21              MR. SMYTH:  Thank you, Mr. Odom.

22              THE COURT:  You may continue.

23       Q       (Mr. Smyth)  Let me give your notes back,

24  sir.  You made those notes at the HPD firearms lab as

25  you were viewing the bullets, correct?

1    A        Yes, sir, I did.

2    Q        With regard to State's Exhibit 27, which

3    is EB one, what notation did you make whether you

4    could match it or not?

5    A        Can't match or eliminate, insufficient

6    micro.

7    Q        With regard to number 29, which is EB two,

8    what notation did you make there?

9    A        I can't match to others.

10    Q        With regard to 144, which is EB 5, what

11    notation did you make?

12    A        I didn't make any notation but, again, I

13    couldn't match that.

14    Q        But you didn't make any notation on this?

15    A        No, I did not.

16    Q        Unlike the other plays (sic), you can't

17    put can't match or eliminate but no notation other

18    than same size as others?

19    A        Right.

20    Q        With respect to 145, EB 6, what notation

21    did you make there?

22    A        Not able to match the EB 5, insufficient

23    detail.

24    Q        Not able to match EB 5?

25    A        Right.

1       Q       Now, with regard to State's Exhibit 146,

2   EB 7, what notation did you make there?

3       A       I didn't.  That was just the nose cap of a

4   bullet.  There wasn't anything there.

5       Q       So you made no notation regarding whether

6   you could match or eliminate EB 7 in your notes?

7       A       Right.

8       Q       Now, with regard to -- it should be EB

9   nine, which is State's Exhibit 132, what explanation,

10  what comment, did you make regarding that?

11      A       I didn't put any other other than drawing

12  the bullet, putting some of the dimensions, and so

13  forth.  I didn't put anything about matching but I

14  wasn't able to match it.

15      Q       There is no notation in your notes?

16      A       I didn't put there.

17      Q       Whether or not you could match or couldn't

18  match or couldn't eliminate?

19      A       Right.  I did not go back to each and

20  every little thing and say I could not match or

21  eliminate it.

22      Q       That's fine.  There's no indication with

23  regard to EB 5 regarding that no match or no

24  elimination.  I think we have gone over in great

25  detail, nor is it with respect to EB 7 or 9; is that

1    correct?

2        A      That's correct.

3               MR. SMYTH:  Pass the witness.

4

5                    FURTHER DIRECT EXAMINATION

6    BY MR. ODOM:

7        Q      Is there any question in your mind,

8    although Mr. Smyth may not have found it in your

9    notes, that you could not match those bullets?

10       A      Right.  Again, my conclusion is that I

11   could not neither match these bullets nor eliminate

12   them.

13       Q      And although it may not be in your notes,

14   that is your absolute remembrance of that event.

15              MR. SMYTH:  Object.  Asked and answered.

16              THE COURT:  Sustained.

17       Q      (Mr. Odom)  Mr. Ernest, Mr. Smyth asked

18   you about different colors on these two lead

19   examinations that were made that one of 155 and 30.

20   We are not talking about color so much.  We are

21   talking about a chemical process that occurs over

22   time?

23       A      It is a chemical process but results in a

24   color that is different.

25       Q      So it's not just that one is one color and

1    another is another color.  There's a distinction

2    between the two based upon a process that has

3    occurred?

4        A    There is some process that has occurred.

5    Again, when I was discussing this with you, I noted a

6    possibility that there could have been a souvenir

7    bullet and did not say it was, in fact, a souvenir.

8    That's one possibility.

9        Q    Something has happened to that bullet that

10   causes it to change colors and to have this oxidation

11   process that has created the different color?

12       A    That's correct.

13       Q    Didn't come out of the manufacturer like

14   that?

15       A    That's correct.

16            MR. ODOM:  Pass the witness.

17            MR. SMYTH:  Nothing further.

18            THE COURT:  Thank you very much for your

19   testimony.  Certainly appreciate it.

20            Call you next witness.

21

22

23

24

25

```
1                        ELLIS MCCULLOUGH,

2    was called as a witness by the defense and, having

3    been duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. ODOM:

6         Q        Would you state your name for the ladies

7    and gentlemen of the jury.

8         A        Ellis McCullough.

9         Q        And, Mr. McCullough, what do you do and

10   where do you reside?

11        A        I am an attorney.  I live in Houston,

12   Texas.

13        Q        What type of attorney are you, good or

14   bad?

15        A        I am a great lawyer and I do mostly

16   criminal work.

17        Q        Do you know myself as well as the

18   gentlemen across, the prosecution here, do you not?

19        A        Yes, I do.

20        Q        You have been here in the courthouse in

21   Harris County, Texas, for how long, Mr. McCullough?

22        A        Well, I have been in private practice

23   since 1974.  Before that, I was in the US Attorneys

24   Office here in Houston and Corpus Christi since '70.

25        Q        Been around for a while?
```

1     A      Too long.

2     Q      Where did you go to law school?

3     A      University of Houston.

4     Q      And undergraduate school?

5     A      I went to Rice University.  It was called

6   Rice Institute, been a while.

7     Q      Are you from Houston?

8     A      No, I am from Texas.  I was born in

9   Austin, and I moved to Fort Worth when I was in junior

10   high school and I finished high school and came here

11   to go to college and went off to the Navy and came

12   back here.

13     Q      What is, if not one of, the primary areas

14   of your practice?

15     A      Criminal.

16     Q      Good answer.

17            Are you on occasion a person that is

18   called by a Judge in order to assist when there may be

19   a need for an attorney occasionally?  Is there a need

20   for an attorney that comes up at all hours and at

21   various times when a defense attorney is needed?

22     A      Yes, occasionally.

23     Q      And are there times wherein a Judge in

24   Harris County, Texas, might call on you in order to

25   fulfill a need to act as a defense attorney in order

1     that a process or a proceeding may go forward?

2          A     Yes.

3          Q     And has that happened few or many times,

4     Mr. McCullough?

5          A     Many times over the 20 or so years.  Yes.

6          Q     It's not an unusual thing?

7          A     No.

8          Q     Do you recall that sometime around

9     February 23, 1996, that you were contacted, I believe,

10    by Judge Godwin in order to assist in a lineup

11    situation?

12         A     Judge Reins, I believe.

13         Q     Judge Reins in a lineup situation?

14         A     Yes.

15         Q     Explain to the ladies and gentlemen of the

16    jury why a Judge would call a defense attorney in

17    order to assist in a lineup.

18         A     Well, if the police are going to hold a

19    lineup in an important case, they are better off with

20    a personal attorney there representing the suspects,

21    and so Judge Reins got the call.  I was standing

22    there, and he said would you go over and attend at

23    lineup this afternoon at the substation out in the

24    south part of town.

25         Q     The Judge asked you to do something.  It's

1    hard to say no, wasn't it?

2         A      Right, but it's not like it was a problem.

3         Q      Did you go out to a substation and attend

4    the lineup?

5         A      Right.  Somewhere off the South Loop, I

6    recall.

7         Q      And was that lineup in relation to the

8    defendant in this particular case?

9         A      Yes, it was.

10        Q      Was there another party that was also

11   involved in the lineup?

12        A      Two suspects in the lineup.  I think they

13   were brothers, as I recall.

14        Q      Now, you did not do any work subsequent to

15   the lineup on this case, did you?

16        A      No, I didn't know the guys.  I never saw

17   them before and have had nothing to do with it since

18   then.

19        Q      Your only involvement in the case was the

20   occasion when Judge Reins asked you to go out to the

21   substation and attend the lineup?

22        A      Right.

23        Q      What happened?

24        A      Oh, I got there and I ran into some ladies

25   out in the parking lot on the way in and determined

1    that they were there in relation to their loved ones

2    being in a lineup.  I talked to them a couple of

3    minutes.  I just introduced myself, went in and found

4    the officer.

5           We ultimately were taken to the area where

6    they did the lineups.  And it usually takes a while,

7    and I don't remember -- it took 30 minutes or so after

8    we got there.

9    Q     Was the officer, was he a tall gentlemen

10   in the homicide by the name of Todd Miller?

11   A     Everybody is taller than me so, I guess,

12   it meets that description.  We got in the area.  They

13   brought in the guys, the fill-ins being made.  Two

14   suspects normally they are going to put four fill-ins

15   with them to complete the lineup.  I looked at all of

16   them, made my suggestions about arranging them and

17   then proceeded with the lineup.

18   Q     Did you recall that there was anything --

19   there were hats involved?

20   A     Hats?

21   Q     Yes.

22   A     Yeah, they had gimmy caps there that they

23   had people put on.

24   Q     You have not seen the videotape of the

25   lineup since that time?

1        A       No.

2        Q       This is your memory from the events that

3   took place on February 23rd?

4        A       I have forgotten about the hats.   I

5   remember they had gimmy caps they had people put on

6   for the lineup.

7        Q       Do you on occasion will you have someone

8   take off an article of clothing and switch the

9   clothing around?

10       A       Right.   I frequently -- I got my own

11  theory about lineups.   I arranged the people in the

12  order I want them in and, you know, with the officers'

13  permission, of course, but they always let me do

14  that.   And frequently I have the people in the lineup

15  change clothes in order to make them look more

16  uniform.

17       Q       And do you recall whether or not you did

18  that in this case?

19       A       No, but I just usually do.

20       Q       But you specifically don't remember?

21       A       No.

22       Q       Now --

23       A       One of the guys had on shorts and there

24  was something about that and I remember -- I had to do

25  something about that.   He said, "Never mind, go ahead,

1    don't worry about it."

2         Q      Do you recall anything as being eventful

3    in regards to the actual lineup itself, the lineup

4    process I should say?

5         A      No.

6         Q      When there has been a lineup, it's

7    practice, common practice, for the person who is

8    viewing the lineup to make their announcement --

9              MR. VINSON:  Object to the leading, what

10    is common practice, and ask what happened.

11             MR. ODOM:  I was trying to hurry along but

12    I will rephrase it.

13        Q      (Mr. Odom)   Does the person make the

14    statement regarding identification during the lineup

15    or after the lineup?

16        A      Okay.  May I back up a little bit.  The

17    officers have the subjects in the lineup come in and

18    they usually go through a procedure where they have

19    them step forward to a spot in the middle and turn 90

20    degrees four times.  Sometimes they have some of them

21    say something or put on a hat or take off a hat or

22    something but they do all of that.  When they are all

23    through with all of the people in the lineup, then

24    they have the witnesses, one at a time if there is

25    more than one, come and they ask them to the words of

1    the effect, "Did you recognize anyone; and if you do,

2    which one," and that was pretty much what was done in

3    this case but there was only one witness there.

4         Q       And do you recall whether it was a male or

5    female?

6         A       Male.

7         Q       After the person making the statement that

8    they make regarding the lineup, are you familiar with

9    a little check list that HPD has in regards to the

10   lineup?

11        A       Yes.  They have a pretty standardized

12   lineup sheet with fill in the information, to put in

13   the names and descriptions of all the people in the

14   lineup and a place for the names and identifiers of

15   the witnesses who viewed it and then a place -- they

16   either check it off or write it in for the result,

17   what the witness said about the lineup.

18               MR. ODOM:  May I approach the chart?

19               THE COURT:  You may.

20        Q       And this may not be exact but let me --

21   generally we have three categories of IDs.  There is a

22   positive.  How do you spell positive.

23               MR. VINSON:  Again, object to the

24   leading.  That's what he brought Mr. McCullough.

25        Q       (Mr. Odom)  What are the three categories

1    of identification?

2         A      In general, the positive identification,

3    negative identification and then the middle ground is

4    tentative identification.

5         Q      And is there in the categories varying

6    degrees of positive, negative or tentative

7    identification as a general rule?

8         A      I don't remember what the form says but in

9    the range of tentative sometimes they break some down

10   to weak and strong tentative.

11        Q      But, at least, I recall an attentive, you

12   got various degrees of tentative?

13        A      Right.  There is no degrees of negative.

14   That's no.

15        Q      And what is your understanding in the

16   lineups as to what a positive identification is?

17        A      Witness says words to the effect of, "I

18   recognize number three, that's the guy.  I remember

19   him."

20        Q      And what is your understanding?

21        A      I don't see the guy here.

22        Q      And what is your understanding of a

23   tentative identification?

24        A      Number three looks like him but I'm not

25   sure.

1       Q     Were you there when the person who viewed

2  the lineup talked to the officer after the lineup?

3       A     Yes.

4       Q     Was there a positive identification?

5       A     No.

6       Q     Was there, in your opinion, a tentative

7  identification?

8       A     No.

9       Q     Do you recall what the officer put on the

10  chart after he was told by the person who viewed the

11  identification what he checked.

12           MR. VINSON:  Objection, Your Honor, he's

13  assuming facts not in evidence.  There's no evidence

14  before this jury that he ever saw anything the officer

15  put in.  I think we need to take that step.

16           THE COURT:  Go ahead.

17       Q    (Mr. Odom)  Do you know what the officer

18  wrote down as the response in response to what the

19  witness said in regards to viewing the lineup?

20       A     Yes.  I saw him make the notation on the

21  form.

22       Q     What did he put down?

23       A     He put down a tentative identification

24  unless -- I'm sure he said a strong tentative.

25           MR. VINSON:  Asked and answered.

```
 1                    THE COURT:  If he rises, please wait.
 2        Q      (Mr. Odom)   He wrote tentative ID?
 3        A      Some classification of tentative, yes.
 4        Q      You are uncertain as to category what he
 5   said?
 6        A      I think he said "strong."
 7        Q      You are not positive?
 8        A      Not positive?
 9        A      No.
10        Q      Did you hear what the witness said?
11        A      Yes.
12        Q      When you say that it was not a positive or
13   a tentative identification, what do you base that
14   upon?
15        A      I base it upon what the witness said in
16   response to the officer's inquiry.
17        Q      And you were there?
18        A      Yes.
19        Q      And you heard it?
20        A      Yes.
21               MR. ODOM:  Pass the witness.
22
23
24
25
```

1                    CROSS EXAMINATION

2       BY MR. VINSON:

3           Q      Mr. McCullough, this lineup took place and

4       I'm not going to hold you to an exact date because you

5       weren't the primary attorney on the case, right, you

6       just went out to stand in at the identification?

7           A      Yes.  There was no attorney on the case.

8       I was just there on behest of the Court.

9           Q      But it was in February, some day in

10      February, correct?

11          A      I don't know that.

12          Q      You wouldn't argue with the 23rd of

13      February, 1996?

14          A      No.

15          Q      Now, when you arrived, I mean that was at

16      Mykawa?

17          A      Off of South Loop somewhere.

18          Q      Right.  And when you arrived there, you

19      had an opportunity to speak with Reinaldo Dennes; is

20      that correct?

21          A      I don't know.

22          Q      Do you recognize him today?

23          A      No.

24          Q      And you talked to Albert Dennes.  Do you

25      recognize him?

1      A      I don't know.  Two brothers.

2      Q      And nothing really stood out in your mind

3  about this case because you just went out and stand in

4  and see how the lineup was conducted?

5      A      Knew it was a capital, had something to do

6  with jewelry merchant.

7      Q      And that was kind of given to you,

8  correct?

9      A      I think the officer told me that when I

10  got there.

11      Q      Now, do you recall selecting the positions

12  that the two brothers would stand in?

13      A      One of them was to the right end of the

14  lineup.  And I'm not sure exactly which position but

15  it was in a fourth or fifth or sixth position, I mean

16  on the right-hand side.  And I believe that's the one

17  that the guy made a tentative on -- or he said he made

18  a tentative on.

19      Q      But you don't have any independent memory

20  of that, do you?

21      A      Of what?

22      Q      Of which one he made a tentative?

23      A      It was the guy on the right.

24      Q      The one on the right?  The right of what?

25  Now, you had what?

1        A        My right.

2        Q        Okay.  How many did you have, by number?

3    How many did you have in the lineup, about six people?

4        A        Five or six.

5        Q        Let's assume you had six, okay.  You

6    wouldn't argue with that, would you?

7        A        No, it's usually five or six.

8        Q        That's what I am saying.  And there's

9    nothing unusual about this lineup from any other

10   lineup, the hundreds that you have attended before,

11   correct?

12       A        No.

13       Q        And you didn't see the officers that

14   conducted that lineup do anything that was improper or

15   to raise your concern, correct?

16       A        Only that when he marked the lineup sheet,

17   he put it down wrong.

18       Q        Don't worry about that.  I am talking

19   about that's your opinion.  We will get to that.

20                But I am saying you didn't see the officer

21   do anything like that, you didn't see him do nothing

22   like that?

23       A        No.

24       Q        Because if he had, you would have made

25   some type of little notation of that and passed it on,

1    right, and that didn't happen?

2        A       No.

3        Q       You didn't see anything improper happen?

4        A       No, never have.

5        Q       Now, do you realize that you selected

6    position number two for Albert Dennes?

7        A       I selected the positions.  I don't know

8    who the guys were and I don't remember which position.

9        Q       You wouldn't argue with that, though?

10       A       No.

11       Q       And do you also realize that you selected

12   position number five for Reinaldo Dennes?

13       A       I don't know their names and I don't

14   remember their position.

15       Q       You wouldn't argue with that?

16       A       No.

17       Q       You didn't take any notes?

18       A       Yes, I did.

19       Q       Do you have them with you?

20       A       No, sir.

21       Q       Do you have them available?

22       A       No.  They kicked around on my desk for

23   several months and I kind of lost track.  If they show

24   the lineup sheet, I could refresh my memory, though.

25       Q       Did the defense attorney show you a video

1      before he asked to come in and testify?

2          A      No, I didn't talk about the case.

3          Q      He didn't show you the video to refresh

4      your memory?

5          A      No.  He told me he was on the case and I

6      told him I was at the lineup.  That's it.

7          Q      And this is the only lineup you have

8      attended since February of 1996?

9          A      Oh, I don't know.  Probably, could be.

10         Q      But you are not sure?

11         A      Huh-uh, not sure.  I think this is the

12     last one I went to.

13         Q      But you are not sure?

14         A      No.

15         Q      You had no objection to the fill-ins; is

16     that correct?

17         A      No, I don't believe I had any.

18         Q      Because if you had, you would have noted

19     it.

20         A      I remember there was something about it I

21     didn't care for but the men involved, let's say, said,

22     "Let's ahead and do it."

23         Q      You didn't put that down or bring it to

24     anyone's attention?

25         A      No.  They wanted to go ahead with the

1    lineup.  We did it.  Yeah.

2         Q      You didn't say wait a minute, wait, I

3    disapprove of that lineup, did you?

4         A      No.

5         Q      And we are not going through with this

6    lineup because I see something here that is unfair?

7         A      No.  I just raised it, and they said,

8    "Let's go ahead and do it."

9         Q      If anything, it wasn't enough to stop that

10   lineup, was it, because you are the attorney?  You

11   know how to stop a lineup.  You could walk out, yes or

12   no?

13        A      I'm not sure I understand the question.

14        Q      What I am saying, if you saw something

15   wrong with that lineup that didn't meet your approval,

16   you would have turned around and walked out of there

17   and gone and told the very judge?

18        A      No.  I would have stayed, and I would just

19   made a note of it.  I would have brought it up.

20        Q      And you made no notes?

21        A      It wasn't important.  They didn't identify

22   anybody.

23        Q      Okay.  No problem.

24               Now, do you remember the person who viewed

25   the lineup?  Do you remember anything about the person

1    who looked at the lineup?

2         A     A guy, man.

3         Q     Little guy, big guy?

4         A     Not real big, not real little.

5         Q     Just a guy.  Okay.

6               Do you remember that the man who viewed

7    that lineup, he eliminated the first person -- strike

8    that -- he eliminated the third person?  Do you

9    remember that?  He said this is not --

10        A     I remember what he said.

11        Q     Just a minute.  Do you remember him

12   eliminating the third person in that lineup?

13        A     No.  I remember him --

14        Q     Just yes or no, if you do.

15              MR. ODOM:  If you can answer it yes or no.

16        Q     That's what I am saying with you, because

17   I know you didn't take notes now that you can bring

18   here today.

19              Do you remember the witness eliminating

20   number four, and only if you can remember?

21        A     In those words?

22        Q     I don't know what words he used.

23        A     Well, the words he used were these.  He

24   said --

25        Q     Let's keep it with respect to elimination

1     first.

2          A      All right.

3          Q      Number three?

4          A      He didn't say anything about number three.

5          Q      Number six?

6          A      I don't think he said anything about

7     number six.

8          Q      Number six?

9          A      I don't remember.

10         Q      Now, the defense asked you what type of

11    IDs do you have and you put three up there.  You got

12    you are positive and the person say without a doubt

13    that's the person who committed the offense, correct?

14         A      Right.

15         Q      And then you got your negative, I don't

16    see anyone here?

17         A      Right.

18         Q      You eliminate the whole group?

19         A      Right.

20         Q      And then you got your tentative where the

21    person will look at the lineup and he says number ten

22    so closely resembles the person who robbed me but for

23    his hair was closer or his hair was longer and you are

24    familiar with those types of identifications, aren't

25    you?

1        A        What you have just said would fit in the

2    category of a tentative identification, yeah.

3        Q        But irrespective and you have tried many

4    lawsuits down here, haven't you?

5        A        Right.

6        Q        Where identification has been a question?

7        A        Sir?

8        Q        Where identification has been a question?

9        A        Yes.

10       Q        And even if a person goes in there and

11   says that's the person who robbed me.  It's still

12   contested in the courtroom.  They can go in and say

13   100 percent sure and still contest it, isn't it?

14       A        Sometimes.

15                MR. ODOM:  Object to that line of

16   questioning as to what they may do in other cases as

17   far as contesting that identification.

18                THE COURT:  It's overruled.

19       Q        (Mr. Vinson)   And issues come up again,

20   like the same jury here, dealing with --

21                MR. ODOM:  Object to that because now he

22   is trying to draw comparisons somehow in this case and

23   controverted issues here and what may go on in other

24   cases, other juries, as far as questioned

25   identification.

```
1                    THE COURT:  Sustained.
2         Q      (Mr. Vinson)   Well, those positive
3    identifications, the only thing the defendant has to
4    do is say I'm not guilty and you have got to go to
5    trial, correct, even with a positive identification.
6                    MR. ODOM:  Object, that's irrelevant and
7    beyond the scope of direct or the relevance of cross
8    examination.
9                    MR. VINSON:  It's very relevant to go to
10   the level of identifications and irrespective whether
11   they was a positive identification, we were still
12   going to end upon this courtroom.
13                   MR. ODOM:  What does that --
14                   MR. VINSON:  Because I will move to my
15   tentative.
16                   MR. ODOM:  What I am saying --
17                   THE COURT:  I sustain it.
18                   Let's move on, Mr. Vinson.
19        Q      (Mr. Vinson)   Now, you say he made a
20   tentative identification?
21        A      No, I didn't say that.  The cop said that.
22        Q      But I am saying, when you told the jury
23   what a tentative identification was --
24        A      Right.  He didn't make one.
25        Q      He didn't make one?
```

1       A       No.

2       Q       You don't recall this witness?

3       A       Yes, I do.

4       Q       Just a minute.  You wouldn't know him if

5   he walked in the back of the door?

6       A       I remember what he said.

7       Q       But out of everything, you remember what

8   he said?

9       A       Right.  Because that's what I was there to

10  hear.

11      Q       Did you make a note of that?

12      A       Yes, I did.

13      Q       Do you have that with you?

14      A       No, I don't.  Do you?

15              THE COURT:  Excuse me, I don't want you to

16  be argumentative with either side.  If that happens

17  again, I will hold you in contempt.  Do we understand

18  each other, sir?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Ask your next question.

21      Q       (Mr. Vinson)   Do you hear the witness

22  tell the officer that number five, which was Reinaldo

23  Dennes, looks the closest.

24              MR. ODOM:  He is attempting to enter

25  something that is not in evidence in the form of a

1 question.

2     MR. VINSON:  I am asking if he heard it.

3     MR. ODOM:  He is attempting to come the

4 offer hearsay, which he kept out and, carefully, so we

5 wouldn't have to do this.

6     (Whereupon, the following proceedings were

7 held before the Bench.)

8     THE COURT:  What is asked?

9     MR. ODOM:  He is going to ask what his

10 notes reflect that Todd Miller wrote down.

11     MR. VINSON:  I said he was there and this

12 man didn't and he should be allowed to question him on

13 that, Your Honor, because we are going to put Todd on

14 the bench.

15     THE COURT:  What did we try to get

16 previously that?

17     MR. ODOM:  They tried to get this Todd

18 Miller as to what the hearsay -- Copeland testifies to

19 what he testifies to.  Todd Miller gets up and he was

20 going to say whatever, and I objected and you kept it

21 out because it is hearsay.  Now, I didn't ask Mr.

22 McCullough what the witness said.  I asked, like they

23 did, Miller, in regards to the type of identification

24 it was, what kind was it, tentative or positive, is

25 that your opinion and now he is attempting to get in

1    Todd Miller's hearsay off of his offense report

2    through the back door.

3             MR. VINSON:  No, we are not.

4             THE COURT:  If that's what you are trying

5    to do, make sure you don't ask the question.

6             MR. VINSON:  I have never been in a trial

7    where an officer couldn't identify the type of

8    identification that was made.  I've never been in one

9    where he couldn't testify to what the witness said

10   once it is put in issue and it has been put in issue.

11            THE COURT:  What's the question that he

12   already said, the officer said?

13            MR. VINSON:  I shouldn't be able to ask

14   testify here and stand there and didn't make an

15   identification.  What did he say?   He has got to have

16   some.

17            MR. ODOM:  You can ask him what he said, I

18   suppose.

19            MR. VINSON:  Then --

20            THE COURT:  Let me hear the question you

21   propose.

22            MR. VINSON:  Yes.  I plan to ask him,

23   okay, did you hear what the witness said to the

24   officer about that identification and then he either

25   heard it, yes or no.  If he did, what did he say and

1    we are allowed to do that.  And he even put the

2    officer on the chart and the offered the chart.

3                THE COURT:  Just ask a direct one response

4    question at a time and take it question by question.

5                MR. VINSON:  Yes, sir.

6                (Whereupon, the following proceedings were

7    held before the jury.)

8        Q      (Mr. Vinson)   Now, sir, you said that the

9    witness didn't identify anyone?

10       A      No.

11       Q      Did you hear what the witness said to the

12   officer?

13       A      Yes.

14       Q      And what did he say?

15       A      Indicated one of the guys on the right --

16   I don't remember which position -- five or six, he

17   said.

18       Q      You know who he was talking about when he

19   was talking about five or six?

20       A      I remember but I just don't remember which

21   one he said.  I remember he picked out one of the

22   suspects and said "that guy is the same height and

23   weight.  You can eliminate the rest of them."

24       Q      "That guy is the same height and weight,

25   you could eliminate the rest of them"?

1       A       Right.

2       Q       Did you ever hear him say the person in

3   number five position?  Did you ever hear him say

4   anything about the person in the number five position?

5       A       If that's where the suspect was standing.

6       Q       Did you ever hear him say, "You put a

7   mustache on him and that's the person, that closely

8   resembled the person who shot me."  Did you hear that?

9       A       The officer asked him that.

10      Q       No, did you hear the man say that?

11      A       No.

12      Q       You didn't hear him say that?

13      A       No, the officer said that.

14      Q       Officer suggested to him, "put a mustache

15  on him."  When I say him, you are talking about the

16  officer who was conducting the lineup suggested to the

17  witness?

18      A       Right.

19      Q       That "if you put a mustache on the

20  witness"?

21      A       Right.

22      Q       That the witness looked the closest to the

23  people in the lineup, that is, the person in position

24  number five looked the closest to the person that shot

25  him provided he had a mustache.  Is that what you are

1     telling the Judge and the jury here?

2          A       No.

3          Q       What are you telling?

4          A       He said something about, "If you change --

5     if he had a mustache, would look more like him," and

6     he said something like "maybe."

7          Q       And who was he talking about, which

8     brother?

9          A       They were talking about the guy on the

10    right-hand side that he had said was the same height

11    and weight as the assailant.

12         Q       Now, this was a capital murder case.

13    Would you agree with me, Mr. McCullough, the most

14    serious case that can be tried?

15         A       Yep.

16         Q       And would you agree with me that you do

17    have some faulty memory based on what you are

18    testifying about today?

19         A       Do I agree with that?

20         Q       You would agree that your memory is

21    somewhat faulty based on what you presented here

22    today?

23         A       No.

24         Q       You can't even identify the person, if you

25    see him again.  You didn't take time to take a

1    picture?

2         A      Who?

3         Q      The two men you went out to represent in

4    the lineup.  Have you ever heard of a Polaroid camera?

5         A      Sure, I have heard of a Polaroid camera.

6         Q      Did you do anything to preserve the

7    identity so you could identify them again in the

8    future if you was called on to give testimony?

9         A      No.

10        Q      The police officer did that, didn't he?

11        A      I have no idea.

12        Q      Did you keep and maintain any conversation

13   or anything that went on in that lineup room while

14   that interview was ongoing with the victim, the person

15   that was brought in to make the identification,

16   knowing this was a capital murder case and knowing the

17   seriousness of it, knowing you may be called on in the

18   future?  You didn't do that?

19        A      Do what?

20        MR. VINSON:  I'll pass on that question.

21   I don't have any further questions, Your Honor.

22        THE COURT:  Mr. Odom.

23

24

25

1                      REDIRECT EXAMINATION

2    BY MR. ODOM:

3        Q       Mr. McCullough, was there something

4    peculiar that happened when you went out there on that

5    lineup that caused you to remember a portion of the

6    lineup?

7        A       I just focused on the identification,

8    whether it was or not.  And I remember vividly that

9    the officer and I had a difference of opinion about

10   the quality of the identification.

11       Q       So, first of all, they don't let us take

12   Polaroids to a lineup?

13       A       Or tape recorders.

14       Q       And in the second place, what is it that

15   stuck in your mind about that identification that you

16   do remember in great detail?

17       A       Well, the most important thing was that

18   there was no identification.

19       Q       And that you are certain about?

20       A       Absolutely.

21       Q       You may not know who was in the position

22   because your notes still aren't around but you do

23   recall that?

24       A       I doubt if I put that in my notes at this

25   time.

```
1                    MR. ODOM:  Pass the witness.

2                    MR. VINSON:  I have nothing further.

3                    THE COURT:  You may step down

4                    THE WITNESS:  May he be excused?

5                    THE COURT:  You certainly may.

6                    Mr. Odom, call your next witness.

7                    MR. ODOM:  Next witness is J. J. Gradoni,

8        Your Honor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          JAMES GRADONI,

2     was called as a witness by the defense and, having

3     been duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5     BY MR. ODOM:

6          Q     Would you state your name for the ladies

7     and gentlemen of the jury.

8          A     James Gradoni.

9          Q     And Mr. Gradoni, where do you live and

10    what do you do?

11         A     I live here in Houston.  I am a private

12    investigator.

13         Q     All right.  And when you say you are a

14    private investigator, what does that mean?  What does

15    that mean?

16         A     I am licensed by the State and I own an

17    investigatory company, and I have been in business

18    since 1989.

19         Q     How does one become licensed by the state

20    to be a private investigator?

21         A     You meet various criteria.  Mine was 14

22    years as a police officer.

23         Q     And do you make application?  Is there a

24    process or review before you are issued a license to

25    be a private investigator?

1        A       Yes.

2        Q       And I believe you just mentioned the fact

3    that criteria gave you the expertise necessary to be a

4    private investigator is that you've previously been

5    involved with law enforcement?

6        A       Correct.

7        Q       And where were you involved with law

8    enforcement?

9        A       Here in Harris County with Constable

10   Precinct No. 2 for 14 years.

11       Q       And when you were involved with the

12   constable's office in Precinct No. 2, what is that,

13   county, state?  Is it constable and describe to the

14   ladies and gentlemen of the jury how our law

15   enforcement agency are subdivided up and where you are

16   in that?

17       A       There are eight constable precincts in

18   Harris County.  I worked in Precinct 2, which was

19   headquartered in Pasadena, Texas, covered southeast

20   Harris County.  We had a patrol investigation

21   division, investigative division and civil process.

22       Q       And you were a full time law enforcement

23   officer, were you not?

24       A       Yes.

25       Q       And how long have you been a private

1    investigator?

2         A    Since 1989.

3         Q    As a private investigator, are you

4    occasionally asked to work with or to assist

5    individuals who are criminal defense attorneys?  Do

6    they occasionally retain your services?

7         A    Yes.

8         Q    And have you been retained and have your

9    services been retained in the case we are presently

10   in, the one involving Reinaldo Dennes?

11        A    Yes.

12        Q    Now, do you recall when it was that you

13   first became involved in the case with Reinaldo

14   Dennes?

15        A    March of '96.

16        Q    And it was not myself who was the attorney

17   that retained you, was it?

18        A    Correct, sir.

19        Q    Who was it that retained you at that time?

20        A    George Parnham.

21        Q    And you have subsequently learned that Mr.

22   Parnham and I are both working on this case in various

23   capacities?

24        A    Yes.

25        Q    Was there a question that arose in your

1    early stages of investigation in this case regarding a

2    safety deposit box in Miami, Florida?

3         A      Yes, there was.

4         Q      And at that time where was Mr. Ray Dennes?

5         A      I believe Ray Dennes was in custody.

6         Q      Where did Ray Dennes' parents live?

7         A      Miami, Florida.

8         Q      And was there a question or a need to look

9    at the contents of a safety deposit box in Miami,

10   Florida?

11        A      Yes, that was expressed to me by Mr.

12   Parnham.

13        Q      And where was the safety deposit box, if

14   you know?

15        A      It was at a bank.  I have the materials

16   that outline the name of the bank in Miami, Florida.

17        Q      Can you just go in and open up a safety

18   deposit box?

19        A      No.

20        Q      Is there certain procedures that one has

21   to go through in order to open up a safety deposit

22   box?

23        A      Yes.

24        Q      One thing, does there have to be an

25   authorized signature to open up a safety deposit box?

1      A      Yes.

2      Q      Were you an authorized signature on the

3  safety deposit box?

4      A      No.

5      Q      Did you have to go through some paperwork

6  in order to acquire the ability to be able to open up

7  the safety deposit box at the bank?

8      A      Yes, I did.

9      Q      And that was with the bank?

10      A      Yes.

11      Q      And without going into detail -- well,

12  what was it you had to get?

13      A      I spoke with a bank officer who needed an

14  authorization signed by the holder of the box,

15  granting us permission to go and open it.

16      Q      Who was the holder of the box?

17      A      Ray Dennes.

18      Q      And Ray Dennes, of course, was not in a

19  position to go to Miami and open up the safety deposit

20  box?

21      A      Yes.  Correct.

22      Q      So was the paperwork required allowing

23  another person to substitute in as an authorized

24  signature and to open up the safety deposit box?

25      A      Yes.

1        Q        And when that was done, were there

2   arrangements made that would be done in the presence

3   of anyone?

4        A        Yes.

5        Q        What arrangements were made upon the

6   insistence of the bank and anybody else as to regards

7   to when and how this particular safety deposit box was

8   going to be open?

9        A        Mr. Parnham hired us to send an

10  investigator to be in Florida to be present when the

11  box was opened by Mr. Dennes' father and videotape the

12  procedure to document and preserve the contents of

13  that box.

14       Q        Now, was the person that went to Florida a

15  person that was retained by yourself?

16       A        Yes.  It was one of my licensed

17  investigators.

18       Q        Explain to the jury how that works.

19       A        Having a state license, those people that

20  are hired by our firm also, quote, and registered and

21  carry an identification card from the state.

22       Q        So they are your employee?

23       A        He was an employee of mine.

24       Q        And they also operate out of your license?

25       A        Correct.

1          Q       You have got a license.  You can hire a

2     certain number of employees you can have do work for

3     you but you got to supervise it and be responsible if

4     anything happens on your license?

5          A       Correct.

6          Q       That's the way the state regulates private

7     investigators?

8          A       Yes.

9          Q       Was there a recording made of the opening

10    of that safety deposit box?

11         A       Yes, there was.

12         Q       Was there a record kept in your office of

13    that recording?

14         A       Yes.

15         Q       Was it conducted in the regular -- was the

16    record that was recorded and what was kept in your

17    office, was it made at or near the time or by or from

18    information transmitted or was it made at or near the

19    time of the events portrayed?

20         A       Yes.

21         Q       Was it made by a person with knowledge of

22    the activity that was occurring?

23         A       Yes.

24         Q       In other words, it was made at the time it

25    was occurred.  It was made by a person who had

1    knowledge of the activity that was going on?

2         A    Correct.

3         Q    Was it kept from the date of the

4    transmission of it in the regular course of your

5    business?

6         A    Yes.

7         Q    And is it the regular practice of your

8    business to take reports and recordings made of such a

9    nature and to categorize and hold those reports and

10   recordings?

11        A    Yes.

12        Q    If you have one -- you don't have a

13   recording in every case, do you?

14        A    No.

15        Q    But it's certainly not unusual, is it?

16        A    No.

17        Q    And you take it and put it in a file and

18   you keep it in the regular course of business?

19        A    Yes, we do.

20        Q    Has it been kept in the regular course of

21   business since the date of its recordings and filed by

22   yourself with your office?

23        A    Yes, it has.

24        Q    Does it accurately show the information

25   that is portrayed upon it?

1       A       Yes.

2       Q       Do you have a copy of that recording with

3    it?

4       A       It's not a copy.  It's the original.

5       Q       Do you have the original with us.

6               MR. ODOM:  May I approach?

7               (Whereupon, Defendant's Exhibit No. 4 and

8    5 were marked for identification.)

9       Q       I would like to show you, first of all,

10   what has been marked, first of all, as Defense Exhibit

11   No. 4 and ask you if you can identify that after I

12   have tagged it?

13      A       Yes.  That's the tape that my investigator

14   returned back from Miami with on March 27th.

15      Q       Actually numbered is the case, is it not?

16      A       Yes.

17      Q       It's the older case, the case has certain

18   markings and notations on it?

19      A       Yes.

20      Q       And the markings and notations on the

21   outside of the case, does that indicate to you the

22   identification of the tape that is found in

23   Defendant's Exhibit 4?

24      A       Yes.

25      Q       All right.  If you'll open that case up, I

1    have marked the actual tape of Defendant's Exhibit 5.

2         A      Yes.

3         Q      That is actually the tape itself that we

4    are talking about that was made at the opening of the

5    safety deposit box here in Miami, Florida?

6         A      Yes.

7         Q      Now, is there more than just the opening

8    of the safety deposit box on Defendant's Exhibit 5?

9         A      Yes.

10        Q      What else is on there without going in to

11   great detail?

12        A      There is a videotape of a vehicle at a

13   body shop in Miami, Florida.

14        Q      Which one is first?

15        A      The bank and the safety deposit box.

16        Q      And is there a clear delineation between

17   the part of the tape that reflects the activities at

18   the safety deposit box and the activities that were

19   conducted at the auto body shop?

20        A      Yes, there is.

21               MR. ODOM:  Your Honor, at this time I

22   would offer the portion of the Defense number 5 into

23   evidence that relates the first portion of the exhibit

24   that relates to the opening of the safety deposit box.

25               MR. SMYTH:  Object, we haven't had a

1    chance to see this tape and see what's on it.

2                   THE COURT:  Sustained.

3                   MR. ODOM:  I tender a copy to the State at

4    this time.

5                   MR. SMYTH:  Be happy to look at it.

6                   THE COURT:  How long does it take?

7                   THE WITNESS:  Nine minutes.

8                   MR. ODOM:  May we look it over the evening

9    recess?

10                  THE COURT:  Very well.

11                  MR. ODOM:  Mr. Gradoni is the major

12   predicate --.

13                  THE COURT:  You laid your predicate.

14                  MR. ODOM:  Raising the issue if we could

15   work around that.  Do you see a problem?

16                  THE COURT:  How many more witnesses do you

17   have?

18                  MR. ODOM:  I have got one more today and

19   take a little bit of time and very short custodial

20   witness tomorrow.

21                  MR. SMYTH:  There is a standard.

22                  MR. ODOM:  All right.

23       A       There's two sizes and that's a little bit

24   larger than, I think, the standard.

25                  MR. ODOM:  So that means.

```
 1                    THE COURT:  Take a ten-minute recess.
 2      Take the jury out.
 3                    (Jury left the courtroom.)
 4                    (Defendant's Exhibit 5 played for the
 5      Court.)
 6                    THE COURT:  You want to publish it, okay.
 7      Let's leave it there.
 8                    (Jury came into the courtroom. )
 9                    THE COURT:  Thank you.  Please be seated.
10                    Are you reoffering?
11                    MR. ODOM:  I offer not number; 4, number 5
12      I do offer.
13                    THE COURT:  What does the State say?
14                    MR. SMYTH:  As long as an exact copy, we
15      have no objection.
16                    THE COURT:  Defendant's Exhibit 5 is
17      admitted.
18                    (Defendant's Exhibit 5 played for the
19      jury.)
20                    THE COURT:  Mr. Odom.
21           Q    (Mr. Odom)  Mr. Gradoni, do your records
22      indicate to you how much cash that was?
23           A    I believe it was a thousand dollars.
24           Q    And do your records indicate to you that
25      there was anything other than what we witnessed in the
```

1    video that was obtained from the safety deposit box?

2        A       No other items in the box.

3                MR. ODOM:  Pass the witness.

4

5                        CROSS EXAMINATION

6    BY MR. SMYTH:

7        Q       Mr. Gradoni, my name is Don Smyth, and I

8    am an assistant district attorney here in Harris

9    County.  Have we ever talked before?

10       A       Yes, sir, when I was a policemen.

11       Q       I thought I recognized your voice.  You

12   probably recognized mine, too.

13               Let me ask you:  When you went in that

14   bank on March 27, 1996, over two months after the

15   killing of Johnny Szucs, what do you really expect to

16   find.

17               MR. ODOM:  Object to what he did expect to

18   find or did not expect to find.

19               THE COURT:  Sustained.

20       Q       (Mr. Symth)  Did it surprise you?

21               MR. ODOM:  Object to whether or not he was

22   surprised or wasn't surprised.

23               THE COURT:  Sustained.

24       Q       (Mr. Symth)  Were you asked to check

25   anything else out when you went to Miami, such as the

1    defendant's parent's house.

2                MR. ODOM:  He is asked one question and

3    now makes it a complex question and he asked to check

4    anything else.

5         Q    (Mr. Symth)   Were you asked to check out

6    any other location?

7         A    No, sir.

8         Q    You weren't asked to check out the

9    defendant's parent's home?

10        A    No, sir.

11        Q    You didn't go out and search the

12   defendant's parent's yard to see if something had been

13   buried in the yard?

14        A    No, sir.

15        Q    Look in the garage to see if something had

16   been hidden in the garage?

17        A    No.

18        Q    Didn't go to -- did you ask to go to the

19   locations that the defendant had been to when he was

20   in Miami?

21        A    I was not aware of what location.

22        Q    So you didn't go to Santo Domingo to look

23   and check in in Santo Domingo?

24        A    No, sir.

25        Q    And you didn't go to any banks in Puerto

1    Rico?

2         A       No, sir.

3         Q       Or any other banks on the off-shore

4    islands?

5         A       No.

6         Q       You weren't asked to do that?

7         A       No, sir.

8         Q       You weren't given any type of permission

9    slips or Court orders or anything like that to check

10   all those places?

11        A       That's correct.

12        Q       The only place you were given to check in

13   Florida was that bank --

14        A       Yes, sir.

15        Q       -- in that particular box?

16                Have you been asked to check any other

17   locations frequented by the defendant?

18        A       No.

19        Q       So you haven't gone down to Manvell,

20   Texas, down to Brazoria, Texas, and checked the

21   property, that acre and third that belongs to the

22   defendant's brother and ex-wife, and look around

23   there?

24        A       No, sir.

25        Q       And you haven't gone around there and dig

1     up and you haven't looked at any of the buildings on

2     that property?

3          A     No.

4          Q     Likewise, you haven't been to the

5     defendant's property belonging to the defendant's

6     ex-wife out on Wayman in northwest Harris County, have

7     you?

8          A     No.

9          Q     Right off of 290?

10         A     No, sir.

11         Q     You haven't checked that particular piece

12    of property either inside or out for any stolen

13    jewels, have you?

14         A     No.

15         Q     You weren't asked to do that, were you?

16         A     No, sir.

17         Q     And you didn't go over here into, I guess

18    what I call, the north side of Houston over on to

19    Jewel Street, I think, 4007 Jewel Street.

20               MR. ODOM:   Judge, I believe this has been

21    asked and answered.

22               MR. SMYTH:   I didn't get to Jewel Street.

23               MR. ODOM:   I believe he asked any other

24    place and I believe his answer was no.

25               THE COURT:   I'll let him answer this

1    question.

2        Q        (Mr. Symth)   You didn't check the

3    residence of the defendant's current wife on Jewel

4    Street either inside or out for any stolen diamonds,

5    did you, sir?

6        A        No.

7        Q        And you weren't asked to do that, were

8    you?

9        A        Was not.

10        Q        These items that we saw in the videotape

11    in the safety deposit box, do you know who put those

12    items in the box?

13        A        I did not observe anyone put them in the

14    box.

15        Q        Do you know who put them there?

16        A        No.

17        Q        Do you know when they were put in?

18        A        No.

19        Q        And for all you know, they were put in the

20    day before you got there to cleaning the box?

21        A        The only people that could have gone in

22    are the boxholders and they were in the custody.

23        Q        Who were the boxholders?

24        A        Albert and Reinaldo Dennes.

25        Q        So you don't know how whatever is in that

1    box was put in there?

2         A      No.

3         Q      And it is your testimony nobody else would

4    have access to that box?

5         A      I was told that by the bank officer.  Yes.

6         Q      Did you look and see when the last time

7    that box was opened prior to you coming?

8         A      Yes.  I believe we did.

9         Q      When do you believe it was last opened

10   prior to you getting there?

11        A      I would have to look my records to give an

12   exact answer.

13        Q      Would you make a report regarding this

14   trip?

15        A      Yes, I did.

16        Q      Can you see your report.

17               MR. ODOM:  Did you personally make a

18   report?

19               THE WITNESS:  My investigator made the

20   report.

21        Q      Well, have you refreshed your memory to

22   testify today from that report?

23        A      Yes, I did.  I can't give you the exact

24   date that the box was opened but I believe we did

25   discover that at our trip there.

1          MR. ODOM:  If he can refresh what it was

2    that refreshed his memory to before he testified and

3    exercised any other that may have been communication

4    from the attorneys, certainly I can let him do so but

5    I would like to make sure that no attorney-client

6    communication, anyone of that is violated by the rule.

7          THE COURT:  Are you telling me that you

8    have not seen this report?

9          MR. ODOM:  Well, Judge, I have seen lots

10   of reports.  And what I am saying --

11         THE COURT:  Tender to you first.

12         MR. ODOM:  We are going to have to make

13   sure we don't violate any rule here but I think that

14   can be done.

15         I believe this is going to require some

16   work taking out a response.

17         THE COURT:  This in is response to the

18   attorney and client privilege?  Let me see.

19         MR. ODOM:  Which I will be happy to tender

20   to you.

21         THE COURT:  Go ahead.

22    Q     (Mr. Smyth)  Can you tell the ladies and

23   gentlemen -- it's kind of hard to tell from looking at

24   the videotape -- how big was that safety deposit box?

25    A     Probably two feet by eight inches.

```
 1        Q       Is that two feet long?

 2        A       Two feet long.

 3        Q       And eight inches wide?

 4        A       Eight inches wide.

 5        Q       And three or four inches deep?

 6        A       Three or four inches deep.

 7        Q       That box big enough to hold $3.6 million

 8   of diamonds?

 9        A       I don't know what 3.6 -- how much mass

10   that would take.  I don't know.

11        Q       Let me ask, your briefcase, some people,

12   would that box be big enough to hold, if full, the

13   entire contents of this briefcase?

14        A       No.

15        Q       Half of it maybe?

16        A       Maybe, maybe not.

17        Q       Did you make an inventory of that box?

18        A       Yes.

19        Q       There is a thousand worth of cash?

20        A       Yes.

21        Q       That fifty dollar bills?

22        A       No, they were twenties, I believe.

23        Q       And anything special about those twenty

24   dollar bills?

25        A       No.
```

1      Q      I thought I saw two watches.

2             THE COURT:  Okay.  Let me have you both up

3      here for a second.

4             (Whereupon, the following proceedings were

5      held before the Bench.).

6             THE COURT:  I have looked at this, and

7      it's my opinion that page five is most clear the

8      testimony was given.

9             Okay, let the record reflect that I have

10     reviewed this report that is in question now and I am

11     prepared to allow the State to see one page of this

12     document at this time and that's page number five.

13     And Mr. Odom has been given a chance to look at it.

14            Do you have any objection?

15            MR. ODOM:  I have no objection to page

16     five.

17            (Whereupon, the following proceedings were

18     held before the jury.)

19     Q      (Mr. Symth)   Mr. Gradoni, what did you

20     guys have to pay ten dollars for?

21     A      Sorry, I didn't understand the question.

22     Q      Why were you required to pay the bank ten

23     dollars, ten dollars for return key deposit?

24     A      No.  They were making a refund of ten

25     dollars for the key deposit.

1   Q  Why did you ask them to send the key

2 deposit to Jose Dennes as opposed to Reinaldo Dennes?

3   A  He was one of the two -- they said

4 designate one person so we did it to Jose since Jose

5 was Mr. Parnham's client.

6   Q  The name of this bank is Ocean Bank?

7   A  Yes, sir.

8   Q  And it's located at 650 northeast 66

9 Second Street, Miami, Florida 33138?

10   A  Yes, sir.

11   MR. SMYTH:  Thank you, very much, sir.  I

12 have no further questions.

13   MR. ODOM:   May I approach the witness to

14 return his document to him?

15   THE COURT:  Anything further from Mr.

16 Odom?

17

18        REDIRECT EXAMINATION

19 BY MR. ODOM:

20   Q  Mr. Gradoni, you don't know if Ray Dennes

21 has gone to Santo Domingo, do you?

22   A  No.

23   Q  You don't know if he has gone to the

24 Antiqua, do you?

25   A  No.

1          Q        You don't know if he has gone anywhere, do

2     you?

3          A        No, sir.

4                   MR. ODOM:  No further questions.

5                   THE COURT:  Anything further, Mr. Smyth?

6                   MR. SMYTH:  No, Judge.  Thank you, Your

7     Honor.

8                   THE COURT:  Thank you for your testimony.

9                   May he be excused?

10                  MR. SMYTH:  Yes, he can.  Thank you very

11    much.

12                  THE COURT:  We are going to stand in

13    recess until 9:45 again in the morning, ladies and

14    gentlemen.  Please remember the admonishments.  See

15    you in the morning.  We stand adjourned.

16                  (Court was adjourned for the day.)

17

18

19

20

21

22

23

24

25