1  APPELLATE COURT NO. *72966*

2  IN THE COURT OF CRIMINAL APPEALS

3  OF THE STATE OF TEXAS

4

5  -----------------------------------------------------

6  REINALDO DENNES

7                    Appellant,

8  VS.

9  THE STATE OF TEXAS,

10                   Appellee.

11 -----------------------------------------------------

12

13 APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

14                   TEXAS

15        Judge Jim Wallace, Presiding

16 -----------------------------------------------------

17             CAUSE NO. 750,313

18             August 28, 1997

19             Reporter's Record

20

21        Volume 33 of *39* Volumes

22

23        Sharon Kay Cook
          Official Court Reporter
24        301 San Jacinto
          Houston, Texas 77002
25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 2 5 1998

Troy C. Bennett, Jr., Clerk

Page 1

Volume 33

Trial

August 28, 1997

Chronologically

Daisy Dennes

|  |  |
|---|---:|
| Direct Examiantion by Mr. Odom | 4 |
| Voir Dire Examination by Mr. Smyth | 11 |
| Direct Examination Continued | 13 |
| Cross Examination by Mr. Smyth | 16 |
| Redirect Examination by Mr. Odom | 25 |
| Recross Examination by Mr. Smyth | 26 |
| Defense Rests | 28 |
| State Rests | 30 |
| Objections to the charge | 32 |
| Closing Arguments by Mr. Smyth | 41 |
| Closing Arguments by Mr. Odom | 61 |
| Closing Arguments by Mr. Vinson | 85 |
| Verdict | 108 |

Volume 33

Trial

August 28, 1997

Alphabetical
Daisy Dennes

|  |  |
|---|---|
| Direct Examination | 4 |
| Voir Dire Examination | 11 |
| Direct Examination Continued | 13 |
| Cross Examination | 16 |
| Redirect Examination | 25 |
| Recross Examination | 26 |

State's Exhibit No. 33   photo

    Marked        Volume 33        105

    Identified                 105

    Offered                    106

    Admitted      Volume 33        106

Defendant's Exhibit No. 6

    Marked        Volume 33         13

    Identified                  13

    Offered⸗                    15

    Admitted

State's Exhibit No. 166A   drawing

    Marked

    Identified

    Offered          Volume 33       28

    Admitted      Volume 33       30

State's Exhibit No. 167A   drawing

    Marked

    Identified

    Offered          Volume 33       28

    Admitted      Volume 33       30

State's Exhibit No. 168A   drawing

    Marked

    Identified

    Offered          Volume 33       28

    Admitted      Volume 33       30

```
State's Exhibit No. 169A      drawing
             Marked
             Identified
             Offered           Volume 33                28
             Admitted          Volume 33                30
STate's Exhibit No. 170A      drawing
             Marked
             Identified
             Offered           Volume 33                28
             Admitted          Volume 33                30
STate's Exhibit No. 171A      drawing
             Marked
             Identified
             Offered           Volume 33                28
             Admitted          Volume 33                30
State's Exhibit No. 173A      drawing
             Marked
             Identified
             Offered           Volume 33               ˉ28
             Admitted          Volume 33                30
```

1                      CAUSE NO. 750,313

2    STATE OF TEXAS              IN THE 263RD DISTRICT COURT

3    VS.                              OF

4    REINALDO DENNES          HARRIS COUNTY, T E X A S

5    A P P E A R A N C E S:

6    For the State:           Mr. Mark Vinson
                              Bar Card No. 2059040
7                             Mr. Don Smyth
                              Bar Card No. 1877700
8                             Assistant District Attorneys
                              201 Fannin
9                             Houston, Texas 77002
                              713-755-7050
10   For the Defendant:       Mr. Wendell Odom
                              Bar Card No. 15208506
11                            Ms. Yalia Guererro
                              Bar Card No. 0078862
12                            Attorneys at Law
                              1301 McKinney, Suite 3100
13                            Houston, Texas 77010
                              713-951-9555
14

15

16              BE IT REMEMBERED that upon this the 28th

17   day of August, A. D. 1997, the above entitled and

18   numbered cause came on for trial before the Honorable

19   Jim Wallace, Judge of the 263rd District Court of

20   Harris County, Texas; and the State appearing in

21   person and the Defendant appearing in person and by

22   counsel, announced ready for trial, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:

```
 1                    (Jury came into the courtroom.)

 2                    THE COURT:  Please be seated, ladies and

 3      gentlemen.

 4                    Good morning.

 5                    Okay.  We are going to try to get started

 6      quickly as possible.  My understanding, we will

 7      definitely, at least I believe we will definitely, be

 8      through with the witnesses and maybe further along,

 9      and that's what our goal will be, if possible, so

10      let's get started.  And we have a new witness.

11                    Please call your next witness.

12                    MR. ODOM:  Daisy Dennes, Your Honor.

13                    THE COURT:  Let me mention to the

14      alternates.  The law is, once the jury commences the

15      deliberation, you are to be released or you can stick

16      around o hear the verdict or, I imagine, the verdict

17      will be published.  If not, certainly feel free to

18      call up here.

19                            Mr. Odom.

20

21

22

23

24

25
```

1                    DAISY MARIE DENNES,

2    was called as a witness by the defense and, having

3    been duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. ODOM:

6         Q        Would you state your name for the ladies

7    and gentlemen of the jury.

8         A        My name is Daisy Maria Dennes.

9         Q        Where do you live, Ms. Dennes?

10        A        6415 Wild River, Katy, Texas.

11        Q        And are you part of the Katy, Texas, that

12   is in Harris County or in the part, that other side of

13   the county?

14        A        No, Harris County.

15        Q        How do you know the defendant, Reinaldo

16   Dennes?

17        A        I am Reinaldo's ex-wife.  I was married to

18   him for 20 years.

19        Q        When were you all married?

20        A        We were married in 1973.

21        Q        When did you get a divorce?

22        A        1990, if I'm not mistaken.

23        Q        Back in 1990?

24        A        If I'm not mistaken, around there.

25        Q        You were not married to Ray Dennes in

1     January of 1996?

2          A     No, sir, I wasn't.

3          Q     During your marriage with Mr. Dennes, did

4     you all have any children?

5          A     Yes, sir.  I have a 21 year-old son and a

6     12-year-old daughter.

7          Q     And during the time that you were married,

8     I would like to ask, if you recall, whether or not

9     there was an event that occurred that resulted in a

10    scarring on the part of Mr. Dennes?

11         A     Yes, sir.

12         Q     And tell the ladies and gentlemen of the

13    jury about when that would have been.

14         A     November, Thanksgiving of 1990, there was

15    an accident at my house.

16         Q     And without going into a great deal of

17    detail, what did this incident involve?  How is it --

18    how is it that Ray Dennes got burned?

19         A     Reinaldo was working on a lawn mower

20    tractor, riding, that was inside the garage.  My

21    daughter was outside, in the driveway, playing, and I

22    was helping Ray.  He was putting gas in the gas tank,

23    to try to start it because it wouldn't start.  When he

24    cranked the key, flames came out, and he was having a

25    small cup in his hand, in his right hand.  The cup

1     started getting fire.  It got flames on it, and he

2     poured the cup back to his back.  At that time my

3     daughter was in the driveway and outside of the

4     garage.  And we hear screaming and here was my

5     daughter being burned severely.  And when Ray saw

6     that, just started jumping and running and practically

7     saved my daughter.  He burned himself severely on his

8     right hand.  He burned himself in the abdomen area.

9          Q     Ms. Dennes, let me ask the questions.

10               First of all, your daughter did not die,

11    did she?

12         A     No, she didn't die.  She received severe

13    burns on her back and her arms, her neck area.

14         Q     Was Ray able to roll your daughter until

15    the flames went out?

16         A     Yes.  Ray carried her and threw her on the

17    grass and that's how he obtained his burns because he

18    stopped the fire on her with his body.

19         Q     Now, in regards to his burns, where was

20    Ray burned?

21         A     Ray was burned severely on his right arm,

22    and he, also, was burned on the left arm.  He was

23    burned around his neck area and his abdomen.

24         Q     Now, how long did Ray stay in the hospital

25    with his burns?

1        A        Ray stayed in the hospital for about 17 to

2    18 days.

3        Q        Which hospital did he go to?

4        A        Hermann Hospital, the burn unit.

5        Q        And were there varying degrees of burns on

6    different parts of his body?

7        A        Yes, sir.

8        Q        And do you know -- I believe you testified

9    that he had burns on his right arms, left arm, his

10    neck and his abdomen?

11        A        Yes, sir, that's correct.

12        Q        How severe were the burns on his neck?

13        A        It's first degree on the neck.  It's very

14    mild.

15        Q        You understand a first-degree burn as

16    being the mildest of the three degrees of burns?

17        A        Yes, sir.  I am in the medical field.

18        Q        And what was the burn on his left arm,

19    what type of burn was that?

20        A        It was a third degree.  He had to have

21    grafting on it.

22        Q        And what about his right arm?

23        A        I'm sorry.  I'm sorry.  His right arm was

24    the one that was third degree, his right arm.

25        Q        If you look at him, it is your left, his

```
 1    right.  His right arm had third-degree burns?

 2        A      Yes, sir.

 3        Q      And what was required on his right arm?

 4        A      It was grafting and it didn't take so he

 5    has got serious markings.

 6        Q      The forearm is serious?

 7        A      Yes, sir.  It's very noticeable, yes,

 8    sir.

 9        Q      Can you stand up briefly for us.  Can you

10    point out where the burns scared.

11        A      It starts about right here and it comes

12    all the way up to here.  Also, in the hand, he has got

13    markings, not severe but you can tell markings.

14        Q      If I understand what you said on the hand,

15    the burns are not as serious?

16        A      Not right here, on top of the palm, it

17    starts right here.

18        Q      Have your seat.  Thank you.

19               What about his left arm?

20        A      His left arm, there is hardly no marking

21    on it.

22        Q      That was a first-degree burn or a minor?

23        A      Yes, it was like a first degree to a minor

24    burn.

25        Q      What about on his abdomen?  How much of a
```

1    burning did he have on the abdomen?

2         A      His abdomen was like a second-degree

3    burning and he has got markings on the whole belt

4    line.

5         Q      Now, you are doing a gesture there.  I'm

6    not good at what gesture.  Can you stand up again,

7    point out on the abdomen where the burns were.

8         A      About this area, he has markings from

9    about here to here of a burn and it's a dark marking

10   and you can see it -- that is, it is burned.

11        Q      Okay.  Now, the abdomen burn, let me talk,

12   as years or the time has gone by, have the burns on

13   his left arm and his neck have those scars diminished?

14        A      Yes, sir.

15        Q      How about the scars on his right arm and

16   his abdomen?

17        A      No, sir.  His right arm, it's very ugly

18   looking, very severe marking.  And his abdomen is

19   still marked.  You can see if you see him without a

20   shirt.

21        Q      His right arm is noticeably scared?

22        A      Yes, it is.

23        Q      And by that, do you mean it's a different

24   color?  Tell the ladies and gentlemen of the jury what

25   you mean by scar.

1          A       He has got -- on the whole forearm he has

2     a real thickness of skin and it's pink, dark color

3     pink, and you could tell that it's severely burned.

4          Q       And on his abdomen, what does his abdomen

5     appear like?

6          A       His abdomen has a marking like a dark

7     brown marking.

8          Q       Now, when this incident occurred, did I

9     ask you to retrieve any records that you had in

10    regards to this particular incident?

11         A       Yes, sir.

12         Q       And did you do so?

13         A       Yes, sir.

14         Q       And did you bring those records to me?

15         A       Yes, sir.

16                 MR. ODOM:  May I approach the witness?

17                 THE COURT:  You may.

18                 MR. SMYTH:  May I take the witness on voir

19    dire?

20                 THE COURT:  You may.

21

22

23

24

25

```
  1                    VOIR DIRE EXAMINATION

  2    BY MR. SMYTH:

  3         Q        These records that you have given to Mr.

  4    Odom, first of all, are you a custodian of the medical

  5    records for Hermann Hospital?

  6         A        -- No, sir, I'm not.

  7         Q        These are records that you collected at

  8    home?

  9         A        No, sir, that's wrong.

 10         Q        Well, where did you get them?

 11         A        I picked them up from the attorney that

 12    handled Desiree's case.

 13         Q        I assume there must have been some kind of

 14    an insurance suit?

 15         A        She was -- what do you call it, yes, they

 16    gave her.

 17         Q        What?

 18         A        They gave her money, for her age, to be

 19    able to have surgeries on her body.  She will need

 20    extensive surgeries on her body.

 21         Q        How much money from the insurance company.

 22    ?

 23                  MR. ODOM:  Objection, I don't know that

 24    it has any relevance as to whether or not Mr.

 25    Dennes --
```

1                    THE COURT:  Sustained.

2          Q       These are medical records that you got

3    from an attorney that represented your daughter; is

4    that correct?

5          A       Yes, sir.

6          Q       And when did you get these?

7          A       Excuse me, sir?

8          Q       When did you get these?

9          A       I got them three days ago.

10         Q       So you can't vouch for the accuracy of

11   these records.  These records reflect something that

12   happened back in 1990; is that correct?

13         A       I don't understand your question.

14         Q       These records would go to an incident that

15   occurred, according to you, back in 1990?

16         A       Yes, sir.

17         Q       And they reflect the medical condition of

18   the defendant back in 1990?

19         A       That is correct.

20                 MR. SMYTH:  Your Honor, I object to these

21   documents.

22                 THE COURT:  Sustained.

23

24

25

```
 1                   DIRECT EXAMINATION CONTINUED
 2      BY MR. ODOM:
 3           Q      Ms. Dennes, did you see these medical
 4      records back in 1990?
 5           A      Yes, sir.  I had copies of the bills.
 6      Yes, sir.
 7           Q      No, I'm not talking about the bills.  I am
 8      talking about like the actual medical records.  Have
 9      you seen that before?
10           A      Yes, sir.
11                  MR. ODOM:  May I approach the witness,
12      Your Honor?
13                  THE COURT:  You may.
14                  (Whereupon, Defendant's Exhibit No. 6 was
15      marked for identification.)
16           Q      Ms. Dennes, I show you what has been
17      marked as Defendant's Exhibit 6.  Can you recognize
18      that document as a document that you have seen
19      previously without telling us what it is?
20           A      Yes, sir, it's --
21           Q      Not now.  I just want to know if you can
22      recognize.
23           A      Yes, sir.
24           Q      Now, do you recognize that document as
25      being a document that you have seen back when this
```

```
1    incident occurred, whenever, after this incident

2    occurred?

3         A      Yes, sir.

4         Q      Now, there is a lot of records in here,

5    right?

6         A      Yes, sir.

7         Q      You don't remember seeing all these

8    records, do you?

9         A      No, sir.

10        Q      Do you remember that document that we have

11   labeled Defendant's Exhibit 6?

12        A      Yes, sir.

13        Q      All right.  You don't know everything that

14   is in that document, do you?

15        A      No, sir, I don't.

16        Q      But you recall that as one of the

17   documents that was obtained at that time.

18               MR. SMYTH:  Object to leading, Judge.

19               THE COURT:  Sustained.

20        Q      (Mr. Odom)  Do you recognize that

21   document?

22        A      Yes.

23        Q      How is it you know that document is a

24   document that you saw back in 1990?

25        A      Because it states about Reinaldo and it's
```

1    about his burns.

2        Q        Yeah.   What I am asking, do you remember

3    it as being a document you have seen before?

4        A        Because it states the amount of degree

5    that he was burned.

6                 MR. ODOM:   At this time I offer

7    Defendant's Exhibit 6.

8                 MR. SMYTH:   Object, there is no proper

9    predicate laid for that document.   She said she

10   doesn't know what is contained in it.

11                THE COURT:   Sustained.

12       Q        (Mr. Odom)   Do you have any question

13   about the burns that Mr. Dennes received?

14       A        I don't understand your question.

15       Q        Is there any doubt in your mind?   You may

16   not know what is in that document before you but what

17   you testified about his burns.   Those are things that

18   you have seen before?

19       A        Yes, sir.   I was with Reinaldo for 17 or

20   18 days.   He was in the burn unit.   I spent 17 days in

21   the hospital.

22                THE COURT:   Ma'am, let's make sure you

23   answer the question that is asked.

24       Q        (Mr. Odom)   Have you seen these burns on

25   Mr. Dennes since then?

1      A      Yes, sir.

2      Q      Are they noticeable?

3      A      Yes, sir.

4      Q      If you were to see Mr. Dennes without his

5   shirt on, is there any way you cannot see these burns?

6      A      No, sir.

7      Q      Unless it was dark and you couldn't see

8   him, right?

9      A      Yes, sir.

10            MR. ODOM:  Pass the witness.

11            THE COURT:  Thank you, Mr. Odom.

12

13                 CROSS EXAMINATION

14   BY MR. SMYTH:

15      Q      In the room you are not going to notice

16   the --

17      A      Not if it is completely dark.

18      Q      And dark like when people go to bed

19   tonight at night together, a lot of people turn off

20   the lights?

21      A      Yes, sir.  When you go to sleep, you are

22   right.

23      Q      Before you turn to go to sleep?

24      A      If you do turn the light off, yes, you

25   cannot see them.

```
 1        Q        You wouldn't notice those burns?

 2        A        Not in a complete dark room, no, sir.

 3        Q        And if Mr. Dennes was wearing a long

 4   sleeved shirt that came down to his wrists, you

 5   wouldn't see any burns on his right arm, would you?

 6        A        Yes, you can.

 7        Q        With a long sleeve, you might see on his

 8   hand?

 9        A        If he stretches his arm, yes, you could

10   see this part.

11                 MR. SMYTH:  Your Honor, may I stand up?

12                 THE COURT:  Yes.

13        Q        In this position, my hands hanging down

14   this way, are you going to see any burns on the right

15   forearm?

16        A        Not up on the forearm but to the bottom,

17   to the wrist area, yes, sir.

18        Q        So if you are looking, you might see

19   something around his wrist?

20        A        You would if you are looking.

21        Q        If you are looking?

22        A        Yes, looking, yes, you could see it.

23        Q        And you say the burns to his left arm and

24   his burns to the neck have diminished over time?

25        A        Yes, sir.
```

1      Q       When was the last time you saw these
2  burns?
3      A       Which ones?
4      Q       The burns to the forearm.
5      A       I see them three weeks ago.
6      Q       When was the last time you saw the burns
7  to his abdomen?
8      A       Well, I haven't been with Ray for four
9  years.
10      Q       I thought you got divorced in 1990?
11      A       No, sir, I didn't get divorced.
12      Q       When did you get divorced from the
13  defendant?
14      A       I think about four years ago, sir.  I'm
15  not sure.
16      Q       Since 1993.  This is 1997?
17      A       Yes, 1993, yes, sir.
18      Q       1993?
19      A       Around there.  Uh-huh.
20      Q       So somewhere between 1990 and 1993, you
21  got divorced from Reinaldo?
22      A       1993, sir.  Yes, sir.
23      Q       So the last time you saw those burns would
24  have been in 1993?
25      A       No, sir, that's not necessary.

```
 1        Q      I believe -- well, when is the last time
 2   you saw the burns?
 3        A      Exactly I can't give you a date but Ray
 4   used to come to my house periodically, riding a
 5   bicycle.  And he rides a bicycle in no shirt.  Lots of
 6   times he comes to my house, when he was out all the
 7   time, to see my daughter, so it has been ever since
 8   before he was in jail.  He has been in jail for a year
 9   and a half.  You could say right before he went to
10   jail.
11        Q      When was the last time you saw it?
12        A      Yes, sir.
13        Q      18 months ago?
14        A      Well, I don't know exactly.  He has been
15   in jail about around that time.  Yes, sir.
16        Q      Now, where did this accident occur?
17        A      It occurred in our house.
18        Q      Did it occur when you were living on Wild
19   River and/or did it at your 1706 Harwick?
20        A      Yes, sir.
21        Q      And you move out of that house on Harwick?
22        A      Correct.  Right.  I bought a house right
23   before the accident happened.
24        Q      Right before the accident happened you
25   bought a new house?
```

```
 1          A      Yes, we were moving to the other house.
 2          Q      You sold the house to a guy named David
 3   Balderus?
 4          A      Yes.
 5          Q      And you currently live on Wild River; is
 6   that correct?
 7          A      Yes, sir.  That's correct.
 8          Q      When did you move from -- did you move
 9   from Harwick to Wild River or to Weimer?
10          A      Weimer Road.
11          Q      When did you move to Weimer Road?
12          A      When we bought the house.
13          Q      Is that going to be November or December
14   of 1990?
15          A      Yeah.  It was about December.  Ray was in
16   the hospital when I moved into the house.
17          Q      When did you move from Weimer Road to the
18   Wild River address in Katy?
19          A      September '96.
20          Q      You have kept pretty close with your
21   husband even though you got divorce; is that correct?
22          A      Yes, sir.
23          Q      In fact, are you the one that went to
24   Florida to pick up that car --
25                 MR. SMYTH:  May I approach, Your Honor?
```

1                    THE COURT:  You may.

2                    MR. SMYTH:  Thank you, Your Honor.

3          Q        Was that house over there on Weimer Road

4    was that your house?

5          A        It was mine and Reinaldo's.  It became

6    mine after the divorce.

7          Q        So you got the whole house in the divorce?

8          A        Yes, sir.

9          Q        And that house on Wild River, that's your

10   house?

11         A        Yes, sir.

12                   MR. SMYTH:  May I approach the witness,

13   Your Honor?

14                   THE COURT:  You may.

15         Q        Ma'am, I'm going to show you what has been

16   marked as State's Exhibit 74 and 75 and ask you if you

17   recognize that particular vehicle?

18         A        No, sir.

19         Q        You've never seen that car before?

20         A        No, sir.

21         Q        You didn't go to Florida and pick up that

22   car?

23         A        No, sir.

24                   MR. ODOM:  Obviously she didn't go to pick

25   up.  She doesn't recognize it.

1          MR. SMYTH:  If the Court will indulge me.

2          MR. ODOM:  I guess my objection, it has

3     been asked and answered.

4          THE COURT:  Go ahead.

5     Q     (Mr. Symth)   You were not involved in the

6     sale of this car to a man in December of 1996.

7          MR. ODOM:  Objection, Judge, it's assuming

8     facts not in evidence.  He is attempting to get in

9     evidence through a question.

10         MR. SMYTH:  May we approach the bench?

11         (Whereupon, the following proceedings were

12     held before the Bench.)

13         MR. SMYTH:  The Court will recall in the

14     hearing we had in this case this defendant testified

15     this woman right here sold that car for him and got

16     $20,000, which he gave to his attorneys.

17         MR. ODOM:  I don't know that he said it

18     was this woman.  I thought it was his family said

19     that.

20         MR. SMYTH:  He was married.  The Court may

21     have a better memory than I.

22         THE COURT:  I know that he sold the

23     vehicle for twenty grand.

24         MR. ODOM:  I think the evidence may have

25     been that she gave counsel money but I don't think the

1    evidence was that she actually sold the car.

2              THE COURT:  I don't know who sold the car

3    nor what type of vehicle it was.

4              MR. SMYTH:  The type we talked about that

5    SNX Accura that was bought for $28,000 and sold for

6    $20,000.

7              THE COURT:  And you basically asked her if

8    she recognizes the vehicle or did she.

9              MR. SMYTH:  I'm going to get her on

10   perjury is what I am going to do, if she is not going

11   to tell the truth.

12             MR. ODOM:  Because she said she didn't

13   recognize that car?

14             MR. SMYTH:  Well, I'll ask her if she sold

15   that car.

16             THE COURT:  I'll let you ask that but

17   don't get too specific at the present time because you

18   don't need that.

19             MR. ODOM:  And, for the record, I don't

20   have a copy of that transcript with me but if the

21   indication is that it was not her that sold that car,

22   she is hearing what is being said and based upon what

23   Mr. Smyth just said, he is intimidating that witness

24   on the record, and if that's not what that transcript

25   said and that's not made in good faith.

1              THE COURT:  Mr. Odom, the only way she

2    could be intimidated if she wasn't being truthful.

3    You have to tell the truth.

4              MR. ODOM:  For him to say that he has

5    sworn testimony that she is the one that sold the

6    car --

7              THE COURT:  It's also states here that I

8    don't remember if she has and I don't remember the

9    car.

10             MR. ODOM:  I don't either, Judge.

11             THE COURT:  Let's continue.

12             (Whereupon, the following proceedings were

13   held before the jury.)

14      Q      (Mr. Symth)   Ms. Dennes?

15      A      Yes, sir.

16      Q      Were you involved in the sale of any car

17   belonging to Reinaldo Dennes back in November,

18   December, 1996?

19      A      No, sir.

20      Q      Not you?

21      A      No, sir.

22      Q      Now, on January 24th, let's say January

23   21st through January 24th, 1996, was Reinaldo Dennes

24   with you?

25      A      No, sir.

1                    MR. SMYTH:  Nothing further.  Thank you

2        very much.

3

4                         REDIRECT EXAMINATION

5        BY MR. ODOM:

6             Q        Ms. Dennes, Ray Dennes has remarried since

7        your divorce?

8             A        Yes, sir.

9             Q        And his present wife is Louisa Dennes?

10            A        Yes, sir.  That's correct.

11            Q        Now, Mr. Smyth asked an interesting

12       question and, that is, if it's pitch black, you can't

13       see these burns, can you?

14            A        No, sir, not if it's pitch black.

15            Q        If it is pitch black, you can't see them?

16            A        No, sir.

17            Q        But let me ask you this:  Are these burns

18       raised from the skin?  Is his skin smooth or raised

19       and bumpy?

20            A        His skin on the right arm is very raised

21       and on the abdomen, you could see, feel it, at least,

22       when I was with him four years ago.

23            Q        So even if it was pitch black and somehow

24       or another you managed to bump into Ray in the total

25       dark without having seen him beforehand, you'd still

1   be able to feel that he has scars on him; isn't that

2   true?

3        A      Yes, sir, definitely.

4               MR. ODOM:  Pass the witness.

5               THE COURT:  Thank you.

6               Mr. Smyth, anything further?

7

8                    RECROSS EXAMINATION

9   BY MR. SMYTH:

10       Q      You say you would be able to feel the ones

11  on his arm pretty readily?

12       A      Yes, sir.

13       Q      And the ones on the abdomen you could

14  feel?

15       A      I haven't felt that for four years so I

16  can't answer.

17       Q      If you are going to feel around and

18  looking for it, you might feel?

19       A      If you are looking for it, you could see

20  them; not even looking for them, you can see it.

21              MR. SMYTH:  Thank you, ma'am.  I

22  appreciate it.

23              THE COURT:  You may be excused.  Thank you

24  for your testimony.

25              MR. ODOM:  May this witness be excused?

1              THE COURT:  Call your next witness, Mr.

2      Odom.

3              MR. ODOM:  At this time I would like to

4      make a jury display on the part of my client to the

5      jury in regards to his body from the waist up.

6              THE COURT:  Mr. Smyth, Mr. Vinson, any

7      comment?

8              MR. SMYTH:  If he wants to do it, that's

9      fine with us.

10             THE COURT:  Are you going to question

11     him?

12             MR. ODOM:  No, Judge, similar when they

13     went.

14             THE COURT:  The State has no objection.

15     It's fine with me.

16             MR. ODOM:  Mr. Dennes, would you please

17     step out here.

18             (The defendant displayed his burns.)

19             MR. ODOM:  Take your coat off and your

20     tie.

21             Mr. Dennes, can you display your arms in

22     this manner to the jury.

23             MR. SMYTH:  May I observe, Your Honor?

24             THE COURT:  Certainly.

25             MR. ODOM:  Can you lift up your tee

1    shirt?

2              At this time the State will rest.

3              THE COURT:  You said the State?

4              MR. ODOM:  The defense.  It's been a long

5    trial.

6              THE COURT:  What says the State?

7              MR. VINSON:  May we approach the bench,

8    Your Honor?

9              THE COURT:  You certainly may.

10             (Off-the-record discussion held.)

11             THE COURT:  What says the state?  On

12   behalf of the State, who is doing the speaking?

13             MR. SMYTH:  Judge, I would, at this time,

14   offer into evidence State's Exhibit 166 through 172,

15   which are the large diagrams.  We have reproduced them

16   in the smaller version, which we would offer as 166 A

17   through 172 A.

18             THE COURT:  Let's tender those to Mr.

19   Odom.

20             MR. ODOM:  Judge, I have seen them and I

21   would re-urge my original objections that have not

22   been covered and the alterations that were so I don't

23   re-urge.

24             THE COURT:  Say that again.

25             MR. ODOM:  Well, I made some objections at

1    the time.  Some of my objections have been resolved:

2    Others have not.  Those which have not, I would

3    re-urge so I don't waive those objections at this

4    time.

5              THE COURT:  So are you saying you object?

6              MR. ODOM:  Yes, sir.  On those grounds

7    that I had previously expressed.

8              THE COURT:  May I see those, please?

9              MR. VINSON:  Yes, Your Honor.

10             (Whereupon, the following proceedings were

11   held before the Bench.)

12             THE COURT:  Again, I'm asking, show me now

13   these modified documents, what it is you are objecting

14   to.

15             MR. ODOM:  My original objection, other

16   than the fact that it had certain categories on it,

17   was that there are conclusions on these exhibits.

18   There's innuendos on the exhibits and, as such, they

19   should only be admitted for demonstrative purposes as

20   opposed to exhibits as to fact.

21             THE COURT:  So can you point something out

22   to me that's not anything as part of the evidence?

23             MR. ODOM:  I'm looking.  For example, it

24   says "Estrella Martinez" on one of the exhibits, that

25   is not -- that is a controverted issue.

1            THE COURT:  Even though they have got up,

2    says "the person in the possession of the phone."

3            MR. ODOM:  I think it is controverted that

4    she was in possession of the phone.  It is, of course,

5    the defense's position that she did not have the phone

6    and, as such, not admissible.  In essence, the gist of

7    my argument:  There are a number of items like that on

8    the exhibit but that's the gist of our argument.

9            THE COURT:  The objections are overruled.

10   166 A through 172 A are admitted.

11            (Whereupon, the following proceedings were

12   held before the jury.)

13            THE COURT:  Anything further?

14            MR. VINSON:  No, Your Honor, the State

15   will rest and close.

16            THE COURT:  I thought you had something

17   else you were going to offer.

18            MR. VINSON:  Yes, that will be in a

19   separate packet.

20            THE COURT:  Okay, very well.

21            Ladies and gentlemen, you have now heard

22   all of the evidence that you are going to hear in this

23   case.  What we have got to do now is -- and they are

24   well on the way of working on a charge in the case,

25   which are the instructions I give you.

1          Basically, as I told you, the charge will

2     give you some definitions to assist you, present the

3     law to you and allow you to focus on those and review

4     that charge as you commence or attend to your

5     deliberations.  We have come a long way in getting

6     that prepared.  We are not quite ready yet for it.

7     I'm not quite sure how long it will take us but I am

8     comfortable, I think we can have this done by the time

9     I get you back.  And we are going to break for lunch

10    at this time.  We will break for lunch, and I am sure

11    you will be back by 12:30 and you may be in there and

12    having a social conversation for another 30 minutes or

13    so.  I think by 1:00, I think, we will be ready to

14    charge you and hear the attorneys' arguments and let

15    you commence your deliberations.

16          Remember you are not at liberty at this

17    time to commence deliberations until I give you that

18    specific instruction to do so.

19          So we stand in recess until not exactly

20    but I would think 12:30 or 1:00 and summon you back in

21    the courtroom and read the charge to you.  Have a good

22    lunch and see you back in a little bit.  We stand in

23    recess.

24          (Recess taken.)

25          THE COURT:  Let the record reflect that

1    the State is present and the defense and the defendant

2    is present and the jury is not.  And that we are now

3    prepared to discuss the charge.

4              With the proposed charge that is now

5    before me, Mr. Vinson, what says the State?

6              MR. VINSON:  The State has no objections

7    to the charge as prepared.

8              THE COURT:  Mr. Odom.

9              MR. ODOM:  Yes, Your Honor.  I have a

10   number of requests and/or objections to the charge.

11   And I hope that I will be able to go in order but I

12   will, at least, start off, and I may have to flip back

13   through parts of the charge.

14             The first request I have is that the

15   charge include an accomplice witness charge similar to

16   the one we have for Estrella Martinez.  That I believe

17   the evidence shows that we should be entitled to a

18   similar charge for Tony Ramirez.  I believe the

19   evidence shows that there is reasonable evidence for a

20   jury to determine that he is an accomplice based on

21   the fact that he testified that he was being told by

22   persons that it was illegal to make a silencer.  That

23   he said he went to a restaurant and was told that,

24   according to his testimony, it will be involved in a

25   robbery of a jeweler and that this would be the

1    different parties had different roles.  It would be

2    his job to keep diamonds, and it would be Jose

3    Albert's job to shoot the jeweler.  And it would be

4    Ray Dennes's job to get the video machine from

5    downstairs.

6              I believe that the evidence then showed

7    that he left to Ecuador because he had previously,

8    prior to this, bought a plane ticket.  And that he

9    took that trip, and he came back after the offense in

10   question occurred.  And then he made certain attempts

11   to retrieve evidence.  And it was after that he went

12   through an unanimous person to seek an award and/or to

13   talk to the authorities.  And I believe there is

14   sufficient evidence for him to be an accomplice as

15   such, and I believe we would be entitled to a charge

16   therein.

17             THE COURT:  That will be denied.

18             MR. ODOM:  The second issue I would like

19   to raise the issue, as it relates to the parties, and

20   there is a number of places in the charge wherein the

21   Court has charged the concept of parties.  And I would

22   object to the charge of parties in that I believe the

23   State has not produced enough evidence to show that

24   Jose Albert Dennes committed the murder of the

25   complainant in this particular case.  And, as such, if

1    there is not sufficient evidence to establish that as

2    a matter of course, then it is the State's theory that

3    the defendant committed the murder of Janos Szucs.

4    And if that is the case, by charging under parties,

5    then the State has in effect broaden its burden of

6    proof than what it is able to prove.  It sort of makes

7    it all encompassing, and if you don't find that the

8    defendant committed this particular robbery, then

9    maybe you can find that it is he who was involved in

10    it under a parties concept and, therefore, he

11    committed a robbery.  And I don't think there is

12    sufficient evidence to show that there would be

13    another party, with the only one there could be based

14    upon Jose Albert Dennes.  And I don't think the

15    evidence is sufficient in that regard to support a

16    parties charge.

17            THE COURT:  That will be denied.

18            MR. ODOM:  I have an objection to the

19    charge in regards to the general definition of

20    intentionally and knowingly.  I believe the charge

21    says "a person acts intentionally, or with intent,

22    with respect to the nature of his conduct or to the

23    result of his conduct when it is conscious objective

24    or desire to engage in the conduct or to cause the

25    result."

1          And I believe that's the general

2     definition charge under the Penal Code of 6.03 section

3     A and section B.  I believe that murder is a -- that

4     the Penal Code's definition refers to two specific

5     types of conduct that can be engaged in, and I believe

6     that, under this offense, the type of offense that is

7     alleged is a result oriented type offense, that is, he

8     consciously engaged in that conduct and, as such, it's

9     an inappropriate definition of intentionally and

10    knowingly.

11          THE COURT:  That will be denied.

12          MR. ODOM:  I object to the portion of the

13    jury charge that defines the extraneous offenses in

14    that it charges the jury on extraneous offenses in

15    that it says "that the evidence may be admitted for

16    purposes of considering motive, opportunity, intent,

17    preparation, plan, knowledge, and identity of the

18    defendant, if any, in connection with the offense."

19          And I would contend that, based upon the

20    evidence, we presently have that the extraneous

21    offense, which would be the shooting of Mr. Copeland,

22    would only apply to an intent, preparation, plan and

23    knowledge, knowledge and identity.  It would not have

24    anything to do with of determining motive or

25    opportunity.

```
 1              THE COURT:  That will be denied.
 2              MR. ODOM:  I object to the definition of
 3    beyond a reasonable doubt in that Gessa G-e-s-s-a
 4    defination that the Court uses, which has been adopted
 5    in this state, contains in it elements of two
 6    different definitions of beyond a reasonable doubt.
 7    In one paragraph, it defines reasonable doubt as "the
 8    kind that would make a reasonable person hesitate to
 9    act in the most important of his own affairs."  And
10    the second paragraph it says "must be proof of such a
11    convincing character that you would be willing to rely
12    and act upon it without hesitation in the most
13    important of your own affairs."
14              I feel that those two definitions, with
15    one being a positive and one being a negative, are in
16    contradiction of each other and, as such, would be
17    conflicting with each other.
18              THE COURT:  Denied.
19              MR. ODOM:  I object to the Gessa
20    definition of beyond a reasonable doubt and I submit
21    there should no beyond a reasonable doubt consistent
22    with the prior before State versus Gessa.
23              THE COURT:  That will be denied.
24              MR. ODOM:  And finally I object to the
25    final paragraph in the instructions of the Court to
```

```
 1      the jury for the second to last paragraph wherein it
 2      states "your sole duty at this time is to determine
 3      guilt or innocence of the defendant under the
 4      indictment in this cause and restrict your
 5      deliberations solely to the issue of guilt or
 6      innocence of the defendant."
 7              I would contend that the part of the Code
 8      of Criminal Procedure that refers to the guilt or
 9      innocence is referring to two sections of the
10      bifurcated proceeding, one that we generally call
11      guilt or innocence.  The one called punishment,
12      however, that is in direct conflict with the standard
13      of proof, which is beyond a reasonable doubt.  I think
14      the charge should read your sole duty at this time is
15      to determine whether or not the State has proved the
16      guilt of the defendant beyond a reasonable doubt, and
17      it has nothing to do with whether or not the defendant
18      is innocent of the charge as such.
19              THE COURT:  That will be denied.
20              MR. ODOM:  That is all I have.
21              THE COURT:  Thank you.
22              Let me ask you to turn to page five.  It's
23      extraneous offense paragraph.  I don't recall any
24      extraneous offense.
25              MR. ODOM:  I believe the extraneous would
```

1    be the shooting of Copeland.

2            THE COURT:  That's the one.

3            MR. VINSON:  Yes, Your Honor.  What we did

4    on the request of defendant's counsel -- meant to

5    bring it to the the Court's attention -- to accident

6    and mistake and he ask that to be removed and we

7    agreed to take accident and mistake out and it now

8    reads "motive, opportunity, intent, preparation plan,

9    knowledge, identity or absence of mistake or accident

10   of the defendant, if any."

11           MR. ODOM:  That's correct, they did.

12           THE COURT:  Okay.  You have asked for an

13   hour each and that's two hours of closing arguments.

14   I realize this is a capital case but I'm going to

15   shave some off that and I will give you each 50

16   minutes, 50 minutes each, and hold you right to the

17   line and don't embarrass yourself by having me to ask

18   you to sit down.  And I will be glad to tell you when

19   five minutes is up or two minutes is up, or whatever,

20   but I am going to hold you to 50 minutes.  And I

21   guarantee that you are over and I'll have to say

22   something.  Okay  50 minutes.

23           If ready, bring the jury out.

24           (Jury came into the courtroom.)

25           THE COURT:  Please be seated, ladies and

1    gentlemen.

2              All right, ladies and gentlemen of the

3    jury, we now have a charge prepared, and I am prepared

4    at this time to read that charge to you.  Again, as I

5    told you earlier, it contains the law in this case,

6    various definitions to assist you, if they do, in your

7    deliberations.  Once the charge is read, the attorneys

8    will have an opportunity to argue the evidence to you.

9    I remind you that nothing that the attorneys say is to

10   be considered evidence.  It's their interpretation of

11   the evidence, their opinion.  Your interpretation of

12   the evidence is what counts.

13             So again, nothing they say can be used by

14   you as evidence in this case.  You have now heard all

15   the evidence.  Once you commence your deliberations,

16   there will be very limited contact with you.

17             Let me also further explain that many

18   times, in cases, I will receive notes from the foreman

19   of the jury asking for this or that or whatever.  Most

20   of the time I cannot respond to you.  I am very

21   limited with the contact I can have with you during

22   your deliberation.  And if you ask a question and you

23   get back from me "refer to your charge and I can't

24   legally answer your question," and things you do ask

25   are actually in the charge.  So if I can answer the

1    question, I will be happy to do so.

2              But as far as testimony, you cannot ask

3    for any testimony to be read back to you unless it is

4    extremely limited, if there is a specific dispute

5    among the jury as to what somebody said.  You can't

6    have testimony read back because you want to refresh

7    your memory, and I will give you further instructions

8    sir that, if that comes up.

9              Let me commence by reading the charge to

10   you and, then, we will have deliberation -- I mean the

11   arguments of the counsel and commence your

12   deliberations this afternoon.

13             (Judge read the charge to the jury.)

14             THE COURT:  Ladies and gentlemen, to the

15   charge is a one page verdict sheet.  That verdict

16   sheet as the following option.

17             (Judge read the verdicts to the jury.)

18             (Whereupon, the following proceedings were

19   held before the Bench.)

20             MR. ODOM:  I forgot to object to something

21   that just occurred to me.  I meant also to object to

22   the fact that we don't have a lesser included offense

23   for the offense of robbery as opposed to the capital

24   murder in the charge.  I request as well.

25             THE COURT:  Okay.

1            MR. ODOM:  Well, it just occurred to me as
2     you were reading the charge.  I can't sit through.
3            THE COURT:  Well, I denied it.
4            MR. ODOM:  Perhaps it is but it just
5     occurred to me.
6            (Whereupon, the following proceedings were
7     held before the jury.)
8            THE COURT:  Who is going to argue first?
9            MR. SMYTH:  May I proceed?
10            THE COURT:  You may.
11            MR. SMYTH:  Ladies and gentlemen, I have
12     got about 25 minutes to discuss this case with.  It's
13     now eight minutes of 2:00.  If I don't use all that
14     time, I will give the remainder to my partner here,
15     Mr. Vinson.
16            First of all, I would like to thank you,
17     each and everyone of you, for your attention in this
18     case.  When we talked to you on voir dire 38 days ago
19     and, well, we missed it.  Now it's into the ninth day.
20       Don't hold it against anyone.  We tried.  We know
21     the importance of it and we brought you a lot of
22     evidence.  We didn't waste a lot of your time, and I
23     think it was brought to you in as efficient a manner
24     as possible.
25            I would also like to thank Mr. Copeland

1    for being here, Mrs. Szucs for being here and the

2    friends and family.  We hope that this summation of

3    the evidence will help you out.

4              As the Judge said, this is the law that

5    governs you and the evidence is what you say it is.  I

6    will tell you what I believe the evidence is, as I saw

7    it.  If there is any disagreement with it, you will

8    rely on your memories and 12 of you, I'm planning

9    stragedy and the next witness out and concentrating on

10   the evidence.  You are going to recall, the 12 of you

11   together, will recall better than perhaps I did.  But

12   I do want to discuss it with you and help you.  I

13   think you will come to a conclusion in this case.

14             First of all, let me talk to the charge.

15   This is not a terribly complicated charge.  It's all

16   the law you need to know to come to a verdict in this

17   case.  The first two pages are definitions.  They are

18   pretty simple definitions.  The next page, we kind of

19   get into there and we talk about the law of parties.

20             Each and every one of you knows the law of

21   parties.  You remember the examples we gave dealing

22   with aggravated robbery and you had the gunman and the

23   guy holding the gun and get-away driver.  That's what

24   we are talking about, the law of parties, which was

25   each role there.  This law of parties and if somebody

1    had a role in the commission of this offense, they are

2    a party.  If somebody opened the back door and with

3    intent that this act be done, the act that was done,

4    then they would be a party to the offense.  If someone

5    carried a bag upstairs, if someone was present and put

6    jewels in the bag, they would be a party.  If someone

7    was present and did the shooting, they would also be a

8    party.  They are all guilty of capital murder if you

9    find they were a party to that offense.  That's what

10   the law of parties is.  A lot of language, but it's

11   pretty simple.

12          I think of each and everyone knows how the

13   law of parties works and knows how it applies to a

14   fact situation.  And it will be applied in this case

15   based upon the evidence you heard.

16          There is also an application paragraph.

17   In fact, there is two of them.  And the first one

18   talks about if Reinaldo Dennes didn't actually do the

19   shooting, is he still a party and he was there and

20   involved, aiding and soliciting, encouraging his

21   brother Albert Dennes in doing the shooting up in that

22   room.  And if he was under the law of parties, he is

23   just as guilty of capital murder as if he pulled the

24   trigger himself.

25          And the second application deals with the

1    law that Reinaldo pulled the trigger.  If you believe

2    the evidence beyond a reasonable doubt that he did,

3    based on everything you heard in the case, regarding

4    all of the case that he is the one that did it, that

5    nobody else did it, then otherwise guilty of the

6    offense of capital murder.

7               In this application, it simply helps you

8    go through it and logically, step by step, and

9    determine whether or not the State has convinced you

10   beyond a reasonable doubt.

11              You also get an instruction being the one

12   that is called the extraneous offenses, about the

13   fifth page.  And that's the one where it talks about

14   if there is another offense presented to you during

15   the testimony regarding the capital murder of the

16   Janos Szucs, then you look at that evidence to help

17   you to return whether there is motive, opportunity,

18   intent, preparation, or knowledge or identity and that

19   deals with Copeland, the shooting of David Copeland,

20   as the security guard.  You look at that and determine

21   does that shooting help you find out whether the

22   defendant was involved in some plan.

23              You heard all the evidence regarding the

24   plan, the language.  "If you don't distract the

25   security guard, I am going to have to shoot."  That

1    can all help you in determining whether this defendant

2    was part of the capital murder of Johnny Szucs.

3              The next page talks about the accomplice.

4    And it tells you that you cannot convict the defendant

5    based solely upon the accomplice testimony, that is,

6    the testimony of Estrella Martinez.  It doesn't say

7    disregard her testimony and you look at her testimony

8    and decide whether or not that testimony has been

9    corroborated in any manner and you heard it suggested

10   to you that how do you know Reinaldo's phone records

11   of all those days and have been introduced to you, and

12   which is in evidence, and you can take them back, 1

13   through 166 A and 172 and go through the actual

14   records and cross reference and determine this is

15   exactly what you heard and saw as this document is

16   produced, then you can essential do that.

17             It was made right before your eyes, made

18   with the sole purpose to simplify the evidence and

19   make it logical, to take the evidence from all the

20   records plus the evidence from these other documents

21   and put it in one form that it is easy for you folks

22   to read and determine.

23             And I suggest that this evidence alone

24   corroborates what Estrella Martinez told you happened

25   in that case.  It also corroborates even though there

1    is no requirement what Tony Ramirez, the man that made

2    the silencer, said and I will go over this in a little

3    bit more on down the road.

4           Other things that it will corroborate:

5    The testimony would be the silencer diagram of Tony

6    Ramirez, what he do, how he had to figure out how to

7    mount a silencer to that .9 mm demo gun that we showed

8    you.  It was found in Reinaldo Dennes' office when the

9    search warrant was run.  The Taurus handbook that

10   deals with the Taurus weapon, the one with the

11   extended barrel, the demo gun that was shown to you

12   found in Reinaldo Dennes' when the search warrant was

13   run as well as the fired bullet that is in evidence

14   that was found in Reinaldo's office.  Those are all

15   things that corroborate what various witnesses said,

16   and it will be up to you to determine whether or not

17   that is sufficient for you to find the defendant

18   guilty beyond a reasonable doubt.

19           My job at this point is to try to refresh

20   your memory regarding the testimony that you heard

21   because it was a long time ago.  It was eight days

22   ago.  And like I say, eight and a half days ago.  Lots

23   has been thrown out at you and I'll try to sort it

24   out.  You recall it the way you folks recall it.

25           As you remember, the first witness was

1    Officer Terry, who talked to you about being

2    dispatched to the scene and got there real quick and

3    secured the scene until an investigator came over

4              The next person is J. L. Kay.  He was the

5    crime scene unit, the CSU.  That CSU crime scene unit

6    that came in and took all the pictures in the lobby

7    area where David Copeland was shot, collected the

8    bullets and spent cartridge cases, those type of

9    things.

10             The next one was David Copeland, the

11   security guard, the new man on the block, been there

12   only three days, didn't know nobody.  He kind of threw

13   a monkey wrench in the plans of the defendant to carry

14   out this robbery.  And he was the new guy.  And he

15   wasn't able to be distracted as he wanted.

16             But you heard from David Copeland, and it

17   probably showed, chilled each and every one to the

18   bone, how he was distracted.

19             When he came around the corner, he

20   observed somebody behind, working with the video.  He

21   thought it was a technician.  And the person got up

22   and was leaving.  He wasn't going to stop him and get

23   that person for whatever reason.  The reason:  He had

24   the job of getting the videotape and that person

25   getting the defendant, Reinalde Dennes, come back,

1    walking back with something behind his back.  And you

2    know what that something is.  It was a semiautomatic

3    .9 mm with a silencer attached.  "I got something I

4    want to show you."

5            It is just fired one time.  Mr. Copeland

6    spins and goes to the floor and, on his back, when

7    Reinaldo Dennes walks up one more time.  And you know

8    that bullet went through and out his chest and struck

9    the bone and shattered out of his coat and recovered

10   by the CSU.  We also have another bullet went and hit

11   -- the other bullet -- the elevator plate and

12   mushroomed and was found intact as well as one spent

13   casing.  We don't know what happened to that spent

14   casing.  It could have been got kicked somewhere over

15   the lobby, could have been inside the overalls worn by

16   Reinaldo.  We don't know.  Maybe he stopped and picked

17   it up.  Who knows, but one case.

18           The next witness is, I think, Mr.

19   Copeland, I don't have to remind you, said that it was

20   very chilling.  You heard it all.  It caught your

21   attention.

22           The next witness was Antonio Ramirez, Tony

23   Ramirez.  He was the man that came in and spoke, with

24   the accent, through the interpreter, how he came to

25   meet Reinaldo and his brother Alberto and Francisco

 1       Rojas, how he worked in the office and making besels

 2       for watches, how he was recruited to make some

 3       silencer.

 4               He told you about how they ordered the

 5       silencer books.  We got the telephone records.  The

 6       calls were made to this company off of the phone that

 7       is in Reinaldo's office.  You can look on page three,

 8       if you don't believe me, if you don't believe the

 9       records, here is the phone number, right there, to the

10       company.  That is in the cellular records that we

11       produced for you.  It's also in the telephone records

12       that came from Southwestern Bell.

13               He got the silencer books.  They weren't

14       of any use to him.  And he went ahead and finished the

15       silencer without it.  You got these, are the silencer,

16       the various generations that they went through and now

17       in evidence as State's Exhibit, substituted for the

18       diagram.

19               But Ramirez went on to tell you things

20       much more disturbing than making the silencer and

21       testing.  You know from all the evidence, I don't

22       think there is a doubt in anybody's mind, that the

23       Greenrich Building is here and the test silencer here

24       and Reinaldo's apartment is right here, all within

25       walking distance of each other.  How convenient.

1           You know, it's very clear.  What we have

2   got, you can put it altogether, if you don't remember

3   that testimony, and you know that evidence was found

4   at all those locations.

5           But Ramirez tells you more than making the

6   silencer.  He tells you about going to dinner with the

7   defendant, Reinaldo Dennes, and his brother, Jose

8   Alberto Dennes, and how the talk turns around to the

9   proposition about how you can get rich.  A proposition

10  about how they are going to rob a jeweler in the

11  building and a proposition about how, "Tony, your job

12  will be to get the diamonds and Alberto's job will be

13  to shoot the jeweler and my job" -- my job -- my,

14  being Reinaldo Dennes, "will be to get the

15  videotapes."

16          Those videotapes were paramount in

17  everything that this man did.  He wanted the

18  videotapes.  He figured without those videotapes, they

19  can't get me.  It was very important for him to get

20  the videotapes, even when he is walking out of the

21  building and turns around and comes back and shoots

22  David Copeland to get those.  It's only by the Grace

23  of God that David Copeland is here today.  There is

24  not a thing that this man did that allowed Mr.

25  Copeland to come in and testify from the stand.  You

1    know the plan is developing.  We brought you more.

2                    We brought Todd Miller, who told about the

3    lineup after his cronny was arrested, along with how

4    they went through the lineup and told you the steps

5    they went, to make it, to allow David Copeland to pick

6    or not.  You know, according to David Copeland, yeah

7    number five, thought, oh, number five.  Again, you

8    heard about number five and thinking the State, the

9    government, was trying to frame this man by putting

10   him in the number five spot.  You now know, even if

11   you don't believe anything else, that the attorney

12   Ellis McCullough.  You know that Ellis McCullough

13   choose the spot for him, his spot, not the police, and

14   the spot was number five.

15                   And Copeland says the closest to the guy

16   that shot me was the number five person, if he had a

17   mustache and glasses.  They weren't to hear from Todd

18   Miller exactly what else he said but Copeland told you

19   how he decided that would have been him if he had the

20   glasses and the mustache.

21                   And you also heard about how Copeland had

22   him put together.  He has been shot two days before

23   and very critical and in the chest and in the back and

24   the police -- and as insensitive as it may be to send

25   the sketch artist to have him recreate who it is who

1    shot him and he did the best job he could, and I think

2    it is remarkable.

3             And I think it is very remarkable and very

4    telling that David Copeland is not unsure of his

5    identity, as some would like to see, when he does the

6    artist's rendition, it's not a photograph.  This is

7    not a photograph of the person.  This is not off the

8    videotape that Reinaldo Dennes stole.  This is out of

9    the man's eye of David Copeland, trying to relate to

10   another person and have them bought and they did

11   that.  And it is absolutely remarkable how close he is

12   to that.  If that doesn't convince you, I don't know

13   what else will.  In split seconds, he found a picture

14   of his killer that he was able to relate to and it

15   could be anybody, any of a hundred people in the

16   world, a thousand or million but look how close he got

17   to him.  And all those other people that could

18   possibly, not possibly, were not in Greenrich Building

19   that night and didn't see the shooting.  Mr. Copeland

20   knows what he saw and he related, as best he could,

21   and I think it is very remarkable how close he came.

22             When you do, as Copeland says, put the

23   glasses on and put a mustache on this particular thing

24   and give him a full head of hair, who is it?

25   Reinaldo Dennes.

```
 1              Ladies and gentlemen of the jury, the

 2    State does not stop with that.  We want to bring you

 3    everything we possibly can and we can get admitted in

 4    court.  You get to the second scene and Lois Gibson

 5    you saw her reproduce.

 6              We brought you Estrella Martinez.  This

 7    document the Judge has given in the charge is an

 8    accomplice so her testimony hs to be corroborated but

 9    Estrella you an entire case.  She led you, came to be,

10    and nobody knew until Estrella came forward, after she

11    had been in jail for a couple of months, and after

12    fear of this defendant caused her to go to her lawyer

13    and have her lawyer come to the State of Texas and

14    said, "I want to tell you what happened to myself and

15    my child.  I want to tell you what happened."

16              And she came in here, and she told you

17    what happened.  And because of what she told you, you

18    have all these phone records.  And you can see exactly

19    what she told you has proven out to be true.  She came

20    in and told you how that Reinaldo recruited her.  And

21    he came to her in November, December, begun to romance

22    her.  She is a single mother.  He is a nice-looking

23    man, married man, but he is still nice-looking because

24    he said he will divorce his wife and wants to be with

25    her and take care of her and her child.
```

1           And she has a five dollar an hour maid

2     job.  It's rough going for her.  She loved to be

3     married to a man who would do what he said he was

4     going to do:  Take care of her.  He wasn't going to

5     take care of her.  He intended to use her and he used

6     her.  He used her for his own personal satisfaction

7     and used her for the greed that is inside, that is, to

8     get her to help him get in the building.

9           You heard about all the security

10    precautions, and you heard about  it's not easy.

11    There is only one way to get in the building without

12    being seen and through that loading dock door into the

13    back and up the stairwell.  And you are in and nobody

14    sees you unless you get picked up on the camera.

15          You wonder what Copeland sees on the

16    camera.  He sees people.  He's new in the building.

17    If he had seen two guys in suits but the defendant and

18    his brother Alberto, walking with a briefcase, it

19    wouldn't attracted attention because the people in the

20    building wear suits, like other businessmen, and he

21    wouldn't have known them because they hadn't been in

22    the building the entire time he had been there.  No

23    way.  Estrella said they weren't around the building

24    those three days prior to the incident.  But he's up

25    on the floor but he still thinks that he has got to

1    get the videotape so they go to the seventh floor and

2    do their deed.  And we will talk about that more.

3            But you know the plan is she distracts

4    Copeland and let's him in the back door.  And she gets

5    the phone call on the cell phone that the defendant

6    had just gotten two days before, on that Monday,

7    January 22nd.  This is the cell phone Estrella

8    Martinez used, this cell phone and to their apartment.

9    And you know it's the cell phone she used.

10            She told you the cell phone I had, the

11    first call I ever made with it after we got it and

12    playing around with it, I called my friend Sonya, who

13    is married to Cepada, and there it is.  The cell phone

14    goes into operation for Monday, January 22nd.  She

15    makes a phone call.  And I kept this phone and I kept

16    this telephone all the way to Thursday, the 25th of

17    January.  I used it to call Francisco Santos Rojas

18    about 2:30, and he met me and I gave it back to him

19    and he gave me $5000.  It's the phone that was used by

20    her that day.

21            But in addition, the plan was she was

22    suppose to be distracting.  She was suppose to be the

23    one that got the security guard away from his desk so

24    that the defendant could get those tapes he wanted so

25    badly.  She did it.  She did it once.  And Copeland

1   left the floor a number of times, looking for the head

2   of the security, so she is not watching one time.  "I

3   left to go up to the fifth floor to get some keys for

4   cleaning ladies, get keys that she locked in the

5   office."

6          And Estrella told you that this was first

7   a ruse, the first time she got him distracted.  And

8   she thought it was all over.  Then she gets another

9   phone call and that other phone call -- and I don't

10  have time and I know you don't want me to go through

11  every one of these phone calls, day by day, but she

12  got the other phone call.

13          THE COURT:  Five minutes.

14          MR. SMYTH:  She had to go back to the

15  security guard and distract him again.  Why fif she do

16  it?   She argued she didn't want to do it but the

17  defendant told her, "You don't distract him, I am

18  going to have to shoot him.  If you don't distract, I

19  am going to have to shoot him."

20          And here it is.  You can look at these

21  records and see how, in two days, a series of phone

22  calls, including phone calls to Johnny's office at

23  713-784-1196 the next night.  And the deal is called

24  off and Johnny can't be called. Look at January 24th.

25  This is like Estrella told you.

1              You get down to the phone call that she

2       gets from Reinaldo Dennes at 8:33, 6:33, just like she

3       said, between 6:00 and 6:30.  She missed it by three

4       minutes.  Ray calls Estrella and gets in the back door

5       and she says about 30 minutes later called again.  And

6       this is at 9:22.  He calls her again at 20-some

7       minutes.  And she does the first round of locking the

8       keys up.

9              And then you get the final one down here,

10      30 minutes after that approximately, she is called.

11      There was a call back between them where she has to go

12      distract the guard again and leave that phone line

13      open for ten minutes.  That certainly corroborates

14      everything she told us.

15             One last thing I want to talk about before

16      I sit down is the evidence that the State presented

17      regarding the bullets.  This evidence will be phew

18      phew as nothing but I think it's pretty good evidence.

19      You decide for yourself.

20             You remember Robert Baldwin, what is the

21      battle of the experts.  Robert Baldwin told you that

22      he was able to match these things.  Their expert said

23      it couldn't be done.  We will talk about that in a

24      minute.  Baldwin was able to match the bullets, no

25      question that the cartridges all came from the same

1    gun.  Both experts agree on that.  Baldwin was able to

2    match bullets off of the shooting scene and matched

3    the security guard Copeland with the bullets that came

4    out of Johnny's body with the bullet that came out of

5    Reinaldo Dennes' office.  Pretty good evidence.  He

6    matched it and he told you how he did it.

7            Everything he did suggested that might

8    have been improper on his part, such as a minimum

9    number of identifiers that you have to have or didn't

10   photograph your bullets.  You know, that's not the way

11   it is done, and I think it is telling.  And you decide

12   for yourself what you want to believe about Richard

13   Ernest.  You decide for Ernest whether or not you

14   believe Richard Ernest, a guy who comes down from

15   Tarrant County and takes time off from the medical

16   examiner's to come and testify in this case.

17           He tells you that he went there and he was

18   in that office for a grand total of two hours or less

19   to identify.  He had nine bullets or bullet fragments

20   and four cartridges.  And he compared everything with

21   each other, and he compared all the bullets with each

22   other all in less than two hours and hit the door,

23   greeting and glad handing.  He sat down and examined

24   each one and made his finding and he made his notes

25   all at the same time.

1        And he got up there and on the stand and

2   was saying, "I cannot match these bullets to each

3   other but I can't eliminate them."

4        What he has told you, "I cannot match

5   them.  I wouldn't give you an opinion that they are

6   matches.  These bullets will all match, but I'm not

7   going to say that they weren't fired from the same

8   gun."

9        He wasn't going to go that far on that.

10  And we talked about that.

11       And there's a couple of things to me that

12  leads me to question his sincerity in his testimony

13  that is a souvenir bullet.  Where did you first hear

14  that?  We haven't talked about a souvenir.  Mr. Odom,

15  where did you first hear this word "souvenir" and

16  Wendell Odom that he was talking to Dr. Brown and did

17  you find a souvenir bullet that indicated that Johnny

18  had been shot on another occasion.  And Dr. Brown said

19  no and he didn't.

20            THE COURT:  One minute.

21            MR. SMYTH:  The bullet that Mr. Ernest was

22  requested to examine and theorize, that theory that it

23  might have come from the bullet that passed through

24  the body.  He jumped at that conclusion.

25            The second thing that interests me about

1    his testimony is what je told you about his bullets
2    showed but I don't remember if I recall exactly.  He
3    had on his notes he wrote, "no match here, no match
4    here," and I think no match here with regard to EB
5    one, two, and five but conspicuously absent from his
6    notes was any reference about whether six, seven, and
7    nine could be matched.  It wasn't in his notes.
8            Now, don't you know if six, seven, and
9    nine could not be matched, there would have been those
10   same kind of notations.  But he wants you to believe
11   that it so obliterated the lands and grooves, the
12   impressions are so obliterated, that it's not possible
13   to match.
14           Ladies and gentlemen, I would judge that
15   testimony very skeptical, if a man that did all this
16   examination in under two hours, and that's including
17   glad handing and greeting everybody and how much time
18   did he really spend looking at that evidence.
19           Ladies and gentlemen, my time is up and I
20   don't want to take time away from Mr. Vinson.  I am
21   going to sit down and defense counsel will have a
22   chance to talk to you and tell you their
23   interpretation of the evidence.  Again, I want to
24   thank you for your patience and thank you for the
25   attention you have given us now.  Thank you on behalf

1    of Nicole Scuzs.

2                THE COURT:  Mr. Odom.

3                MR. ODOM:  Ladies and gentlemen, I, too,

4    want to thank you.  This has been a long and hard

5    case, at least it has for me.  You have to bear with

6    me.  I know you have heard from me for almost two

7    weeks now plus you also were subjected to me asking

8    you questions on voir dire.  And from my end of me,

9    there's only one of me, so you are tired of hearing me

10   speak.  You don't get any break.  It is just me on

11   this end of it.

12               And I have to be quite candid with you and

13   tell you closing arguments are not my forte, so I

14   probably will not be as eloquent as Mr. Vinson or Mr.

15   Smyth.  That is, however, not to say what I have to

16   say is any less important or that the points that I

17   raise that I am going to talk to you about are not

18   significant.

19               If I have done something that offends you

20   through this trial -- and I say this with all

21   sincerity -- hold that against me.  It is a very

22   difficult job to sit here by myself and opposite the

23   State, although I do have little Lee.  She has

24   certainly been here with me, to try to think of all of

25   the issues that are constantly being thrown at me at

1    the same time.

2              And if I made an objection that you all

3    thought was improper or I attacked a witness you felt

4    was done away that you felt was inappropriate, then,

5    by all means, tell me about it after this case is

6    over.  Talk to me about it in person.  But whatever

7    you do, don't hold it against my client for something

8    that I may have done that you noticed.

9              I told most of you in voir dire that this

10   is an adversary proceeding, and if you haven't seen

11   anything, you have seen that.  This is an adversary

12   proceeding and you saw a good adversary proceeding,

13   too, and these guys were good.  And they have a theory

14   of their case and they are going to push their theory

15   of their case.  And I told you, up front, on voir dire

16   that I did, too, have a theory of the case and I am

17   going to push it strong and I am going to push it

18   hard.  And I'm not going to stretch your credibility

19   or ask you to believe things that can't be believed.

20             My theory of my case from the very

21   beginning of this and right now and still my theory of

22   the case is this:  You know, they may have presented

23   some evidence about some type of conspiracy, and they

24   may have talked to you.  And if you believe Mr.

25   Copeland beyond a reasonable doubt and Miss Scarlett

1    (sic) beyond a reasonable doubt, you have got some

2    evidence before you of Mr. Copeland, David Copeland,

3    and we talked about that.

4              But what they haven't presented to you is

5    what they charged this man with.  They charged the man

6    not with shooting David Copeland. You don't have an

7    indictment in front of you as far as shooting David

8    Copeland.  What they charged the man with is having

9    murdered Janos Szucs, the complaining witness.  And,

10   ladies and gentlemen, where is the evidence that

11   proves to you beyond a reasonable doubt that Ray

12   Dennes was up on the seventh floor and that he shot

13   Janos Szucs to death?  It's not there.  And that's my

14   theory, and that's what I have contended all along.

15             Now, ladies and gentlemen, the State wants

16   to kind of broaden that by saying maybe, maybe someone

17   else did it.  Maybe Jose Albert Dennes did it or maybe

18   someone else was let in that door did it; however,

19   they have to prove to you beyond a reasonable doubt

20   that Ray Dennes was part of the murder, not the

21   robbery, not that he was part of getting the video

22   machine from the first floor or that if he was part of

23   shooting anyone else.  They have to prove to you

24   beyond a reasonable doubt that Ray Dennes murdered

25   Janos Szucs or that he didn't, that he was so aiding

1    and so abetting -- that he wasn't aiding and abetting

2    in a robbery -- that he was aiding and abetting in the

3    murder of Janos Szucs.

4            Now, that's been up front all along, and

5    although you may think it's hard for me or it's hard

6    for you to think that, well, here I am questioning

7    lineup techniques, here I am questioning bullet

8    techniques but when you think about everything I have

9    done and everything I have done has been aimed in that

10   one category, in that one point, and, that is, do you

11   know beyond a reasonable doubt what happened on the

12   seventh floor?

13           Of course, you don't.  I don't know what

14   happened up there on the seventh floor, and I know

15   that the State doesn't know what happened up there on

16   the seventh floor.

17           When you go back and look at the law in

18   the charge the Judge gives, you look at the

19   indictment.  And you look real hard at that

20   indictment.  And, ladies and gentlemen, if this man

21   were found not guilty today, this is nothing, nothing

22   that would keep the State from prosecuting that man

23   for the attempted murder of David Copeland.  But

24   that's not what he is charged with.

25           The Judge charges you that before you

1    could find someone guilty, you have to have more than

2    what the State has or what the defense has.  You have

3    to have more than a theory.  It's easy for us to get

4    up here and tell you, hey, there is my theory of the

5    case.  Hey, this is what I think the evidence shows.

6    It's easy for the State to get up.  It's pretty hard

7    but we can say that.

8            We are not bound to the same standard the

9    Judge tells you they are bound to.  And it's the same

10   standard we talked about in voir dire, when I talked

11   to you, and it's the same standard that each and every

12   one of you promised -- you promised -- me you could

13   follow as a matter of law.  And that is "reasonable

14   doubt is a doubt based on reason and common sense

15   after an impartial consideration of all the evidence

16   in the case.  It's the kind of doubt that would make a

17   reasonable person hesitate to act in the most

18   important of his own affairs," or to put it in another

19   way, "proof beyond a reasonable doubt, therefore, must

20   be proof of such a convincing character that you would

21   be willing to rely and act upon it without hesitation

22   in the most important of your own affairs."  And the

23   doubt doesn't go to the extraneous offense.  The doubt

24   goes to what the charge is and that is capital murder.

25           Let me talk generally about what I believe

1    the key issues in this case are.  The State puts the

2    whole case on the following:  Tony makes two

3    silencers.  You haven't got the silencer.  Notice how

4    they try to slide and say the one silencer and the

5    evidence before you is Tony makes two silencers.  And

6    I will talk in more detail about that issue.

7              There was a bullet found in the

8    defendant's office, a bullet found in Ray Dennes's

9    office.  Number three, the casings that are found in

10   the lobby matched the casings that are found out on

11   the site that Tony Ramirez takes the police to.

12             Number four, Estrella says that she gets

13   paid to let -- originally she says to let Ray and

14   Albert into the building and let some other guy in.

15   They are going to let some other people, some bad

16   guys, in the building. That's the next issue they

17   have.  Estrella is paid to let them into the building.

18   Five, a silencer is used both on the guard and on

19   Janos Szucs.

20             Six, we have cellular phones -- and I'll

21   go in great detail on that -- but we have some

22   cellular phone records that are used. Seven, the

23   defendant, Mr. Dennes, leaves for Florida; and, eight,

24   the defendant, Mr. Dennes, knows Janos Szucs.  That's

25   the key issues in their case.

1           Now, let me tell you the key issues in the

2      defense before I go into the details of the various

3      witnesses.  Number one, once the State had a theory,

4      then everything that they did was geared, gathered and

5      calculated towards that theory.  Once it is that Mr.

6      Ramirez told the police -- and you know how he came to

7      the police, asking for a reward under a unanimous name

8      -- once he talks to the police, then everything that

9      the police has done up to that point is sort of

10     dropped and everything starts to go in a different

11     direction.  What do I mean by that?

12          You heard from Sergeant Waltman.  You

13     heard from Officer Halling, and you heard from one of

14     the other officers about various investigations that

15     were on going.  You even heard that there was a

16     tentative ID by the fellow named James Bogattas.  We

17     sort of close that investigation but you didn't hear

18     anything about that investigation.

19          Now, why is it that the State has to prove

20     their case beyond a reasonable doubt?  There's a lot

21     of reasons but one of them is this.  I'm not a police

22     officer.  I'm an officer of the court but I'm not a

23     police officer.  I can sometimes subpoena people here

24     to court but I can't investigate a case like the

25     police department can.  I can't have sketch artists on

1    call that can recreate and can take a photograph and

2    turn it into another photograph.  I can't do that.

3    The State can.  The State has the resources and the

4    investigative manpower to do things that I can't do.

5    But the investigation that was going and aimed towards

6    the people that tentatively ID that we know are

7    involved in this type of activity that we know were in

8    the general area at that time; by that, the Harris

9    County area, during January, we know that those type

10   of investigations we don't hear any more from them.

11         The State's theory changes completely from

12   whatever they were investigating to focus solely upon

13   Ray Dennes, and, ladies and gentlemen, this is the

14   type of thing that years from now people come around

15   and say what happened on that case.  You know, there

16   may be new evidence or there may not be new evidence.

17         You find someone guilty beyond a

18   reasonable doubt because this cannot be a slipshod

19   conclusion on your part.  This cannot be one of those

20   cases that, after the fact, we say, "Hey, we may have

21   gotten the wrong person."  That question has to stop

22   here.  All of those questions about whether it's the

23   wrong person or the right person has to stop here.

24   You are the ones that have to resolve that.

25         Why I do I say they support this theory of

1    the case to exclude all other theories?  Well, I'll

2    tell you that some of the evidence shows that you had

3    State's Exhibit on the lineup.  And you had a photo

4    spread on the lineup and I believe it was 33 and 34.

5    And State's Exhibit 33 and 34 you have this spread

6    and, on number five here, Mr. Copeland IDs a person

7    that we now know as a James Bogottus and we know now

8    is involved in the armed robbery of jewelry dealers.

9    And suddenly that identification goes from a tentative

10   ID to a no ID.

11          And what did you hear from Mr.

12   McCullough?  Suddenly Mr. Copeland goes from a no ID

13   to a tentative ID and that's a very subtle thing.  And

14   I'm not saying this is overt or outright or malicious

15   intent on anybody's part but I am saying this:  In our

16   society, to prove our case, subtle distinctions are

17   made and investigations on one area get started real

18   hard on another area.

19          And you heard Ellis McCullough's

20   testimony.  "Look, I didn't keep, I do mean one

21   thing.  I sure thought it peculiar that what I heard

22   was no identification."  This is the one that he is

23   the same height and the same weight, suddenly turns

24   into a tentative identification.  And, then, that

25   tentative identification, by time we get to the

1    courtroom, is no longer a tentative identification.

2    Then Mr. Copeland knows that is the person that shot

3    him.  The first time he knows it is when the person is

4    charged with capital murder and sitting at defense

5    table.  He doesn't know it at the lineup.  Those are

6    subtle things that support a theory of the case.  They

7    may be subtle at the start but they are mischievous

8    and it's you, as a jury, have to view and view it in

9    light of beyond a reasonable doubt.

10              Mr. Ramirez:  Mr. Ramirez says he's not

11   guilty of anything; therefore, the State is never

12   going to charge Mr. Ramirez of anything.  Ladies and

13   gentlemen, when is it that someone confesses that they

14   make a silencer, whether there is physical evidence

15   that a silencer may be used, that the State says they

16   can't prosecute the persons because they can't find a

17   silencer?  Remember when Rosenthal was saying that?

18   We can't prosecute him.  There wasn't a silencer.

19              Does that mean we can't prosecute Ray

20   Dennes because we didn't find a gun?

21              What kind of craziness is that?

22              Tony Ramirez gets a free witness.  And

23   Tony Ramirez, even though people were telling him it

24   is illegal, the people were saying at the shop what

25   you are doing is illegal.  I had questions about it is

1    the way he puts.

2            Tony Ramirez builds two silencers and

3    here, according to the restaurant conversation, we

4    hear this the first time on the witness stand, they

5    talk about going in and shooting somebody.  And, at

6    first, I thought he said, well, I went to Ecuador.

7    After hearing that, upon cross examination, do you

8    remember what he said?   "I was going to Ecuador

9    anyway.  I already bought my tickets and was already

10   to go."

11           He was so afraid and I believe that really

12   goes on and he calls Ray Dennes three times from

13   Ecuador, twice at the office and once at his home

14   because he has got some watches and he wants to bring

15   his watches.  And he wanted to do business with

16   Reinaldo Dennes.  That is completely inconsistent with

17   any theory that Reinaldo Dennes tells him, hey, let's

18   go shoot somebody and steals a million dollars worth

19   of diamonds and he's so afraid he flees to Ecuador?

20   It's inconsistent.

21           We heard from Estrella Martinez, says,

22   well, I'm told originally that Ray Dennes wants to

23   gets into that building because he needs to get a

24   video and then some of the earlier tapes.  And on

25   cross, she finally says, "Yeah, he was going to let

1    some bad guys in." But we don't hear anything about
2    cellular phones until after Estrella Martinez has
3    already been debriefed twice but she is in jail.
4    She's not with her child and, then, when we start to
5    corroborate, what they called corroboration -- and
6    I'll talk about that corroboration in a minute -- but
7    how much corroboration do we really have?
8            You have been told that there is a phone
9    call to a fellow by the name of Cepada. Did you see
10   any proof that there was a phone call to the guy
11   Cepada?  We had been told that phone call to the
12   Roadway Place.  Do you see any proof of that phone
13   call made to Roadway Inc.
14           You were told that the latent print
15   examinations were put all over the cellular phone and
16   whose print did we ever come up with:  Albert Dennes.
17   It is only corroboration if you believe Estrella's
18   story.  The last time she told you, the last time she
19   tells you, not the first, not the second and not the
20   third, but the last time when her child is kept from
21   her because she is in custody.
22           The sketch manipulation, this is
23   wonderful.  It's so wonderful that when I ask Ms.
24   Gibson, "Why didn't we do one of those Albert
25   Dennes?"  Well, it wouldn't alike.  Why didn't we do

1    one of James Boggotus?  Well, it wouldn't what.

2              Ladies and gentlemen, I would like you to

3    look at this man.  If you gave me these glasses, a

4    mustache and that kind of hair, I would look like him.

5    But they wouldn't make that demonstration for you even

6    after we pointed it out in cross examination.  Yeah,

7    it looks just like him if you give him different

8    features.  I would look like him, too, if you gave me

9    different features.  That's not evidence of

10   identification beyond a reasonable doubt.

11             The bullets, Mr. Smyth makes a great deal

12   of the bullet issue by talking about Richard Ernest

13   spending a certain amount of time in the police

14   department.  Now, what's the importance of the

15   bullets?

16             Here's the importance of the bullets.  The

17   bullets is the only evidence that exists that ties

18   anyone up to Janos Szucs, EB five, six, and seven.

19   That's the only evidence we have.  They put on Robert

20   Baldwin and they make it that fiat complete.  That's

21   it.  There is no question about it.  These bullets

22   match.  There's no room for a second thought.  There's

23   no thought for another opinion.  The bullets match.

24             So what do we do?  I can't hire Robert

25   Baldwin.  He's on the case.  The Harris County people

1    are on the case in Harris County, so I do the same

2    thing that would happen if the case was in Fort Worth.

3    I have to go to the next examiner.  If it's in Fort

4    Worth, I have to get Robert Baldwin and bring him up,

5    and if I did, the State proving their theory of their

6    case, well, they bring in someone from Harris County.

7               And you know what?  He spends two hours,

8    even though they haven't told you how long Robert

9    Baldwin spent with them either.  And you know what he

10   says?  He says, "Well, they don't match," but his

11   notes are all that exact.  Remember the fact that

12   Robert Baldwin had one and a half pages of notes.

13   That doesn't mean that Robert Baldwin's opinion is any

14   different.  That doesn't mean that Richard Earnst's is

15   any different.

16              But something interesting came in in

17   Robert Baldwin's cross examination.  You know what he

18   didn't know?  Remember what he didn't know, that he

19   was surprised to learn, "You mean that the bullet went

20   through the steel wool?"  "Well, yes."

21              His theory was I can look in the grooves

22   and all due respect to Robert Baldwin, he's an

23   excellent bullet examiner.  You can see where he would

24   make this mistake.  You got a bullet that has gone

25   through the silencer and scared up from the silencer

1    and he has got a bullet, .9 mm, and got a bullet that

2    is from the same manufacturer, that is, the gun that

3    was used was the same manufactured gun.  It would be

4    very easy to jump to the conclusion, well, they match.

5     They both were fired through a silencer, not only a

6     .9mm and they are both one of those eight or nine

7    Beretta-type millimeter firearms.

8              But what you don't have is you don't have

9    his knowledge of silencers that Richard Ernest has.

10   You hear what Richard says, yeah, I have done lots of

11   experience with.  Remember how Mr. Smyth, "I tried to

12   tell you, look, all the steel wool is gone."  Do you

13   remember what his response was?  Well, I don't know,

14   Mr. Smyth, I have shot them six or seven times through

15   there and it didn't change them.

16             The point is this:  Richard Ernest could

17   not match them.  And the big issue about, well, he

18   couldn't say they didn't match either.  Of course, he

19   can't say they didn't match.  If he can't match them,

20   then he can't say they didn't come from the firearm.

21   For the very same reason, the same surface is scared.

22   If you can't do one, you obviously can't do the other.

23   That's not a halfway saying in that regard.

24             The souvenir, I think Mr. Smyth missed the

25   issue on the souvenir.  Did you ever hear Richard

1    Earnst say he never told me about the souvenir?   The

2    point was he never gave an opinion that it was a

3    souvenir bullet.  He asked me what I think the

4    evidence.  He asked me what about this oxidated

5    bullet, and he came up here in the morning to look at

6    that bullet again and to determine why is this lead

7    core so different from the other lead cores.  He never

8    gave an opinion that it was a souvenir bullet, but he

9    did give an opinion that this is something a lot

10   different from that lead core than the other fragments

11   of lead core that were found down in the lobby.  And

12   that's the issue in regards to Richard Ernest.

13        Ladies and gentlemen, the seventh issue

14   that the State has is that there never were diamonds

15   found and there was never a gun found.  Now, the State

16   will always say, well, they got away.

17        But the truth of the matter is, ladies and

18   gentlemen, despite the State having proved their

19   theory of the case would ask questions, did you check

20   Santo Domingo, did you check Tahiti, did you check

21   Bali, did you check anywhere else in the world in

22   their zeal to prove the case?

23        Did you hear any evidence, any evidence at

24   all, that Ray Dennes went anywhere other than

25   Florida?  Well, yeah, you did.  You heard in order to

1    get to Florida you had to go through Louisiana, and I

2    think we got some evidence that he was in Pensacola,

3    Florida.  But don't let the lawyer ever -- and next,

4    well, did you check Santo Domingo, being mistaken for

5    any evidence anywhere in this case that you hadn't

6    seen or haven't heard from.  The evidence is what you

7    heard.

8         The State has to prove that the person

9    went in and murdered Janos Szucs knew Janos Szucs.  So

10   what they do is they establish a very natural act and

11   make it look like it's an unnatural act.  They, on one

12   hand, establish the fact that Ray Dennes is doing work

13   for the complainant.  They establish the fact that Ray

14   Dennes who would call the complainant's office and

15   then they say Louisiana.  There is your proof.  That's

16   it.

17        Ladies and gentlemen, that is just a

18   theory of the case and that's not proof beyond a

19   reasonable doubt.  If it were, then everybody would

20   call that man the four days proceeding this offense.

21   You could say the same to everybody.  If that were the

22   case, everybody who has ever worked for Janos Szucs or

23   did business with him those four days proceeding this

24   offense.  Obviously, there would be corroboration or

25   they could be guilty of the offense.

1           No, you can't take a natural act, like a

2    phone call, or the fact that he is doing business with

3    Janos Szucs and say that convinces you beyond a

4    reasonable doubt that Reinaldo Dennes killed Janos

5    Szucs.

6           Estrella Martinez -- Estrella Martinez,

7    you kind of get her to go both ways.  Number one, if

8    you believe her testimony, if you believe her

9    testimony, then listen to this.  Ray tells me he is

10   going to come, into the building.  And he wants to get

11   some videotapes.  Ray tells me that there are some bad

12   guys that are coming into the building.  Ray tells me

13   I am suppose to distract the guard so I distract.  Ray

14   tells me again I got to distract the guard again.  So

15   what do I do:  I go up and get the guard and we go

16   down together and we go to the deli.  Do you remember?

17   That's not what Mr. Copeland says but that's what

18   Estrella Martinez says, if you believe her.

19          Then Estrella, one of the most remarkable

20   things that has ever been heard and, that is, "I see

21   Ray Dennes walk down that hallway and I see his

22   mustache and I see him but I really don't see him."

23   Maybe it was the interpreter but I see him but here I

24   can recognize him from his walk.  And I go to the

25   bathroom.  He shoots Mr. Copeland twice, shoots him

1    down.  I then get money from the man.  He returns from

2    Florida and what do I do?  I go and sleep with him and

3    talk about how, "What a great deal.  You have got to

4    disguise yourself better."

5              Then, when I get arrested and when that

6    man gets arrested and is put in custody, I'm afraid of

7    him.  I become afraid of him.  Boy, what kind of sense

8    does that make?

9              According to her testimony, she sees him

10   gun down a man almost but she is not afraid of him.

11   She only becomes afraid of him when she is afraid for

12   her child.  And, ladies and gentlemen, what she is

13   afraid of is not Ray Dennes but what she is afraid of

14   is the State, because the State can keep her away from

15   the child, so what does she do.  She cops a deal.  The

16   deal is that she goes scot free.  And don't buy any of

17   their stuff she is on the probation because she is not

18   on probation.  Through a piece of paper, she is on

19   probation but where is she?  She is being deported

20   back to Mexico.  She gets a free ride.

21             No wonder the telephone records, for the

22   first time, corroborate her story because, for the

23   first time, she has a real reason, a real reason, to

24   make those telephone records to corroborate her

25   story.  And there is no corroboration that any of

1    these phone calls that are supposedly to her friends

2    or her other boyfriends or to Cepada, that guy, that

3    any of that is someone that we know of.  There is no

4    evidence before you in that regard.  It doesn't exist.

5         The only corroboration you have to

6    Estrella Martinez' phone records that Estrella gets to

7    go back to Mexico with her son and gets to walk away

8    from this whole thing.

9         And the only two pieces evidence that you

10   have that says that Ray Dennes was up on the seventh

11   floor; one, Tony Ramirez suddenly says, oh, by the

12   way, Alberto was going to shoot somebody and Ray was

13   going to get the video after the fact and Estrella

14   Martinez was saying we have got these phone calls and

15   I let them in the back door.  I let them in a door

16   that was already open.  I let them in the door where

17   they were not mustached.  There was no disguise.  And

18   then I am supposed to distract the security guard.

19   Why are they distracting the security guard?  Why does

20   her story say Ray said call and distract a security

21   guard the first time?  There is no need to distract

22   the security guard the first time.

23        Now, why that testimony is there is

24   because the phone record said there was a phone call,

25   not because there was a distraction, that was an

1   unnecessary distraction of the security guard.  The

2   only time there needed to be a distraction of the

3   security guard when they were going to get a video

4   and, ladies and gentlemen, what was Mr. Copeland's

5   testimony?

6            I go down from the fifth floor.  I am

7   going to go check on the deli.  I'm not going to open

8   a door for anyone.  I am checking on the deli because

9   why?  Because sometimes plenty of people go in there

10  and eat all the food up and I go down by myself and

11  there is someone working under the security booth.

12  Someone is already there.  He goes out of the elevator

13  and goes into the deli.  Then he doesn't see Estrella

14  Martinez there at the door.  There is no conversation

15  between Giovani when she is there and left the phone

16  on for ten minutes.  Now why that is there because

17  there is a phone record of a ten-minute phone

18  conversation.  That's why you hear that story because

19  Estrella Martinez has got to tell them a story that

20  will let her go back to Mexico.  She tells them I

21  leave the phone on for ten minutes.

22           Is it beyond possibility that there might

23  have been a conversation between two people going on

24  there for ten minutes and that maybe Estrella Martinez

25  wasn't in on that loop?  You got a ten-minute

1    conversation that wasn't a conversation because she

2    has got to have a ten-minute conversation.

3              Ladies and gentlemen, this is one of the

4    most unusual situations that I think you are ever

5    going to get as a juror.  You may have something in

6    front of you but it may be the wrong stuff.  That's

7    what it comes down to.  I have to look at this

8    evidence in light of the way the State charged it.

9    Think about that.  You have to look at this evidence

10   in regards to what they have charged as far as what

11   occurred and what the evidence you see.  I didn't make

12   that charge.  I didn't make it happen that way, and

13   you didn't make it happen that way.  But what you have

14   to do is you have to base your verdict according to

15   the law and the evidence and the charge as you see it.

16             Now, if your evidence shows that Ray

17   Dennes in your mind shot Mr. Copeland, the Judge tells

18   you that you can view an extraneous offense, that is,

19   as an extraneous offense.  But if the evidence

20   presented before you does not show that Ray Dennes

21   shot Janos Szucs, you can't find him guilty of

22   shooting Janos Szucs.  You can't do it.  That's not my

23   doing.  That's not the Judge's doing.  You just can't

24   do it.

25             Every one of you said you could follow the

```
 1    law.  And everyone of you are now put into a very

 2    tough situation and that is of following the law.

 3    When you make your decision as to whether this

 4    evidence fits this charge and when you make that

 5    decision, you are not supposed to try to decide, well,

 6    if we do this, does that mean nothing else is going to

 7    happen.  I think it's safe to say that we all know

 8    something would but that's not supposed to go into

 9    your deliberations.

10              What you are suppose to deliberate is

11    whether the charge they have given you and the

12    evidence they have given you match.  It ain't enough

13    for Ray Dennes to be involved in something but they

14    have got to prove to you beyond a reasonable doubt,

15    beyond a reasonable doubt, for Houston's sake, that he

16    was guilty of capital murder.  That there is no

17    greater offense.

18              Well, man, here I am standing up here,

19    telling you something that everybody hears and we get

20    lip service to but so seldom it gets put into actual

21    practice like it's being put into practice now. We

22    didn't make up these terms "beyond a reasonable

23    doubt."  This isn't an accident.

24              For hundreds of years, we have been using

25    our criminal system to say that someone is not going
```

1    to be guilty until they are found guilty beyond a

2    reasonable doubt, especially on a case where you are

3    talking about life and death.  For hundreds of years,

4    we have been doing that.  For hundreds of years, there

5    have been other cases.  And for hundreds of years,

6    there have been criminal charges.  And for hundreds of

7    years, we know that you don't go around assuming

8    anybody into the penitentiary much less even more.  We

9    have known for hundreds of years that you don't decide

10   that someone may have done something or that someone

11   could have done something.  You have to know that they

12   did something beyond a reasonable doubt.

13          And, ladies and gentlemen, I'm scared to

14   death.  I may not look it.  I have actually done this

15   before, and I am telling you I'm scared to death

16   because of the choice, the rough choice, that you all

17   have to make.  And, ladies and gentlemen, I didn't

18   create that choice for you.

19          You look at the evidence.  You follow the

20   Judge's charge and I will rely upon what you told me,

21   each and everyone of you, when I talked to you in voir

22   dire.  It's my belief that if you do that, the verdict

23   will not be a guilty and that will be a very difficult

24   thing to do.

25          THE COURT:  Thank you, Mr. Odom.

1        Mr. Vinson.

2        MR. VINSON:  May it please the Court,

3   ladies and gentlemen of the jury, Mr. Defense

4   counsel:  When we talked to you on voir dire several

5   weeks ago, we told you that at some point in time in

6   trial 12 of you would end up in the jury box.  And we

7   made you aware then that there would be no pity shown

8   because nowhere in your oath is there anything about

9   pity or sympathy or scared.  Yours is to return a true

10  verdict based on the law and the evidence that we gave

11  to you in this courtroom and that's all you are

12  charged with.

13       And you took that oath, and I believe you

14  are going to do that and I believe that Mr. Odom

15  sometimes -- I agree with Mr. Odom, sometimes it's

16  hard to do the right thing but the right thing is a

17  guilty verdict.

18       In response to Mr. Odom's argument that he

19  didn't make this charge, he didn't have anything to

20  do, I agree with him.  The person that did it is

21  sitting in this courtroom right here, wearing the

22  green jacket.  I don't know why and we don't know

23  where, you, as a jury, don't know when, you know, he

24  thought of this quick way to wealth instead of

25  working, like most of us do every day.  I don't know.

1    But really it doesn't concern you.

2              But I do know this.  He made some mistakes

3    and I don't know if Mr. Odom might have been in the

4    same courtroom, listening to the same evidence, but

5    here is a capital murder case.  We wanted to bring you

6    everything that we could possibly bring you, to show

7    you that your verdict of guilty would be a correct

8    verdict.  We brought you everything that was legal and

9    competent, and that's why we had Judge Wallace here.

10   He ruled on that.  And everything that was admitted

11   before you in this courtroom is legal and competent

12   evidence for your consideration.  We brought it here

13   to assist you.  So let's talk about some of this

14   evidence.

15             Start off with Mr. Copeland.  What did Mr.

16   Copeland testify to?  He came in and he identified the

17   defendant and said, "That's the man who shot me.

18   That's the man right there."  They made a big deal if

19   I put a mustache -- if I hadn't been, well, he didn't

20   have a mustache.  Well, we put one on him.  Even in

21   spite of that, Mr. Copeland said that's the man that

22   shot me.

23             And, ladies and gentlemen, there's

24   something about the man, it triggers when a man you

25   are that close to death.  You generally are not going

1    to forget the face of death and that's a face of death

2    facing this Court, this defendant seated in this

3    courtroom.  He tried to disguise himself and he did.

4    And he did.

5              What did Mr. Copeland tell you?  He said

6    that, of course, the defense is going to twist

7    everything and twist it and under cross examination,

8    they may convince me that this suit is not beige in

9    color; that it is, in fact, red.  What did he tell

10   you?

11             He said out of the six men here, the fifth

12   man is the closest one that looks similar.  He never

13   said this is the man.  He never said that.  And how

14   did this man come into play?  How did he come into

15   play?   I heard a lot of objection, a lot developed.

16   You know how it came in play because the police

17   department investigated him.  He was nowhere to be

18   found when this offense was committed.  But maybe we

19   should drag him down here.

20             MR. ODOM:  I believe that's a misstatement

21   of fact.

22             THE COURT:  Stay within the record.

23             MR. VINSON:  I am responding to his

24   argument.

25             MR. ODOM:  I ask for an instruction to

1    disregard.

2              MR. VINSON:  Your Honor, I am responding

3    about the Bogottus brothers.

4              THE COURT:  It's overruled.

5              MR. VINSON:  Maybe we should drag him

6    through and drag him until we determine after this,

7    lock him up, knowing he didn't have anything to do

8    with it, mistreat him and abuse him.

9              MR. ODOM:  Object, once again a

10   misstatement.  There is no fact in evidence to support

11   that.

12             THE COURT:  Excuse me.

13             Mr. Vinson, let me hear what the objection

14   is.  Again, both sides, if I start to respond, please

15   wait.

16             Now let me hear your objection.

17             MR. ODOM:  My objection is continuing to

18   put facts not in evidence before the jury and I

19   object.

20             THE COURT:  Stay within the evidence.

21             MR. VINSON:  I think it is final argument

22   and I can make suggestions.

23             MR. ODOM:  Excuse me.  Did I have a ruling

24   on my objection?

25             THE COURT:  Overruled.

1          MR. VINSON:  Maybe we should drag him in

2     here and hold him over there and in spite of what the

3     evidence dictates and in spite of whom the evidence

4     points to, this defendant, no one else but this

5     defendant and his brother and Francisco Rojas.

6          Now, he talks about wanting to put Tony

7     Martinez (sic), down Tony Martinez (sic).  Why?

8     Because Tony Martinez (sic) came back to the states

9     after this offense.

10         THE COURT:  Tony Ramirez.

11         MR. VINSON:  After this offense has been

12    committed and then he goes to the authorities and that

13    upsets him.  That upsets the defense.  He did not like

14    what Tony Ramirez had to say.  They can try to twist

15    that around.  Is there any disputed evidence from

16    anywhere that Tony Martinez made some kind of make

17    shift silencer and we don't even know if that thing

18    meets the criteria of federal law or state law, and we

19    don't know.  What is unique about that silencer is in

20    his expert witness who came in here.

21         His expert witness never seen the

22    silencer, didn't even know how it was designed, didn't

23    know how much steel wool.  Remember this was something

24    done without a lot of sophistication.  It was

25    something homemade by this defendant here and put into

1    use.  He never said.  But he could sit there and he

2    could tell Mr. Smyth, under cross examination, how the

3    bullets and the configurations on the fired projectile

4    would look under the microscope and yet he never had

5    exposure to the weapon nor the silencer that was used.

6    Isn't that unique?  Isn't that unique?

7            He never even had, never even saw it but

8    made a statement from this witness stand and gave

9    testimony, oh, I have fired plenty of them.  Never

10   inquired how much steel wool was in it and how many

11   washers was in it and whether was there anything fired

12   through steel wool and I tried to come up with steel

13   wool, what is being fired through steel wool.

14           If you remember the design, the design,

15   they had these washers in there.  They were packed

16   back to back.  You ever try to fire a weapon when the

17   chamber is blocked?  I could imagine what would have

18   happened to his hand.

19           MR. ODOM:  Object, that is unsworn

20   testimony that he has presented to the jury at this

21   point.

22           THE COURT:  Sustained.

23           MR. ODOM:  Ask jury to disregard.

24           THE COURT:  The jury will disregard the

25   last comment.

1            MR. ODOM:  Ask for a mistrial.

2            THE COURT:  Overruled.

3            MR. VINSON:  We do know that silencer was

4    modified and used on a .9 mm.  We do know that the

5    defendant told Ms. Martinez that if she did not

6    distract that guard, what was going to happen.  And we

7    do know that Ms. Martinez tried, or attempted to do

8    such, and we do know that she failed in her attempt.

9    And we do know that those tapes are missing and we do

10   know that Mr. Copeland was shot.  And we do know that

11   Mr. Copeland wasn't shot simply because of some hate.

12   We know that Mr. Copeland was shot in carrying out the

13   plan to rob who -- Johnny Szucs.

14            What is so important about some tapes that

15   you would walk into a building and shoot an unarmed

16   security guard, who you know is not armed, who you

17   know is not armed unless he is going to put you in

18   that building during the time the robbery is ongoing?

19            We don't know the sequence of the robbery.

20   We don't know if he went upstairs first and committed

21   the robbery and shot Johnny Szucs and then returned

22   downstairs, while his brother was up there, Albert,

23   putting the diamonds away, or we don't know if Albert,

24   did the shooting and then Reinaldo put the diamonds

25   away.  And we don't know the combination, and we don't

1    need to know any of that.  The law doesn't require

2    that.

3            I don't know what charge the defense was

4    reading but I will read that portion to you.  His

5    Honor has given you.  This is the law.  This one will

6    guide you through the storm and it says right here,

7    and this part, "You can find him guilty if he actually

8    committed the offense himself or if you find from the

9    evidence beyond a reasonable doubt that on or about

10   the 24th day of January, 1996," and I am going to ask

11   you do you have a reasonable doubt that this offense

12   was committed in January of 1996?  No, you do not.

13           Is there a reasonable doubt that the

14   person who was killed was Janos Szucs?  No, you do

15   not.

16           Do you have any doubt that he was shot

17   with a firearm, a deadly weapon?  No, you do not.

18           Do you have any doubt that at the time

19   that he was shot that he was being robbed?  No, you do

20   not.  His safe is empty.  All the cash on him is gone.

21   The only question you have is was this defendant

22   involved in any way.  Let's look at the charge again.

23           MR. ODOM:  Object to that, that

24   misstatement of law and "involved any in way."

25           MR. VINSON:  And I think the lawyer knows,

1      Your Honor.

2              THE COURT:  Overruled.

3              MR. VINSON:  And we go here, "if you find

4      from the evidence beyond a reasonable doubt that on or

5      about 24th day of January, 1996, in Harris County,

6      Texas, Jose Albert Dennes did then and there

7      unlawfully while in the course of committing or

8      attempting to commit the robbery Janos Szucs

9      intentionally cause the death of Janos Szucs by

10     shooting Janos Szucs with a weapon."

11             Any question about the intent that killed

12     Janos Szucs, the number of times he was shot and the

13     location and the manner, any question about that?  I

14     don't think you have any doubt in your mind,

15     absolutely not, based upon the evidence, ladies and

16     gentlemen.

17             We go further, and that the defendant,

18     Reinaldo Dennes, even if he was only down on the first

19     floor, trying to get the tapes in supporting and

20     assisting and encouraging, directing, aiding his

21     brother Albert to commit the offense, the law permits

22     you to find him guilty beyond a reasonable doubt, and

23     then you will not be violating your oaths as a juror.

24             It says right here, right here in front of

25     you, "that the defendant, Reinaldo Dennes, with the

1    intent to promote or assist the commission of the

2    offense, if any, solicited, encouraged, directed,

3    aided or attempted to aid Jose Albert Dennes, if he

4    did, then you will find the defendant guilty of

5    capital murder as charged in the indictment."

6              This is not Mark Vinson talking.  That is

7    the instruction you receive from the Judge that the

8    legislature has provided you.  And that's what we are

9    looking at, ladies and gentlemen.

10             Now, let's talk about some of the other

11   evidence.  The diamonds were never recovered.  You can

12   still find him guilty of capital murder.  The weapon

13   was never recovered.  The silencer wasn't recovered.

14   You can still find him guilty of capital murder.  And

15   don't think this is a cop-out, oh, if you find him not

16   guilty, we are going to prosecute him on the other

17   case.  That's not what you are charged with.  You are

18   charged with the case before you.  And I know you are

19   good and honest people and I know you are going to

20   look at this evidence and you are going to say to

21   yourself common sense will dictate and rule in this

22   case.  The day of foolishness is over.  When we

23   started it, it went out and decided he was going to

24   set up that robbery.

25             What did he say on the phone Tony

1    Martinez?  "Do you want to be part of a robbery?"

2                "Okay."

3                "A jeweler, where?"

4                "On the seventh floor of the Greenrich

5    Building."

6                You heard it from Tony's mouth and it

7    wasn't disputed.  It wasn't disputed.  "Well, my

8    brother will shoot the man."

9                And what would they make a silencer for?

10   Think about that.  You get the diamonds and I will get

11   the tape.

12               What more do we need, ladies and

13   gentlemen?  What more do we need?  Exactly what he is

14   saying?

15               Then he went further.  He needed another

16   alibi so resorted to whom:  Estrella.  He had

17   befriended her to become her lover, her provider.  He

18   told her that he will leave his wife for her.  And

19   remind you, Mr. Smyth, when he had Estrella Martinez

20   testifying, what did he ask her?  He proved that she

21   only made about $5 an hour.  You tell me why do a $5

22   an hour young lady, who is working as a maid -- and

23   that's not a put down, it is just a fact -- why does

24   she need a portable cell telephone?  Why does she need

25   that?  And why does she need it for such a short

1    period of time?  And how does she come into possession

2    of it when this defendant is suppose to be in

3    Florida?

4                    That, ladies and gentlemen, if he had been

5    in Florida, that he sent an investigator in here and

6    brought an investigator in here to show us, you know,

7    the box out of the bank, safety deposit bank.  I would

8    think that investigator would bring in some evidence

9    that he was down in Florida.

10                   MR. ODOM:  Object.

11                   MR. VINSON:  That's don't you know --

12                   MR. ODOM:  I object to I am inclined to

13   bring in evidence in that regard.  I object to that.

14   It's attempting to shift the burden of proof.

15                   MR. VINSON:  I haven't attempted to shift

16   the burden.  It rests with the State beyond a

17   reasonable doubt.  I don't mean to infer that, ladies

18   and gentlemen.

19                   MR. ODOM:  Judge, I have an objection in

20   that regard and ask for a ruling.

21                   THE COURT:  It's overruled.

22                   MR. VINSON:  What I am saying, if they

23   went so far as to send an investigator and went

24   through that expense, don't you know, if he had been

25   down there in Florida at the time, you would have seen

1     something.   They even went through the charade today

2     to show the burns around his chest and some of them

3     looked like sunburn to me.   I don't know how you

4     viewed them.

5              But, again, there was no disputed evidence

6     that Estrella did not sleep with him, that Estrella

7     was not there with him.

8              And, remember, on Monday that he was

9     suppose to be out of town, on the 22nd, the day of

10    January.   What happened?   Estrella come into

11    possession of a cell phone.   And Mr. Odom was talking

12    about the telephone calls.   Well, let's look there and

13    look at Estrella Martinez, a young lady, from Mexico,

14    has a child, trying to make a living.   Does she look

15    like the kind of person who could scheme and come up

16    with telephone numbers and all this and remember such

17    accuracy about her contact with this defendant?   And

18    why would she get a phone for that time?   No, she

19    didn't.

20             This defendant rented that telephone.   He

21    needed inside communication.   So he would know the

22    whereabouts of the guard, so he needed her as his

23    inside hand and that's how he was able to get in

24    communication with her.   And that's how he was able to

25    tell her what to do inside the building.

1      I don't know, maybe you will go back there
2   and look these records and feel they are no good, if
3   you listen to what Mr. Odom had to say, but I would
4   submit to you these records bear on the truth.
5      Look what time she got this telephone.
6   Her first call was on the 22nd day of January, two
7   days before Mr. Szucs was shot and killed.  The first
8   telephone call was at 1647, 4:47 in the afternoon.
9   She called a friend.  At 1656 Ms. Martinez called
10   Roadmaster Auto.  And she was calling to the very
11   people that the defendant stood up here and told you
12   she was not calling.  I mean, the defense attorney
13   stood here and said she was not calling.  Now, I don't
14   know what he expects you to do, to look at this and
15   say it does not exist, just throw it away.  It doesn't
16   exist.  We don't want to see it but these are records
17   that were made when these phone calls were being made.
18      Now, Ms. Martinez didn't make a record but
19   the telephone company was keeping a record of it.
20      Look here, on the 24th, too.  Why don't
21   you look at something else that is unique.  If you
22   look at these telephone calls here, again, it has a
23   lot of communication between the subscriber Reinaldo
24   Dennes and Estrella Martinez.  And those telephone
25   calls are all local because if they were not local,

1    what would you have?  You would have right here, 2358

2    of that, almost midnight, yes.  He put a lot of tracks

3    on them between Houston and Mr. Szucs' office because

4    now he is in Louisiana but he is too stupid to realize

5    he is using the cell phone and it is traceable.

6              When you plan an offense and you bring

7    other people in, especially if you go outside the

8    blood line, the only way is you got to kill everybody.

9    You kill Estrella Martinez and Estrella Martinez

10   probably wouldn't be here.  It probably still would

11   not be solved but we brought in Ms. Martinez.  And,

12   for some reason, after having a conversation with this

13   defendant after he was arrested, she decided that she

14   better look out for herself.  And there's nothing

15   wrong with that.  There's nothing wrong with that.

16   And the defense attorney is going to make you think

17   there is something sinister about Ms. Martinez coming

18   and telling the truth.

19             MR. ODOM:  I am going to object to that as

20   a criticism of defense counsel, striking at the

21   defendant over his back in regards to what defense

22   counsel attempting to make sinister evidence on the

23   part of a witness.  We would ask for a ruling, Your

24   Honor.

25             THE COURT:  I think what he said --

1          MR. VINSON:  Throughout this trial he

2   attacked Ms. Martinez in argument, and I am responding

3   to his argument.

4          MR. ODOM:  I re-urge my objection again,

5   attempting to think the defense counsel is up to some

6   kind of trickery or improper procedure and that such

7   is striking at the defendant through his counsel.

8          THE COURT:  Sustained.  The jury will

9   disregard that last comment by Mr. Vinson.

10          MR. ODOM:  Ask for a motion for new trial.

11          THE COURT:  Be denied.

12          MR. VINSON:  Well, ladies and gentlemen,

13   you saw and you heard what this attorney said about

14   Ms. Martinez.  Now, that's in your brain.  That's in

15   your ear.  You heard what he said and you heard how he

16   tried to attack her.  And why does she rate this

17   morning and, again, it was an attack upon her, the

18   charge.  The defendant take her as a charade.

19          MR. ODOM:  Attempt to object to defense

20   counsel's remark charade.

21          THE COURT:  I sustain the objection, Mr.

22   Vinson.  Let's move on.

23          The jury will disregard.  Any motion for

24   mistrial is overruled.

25          MR. ODOM:  Thank you, Judge.

1          MR. VINSON:  Again, ladies and gentlemen,

2     look at all the evidence.

3          And with respect to the attorney who came

4     in here and testified yesterday, you know what's

5     unique about him.  He couldn't even tell you -- and I

6     didn't even correct him -- he couldn't even tell you

7     the Judge who appointed him to go over there and stand

8     in on behalf of this defendant and his brother.  He

9     came in here and he told you that it was another

10    Judge.  He recalled another Judge's name.  It was

11    Judge godwin.

12         He couldn't even remember what they looked

13    like.  He couldn't even remember where they were in

14    the lineup.  He kept no notes.  He didn't refresh

15    anything.

16         He just walked in here, like he walked off

17    the street, and came in here or, oh, I do remember

18    this.  I remember that it was, no, didn't identify

19    anyone.

20         And he suggested to you -- he didn't

21    suggest, he said it -- he said that the police

22    officer, that is, Officer Todd Miller, who came in

23    here and testified, told you how the lineup went, came

24    in here and he told you Officer Todd Miller suggested

25    that it was number five and put a mustache on him.

1         Now, ladies and gentlemen, you know that
2    wasn't true.  If it had happened, you would have heard
3    something about that.  If you heard something about
4    that that lineup long before Todd Miller testified.
5    You didn't hear nothing about that, and it didn't
6    happen that way.  It did not happen that way.
7         And go back and ask yourself if this is a
8    serious case, wouldn't you keep notes?  Wouldn't he,
9    at least, look at the video?  Wouldn't he be prepared
10   to come in?
11        And we talked to our witnesses and we
12   prepared our witnesses because we wanted the truth
13   brought to you and we didn't want to waste your time.
14        But, again, you go back there and look at
15   all the evidence and there is nothing to dispute what
16   Tony Martinez told you.  There's no evidence to
17   dispute what Estrella told you.  This is all the
18   evidence in the world you need to find this defendant
19   guilty of capital murder.  But if you come back with a
20   guilt of capital murder, you are not going to cry.  He
21   is just as guilty today as he was the day he committed
22   the offense.  He is just as guilty today as the day he
23   started planning this offense.
24        And when you make a silencer, you know
25   it's to be used.  You just don't make that, or have

1     somebody make it for you, for keep's sake.   And Tony

2     Ramirez told you that steel wool was in it and what

3     happened?  You found steel wool in his office.   Tony

4     Ramirez said that it was made out of aluminum.   What

5     do you find:  Aluminum in his office.

6               When you heard the crime scene

7     investigator went into the office of Mr. Szucs, Johnny

8     Szucs, what did he tell you?  "It was very unique,

9     that crime scene.  Never seen anything like it."

10              And what did he find there?  Steel wool.

11              THE COURT:  Five minutes.

12              MR. VINSON:  Steel wool.  And I realize

13    you will be wrestling with this very shortly.  This

14    will be your case.  In fact, I believe I have said all

15    I can really say about this case.  And I think you are

16    intelligent and I think you are smart enough and you

17    won't fall for any shenanigans and you are going back

18    there and return a proper verdict and a verdict that

19    you can be proud of, a verdict that will say to other

20    schemers like this defendant here, if you do it in

21    this county, in the State, bring the evidence and

22    convince us beyond a reasonable doubt, we are going to

23    find you guilty.  And we are going to be willing to

24    walk back in the courtroom, hold our heads proud and

25    high, and give that verdict to that Judge and move on

1    to other business.

2             Thank you, ladies and gentlemen.

3             THE COURT:  Thank you, Mr. Vinson.

4             Ladies and gentlemen, we are going to take

5    a little break for about as long as it takes you, if

6    you want to run downstairs and come back.  Any

7    objection.

8             Once you already commence your

9    deliberations, you will be in there for a while.  You

10   wait a moment, have another chance to get back

11   downstairs so, please, it's about 2:20.  After, I

12   would like you back up here in the jury box at 25 till

13   and we stand in a very brief recess.

14             The audience will remain.

15             THE BAILIFF:  Everybody be seated until

16   the jury leaves.

17             THE COURT:  There is a couple that went

18   outside. I want somebody to escort them down and back.

19             (Recess taken.)

20             (Jury came into the courtroom.)

21             THE COURT:  Ladies and gentlemen, what has

22   happened, you have now heard all the evidence in the

23   case.  You have heard arguments of counsel and it's

24   now almost a quarter to 4:00.  We are going to allow

25   you to commence your deliberations in this case.

1          And it's my goal to stay a reasonable

2     amount of time this evening, to see if we are near

3     reaching a verdict on the guilt or innocence phase.

4     So, later on, if we are here, you need to make phone

5     calls, obviously you can do that and we will commence

6     our deliberations now.

7          Remember the law that I have given you in

8     the charge.  Specifically I want to reiterate the fact

9     that in the charge there is a paragraph dealing with

10    the right to be subject or to testify and you are not

11    to, in any way, discuss the fact that the defendant

12    did not testify.  You are not to use it against him in

13    any form or fashion.  If you mention it out loud to

14    anybody in the jury room, somebody is to let me know

15    immediately because all that does is lead to

16    reversible error in this case, and I do not want that

17    to happen.  You are not to discuss it.  You are not to

18    consider it.  Is there any questions?

19         Very well.  Please commence your

20    deliberations and go with the bailiff.  Stand

21    adjourned until you have reached a unanimous verdict.

22              (Jury the courtroom.)

23              (Whereupon, State's Exhibit No. 174 was

24    marked for identification.)

25              THE COURT:  What would you like to place

1    on the record?

2            MR. VINSON:  Your Honor, there were a

3    total of 27 autopsy photos.  We introduced seven to

4    show specifically one location and the locations and

5    injuries sustained by those wounds, and for

6    demonstrative purposes, to show how the wounds could

7    have been inflicted.  There are 20 additional

8    photographs that we did not offer.  And I think the

9    Court looked at when we initially offered nine

10   photographs and the Court only allowed us to offer

11   seven photographs, which was still suitable.  And the

12   additional 20 we have marked for identification as

13   State's Exhibit 174.  We are going to seal this and

14   the Court can look at this, and we will seal this for

15   the appellate review only.

16           THE COURT:  You don't have any objection?

17           MR. ODOM:  No, Judge.

18           THE COURT:  They are admitted for an

19   appellate purpose.

20           MR. ODOM:  And I assume that the exhibit

21   I offered, which, I believe, was number -- the proof.

22           THE COURT:  All right, that, too.

23           Ladies and gentlemen, if I could have your

24   attention, they have a verdict.  I want no outcries or

25   any comments made from the audience or any such

1    remarks.  And I will hold you in contempt and I am

2    very serious.  If you holler out anything, you are

3    going to jail.  Do we understand each other on that

4    matter?

5              Thank you very much.

6              Let's bring the jury out.

7              (Jury came into the courtroom.)

8              THE COURT:  Please be seated, ladies and

9    gentlemen.

10             Sir, are you the foreman?

11             THE FOREMAN:  Yes, sir.

12             THE COURT:  Has the jury reached a

13   unanimous verdict in this case?

14             THE FOREMAN:  Yes.

15             THE COURT:  Will the defendant please

16   stand.

17             "We, the jury, find the defendant,

18   Reinaldo Dennes, guilty of capital murder as charged

19   in the indictment," signed foreman of the jury.

20             Do you need to request to have to jury

21   polled?

22             MR. ODOM:  Yes it's for the appellate

23   record.

24             THE COURT:  We are going to ask each of

25   you individually whether or not this is your

1    individual verdict.  For that purpose, I will number

2    you from one through six, seven through twelve, and

3    let me complete the question for the record before you

4    respond.

5                    (Jury polled and all affirmed the

6    verdict.)

7                    THE COURT:  Thank you very much.

8                    What we are going to do at the present

9    time is we are calling it a day.  And what we plan to

10   do tomorrow is commence the punishment phase of the

11   trial, and that's going to commence at 1:00 for

12   reasons of conflicts that there are just some things

13   that need to be done, doctor appointments, and that's

14   including myself.  And so we are going to recess until

15   1:00 tomorrow.

16                   You are going to go directly up to the

17   courtroom.  Do not go downstairs.  Come directly up to

18   the courtroom and give yourself maybe a couple of

19   minutes leeway and maybe he will here by five till and

20   we will place you directly in the jury room.

21                   All we are going to do tomorrow is, from

22   my understanding, we will complete tomorrow, the

23   punishment phase, as far as any evidence by the State

24   or the defense regarding punishment and, then, I will

25   let you go home.  Because if we go into argument and

1    as far as continue your deliberations, I will have to

2    keep you overnight until you have reached a verdict.

3    I don't think anybody wants to be sequestered over

4    Labor Day weekend, for all 12 of you said you wanted

5    to do otherwise.  We will commence the punishment

6    phase tomorrow.  As soon as all the evidence is

7    offered by either side, I will recess and come back

8    Tuesday morning, you will then hear arguments of

9    counsel and then you will commence your

10   deliberations.  And the reason for that is to give you

11   much more time to deliberate in this case on

12   punishment, but in the event I forget to tell you,

13   tomorrow, Tuesday, be sure to bring any medications

14   you need and any overnight accommodations, personal

15   toiletries, and things of that nature.  So in the

16   event you do not reach a verdict on Tuesday with

17   regard to the punishment, you will have those things

18   available to you because we will need to sequester

19   you.  Any question?

20          Let me admonish you again about I have no

21   doubt that before you return, be it tomorrow or

22   certainly by Tuesday, there will be some publicity

23   about this case in the various media.  You are

24   instructed once again not to read anything about this

25   case in the paper, to watch any television accounts or

1    listen to anything on radio about this matter.

2              If there are any questions about what is

3    going to happen over the course of the next few days,

4    I want to make sure there is no confusion.  And,

5    again, my idea is not to commence your deliberations

6    tomorrow because I don't know how many of your

7    attitude is.  Let's get it over and get through and

8    continue to deliberate and take a break and come back

9    on Tuesday.  I assume all of you, most of you,

10   Tuesday; is that improper or incorrect?  How many you

11   want to get through with it and take Saturday,

12   whatever, that's wants to, whatever?

13             We stand in recess until 1:00 tomorrow.

14   Come straight up here.  And we will get started

15   immediately after we get all of you in the courtroom.

16             Ladies and gentlemen in the audience,

17   please keep your seats.

18             The jury is dismissed.  Thank you very

19   much.  See you tomorrow at 1:00.  We stand adjourned.

20             (Court adjourned for the day.)

21

22

23

24

25

1                    CAUSE NO. 750,313

2    THE STATE OF TEXAS        IN THE 263RD DISTRICT COURT

3    VS                              OF

4    REINALDO DENNES          HARRIS COUNTY, T E X A S

5

6

7             I, Sharon Kay Cook, Official Court

8    Reporter of said court, hereby certify that the

9    foregoing pages comprise a true, complete and correct

10   transcript of the proceedings had in the above styled

11   and numbered cause.

12            WITNESS MY HAND this the 21st day of

13   _____, 1998.

14

15

16                    Sharon Kay Cook

17                    Official Court Reporter
                      301 San Jacinto
18                    Houston, Texas 77002
                      713-755-6944
19                    Certificate No. 1013
                      December 31, 1998
20

21

22

23

24

25

APPELLATE COURT NO. *72966*

IN THE COURT OF APPEALS

OF THE STATE OF TEXAS

---

REINALDO DENNES,

               Appellant,

VS.

THE STATE OF TEXAS,

               Appellee.

---

TRIAL CAUSE NO. 750,313

APPEAL FROM 263RD JUDICIAL DISTRICT

OF HARRIS COUNTY, TEXAS

THE HONORABLE JIM WALLACE, PRESIDING JUDGE

---

PUNISHMENT HEARING

August 29, 1997

REPORTER'S RECORD

VOLUME 34 OF *39* VOLUMES

Kaye G. Jameson
Deputy Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

1

1                          CAUSE NO. 750,313

2    STATE OF TEXAS            IN THE 263RD DISTRICT COURT

3    VS.                                OF

4    REINALDO DENNES          HARRIS COUNTY, T E X A S

5

6

7    A P P E A R A N C E S:

8

9    For the State:        Mr. Mark Vinson

10                         SBOT NO.: 20590450

11                         Mr. Don Smyth

12                         SBOT NO.: 18777700

13                         Assistant District Attorneys

14                         201 Fannin St.

15                         Houston, Texas  77002

16                         (713) 755-7050

17

18   For the Defendant:    Mr. Wendell Odom

19                         SBOT NO.: 15208500

20                         Ms. Yalila Guerrero

21                         SBOT NO.:

22                         Attorneys at Law

23                         1301 McKinney

24                         Houston, Texas 77010

25                         (713) 951-9555

                                                    2

1            BE IT REMEMBERED that upon this the

2   29th day of August, A. D. 1997, the above entitled

3   and numbered cause came on for punishment hearing

4   before the Honorable Jim Wallace, Judge of the

5   263rd District Court of Harris County, Texas; and

6   the State appearing by counsel and the Defendant

7   appearing in person and by counsel, announced

8   ready for hearing and a jury having been selected,

9   impaneled, and sworn and all preliminary matters

10  having been disposed of, the following proceedings

11  were had, viz:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      CHRONOLOGICAL INDEX

2    WITNESSES:                       VOLUME 34/PAGE

3         JIMMY DE LOS SANTOS

4              Direct Examination ...............  43

5

6         DAVID BALDERAS

7              Direct Examination ...............  49

8              Cross Examination ...............  82

9              Redirect Examination .............  95

10             Recross Examination ..............  96

11

12        DANNY TSANG

13             Direct Examination ..............  101

14

15        CHRISTINA TSANG

16             Direct Examination ..............  121

17

18        RACHEL OHAYON

19             Direct Examination ..............  128

20             Cross Examination ...............  133

21

22        NICOLE SZUCS

23             Direct Examination ..............  135

24

25

4

1                    INDEX CONTINUED

2                               VOLUME 34/PAGE

3

4     ANA MORENO

5          Direct Examination ................  146

6

7     ROY WILLIAM MCDONALD

8          Direct Examintion .................  150

9

10   State Rests .................................  156

11   Defendant's Motion .........................  156

12

13   DEFENSE WITNESSES:

14

15     CALVIN WILSON

16          Direct Examination ................  159

17          Cross Examination .................  170

18          Redirect Examination .............  174

19          Recross Examination ..............  175

20          Further Direct Examination ........  176

21

22

23

24

25

INDEX CONTINUED

VOLUME 34/PAGE

DR. JEROME BROWN

     Direct Examination ................ 179

     Cross Examination ................ 207

     Redirect Examination ............. 235

     Recross Examination .............. 241

     Further Direct Examintion ........ 243


RAY DENNES

     Direct Examination ................ 244


Reporter's Certificate ..................... 250

ALPHABETICAL INDEX

WITNESSES:

VOLUME 34/PAGE

BALDERAS, DAVID
    Direct Examination ................. 49
    Cross Examination .................. 82
    Redirect Examination ............... 95
    Recross Examination ................ 96


BROWN, DR. JEROME
    Direct Examination ................ 179
    Cross Examination ................. 207
    Redirect Examination .............. 235
    Recross Examination ............... 241
    Further Direct Examination ........ 243


DE LOS SANTOS, JIMMY
    Direct Examination ................ 43


DENNES, RAY
    Direct Examination ................ 244


MCDONALD, ROY WILLIAM
    Direct Examination ................ 150

INDEX CONTINUED

VOLUME 34/PAGE

MORENO, ANA
     Direct Examination ................ 146

OHAYON, RACHEL
     Direct Examination ...............  128
     Cross Examination ................  133

SZUCS, NICOLE
     Direct Examination ...............  135

TSANG, CHRISTINA
     Direct Examination ...............  121

TSANG, DANNY
     Direct Examination ...............  101

WILSON, CALVIN
     Direct Examination ...............  159
     Cross Examination ................  170
     Redirect Examination .............  174
     Recross Examination ..............  175
     Further Direct Examination ........  176

1                          EXHIBIT INDEX

2     APPELLANT:  REINALDO DENNES

3                                           VOLUME/PAGE

4

5     VOLUME 34  -  August 29, 1997

6

7     STATE'S EXHIBIT NO. 1

8     Photograph

9          Marked ..................... 34/46

10         Identified ................. 34/48,107,122

11         Offered .................... 34/63

12         Admitted.................... 34/63

13         Shown ...................... Volume 38

14

15    STATE'S EXHIBIT NO. 2

16    Photograph

17         Marked ..................... 34/466

18         Identified ................. 34/48,61,107,122

19         Offered ....................  34/63

20         Admitted ..................  34/63

21         Shown ......................  Volume 38

22

23

24

25

9

```
 1                    INDEX CONTINUED

 2                                      VOLUME/PAGE

 3    STATE'S EXHIBIT NO. 3

 4    Judgment and Sentence

 5          Marked .....................  34/148

 6          Identified .................  34/148

 7          Offered ....................  34/154

 8          Admitted ...................  34/155

 9          Shown ......................  Volume 38

10

11    STATE'S EXHIBIT NO. 4

12    Jail record

13          Marked .....................  34/148

14          Identified .................  34/148

15          Offered ....................  N/A

16          Admitted ...................  N/A

17          Shown ......................  N/A

18

19    STATE'S EXHIBIT NO. 4-a

20    Jail record (copy)

21          Marked ....................  34/148

22          Identified ...............  34/148,152

23          Offered ..................  34/149

24          Admitted .................  34/149

25          Shown ....................  Volume 38
```

1

EXHIBIT INDEX CONTINUED

2

VOLUME/PAGE

3

4   STATE'S EXHIBIT NO. 5

5   Print Card

6        Marked ...................... 34/152

7        Identified .................. 34/153

8        Offered ..................... N/A

9        Admitted .................... N/A

10       Shown ....................... N/A

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              EXHIBIT INDEX CONTNUED

2                                      VOLUME/PAGE

3

4      DEFENDANT'S EXHIBIT NO. 1

5      Jail records

6           Marked ....................   34/160

7           Identified .................   34/163

8           Offered ....................   34/163

9           Admitted ...................   34/163

10           Shown ......................   Volume 38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2

3        THE COURT:  Let's let the record reflect

4   the State is present.  The defendant is present

5   with his attorney.  The jury is not present.

6        In an attempt to save time, we've got a

7   proposed charge that I understand, of course,

8   we'll have an opportunity to further review after

9   the close of punishment evidence.  But at this

10  time with the changes that we had previously

11  discussed with the State, does the State have any

12  objections to the charge?

13       MR. VINSON:  We have no objection, Your

14  Honor, other than where the defense has attempted

15  to add circumstances, warranted life rather than

16  death to the special issues.  We have no objection

17  to having that placed in the instruction omitting

18  evidence or circumstances with respect to the

19  third issue.

20       THE COURT:  Well, I thought that's where

21  we were going to put it.

22       MR. VINSON:  Well, they made some

23  changes.  I think they put it in the first and

24  second.

25       MR. ODOM:  Well, this is relating to this

13

1   special issue and it doesn't differentiate between

2   the first issue, the second issue, or the third

3   issue.  Aren't they all three special issues?

4           MR. VINSON:  No.

5           THE COURT:  It's in all three special

6   issues.

7           MR. VINSON:  Yes, it is.  I apologize.

8           MR. ODOM:  That's general language, as I

9   understand it.

10          MR. VINSON:  It does say deliberating on

11  the issues where they make them collective.

12          THE COURT:  Anything further other than

13  the request of the State to add a paragraph

14  dealing with extraneous?

15          MR. VINSON:  Nothing further, Your

16  Honor.

17          THE COURT:  Go ahead and proceed into

18  that, Mr. Vinson.  You're asking that an

19  extraneous paragraph be included?

20          MR. VINSON:  Yes, Your Honor, and that

21  the extraneous paragraph instruct the jury that

22  you are further instructed that if there is any

23  testimony before you in this case regarding the

24  defendant having committed offenses other than the

25  offense alleged against him in the indictment, you

14

1    cannot consider said testimony for any purpose

2    unless you find and believe beyond a reasonable

3    doubt that the defendant committed such other

4    offenses, if any were committed, and then you may

5    only consider the same in determining the answer

6    to the special issues.

7            THE COURT:  Okay, let's let the record

8    reflect that previously I had heard a rendition of

9    what it is regarding the particular extraneous the

10   State intends to offer on punishment.  It's my

11   ruling that there is sufficient evidence that if

12   the jury were to believe everything that the

13   witnesses called by the State were to testify to,

14   there is sufficient evidence to find that the

15   defendant, Mr. Dennes, would be guilty of that

16   offense beyond a reasonable doubt.  Having made

17   that determination, I'm going to allow the State

18   the opportunity to present those witnesses to

19   testify regarding such extraneous offense and, of

20   course, with the addition of the charge now of the

21   extraneous paragraph.

22           Anything further from the State?

23           MR. VINSON:  Nothing further from the

24   state, Your Honor.

25           THE COURT:  Mr. Odom, do you have

15

1    anything else?

2         MR. ODOM:  Yes, sir, I have several

3    objections.

4         THE COURT:  Other than anything that

5    we've not already agreed to address in place of

6    the charge?  Anything that we've said that we're

7    not inclined to do so, please feel free to

8    proceed.

9         MR. ODOM:  Judge, the only issue is Mr.

10   Vinson and I have not had time to discuss whether

11   and/or how we would apply this last issue that

12   they objected to to the fine to Issue No. 3 in the

13   charge.

14        THE COURT:  And what are we talking

15   about?

16        MR. VINSON:  Mitigation.

17        MR. ODOM:  In the application part of the

18   charge, we were working on this.

19        Okay, the page, we have it as page 6 on

20   this rough copy that it's in answering Special

21   Issue No. 3, you shall consider mitigating

22   evidence to be evidence that a juror might regard

23   as reducing the defendant's moral blameworthiness,

24   including evidence of the defendant's background,

25   character --

16

1          THE COURT:  Slow down a little bit.
2     She's putting this on the record.
3          MR. ODOM:  The personal moral culpability
4     of the defendant or the circumstances of the
5     offense that mitigates against the imposition of
6     the death penalty, which I believe is correct
7     under Article 37.07 (1-e).  However, we have not
8     yet figured out how to put in the rest of the
9     sentence under that section.
10          THE COURT:  Which is?
11          MR. ODOM:  "Or circumstances to warrant
12     that a sentence of life rather than a death
13     sentence be imposed."  And I think that because of
14     the wording of this language that it has to be
15     either in another paragraph or we have to
16     incorporate it somehow because they have
17     incorporated the definition of what is mitigating
18     evidence under Section 4 under (e-4), into section
19     E, and therefore it makes it difficult --
20          THE COURT:  Read the language you want to
21     include one more time for me.
22          MR. ODOM:  The language is, "or
23     circumstances to warrant that a sentence of life
24     imprisonment rather than a death sentence be
25     imposed."

17

1          Now, what we have done on this particular

2      charge is we've combined the first part of that

3      paragraph with the definition of what is

4      mitigating evidence which is appropriate because

5      the first part of the definition talks about

6      mitigating evidence.

7              THE COURT:  Okay.

8              MR. ODOM:  Then the legislature says

9      clearly or referring to something other than

10     mitigating evidence, circumstances to warrant that

11     a life -- that a sentence of life imprisonment

12     rather than the death sentence be imposed.

13             No, that says "circumstances of the

14     offense," and there is a big difference.

15             THE COURT:  Excuse me.  Let's follow

16     along, third line, "including evidence" -- do you

17     see that, the very last -- "including evidence of

18     the defendant's background, character, personal

19     moral culpability of the defendant or the

20     circumstances of the offense that mitigates

21     against" -- throw in your language.

22             MR. ODOM:  But, Judge, that is -- I mean

23     that is -- you can't just add "or."

24             MR. SMYTH:  You add that onto the end of

25     that sentence, or to warrant, circumstances to

18

1    warrant that a sentence of life rather than death

2    sentence be imposed.

3          THE COURT:  There you go.  Then take out

4    the rest of that, beyond -- take the rest of that

5    sentence out, the imposition of the death

6    penalty.

7          Now read that to yourselves and see if

8    that makes sense and see if that satisfies your

9    requirement.  You can just pick it up where it

10   was.

11         (Brief recess).

12         THE COURT:  Back on the record.  Let's

13   get back on the record.

14         You took out more than what I thought.

15   What I said was you were going to leave in, or the

16   circumstances of the offense that mitigates

17   against or warrants that a sentence of life

18   imprisonment rather, blah, blah, blah, be

19   imposed.

20         MR. SMYTH:  Wouldn't you have to have,

21   Judge, "that mitigates against the death penalty,"

22   have that whole phrase in there in order to

23   complete the thought?

24         THE COURT:  Listen again. "Or the

25   circumstances of the offense that mitigates

19

1    against."  Or circumstances --

2         MR. ODOM:  Here the problem is is that

3    the way I read this, there is two --

4         THE COURT:  We're not on the record.

5         MR. ODOM:  Well, we can be.  There is two

6    issues here.  Mitigating circumstances or

7    circumstances to warrant that life as opposed to

8    death be imposed.  Mitigating circumstances are

9    defined -- and we give examples of that -- and

10   mitigating circumstances are circumstances that

11   might reduce the defendant's moral

12   blameworthiness.  But circumstances to warrant

13   life as opposed to death is not defined as such

14   although examples are given.  Such as all the

15   evidence in the case in chief, the defendant's

16   character and background and then the personal

17   moral culpability of the defendant, I suppose,

18   would be that --

19        THE COURT:  Okay, I don't want to drag

20   this out forever.  The end of the paragraph says

21   "death penalty."  The personal moral culpability

22   of the defendant or the circumstances of the

23   offense that mitigates against the imposition of

24   the death penalty or circumstances to warrant that

25   a sentence of life imprisonment rather than a

20

1   death sentence be imposed.  We just add it to the

2   end of the sentence.  Add that language.

3          MR. ODOM:  But how does the sentence

4   start?

5          THE COURT:  In answering Special Issue

6   No. 3, you shall consider mitigating evidence to

7   be evidence that a juror might regard as reducing

8   his blah, blah, blah, the personal moral

9   culpability of the defendant or the circumstances

10   of the offense.  That's all the what if's that

11   mitigates the imposition of the death penalty,

12   comma, or circumstances, I would say that

13   warrant --

14          MR. ODOM:  Well, see, that's implying

15   that that's mitigating evidence.  And I think

16   you've got a difference between what they define

17   as mitigating evidence and circumstances that

18   warrant life versus death because you have a

19   specific definition of mitigating evidence.

20          MR. SMYTH:  The "or" takes care of that.

21   That's what the "or" is all about.  It starts a

22   new thought.

23          MR. ODOM:  May I see that?

24          THE COURT:  Yes, it can be "and" instead

25   of "or."

21

1          MR. ODOM:  That's certainly what the
2     statute does.
3          THE COURT:  It's two separate trains of
4     thought.
5          MR. ODOM:  Right.
6          THE COURT:  So if we just add that
7     sentence, I think, to identify.
8          MR. SMYTH:  That allows it to go either
9     way.
10         MR. ODOM:  I still object to it because I
11    think mitigating evidence is simply evidence that
12    a juror might regard as reducing the defendant's
13    moral blameworthiness.  The rest of this may be
14    circumstances that warrant a sentence of life
15    imprisonment as opposed to pure mitigating
16    evidence.
17         THE COURT:  May I see it again?  I think
18    the "or" takes care of it.
19         MR. ODOM:  See what you've got.  We have
20    incorporated a definition of mitigating evidence
21    into the section of the paragraph that talks about
22    the factors that the Court, that the jury shall
23    consider on Special Issue No. 3.  And you're
24    defining everything as mitigating circumstances
25    when the Code doesn't define everything as

22

1    mitigating evidence.

2            MR. SMYTH:  Basically, Judge, that's

3    tracking -- that's tracking the question three.

4            THE COURT:  Okay.  This is what I'll

5    allow: Semi colon, penalty and track the language

6    right there, "or circumstances to warrant that a

7    sentence of life imprisonment rather than a death

8    sentence be imposed."

9            I'll allow that and that's it.  Is there

10   an objection to that?

11           MR. ODOM:  Judge, I'm not sure what's on

12   the record and what's not on the record.  But my

13   objection is this, is that the article under

14   section (e) gives a definition of fact of evidence

15   in circumstances that a jury considers, and they

16   list a number of items.  And one of those items is

17   mitigating circumstances.  Number 4 under (e)

18   defines mitigating circumstances as evidence that

19   a juror might regard as reducing the defendant's

20   moral blameworthiness.  The way this is read, it

21   implies that all of these factors such as

22   circumstances of the offense, the defendant's

23   character and background and the personal moral

24   culpability of the defendant is a mitigating

25   circumstance when, in fact, they may very well be

1    circumstances that warrant a sentence of life as

2    opposed to death.  And I think that the way that

3    it's written now allows a jury to not consider

4    those as circumstances to warrant life as opposed

5    to death, it only limits to them as to the

6    definition of mitigating circumstances which go

7    entirely to reducing the defendant's moral

8    blameworthiness.

9         THE COURT:  Okay, and I already made the

10   ruling on that last portion.  What else, Mr.

11   Odom?

12        MR. ODOM:  He's completely misreading

13   that, Judge.  I'm not going to get into it.  But

14   that "or" in there is mitigating circumstance or

15   circumstances mitigating modifies both

16   circumstance and circumstances.

17        THE COURT:  I take it at this time the

18   State has no objection to adding that last -- I

19   don't think it makes any difference.

20        MR. SMYTH:  No.

21        THE COURT:  Okay, what else?

22        MR. ODOM:  My objections to the charge

23   are --

24        THE COURT:  Additional?

25        MR. ODOM:  Additional are that in a

24

1  number of places we have put in the charge what we
2  call a sympathy charge.  And the first place I see
3  it is what I view on my copy as page 4 of my copy,
4  language that says, "You are further instructed
5  that you are not to be swayed by mere sentiment,
6  conjecture, sympathy, passion, prejudice, public
7  opinion or public feeling in considering all the
8  evidence before you in answering Special Issue No.
9  1."
10         THE COURT:  I thought that's what we
11  added that you requested earlier to take care of
12  that problem.  No?
13         MR. ODOM:  No, Judge.  I think that some
14  of that charge isn't appropriate in that sympathy
15  is a -- could very well be a consideration that a
16  jury could take into consideration in determining
17  either mitigating circumstances or circumstances
18  to warrant a life imprisonment as opposed to a
19  death sentence and/or could be in conflict with
20  the section 37.071 that says the State and the
21  defendant shall be permitted to present arguments
22  for and against the death penalty.
23         THE COURT:  Let me ask you this:  You
24  want it out of 1, 2, and 3 or just out of 3?
25         MR. ODOM:  Judge, I think -- well, you're

1    right.  I would request that it be out of all of

2    them but certainly my arguments are geared more

3    towards No. 3, towards the issue --

4              THE COURT:  Mitigating?

5              MR. ODOM:  -- what we call the mitigation

6    issue.

7              THE COURT:  What is it that you would

8    want out, all of that or just the passion or the

9    sympathy?

10             MR. ODOM:  Under No. 3, it says you're

11   not to be swayed by mere sentiment, conjecture,

12   sympathy, passion, prejudice, public opinion or

13   public feeling.  I think that mere sentiment and

14   sympathy should be taken out.  It should be:  You

15   should not be swayed by passion, prejudice, public

16   opinion or public feeling in considering all the

17   evidence before you in answering Special Issue No.

18   3.

19             THE COURT:  Does the State have a problem

20   with that?

21             MR. SMYTH:  What do you want to do?

22             MR. ODOM:  I want to take out "sympathy

23   and sentiment."

24             THE COURT:  It's on page 6.  Does the

25   State have any objection?

26

1          MR. VINSON:  Judge, that has been

2    standard throughout all our charges, and we're

3    going to keep manipulating this charge until we

4    don't know what we have here.  I would say leave

5    it just as it is.  He has plenty of protection

6    under the Court's guidance with respect to Special

7    Issue No. 3.  You have instructed the jury on

8    mitigation, if there is any mitigation, and what

9    weight to give the mitigation.

10          THE COURT:  Okay, it's overruled.  What's

11    next?

12          MR. ODOM:  I do not object to the

13    extraneous offense charge because I think it is

14    admissible as to David Copeland.  However, I

15    strongly object to evidence regarding any other

16    extraneous acts of misconduct or bad acts of

17    misconduct.  And I'd like to go on the record and

18    reiterate my objection that I raised earlier in

19    regards to that issue --

20          THE COURT:  Go ahead.

21          MR. ODOM:  -- and put in certain issues

22    into evidence.  I have filed a number of motions.

23          THE COURT:  I take that back.  I think

24    this is inappropriate.  Let's finish the charge.

25    What else on the charge then immediately?  You can

27

1    circumstances that warrant a sentence of life as

2    opposed to death.  And I think that the way that

3    it's written now allows a jury to not consider

4    those as circumstances to warrant life as opposed

5    to death, it only limits to them as to the

6    definition of mitigating circumstances which go

7    entirely to reducing the defendant's moral

8    blameworthiness.

9           THE COURT:  Okay, and I already made the

10   ruling on that last portion.  What else, Mr.

11   Odom?

12          MR. ODOM:  He's completely misreading

13   that, Judge.  I'm not going to get into it.  But

14   that "or" in there is mitigating circumstance or

15   circumstances mitigating modifies both

16   circumstance and circumstances.

17          THE COURT:  I take it at this time the

18   State has no objection to adding that last -- I

19   don't think it makes any difference.

20          MR. SMYTH:  No.

21          THE COURT:  Okay, what else?

22          MR. ODOM:  My objections to the charge

23   are --

24          THE COURT:  Additional?

25          MR. ODOM:  Additional are that in a

24

1   number of places we have put in the charge what we

2   call a sympathy charge.  And the first place I see

3   it is what I view on my copy as page 4 of my copy,

4   language that says, "You are further instructed

5   that you are not to be swayed by mere sentiment,

6   conjecture, sympathy, passion, prejudice, public

7   opinion or public feeling in considering all the

8   evidence before you in answering Special Issue No.

9   1."

10          THE COURT:  I thought that's what we

11   added that you requested earlier to take care of

12   that problem.  No?

13          MR. ODOM:  No, Judge.  I think that some

14   of that charge isn't appropriate in that sympathy

15   is a -- could very well be a consideration that a

16   jury could take into consideration in determining

17   either mitigating circumstances or circumstances

18   to warrant a life imprisonment as opposed to a

19   death sentence and/or could be in conflict with

20   the section 37.071 that says the State and the

21   defendant shall be permitted to present arguments

22   for and against the death penalty.

23          THE COURT:  Let me ask you this:  You

24   want it out of 1, 2, and 3 or just out of 3?

25          MR. ODOM:  Judge, I think -- well, you're

25

1     right.  I would request that it be out of all of

2     them but certainly my arguments are geared more

3     towards No. 3, towards the issue --

4           THE COURT:  Mitigating?

5           MR. ODOM:  -- what we call the mitigation

6     issue.

7           THE COURT:  What is it that you would

8     want out, all of that or just the passion or the

9     sympathy?

10          MR. ODOM:  Under No. 3, it says you're

11    not to be swayed by mere sentiment, conjecture,

12    sympathy, passion, prejudice, public opinion or

13    public feeling.  I think that mere sentiment and

14    sympathy should be taken out.  It should be:  You

15    should not be swayed by passion, prejudice, public

16    opinion or public feeling in considering all the

17    evidence before you in answering Special Issue No.

18    3.

19          THE COURT:  Does the State have a problem

20    with that?

21          MR. SMYTH:  What do you want to do?

22          MR. ODOM:  I want to take out "sympathy

23    and sentiment."

24          THE COURT:  It's on page 6.  Does the

25    State have any objection?

26

1              MR. VINSON:  Judge, that has been

2    standard throughout all our charges, and we're

3    going to keep manipulating this charge until we

4    don't know what we have here.  I would say leave

5    it just as it is.  He has plenty of protection

6    under the Court's guidance with respect to Special

7    Issue No. 3.  You have instructed the jury on

8    mitigation, if there is any mitigation, and what

9    weight to give the mitigation.

10             THE COURT:  Okay, it's overruled.  What's

11   next?

12             MR. ODOM:  I do not object to the

13   extraneous offense charge because I think it is

14   admissible as to David Copeland.  However, I

15   strongly object to evidence regarding any other

16   extraneous acts of misconduct or bad acts of

17   misconduct.  And I'd like to go on the record and

18   reiterate my objection that I raised earlier in

19   regards to that issue --

20             THE COURT:  Go ahead.

21             MR. ODOM:  -- and put in certain issues

22   into evidence.  I have filed a number of motions.

23             THE COURT:  I take that back.  I think

24   this is inappropriate.  Let's finish the charge.

25   What else on the charge then immediately?  You can

27

1    leave it up here.

2           MR. ODOM:  That's all I have on the

3    charge, Judge.

4           THE COURT:  Let's make those changes

5    based on what we have either now agreed to or have

6    been ruled on so that as quickly as possible we

7    can get a fresh copy of this so that when you rest

8    on punishment we can have something to look at so

9    we don't have to keep the jury out very long

10   waiting to deal with the punishment charge.

11          MR. VINSON:  Judge, on page 6, "You shall

12   consider evidence that a jury might consider

13   regarding reducing the defendant's moral

14   blameworthiness, including evidence of the

15   defendant's background, character, personal moral

16   culpability of the defendant, or the circumstances

17   of the offense to warrant a sentence of life be

18   imposed rather than a death sentence be imposed."

19          THE COURT:  Well, that's close to it.

20          MR. VINSON:  Is that what you wanted?

21          THE COURT:  No.  No, this entire

22   paragraph just like it is with a semicolon at the

23   end of that paragraph and add that additional

24   language.  Did you follow that?

25          MR. VINSON:  Yes, correct.

28

1          THE COURT:  The entire paragraph just as
2     it is and add that additional.
3          Anything further on that, Mr. Vinson?
4     You-all think you have it?
5          Okay, now, Mr. Odom.
6          MR. ODOM:  Yes, sir.  I renew my
7     objection that I made prior to the start of this
8     case.  I filed two motions.  I filed a motion for
9     continuance and I requested and/or of the Court
10    that if we not, either that we continue the case
11    in order to allow me to investigate the extraneous
12    offenses or that the extraneous offenses not come
13    into evidence.  I filed that motion after becoming
14    aware on August the 13th of 1997, or being told
15    that there were going to be extraneous offenses
16    that are offered into evidence.  The following
17    Monday, which date I believe is the 18th, is when
18    I filed the motion and we had a hearing in
19    chambers regarding these issues.  And I reiterate
20    all the objections I had at that time.  The basis,
21    the primary basis of my objection is this, that
22    the Court on January the 13th of 1997, made a
23    ruling in regards to motions that I filed,
24    defendant's request for notice of intent to offer
25    extraneous conduct at the punishment phase, motion

29

1    for discovery and inspection, motion for discovery

2    of relevant extraneous matters that may be

3    presented by the State under Article 37.071 and

4    37.07 of the Texas Code of Criminal Procedure and

5    have a request for notice of intent to offer

6    extraneous conduct at the guilt-innocence phase,

7    that the State inform me of any extraneous

8    offenses that they would offer at the punishment

9    stage.  And the Court ruled on that day that the

10   State would have to give me the date and count of

11   the allegations, the offense reports, let them see

12   the offense reports so they can gather all the

13   information they have in the offense reports, and

14   that will be done two weeks prior to the date of

15   trial.

16              THE COURT:  Two weeks prior to the date

17   of trial?

18              MR. ODOM:  Yes, sir.  We then determined

19   that date of trial would be the actual start of

20   the testimony.

21              THE COURT:  May I see where that is?

22              MR. ODOM:  Yes, sir.  Actually you said

23   no less than 15 days.  I have it paper clipped,

24   Judge, at the various locations.

25              THE COURT:  Okay.

30

1           MR. ODOM:  When we got to 15 days prior
2   to the actual date of testimony, I started voir
3   diring the jury on the fact, based upon the
4   Court's ruling and based upon the fact the State
5   had not given me any notice of the fact that in
6   regards to Special Issue No. 1 and Special Issue
7   No. 3 that there would not be extraneous offenses
8   and detrimentally relied on the Court's ruling
9   that the State give me notice within 15 days prior
10  to the start of testimony and does so in good
11  faith and did so to my detriment in that I have
12  voir dired the jury for a different case than the
13  one I am presently facing.
14          I believe that when this matter came
15  before the Court on the 18th that the issue then
16  arose as to whether this was newly discovered
17  evidence on the part of the State.  And I believe
18  that at that hearing it was determined that
19  although the State was working up its case and was
20  working on various witnesses and made the
21  representation that they hadn't firmed it up, that
22  they certainly had knowledge of these matters
23  prior to the five day notice.  And as such, I
24  don't think the State can rely upon a "we just
25  discovered this evidence" in order to say that

31

1   there was not a compliance to the five day

2   requirement ruling that I relied upon on the part

3   of the Court.

4           I'd further put in evidence the fact that

5   the 15 days prior from that day, the date of

6   August the 13th, up until we actually started

7   testimony, that I picked the jury by myself

8   although on rare occasions when I had a non-lawyer

9   sit with me during that time period, that during

10  the trial of this case I have been unable to do

11  anything other than try this case and certainly

12  have been unable to investigate and to pursue any

13  matters regarding the validity of these extraneous

14  offenses that they intend to offer.  And I would

15  submit to the Court that I am absolutely

16  unprepared to deal with these issues as far as

17  cross examination, as far as research, as far as

18  being aware of the matters, and as such would

19  re-urge my motion for continuance if the Court is

20  going to allow the extraneous offenses to come in

21  so that I have an opportunity to investigate this

22  matter and offer some semblance of effective cross

23  examination and investigation into this matter.

24  All of the work that has been done has been done

25  on the case as I knew it to exist from that date

32

1    prior to the 15th.  I'd also point out to the

2    Court that the Court, although withholding a

3    ruling on the 18th, certainly indicated that the

4    Court had serious concerns about the matter and

5    indicated an unwillingness to let these extraneous

6    offenses to come in.  While I know that that is

7    nothing to -- that a defense counsel can rely on,

8    I can represent to the Court that I haven't had

9    time to do anything other than work on this case

10   since that time.  I believe that it is not

11   adequate notice.  I believe that the State new

12   this prior to the 15 days prior to this offense --

13   this trial starting.  I believe I relied upon the

14   Court's order, and I believe I relied upon the

15   Court's order to accomplish a detrimental jury to

16   myself as well as surprise to myself and as such I

17   would, first of all, ask for a continuance, renew

18   my motion for a continuance so that I can

19   investigate this matter.

20            THE COURT:  You're getting repetitious,

21   Mr. Odom.

22            MR. ODOM:  If that's denied, I would

23   object to any admissibility of these extraneous

24   offenses.

25            THE COURT:  Let's let the record reflect

33

1    that Mr. Odom was advised by the State on the 13th

2    August that they were working on the possibility

3    of bringing up an extraneous.  It's my

4    recollection of that meeting that even at that

5    time they were not yet prepared to be able to move

6    forward.  Let's let the record reflect that it's

7    been 21 days since that date, this being September

8    2nd, in which Mr. Odom was advised that the State

9    was preparing to bring forward an extraneous.

10   Let's let the record further reflect that

11   this case commenced on July the 22nd with the

12   selection of the jury, that at that period of time

13   and it was in the opinion of the Court that

14   counsel did know or should have known that we were

15   still over a month away from trial and that that

16   was certainly a large enough window of opportunity

17   that an extraneous might pop up within that

18   period, well within the time frame that had been

19   provided, and that in an abundance of caution, I

20   think it should have been the defense attorney's

21   responsibility if you believed it to be important

22   enough to voir dire his jury on the issues of

23   extraneous offenses, given the fact that there was

24   still plenty of time for the State to bring in an

25   extraneous offense, as I mentioned, in an

34

1    abundance of caution.

2          Let's further reflect that my

3    recollection recalls that the jury -- the

4    selection of the jury was completed on -- we

5    completed --

6          MR. SMYTH: That's when we picked that

7    jury, Your Honor, on the 18th. The Court gave us

8    each an opportunity to voir dire then.

9          THE COURT: Okay, on the 18th the jury

10    was selected and thereafter -- that was a Monday

11    -- we had no business with the Court regarding

12    this matter on the 19th, 20th, 21st, 22nd, 24th

13    and not until the 25th did we commence trial. So

14    there was almost a week's period at that time when

15    this case was in recess, if you will, where there

16    was no jury selection and there was no trial being

17    had with regard to this matter that defense

18    counsel had an opportunity to do whatever. And I

19    want to finalize that with the conclusion that

20    defense counsel came to this Court, asked for

21    investigative help. All the investigative help

22    that was requested was granted. And your request

23    is overruled.

24          MR. ODOM: Judge, I would like to put

25    some evidence on in this regard. I need to bring

1   my investigator here.  And I believe that my

2   investigator would be able to put on to the Court

3   his efforts that he employed and the amount of

4   efforts that he employed from the time of August

5   the 18th until the time we went to trial.  I'd

6   also like to represent to the Court that from the

7   18th until the time of the trial I was by myself

8   on this case and could not physically prepare both

9   for the capital case, the case in chief, as well

10  as prepare for these extraneouses and that I would

11  have been unprepared to proceed on the case in

12  chief had I spent the time the Court is talking

13  about working on these extraneouses that even at

14  that point the Court had not ruled upon and I did

15  not know was coming into evidence and as a matter

16  of fact thought was not coming into evidence based

17  upon statements made by the Court.  But I would

18  like to have an opportunity to put that

19  investigator on to establish what we were doing

20  during that time period.

21          I'd also -- and if the Court would allow

22  me time to do that, I'd like to put that on to

23  evidence --

24          THE COURT:  That will be denied.  The

25  issue is not so much how busy your investigator

36

1    was.  The question is you should have approached
2    the Court requesting additional help if you
3    thought that was necessary to investigate.  We're
4    not talking about extraneouses other than Mr.
5    Copeland you have no objection to.  That was in
6    the primary case.  I think we're talking about one
7    extraneous offense and that is what we're focusing
8    on here today.  So I don't see any need for your
9    investigator to testify how busy he was.  All
10   you've got to do is come back to me and say I need
11   another investigator to look into this matter.
12   That was not done.  Whether or not I would have
13   given you that, frankly, that would have depended
14   on what you presented to me at that time.
15            MR. ODOM:  Well, Judge, in regards to the
16   one extraneous, I believe the evidence will show
17   that this extraneous is the equivalent of a case
18   in and of itself, the magnitude of which is the
19   size, almost the size of the case we just tried.
20            Also, I would remind the Court, that the
21   Court, when I asked for these issues on the 18th,
22   when this issue was presented to the Court, the
23   Court indicated to the State that it probably
24   would not let these extraneouses in and that there
25   was no ruling by the Court at that time when I

37

1    asked for a continuance to investigate this

2    particular case.

3            THE COURT:  I don't recall that aspect.

4    I do recall stating that I was making no ruling.

5    I told the State that they were under a burden to

6    prove to me beyond a reasonable doubt that this

7    extraneous was proper.  And I specifically

8    remember telling you, Mr. Odom, that you are not

9    to take it in any way as a ruling that I'm not

10   going to let this extraneous in.

11           MR. ODOM:  I do understand the -- my

12   understanding is the Court had made no ruling at

13   that point, and I specifically had a motion for

14   continuance at that point as well as a motion to

15   preclude the extraneouses.  And now here I am --

16           THE COURT:  Well, I'll just rule that you

17   had proper notice.

18           MR. ODOM:  I understand.  I'm excepting

19   is all.

20           THE COURT:  I understand.  Anything

21   further?

22           Okay, here is what we're going to do.

23   We're going to start trial.  We're going to bring

24   out the jury.

25           How many witnesses?  Do we have these

38

1    witnesses available?

2              MR. VINSON:  Yes, we can go ahead and get

3    them sworn.

4              THE COURT:  How long is this going to

5    take the State, do you believe, to run through

6    those witnesses?

7              MR. VINSON:  Hopefully we'll be finished

8    by 12:00 or 12:30.

9              THE COURT:  Mr. Odom, how long do you

10   think it will take you to present any defense you

11   may wish to present?

12             MR. ODOM:  Judge, I think that it

13   probably will take the afternoon to present mine

14   if we're going to finish by 1:30.

15             THE COURT:  No hindrance on you

16   presenting your case, I'm not going to allow a lot

17   of repetition.

18             Let's be seated.  Let's bring out the

19   jury.

20             (Jury in jury box).

21             THE COURT:  Please be seated, ladies and

22   gentlemen.

23             Good morning, ladies and gentlemen of the

24   jury.  We hope you had a nice weekend.  I

25   apologize again to those who showed up here on

1    Friday.  There were certainly unavoidable

2    circumstances.  I hope you understand that.

3            We are going to move into the punishment

4    phase at this time.  The State will have an

5    opportunity to call witnesses.  The defense has an

6    opportunity, if it wishes, to call witnesses.

7    There is no obligation for them to do so.

8            Once we complete that phase, we'll have

9    the same scenario that we had earlier.  The State

10   will have a chance to argue.  The defense will

11   have a chance to argue, and then you will commence

12   your deliberations.

13           Let me remind you once again -- and I

14   certainly anticipate that you will be deliberating

15   today -- that we will not separate until you have

16   a verdict.  So keep that in mind.

17           Let me ask, is the State ready?

18           MR. SMYTH:  The State's ready, Your

19   Honor.

20           THE COURT:  Is the defense ready?

21           MR. ODOM:  Other than what I expressed

22   before, the issue that I raised before outside the

23   presence of the jury.

24           THE COURT:  What does that have to do

25   with you being ready?  I see.  I'm sorry.  Other

40

1    than that?

2           MR. ODOM:  Other than that, we're ready

3    to proceed.

4           THE COURT:  Very well, let's proceed, Mr.

5    Vinson.

6           MR. VINSON:  Your Honor, at this time the

7    State will reoffer all the evidence admitted

8    during the guilt stage of the trial.  And the

9    State would -- we have the witnesses in the

10   courtroom.

11          THE COURT:  Are there any witnesses in

12   the courtroom?

13          Sir, are you a witness in this case?

14          A WITNESS:  Yes, sir, I am.

15          THE COURT:  You are a witness for the

16   State?

17          MR. SMYTH:  If the Court wants to swear

18   them all in at once.

19          MR. VINSON:  We only have one at this

20   time, Your Honor.

21          THE COURT:  Very well.  Let's call your

22   first witness.

23          MR. VINSON:  That will be investigator De

24   los Santos.

25          (Witness is sworn).

41

1    THE COURT: Please be seated. Before you
2    start, the reason that we're coming out late,
3    because I try to be prompt, is we have been
4    working on a proposed charge and so instead of
5    having an hour of your time after we complete this
6    stage, we tried to do it now so that we can move,
7    as quickly as possible, move right from the
8    attorneys' argument to allowing you to deliberate
9    other than between the close of the punishment
10   trial. Once you hear all the evidence, I'd rather
11   move directly into argument and deliberations
12   versus having you sit back there for an hour or
13   two while we get the charge ready. I think now
14   we've got the charge 99 percent complete, so we
15   took that time this morning so we'd have a smooth
16   transition. That's why you were back there for an
17   hour. I appreciate that.
18        Mr. Vinson.
19        MR. VINSON: Thank you, Your Honor.
20
21
22
23
24
25

42

1
2                    JIMMY DE LOS SANTOS,
3       was called as a witness by the State and, having
4       been duly sworn, testified as follows:
5                      DIRECT EXAMINATION
6       BY MR. VINSON:
7           Q.   Sir, will you give your complete name for
8       the record.
9           A.   My name is Jimmy De los Santos.
10          Q.   And how are you employed?
11          A.   I work for the Houston Police Department
12      in homicide, sex crimes division.
13          Q.   How long have you been working with the
14      Houston Police Department?
15          A.   Almost 15 years.
16          Q.   Let me take your attention back to
17      November of 1995.  Were you working with the
18      Houston Police Department at that time?
19          A.   Yes, sir, I was.
20          Q.   And will you tell the ladies and
21      gentlemen of the jury what your job was at that
22      time and what were your duty hours?
23          A.   I work as an investigator in our sex
24      crimes division.  My duty hours are 10:00 to 6:00
25      p.m.

                                                    43

1      Q.   And did you have an occasion while you

2    were on duty to investigate an aggravated robbery

3    that was committed here in Harris County, Texas,

4    where a sexual assault was also committed?

5      A.   Yes, sir, I was.

6      Q.   And would that address location be on

7    Portal Street in Harris County, Texas?

8      A.   Yes, sir.

9      Q.   Can you tell the ladies and gentlemen of

10   the jury how you became involved in the

11   investigation of that offense?

12     A.   I became involved in the investigation

13   when I was advised that the suspect had been

14   arrested in a possible home invasion where one of

15   the complainants, the lady in the house, had been

16   sexually assaulted.

17            MR. ODOM:   Judge, I'm going to object to

18   the hearsay on the part of the witness at this

19   stage in regards to his testimony.

20            THE COURT:   Sustained.

21   BY MR. VINSON:

22     Q.   What was your involvement?   Just tell us

23   your involvement.

24     A.   I took a written statement from one of

25   the suspects which had been arrested.

44

1      Q.   Okay.   Now, how many suspects were

2  arrested?

3      A.   At this time one.

4           MR. ODOM:   Judge, I ask the jury to

5  disregard the prior statement that I made my

6  objection as to in regards to the hearsay.

7           THE COURT:   Would you come up.

8           (Whereupon counsel approached the bench).

9           THE COURT:   The jury will disregard that

10  last response.

11          MR. ODOM:   I make a motion for mistrial.

12          THE COURT:   That will be denied.

13          Approach the bench, please.   You don't

14  need this on the record.

15          (Whereupon counsel approached the

16  bench).

17  BY MR. VINSON:

18     Q.   Did you interview one of the suspects,

19  sir?

20     A.   Yes, sir, I did.

21     Q.   And can you tell us who you interviewed?

22     A.   His name was Francisco Elvira.

23     Q.   And while you were interviewing this

24  defendant, did you also learn who was the second

25  person?

45

 1          A.    Exhibit No. 1 is Elvira, and Exhibit No.
 2     2 is Fugon.
 3          Q.    And the person in No. 2 is Fugon.  His
 4     name is Hector Fugon?
 5          A.    Hector Fugon.
 6          Q.    Now, during the course of your
 7     investigation, did you have a conversation with
 8     Mr. Fugon?
 9          A.    Yes, sir, I did.
10          Q.    And not what he told you -- don't tell me
11     that -- but did you get a name from Mr. Fugon?
12          A.    Yes, sir, I did.
13          Q.    What name did you get?
14          A.    David Balderas.
15               MR. ODOM:  That's okay.
16          Q.    David Balderas?
17          A.    Yes, sir.
18          Q.    Now, during the course of talking to Mr.
19     Balderas -- strike that -- Mr. Fugon, did you
20     attempt to contact Mr. Balderas?
21          A.    Yes, sir, I did.
22          Q.    And did you have any success?
23          A.    No, sir, I was not successful.
24          Q.    All right.  You didn't have any further
25     involvement in this case; is that correct?

                                                      47

1        A.    No, sir, I didn't.

2              MR. VINSON:  I pass the witness, Your

3        Honor.

4              THE COURT:  Thank you, Mr. Vinson.  Mr.

5        Odom.

6              MR. ODOM:  Did you offer the

7        photographs?

8              MR. VINSON:  I didn't offer them.

9              MR. ODOM:  I have no questions of this

10       witness.

11             THE COURT:  Stand down.  Thank you for

12       your testimony.

13             Call the next witness, please.

14             MR. VINSON:  Your Honor, at this time the

15       State would call David Balderas.

16             (Witness is sworn).

17             MR. VINSON:  May I proceed, Your Honor?

18             THE COURT:  Please, Mr. Vinson.

19             MR. VINSON:  Has he been sworn in, Your

20       Honor?

21             THE CLERK:  Yes, sir.

22

23

24

25

48

1                      DAVID BALDERAS,

2       was called as a witness by the State and, having

3       been duly sworn, testified as follows:

4                      DIRECT EXAMINATION

5       BY MR. VINSON:

6            Q.   Sir, would you give your name for the

7       record and spell your last name.

8            A.   David Balderas.

9            Q.   How old a person are you?

10           A.   Thirty-three.

11           Q.   And do you live here in Harris County,

12      Texas?

13           A.   Yes.

14           Q.   How far did you go in school?

15           A.   Just to high school, just to 10th grade.

16           Q.   To the 10th grade?

17           A.   Yes.

18           Q.   That seat has a tendency to rotate.  I'd

19      like you to kind of hold it steady if you can.

20           A.   Okay.

21           Q.   Can you tell us what high school you

22      attended, sir?

23           A.   Sam Houston.

24           Q.   Sam Houston?

25           A.   Uh-huh.

49

1          Q.    And what type of work are you engaged in?

2          A.    Body work, paint and body.

3          Q.    How long have you been engaged in that

4     type of work?

5          A.    About eight years.

6          Q.    And what did you do before that?

7          A.    I was a house painter.

8          Q.    Do you know a man by the name of Reinaldo

9     Dennes?

10         A.    Yes, sir.

11         Q.    Is Reinaldo Dennes here in the courtroom

12    today?

13         A.    Yes.

14         Q.    Would you please point to Reinaldo Dennes

15    and tell us where he's seated and what he's

16    wearing?

17         A.    Right over there.  He's wearing a green

18    jacket, suit.

19              MR. VINSON:  Your Honor, may the record

20    reflect that this witness has identified the

21    defendant?

22              THE COURT:  The record will so reflect.

23         Q.    (By Mr. Vinson)  As of January of last

24    year, 1996, if you track back, how long had you

25    known Reinaldo Dennes?

1        A.    Since about 1990.

2        Q.    And how did you come to meet Reinaldo

3   Dennes?

4        A.    I bought a house from him.

5        Q.    And can you tell us where this house was

6   located?

7        A.    The address?

8        Q.    Yes, in the city, in the county, where?

9        A.    It's in the county, off of Highway 6.

10       Q.    And you purchased that home from him?

11       A.    Yes, sir.

12       Q.    Did you live in the home?

13       A.    Yes, sir.

14       Q.    After you purchased that home, did you

15   have any further contact with Reinaldo Dennes?

16       A.    Yes, he did some of my jewelry repair.

17       Q.    Did what?

18       A.    Some of my jewelry repair.

19       Q.    Did you ever have occasion to visit with

20   Mr. Dennes or did he have occasion to visit with

21   you?

22       A.    Oh, yes, uh-huh.

23       Q.    Isn't it a fact that he carried a second

24   lien on the property?

25       A.    Oh, yes, yes, sir.

51

1      Q.   Now, how did you see him on the other

2  occasions?

3      A.   He repaired my jewelry, and I bought some

4  jewelry from him.

5      Q.   He repaired your jewelry?

6      A.   Uh-huh.

7      Q.   What type of jewelry are we talking

8  about?

9      A.   Chains, rings.

10     Q.   Where would these repairs take place at?

11     A.   I didn't know then.  He was working for

12  somebody.  I don't know where he did it, maybe at

13  his house.  I don't know.

14     Q.   But he would come to your house and pick

15  them up or just how did the transaction take

16  place?

17     A.   Yes, he would come to the house.

18     Q.   And how long did that go on?

19     A.   A few years.

20     Q.   Did you ever make purchases from him?

21     A.   Yes, I bought some jewelry from him for

22  my wife.

23     Q.   Did you ever have an occasion to go to

24  any business address that he held in this county?

25     A.   Yes, sir.

52

1       Q.    And what address did you go to?

2       A.    I don't know the right address.  I know

3    it was off of Richmond.

4       Q.    It was on Richmond?

5       A.    Uh-huh.

6       Q.    Do you recall the name?  Do you recall

7    the name of the building?

8       A.    No, I don't.

9       Q.    Okay, could you identify that building if

10   you were to see a picture of it?

11      A.    Yes.

12            MR. VINSON:  May I approach, Your Honor?

13            THE COURT:  You may.

14      Q.    (By Mr. Vinson)  Let me show you what's

15   been admitted into evidence as State's Exhibit No.

16   16.  Does that appear to be the building?

17      A.    Yes, sir.

18      Q.    Okay.  And is that the building that you

19   were speaking about that's located on Richmond

20   Street?

21      A.    Yes, sir.

22      Q.    Will you keep your voice up, please.  How

23   did you start going to that building?

24      A.    I was going there to purchase some

25   jewelry and stuff, get jewelry repaired and stuff

53

1     like that.

2          Q.   Now, do you know if the defendant had a

3     brother?

4          A.   Yes, sir.

5          Q.   Okay, and what was his brother's name, if

6     you recall?

7          A.   Albert, Alberto.

8          Q.   Albert?

9          A.   Uh-huh.

10         Q.   During the time that you were going to

11    the building there, did you go there to make

12    purchases or have repairs or just what?

13         A.   Just that, just to get some -- buy some

14    jewelry and get some jewelry -- look at jewelry or

15    new stuff, just whatever he had there.

16         Q.   How did you all get along together?

17         A.   Pretty good.

18         Q.   Did he ever work on a big lathe machine

19    in his office?  Did you ever see a big lathe

20    machine in that office?

21         A.   Yes, I saw one, but I never seen him use

22    it.

23         Q.   What type of machine would he work out

24    of?  When I'm talking about "he," I'm talking

25    about Reinaldo Dennes.  What type of machine would

1       he work on, if any?

2           A.   Little torches and little stuff to do

3       jewelry repair with, I guess.  That's what I seen

4       him use.

5           Q.   Now, around some time in October of 1995

6       were you still in contact with the defendant?

7           A.   Yes.

8           Q.   During that month did he approach you

9       about committing an offense?

10          A.   Yes.

11          Q.   And how did that come about?

12               MR. ODOM:  Judge, I renew my objection

13      and ask may I have a running objection.

14               THE COURT:  Certainly.

15          Q.   (By Mr. Vinson)  How did that come about?

16          A.   He just asked me if I wanted to, if I

17      wanted to make any money and do something.

18          Q.   Okay, he asked you if you wanted to make

19      any money?

20          A.   Uh-huh.

21          Q.   Is that all he asked you?

22          A.   Until I asked what it was.

23          Q.   Okay, you asked what it was?

24          A.   Uh-huh.

25          Q.   Now, when he asked you that, who was

```
 1      present?  Were you just there alone or who else

 2      was present, if anyone else?

 3           A.   Just me and him.

 4           Q.   Just the two of you all?

 5           A.   Uh-huh, yes, sir.

 6           Q.   Where did this take place?

 7           A.   At his office.

 8           Q.   What did you think about making some

 9      money?

10           A.   I didn't, you know.

11           Q.   Did you ask him how you were going to

12      make this money?

13           A.   Yes, I did.  You know, after we talked

14      about it, what was it we had to do.

15           Q.   And did he tell you what you had to do?

16           A.   Yes.

17           Q.   What did he tell you?

18           A.   He said that he knew somebody that might

19      have a large amount of jewelry in the house.

20           Q.   He knew someone that had a large amount

21      of jewelry?

22           A.   That may have.

23           Q.   That may have.  What else took place?

24           A.   He just told me he was going to check

25      into it and let me know.
```

56

1          Q.    What did you tell him at that time?

2          A.    I told him to let me know what was the

3     deal on it, to let me know what was up.

4          Q.    Okay.  Did he -- did you ever get back

5     with him, or did he ever get back with you and let

6     you know what was up?

7          A.    Yes, sir.

8          Q.    And what was up?

9          A.    That there was supposed to be a house

10    with jewelry in it, and if I wanted to go ahead

11    and either do it or find somebody to do it, to go

12    in there and get the jewelry.

13         Q.    Did you want to go in and get the

14    jewelry?

15         A.    No, not myself.

16         Q.    How do you mean, saying go in and get the

17    jewelry?  How was this going to be accomplished?

18         A.    He was going to go in there and tie the

19    guy up and take his attache case.

20         Q.    He was going to go up to the house and

21    knock on the door and let him know you were there

22    to take the jewelry?

23         A.    I didn't know.  Either I was going to do

24    it or I was going to get somebody to go in there,

25    knock on the door or go in, however, just to find

1    somebody to go in there and do this.

2         Q.   Okay.  But you declined to do that?

3         A.   Myself.

4         Q.   What happened next?

5         A.   I started looking for somebody to do

6    that.

7         Q.   Who started looking for someone to do it?

8         A.   I did.

9         Q.   Now, did you do it at the request of

10   Reinaldo Dennes or did you do it on your own

11   notion?

12        A.   Well, after I said I wasn't going to do

13   it, I had to go out there and find somebody if I

14   wanted to get anything out of it.

15        Q.   Who said that?

16        A.   I figured that out by myself.  I don't

17   think they would have been able to do it.  I had

18   to get somebody to do it because I wasn't going to

19   do it.

20        Q.   Did he ask you to find someone to do it?

21        A.   Yes.

22        Q.   And who did you -- strike that.  Did you

23   go and look for someone to do it?

24        A.   Yes.

25        Q.   And who did you go to look for?

58

1          A.    Hector Fugon.

2          Q.    You didn't check the yellow pages or

3     anything like that?

4          A.    No.

5          Q.    What did you do?

6          A.    Talked to my brother-in-law.

7          Q.    Who is your brother-in-law?

8          A.    Clifford Harwin.

9          Q.    Clifford Harwin?

10         A.    Uh-huh.

11         Q.    Why did you go ask your brother-in-law?

12         A.    Because he was into that, robbing and

13    stuff like that.

14         Q.    Was your brother-in-law able to help you?

15         A.    He just told me about this guy, this one

16    guy that probably would do it.

17         Q.    Okay.  Don't tell me what your

18    brother-in-law told you, but just after talking

19    with your brother-in-law, what did you do?

20         A.    I talked with him, told him to tell his

21    guys to call me.

22         Q.    You talked with your brother-in-law?

23         A.    Right.

24         Q.    After talking with your brother-in-law,

25    what did you do?

59

 1       A.    Contacted Ray and told him, "I think I
 2  found somebody."
 3       Q.    And where did you contact Ray at?
 4       A.    His office.
 5       Q.    Was Ray receptive to that?
 6       A.    Yes.
 7       Q.    Did you know the name of the people at
 8  that time?
 9       A.    I just knew their nicknames.
10       Q.    You just knew what?
11       A.    Their nicknames.
12       Q.    What were their nicknames?
13       A.    Honduras and Compadre.
14       Q.    Compadre?
15       A.    Uh-huh.
16       Q.    And what's the other name?
17       A.    Honduras.
18       Q.    Honduras?
19       A.    Uh-huh.
20            MR. ODOM:   Can we approach the bench on
21  that, please?
22            THE COURT:   You may approach.
23            (Whereupon counsel approached the bench).
24            MR. ODOM:   I'm sorry, Judge.  We were off
25  the record back in your office and I didn't get to

                                                    60

1   put on the record what I had voiced back in the

2   office and that is that I object to the

3   extraneouses in that I don't feel that the State

4   has shown the Court enough for the Court to make a

5   determination that it should be admissible beyond

6   a reasonable doubt based on the fact that it's all

7   uncorroborated testimony of a co-conspirator.

8           THE COURT:  I already ruled on that

9   earlier.

10          MR. ODOM:  That's not on the record,

11  Judge.  I don't think we were on the record.

12          THE COURT:  I ruled on it this morning

13  when I said I found sufficient evidence.

14          MR. ODOM:  I just wanted my objection to

15  be there before we forgot.

16          (Testimony continued before the jury:).

17  BY MR. VINSON:

18     Q.   So you had two names, Honduras and

19  Compadre.  Those are street names.  Did you later

20  learn their real names?

21     A.    Not until a long time afterwards because

22  that's what they go by.

23     Q.   Did you later learn their real names?

24     A.   Yes.

25     Q.   What was the real name?

61

1      A.    Hector Fugon was Honduras.

2      Q.    Hector Fugon.  Did you ever learn the

3   real name of Compadre?

4      A.    Francisco something.

5      Q.    Okay.  Could you recognize Francisco

6   something and Hector Fugon if you were to see

7   their pictures again?

8      A.    Yes.

9            MR. VINSON:  May I approach, Your Honor?

10           THE COURT:  You may.

11     Q.    (By Mr. Vinson)  Let me show you what's

12   been marked for identification purposes as State's

13   Exhibit No. 1 and 2 and ask you can you identify

14   the people in those photographs?

15     A.    Yes, sir.

16     Q.    Okay.  And who is State's Exhibit No. 1 a

17   picture of?

18     A.    That's Francisco, Compadre.

19     Q.    Compadre?

20     A.    Uh-huh.

21     Q.    Who is State's Exhibit No. 2?

22     A.    That's Honduras, Hector Fugon.

23     Q.    Honduras?

24     A.    Yes, sir.

25     Q.    Known as Hector Fugon?

62

1      A.   Yes, sir.

2           MR. VINSON:  Your Honor, at this time the

3      State will offer into evidence Exhibit 1 and 2 and

4      tender same to defense counsel for his

5      inspection.

6           MR. ODOM:  We have no objection other

7      than the previous objection that we've raised.

8           THE COURT:  Very well, State's 1 and 2

9      are admitted.

10          (Whereupon State's Exhibits Nos. 1 and 2

11     were admitted into evidence).

12     Q.   (By Mr. Vinson)  Now, did you ever meet

13     with Hector Fugon and Francisco?

14     A.   Yes.

15     Q.   And how did that come about?

16     A.   Well, I had to meet them to tell them

17     what the deal was on this little job we had got.

18     Q.   But I mean where did you all meet?  Where

19     did you go?

20     A.   We went to a Burger King off of Fondren

21     and Bellfort.

22     Q.   Now, you met the two men, Hector Fugon

23     and Francisco at a Burger King?

24     A.   Yes, sir.

25     Q.   And who all was present, just the three

63

1      of you all?

2         A.   Ray was there.

3         Q.   Okay.  And what happened then?

4         A.   Just talked and he wasn't really --

5         Q.   Let's take it a step at a time.  When you

6      all went to the Burger King, how did you get

7      there?  Did all of you go there together?

8         A.   No.  Me and Compadre and Honduras rode

9      together to Burger King.

10        Q.   In whose vehicle?

11        A.   Mine.

12        Q.   And how did Ray Dennes get to the Burger

13      King?

14        A.   He come in his car, his car.

15        Q.   Was Ray Dennes alone, or did he have

16      someone else with him?

17        A.   At that time he was alone.

18        Q.   Where did this meeting take place,

19      outside in the parking lot, inside the Burger

20      King, or where?

21        A.   Inside.

22        Q.   What happened inside the Burger King?

23        A.   We just all met.  You know, he met them

24      and, you know, asked if they were ready, whatever.

25        Q.   I need you to keep your voice higher and

1    to tell us what happened.

2        A.   We just all met.  We just shook hands.

3    He just asked if they were ready, you know.

4        Q.   Who made the introduction?

5        A.   I did.

6        Q.   Who did you introduce?  Did you introduce

7    those two men to the defendant?

8        A.   Not like shake his hand or anything.

9    Just like I just pointed to him, told him who he

10   was and stuff, not by name, just said this is the

11   guy who is going to give us the job.

12       Q.   These are the guys that's gonna do what?

13       A.   This is the guy that's going to give us

14   the job.  That's what I told Honduras, Compadre

15   when I introduced them to Ray.

16       Q.   What happened then?

17       A.   He wasn't too sure about the place where

18   it was at yet, Ray wasn't.

19       Q.   Okay.  What do you mean he wasn't too

20   sure about the place?

21       A.   He didn't know which house it was.

22       Q.   What happened then?

23       A.   He said when he found out he would get

24   back with me.

25       Q.   Now, had Ray ever taken you around in a

65

1   neighborhood there in the Fondren area?

2   A.   Yes, sir.

3   Q.   When did that happen?  Did that happen

4   before the meeting with Fugon and Francisco or

5   after the meeting?

6   A.   Before.

7   Q.   And how did that come about?

8   A.   Well, he just showed me the area kind of

9   and told me -- he wasn't sure which house, but he

10  took me down the street it was gonna be on.

11  Q.   And what part of the City was this

12  located?

13  A.   The southwest.

14  Q.   Now, Ray told you that he wasn't sure of

15  the address at that time?

16  A.   Right, correct.

17  Q.   And then what happened?

18  A.   That's when he told me he was going to

19  try to, you know, find out which house it was.

20  Q.   And what were the two men who were with

21  you, what were they supposed to do in the

22  meantime?

23  A.   Well, this was before, you know, he asked

24  me if I had ever been there before, he had took me

25  before.  I had already contacted them and told

66

1   them what we were going to do, but we hadn't met

2   at Burger King yet before he showed me the area.

3        Q.   So were the other two men supposed to

4   wait until they got the correct address?

5        A.   Yes, sir.

6        Q.   And who was Ray contacting?  Was he

7   contacting you or was he making contact with the

8   other two men?

9        A.   With myself.

10        Q.   You were the go-between?

11        A.   Yes, sir.

12        Q.   And how would Ray contact you?

13        A.   On my pager.

14        Q.   Did Ray ever get back to you with the

15   right address?

16        A.   Yes, sir.

17        Q.   And when did this happen?

18        A.   It was some time like in November, early

19   November -- yes, November.

20        Q.   Now, when you got the right address, did

21   you ever go -- strike that.

22             When you got the address from the

23   defendant, did you personally go and check that

24   address out yourself, anything of that nature?

25        A.   I didn't get the address, like the

1    number, but he like pointed to it.

2        Q.   Okay.

3        A.   So I kind of like took the guys by it and

4    pointed to them.

5        Q.   Okay.  When Ray got back to you -- what

6    I'm trying to get clear now is how was this

7    location determined?  Did he tell you where it was

8    or just what happened?

9        A.   Yes, he took me by there and he showed me

10   which house it was.

11       Q.   He took you by there?

12       A.   Yes, sir.

13       Q.   And did he point out a house to you?

14       A.   Yes, sir.

15       Q.   Do you know what street that was located

16   on?

17       A.   Portal.

18       Q.   Do you remember the address or anything

19   of that nature?

20       A.   No, sir.

21       Q.   Okay, after you hear the location, what

22   happened next?

23       A.   I contacted Honduras and Fugon -- I mean

24   Honduras and Compadre.

25       Q.   Now, did Ray ever tell you how he knew

68

1    that there was diamonds in that home?

2        A.   Some guy that came into his building or

3    that somebody knew inside the building, he flew

4    around with a bunch of jewelry, around the States.

5        Q.   Did he tell you how he was supposed to

6    determine where this person lived?

7        A.   He said he was going to follow him, have

8    him followed or something.

9        Q.   He was going to follow him?

10       A.   Yes, sir.

11       Q.   Where?

12       A.   From the airport.  That's what he told

13    me, it's going to be from the airport.

14       Q.   Okay, now, you have all this

15    information.  You've got an idea of where this

16    house is located.  What happened next?

17       A.   When he found out that the guy was there,

18    because he never knew when the guy would be

19    there --

20       Q.   Okay, what do you mean he never knew when

21    the guy was going to be there?

22       A.   When he found out that the guy was there,

23    he called me and told me.

24       Q.   Was that because the man traveled?

25       A.   Yes, sir.

1    Q.   Did Ray ever describe or tell you where
2  this diamond jewelry was supposed to be located
3  within this household?
4    A.   No, sir, he didn't say where.  He just
5  said what he was in.
6    Q.   Did he ever tell you what it was supposed
7  to be in?
8    A.   Yes, sir.
9    Q.   What was it supposed to be in?
10   A.   Black attache.
11   Q.   Black attache bag.  What happened next?
12 What happened in connection -- right now you've
13 located the house.  You know the jewelry is in a
14 black attache bag.  Do you have any idea when the
15 person attached to this bag is supposed to be
16 home?
17   A.   I didn't know until he called me and told
18 me the guy was there.
19   Q.   How did Ray contact you at that time?
20   A.   He paged me.
21   Q.   Was this day or night?
22   A.   It was night.
23   Q.   Okay.  And what happened then when he
24 paged you?  Did you return the page?
25   A.   Yes, sir.

70

1       Q.   Did you have a conversation with Ray?

2       A.   Yes, sir.

3       Q.   Okay.  What did he tell you?

4       A.   He said that the guy was at home.

5       Q.   And what was supposed to take place at

6  that time?

7       A.   I was supposed to tell the guys to go

8  ahead and go over there.

9       Q.   Now, how did you maintain contact with

10  Fugon and Francisco?

11       A.   By pager.

12       Q.   And did they -- did you page him?

13       A.   Yes, sir.

14       Q.   Did they return your page?

15       A.   Yes, sir.

16       Q.   What happened after they returned your

17  page?

18       A.   They told me they were going to take off

19  over there.

20       Q.   You told them where to go, or did you

21  take them there?

22       A.   I told them where to go.

23       Q.   And how did they get there?  Do you know?

24       A.   No, sir, I don't.

25       Q.   Then what happened?

1      A.   They were gone for a long time.  It was
2  real late.
3      Q.   What do you mean a long time?
4      A.   It was like about close to 10:00 when
5  they took off, and Ray paged me and asked me if
6  they had took off yet.
7      Q.   What did you say?
8      A.   I said yes.
9      Q.   Now, did you actually see them take off
10  or did you just telephone them, talking with them
11  over the phone, or did they actually come to your
12  location or did you go where they were located?
13      A.   I went to where they were located.
14      Q.   Where were they located?
15      A.   They were at some bar off of Cavalcade,
16  45.
17      Q.   And you gave them the word at that time?
18      A.   Yes, sir.
19      Q.   And did they proceed to the location?
20      A.   Yes, sir.
21      Q.   Now, had you ever taken them there
22  before?
23      A.   Yes, sir.
24      Q.   So they knew where to go?
25      A.   Yes, sir.

1       Q.   How were you all going to communicate?

2  Did they have any plan after they get -- if they

3  got into the home and they got the diamonds, what

4  was supposed to happen then?

5       A.   They had Ray's pager and they had my

6  pager and they were supposed to beep one of us

7  when they were done.

8       Q.   About how long did you anticipate that if

9  this was a smooth operation, how long would it

10  have taken to get in and get the diamonds and get

11  out?

12       A.   How long did I anticipate it to be?

13       Q.   Yes, sir.

14       A.   I thought it would take about an hour.

15       Q.   Does that include driving time?

16       A.   That was half.

17       Q.   To get to the house, to get the diamonds?

18       A.   Yes, sir.

19       Q.   And then contact you or Ray.  Is that

20  what you planned?

21       A.   Yes, they were just supposed to just go

22  in and tie the guy up and take his bag and leave.

23       Q.   Okay, now, how long had you known Fugon

24  and Francisco?

25       A.   A few months, about maybe a year, maybe.

73

1       Q.   So you did trust them?

2       A.   Yes.

3       Q.   What type of work did Fugon and Francisco

4    do on a daily basis?

5       A.   Fugon was a mechanic, auto mechanic.

6       Q.   He's a mechanic?

7       A.   Uh-huh.

8       Q.   And what type of work did Francisco do?

9       A.   I know he worked at -- they say he worked

10   at Luby's.  I'm not sure.

11      Q.   Neither one of those people were in the

12   diamond business?

13      A.   No.

14      Q.   Now, did you -- after the initial call

15   from Ray to see if they were gone, I take it that

16   you told him they had departed?

17      A.   Yes, sir.

18      Q.   Did you get any further communication

19   from Ray?

20      A.   No, sir.

21      Q.   Did he ever call you to try to find out

22   where they were?

23      A.   No, sir.

24      Q.   Did you ever call Ray back?

25      A.   Yes, sir.

74

1        Q.    And for what reason did you call Ray
2    back?
3        A.    Because the guys had came out of the
4    house already.
5        Q.    What?
6        A.    The guys had came out of the house they
7    were in already.
8        Q.    I couldn't understand you.
9        A.    The guys, they had came out of the house,
10   they had came out of the house already.   That's
11   why I had called Ray.
12       Q.    How did you know they came out of the
13   house already?
14       A.    They paged me.
15       Q.    They paged you, and you returned the
16   call?
17       A.    Yes, sir.
18       Q.    And how were you-all supposed to meet?
19   Did you have any rendezvous point where you were
20   supposed to meet?
21       A.    Either they were going to beep me or beep
22   Ray, page me or page Ray, and whoever got it was
23   going to hook up with him.
24       Q.    And did you hook up?
25       A.    No.

75

1      Q.   Why not?

2      A.   Because it was the wrong house, nothing

3   was in there that was supposed to be in there, in

4   other words.

5      Q.   Okay.  Did you ever contact Ray and let

6   him know it was the wrong house?

7      A.   Yes, sir.

8      Q.   And how did that happen?

9      A.   I called him when the guys called me and

10   told me that nothing like that was in there.

11      Q.   Did you call Ray?

12      A.   Yes, sir.

13      Q.   What did you tell Ray?

14      A.   I told him there was nothing in there,

15   nothing like that was in there.

16      Q.   What did he say?

17      A.   That I was lying.

18      Q.   Did you make him aware that you were just

19   relying upon the word of Francisco and Fugon?

20      A.   Yes, sir.

21      Q.   How did he respond to that?

22      A.   He said he'd find out in the morning.

23      Q.   Did you have any further contact with

24   Fugon or Francisco?

25      A.   Yes, sir, he paged me.

76

1       Q.   Who paged you?

2       A.   Fugon.

3       Q.   And why did Fugon page you?

4       A.   Because the police had picked up

5 Compadre.

6       Q.   The police picked up Compadre and

7 Compadre was Francisco?

8       A.   Yes, sir.

9       Q.   And was that the same night or the

10 following morning or what?

11      A.   It was like about four days later.

12      Q.   About four days later when Francisco

13 contacted -- strike that -- when Fugon contacted

14 you?

15      A.   Yes, sir.

16      Q.   During that four days separation there,

17 had you tried to locate Fugon or Francisco?

18      A.   No, I wasn't looking for them.

19      Q.   Did you believe what they told you?

20      MR. ODOM:  Objection as to whether he

21 believed them.  That's speculation, his state of

22 mind in that regards --

23      THE COURT:  It's overruled.

24      Q.   (By Mr. Vinson)  Did you believe what

25 Fugon and Francisco told you about nothing being

1    in the house?

2         A.    Yes, sir.

3         Q.    Why did you believe that?

4         A.    Because Ray had called me -- hadn't

5    called me and told me anything different.

6         Q.    He what?

7         A.    Ray hadn't called me and told me anything

8    different.

9         Q.    What do you mean Ray had not called you,

10   called you and told you anything different?

11        A.    Like when I called him and asked him if

12   anything was missing out of there or was it the

13   house, he didn't really talk about it too much, so

14   I figured if something was in there and they were

15   lying, he would have told me.

16        Q.    Now, you got a call about Francisco being

17   arrested; is that correct?

18        A.    Yes, sir.

19        Q.    And who called you?

20        A.    Honduras, Fugon.

21        Q.    Fugon.  Did he make any special request

22   or anything?

23        A.    He asked me to call Ray or for myself to

24   get him out of jail, to bond him out.

25        Q.    Bond who out?

78

1          A.    Compadre.

2          Q.    Compadre.  Why was he concerned about

3    getting Compadre out?

4          A.    Because he said he was just starting to

5    talk.  He was going to start saying stuff.

6          Q.    Compadre was going to start saying

7    things.  Did you talk with Ray Dennes about that?

8          A.    Yes, I did.

9          Q.    How did you do that?

10         A.    I called him up.  I called his office and

11   spoke with him.

12         Q.    Did you speak with him about it?

13         A.    Yes, sir.

14         Q.    What did you tell him?

15         A.    I told him that they had got arrested for

16   some things they had did inside the house.

17         Q.    What did Ray do?

18         A.    He told me those were my friends and for

19   me to handle it.

20         Q.    And did you attempt to handle it?

21         A.    No, sir, I didn't.

22         Q.    What did you do after that?

23         A.    I just stayed low.

24         Q.    Did you have any further contact with

25   Ray?

79

1      A.    No, I didn't.

2      Q.    Did you have any further contact with

3   Fugon or Francisco?

4      A.    Not after that.

5      Q.    Did you have any reason to believe maybe

6   the diamonds were taken and you weren't getting a

7   share?

8      A.    No.

9      Q.    How were the proceeds that were supposed

10  to be taken, these diamonds, was there ever any

11  discussion about how the breakdown would go?  Were

12  you supposed to get anything?

13     A.    Yes, I was.

14     Q.    What were you supposed to get?

15     A.    That was going to be determined after it

16  was done.

17     Q.    What about Fugon and Francisco?  Were

18  they supposed to get anything?

19     A.    That was going to be determined after it

20  was done also.

21     Q.    So this was a deal you do it first and

22  then we'll discuss the breakdown?

23     A.    Yes, sir.

24     Q.    How much jewelry and diamonds were

25  supposed to be in that house?

1          MR. ODOM:  If he has knowledge or was
2     told by one of the co-conspirators.
3          MR. VINSON:  I'll rephrase it, Your
4     Honor.
5          THE COURT:  Please.
6     Q.   (By Mr. Vinson)  Were you ever told
7     approximately how much was supposed to be in that
8     house by anyone that was involved in this offense?
9     A.   Yes, sir.
10    Q.   And who told you that?
11    A.   Ray.
12    Q.   How much was supposed to be in there?
13    A.   He said about maybe about a half or a
14    whole, maybe.
15    Q.   Anywhere from a half to a million?
16    A.   Uh-huh.
17    Q.   How did you feel about that, not knowing
18    what the share, the breakdown was going to be
19    until after the event had taken place?
20    A.   I wasn't too worried about it.
21    Q.   What if he hadn't given you anything?
22    What then?
23    A.   Who?
24    Q.   Ray hadn't given you anything.  What was
25    going to happen then?

81

1      A.   He wouldn't have done that.

2           MR. ODOM:  Objection, Your Honor.  It's

3  speculation what would have happened if the deal

4  wasn't cut.  It's speculative in nature.

5           THE COURT:  Sustained.

6           MR. VINSON:  I'll withdraw it.

7      Q.   (By Mr. Vinson)  You personally never

8  came in contact with any of the victims out of the

9  house that was entered?

10     A.   No, sir.

11     Q.   Do you know how the location got mixed

12 up?

13     A.   No, sir.

14          MR. VINSON:  May I have just a moment,

15 Your Honor?

16          THE COURT:  You may.

17          MR. VINSON:  I'll pass the witness, Your

18 Honor.

19          THE COURT:  Thank you.  Mr. Odom.

20          MR. ODOM:  Thank you.

21

22                    CROSS EXAMINATION

23  BY MR. ODOM:

24     Q.   Mr. Balderas, is that right?

25     A.   Balderas.

82

1        Q.   My name is Wendell Odom.  We've never

2   met, have we?

3        A.   No, sir.

4        Q.   When did you get arrested for being

5   involved in this offense?

6        A.   Never did.

7        Q.   When did you get arrested on something

8   else that led you to talk to the D.A. about this

9   offense?

10        A.   Never did.

11        Q.   All right.  How is it that the District

12   Attorney approached you initially?

13        A.   My brother-in-law.  He's a homicide

14   detective.

15        Q.   Your brother-in-law is a homicide

16   detective?

17        A.   Yes, sir.

18        Q.   And he approached you initially?

19        A.   We were talking over dinner.

20        Q.   All right.  And my question was he talks

21   to you or you talk to him first?

22        A.   I talk to him.

23        Q.   All right.  And before this, you're

24   laying low, right?

25        A.   Uh-huh.

1     Q.   And you've decided that you don't want to
2  lay low any longer?
3     A.   No, it had nothing to do with that.
4     Q.   You just have a conversation with your
5  brother-in-law that wherein you tell him of your
6  involvement in this case?
7     A.   No, not at all.  I didn't involve myself
8  at all.  I talked to him about something else that
9  pertains to what you all are doing now.
10    Q.   You talked to him about a matter that's
11  not a matter that is this particular offense,
12  right?
13    A.   Right.
14    Q.   Is that another matter that involves the
15  law?
16    A.   Yes, sir.
17    Q.   And is it another matter that you were
18  involved in?
19    A.   No, sir.
20    Q.   It was just another matter you're talking
21  to him?
22    A.   Right.
23    Q.   It's not a matter that you have any
24  personal concern about?
25    A.   A little bit.

84

1      Q.   All right.  What is your concern in the

2  first matter that you talked to your

3  brother-in-law about?

4      A.   It was something I was approached about,

5  and I didn't want to be down with --

6      Q.   Is it something that Ray Dennes

7  approached you in regards to?

8      A.   No.

9      Q.   It was something that someone else

10  approached you in regards to.

11      A.   Yes.

12      Q.   And did it involve criminal activity?

13      A.   Yes.

14      Q.   And did you talk to the person about the

15  criminal activity that they approached you in

16  regards to?

17      A.   Yes.

18      Q.   And what type of criminal activity was

19  it?

20      A.   I'm not sure.  It was kind of bad though.

21      Q.   All right.  Tell us a little bit.  What

22  do you mean it was kind of bad?

23      A.   Kind of like murder.

24      Q.   All right.  And when the person talked to

25  you about this kind of like murder matter, did you

1      tell him no?

2          A.   Yes.

3          Q.   But that concerned you a great deal, that

4      approach, so you talked to your brother-in-law?

5          A.   Correct.

6          Q.   Some way or another that conversation led

7      to the conversation of this matter?

8          A.   Yes.

9          Q.   All right.  Did someone come to talk to

10     you about this homicide matter, this other matter

11     that was kind of like murder?

12         A.   Yes.

13         Q.   And when they talked to you about this

14     other matter, kind of like murder, then did it

15     come out that you may have been involved in this

16     burglary of this habitation, this home?

17         A.   Correct.

18         Q.   And who did you talk to about the

19     burglary of a home that you were involved in?

20         A.   The first person I talked to about it?

21         Q.   Uh-huh.

22         A.   Some homicide investigators.

23         Q.   And who was that?

24         A.   I don't remember their name.  I've got

25     their card in my wallet.

86

1          Q.   Did you tell them about -- obviously at

2     some point you told them about your involvement in

3     this burglary?

4          A.   In this what?

5          Q.   What we call burglary of a habitation.

6     We call it that.

7          A.   Yes, yes.

8          Q.   You talked to him about that, right?

9          A.   Well, they talked to me about it first.

10    I just went in for that murder kind of thing.

11    Then they mentioned the burglary thing to me, if I

12    was involved in it.

13         Q.   Okay.  And have you been charged on this

14    burglary case?

15         A.   No.

16         Q.   Are you going to be charged on this

17    burglary case?

18         A.   I hope not.

19         Q.   All right.  Have you talked with anyone

20    about what your exposure is on being charged on

21    the burglary case?

22         A.   Yes.

23         Q.   Who did you talk to?

24         A.   The D.A.'s.

25         Q.   And when did that take place?

87

1     A.    When I came in for questioning,
2    statement, whatever.
3         Q.    All right.  When you first talked to
4    homicide about the burglary of a habitation, when
5    was that?
6         A.    Shoot, February.
7         Q.    February?
8         A.    '97.
9         Q.    February of  this year.  Now, what do the
10   District Attorneys tell you that your deal could
11   be?
12        A.    They didn't -- they don't make no deals.
13   They just said that anything I say I'd get
14   immunity to for a burglary.
15        Q.    They told you that anything that you say
16   you're going to get immunity for being involved in
17   that burglary?
18        A.    Correct.
19        Q.    And what is your understanding that that
20   means?
21        A.    That maybe I won't get charged.
22        Q.    All right.  What is your understanding of
23   immunity?
24        A.    Like, you know, I won't get charged.
25   Probably, hopefully that's what -- nothing will

1    happen.

2         Q.    See here is what bothers me is that

3    you're telling me you probably won't get charged,

4    but your understanding of immunity is that you

5    won't get charged?

6         A.    I didn't say won't.  I said maybe because

7    I don't know how that really works.

8         Q.    Okay, your understanding is that you

9    don't have any deal?

10        A.    I don't have any what?

11        Q.    You don't have any deal?

12        A.    Right.

13        Q.    Right.  But based upon what is testified

14   to, then you might get off these charges?

15        A.    Correct.

16        Q.    Now, as far as your activity with Ray

17   Dennes is concerned, you bought a house from Ray

18   Dennes, didn't you?

19        A.    Yes, sir.

20        Q.    That was back in '96?

21        A.    No, sir.

22        Q.    Back in '90?

23        A.    Uh-huh.

24        Q.    Okay.  And both prior to that and after

25   that you did business with Ray Dennes, didn't you?

1      A.    Yes, sir.

2      Q.    And that is he repaired jewelry for you

3  and sometimes even would sell jewelry to you?

4      A.    Yes, sir.

5      Q.    Now, you don't know whether Ray Dennes

6  can work on a lathe or not, do you?

7      A.    No, I don't.

8      Q.    How many times did you go to his office?

9      A.    A lot of times.

10     Q.    How many?

11     A.    A lot.

12     Q.    And were you there during most of his

13  working hours when he was working?

14     A.    Yes, sir.

15     Q.    So you were there kind of eight hours a

16  day?

17     A.    Not that much; but, you know, I was there

18  during the normal hours, but I wasn't there every

19  day.

20     Q.    You went there every day?

21     A.    No, I wasn't there every day.

22     Q.    But you really don't know whether he can

23  or can't work on a lathe, do you?

24     A.    No, sir.

25     Q.    Also you identified one of these persons,

90

1      Compadre, as Francisco?

2           A.   Yes, sir.

3           Q.   All right.  Do you know Francisco

4      Rojos --

5           A.   No, sir.

6           Q.   -- someone that works for Ray there at

7      that office you hang out in?

8           A.   Yes, I've seen him.

9           Q.   That's not the same person, is it?

10          A.   No, sir.

11          Q.   It's a totally different person?

12          A.   Yes, sir.

13          Q.   When did you tell the homicide detectives

14     about your involvement and Ray's involvement in

15     this burglary?

16          A.   When they asked me to come in.

17          Q.   All right, when was that?

18          A.   I want to say like it was after Easter.

19          Q.   It was before August the 13th though,

20     wasn't it?

21          A.   Yes, sir.

22          Q.   And you told them what you told this

23     Court today, didn't you, before August the 13th?

24          A.   Yes, sir.

25          Q.   Now, when Ray approached you to do this,

91

1   you said that you didn't know anyone right off the
2   top of your head that would go in and do this
3   job?  Do you recall that testimony?
4        A.   Did I say what?  Did I know anybody?
5        Q.   Yes, and you didn't know anybody when he
6   first asked you to do this burglary or this
7   robbery?
8        A.   I just said I wasn't going to do it.
9        Q.   Right, and then you said you had to ask
10  your brother-in-law because you didn't know
11  anybody?
12       A.   Yes, I said I was going to ask my
13  brother-in-law.  I tell him that -- that's what I
14  said to myself or whatever.
15       Q.   And your brother-in-law introduced you to
16  these two people, Compadre and Honduras?
17       A.   Yes, sir.
18       Q.   Now, you didn't know Compadre and
19  Honduras prior to that, did you?
20       A.   Yes, I did.
21       Q.   So you already knew them, it is just that
22  your brother-in-law is the person that told you
23  that these are the people that you need to talk
24  to?
25       A.   No, he was doing that, too, my

92

1    brother-in-law was; but he was locked up.  And

2    when he had been calling collect from the county,

3    he gave me their number and told me how to get

4    hold of them.

5         Q.   Yes, sir.  Okay, but you had known them

6    ahead of time?

7         A.   Yes, sir.

8         Q.   Now, is there any record that you have of

9    telephone calls that you made or that Ray made to

10   you?

11        A.   Maybe my old car phone bills.

12        Q.   All right.  Do you have any such

13   telephone calls that you know of?

14        A.   Do I have it in my possession?

15        Q.   Yes.

16        A.   Probably not because I throw all that

17   away.

18        Q.   And, Mr. Fugon said that he was going to

19   spill the beans if Ray, Reinaldo Dennes, didn't

20   bail him out, correct?

21        A.   No, it was Compadre.  He was already in

22   jail.

23        Q.   Compadre was going to spill the beans,

24   tell everybody, if Ray didn't bail him out, right?

25        A.   Ray or me.

1   Q. Ray never bailed him out, did he?

2   A. No.

3   Q. And Compadre and Fugon never spilled the

4 beans, did they?

5   A. On Ray?

6   Q. Yes.

7   A. I'm not too sure.  Well, the homicide

8 investigators told me that my name was in there,

9 so was his.

10   Q. All right.  Now, told you that your name

11 was in there?

12   A. Uh-huh.

13   Q. So we've got you that are basically the

14 only one that's testifying that Ray is involved in

15 this, right?

16   A. Uh-huh, yes.

17   Q. And you, depending on how you testify

18 today, might get off this, right?

19   A. Yes.

20   Q. And you didn't step forward and talk to

21 anybody about this until after Ray was already

22 arrested, did you?

23   A. Correct.

24   Q. Ray was never charged in this case, was

25 he, that you know of?

1      A.    No, sir, not that I know of.

2            MR. ODOM:  Pass the witness.

3            THE COURT:  How much longer do you think

4     your redirect will be?

5            MR. VINSON:  It will be very short.

6            THE COURT:  Proceed.

7

8                    REDIRECT EXAMINATION

9     BY MR. VINSON:

10     Q.    Now, do you recall when you spoke with me

11    and Don Smyth?  Do you recall that?

12     A.    Yes, sir.

13     Q.    Okay, and what was that, a couple of

14    weeks ago?

15     A.    Yes, sir.

16     Q.    The first time we ever laid eyes on you;

17    is that correct?

18     A.    Correct.

19     Q.    The first time Don Smyth ever saw, you,

20    correct?

21     A.    Correct.

22            MR. VINSON:  Can I have just a moment.

23     Q.    Now, why did you come forward on this?

24    Why did you come forward?

25     A.    Come forward?

1     Q.   Since that became an issue, why did you

2   come forward?  There had to be a reason.

3     A.   Because my brother-in-law told his

4   captain about what I knew, and they drug me in.

5     Q.   I mean you didn't voluntarily just come

6   down here, did you?

7     A.   No.

8     Q.   We had to go look for you; is that

9   correct?

10     A.   Yes.

11     Q.   You were served a subpoena; is that

12   correct?

13     A.   Yes.

14     MR. VINSON:  I have nothing further, Your

15   Honor.

16     THE COURT:  Mr. Odom.

17

18            RECROSS EXAMINATION

19   BY MR. ODOM:

20     Q.   You didn't mention Ray Dennes until you

21   were in trouble, did you?

22     A.   To who?  To the D.A.'s?

23     Q.   Uh-huh.

24     A.   True.

25     MR. ODOM:  Pass the witness.

1          MR. VINSON:  I don't have anything

2     further, Your Honor.

3          Is this witness to be excused?

4          MR. VINSON:  Yes.

5          THE COURT:  Any objection?

6          MR. ODOM:  On call, Judge.

7          THE COURT:  Thank you very much for your

8     testimony.  You may be excused.

9          Ladies and gentlemen, it's a little after

10    12:15.  We're going to break for lunch.  One hour

11    and 15 minutes, please.  Let's try to have them

12    back by 1:30.

13         We stand in recess.

14         (Noon recess).

15         THE COURT:  Let the record reflect the

16    State is present, that the defendant and his

17    counsel is present.  The jury is not.  Other than

18    the minor modifications that we've just discussed,

19    Mr. Odom, do you have any further objections?

20         MR. ODOM:  Yes, Judge.  Judge, we made

21    the two minor modifications --

22         THE COURT:  Who is taking care of those?

23    Who is going to run downstairs to make sure it

24    gets done?  Is somebody in charge of doing that?

25         MR. VINSON:  Your Honor, what I can --

97

1            THE COURT:  Can you just call down

2    there?

3            MR. VINSON:  He's going to be starting

4    with the evidence, and I can run down and take

5    care of it.

6            THE COURT:  What additional --

7            MR. ODOM:  The only other request I

8    would make that I didn't make at the time I made

9    my other objections previously -- of course, I

10   renew those objections -- is that we feel that the

11   State's burden to prove Issue No. 3 exists as well

12   as the State's burden to prove Issues No. 1 and

13   No. 2, that the State has the burden of proof and

14   it would go as to mitigating issues as well as to

15   the other two special issues.

16           THE COURT:  Didn't we just say we were

17   going to add a general paragraph with regard to

18   the State's burden?

19           MR. SMYTH:  It's a one phrase sentence,

20   Judge.

21           THE COURT:  It doesn't have any

22   applicability as far as specifically to any

23   particular issue?

24           MR. VINSON:  No, sir.  There the State

25   doesn't have any responsibility on Issue No. 3.

98

1          THE COURT:  That's fine.  We're going to
2     add that one sentence.
3          Wasn't there something additional, Mr.
4     Odom?  Maybe not with regard to the charge.
5          MR. ODOM:  Not with regard to the
6     charge.  Judge, my point, I believe that in the
7     application parts of the special issue there is a
8     comment that the State has a burden of proof as to
9     Issue No. 1, the State has a burden as to Issue
10    No. 2.  And there is nothing that relates to Issue
11    No. 3, and that is what I'm objecting to as it's a
12    constitutional argument that I make.
13         THE COURT:  That's overruled.  Why don't
14    you give me your other two motions?
15         MR. ODOM:  These are my copies of them.
16    They were filed back in June, I believe.
17         THE COURT:  We've never ruled on these?
18         MR. ODOM:  No, Judge, they're trial
19    motions.  Maybe you have ruled on them, but I
20    don't imagine that you have.  They only would be
21    applicable at the punishment.
22         THE COURT:  Motion to require the Court
23    to rule upon the objections made during final
24    arguments is granted.
25         Motion to limit the jury argument of the

1    State at the punishment stage.

2           Did the State look over that?

3           MR. SMYTH:  Judge, I think it's the same

4    things we're supposed to argue, and we don't

5    intend to do anything other than that.

6           THE COURT:  In any way impugn the

7    character of defense counsel.

8           Motion to limit the jury argument of

9    State as to punishment as to what's required per

10   the statute.  That's granted.  I think it pretty

11   well tracks that.

12          MR. ODOM:  Yes, sir.  It's supposed to.

13          THE COURT:  All right.  30 minutes on

14   argument.  And, again, once the testimony is

15   completed, I'll give you another opportunity to

16   let me know if you believe the charge is still in

17   order after we hear additional testimony.

18          Let's proceed then.  Okay.  Let's call

19   out the jury.

20          (Jury in jury box).

21          THE COURT:  Please be seated.  State,

22   call your next witness.

23          MR. SMYTH:  Your Honor, the State would

24   call Danny Tsang.

25          Would you like to have both of them sworn

1    at the same time, Judge?

2              (Witnesses are sworn).

3              THE COURT:  The rule has been invoked

4    which means the witnesses may not remain in the

5    courtroom while other witnesses are testifying.

6    While you're outside the courtroom you're not to

7    discuss this case with anyone other than your

8    attorney.

9              All right, we'll call you in very

10   shortly.

11             Which one is going to testify first?

12             Okay, Mrs. Tsang, would you step outside

13   the courtroom.

14             THE COURT:  Please be seated.

15             MR. SMYTH:  May I proceed?

16

17                 DANNY TSANG,

18   was called as a witness by the State and, having

19   been duly sworn, testified as follows:

20                 DIRECT EXAMINATION

21   BY MR. SMYTH:

22        Q.   Sir, would you please state your name and

23   speak loud enough for the entire jury panel to

24   hear you.

25        A.   Okay.  Danny --

                                              101

1            THE COURT:  Sir, about that far away.

2            THE WITNESS:  Danny, D-a-n-n-y; Tsang,

3    T-s-a-n-g.

4        Q.   Okay.  Mr. Tsang, do you live in Harris

5    County, Texas?

6        A.   Yes, I do.

7        Q.   How long have you lived in Harris County,

8    Texas?

9        A.   About 13 years.

10       Q.   Thirteen years.  Do you own a home here

11   in Houston, Harris County, Texas?

12       A.   Yes, I do.

13       Q.   And when did you buy that house?

14       A.   1975, about May.  I move in about July.

15       Q.   And is that home that you bought in May

16   and moved in in July of 1995, is that on Portal

17   Street here in Houston, Harris County, Texas?

18       A.   Yes, sir.

19       Q.   Were you living in that house back on

20   Thursday, November the 16th, 1995?

21       A.   Yes.

22       Q.   Did you live there by yourself or did

23   other people share the home with you?

24       A.   With my wife and my daughter.

25       Q.   Okay, and what's your wife's name?

                                              102

1      A.    Christina Tsang --

2      Q.    Excuse me?

3      A.    -- and Susan, Susan Tsang, my daughter's

4    name.

5      Q.    Christina is the lady that just left a

6    second ago?

7      A.    Yes, sir.

8      Q.    Back on Thursday night approximately

9    10:30, 10:35, were you in your home?

10     A.    Yes, sir.

11     Q.    Can you tell the ladies and gentlemen of

12   the jury exactly what you were doing in your home

13   at  10:30, 10:35 on that Thursday night, November

14   the 16th, 1995?

15     A.    Watching TV.

16     Q.    Do you recall what you were watching?

17     A.    Nightline.

18     Q.    Nightline?

19     A.    Nightline.

20     Q.    All right.  While you were there watching

21   Nightline, did anything unusual happen or cause

22   you to quit watching TV?

23     A.    Yes.

24     Q.    And what was that?

25     A.    Someone tapped on my back window, on the

103

1    back of the house.

2         Q.   I guess are you in the den area of your

3    home?

4         A.   Yes, the living room.

5         Q.   Living room.  Do you have great big floor

6    to ceiling windows across the back of your house?

7         A.   Yes.

8         Q.   Your house on Portal Street, does it back

9    up to something?  Instead of backing up to other

10   houses, is there something right behind your

11   house?

12        A.   A bayou.

13        Q.   A bayou?

14        A.   Yes.

15        Q.   Okay.  And that bayou runs the whole

16   length of the street behind your house?

17        A.   Yes, sir.

18        Q.   You hear something on your back window.

19   Is that inside your fence?

20        A.   Say that again, please.

21        Q.   You say you heard some tapping on your

22   back window?

23        A.   Yes, sir.

24        Q.   You have a fence around your house?

25        A.   Yes, I do.

1       Q.   A fence between your house and the bayou?

2       A.   Right.

3       Q.   Okay.  When you hear the tapping, what do

4 you do?

5       A.   I was kind of lying down on the couch,

6 and I stood up --

7       Q.   Okay, when you stood up --

8       A.   -- and looked outside.

9       Q.   When you stood up and looked outside, did

10 you see anything?

11       A.   I saw two men pointing their guns at me.

12       MR. ODOM:  Your Honor, I would renew my

13 objection that I posed before and ask that I have

14 a running objection on this issue.

15       THE COURT:  Very well.

16       MR. ODOM:  I would also object that the

17 prejudicial value outweighs the probative value of

18 the evidence.

19       THE COURT:  That's overruled.

20 BY MR. SMYTH:

21       Q.   Two people are pointing a gun at you.

22 Are they still outside your house?

23       A.   Yes.

24       Q.   What happened when these two guys pointed

25 guns at you?

1        A.    They pointed at the back door and
2    demanded me to open the door.
3        Q.    Okay.  Now, is your wife and daughter in
4    the home at the same time as you are?
5        A.    Yes, they were.
6        Q.    Are they in the living room there with
7    you?
8        A.    They were sleeping.
9        Q.    They were sleeping.  Are they sleeping in
10    another part of the house then?
11        A.    Yes.
12        Q.    So how close are you to these men with
13    guns when they tap on the back window?
14        A.    Almost seven, eight feet away.
15        Q.    Okay.  Do you go to the back door and
16    then let them in?
17        A.    Yes.
18        Q.    Is there some reason why you didn't just
19    run out the front door?
20        A.    Well, I was afraid they're going to shoot
21    me.
22        Q.    Do you know the names of those two men?
23        A.    Now I do.
24        Q.    Okay.  Do you now know the names of those
25    two men?

106

1      A.   Yes.

2      Q.   Could you tell the ladies and gentlemen

3  of the jury what the names of the two men were?

4      A.   One is Fugon and the other one is

5  Francisco.

6      Q.   If I showed you pictures of those people,

7  would you recognize them?

8      A.   Yes, sir, I do.

9           MR. SMYTH:  May I approach the witness,

10 Your Honor?

11          THE COURT:  You may.

12          MR. SMYTH:  Thank you, sir.

13     Q.   Let me show you what's been marked and is

14 in evidence as State's Exhibit No. 1 and ask you

15 if you recognize that person as well as State's

16 Exhibit No. 2?

17     A.   This is Francisco and this is Fugon.

18     Q.   You pointed to State's Exhibit No. 1.

19 That is -- which one is the one right here?

20     A.   One, yes.

21     Q.   Who is that?

22     A.   Francisco.

23     Q.   And State's Exhibit No. 2?

24     A.   Fugon.

25          MR. SMYTH:  Your Honor, at this time may

107

1    I publish these photos to the jury?

2         Q.   No. 1 is Francisco.  Was he a shorter,

3    heavier set guy?

4         A.   Yes, shorter, heavier.

5         Q.   And Fugon?

6         A.   Taller, skinnier.

7         Q.   Now, you let both of these two folks in

8    your house, State's Exhibit No. 1, Francisco and

9    State's Exhibit No. 2, Fugon; is that correct?

10        A.   Yes.

11        Q.   Okay.  What's the next thing that

12   happened after you let these men in your house?

13        A.   They pushed me down on the floor.

14        Q.   Were both of them involved in pushing you

15   down?

16        A.   Yes, pointing the gun on my head.

17        Q.   Both of them pushed you down and pointed

18   guns to your head?

19        A.   Yes.

20        Q.   Did they get you on the floor of your

21   living room?

22        A.   Yes.

23        Q.   Do they say anything to you at that time,

24   or do you --

25        A.   No, Fugon went into one of the rooms and

1    pull off the power cord from the iron, and then

2    they tie me up, tie my hands behind my back.

3         Q.   Okay.  After you've got your hands tied

4    behind your back, do either one of these men say

5    anything to you?  Do they tell you why they're

6    there or what they're looking for?

7         A.   Fugon said, kept on asking me where the

8    diamonds are.

9         Q.   Okay, he asked you where the diamonds

10   are?

11        A.   Yes, where the diamonds are.

12        Q.   Did he do that more than once?

13        A.   Yes.

14        Q.   What did you tell him about the diamonds?

15        A.   I said, "I have no diamonds.  What you

16   guys talking about?"

17        Q.   Okay.  After you told him there's no

18   diamonds, what are you talking about, did he leave

19   you?

20        A.   No.

21        Q.   He stayed in the house?

22        A.   Yes.

23        Q.   What did he do?

24        A.   Well, he kept on asking me for the

25   diamonds or the jewelry.  And then he asked me,

1   "Did you go to New York yesterday?"

2       Q.   Did you go to New York yesterday?

3       A.   Right.

4       Q.   What did you say to that?

5       A.   I said no.

6       Q.   Did you ever figure out, figure out why

7   they're asking you about the diamonds?

8       A.   They intend to rob a jewelry store.

9            MR. ODOM:  Objection unless the witness

10  knows, Your Honor.

11           THE COURT:  Sustained.

12      Q.   (By Mr. Smyth)  Let me just ask you

13  this:  You're sitting there.  You don't have any

14  diamonds, right?  Did you ever tell them you're

15  not a jeweler?

16      A.   Yes, I did.

17      Q.   Do you have any people in the jewelry

18  business on your street?

19      A.   Yes.

20      Q.   Specifically, are there any jewelers,

21  jewelry people within a couple of houses of you?

22      A.   Yes, two doors down to my right, to my

23  right.

24      Q.   Two doors down.  So if I'm in your house

25  looking out the front door, not the next house but

110

1    the house after that there is jewelry people live

2    there?

3         A.    Correct.

4         Q.    Do you know the names of the people that

5    live there?

6         A.    His name Albert.  I don't know his first

7    name.

8         Q.    Do you know his last name?

9         A.    No.

10        Q.    How about his wife?  Do you know his

11   wife's name?

12        A.    Rachel first name.

13        Q.    First name is Rachel?

14        A.    Rachel.

15        Q.    And he's in the diamond business?

16        A.    I knew he was in the jewelry business.  I

17   don't know what kinds of jewelry.

18        Q.    When you realized you have people in the

19   jewelry business in your neighborhood, did you say

20   anything about that to Mr. Fugon?

21        A.    Yes, I told him, I told him, "You got the

22   wrong house."

23        Q.    You've got the wrong house?

24        A.    Yes.

25        Q.    Did they -- after you told him, you've

111

1   got the wrong house, did they leave?

2        A.   No.

3        Q.   Okay, what did they do?

4        A.   Then they ask me who else is in the

5   house.

6        Q.   Who else is in the house?

7        A.   Yes, who else is in the house.

8        Q.   What did you say?

9        A.   Well, I told them my wife and my

10  daughter, and they're sleeping.

11       Q.   Okay.  What happened after you told them

12  your wife and daughter were in the house?

13       A.   Well, I guess they didn't want to, you

14  know, wake them up and make sure -- you know, I

15  guess they want to know where everybody was.

16       Q.   Okay, so what happened?

17       A.   And so I think he wanted -- Fugon, he

18  want to, you know, wake my wife and my daughter

19  up.  Well, let me do it because, of course, they

20  are going to be scared anyway.  So I said, let me

21  wake them up.

22       Q.   Excuse me, excuse me, Mr. Tsang.  Let me

23  do this real slow just step by step.

24       A.   All right.

25       Q.   He finds out somebody else is in the

112

1    house and he's going to wake them up.  You just
2    asked him if you could wake your wife and daughter
3    up instead of him; is that right?
4         A.   Yes.
5         Q.   So after you communicate that to Fugon,
6    what do you do?  Just what did you do next, just
7    one step at a time?
8         A.   So I guess he said okay.  So I walk in to
9    one of the bedrooms where my wife and daughter
10   were sleeping.
11        Q.   Okay.
12             MR. ODOM:  Judge, at this point I'm going
13   to pose another objection.  I'd like to do it
14   before the Court if possible.
15             THE COURT:  All right.
16             (Whereupon counsel approached the bench
17   outside the hearing of the jury).
18             MR. ODOM:  Judge, I believe they're going
19   to go into a rape at this point, and I think that
20   is beyond an extraneous offense, the rape
21   business.  I think the only purposes of them going
22   into this sexual assault is to add a prejudice to
23   the original robbery.  I think it is beyond the
24   scope of the defendant's activity.  I think its
25   purpose is to inflame the jury and I think that it

1    is an extraneous of the extraneous, if you will,

2    and as such I object to it and I don't think it

3    should be admissible.

4              THE COURT:  Mr. Smyth.

5              MR. SMYTH:  Judge, I think we should be

6    allowed to show everything that happened as a

7    result of this defendant's directing those folks

8    to go to that house.  You know, that's part of

9    once he puts people out to doing things, he may

10   lose control over what he's set in motion.  And I

11   think that's part of the danger of the type of

12   business, criminal activities he engages in.

13             MR. ODOM:  He certainly has the right to

14   establish the extraneous offense.  But when these

15   people take it on their own to commit other

16   offenses, I don't think unless the State can show

17   that there was some sort of knowledge on my

18   client's part or anticipating of the last part of

19   that, it's only prejudicial.

20             THE COURT:  Sustained.

21             MR. SMYTH:  May I have a moment, Judge?

22             THE COURT:  Sure.

23             MR. SMYTH:  Thank you, Judge.

24   BY MR. SMYTH:

25        Q.   Were you able to go to the bedroom where

114

1    your daughter and wife were sleeping?

2        A.   Yes.

3        Q.   Okay, did you still have your hands tied

4    behind your back?

5        A.   Yes.

6        Q.   Did you wake up your wife and daughter

7    and explain what's going on?

8        A.   Yes.  I just woke my wife up and told

9    them, "We are being robbed."

10       Q.   Okay.  Fine.  At that point had Fugon or

11   Francisco taken any property from you?

12       A.   Not yet.

13       Q.   Okay.  Did they tie your wife and

14   daughter up at that time, just a simple yes or no?

15       A.   No.

16       Q.   Okay.  Did they leave you in the room

17   with your wife and daughter or did they take you

18   some place else?

19       A.   No, they took me to the master bedroom.

20       Q.   Did you still have your hands tied behind

21   your back?

22       A.   Yes, that's correct.

23       Q.   Did they ever untie your hands from

24   behind your back?

25       A.   I'm sorry?

1      Q.   Did Francisco or Fugon ever untie your
2  hands from behind your back?
3      A.   At one point, yes, but they untie me and
4  tie me up again better --
5      Q.   Okay.
6      A.   -- and tie my feet up the second time.
7      Q.   Okay.  So they tied you up better than
8  they tied you the first time?
9      A.   Right.
10     Q.   While they're in the house, do they look
11 for any property or take any property?
12     A.   Well, they look for diamonds again.
13     Q.   What did they do to look for diamonds in
14 your house?
15     A.   Just ransacked the house pretty much.
16     Q.   They ransacked the whole house?
17     A.   Yes.
18     Q.   Did they look in the closets?
19     A.   Closets, drawers, under the bed, pillows,
20 return air duct, just the whole house.
21     Q.   They opened up the return air duct of
22 your house and looked in there?
23     A.   Right.
24     Q.   Did they find any diamonds in there?
25     A.   No.

116

1      Q.    How long did these folks stay in your
2  house?
3      A.    Two and a half hours.
4      Q.    Two and a half hours?
5      A.    Yes.
6      Q.    Was there some time that they were in
7  your house that you weren't present with them?
8      A.    Well, most of the time I stay on my bed
9  in the master bedroom.  And they took my wife over
10  the house, I guess, you know, tried to tell her,
11  you know, get the jewelry, get the diamond out.
12      Q.    You could hear this from your position on
13  the bed?
14      A.    Yes.
15      Q.    So after they put you on the bed, then
16  they led your wife around the house trying to get
17  her to show them where the diamonds were?
18      A.    Right.
19      Q.    Okay, did they ever leave your house?
20      A.    Did they ever leave the house?
21      Q.    At some point in time they left, I guess;
22  is that right?
23      A.    Yes, just like five minutes after 1:00.
24      Q.    Five after 1:00?
25      A.    Five minutes after 1:00 next morning.

1    Q.   So that means over into Friday morning

2    they're still there?

3    A.   Yes.

4    Q.   Did they ever take any of your property

5    when they left your house?

6    A.   They did.

7    Q.   Don't tell me an itemized list of

8    everything they took, but what kind of things did

9    they take?

10   A.   You know, some jewelry, my watch, the

11   camera, my daughter's jewelry.

12   Q.   Your daughter's jewelry?

13   A.   Yes, a small amount, some collectible

14   coins, my jacket, my wife's jackets, a gun, and

15   the whole stereo system.

16   Q.   Okay.

17   A.   Some decoration, you know, stuff.

18   Q.   Did somebody come and pick them up?

19   A.   No.  The reason they stayed there so long

20   because they kept on telling -- at one point

21   telling us, my wife and I, they're waiting for

22   someone to pick them up.

23   Q.   Okay, did a person ever come and pick

24   them up as far as you know?

25   A.   No.

118

1          Q.    How did they leave?  Did they just walk
2     out the front door or the back door?
3          A.    From the garage.
4          Q.    Okay.  When they left the garage, did
5     they take anything with them?
6          A.    They took my car.
7          Q.    Okay.  Did they load all your property in
8     your car?
9          A.    Right.
10         Q.    And then they drove off?
11         A.    Before they left, they unplug all the
12    phones, cut all the phones, you know, make sure we
13    couldn't call the police quick, I guess.
14         Q.    They cut your phone lines before they
15    left?
16         A.    No, they didn't cut the phone lines, but
17    they took all the phones, all the phones.
18         Q.    While you were there, did this event, did
19    it scare you?
20         A.    Oh, yes, of course.
21         Q.    What were you afraid of?
22         A.    They're going to kill us.
23         Q.    Do you still live in that house?
24         A.    Yes, I do.
25         Q.    And you just bought that house or just

119

1    moved in in July?

2        A.   Yes.

3        Q.   Do you take any additional security

4    precautions now that you have had this experience?

5        A.   Yes, we get a, what, panic button.   Now

6    we have -- it's getting a little better.   But

7    right after the incident we were very, very

8    scared.   And especially at night my daughter

9    constantly look to the back window and my daughter

10   used to wear the panic button on her neck, you

11   know, as to how scared she was, probably for four

12   or five months.

13       Q.   How old was your daughter at the time

14   this happened?

15       A.   Nine.

16       Q.   Nine years old?

17       A.   Yes.

18            MR. SMYTH:  Pass the witness, Your Honor.

19            THE COURT:  Mr. Odom.

20            MR. ODOM:  No questions, Your Honor.

21            THE COURT:  You may step down.   Thank you

22   for your testimony.

23            MR. SMYTH:  Your Honor, the State would

24   call Mrs. Christina Tsang.

25            MR. ODOM:  Judge, I would object.   It is

                                                  120

1    repetitious and it will be prejudicial and any

2    prejudicial value would outweigh its probative

3    value.

4           THE COURT:  That will be overruled, but I

5    will instruct the State to not be repetitious in

6    the questioning.  Ask something new.

7           MR. SMYTH:  Thank you, Your Honor

8

9                   CHRISTINA TSANG,

10   was called as a witness by the State and, having

11   been duly sworn, testified as follows:

12                DIRECT EXAMINATION

13   BY MR. SMYTH:

14      Q.   Ma'am, would you please state your name

15   and speak loud enough so the entire jury panel can

16   hear you?

17      A.   My name is Christina, last name Tsang,

18   T-s-a-n-g.

19      Q.   Ms. Tsang, are you a married woman?

20      A.   Yes, I am.

21      Q.   Is the man that just preceded you on the

22   stand, Danny Tsang, your husband?

23      A.   That's correct, yes.

24      Q.   Mr. Tsang has given us a great deal, told

25   us all about what happened on November the 15th

1    and 16th, 1995.  I'll skip through most of that

2    and just skip to information that has not been

3    heard by this jury before.  You were in the house

4    when somebody came in and robbed you, correct?

5         A.   That's correct.

6         Q.   Okay.  Did the people that came in, would

7    you recognize them if you saw them again?

8         A.   Yes.

9              MR. SMYTH:  May I approach the witness,

10   Your Honor?

11             THE COURT:  Yes.

12        Q.   (By Mr. Smyth)  I'll show you, ma'am,

13   what's been marked as State's Exhibit No. 1 and

14   No. 2 and ask if you recognize those individuals?

15        A.   Yes, I do.

16        Q.   Do you now know their names?

17        A.   Yes.

18        Q.   State's Exhibit No. 1, do you know what

19   his name is?

20        A.   Francisco.

21        Q.   Francisco?

22        A.   Right.

23        Q.   State's Exhibit No. 2?

24        A.   Fugon.

25        Q.   Fugon?

                                              122

1       A.    Right.

2       Q.    Can you tell the ladies and gentlemen of

3   the jury how it was that you became aware that

4   these two folks were inside your home?

5       A.    I was sleeping with my daughter that

6   night in her bedroom because I had some problem

7   with surgery with my eyesight that week.

8       Q.    Okay.

9       A.    And I was awakened by the light, the

10  switch on, and the bright light, and I look at my

11  husband first and I notice that his hand was

12  tied.  And there was another man with him, and I

13  thought I was dreaming.  I tried to close my eyes

14  one more time and try to put the cover over.  I

15  just wanted it to go away.  But then I realized --

16      Q.    I'll tell you what.  Let me just ask you

17  this.  We can go a lot faster if we just go

18  question and answer.  I want to get to a couple of

19  areas that will be new to the jury.

20      A.    Okay.

21      Q.    When these men came into your bedroom,

22  did you do anything with respect to your daughter?

23      A.    I put the blanket over here and put some

24  pillows around her because I was concerned that

25  when they through with us they probably would

123

1    waste us.

2         Q.   When you say waste you, what do you mean?

3         A.   Kill us.

4         Q.   Did you see guns in their hands?

5         A.   Yes, I did.

6         Q.   Both of these men had guns?

7         A.   Both of them, yes.

8         Q.   Did they tell you, either one of these

9    men tell you why they were in your house?

10        A.   Yes.

11        Q.   Okay, now, let's do it question and

12   answer, then let me follow up with a question or

13   two in response.

14             MR. ODOM:   Judge, if I don't have running

15   objections to this witness, I would request it for

16   the same reasons that I had objected to the other

17   witnesses.

18             THE COURT:   Certainly.

19        Q.   (By Mr. Smyth)  Your answer was, yes,

20   they told you why they were in the house.  What

21   did they tell you the reason they were in your

22   house?

23        A.   They were looking for diamonds and

24   jewelry.

25        Q.   Okay, did you have any big quantities of

124

1    diamonds or jewelry in your house?

2         A.   No, I don't.

3         Q.   Did you tell those men that you didn't

4    have any diamonds and jewelry in your house?

5         A.   Yes, we told them, but I don't think they

6    believed us.

7         Q.   Did they look around your house looking

8    for property?

9         A.   Yes, they did, for two and a half hours.

10        Q.   Okay.  All this time they're doing that,

11   does your daughter stay in bed covered up?

12        A.   Yes, she did.

13        Q.   Did they get you up out of bed and have

14   you look around the house for diamonds and

15   jewelry?

16        A.   Yes, they did.

17        Q.   Did you have any jewelry on your person?

18        A.   Yes, I had a bracelet on my arms, and

19   they told me to take it off.  And it was -- I wore

20   that bracelet since I was 16, so it was kind of

21   hard to take it off.  He just kept on, you take it

22   off.  And I got scared he would chop my hands off,

23   so I said let me get some soap to take it off.

24   And they took off my bracelet and my necklace on

25   my neck.

125

1       Q.   You apparently had worn that bracelet for

2   a number of years then?

3       A.   Yes, I did.

4       Q.   You got the bracelet off?

5       A.   Yes.

6       Q.   Did they take any other jewelry off your

7   person?

8       A.   They took off one of my rings on my

9   right-hand side, but I turned my diamond ring over

10  so they didn't see the diamond on my left-hand

11  side.

12      Q.   They didn't get your diamond ring?

13      A.   No, they did not.

14      Q.   Is that your wedding ring?

15      A.   Yes.

16      Q.   Did these men say anything to you about

17  whether they were there to rob you on their own or

18  because somebody had sent them?

19      A.   Both of them had told me that in a way of

20  saying that they apologized for being here but

21  they were forced to be here because if they don't

22  bring something back, they can be harmed or hurt

23  in their own words.

24      Q.   That's what they told you?

25      A.   That's what they told me more than once,

126

1    yes.

2        Q.   Did they ever tell you why they were

3    spending two and a half hours in your house?

4        A.   Because they were told that we have some

5    diamonds and jewelry in our house.

6        Q.   I take it they eventually left your house

7    and you folks got in contact with the police; is

8    that correct?

9        A.   That's correct, yes.

10            MR. SMYTH:  I'll pass the witness, Your

11   Honor.

12            THE COURT:  Thank you, Mr. Smyth.  Mr.

13   Odom.

14            MR. ODOM:  No questions, Your Honor.

15            THE COURT:  You are excused.  Thank you

16   for your testimony.

17            Please call your next witness.

18            MR. SMYTH:  The State will call Rachel

19   Ohayon.

20            (Witness is sworn).

21            THE COURT:  Mr. Smyth

22

23

24

25

127

```
 1                      RACHEL OHAYON,

 2     was called as a witness by the State and, having

 3     been duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5     BY MR. SMYTH:

 6          Q.   Ma'am, would you please state your name

 7     and speak loud enough and slow enough so that the

 8     entire jury panel can hear you.

 9          A.   My name is Rachel Ohayon.

10          Q.   Ma'am, do you work outside the home at

11     this time?

12          A.   At this time, no.

13          Q.   In the past have you worked outside the

14     home?

15          A.   Yes, I did.

16          Q.   When was the last time you worked outside

17     the home in a professional capacity?

18          A.   I was engaged in the diamond wholesale

19     business from 1994 until 1996.

20          Q.   Who did you work for?

21          A.   I worked for MGI which was a diamond

22     wholesale company.

23          Q.   And what did you do for MGI?

24          A.   I managed the company and owned part of

25     it.
```

128

1      Q.    Is MGI in any way connected with Szucs
2  Jewelry?
3      A.    Yes, it's a subsidiary company for
4  Satler's Jewelry.
5      Q.    And what street in Texas -- in Houston,
6  Harris County, Texas, do you live on?
7      A.    I live on 7731 Portal Drive.
8      Q.    And you just saw, I believe, Mrs.
9  Christina Tsang get off the stand.  Does she live
10  in your neighborhood?
11      A.    Yes, sir, she's two doors down.
12      Q.    So your house, then one house, then her
13  house?
14      A.    Yes, sir.
15          MR. ODOM:  Judge, I would renew my same
16  objection and ask that I have a running objection
17  as to this witness.
18          THE COURT:  Certainly.
19      Q.    (By Mr. Smyth)  Do you recall Thursday,
20  November the 16th, 1995, and on into the early
21  morning hours of Friday, November the 17th, 1995?
22      A.    Yes, sir, I do.
23      Q.    Did you live at that address on Portal
24  Street, 7731; is that correct?
25      A.    Yes, sir.

129

1       Q.   Did you live there on that address at

2   that period of time?

3       A.   Yes, sir, I did.

4       Q.   Are you a married woman?

5       A.   Yes, sir.

6       Q.   Who is your husband?

7       A.   My husband is Albert Ohayon.

8       Q.   Do you have any children?

9       A.   Yes, I have three children.

10       Q.   Back on that date, November the 16th and

11  17th of 1995, what did your husband do for a

12  living?

13       A.   He was a salesman carrying diamonds and

14  fine jewelry and he worked in the same company

15  that I did from 1994 until May of 1996.

16       Q.   And back in November of that year, did he

17  sell to diamond jewelry stores in the Houston area

18  or someplace else?

19       A.   He used to travel all over the United

20  States.

21       Q.   Was there any particular routine that he

22  had the week -- that week in November?

23       A.   Yes.

24       Q.   Did he leave at a certain time?

25       A.   Yes.

1          Q.    What was his schedule?

2          A.    He used to leave on Monday morning and

3    come back on Thursday evening.

4          Q.    When he'd come back on Thursday evening,

5    did he go by the office before he came home or did

6    he just come straight from the airport?

7          A.    No, he came straight from the airport

8    home, and then on Friday morning he would bring

9    his briefcase with the jewelry and bring it to the

10   safe.  But Thursday night he would have his

11   jewelry with him.

12         Q.    When he came home on Thursday -- and he

13   was in your home on the evening of Thursday,

14   November the 16th, 1995; is that correct?

15         A.    Yes.

16         Q.    Had he brought his jewelry with him, his

17   jewelry there?

18         A.    Yes, he did.

19         Q.    You were in the diamond business at that

20   time.  Do you personally know how much, what was

21   the value of the diamonds in his case that was in

22   your house on Portal Street on Thursday, November

23   the 16th, 1995?

24         A.    It was approximately five hundred

25   thousand dollars in value.

131

1     Q.   In the early morning hours of Friday,
2   November the 17th, 1995, did anybody come knock on
3   your door?
4     A.   Yes, a police officer came in in the
5   morning hours.
6     Q.   Okay.  Is this before the sun comes up?
7     A.   Yes.
8     Q.   Without telling anybody what the police
9   officer said, at that time did you become aware
10   that there had been a home invasion robbery at the
11   home of Danny and Christina Tsang just two doors
12   down?
13     A.   Yes, I did.
14     Q.   When the police come to your door to wake
15   you up, or did they come to check on you?
16     A.   This police officer came in to check on
17   my welfare.  He said there was a robbery.
18     Q.   Don't tell me what the police said.  They
19   came to check on your well-being?
20     A.   Yes, sir, that it's fine.
21     Q.   You were in the diamond business from '94
22   through '96, and your husband had been in the
23   diamond business for how long?
24     A.   He's been in business from '91 since we
25   came to Houston until about three months ago.

132

1      Q.    While you were in the diamond business,

2    did you come to know the names of Jose Albert

3    Dennes and Reinaldo Dennes?

4      A.    Just by name, yes, sir.

5      Q.    Do you know whether or not either Jose

6    Albert Dennes or Reinaldo Dennes worked for

7    Satler's Jewelry at the same time your husband

8    did?

9      A.    They worked there about six years ago,

10   not at the same time my husband did.

11     Q.    Is your husband, is he well known in the

12   diamond business?

13     A.    Yes, sir, he is.

14           MR. SMYTH:  Pass the witness, Your Honor.

15           THE COURT:  Thank you, Mr. Smyth.  Mr.

16   Odom.

17           MR. ODOM:  Thank you.

18

19                    CROSS EXAMINATION

20   BY MR. ODOM:

21     Q.    I just have a few questions I'd like to

22   ask you as well.  At the time you were working for

23   which company?

24     A.    MGI.

25     Q.    Is that the same company that your

133

1    husband was a salesman for?

2         A.   Yes.

3         Q.   Where were they located?

4         A.   They're located at Post Oak right next

5    door to Satler's Jewelers.

6         Q.   What's the address on Post Oak?

7         A.   I think it's 1749.  It's between

8    Westheimer and San Felipe on Post Oak.

9         Q.   Is it on Richmond?

10        A.   No.

11             MR. ODOM:  Pass the witness.

12             MR. SMYTH:  Nothing further, Your Honor.

13             THE COURT:  This witness can be excused.

14   Thank you, ma'am, for your testimony this

15   afternoon.  Appreciate you coming down.

16             Call your next witness, please.

17             MR. VINSON:  Your Honor, at this time the

18   State would recall Nicole Szucs.

19             THE COURT:  Mr. Vinson.

20             MR. VINSON:  Thank you, Your Honor.

21

22

23

24

25

                                                    134

1                        NICOLE SZUCS,

2    was called as a witness by the State and, having

3    been duly sworn, testified as follows:

4                     DIRECT EXAMINATION

5    BY MR. VINSON:

6         Q.   You are the same Nicole Szucs who

7    testified here last week?

8         A.   Yes, I am.

9         Q.   And you realize that you're still under

10   oath today?

11        A.   Yes, I know.

12        Q.   Ms. Szucs, can you tell His Honor and the

13   ladies and gentlemen of the jury where did your

14   husband come from?

15        A.   He came from Hungary.  He was born in

16   Hungary.

17        Q.   Go ahead.

18        A.   And he left Hungary when he was 18.  He

19   escaped to Austria.

20             MR. ODOM:  Judge, may I approach the

21   bench.

22             (Whereupon counsel approached the bench).

23             MR. ODOM:  I'm going to object to going

24   into the background and the character of the

25   deceased at this time in that it's not an

                                                      135

1    appropriate matter to be considered for

2    sentencing.  I don't think it goes to any of the

3    three issues.  And I think that there is case law

4    to indicate that that is not an issue that should

5    be considered at this time.

6              MR. VINSON:  I'll withdraw, Your Honor.

7              THE COURT:  Thank you very much.

8    BY MR. VINSON:

9         Q.   Let's go back to the relationship that

10   your husband had with the defendant Reinaldo

11   Dennes.  I think you testified last week that he

12   sent business to Reinaldo; is that correct?

13        A.   Yes.

14        Q.   And how long had he been doing that

15   before he was killed?

16        A.   Well, apparently they have had a working

17   relationship for quite awhile.  I don't know how

18   many years, but it was more than five years.

19        Q.   And how frequently would your husband

20   refer work to Mr. Dennes, on a weekly, monthly

21   basis?

22        A.   You know, since Johnny kept it so

23   personal and he didn't really get into everyone he

24   saw on a regular basis, but the week before I was

25   helping him with his income tax and the chair

                                                    136

1    broke and he started laughing.  He says, well,

2    I'll take it down to Ray so he can weld it for

3    him.

4        Q.   And so would it be a fair statement to

5    say that your husband had a great deal of trust in

6    this defendant?

7        A.   I don't know if I would say trust, but I

8    think he always helped the underdog type.  He

9    always gave people chances.  You know, he was just

10   that way.

11       Q.   Now, how has the death of your husband,

12   how has it impacted upon your life?

13            MR. ODOM:  I object to the form of the

14   question.  I object to the question.

15       Q.   (By Mr. Vinson)  This offense, how has

16   that impacted upon your life?

17            MR. ODOM:  I object to that as beyond the

18   purview of the issues and goes to the effect of

19   the case upon the victims.  The family is not an

20   issue as to the three special issues.

21            MR. VINSON:  It is to the respect, Your

22   Honor, that she was trying to locate him that

23   night, and she can testify how it impacted upon

24   her.

25            MR. ODOM:  That's not what he asked

137

1    though, Judge.  He asked an open ended how this

2    has -- what has the effect been upon her.

3             THE COURT:  Very well.  Sustained.

4    BY MR. VINSON:

5        Q.   How did the night that you were trying to

6    locate your husband, how did that then determining

7    that something had happened at the building, how

8    did that impact upon you, that building?

9        A.   You know, Johnny just meant so much to

10   me.  I always watched out for him.  I was always

11   careful about him.  I just loved him.

12            MR. ODOM:  Once again, I object.  This is

13   victim impact evidence.  This is not evidence

14   that's appropriate at the punishment stage of the

15   hearing as to the three special issues.

16            MR. VINSON:  There is a case, Payne

17   versus Tennessee.

18            MR. ODOM:  There is also a case that

19   comes out from victim impact not being available

20   because they're improper.

21            MR. VINSON:  May we approach, Your

22   Honor?

23            (Whereupon counsel approached the bench).

24            MR. VINSON:  We have had a recent case

25   where the husband -- I mean the wife was able to

138

1       testify to the impact that it had upon her at the

2       time her husband was killed in that she was in the

3       same room with him.  She testified to that.  In

4       that case it's live victim impact.  And this I

5       have restricted to the events and the impact it

6       had upon her the night the offense was committed.

7       She was looking for her husband.  She had

8       knowledge that an offense had been committed in

9       the building, a shooting had taken place in the

10      building.  She should be able to tell the jury

11      what impact that had on her.

12              MR. ODOM:  Judge, there is no way she can

13      delineate between what is general victim impact

14      type evidence that the Court of Criminal Appeals

15      has clearly said is not admissible from what

16      occurred that evening as to what may have occurred

17      at a later date.  And --

18              MR. VINSON:  We're talking about that

19      evening.

20              MR. ODOM:  That's what the question

21      says.  But there is no way you can make such a

22      delineation.

23              MR. VINSON:  Yes, she can.  She can tell

24      what went through her mind that evening and what

25      went on.

139

1          MR. ODOM:  Judge, haven't we gone into
2     this on the case in chief?
3          MR. VINSON:  No, no.
4          MR. ODOM:  That's the State's opportunity
5     to do that was during the case in chief and they
6     chose not to do so.  So now we're at punishment
7     where there are specific rulings in regard to that
8     and they wish to get in evidence that was
9     appropriate at the case in chief at the punishment
10    stage.
11         MR. VINSON:  We'll comply with whatever
12    rule the Judge makes.  We'll comply.
13         THE COURT:  In an abundance of caution, I
14    sustain the objection.
15         MR. ODOM:  Could I ask for an instruction
16    to disregard and also ask for a motion for
17    mistrial, Judge.
18         THE COURT:  Disregard what?
19         MR. VINSON:  We would ask to disregard
20    that.  We won't ask anything further.
21         THE COURT:  Disregard what?
22         MR. ODOM:  The question was already
23    asked.  The harm is already done.  She's up here
24    crying, and the jury can see it, Judge.
25         THE COURT:  Disregard the witness

140

1     crying?

2          MR. ODOM:  If that's what the record

3     says, I've got to do --

4          THE COURT:  Is that what you want me to

5     do?  Do you want me to tell this jury to disregard

6     that the witness is crying?

7          MR. ODOM:  Judge, I've got to preserve my

8     record.

9          THE COURT:  Excuse me, Mr. Vinson.

10         I'm just asking you is that what you want

11    me to pose to the jury?  I'll do that, but I don't

12    know if that's to your benefit.

13         MR. ODOM:  No, sir, Judge, to disregard

14    the last question that Mr. Vinson asked, and then

15    I'd asked for a mistrial based upon the witness's

16    crying.

17         THE COURT:  The jury will disregard Mr.

18    Vinson's last question to this witness.

19         Please continue.

20         MR. VINSON:  Your Honor, we have no

21    further questions.

22         MR. ODOM:  I have no further questions.

23         THE COURT:  Thank you again for coming

24    down.  We appreciate again your testimony.

25         Is she welcome to remain in the

141

1   courtroom, Mr. Odom?  Do you have any objection?

2          Very well.  If you'd like to remain in

3   the courtroom, you may.

4          MR. VINSON:  May we approach, Your

5   Honor?

6          THE COURT:  Sure.

7          (Whereupon counsel approached the bench).

8          MR. SMYTH:  Your Honor, may she be

9   excused from the rule?

10          MR. VINSON:  HPD just arrived.  We have a

11   judgment and sentence we have to introduce, but we

12   need an HPD jail card.  We have the man from the

13   Sheriff's Department at ID.  He needs to take a

14   look at that.

15          THE COURT:  What's the judgment and

16   sentence for?

17          MR. VINSON:  It's indecency.  Let me grab

18   it real quick.

19          THE COURT:  A conviction?

20          MR. ODOM:  Yes, public indecency in a

21   park.

22          THE COURT:  Is he going to stipulate?

23          MR. ODOM:  I don't know.

24          THE COURT:  I mean if he stipulates, we

25   don't have to do fingerprints.

142

1          MR. ODOM:  I'll ask him, but I don't

2    know.

3          THE COURT:  Well, let's find out if he's

4    going to stipulate.

5          MR. ODOM:  Although we are willing to

6    stipulate that they do not have to bring down the

7    person from jail records, I do object to the

8    admissibility of the document because it relates

9    to a deferred adjudication that this defendant

10   successfully lived out.  And I feel that it is

11   beyond the scope of evidence that this Court

12   should allow in consideration of evidence on

13   punishment.

14         THE COURT:  Are we talking about

15   deferred?

16         MR. ODOM:  Yes, it was a deferred.

17         THE COURT:  He was never convicted?

18         MR. VINSON:  It's still admissible, any

19   act, adjudicated or unadjudicated acts.

20         THE COURT:  Are you certain about that?

21         MR. VINSON:  Yes.

22         MR. ODOM:  It's my position that it would

23   be in violation of the constitution of the State

24   of Texas for such evidence to come in once a

25   person has successfully lived out the terms of

143

1   this deferred adjudication.

2           THE COURT:  What are we stipulating to?

3           MR. ODOM:  I'd stipulate to the fact that

4   if the guy came in, he is one and the same.  As

5   far as them being able to prove it up, I stipulate

6   to that.  I'm objecting to the admissibility.

7           THE COURT:  All you're willing to

8   stipulate to is this is one and the same person?

9           MR. ODOM:  I'm objecting to the

10  admissibility of it is what my objection goes to.

11  But I still don't think it's admissible.

12          THE COURT:  I appreciate it.  Let's bring

13  up that stipulation that says you're stipulating

14  this defendant is one and the same person who was

15  charged with this offense.

16          MR. VINSON:  He was placed on deferred

17  adjudication.

18          THE COURT:  For the offense?

19          MR. VINSON:  Yes, sir.

20          MR. ODOM:  I will stipulate --

21          MR. VINSON:  Either you accept the full

22  stipulation or you don't.

23          MR. ODOM:  All I'm saying is I stimulate

24  he's one and the same.  You're saying I'm waiving

25  all objections, which I'm not doing.

1          I'm stipulating he's one and the same.

2     That's all I'm stipulating to.

3          THE COURT:  Mr. Odom, will you approach.

4     I think he needs to be sworn.  Do we need to do

5     that outside the presence of the jury?  Does that

6     make any difference to you?

7          MR. ODOM:  Yes, why don't we do that

8     outside the presence of the jury.

9          THE COURT:  Mr. Schillaci, let's take the

10    jury out for one moment, please.

11         Don't get too comfortable.  We'll have

12    you right back out in about two minutes.

13         (Jury retired).

14         THE COURT:  You may be seated.

15         MR. ODOM:  Judge, we don't have a

16    stipulation.

17         THE COURT:  We do not?

18         MR. VINSON:  In that case we can get him

19    fingerprinted while the jury is out.

20         THE COURT:  Let's do that real quickly.

21         (Jury in jury box).

22         THE COURT:  Please be seated.  Let's

23    continue.

24         MR. VINSON:  Thank you, Your Honor.  At

25    this time the State would call Ana Moreno.

145

1          THE COURT:  Mr. Vinson.

2          MR. VINSON:  Thank you, Your Honor.

3

4                    ANA MORENO,

5     was called as a witness by the State and, having

6     been duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8     BY MR. VINSON:

9          Q.   Ma'am, would you give your complete name

10    for the record?

11         A.   Ana Moreno.

12         Q.   I take it by your uniform that you're

13    employed by the Houston Police Department?

14         A.   Yes, sir.

15         Q.   How long have you been so employed?

16         A.   Five years.

17         Q.   Are you assigned to a particular

18    department or certain area within the police

19    department?

20         A.   Yes, I work for the Identification

21    Division.

22         Q.   And would you tell the ladies and

23    gentlemen of the jury what you do in that

24    capacity?

25         A.   I deal with criminal histories.  When the

1      prisoners come in to the jail, they take their

2      fingerprints.  I verify them and class them, and

3      I'm also a custodian of records.

4           Q.   Now, as custodian of the records, are

5      these records kept in the regular course of

6      business?  Are they kept in the regular course of

7      business?

8           A.   Yes.

9           Q.   And are the entries made at or near the

10     time of the events depicted in that report?

11          A.   Yes, sometimes the same day.

12          Q.   And it's made by a person who has

13     personal knowledge?

14          A.   No.  Like that knows him?  No.

15          Q.   No, not that knows.  No, not that knows

16     him.  Someone who has personal knowledge that the

17     entry is being made.

18          A.   Oh, yes.  I'm sorry.

19          Q.   And do you maintain those records in the

20     regular course of business?

21          A.   Yes, we do.

22          Q.   Now, at my request this afternoon, did

23     you bring a jail card on a person by the name of

24     Reinaldo Dennes?

25          A.   Yes.

1          MR. VINSON:  May I approach the witness,

2     please.

3          THE COURT:  You may.

4          (Whereupon State's Exhibits Nos. 3, 4,

5     and 4-a were marked for identification purposes).

6     Q.    (By Mr. Vinson)  Let me show you what's

7     been marked for identification purposes as State's

8     Exhibit 4.  I'm going to ask you, can you identify

9     State's Exhibit No. 4?

10    A.    Yes, it's a hold card for Reinaldo

11    Dennes.

12    Q.    Let me show you what's been marked for

13    identification purposes as State's Exhibit 4-a.

14    Can you identify that as well?

15    A.    Yes, it's a certified copy of the same

16    hold card.

17    Q.    Okay.  And is this made at the time a

18    person comes into the jail?

19    A.    Yes.

20    Q.    Just like you testified to earlier?

21    A.    Yes.

22    Q.    And do you also take the fingerprints of

23    the person?

24    A.    Yes, we put them on the corner, the right

25    hand fingerprints on the card.

148

1          MR. VINSON:  Your Honor, at this time the
2    State will offer into evidence Exhibit 4-a and
3    tender same to defense counsel for his
4    inspection.
5          MR. ODOM:  No objection, Your Honor.
6          THE COURT:  State's 4-a is admitted.
7          (Whereupon State's Exhibit No. 4-a was
8    admitted into evidence).
9          MR. VINSON:  May I just have a moment,
10   Your Honor?
11          I have nothing further from this witness,
12   Your Honor.
13          THE COURT:  Thank you, Mr. Vinson.  Mr.
14   Odom.
15          MR. ODOM:  I have no questions for this
16   witness.
17          THE COURT:  Thank you.  You may step
18   down.  Thank you for your testimony.
19          Please call your next witness.
20          MR. VINSON:  Your Honor, at this time the
21   State would call Deputy Mc Donald, Harris County
22   Sheriff's ID.
23          MR. VINSON:  Your Honor, I'm returning
24   her original copy.
25          THE COURT:  Very well.

1              ROY WILLIAM MC DONALD,

2    was called as a witness by the State and, having

3    been duly sworn, testified as follows:

4                   DIRECT EXAMINATION

5    BY MR. VINSON:

6         Q.   Sir, would you introduce yourself to His

7    Honor and the ladies and gentlemen of the jury?

8         A.   I'm Roy William McDonald.  I'm a deputy

9    with the Harris County Sheriff's Department, and

10   I'm assigned to the Identification Division.

11        Q.   And how long have you been with the

12   Harris County Sheriff's Department?

13        A.   I've been full-time for approximately 14

14   years.

15        Q.   And how long have you been in the

16   Identification Division?

17        A.   For over 13 years.

18        Q.   Can you tell the ladies and gentlemen and

19   His Honor what type of training you received to

20   prepare you to work in that locale?

21        A.   I've received the basic and advanced

22   courses in fingerprints taught by the Texas

23   Department of Public Safety and those same two

24   courses taught by the FBI and over 13 years

25   day-to-day experience.

150

1      Q.    And, sir, in your work are you called on

2   from time to time to take a print from a judgment

3   and sentence and compare that with a known print

4   and determine if the print on the judgment and

5   sentence is made by one and the same person?

6      A.    Yes, sir.           .

7      Q.    And at my request did you do that today?

8      A.    Yes, sir.

9      Q.    And can you identify the person whose

10  fingerprint you secured?

11     A.    The individual seated on the other side

12  of the table from the jury with no glasses on, the

13  green colored suit.

14          MR. VINSON:  Your Honor, may the record

15  reflect that this witness has identified the

16  defendant.

17          THE COURT:  The record will so reflect.

18     Q.    (By Mr. Vinson)  Would you tell the

19  ladies and gentlemen of the jury how you take a

20  person's fingerprints?

21     A.    On the underside of our fingers there are

22  very small ridges, and these ridges form patterns

23  that contain characteristics.  And to take a

24  fingerprint, we apply a thin film of ink to the

25  underside of the finger and reproduce that pattern

151

1     or characteristics onto a smooth surface.

2          Q.   And did you do that in this case?

3          A.   Yes, sir.

4          Q.   Now, after taking the defendant's

5     fingerprints, did you have an occasion to compare

6     those prints with the criminal history from the

7     Houston Police Department?

8          A.   I compared them to a document from the

9     Houston Police Department.  I didn't notice what

10    it was.

11              MR. VINSON:  Okay.  May I approach, Your

12    Honor?

13              THE COURT:  You may.

14              (Whereupon State's Exhibit No. 5 was

15    marked for identification purposes).

16         Q.   (By Mr. Vinson)  Let me show you what's

17    been introduced into evidence as State's Exhibit

18    4-a.  I'm going to ask you can you identify that

19    document?

20         A.   Yes, sir, I can.

21         Q.   And is that the same document that you

22    had an opportunity to look at earlier this

23    afternoon while the jury was out?

24         A.   Yes, sir.

25         Q.   Now, let me show you what's been marked

152

1    for identification purposes as State's Exhibit 5.

2    Can you identify that as well?

3        A.   Yes, sir, I can.

4        Q.   And what is State's 5 that is marked for

5    identification purposes?

6        A.   Exhibit 5 is a 3 x 5 card upon which I

7    placed the fingerprints of the individual I

8    pointed out to you earlier.

9        Q.   Okay.  And did you have an opportunity to

10    compare the fingerprints that's on State's Exhibit

11    4-a with the fingerprints that's contained on

12    State's 5 that was marked for identification

13    purposes?

14        A.   Yes, sir, I did.

15        Q.   And did you form an opinion as to whether

16    or not those fingerprints in State's 4-a and 5

17    that was marked for identification purposes were

18    made by one and the same person?

19        A.   Yes, sir, I did.

20        Q.   Who would that person be?

21        A.   These prints were all made by the

22    defendant, the one I pointed out to you.

23        Q.   Okay, and can you tell the ladies and

24    gentlemen of the jury and His Honor the basis of

25    your opinion?

1      A.    Based on -- after comparing the prints,

2  it's based on my training and experience.

3      Q.    Have you ever seen two people with the

4  same fingerprints?

5      A.    No, sir.

6            MR. VINSON:  I have no further questions,

7  Your Honor.  Pass this witness.

8            MR. ODOM:  Judge, I have no questions for

9  this witness.  However, let me make sure I didn't

10  misspeak.  I said I didn't have an objection to

11  4-a.  I didn't have an additional objection other

12  than the objections I had raised outside the

13  presence of the jury before the bench.

14           THE COURT:  Very well.  May this witness

15  be excused?

16           Thank you for your testimony, Deputy.

17  Call your next witness.

18           MR. VINSON:  Your Honor, at this time the

19  State has no further witnesses to call but we

20  would offer into evidence State's Exhibit 3 is a

21  certified copy of the indecent exposure charge

22  under Cause No. 8911934 against Reinaldo Dennes in

23  County Court No. 13, Harris County, Texas.

24           THE COURT:  Tender to the defendant.

25           MR. ODOM:  Judge, I renew the objections

154

1    I made to the bench outside the presence of the
2    jury.
3              THE COURT:  It's overruled.  It's
4    admitted.
5              (Whereupon State's Exhibit No. 3 was
6    admitted into evidence).
7              THE COURT:  Is it to be published or not
8    published?
9              MR. VINSON:  Yes, Your Honor, we ask that
10   it be published.
11             THE COURT:  Did you want them to read it
12   or do you want to just circulate it?
13             MR. VINSON:  We could speed it up if I
14   were to read it, with the Court's permission.
15             Minutes of County Clerk Criminal -- that
16   is County Criminal Court at Law No. 13 on April
17   term 1989.  The Cause is 8911934, the State of
18   Texas versus Reinaldo Dennes, April the 26th
19   of '89, Order of Deferred Adjudication of Guilt
20   and Probation.  And it reflects here that the
21   offense is indecent exposure as charged in the
22   information, a plea of guilty, a fine of two
23   hundred dollars, adjudication of guilt deferred
24   for a period of 180 days.  And it was signed on --
25   date of offense was April the 1st of 1989, and it

155

1    was signed on the 26th day of April, 1989.

2          THE COURT:  Very well.

3          Did I hear you say the State rests?

4          MR. VINSON:  The State will offer all the

5    previous evidence and rest at this time.

6          THE COURT:  Mr. Odom, please call your

7    first witness.

8          MR. ODOM:  Before I do that, could the

9    Court allow me to make a brief motion?

10         THE COURT:  Does the State want to

11   approach?

12         MR. VINSON:  I'm sorry.

13         (Whereupon counsel approached the bench).

14         MR. ODOM:  I make a motion for a judgment

15   of acquittal, motion for instructed verdict of

16   acquittal.  I believe Hayes vs the State says,

17   based upon the fact the extraneous matters that

18   have been presented are inadmissible for the

19   reasons I expressed and that without them the

20   State does not have the prerequisite necessary to

21   prove the special issues for which they are

22   required to prove beyond a reasonable doubt.

23         THE COURT:  Thank you.  That's

24   overruled.

25         MR. ODOM:  Yes, Your Honor, we would like

1    to proceed at this time.

2            THE COURT:  Please call your first

3    witness.

4            MR. ODOM:  We call the custodian of

5    records for the Harris County Jail, Your Honor.

6            THE COURT:  Very well.

7            MR. ODOM:  This witness has not been

8    sworn in, Your Honor.

9            (Witness is sworn).

10           (Whereupon counsel approached the bench).

11           MR. ODOM:  I'm certainly not opposed to

12   Mrs. Szucs being in the courtroom, but she's been

13   crying the whole time she's been in the

14   courtroom.  And I think we have a motion that I

15   adopted from Mr. Parnham to try to prohibit over

16   displays of emotion.  And I think it's quite

17   distracting to any testimony that I want to put

18   on.  I don't mind if she's here as long as she's

19   not crying.

20           THE COURT:  Would you be satisfied if I

21   call her up?

22           MR. ODOM:  Judge, at some point, a

23   break.  I don't want to be hard about this, but

24   that's one of the reasons I did not want her

25   waived from the rule is because she's obviously

1    very emotional, and that's understandable.

2           THE COURT:  Do you want me to ask her to

3    leave?

4           MR. ODOM:  Or perhaps the State can talk

5    to her.

6           MR. SMYTH:  Why don't we clear the front

7    row during the first break and keep both the

8    families off the front row?

9           THE COURT:  I'll think about that.  Go

10   back and tell Mrs. Szucs if she's going to

11   continue to show some type of emotion, she'll have

12   to leave.

13          MR. SMYTH:  I'll certainly tell her

14   that.  But his client's family have been

15   snickering and making all kinds of sounds.

16          THE COURT:  That's fine.  You didn't

17   bring it to my attention.

18          MR. ODOM:  I didn't see that, but I know

19   I've been putting on my testimony and she's been

20   crying since she was up here.  She's not in here

21   now.

22

23

24

25

CALVIN WILSON,

was called as a witness by the Defense and, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ODOM:

Q.   State your name for the Court and the record, please, sir.

A.   My name is Calvin Wilson.

Q.   All right, and how are you employed, Deputy Wilson?

A.   I'm a deputy sheriff with the Harris County Sheriff's Department.

Q.   And what position do you have with the Harris County Deputy Sheriff's Department?

A.   I work a division called classification division.  We keep the records for all inmates that are incarcerated in the Harris County Jail.

Q.   And did you receive a summons or a subpoena to appear in court in regards to certain records for an inmate by the name of Reinaldo Dennes?

A.   Yes, I did.

Q.   And pursuant to that subpoena, did you bring certain records over that are in the possession of your particular office?

1       A.   Yes, I did.

2       Q.   Now, Mr. Wilson, I'd like to ask you some

3   questions.  First of all, is the information

4   contained in your records, the records you brought

5   over, is it reports and data, events that are made

6   at or near the time?

7            MR. VINSON:  Your Honor -- if you're

8   representing that he is a custodian of the

9   records, we'll stipulate that he is.

10           THE COURT:  Very well.  Thank you very

11  much.

12           MR. ODOM:  It saves us asking some

13  questions.

14      Q.   (By Mr. Odom)  Are you the custodian of

15  the records of Reinaldo Dennes?

16      A.   Yes, I am.

17           MR. ODOM:  Your Honor, at this time, may

18  I approach the witness?

19           May I see those records and have them

20  marked.  Are these copies?

21           THE WITNESS:  These are copies.

22           (Whereupon Defendant's Exhibit No. 1 was

23  marked for identification purposes).

24      Q.   (By Mr. Odom)  Deputy Wilson, I'd like to

25  show you what's been marked as Defense Exhibit No.

1    1 for purposes of sentencing hearing and ask if

2    Defense Exhibit No. 1 represents those records

3    that we're talking about that belong to an inmate

4    by the name of Reinaldo Dennes?

5         A.   Yes, they are.

6         Q.   All right.  Deputy, by looking at your

7    records, can you tell the jury at what time he

8    went in custody with the Harris County Jail?  On

9    what date it is by that is what I mean.

10        A.   The date I see, the record I have in my

11   hand, it's February 24th, 1996, is the actual date

12   that the jail card was printed indicating that

13   someone was brought into the Harris County Jail

14   which was Reinaldo Dennes.

15        Q.   All right.  And do your records indicate

16   that he has been released or that he has stayed

17   within the Harris County Jail from that date of

18   February 24th of 1996?

19        A.   Yes, the records that I have indicate

20   that he's been incarcerated since the time he came

21   to the Harris County Jail.

22        Q.   All right.  So just to make sure there is

23   no confusion in that regards, he hasn't been out

24   since he came in?  He's been there since that

25   time?

161

1      A.    Yes, there is no record to indicate that

2   he's been released.

3      Q.    All right.  Now, originally -- well, I've

4   not offered those records in evidence yet.

5            May I approach the witness?

6            THE COURT:  You may.

7      Q.    (By Mr. Odom)  Deputy, there is one

8   record in here that is what we call a hearsay

9   matter.  Isn't there a copy of a newspaper

10  clipping in here?

11     A.    Yes, there is.

12           MR. ODOM:  Other than that, I would

13  tender --

14           THE COURT:  Excuse me.  Mr. Vinson, do

15  you have an objection?

16           MR. VINSON:  May we approach, Your

17  Honor?

18           THE COURT:  You may.

19           (Whereupon counsel approached the bench).

20           THE COURT:  Go ahead.

21           MR. VINSON:  You can staple them

22  together.

23           MR. ODOM:  I was going to put them in a

24  paper clip, but I did want to take out the

25  newspaper article.

162

1       MR. VINSON:  Okay, I have no objection to
2   that.
3       THE COURT:  Yes, that's just hearsay.
4       MR. ODOM:  At this time I would offer
5   Defense Exhibit No. 1, Your Honor.
6       THE COURT:  Any objection?
7       MR. VINSON:  May I have one quick look at
8   it again, Your Honor?
9       THE COURT:  Sure.
10      MR. VINSON:  Your Honor, the State has no
11  objection.
12      THE COURT:  Defense 1 is admitted.
13  Please proceed.
14      (Whereupon Defendant's Exhibit No. 1 was
15  admitted into evidence).
16  Q.    (By Mr. Odom)  Now, Deputy Wilson, when
17  the defendant originally came in to the jail, was
18  he given an unusual classification or was he given
19  a classification that, as a layman, I would call
20  general population classification?
21  A.    Not when he was first classified by our
22  division.  We put him in what we consider inmate
23  separation from other inmates because of the
24  nature of his case.
25  Q.    And by that, the fact that he's charged

163

1    with capital murder?

2        A.   Not so much charged with capital murder,

3    but one of the reasons the newspaper clipping was

4    there because that gave us an indication of the

5    possibly it was a high profile case from what we

6    read in the newspaper.  And to protect him at that

7    particular time, we separated him from other

8    inmates until maybe the case had died down in the

9    media or the newspaper.

10       Q.   A high profile case can pose unique

11    problems to the jail and its security, can it not?

12       A.   Yes, it can.

13       Q.   As a security precaution initially he was

14    classified in a special status when he came in?

15       A.   Yes, he was.

16       Q.   And was there a time when he was

17    reclassified according to your records?

18       A.   Yes, he was.

19       Q.   And what was he reclassified from and

20    what was he reclassified to?

21       A.   He was reclassified from inmate

22    separation which was like a protection to a

23    general population which when he was moved, the

24    officers who moved him maybe considered him that

25    he no longer needed protection for whatever

1    reason.

2         Q.   Now, has he been in -- I forgot the term

3    you used --

4         A.   General population.

5         Q.   -- general population since that time?

6         A.   I don't know exactly when.  I would have

7    to look over the records and see when he was moved

8    to general population.

9         Q.   I'm not asking the exact date; but that

10   is in the records, is it not?

11        A.   Yes, it is.

12        Q.   But once he was moved in to general

13   population, the records reflect that he's been in

14   general population ever since, do they not?

15        A.   Yes, from what I see, yes, he has.

16        Q.   If someone is involved in an incident in

17   the jail, what is the procedure that -- by that an

18   infraction -- is there a procedure that is

19   employed to record what that infraction might be?

20        A.   Yes, it is.

21        Q.   What procedure is that, sir?

22        A.   An inmate is written up by the deputy who

23   either observed or was given the information by

24   whomever to write up the inmate on an inmate

25   record form.

1          Q.    We call that a write-up?

2          A.    Yes, sir.

3          Q.    There are what appear to be two write-ups

4     on Mr. Dennes during the year and some six odd

5     months that he's been in jail, is there not?

6          A.    Yes, it is.

7          Q.    What are the two write-ups that he's

8     received a note in his file for infractions for if

9     you can -- if it will help you to look at the

10    file, you certainly can.

11         A.    The one write-up that I have in my hand

12    was from the offense or incident we consider

13    failure to be properly dressed in the day room,

14    refusing to obey an order.  It was on one sheet,

15    but that was two write-ups on one form.

16         Q.    Okay.  So, in other words --

17         A.    And the other write-up came at another

18    time, refusing to obey an order.

19         Q.    Now, did he have an explanation or is

20    there anything in the file that would reflect the

21    failure to be properly dressed?

22         A.    Yes.

23         Q.    What does that reflect?

24         A.    You mean whether he was found innocent or

25    guilty or what?  I'm sorry.

166

1    Q.   I'll ask that, too.  First of all, was he
2    found innocent or guilty with regards to those
3    charges?
4    A.   From an indication of a copy off the
5    disciplinary sheet, it appeared that he was found
6    guilty.
7    Q.   All right, and what did he receive for
8    that?
9    A.   Thirty days loss of privileges.
10    Q.   All right.  And what was his explanation
11    for that, if any?
12    A.   He wrote a statement -- am I allowed to
13    read the statement?
14    Q.   Yes, sir, can you read the statement to
15    us, please.
16    A.   The statement read by Mr. Reinaldo --
17    written by Mr. Reinaldo Dennes, it's kind of hard
18    to read the writing.  It will take a minute, if I
19    could look at it.
20          It appears to be, "I surrendered my bunk
21    to an inmate.  I moved to the day room.  I didn't
22    have a shirt on," period.
23    Q.   Right.  And that would be an infraction
24    of the rules if he was in the day room without his
25    shirt on, correct?

167

1          A.    Yes, it would be.

2          Q.    Do you see any write-ups for Mr. Dennes

3     in regards to any fighting?

4          A.    No, not any records that I have.

5          Q.    All right.  Do you have -- show any

6     records of the defendant being involved in any

7     acts of violence of any sort in the records that

8     you have from February the 24th of 1996, to the

9     present?

10         A.    No, I don't have any records of that.

11         Q.    All right.  But he has the two write-ups,

12    one for improperly being dressed in the day room

13    and then another for refusing to obey orders?

14         A.    He has two for refusing to obey an order

15    and one failure to be properly dressed, yes, sir.

16         Q.    And one of the refusing to obey orders

17    was associated with the failure to be properly

18    dressed?

19         A.    Yes, sir.

20         Q.    Then there is a second refusing to obey

21    orders; is that correct?

22         A.    Yes, sir.

23         Q.    What's the nature of that offense if you

24    can tell by looking at the write-up?

25         A.    From what I can tell, basically the

168

1   nature was not returning his laundry, or something

2   to that effect, to the laundry cart, I guess to be

3   sent out to be laundered, I'm assuming.  It's kind

4   of hard to read some of that writing.

5       Q.   But the general nature of it is something

6   to that effect, that he didn't properly return the

7   laundry to the laundry cart?

8       A.   Right.

9       Q.   Do you have a separate unit for people

10  that not only may be a danger for other prisoners

11  but is there sometimes a segregation that's done

12  because a person is dangerous to either the

13  personnel in the jail or to other inmates?

14      A.   Yes.

15      Q.   And what do you call that?

16      A.   The same thing, inmate separation.  We

17  might title it protection, maximum security or

18  protection.

19      Q.   There is no indication that Mr. Dennes

20  was either placed in any of those facilities, is

21  there?

22      A.   For write-ups?

23      Q.   Or at any time.

24      A.   Only when he first came in.

25      Q.   All right, and that was because of the

1    nature of the offense?

2         A.    Yes, sir.

3              MR. ODOM:  Pass the witness, Your Honor.

4              THE COURT:  Thank you, Mr. Vinson.

5              MR. VINSON:  Yes, Your Honor.

6

7                        CROSS EXAMINATION

8    BY MR. VINSON:

9         Q.    Why do you have those rules over there in

10   the jail?

11        A.    One reason we have the rules over in the

12   jail, so we can make sure that we keep an orderly

13   running of the institution.  Also, we pass out

14   handbooks to make inmates aware of the rules.  We

15   have them in both English and Spanish.

16        Q.    Mr. Dennes was given a handbook; is that

17   correct?

18        A.    Yes, he was.

19        Q.    You have those rules to maintain good

20   order and discipline over there; isn't that right?

21        A.    Yes, sir.

22        Q.    And any infraction could be a breach of

23   good order and discipline?

24        A.    Yes it could be.

25        Q.    And it could lead to further breaches of

                                                 170

1    good order and discipline; isn't that correct?

2         A.   Yes, sir.

3         Q.   You wouldn't write him up if he didn't

4    violate one of those rules; isn't that right?

5         A.   No, they wouldn't or they shouldn't.

6         Q.   Because when they write them up, they are

7    referred to -- I think you have to refer to what

8    rule was violated; is that correct?

9         A.   Yes, sir.

10        Q.   And I think you stated that the defendant

11   was then released to general population; is that

12   right?

13        A.   Yes, he was.

14        Q.   Okay, tell the ladies and gentlemen of

15   the jury who is in general population?

16        A.   General population we have a little bit

17   of everyone who has committed a crime that you can

18   probably name in the Penal Code, in the book, from

19   capital murder, murder, aggravated assault, rape,

20   robbery.  It doesn't necessarily mean when a

21   person comes in that they have to go to

22   protection.

23        Q.   But I mean you also have people charged

24   with DWI in there?

25        A.   Right, yes, sir, DWI.

171

1      Q.    People charged with just basic theft?

2      A.    Basic theft.

3      Q.    So you're telling the ladies and

4    gentlemen of the jury that in a capital murder

5    case, a defendant could have an occasion to come

6    in contact with people who have been charged with

7    misdemeanors in the general population?

8      A.    Yes, sir, very much so.

9      Q.    Those people who are charged with

10   misdemeanors, they are later released from the

11   jail and don't go to the penitentiary; isn't that

12   right?

13     A.    Yes, sir.

14     Q.    What was the latest infraction, the date

15   of the latest infraction that the defendant was

16   involved in?

17     A.    May I look at the notes?

18     Q.    Yes, sir.

19     A.    The latest one that I see, the dates of

20   refusing to obey an order, the last one was August

21   17th, 1997.

22     Q.    And was that disobeying a direct order?

23     A.    Yes, sir.  Yes, it was.

24     Q.    Tell the ladies and gentlemen of the jury

25   what the direct order was.  Do you have it?

172

1      A.    Yes.   I was trying to read it to make
2  sure --
3      Q.    All right.
4      A.    Okay, it appears to me that the deputy
5  that wrote the report indicated that the inmates
6  were lying back on the bunks, they were ordered to
7  make their bunks.
8      Q.    Now, they were ordered.   Who ordered them
9  to do that?
10      A.    The deputy who wrote the report.   The
11  deputy who was in the pod or the cell block.
12      Q.    That's a person wearing a uniform like
13  you're wearing?
14      A.    Yes, sir.
15      Q.    And a badge like you're wearing?
16      A.    Yes, sir.
17      Q.    And then he still disobeyed that person?
18      A.    From the writings, yes, sir.
19      Q.    And what date was that?
20      A.    That was August 17th, 1997.
21      Q.    That was just last month?
22      A.    Basically, yes, sir.
23      Q.    And I think you testified that he already
24  had been sent -- had he previously been sent, that
25  is sentenced to 30 days and loss of privileges, or

173

1    was that before this infraction?

2        A.   Yes, sir.

3        Q.   Do you know what happened as a result of

4    the last infraction?

5        A.   The last infraction, you're talking about

6    the one on August?

7        Q.   August, if you know?

8        A.   No, I don't know.  I don't know if he

9    even went to disciplinary court or not yet.

10            MR. VINSON:  I have nothing further, Your

11   Honor.

12            THE COURT:  Mr. Odom.

13            MR. ODOM:  Briefly, Your Honor.

14

15                  REDIRECT EXAMINATION

16   BY MR. ODOM:

17       Q.   Officer Wilson, when it says refusing to

18   obey orders, for example, in making up the bunk,

19   that can be a refusal because it's not done in a

20   timely manner, can it not?

21       A.   I'm assuming, sir.

22       Q.   So, in other words, it's not like, up

23   yours, I'm not going to do it.  You can get a

24   write-up because you don't respond as fast as you

25   should respond to that particular order and

                                              174

1    failing to obey the order?  Isn't that true?

2        A.   It could be, sir.

3             MR. ODOM:  Yes, sir.  Pass the witness.

4             THE COURT:  Thank you.

5             MR. VINSON:  Let us approach, Your Honor,

6    just on one.

7             May I approach, Your Honor?

8             THE COURT:  You may.

9             (Whereupon counsel approached the

10   bench).

11

12                   RECROSS EXAMINATION

13   BY MR. VINSON:

14       Q.   I want you to read this portion right

15   there to yourself, sir.

16       A.   Myself?

17       Q.   Yes, just read that to yourself.  How

18   many times was this defendant here ordered to

19   comply with the rules?  How many times was this

20   deputy ordering him to do that from this report?

21       A.   If I could see it again.  It's kind of

22   hard to read his writing.

23       Q.   How many more times?  What does that say?

24       A.   Three more.

25       Q.   Three more times.  Three more.  So that

175

1    implies he had already ordered him one time to do

2    it; is that correct?

3         A.   Yes, sir.

4         Q.   And it took three more times to get

5    compliance; is that right?

6         A.   Yes, sir.

7         Q.   I have nothing further, Your Honor.

8              THE COURT:  Mr. Odom.

9

10              FURTHER DIRECT EXAMINATION

11   BY MR. ODOM:

12        Q.   Mr. Wilson, there are a bunch of people

13   in these bunks, are there not?  In these cells,

14   there is more than one person, is there not?

15        A.   Yes, it is.

16        Q.   An officer doesn't go in and shake them

17   on their shoulder and say, get up, make your bunk,

18   for example, does he?  He usually shouts from a

19   corridor, does he not?

20        A.   Yes, sir.

21        Q.   If someone is sleeping, he's got to wake

22   that person up, does he not?

23        A.   Yes, he would have to.

24        Q.   And there are a number of people, like I

25   said -- how many people do we normally have to one

1    of those blocks?

2         A.    Roughly in a block about 60 to a hundred.

3         Q.    All right.  But when the officer is

4    yelling in there, okay, everybody up, make your

5    bunks, how many people is he normally talking to

6    in that type of situation?  Is he talking to 60 to

7    a hundred?

8         A.    It all depends if he's broadcasting with

9    all four or five of the pods.  They're like in a

10   circle.

11        Q.    Right.

12        A.    Or he can individually communicate with

13   an individual cell also.

14        Q.    All right.  You don't know whether the

15   officer was talking directly to Ray Dennes telling

16   him three times to make his bunk or whether the

17   officer was giving an order to make the bunk and

18   he had to give it three times and that the two men

19   that were left were Mr. Acosta and Mr. Dennes,

20   correct, by just looking at that record?

21        A.    Looking at that report it seems like he,

22   after he indicated to everyone in the cell to make

23   their bunks, then it appears to me he individually

24   went to Mr. Dennes and Mr. Acosta to make their

25   bunks up.

177

1      Q.    Right, right, and you don't know how many

2      times he had already told them at that point to

3      make up their bunks?

4      A.    Just from the report, it's three times

5      from the report.

6      Q.    Right, but that is not necessarily when

7      he goes up to them individually.  He is telling

8      everybody to make up their bunk normally in the

9      normal course of business, is he not?

10     A.    Yes, sir.

11     Q.    All right, sir.  He tells them to make up

12     their bunk three times.  You don't know if that's

13     one on one with Mr. Acosta and Mr. Dennes or

14     whether that's after he's ordered everybody to

15     make up the bunks, he then says that Mr. Acosta

16     and Mr. Dennes are the two persons that after he's

17     ordered three times and that have not made up

18     their bunks, correct?

19     A.    Yes, sir.

20           MR. ODOM:  Pass the witness.

21           MR. VINSON:  I have nothing further.

22           THE COURT:  You may step down.  Thank you

23     for your testimony.

24           Let's take a 15-minute break, please.

25           (Brief recess).

178

1           (Jury in jury box).

2           THE COURT:  Please be seated.  Ladies and

3     gentlemen, this witness has been sworn.

4           Mr. Odom.

5

6                 DR. JEROME BROWN,

7     was called as a witness by the Defense and, having

8     been duly sworn, testified as follows:

9                 DIRECT EXAMINATION

10    BY MR. ODOM:

11        Q.   Dr. Brown, would you state your name to

12    the Court and the jury, please.

13        A.   Jerome Brown.

14        Q.   And how are you employed?

15        A.   I am a mental health professional and

16    clinical psychologist.

17        Q.   Dr. Brown, tell the jury what that means?

18        A.   A clinical psychologist is a person who

19    has been trained at a graduate school of

20    psychology to become versed in the assessment and

21    evaluation and treatment of human mental

22    disorders.

23        Q.   And what qualifies you to be in the

24    profession and to refer to yourself as a clinical

25    psychologist?

179

1      A.   Well, I have a Bachelor's Degree in
2   psychology I received from Rice University in
3   1969.  I then began attending the University of
4   Houston graduate school of psychology where I
5   completed a Master's degree in 1967 and a PhD
6   degree in clinical psychology in 1969.  I then
7   attended a two year internship at the Houston VA
8   medical center, and I've been practicing in the
9   Houston area since that time, about 28 to 29 years
10   now.
11      Q.   So if I figure that out right, if you got
12   your PhD in '69 and then spent two years doing
13   your internship, clinical internship at the
14   Houston Veteran's Hospital; is that correct?
15      A.   Yes, sir, Houston VA Medical Center.
16      Q.   That would put you out around 1971; is
17   that correct?
18      A.   I've been licensed by the State since
19   that time, yes, sir.
20      Q.   Since that time when you say you're in
21   private practice, what does that mean, Dr. Brown?
22      A.   Well, that means that I am -- I have a
23   private practice that I conduct on my own.  I see
24   clients, patients, people in various circumstances
25   for psychological assessment and treatment.

1    Q.    Now, Dr. Brown, in my profession although

2    there is no degree for it, once we get out, we

3    often specialize in a certain area or a certain

4    field.  Do clinical psychologists do the same

5    thing or is it more of a broad field of

6    professionalism?

7    A.    It can vary.  I guess it's like any

8    profession.  You can specialize in a certain area

9    or you can have a more general practice.  Over the

10   years I've really developed two areas of

11   practice.  I spent about 15 years as assistant

12   department of psychiatry at the Baylor College of

13   Medicine where I did quite a bit of teaching and

14   research.  And my private practice continued

15   through that time, but it went in to full-time

16   about 1982 when I went in to full-time practice

17   and went to a clinical position at Baylor.  For

18   the past 28 years or so until a couple of years

19   ago, I was the senior psychologist for the Harris

20   County Forensic Psychiatry unit which is a special

21   group of mental health professionals who examine

22   criminal defendants mainly regarding their

23   competency to stand trial and their state of mind

24   or their sanity at the time of the offense.

25   Q.    Dr. Brown, when you say that you were the

181

1    senior psychologist to examine persons in Harris
2    County regarding their mental competency, who
3    would pay you for your services in that regards?
4        A.    The contract was paid by the Harris
5    County Mental Health and Mental Retardation
6    Authority.
7        Q.    Was that a branch of the County
8    government as you know it?
9        A.    Yes, it is.
10       Q.    And if someone -- if there was a question
11   as to someone's mental facilities in order to be
12   tried or not to be tried in one of our courtrooms,
13   what is the procedure that would be employed that
14   would involve your expertise?
15       A.    Well, we would be assigned the cases on a
16   rotating basis as they would come up on court
17   order from the various Harris County criminal
18   courts.  Both the prosecution and/or the defense
19   can file motions with the Court to have their
20   clients examined, have a psychological or mental
21   examination of their clients because they're
22   concerned about their mental well-being or their
23   mental ability to stand trial or their mental
24   state when the offense occurred.
25            The county then provides a group of

182

1    consultants in this case -- I'm one of them -- to

2    provide these services and report back to the

3    Courts about our findings after the examination is

4    done.

5        Q.   Dr. Brown, how many people, if you could

6    guess, do you think you've examined in the past

7    either for the State or the defense that are

8    individuals who have been charged with or were

9    incarcerated as far as criminal activity, how many

10   of those people do you think that you've

11   interviewed and seen and done various tests upon?

12       A.   By this time it will be about five to six

13   thousand criminal defendants.

14       Q.   Most of those are here in Harris County,

15   Texas?

16       A.   Most of them, not all of them, but a good

17   portion.

18       Q.   You've had occasion where you've gone to

19   other jurisdictions?

20       A.   Yes, I'm sometimes called to other

21   jurisdictions, surrounding counties to perform

22   similar services.

23       Q.   Now, did you have occasion to be

24   contacted by someone that is affiliated with

25   myself in regards to a particular case?

183

1     A.    Yes, I was.

2     Q.    And who was the person that you were

3     contacted in regards to?

4     A.    I think I was originally contacted by Mr.

5     George Parnham who I think is co-counsel on this

6     case.

7     Q.    And what was the defendant that he asked

8     you-- what was the person that you were asked to

9     be contacted about?

10    A.    The defendant's name was Reinaldo

11    Dennes.  He was charged with capital murder.

12    MR. ODOM:  Your Honor, at this time I

13    would ask that Dr. Brown be considered an expert

14    for purposes of opinion testimony.

15    MR. VINSON:  We have no objection to

16    that, Your Honor.

17    THE COURT:  Very well, this witness shall

18    be considered an expert.

19    Q.    (By Mr. Odom)  Dr. Brown, what do you do

20    when someone asks you, either for the State or the

21    defense, to see a client in order to give opinions

22    regarding that client?  What is the procedure that

23    you or any other clinical psychologist would

24    employ initially?

25    A.    Well, the procedure usually involves

184

1    seeing the person in the Harris County Jail.

2    Although that's not one hundred percent true, the

3    great majority of the cases that I've seen have

4    been people who are incarcerated.  And this

5    includes Mr. Dennes.

6          The evaluation typically consists of an

7    interview, review of records or talks with what we

8    call collateral sources of information.

9          In this case I did interview Mr. Dennes

10   and did talk with his sister on the telephone

11   about a week after that.  And then the admission

12   of a battery of psychological tests which provides

13   additional information about the person's

14   psychological functioning.

15     Q.   All right, what are these tests and

16   essentially how long do they take?  What all do

17   they involve?

18     A.   Well, some of the tests are administered

19   by me and some are what we call self

20   administered.  They can be taken by the person

21   that's being tested.  The battery that I use is

22   the Rorschach technique, the minimum multiphasic

23   personalities inventory, the 16 personality factor

24   questionnaire, the FIRO-B, the Mooney problem

25   checklist, the Michigan alcoholism screening test,

185

1    the anger control survey.  And I think in this

2    case that was the entire battery of psychological

3    tests.

4        Q.   The Rorschach, the Minnesota something or

5    another?

6        A.   Multiphasic personality inventory.

7        Q.   There is a diagram for that, isn't there?

8        A.   MMPI they call it.

9        Q.   The 16 personality test, the Mooney?

10       A.   Yes.

11       Q.   Something the FIRO?

12       A.   FIRO it's called.

13       Q.   FIRO-B, the anger control, and then the

14    Michigan alcohol screening exam?

15       A.   Yes.

16       Q.   Each test, does it specifically test to a

17    specific area?

18       A.   That varies from one test to the next.

19    They serve active functions and purposes.  Some of

20    them are fairly specific.  Some of them are

21    general.

22       Q.   Do some of them cross-reference or

23    double-check another test?

24       A.   Yes, they do.

25       Q.   In other words, if you have in one test,

1    if you have a pattern that is not reflected in

2    another test, it might show that there is

3    something you need to look into a little more?

4        A.    Right, you would not expect

5    inconsistencies if the person answers consistently

6    about himself.

7        Q.    Do the tests have within them to deal

8    with the problem of deception?

9        A.    Yes, they do.

10       Q.    Explain what kind of problem that is for

11   a clinical psychologist and how the tests are

12   designed, not in great detail but how the test

13   would generally be designed to deal with that

14   problem.

15       A.    Well, there is basically three ways a

16   person can provide wrong information about

17   themselves in psychological tests.  The first is

18   to deliberately or consciously try to portray

19   one's self as exceptionally virtuous or without

20   problems or without any difficulties,

21   unrealistically good and problem-free.

22            The second way is to portray themselves

23   as unrealistically bad or as being more disturbed,

24   more troubled than they actually are.

25            The third way has to do with a person

1    being confused or they don't understand the items

2    or they don't really know for one reason or

3    another how to answer properly or to present

4    themselves in a consistent way properly.  And the

5    tests then are designed to try to pick up those

6    tendencies if they are there.

7         Q.   Were the various tests that were

8    administered, were they completed by Mr. Dennes?

9         A.   Yes, they were, all of them.

10        Q.   Did you establish a pattern in those

11   tests of deception in your opinion?

12        A.   In my opinion, no, there was no

13   deception.  As might be expected, he did reflect

14   that he is aware that he's being scrutinized, that

15   he was careful in his answers, but there is no

16   evidence of deliberate deception or distortion of

17   the information.

18        Q.   Do you also, other than the battery of

19   tests that you give to a defendant or an

20   individual, do you also make, for lack of a better

21   term, an interview or a subjective sort of a

22   nonformalized test that a clinical psychologist

23   would engage in as far as an interview with the

24   person, one-on-one?

25        A.   Yes, that was conducted with Mr. Dennes,

188

1    and I covered with him what I usually cover in

2    interviews like this, things like his family

3    background, his prior criminal history, if any,

4    his use of street drugs and alcohol, his

5    education, his work accomplishments, family and

6    marital information, information about what he

7    understands about the charge against him and why

8    these charges have come about, how he responds to

9    them, information about his early family life and

10   development, the kind of family he came from.

11   Those kinds of things provide important

12   information about the kind of world this person

13   grew up in and lived in and the kind of person

14   they were before this trouble happened.

15        Q.   Dr. Brown, what are you looking for, in

16   essence, from a layman's perspective?  What is it

17   that you're looking for when you were doing all

18   these various interviews and testing and

19   background checks and various inquiries that you

20   may have gone into with the defendant?

21        A.   Well, in this particular case what I

22   would be looking for is some kind of pattern of

23   behavior, some kind of evidence, some kind of

24   information that would demonstrate something about

25   his character as it might relate to the offense

1    itself or his propensity for committing such an

2    offense.  In other words, can I in my

3    investigation, in the interview or in the

4    psychological test, find a reason why someone like

5    this might become involved in a situation like

6    this.

7         Q.   Now, have you interviewed other

8    individuals that are charged with capital murder

9    before?

10        A.   Many.

11        Q.   And for both the State and the defense?

12        A.   Yes.

13        Q.   And are there certain patterns that are

14   sometimes evident with individuals that are

15   charged with crimes like this?

16        A.   There are, yes.

17        Q.   All right.  And what are some of the

18   patterns that you look for as a clinical

19   psychologist in a case like a capital murder case?

20        A.   Well, when you're looking at an

21   individual as a professional, we look at human

22   behavior as not occurring in a vacuum.  In other

23   words, it doesn't just all of a sudden happen.  We

24   think behavior is predictable and understandable

25   and that there should be some relationship.  If

1    you have access to the right kinds of information,

2    there should be some way of predicting, not

3    exactly predicting but at least showing that there

4    is some kind of relationship between a person's

5    background, his development, the character he

6    shows as he's growing up and as he becomes a young

7    adult, all the way through the time an offense is

8    committed that would somehow be related or help

9    explain why this offense occurred.

10           Now, there should be some way to

11    understand in terms of the personality variables

12    and the background variables of this person to try

13    to account for why this person had the motivation

14    or developed the motivation to commit this

15    offense.  And that way we develop some kind of

16    picture to explain in some kind of way why this

17    happened.  And we believe in most cases that human

18    behavior such as this, certainly this

19    extraordinary and this unusual, which is certainly

20    this kind of behavior, murderous behavior, where

21    we should be able to see it somewhere.

22      Q.   All right.  In other words, someone just

23    doesn't wake up in the morning and decide to go

24    commit a capital murder?

25      A.   No, it does not happen that way.

191

1    Q.   Dr. Brown, when you did your analysis,
2  were you aware of certain factors such as the fact
3  that a number of years ago Mr. Dennes had received
4  a public indecency?
5    A.   Yes, he did inform me of this during the
6  interview.
7    Q.   And what do you know about the public
8  indecency?
9    A.   Well, according to Mr. Dennes, he and his
10  girlfriend were caught in a park by a police
11  officer.
12    Q.   Is that the sort of behavior that you
13  think contributes towards what you're talking
14  about, the type of behavior that's not in a vacuum
15  that leads to antisocial behavior such as capital
16  murder?
17    A.   I'm afraid that has no particular value
18  in this particular case.  I mean it is just too
19  many times people make indiscreet types of
20  mistakes like this.  It's really of no value.
21    Q.   Now, you were informed, were you not, of
22  the possibility, whether it's true or not, of what
23  we call an extraneous matter or an extraneous
24  offense that might have occurred because of Mr.
25  Dennes?

192

1      A.    Yes, sir.

2      Q.    Were you informed of the possibility that

3   Mr. Dennes may have been involved in other home

4   robberies?

5      A.    I only know of one, I think, that Mr.

6   Dennes made reference to.

7      Q.    Yes.

8      A.    And I think your office or you made

9   reference to.  I only know of one.

10      Q.    Did Mr. Dennes at any time say that he

11   was personally involved in a home robbery?

12      A.    No.  In fact, he said he wasn't but he

13   does know that he's accused of that.

14      Q.    Now, did you get a time reference that

15   that home robbery occurred at or near the time of

16   the alleged capital murder offense?

17      A.    It's my understanding it was somewhere

18   around then.

19      Q.    Knowing that, would that be a prior act

20   that fills in some of the information that you're

21   talking about, this prior behavior that would lead

22   up to criminal, capital murder type activity?

23      A.    Well, no, not in and of itself.  That

24   would also be of no value.  However, a pattern of

25   criminal behavior might be expected.  We do see

193

1    that with other individuals charged with these

2    types of serious crimes, and I would expect some

3    kind of pattern of criminal behavior.

4        Q.    That's what I'm really asking.  In your

5    testing based upon your experience, did you see a

6    pattern of criminal behavior prior to the events

7    in or around the dates we're talking about?

8        A.    Actually, no.  Mr. Dennes is 41 years old

9    now, and to my knowledge there is no pattern of

10   any type of aggressive or criminal behavior

11   whatsoever until these recent episodes emerged.

12   And in my experience it's very, very unusual to

13   see this start happening at a relatively late age

14   in life.  You know, when people start committing

15   criminal behavior, typically they're much

16   younger.  Young people tend to commit the crimes

17   in our society more than the older people.

18       Q.    Would you call this a normal case, or

19   would you call this an unusual case?  How would

20   you categorize this case?

21       A.    I think this is an extraordinary case.

22   It's one of the most unusual cases I've ever

23   seen.  Certainly of all the capital murder cases

24   I've seen, this may be the most extraordinary in

25   terms of the lack of information that would

194

1    suggest this person would be capable of such

2    behavior.

3        Q.   Do you have any evidence of a normal home

4    life on the part of the defendant?

5        A.   Everything I could tell, including talks

6    with the sister, indicates that he had a very

7    normal upbringing,.  His family was stable.  His

8    parents are still married.  They were strict,

9    conservative parents.  The father brought him into

10   the jewelry business fairly early in his life and

11   taught him everything he knew.  And he picked that

12   up and went on with it.

13       Q.   You say he picked it up and went on with

14   it.  What do you mean by that remark?

15       A.   He became a jeweler himself.  He went

16   into the jewelry business fairly early.

17       Q.   What about in regards to his family, his

18   immediate family in the sense of wife and

19   children?

20       A.   Well, Mr. Dennes reported two marriages.

21   The first marriage lasted 20 years.  We never see

22   this on death row.  And he continued to provide

23   child support for his children after this.  One of

24   his children is now a college student doing very

25   well.  He still pays child support for his

195

1    12-year-old daughter.

2            He married for a second time about four

3    years ago, and that marriage is still stable.  His

4    wife is still sticking by him through these

5    difficult times.  And a child --

6        Q.   That's my next question.  How old is the

7    child to that marriage?

8        A.   The child is nine months old.  His wife

9    was pregnant just about the time he was arrested.

10       Q.   Do you know if that's a male or female

11   child that he has in that regards?

12       A.   I think it's a son.

13       Q.   Now, in regards to family life and to

14   work life, he appears to have normal behavior for

15   society and normal behavior for someone that you

16   would normally be viewing as someone on death

17   row.  Is that a fair statement?

18       A.   I think it's extremely fair.  This person

19   is not that much different, as far as I can tell,

20   from the person walking down the street that you

21   might find anywhere downtown.

22       Q.   Now, Dr. Brown, let me ask you some

23   questions in regards to what you can and can't do

24   in your profession.  No. 1, is it possible to

25   predict what someone's future behavior will be

196

1    like?

2        A.   The professional position that is taken

3    at this point by our professional societies,

4    specifically by the American Psychological

5    Association, is that the state of science is not

6    such that human behavior can be predicted more

7    than a few days in advance.

8        Q.   Do you agree with that position?

9        A.   As far as everything I know, that's the

10   truth.  We cannot really do that, especially with

11   regard to something like future episodes of

12   violence, years into the future.  There is simply

13   no method, no ways that we have, common sense,

14   scientific research, prior episodes, anything to

15   use that would be predictive of human violence in

16   the future.

17       Q.   If you cannot predict future

18   dangerousness or future behavior on the part of a

19   person, what is it that you primarily rely on in

20   order to try to make determinations regarding that

21   personality type that may or may not pose future

22   danger or not pose future danger?

23       A.   Well, there are certain personality types

24   or personality disorders as we call them that have

25   a higher rate of criminal behavior than other

197

1    personality types.

2        Q.   Give me an example.

3        A.   Well, in other words, there are

4    categories of human mental disorders including

5    what we call personality disorders, long term

6    personality characteristics that are

7    maladjustments that don't fit in the world or get

8    people in trouble.  And certain kinds of these

9    personality disorders do show higher rates of

10   criminal behavior than other types of human mental

11   problems or human mental disorders.

12       Q.   Did Mr. Dennes display any of those

13   personality types?

14       A.   He did not.  There is no way he could be

15   categorized as the type of personality disorder,

16   specifically an antisocial personality disorder.

17   There is no way you can make this diagnosis of

18   this man.

19       Q.   Obviously I'm a layman in this type of

20   conversation, and I hear the term thrown around,

21   "a sociopath."  That's what I read in the paper.

22   That's what I hear about.  Is that an incorrect

23   term or is that a correct term?  Do you guys use

24   that term?

25       A.   It's what now would be called an old

198

1  fashioned term for the same category.  These

2  people used to be called sociopaths.  They're now

3  called antisocial disorder.  But the truth is

4  they're really the same thing.

5      Q.   A person that exhibits antisocial

6  personality disorders, what is it that they

7  exhibit that you do not see reflected in Reinaldo

8  Dennes?

9      A.   Almost none of the characteristics.  But,

10  for example, let's talk about problems with

11  authority.  There is no evidence of violations of

12  the law, problems breaking the rules over and over

13  again.  There is no evidence of callous or

14  cold-blooded behavior toward other people or

15  inability to form attachments and closeness to

16  other people.  They show repeated criminal

17  behavior.  They demonstrate problems with what we

18  would call impulse control.  They have trouble

19  putting aside their needs of the moment for longer

20  term goals.  They're concerned about gratifying

21  themselves immediately.  These people are

22  sensation seeking as we call them.  They look for

23  stimulus in something thrilling and exciting.

24  They're typically seen as shallow and superficial

25  although initially friendly and gregarious.  The

1   only thing that Mr. Dennes has in his history that

2   might be one of the items on a checklist for this

3   type of disorder is the history of alcohol abuse

4   and street drug abuse.

5       Q.   Talk to me about that.

6       A.   He does report that, although that's

7   characteristic with many other types of disorders,

8   too.  But Mr. Dennes does acknowledge that he is

9   drinking very heavily, that he's probably an

10  alcoholic.  He has been using cocaine on a regular

11  basis although it does not appear heavy, but

12  frequent and regular.  And he also uses marijuana.

13      Q.   When you say that he doesn't show

14  aggressive behavior or he doesn't show selfish

15  behavior or cold-bloodedness, now, are you

16  referring to the facts as recited to you in this

17  case or are you referring to the facts that you

18  know of his past life up and until the time of the

19  facts of the case?

20      A.   I'm talking about the latter.  In other

21  words, the offense itself cannot be denied.  It is

22  what it is.  It's a terrible offense.  But I'm

23  saying that if I had seen this man a year before

24  all this thing began, six months, there is no way

25  I could have told you this man is in danger of

1    doing something violent because he has no record

2    of violence of any kind that I can determine at

3    all.   There is just no evidence of it at all.   It

4    doesn't exist.

5        Q.   Dr. Brown, in your opinion would Ray

6    Dennes do well in an institutional type of

7    background or setting?

8        A.   Well, there is no reason he wouldn't make

9    the same adjustment to whatever future settings

10   he's in as the adjustment that he's made in the

11   past.   In other words, once again, his record has

12   fairly been fine and he shows, you know, capable

13   adjustment.   He manages his responsibilities

14   apparently.   He takes care of the people that he

15   cares about.   And he'll carry out any

16   responsibilities or rulings or whatever that he

17   has to carry out in an appropriate way, I would

18   say.

19       Q.   Does Mr. Dennes appear to have any type

20   of philosophical or metaphysical commitment

21   towards religion one way or the other?

22       A.   Well, he does express a strong religious

23   commitment.   Of course, that's not unusual for

24   people who get in this kind of situation.   But he

25   certainly seems to be carrying it out fairly

201

1   vigorously.  He's reading quite a bit.  He's

2   educated himself quite heavily in this area and

3   seems to believe pretty strongly.  I think that's

4   reflected in his basically optimistic point of

5   view that he seems to maintain in spite of the

6   terrible circumstances that he's in.

7       Q.   What are you showing -- do your records

8   reflect his date of birth, Dr. Brown?

9       A.   Yes, uh-huh.

10      Q.   What is his date of birth?

11      A.   February 9th, 1956.

12      Q.   You had indicated earlier that very often

13  criminal activity occurs when someone is younger.

14  In your business as a psychologist, do you see age

15  as having an influence on making more or less of a

16  likelihood for certain criminal behavior,

17  especially violent behavior?

18      A.   Yes, yes, there is a correlation.

19      Q.   What is the pattern that you as a

20  clinical psychologist see in regards to the effect

21  of age upon violent criminal behavior?

22      A.   Well, violent or other forms of serious

23  criminal behavior tend to peak in the twenties for

24  men and it tends to start diminishing after that

25  when it hits the age of fifties.  In the fifties,

1   especially the late fifties, it drops off

2   dramatically, both the recidivism rate, the repeat

3   rates of criminal behavior, return to prison, and

4   original offenses or first time offenses drop off

5   dramatically in the fifties.

6        Q.    If you were to factor in a 40 year

7   commitment at a minimum on Mr. Dennes, which would

8   put him not eligible for parole until he was 81

9   years old, do you think that someone who is 81

10   years old has an even more or even less of a

11   tendency to be violent and have violent

12   tendencies?

13        A.    Well, of course, the answer is no.  I

14   mean I think even probably lay people know that

15   there is just not many 81 year old criminals

16   running around.

17        Q.    Now, I have told you, I believe, in

18   certain factors that are reflected in Defense

19   Exhibit No. 1, that is that Mr. Dennes has

20   received a couple of what I called minor

21   infractions while he's been in custody.

22             Do you view an infraction such as not

23   wearing a shirt or not making up a bed when you're

24   told to on time, do you view that as systematic of

25   the type of behavior you've been talking about

1    that reflects these antisocial or what I call -- I

2    forgot your name for it, but the psychopathic type

3    of behavior that you're familiar with and that you

4    see?

5         A.   No, this would not be of value at all

6    because, as one might imagine, the jail

7    environment is very strict and very structured and

8    it's hard to find anyone in the jail who doesn't

9    have some kind of infraction of some kind if

10   they're there for any length of time.  And things

11   like not making your bed, I mean, this is -- no

12   one in jail could avoid something like this

13   happening if they're in jail for months or a year

14   or something like that.

15        Q.   If Ray Dennes had been in jail for over a

16   year and a half, would you expect to see if he was

17   the type of classic characteristic of a -- what

18   did you call it again?

19        A.   Antisocial personality.

20        Q.   Antisocial personality, what would be the

21   type of infractions that you would expect to see

22   in an antisocial -- what you are calling an

23   antisocial type person?

24        A.   Fighting, abusing other inmates,

25   predatory behavior, taking advantage of other

1    inmates, chronic rule violations, stealing, things

2    like this.

3        Q.   Dr. Brown, as best you can tell, when

4    someone performs well --

5            MR. VINSON:  Your Honor, I'm going to

6    object to the continuous leading questions.

7    That's what he's been doing for a while.  I'm

8    going to object at this time to his leading

9    questions.

10           THE COURT:  For the purpose of

11   expediency, I'll give you a little leeway, but

12   I'll sustain that objection.

13           MR. ODOM:  Yes, sir.

14       Q.   (By Mr. Odom)  Dr. Brown, when a son or a

15   sibling performs well, can you state as a

16   psychologist whether or not that has some bearing

17   on a type of influence or role model of parents?

18       A.   Well, usually you attribute some good

19   performance on the child's part to the influence

20   of his parents.

21       Q.   Has it been your experience that even

22   in a penitentiary type of environment that a

23   person --

24           MR. VINSON:  Again, Your Honor, I'm going

25   to object to the leading question.  Has it been

205

1      your experience.  Ask him what his experience has

2      been.

3              THE COURT:  Sustained.

4         Q.   (By Mr. Odom)  What, if any, knowledge do

5      you have regarding whether a father can continue

6      to be an asset to his son in a penitentiary type

7      of environment?

8         A.   Well, I've certainly seen many criminal

9      defendants who have been in prison before who tell

10     about their experiences and who relate their

11     experiences with their family, how they deal with

12     their family over the years that they're in

13     confinement, things like that, sure.

14        Q.   In reverse, are you qualified to answer

15     the question as to what effect execution would

16     have on either a young son or a son who is old?

17             MR. VINSON:  I'm going to object to

18     speculation, Your Honor.

19             MR. ODOM:  Well, if you can, Judge.

20             THE COURT:  I sustain the objection.

21             MR. ODOM:  Pass the witness, Your Honor.

22             THE COURT:  Thank you, Mr. Odom.  Mr.

23     Vinson.

24             MR. VINSON:  May I proceed?

25

                                                    206

```
 1                      CROSS EXAMINATION
 2    BY MR. VINSON:
 3         Q.   Good afternoon, Dr. Brown.  How are you
 4    doing?
 5         A.   Fine, thank you.
 6         Q.   Now, at the time that you interviewed Mr.
 7    Dennes, did you make some notes?
 8         A.   Yes, I did.
 9         Q.   And do you have all your notes with you
10    today?
11         A.   I have everything, yes.
12              MR. VINSON:  Your Honor, may I have an
13    opportunity to look at the notes?
14              THE COURT:  Certainly.
15              MR. VINSON:  May I approach, Your Honor.
16              THE COURT:  Yes.
17              (Whereupon counsel approached the bench).
18              MR. VINSON:  What I'll do, I'll continue
19    to question and Mr. Smyth may review the notes.
20              THE COURT:  Thank you very much.  I
21    appreciate that.
22    BY MR. VINSON:
23         Q.   Let's start off, sir, with the basic
24    premise that there is something in a person's
25    background that keeps them from engaging in
```

207

1    serious acts of criminal conduct.  Correct?

2        A.    That's hard to find but, sure, go ahead.

3    I'll go with you on that.

4        Q.    Well, first of all, the perception that

5    one has of himself, while I won't do this, I will

6    not engage in this offense because I don't want

7    others to think I'm this type of a person.

8    Correct?

9        A.    Sure.

10       Q.    I will not engage in this type of offense

11   because I don't want my parents to realize I'm

12   this type of a person.  Right?

13       A.    Okay.

14       Q.    And then you can also say, I'm not this

15   type of a person.  So irrespective of what others

16   think about me, I'm not going to engage in this

17   type of offense, correct?

18       A.    Sure.

19       Q.    Those are the safeguards that keep all of

20   us from going out here and committing these

21   offenses, correct?

22       A.    Of course.

23       Q.    And those are instilled in us at an early

24   age --

25       A.    That's correct.

1      Q.   -- supposedly.  Now, when you talked to

2   this defendant, Mr. Dennes here -- and I take it

3   that this man here at counsel table in the green

4   jacket here, this is the person that you spoke

5   with?

6      A.   It is, yes.

7      Q.   And where did you speak with him?

8      A.   In the Harris County Jail.

9      Q.   Can you tell us on what day that was?

10     A.   August 13th, I believe.

11     Q.   August the 13th of 1997?

12     A.   Right.

13     Q.   That's the first time you saw Mr. Dennes?

14     A.   Yes.

15     Q.   And the first time you've talked with Mr.

16  Dennes?

17     A.   That's correct.

18     Q.   And how long was that conversation?

19     A.   Oh, probably a couple of hours.

20     Q.   And did you give Mr. Dennes any tests at

21  that time?

22     A.   Yes.

23     Q.   What tests did you give him at that time?

24     A.   I administered the Rorschach to him

25  myself directly and then gave him the other --

209

1          Q.    The spelling on that is R-o- --

2          A.    R-o-r-s-c-h-a-c-h.

3          Q.    And tell the ladies and gentlemen of the

4     jury what type of test that is.

5          A.    Well, basically it's been called the ink

6     blot test.

7          Q.    Right.  And everything looks like a

8     butterfly or something of that nature, isn't it?

9          A.    Well, if you're an antisocial

10    personality, you don't see butterflies.

11         Q.    But it kind of looks like a butterfly.

12    Is that the ink blot test, right?

13         A.    I guess that's what you saw, Mr. Vinson.

14         Q.    You gave it to him, Dr. Brown, did you

15    not?

16         A.    Yes, I did.

17         Q.    And how long did that test take?

18         A.    Oh, probably 30 minutes.

19         Q.    All right.  And what other test did you

20    give him, sir?

21         A.    Well, the rest was a packet of tests for

22    him to fill out on his own.  Those are

23    self-administered.

24         Q.    Okay, and would one of those tests be the

25    Minnesota multipersonality inventory test?

                                                      210

1        A.    Right.

2        Q.    That's called the MMPI?

3        A.    MMPI.

4        Q.    And what type of test is that?

5        A.    It's a personality test.  Basically it's

6    both a personality and a test to determine certain

7    types of psychiatric or mental disorder

8    categories.

9        Q.    How many questions are on that test?

10       A.    It has 566 true/false items.

11       Q.    And you had to leave that test for him to

12   take?

13       A.    Yes.  It takes a couple of hours, three

14   hours to fill out.  It's pretty long.

15       Q.    What other tests did you give him?

16       A.    Sixteen personality factor questionnaire.

17       Q.    Sixteen?

18       A.    Personality factor questionnaire.

19       Q.    And how long did that take?

20       A.    That takes about an hour and a half to

21   two hours to complete.  It has -- I think it has

22   186 items on it, something like that.  There are

23   three choices on those items.

24       Q.    186 items, about an hour and a half to

25   take.  Okay.  Did you have to leave it with the

211

1      defendant as well?

2          A.    Yes, I did.

3          Q.    Okay.   What other tests did you take?

4          A.    Well, the Mooney problem checklist.

5          Q.    Mood?

6          A.    Mooney problem checklist.   This is a list

7      of psychological symptoms and difficulties people

8      can have.   They underline the different things

9      that are bothering them.   There is about something

10     like 188 items, something like that, on that one.

11         Q.    Okay.  About how long does that take to

12     complete those questions?   It depends on the

13     person?

14         A.    Yes, I would say probably, maybe an hour

15     to go through those.

16         Q.    And that was left to the defendant to

17     administer to himself?

18         A.    That's right.

19         Q.    Now, what else did he take?

20         A.    The FIRO-B is another one.   That's a

21     little bit shorter.   I think it has about 50

22     items.   It possibly takes about maybe 30 minutes

23     to take.

24         Q.    And that's called --

25         A.    FIRO-B, it's called.

1       Q.   And what is the purpose of that test?

2       A.   This gives us information about the way a

3    person relates to other people in three important

4    behavioral categories, what we call inclusion,

5    control and affection and the degree to which

6    that's expressed by them or wanted by them.

7            So there is actually six categories of

8    scoring on that.

9       Q.   And so from that test you try to

10   determine how a person relates to others?

11      A.   Yes, uh-huh.

12      Q.   And how long does it take to take that

13   test?

14      A.   I think I said about 30 minutes on that,

15   something like that.

16      Q.   Was that also something the defendant

17   self-administered?

18      A.   Yes, it was.

19      Q.   What other test did you take?

20      A.   Michigan alcoholism screening test.  I

21   think it has about 20 items.  It only takes maybe

22   10 minutes to complete.

23      Q.   And that was left with him as well?

24      A.   Yes.

25      Q.   And this is in no way to embarrass you,

1    Doctor, just a fact.  There is no way that you can

2    tell the ladies and gentlemen of the jury that the

3    defendant filled out all those tests himself, is

4    there?

5         A.   Well, there is no way to say for sure.  I

6    don't have much choice about it.  But I guess he

7    could give it to his cell mate to take.  That

8    would be very foolish.  But maybe he would.  I

9    don't know.  It's theoretically possible, sure.

10        Q.   You couldn't say -- sit here and actually

11   say he took those tests?

12        A.   I didn't see him take them, no.

13        Q.   And it is -- it is just the way it

14   works.  It's not that you had not stayed and taken

15   the test.  It is just that he was in the location

16   that he was?

17        A.   Well, not only that.  You just can't sit

18   and watch someone fill out tests for seven or

19   eight hours which is what we're looking at.

20        Q.   Right.  Now, doctor, I think of something

21   you did hit on that was very interesting.  In all

22   these tests, they are just tests.  They're just

23   paper tests, correct?

24        A.   That's right, they are.

25        Q.   And even some of these tests they have

214

1    had in Reader's Digest and things like that,

2    little self analysis, right?

3         A.   No, these tests haven't been in Reader's

4    Digest, I wouldn't think.  They're not allowed to

5    be published.

6         Q.   I understand.  But what I'm saying,

7    Doctor, they're similar to tests you see in

8    Reader's Digest where if you take this test and

9    you answer this question, you answer this

10   question, you can almost determine your longevity,

11   how long your going to live or how many or how

12   much rest --

13        A.   Well, I don't want to minimize --

14        Q.   And I'm not.

15        A.   -- the tremendous amount of research and

16   work that has gone into the establishment of the

17   norms of profiles.  We're talking about thousands

18   and thousands of people who have been provided the

19   normative samples for all of these tests.  And

20   they're very widely used.  But some of the tests,

21   like you said something about longevity.  I think

22   some of those have been researched pretty well and

23   they do have pretty good research underpinning

24   that would make them pretty valid tests like the

25   ones that we're talking about today.

215

1      Q.   What I'm saying, if one wanted to sit

2   there and take that test, then one could fudge on

3   that test, correct?

4      A.   Well, I don't know which test you're

5   talking about.  The longevity test, yes, you could

6   lie on that, sure.

7      Q.   Sure.  Now, you said another thing, that

8   human behavior is predictable and understandable,

9   correct?

10     A.   Yes, it is; not always predictable.  I

11  don't want to use the word the same way we're

12  using the word here like predicting violence.  But

13  I think human behavior is understandable.  It has

14  some kind of antecedents.  There is some kind of

15  chain of causal relationships that you can

16  understand.  In other words, people have

17  personalities.  We all know that.

18     Q.   I'm just referring to what you're

19  testifying to.  And at that time you said that

20  human behavior is predictable and understandable.

21     A.   Yes, it is.  I think that's true.

22     Q.   I wrote it down as you said it.

23     A.   Oh, uh-huh.

24     Q.   Now, you also stated that if Mr. Dennes

25  had taken the same test that you administered at

216

1    the jail, assuming he did take the test, same test

2    you took, you could not have made any predictions

3    about his future conduct?

4         A.   That's right.

5         Q.   So the test in itself doesn't help you

6    with respect to determining one's future conduct?

7         A.   It doesn't.

8         Q.   The test in itself only stands for

9    whatever it stands for, correct?

10        A.   That's right.

11        Q.   And at that particular point in time,

12   correct?

13        A.   At that particular point in time, that's

14   right.

15        Q.   Now, I think you said you all discussed

16   one armed robbery.  Okay.  Do you have the data of

17   that armed robbery?

18        A.   No, Mr. Dennes was very vague about

19   this.  He said that he knew that he was accused of

20   this, of some kind of break-in robbery or

21   something like this, and that he did not do it.

22   So he didn't have that much to say about it.

23        Q.   But he was aware at the time that he

24   talked to you that he at least was a suspect or

25   had some allegation that he had something to do

217

1    with it?

2         A.   Yes, he did report that.

3         Q.   I think you also testified that there was

4    no pattern of criminal behavior until the recent

5    episode?

6         A.   As far as I can tell, there is not.

7         Q.   Now, what were you told about the recent

8    episode, if you can recall?

9         A.   I can't remember a lot of that without my

10   notes, but apparently he's accused of --

11             MR. VINSON:  Wait just a minute, Doctor.

12             May I approach, Judge?

13             THE COURT:  You may.

14        Q.   (By Mr. Vinson)  Why don't you take a

15   look at your notes there.

16        A.   He said that he had been accused by a man

17   named Tony Ramirez of conspiring to create a plan

18   to rob one of his co-tenants in the building where

19   he worked or something like this, another jewelry

20   business of some kind, and that he would be

21   accused of doing things like using his office

22   machinery to make a silencer or something like

23   this and that Mr. Ramirez would say that after

24   they planned on doing this that apparently Mr.

25   Dennes went ahead without him and did it on his

218

1    own or he and his brother, I think, are accused of

2    doing it and that he's now accused of killing

3    during the robbery the store owner in the building

4    where he worked, the co-tenant, and shooting a

5    security guard, which he says the security guard

6    was not killed, thank God, and he'll probably say

7    that they planned it together.  And he's also

8    accused of somehow there is a cleaning lady that's

9    involved that said he paid her five thousand

10    dollars and that they were lovers.  He would say

11    something about that.  He mentioned something

12    about this, but I don't know how it developed the

13    offense itself.

14        Q.   Now, even after having discussed that

15    with Mr. Dennes, you still could not pick up any

16    information from those tests that would show you

17    that Mr. Dennes was capable of committing that

18    type of an offense, could you?

19        A.   Honestly, I cannot find it.  I do not see

20    this offense in this man.

21        Q.   You're not saying he didn't do it; you're

22    just saying the tests that you rely upon, you

23    could not predict that type of conduct?

24        A.   No, these are not lie detector tests, for

25    example.

1          Q.    These are what?

2          A.    They're not lie detector tests.  I can't

3     tell if he's telling me the truth, no, I just

4     can't find the capacity.  That's what I said,

5     that's what I look for, the capacity or the

6     motivation to do something like this.  I don't

7     know whether he actually did it.

8          Q.    And what do you mean this is an

9     extraordinary case?

10         A.    Well, as I said earlier, I've seen many

11    people who are now on death row.  And of those

12    people on death row, I can really understand, I

13    know why they're there and I know what's in them

14    that put them there.  In this case, the question

15    is unanswered.  I have no idea why this man

16    committed this offense.  And if he goes there, I

17    will never understand why to this day.  That's the

18    best I can say.  I can't explain this.

19         Q.    Okay.  Why he committed the offense?

20         A.    Right.

21         Q.    And you can't tell the ladies and

22    gentlemen of the jury he would not do it again?

23         A.    I can't say that.

24         Q.    You can't tell the ladies and gentlemen

25    of the jury that he would not engage in other acts

1    of violence?

2        A.   I can't say that.

3        Q.   I understand that.  Now, this is because

4    you can't -- you couldn't even predict his conduct

5    if you were to have given him that test without

6    even knowing that he was engaged in an offense,

7    correct?

8        A.   That's right.  This has really stumped

9    me.

10       Q.   All right.  Did the marriages have

11   anything to do with it?

12       A.   Not that I can tell.  They were fairly

13   stable marriages.  He maintains a good

14   relationship with his ex-wife today.  He pays

15   child support.  He was married 20 years the first

16   time.  There is no history of violence in the

17   marriages.  The sister reports that there is no

18   history of violence that he's ever done to anyone

19   before.  I can't explain it.

20       Q.   Now, you stated that he appeared to have

21   the normal behavior that is consistent with a

22   person walking down the street?

23       A.   As far as I can tell, that's the way it

24   is.  I mean, you know, he's certainly no angel;

25   but, again, in terms of before this began, his

1    story is a story that anyone could have.

2        Q.   And knowing that, he appears to be

3    normal, you know, doesn't appear to have any horns

4    on his head or any signs of violence coming your

5    way, he can get close to people, can he not?

6        A.   Yes, he can.

7        Q.   And he can gain people's confidence, can

8    he not --

9        A.   Yes, he can.

10       Q.   -- based upon what you found out about

11   him?

12       A.   Yes, I think he could do those things.

13       Q.   And depending on how strong he gained

14   that person's confidence, he could possibly

15   persuade them to engage in offenses, could he not?

16       A.   Again, that capacity I don't know about.

17   I don't know.  I don't see that kind of predatory

18   level kind of motivation.

19       Q.   But you didn't see that in him.  But

20   would it shock you to know that he was the one who

21   planned the offense?

22       A.   It would shock me, yes.

23       Q.   All right.  The jury has already made

24   that determination.

25       A.   Well, I know.  I mean that's the nature

1      of this offense.  But I can't explain it to you.

2          Q.   Have you ever heard of Kenneth McDuff?

3          A.   Oh, yes.

4          Q.   Who is Kenneth McDuff?

5               MR. ODOM:  Objection, Judge.  That's

6      beyond the scope of the fact of the matter of this

7      case.

8               MR. VINSON:  Can we approach, Judge.

9               THE COURT:  Okay.

10              (Whereupon counsel approached the bench).

11              MR. VINSON:  He's going into future

12     dangerousness with this witness.  He's an expert.

13     If he knows of Kenneth McDuff, I can bring it

14     out.  Mr. McDuff was a model prisoner.  He came

15     out of T.D.C.  What did he do?  He killed again.

16     The same thing with the model prisoner Richard

17     Speck.  He came out of the Texas Department of

18     Corrections, went to Chicago and offed about seven

19     nurses.  And we can do this and he has had similar

20     conduct where he persuaded people to release him.

21              MR. ODOM:  He's not trying to establish

22     similar conduct at all.  He hasn't established

23     that Kenneth McDuff's personality patterns --

24              THE COURT:  How do you think she's taking

25     down both of you all talking at the same time?

223

1        MR. ODOM:  Unless he shows that the
2   personality traits that Dr. Brown is talking about
3   is similar to that of Kenneth McDuff, then it
4   would be an improper hypothetical.  It would be an
5   improper area of cross examination.
6        THE COURT:  Sustained.  Let's move along
7   BY MR. VINSON:
8        Q.   You remember when the defense attorney
9   had you on cross examination --
10       MR. ODOM:  Direct examination.
11       Q.   -- and he started asking you about other
12  people on death row and what traits they
13  exhibited?  Do you recall that, sir?
14       A.   I remember making a comment about that.
15  I don't recall him asking me directly but, okay.
16       Q.   Well, I think that's the way it
17  supposedly came up.
18       A.   Okay.
19       Q.   Well, you are familiar with some of the
20  patterns of people on death row; is that correct?
21       A.   Oh, yes.  Yes, I am.
22       Q.   And have you studied some of the history
23  of people before they got to death row?
24       A.   Yes.
25       Q.   And have you studied the history that

224

1    will show you that at some point in their life

2    they did not exhibit the same characteristics that

3    led them to death row?

4        A.   Not in any reasonable way.  You know,

5    when they're all children, they don't do too

6    much.  But after that --

7        Q.   I'm talking about adults.  I'm talking

8    about adults.  Have you ever examined someone who

9    is charged with the offense of unauthorized use of

10    a motor vehicle?

11        A.   Oh, yes, of course.

12        Q.   That's the only offense?

13        A.   Right.

14        Q.   And then at some later point in time they

15    commit a capital offense.  Have you ever been

16    engaged in that?

17        A.   Yes.

18        Q.   Could you make that determination at that

19    time that that person was going to go out and

20    commit a capital?

21        A.   Not just on the basis of a car theft

22    charge, no.

23        Q.   Now, you say there was no evidence of any

24    cold-bloodedness, I guess is my interpretation,

25    attitude or behavior towards others?

225

1         A.    No.   In fact, just the opposite.

2         Q.    Well, would this constitute a

3    cold-blooded attitude toward another, to approach

4    an unarmed guard --

5              MR. ODOM:   Judge, I object.   I believe

6    the question was other than in the facts of this

7    case did he exhibit any cold-blooded behavior.

8    And I think he's mischaracterizing the question

9    and answer that was posed to the witness.

10             THE COURT:   That's overruled.

11        Q.    (By Mr. Vinson)   Would this be

12   cold-blooded toward another human being, an

13   attitude or conduct, to approach an unarmed guard,

14   knowing in advance that the guard is unarmed, walk

15   right up to him, place your hand on his shoulder,

16   put a firearm in his chest and squeeze a round

17   off?   Would that give you, would that be an

18   example of someone being coldhearted?

19        A.    Could be, yes, could be.

20        Q.    Show a callous disregard for human life?

21        A.    Yes, certainly.

22        Q.    Let's take it a step further.   The person

23   falls to the floor reacting to the gunshot, the

24   defendant can obviously see the person is still

25   alive, then fires another round into their body.

1      I mean how calloused can you get, Doctor?

2           A.   That's very calloused.  That's terrible.

3           Q.   Total disregard for human life, is it

4      not?

5           A.   Yes, it is.

6           Q.   But you couldn't pick that up in your

7      tests of the defendant?

8           A.   I could not.

9           Q.   Even after he committed such offense?

10          A.   That's right.

11          Q.   Now, you said the defendant now expressed

12     strong religious commitment?

13          A.   Yes.

14          Q.   When did this come about?

15          A.   Well, he acknowledged this has mainly

16     taken place after his arrest when he wasn't able

17     to use alcohol, abuse street drugs.  He started

18     realizing what he was doing to himself.

19          Q.   Now, Doctor, I guess what I'm trying to

20     do is just get you to communicate to us if you

21     know when did the religious commitment come

22     about.  Was it after the offense was committed or

23     before the offense was committed?

24               MR. ODOM:  He just answered that

25     question.  Asked and answered.

227

1          MR. VINSON:  I missed it.

2          THE COURT:  Go ahead.

3          THE WITNESS:  After the offense.  After

4    his arrest.

5     Q.   (By Mr. Vinson)  Because, in fact, when

6    he was growing up, he was not very religious,

7    correct?

8     A.   Not very, no.

9     Q.   The marriage apparently was not that

10   stable, as you testified to?

11    A.   Twenty years.

12    Q.   Twenty years?

13    A.   That's pretty good.  It's much better

14   than average.  The average American marriage lasts

15   about seven years.

16    Q.   Did he make any admission to you about

17   other relationships during his marriage?

18    A.   Yes, he admitted to infidelities.

19    Q.   For how many years?

20    A.   I didn't ask him that.

21    Q.   Well, you made a note on here, unfaithful

22   for five years?

23    A.   Oh, I'm sorry.  Yes, I did.  I didn't

24   remember that.

25    Q.   Well, he didn't tell you he was on

1    cocaine at the time this offense was committed,

2    did he?

3        A.   He was using alcohol -- yes, he said --

4        Q.   He said he was on cocaine when it was

5    committed?

6        A.   Again, he didn't say to me that he

7    committed this offense, but he did state that

8    around that time he was using cocaine, yes.

9        Q.   Well, let's assume he was using cocaine.

10   Cocaine, isn't that another antisocial type of

11   behavior by one, to know what the law is and then

12   to go ahead and violate it?

13       A.   Now you're getting in to difficult

14   territory.  Cocaine use is very widespread.  It's

15   used by many segments and strains of society.

16   It's used as a recreational drug by many people

17   who have no other -- .

18       Q.   I'm not asking you for what purpose it's

19   used.  I'm asking you, is that a known violation

20   of the law?

21       A.   Oh, it certainly is that, yes, it is.

22       Q.   But if he hadn't made that admission to

23   you, you couldn't have picked that up with your

24   test, could you?

25       A.   Well, no, there is no way I could tell he

229

1    would be using cocaine unless he told me.

2        Q.   Incidentally, did you take a urine sample

3    or anything to verify what the defendant was

4    telling you?

5        A.   He's been in the jail for a year and a

6    half.  There is no use to do that.

7        Q.   Fair enough.  That's the first time that

8    admission was made to you?

9        A.   Yes, uh-huh.

10       Q.   Did he tell you he was intoxicated at the

11   time, not that he was just an abuser of alcohol

12   but that he was intoxicated at the time he

13   committed the offense, the alleged offense?

14       A.   Well, at the rate he was drinking, he was

15   intoxicated every day.  So, yes, of course he was

16   intoxicated then.  He was intoxicated every day

17   for a long time.  He was drinking very heavily.

18       Q.   Then did he also tell you about his

19   fascination for weapons?

20       A.   Yes.

21       Q.   Including guns, knives, switch blade

22   knives, rifles, hand guns?

23       A.   Yes.

24       Q.   Did he tell you of any acts of

25   compulsion?

230

1          A.    Well, that's the word he used.   I
2     wouldn't use that word.   But I would say that,
3     yes, he bought a car on impulse, yes.
4          Q.    What type of car was that?
5          A.    I think it was a BMW, but I'm not
6     positive about that.
7          Q.    It's unfair to you, Doctor, under these
8     circumstances, but your notes here say Acura NS?
9          A.    I'm not reading my notes in detail.   I'm
10    trying to recall as I'm going along.   Okay, that
11    sounds fine, Acura, right, Acura Legend.
12         Q.    The defense also brought, I think, to the
13    jury's attention through you how a father can
14    influence his son.   Is that a fair statement?
15         A.    Right.
16         Q.    Doctor, have you ever heard of two young
17    men growing up under the same father's discipline,
18    living in the same bedroom or sharing the same
19    bedroom until they reach an age where they're in
20    their own individual rooms or what have you, and
21    one leaves home and goes out and makes a success
22    of himself and the other leaves home and turns to
23    criminal behavior?
24         A.    Yes.
25         Q.    Have you heard of that?

1        A.    It does happen.

2        Q.    So that is nothing unusual, is it?

3        A.    Not unusual.

4        Q.    You have seen that?

5        A.    Yes.

6        Q.    And also to find religion after the fact,

7   that's nothing unusual about that, is it?

8        A.    No.  No, that does happen.

9        Q.    Then what one is attempting to do is

10   salvation, if that's true, of their own soul.  But

11   what about the soul of the person whose life they

12   took?  What about the salvation of that person?

13       A.    There is no salvation for them through

14   their behavior, their own salvation, of course.

15       Q.    And your testimony is, I think, that

16   people begin to engage in criminal conduct less

17   and less as they grow older and older?

18       A.    That's right.

19       Q.    Now, but actually this defendant here has

20   gone past that age of 20-something years old,

21   hasn't he?

22       A.    He has.

23       Q.    Well, were you also able to predict, make

24   any predictions based on the fact that he told you

25   about this other suspected criminal conduct where

232

1    a home invasion was committed in this county?
2    Were you able to make any future prediction on
3    that?
4        A.   No.
5        Q.   In essence, Doctor, the test that you
6    took, in spite of the defendant's conduct, your
7    profession wouldn't permit you to make a
8    prediction; isn't that right?
9        A.   That's right.
10       Q.   Even if you could make a prediction, your
11   profession wouldn't allow you to do it?
12       A.   That's right.
13       Q.   I guess that's part of the oath you all
14   take --
15       A.   That's right.
16       Q.   -- or commitment to your science?
17       A.   We have to be responsible in what we say.
18       Q.   I understand.  But you're not saying that
19   a jury can't make that determination, are you?
20       A.   Well, the law gives the jury the right to
21   make that determination.
22       Q.   So what I'm saying, you're not saying
23   this jury can't make that determination, are you?
24       A.   No, I'm saying they have the legal
25   responsibility to try.

233

1    Q.   Okay.

2    A.   I'm just saying that the truth is that

3    it's not really possible scientifically to do

4    that.

5    Q.   And scientific -- any way scientifically

6    to prove it up, then not one person based on your

7    testimony coming through any court would ever hear

8    that prediction from you; isn't that correct?

9    A.   That's right.

10   Q.   A person could go out and kill and kill

11   and kill again and you would never come in and

12   make that prediction, correct?

13   A.   That's right, I probably couldn't.

14   Q.   Right, I understand.  You couldn't find

15   anywhere in the defendant's evaluation that he

16   thought about himself, how he would be looked upon

17   by others if he engaged in an offense?  Couldn't

18   find something there that would temper him and

19   stop him from engaging in the offense?

20   A.   No, I found lots that should have stopped

21   him.

22   Q.   I agree should have, but you didn't find

23   anything that prevented him from doing it,

24   correct?

25   A.   Well, if you assume he did it, no,

1    nothing prevented it.  Whatever went on didn't
2    prevent him from doing it, no.
3         Q.   That's not an assumption, Doctor, at this
4    time.  That's a fact.
5         A.   Right.  Well, again --
6         Q.   The jury has found him guilty.
7         A.   That's the position I have to take.  I'm
8    sorry.
9              MR. VINSON:  I appreciate your testimony,
10   Doctor.  I have no further questions.
11             THE COURT:  Thank you, Mr. Vinson.  Mr.
12   Odom.
13
14                  REDIRECT EXAMINATION
15   BY MR. ODOM:
16        Q.   Dr. Brown, your profession precludes you
17   from attempting to scientifically make the
18   prediction of whether or not a person would be a
19   future danger to society, correct?
20        A.   It does, yes.
21        Q.   All right.  Mr. Vinson asked you a number
22   of questions in regards to that.  But regardless
23   of that, the people that you do see on death row
24   develop patterns that you're able to identify as
25   antisocial type behavior patterns?

                                                        235

1      A.   Yes, everyone that I can remember, I
2  could see why they were there, yes.
3      Q.   And those patterns were not present in
4  Mr. Dennes?
5      A.   They were not.
6      Q.   Now, Mr. Vinson asked you a number of
7  questions as to whether or not Mr. Dennes did or
8  didn't take the tests.  Do you have any reason to
9  believe that he didn't take those 9, 12 hours of
10 tests that he was given?
11     A.   No, no, I don't have any reason to
12 believe that.  He signed some of the tests.  It's
13 his signature.  I don't know -- he's isolated --
14 well, I think he's isolated to some extent in the
15 jail.
16     Q.   Is there a consistency as far as the
17 taking of the tests in regards to one person
18 having taken the tests?
19     A.   Well, that's one of the things the test
20 is built to measure is whether or not there is
21 consistency in the answers across time.  And for
22 example, if several people take it, it would be
23 obvious.  And if one person other than Mr. Dennes
24 took it, then I don't know who you might select in
25 the jail who you would think would be a better

                                                    236

1    person than he would.  So I just don't have any
2    reason to believe that would be sensible.
3         Q.   Mr. Vinson attempted to draw a parallel
4    between these battery, 12 hour tests that you
5    administer and that have been prepared by your
6    profession based upon a tremendous amount of
7    research to taking a Reader's Digest test.
8         A.   Well, I have a little trouble with that
9    because there are all kinds of self help tests you
10   read in magazines all the time.  Most of those are
11   games, silly things for people to occupy their
12   time.  They're not anywhere comparable to what
13   these tests have done in terms of research and
14   background.  But some of the tests that you might
15   find in places such as Reader's Digest, for
16   example, how long you will live, those are well
17   researched.  But, again, those tests do not have
18   validity scales and lie scales and deception
19   scales built in to them to counter for any people
20   faking or trying to mislead themselves.  If
21   someone wants to take a Reader's Digest test and
22   lie on it and say I'm going to live to be a
23   hundred years old and that's not true at all, I
24   guess they can do that.  But I don't see the
25   purpose in that.

1    Q.   That answers my next question.  The tests

2    that you have have built within them a mechanism

3    to detect the type of fudging that Mr. Vinson was

4    talking about that you can do when you're filling

5    out the little self help tests?

6        A.   Yes, they do.

7        Q.   Now, when you did your interview -- by

8    the way, were you by yourself when you interviewed

9    Mr. Dennes?

10       A.   I think I was accompanied by an intern

11   that day.

12       Q.   Was the difference, the contrast in Mr.

13   Dennes's apparent patterns as well as those to the

14   ones you're talking about that are on death row,

15   was that obvious -- is that a very obvious thing?

16   Is it a striking difference that you have here

17   between Mr. Dennes and your typical type person

18   that's on death row?

19       A.   Some of them, yes.  But a good number of

20   them, no.  Some of the people who are on death

21   row, when you first begin talking to them, are

22   very polite and very cordial and friendly and

23   agreeable and cooperative, as Mr. Dennes was.  And

24   their true nature is only revealed in later

25   descriptions of their life and their attitudes

238

1    about people and the way their life emerges over

2    the interview and then in the psychological tests.

3        Q.   If Mr. Dennes were attempting to rose

4    color all of his behavior, would he have, for

5    example, on one hand portray himself as being

6    subject to alcohol and drug abuse and on the other

7    hand characterize himself as maintaining stable

8    environments in other areas?  Is that

9    characteristic for someone who is trying to lie to

10   you or trying to deceive you into thinking that

11   they are a person that they are not?

12       A.   Well, usually when someone is trying to

13   misrepresent themselves and look especially good,

14   they usually stay pretty consistent with that,

15   don't admit any real shortcomings or anything

16   really negative about themselves.

17       Q.   Doctor, you're not -- and your testimony,

18   you're just telling it like it is, aren't you?

19   You're not taking a side on this particular issue

20   one way or the other?

21       A.   Well, I'm trying not to.  There have been

22   times when I've had to tell defense attorneys, for

23   example, who ask me to do this, that I'm afraid I

24   can't offer much that is helpful.  Their clients

25   turned out to be people that are perfectly capable

1    of doing the offense they're charged with.  And

2    that's what I have to say.  So you could only

3    defend the information that you have and the

4    results that you have.  Mr. Vinson looked at my

5    file.  It's all there for everybody to look at.  I

6    can't defend something that's not there.

7        Q.    The good and the bad?

8        A.    Yes, you have to take the good with the

9    bad.  And whatever comes up is the way it ends up.

10       Q.    Dr. Brown, are you familiar with the

11   term "abhorrent behavior"?

12       A.    Yes.

13       Q.    What is abhorrent behavior?

14       A.    That's behavior that's not considered

15   normal or typical in the situation.  That's a lot

16   of different behaviors.

17       Q.    Does your profession recognize an

18   instance wherein someone is capable of doing

19   something that is abhorrent or not normal and that

20   that is or can be a once or a one time event?

21       A.    Again, there is always some reason

22   behavior occurs.  It just doesn't all of a sudden

23   erupt and then the person is normal again.  Even

24   people who do something totally out of character,

25   which happens occasionally, there is a reason for

1    it.   And if you have the right kind of history and

2    the right kind of information, you'll know the

3    reason.   For example, people -- we see people who

4    get strung out on various kinds of street drugs

5    and they do things that are absolutely

6    incredible.   And they would not be expected to do

7    this behavior if they had not been strung out on

8    street drugs like this.   But, you know, there are

9    people under various kind of stresses.   They

10   perform behaviors or they do something they wish

11   they hadn't done.   It was totally new for them.

12   There are like singular events that occur, but

13   even then it's not in a vacuum.   There is some way

14   to reasonably explain why this unusual or out of

15   character or abhorrent, as you call it, behavior

16   occurs.

17             MR. ODOM:   Pass the witness, Your Honor.

18             THE COURT:   Thank you, Mr. Odom.   Mr.

19   Vinson.

20

21                  RECROSS EXAMINATION

22   BY MR. VINSON:

23      Q.   Doctor, you don't know what we're dealing

24   with here, do you?

25      A.   In this case, like I said a while ago,

241

1    I'm stumped.  I don't know what you've got here.

2         Q.   You've heard of Dr. Jekyll and Mr. Hyde,

3    have you not?

4         A.   Yes, I have.

5         Q.   But you don't know if we're dealing with

6    Mr. Hyde or Dr. Jekyll, do you?

7         A.   Well, believe me, if I could find a

8    potion that he took to change him into this, I'd

9    feel good about it.  But, no, I don't even have

10   that.

11        Q.   And you know the result in that case.

12   Okay.  But you can't even say that this was it,

13   the type abhorrent behavior.  Would you want to be

14   in proximity of this defendant when he had that

15   behavior change again?

16        A.   Absolutely not.  I would not want to be

17   there, no.

18        Q.   You wouldn't want any other innocent

19   person there when he had that change again, would

20   you?

21        A.   No.

22             MR. VINSON:  I have nothing further, Your

23   Honor.

24             THE COURT:  Mr. Odom.

25

242

1                  FURTHER DIRECT EXAMINATION

2    BY MR. ODOM:

3         Q.    Although, are there any indicators of

4    flash anger or uncontrollable impulses to commit

5    violence?

6         A.    No.

7         Q.    Mr. Vinson asked would you want to be

8    there if there is a sudden abhorrent behavior that

9    occurs.  You see few instances of where someone --

10             MR. VINSON:  Object to the leading, Your

11   Honor.

12             THE COURT:  Sustained.

13        Q.    (By Mr. Odom)  That's not what you see

14   either in your testing or the facts that you've

15   heard about this case?

16             MR. VINSON:  Objection, leading.

17             THE COURT:  Sustained.

18        Q.    (By Mr. Odom)  Can you state whether or

19   not a flash type temperament or a sudden burst of

20   uncontrollable abhorrent behavior is what you see

21   in either the facts of this case or your tests of

22   this defendant?

23        A.    Yes, I can say something about that.

24        Q.    Could you?

25        A.    I don't see it.  I don't believe it's

1    there.

2              MR. ODOM:  Pass the witness.

3              MR. VINSON:  I have nothing further, Your

4    Honor.

5              THE COURT:  You may step down.  We'll

6    place you on call, Doctor.

7              Call your next witness.

8              This witness has to leave today and go

9    back to Austin; is that right?  I understand from

10   counsel it's going to be very brief.

11             Five minute break for the jury, please.

12             (Brief recess).

13             (Jury in jury box).

14             THE COURT:  Please be seated.

15             (Witness is sworn).

16             THE COURT:  Mr. Odom

17

18                    RAY DENNES,

19   was called as a witness by the Defense and, having

20   been duly sworn, testified as follows:

21                 DIRECT EXAMINATION

22   BY MR. ODOM:

23        Q.   Would you state your name for the ladies

24   and gentlemen of the jury, please.

25        A.   Ray Dennes.

                                                    244

1      Q.    And you are the son of Reinaldo Dennes?

2      A.    Yes, sir.

3      Q.    Are you a junior, or is it --

4      A.    No, sir, just Ray Dennes.

5      Q.    How old a person are you?

6      A.    Twenty-one.

7      Q.    And what do you presently do, Ray?

8      A.    I'm a full-time student at UT Austin.

9      Q.    And what grade are you in at UT?

10     A.    I'm in my senior year.

11     Q.    And what is it that you are majoring in?

12     A.    MSI, management information systems.

13 It's a type of computer degree.

14     Q.    Ray, where did you go to high school?

15     A.    Mayde Creek in the Katy area.

16     Q.    And how is it that you have been able to

17 afford or I guess a better way to put it is have

18 you had any financial assistance in college?

19     A.    Yes.

20     Q.    Explain that to the jury.

21     A.    Well, I have -- actually, my first couple

22 of years I had a scholarship from the school,

23 Texas Achievement award.  That was for achievement

24 in my high school grades, scholarship,

25 activities.  And this past year I had also a

245

1 presidential endowed scholarship and that was also

2 for scholastic achievement as well.  I have

3 several government grants and a lot of support

4 from mom and dad, also hard work on my part

5 helping myself through school.

6  Q.  Ray, other than the obvious rewards that

7 you've gotten as far as academic and financial

8 scholarships that you can see, were you involved

9 in extracurricular activities?

10  A.  Now with the amount of work that I do, my

11 extracurriculars have substantially decreased.

12 I'm putting in 12 hours during the week at school

13 and around about 40 hours at a part-time job the

14 rest of the week.

15  Q.  All right.  What prior to your full-time

16 delving into your academics, what type of

17 extracurriculars have you been involved in?

18  A.  I've been in just about every sport.

19 I've done tae kwon do.  I did that for a long time

20 on my own during school.  A lot of weight lifting,

21 basketball.  I've played some volleyball and

22 several organizations.

23  Q.  Have you been involved in any politics?

24  A.  Well, not too much politics.  I do work

25 at a political organization.

1      Q.   Ray, you don't know anything about the

2   facts of this case, do you?

3      A.   No, sir.  I was booted out the first day.

4      Q.   Well, other than that, you're not aware,

5   you don't have any personal knowledge of anything

6   that's gone on in this case?

7      A.   No, sir.

8      Q.   When did your folks get divorced?

9      A.   It's been several years now.  The exact

10  time I don't know.  More than-- I'd say more than

11  about four or five years ago at least.

12     Q.   Has your father always been supportive of

13  you?

14     A.   Yes, sir.

15     Q.   Has your father encouraged you to attempt

16  to achieve certain goals?

17     A.   Yes.

18     Q.   You understand that after last week your

19  father is facing --

20          MR. SMYTH:  I object to leading, Judge.

21          THE COURT:  I'll allow it for expediency

22  purposes.

23          MR. ODOM:  I'm trying to hurry us along.

24          MR. SMYTH:  I'm going to object to the

25  side bar.

247

1          MR. ODOM:  Excuse me.  I apologize.

2     Q.   (By Mr. Odom)  You understand the two

3     options your dad is facing?

4     A.   Yes, sir.

5     Q.   Regardless of what your father may or may

6     not have done, will you still view him as an

7     influence in your life?

8     A.   Absolutely.

9     Q.   Regardless of what your father may or may

10    not have done, would you still to some extent if

11    he's around rely upon him as far as certain forms

12    of advice and guidance in your life?

13    A.   Of course.

14         MR. ODOM:  Pass the witness.

15         MR. SMYTH:  No questions, Your Honor.

16    Thank you.

17         THE COURT:  You may step down, Mr.

18    Dennes.  Thank you for your testimony.

19         All right, ladies and gentlemen of the

20    jury, it's 5:20.  I don't think we're going to get

21    to deliberate today.  I don't think you'd want to

22    start at this late hour anyway.

23         My understanding from Mr. Odom, they have

24    one more witness.  So we're going to recess at

25    this time until 9:45 in the morning.

248

 1              Please be downstairs.  Remember your

 2     admonishments.  I feel certain that we'll get to

 3     deliberate tomorrow.  Make the necessary

 4     preparations because, as I told you, once

 5     deliberations commence, you're not going home

 6     until you reach a verdict.  So again, as far as

 7     personal items, toiletries, medicines, anything of

 8     that nature, bring that with you.

 9              We stand in recess until 9:45.  Thank

10     you.

11              (Evening recess).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS

2    COUNTY   OF   HARRIS

3

4                    I, Kaye G. Jameson, Deputy

5    Official Court Reporter of said Court, hereby

6    certify that the foregoing pages comprise a true

7    and correct transcription of all portions of

8    evidence and other proceedings requested in

9    writing by counsel for the parties to be included

10    in the reporter's record in the above styled and

11    numbered cause, all of which occurred in open

12    court or in chambers and were reported by me.

13

14    I further certify that this transcription of the

15    proceedings truly and correctly reflects the

16    exhibits, if any, offered by the respective

17    parties.

18

19                    WITNESS MY HAND this the 4th day of

20    _February_ , 1998.

21                    _Kaye G. Jameson_

22                    Kaye G. Jameson
                      Deputy Official Court Reporter
23                    301 San Jacinto
                      Houston, Texas  77002
24                    281-328-4918
                      Certificate No. 476
25                    Expires December 31, 1998

                                                      250

APPELLATE COURT NO. _**72966**_

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

--------------------------------------------------

REINALDO DENNES

                    Appellant,

VS.

THE STATE OF TEXAS,

                    Appellee.

--------------------------------------------------

APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

                    TEXAS

Judge Jim Wallace, Presiding

--------------------------------------------------

CAUSE NO. 750,313

September 3, 1997

Reporter's Record

Volume 35 of _39_ Volumes

Sharon Kay Cook
Official Court Reporter
301 San Jacinto
Houston, Texas 77002

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Page 1



Volume 35

PUnishment

September 3, 1997
Chronological

Demitra  Dennes

|  |  |
|---|---|
| Direct Examination by Mr. Odom | 6 |
| Cross Examination by Mr. Smyth | 17 |
| Redirect Examination by Mr. Odom | 23 |
| Defense REsts | 24 |

Royce Smithey

|  |  |
|---|---|
| Direct Examination by Mr. Vinson | 26 |
| Cross Examination by Mr. Odom | 40 |
| STate Rests | 50 |
| Closing Arguments by Mr. Smyth | 58 |
| Closing Arguments by Mr. Odom | 67 |
| Closing Arguments by Mr. Vinson | 84 |

September 4, 1997

|  |  |
|---|---|
| Verdict | 106 |
| Sentencing | 108 |

Volume 35

Punishment

September 3, 1997

Alphabetical

Demitra Dennes

      Direct Examination             6

      Cross Examination              17

      Redirect Examination        23

Royce Smithey

      Direct Examination            26

      Cross Examination              40

Defendant's Exhibit No. 2    photo

    Marked            Volume 35                10

    Identified                                 10

    Offered                                    11

    Admitted          Volume 35                11
Defendant's Exhibit No. 3    photo

    Marked            Volume 35                10
    Identified                                 10

    Offered                                    11
    Admitted          Volume 35                11

Defendant's Exhibit No. 4    photo
    Marked            Volume 35                10

    Identified                                 10
    Offered                                    11

    Admitted          Volume 35                11

1                        CAUSE NO. 750,313

2    STATE OF TEXAS            IN THE 263RD DISTRICT COURT

3    VS.                              OF

4    REINALDO DENNES         HARRIS COUNTY, T E X A S

5    A P P E A R A N C E S:

6    For the State:          Mr. Mark Vinson
                             Bar Card No. 2059040
7                            Mr. Don Smyth
                             Bar Card No. 1877700
8                            Assistant District Attorneys
                             201 Fannin
9                            Houston, Texas 77002
                             713-755-7050
10   For the Defendant:      Mr. Wendell Odom
                             Bar Card No. 15208506
11                           Ms. Yalia Guerrero
                             Bar Card No.0078862
12                           Attorneys at Law
                             1301 McKinney, Suite 3100
13                           Houston, Texas 77010
                             713-951-9555
14

15

16            BE IT REMEMBERED that upon this the 3rd

17   day of September, A. D. 1997, the above entitled and

18   numbered cause came on for punishment before the

19   Honorable Jim Wallace, Judge of the 263rd District

20   Court of Harris County, Texas; and the State appearing

21   in person and the Defendant appearing in person and by

22   counsel, announced ready for punishment, after a jury

23   having been selected, and all preliminary matters

24   having been disposed of, the following proceedings

25   were had, viz:

1          THE COURT:  Let the record reflect the

2     State is present, the defendant is present with his

3     attorney and the jury is not present.

4          We now have a further proposed charge.

5          What says the State?

6          MR. VINSON:  Your Honor, we ask that page

7     seven on the extraneous be removed, and we would have

8     no further complaints with the charge.

9          THE COURT:  Thank you, Mr. Vinson.

10          What says the defense?

11          MR. ODOM:  I would object to any removal

12     of any instruction that would lessen the burden upon

13     the State and the proof of extraneous offenses at the

14     punishment stage of this trial.  I rely on the cases

15     of Powell and Howell, which indicate are non-capital

16     cases, and there has to be proof beyond a reasonable

17     doubt and the Supreme Court has indicated in a number

18     of cases that the Eighth Amendment requires a higher

19     standard of reliability in a capital case than it does

20     in a non-capital case.

21          I would submit, although the State has

22     submitted case law from the Court of Criminal Appeals

23     to the effect that is permissible, I would argue to

24     the Court that there is some dicta that says there can

25     be certain circumstances that may require an

```
 1    instruction as to the reliability of extraneous

 2    evidence, depending on the nature of that extraneous

 3    offense evidence.  The extraneous evidence that the

 4    State has is uncorroborated, is based upon an

 5    absolute, absolute plea of immunity based upon what

 6    the testimony is and runs contrary to an Eighth

 7    Amendment requirement of a greater degree of

 8    reliability in a capital case than a non-capital case.

 9    As such, we would argue strenuously for an instruction

10    to be presented by the Court.  And I would ask that

11    instruction be submitted in the record along with

12    everything else, if the Court chooses not to put it

13    in, or a similar instruction regarding reasonable

14    doubt on the extraneous offenses be submitted on this

15    particular case.

16              THE COURT:  Let me think about it for a

17    second.

18              Any other comments regarding the proposed

19    charge at this time?

20              MR. ODOM:  None other than those I

21    expressed yesterday, Judge.

22              THE COURT:  Very well.  We are going to

23    remove page seven of the charge dealing with the

24    matter of instruction regarding extraneous, and I will

25    allow that to go up as part of the appellate record,
```

1    that particular page.  And it's up to the attorneys to

2    make sure that is included in the record.  Mark it as

3    Court's 1 for exhibit.

4                    Bring out the jury, please.

5                    (Jury came into the courtroom.)

6                    THE COURT:  Thank you.  Please be seated.

7                    Good morning, ladies and gentlemen, thank

8    you for being with us this morning.  I hope this

9    morning we will have an opportunity to allow the

10   attorneys to commence arguments.  I certainly

11   anticipate.  Again, as I told you yesterday, I

12   anticipate that we will be in a position to hand the

13   case to you for your deliberations.

14                   With that, Mr. Odom, would you please call

15   your next witness.

16                   MR. ODOM:  I would call Demetria Dennes,

17   please.

18

19

20

21

22

23

24

25

```
 1                      DEMETRIA DENNES,
 2    was called as a witness by the defense and, having
 3    been duly sworn, through an interpreter testified as
 4    follows:
 5                    DIRECT EXAMINATION
 6    BY MR. ODOM:
 7         Q     Would you please state your name for the
 8    jury.
 9         A     Demetria Dennes.
10         Q     And Mrs. Dennes, how are you related to
11    Reinaldo Dennes?
12         A     I am his mother.
13         Q     Mrs. Dennes, where was Reinaldo Dennes
14    born?
15         A     In Cuba.
16         Q     And where were you born?
17         A     In Cuba.
18         Q     And when was it that you came to the
19    United States?
20         A     In 1961.
21         Q     And who did you come to the United States
22    with?
23         A     With my two sons, with Alberto and
24    Reinaldo, and the little girl was born here.
25         Q     And you also came -- did you come with
```

1       your husband at that time or did he came later?

2              A       The four of us came.

3              Q       And your husband is the gentlemen sitting

4       here on the front row?

5              A       Where is he?  Oh, yes.

6              Q       After you were here, you had a daughter as

7       well?

8              A       Yes.

9              Q       What's her name?

10             A       Barbara Dennes.

11             Q       Mrs. Dennes, did Ray grow up in the

12      Florida area or did he grow up in another area?

13             A       In New Jersey.

14             Q       And what age did Ray leave the house, go

15      out on his own?

16             A       From my home?

17             Q       Yes, sir.

18             A       When he was 18 years old, when he got

19      married.

20             Q       And previously the jury has seen from

21      Daisy Dennes --

22                     THE INTERPRETER:  I'm sorry.

23             Q       Previously the jury heard from a Daisy

24      Dennes?

25             A       Yes, that's his wife.  It's his wife.

```
1         Q      Now, Mrs. Dennes, I know that you are
2    nervous and that this is difficult but you need to
3    speak up and David is not talking here.  You are
4    talking.
5                When he left the house at 18 and he was
6    married at that time --
7         A      Yes.
8         Q      -- did he start working on his own?
9         A      He finished school and he started working.
10        Q      What school -- how far did he go in
11   school?
12        A      High school.
13        Q      Did he ever go to college?
14        A      No.
15        Q      And what did he start doing jobwise?
16        A      The vocation of his father, jeweler.
17        Q      Mrs. Dennes, at what point did Ray Dennes
18   and Daisy move to Houston?
19        A      We lived in New Jersey.  All of us moved
20   to Houston because he began working in Houston.
21        Q      And at that time had you moved to Florida
22   yet or were you still in New Jersey?
23        A      When I left Cuba, the only place I lived
24   was in New Jersey and Houston.
25        Q      How many children did Ray and Daisy have?
```

1       A       Two.

2       Q       And we have seen Ray Dennes, his son.  How

3   old is his daughter and what is her name?

4       A       My daughter Barbara?

5       Q       No, no, Ray's daughter.

6       A       12 years old.

7       Q       And what is her name?

8       A       Desirre.

9       Q       Mrs. Dennes, have you remained close to

10  Ray and his family?

11      A       Oh, yes.

12      Q       When did you move to Florida?

13      A       Three years ago.

14      Q       When was it that Ray remarried?

15      A       It's been exactly four years.

16      Q       And does he have a child from that

17  marriage?

18      A       Yes.

19      Q       How old is that child?

20      A       Ten months, nine months.

21      Q       Pardon?

22      A       Nine months or ten months.  It will be a

23  year in October.

24      Q       What is his present wife's name?

25      A       Louisa.

1      Q      What is the name of his youngest son?

2      A      Christen.

3      Q      Was Christen born while Ray has been in

4    custody?

5      A      Yes.

6      Q      Mrs. Dennes, did I ask you to provide me

7    and to go over certain photographs?

8      A      Yes.

9      Q      And you provided those to me, did you not?

10     A      Correct.

11            MR. ODOM:  May I approach the witness,

12   Your Honor?

13            THE COURT:  You may.

14     Q      Mrs. Dennes, I would like to ask you to

15   look at Defendant's Exhibit 2, 3, and 4, and without

16   telling me what they are, tell me if you can recognize

17   them.

18     A      I took -- I have to have my glasses in my

19   purse.

20     Q      Can you identify those?

21     A      Yes.

22     Q      And are they true pictures of what they

23   represent?

24     A      Yes.

25            MR. ODOM:  May I approach the witness,

1     Judge? .

2                         THE COURT:  You may.

3                         MR. ODOM:    I tender Defendant's Exhibit

4     2, 3 and 4 to State's counsel.

5                         MR. SMYTH:  State has no objection, Your

6     Honor.

7                         THE COURT:  Defendant's Exhibit 2, 3 and 4

8     are admitted.

9          Q     Mrs. Dennes, looking at Defendant's

10    Exhibit 2, punishment number 2, what is the front page

11    of that album?  What does it show?

12         A     Where my son belonged to the karate school

13    and the grandson, also.

14         Q     And that's a photograph of his class?

15         A     Yes.

16         Q     And on the back side, what is on that

17    exhibit?

18         A     Well, here they are practicing with his

19    oldest son.  Here is my son.  And that's his home,

20    practicing with the little boy in the living room.

21         Q     To your knowledge, was Reinaldo active

22    with his son in sports --

23         A     Very, yes.

24         Q     -- other than the karate that he and his

25    son attended?

1       A       They went to the one where you hit it with

2    your foot, the ball, the baseball, to the park.  He

3    would take him a lot to the park.

4       Q       Looking at exhibit 3 now, what does the

5    front page of that photo album represent?

6       A       Well, in the first one he is holding the

7    little girl.  And here he had the boy dressed up where

8    they get the carmel candies on Halloween.  And the

9    second one, the family is at the beach.

10      Q       Is that in Florida or in Texas?

11      A       This is in Texas, here.

12              And the third one is his daughter's

13   birthday.  They always celebrated it.

14      Q       What's on the back side of that?

15      A       And the first one is in the park where he

16   took the little boy like on a picnic.  The second one

17   they are cutting a cake at a birthday party for the

18   boy.  And the third one is the hospital where the

19   little girl was born.

20      Q       Please look at Defendant' Exhibit 4.  What

21   does that photo represent?

22      A       Here they are among friends and the little

23   boy.  Here's another time at the park, the second one.

24   The third one he goes there at the house with the

25   nephew, with Daisy's nephew.  They are together, with

1   a view towards the sea, with the little boy and the

2   little girl.  He always went to many places with the

3   children.

4   　　　Q　　　What's on the back sides?

5   　　　A　　　Here we are all at the church with the

6   little boy on his first communion.  And here we are in

7   a place where there is animals, like a zoo, with the

8   little boy.  Here he is in the sand with the little

9   boy, making something in the sand.  Here we are at

10  home, eating.

11  　　　Q　　　Mrs. Dennes, did you have a whole book of

12  photo albums you gave me?

13  　　　A　　　Yes.

14  　　　Q　　　And I just selected those three pages?

15  　　　A　　　(Witness nods head.)

16  　　　Q　　　You need to say something.

17  　　　A　　　Yes.

18  　　　　　　MR. ODOM:  I would ask that the exhibits

19  be published to the jury.

20  　　　　　　THE COURT:  Very well.

21  　　　　　　MR. ODOM:  May I hand them to them?

22  　　　　　　THE COURT:  Sure.

23  　　　Q　　　Mrs. Dennes, you don't know anything about

24  the facts in this case, do you?

25  　　　A　　　No.

```
 1        Q        You have not been here during the trial?

 2        A        At Daisy's house.

 3        Q        But you've been out in the hallway?

 4        A        Oh, yes, totally.

 5        Q        Every day you have not been in the

 6   courtroom?

 7        A        No.

 8        Q        So the only thing you know about the facts

 9   is what I have told you?

10        A        Yes.

11        Q        You do know --

12                 MR. SMYTH:  Object to the leading.

13        Q        Do you know what type of father Ray has

14   been?

15        A        The best.

16        Q        Why do you say that?

17        A        Because he has always given the children

18   everything they needed, love, protection, education,

19   and the oldest one is studying at the university now.

20   And the little girl has always been in the piano and

21   dance classes.  He's been the best father.

22        Q        Do his children love him.

23                 MR. SMYTH:  Object, she can't testify for

24   his kids.

25                 MR. ODOM:  If she knows.
```

1                    MR. SMYTH:  Pure speculation on her part.

2                    MR. ODOM:  Not from the grandmother.

3                    THE COURT:  Sustain the objection.

4                    MR. SMYTH:  Object to the side bar.

5                    THE COURT:  Let's not veer off to those

6     roads.

7         Q      (Mr. Odom)  Do his children to your

8     knowledge show affection towards him?

9         A      Much.

10        Q      Do you know if Ray has, in what you have

11    seen, attempted to set a good example for the

12    children?

13        A      Yes.

14        Q      Mrs. Dennes, you know he has been found

15    guilty of capital murder?

16        A      I have heard it here.

17        Q      And do you love your son?

18        A      I think my son is telling the truth.

19        Q      Regardless of what happens, you are Ray

20    Dennes's mother?

21        A      Yes.

22        Q      But even as his mother, are you able to

23    see what type of family man he is?

24        A      Yes.

25        Q      And what type of family man is he?

1      A      The best.

2      Q      Mrs. Dennes, I have asked you what type of

3   father Ray has been.  What type of son has Ray been to

4   you and your husband?

5      A      First he has been a very loving son, very

6   attentive to our needs, to us.  We have always been

7   able to count on him at all times.  We have always had

8   his help and now his father -- he has given much love

9   to his children, much attention, protection.  And he

10  has given him all his time and has taken him to the

11  park and everything.  He has shared the karate with

12  him, the child.  The boy child has been very involved

13  in sports.

14     Q      Mrs. Dennes, is your family a close

15  family?

16     A      Yes.

17     Q      Where are all the family members located?

18  Where were they living?

19     A      Well, like my mother in New Jersey, a

20  sister, nephews.  Here I have Daisy, the son, Alberto,

21  the sons of Alberto and Louisa, the wife of Ray, the

22  first one, my grandson.

23     Q      Where is your daughter Barbara?  Where

24  does she live?

25     A      In Dallas.

1          Q       Despite the fact that everybody is spread

2      out, do you still get together and maintain a family

3      unit?

4          A       Yes.  Barbara has come a lot to be with

5      her brother here.

6          Q       How old is your husband?

7          A       My husband is 68 years old.

8          Q       Mrs. Dennes, what would be the affect of

9      Reinaldo receiving the death penalty to you and your

10     husband.

11              MR. SMYTH:  Object, totally irrelevant and

12     has no part in this trial.

13              MR. ODOM:  It's mitigating.

14              THE COURT:  What was the question?

15              MR. ODOM:  What would be the affect on her

16     and her husband of Ray receiving the death penalty.

17              THE COURT:  Sustained.

18          Q       (Mr. Odom)  What will the affect of

19     finding Ray being found guilty of murder, what affect

20     will that have on you and your family?

21          A       We would feel almost death.

22              MR. ODOM:  Pass the witness.

23              THE COURT:  Thank you.

24              Mr. Smyth.

25

```
 1                      CROSS EXAMINATION
 2   BY MR. SMYTH:
 3       Q      Mrs. Dennes, my name is Don Smyth.  And I
 4   am the assistant district attorney here in Harris
 5   County, Texas.
 6              I have never had an opportunity to talk to
 7   you, have I, ma'am?
 8       A      Yes.
 9       Q      Now, I take it, from your conversation,
10   you and your husband tried to keep a close family; is
11   that correct?
12       A      Yes.
13       Q      You did everything possible you could to
14   raise Ray properly, did you not?
15       A      We gave him a good upbringing.
16       Q      You never had any trouble with him at
17   home?
18       A      Never.
19       Q      Saw that he got a good education?
20       A      Yes.
21       Q      Provided for his needs?
22       A      Everything.
23       Q      Instructed him in the responsibilities
24   that he would have as a citizen?
25       A      Yes.
```

```
 1          Q          Taught him to obey the law?

 2          A          Yes.

 3          Q          Taught him to work hard for a living?

 4          A          Yes.

 5          Q          And you taught him it's not right to

 6     steal?

 7          A          Yes.

 8          Q          It's not right to hurt other people?

 9          A          Yes.

10          Q          And if you wanted something, you should go

11     out and work on it?

12          A          Yes, he works.

13          Q          And you taught him hard work is what he

14     should do if he wanted something?

15          A          Yes.

16          Q          You taught him about the evils of drugs --

17          A          Yes.

18          Q          -- and alcohol?

19          A          Yes.

20          Q          You taught him that he should be faithful

21     to his wife?

22          A          Yes.

23          Q          He should respect his wife?

24          A          Yes.

25          Q          So you did everything you could do to make
```

1    sure that he became a productive citizen, did you not,

2    ma'am?

3         A        Yes.

4         Q        It's not your fault that Mr. Dennes, the

5    defendant, is in the jam he is in today, is it?

6         A        Correct.

7         Q        You didn't have anything to do with what

8    happened on January 24, 1996, did you?

9         A        No.

10        Q        And if he had come to you, you'd have told

11   him certainly not to do it, wouldn't you?

12        A        Correct.

13        Q        You were living in Florida, were you not,

14   ma'am?

15        A        Yes, I had moved to Florida.

16        Q        And shortly after January 24, 1996,

17   probably by January the 25th or the 26th, Ray came to

18   Miami where you lived, did he not?

19        A        Yes.

20        Q        And with him was his brother, Jose Alberto

21   Dennes?

22        A        Yes.

23        Q        They drive up in a bright, fancy, white

24   colored sports car, right?

25        A        I didn't see the car.  No.

1      Q      You didn't see the car?

2      A      (Witness shakes head.)

3      Q      How did they get to your house?

4      A      They came in bus or car.  I didn't see the

5  car.

6      Q      You never saw a bright, shiny sports car

7  at your house?

8      A      No.

9      Q      Now, Alberto and Ray have come to your

10  house on holiday, right?

11      A      Yes.

12      Q      Come to visit with you?

13      A      Yes.

14      Q      And then they left the country and went to

15  Santo Domingo, right?

16      A      Yes.

17      Q      Both Ray and Alberto went to Santo

18  Domingo?

19      A      Yes.

20      Q      Did you go with him, you and your husband?

21      A      Yes.

22      Q      And in addition to Santo Domingo, where

23  else did you go?

24      A      No place else.

25      Q      Just to Santo Domingo?

```
 1        A      Santo Domingo.

 2        Q      How long did you stay in Santo Domingo?

 3        A      Four days, three days.

 4        Q      Do you have any family in Santo Domingo?

 5        A      No.  We went to get acquainted with that

 6   place.

 7        Q      Just for vacation?

 8        A      Yes.

 9        Q      Was somebody planning on moving there?

10        A      No.

11        Q      Just wanted to kind of see what the island

12   of Santo Domingo looked like?

13        A      I always wanted to visit Santo Domingo.

14        Q      And Ray and Alberto took you there?

15        A      And my husband, too.

16        Q      And your husband.  And then you came back

17   from Santo Domingo, got back into Miami on

18   February 2, 1996?

19        A      I don't know exactly the days but four

20   days later we went back to my home.

21        Q      Did all four of you come back together?

22        A      Yes.

23        Q      Okay.  You flew back into Miami?

24        A      Yes.

25               MR. SMYTH:  I have nothing further.
```

```
 1      Appreciate it.
 2                  THE COURT:  Mr. Odom.
 3
 4                  REDIRECT EXAMINATION
 5      BY MR. ODOM:
 6          Q      Mrs. Dennes, when you went to Santo
 7      Domingo, did your children stay with you the whole
 8      time?
 9          A      All the time.
10          Q      They didn't slip off and go do any
11      business that you know of, did they?
12          A      No.  We were all the time at the beach.
13          Q      They didn't go off and do a business trip,
14      did they?
15          A      No.
16          Q      Santo Domingo is that not near your
17      homeland, your original homeland?
18          A      No.
19          Q      It's on the island of Hispaniola, right?
20          A      Yes.
21          Q      The prosecutor asked you whether or not
22      you raised Reinaldo the best way you could.
23          A      Yes.
24          Q      And you said you did.
25          A      I raised him with all respect and all love
```

1    along with his father.

2         Q      Even if Ray has committed a horrible

3    crime, even if, does that mean that when you testified

4    about him being a good father --

5         A      Uh-huh.

6         Q      -- that is not true?

7         A      How you ask is it not true?

8         Q      I am asking.  Even though he may have

9    committed a horrible crime, what kind of father has he

10   been.

11               MR. SMYTH:  Your Honor, repetitious.  That

12   has been asked and answered twice.

13               THE COURT:  Sustained.

14               MR. ODOM:  I believe on redirect at this

15   point and I am answering one of the issues he raised

16   on his cross examination.

17               THE COURT:  Okay.  I'll allow it.

18        A      Yes,

19               THE INTERPRETER:  She answered the

20   question.  The answer was yes.

21               MR. ODOM:  Pass the witness.

22               MR. SMYTH:  Nothing further.

23               Thank you, ma'am.

24               THE COURT:  Mr. Odom, call your next

25   witness.

```
 1                    MR. ODOM:  That's all we have at this
 2      time.
 3                    THE COURT:  What says the State?
 4                    MR. VINSON:  Your Honor, the State will
 5      call one rebuttal witness.
 6                    THE COURT:  Very well, call that witness.
 7                    Can we waive the rule to Mrs. Dennes?
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          ROYCE SMITHEY,

2     was called as a witness for the State and, having been

3     duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5     BY MR. VINSON:

6          Q      Sir, will you give your name and spell

7     your last name for the record.

8          A      Royce Smithey, S-m-i-t-h-e-y.

9          Q      And how are you employed?

10         A      I am chief investigator with the special

11    prosecution unit.

12         Q      And how long have you been chief

13    investigator for the special prosecution unit?

14         A      I have been with the unit 12 years.  I

15    have been the chief investigator for ten years.

16         Q      And what is your education, sir?

17         A      I have a bachelor of science degree from

18    Sam Houston University in law enforcement, police

19    science.  I am a graduate of Law Enforcement

20    Management Institute of Texas.  I currently hold a

21    master's certification with the Texas Commission on

22    Law Enforcement Officers Standards and Education,

23    probably have over two thousand hours of specialized

24    training in the field of law enforcement.

25         Q      Now, as an investigator with the special

1    prosecution unit, can you give us some background on

2    what you do.

3         A        Okay.  Our unit was organized in 1984, out

4    of the governor's office, State of Texas.  We are a

5    prosecutor assistance program that assists all

6    district attorneys in the State of Texas that have a

7    prison unit within their district.  Our function is to

8    investigate and prosecute felony offenses that occur

9    on state property that are related to the Texas

10   Department of Criminal Justice.

11        Q        And have you done that on few or many

12   occasions?

13        A        Every day, many occasions.

14        Q        Now, sir, when a person, that is, becomes

15   an inmate, when he was defendant in the courtroom, but

16   a defendant who has been found guilty of capital

17   murder, receives a life sentence, when he comes into

18   the penitentiary, would he be handled any differently

19   from anyone else that is sent to the penitentiary by

20   virtue of the crime that he committed while he was on

21   the streets?

22        A        No, sir, he would not.

23        Q        Can you tell the ladies and gentlemen of

24   the jury and His Honor just what would happen to that

25   person.

1          A          Once he is convicted and transported by

2     the county in which his conviction came from, he would

3     go through a diagnostic process in the prison system.

4                And basically what they do, they look at

5     each individual that comes through.  They look at

6     their education background, their medical background

7     and they look at special needs that individual may

8     have while incarcerated in the prison system, they

9     will look at special training he had.

10               An example would be, say, for instance, is

11    a welder, for example.  And what we refer to as a

12    prison set, for example, the free world is outside the

13    prison -- if he was a welder, then the prison system

14    is going to try to assign these inmates to units where

15    they can best utilize their capabilities for

16    rehabilitation.

17               The prison system wants to rehabilitate,

18    if they can.  Of course, rehabilitation is solely on

19    that individual whether he wants to be rehabilitated

20    or not.  But they want to be able to place them where

21    the State can utilize them to work as well as put them

22    in positions where they can benefit themselves.  Such

23    as a welder, they want to put them on an unit where a

24    lot of welding is done and things like that.

25               Each individual that comes in goes through

1      diagnostic, is graded and tested on what that

2      particular individual will do and that determines what

3      unit he was placed on.  A person that is convicted of

4      capital murder and receives a life sentence will go

5      through the same process as basically a felony DWI

6      that has been sentenced to a prison system.

7          Q     Would he be housed differently, locked

8      down or shackled and chained simply by the offense he

9      committed on the street or the offense that the jury

10     found him guilty of?

11         A     No, sir.  That's not a determining factor

12     on his incarceration inside the prison system.  Let me

13     rephrase that.  That's not the sole determination.

14     The fact that he is convicted of a violent offense

15     certainly will go into effect when he goes through

16     diagnostic but eventually, once he gets into the

17     system, the classification process, the housing

18     process of an individual or inmate is solely

19     determined by how he acts while he is in the prison

20     system and does not reflect what he has been convicted

21     of.

22         Q     So, in essence, he could eventually be

23     housed with somebody who has been convicted for DWI?

24         A     Yes, sir.  That's correct.

25         Q     Or somebody who just convicted for theft?

1          A        Yes, sir.

2          Q        And the jury found him guilty of capital

3     murder?

4          A        Yes, sir.

5          Q        Now, you was also speaking of work.   Do

6     you have inmates who receive a life sentence who work

7     there in the prison system?

8          A        Yes, sir, we do.

9          Q        Do you have circumstances where they can

10    work outside the walls of the system --

11         A        Yes, sir.

12         Q        -- even though a jury found a person

13    guilty of a violent offense and they receive a life

14    sentence?

15         A        Yes, sir.  That's correct.

16         Q        Are they allowed to come in contact with

17    other personnel that work there at the prison center?

18         A        Yes.  They come in contact with them

19    immediately.  There are correctional officers, guards

20    immediately, teachers, medical personnel.  These are

21    people -- a lot of people that are actually working in

22    the prison system are not trying to -- the officers,

23    they may be nurses, teachers and depending on an

24    inmate's situation as far as his education, if he

25    wants to continue his education, well, then, he will

1      come in contact every day, just like a child going to

2      school would be in contact with these people every

3      day.  They have medical problems, they will be in

4      contact with the medical people every day.  You have

5      counselors.  You have classification people, and

6      people like that, they will come in contact with just

7      all the time.

8           Q      Assuming a person has the financial

9      resources, can they get drugs in the penitentiary?

10          A      Yes, sir.

11          Q      What about cocaine?

12          A      Yes, sir.

13          Q      Have you investigated incidents of such?

14          A      Yes, sir, I have.

15          Q      And how does that happen?

16          A      It happens on numerous -- numerous

17     situations.  If the individual has the money, once he

18     is in a prison unit, in a matter of short time, he

19     could learn how to get things in.  He can learn the

20     people to talk to, to get whatever it is he needs to

21     get in.  In my experience, over the last 12 years,

22     just about any narcotic or controlled substance that

23     you could think of, even prescription medicine,

24     inmates have been able to clandestinely get in the

25     prison system and use it.  There are criminal

1      organizations within the prison system that utilize

2      their ability to get these type of drugs and even

3      alcohol in the prison system and use it for sale.  And

4      this is how they actually make their black market

5      money while they are incarcerated in the prison

6      system.  They get it in from the outside trustees, who

7      are trustees that basically work outside the prison

8      perimeter.

9          Q      Outside trustees, what are you talking

10     about, the outside trustees?

11         A      Once an individual is in the prison

12     system, he obtains a classification status of line

13     class three, line class two, line class one.  And I am

14     going from the bottom up.  What is at SAT S-A-T,

15     stated the approved trustee three, two, and one.  The

16     better his disciplinary, the least trouble he causes.

17     It is more work, he behaves, the higher he goes on the

18     scale.

19             For the individuals that do work and want

20     to do right in the prison system, they can eventually,

21     under some circumstances, obtain a situation where

22     they could actually work outside the perimeter fences

23     of a prison unit, work on tractors, work on the

24     different animal farms that are outside the actual

25     perimeter fences, and these people are trusted.  It is

1    a good program.  A lot of these people -- they have

2    very few of these people that walk off.  These are

3    people, some of them are what considered short time.

4    These aren't a people that are not doing a whole lot

5    of time.  It would be to their benefit to keep a good

6    job they have and go ahead and before they are

7    paroled.  Trustees have access to the outside.

8              We have cases other individuals have

9    dropped something off on the road side and prearranged

10   to pick it up and taken it back into the penitentiary.

11   Unfortunately, we have guards that have brought drugs

12   and alcohol and even weapons into our prison system.

13        Q    You said weapons.  What type of weapons

14   are we talking about?

15        A    We have had a couple of incidents where

16   zip guns were made either outside or inside the

17   walls.  We are not exactly sure where they were made

18   but ammunition was brought into the prison system,

19   either through a guard or a trustees, and was used in

20   the zip guns.  Homemade knives, those type of weapons,

21   are predominantly what are used.  There are -- we

22   have, on quite few occasions, had bombs that were made

23   and utilized inside the prison system.

24              Our office, my office itself, has received

25   a letter bomb from an inmate that was made in the

1    prison system, mailed through the United States mail

2    to our office and, fortunately, when our secretary

3    opened the letter, it spewed but it didn't blow up.

4         Q     Now, you stated some of the short timers

5    don't walk out.  Do you have people that go outside

6    the prison system that do walk off?

7         A     Yes, sir, we have.

8         Q     Do you know about how many prisoners are

9    you talking about in an unit?  Do you have a figure of

10   that?

11        A     I think there is approximately 140 inmates

12   in the prison system at this time.

13        Q     With that vast number of prisoner inmates

14   in our system, is it possible to monitor a person's

15   conduct 24 hours a day?

16        A     There are areas in the prison system where

17   there is very, very close monitoring.  These are

18   individuals that are disciplinary problems.  They have

19   committed felony offenses since in the federal system.

20   They are supremely dangerous individuals, and they are

21   placed in a segregated-type area within our prison

22   systems but even those individuals, even though you --

23   when you say monitor, you can watch somebody 24 hours

24   a day but that doesn't mean they are not going to do

25   what they want to do.  We constantly have guards that

1    are assaulted.

2             One of the problems we have is that the

3    State requires all inmates to shave.  If you are going

4    to require them to shave, you have to give them

5    razors.  They give disposable razors.  Unfortunately

6    these disposable blades and they take razor blades

7    out.  We have numerous officers who have been cut on

8    the face and wrists and arms, seriously injured.  And

9    these are by individuals that are probably the most

10   closely watched inmates within our system has still

11   been able to manipulate a weapon of some sort and

12   injure an officer, injure an employee and certainly

13   injure other inmates.

14        Q       Assuming that, again, money is not an

15   object.  You have the financial resources.  Are there

16   inmates available to do the bidding of other inmates

17   that have that money?

18        A       Yes, sir, certainly.

19        Q       Now, you were talking about, I think you

20   said, segregation and what?

21        A       Yes, sir.  There is an area that is

22   considered administrative segregation.

23        Q       What is administrative segregation?

24        A       It is for inmates of the low security

25   level.  These for inmates that are extremely violent.

1    They are either inmate- or staff-assaulted.  They have

2    refused to work.  They are a disciplinary problem.

3    They don't abide by the rules.  They won't do what

4    they are suppose to do and completely are locked up in

5    the administrative segregation or in our higher

6    security areas within the prison system.

7        Q      How available is that type of security?

8        A      That security is closer watched than the

9    general population area simply because the nature of

10   the situation.  You are talking about people here that

11   have continued to be security threats, either they are

12   an escape risk or they are assaulted and you house

13   these people different.  They are placed -- they are

14   segregated away from the general population.

15          They are fed in their cells in most of our

16   units but they still have to bring them out to

17   recreate (sic) each day.  If they have visitors, they

18   have to bring them out to visit.  If they have medical

19   problems, they bring them out for medical attention,

20   so even though you could take the worse of the worse

21   inmate that the prison system has, someone who is

22   extremely dangerous, that has hurt many people, and he

23   still is going to come in contact with human beings,

24   at least on a daily situation, simply because, maybe

25   unfortunately for our society today, we don't take

1    individuals and throw them in a room and lock them up

2    24 hours a day with no contact.  We just don't do

3    that.  We still feed them and we still give them

4    medical attention.  And because of that, they still

5    come in contact with people daily.

6        Q     How is a person housed on death row?

7        A     Death row has different sections.  This is

8    what is considered --

9              MR. ODOM:  Object to how people are housed

10   on death row in that it is irrelevant in the issue.

11             MR. VINSON:  I think it is relevant for

12   the jury.

13             MR. ODOM:  May we approach the bench on

14   this?

15             THE COURT:  I sustain the objection.

16       Q     (Mr. Vinson)  Now, I think you already

17   testified that you had this segregation?

18       A     Yes, sir.

19       Q     Now, I guess my question is:  The person

20   can, an inmate, still can commit an offense, can he

21   not?  And do you have -- what is the circumstances to

22   get them in to admin segregation, if you already have

23   people in there?

24       A     Well --

25       Q     I mean, do you have infinite space in the

1     admin segregation?

2          A     No, you don't.  Unfortunately we have

3     quite a few people in the administrative segregation

4     system now.  Basically, when the inmate comes in -- a

5     person who receives a sentence less than death -- when

6     he comes in, they are all treated basically the same.

7     Everybody goes through the same process as diagnostic,

8     whatever.

9              Once they are assigned to the units, then

10    these individuals have jobs.  They have things they

11    have to do.  The better they do the better jobs, they

12    can eventually get.  It is just kind of like the same

13    thing in the free world.  You work hard, you get

14    promotions.

15             But then once they have become a security

16    threat, that's when they are placed in the

17    administration segregation.  They have to do something

18    in order to be placed in that custody level.  Once

19    they are in that custody level, they have to maintain

20    a good disciplinary history.  Subsequently they could

21    get out of that and work their way back up, depending

22    on the seriousness of the offense that they committed

23    to get there.  If they committed a felony assault on a

24    correctional officer, chances they could stay in the

25    admin segregation for two or three years before they

1       actually get out.

2               We have inmates that we have prosecuted

3       for assaulting guards, give them a substantial amount

4       of years added on to the time they are doing.  They

5       are placed in the admin segregation.  And they

6       eventually got out of the admin segregation and they

7       assaulted guard and prosecuted them and stacked

8       additional time and placed them back in the admin

9       segregation.  If they maintain a good disciplinary

10      history and change their attitude and change their way

11      in the prison system, that individual can work his way

12      back out.  It may take five or six years but

13      eventually he could do it.

14          Q       But, eventually, when you are housed with

15      other criminals, there is always the opportunity to

16      engage in criminal offenses; is that a correct

17      statement?

18          A       Yes.  That society is one hundred percent

19      criminal element.  They feed off of each other.

20          Q       Sir, would it also be a fair statement to

21      say in a confined area of the penitentiary you have

22      had criminal acts of violence committed?

23          A       Yes, sir.  In the most secure areas of our

24      prison system, we have criminal activity, violent

25      criminal activity.

```
 1                    MR. VINSON:  I have nothing further.
 2                    THE COURT:  Mr. Odom.
 3
 4                         CROSS EXAMINATION
 5        BY MR. ODOM:
 6             Q      My name is Wendell Odom.  We have never
 7        met?
 8             A      I think we have somewhere down the line.
 9        The name is awfully familiar.
10             Q      I would like to ask you some questions as
11        well.
12             A      Okay, sir.
13             Q      Your job is to assist the prosecutors who
14        are on a grant from the governor, I take it?
15             A      Yes, sir.
16             Q      And you primarily assist the prosecutors
17        in the area of activities regarding prison units,
18        right?
19             A      Yes, sir.
20             Q      And you have been asked by the State to
21        come down and assist them and talk to us about the
22        prison units, right?
23             A      Yes, sir.
24             Q      You made several statements about, when
25        someone goes into a prison system, that they go in and
```

1    they are treated the same way as everybody else that

2    goes into the prison system, correct?

3        A       Yes, sir.

4        Q       That is, that diagnostic makes an

5    evaluation as to each and every prisoner, right?

6        A       That's correct.  Correct.

7        Q       And who runs diagnostic?

8        A       Are you talking about the warden on that

9    unit or in general?

10        Q       In general, who is running the unit or who

11    is making those decisions?

12        A       The prison system.

13        Q       It's not the prisoners that are deciding

14    where you are going to go in diagnostic?

15        A       No, sir.

16        Q       It's the guards.  Actually it's the

17    officials that are hired by the department -- well, we

18    don't call it that any more.  What do we call it now?

19        A       Texas Department of Criminal Justice

20    Institutional Division.

21        Q       Those employees are the ones that decide,

22    based upon the information they receive, where a

23    person goes in a particular prison unit?

24        A       Yes, sir.  That's correct.

25        Q       And there are factors other than what a

```
1    person's skills are that make that determination,

2    correct?

3         A    That's correct.

4         Q    If, for example, someone has been

5    incarcerated for quite a while with the county, they

6    are going to look at his record at the county before

7    they just summarily decide that he's no threat to

8    himself or any other prisoners, aren't they?

9         A    They will take that information into

10   consideration, if they have that information, not at

11   all times do they have the information.

12        Q    Some counties don't always send that

13   information, do they?

14        A    That's correct.

15        Q    Especially the rural counties and the

16   smaller counties?

17        A    That's correct.

18        Q    Now, the offense that a person has

19   committed, in diagnostic, they certainly take that

20   into account, don't they, when they are making their

21   decisions?

22        A    Yes, sir, they do.

23        Q    It's not like they take the DWI people and

24   the murderers and randomly, hey, you guys go out there

25   in that unit?
```

1          A       No, sir.  They screen them very well.

2          Q       When you say they are all treated the

3     same, that is what you said, they are screened very

4     well, are they not?

5          A       That's correct.

6          Q       Isn't it a true statement that very often

7     someone who has been convicted of the offense of

8     murder can be one of your best prisoners?

9          A       I believe that's a fair statement to say

10    that.

11         Q       You can't say this class is all bad and

12    this class is all good but very often a murderer will

13    be a good prisoner; isn't that true?

14         A       Yes, sir.  That's true.  But there's such

15    a wide range of murder.

16         Q       Exactly.  There are all types of crimes?

17         A       Yes, sir.

18         Q       And all kinds of people, right?

19         A       Yes, sir.

20         Q       And that's part of what the function of

21    the prison unit does when it screens someone in and

22    even, then, while you are in the prison unit, how to

23    treat that person and where that person is going to

24    go, right?

25         A       The screening process may determine his

1    initial assignment.

2         Q        Right.

3         A        The way he acts, the way he conducts

4    himself, the way he continues to work is going to

5    basically dictate what he does from that point on.

6         Q        Exactly.  It's an ongoing process, is it

7    not?

8         A        Yes.

9         Q        It's a continuing process?

10        A        Yes, sir.

11        Q        And the system, our prison systems -- and

12   I assume most prison systems, although I'm not

13   familiar with other systems -- is based on a system of

14   rewards and punishments, is it not?

15        A        Yes, sir.

16        Q        And if you mess up, you get punished.  If

17   you don't mess up, if you do right, you don't get

18   punished and you can be rewarded?

19        A        That's correct.  It appears it's kind of

20   handled like your children.

21        Q        Right, exactly.

22        A        You know, your children behave, they are

23   rewarded.  If they don't behave, they are punished.

24        Q        Mr. Vinson asked you a number of questions

25   about administrative segregation.  I have been to the

1        Ellis II Unit down in Rosenberg, one of the Ellises,

2        not near Rosenberg, Rosharon.

3            A        No.   The Ellis units are in Walker County

4        at Huntsville.

5            Q        Is it the Ramsey?

6            A        Ramsey.

7            Q        One of the Ramsey II or Ramsey I is an

8        administrative segregated unit?

9            A        Now, let me explain something here, if I

10       can.   When we talk about the administrative

11       segregation, we are talking about an area within the

12       prison system, within a unit, not the whole unit

13       itself.

14           Q        Then, I am starting off too narrow.   Let

15       me get bigger.   There are prisons in our system that

16       have different personalities based on the level of

17       what the prison system decides as to whether a person,

18       based upon a number of factors, should go to a higher

19       security unit or a lower security unit; is that a fair

20       statement?

21           A        Yes, sir.

22           Q        We have got some units out there that are

23       almost, for lack of a better term, the prison for

24       prison units.   And you have got other units out there

25       that are geared, in some instances, for less violent

1    or less dangerous type of offenders?

2         A    That's partially correct.

3         Q    We also have a bunch in between, don't we?

4         A    Yes, sir.  You can take -- actually within

5    the prison system, they consider only two types of

6    units:  maximum security units and medium security

7    units.  There are no minimal security units.  The

8    maximum security units, though, this is in referring

9    to your administrative segregation like we were

10   talking about, there is an administrative segregation

11   on unit A but there are also every other

12   classification of inmate on there.  You will have the

13   most highest from the State trustee four to the lowest

14   line class one inmate that will be housed on that

15   unit.  The whole unit itself is not an administrative,

16   only a portion is the administrative segregation.

17        Q    What we are talking about a wing, for

18   example?

19        A    Yes, sir.

20        Q    On that wing, I saw actually shields that

21   kind of rolled along that can shield from actual --

22        A    If you are referring to Ramsey I, Ramsey I

23   is a predominant protective custody unit now. There

24   are inmates that are in that unit, if I am following

25   you with what you are talking about, the area that you

1    would have viewed on Ramsey, it could have the

2    protective custody where these are inmates that have

3    testified in court against other inmates or they have

4    testified against gang members and those shields are

5    protection for the inmates that are walking in the

6    hallway as well as those in the cell.

7         Q       Actually this was a number of years ago,

8    and those shields were to make sure that in those

9    situations where you were talking about where you had

10   someone so violent that the guards would be shielded

11   from the person as they went by.  They may have

12   changed that in the last few years?

13        A       The shields were -- the policy that the

14   prison system set up on the rolling shields were to

15   protect the inmate because the officers walked in

16   front of the shield and behind the shield and the

17   inmates was in the middle.  That's what it was

18   designed for.

19        Q       There are wings and there are units that

20   are designated for people who have shown, either at

21   the screening or while they have been in the unit, or

22   all of the above, that they just cannot function in a

23   prison society without being segregated and isolated,

24   correct?

25        A       Yes, sir.

1        Q       And you are not trying to tell the jury,

2    if someone reaches that level, because of space, that

3    the prison unit isn't going to segregate them?

4        A       No, no.

5        Q       Trustees, someone doesn't automatically

6    become a trustee, do they?

7        A       They have to earn the position.

8        Q       And trustees are someone -- well, you made

9    a statement that someone that rates of trustees

10   escaping or walking off is a real small rate, isn't

11   it?

12       A       You have different levels of trustees.

13       Q       That's fair enough.  Trustee can be anyone

14   from someone handing the trays in the cafeteria to

15   someone that is in the field, outside the gates?

16       A       Yes, sir, depending on what level of

17   trustee they are.

18       Q       But someone doesn't automatically become a

19   trustee, they earn the status of becoming a trustee?

20       A       That is correct.

21       Q       Now, is everybody in our prison units

22   doing cocaine?

23       A       I hope not.

24       Q       I do, too.

25               You are not trying to tell us that

1    everybody there has access and that everybody is doing

2    drugs, are you?

3        A        What I am saying is that if you want

4    cocaine and you are in a prison system, you can get

5    it.

6        Q        If you got enough money and you work at it

7    hard enough in the prison system, just like any other

8    system, you can get cocaine?

9        A        Sure.

10       Q        What happens when a person is discovered

11   to have drugs in a prison system.

12               THE COURT:  Let's approach.

13               (Whereupon, the following proceedings were

14   held before the Bench.)

15               THE COURT:  We are getting way off base.

16   This case has nothing to do with anything with the

17   elements of.  I want this to wrap up quickly.  You

18   have pertinent questions and Mr. Vinson asked about

19   something pertinent but this is way off base and I'm

20   not going to allow questions that I believe are not

21   relevant to an issue that this gentlemen is here to

22   speak about.

23               MR. ODOM:  If I may, that's in direct

24   response to the questions that Mr. Vinson asked about

25   drugs in the unit.

1          THE COURT:  What was the question that you

2     just asked?

3          MR. ODOM:  What happens to a person who is

4     caught in prison with drugs.

5          THE COURT:  What does that have to do with

6     the time of death?

7          MR. ODOM:  It has a lot to do with

8     response.

9          THE COURT:  He asked a relevant.  You

10    didn't object.

11         MR. ODOM:  Judge, if it's in the evidence,

12    I have a right to rebut.

13         THE COURT:  I'm not going to allow any

14    further questions that I find to be not pertinent to

15    this matter.  That's all I got to say.  That's it.

16         (Whereupon, the following proceedings were

17    held before the jury.)

18         MR. ODOM:  I'm uncertain as to the Court's

19    ruling as far as whether I can or cannot proceed in

20    this area.

21         THE COURT:  I'll give you a couple of

22    questions in that area.

23         MR. ODOM:  Okay.

24    Q     (Mr. Odom)  Mr. Vinson asked you a number

25    of questions about drugs in a prison unit.  If a

1    person is caught with drugs in a prison unit, what

2    happens?

3         A      Hopefully, we will prosecute them.

4         Q      Not only will you prosecute him but he

5    also is facing internal disciplinary rules of the

6    unit, is it not?

7         A      That's correct.

8         Q      All the rewards we are talking about

9    earlier, or at least a number of them, are taken away,

10   or if not all of them?

11        A      Yes, sir.

12        Q      And he faces the additional possibility of

13   more time?

14        A      Yes, sir.  That's correct.

15        Q      Now, if a person receives more time on a

16   sentence where he is already doing time, does it run

17   with the sentence or tack on the end?

18        A      No.  It is stacked on top of what he is

19   currently doing.

20               MR. ODOM:  Pass the witness.

21               THE COURT:  Any questions?

22               MR. VINSON:  I don't have anything

23   further.

24               THE COURT:  Thank you very much.

25               MR. VINSON:  With that, Your Honor, the

1      State will rest.

2               THE COURT:  You may step down and remain

3      in the courtroom.

4               The State rests?

5               MR. VINSON:  The State rests.

6               THE COURT:  The defense rest as well?

7               MR. ODOM:  The defense rests.

8               MR. VINSON:  Then the State close.

9               THE COURT:  The defense closes?

10              MR. ODOM:   Yes, Your Honor.

11              THE COURT:  Ladies and gentlemen, you

12     heard all the evidence that is going to be presented

13     to you in the punishment phase of this case.  I

14     believe that we have the charge completed.  I need to

15     verify that with counsel.  If you will go with the

16     bailiff for a few moments, it's my goal to have you

17     right back out to hear arguments and allow you to

18     commence your deliberations.  Go with the bailiff for

19     a few minutes.  We stand in recess for about five

20     minutes.

21              (Jury left the courtroom.)

22              THE COURT:  You may be seated.

23              I am reversing myself and I am going to

24     allow an extraneous charge that was removed previously

25     to be in the charge.  And I think all we need to do,

1    if we run off another, and I hope not take too long

2    and go ahead and the copy I read to the jury will

3    insert.

4              MR. SMYTH:  Give me a cite you relied on.

5              THE COURT:  And I also had your appellate

6    shepardized 802 SW 2d 109 and that states the other

7    charge.  And that's 892 SW 2d, 213 at 215.

8              THE COURT:  Other than the modification,

9    which I have included in the charge, which I

10   understand the State accepts, is there any other

11   comments about this proposed charge from the State?

12             MR. VINSON:  No further comments, Your

13   Honor.

14             THE COURT:  Mr. Odom, anything further?

15             MR. ODOM:  No, Your Honor.

16             THE COURT:  30 minutes each side and a

17   five minute warning.

18             MR. ODOM:  On behalf of Mr. Dennes, I

19   would request for more time on closing arguments.  I

20   would submit to the Court we have been in trial for

21   three weeks now.  That this is a death case.  That the

22   issues here are very important.  I don't know that I

23   would use more than 30 minutes time but I would press

24   for additional time.

25             THE COURT:  That will be denied.  It's

1    been two weeks, two days in the trial.

2            While we have a chance, on the record,

3    something that we were talking about the other day,

4    Mr. Odom had made a previous objection, which I

5    denied, about not having an opportunity to voir dire

6    the panel with regard to extraneous.  I want the

7    record to reflect the fact, after the individual voir

8    dires by both sides, we wound up with a panel of 50, I

9    believe, perspective jurors for this case.  At that

10   point in time I presented each side with the

11   opportunity to continue a voir dire, a general voir

12   dire, on which they wished to go into.  Neither the

13   State nor the defense requested that opportunity.

14   That was at such a time on the 18th, well, after the

15   time that Mr. Odom was aware of the fact that the

16   State intended to offer an extraneous offense.  I want

17   the record to reflect.

18           MR. ODOM:  On the record, in that regards

19   as well, that date that the Court requested a charge

20   would be a general charge on a general voir dire and

21   as individual voir dire, that was the same day that I

22   requested the Court to rule on one of two motions, one

23   to exclude the extraneous offenses, because I did not

24   have time to be prepared, and I was gave notice of

25   those extraneous two working days prior to that day;

1      and, two, a motion for continuance to allow me to be

2      prepared to investigate those extraneouss.  At that

3      time I was unaware of the details, as I am essentially

4      at the time they were presented the details of the

5      voir dire.  As such, I was not in a position to

6      individually voir dire them like I would have when I

7      relied upon the Court's ruling back on

8      January 23, 1997, nor was I in a position to voir dire

9      generally because I hadn't had time to investigate the

10     issues so I could voir dire in enough detail to be

11     confident in that regards, as well as the fact I had

12     requested the Court to rule one way or another on that

13     matter, which the Court refused to do.

14              THE COURT:  Either way the record reflects

15     you had an opportunity to voir dire on that issue.

16     The fact that he did not have voir dire individually,

17     I don't believe is required on the issue of

18     extraneous.

19              All right.  Let's bring them out.  30

20     minutes for each side.)

21              (Recess taken.)

22              THE COURT:  We are not going to lunch.

23              MR. ODOM:   I would like the record to

24     reflect that it is 11:45 and we are being given 30

25     minutes each on the issue of death, and we are not

1    going to lunch.  And the jury has been here since, I

2    assume, 9:45, when the Court requested the jury to be

3    here, and at this point I don't know that the jury

4    will be able to pay attention in detail that the

5    Eighth Amendment requires in a capital case to

6    argument, especially in lieu of the fact that it is

7    such a limited argument time, and I would object going

8    forward at this point with the jury either not going

9    to lunch or doing it at this point in time.

10                   THE COURT:  That will be denied.

11                   (Recess taken.)

12                   THE COURT:  Bring the jury out.

13                   MR. ODOM:  I would like the record to

14   reflect that it is now 12:10.

15                   (Jury came into the courtroom.)

16                   THE COURT:  Please be seated.

17                   Ladies and gentlemen, it is my plan now to

18   read the charge to you, to allow the attorneys then to

19   commence their arguments.  I have given each side 30

20   minutes opportunity to do that, which means by the

21   time I read the charge, the attorneys argue, I will

22   probably give you this case to deliberate at

23   approximately 1:15.  Can we all stand waiting until

24   1:15.

25                   My preference is to proceed in this

1    manner, but if there are some of you that are thinking

2    you are not going to be able to pay suitable attention

3    because you are starving or everything else and you

4    would rather get something to eat and start this

5    process, if a majority wishes.  What's your

6    preference, to continue on now or break for lunch and

7    come back?

8            See a show of hands of those that would

9    like to continue now.  Is that unanimous?

10           Okay.  Thank you very much.

11           I'll read the charge to you.  The

12   attorneys will have the same opportunity to argue, as

13   they have done in the past, as they had in the

14   guilt-innocence phase.  At that point in time, I will

15   allow you to commence your deliberations with regard

16   to punishment, and I think our bailiff will inform you

17   that we will stay in during the lunch hour and serve

18   you food while you are back there deliberating.

19           (Judge read the charge to the jury.)

20           THE COURT:  As you noticed, ladies and

21   gentlemen, I think there is a last page that is

22   repetitious of the previous page.  Attached to the

23   charge are the special issues that you must consider.

24   For purpose of clarity, the charge goes on to state,

25   if you answer one yes, you go to two; if you answer

1    two yes and you go to three.  And the instructions at

2    the end of the special issue page, after the jury has

3    answered each of the special conditions, the

4    conditions and instructions outlined above, your

5    foreperson will sign the verdict form to be found on

6    the last page of this charge and, of course, at that

7    time you would notify the bailiff.

8            Let me further, in the event that in

9    answering Special Issue Number One or Special Issue

10   Number Two that your answer is no, at that point in

11   time you have no further obligation to go forward and

12   you are to sign the verdict and notify your bailiff.

13           Mr. Smyth, let's proceed.

14           MR. SMYTH:  Ladies and gentlemen of the

15   jury, by the clock on the wall it is 25 minutes after

16   12:00.

17           We have been given a brief amount of time

18   to talk to you as in the previous session.  I'm going

19   to open for the State and Mr. Vinson is going to close

20   for the State.

21           First of all, I would like to thank you

22   for your verdict that you rendered in the previous

23   part of this trial, the guilt-innocence portion of the

24   trial.  It was an absolute correct verdict.  Don't let

25   anybody tell you differently or don't let anyone shame

1    you on that verdict.  It was absolutely, totally

2    correct based on the evidence in this case.

3            During this case, you had seen that this

4    defendant's rights have been protected to the utmost,

5    to the nth degree.  It is now time to protect the

6    rights of society, and that's what your job is here

7    now, to protect the rights of society.  We are not

8    here to do what is right for this defendant.  We are

9    in here to do what is right for society.

10            The charge is something I would like to

11   talk to you.  It's a lot of words here.  You heard

12   everything.

13            MR. ODOM:  Object, that is beyond the

14   scope of the proper examination.  We are not here to

15   protect, to do what is right for the defendant beyond

16   the scope of argumentation.

17            THE COURT:  It's overruled.

18            MR. SMYTH:  May I have additional time

19   every time I am interrupted?

20            THE COURT:  You may.

21            MR. SMYTH:  Special Issue Number One, we

22   all talked to you about that and you got the

23   short-hand issue and that's the future dangerousness

24   issue.  This is the first issue.  And it's the one the

25   State has got the burden.  "Do you find beyond a

1   reasonable doubt that there is a probability that the

2   defendant, Reinaldo Dennes, would commit criminal acts

3   of violence that would constitute a threat to

4   society."

5        You have heard the evidence.  You think

6   about when you are asked that question.  You think

7   about David Copeland.  You think about Johnny Szucs.

8   You think about Danny Tsang.  You think about

9   Christina Tsang.  You think about little nine-year-old

10   christina Tsang.  Does that help you answer that

11   question?  And what is the answer?  Yes, this man is a

12   continuing threat to society.

13        You think about the fact that gun and

14   silencer will never be recovered.  You think about the

15   fact that the 3.5 million dollars in diamonds has

16   never been recovered.  You think about the fact that

17   he indeed did go to Santo Domingo within six days or

18   came back to the United States six days after this was

19   done.  You think about all that stuff.  And you think

20   about what Royce Smithey told you.  You can do

21   anything you want in prison.  Is he a continuing

22   threat to society?  You bet he is.

23        Special Issue Number Two, we talked about

24   that.  We spent 20 minutes, at least, with you,

25   probably 40 minutes.  You heard the inside and upside

1    and downside and you heard the definition.  You heard
2    it in respect to the robbery case where the gunman or
3    the get-away driver or the guy holding the bag.  "Do
4    you find beyond a reasonable doubt that, Reinaldo
5    Dennes, the defendant himself, actually caused the
6    death of Janos Szucs on the occasion in question, or
7    if he did not cause the death, that he intended to
8    kill Janos Szucs or he anticipated that a human life
9    would be taken."
10              Is there absolutely any doubt in your mind
11   that this defendant intended, at the very least
12   intended, that Janos Szucs die?  And he hired somebody
13   to make a silencer and he tested the silencer and he
14   made sure, when you go up to see somebody with a
15   loaded gun, with a silencer, do you intend anything
16   other than to kill them?
17              You know, because of the security
18   precautions, that Johnny Szucs was a dead man the
19   minute that guy right there decided he was going to
20   rob him.  He couldn't leave him alive.  He knew the
21   defendant.  They had worked together on the various
22   jewelry projects.  He decided his greed was more
23   important than a man's life.  You know the answer to
24   that question is absolutely, unequivocally, undeniably
25   yes.  Even if you didn't go to trial, and I submit to

1    you that the evidence is plenty that he pulled the

2    trigger, those two gunshot wounds are fatal through

3    the heart and fatal through the head.  And two guys

4    went upstairs.  No question about it.

5         Now, we get to the third issue, mitigation

6    issue.  Don't let anybody confuse you what this issue

7    is all about.  "Do you find from the evidence, taking

8    into consideration all the evidence, including these

9    circumstances of the offense, that the defendant's

10   character and background, and the personal moral

11   culpability of the defendant, Reinaldo Dennes, that

12   there is a sufficient mitigating circumstance or

13   circumstances" -- and whatever might be anybody says

14   that is mitigating for your English, modified

15   circumstance or circumstances, it doesn't apply to

16   anything else.

17        You are looking for the mitigating

18   evidence, if there is any in this case, and you don't

19   have to find if it is not there.  You don't have to go

20   if it is there.  If it is there, you should know it is

21   there right now.  I absolute submit to you there is no

22   mitigating evidence in this case.  Absolutely none, no

23   question about it.  It's not our burden.  It's not a

24   burden on the State to show there is any but there

25   isn't, and you know that.

1      That's about all you need know about the

2  charge is those three issues, yes, yes and no, and

3  this defendant gets exactly what he deserves.

4      You got to learn a lot to lot about the

5  defendant in this case.  You got to learn about his

6  couple of marriages and his families and his

7  children.  You got to learn that, and I don't know, I

8  have yet to figure out, how he could be so stable and

9  perfect and I don't know where, what a stable family

10  is, but you got a man who, according to Dr. Brown, who

11  abuses alcohol and drugs repeatedly and frequently.

12  You got a man who had a great marriage, admittedly

13  unfaithful to his wife, and you can make that

14  pleural.  First wife, over a five-year period of time,

15  and an indecency case where he is caught in the park

16  with his girlfriend, according to her, while he is

17  married to Daisy Dennes but yet he is a great guy,

18  stable.

19      You have got a case where I believe Louisa

20  Dennes, the second wife who has this nine-month old or

21  ten-month child, he is out there and flirting and

22  carrying on with Estrella Martinez but yet he is a

23  great guy.  You can't be faithful to anybody or

24  anything.

25      What else do you know about the guy?  You

1   know what this guy does.  He likes women.  He likes

2   cars, a hot car, a car his mother never saw.  He liked

3   that car.  The interesting thing on his 1989 arrest

4   for indecent exposure, he is arrested in his 1976

5   Chevy red Corvette.  The guy likes hot cars and will

6   do anything to get them.

7            You don't get to know much about Johnny

8   Szucs, and I am going to spend what little time to

9   tell you what you do know, what little you have been

10  allowed to learn about Johnny Szucs.

11           MR. ODOM:  I object to somehow or another

12  that the defense is not letting the jury to learn

13  about the complaining witness or in any way that it's

14  my fault.

15           THE COURT:  Sustained.

16           MR. ODOM:  Ask for an instruction to

17  disregard.

18           THE COURT:  Jury disregard.

19           MR. ODOM:  Ask for a motion for mistrial.

20           THE COURT:  Denied.

21           MR. SMYTH:  I am going to tell you what

22  little you know about that.

23           All right, you got one photograph of

24  Johnny Szucs, a photograph of Johnny Szucs in life

25  with his wife.  Don't forget that photograph.  Don't

1    forget that.

2            You have got several photographs

3    unfortunately of Johnny Szucs in death, and don't

4    forget this photograph.  This is what this trial is

5    all about.  Johnny Szucs was killed for nothing more

6    than greed.  And what have you been able to learn

7    about Johnny Szucs?  You learned from Sam Salomay that

8    he was a successful and respected business man in the

9    diamond industry.  You learned from Nicole Szucs that

10   he was a loving husband and that they tried to do

11   everything together as much as possible.

12           You learned that, during the few days

13   prior to his death, he went on a trip to the Holly

14   Land with the Second Baptist Church, and that he was

15   baptized.  You also learned, from looking at these

16   photographs, that Johnny Szucs did not know the time

17   or hour that he would be taken from this earth but he

18   did die with a Bible, a Bible, a Holly Bible close to

19   his feet, close at hand.  That ought to tell you

20   something about Johnny Szucs.  He wasn't somebody that

21   came to Christ late in life at a late time.

22           You, also, if you look at this photograph,

23   I think you see Johnny Szucs died in peace.  Even

24   though he took a bullet through the heart and a bullet

25   through the brain, he died in peace and that's got to

1    be some satisfaction.  He doesn't get the credit for

2    that at all and you shouldn't give him the credit for

3    that.

4         Ladies and gentlemen, I don't want you to

5    forget what this case is all about.  Don't forget that

6    after David Copeland met this defendant his life has

7    been changed forever.  After Johnny Szucs met this

8    defendant his life was changed forever.  His wife's,

9    Nicole, life has been changed forever.  After Danny

10   Tsang met the defendant, his life has been changed.

11   Defendant's hench man his life has been changed.   And

12   even with Christina Tsang, huddled under her covers, a

13   pillow over her head, having never even seen the

14   defendant's hench man, her life has been changed

15   forever.

16        And this is the mitigation evidence.  You

17   get a lot of family photos that somehow is suppose to

18   mitigate against the death penalty.  You tell me, in

19   good conscience, how in the world those photographs in

20   any way take away from the deeds that this defendant

21   has done.  Tell me how they are anything that wasn't

22   his moral culpability for the deed he did in this

23   case.

24        I submit to you, ladies and gentlemen, it

25   does not, and the only proper verdict under this case,

1    the only proper answers are yes, yes and no.  Thank
2    you very much.
3              THE COURT:  Thank you very much, Mr.
4    Smyth.
5              MR. ODOM:  Thank you, Judge.
6              Ladies and gentlemen of the jury, the last
7    time I stood before you I asked you to find the
8    defendant not guilty.  But I want you to recall what I
9    said at that time.  I didn't say that the defendant
10   was not involved in any bad activity or that he wasn't
11   involved, that he had no culpability.  What I said was
12   that the State did a pretty good job of proving that
13   Ray Dennes was involved in stealing the video and the
14   shooting of Mr. Copeland but the State never proved
15   who was up on the seventh floor and whether Ray Dennes
16   was involved in the murder of Janos Szucs to the
17   extent that you could find him guilty.  That's what I
18   asked.
19             You looked at the charge and you
20   determined, based upon the evidence in the charge,
21   that my client was involved in the murder on the
22   seventh floor.  I can see that, based upon the law of
23   parties, you could determine based upon Mr. Ramirez
24   and Estrella Martinez's evidence that you could find
25   that Mr. Dennes was under the law of parties

1    responsible for what happened up on the seventh floor.

2    I'll accept that verdict.  I may disagree with you

3    legally, I may have thought that the charges were

4    improper, but I can accept and understand the verdict

5    based upon what you have seen and what you did.

6              But now we are at the second issue.  And

7    we are at the issue of punishment.

8              And I suppose, in my heart of hearts, back

9    when I was talking to each and every one of you, I

10   always knew we were going to be at this point.  I knew

11   that.  And I think I knew that ultimately I'd have to

12   be looking at you and talking to you about what I want

13   to talk to you about.

14             Mr. Smyth tells you that the only thing

15   this case is about is Janos Szucs.  Well, I'm not

16   going to tell you that's certainly not something you

17   should consider but neither the law nor your common

18   sense tells you that's the only thing that this case

19   is all about.

20             The law requires you to focus upon three

21   separate issues, all of which has the underlying

22   thing:  Is this the person that we want to execute?

23   And that's really the issue to be dealt with at this

24   point, and I think we all know that, everyone of us

25   knows that.  This is an issue of capital punishment

1     and is this the case that capital punishment should be

2     used on.

3              Every one of you expressed various reasons

4     to me and to the Judge and to the prosecutor about

5     your feelings on capital punishment.  Every one of you

6     feels that in a certain case it would be appropriate;

7     otherwise you wouldn't be on this jury.  We know that.

8     So the question is this that case.

9              And the only issue isn't going to be the

10    rage that Mr. Smyth talked about or the photos of the

11    deceased.  The issues are legally and morally and

12    based upon the law and the evidence you have seen is

13    this a capital punishment case for it.  No, these

14    photographs aren't the reason not to give the death

15    penalty.  You have to have heard Mrs. Dennes testify.

16    And you have to have heard Ray Dennes testify, and you

17    have to put the whole package together to know whether

18    these photographs mean anything or not.  Just as, no,

19    these photographs do not constitute death.

20             Remember what we told you when we were

21    talking to you?  We have got a system that says if you

22    got murder, even a cold-blooded murder, even a

23    premeditated murder, that does not in and of itself

24    constitute the death penalty.  Every one of you talked

25    about that and everyone of you agreed with us that our

1   legislature set up a stairstep system.

2           Okay.  We have done that.  We have reached

3   the cold-blooded murder part.  What is this beyond the

4   murder, the capital murder?  What is there beyond the

5   capital murder that tells you that we have to put this

6   person to death and that we have to put this person to

7   death because of reasonable doubt on two issues and

8   because of what you, in your heart of hearts, in your

9   soul of souls, believe either mitigates for or

10  mitigates against death.  That's where we are now.

11          And the State can retry this murder case

12  over and over again but we all talked about this and

13  we are not retrying the murder case now.  Now we are

14  trying Ray Dennes and what is right for Ray Dennes, as

15  well as all these other issues, is the issues that we

16  try right now and that is the issue that is staring

17  right in the face and that's the issue -- I don't care

18  how unpleasant it is or how much you may not want to

19  deal with that, we have to deal with it right now.

20          You have all talked about various reasons

21  for capital punishment.  There were two that sort of

22  permeated your questionnaires and the discussions we

23  had.  One was do we punish the offender to punish the

24  offender.

25          Ladies and gentlemen, I suppose some of

1    you can think that death is more of a punishment than

2    a life in the penitentiary.  But I would submit to you

3    you think about that in the context of someone who has

4    a nine-month-old son that they will never be able to

5    touch and never be able to hold.  I would submit to

6    you what life in the penitentiary means to someone who

7    is 41 years old, not 23 years old, 41 years old.

8              And what that means, according to the law

9    as the Judge presented it to you.  We don't know if he

10   will ever get out, you are not to consider that but we

11   do know thing:  He will be an 81-year-old man before

12   that option ever raises itself.  We know that.  I

13   personally, and some of you agree with me, some of you

14   didn't, can't imagine more of a punishment, if that's

15   what you really want is a punishment than to make

16   someone sit there for the rest of their life in that

17   confined institution, knowing that person, whatever

18   else he may be, is a family man, and knowing whatever

19   else he may be, that is deprived of him, just as he

20   deprived Mrs. Szucs of her husband and her family.

21   That is punishment.

22             Another issue you talked about that I

23   thought was the issue that goes to the heart of the

24   matter is several you indicated, well, capital

25   punishment adds finality to the family of the

1   deceased, for the family, for the Szucs, that if you

2   execute someone, that gives closure to them.

3           And I suppose that argument is right there

4   with the argument that we all talked about of an eye

5   for an eye and a tooth for a tooth.  I quoted that

6   part of the scripture and a number of you talked about

7   the fact that this is closure, this is closure.  If

8   it's scripture, you are looking at and if it's

9   religion, you are looking at, listen to me for a

10  moment.

11          You can look at the Old scriptures, at the

12  Jewish and the Christian scriptures, and you can find

13  the words "an eye for an eye, a tooth for a tooth."

14          You can go to the early part of the

15  scripture that deals with the history of retribution

16  and you can see retribution.  You can see retribution,

17  especially in the history.  A village would lose the

18  battle and the women raped and the children be killed

19  and the children hauled off into slavery.

20          That's when you look in the history of

21  what the Scriptures offer but when you look what the

22  Scriptures say in Western culture, be it a Judo

23  religion, what do the Scriptures say, the Scriptures

24  don't talk about the violence and a Scriptures say "an

25  eye for an eye and tooth for a tooth."

1                    The Scriptures talk about when David

2          committed the murder that God felt that there was a

3          reason for him to still live and let him live and let

4          him do something.

5                    If you look at the New Testament, it's

6          replete with second chances and the purpose for life,

7          not a purpose for death.  If you want to look at the

8          Scriptures, you look at all the Scriptures and you

9          look at the underlines of the Scriptures.  The

10         Scriptures don't say an eye for an eye and a tooth for

11         a tooth.

12                    If you want finality for something, if you

13         want to give the family something, what are you going

14         to give them?  More death?  Everywhere I look, I see

15         it, death.  It peeps out at from me from the file.  It

16         comes from the witness stand.  Ever since I talked to

17         you since the very beginning, that's all we have done

18         is talk about death.  It leaks out from the courtroom

19         and it's lying around us and is that the finality we

20         give them?  Is that true closure, another death?

21                    Is that a real closure for a family?  Hey,

22         we will close it by another death.

23                    Closure can be life.  It doesn't have to

24         be death.

25                    And I would submit to you, if appropriate,

1    it's mandatory that closure should be life and not be

2    death.

3              There is issues to consider here.  There

4    is legal issues.  Special Issue Number One is the

5    defendant -- "beyond a reasonable doubt is there a

6    probability he is going to commit future acts of

7    violence that would constitute a continuing threat to

8    society"?

9              Now, you heard Dr. Brown.  And Dr. Brown

10   is not a person you could deduct from what he said who

11   is going to get up there and say whatever a defense

12   attorney wants him to say.  To the contrary,  Dr.

13   Brown told you how it was, warts and all.  He told you

14   about activity that doesn't help the client, drug

15   activity, drinking activity.  That's not helping the

16   client.

17             But he also told you something that he

18   found remarkable and that makes these photographs come

19   alive, that makes these photographs important to you,

20   ladies and gentlemen, and that's this:  He has seen

21   them.  He has seen the people on death row.  He knows

22   and he doesn't see the characteristics that those

23   people have in this man.  He doesn't.

24             Now, he is not going to lie to you.  He is

25   going to tell you straight up and the truth in that,

1    hey, my testing only can go so far.  If my testing

2    would have said he would have gone out and committed a

3    capital murder, he would have testified to that.  He

4    testified, hey, I don't want to be there if he ever

5    goes off again.  But what did he say?

6              What he said was that this person, this

7    person, has a very good chance, a very good chance of

8    living in a prison environment and not being a

9    continuing threat.

10             And they, ladies and gentlemen, have to

11   prove to you beyond a reasonable doubt.  Do you

12   remember what that was:  Beyond a reasonable doubt

13   that he probably -- that he probably -- will commit a

14   future act of violence, short of a public indecency of

15   having carnal knowledge of someone in a park, we have

16   no criminal activity for 41 years.  He would be 81.

17             You have a doctor that says that

18   probability on the State's part that they have to

19   prove to you beyond a reasonable doubt stands for one

20   thing, and I hate to say it but I suppose that what

21   the State has really proved to you is that if there is

22   a million dollars' worth of diamonds, this guy resorts

23   to murder.  This guy would resort to murder.  They

24   haven't proved to you that there is a probability that

25   he will be a future threat to society in prison and

1     that's the question that, by law, you have to answer.

2              The second question you have to, by law,

3     answer is did Ray Dennes anticipate the death of Janos

4     Szucs?   Even if you believe Mr. Balderas, the person

5     that came up with some kind of murder and got to

6     talking to the State and worked a deal wherein he gets

7     to walk off free, depending on what his testimony may

8     or may not be from his perspective, even if you

9     believe everything he says beyond a reasonable doubt,

10    that would be consistent with the fact that Ray Dennes

11    is not up on the seventh floor, doesn't it?   That's

12    consistent with someone else is up there, be it a

13    hench man that let him in or be it someone else.

14             Ladies and gentlemen, you may find him

15    guilty of parties but do you know beyond a reasonable

16    doubt that he anticipated what was going on the

17    seventh floor when the State has never put him on the

18    seventh floor?

19             I can go on an original verdict but now we

20    are talking about life or death and now is the part

21    where I stand up and I address you.

22             Issue Number Three, is there any

23    mitigating evidence or circumstances that warrant life

24    over death?

25             Mr. Smyth tells you there is not any.

1    Well, you get to decide what is mitigation and what

2    isn't.  I can't tell you what is and isn't.  But I can

3    give you some names.

4            Ray Dennes, his son, that's one issue

5    that's a mitigating issue.  Number two, his daughter

6    is 12 years old.  That's a mitigating issue.  That

7    warrants life over death.  And his son, he has never

8    held before, that's nine months old, that's a

9    mitigating issue.  Number four, his family, his mother

10   and his sister, those are mitigating issues, and you

11   can't judge this issue and you can't decide that issue

12   in the vacuum.  You can't only look to the

13   complainant.  You have to go beyond that.

14           And another mitigating issue, I submit to

15   you, is his age.  He is 41.  A life sentence is just

16   that, a life sentence.

17           The Judge addresses you on legal issues.

18   He tells you you can believe this extraneous offense

19   evidence you have heard in regards to this home

20   invasion, if you want, but you have to believe it

21   beyond a reasonable doubt.

22           Ladies and gentlemen, do you realize what

23   you heard?  You heard a guy that gets up there that

24   starts talking to the homicide division because of a

25   murder.  They mention that they have heard his name on

1    home invasion.  He knows this man is sitting in jail,

2    charged with this offense, and he says, with nothing

3    to support it, nothing to support it, "Hey, it was all

4    Ray's idea."  And he tells you I hang around that

5    office all the time and I hang around the building all

6    the time and it's someone that worked in that building

7    because Ray said it was someone that worked in that

8    building.

9              Remember what she says, she doesn't work

10   in that building.  Her husband doesn't work in that

11   building.

12             Ladies and gentlemen, what you just

13   witnessed, what you just saw, is the type of

14   testimony, the type of testimony, that makes all this

15   a mistake.  That's what you just saw.  You don't kill

16   someone based on that.  I find it remarkable.

17             The Judge tells you, well, you heard that

18   there were two other people that actually did it, this

19   hench man that actually did it.  Where are these phone

20   records?  It's so replete with phone records in the

21   previous case.  Unsubstantiated, uncorroborated and

22   highly suspect.

23             The Judge tells you, when you address

24   these special issues, you may not agree as to the

25   reasons why.  You can have what you consider a

1    mitigating issue that your co-juror does not feel is a

2    mitigating issue.  You can have your standard, what

3    makes someone decide beyond a reasonable doubt may

4    differ from your co-juror.  That's why can you respect

5    and listen to your co-jurors, and if they defer with

6    you, after you talk to them about it, will you not

7    compromise your principles and your ideas.  That's why

8    I asked that.  We are not talking about issues of

9    evidence alone here.

10            We are talking about issues of what you

11   feel mitigates for or against life and what you feel

12   mitigates for and against the death, what you feel

13   beyond a reasonable doubt makes a person a probability

14   to be a future danger in society.  And you get to

15   decide that a future danger in society for violence.

16   Does the fact that someone doesn't wear a shirt in

17   prison when he is suppose to or the fact that he

18   doesn't make up his bed or is it you have evidence

19   while he is in prison that he has resorted to

20   violence?  He has been there for a year and a half.

21   You have no evidence before you of anti-social

22   behavior.  If Mr. Vinson said probably, he didn't

23   follow orders and didn't follow orders but that's not

24   violence, not violence of future criminal acts to

25   society.

1          The State is going to talk to you about a

2   lot of things, and I anticipate they are going to talk

3   about the fact why should you show mercy to him.  He

4   didn't show any mercy to Janos Szucs.

5          Ladies and gentlemen, we are answering

6   special issues that relate to him.  We have tried the

7   murder case.  Now we are trying the death phase of

8   this case.

9          They are going to talk to you, and they

10  did talk to you, about the family of the complaining

11  witness.  You can't but help feel for the family of

12  Janos Szucs.  Everyone feels for the family of Janos

13  Szucs.  They would never feel -- I feel for the family

14  of Janos Szucs but if you put him to death, that

15  doesn't bring Janos Szucs back alive?

16         The issue is, the issue is, while in the

17  penitentiary, will he be a future danger and is there

18  a reason not to give him the death penalty.  They will

19  tell you that he has forfeited his right for life.  He

20  has forfeited his right to life when, and only when,

21  you have decided, only when you have decided he has

22  forfeited his right to life, and that, ladies and

23  gentlemen, when you know there is no reason for him to

24  live.

25         Is this one of the animals we have to kill

1    or is there still a reason for his life?  Is there

2    still a purpose for his life, and is there still

3    something out there that his life can contribute to

4    somebody that would mitigate for it?

5         You can bash him with these photos and

6    talk about how bad this murder is all you want but the

7    issue here is the life of Ray Dennes and whether we

8    should take that life.

9         The Judge tells you -- and you have heard

10    he was unfaithful to his wife and he liked fast cars.

11    What are we willing to do to take a life?  Is that the

12    State's reason for mitigation for death?  If we kill

13    everybody that is unfaithful, this is going to be a

14    sad society.

15         You know, we execute people at 6:00 p.m.

16    That's when we do it.  And ladies and gentlemen, I

17    don't care who actually reads the sentence.  The

18    decision is in your hands.  6:00 p.m., when you are

19    coming home from work and driving in your car, you

20    hear that Ray Dennes has been executed and you have a

21    thought or hesitate as to whether your decision was

22    right or wrong, I would submit to you that decision

23    was right.  And you may hate me right now because I am

24    putting all this guilt right on you.  It's not guilt

25    at all.  You bet I am playing on it.  It's the

1    decision.   It's the decision I am putting on you.   And

2    while the State will tell you, he is the one that will

3    put it on you.   He is responsible for you.   It's still

4    in your hands.

5                    THE COURT:  Five minutes.

6                    MR. ODOM:  Thank you, Your Honor.

7                    May I have additional time?

8                    THE COURT:  No.

9                    MR. ODOM:  If you make the wrong decision,

10   if you view no mitigating circumstances, if you make

11   the wrong decision, the consequences of it are

12   devastating.

13                   Ladies and gentlemen, what are we talking

14   about here, just as you can't throw a rock into the

15   bay without all the bays of the ocean, you can't take

16   a human life without disturbing all lives.   There are

17   people that this man can still be of value to.   There

18   is at least one son who has told you that.   There is

19   one son, we don't know if he will or not.   He is too

20   young to tell you that.   What will he say ten years

21   from now if he doesn't have that opportunity to know?

22   There is the daughter you didn't hear from and other

23   family members.

24                   If we make the wrong decision, we have

25   done that one time too many.   That's what we have

1    done.  We have done it too many.  One time too many

2    when we have taken a life, and it's our decision to

3    make.  And it's done one time in civilization, reached

4    in the religion, that we base our home upbringing and

5    ideas around has been swept aside so we might deal

6    with what:  with rage and with hate and vengeance.

7    It's one time too many -- if one time it is right, if

8    one time it is right.

9            You know, I told you, when in my closing

10   argument before, ladies and gentlemen, I am petrified.

11   I have never been here before.  I have never done

12   anything like this before.  I stand before you,

13   demanding and begging at the same time.  I am begging.

14   I am begging for the life of someone that I think the

15   evidence tells you shouldn't die.  I am demanding that

16   you remember the law and apply the law because the law

17   tells you if there is a mitigating circumstance, you

18   give life.  You don't give death.  You give life.  You

19   don't give death.

20           The State will tell you there is no blood

21   on your hands.  The only blood is on Ray Dennes's

22   hands.

23           Ladies and gentlemen, what you are

24   witnessing is the Judge giving you the law, the

25   prosecution giving you rage and rage to an extent is

1    appropriate.  Rage is sometimes acceptable.  That's

2    what they give you.  They give you rage.

3              And at this moment in time, at this

4    particular instant where I stand, I am giving you the

5    truth.  I am.  I feel I am giving you life; whether he

6    did or didn't, I am.  You can be like the person they

7    want you to execute, if you want, or you can take that

8    truth and you can breath on it and you can give

9    someone else, not this man, but someone else you can

10   give them a reason for this not to be all death and

11   not all bad.

12             I don't have another chance to talk to

13   you.  I wish I did.  But I don't.  You are probably

14   glad that I don't.  Well, I know that there is

15   something I could have said and I know down to me that

16   I could have done that is different if I just had the

17   ability to do it, if I could have reached in to let

18   you know I know it is there.  I have to take what

19   little I had and deal with it.  And my ideals may be

20   old and may be old fashioned, and I still stick to

21   them, but don't kill this man.

22             THE COURT:  Thank you, Mr. Odom.

23             Mr. Vinson.

24             MR. VINSON:  May it please the Court,

25   defense counsel, ladies and gentlemen, on behalf of

1    the State of Texas, I certainly welcome your verdict,

2    and like Mr. Smyth said, it was a proper verdict.

3    Mrs. Szucs also appreciates your verdict.

4         It's been a long trial.  We tried to bring

5    to you as much evidence as we could because we knew

6    from the beginning there was no ifs, ands and buts.

7    We knew that a good jury would return this verdict and

8    we would reach this point so we didn't try to

9    sugarcoat it to you when we had our voir dire.  We

10   told you like it is and like it was going to be.

11        The defense say we bring you rage and he

12   brings you the truth.  Well, on January 24th, myself,

13   Mr. Smyth, I don't recall what we were doing on

14   January 24, 1996, but I can tell you this:  We didn't

15   have any interest in Ray Dennes.  We wasn't sitting

16   around our office scheming up something on Ray Dennes

17   so we can bring you what we call rage.

18        Every time we are brought into the

19   courtroom, we are brought into this courtroom by a

20   defendant's conduct.  We don't sit in that office and,

21   look, we can scheme and, look, we can bring some rage

22   before the jury so the defense can bring the truth.

23        Now, you looked at the evidence that was

24   presented in this courtroom and you determined where

25   the truth lies.  Obviously it's on this side because

1    you found the defendant guilty.

2         And you know it burns me up inside to hear

3    somebody stand here and try to put the burden on you

4    and tell me that Mr. Smyth and I bring you rage.  I

5    would be derelict in my duty if I didn't present this

6    case to the best of my ability.  Under the guidance

7    of the Court, we have done that and he says he don't

8    bring you rage.  He don't know what rage is.  Rage

9    should be in this lady's heart, this lady sitting

10   right here, Nicole Szucs, who this defendant decided

11   he would take her husband's life.  Let's talk about

12   the truth.

13        And I won't beg you because the Judge has

14   instructed you in his charge.  He said you are again

15   instructed that you are not to be swayed by mere

16   sentiment, conjecture, sympathy, passion, prejudice,

17   public feeling in considering all the evidence before

18   you in answering Special Issue Number Three, and we

19   will talk about that.

20        And moreover, the Judge also tells you --

21   he tries to make you think you just found somebody

22   guilty of murder.  You found him guilty of capital

23   murder.  Does he think your brain has left your body?

24        You are to consider everything His Honor

25   tells you right here, on the first page of the jury

1   charge, in determining your answer to the special

2   issue submitted to you.  You should consider all the

3   evidence submitted to you in this whole trial -- in

4   this whole trial.  And he goes on to give you the

5   further instruction.  He doesn't tell you you find the

6   defendant guilty of murder you decide this.  You find

7   him guilty of capital murder.  Let's talk about some

8   of these things.

9          With Special Issue Number One that you

10  find in your jury charge, ladies and gentlemen, on

11  page number 11, and it says here: "Do you find from

12  the evidence beyond a reasonable doubt that there is a

13  probability that the defendant, Reinaldo Dennes, would

14  commit criminal acts of violence that constitute a

15  continuing threat to society?  Answer:  We, the jury,

16  unanimously" -- that means you all collectively.

17         Now, you can go back there and have

18  lengthy discussions on it.  That's what you are

19  suppose to do but don't put yourself in a corner and

20  don't talk to each other because if you do that, the

21  defendant wins.  He gains.  Don't do that.

22         MR. ODOM:  Object to his characteristic

23  how the jurors should act if the defendant wins or not

24  wins.

25         THE COURT:  It's overruled.

1          MR. VINSON:  Go back there and work
2    together.  Remember you are the pulse of this
3    community.  You are the one that is going to
4    determine, at least put some standard of conduct upon
5    people for their acts that they go out and commit.
6    You are going to establish that.

7          You go back there and you look at the
8    evidence.  And when you are considering Issue Number
9    One, you can think what happens to Mr. Tsang's, his
10   little daughter, Christine?  Was that planned?

11         Well, obviously it wasn't planned for Mr.
12   and Mrs. Tsang to become invaded but did Ray Dennes
13   care?  He really didn't care.  The only thing he
14   wanted was some diamonds.  They sent nitwits out there
15   and they went into the wrong house, no big thing.
16   They are not my friends any more.  Mind you, this is a
17   household where somebody makes his living working on
18   automobiles in that body repair shop.  How would that
19   person know who has diamonds in that community and who
20   is supposed to live in that community unless he had
21   some connection with someone what had inside knowledge
22   or had reason to know that the man had diamonds, the
23   alleged targeted victim?

24         And if you notice, there was no discussion
25   in cross examination.  You never met Ray Dennes and

1    you don't know David Balderas.  That gives you a lot

2    about the defendant, who he was in association --

3              MR. ODOM:  He is referring to the

4    defendant will tell you.  I object to the failure to

5    testify.

6              MR. VINSON:  I said, "It tells you a lot

7    about the defendant."  That's what I said.

8              MR. ODOM:  May I have a ruling?

9              THE COURT:  Overruled.

10             MR. VINSON:  That will tell you that he

11   was running around with David.  And when he needed

12   somebody to do a job for him, David refused to do it,

13   go in himself but he said he will get somebody to do

14   it.  Can you get somebody to do it?

15             And what did he do?  He didn't care what

16   happened to those people in the home.  He didn't care

17   about the diamond broker that lived in that house two

18   houses away.  The only thing he wanted was the

19   jewelry.  To show how greedy, he didn't sit there and

20   discuss with the people the breakdown.  You bring it

21   to me.  We get it first and then we will make that

22   decision.  I would say had they been successful, they

23   probably -- don't you know they got about the same

24   thing Estrella, a couple of thousand.  He walks off

25   with the rest.

1           He is a greedy, self-centered individual

2      but Dr. Brown couldn't tell you that.  Remember that.

3      He did bring you a warning.  He brought one warning.

4      When the defendant has another episode, he wouldn't

5      want to be around and he wouldn't want anybody else to

6      be around.  What do you think he is doing?  Are we

7      going to be so isolated inside where he can't bother?

8      He is going to the penitentiary and there is other

9      people up there.  So think about that when you are

10     looking at this.

11          Is there a reasonable doubt about the

12     probability that the defendant would commit criminal

13     acts of violence that would constitute a continuing

14     threat to society.  Just think about that.

15          Now, with that failed venture, it would be

16     like he said, "Enough is enough.  I'm not going to get

17     involved in this any more."  But 60 days passed and he

18     was engaged in it again.

19          And, again, look how that man works. First

20     of all, he selects his target, the victim, that is.

21     In this case, on the 24th, it happened to be Janos

22     Szucs.  He selects someone who he has an established

23     relationship.  Mr. Szucs had, at some point in time --

24     I know his ex-wife was reluctant -- at some point in

25     time he had to trust this defendant.  There had to be

1    some trust.  You don't let somebody in when you are

2    closed whether you had some trust.  He gained the

3    trust of this man who sent him business, who had an

4    interest in him, who had an interest in him, who sent

5    him business.  He gained his trust.

6            What did he do?  He went out and recruited

7    people, again the conniving plan of this defendant who

8    can twist and get people to bend to his will.

9            He goes out and what does he do:  He gets

10   Antonio to make a silencer.  Now, that took time and,

11   again, Mr. Szucs is going to and fro from his business

12   on a daily basis and yet he doesn't know he is the

13   target of death.  This defendant has already given him

14   a death warrant.  He is a walking dead man.  This lady

15   is sleeping with a walking dead man.  It's only a

16   matter of time before he executes his plan.

17           And the defense is going to say I bring

18   you rage.  That should insult you.  We should live in

19   a better community than this.

20           Another thing, not only did he know his

21   target, he already had made up his mind that his

22   target was going to be dead and he wanted what?   He

23   wanted the jewelry.  He wanted the diamonds.  He

24   wanted the cash and he wanted anything else liquid he

25   could get his hands on.

1          And he knew he was going to do it because,

2     by impulse, he went out and bought him a nice sports

3     car, a nice sports car.  Well, he can have that to

4     drive from Houston, Louisiana, or wherever, and then

5     take his family on a vacation.  Well, where do you

6     think that money came from, ladies and gentlemen?

7          Use your own common sense.  Take his

8     mother and father and family, let's go on a vacation.

9     I'll just go down to the islands.  Who cares, Mr.

10    Szucs is dead.  He don't need it.  I have taken care

11    of that matter.

12          Think about that.  Think about that.  When

13    you start thinking about this defendant, think about

14    Mr. Szucs.  Try to think how does it feel, you are

15    dead and you are walking.  How does it feel, you are

16    dead when you leave your home?  How does it feel to

17    know you are dead and say good bye and drop you off

18    and never see your wife again and you never get a

19    chance to say anything to her again?  How does it

20    feel?  Think about that.

21          You can use all that when you refer to

22    Special Issue Number One.  You can use all that

23    evidence.

24          Special Issue Number Two, "Do you find

25    from the evidence beyond a reasonable doubt that

1    Reinaldo Dennes, the defendant himself, actually

2    caused the death of Janos Szucs on occasion in

3    question, or if he did not actually cause the death of

4    Janos Szucs, that he intended to kill Janos Szucs or

5    that he anticipated that a human life would be taken."

6            Why would you make a silencer?  The

7    question is answered.  I'm not going to wordy you on

8    that.  The question is answered.  You are going up

9    there.  You are going to rob Mr. Szucs.  He knows you.

10   Why would you take a silencer?  Why?

11           The answer speaks for itself.  You don't

12   want any witnesses.  This wasn't some nickel-and-dime

13   story.  You are talking about 3.5 million or better

14   with the jewelry and diamonds and cash.  We know a

15   substantial amount of cash was taken.  What do you

16   think Mr. Szucs was going to do?  Bye, Ray, have a

17   good trip.  Of course, he is going to report it.  So

18   he had to eliminate him.

19           And then look his conduct with respect to

20   Issues Number One and Two.  Look his conduct when he

21   met Mr. Copeland.  Mr. Copeland left his home that

22   morning to come to work that afternoon.  He didn't

23   know that he is going to see his wife dead again but

24   for their defendant's conduct, based on just a

25   videotape, they want you to believe a videotape --

1   assume it is -- a person that is willing to kill over

2   a videotape, you tell me where there is some salvation

3   in his body.  You tell me that.

4          Go back there -- and how many times have

5   you heard or said, "You mean to tell me, somebody

6   killed over dollars, somebody killed over this."

7          Ladies and gentlemen, you see that person

8   personified in this defendant right here in this

9   courtroom today.  He is sitting right in here.  And

10  that's what you are looking at.  He walked right up to

11  Mr. Copeland and placed his hand on the shoulder and,

12  pow, didn't hesitate, didn't flinch, didn't back

13  down -- excuse me, I'm sorry, nothing.  Mr. Copeland

14  made another move.  From the reaction, he hit the

15  ground, startled, not realizing.  The defendant backed

16  off and shot another shot.  And, believe me, if Mr.

17  Copeland had moved again, he wouldn't be here to

18  testify.  Those are serious wounds with intent to

19  kill.  You think he is not dangerous?  You think he

20  wouldn't do it again?  Answer that yes and we all get

21  together.

22          And I am going to ask you to do it because

23  the evidence dictates.  I'm not going to beg you to do

24  it because that would be inappropriate.  That would be

25  inappropriate.  This case did not come to you in that

1   manner.  We are going to ask that you to follow the

2   law.

3               With respect to Issue Number Three, when

4   you go back there and you are dealing with Issue

5   Number Three, you look at what the Judge has

6   instructed you on.  And you have answered yes, yes pm

7   Issues Number One and Two because you know it is the

8   right thing to do, then go to Issue Number Three.

9               "Do you find from the evidence, taking

10  into consideration all the evidence, considering the

11  circumstance of the offense," look the circumstances

12  of the offense.  Look at that offense again.  Look at

13  it:   Had already picked the target, knew he was going

14  to kill him ahead of time and knew what he was going

15  to gain, what he thought he was going to get away

16  with, too.  Look how it was done.  Make sure that Mr.

17  Szucs had no one around him.  Isolate him from his

18  loved ones.  The defense attorney brought his loved

19  ones in.

20              You have got to do a balancing act here,

21  people.  Don't you think Mr. Szucs had loved ones?

22  Do you think he just sprouted up one day?

23              He came to this country, too, and he tried

24  to do something in his life.  Like Mr. Smyth says, the

25  evidence showed that he was decent, fine, respectable,

1  went to work and worked hard to take care of his wife.

2  And look at this defendant's moral culpability.  Look

3  the defendant's moral culpability and the defendant's

4  moral blameworthiness.

5          Okay.  You find him guilty of capital

6  murder, so you sure answered that issue.  You found

7  him morally culpable.  Because, remember, this offense

8  would never have got off the ground and it would still

9  be in the runway, if he hadn't triggered.  He is the

10  one that got it rolling.  He is the one that went out

11  and got it rolling.

12          So when he brings his family in here, when

13  he brings some picture in here of some young child

14  that defense counsel tells you that he has a

15  nine-month-old baby, explain to me how does that

16  explain his conduct to go out here and commit a

17  capital murder, take this lady's husband and attempt

18  to take Mr. Copeland's life and could care less what

19  happened to the home that was invaded to those people?

20   How does that explain his conduct?

21          And remember one thing that Dr. Brown

22  said:  Dr. Brown said to you, he said this defendant

23  here, he could have given him that little paper test,

24  that series of tests could have been given six weeks

25  off from the offense.  He could have made no

```
1     prediction what he was going to do.  It tells you a he
2     was devious.  He is a trained psychologist who can't
3     even deal with him.  What do you think those people up
4     in TDC, in the Texas Department of Criminal Justice --
5     and real fancy name for it now -- what do you think
6     they are going to be able to do?  That is a devious
7     mind sitting in this courtroom and he can get others
8     to do his will.  You have seen it.
9                    THE COURT:  Five minutes.
10                   MR. VINSON:  You have seen it.
11                   And I submit to you, give him the
12    opportunity, give him the place, and he will get those
13    to do his deeds.  He is known for it because why?
14    That money has not been recovered.  Those diamonds
15    have not been recovered.
16                   What do you think he is going to do?
17                   He will be the high man on the totem pole
18    there and, believe me, they will be lining up, when
19    they find out who he is, to do his deeds.
20                   We also brought in here so that it would
21    assist you, we brought in Mr. Royce Smithey, a special
22    investigator?  What did he tell you?
23                   The defendant will go in.  He will be in
24    diagnostic and sometime he will be released in prison
25    and with people in there with DWIs and other lower
```

1    level offenses.  He is not going to walk around in the

2    prison unit with a big sign on his head saying I am a

3    capital murderer.  You have got people coming and

4    going, want to know who they are dealing with, won't

5    have any idea who they are dealing with.  Well, can we

6    make a mistake?

7            The mistake was made when that defendant

8    chose to execute because that's what he did. He

9    executed Mr. Szucs.  He executed him.  He was the

10   judge, he was the jury and his executioner.  At least

11   you will not be his executioner.

12           The only thing you are to do are to answer

13   the questions.  And you promised us on voir dire, and

14   I know you can still keep that promise, you said that

15   you would answer those issues according to the law and

16   the evidence.  And when you go back there and you find

17   out what is mitigating, ask yourself, remember the

18   State has no burden.  Go back there and say how does

19   having a family mitigate what he did?  Because if

20   that's the rule, if that is it, then everyone who has

21   a decent family can go out here and become a hit man

22   and come to court and drag your family.  "I have got a

23   decent family."

24           I do know the young boy has accomplished a

25   lot from his own sweat and he got a scholarship from

1    there and he appears to be -- he didn't say daddy gave

2    me a scholarship.  Daddy gave me this.  Not one time

3    did he ever say that I love daddy.  Not one time.

4    Now, it was their witness -- not one time.  That was a

5    show boat.

6            Now, ladies and gentlemen, remember, when

7    justice is denied, we all become victims.  We all

8    become victims, and there is one way that you can say

9    to this defendant here that we are not going to become

10   your victim.  We are not going to go into the jury

11   room with this burden on our backs.  We didn't ask for

12   it, and I know each and every one of you would rather

13   be some place else.  And on 24th of January, you

14   didn't know nothing else, you would be prefer to.  You

15   are not here and, believe me, if the State legislature

16   trusts you as well and they have given you an

17   abundance of power here and right now you hold more

18   power in your hands than anyone in the State of

19   Texas.  It's what you do with it.

20           Now, the defense says you are driving home

21   and you hear on the radio this defendant had been

22   executed, then you should say to yourself hallelujah.

23   There shouldn't be no second thoughts there.  You can

24   take it, like after, when you are driving home, and,

25   bam, Ray Dennes has been involved or did something

1   else, injured someone else, and then you will be

2   second-guessing.  I could have saved that person.  I

3   could have prevented that but I let it slip through my

4   hand.  Don't do it.

5           THE COURT:  One minute.

6           MR. VINSON:  Thank you, Your Honor.

7           Don't do it.  Exercise the power that you

8   are given through this Court's jury charge.  Exercise

9   the power, based on the evidence that we presented to

10  you here.  And, again, it takes some time.  It takes a

11  real stern hand to hold and a half gate that slip in

12  the troubled waters.  That's where we are in this

13  community.  Like I say, you can be the conscience of

14  this community.

15          When you go home tonight, one thing you

16  will know.  If you return that verdict that causes the

17  defendant to be sentenced to death, one thing you will

18  know:  At some point in time Ray Dennes will never be

19  in a position to hurt someone else or manipulate.

20  Short of that, you don't know what he is going to do.

21  You can't go back there and start talking about get 40

22  years and the Judge has instructed you on that.  You

23  are not to consider.

24          MR. ODOM:  That's not what the law says.

25  It's not to consider parole after that.

1           MR. VINSON:  I will read it to you.

2           MR. ODOM:  Object, misstatement of the

3     law, Your Honor.

4           THE COURT:  Overruled.

5           MR. VINSON:  I think on page seven, if you

6     go back there, during your deliberations, "You are not

7     to consider or discuss the possible action of the

8     board of pardons or the governor, nor how long the

9     defendant would be required to serve to satisfy a life

10    sentence."  It tells you.  His Honor gave it to you.

11          THE COURT:  Let's wrap it.

12          MR. VINSON:  And remember that's the law

13    today.

14          MR. ODOM:  Object that is -- that it will

15    change tomorrow or something like that.  It's an

16    inappropriate comment.

17          THE COURT:  It's overruled.

18          Mr. Vinson, I'll give you 15 seconds.

19          MR. VINSON:  That's the law today, ladies

20    and gentlemen.

21          So I have to leave you now but you go back

22    there and you are strong enough to answer those issues

23    and strong enough with the same determination that you

24    came back and hold this defendant.  He was guilty on

25    this verdict under the indictment that we charged him

1    under and tried to you and answered those issues yes,

2    yes, no.  And you'll feel good about yourself.  Thank

3    you.

4                THE COURT:  Thank you, Mr. Vinson.

5                Ladies and gentlemen, you have now heard

6    all the evidence in the punishment phase and heard all

7    arguments of counsel.  I ask that you go back with the

8    bailiff and commence your deliberations at this time.

9    And we will stand in recess until you have reached a

10   unanimous verdict.  If it's a yes, yes, no, remember

11   what the instructions told you in the charge, if the

12   other answers on one or two are no, it must be ten

13   that agree on such.  And we will stand in recess until

14   you have reached a verdict in this case.

15               (Jury left the courtroom.)

16               THE COURT:  Please be seated.

17               (Jury came into the courtroom.)

18               THE COURT:  Please be seated.

19               Ladies and gentlemen, we have reached the

20   6:00 o'clock hour.  And when I told you, when you

21   first started, I would call you out about this time to

22   inquire basically as to whether or not you would like

23   to continue this evening to deliberate, if you feel

24   that would make progress, or what time you say you

25   would like to stop.  And like I said, you are being,

1     as I told you earlier, sequestered.

2              I need to know from your foreman if you

3     would like to continue to deliberate further into the

4     evening or retire to quarters this evening and start

5     back tomorrow and poll yourself and see what you would

6     like to do.

7              A JUROR:  Can we retire to deliberate

8     this?

9              THE COURT:  If not, let me tell you, if

10    you do deliberate further, I don't think there will be

11    a whole lot and we can order a dinner and we are all

12    prepared to stay as long as you like to but let me

13    know if you want to deliberate longer but if you are

14    going to deliberate for a period of time, it will be

15    getting around the dinner hour, and let me know and we

16    will make arrangements for dinner.

17             THE FOREMAN:  We will stay awhile.

18             THE COURT:  Should we make arrangements

19    for dinner?  Are you all getting hungry?

20             A JUROR:  We would like more cream.

21             THE COURT:  We will continue to deliberate

22    until I hear from you and pull you out and continue

23    this process and it's at your convenience.  At that

24    point in time, before then, if you all are getting

25    hungry, and let us know and we will make arrangements

1    for dinner.

2                    (Jury left courtroom.)

3                    (Jury came into the courtroom.)

4              THE COURT:  Please be seated.

5              Where are you, Mr. Kappes?

6              THE FOREMAN:  I think we need some more

7    time.

8              THE COURT:  Very well.  What are the

9    arrangements for the bus?

10             THE BAILIFF:  I have to call as soon as we

11   get everything together.

12             THE COURT:  We are going to take you by

13   bus to the Holiday Inn Medical Center where we will

14   get you situated.  The restaurant is open until 10:30,

15   and we will have dinner.  You will each have your own

16   rooms, no television, no telephone, no newspapers.

17   That's just the way the system works.  I'm sorry.  I

18   want you back here at 8:00 o'clock in the morning.  Do

19   not go downstairs.  Come directly up to the courtroom

20   and proceed into the jury deliberation room.

21             You are not to commence your deliberations

22   until all 12 of you are here.  You are all going to be

23   together.  When all 12 of you get in the room, you can

24   continue deliberations until such time as you have

25   reached a unanimous verdict.

1          Remember all the admonishments I have

2     given you.  If there are any questions about

3     procedure, anything that you need to ask about

4     spending the night to answer, I will.

5          THE FOREMAN:  Will we be able to go back

6     to our cars?

7          THE COURT:  The bailiff will arrange all

8     that.  You have to remain together as a group.  Like I

9     say, I don't know how they work around or whatever

10    time you need to be woken.  I guess the bus will be

11    there at whatever appropriate time to make sure you

12    are back here at 8:00 o'clock so you had a chance to

13    have breakfast.  And I can't think of anything else I

14    need to talk to you about except have a pleasant

15    evening, and I apologize that this is required but

16    this is the way the system works.  And I can see all

17    of you -- I'll be here at 8:30.  So commence your

18    deliberation with the goal to see what we can

19    accomplish tonight.  We will stand in recess until

20    morning.  Remember they will bring you directly up

21    here.

22          (Court adjourned for the day.)

23

24

25

1              September 4, 1997

2              (Jury came into the courtroom. )

3              THE COURT:  Please be seated.

4              Mr. Kappes, has the jury provided answers

5     to the three special issues?

6              THE FOREMAN:  Yes, sir.

7              THE COURT:  Would you please hand your

8     jury verdict to the bailiff.

9              Will the defendant please stand.

10             "Special Issue Number One, do you find

11    from the evidence beyond a reasonable doubt that there

12    is a probability that the defendant, Reinaldo Dennes,

13    would commit acts of violence that would constitute a

14    continuing threat to society.  Answer:  We, the jury,

15    unanimously find and determine beyond a reasonable

16    doubt that the answer to this special issue is yes,"

17    signed foreman of the jury.

18             "Special Issue Number Two, do you find

19    from the evidence beyond a reasonable doubt that

20    Reinaldo Dennes, the defendant himself, actually

21    caused the death of Janos Szucs, on the occasion in

22    question, or if he did not actually cause the death of

23    Janos Szucs, that he intended to kill Janos Scuzs, or

24    that he anticipated that a human life would be taken?

25    Answer:  We, the jury, unanimously find and determine

1    beyond a reasonable doubt that the answer to the

2    special issue is yes," signed foreman of the jury.

3                "Special Issue Number Three, do you find

4    from the evidence, taking into consideration all the

5    evidence, including the circumstances of the

6    defendant's character and background, and the personal

7    moral culpability of the defendant, Reinaldo Dennes,

8    that there is sufficient mitigating circumstance or

9    circumstances to warrant that a sentence life

10   imprisonment rather than a death sentence be

11   provided," -- which I I want no outburst in the

12   courtroom.  I will hold you in the contempt if any

13   outbursts whatsoever from anybody that is seated.

14               Answer to the question:  "We, the jury,

15   unanimously find answer that the answer to this

16   special issue is no," signed foreman of the jury.

17               "We, the jury, return in open court the

18   above answers to the special issues submitted to us.

19   It is our verdict in this case."  Signed foreman of

20   the jury.

21               Mr. Odom, is there any request to poll?

22               MR. ODOM:  Yes, Your Honor.

23               THE COURT:  Ladies and gentlemen, just as

24   in the guilt, I'll number you one through six.

25               (Judge polled the jury and all affirmed

1       the verdict.)

2                   THE COURT:  Thank you.  Your services

3       toward the State in this case are now complete.  If

4       you will go with the bailiff into the jury room, I'll

5       be back there to meet with you in just a moment.

6                   (Jury left the courtroom.)

7                   THE COURT:  Please be seated.

8                   I'm sorry.  Please be seated.  I figure

9       you can stay for the rest as well.

10                  It is the order of the Court that you,

11      Reinaldo Dennes, the defendant, herein who has been

12      adjudged to be guilty of the offense of capital murder

13      and whose punishment has been assessed by the verdict

14      of the jury at death shall be delivered by the Sheriff

15      of Harris County immediately to the director of the

16      Institutional Division of the Texas Department of

17      Criminal Justice, or any other person legally

18      authorized to receive such convicts, there to be

19      confined in the said institutional division in

20      accordance with the provisions of the law governing

21      the Texas Department of Criminal Justice Institutional

22      Division until a date for your execution is imposed by

23      this Court after receiving the mandate of affirmance

24      from the Court of Criminal Appeals.  The defendant is

25      remanded to the Sheriff so he can obey and carry out

1     the order of this sentence.

2                    Now, ladies and gentlemen, if you will go

3     with the bailiff.

4                    (Jury adjourned in this case.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    APPELLATE COURT NO. _72966_

2         IN THE COURT OF CRIMINAL APPEALS

3            OF THE STATE OF TEXAS

4

5    ---------------------------------------------------

6    REINALDO DENNES

7                    Appellant,

8    VS.

9    THE STATE OF TEXAS,

10                   Appellee.

11   ---------------------------------------------------

12   APPEAL FROM 263RD DISTRICT COURT OF HARRIS COUNTY,

13                    TEXAS

14        Judge Jim Wallace, Presiding

15   ---------------------------------------------------

16            CAUSE NO. 750,313

17            November 6, 1997

18            Reporter's Record

19

20        Volume 36 of 39 Volumes

21

22            Sharon Kay Cook
             Official Court Reporter
23            301 San Jacinto
             Houston, Texas 77002

24

25

FILED IN
COURT OF CRIMINAL APPEALS

FEB 25 1998

Troy C. Bennett, Jr., Clerk

Page 1

Volume 35
Motion for New Trial
November 6, 1997
Wendell Odom                    Crhonological

    Examination by Mr. Charlton          13

    Examination by Mr. Vinson            31

    Examination by Mr. Charlton          68

    Examination by Mr. Vinson            72

Defense Rests                                 77

Mark Vinson

    Examination by Mr. Smyth             78

    Examination by Mr. Schneider         90

    Examination by Mr. Smyth            102

    Examination by Mr. Schneider        107

    Examination by Mr. Smyth            108

November 13, 1997

Wendell Odom

    Examination by Mr. Vinson           131

    Examination by Mr. Charlton         145

    Examination by Mr. Vinson           149

Volume 35

Motion for New Trial

November 6, 1997

Wendell Odom                    Alphabetical

        Examination                                    13

        Examination                                    31
        Examination                                    68

        Examination                                    72
Wendell Odom

        Examination                                    131

        Examination                                    145

        Examination                                    149

1     Motion for New Trial Exhibits

2     Defendant's Exhibit No. 1 copy of motion

3          Marked              Volume 35                4

4          Identified          Volume 35                5

5          Offered             Volume 35                8

6          Admitted            Volume 35                8

7          Shown          Volume 39

8     Defendant's Exhibit No. 2 motion for continuance

9          Marked              Volume 35                4

10         Identified          Volume 35                5

11         Offered             Volume 35                8

12         Admitted            Volume 35                8

13         Shown               Volume 39

14    Defendant's Exhibit No. 3

15         Marked              Volume 35                4

16         Identified          Volume 35                5

17         Offiered            Volume 35                8

18         Admitted            Volume 35                8

19         Shown               Volume 39

20    Defendant's Exhibit No. 4 motion to transfer motions

21         Marked              Volume 35                4

22         Identified          Volume 35                5

23         Offered             Volume 35                8

24         Admitted            Volume 35                8

25         Shown               Volume 39

| | | | |
|---|---|---|---|
| 1 | Defendant's Exhibit No. 6 motion for continuance | | |
| 2 | Marked | Volume 35 | 4 |
| 3 | Identified | Volume 35 | 5 |
| 4 | Identified | Volume 35 | 8 |
| 5 | Admitted | Volume 35 | 8 |
| 6 | Shown | Volume 39 | |
| 7 | Defendant's Exhibit No. 7 request for notice of intent | | |
| 8 | to offer extraneous conduct at punishment | | |
| 9 | Marked | Volume 35 | 4 |
| 10 | Identified | Volume 35 | 5 |
| 11 | Offered | Volume 35 | 8 |
| 12 | Admitted | Volume 35 | 8 |
| 13 | Shown | Volume 39 | |
| 14 | Defendant's Exhibit No. 8 motion for discovery | | |
| 15 | Marked | Volume 35 | 4 |
| 16 | Identified | Volume 35 | 5 |
| 17 | Offered | Volume 35 | 8 |
| 18 | Admitted | Volume 35 | 8 |
| 19 | Shown | Volume 39 | |
| 20 | Defendant's Exhibit No. 9 statement of facts | | |
| 21 | Marked | Volume 35 | 4 |
| 22 | Identified | Volume 35 | 5 |
| 23 | Offered | Volume 35 | 8 |
| 24 | Admitted | Volume 35 | 8 |
| 25 | Shown | Volume 39 | |

| 1 | Defendant's Exhbit No. 10 motion for continuance | | |
| 2 | Marked | Volume 35 | 4 |
| 3 | Identified | Volume 35 | 5 |
| 4 | Offered | Volume 35 | 8 |
| 5 | Admitted | Volume 35 | 8 |
| 6 | Shown | Volume 39 | |
| 7 | Defendant's Exhibit No. 11 docket sheet | | |
| 8 | Marked | Volume 35 | 4 |
| 9 | Identified | Volume 35 | 5 |
| 10 | Offered | Volume 35 | 8 |
| 11 | Admitted | Volume 35 | 8 |
| 12 | Shown | Volume 39 | |
| 13 | Defendant's Exhibit No. 12 motion | | |
| 14 | Marked | Volume 35 | 4 |
| 15 | Identified | Volume 35 | 5 |
| 16 | Offered | Volume 35 | 8 |
| 17 | Admitted | Volume 35 | 8 |
| 18 | Shown | Volume 39 | |
| 19 | Defendant's Exhibit No. 13 motion | | |
| 20 | Marked | Volume 35 | 4 |
| 21 | Identified | Volume 35 | 6 |
| 22 | Offered | Volume 35 | 8 |
| 23 | Admitted | Volume 35 | 8 |
| 24 | Shown | Volume 39 | |
| 25 | | | |

```
 1      Defendant's Exhibit No. 14 motion

 2          Marked              Volume 35              4

 3          Identified          Volume 35              6

 4          Offered             Volume 35              8

 5          Admitted            Volume 35              8

 6          Shown               Volume 39

 7      Defendant's Exhibit No. 15 indictment, pre-trial

 8      interview sheet, motion to dismiss

 9          Marked              Volume 35              4

10          Identified          Volume 35              6

11          Offered             Volume 35              8

12          Admitted            Volume 35              8

13          Shown               Volume 39

14      Defendant's Exhibit No. 16 copy of Clerk's file

15          Marked              Volume 35              4

16          Identified          Volume 35              6

17          Offered             Volume 35              8

18          Admitted            Volume 35              8

19          Shown               Volume 39

20      Defendant's Exhibit No. 17 copy of clerk's file

21          Marked              Volume 35              4

22          Identified          Volume 35              6

23          Offered             Volume 35              8

24          Admitted            Volume 35              8

25          Shown               Volume 39
```

```
 1      Defendant's Exhibit No. 18

 2          Marked          Volume 35                4

 3          Identified      Volume 35                6

 4          Offered         Volume 35                8

 5          Admitted        Volume 35                8

 6          Shown           Volume 39

 7      Defendant's Exhibit No. 19

 8          Marked          Volume 35                4

 9          Identified      Volume 35                6

10          Offered         Volume 35                8

11          Admitted        Volume 35                8

12          Shown           Volume 39

13      Defendant's Exhibit No. 20 attorney's notes

14          Marked          Volume 35                4

15          Identified      Volume 35                19

16          Offered         Volume 35                19

17          Admitted        Volume 35                19

18          Shown           Volume 39

19      Defendant's Exhibit No. 21 notice to use extraneous

20          Marked          Volume 35                4

21          Identified      Volume 35                68

22          Identified      Volume 35                68

23          Admitted        Volume 35                69

24          Shown           Volume 39

25
```

| | | | |
|---|---|---|---|
| 1 | Defendant's Exhibit No. 22 | | |
| 2 | Marked | Volume 35 | 4 |
| 3 | Identified | Volume 35 | 68 |
| 4 | Offered | Volume 35 | 68 |
| 5 | Admitted | Volume 35 | |
| 6 | Volume | Volume 39 | |
| 7 | Defendant's Exhibit No. 23 | | |
| 8 | Marked | Volume 35 | 4 |
| 9 | Identified | Volume 35 | 68 |
| 10 | Offered | Volume 35 | 68 |
| 11 | Admitted | Volume 35 | |
| 12 | Shown | Volume 39 | |
| 13 | Defendant's Exhibit No. 24 motion quash subpoena/bench | | |
| 14 | warrant | | |
| 15 | Marked | Volume 35 | |
| 16 | Identified | Volume 35 | 92 |
| 17 | Offered | Volume 35 | 92 |
| 18 | Admitted | Volume 35 | 92 |
| 19 | Shown | Volume 39 | |
| 20 | Defendant's Exhibit No. 25 bench warrant return | | |
| 21 | Marked | | |
| 22 | Identified | Volume 35 | 92 |
| 23 | Offered | Volume 35 | 92 |
| 24 | Admitted | Volume 35 | 92 |
| 25 | Shown | Volume 39 | |

```
 1      Defendant's Exhibit No. 26 NCIC report

 2          Marked

 3          Identifed           Volume 35              94

 4          Offered             Volume 35              94

 5          Admitted            Volume 35              94

 6          Shown               Volume 39

 7      Defendant's Exhibit No. 27 juror questionnaire

 8          Marked

 9          Identified          Volume 35              95

10          Offered             Volume 35              97

11          Admitted            Volume 35              Bill

12          Shown               Volume 39

13      State's Exhibit No. 1   large chart

14          Marked              Volume 35              128

15          Identified          Volume 35              128

16          Offered             Volume 35              128

17          Admitted            Volume 35              128

18          Shown               Volume 39

19      State's Exhibit No. 2   large chart, copy of S-1

20          Marked

21          Identifed           Volume 35              153

22          Offered             Volume 35              153

23          Admitted            Volume 35              153

24          Shown               Volume 39

25
```

1                      CAUSE NO. 750,313

2    STATE OF TEXAS            IN THE 263RD DISTRICT COURT

3    VS.                               OF

4    REINALDO DENNES          HARRIS COUNTY, T E X A S

5

6    A P P E A R A N C E S:      For the State:
                                 Mr. Mark Vinson
7                                Bar Card No. 2059040
                                 Mr. Don Smyth
8                                Bar Card No. 1877700
                                 Assistant District Attorneys
9                                201 Fannin
                                 Houston, Texas 77002
10                               713-755-7050
     For the Defendant:         Ms. Leora Kahn
11                               Bar Card No. 11073100
                                 Mr. Stanley Schneider
12                               Bar Card No. 17790500
                                 Attorneys at Law
13                               11 Greenway Plaza #3312
                                 Houston, Texas 77046
14                               713-222-1353
                                 Mr. Michael Charlton
15                               Bar Card No. 04144800
                                 Attorney at Law
16                               4515 Yoakum
                                 Houston, Texas 77006
17                               713-522-7224

18

19              BE IT REMEMBERED that upon this the 6th

20   day of November, A. D. 1997, the above entitled and

21   numbered cause came on for trial before the Honorable

22   Jim Wallace, Judge of the 263rd District Court of

23   Harris County, Texas; and the State appearing in

24   person and the Defendant appearing in person and by

25   counsel, announced ready for Motion for New Trial, and

1    all preliminary matters having been disposed of, the

2    following proceedings were had, viz:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  We are ready to the start on

2     the first amended motion for new trial.

3            Is the State ready to proceed?

4            MR. VINSON:  State's ready to proceed.

5            THE COURT:  For the record, let's make

6     sure we have everybody here.

7            Would you state your name, for the record,

8     and all counsel state their name for the record.

9            MR. VINSON:  Mark Vinson, Harris County

10    District's Attorney Office.

11           MR. SMYTH:  Don Smyth, Harris County

12    District Attorney's Office.

13           THE COURT:  Is the defense is --

14           MS. KAHN:  Leora Kahn, representing the

15    defendant, Reinaldo Dennes.

16           Your Honor, at this time I have asked

17    counsel, Stanley Schneider and Mike Charlton, to

18    assist me in this motion for new trial with the

19    Court's permission.

20           THE COURT:  Certainly.  Let's proceed.

21           MR. CHARLTON:  If the Court would permit

22    me to lead off, we have some preliminary matters that

23    we think will save some time.  With your permission, I

24    would like to go into them.

25           At this point we are not really abandoning

1    but we are not going to go forward on any of the

2    paragraphs in the motion for new trial except

3    paragraphs 7, 13 and 14.  Those are the only ones that

4    we are going -- those are the only paragraphs which we

5    are going to support with evidence.  And in light of

6    that, if I could approach the bench with counsel for

7    the State.

8                   THE COURT:  Very well.

9                   MR. CHARLTON:  We have certain documents

10   that we would like to move to introduce into evidence,

11   and we will be asking the Court to judicial notice of

12   their admissibility.  And if you will permit me so

13   that the record is clear and I can recite.

14                   (Whereupon, Defendant's Exhibit Nos. 1

15   through 28 were marked for identification.)

16                   MR. CHARLTON:  The first one we will be

17   asking is Defendant's Exhibit 1.  It is a motion to

18   adopt motions of the codefendants, the codefendant

19   being Jose Dennes, and the motion being prepared and

20   filed by Wendell Odom, the defendant's trial counsel.

21                   Number two is a defendant's first motion

22   for continuance filed by Mr. Odom in this case.  It

23   was filed, I believe, on January 13 of 1997.

24                   Number 3 -- I apologize for having these

25   things out of order, I may have misnumbered -- at any

1      rate Defendant's 4 is a motion to transfer motions

2      filed by Mr. Odom on behalf of the defendant, Reinaldo

3      Dennes; number 5 is the First Amended Motion for New

4      Trial; number 6 is a motion for continuance filed by

5      Mr. Dennes and filed with this Court on July 24, 1997;

6      number 7 is a request for notice of intent to offer

7      extraneous conduct at the punishment filed by Mr. Odom

8      and addressed to Mr. Rosenthal of the Harris County

9      District Attorney's Office; number 8 is discovery for

10     extraneous matters to be presented by the State under

11     37.071 and 37.07 of the Code of Criminal Procedure

12     filed by Mr. Odom on behalf of Mr. Dennes; number 9 is

13     a transcript of the Court's -- specifically pages

14     five, six, seven, and eight -- transcript of the

15     hearings on your orders about notice of extraneous

16     offense -- the hearing was January 13 '97; defendants

17     10 is a third motion for continuance filed by Mr. Odom

18     on behalf of Mr. Dennes, and it is dated August 18,

19     1997; number 11 is a docket sheet from a J.P. Court

20     from justice court, Precinct 1, Position 2 that

21     charges an individual named Irene Umshteim Collins on

22     this docket sheet, which the record later reflected is

23     a person that served as a juror in this particular

24     case and charging her with the offense of theft on

25     February 1985, a charge that was dismissed in August

1    of '91; Defendant's 12 is a motion filed on behalf of

2    Mr. Parnham for the defendant, Jose Dennes -- this is

3    one of the motions that Mr. Odom moved to be adopted

4    in this case -- motion asking for equal access to the

5    background information on the perspective jurors;

6    number 13 is a motion -- another motion to adopt

7    motions of the codefendant filed by Reinaldo Dennes

8    and his attorney Wendell Odom; number 14 is a motion

9    to prohibit the introduction of the extraneous

10   offenses at the punishment phase of the trial filed on

11   behalf of Mr. Reinaldo Dennes by his counsel, Wendell

12   Odom.

13            I'm sorry, here is number 3.  Number 3 is

14   questionnaire, two separate jury questionnaires,

15   filled out or prepared by Irene Umshteim Collins.  And

16   Ms. Collins served as a juror in this particular

17   case.  And this first page is the short form sent to

18   her by the district clerk for the summons.

19            The next 15 to 20 pages of Defendant's 3

20   is the long form questionnaire that was filled out

21   prior to voir diring the capital case; and then we

22   have number 15, which is a -- excuse me -- an

23   indictment, a motion to dismiss, and a Harris County

24   pre-trial services form on a man named David Rene

25   Balderas.  And that will become relevant in the course

1    of our argument.

2              We also haven't prepared this motion.  We

3    would have to ask the Court to allow substitution of

4    copies.  We are asking that these documents be copied

5    and made part of this transcript so we haven't marked

6    them.

7              THE COURT:  Anything that is entered?

8              MR. CHARLTON:  And this is the first one

9    is Cause No. 9347066.  It is an information charging

10   Irene Renie Collins with the offense of public

11   lewdness, to wit, placing her exposed buttocks against

12   the clothed genitals of R. Leija in a public place,

13   namely Riviera Cabaret.

14             9304928 charging Ms. Collins with

15   prostitution.  Both of these resulted in convictions

16   and probated sentences.

17             THE COURT:  That's not what I heard.

18             MR. SMYTH:  Deferred adjudication.

19             MR. CHARLTON:  Whatever the judgments say,

20   I will stand by whatever that judgments say.

21             And we would ask that the Court then -- we

22   have shown these copies to the State that we have been

23   reciting and judicially notice all the records for

24   their admissibility so the Court can consider them as

25   part of our argument.

1               THE COURT:  What says the State?

2               MR. VINSON:  In each cause number, why

3    don't we do it this way.  Why don't we take the

4    allegations in the respective cause numbers and deal

5    with the admissibility of documents first.

6               MR. CHARLTON:  All these documents we are

7    asking judicially to admit.

8               MR. VINSON:  I have no objection, Your

9    Honor.

10              THE COURT:  Very well.  They are admitted

11   for that purpose.

12              MR. CHARLTON:  We have Ms. Kahan who would

13   ask me to ask the Court to take judicial notice of all

14   of the documents that are filed in this Cause No.

15   750,313, which was essentially all the documents filed

16   in the respective cause numbers for Mr. Dennes.

17              THE COURT:  Sure.

18              MR. CHARLTON:  And I think the State and I

19   have agreed on a certain factual matters, which we

20   can, rather than call witnesses and questions and

21   answers, we can, if it's okay with the Court, move to

22   proffer.

23              THE COURT:  That's fine.

24              MR. CHARLTON:  State has no objection, I

25   assume?

1          MR. VINSON:  We don't have any objection.

2          THE COURT:  Very well.

3          MR. CHARLTON:  We would proffer then the

4     testimony of Ms. Collins is that she is the same

5     individual who was convicted -- or whatever the term,

6     whether it's deferred or convicted -- charged with, at

7     least, in the prior prostitution case and the prior

8     theft case and the prior public lewdness.

9          THE COURT:  The theft case?

10         MR. CHARLTON:  J.P. Precinct.

11         MR. VINSON:  The theft case was not -- I'm

12    not aware of the theft case.

13         THE COURT:  That's the first I have heard

14    of it.

15         MR. CHARLTON:  Do you want to ask her if

16    she is or call her as a witness?

17         MR. VINSON:  Get her up here.

18         MR. CHARLTON:  I don't have a problem with

19    that.  Do you want to ask her?

20         MR. VINSON:  Really right --

21         THE COURT:  Okay.

22         MR. VINSON:  Can we clarify that later?

23         THE COURT:  Certainly.  Let's not forget

24    to do that.

25         MR. CHARLTON:  I wanted to correct one of

1    the prior recitations between Mr. Smyth and Mr. Vinson

2    and Mr. Schneider that the two prior, at least, public

3    lewdness are deferred adjudication, as they are not

4    probations, and I apologize to the Court for

5    misleading.

6                THE COURT:  No problem.

7                MR. CHARLTON:  Anyway that she is the same

8    individual.

9                THE COURT:  Okay.  Anything further?

10                MR. CHARLTON:  At this point?

11                THE COURT:  As far as the proffering.

12                MR. CHARLTON:  No, sir.  And we will call

13   Wendell Odom.

14                THE COURT:  The rule is invoked.  All

15   those who give plan to testimony in this case please

16   stand and raise your right hand.

17                (Witnesses sworn.)

18                THE COURT:  The rule has been invoked.

19   Would you please leave the courtroom and not discuss

20   with anyone your testimony until you are called.

21                MR. CHARLTON:  If the Court will permit

22   me, because I will be approaching, asking permission

23   to approach the witness from time to time and use

24   those documents, would you permit me to examine him

25   from this position so in order to avoid.  I'll be

1    happy to sit at counsel table, if you would.

2                THE COURT:  Considering we don't have a

3    jury here, that's fine, whatever is basically most

4    expedient.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          WENDELL ODOM,

2      was called as a witness by the Defendant, and was duly

3      sworn and testified as follows:

4                           EXAMINATION

5      BY MR. CHARLTON:

6           Q      For the record, you are Wendell Odom.  And

7      you were the trial counsel for the defendant in this

8      cause, Mr. Reinaldo Dennes; is that correct?

9           A      That's correct.

10          Q      And just for background information, when

11     did you first come on board to defend Mr. Dennes?

12          A      I don't know the exact date I came on

13     board to defend Mr. Dennes.

14          Q      Can you give me an approximation how long

15     you represented him before the trial for a year?

16          A      About a year, yes, sir.

17          Q      How long have you been a lawyer?

18          A      For 23 years.

19          Q      When you first became a lawyer, what was

20     your first job?

21          A      I was a briefing attorney for the criminal

22     district judges here in Harris County, Texas.  It was

23     a government grant for the briefing attorneys at that

24     time.

25          Q      And from that job, where did you go?

1          A       I went to the Harris County District

2     Attorney's Office.  I was an assistant district

3     attorney of Harris County for four years.  And then I

4     went from the Harris County District Attorney's Office

5     to the US Attorney's Office.  And I was an assistant

6     United States attorney in the Southern District of

7     Texas for a period of three years.

8                 At that time I left the United State's

9     Attorney's Office and went into private practice with

10    a group of people that I have been practicing with for

11    the last 13 some odd years.

12         Q       Do you hold any honors in the State bar?

13    Are you board certified?

14         A       I am not board certified.

15         Q       Has your practice been primarily in the

16    field of criminal defense since you left the US

17    Attorney's Office?

18         A       My practice is exclusively in the area of

19    criminal defense.

20         Q       You have tried then a lot of cases?

21         A       Yes, sir.

22         Q       And I know you don't like to brag but you

23    are a highly regarded defense lawyer in the bar, the

24    criminal defense bar of Harris County, are you not?

25         A       Perhaps.

1        Q        You've voir dired many, many juries?

2        A        I have.

3        Q        Would you agree with me that at least one

4    of the purposes of voir dire is to find out as much

5    information as you possibly can about people who will

6    serve on your client's jury?

7        A        I would agree that's the primary purpose

8    of voir dire.

9        Q        And when you go to voir dire, what

10   information are you looking for?  I mean, what

11   documents do you rely on in the course of your voir

12   dire to get this information?

13       A        If I have documents before me, I rely on a

14   questionnaire, if it has been filled out.  I certainly

15   rely upon the testimony of the venireman, venire

16   persons, but as far as documents, if there hasn't been

17   an investigation done on them, I rely primarily on the

18   questionnaire I have been looking at and has been

19   submitted to the voir dire person.

20               MR. CHARLTON:  May I approach, Your

21   Honor?

22               THE COURT:  Certainly.

23       Q        I will show you what has already been

24   marked and entered into evidence as Defendant' Exhibit

25   3 and ask you if that is a jury questionnaire of an

1     Irene Collins, a person who served on the jury in this

2     cause?

3        A     Yes, sir, it is.

4        Q     Do you see attached to that questionnaire

5     any document indicating a criminal history of Ms.

6     Collins?

7        A     You mean in the entire docket, exhibit

8     number 3?

9        Q     No, a separate form, separate and apart

10    from that questionnaire, that would suggest a criminal

11    history of Ms. Collins other than the questionnaires

12    themselves?

13       A     Is your question in exhibit number 3 do I

14    see anything that indicates a criminal record?

15       Q     What I am looking for is other than the

16    questions themselves -- and you have discussed the

17    questions -- other than the questions is there any

18    other kind of form which would suggest her criminal

19    history?

20       A     No, sir.

21       Q     Now, when you were engaged in voir dire,

22    did you have anyone assisting you?

23       A     At various times I would have some

24    assistance.  At other times I had no assistance.

25       Q     And can you describe briefly, for the

1     Court, the nature of that assistance?

2          A       For the first two days, I believe, there

3     was another attorney who has tried several capital

4     murder cases that assisted me in the voir dire.

5          Q       And that was Randy McDonald?

6          A       Randy McDonald -- who I office with --

7     after that, there was no other legal person -- there

8     was no other lawyer who assisted me in voir dire.  I

9     did have a paralegal as such, a person that was

10    starting law school that would sit down with me and

11    help me organize and try to maintain the papers and do

12    some notes, but as far as another attorney or as far

13    as anyone assisting me in the voir dire, it would have

14    only been support person such as that.

15         Q       Was your paralegal a man or a woman?

16         A       It was a woman.

17         Q       Did she -- was part of her function to

18    review jury questionnaires and take notes?

19         A       Yes, sir.

20         Q       And did both of you take notes of each of

21    the people you examined?

22         A       Yes, both prior to the examination as well

23    as during the examination.

24         Q       And prior examination notes were based on

25    your examination of the questionnaires?

1          A       Yes, sir.

2          Q       Did you rely on answers given in these

3   questionnaires to give you the scope or the direction

4   of your voir dire?

5          A       I did.

6          Q       Have you in connection before this motion

7   for the new trial hearing, have you reviewed those

8   notes?

9          A       Yes, sir.

10         Q       Have you reviewed your paralegal's notes?

11         A       Yes, sir.

12         Q       Have you found any indication in those

13  notes that Ms. Collins had a criminal record other

14  than what was in that jury questionnaire?

15         A       No, sir.

16         Q       You now have known that Ms. Collins has a

17  criminal record?

18         A       I was informed of that.

19         Q       Do you know it to be some difference than

20  what's in that questionnaire?

21         A       Yes, sir.

22         Q       The questionnaire says, what in the scope

23  -- I think it is question 8 A says what regarding her

24  criminal history?

25         A       It's not.  Let me see if I can try to find

Page 18

1    question number 37.

2        Q        Try question number 37.

3        A        Yes, sir.  There is a question that

4    states:  "Have you or any member of your family or

5    acquaintance ever been accused in a criminal action?"

6    The answer is "yes," and, then, "if yes, please state

7    the details."  I believe it's written in "the blowing

8    off firecrackers on New Years's Eve."

9        Q        There is nothing about being charged with

10   a public lewdness or prostitution or theft?

11       A        No, sir.

12       Q        Going to question 8 A about prior

13   employment history --

14       A        Yes, sir.

15       Q        -- what does it state in there as a prior

16   employment history?

17       A        8A, "other jobs you have held in the

18   past," also "medical assistant, bar maid."

19       Q        So there was nothing in the record about

20   Ms. Collins had ever been a topless dancer?

21       A        No, sir.

22       Q        Now, do you recall whether you were ever

23   given that information by anybody other than Ms. Kahn

24   or Mr. Schneider or myself -- referred to a voir

25   dire -- were you ever given any information about her

 1    criminal history from essentially members of the

 2    State?

 3         A        Not that I recall.

 4         Q        Were you ever told about that she might

 5    have committed the offense of theft by anybody other

 6    than Ms. Kahn or myself or Mr. Schneider?

 7         A        Not that I can recall.

 8         Q        Is that the kind of information that you

 9    would certainly have noted in your files, in your

10    notes?

11         A        I believe either I would have recalled

12    that information or that I certainly would have made a

13    notation of that in the process that I use to make my

14    determination as to what my strikes were going to be.

15              MR. CHARLTON:   I would like to tender to

16    the State Defendant's Exhibit 20.

17         Q        Let me ask you to take a look at that and

18    see if those are your notes taken from Ms. Collins,

19    her voir dire?

20         A        Yes, sir.

21              MR. VINSON:   We have no objection, Your

22    Honor.   I didn't object anyway if he testifies those

23    are his notes, I have no objection to the admission.

24              THE COURT:   You move to admit?

25              MR. CHARLTON:   Yes, sir.

1              THE COURT:  Defendant's 20 is admitted.

2       Q      On the page, the second page of those

3    notes, you make a note that you wanted to strike Ms.

4    Collins if at all possible?

5       A      Yes, my note is "strike if possible."

6       Q      Had you known about her criminal history

7    and the fact that it differed significantly from the

8    questionnaire, would that become a part of your voir

9    dire?

10      A      No question about it.

11      Q      Would you have moved to strike her, at

12   least, then on the basis that she had misrepresented

13   some of the facts in the context of her voir dire?

14      A      I believe that I would have moved to

15   strike her for cause for another reason for two other

16   issues.  I can't imagine that I wouldn't also attempt

17   to incorporate that as an additional strike for cause

18   on that particular juror.

19      Q      The record reflects that you did not

20   exercise a peremptory challenge once your motion for

21   challenge for cause was overruled.  Had you known that

22   she had misrepresented the facts about her prior

23   criminal history, would you have challenged her

24   peremptorily?

25      A      Yes, I would.  We did our peremptory

1    challenges at the end of voir dire.  And I had a chart

2    laid out as to the order of strikes and the people

3    that I was going to strike and the priorities I had

4    for them.  I did all my peremptory strikes from it.  I

5    asked for additional strikes.  The Court gave me two

6    additional strikes.  The two alternate persons would

7    have then ended up on the panel that I found them more

8    objectionable than any other person on the panel.  And

9    I would certainly have used a peremptory strike on

10   this juror had I known that there was an incorrect

11   statement of the manner that there is in the juror

12   questionnaire.

13        Q     In other words, she would have moved up on

14   your strike list and she would have been one of those

15   that would have gone for certain if you knew she

16   didn't --

17        A     I do a number system from A to F.  I

18   believe she had gone up to either a D plus or a C

19   minus and I think she would have gone down to F and I

20   would have struck her.  I don't believe -- I'm

21   positive that I would have.

22        Q     I want to ask you also about question

23   number 40 in Defendant's 3, if you would take a look

24   at question number 40.

25        A     Yes.

1       Q       That question asked whether they or any

2   other member of the family have ever been accused of a

3   crime, I believe.

4       A       Well, it's a series of questions.  Yes,

5   sir.

6       Q       And what was Ms. Collins' response to

7   whether she had been accused of a crime?

8       A       It actually says, 39 says, "Have you or

9   any other member of your family or friend ever been a

10  victim of a crime?  That's "yes."

11              Then the next, "Have you or any member of

12  your family, or acquaintance, ever been arrested?"

13  The answer is, "yes, driving without a license."

14              40A, "Are you presently under indictment

15  or legal accusation for a misdemeanor or felony?"  The

16  answer is "no."

17              40B, "Are you currently on felony deferred

18  adjudication or probation?"  The answer is "no."

19      Q       But to the question "had she ever been

20  arrested," the only thing in response "to driving

21  without a license"?

22      A       Yes.

23      Q       The question 68, could you direct your

24  attention to that, please.

25      A       Yes, sir.

1       Q       Would you please recite into the record
2   Ms. Collins' response to the question:  "Do you think
3   there is a crime problem?  And if yes, explain."
4   Would you give a response?

5       A       She checked "yes."  The answer is "people
6   have lost morality.  It's easier to steal, take than
7   to work for it.  Seems to be the latest thing."

8       Q       Does a person who would give that kind of
9   response and been charged and on deferred adjudication
10  for public lewdness in a topless bar and an offense of
11  prostitution and being charged with the offense of
12  theft, does that suggest a certain amount of
13  hypocrisy?

14      A       Raised certain questions in my mind.

15              THE COURT:  What does that got to do with
16  it?

17              MR. CHARLTON:  It concerns more the
18  intelligent use of peremptory challenges and the fact
19  that she mislead the defense counsel about herself for
20  the intelligent use for the peremptory challenges and
21  both these were all areas that would have been
22  explored by him during the course of voir dire.

23              THE COURT:  Very well.

24      Q       (Mr. Charlton)  Let me also ask you
25  about -- let's move to a different subject about the

1    motions you filed regarding specifically extraneous

2    offenses.

3              Did you seek notice from the State for the

4    extraneous offenses that they planned to introduce?

5         A    I did.

6         Q    Did you seek formal notice of extraneous

7    offenses if they planned to introduce at the

8    punishment phase as well?

9         A    I did.

10        Q    The record reflects that the Judge agreed

11   with you and gave certain deadlines when the State was

12   to comply with?

13        A    Yes, sir.

14        Q    Do you recall what those deadlines were?

15        A    My recollect is that 15 days prior to

16   trial, and that being the testimony part of the trial,

17   I was to receive any notice of any extraneous offenses

18   that the State was to offer in the punishment stage of

19   trial.

20             MR. CHARLTON:  May I approach?

21             THE COURT:  Yes.

22        Q    Let me show you pages seven and eight of

23   Defendant's Exhibit 9, which is the Court's ruling on

24   the pre-trial motions.

25        A    Yes, sir.

1       Q       Would you read the top bottom of seven and

2   top of eight?

3       A       Yes.

4       Q       So was it clear to you, in your mind, was

5   the Judge's ruling emphatic?

6       A       Yes, sir.

7       Q       Did you rely on that ruling?

8       A       Yes, sir.  I got a copy of the transcript

9   and very clearly had this in my mind that they were

10  under a Court order to give me -- I believe actually

11  says -- "at least no later than 15 days."

12      Q       Did you have conversations with your

13  investigator and your staff about further

14  investigations to be done in light of the Judge's

15  ruling?

16      A       Yes, sir.

17      Q       Did you specifically discuss investigation

18  of extraneous offenses?

19      A       Yes, sir.

20      Q       What did you tell your staff and your

21  investigator about that?

22      A       I received the okay from the Judge to

23  receive funds for an investigator shortly before the

24  voir dire was to start.  Recognizing that the voir

25  dire process, although it takes some time, is not

1    going to be that much time, I instructed my

2    investigator and my staff to concentrate on the

3    guilt-innocence stage of the investigation because I

4    knew that was of the utmost importance.  Once the 15

5    day period came by, then I instructed them not to

6    worry about the extraneous offense at all; that we had

7    not received notice and that to concentrate on certain

8    leads that we had on the case in chief.

9         Q       So relying on the Court's ruling then, you

10   chose not to investigate extraneous offenses?

11        A       Yes, sir.

12        Q       Because you had determined, based on the

13   ruling, they were not coming in evidence?

14        A       Yes, sir.

15        Q       After you learned of the State's intent

16   to -- I believe, on August 13, '97 - the intent to

17   introduce extraneous offenses, did you ask the Court

18   for a continuance to investigate that issue?

19        A       Yes, sir.  I filed two motions.  I filed a

20   motion to preclude the admissibility of that evidence

21   or, in the alternative, a motion for continuance so

22   that I could investigate those matters.

23        Q       In the context of that motion, you

24   informed the Court that you could not develop either

25   the resources of time or money at that late date to

                                          Page 27

```
1    investigate any extraneous offenses?

2         A      I'm sure I did.

3         Q      Do you remember a witness named Balderas?

4         A      I do.

5         Q      Was Mr. Balderas a witness in the context

6    of an extraneous offenses offered at the punishment

7    phase?

8         A      He was.

9                MR. CHARLTON:  May I approach again, Your

10   Honor?

11               THE COURT:  Certainly.

12        Q      Let me show you what has been admitted as

13   Defendant's Exhibit 15.

14        A      Yes, sir.

15        Q      It reflects, does it not, a charge, a

16   felony charge, of a possession more than fifty pounds

17   of marijuana but less than two thousand pounds of

18   marijuana by Mr. Balderas?

19        A      Yes, sir.

20        Q      What do those documents reflect the

21   disposition on that case?

22        A      It was nolle on May 9, '97.

23        Q      Are these the kinds of facts that you try

24   to investigate about witnesses who will testify

25   against your client?
```

```
1        A       Absolutely.

2        Q       And why do you investigate them?

3        A       Well, I believe the legal statement is

4    that it shows motive to testify in a particular

5    manner.

6        Q       In Harris County, the charge of that much

7    marijuana is a serious charge, is it not?

8        A       Yes, sir.

9        Q       Does it frequently carry rather extended

10   lengths in the penitentiary as a punishment?

11       A       You bet.

12       Q       So if this is something that had you known

13   about and investigated it, you clearly would have used

14   it?

15       A       Yes, sir.

16       Q       If you will look at the pre-trial

17   interview of Mr. Balderas, which I think is pages

18   three and four of Defendant's Exhibit 15, do you see

19   where Mr. Balderas reflects his prior criminal

20   history?  Does he reflect that Mr. Balderas had an

21   additional criminal history?

22       A       On the charge information, yes, sir.

23       Q       What are those offenses?

24       A       Possession of marijuana in the 1970s.  He

25   was fined for it.  I assume that would be a
```

1    misdemeanor charge.

2        Q        Anything else?

3        A        It's showing the misdemeanor convictions

4    for -- I don't see -- here we go.  Aggravated

5    possession -- no, it's this cause number.  Right now I

6    don't see any breakdown under what those four

7    misdemeanor convictions would be.

8        Q        So there is at least four offenses out

9    there which would have been investigated had you known

10   that Mr. Balderas would likely to testify?

11       A        Had we seen this piece of evidence, we

12   would look in the four misdemeanor convictions on this

13   individual.

14              MR. CHARLTON:  May I have just a moment?

15       Q        Did the prosecution in this case ever give

16   you any information on Defendant's Exhibit 15?

17       A        I don't know.  I did not review my notes

18   as to what the witness said from the witness stand.

19   He may have during his testimony acknowledged some of

20   these offenses.  I don't recall that.  But I know that

21   prior to the witness taking the stand that I was

22   unaware of any priors as to this witness.

23       Q        So even when they gave you notice of

24   intent, you did not get that information from the

25   prosecution?

1          A       No.

2          Q       Back to the question about the jury

3   questionnaires, did you intend for those jury

4   questionnaires when you submitted to the Court for its

5   approval for submission to the jury voir nireman, did

6   you intend for those questionnaires to elicit the kind

7   of evidence that you have heard today about Ms.

8   Collins?

9          A       Yes.

10         Q       Did you rely on it?

11         A       Yes.  We had a discussion at one point as

12   to whether they were under oath, and it was my

13   understanding that they were under oath.  And I very

14   much relied upon that.

15         Q       Did you ever get from the State of Texas,

16   from Mr. Vinson or Mr. Smyth, a printout of Ms.

17   Collins' prior criminal history?

18         A       Not that I recall.

19                 MR. CHARLTON:  Pass the witness, Judge.

20                 THE COURT:  For the State, who is it?

21

22                         EXAMINATION

23   BY MR. VINSON:

24         Q       Mr. Odom, I think you have already

25   testified that you have worked as a criminal lawyer

1     for 23 years?

2          A     Yes, sir.

3          Q     Having both experience as a briefing

4     attorney and --

5          A     Yes, sir.

6          Q     -- as a prosecutor with the Harris County

7     District Attorney's Office?

8          A     Yes, sir.

9          Q     And what level were you when you left the

10    D.A.'s office?

11         A     I had moved from a felony court over into

12    special crimes.

13         Q     Okay.  And what level had you achieved at

14    that time?

15         A     I was the chief of consumer fraud.

16         Q     And you also worked in special crimes?

17         A     I think at that time special crimes was

18    part of consumer fraud.

19         Q     Then you worked at the US Attorney's

20    Office; is that correct?

21         A     Yes, sir.

22         Q     And what level of cases did you handle?

23         A     I handled public cases and white collar

24    crime and criminal type of work as well.

25         Q     You have been in private practice for

```
 1    about --
 2        A      13 years, whatever the differences.
 3        Q      And I didn't hear the answer.  Are you
 4    board certified?
 5        A      No, I have never taken the courses.
 6        Q      Well, even without being board certified,
 7    you do have extensive background as a criminal defense
 8    attorney?
 9        A      Yes, sir.
10        Q      And you also have a background both as a
11    state prosecutor and a federal prosecutor?
12        A      Yes, sir.
13        Q      Now, during the voir dire -- if you will
14    look at Ms. Collins' questionnaire -- she made mention
15    of the fact that she worked as a bar maid at some
16    point in time?
17        A      Yes, sir.
18        Q      Based on your training and experience,
19    people that work in bars from time to time get in
20    trouble?
21        A      Yes, sir.
22        Q      You even represented them?
23        A      Right.
24        Q      And they have been charged with
25    prostitution before, have they not?
```

1        A        I'm not sure that's the case.

2        Q        Not sure that's the case -- you have

3    represented people in that capacity, haven't you?

4        A        It sort of depends on how the bar maid is

5    employed.

6        Q        Have you represented people who work in

7    bars being charged with prostitution, yes or no?

8        A        Oh, definitely.

9        Q        Certainly.  And when you are representing

10   them, they are not that bad, are they?

11       A        It all depends on the person.

12       Q        You have represented them.  They are not

13   that bad?

14       A        No.  Sometimes the ones I represent are

15   very bad is the answer to your question.

16       Q        You have answered it.

17                And then you went on to look at Ms.

18   Collins' questionnaire with respect to question number

19   37 and it said:  "Have you, any member of your family,

20   or any acquaintance, ever been accused in any criminal

21   action?"  And she said "yes."

22       A        Yes, sir.

23       Q        That's a truthful statement, yes?

24       A        Yes, sir.

25       Q        But the question said, "have you, any

1    member of your family, or any acquaintance, ever been

2    accused."  You didn't ask her anything about that, did

3    you?

4         A     No, I don't believe I did.  I don't recall

5    if I did but I don't think I did.

6         Q     Because your notes are up there, right?

7         A     Yes, sir.

8         Q     And when you were voir diring her, you had

9    an opportunity to ask about question 37, right?

10        A     Yes, sir.

11        Q     And then, also, having the experience,

12   having represented people who work in bars before,

13   something of that nature, then that could click in

14   your mind just maybe and then you could have gone

15   ahead and asked any question you chose to ask?

16        A     No question about it, I could have asked

17   any question the Court would have allowed me to ask.

18        Q     And that's a permissible question?

19        A     I believe so.

20        Q     You know so.

21        A     I believe so, yeah.  It ought to be.

22        Q     Number 39, "Have you, or any member of

23   your family, or friend ever been a victim of a

24   crime?"   "Yes."  And that was a honest question,

25   right?

1       A       I think so.

2       Q       Number 40, "Have you, any member of your

3   family, or any acquaintance, ever been arrested?"  She

4   said "yes."

5       A       That's right.

6       Q       "Driving without a license"?

7       A       Yes, sir.

8       Q       And you had an opportunity to explore that

9   further, did you not?

10      A       Sure.

11      Q       Nobody cut you off, correct?

12      A       Not in regards to that question, no.

13      Q       You didn't even ask if Ms. Collins had, in

14  fact, been arrested for DLS, did you?

15      A       I don't know.

16      Q       Check your notes.

17      A       Everything I asked is not in my notes, Mr.

18  Vinson.

19      Q       You can't say anybody prevented you from

20  doing that, can you?

21      A       No, no one prevented me from doing it.

22      Q       You didn't ask Ms. Collins if it was a

23  member of her family who had been arrested for DLS?

24      A       No, sir.  I don't know if I did.  It's not

25  reflected in my notes.

1        Q        But what I am saying, those are areas a

2    person with your experience and training could have

3    explored, if you chose to do so?

4        A        Absolutely.

5        Q        "Are you presently under indictment or

6    legal accusation for a misdemeanor or a felony?"

7    Question number 40A.

8        A        Yes, sir.

9        Q        She said "no"?

10       A        Yes, sir.

11       Q        Are you, you know, you are speaking

12   specifically to her?

13       A        Yes, sir.

14       Q        And she was telling the truth, wasn't she?

15       A        I assume so.

16       Q        You don't have to assume.  You have an

17   investigator out looking at this case.

18       A        I haven't had an investigator looking at

19   this case.  I'm just relying on what I am being told

20   and shown this morning.

21       Q        Well, to your knowledge, there's been

22   nothing to make you disbelieve that, have you?

23       A        I have heard nothing to indicate

24   otherwise.

25       Q        Number 40B, "Are you currently on felony

1    deferred adjudication or probation?"   Any question

2    about that?  She answered "no."

3        A       Right.

4        Q       That's a truthful statement, is it?

5        A       I don't know.  I assume so.  No one has

6    told me otherwise, if that's what you are asking.  I

7    have not done any investigation.  I don't know.  I'm

8    just answering what I have been told.  No one has told

9    me of it.

10       Q       I don't mean to put you -- you had a

11   chance to look at the documents that were offered into

12   evidence today; was that correct?

13       A       I have not seen some of these documents

14   before but most of these documents are documents that

15   I filed -- some of these I am seeing for the first

16   time this morning.

17       Q       But if she was under felony indictment or

18   on deferred adjudication --

19       A       I have seen none of those documents.

20       Q       But if she was under felony indictment or

21   deferred probation or any form of probation, both

22   attorneys would have presented such to the Judge

23   today, correct?

24       A       I assume they would have.

25       Q       They are trained?

```
 1          A       I assume that you would have discovered
 2     that before we ever --
 3          Q       We will get to that.
 4          A       -- got to that point.
 5          Q       But what I am saying, right here, the
 6     question that Ms. Collins answered, she did not lie,
 7     did she?
 8          A       Well, you only asked half of the question.
 9          Q       Well, she answered.  Just a minute.  You
10     had a chance to explore every question, correct?
11          A       Yes.  I had a chance to go over every
12     question in the questionnaire and ask it again.
13          Q       That's what we have the questionnaire for;
14     isn't that right?
15          A       That's not my understanding.
16          Q       Let me see if you agree with this.
17                  The questionnaire is to give us like a
18     snapshot picture of this person and the person's
19     family perhaps, some relationship?
20          A       One of the things.
21          Q       From there, we can begin to probe as
22     lawyers?
23          A       That's correct.
24          Q       And you have done that on many occasions,
25     have you not?
```

1        A        That's correct.

2        Q        And you had an opportunity to do it here,

3    correct?

4        A        That's correct.

5        Q        So if it was your lack of diligence, you

6    can't blame anyone else for that, can you?

7        A        No.   It's not a lack of diligence.   We

8    have a right to rely on the answers to some of these

9    questions so we don't have to go into matters that

10   there is no necessity for us to go in and you didn't

11   ask some of those questions, such as, "Have you ever

12   been convicted of a crime?"   "Yes," and then she gives

13   an explanation of the crime that she is convicted and

14   did not include in that explanation the matters we are

15   talking about now.

16              Based upon that, I think a reasonable

17   person can rely on the fact that what she had been

18   convicted of was blowing off the firecracker, not some

19   other matter that wasn't mentioned.

20       Q        Well, how can you draw that conclusion

21   when you don't even know who was charged?

22       A        It says, "Have you or any other member of

23   your family ever been arrested?"   She answered "yes."

24   "If answered yes, please explain," under that,

25   "blowing off firecrackers."   I know then if either

1    she or a member of her family have been arrested for

2    blowing off firecrackers.  I also don't know if the

3    answer is answered correctly.

4         Q       What is correctly to you?

5         A       Correct.  "If you have been arrested,

6    please explain."  If I had been arrested for several

7    things, I explain what I have been arrested.

8         Q       That's the way you think.  You can't say a

9    juror, a novice, knows exactly what we as lawyers want

10   them to answer and that's why we speak to them and

11   have the voir dire, correct?

12        A       Well, I think that is pretty obvious.

13        Q       No, you think it is obvious but they

14   didn't think it is obvious?

15        A       That may be a possibility.  Any question

16   they might not answer correctly but the purpose of the

17   questionnaire is to keep us, if it's a reasonable

18   question, from going into matters and asking matters

19   that are already answered in the questionnaire.

20        Q       And it's also there to trigger questions

21   in our mind if we see something that raises some

22   question?

23        A       That's right.

24        Q       And you are aware that she had worked as a

25   bar maid?

1       A       Yes.  I think I made a notation to that.

2       Q       Didn't hide that.  She didn't have to get

3    up and say she was a dancer.  You don't know under

4    what circumstances she may have been charged, do you?

5       A       I have no idea.

6       Q       Now, on question number 14, it says, "that

7    Ms. Collins lied under oath."

8       A       Question 14.

9       Q       Yeah, "lied under oath."  Question 14,

10   I'm sorry, in the motion.

11      A       Oh, I haven't seen the motion.

12      Q       Would you like to take a look at that?

13      A       Yes.

14              MR. VINSON:  May I approach, Your Honor?

15              THE COURT:  Sure.

16      Q       Number 14 is strong language, "She lied

17   under oath."  Now, I know you didn't prepare that

18   motion but would you agree that's strong language,

19   "lied under oath"?

20      A       It's strong language.

21      Q       Extremely?

22      A       I don't know that.  It's not inapplicable

23   though --

24      Q       Right.

25      A       -- but it's strong language.

1       Q       Because the question:  "Have you ever been

2    convicted" -- and the Judge, when he qualified the

3    jury, has always said, "have you ever been convicted

4    or are you presently charged with theft or under

5    indictment or on probation."  A person who received

6    deferred adjudication and is off it, they are not

7    lying, are they?

8       A       To the question, "have you ever been

9    convicted" --

10      Q       Convicted and that's the question that is

11   put to you, not have you been charged.

12              MR. CHARLTON:  Object, first of all, I

13   apologize for interrupting but I object to Mr.

14   Vinson's testimony about what the Court may have

15   recited at certain points.  And if he wants to take

16   the stand about what was actually colloquy or

17   testimony, then fine.  That's okay.  But I have not

18   seen -- I object to his testifying at this point, and

19   besides he is misrepresenting the questionnaire.  The

20   questionnaire says not have you ever been convicted or

21   whether you have been accused of.

22              MR. VINSON:  What I am saying, right

23   here --

24              MR. CHARLTON:  -- question number 37.

25              MR. VINSON:  -- would reflect to what they

1    say here, "Ms. Collins lied under oath."  Under whose

2    oath?

3              MR. CHARLTON:  Well, you know, object to

4    the use of documents that he did not prepare in cross

5    examination.  I mean, what we as Mr. Dennes' lawyers

6    now have said has nothing to do with the testimony at

7    trial.  He did not make those statements.

8              MR. VINSON:  I understand that, Your

9    Honor.  But what I am saying, I am asking him, does he

10   agree with that and I am entitled to do that.

11             THE COURT:  Okay.  Couch it in those

12   terms.

13   Q         (Mr. Vinson)  Do you agree with "she lied

14   under oath" that these lawyers over here say?

15   A         I don't know for sure what her record is.

16   Assuming that there is more of a record than what is

17   in this jury questionnaire, there has been a

18   misrepresentation in the juror questionnaire.  Now,

19   whether you want to use the word "lie" or I want to

20   use the word "misrepresent," I think the questionnaire

21   is pretty clear that you are to tell if you have had

22   any arrests or any run-ins with the law in a number of

23   different questions.  None of that was included in the

24   questionnaire.

25             Perhaps I would have worded it a little

1    different, I don't know, but I certainly think that

2    the courts have held that failing to make a statement

3    can be as much of a misrepresentation as an outright

4    misrepresentation that is verbalized.

5              THE COURT:  Has there been a determination

6    if the questionnaire was given under oath?

7              MR. CHARLTON:  The last statement suggests

8    that they have affirmed that everything is true and

9    correct.

10             THE COURT:  Well, that's not under oath.

11             MR. VINSON:  I am objecting to him --

12             THE COURT:  Excuse me, gentlemen, we are

13   not going to get out of hand.  Let's have one talking

14   at a time.

15             Mr. Charlton, I'm just asking was this

16   sworn to.

17             MR. CHARLTON:  Yes, Your Honor.  The last

18   statement on page 19 of the questionnaire, signed by

19   Ms. Collins, "I hereby swear to the responses and

20   information provided herein are true and correct."

21             THE COURT:  Okay.  Who did she give that

22   affirmation to?

23             MR. CHARLTON:  That I cannot answer.  The

24   only thing I can address to, that is, when you to go

25   the jury assembly room -- my memory of the jury

1    assembly room -- that somebody puts you under oath.

2                    MR. VINSON:  Object to him testifying.

3                    THE COURT:  That's all right.

4                    MR. CHARLTON:  That some Judge over in the

5    jury assembly room puts you under oath about the

6    questions and answers you are supposed to give.

7                    THE COURT:  You don't know for certain

8    that happened in this case?

9                    MR. CHARLTON:  No, sir.

10                   THE COURT:  Okay.  There is really a

11   question as to whether this was sworn under oath to

12   someone or not or whether or not it was just based on

13   the representations that she swears to.

14                   MR. CHARLTON:  The only thing that Mr.

15   Schnieder points out to you, and I don't know what

16   your procedure on that, I will have to testify I don't

17   know whether you tell the jurors when you put them

18   under oath and say they have to give true and correct

19   answers.

20                   THE COURT:  When they start their voir

21   dire.

22                   I'm sorry, Mr. Vinson, please proceed.

23        Q        (Mr. Vinson)   And you do understand what

24   deferred adjudication is, correct?

25        A        Yes, sir.

1        Q       And once a person has served their

2    deferred adjudication and has been charged by the

3    Court, under state law, there is no conviction?

4        A       Yes, sir.

5        Q       Now, Mr. Odom, you appeared with Mr.

6    Dennes, Reinaldo Dennes, in the initial cause and that

7    was in Cause No. 715,325 for the offense of capital

8    murder.  The case was filed on February 24, 1996.  And

9    you made your first Court appearance with him on

10   February 26, 1996, correct?

11       A       If you are looking at the docket sheet and

12   that's what it reflects, I will agree with that.  I

13   have no independent recollection of that.

14       Q       Would you like to look at the docket

15   sheet?

16       A       I'll take your word for it, Mr. Vinson.

17       Q       It showed that you appeared with him as

18   counsel on February 26, 1996, and from that date on,

19   you appeared with him; is that correct?

20       A       Yes, sir.  I was his attorney from that

21   date on.

22       Q       And shortly after appearing with the

23   defendant, you approached, I think, Mr. Rosenthal and

24   you also approached myself as well as along with the

25   attorney George Parnham, who practices here in Harris

```
 1      County, Texas, who was representing Alberto Dennes.

 2      You all both appeared wondering if the State was going

 3      to seek the death sentence?

 4           A      I didn't understand that.

 5           Q      You and Mr. Parnham both spoke to Mr.

 6      Rosenthal early on in this trial --

 7           A      Yes, sir.

 8           Q      -- early on in the capital case and you

 9      wanted to know if the State was going to seek the

10      death sentence?

11           A      That's correct.

12           Q      And from time to time you would speak and

13      ask about the extraneous; is that correct?

14           A      That is true.

15           Q      During that time, I think, Mr. Rosenthal

16      made you aware that there was a home invasion that he

17      was looking into; isn't that correct?

18           A      He said that there was the possibility of

19      a home invasion.  Yes, sir.

20           Q      Because nobody was really certain at that

21      time?

22           A      That's right.

23           Q      And I think from time to time you had met

24      and spoke with me.  I said, "We will check with Chuck

25      because I still think he is trying to develop a home
```

1    invasion where your client was involved"?

2         A       Something to that effect, yes, sir.

3         Q       So you were aware, you had in the back of

4    your mind -- and you again having experience -- that

5    the State was out there trying to find something?

6         A       I was concerned about the possibility of

7    an extraneous offense.

8         Q       Correct.  And the State was trying to find

9    something.

10               Now, are you saying at this time because

11   we had not developed it within the time constraint His

12   Honor gave us, that you washed it off at that time?

13        A       I think the evidence showed you developed

14   it, well, prior to the time that I received notice.

15   But what I am saying is that once the Court made its

16   ruling and once I didn't receive notice within those

17   15 days of the ruling at that point I relied on the

18   ruling that the extraneous weren't coming in because I

19   didn't get notice.

20        Q       So what I am saying, you just went into

21   the trial assuming that there was not going to be any

22   extraneous against your client?

23        A       Not on punishment.  I think you gave me an

24   extraneous on the case in chief.  Yes, sir, at that

25   point in time I believed that you had failed to

1    properly comply with the Court's orders and that

2    extraneous wouldn't come in.

3                    MR. VINSON:  May I approach, Your Honor?

4                    THE COURT:  Certainly.

5        Q      It says here that we are supposed to make

6    that two weeks prior to trial.

7        A      Yes, sir.  I believe the next page says,

8    "no less than 15 days."

9        Q      It goes to 15 days?

10       A      Right.

11       Q      But nowhere did His Honor say that if it's

12   not produced within 15 days prior to trial, it was not

13   coming in at all?  Nowhere were you led to believe

14   that, were you?

15       A      I was lead to believe that, yes, sir.  He

16   didn't say those words.  He said that the State had to

17   give me that notice within 15 days.  The implication:

18   If they didn't, then the State doesn't comply with the

19   order and it doesn't come in.  That's the way the

20   Criminal Procedure Code reads in the extraneous

21   offense itself.

22       Q      We started voir dire.  Do you recall the

23   date we started?

24       A      You would have to refresh my memory on

25   that.

1        Q        Would you agree with me that, after the
2    jury was selected, we did have an adequate break
3    between the time the jury was selected and the time
4    that we actually started evidence?  We had about a
5    week's break; is that correct?
6        A        I think you are right.  I think we
7    finished our jury selection on a Monday, or something
8    like that, and then we started the actual trial the
9    following Monday.
10       Q        So that was well within seven working days
11   that we had, I mean, at least five days and the
12   weekend but the Court gave us a break?
13       A        There was a break.  Yes, sir.
14       Q        And then we started the trial testimony --
15   we started on August 18th; is that correct?
16       A        I will have to take your word for it but
17   that sounds about right.
18       Q        And I think the trial lasted, just the
19   guilt stage alone, some nine days?
20       A        That sounds about right.
21       Q        We didn't start punishment evidence on
22   your client's case until the 2nd day of
23   September, 1997, correct?
24       A        I'll have to rely on you for those dates
25   but that sounds about right.

1          Q        And we filed a subpoena on

2     August 18, 1997; is that correct?

3          A        I don't have any idea.

4          Q        The subpoena was filed on August 13, 1997;

5     is that correct?

6          A        I don't know, Mr. Vinson.

7          Q        Would you agree?

8          A        You would have to show me.

9          Q        What date was the subpoena filed?

10         A        It's highlighted "August 18, 1997."

11         Q        No, look at the bottom.

12         A        When it is filed, "August 14, '97."

13         Q        That's August 13,'97?

14         A        You said 14th, didn't you?  It says filed

15    here "August 14th."

16         Q        What does that say?

17         A        The clerk stamp marked "August 14th."  It

18    is filled out on August 13th.  I don't know which date

19    is controlling.

20         Q        Okay.  And we gave you a copy right in

21    Judge's chamber, I think, or the jury room -- one of

22    them -- we gave you a copy of this before we even

23    started evidence?

24         A        There was a day -- I don't know which one

25    it is -- in one of the motions you and I sat down

1    prior to trial, during that week we were preparing for

2    trial, where you informed me of the home invasion

3    extraneous offense.  And at that time I was aware of

4    the witness.

5         Q     And, in fact, I even came to your office,

6    I think, the Friday before trial, wasn't it, and

7    delivered?

8         A     I don't recall that but you may have.

9         Q     My investigator took me there and I

10    delivered it to your office. You were not in.

11        A     Now that you mention, I remember something

12    to that fact.

13        Q     And so during -- and we only had, just so

14    the record can be clear, we finished August 11th with

15    the jury selection, and we didn't start evidence until

16    August 18th.  And in the meantime you had been given

17    the information on the extraneous?

18        A     Not on the 11th.  I was given the

19    information sometime during that week we were

20    preparing for trial.  I want to say -- I don't

21    remember exactly.  I want to say it was a Thursday,

22    and we were supposed to start testimony that following

23    Monday.

24        Q     But you were given that information,

25    correct?

1        A        Sometime during that -- towards the end of

2    that week, as I recall.

3        Q        Right before testimony started?

4        A        Yes, sir.

5        Q        And then you still had an investigator on

6    hand, right?

7        A        I had my investigator.  Yes, sir.

8        Q        We put the addresses of all the witnesses

9    there, correct?

10       A        I think so.

11       Q        Well, that's --

12       A        It's on the subpoena.  It was certainly

13   there.

14       Q        And those were the witnesses we called to

15   the witness stand, correct?

16       A        As I recall, I don't know.

17       Q        And during the time we were in trial, I

18   think we got the case to the jury and, then, after we

19   completed that, I think there was another break in the

20   trial?

21       A        I don't remember that.  There might have

22   been.  There was a break because my wife was in the

23   hospital, as I recall.

24       Q        We are not blaming you for anything but

25   there was a break in the trial, correct?

```
 1          A       I recall there was some sort of break.
 2     Yes, sir.
 3          Q       In fact, the verdict came in on the 28th
 4     of August, correct?
 5          A       I don't recall, but I will take your word.
 6          Q       And we were supposed to start that Friday
 7     but the Judge saw fit to allow you some extra time
 8     because of the illness?
 9          A       Right.
10          Q       And then we started on the 2nd because
11     Monday was Labor Day.  September 1st was Labor Day and
12     we started right after Labor Day on punishment?
13          A       I believe so.
14          Q       And all these people, they are local
15     people.  They live right here in Houston, Texas.  I
16     mean, just a good spit from the courthouse you may
17     say, right?
18          A       I don't know.
19          Q       Right here on Porter, Cambridge Streets in
20     Houston and then two HPD officers?
21          A       I don't know where Porter Street or
22     Cambridge Street is.
23          Q       I understand.  Right here in the city?
24          A       Sounds like it is in the city of Houston.
25          Q       And I think you sent an investigator all
```

1      the way to Florida; is that right?

2          A      Yes, sir, I did.

3          Q      And, obviously, if he can go all the way,

4      find a bank down there, he can properly locate these

5      streets in this county?

6          A      I assume that he certainly could

7      investigate and try to locate those streets.

8          Q      You had access to this subpoena?

9          A      Yes, sir.

10         Q      You had a copy of it and you were aware,

11     correct?

12         A      I was aware that you put me on notice of

13     the extraneous offense.  We had a little hearing back

14     in the Judge's area.  My understanding was that, based

15     upon the 15 day transcript, which I showed him that,

16     this information wasn't coming in.  But, yes, I could

17     have.  Had I thought it was coming in, I could have

18     done investigation and I could have discovered his

19     priors and this other information.

20         Q      We also gave you the offense report on

21     this case, correct?

22         A      You gave me an offense report as to the

23     victims.  There was nothing that related to my client

24     in the offense report.

25         Q      But, I mean, you were aware of the

1    allegation?

2        A       I was aware of the allegation that there

3    was a home invasion.  Nothing in that offense

4    report -- at that time it was an early on report

5    indicated --

6        Q       You saw the entire report because there

7    was nothing ever connecting your client to it?

8        A       That's right.  The offense report did

9    little, if any, good in regards to the punishment

10   stage because that was developed at a later time.

11       Q       And you also remember that we were trying

12   to get a Cuban national to come back here and testify

13   against your client?  You were aware of that, right?

14       A       It may have been.  I remember there was

15   another witness.  I didn't know it was a Cuban

16   national.  It couldn't have --

17       Q       But you do know?

18       A       I do know there was a second witness and

19   something about a second witness.  I thought something

20   to do with someone coming in from the penitentiary or

21   something.

22       Q       Right.  As an experienced defense

23   attorney, you are always on alert for extraneous,

24   aren't you?

25       A       You should be.

1          Q        And you never close down.  And when you

2     voir dire a jury, you voir dire with that potential;

3     isn't that correct?

4          A        Unless the Judge has ruled otherwise.

5          Q        The Judge didn't make a final ruling?

6          A        Obviously but I was under the impression

7     based upon the previous ruling.

8          Q        This wasn't an impression the Judge gave

9     you?

10         A        I believe it was the impression the Judge

11    gave me.

12         Q        That was one that you drew from your own

13    conclusion because you do recall the Judge saying that

14    he would make a final ruling at a later time.  There

15    was an argument over that.

16         A        I recalled -- we are talking about two

17    different hearings here.  There was one hearing

18    wherein there was no question in my mind but that I

19    was to receive 15 days notice.  And there was another

20    hearing wherein the Judge looked at the 15 day notice,

21    said, "Well, I don't think it is coming in."  And you

22    are right.  There was no absolute ruling on his part

23    that it wasn't coming in at that time.

24         Q        You are not claiming surprise, are you?

25    You weren't surprised?

Page 58

1          A       I was surprised.

2          Q       How could you be surprised when you knew

3    the possibility of something out there?

4          A       Because I thought that the Court's ruling

5    was going to preclude that testimony from coming in.

6          Q       You couldn't see a possible --

7          A       It may be my fault for doing that but, in

8    all honesty, yes, it's a possibility but I thought the

9    Court's ruling would prevent that testimony from

10   coming in.

11         Q       You had no perception in your mind that if

12   something is discovered and matures into something

13   that we can present it to the Court.  It just may give

14   us a break to allow the State to develop it along with

15   you.  You never even perceived that?

16         A       Well, it's not that I didn't perceive

17   that.  It is just I was pretty much convinced that

18   this wasn't developing on your part.  I believed that

19   from what little I did know you had this information

20   long before the 15 days and that, as such, you were

21   obliged to give that information to me.  And you

22   didn't and that, therefore, the law would allow that

23   to stay out of evidence.  Obviously, that was an

24   incorrect impression but that's what I was thinking.

25         Q       And you had talked to Mr. Rosenthal

```
 1    before, correct?

 2         A      That's right.

 3         Q      And he kind of put you on notice that he

 4    was trying to find somebody to tie your client to that

 5    home invasion?

 6         A      I don't know if it was trying to find

 7    somebody, more in a sense of trying to make it.

 8         Q      Okay.  And you knew that back in '96,

 9    correct?

10         A      I assume so.  It's early on in the case.

11         Q      Okay.  Along with the defendant's

12    brother's attorney, you all were both aware of that,

13    correct?

14         A      I believe Mr. Parnham was aware as well.

15         Q      Now, you remember when we had the jury

16    selection, when we had the pool here, that was the 2nd

17    day of September when we got ready to start trial?

18         A      Yes, sir.

19         Q      And I think Ms. Collins, she was in that

20    jury pool, she was about number six selected.

21         A      I would have to look at my chart but I'll

22    take your word for it.

23                MR. VINSON:  May I approach?

24                THE COURT:  You may.

25         Q      See.
```

1        A        Yes, sir.

2        Q        Now, by the time we got to the 16th juror,

3    Ms. Collins, you weren't out of strikes, were you?

4        A        No.

5        Q        In fact, you hadn't even asked for a

6    peremptory strike at that time?

7        A        I had asked for.

8        Q        You hadn't asked for an additional by the

9    time we got to Ms. Collins?

10       A        No, no.  I was making strikes.

11       Q        You still had plenty of strikes?

12       A        Because of the way we did it, saved all of

13   our strikes until the end and I had seen the people

14   that --

15       Q        What I am saying, just listen to me, and

16   answer my question.

17       A        Yes.  I still had peremptories by the time

18   I got to Ms. Collins.

19       Q        I think you had exercised just about five

20   strikes at that time?

21       A        I'll take your word for it.

22       Q        So you still had plenty of strikes?

23       A        I could have struck Ms. Collins.  Yes,

24   sir.

25       Q        And in fact --

1                    MR. VINSON:  May I approach, Your Honor?

2                    THE COURT:  Sure.

3          Q        According to your notes, you didn't care

4     for Ms. Collins too much, did you?

5          A        No.  She was on the lower end of the

6     jurors that I wanted.

7          Q        Okay.  But you said "strike if possible"?

8          A        Yes, sir.

9          Q        Now, it was possible to strike her; isn't

10    that right?

11         A        Only by getting someone less desirable

12    later on.

13         Q        Well, His Honor told you up front that if

14    you run out of strikes and you need some more, he

15    would consider?

16         A        He would consider it.  Yes.

17         Q        He would consider it.  He never told you

18    if you run out of strikes, you are on your own.  He

19    told you that he would consider some additional

20    strikes for you?

21         A        When that time came, he would consider.

22    He didn't tell me get.

23         Q        He would consider it?

24         A        He said he would consider it.

25         Q        He said he was going to consider them

1    based on your experience, just about to get them,

2    don't you?

3        A      A reasonable possibility, yes.

4        Q      And you don't know and the Judge can't

5    make that decision until you run out of strikes?

6        A      That's right.

7        Q      Because that would be improper for him to

8    try to sit there and anticipate your needs?

9        A      Right.

10       Q      After you run out of strikes, then you

11   looked to the Court and the Judge in this case, Judge

12   Wallace --

13       A      That's correct.

14       Q      -- gave you additional strikes and he

15   gave --

16       A      He gave me two additional strikes.

17       Q      You didn't use them?

18       A      No, because the people I would have gotten

19   using those would have been worse.

20       Q      The question is:  You didn't use them?

21       A      No, I didn't.

22       Q      And you had plenty of strikes left when

23   you failed to strike Ms. Collins?

24       A      Well, that's a relative term.  I had

25   plenty of strikes left but I had people, as I keep

1    saying, that were less desirable in my mind than Ms.

2    Collins that those strikes were reserved for, so I

3    only had plenty of strikes left in the sense of

4    numbers.  I didn't have plenty of numbers left in the

5    sense of striking and using my peremptories in an

6    intelligent manner.

7         Q      Do you have the rest of your notes with

8    you so we can take a look at those?

9         A      I don't have them with me.

10        Q      Okay.  Do the attorneys?

11        A      I have no idea.

12               MR. VINSON:  Do you have the rest of his

13   notes?

14               MR. CHARLTON:  No, we do not.

15               MR. VINSON:  We would like to see them.

16               MR. CHARLTON:  Privileged.  You can

17   subpoena them, if you wish.

18        Q      Well, let's say it was possible, correct?

19        A      Not in the sense of exercise.

20        Q      It was --

21        A      If you want me to answer the question.

22               THE COURT:  Let him finish.

23        A      It's only possible to achieve a less

24   desirable result based on information I had.  That's

25   what that meant.  It didn't mean if physically

1    possible, I had to spend a strike.   Those are Fs.   As
2    you can see, that was a D minus.   What that means, in
3    my note taking, was that if there is a -- if there is
4    not a more undesirable juror somewhere, then I use a
5    strike.   If there is a more undesirable juror, I don't
6    use a strike.   That's what that note means, not if it
7    is physically possible to use a strike.
8         Q    You say there is a D minus, correct?
9         A    That's what at that time she was.   I did
10   another chart prior to doing my final strikes and I
11   think she moved up at that point from a D minus, I
12   believe, to D plus.
13        Q    Did you get rid of the D minuses with the
14   rest of your strikes?
15        A    Most of them I either did or I seriously
16   thought about it.   I ended up with, I believe, at
17   least two Ds, I don't know, D minuses or D pluses,
18   like she may have changed.
19        Q    You didn't exhaust the 15 strikes you were
20   given, did you?
21        A    I exhausted all the strikes until I got to
22   the two peremptory, to the additional ones.   I
23   exhausted all my strikes and I was given two more but
24   at that time the people I would have received, had I
25   used those two strikes, would have been less desirable

1    than the people if I would have not used those two

2    strikes, so by the time I got my two strikes, I had

3    like six jurors left so the two strikes, the two

4    additional strikes that the Court granted me, did me

5    no good at that point.

6        Q    Okay.  You had only used five strikes when

7    you got there and you had ten left?

8        A    I don't know.  If that's what the record

9    reflect, then, yes.  I don't have those records.

10       Q    That's what the record reflects.

11            And you got two additional strikes and you

12   never --

13       A    But I got the two additional strikes way

14   on down the line.  I mean, we had already passed over

15   this one at that point.

16       Q    But yeah, then you heard us stand there

17   and say, "We accept Ms. Collins," and at that time

18   you, as an experienced attorney, knew at that time you

19   had to do one of two things:  You had to accept Ms.

20   Collins or exercise a strike?

21       A    That's correct.

22       Q    Every criminal defense lawyer practicing

23   in this state knows that; isn't that right?

24       A    Absolutely.

25       Q    And you chose to accept Ms. Collins?

1          A       Based upon what I had in the questionnaire

2     and the answers in voir dire, I did.

3          Q       And you already had your notes say

4     "strike"?

5          A       "If possible".

6          Q       And you tried to get her for cause and

7     that failed?

8          A       That's right.

9                  MR. VINSON:  Your Honor, at this time I

10    have no further questions.  However, we would like it

11    on the record so we can have a truthful and accurate

12    record of what happened to those other strikes, you

13    know, they have only brought forth this one with Ms.

14    Collins.  We would like to see what was the sequence

15    of strikes with respect to the notation of the other

16    jurors.  He is alleging that he was forced to take Ms.

17    Collins.

18                 THE COURT:  I understand from defense

19    counsel they will make that available for you.

20                 MR. CHARLTON:  I don't want to make that

21    understanding clear.  I am not making that

22    representation to anybody we are going to make that

23    available.

24                 THE COURT:  That's exactly what you said.

25                 MR. CHARLTON:  I apologize if I misled.

1          THE COURT:  Then those notes will become

2    available to the State.

3          MR. VINSON:  I have nothing further.

4          THE COURT:  Very well.  Mr. Charlton.

5

6                    EXAMINATION

7    BY MR. CHARLTON:

8      Q     Mr. Vinson, in his cross examination, has

9    made a big issue --

10         MR. VINSON:  Object to the side bar, "the

11   big issue."

12     Q     (Mr. Charlton)   I have a motion to

13   discuss the extraneous offense offered at punishment?

14     A     Yes.

15     Q     Were you all in the discussion with Mr.

16   Rosenthal or Mr. Smyth or any representative from the

17   State ever given any information about Mr. Balderas

18   having a major drug charge dismissed against him three

19   months before he testified?

20     A     Unless it came out from his testimony, I

21   was not given that information.

22     Q     That's right.  You were not told that

23   before trial?

24     A     Not to my recollection.

25         MR. CHARLTON:  May I approach again, Your

1   Honor?

2            THE COURT:  Certainly.

3       Q    One other thing first:  Do you recall

4   whether people were sworn, whether the voir niremen

5   were sworn?

6       A    There was specifically a discussion about

7   that during voir dire when Judge Densen was presiding

8   over that and that issue came up. And it was

9   determined from the clerk that before the jurors came

10  to us individually they had been sworn in by someone

11  from the clerk's office in the general jury room

12  across the street in the jury assembly room on

13  Congress?

14      A    Right.

15           THE COURT:  Well, let's clear the record

16  up because I swore each individually.  When Ms.

17  Collins was here, was I there?   Was I there the day

18  Ms. Collins was voir dired?

19           MS. KAHN:  It was Judge Densen.

20           THE COURT:  Thank you.

21      Q    I also call your attention to the

22  transcription hearing, specifically the top of page

23  eight, and ask you to recite that portion that I have

24  underlined that has been underlined for you.  Would

25  you recite into the record the Judge's ruling about

1    notice.

2         A       "You are under obligation to notify the

3    defense but no later than 15 days."

4         Q       That was about as emphatic as I think you

5    can get it?

6         A       I certainly believed it was.

7                 MR. CHARLTON:  May I approach one more

8    time, Your Honor?

9                 THE COURT:  Certainly.

10                (Whereupon, Defendant's Exhibit No. 21 was

11   marked for identification.)

12                MR. CHARLTON:  I will tender to the State

13   Defendant's Exhibit 21, which is the notice of

14   extraneous offenses.

15                THE COURT:  Any objection?

16                MR. VINSON:  I have no objection.

17                MR. CHARLTON:  And also tender to the

18   Defendant's Exhibits Nos. 22 and 23.

19                MR. VINSON:  Your Honor, I have no

20   objection to Defendant's Exhibit  21 but to

21   Defendant's Exhibit 22 and 23, I think we have already

22   had testimony on that disclosure of Ms. Collins -- any

23   criminal activities that Ms. Collins may have been

24   involved in.  We already have that on the record.

25                THE COURT:  I don't know what 22 and 23

1    is.

2              MR. CHARLTON:  They are in the affidavits.

3              THE COURT:  Affidavits from the --

4              MR. CHARLTON:  The defense, Mr. Odom.

5              THE COURT:  Not from Ms. Collins?

6              MR. CHARLTON:  No, sir.

7              MR. VINSON:  Then State's Exhibit 23 --

8              THE COURT:  Are these the same affidavits

9    that were offered as part of the motion?

10             MR. CHARLTON:  Yes, sir.

11             THE COURT:  Defendant's Exhibit 21 is

12   admitted.

13        Q    I'll show you what has been marked as

14   Defendant's Exhibit 21?

15        A    Yes, sir.

16        Q    And is that only notice from the State you

17   ever got about extraneous offenses?

18        A    In writing, yes.

19        Q    You are a long-standing and well-regarded

20   criminal defense counsel.  You are familiar with the

21   holdings about the requirement for notice of

22   extraneous offenses, are you not?

23        A    Somewhat, yes, I believe I am.

24        Q    And the notice that's required to be in

25   writing?

1          A     Well, the notices on the case in chief are

2     required to be in writing.  Notices on the punishment

3     stage are somewhat of a gray area of law.  I believe

4     the better practice that they be in writing but, like

5     I said, there is some law indicating that doesn't

6     necessarily have to be the case.

7                    MR. CHARLTON:  Pass the witness.

8                    THE COURT:  Mr. Vinson.

9

10                      EXAMINATION

11    BY MR. VINSON:

12                    MR. VINSON:  I have a couple of questions.

13         Q     Who has your notes?

14         A     My filed has been turned over to Mr.

15    Dennes' present attorney.

16         Q     So they would have all that.  They would

17    have your strike sheet, the one that you made the

18    decision on, and they would have all your notes on the

19    jurors?

20         A     I turned all that over to Ms. Kahn.

21         Q     Who has it?

22         A     I don't know who has it but I turned it

23    all over to Ms. Kahn, Leora Kahn.

24         Q     Now, with respect to the notice on

25    extraneous, you are not saying I didn't deliver to

1    your office, I think, on a Thursday or a Friday

2    evening, whatever it was --

3         A    I'm not saying.

4         Q    -- the notice on the extraneous?

5         A    I am saying the only formal written notice

6    I received was there on the case in chief.

7         Q    I said written notice.

8         A    No, we talked about it earlier.  You gave

9    me verbal notice prior to you coming to my office on

10   that day sitting back in the jury room.

11        Q    And, also, I came to your office and

12   brought information as well?

13        A    I recall you delivering some information

14   to my office.  Yes.

15        Q    Now, with respect to your inability to, I

16   guess, defend your client, the Court provided the

17   funds for the expert who came here from Dallas?

18        A    Yes, sir.

19        Q    And that expert had an opportunity to look

20   at the firearms and all the evidence?

21        A    Right.  The Court authorized payment for

22   those.  I put out the funds on that but, yes, sir.

23             THE COURT:  Will you let me interrupt.

24             Mr. Parnham has got a call from the

25   federal court that he needs to go to federal court.

1    So any problem with that?

2                MR. CHARLTON:  No, sir, I don't believe

3    so.  Other than his good looks, we don't need Mr.

4    Parnham.

5                THE COURT:  We already had that this

6    morning.

7        Q     (Mr. Vinson)   And that expert was allowed

8    to testify?

9        A     Yes, sir.

10       Q     And I think he gave compelling testimony,

11   correct?

12       A     I thought so.

13       Q     That he was an expert that even if you

14   looked at his credentials, he's a little head and

15   shoulders above our man?

16       A     Credential wise, yes.

17       Q     And you also had an opportunity and I

18   think His Honor approved funds for your investigator

19   to go to Florida?

20       A      I don't know if he approved funds for my

21   investigator to go to Florida but he approved money

22   for me to investigate the case with, which we did.

23       Q     Okay.  And, also, the Court provided you

24   with funds to get the testimony in on the defendant.

25   I think it was a psychologist?

1          A          He approved Dr. Brown.

2          Q          Dr. Brown had adequate time to do what he

3     needed to do when he came in here and gave testimony?

4          A          Yes, sir.

5          Q          And he was a professional about it,

6     correct?

7          A          Yes, sir.

8          Q          And so that we may end on this note:   You

9     were retained on this case, correct?

10         A          Yes, sir.

11         Q          And in spite of your being retained, the

12    Court still granted funds to assist in Mr. Dennes'

13    defense?

14         A          I was retained by the mother and father of

15    Mr. Dennes but, yes.   And then in court we had a

16    hearing on indigency of the client, and that's the

17    basis of the investigator, the psychologist and the

18    firearms expert.

19                    MR. VINSON:   I have no further questions,

20    Your Honor.

21                    MR. CHARLTON:   We will pass him.

22                    THE COURT:   Thank you, Mr. Odom.   I

23    appreciate it.

24                    THE COURT:   Mr. Vinson.

25                    MR. VINSON:   I was asking, Your Honor, if

1    we could ask that Mr. Odom remain until such time we

2    had a chance to look at his list for the other jurors,

3    strike list and the notes that he took on the jurors

4    that he testified that he had to strike and to force

5    him to accept Ms. Collins.

6                    THE COURT:  Ms. Kahn.

7                    MS. KAHN:  May I respond, Your Honor,

8    please.  As the attorney appointed on the appeal of

9    Mr. Dennes and as the attorney who is suppose to have

10   all this information, I would invoke my client's right

11   to not divulge any of this information regarding other

12   strikes of other jurors.  First, on the grounds that

13   they are irrelevant to this hearing; and secondly, it

14   is a violation of work product privilege of the

15   attorney in this case and it has no bearing whatsoever

16   on this issue regarding other jurors.

17                   The fact remains that all the notes that

18   were taken by this attorney regarding juror Collins

19   have been turned over to the State for their

20   inspection and for cross examination in this hearing.

21   Any other matters have been admitted into evidence as

22   Defendant's Exhibit 20.  The fact remains that any

23   other notes are privileged.  They are work product and

24   they are irrelevant to any other jurors.  It's a

25   fishing expedition on the part of the State.

1                    THE COURT:  It's denied.  I move that the

2        notes be made available to the State immediately.

3                    MS. KAHN:  I don't have them here.

4                    THE COURT:  As soon as you can get them

5        today, provide those to the State.

6                    MR. CHARLTON:  Do you want to recess the

7        hearing to another day to complete the hearing?

8                    THE COURT:  No, let's complete all we can

9        do today and come back for more.

10                   Let's take about a one or two minute

11       break.)

12                   (Recess taken.)

13                   MS. KAHN:  At this time we rest, Your

14       Honor.

15                   THE COURT:  What says the State?

16                   MR. SMYTH:  The State would call Mark

17       Vinson.

18                   MR. CHARLTON:  We will waive the oath.

19

20

21

22

23

24

25

1                        MARK VINSON,

2    was called as a witness for the State and, having been

3    duly sworn, testified as follows:

4                        EXAMINATION

5    BY MR. SMYTH:

6        Q       Sir, will you, please, state your name and

7    speak loud enough so the entire counsel table can hear

8    you.

9        A       My name is Mark Vinson, V-i-n-s-o-n.

10       Q       How are you employed?

11       A       I am employed as an assistant district

12   attorney with the district attorney's office.

13       Q       And to what Court are you currently

14   assigned and what is your position?

15       A       I am chief prosecutor of the 263rd

16   District Court in which we are in today.

17       Q       And in that position as chief prosecutor

18   of the 263rd, Judge Wallace's Court, did you have an

19   occasion to be involved in the trial of Reinaldo

20   Dennes, the subject matter of this hearing?

21       A       Certainly did.

22       Q       What was your role in that case?

23       A       I was chief prosecutor in that case as

24   well and I was assisted by you, Don Smyth.

25       Q       Were you present during the entire voir

1    histories or the dockets showing there was no criminal

2    history?

3        A    I told the Court every day we would bring

4    along of what jurors we were going to interview that

5    day.

6        Q    And did you provide a copy of that

7    printout involving the 60 persons on each panel to the

8    defense attorney?

9        A    The copy was always there.  The defense

10    attorney was aware of that.  I made him aware it was

11    did, and it was never out of his reach.  It was right

12    there with us every day.  Everything was there.

13        Q    So he had access to it.  Each time you

14    impaneled 60 people he had access to whether or not

15    anyone on that panel of 60 had a criminal history or

16    did not have a criminal history?

17        A    Certainly did.

18        Q    You didn't try to hide that document from

19    him?

20        A    Never did.

21        Q    During the voir dire of the panel, during

22    the voir dire of this case, did Mr. Odom or his

23    assistant Randy McDonald or his paralegal ever take

24    the opportunity to look at that list?

25        A    In some instances, I do recall they did

1    look at some of the list because we had it available.

2    To what extent, I don't recall.  It was there.

3         Q     So you don't know whether he looked at

4    Irene Collins or didn't pay any attention to it or

5    not?

6         A     No.  But I was aware of it.  And I know

7    when they first filed their motion for new trial and

8    then I pulled Ms. Collins' file and looked at the --

9    because it is attached there as well, because I went

10   back to the entire criminal history packet we had and

11   I pulled hers and attached it to that file for this

12   hearing and how can he say that because everything was

13   available to him, how can they or whoever.

14        Q     So he had access to it if he chose to look

15   at it?

16        A     It was there.

17        Q     Now, with regard to the extraneous offense

18   and Mr. Balderas, first of all, did you ever -- did

19   you know anything about this Tony Balderas or a Tony

20   Balderas prior to, let's say, August 1, 1997?

21        A     Never heard of him.

22        Q     And you said there is some conversation

23   early on, back in '96, when Mr. Rosenthal was involved

24   in the case so that would be sometime February of '96,

25   that the State was trying to develop an extraneous

1       involving this defendant on a home invasion robbery?

2       A       Correct.

3       Q       And Mr. Odom was aware of that?

4       A       Correct.

5       Q       Mr. Parnham was aware of that?

6       A       Correct.

7       Q       And you were aware of that?

8       A       Correct.

9       Q       During '96, apparently were you able to

10      definitively tie the defendant, Reinaldo Dennes, into

11      that home invasion robbery?

12      A       The only way we could tie into the home

13      invasion robbery we thought was that we would have to

14      bring back one of the codefendants who had been

15      convicted and that was a matter of public record he

16      had been convicted for the home invasion.

17      Q       Did you make an attempt to do that?

18      A       Yes.

19      Q       To your knowledge was Mr. Odom aware of

20      your attempt to use this person that was in the

21      penitentiary, the fact that the person's name was a

22      Fugon, was it?

23      A       Yes, certainly was, because I think the

24      defense attorney for that defendant -- actually I

25      think she filed a motion to prohibit us from speaking

1   histories or the dockets showing there was no criminal

2   history?

3       A     I told the Court every day we would bring

4   along of what jurors we were going to interview that

5   day.

6       Q     And did you provide a copy of that

7   printout involving the 60 persons on each panel to the

8   defense attorney?

9       A     The copy was always there.  The defense

10  attorney was aware of that.  I made him aware it was

11  did, and it was never out of his reach.  It was right

12  there with us every day.  Everything was there.

13      Q     So he had access to it.  Each time you

14  impaneled 60 people he had access to whether or not

15  anyone on that panel of 60 had a criminal history or

16  did not have a criminal history?

17      A     Certainly did.

18      Q     You didn't try to hide that document from

19  him?

20      A     Never did.

21      Q     During the voir dire of the panel, during

22  the voir dire of this case, did Mr. Odom or his

23  assistant Randy McDonald or his paralegal ever take

24  the opportunity to look at that list?

25      A     In some instances, I do recall they did

1    look at some of the list because we had it available.

2    To what extent, I don't recall.  It was there.

3        Q    So you don't know whether he looked at

4    Irene Collins or didn't pay any attention to it or

5    not?

6        A    No.  But I was aware of it.  And I know

7    when they first filed their motion for new trial and

8    then I pulled Ms. Collins' file and looked at the --

9    because it is attached there as well, because I went

10   back to the entire criminal history packet we had and

11   I pulled hers and attached it to that file for this

12   hearing and how can he say that because everything was

13   available to him, how can they or whoever.

14       Q    So he had access to it if he chose to look

15   at it?

16       A    It was there.

17       Q    Now, with regard to the extraneous offense

18   and Mr. Balderas, first of all, did you ever -- did

19   you know anything about this Tony Balderas or a Tony

20   Balderas prior to, let's say, August 1, 1997?

21       A    Never heard of him.

22       Q    And you said there is some conversation

23   early on, back in '96, when Mr. Rosenthal was involved

24   in the case so that would be sometime February of '96,

25   that the State was trying to develop an extraneous

1      involving this defendant on a home invasion robbery?

2          A      Correct.

3          Q      And Mr. Odom was aware of that?

4          A      Correct.

5          Q      Mr. Parnham was aware of that?

6          A      Correct.

7          Q      And you were aware of that?

8          A      Correct.

9          Q      During '96, apparently were you able to

10     definitively tie the defendant, Reinaldo Dennes, into

11     that home invasion robbery?

12         A      The only way we could tie into the home

13     invasion robbery we thought was that we would have to

14     bring back one of the codefendants who had been

15     convicted and that was a matter of public record he

16     had been convicted for the home invasion.

17         Q      Did you make an attempt to do that?

18         A      Yes.

19         Q      To your knowledge was Mr. Odom aware of

20     your attempt to use this person that was in the

21     penitentiary, the fact that the person's name was a

22     Fugon, was it?

23         A      Yes, certainly was, because I think the

24     defense attorney for that defendant -- actually I

25     think she filed a motion to prohibit us from speaking

```
1    involving this defendant on a home invasion robbery?

2         A      Correct.

3         Q      And Mr. Odom was aware of that?

4         A      Correct.

5         Q      Mr. Parnham was aware of that?

6         A      Correct.

7         Q      And you were aware of that?

8         A      Correct.

9         Q      During '96, apparently were you able to

10   definitively tie the defendant, Reinaldo Dennes, into

11   that home invasion robbery?

12        A      The only way we could tie into the home

13   invasion robbery we thought was that we would have to

14   bring back one of the codefendants who had been

15   convicted and that was a matter of public record he

16   had been convicted for the home invasion.

17        Q      Did you make an attempt to do that?

18        A      Yes.

19        Q      To your knowledge was Mr. Odom aware of

20   your attempt to use this person that was in the

21   penitentiary, the fact that the person's name was a

22   Fugon, was it?

23        A      Yes, certainly was, because I think the

24   defense attorney for that defendant -- actually I

25   think she filed a motion to prohibit us from speaking
```

Page 82

```
 1        involving this defendant on a home invasion robbery?

 2        A       Correct.

 3        Q       And Mr. Odom was aware of that?

 4        A       Correct.

 5        Q       Mr. Parnham was aware of that?

 6        A       Correct.

 7        Q       And you were aware of that?

 8        A       Correct.

 9        Q       During '96, apparently were you able to

10   definitively tie the defendant, Reinaldo Dennes, into

11   that home invasion robbery?

12        A       The only way we could tie into the home

13   invasion robbery we thought was that we would have to

14   bring back one of the codefendants who had been

15   convicted and that was a matter of public record he

16   had been convicted for the home invasion.

17        Q       Did you make an attempt to do that?

18        A       Yes.

19        Q       To your knowledge was Mr. Odom aware of

20   your attempt to use this person that was in the

21   penitentiary, the fact that the person's name was a

22   Fugon, was it?

23        A       Yes, certainly was, because I think the

24   defense attorney for that defendant -- actually I

25   think she filed a motion to prohibit us from speaking
```

```
22   strong opposition, and in light of an appeal case

23   which he was being represented by her, and I certainly

24   thought the Court would rule against us on that effort

25   since he was represented by counsel and the case was
```

1    on appeal.

2         Q        Did you quit trying to develop that home

3    invasion robbery that involved the defendant, Reinaldo

4    Dennes, as the master mind just because a codefendant

5    wouldn't testify --

6         A        That's correct.

7         Q        -- when you gave it up then?

8         A        I did because we didn't have sufficient

9    evidence.

10        Q        Did you later make another attempt to get

11   somebody else who knew about this home invasion

12   robbery of Reinaldo Dennes to testify?

13        A        Yes.

14        Q        And who was that?

15        A        David Balderas.

16        Q        Do you remember the first day you ever

17   talked to David Balderas?

18        A        I don't recall but I think you have it on

19   the calendar.  I think we both met with him.  Do you

20   have the date there?

21        Q        Let me.  Can you relate that without

22   giving me a date, can you relate it?  Were you still

23   in active voir dire of the panel or had the panel

24   already been completed by that time?

25        A        I think by that time the panel had been

1    completed.

2        Q      Can you relate it to any document in the

3    file?  There is a subpoena for a David Balderas and

4    some other people.  I think it's dated

5    August 13, 1997.

6        A      I think we talked -- the way it worked, I

7    think we talked to Mr. Balderas.  That apparently had

8    to be on the 12th.  At that time we determined, hey,

9    he can't help us.  We weren't even certain we could

10   but after we talked to him, he could help us get the

11   case to the jury so at that time I immediately

12   prepared the subpoena to be filed the next day.

13       Q      And you filed the subpoena on

14   August 13, 1997?

15       A      That's correct.

16       Q      Did you subsequently make Mr. Odom aware

17   of the fact that you now believe you are going to be

18   able to actually prove this extraneous on punishment?

19       A      I certainly did.

20       Q      And do you recall when you did that?

21       A      Immediately following the filing of the

22   subpoena.

23       Q      Do you remember having a meeting with the

24   Judge and Mr. Odom back in the jury room of this

25   courtroom on a Thursday, the 14th?

1          A       Yes.

2          Q       Do you recall at that meeting advising

3    again Mr. Odom that here's the file of subpoenas for

4    the following people, here is who they are, including

5    David Balderas?

6          A       Correct.

7          Q       Do you recall at that meeting giving Mr.

8    Odom the opportunity to read the offense report

9    regarding that home invasion robbery, which you used

10   as an extraneous offense at punishment?

11         A       Correct.

12         Q       And in that offense report, which you

13   provided him, did it talk about information from David

14   Balderas about two Cubans being the master minds of

15   this particular home invasion robbery?

16         A       Yes.  He identified Hector Fugon along

17   with a second person as actually committing the

18   offense but he further stated that it was set up by

19   the defendant, who had befriended Mr. Balderas, and so

20   I didn't feel that Mr. Balderas was a complete

21   stranger to defense counsel because his client, Mr.

22   Dennes, had a prior relationship with Mr. Balderas.

23         Q       That's all in the offense report?

24         A       If I recall, yes.

25         Q       And so that offense report was made

1    available on August 14th?

2         A     That's correct.  And it's the same offense

3    report that we used during the punishment stage of the

4    trial.

5         Q     And it wasn't until, I guess, August 12th

6    that you finally became aware that you might be able

7    to use that particular extraneous offense on

8    punishment?

9         A     That's correct.

10        Q     In addition to not just telling -- in

11   fact, wasn't there some conversation regarding the

12   State's concern for the well being of the various

13   witnesses in this case in front of the Judge, as well

14   as Mr. Odom, when we were talking about the extraneous

15   offenses?

16        A     That's correct.  In fact, I think Mr.

17   Balderas represented to us that an investigator had

18   been tracking him down before we even located him.

19   Before we even located him somebody had been tracking

20   him down and we made him aware that no one from our

21   office at that point of time because we weren't aware

22   of it.

23        Q     Did you do anything in addition to

24   notifying Mr. Odom of the subpoenas you filed and the

25   people who were on that subpoena list as well as

1    letting him look at the offense report in the

2    extraneous offense case?  Did you do anything

3    additional with that on Friday, the 15th of August?

4        A      If I recall, I think I took information to

5    his office.  I don't recall what it was but it was on

6    the extraneous offense.  And I know, I think, he was

7    gone.  We arrived there but I did speak to his

8    secretary, receptionist, there in the office and left

9    the information that he had requested or the

10   information that he needed.

11       Q      At any time did you ever close your file

12   to Mr. Odom?

13       A      No.  In fact, we encouraged him to read it

14   and he had free access to the file from the day the

15   case had been filed against his client.  He and Mr.

16   Odom met on occasion in the courtroom and reviewed the

17   file and met on occasion and reviewed the file.  It

18   was always open.

19       Q      When you say he, who are you talking

20   about?

21       A      I am talking about Mr. Odom, who

22   represented Mr. Reinaldo Dennes, the defendant.

23       Q      Would that file include the offense report

24   of the home invasion robbery that was eventually used

25   as extraneous on punishment?

1      A      If I recall, it did.  But the problem we

2  were having was just trying to locate someone who

3  could substantiate that the defendant set up the

4  invasion.

5      Q      When the strikes were finally made and the

6  jury was finally put together in this case, did Mr.

7  Odom ever make any attempt to strike Irene Collins?

8      A      He never did.

9      Q      Even though he tried to get her for cause

10  and even though his notes reflect that she is not an

11  acceptable juror to him, he made no attempt to strike

12  her; is that correct?

13      A      And I think his notes reflect that she was

14  strong on death and in spite of that, he still didn't

15  strike her.

16      Q      She was the number six juror selected; is

17  that correct?

18      A      That's correct.

19      Q      By the time she was selected, the

20  defendant had only used five strikes?

21      A      That's correct.

22      Q      They still had ten to go?

23      A      Correct.

24      Q      And do you recollect when he eventually

25  used all 15 of his peremptory strikes he asked the

1    Court for additional ones?

2          A        That's correct.

3          Q        And the Court gave him two additional

4    strikes?

5          A        That's correct.

6          Q        And he didn't even use those two

7    additional peremptory strikes, did he?

8          A        He did not.

9                   MR. SMYTH:  Pass the witness.

10                  THE COURT:  Thank you.

11

12                          EXAMINATION

13   BY MR. SCHNEIDER:

14         Q        Mr. Vinson, does HPD investigate

15   extraneous offenses?

16         A        Yes.

17         Q        Did they provide a supplement to you

18   regarding David Balderas?

19         A        No, not that I recall.  The only thing

20   that was in the offense report, as I recall, was the

21   -- I am trying to think if he was interviewed by HPD

22   because the things that I remember that was in the

23   offense report was the two defendants going to the

24   wrong home, or whatever, going through the back door

25   and committing the offense.  And then I think Fugon

1    was arrested.  I don't recall all the details of it.

2         Q      So when was it Mr. Balderas' name came to

3    the State of Texas, I mean, HPD, I mean any

4    investigative agency?

5         A      I think it was about -- that I recall, I

6    think it was about the time when we filed a motion to

7    subpoena.  I think it was about that time that I

8    became aware.

9         Q      When was that?

10        A      And that's after we interviewed Mr.

11   Balderas.

12        Q      What about the other agency?

13        A      What other agency?

14        Q      Did HPD bring him to your attention?

15        A      I don't recall who brought Mr. Balderas to

16   my attention.

17        Q      What agency brought him to your attention?

18        A      I do not recall.

19        Q      Do you have that information in your file?

20        A      I would think it should be there.

21             MR. SCHNEIDER:  Would that produce that

22   information of which agency and when?

23             MR. SMYTH:  Balderas' name is in the

24   offense report that the State received from HPD, and

25   it's in the offense report that the State gave to Mr.

1   Odom to read.

2            MR. SCHNEIDER:  What is the date of that

3   offense report?

4            MR. SMYTH:  I have no idea what the

5   offense but it was pretty close to the time the event

6   committed.

7            MR. SCHNEIDER:  When was the event

8   committed?

9            MR. SMYTH:  I want to say September of

10   '85.  So it has been in the offense report a long

11   time.

12            MR. SCHNEIDER:  May that offense report be

13   admitted for the record?

14            THE COURT:  What?  Don't you have a copy

15   of it?

16            MR. SCHNEIDER:  No, Your Honor.

17            MR. SMYTH:  I don't know whether they got

18   a copy of it.

19            THE COURT:  Sure.  Let's include that part

20   and parcel.

21            MR. SMYTH:  I'll certainly do that.

22       Q    (Mr. Schneider)   Mr. Balderas' name is in

23   the offense report dated September, 1995, according to

24   Mr. Smyth?

25       A    If Mr. Smyth says that, I'm not going to

1    argue with his recollection.

2        Q       At some point did you request that

3    somebody go and interview Mr. Balderas?

4        A       I didn't request anyone to go and

5    interview Mr. Balderas.  It was our intent to try to

6    locate Mr. Balderas and interview him ourselves.

7        Q       When did you locate Mr. Balderas?

8        A       Mr. Balderas came to our office.  I think

9    it was the day before the subpoena was filed.

10       Q       All right.  So sometime the week of August

11   11th he came to your office?

12       A       The subpoena was filed on the 13th.  He

13   had to come about the 12th.

14       Q       And you picked the last juror on the

15   11th.  You picked the last juror on the 11th?

16       A       If the record reflects that, that's

17   correct.

18       Q       Who brought him to your office?

19       A       I think my investigator located him.  I'm

20   not certain if she brought him.  I'm not certain.

21       Q       When did your investigator locate him?

22       A       I don't know.  I guess it would have to be

23   at or near the time he appeared in my office.

24       Q       Do you have any reports from your

25   investigator about when she located Mr. Balderas?

1      A      I have no such report.

2      Q      No such report?

3      A      I have no such report.

4      Q      No notes?

5      A      I have no notes.  The only concern to me

6   was if Mr. Balderas was out there, get him here and

7   see if he could help.  I didn't keep notes on that.

8      Q      When you did you start investigating or

9   looking for Mr. Balderas?

10      A      When it became apparent that Hector Fugon

11   was not going to assist us.

12      Q      I show you Defendant's 24.  Do you

13   recognize it?

14      A      Yes.

15             MR. SMYTH:  Could I see that document

16   before any testimony regarding that?

17             These are documents that are already in

18   the Court's file so I certainly have no objection to

19   them.

20      Q      Defendant's Exhibit 24 is a document

21   regarding Mr. Fugon filed by his lawyer saying leave

22   him alone --

23      A      Right.

24      Q      -- and your conversations with his lawyer

25   prior to that date; is that correct?

1          A          Correct.

2          Q          And you had bench warranted, caused to be

3     bench warranted from TDC?

4          A          That's correct.

5          Q          And you brought him back and then he was

6     returned to TDC on September 2nd; is that correct?

7          A          If the document says that.

8          Q          And Defendant's 25 is a Bench warrant

9     returned?

10         A          If the document says that.

11         Q          So Mr. Fugon refused to talk to you?

12         A          No.  His attorney refused to let us talk

13    to him.

14         Q          And he's not going to be a witness in this

15    case?

16         A          After his attorney refused to allow us to

17    talk to him, I think you are aware that he couldn't be

18    a witness.

19         Q          Now, in regards to juror, Ms. Collins, you

20    have a printout here?

21         A          It should be attached right up there.

22         Q          I have marked Defendant's Exhibit 26, the

23    printout that was handed to me by Mr. Smyth.

24                    THE COURT:  What's 25?

25                    MR. SCHNEIDER:  The return, bench warrant

Page 95

1    return.

2          Q       Let me show you Defendant's Exhibit 26.

3                  MR. SMYTH:  We have no objection to it.

4          A       Yes.  I can recognize it.

5                  MR. SCHNEIDER:  Your Honor, I would offer

6    Defendant's Exhibit 26 into evidence.

7                  THE COURT:  Defendant's 26 is admitted.

8          Q       Well, now, you had the statement to your

9    questionnaire?

10         A       Correct.

11         Q       Did you make any notes on the

12   questionnaires concerning the contents of Defendant's

13   26?

14         A       No.  No, my questionnaire.

15                 THE COURT:  What is Defendant's Exhibit

16   26?

17         Q       Is there any question 37 through 41 -- did

18   you make any comments regarding the contents of

19   Defendant's 26?

20         A       No more, counsel, than criminal history.

21         Q       Excuse me?

22         A       Criminal history.

23         Q       Did you write anything down yourself

24   regarding her criminal history?

25         A       That's all I put down.  I had here the

1    attached printout.

2         Q       Now, are these -- is this your

3    questionnaire?

4         A       This is my questionnaire.  These are my

5    notes.

6         Q       Is there any notes regarding the criminal

7    history that is reflected in Defendant's Exhibit 26

8    contained in your questionnaire?

9         A       Prior deferred.

10        Q       Is that in your handwriting?

11        A       I think every one can recognize my

12   handwriting.

13               MR. SCHNEIDER:  I offer to mark this as

14   Defendant's Exhibit 27.

15               THE COURT:  All right.

16        Q       Now, questions 37 and 40 --

17        A       That's correct.

18        Q       -- when did you bracket those?

19        A       I bracketed those this morning while you

20   were asking questions.

21        Q       And the green underlining?

22        A       That was during the trial.

23        Q       The yellow underlining?

24        A       I mean, during the voir dire.

25        Q       So, on question 40, you underlined that

1    she had been arrested for driving without a license?

2         A      No, I understand driving.

3         Q      Driving without a license?

4         A      Whom I did not know.

5         Q      And you underlined that question?

6         A      That's correct.

7         Q      Did you ask her any questions about that?

8         A      No.

9         Q      At any time you were reviewing this were

10   you aware that she was on deferred?

11        A      Yes.

12        Q      So you knew?

13        A      No, that's improper.  At the time that I

14   looked at it we were doing jury selection.  I was

15   aware that she had two deferred adjudications and each

16   had been set aside.

17        Q      So you knew she had been arrested on at

18   least two occasions that were not counted in the

19   answer to question number 40?

20        A      Yes.  I knew she had been arrested on two

21   occasions.

22        Q      And you knew that the answer to question

23   number 40 where it says, "ever been arrested or member

24   of your family or any acquaintance ever been

25   arrested," you knew that the answer to that question

1    was not true?

2         A      No.  I did not know it was not true.

3         Q      You knew she had been arrested on two

4    occasions?

5         A      Yes, sir.

6         Q      And those two occasions were written down

7    there?

8         A      They were not there.

9         Q      On question 37, "Have you, any member of

10   your family, or any acquaintance, ever been accused in

11   any criminal action?"  There was a "yes" there.

12        A      That's correct.

13        Q      Was there any notation made by this juror

14   regarding her prior deferred adjudication?

15        A      No, just on the outside of the

16   questionnaire.

17        Q      That you wrote?

18        A      That's my writing.

19        Q      Did you specifically inform Judge Densen?

20               MR. SMYTH:  I ask Mr. Schneider to resume

21   his seat and, first of all, object to any further

22   question that document which -- have you offered it?

23               MR. SCHNEIDER:  Offer Defendant's Exhibit

24   27, if I haven't.

25               THE COURT:  Any objection?

1           MR. SMYTH:  Yes.  It's irrelevant, what's

2    in his mind regarding this particular juror.  They are

3    not claiming that there is some problem because we

4    didn't strike him so what notes we made regarding that

5    document is absolutely irrelevant to this motion,

6    Judge.

7           THE COURT:  Sustained.

8           MR. SCHNEIDER:  I'll include it in the

9    record for a bill.

10          THE COURT:  Certainly.

11    Q     So you knew at that time you were

12    questioning that she did not answer questions

13    consistent with the information you had; is that

14    correct?

15    A     I knew she had two arrests there for

16    deferred.

17    Q     And you knew --

18    A     Well, whether they were consistent, I

19    don't know what going through her mind at that time

20    when she filled out the questionnaire.  I don't know

21    what she was thinking.

22    Q     Did you inform Judge Densen that this

23    juror had been arrested for public lewdness?

24    A     No, and I never have.

25    Q     Did you inform Judge Densen that this

1    particular juror had been arrested for prostitution?

2        A        No, and I would not.

3        Q        And you would not?

4        A        And I would not.

5        Q        Even though the juror --

6        A        And I would not.  The answer is I would

7    not.

8        Q        So it's irrelevant to you whether a juror

9    answers the question or not?

10        A        Whether it's irrelevant to me is not the

11    issue.  Your question is would I have asked or made

12    the Judge aware that she had been arrested for

13    prostitution.  She received deferred adjudication.

14    That did not concern me.

15        Q        Did you hand this document, Defendant's

16    Exhibit 26, to defense counsel?

17        A        I don't recall handing him that.  Did I

18    didn't hand it to him?

19        Q        Did you tell him that Ms. Collins had been

20    arrested?

21        A        No.  No, the documents were there.  I

22    don't think I had to lawyer for him.

23        Q        Did you tell him about the deferred

24    adjudication?

25        A        No.

1    Q    Did you tell him about the public lewdness

2  or the prostitution?

3    A    If I didn't tell him about the deferred, I

4  didn't tell him that as well.

5    Q    Did you tell him that the answers to

6  questions 37 and 40 may have been incorrect?

7    A    No.

8    MR. SCHNEIDER:  Pass the witness.

9

10                    EXAMINATION

11  BY MR. SMYTH:

12    Q    Mr. Vinson, Ms. Collins was, I believe,

13  number 60 on the first panel of 60 that was put

14  together by the Court; is that correct?

15    A    That's correct.

16    Q    And that entire criminal history or lack

17  of criminal history on all the jurors to number 60 was

18  available for when any juror was voir dired in this

19  case; is that correct?

20    A    That's correct.

21    Q    And that entire packet, starting with

22  juror number 1 all the way down to Irene Collins,

23  juror number 60, was in that packet?

24    A    That's correct.

25    Q    And that entire packet was made available

1    to counsel for the defense on the first day of voir

2    dire.  That was Randy McDonald and Wendell Odom.

3         A       That's correct.

4         Q       And they had that document in their hands

5    on the first day of voir dire before any -- did they

6    have that document in their hands on the first day of

7    voir dire before a single juror was talked to?

8                 MR. SCHNEIDER:  Your Honor, which document

9    are we talking about?

10        Q       That document would be the entire list of

11   the entire criminal history, lack of criminal history,

12   including -- excuse me -- Defendant's 26, which would

13   have been part of that entire criminal history run?

14        A       Okay.  The first day we started the voir

15   dire.  That's what I am trying to get squared.  The

16   first day the Judge spoke to them and they got a short

17   rendition of what they were expected to do.  We broke

18   them down and started assigning days for them to come

19   back.

20              Now, I know for certain that when they

21   came back, when we started the individual voir dire,

22   we had that because by that time we had determined who

23   we wanted on the panel and who was going to be

24   dismissed.  And we had all of that information

25   available to both sides.  It was always right within

1    arm's reach.   In the room we selected the jury panel

2    in, we could sneeze into each other.

3         Q       In fact, the criminal history run on every

4    juror was available at the initial voir dire when the

5    Judge talked to the group?

6         A       I would believe so.

7         Q       And if it wasn't -- it certainly was

8    available before any individual voir dire was spoken

9    to by an attorney?

10        A       That's correct.

11        Q       And, in fact, it was given to Mr. McDonald

12   as well as Mr. Odom on that first day regarding the

13   first 60 and Ms. Collins was number 60 in that first

14   60?

15        A       That's correct.

16        Q       So what they did with it, you don't know.

17   Do you have any idea?

18        A       No.   And moreover there is a public record

19   that they had access to as well through the clerk's

20   office if they thought they wasn't using their time

21   correctly.   It wasn't like it was out of the State of

22   Texas, right here in Houston, Harris County.

23        Q       So you didn't hide this from Mr. Odom or

24   Mr. McDonald?

25        A       No.

1        Q        Or anybody else --

2        A        No.

3        Q        -- representing this defendant?

4        A        No.  And since it was deferred
adjudication, I didn't see any reason to attempt to
embarrass Ms. Collins or anything.  She had succeeded.
My interest was could she follow the Court's rulings
and return a true verdict.  And that was the only
thing I was concerned about.

10       Q        And is there any reason for you to believe
that Mr. Odom didn't look at that criminal history
himself?

13       A        No.  I think Mr. Odom was very diligent
throughout the entire jury selection process.  And he
was looking for any way he could to get rid of anyone
that he perceived to have a strong State interest in
the death penalty.

18       Q        And these criminal history information or
the result in the deferred adjudication and subsequent
dismissals, are those, in your understanding of law,
is that a ground for automatic dismissal or discharge
of a juror?

23       A        And, no, and they are misdemeanors anyway
and, again, my interest is not to embarrass the person
but to see if they could follow the law.

1     Q     And Mr. Odom didn't try to get Ms. Collins

2     for cause; is that correct?

3     A     Yes, he had other reasons.  I think he

4     stated, according to his notes -- and I don't

5     particularly recall his voir dire -- but relying on

6     his notes you have there and "strong death," or

7     something of that nature.  And the way he certainly

8     had an opportunity when we made our selection.

9     Sometimes we go through what we will call a little

10    bluffing game where we will accept a juror

11    anticipating that the defense will strike them but in

12    this case, when we accepted the juror, in my mind, I

13    thought Ms. Collins was going to be on the jury unless

14    Mr. Odom struck her because I wasn't aware of his

15    notes.

16    Q     And Mr. Odom made no attempt to strike her

17    at any time?

18    A     No.

19    Q     Other than his attempts to strike for

20    cause?

21    A     No.

22    MR. SMYTH:  Nothing further.

23

24

25

1                          EXAMINATION

2    BY MR. SCHNEIDER:

3         Q       Is it your testimony that Mr. McDonald and

4    Mr. Odom had this Defendant's Exhibit 26 in their

5    possession?

6         A       I don't know if they had it in possession.

7    It was available to them right there in the courtroom

8    just like that document is laying right there.   A

9    stack of documents was on the table in front of you.

10   They were criminal histories and everybody understood

11   that.

12        Q       And you are not saying though you saw him

13   look at this?

14        A       I'm not saying that.

15        Q       And you are not saying you handed it to

16   him?

17        A       I'm not saying that.

18        Q       And you aren't saying that this juror

19   number 60 has an arrest record.   You told him?

20        A       I didn't tell him she had an arrest

21   record.

22        Q       You didn't show him the front of your form

23   that said "prior deferred"?

24        A       No.   That was for my notes and he didn't

25   show me the front of his form.

1        Q       Question 64 A says, "Have you ever visited

2    inside a prison, jail or a detention center?"   The

3    answer is "no."

4        A       I think if you're arrested, that's not a

5    visit.  A visit is something voluntarily.

6        Q       The person inside the jail, going to jail?

7        A       Read the content, "I have visited."  I'm

8    not a visitor if I'm arrested and taken there.  That's

9    not a visit in my mind.

10               MR. SCHNEIDER:  Pass the witness.

11               THE COURT:  You can stand.

12

13                    EXAMINATION

14    BY MR. SMYTH:

15        Q       One question.  Did you point out to Mr.

16    Odom or Mr. Mc Donald, and whoever else was helping in

17    this case for the defense, that there's the criminal

18    histories?

19        A       Everyday there was a stack right about the

20    same place and I bring it there and set it down.

21    "Here we go.  Here we are, guys." Boom.  They had

22    free access.  Go for it.

23               MR. SMYTH:  I said one question.

24               THE COURT:  Mr. Schneider.

25               MR. SCHNEIDER:  Nothing further.

1              THE COURT:  Take your seat.

2              Any further witnesses?

3              MR. SMYTH:  No, Your Honor.

4              THE COURT:  Okay.  Subject to the State

5     being able to review notes of the defense counsel and

6     subject to the defense being able to receive from the

7     State a copy of offense report, is there anything

8     further?

9              MR. CHARLTON:  No, sir.

10             THE COURT:  Then, obviously, let's recess

11    this case until both sides had an opportunity to

12    review those documents, a brief recess.  Sometime, I

13    would think, late next week when we will hear any

14    arguments, and I will make a ruling at that time.

15             MR. SMYTH:  State will bring over a copy

16    of that offense reports and file mark it today and

17    have it in the Court's file.

18             THE COURT:  And I order the defense to

19    have the State copies of the notes of defense counsel

20    no later than tomorrow.

21             MS. KAHN:  May I be clear what notes the

22    State and the Court is ordering me to produce?

23             THE COURT:  Juror notes on the voir dire.

24             MR. SMYTH:  The spread sheet from which

25    Mr. Odom made his strikes.

1                    THE COURT:  That's exactly it.  Nothing

2     more than.

3                    MS. KAHN:  Renew the objection on the

4     basis of privilege and work product.

5                    THE COURT:  Right.

6                    MS. KAHN:  And the basis of relevance

7     again.

8                    THE COURT:  I think I have made my ruling.

9                    Anything further?

10                   MR. VINSON:  Not from the State.

11                   MR. CHARLTON:  No, Your Honor.

12                   (Court adjourned in this cause.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      November 13, 1997
 2              THE COURT:  State ready to proceed?
 3              MR. VINSON:  State's ready.
 4              Defense?
 5              MR. CHARLTON:  May we take up a
 6    preliminary matter?  We have issued a subpoena for
 7    some records.  Ms. Vollman from the D.A.'s office is
 8    here to -- she was here a few minutes ago.  I think
 9    she answered the telephone.  She has filed a motion to
10    quash that subpoena.  And that I think is directly
11    relevant to some issues that are before you, and I
12    would like if we could resolve that issue.
13              THE COURT:  Let's resolve it.
14              MR. CHARLTON:  I informed the Court in
15    response to our subpoena that I had filed a motion to
16    quash certain records and after we were called some
17    dirty names --
18              THE COURT:  Okay.  I want to see a copy of
19    it.  She is getting a copy.
20              MS. VOLLMAN:  Judge, we received a
21    subpoena, I assume, pursuant to 24.03.  One of the
22    issues that I think needs to be addressed is the
23    materiality of the information that they are seeking.
24    And in addition to that, we have asserted a privilege
25    of work product regarding one of the documents that
```

1    they have requested.  And the other document we

2    believe should remain confidential because of the

3    nature of the document itself.  And we, also, if the

4    Court is so inclined, we would like to present those

5    to the Judge for an in camera inspection regarding

6    those three issues.

7                    THE COURT:  Response?

8                    MR. CHARLTON:  Yes, sir.  As to the second

9    response about I understand the confidentiality that

10   they seeking, especially, I presume, they are

11   referring to item number two in their response, given

12   the nature of the information we are seeking, we have

13   no objection to having these proceedings, as far as

14   that particular document, conducted in private, and we

15   would waive a public hearing on disclosure of that

16   particular document in evidence relating to that

17   particular document.  So, I mean, if the Court is of

18   concern about the nature of the privacy and you would

19   rather me not make recitations in the record, then my

20   suggestion would be that either clear the courtroom or

21   go back into your chambers and have the discussion

22   back in chambers.

23                   THE COURT:  So the argument basically of

24   the State is it's confidential.  It is not an

25   alternative argument, that it is not germane to the

1    issues at hand?

2              MS. VOLLMAN:  That is the case and it's

3    irrelevant.  It's not material to the case.  And I

4    don't want to be arguing the motion for new trial in

5    the validity of that with the prosecutors that are

6    handling it.  As far as the documents, it is not

7    material.  These documents are not material, and I

8    think the materiality would be to the Court upon a

9    recap and the other document, which we are asserting

10   is a work product document.

11             MR. CHARLTON:  If I can respond to that, I

12   think we can make a very good materiality argument.

13   And for several reasons, I just don't want to start

14   treading on that.  If the State has a fear about

15   disclosure of information that is addressing item

16   number two in their motion, then I would prefer -- I

17   don't mind acquiescing to that fear.  I'd just rather

18   make my discussions about materiality in private in

19   order to accommodate that interest.  However, you

20   know, we are fully prepared to make a very cogent and

21   a persuasive argument why those documents are at

22   issue.

23             THE COURT:  Okay.  Do you have the

24   documents with you?

25             MS. VOLLMAN:  For record, I am presenting

1 to the Court a manila envelope that has the documents

2 that are subject of the subpoena to custody for an in

3 camera inspection and request that it be kept

4 confidential.

5    THE COURT:  Okay.  Let me quickly go back

6 to chambers and read those documents and what is

7 applicant and whether or not subject to disclosure.

8    MS. VOLLMAN:  One additional fact:  We

9 would ask you to take notice of the expiration date

10 that is reflected on it.

11    (Recess taken.)

12    THE COURT:  I have reviewed the

13 documents.

14    Is there anything further before I make a

15 determination as to whether or not the subpoena will

16 be quashed or not?

17    MR. CHARLTON:  I think the only concern,

18 whether you want us to address our arguments about why

19 it is material.

20    MR. SCHNEIDER:  Excuse me.

21    (Off-the-record discussion held.)

22    THE COURT:  Okay.  Well, let's get back on

23 the record.

24    I have read now both arguments in camera.

25    Does defense counsel wish to argue about

1    the relevancy based on the documents that I reviewed

2    and the dates that are applicable to these documents?

3            I do not see the relevancy at all with

4    regard to the trial of this case or the testimony of

5    anybody that has provided any evidence in this case

6    regarding the effect of these documents on that

7    person's testimony.

8            MR. CHARLTON:  Then in order for us to go

9    forward again -- and, again, I am suggesting this

10   because I want to accommodate their interests by

11   keeping certain matters confidential -- I would like

12   to go ahead and make a proffer to the Court of why we

13   think it is relevant.

14           THE COURT:  Let me rule.  I rule that the

15   subpoena is to be quashed, and I'll allow you to make

16   a proffer.

17           MR. CHARLTON:  Do you want to do it in

18   private?

19           MS. VOLLMAN:  We would do that.  For

20   record, you know, for obvious reasons now that you

21   have had an opportunity to look at the documents,

22   there are concerns.

23           MR. SCHNEIDER:  May those documents be

24   sealed?

25           THE COURT:  We can do that after the

1    hearing or do it now.

2              MR. CHARLTON:  I am trying to accommodate

3    Ms. Vollman's schedule because we ask that those

4    records be sealed and made part of the appellate

5    record.

6              So, sorry, do you want to wait?

7              MS. VOLLMAN:  Whatever you all want to

8    do.

9              THE COURT:  Okay.  Let's go back in

10   chambers and take care of this matter.

11             MR. SCHNEIDER:  May we bring Mr. Munier

12   with us?

13             (Whereupon, the following proceedings were

14   held in the Judge's  chambers.)

15             THE COURT:  Okay.

16             MR. CHARLTON:  Thank you for allowing us

17   this opportunity.

18             It's our position that the State left you

19   with the impression the last time that in the course

20   of investigating the extraneous offense that there was

21   a Cuban national Fugon, who was convicted of a crime

22   and put his case on appeal and, therefore, was

23   invoking his Fifth Amendment privilege and was

24   unavailable.  And that's why they didn't go any

25   further.

 1            THE COURT:  I was a witness to his counsel

 2   being very emphatic about the fact that he was not to

 3   testify.  And that's about the extent of it that I

 4   have had any personal dealings with her or him.

 5            MR. CHARLTON:  Nevertheless the State's

 6   position was that Balderas just fell into their lap --

 7   and that is my words, not theirs -- appeared as a

 8   friendly witness between voir dire and the

 9   commencement of the trial.  As a point of where they

10   were unable to comply with your order regarding those

11   extraneous offenses, we think then that the documents

12   that you have show that this witness Balderas had a

13   relationship with the district attorney's office -- an

14   extensive relationship with the district attorney's

15   office -- that existed several months prior to the

16   commencement of the trial.  And I think the record

17   reflects at one point there was even an April trial

18   setting in this particular case.

19            THE COURT:  How is it a correlation, the

20   fact he may or may not have had a relationship with

21   the district attorney and counsel trying this case had

22   any idea there was a relationship there that he was

23   involved in this case whatsoever?

24            MR. CHARLTON:  I think that's our point,

25   that secondary point in this matter.  The State's

1    position is that, you know, Balderas apparently was

2    unavailable.   That's not accurate.   He had a working

3    relation and we believe the documents speak of an

4    ongoing working relationship with the State of Texas

5    out of which he received a dismissal of a major drug

6    case.

7            The second part to that problem -- and

8    this is the more problematic -- that relationship with

9    the State and his desire to work with the State in

10   order to secure dismissal of the case, not disclosed

11   to trial counsel when Mr. Balderas testified, and we

12   think that should have been disclosed under Brady.

13   That's impeachment, exculpatory, and that should have

14   been disclosed, so you have really a two-fold problem

15   is that they should have found out and they could have

16   known about Balderas and his role and his willingness

17   to cooperate had they simply gone over to whoever

18   negotiated on behalf of the State.   And I presume that

19   was Mr. Lambright.   I presume that.   I don't know

20   that, but I presume that's the case.

21           And, secondly -- and, really, what's far

22   more important about that relationship and his

23   willingness to work for the State in order to get

24   himself out of a serious jam was never disclosed to

25   Mr. Odom under Brady.

1           And we have a case called -- with the

2   Fifth Circuit, granted relief and a capital case  that

3   was released six weeks ago where that precise -- not

4   precise impeachment evidence but that kind of similar

5   kind of impeachment evidence -- well, at least

6   impeachment -- whether similar I'll leave you to

7   decide -- but impeachment about the only witness to an

8   extraneous offenses offered at the punishment phase

9   was not disclosed to the State or to defense counsel

10  before trial.  And so we think that this relationship

11  that Mr. Balderas had with the prosecution and the

12  district attorney's office is extremely relevant for

13  two very important issues.

14          THE COURT:  I could see your point if

15  there was an ongoing relationship, if the documents

16  were to be clear enough that any relationship that may

17  was already either -- well, let's say concluded well

18  before the trial date, how exactly would that impact

19  on Mr. Balderas' testimony?  His obligations were

20  totally severed at that point.

21          MR. CHARLTON:  Davis versus Alaska, it is

22  the witness' motivation that has to be explored in

23  front of the jury, his bias or willingness to

24  cooperate with the State is the appropriate area for

25  cross examination.  Under Green versus State, you

1    know, even if he were to deny on the stand that he had

2    any such motivation is no moment.  The language from

3    Green, an incredible denial is probably more probative

4    of his credibility than credible admission that he had

5    such an interest.

6              THE COURT:  Well, again, I go back and

7    I'll let the State pick this up -- I go back to the

8    fact there is a contract and that contract has been

9    fulfilled and concluded well before the time of

10   trial.  I don't really see the correlation between Mr.

11   Balderas' testimony to be in favor or biased in favor

12   of the State, any or all obligations that he may or

13   may not have had with the State will be concluded long

14   before the trial occurred, such that he would be under

15   no incentive to taint his testimony, given the fact

16   that any charges that may have been at one time

17   pending against him had been concluded.

18             MR. CHARLTON:  Again, those charges can be

19   resurrected but nevertheless and within the statute of

20   those charges resurrected, he still has a motive to

21   stay on the --

22             THE COURT:  Does the State wish to

23   respond?

24             MS. VOLLMAN:  Judge, there is a case --

25   this is a Court of Criminal Appeals out of Texas and

1     an Ex Parte Scott Kimes.  I think 872 SW 2d, 700.

2               THE COURT:  Spell that.

3               MS. VOLLMAN:  K-I-M-E-S -- and it

4     basically talks about the Brady issue, if a prosecutor

5     fails to provide certain evidence.  The Court on page

6     702 said, "Thus, under Bragley, a due process has

7     occurred if" -- referring back to because information

8     that was not provided under Brady has occurred -- if

9     the prosecutor failed to disclose the evidence, the

10    evidence is favorable to the defendant; and the

11    evidence is material, such that there is a reasonable

12    probability that had the evidence been disclosed to

13    the defense, the outcome of the trial would have been

14    different."

15              "A prosecutor does not have a duty to turn

16    over evidence that would be inadmissible at trial.

17    Evidence offered by a party to show bias of an

18    opposing witness should be excluded if that evidence

19    has no legitimate tendency to show bias of an opposing

20    witness."

21              And I think in this particular case it's

22    not directly on point, but I think it does go to show

23    that the crucial issues in this case, what bias would

24    that man have if the contract was completed and it was

25    over, one issue, you know, one case.  It was

1    completed, and it was over with by the time he

2    testified.

3                    THE COURT:  That's my point.

4                    Does the State wish to further comment on

5    the record?  Does that pretty well qualify?

6                    Anything further for the proffer?

7                    MR. CHARLTON:  We proffer the testimony of

8    Mr. Balderas' counsel, John Munier, who would testify

9    about the circumstances about that agreement.  And we

10   would offer his testimony.

11                   Did you want to add anything to that,

12   Stanley?

13                   MR. SCHNEIDER:  Mr. Munier would testify

14   that there was a contract and the contract was in

15   terms whether it was going to be fulfilled.

16                   THE COURT:  Why do we need the testimony

17   if I already read the contract?   Is there an

18   obligation as part of the appellate?

19                   MS. VOLLMAN:  I have one question.  Since

20   the subpoena is quashed, I want to run one thing down

21   with my counsel across the --

22                   THE COURT:  Depends on whether or not Mr.

23   Munier's testimony is necessary or not.

24                   MR. VINSON:  The contract speaks for

25   itself.

1          THE COURT:  If we are not going to offer

2     the contract to appellate and obviously there may be

3     some necessity for Mr. Munier to testify.

4          MR. SMYTH:  Judge, first of all, we

5     stated, and I think Mr. Vinson clearly stated on the

6     record when he was on the stand, that we didn't make

7     any deals with Mr. Balderas.  We didn't know he had a

8     contract with our office for anything regarding that

9     prior conviction.  He came in, as the Court recognized

10    five or so months.  He completed whatever contract he

11    had with some other portion of our office, and we

12    didn't ask him for anything other than to tell us what

13    happened.  We didn't offer him anything.  We went down

14    and got use immunity for his testimony but we didn't

15    tell him we had it.  Everything was disclosed.

16         THE COURT:  Excuse me.  For the record, I

17    know we probably have it somewhere else at this

18    particular hearing, what is it Mr. Odom was told about

19    Mr. Balderas' background regarding any matter?

20         MR. SCHNEIDER:  We can ask Mr. Odom.

21         MR. SMYTH:  I honestly -- I know I told

22    who he is and had a relationship with your client for

23    a number of years, and then gave him a copy of the

24    offense report in which Balderas' name came up and

25    somebody had a connection with him.

1          THE COURT:  My understanding is that Mr.
2     Balderas was not charged in that offense.
3          MR. VINSON:  He was not going to be
4     charged.  And we made Mr. Odom aware of that.
5          THE COURT:  And the reason was
6     insufficient evidence.
7          MR. SMYTH:  To his testimony, we couldn't
8     corroborate anything he said.  We couldn't use it.
9          THE COURT:  Mr. Odom was aware?
10          MR. SMYTH:  Sure.
11          THE COURT:  Your testimony a moment ago
12     was you did not know there was a prior contract.
13          MR. SMYTH:  We didn't have any idea of
14     John Munier and George Lambright of special crimes
15     ever working out a contract and disposing of any case.
16     We just knew the case, according to Balderas, got
17     disposed of somehow.
18          THE COURT:  Go ahead.
19          MR. SCHNEIDER:  Mr. Smyth just stated that
20     Mr. Balderas got use immunity, a formal use order.
21          MR. SMYTH:  No, there wasn't.
22          MR. SCHNEIDER:  That was not disclosed?
23          MR. VINSON: Don't say it was not
24     disclosed.  We made -- if you are an attorney, and if
25     I come to you and I say that we are not going to

```
 1    prosecute him, I don't care what he said on the stand
 2    about this offense, as long as he didn't kill anybody,
 3    we are not going to prosecute, what does that say to
 4    him.
 5              MR. SCHNEIDER:  That means you are not
 6    going to need use of immunity.
 7              MR. SMYTH:  There was no formal order
 8    entered.
 9              THE COURT:  That's enough of that.
10              Fine.  I think the record is clear that
11    there was a contract.  I think I have indicated, from
12    my reading of that document, that the contract had
13    been fulfilled many months before the testimony of Mr.
14    Balderas, that any obligations under that contract
15    were concluded by the time he testified.  And I still
16    believe the documents, as I have said, are
17    confidential and are not relevant to the issues with
18    regard to the motion for new trial.
19              What else do we need to proffer?
20              MR. CHARLTON:  The only thing, Ex Parte
21    Castellano and on there is an extensive discussion of
22    imputed knowledge that Mr. Smyth's argument about
23    someone else in the office knew this and Mr. Vinson
24    and I didn't know is of no moment.  That if one branch
25    of law enforcement knows of this evidence, the
```

1    responsibility has to be shared by all of them.   Ex

2    parte Castellano -- and assuming Mr. Lambright

3    negotiated the agreement on behalf of district

4    attorney's office and that knowledge is imputed to Mr.

5    Vinson and Mr. Smyth.   We have a copy of Castellano

6    and his argument he didn't know is legally of no

7    moment.

8              The other thing that we do ask that, since

9    you have quashed the subpoena and I am presuming that

10   you don't wish to hear from Mr. Munier on the stand,

11   we would ask --

12             THE COURT:   Not that I don't like Mr.

13   Munier.

14             MR. CHARLTON:   I understand.

15             MS. VOLLMAN:   Before you do that, I would

16   rather not attach an in camera.

17             MR. CHARLTON:   That's what we are going to

18   ask that you seal the documents and treat them as part

19   of the appellate record.

20             THE COURT:   Before I agree to do that,

21   I'll give both sides time expeditiously to provide my

22   guidance as to whether or not that is necessary,

23   required.   I think, I take it, the State will do that

24   and, certainly, the defense.   You will have an

25   opportunity to show whether or not based upon the fact

1    that I have now quashed the subpoena as to whether it

2    is proper to attach those documents, which I have

3    ruled are confidential, as part of the appellate

4    record, which somewhat compromises and I think

5    confidential.

6            MR. CHARLTON:  We would agree, however,

7    that if your attachment as a part of an appellate

8    record that they should be sealed from public view so

9    that only to be examined either on motion by us in

10   front of the Court of Criminal Appeals or by the Court

11   of Criminal Appeals.

12           THE COURT:  I am prepared to make a ruling

13   on that tomorrow so I would want something

14   expeditiously to determine whether or not there is any

15   law or anything else that guides me in that matter.

16           MS. VOLLMAN:  We also ask that this

17   particular part of the hearing be sealed.

18           THE COURT:  It is sealed.

19           Anything further before we go back in the

20   courtroom?

21           MR. SCHNEIDER:  The attorneys have to have

22   access to this hearing to do the record.

23           MR. CHARLTON:  I sealed it for the public

24   record.

25           THE COURT:  Certainly.  I am talking not

1    to be disclosed publicly.

2              Anything further?

3              Let's go back in the courtroom and

4    continue where we left off.

5              (Whereupon, the following proceedings were

6    held in open Court.)

7              THE COURT:  All right.  Let's get on the

8    record, please.

9              Let the record reflect that I have now

10   agreed to attach those documents as part of the

11   appellate record, that they will be sealed but will be

12   attached to the appellate record.

13             Let's proceed on behalf of the defense, I

14   guess.

15

16

17

18

19

20

21

22

23

24

25

1          Is there any necessity to swear Mr. Odom

2    again?

3          MR. CHARLTON:  No, sir.

4          THE COURT:  Let's proceed.

5          MR. SCHNEIDER:  The State asked to see an

6    original of document we provided them last week.  The

7    original needs to stay in Mr. Dennes' file, and we

8    object to them taking the original and marking the

9    original document and attempting to offer the original

10   document in Mr. Dennes' file and try to stay in.  That

11   needs to be there.

12         MR. VINSON: The reason we want to offer

13   the original, we cannot read the duplicate.

14         MR. SMYTH:  The copy provided to us, it's

15   not their fault but the pencil marks don't come

16   through.

17         MS. KAHN:  We can try to make a better

18   copy of that.

19         THE COURT:  Excuse me.  Let me make a

20   ruling.  We will allow the original at this time,

21   subject to the fact that the defense has an absolute

22   right to substitute the original for an adequately

23   readable copy.

24         MR. VINSON:  We have no objection to that.

25         Your Honor, we have had marked State's

1   Exhibit 1 for identification, a drawing of the

2   defense's strikes in the Reinaldo Dennes' case.  We

3   will make it as State's Exhibit 1.  Mr. Odom has an

4   opportunity to look at that.

5                   (Whereupon, State's Exhibit No. 1 was

6   marked for identification.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          WENDELL ODOM,

2    was called as a witness by the State and, having been

3    duly sworn, testified as follows:

4                          EXAMINATION

5    BY MR. VINSON:

6         Q       Is that the original of the strikes you

7    made during the course of trial?

8         A       Yes.  This is my original chart that I did

9    my strikes off of it, the day we did our strikes.

10             MR. VINSON: Your Honor, we will offer into

11   evidence for the appellate record, with the

12   understanding of the Court's ruling, where the defense

13   will make a readable copy available to the Court.

14             THE COURT:  Let me further expand upon

15   that.  If the defense also is trying to make a copy,

16   the pencil don't come out, as long as the defense

17   reproduces any markings that are not recordable by use

18   of a copy machine, if they will make identical

19   reproduction by hand, I think that will suffice.

20        Q       (Mr. Vinson)   Now, if you will continue

21   to look at State's Exhibit 1 there, Mr. Odom.  Now, so

22   that the record can be quite clear on this, you use

23   your first strike striking Mr. Thomas John Kelly, is

24   that correct, and that was 4 in the pool?

25        A       Yes.  I had him on less as 23, number 4 in

1    the pool, and I believe that is my first strike.

2         Q       And then number 7 in the pool, Martha Jean

3    Gutierrez G-u-t-i-e-r-r-e-z?

4         A       Gutierrez, I believe, was my second

5    strike.

6         Q       Then number 9 was your third strike; is

7    that correct?

8         A       The one I have listed is number 36, Mr.

9    Alamo.

10        Q       Alaimo?

11        A       R-O but maybe it's an "E".

12        Q       And M-O.  And that was the third strike?

13        A       Yes, sir.

14        Q       And then you struck number 10 in the pool,

15   Daniel Lee Williams?

16        A       Yes, which I have had listed as number 37.

17        Q       And that would be the fourth strike?

18        A       Yes, sir.

19        Q       And then your next strike -- you skipped

20   over -- number 14 in the pool was a Yomi M. John,

21   J-o-h-n?

22        A       Yes.

23        Q       And that was your fifth strike, correct?

24        A       Yes, I had listed as juror number 54.

25        Q       Right.

1      Q      And then you skipped over number 16 in the

2   pool and that was Ms. Irene Collins, correct?

3      A      Well, I didn't strike her but Ms. Irene

4   Collins was number 16 in the pool, if that's your

5   question.

6      Q      Okay.  But I mean, when we accepted her,

7   is that correct, the State?

8      A      Yes, sir.

9      Q      And then you had to follow suit and accept

10  her and you did?

11     A      Right.

12     Q      And at the time you accepted her you had

13  on your chart there D plus, correct?

14     A      Yes.

15     Q      And you made no complaint to His Honor at

16  that time; isn't that correct?

17     A      I believe I made my complaint at some

18  point, re-urged my cause strikes.  I don't remember

19  the time I did that.  I think I did that after we did

20  all of our strikes.

21     Q      But I am saying at the time we accept Ms.

22  Collins, the State.

23     A      Right.

24     Q      And when you accepted Ms. Collins, there

25  was no complaint lodged to His Honor the record will

1    reflect?

2          A     I think that's right.  I'm not arguing

3    with that.  I just don't remember.  I remember at one

4    point I explained -- I renewed my objections for cause

5    because I had already asked -- objected to this

6    particular juror for cause.  I renewed them at some

7    point.  I think you are right.  I don't think I did it

8    then.  I may have done it later on.

9          Q     Right.  And you understand the procedure

10   in a capital case, correct?

11         A     Well, I think so.

12         Q     Right.  And then the next strike was the

13   number 17, a Bruce Alan C-r-o-u-c-h?

14         A     Yes.

15         Q     And that was your sixth strike?

16         A     Yes.

17         Q     And Mr. Crouch had a D plus as well,

18   correct?

19         A     Yes.

20         Q     And we accept Mr. Crouch, correct?

21         A     Yes.

22         Q     And then you struck Mr. Crouch?

23         A     Yes.

24         Q     And then we proceeded on.

25               Now, with juror number 4, I think you had

1    already listed down you tried to get that juror for

2    cause early on, correct?

3         A     I don't know.  I'll have to check to see.

4    I'll take your word for it if I did.

5         Q     Okay.  That's Mr. Kelly.  And then you

6    tried to get Ms. Pedigo for cause on voir dire?

7         A     Yeah, my notes reflect that.

8         Q     And failed to do so.  And then you tried

9    to get Ms. A-l-a-i-m-o for cause during voir dire?

10        A     Ms. Alaimo, yes, I believe that is

11   correct.

12        Q     And you failed to get that person for

13   cause?

14        A     Right.

15        Q     And then you tried to get Mr. Williams,

16   Daniel Lee Williams, number 10 in the pool, for cause

17   during voir dire?

18        A     That's correct.

19        Q     And you failed to get that person for

20   cause?

21        A     Apparently.

22        Q     And then you tried to get Mr. Yomi M. John

23   for cause during the voir dire?

24        A     I don't know that.  My notes don't reflect

25   that.  You are probably right.  I just don't know

1    that.

2         Q       And you failed to get that a person for

3    cause.  And then you tried to get Ms. Collins for

4    cause during voir dire?

5         A       I do.  I refreshed my notes on Ms. Collins

6    and I believe that is correct.  Yes.

7         Q       And then you tried to get Mr. -- I'm sorry

8    -- tried to get Crouch for cause.

9                 But you will agree with me that everybody

10   that you tried to get for cause during the regular

11   voir dire, when you got a chance to exercise the

12   strike peremptorily, you did strike them except Ms.

13   Collins?

14        A       I don't know that.

15        Q       Well, I am saying by the time you got to

16   Ms. Collins --

17        A       I don't know that.  You may be right.  I

18   haven't looked at each one of these to determine if I

19   had made a motion for cause on those particular

20   jurors.  If that's what the record reflects, then,

21   yes.

22        Q       And when you accepted Ms. Collins who had

23   a D plus, and you had to affirmatively make a step to

24   do that but yet you struck Mr. Crouch with D plus; is

25   that correct?

1        A       That's correct.

2        Q       And at the time you did that you still had

3    a hand full of strikes?

4        A       I still had a number of.

5        Q       Ten strikes?

6        A       That's right.  We were striking these so I

7    knew the entire panel so I had to allocate my strikes

8    for the other jurors that were still coming up that I

9    had rated an F or a D minus.

10       Q       And you were aware that His Honor would

11   have considered additional strikes if you exercised

12   all your strikes, exhausted your strikes, and the

13   occasion dictated such?

14       A       I knew if I asked for them that he would

15   listen to me.  I didn't know whether I would get

16   additional strikes.

17       Q       I understand.

18               Now, are you aware -- and I mean you have

19   did a lot of trial work, correct?

20       A       I have tried a lot of cases.

21       Q       And a lot of appellate work?

22       A       I have done appellate.

23       Q       Are you aware in the capital case where

24   the State is seeking a death penalty where the Judge

25   refuses to grant a couple of strikes?

1          A       I have never done an appeal on a capital

2     case and I have never tried a capital case before.

3          Q       Are you aware or read any case that the

4     Judge refused to grant defense counsel?

5          A       I have not.  I don't know whether I have

6     or not, Mr. Vinson.  I really don't.  I have -- I'm

7     not a capital appellate lawyer.  I have never looked

8     at that issue.

9          Q       It's common knowledge in most capitals, in

10    death cases, if the defense exhausts the strikes, the

11    Court will generally grant a couple of more strikes?

12         A       I did not know that.

13         Q       You weren't aware of that?

14         A       I was told afterwards by Mr. McDonald,

15    hey, you might have counted on some extra but I did

16    not know that when I was making these strikes.  I did

17    not know it was a guarantee at all.

18         Q       But you did ask for two additional

19    strikes?

20         A       I did.

21         Q       And you didn't even use those, did you?

22         A       No, I didn't.  But when I got those, I was

23    at juror number 41, I believe, and if I had used those

24    strikes that I would have gotten, I would have ended

25    up with a worse juror at that point than I would have

1      if I didn't use those two strikes.

2          Q       But you would agree that is your duty to

3      exercise your strikes and then ask the Court for

4      additional strikes when you run out?  That's your

5      duty?

6          A       The law says -- I don't know about my duty

7      but the law says if you have used up all your strikes,

8      you can ask the Court for additional strikes.

9          Q       And what I am saying, you can't go for

10     strikes while you still have strikes so your duty is

11     to exhaust the strikes, if necessary?

12         A       That is true.  But most capital cases are

13     not picked in this manner.  In most capital cases, one

14     juror comes up and after you voir dire your juror,

15     then you make your selection or you don't make your

16     selection, at least that's what I was told.

17              Here we had a regular panel, and I was

18     able to look at this exhibit one here and I was able

19     to allocate the really bad jurors and the ones that I

20     wanted to get rid of the most.  So although I could

21     have used up all 12 of my strikes on the first 12, I

22     suppose if I had done that, I knew good and well what

23     I had lurking upon me in the next three or four

24     columns.

25         Q       But you had, I mean, this wasn't an

1    overnight thing that juror had been put in the pool

2    for sometime.  They had been going in the pool.  You

3    had an opportunity to go home in the evening, rehash

4    the day.  It wasn't like an immediate response that

5    you had to make a selection at that time?

6         A      No, not at all.

7         Q      You were allowed to think?

8         A      No, sir, not at all.  That's why I had an

9    a big chart.  I knew if I struck Ms. Collins, I was

10   going to have to eat Mr. Darrow, number 120, or Ms.

11   Miller, number 122, which I had rated in my mind even

12   much worse than Ms. Collins.

13        Q      But just a couple of last questions here,

14   with respect to Ms. Collins, have you had a chance to

15   review your voir dire of Ms. Collins?

16        A      No.

17        Q      Would you like to do that sometime today.

18   The Judge will make a ruling tomorrow.  Could you

19   review your voir dire of Ms. Collins and see if you

20   asked her any specific questions about any criminal

21   background?

22        A      I'm sure I didn't ask her any questions

23   about her criminal background because I was relying

24   upon what she put on her questionnaire.

25        Q      Again, too, you would agree with me that

1    this is a tactical decision that an attorney makes

2    whether to go into those matters or not, correct?

3        A    Yes.  But that decision is made upon the

4    sworn questionnaire you get from the jury panel.

5        Q    And Ms. Collins was sworn when she took

6    the stand?

7        A    I'm sure she was.

8        Q    Because the record reflects that?

9        A    Yeah.  That's the way we normally did it.

10   I'm sure she was.

11       Q    And she is sworn at that time to tell the

12   truth?

13       A    Right.

14       Q    And everything you put to her you didn't

15   find any untruthfulness with it?

16       A    No.  My understanding, also, she was sworn

17   down there when she filled out that questionnaire,

18   too.

19       Q    But you know from your own eyes that she

20   was sworn in the courtroom?

21       A    Well, we also had a discussion and were

22   told --

23       Q    Just if I could.

24       A    And they were told and, yes, I did know

25   from my own eyes that she was sworn when we did our

1    voir dire.

2        Q       And you know you had an opportunity to

3    address any potential question about criminal history

4    when you were voir diring her?

5        A       We had a time limit.  Yes, You are right.

6    You are absolutely right, Mr. Vinson.  I knew that she

7    would have to answer any question that I propounded

8    that was a relevant question.

9        Q       Good.  So you can't sit here and say on

10   the record that you put any question to Ms. Collins

11   and she was dishonest with you?

12       A       Unless you say that I had input in that

13   questionnaire, in which case I can.

14       Q       On the record, the questionnaire was not

15   on the record, sir, the questionnaire?

16       A       The questionnaire was certainly on the

17   record.

18       Q       The question:  When you had a chance to

19   speak directly to Ms. Collins, did she ever tell you

20   an untruth on any question you asked her that you know

21   of?

22       A       When I talked to her, one on one, in the

23   voir dire, I didn't ask any question about her prior

24   criminal record and, as such, she didn't have an

25   opportunity to address that issue.

1      Q      And you had an opportunity to do that?

2      A      I did, had I not believed she had already

3   answered that question.

4      Q      And, incidentally, since we are here, did

5   you ever have an investigator looking for David

6   Balderas?

7      A      No.

8      Q      Well, who did --

9      A      Is Balderas --

10     Q      -- look David Balderas?

11     A      -- the extraneous guy?

12     Q      He was an extraneous guy.  Didn't you have

13   an investigator looking for him?

14     A      At one point I did until we had our

15   hearing back in chambers where I was led to believe

16   that we weren't going to go into the extraneous

17   offense.  And at that point I laid off on extraneous

18   offenses.  They are not going to come in.

19     Q      When was this investigator looking for

20   David Balderas?

21     A      I don't know if he looking for him or

22   running records or what he was doing but it would have

23   been shortly prior to the hearing that we had on the

24   extraneous offenses.

25     Q      Let's make it short.  He was looking for

1    Mr. Balderas way before we gave you any information on

2    the subpoena on Mr. Balderas, wasn't he?

3        A       If Balderas is the extraneous guy?

4        Q       Yeah, that's what we are talking about.

5        A       I don't believe it is true.  It may be but

6    I don't remember it that way.

7        Q       Do you have any reason why Mr. Balderas

8    would have told me that somebody was looking for him,

9    had been looking for him, an investigator?

10       A       I don't know everything my investigator

11   did.  And, I mean, I'm not quarrelling with you.  I

12   don't remember that we concentrated on Balderas until

13   after you informed me about the -- gave me those

14   extraneus but I may be wrong about that.  I don't

15   remember that.

16       Q       But Mr. Balderas wasn't a total stranger

17   to you nor a stranger to you or your client, was he?

18   I'm not going into attorney client privilege.  I'm not

19   saying -- he wasn't a total stranger?

20       A       I don't recall.  I would have to look at

21   my notes.  I do not recall what knowledge I had of Mr.

22   Balderas prior to you informing me the morning you

23   informed me of the extraneous offenses on punishment.

24       Q       But your only claim that you were

25   surprised that we were going to be able to use it.

1      You weren't surprised that Mr. Balderas possibly could

2      be a witness?  That didn't surprise you?

3          A      Well, I believe that the day you told me

4      that it was going to be an extraneous offense you had

5      also subpoenaed -- had issued a subpoena for it.

6          Q      Yeah.  And I made you aware of that.

7          A      I believe you did.  Yes.

8          Q      And it didn't come as a surprise to you,

9      did it, in terms of who the witness would be?

10         A      In terms of who it was going to be, no.

11         Q      No.

12                MR. VINSON:  I have no further questions,

13     Your Honor.

14

15                          EXAMINATION

16     BY MR. CHARLTON:

17         Q      The bottom line, I think, from my

18     perspective, at the time when you were exercising your

19     peremptory challenges is the reason you chose not to

20     exercise a peremptory challenge on Irene Collins

21     because you thought you were looking at worse jurors

22     down the road and wanted to save the strikes?

23         A      No question about it.

24         Q      Had you known what you know now about Ms.

25     Collins, would you have exercised a peremptory on her?

1          A       Absolutely.

2          Q       When you were in voir dire, you were in

3     one of these smaller rooms that is reserved for

4     capital jury selection; is that not right?

5          A       During most of it.  Sometimes we came down

6     to the courtroom but most of the time we were in one

7     of two rooms that we pick capital jurors out.

8          Q       Can you describe the physical plant or the

9     physical description of the small courtroom where you

10    were.

11              THE COURT:  What's the relevancy?

12              MR. CHARLTON:  The State has argued on

13    their last hearing that they had an open file -- or

14    not an open file -- had a file laying out on the table

15    with the criminal histories of the jurors that was

16    available to the defense.  And I can proffer the

17    testimony as easily but the particular room where this

18    was done has a very large post in the middle between

19    the defense table and the prosecution's table, making

20    it physically cumbersome to reach over and take papers

21    off the table of the prosecution.

22              THE COURT:  Well, that's, frankly, not

23    accurate.  We were in one room at some point in time,

24    and I know for an entire week we moved over to the

25    larger of the two rooms.  One those two rooms

1    certainly did not have that column that was impeding

2    anybody's view.  So you proffered what you need to.  I

3    don't want to rehear everything we heard last

4    Thursday.  I think it's been evidenced that the file

5    was there, that it was made available.  And I think we

6    ought to move on.

7             MR. CHARLTON:  Thank you, Your Honor.

8        Q      Did you ever see the computer printout

9    history of Irene Collins of her criminal history?

10       A      Not to my recollection, no.

11       Q      Were you ever told or ever given those

12   documents by the prosecution?

13       A      Not that I was told.

14       Q      Before were you ever told before her voir

15   dire that those documents were available to you?

16       A      Not that I am aware of.

17       Q      About, Mr. Balderas, I have some documents

18   that I would like to show to you.

19             MR. CHARLTON:  May I approach?

20             THE COURT:  Certainly.

21             MR. CHARLTON:  I will tender for

22   admission, Your Honor, Defendant's 28 and 29, that

23   being a complaint, a motion to dismiss, actually --

24   I'm sorry, information goes on the motion to dismiss

25   and an indictment and a motion to dismiss on a David

1    Rene Balderas and ask that be made part of the record.

2    I would like to use them for examination of this

3    witness.

4              THE COURT:  Mr. Vinson.

5              MR. VINSON:  For what purpose, Your

6    Honor?

7              MR. CHARLTON:  Merely whether they were

8    shown to Mr. Odom before Mr. Balderas testified.

9              THE COURT:  All right.

10             MR. VINSON: May I see them?

11             First of all, I would like to make two

12   comments.  First of all, we were not aware of it; and,

13   second of all, there's a complainant in here and we

14   wouldn't have the authority to just dismiss a case

15   where we have a complainant alleging an injury; and,

16   thirdly, it's not an impeachable offense.  And even if

17   it had been dismissed, I would have shown it to him if

18   I had knowledge, if it is not impeachable unless he

19   could tell me some reason it is necessary.  These are

20   not impeachable offenses.

21             MR. CHARLTON:  Again, our position is, as

22   we have reiterated previously, is that there was a

23   motivation for Mr. Balderas to testify the way he did,

24   and we think that these are simply other aspects of

25   that motivation.

1          THE COURT:  When were they dismissed?

2          MR. VINSON: This was dismissed, Your

3    Honor, by someone in misdemeanor back on the 23rd day

4    of August, 1996, and that allegation is against a

5    Sylvia Casillas, C-a-s-i-l-l-a-s.  So what authority

6    would Mr. Smyth or myself have to dismiss a case where

7    we have a complainant?

8          THE COURT:  Let's not be walking up and

9    back and forth.  Please take your seat.

10          The motion is overruled.  If you want to

11    attach it to the appellate record, we can do that.

12          MR. CHARLTON:  We have no further

13    questions of Mr. Odom.

14          THE COURT:  Thank you.

15          Anything further from the State?

16

17                    EXAMINATION

18    BY MR. VINSON:

19      Q     What you are saying you just don't

20    remember if you checked those criminal histories?

21      A     No, no.  And I believe I testified to this

22    the other day.  I have no independent recollection you

23    showed me --

24      Q     Just a minute.

25          MR. CHARLTON:  Objection, let him answer

1    his question.

2              MR. VINSON: We can go on for a day.

3              MR. CHARLTON:  He asked a question and he

4    is entitled to answer it the best way he can.

5         A    There were occasions when I was shown

6    criminal history records.  As to Ms. Collins, I have

7    no independent recollection that I wasn't shown this

8    until I go and look at my notes and realize that there

9    is no notation in my notes.  And I don't remember any

10   criminal history record on her, which is why I say

11   that I was never shown any criminal history record on

12   Ms. Collins.  But as far as every single time you did

13   show me one or you didn't show me one, I would have to

14   look at my notes to try to figure that out.

15        Q    Okay.  Now, you do realize that we never

16   pointed out criminal histories on anybody.  We brought

17   them in the courtroom.  We made you aware that they

18   were there and we left them on the table.  We never

19   hid them.

20        A    I don't know about never hiding them but I

21   have a different recollection of the procedure.  And I

22   definitely remember several occasions by several more

23   than two wherein I was specifically given a criminal

24   history record of a potential venireman that we were

25   doing a voir dire on.  I do not recall any arrangement

1    on the desk.  That's not to say that you didn't have

2    something on the desk that I could have seen.  I just

3    don't recall that arrangement.

4         Q    What I am saying, we always ran those

5    criminal histories the minute we got those jurors.  We

6    run the criminal history and that was the procedure.

7    And we would bring them back the next day, after they

8    were run.  We bring the criminal histories back with

9    all the jurors who had a criminal history and that was

10   the way it was done.  It was brought in every day.

11   Nothing was hidden from you.

12              MR. CHARLTON:  Object to this question.

13   Is that a question or Mr. Vinson testifying?

14              THE COURT:  I agree we testified last

15   week.  If there's something new, we will go into it,

16   and I pretty well understand it.  And I think the

17   record is clear as to what the State's position is

18   with regard to those records.  I think Mr. Odom's

19   position is pretty clear as to what his understanding

20   was.

21              MR. VINSON:  We will move on, Your Honor.

22        Q    (Mr. Vinson)   And one final question:  I

23   think it was later determined that, based on what you

24   are saying, you later determined -- somebody

25   determined -- after the trial that Ms. Collins had

Page 151

1    received deferred adjudication for public lewdness?

2         A     I was told that and shown the records.

3    Yes.

4         Q     And your client had received a deferred

5    adjudication for public lewdness?

6         A     Right.

7         Q     Kind of go hand in hand?

8         A     It's not that she received the deferred

9    adjudication.  The reason I would have struck her

10   because she had, in my view, misrepresented to me on a

11   questionnaire a matter which means that every question

12   that I asked her in qualifying her for mitigation

13   issues and qualifying her for the future dangerousness

14   issues, she could not be trusted under oath because

15   she had already shown a propensity to misrepresent

16   under oath her true feelings about a capital case.

17   It's not because if she had answered the question,

18   yes, I received a prior public lewdness, I might have

19   wanted her as a juror.  The fact that she tried to

20   hide that in my mind would make her totally

21   distrustful to put on a capital case.

22              MR. VINSON:  I have nothing further.

23              THE COURT:  Mr. Charlton.

24              MR. CHARLTON:  Nothing further.

25              THE COURT:  May he be excused?

1          MR. VINSON:  May we mark number 2.

2          (Whereupon, State's Exhibit No. 2 was

3    marked for identification.)

4          MR. CHARLTON:  We are able to state

5    unequivocally we have no other witnesses or evidence

6    to present.

7          THE COURT:  What says the State?

8          MR. VINSON:  We have nothing further to

9    present.  We want the record to reflect initially the

10   fact defense's striking charts and we ask that it be

11   reflected as State's Exhibit 2.

12         MR. CHARLTON:  No objection.

13         MR. VINSON: And the State has nothing

14   further.

15         THE COURT:  And nothing further from the

16   defense?

17         MR. CHARLTON:  No, sir.

18         THE COURT:  And nothing else that we need

19   to do?

20         MR. CHARLTON:  I think you have resolved

21   the issue to the documents attached to the record.

22         THE COURT:  Very well.  I am ready to make

23   a ruling.  Any objection?

24         Do you want to provide some legal

25   authority to us?  You can provide me with legal

1    authority but I am ready to make a ruling.

2                Okay.   Motion for new trial is denied.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAUSE NO. 750,313

THE STATE OF TEXAS          IN THE 263RD DISTRICT COURT

VS                                    OF

REINALDO DENNES          HARRIS COUNTY, T E X A S


          I, Sharon Kay Cook, Official Court

Reporter of said court, hereby certify that the

foregoing pages comprise a true, complete and correct

transcript of the proceedings had in the above styled

and numbered cause.

          WITNESS MY HAND this the *13th* day of

*Fichey* _____, 1998.


                    Sharon Kay Cook
                    Official Court Reporter
                    301 San Jacinto
                    Houston, Texas 77002
                    713-755-6944
                    Certificate No. 1013
                    December 31, 1998