United States District Court
Southern District of Texas

**ENTERED**

March 23, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

REINALDO DENNES, §
§
            Petitioner, §
§
v. §
§     CIVIL ACTION NO. H-14-0019
LORIE DAVIS, Director, §
Texas Department of Criminal §
Justice-Correctional §
Institutions Division, §
§
            Respondent. §

## MEMORANDUM OPINION AND ORDER

Petitioner Reinaldo Dennes, currently in the custody of the Texas Department of Criminal Justice, filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. Dennes was convicted of capital murder and sentenced to death for the murder of Janos Szucs during the course of a robbery. This case is before the court on Dennes's First Amended Death Penalty Case Application for Post-Conviction Writ of Habeas Corpus ("Amended Petition") (Docket Entry No. 22) and Respondent Lorie Davis's Answer with Brief in Support ("Respondent's Answer") (Docket Entry No. 30). Having carefully considered the Amended Petition, the Answer, and the arguments and authorities submitted by counsel, the court is of the opinion that Dennes's Amended Petition should be denied.

## I. Background

The Texas Court of Criminal Appeals ("TCCA") set out the relevant facts in its opinion on Dennes's direct appeal.

> In December of 1995, Antonio Ramirez came from Ecuador to work in Texas. Shortly after his arrival, Ramirez met a man named Francisco Rojas who sold jewelry for [Dennes].[1] Some time later, Ramirez gave several rings to Rojas that he wanted to sell. Rojas then took Ramirez and the rings to [Dennes] at [Dennes]'s office in the Greenrich Building on Richmond Avenue. During this visit, Ramirez noticed a lathe in [Dennes]'s jewelry workshop and began to play with it. [Dennes] asked Ramirez if he knew how to operate the machine and Ramirez said that he did. [Dennis] then "hired" Ramirez to make watch bezels for him.[2]
>
> Shortly thereafter [Dennes] invited Ramirez to travel to Mexico with him to buy a diamond. After the diamond purchase, the pair returned to Texas and [Dennes] gave Ramirez more work. In early January 1996, [Dennes] made a sketch for Ramirez and asked him if he could make the object depicted. By the time he completed the job, Ramirez had manufactured what turned out to be a silencer for [Dennes]. After the silencer was completed, [Dennes], his brother Alberto, and Ramirez went to a field a few minutes away to test it. Thinking the silencer did not work as it should [Dennes] modified his design and had Ramirez make another one. [Dennes] test fired this model in his office.
>
> Shortly after the completion of the second silencer, [Dennes] asked Ramirez to help him and Alberto rob a jewelry dealer who also had an office in the Greenrich Building. [Dennes] explained that he would take the videotape from the security station while Ramirez secured the diamonds and Alberto shot the dealer. Ramirez consented, but returned to South America two days later.[3]

---

[1][Dennes] ran a business called "Designs by Reinaldo."

[2]Ramirez stated that he did not expect to be paid for this work, but thought it would be a good thing to do while waiting to get money from the sale of his rings.

[3]Ramirez testified that he only consented so as not to alarm the Dennes brothers; however, he had no intention of helping them.

Estrella Martinez, [Dennes]'s lover, had a cleaning job at the Greenrich Building.  In January of 1996, [Dennes] told Martinez he wanted her to let him in a side door of the building after working hours.  He told her he was going to take some videotapes from the security guard's station on the first floor.  On January 22, 1996, [Dennes] gave Martinez a cellular phone with which he planned to call her to tell her when to let him and Alberto into the building.  [Dennes] also wanted Martinez to distract the guard so he could take the tapes.

Janos Szucs was a reputable wholesale diamond dealer who had an office in the Greenrich Building.  Shortly before his death, Szucs had a diamond inventory worth more than $3,600,000 which he kept in his office safe.  He also had approximately $200,000 in cash that he planned to use to purchase diamonds on an upcoming trip.  Szucs did not have a receptionist or secretary; access to his office was controlled through an electronically-locked door. Szucs had a television monitor in his office so he could see who was at the door and he would allow people in by pushing a remote button located on his desk.  In early January 1996, Szucs and Sam Solomay formed a partnership and Solomay moved into Szucs's office suite.

On January 24th, Solomay left the office at 5:40 p.m., but Szucs remained, explaining that he had an appointment that evening.  David Copeland was the security guard on duty at the Greenrich Building that evening, working the 3:00 p.m. to 11:00 p.m. shift.  A videotape recorder at the security desk recorded the images from the security cameras around the building.  When Copeland arrived for his shift, a technician was there working on the surveillance system.

Around 6:30 p.m. that same evening, [Dennes] called Martinez on the cellular phone he had provided her and told her to open the loading dock door.  [Dennes] and Alberto entered and immediately turned into a stairwell, thereby avoiding the security guard's desk.  Shortly after 7:00 p.m. [Dennes] called Martinez and told her to distract the security guard.  Martinez told Copeland that she had locked her keys in a fifth floor office and asked him to help her retrieve them.  A little after 7:30 p.m., [Dennes] again called Martinez and told her that he needed another distraction.  The security guard kept the key to the snack bar so Martinez approached Copeland and told him that she needed to clean the area and asked if he would let her in.  Shortly after Martinez began

-3-

cleaning, however, the owner of the snack bar arrived and told her to come back later.

When Copeland returned to the lobby, he found a man kneeling behind the security desk apparently working on the security system. Copeland assumed this was related to the earlier repairs. As Copeland approached, the man scrambled to his feet and walked briskly toward the loading dock door. As Copeland neared the security desk, the man turned and headed back toward the guard. When he reached Copeland, the man placed his left hand on Copeland's shoulder, stuck a .9 mm gun with a silencer to Copeland's chest with his other hand and fired. The man shot the guard again after he had fallen. As Copeland lay there playing dead, he heard the man walk to the security desk. He then heard equipment and wires being moved around followed by footsteps running toward the loading dock door.[4] The owner of the snack bar called "911."

Houston Police Officer Paul Terry arrived on the scene to find Copeland lying face down in the lobby. Copeland told Terry what had happened and the officer unsuccessfully searched for a suspect. Inside the lobby, Terry found spent shell casings and fragments of a fired bullet. He also noticed that the video equipment was missing.

That same evening, Szucs's wife, Nicole, became concerned that her husband had not arrived home. After several failed attempts to reach her husband, she received a call from a friend who worked in the Greenrich Building who told her that the building guard had been shot. Nicole asked the friend to contact the building's office manager. Sometime after 11:00 p.m., the building manager approached one of the officers remaining at the scene. Officer M.R. Furstenfeld and a couple of other officers then accompanied the manager to Szucs's suite to check on his welfare. Upon gaining access to the office, Furstenfeld found Szucs's dead body. Detectives who

---

[4]As she walked toward the restrooms, Martinez looked into the lobby and saw a man in overalls approaching the guard with his hands behind his back. Martinez recognized this person as [Dennes] by his walk, but noted that he was wearing a mustache and some sort of disguise. Shortly after entering the bathroom, Martinez heard a strange sound. When she returned to the lobby, Martinez saw the guard lying on the floor bleeding.

arrived at the scene noted no signs of a forced entry.
They also noticed that the safe was empty and there were
no signs of the 3.6 million dollar diamond inventory
Szucs maintained or the $200,000 he was supposed to have
on hand in cash. Plus, Szucs was not wearing the five-
carat diamond pinky ring he always wore nor was the ring
ever recovered.[5]  The detectives also discovered that
Szucs's computer had been damaged as if someone had tried
to remove a disc with tweezers.[6]

The police eventually focused their investigation upon
[Dennes].  A search of his office revealed a lathe that
had been broken down and boxed up, a fired .9 mm bullet,
and an owner's manual for a .9 mm Taurus handgun.
Firearms examiner Robert Baldwin determined that the
bullets recovered from Szucs's body, the bullet found in
[Dennes]'s office, and the bullets found in the lobby of
the Greenrich Building were all fired from the same gun.
Moreover, the cartridge casings found in the lobby of the
Greenrich Building and those found in the field where
[Dennes] tested the silencer were fired from the same
gun.  The weapon was determined to be either a Taurus or
a Beretta .9 mm handgun.

Dennes v. State, No. 72,966 (Tex. Crim. App. Jan. 5, 2000), slip

op. at 2-7 (footnotes in original, footnote numbering changed to

keep notes sequential in this opinion).

The jury found Dennes guilty of capital murder for murdering

Szucs during the commission of a robbery.  (CR at 2, 137)[7]  At the

conclusion of the punishment phase of Dennes's trial, the jury

found that there was a probability that Dennes would commit acts of

criminal violence constituting a continuing threat to society, that

---

[5]Nicole testified that her husband was wearing the ring that
morning when she took him to work.

[6]Szucs kept his diamond inventory records on the computer.

[7]"CR" refers to the Clerk's Record on Dennes's state post-
conviction proceedings.

Dennes caused Szucs's death, intended to kill Szucs, or anticipated that a human life would be taken, and that the mitigating evidence did not warrant imposition of a life sentence.  Id. at 151-54. Accordingly, the trial court sentenced Dennes to death.  Id. at 155-56.

The TCCA affirmed Dennes's conviction and sentence.  Dennes v. State, No. 72,966 (Tex. Crim. App. Jan. 5, 2000).  The TCCA subsequently denied Dennes's application for a writ of habeas corpus.  Ex parte Dennes, No. WR-34,627-02 (Tex. Crim. App. Dec. 18, 2013).

Dennes filed his initial federal habeas corpus petition on December 17, 2014, and amended the petition on September 17, 2015. Respondent answered the amended petition on July 1, 2016.

## II.   The Applicable Legal Standards

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  See Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in

-6-

the State court proceeding." 28 U.S.C. § 2254(d); <u>Kitchens v.</u> <u>Johnson</u>, 190 F.3d 698, 700 (5th Cir. 1999). For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." <u>See</u> <u>Martin v. Cain</u>, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" <u>Dowthitt v. Johnson</u>, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court . . . unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply . . . ." <u>Williams</u>, 529 U.S. at 407. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and

-7-

(2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." Hoover v. Johnson, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001), aff'd, 286 F.3d 230 (5th Cir. 2002) (en banc). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" Id. (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)); see also Gardner v. Johnson, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d)(2); Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000). The state court's factual determinations are presumed correct

-8-

unless rebutted by "clear and convincing evidence."   28 U.S.C.
§ 2254(e)(1); see also Jackson v. Anderson, 112 F.3d 823, 824-25
(5th Cir. 1997).

### III.   Analysis

Dennes's Amended Petition raises 33 claims for relief.   The
claims are addressed below.

### A.   Denial of Motion For New Trial

Dennes's first three claims relate to the trial court's denial
of his motion for a new trial on the grounds that juror Irene
Collins failed to disclose that she had been previously charged
with two misdemeanor offenses.   She received probation for both.
(Amended Petition, pp. 23-50)

Respondent argues that Dennes's first claim relies entirely on
state law, and is therefore not cognizable on federal habeas corpus
review.   She argues that the second claim, citing federal law, is
unexhausted and procedurally defaulted.   Dennes's third claim is
not, in fact, a claim for relief but is an argument that any
procedural default of these claims can be excused under Martinez v.
Ryan, 132 S. Ct. 1309, 1318-19 (2012).

In fact, Dennes's first claim cites two federal cases.   The
first of these, McDonough Power Equipment, Inc. v. Greenwood, 464
U.S. 548 (1984), addressed questions concerning the selection of a
civil jury in federal court under the Federal Rules of Civil

-9-

Procedure and federal statute.  It held that a party is entitled to a new trial when he can demonstrate that a juror gave inaccurate answers <u>and</u> was biased against that party.  <u>Id.</u> at 556.

The second case cited by Dennes in support of his first claim is <u>United States v. Scott</u>, 854 F.2d 697 (5th Cir. 1998).  In <u>Scott</u> the juror in question failed to disclose that his brother was a deputy sheriff in an office that performed some investigation in the case for which the juror was selected.  The issue in <u>Scott</u> was the juror's bias, not merely providing an inaccurate answer.

While respondent's argument that Dennes's first claim is purely a state law claim is not accurate, the federal cases Dennes cites do not support his contention that the allegedly inaccurate answers, by themselves, merited a new trial.  Rather, both <u>McDonough</u> and <u>Scott</u> stand for the proposition that a party's right to a fair trial is violated by a biased juror whose bias is undiscovered before trial because the juror gave inaccurate answers to material <u>voir dire</u> questions.  Dennes, however, argues merely that the juror gave inaccurate answers.  He makes no showing of bias by the juror.  Indeed, as respondent notes, the juror's experiences with the criminal justice system seem more likely to make her biased against law enforcement than against one charged with a crime.

Assuming that Dennes's citations to <u>McDonough</u> and <u>Scott</u> were sufficient to alert the state courts to the federal constitutional nature of his claim, he nonetheless is not entitled to relief.

While the juror in question failed to disclose her arrests and probation for the misdemeanor charges of public lewdness and prostitution, Dennes fails to demonstrate any bias on her part.  He therefore fails to demonstrate any entitlement to a new trial based on this juror's misleading answers, or any error by the trial court in denying his motion.  He is not entitled to relief on his first, second, or third claims for relief.

**B.   Suppression of Evidence**

In his fourth claim for relief Dennes contends that the State suppressed material impeachment evidence concerning punishment phase witness David Balderas.  Balderas testified to Dennes's involvement in an extraneous robbery.  According to Balderas, Dennes hatched a plan to rob a diamond courier.  Dennes would follow the courier home when he knew that the courier had diamonds, and then call Balderas who would call two confederates to break in to the courier's home and steal the diamonds.  When the call came, however, the two accomplices broke into the wrong house, detained Danny Tsang and his family, and stole some jewelry and other items from them.  Balderas testified that he was never arrested or charged for the Tsang robbery, that he told prosecutors everything he knew about it, that he received immunity with regard to the Tsang robbery, and that he had not reached any other deal with prosecutors.  (34 Tr. at 83-88)  Dennes contends that the State failed to disclose that Balderas entered into an agreement with the

-11-

State to provide information unrelated to Dennes's case, and that the State dismissed two criminal charges against Balderas in exchange for the information.

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The question is not whether the result would have been different. Rather, it is whether given the non-disclosures of material evidence the verdict is less worthy of confidence. In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it. Rather, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Banks v. Dretke, 540 U.S. 668, 691 (2004) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). In Strickler v. Greene the Supreme Court framed the three components or essential elements of a Brady prosecutorial

misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Banks, 540 U.S. at 691 (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

On Dennes's motion for a new trial the state trial court found that the contract between Balderas and law enforcement authorities was not Brady material because it was unrelated to Dennes's case, and because the terms of the contract had already been fulfilled by both parties before Balderas testified at Dennes's trial.   Dennes now argues that the State failed to disclose additional information, including the fact that Balderas was considered a suspect in the Szucs murder, and that one of Balderas's alleged accomplices in the Tsang robbery -- Luis Hector Fugon -- testified at his own trial that he did not know Balderas.

Respondent points out that most of the new information submitted by Dennes comes from Fugon's trial.   That trial took place almost a year before Dennes's trial.   Respondent asserts that counsel could have obtained those transcripts, and correctly notes that the State has no obligation to provide exculpatory evidence that is available to the defense through the exercise of due diligence.   See Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997).   Thus, the bulk of the allegedly suppressed evidence was

-13-

available to Dennes, and was not suppressed within the meaning of
Brady.

Whether or not the evidence was suppressed, Dennes fails to
demonstrate that the evidence was material, i.e., that there is a
reasonable probability that he would have been sentenced to life
imprisonment had the evidence been disclosed. As noted above, the
trial court found that the agreement Balderas had with the State
was unrelated to Dennes's case, and was completed before Dennes's
trial. Because the contract was completed by both parties before
trial, it provided no reason for Balderas to fabricate testimony.

Dennes argues that Balderas testified falsely about the
circumstances under which he provided information about the Tsang
robbery. Balderas testified that he provided the information to
his brother-in-law, a Houston homicide detective, and that it was
not the result of Balderas being arrested. Dennes argues that
Balderas provided the information in connection with his arrest for
felony possession of marijuana, but provides nothing more than his
speculation that the two events were connected. A petitioner's
speculation about the suppression of exculpatory evidence is an
insufficient basis to support a Brady claim. Hughes v. Johnson,
191 F.3d 607, 630 (5th Cir. 1999).

On direct appeal Dennes argued that information about the
dropped charges was material because it showed a relationship
between Balderas and the prosecution. See Brief for Appellant in
Dennes's direct appeal, pp. 60-63. The TCCA rejected Dennes's

argument on the grounds that Balderas was never convicted on these charges, and that evidence of the alleged crimes would therefore be inadmissible under Texas law.  Dennes v. State, No. 72,966 (Tex. Crim. App. Jan. 5, 2000) slip op. at 14.  Dennes makes no showing that this ruling is incorrect.

To the extent that Dennes now argues that the charges were dropped as consideration for Balderas's testimony against Dennes, such a claim is unexhausted.  The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)(i) there is an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds."  "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."  Orman v. Cain, 228 F.3d 616, 619-20 (5th Cir. 2000); see 28 U.S.C.

§ 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . ."). This rule extends to the evidence establishing the factual allegations themselves. Knox v. Butler, 884 F.2d 849, 852 n.7 (5th Cir. 1989) (citing 28 U.S.C. § 2254(b)); see also Jones v. Jones, 163 F.3d 285, 298 (5th Cir. 1998) (noting that "[s]ubsection (b)(1) [of AEDPA] is substantially identical to pre-AEDPA § 2254(b)"). Because Petitioner did not present this claim to the Texas state courts, he has failed to properly exhaust the claim, and this court may not consider it. Knox, 884 F.2d at 852 n.7.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. Rose v. Lundy, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. Martin v. Maxey, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion

requirement would now find the unexhausted claims procedurally barred.  Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a).  The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

Id.  The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly.  Fearance v. Scott, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Dennes does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent.  Therefore, his unexhausted claim does not fit within the

-17-

exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. <u>Coleman</u>, 501 U.S. at 735 n.1. That bar precludes this court from reviewing Dennes's claim absent a showing of cause for the default and actual prejudice attributable to the default, or absent a showing that this court's refusal to review the claim will result in a fundamental miscarriage of justice. <u>Id.</u> at 750.

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule or a showing of a prior determination of ineffective assistance of counsel. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986); <u>Amadeo v. Zant</u>, 486 U.S. 214, 222 (1988). Dennes makes no showing of cause.

A "miscarriage of justice" means actual innocence, either of the crime for which Butler was convicted or of the death penalty. <u>Sawyer v. Whitley</u>, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, Butler would not have been legally eligible for a sentence of death. <u>Id.</u> at 343. Dennes makes no claim that he is actually innocent. Therefore, the miscarriage of justice exception to the procedural default rule is inapplicable. Because Dennes fails to demonstrate cause for his procedural default, this court cannot address his claim that the dropped charges constitute impeachment evidence.

## C.   Extraneous Offense Evidence

In his fifth through ninth claims for relief Dennes complains that the trial court erred in admitting evidence of his involvement in the Tsang robbery.  Dennes's counsel testified that he was advised in early 1996 that the State was trying to develop evidence of Dennes's involvement in a home invasion robbery.  (24A Tr. at 20; 36 Tr. at 47-49, 81-83)  At a pretrial conference in January of 1997 the trial court ordered the State to provide notice of any extraneous offense evidence it intended to introduce at least two weeks before trial.  (3 Tr. at 7-8)

The prosecutor testified that he had hoped to call Hector Fugon as a witness, but that Fugon's case was still on appeal at the time of Dennes's trial, and Fugon's attorney did not want him to testify.  (36 Tr. at 82-84)  It was only after learning that Fugon was unavailable that the prosecution became aware that Balderas could testify about the Tsang robbery.  Id. at 84-85.  The prosecutor spoke to Balderas on August 12, 1997, and informed defense counsel the following day of his intention to call Balderas.  Id. at 85-87.  Individual jury voir dire commenced on July 22, 1997, and was completed on August 18, 1997.  (5 Tr. at 2, 24A Tr. at 44)

Defense counsel objected to the extraneous offense evidence because the State gave notice less than two weeks before trial.  (24A Tr. at 4-21)  He requested a continuance to prepare for Balderas's testimony.  The State responded that it gave notice

-19-

immediately after obtaining the evidence.  Id. at 17-18.  Defense
counsel renewed the objection and the request for a continuance
before the beginning of the punishment phase.  The trial court
denied both.  (34 Tr. at 29-38)

### 1.   Notice/Unfair Surprise

In claims five, six, and seven Dennes contends that the
admission of the Tsang robbery evidence unfairly surprised him,
that he was not given proper notice of the State's intent to
introduce this evidence, and that the trial court improperly denied
his request for a continuance.  Dennes disputes the timing of
events discussed above, arguing that the State knew much earlier
that Fugon would be unavailable to testify.  Implicitly
acknowledging that there is no federal constitutional basis for a
claim that the State must disclose the identities of witnesses
ahead of time, Dennes attempts to characterize this information as
falling under the Brady standards discussed above, and argues that
he is entitled to voir dire jurors about their attitudes toward
extraneous offense evidence.

As discussed above, Brady and its progeny pertain to evidence
that is either exculpatory or impeaching.  There is nothing about
the identity of the witness or the State's intention to introduce
this evidence that is either exculpatory or impeaching.

While a defendant facing a possible death sentence does have
a right to determine potential jurors' attitudes about the death

-20-

penalty, see, e.g., Adams v. Texas, 448 U.S. 38, 45 (1980); Witherspoon v. Illinois, 391 U.S. 510 (1968), the record clearly demonstrates that Dennes was aware that the State was at least considering presenting extraneous offense evidence at the time of jury voir dire. See 24A Tr. at 20; 36 Tr. at 47-49, 81-82. Dennes thus had the opportunity to inquire about jurors' attitudes. The fact that the State did not make its final decision until later did not impinge on that opportunity. Therefore, Dennes fails to demonstrate any constitutional violation caused by the timing of the State's disclosure, or by the trial court's denial of Dennes's request for a continuance.

### 2.   Accomplice Testimony

In his eighth and ninth claims for relief Dennes notes that the only evidence linking him to the Tsang robbery was accomplice testimony by Balderas. He argues that it was unconstitutional to allow uncorroborated accomplice testimony.

Dennes correctly observes that the Supreme Court has held that the constitution imposes a requirement of heightened reliability on capital proceedings. See, e.g., Woodson v. North Carolina, 428 U.S. 280 (1976). He argues that this heightened reliability requires corroboration for accomplice testimony. Dennes acknowledges that federal courts have rejected the claim that accomplice testimony must be corroborated, see Thompson v. Lynaugh, 821 F.2d 1054 (5th Cir. 1987), but argues that this ignores the requirements of Woodson.

Dennes is unable to cite a single case in the almost 30 years since <u>Thompson</u> that holds that <u>Woodson</u> requires corroboration of accomplice testimony concerning an unadjudicated extraneous offense. In <u>Thompson</u>, however, the Fifth Circuit expressly rejected the claim now asserted by Dennes. "The state-law requirement that accomplice witness testimony be corroborated has no independent constitutional footing." <u>Thompson</u>, 821 F.2d at 1062. The fact that the Fifth Circuit has expressly rejected the claim that accomplice testimony must be corroborated, along with the fact that no federal court has ever held to the contrary, persuades the court that Dennes's eighth and ninth claims for relief should be denied.

## D. Eyewitness Identification

David Copeland, the security guard at the building where Szucs had his office, identified Dennes in a photo spread and at trial as the person who shot him on the night of the murder. In his tenth and eleventh claims for relief Dennes argues that the photo spread and lineup at which Copeland identified him were unduly suggestive. In his twelfth claim for relief Dennes argues that Copeland's in-court identification of Dennes was tainted by the allegedly suggestive out-of-court identifications.

At a suppression hearing Copeland testified that he was shown a photo spread at his home on or about February 5, 1996. The photo spread consisted of two sheets, each containing six photos.

-22-

Copeland chose a picture that looked familiar to him. Copeland said that the person in the photo had similar facial features to the man who shot him. (6 Tr. at 72-75) The man he picked was not Dennes.

Dennes was arrested on February 22. The following day, Copeland viewed a lineup consisting of Dennes, his brother Albert, and four other men. Id. at 13. Copeland testified that he was told before the lineup that an arrest had been made, id. at 75, but the homicide detective who called Copeland disputed that statement, id. at 19. The detective testified that he told Copeland that the person who shot him might or might not be in the lineup, id., and Copeland testified that he was told that he was under no obligation to pick anyone out of the lineup, id. at 75. Copeland testified that all six of the men in the lineup were similar in height and weight. Id. at 76. Copeland identified Dennes as the one who was closest in appearance to the shooter, though Copeland noted that Dennes had shorter hair and was not wearing glasses or a mustache in the lineup. Id. at 77. Following the hearing, the trial court denied Dennes's motion to suppress the identification.

At trial Copeland testified about the photo spread and how he identified someone who looked similar to the shooter, but that it was not, in fact, the shooter. (25 Tr. at 149-52) He testified that he picked Dennes out of a lineup, and that he had some reservations because of the difference in Dennes's hair and the

absence of the disguise.  Id. at 152-57.  When Dennes donned the disguise in court, Copeland identified him as the shooter.  Id. at 142-43.

An identification resulting from an unduly suggestive lineup must be suppressed.  See, e.g., Stovall v. Denno, 388 U.S. 293, 298 (1967).  The admissibility of identification evidence is governed by a two-step analysis.  Initially, a determination must be made as to whether the identification procedure was impermissibly suggestive.  Next, the court must determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.  Lavernia v. Lynaugh, 845 F.2d 493, 499 (5th Cir. 1988).

Dennes argues that the photo spread and lineup were impermissibly suggestive because Copeland knew that the police had a suspect in custody.  That assertion is disputed in the record.  Even assuming that it is correct, however, the identification contains sufficient indicia of reliability to be admissible.

The Supreme Court has noted several factors relevant to determining the reliability of an identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

The record establishes that Copeland initially saw Dennes in the lobby of the office building from a distance of about 10 yards. The lobby was well lit.  (6 Tr. at 67-68)  He saw Dennes again a short time later when Dennes came within inches of Copeland and shot him.  Id. at 69-71.

Copeland was working as a security guard and saw Dennes in the lobby.  Dennes presents nothing to suggest that Copeland was inattentive.  Copeland also gave a detailed and accurate description of the shooter to the police.  (6 Tr. at 65-87)

Copeland identified Dennes at the lineup, expressing reservations only about the length of Dennes's hair and the lack of disguise.  When Dennes put on the disguise in court, Copeland was certain of the identification.  (25 Tr. at 142-43)

Copeland testified that the photo spread occurred somewhere around February 5, and the live lineup occurred on on February 23, 1996.  Both dates are within a month of the murder, on January 24, 1996.

Under the totality of the circumstances, the identification is reliable.  The trial court did not err in admitting Copeland's identification.

### E.   Testimony of Antonio Ramirez

In his thirteenth through sixteenth claims for relief, Dennes contends that the trial court erred in admitting the testimony of Antonio Ramirez.  Ramirez testified during the guilt-innocence

phase that he assisted Dennes in smuggling diamonds into the United States from Mexico, and that he manufactured two gun silencers for Dennes.

Dennes complains that this amounted to extraneous offense evidence that was not relevant to the crime for which he was on trial. He further argues that the trial court erred in not instructing the jury that it must determine if Ramirez was an accomplice and, if so, that his testimony must be corroborated. All of these claims allege errors of Texas evidence law. Dennes cites no federal authority in support of any of these claims.

As discussed above, the Fifth Circuit has held that there is no basis in the United States Constitution for a rule requiring corroboration of accomplice testimony. Therefore, Dennes's fifteenth and sixteenth claims for relief fail to state a cognizable claim for relief.

His complaints about the general admissibility of Ramirez's testimony are complaints about state court evidentiary rulings. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Because Dennes fails to identify a constitutional violation, he is not entitled to relief on his claims that the trial court erred with regard to the testimony of Antonio Ramirez.

## F.    Sufficiency of the Evidence

In his seventeenth and eighteenth claims for relief, Dennes argues that the evidence was insufficient to support his conviction for capital murder because the evidence did not prove the underlying offense of robbery or attempted robbery beyond a reasonable doubt.    In addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."    Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).    The sufficiency of evidence is a mixed question of law and fact.    See Gomez v. Acevedo, 106 F.3d 192, 198 (7th Cir.), vacated on other grounds, 522 U.S. 801 (1997).    Therefore, as noted above, this court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."    Martin v. Cain, 246 F.3d 471, 475 (5th Cir. 2001).

The TCCA summarized the evidence in addressing these claims.

Ramirez's testimony . . . indicated that [Dennes] intended to rob and murder a jewelry dealer who kept an office in the Greenrich Building.    The testimony also indicated that [Dennes] test-fired a weapon in a field. Further testimony and physical evidence indicate that a jewelry dealer was shot to death in the Greenrich building with bullets matching those used to shoot the security guard as well as matching some spent casings from bullets test-fired in a field.    [Dennes] was seen approaching the security guard and immediately thereafter the guard was found wounded and lying on the floor of the

-27-

building where the murder victim was eventually found. All of this evidence connects [Dennes] to Szucs's murder.

Regarding the proof supporting the robbery, testimony revealed that Szucs was in possession of $3.6 million in diamond inventory and approximately $200,000 dollars in cash at the time of the murder.   Plus-Szucs's wife testified that the victim always wore a diamond ring on his pinky and had been wearing that ring the morning of his death.  However Szucs was not wearing this ring when his body was found by the police shortly after he had been killed nor was the ring ever recovered.   Finally access to Szucs's office was limited to persons who had a key or persons who were let in from the inside of the office.

[Dennes] speculates that someone else could have taken these items during the course of the evening as he committed his own crime but he has presented no evidence that anyone else was near the scene of the murder.  Hence the only reasonable conclusion for the jury to draw was that [Dennes] or his accomplice took the items and killed Szucs.

Dennes v. State, No. 72,966 (Tex. Crim. App. Jan. 5, 2000), slip op. at 7-8.

The TCCA's discussion accurately summarizes the evidence. Even if robbery by Dennes was not the only reasonable conclusion for the jury to have drawn, it was certainly a reasonable conclusion.  Therefore, the evidence was sufficient under Jackson, the TCCA's conclusion is entitled to deference, and Dennes is not entitled to relief on his seventeenth and eighteenth claims for relief.

## G.   Denial of Challenges for Cause

In his nineteenth and twentieth claims for relief, Dennes argues that the trial court erred in denying his challenges for

cause to two venire members.  Dennes asserts that Richard Wayne Miller stated that "I have my mind made up right now" that a defendant found guilty of capital murder would probably kill again in the future.  18 Tr. at 100.  Venire member Martha Jean Gutierrez stated that she could not consider mitigating evidence after finding a defendant guilty of capital murder and finding that he would pose a future danger to society.  In a capital case, a juror can be challenged for cause if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his . . . oath.'"  <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)).  Dennes used peremptory strikes to remove both Miller and Gutierrez after the trial court denied his challenges for cause.

Assuming that the trial court erred in denying Dennes's challenges for cause to these two venire members, Dennes nonetheless fails to demonstrate any constitutional violation.  Dennes used peremptory strikes to remove both Miller and Gutierrez.  While he contends that he used all of his peremptory challenges and was forced to accept an unfavorable juror, the record shows that the trial court granted him two additional peremptory strikes, and both parties then promptly accepted the next juror on the list as the twelfth juror.  <u>See</u> 24A Tr. at 30-34.  At most, Dennes was forced to accept an alternate juror who he would have challenged if he had an additional peremptory challenge.  He makes no claim,

however, that any alternate juror participated in deliberations or in rendering the verdict.

> As a general rule, a trial court's erroneous venire rulings do not constitute reversible constitutional error "so long as the jury that sits is impartial." United States v. Martinez-Salazar, 528 U.S. 304, 313, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (quoting Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)); see also United States v. Prati, 861 F.2d 82, 87 (5th Cir. 1988) ("Only in very limited circumstances ... will such an unintentional mistake warrant reversal of a conviction.").

Jones v. Dretke, 375 F.3d 352, 355 (5th Cir. 2004).  Dennes makes no showing that any of the jurors, including the alternates, were not impartial.  He therefore fails to demonstrate a Sixth Amendment violation.

Moreover, on federal habeas review, error is harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotation marks and citation omitted). The burden of proving such injury is on the petitioner. Id. at 637.  Dennes makes no showing that any juror whom he found unacceptable participated in deliberations.  He therefore fails to demonstrate that any trial court error in denying his challenges "had a substantial and injurious effect or influence in determining the jury's verdict."  Therefore, any error was harmless.

## H.   Burden of Proof on Mitigation Special Issue

One of the special issues submitted to the jury required the jury to determine:

-30-

> Whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.071(e) (Vernon Supp. 1998).   In his twenty-first claim for relief, Dennes argues that the trial court erred in not instructing the jury that the State bears the burden of disproving the existence of any mitigating evidence.

> The Fifth Circuit

> has held that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." Rowell v. Dretke, 398 F.3d 370, 378 (5th Cir. 2005).   In Avila v. Quarterman, this court rejected a petitioner's argument "that allowing a sentence of death without a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment violated his Sixth and Fourteenth Amendment right to due process and a fair trial."   560 F.3d 299, 315 (5th Cir. 2009).   Other decisions have likewise rejected the argument that failure to instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation issue is unconstitutional. See, e.g., Scheanette v. Quarterman, 482 F.3d 815, 828 (5th Cir. 2007); Granados v. Quarterman, 455 F.3d 529, 536-37 (5th Cir. 2006) . . . .

Druery v. Thaler, 647 F.3d 535, 546-47 (5th Cir. 2011).   Therefore, well-established Fifth Circuit precedent shows that Dennes is not entitled to relief on this claim.

## I.   Meaningful Appellate Review

In his twenty-second claim for relief Dennes argues that the Texas capital sentencing scheme is unconstitutional because the

jury's conclusions on the special issues are not capable of meaningful appellate review. Federal death penalty jurisprudence requires states to provide an opportunity for review by appellate courts to guard against arbitrary imposition of the death penalty. See, e.g., Clemons v. Mississippi, 494 U.S. 738, 749 (1990). The Supreme Court has also held, however, that there a difference between the jury's decision whether a defendant is eligible for the death penalty, and its decision whether to impose a death sentence. Tuilaepa v. California, 512 U.S. 967 (1994). While the former must follow a process that is rationally reviewable by appellate courts, the latter "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." Id. at 973. Accordingly, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that [death] penalty.'" Id. at 979-80.

As the Fifth Circuit has explained,

> [a] capital murder trial in Texas proceeds in a bifurcated process. In the first, or "guilt-innocence," phase, a defendant's eligibility for consideration of the death penalty is determined. Once that eligibility is determined, the trial proceeds to the second, or "punishment," phase, wherein the defendant is either selected for death or for the alternative sentence of life imprisonment.

Woods v. Cockrell, 307 F.3d 353, 359 (5th Cir. 2002). Because the jury's answers to the special issues is not relevant to the

-32-

question of a defendant's eligibility for the death penalty, Dennes's twenty-second claim for relief has no merit.

## J.   The 12-10 Rule

Article 37.071 of the Texas Code of Criminal Procedure requires a jury instruction informing the jury that it must have at least 10 "no" votes to answer "no" on the aggravating special issues, and at least 10 "yes" votes to answer yes on the mitigation special issue.  In his twenty-third claim for relief Dennes argues that this "12-10 rule" confuses jurors as to the effect of a single negative vote on the special issues, and might cause jurors inclined to vote against a death sentence to waver and vote for a death sentence instead.

Petitioner relies on Mills v. Maryland, 486 U.S. 367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990), to support his claim.   In those cases the Supreme Court held that capital sentencing schemes requiring the jury to unanimously find the existence of any mitigating factor before giving that factor any weight violated the Eighth Amendment.   Instead, the Court held, each juror must be free to give any mitigating evidence any weight that juror deems appropriate in weighing mitigating against aggravating evidence.

The Fifth Circuit has rejected this claim.   "Mills is not applicable to the capital sentencing scheme in Texas.   We have concluded that '[u]nder the Texas system, all jurors can take into

account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.'" <u>Miller v. Johnson</u>, 200 F.3d 274, 288-89 (5th Cir. 2000) (quoting <u>Jacobs v. Scott</u>, 31 F.3d 1319, 1329 (5th Cir. 1994)).

While the trial court in this case informed the jury that it could not affirmatively find that the mitigating evidence was sufficient to warrant a life sentence unless at least 10 jurors agreed, it never instructed the jury that any particular number of jurors had to agree that any particular piece of evidence was mitigating.  In other words, even if only one juror felt that a specific piece of evidence was mitigating, that juror could give the evidence any weight he deemed appropriate.  The instruction stated only that at least 10 jurors, individually weighing mitigating evidence, had to agree that there was sufficient mitigating evidence to impose a life sentence.  Because this instruction does not suffer from the constitutional flaw underlying <u>Mills</u> and <u>McKoy</u>, Dennes is not entitled to relief.

### K.  Conclusory Claims

In his twenty-fourth through thirty-second claims for relief Dennes asserts numerous claims of error in conclusory fashion with no citations to the record, and only one citation to any authority. "The . . . presentation of conclusory allegations unsupported by specifics is subject to summary dismissal. . . ." <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977).  Therefore, claims twenty-four through thirty-two will be dismissed.

L.    **Ineffective Assistance of Counsel**

In his thirty-third and final claim for relief Dennes contends that he received ineffective assistance of counsel in several respects.    To prevail on a claim for ineffective assistance of counsel, Dennes

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.    Second, the defendant must show that the deficient performance prejudiced the defense.    This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).    In order to prevail on the first prong of the Strickland test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.    Id. at 687-88.    Reasonableness is measured against prevailing professional norms and must be viewed under the totality of the circumstances.    Id. at 688.    Review of counsel's performance is deferential.    Id. at 689.

Where a state court has decided an ineffective assistance claim adversely to the petitioner, the petitioner faces an extraordinarily difficult burden.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.    The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles [v. Mirzayance], 556 U.S., at 123, 129 S.Ct. [1411], at 1420.    The Strickland standard is a general one, so the range of reasonable applications is

substantial.   556 U.S., at 123, 129 S.Ct. at 1420.
Federal habeas courts must guard against the danger of
equating   unreasonableness   under   <u>Strickland</u>   with
unreasonableness   under   § 2254(d).     When   § 2254(d)
applies, the question is not whether counsel's actions
were reasonable.   The question is whether there is any
reasonable argument that counsel satisfied <u>Strickland</u>'s
deferential standard.

<u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011).

### 1.   Probable Cause

Dennes first complains that counsel failed to object when
police officer Todd Miller testified that Dennes was arrested
pursuant to a warrant based on a probable cause determination by a
judge.   Miller explained what an arrest warrant is, and then
stated: "Attached to the warrant is a detailed probable cause,
which the judge goes over in which the officer . . . ." 27 Tr. at
154.   Counsel then objected, and the objection was sustained.   <u>Id.</u>
Miller gave no further testimony about the contents of the warrant.

Dennes now complains that the reference to the finding of
probable cause suggested to the jury that a judge had already made
a determination of Dennes's guilt.   He argues that counsel should
have objected to the testimony as irrelevant and requested an
instruction for the jury to disregard the testimony.

Dennes clearly cannot demonstrate that he was prejudiced by
his attorney's conduct -- counsel objected, the objection was
sustained, and the witness did not mention the objectionable
subject matter again.   Dennes makes no showing that a different
objection would have produced a more favorable result.

-36-

Dennes also claims that counsel should have requested an instruction to disregard. Counsel submitted an affidavit in connection with Dennes's state habeas application. Counsel stated that he did not request an instruction because he did not wish to highlight the statement for the jury. He also noted that the judge stopped the witness's statement when counsel objected, and counsel did not think any further action was necessary. SH at 174. The state habeas court found that counsel was not ineffective because his objection was sustained, and it was a reasonable decision to choose not to emphasize the witness's statement. Id. at 240.

The Supreme Court has held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Strickland, 466 U.S. at 690. Thus, counsel's strategic decision not to emphasize the officer's statement is "virtually unchallengeable," and the state habeas court's conclusion that counsel did not render ineffective assistance is reasonable, and is entitled to deference under the AEDPA.

2. Hearsay

Dennes next complains that counsel should have raised a hearsay objection to testimony by Officer Miller concerning statements made by Dennes's counsel and by David Copeland at the pretrial lineup. Miller testified that he asked Dennes's lineup counsel, Ellis McCullough, if he had any problem with the fill-ins

-37-

used in the lineup, and that McCullough stated that they were "fine as they were."  27 Tr. at 167.

McCullough's statements were not hearsay.  The Texas Rules of Evidence define hearsay as an out-of-court statement offered to prove the truth of the matter asserted.  See Tex. R. Evid. 801(d). The State did not introduce McCullough's statement for the truth of the statement, i.e., that the fill-ins were fine, but to demonstrate that counsel was satisfied with the makeup of the lineup.  Because the statement was not hearsay, counsel was not deficient for failing to raise a hearsay objection.

Miller also testified that David Copeland identified Dennes in the lineup, though he characterized the identification as tentative.  When Miller was asked why the identification was tentative, counsel objected on hearsay grounds.  Id. at 176-77. The prosecutor rephrased the question to ask if Copeland eliminated anyone from the lineup, and Miller responded that Copeland eliminated three fill-ins.  Id.  He also testified that Copeland stated that number five in the lineup, which was Dennes, looked closest to the shooter.  Id.

There was nothing objectionable about Miller's testimony that Copeland eliminated three fill-ins.  The testimony does not relate a statement, but an action that Miller observed.  Thus, to the extent that Dennes complains about this testimony, the complaint is meritless.

The state habeas court found that Copeland's statement that Dennes looked most like the shooter came within the present sense impression exception to Texas's hearsay rule.  <u>See</u> SH at 240 (citing Tex. R. Evid. 803(1).  Therefore, it was not hearsay.

Because none of the complained-of statements were hearsay, any hearsay objection would have been futile.  Counsel's failure to raise a meritless claim did not constitute deficient performance. <u>See, e.g.</u>, <u>Sones v. Hargett</u>, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); <u>Koch v. Puckett</u>, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").  In addition, because such objection would have been without merit, it is not reasonably probable that counsel would have obtained any relief had the objection been made. Dennes fails to demonstrate deficient performance by counsel or <u>Strickland</u> prejudice.

### 3.   Leading Questions

In his final claim Dennes argues that counsel was ineffective by failing to object to several allegedly leading questions posed to Estrella Martinez.  Martinez was the cleaning lady in the Greenrich Building on the night of the murder.

Martinez testified through an interpreter.  Respondent points out that the Texas Rules of Evidence allow for leading questions when necessary to develop the testimony of a witness, and argues

that leading questions were necessary here because of the language barrier. Dennes's trial counsel stated the same in his affidavit, SH at 176, and the state habeas court found that this was the case, id. at 241. Dennes makes no showing that the state court's conclusion was unreasonable. Moreover, even if the questions were improper and counsel was deficient by failing to object, Dennes makes no showing that such deficiency caused him any prejudice.

## IV.  Certificate of Appealability

Dennes has not requested a certificate of appealability ("COA"), but this court may determine whether he is entitled to this relief in light of the foregoing rulings. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA sua sponte. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued."). A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C.

§ 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000).

The court has carefully considered each of Dennes's claims and concludes that each of his claims is foreclosed by clear, binding precedent. The court concludes that Dennes has failed to make a "substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c)(2).   Dennes is not entitled to a certificate of appealability.

### V.   Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.   Petitioner Reinaldo Dennes's First Amended Death Penalty Case Application for Post-Conviction Writ of Habeas Corpus (Docket Entry No. 22) is **DENIED** and is **DISMISSED with prejudice.**

2.   No Certificate of Appealability shall issue.

**SIGNED** at Houston, Texas, on this 22nd day of March, 2017.


_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-42-